1   John T. Jasnoch (CA 281605)
    jjasnoch@scott-scott.com
2   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
    600 W. Broadway, Suite 3300
3   San Diego, CA 92101
    Tel.: 619-233-4565
4   Fax: 619-233-0508

5   *Attorneys for Plaintiff and the Proposed Class*

6   [Additional Counsel on Signature Page.]

7

8                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
9

10  NICK PATTERSON, Individually and on Behalf    | Case No.
    of All Others Similarly Situated,
11
                                                   |
12                      Plaintiff,
                                                   | **CLASS ACTION COMPLAINT FOR**
13          v.                                     | **VIOLATIONS OF THE FEDERAL**
                                                   | **SECURITIES LAWS**
14  TERRAFORM LABS, PTE. LTD., JUMP
    CRYPTO, JUMP TRADING LLC, REPUBLIC
15  CAPITAL, REPUBLIC MAXIMAL LLC, TRIBE          | DEMAND FOR JURY TRIAL
    CAPITAL, DEFINANCE CAPITAL/
16  DEFINANCE TECHNOLOGIES OY, GSR/GSR
    MARKETS LIMITED, THREE ARROWS
17  CAPITAL PTE. LTD., NICHOLAS PLATIAS,
    and DO KWON,
18
                        Defendants.
19

20

21

22

23

24

25

26

27

28

———————————————————————————————————————
                    CLASS ACTION COMPLAINT

Plaintiff Nick Patterson ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the various regulatory filings of Defendants, press releases, and public statements issued by Defendants, analyst and media reports, and other commentary analysis and publicly disclosed reports and information about Defendants.  Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below).   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE OF THE CASE

*This collapse was one of the most violent collapses in a long time,*
*only comparable to Lehman's collapse in 2008!*
Remi Teto (Member of the Governing Council of the Luna Foundation Guard)

1.     Plaintiff brings this Class Action Complaint ("Complaint") under §§5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act"), as well as under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Defendants TerraForm Labs Ptd Ltd. ("TFL" or the "Company"), Jump Crypto, Jump Trading LLC, Republic Capital, Republic Maximal LLC, Tribe Capital, DeFinance Capital/Definance Technologies Oy, GSR Markets Limited, and Three Arrows Capital Ptd Ltd. (collectively, the "Luna Foundation Guard"), and Individual Defendants Nicholas Platias and Do Kwon (together with the Luna Foundation Guard and TFL, the "Defendants").  This action is brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Terra Tokens between May 20, 2021 and May 25, 2022, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

2.      TFL is a company that operates the Terra blockchain and its related protocol,[1] which hosts, supports, and funds a community of decentralized financial applications and products known collectively as the Terra ecosystem.  TFL's primary focus is developing, marketing, and selling a suite of digital assets and financial products within the Terra ecosystem, including the native and governance tokens[2] within the Terra ecosystem, so-called "stablecoins," a bevy of financial products such as "mirrored assets," bonded assets, liquidity pool tokens, along with various protocols (*e.g*., Anchor, Mirror, etc.) to support and facilitate their sale. These digital assets are collectively referred to as the "Terra Tokens" and are worth tens of billions of dollars in total market cap.  All of TFL's decentralized applications are designed to manufacture a reason to use the Terra Tokens since there is no purpose for these digital assets other than as investments.

3.      Plaintiff and the Class paid fiat and/or cryptocurrencies in exchange for the Terra Tokens with the expectation of profit from either an increase in the price of particular Terra Tokens like Luna and the mirrored assets or from receiving interest payments for staking UST or other TFL governance tokens.  This expectation was based on the efforts of Defendants to maintain the Terra ecosystem.  Defendants sell or sold the Terra Tokens from the retained supply and used the proceeds from the sales to fund TFL, to reward investors, and as governance tokens.  Even though the Terra Tokens bear all the hallmarks of being investment contracts and, thus, securities under the *Howey* test, no registration statements have been filed with the SEC with respect to the various Terra Tokens.

---

[1]     Akin to a company's charter, a "blockchain protocol" is a piece of code that operates as a set of regulations and guidelines that govern the functioning of various parts of a blockchain company's technology.  Investors in TFL's digital assets can gain governance rights over the Terra blockchain protocol by purchasing and staking those assets much in the same way that an investor gains voting rights in a public corporation by owning that corporation's stock and voting at the shareholders' meeting.

[2]     A "token" is a financial product that is contractually based (via a "smart" contract) and is created and uploaded permanently to a given blockchain.  When investors purchase these products/contracts on a given blockchain, their expectation is that the general buying, selling, and exchanging of these tokens will function according to the terms of the original smart contract and in a manner similar to other tokens on the same blockchain.  Thus, when a token owner transfers assets from one wallet address to another new wallet address, on the same blockchain, the owner reasonably expects that those assets will actually be transferred to the new wallet address.  This expectation is much like an industry standard in that the same expectation applies to all current blockchains and tokens, not just the Terra blockchain.

4.     On top of selling unregistered securities with the Terra Tokens, Defendants made a series of false and misleading statements regarding the largest Terra ecosystem digital assets by market cap, UST and LUNA, in order to induce investors into purchasing these digital assets at inflated rates.

5.     TFL repeatedly touted the stability of UST as an "algorithmic" stablecoin that is paired to the Terra ecosystem's native token LUNA and the sustainability of the Anchor Protocol ("Anchor") – a type of high-yield savings account whereby investors can "stake" or deposit UST with TFL in exchange for a guaranteed 20% APY interest rate.  As a part of this promotional campaign, TFL formed the Luna Foundation Guard – a group six venture capital groups that promised to support and fund the Terra ecosystem and to "defend the peg" in the event that high volatility caused the UST/LUNA pair to become untethered from one another.   The Luna Foundation Guard and its members Jump Crypto, Tribe Capital, Republic Capital, GSR, DeFinance Capital, and Three Arrows Capital acted on behalf of TFL to promote the stability of UST and mislead investors into believing that (1) the Luna Foundation Guard's reserve pool would be sufficient to defend the peg against a proverbial run on the bank by UST/LUNA investors, and (2) that the Luna Foundation Guard would be able to maintain interest payments from the Anchor Protocol through a well-capitalized "Anchor Yield Reserve" fund.

6.     These promotions, along with the announcement of financial backing of major venture capitalists in the sector, were a siren song to both veteran and rookie crypto investors alike, luring them in with a purportedly "stable" digital asset in UST that would nevertheless provide outsized returns on investment via Anchor.  The marketing of UST and Anchor was so effective that approximately $14 billion of UST's market cap (75%) was deposited into Anchor at its peak.

7.     Between May 6, 2022 and May 9, 2022, however, structural infirmities specific to the Terra ecosystem exposed a crack in UST's ability to maintain its peg to $1.  The truth regarding the stability and sustainability of the UST/LUNA pair and the Anchor Protocol could not be hidden any longer from investors, and within a week, the price of UST and LUNA collapsed by approximately 91% and 99.7%, respectively.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PARTIES**

*Plaintiff*

8.      Plaintiff Nick Patterson ("Patterson") is a resident and citizen of Illinois, living in Chicago, Illinois.  As set forth in the attached certification, Plaintiff Patterson purchased Terra Tokens, including UST, LUNA, ANC, Mirrored Assets, and Bonded Assets during the Relevant Period, and suffered investment losses as a result of Defendants' conduct.

*Defendants*

9.      Defendant TerraForm Labs Pte. Ltd. ("TFL") is a Seoul-based company with its headquarters located at 80 Raffles Place, #32-01, UOB Plaza, Singapore 048624.

10.      Defendant Jump Crypto is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.  In addition to providing funding to TFL and the Luna Foundation Guard, Jump Crypto also contributed to Wormhole, a bridge between blockchains that can be used to transfer digital assets from one blockchain to another.  Wormhole unleashes Terra assets, particularly UST, into the Solana blockchains' burgeoning DeFi ecosystem and presents a trust-minimized conduit for users to send assets between Terra and Ethereum as well.  Upon information and belief, Jump Crypto used its relationship with Wormhole to secure a favorable exit from its UST/LUNA holdings prior to the complete collapse of the Terra ecosystem.

11.      Defendant Jump Trading LLC is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12.      Defendants Jump Crypto and Jump Trading LLC are collectively referred to as "Jump."

13.      Defendant Republic Capital ("Republic") is a limited liability company with its headquarters located at 335 Madison Avenue, Suite 7E, New York, New York 10017.

14.      Defendant Republic Maximal LLC is a limited liability company, incorporated in Delaware with its headquarters located at 335 Madison Avenue, Suite 7E, New York, New York 10017.

15.     Defendants Republic Capital and Republic Maximal LLC are collectively referred to as "Republic."

16.     Defendant Tribe Capital ("Tribe") is a limited liability company with its headquarters located at 2700 19th Street, San Francisco, California 94110.

17.     Defendant DeFinance Capital/DeFinance Technologies Oy ("DeFinance") is a Finnish limited liability company with its headquarters located at Lönnrotinkatu 36 K 22, 00180 Helsinki, Finland.

18.     Defendant GSR/GSR Markets Limited ("GSR") is a foreign limited company registered in Hong Kong, with its headquarters located at Suite 5508, 55th Floor, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.

19.     Defendant Three Arrows Capital Pte. Ltd. ("Three Arrows") is a Singapore-based company with its headquarters located at 7 Suntec Tower One 038987, 21-04 Temasek Blvd., Singapore.

20.     Defendant Nicholas Platias is the Head of Research and a "founding member" of TFL, a member of the Governing Council of the Luna Foundation Guard, and one of the co-founders/creators of the Anchor Protocol.  Platias served as a consultant and spokesman for TFL, the Luna Foundation Guard, and the Anchor Protocol, has exercised control over TFL and directed and/or authorized, directly or indirectly, the sale and/or solicitations of the Terra Tokens to the public.

21.     Defendant Do Kwon is the co-founder and Chief Executive Officer of TFL and has been since 2018.  Kwon is a resident of the Republic of Korea.  Since its inception, Kwon has exercised control over TFL and directed and/or authorized, directly or indirectly, the sale and/or solicitations of the Terra Tokens to the public.  Kwon graduated with a Bachelor of Science degree in computer science from Stanford University in California and travelled to the United States to conduct business on behalf of TFL, including to a digital asset and blockchain conference held in New York City in September 2021.

1

## JURISDICTION AND VENUE

2        22.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

3    §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an

4    aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there

5    is minimal diversity because Plaintiff and at least one Defendant are citizens of different states.

6    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

7        23.      This Court may exercise jurisdiction over Defendants because they have continuous

8    and systematic contacts with this District, do substantial business in this State and within this

9    District, and engage in unlawful practices in this District as described in this Complaint, so as to

10   subject themselves to personal jurisdiction in this District, thus rendering the exercise of

11   jurisdiction by this Court proper and necessary.

12       24.      TFL appears to be actively conducting business within this District.  Significantly,

13   Defendant Platias – a resident of California – is a founding member of TFL and serves as its Head

14   of Research.  Platias, along with Defendant Kwon, authored the April 2019 LUNA whitepaper[3] on

15   behalf of TFL and serve as two of six members on the Luna Foundation Guard's Governing

16   Council.  The June 2020 whitepaper for the Anchor Protocol was also co-authored by Platias.

17   Relatedly, Platias wrote the "Introducing Anchor" opening statement that was published by TFL

18   on July 6, 2020.[4]  As discussed at length below, the Anchor Protocol was at the primary driver of

19   the Terra ecosystem's collapse.  Thus, the source of the alleged misconduct related to the Anchor

20   Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of TFL,

21   occurred within California and impacted its residents.

22       25.      In addition, as noted in court filings by the SEC concerning TFL's Mirrored Assets

23   (discussed below), TFL's financial products "are offered and available for purchase by U.S.

24   investors through Terraform's web application" as well as on digital asset trading platforms.  TFL

25

26   _____

[3]      A "whitepaper" is a document created by blockchain companies that describe the project
27   and the terms of its launch and operations.  While whitepapers contain vastly less information than
     what is required in an SEC registration statement, they do represent the primary offering document
     for a blockchain-related project.

28   [4]      Nicholas Platias, *Introducing Anchor*, MEDIUM (July 6, 2020), https://medium.com/terra-
     money/introducing-anchor-25d782cbb509.

CLASS ACTION COMPLAINT

and Individual Defendants Kwon and Platias promoted the Terra Tokens and related protocols through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media.[5]

26.     TFL's origins are firmly rooted in California and began, upon information and belief, during Defendant Kwon's time at Stanford.  For example, TFL has had several funding rounds since its inception in 2018.  According to TFL, the majority of the "Early VC" and "Seed" investors were California businesses.  For example, TFL received millions of dollars of start-up and maintenance funding from the following California entities:

        a.     Pantera Capital located in Menlo Park, California;

        b.     Lightspeed Venture Partners located in Menlo Park, California;

        c.     Blockchain.com Ventures located in Palo Alto, California;

        d.     TransLink Capital located in Palo Alto, California;

        e.     Coinbase Ventures located in San Francisco, California;

        f.     Polychain Capital located in San Francisco, California; and

        g.     Synapse Capital located in San Francisco, California.

27.     Anchor Protocol has similarly received millions of dollars in start-up funding from the following California entities:

        a.     Alameda Research located in Berkeley, California;

        b.     Dragonfly Capital Partners located in San Francisco, California;

        c.     Pantera Capital located in Menlo Park, California; and

        d.     Naval Ravikant, an investor located in Palo Alto, California.

28.     Likewise, one of the members of the Luna Foundation Guard – Defendant Tribe Capital – is also located in and operates out of San Francisco.

---

[5]     *See, e.g.*, Michael P. Reagan, *Fake Tesla, Apple Stocks Have Started Trading on Blockchains*, BLOOMBERG NEWS (July 6, 2021), https://www.bloomberg.com/news/articles/2021-07-06/fake-teslaapple-stocks-have-started-trading-on-blockchains; *Our mission is to bring decentralized monies to as many blockchains as possible: Terraform Labs CEO*, YAHOO! NEWS (July 12, 2021), https://news.yahoo.com/mission-bring-decentralized-monies-many171201969.html.

CLASS ACTION COMPLAINT

29.     Defendant Three Arrows Capital was initially established and headquartered in San Francisco, California, and maintains investments in several California-based cryptocurrency projects and businesses.

30.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     The Terra Ecosystem**

        **1.     TFL**

31.     TFL is a Seoul-based company founded in 2018 by Defendant Do Kwon and Daniel Shin that, as noted by the SEC in its own investigation into TFL's digital assets, "regularly transacts business in the United States, included by contracting with U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware.  Several employees of [TFL] appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Defendant Platias] (located in California), and its Director of Special Products (located in New York)."[6]

32.     TFL operates the Terra blockchain, a platform upon which the Terra ecosystem's decentralized financial products and services are developed and supported.  These products and services take the form of "decentralized applications" and protocols built by TFL.  With respect to financial products, TFL has three main types of digital assets that it created: (1) tokens that are native to the Terra ecosystem; (2) stablecoins; and (3) the various Mirrored Assets, Bonded Assets, and LP Tokens.

33.     According to South Korea's Supreme Court Registry Office court documents, Do Kwon dissolved TFL's headquarters on May 4, 2022, and the Seoul branch on May 6, 2022.  The

---

[6]     *SEC v. Terraform Labs PTE, Ltd.*, No. 1:21-mc-00810 (S.D.N.Y. Nov. 12, 2021), Declaration of Roger J. Landsman in Support of U.S. Securities and Exchange Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas, ECF No. 4.

decision came following a general shareholder meeting on April 30, 2022, with Do Kwon acting as the liquidator.[7]

### 2. Do Kwon

34. *The New York Times* described Defendant Kwon as "a trash-talking entrepreneur" that caused a "$40 Billion Crash."[8]  One of Kwon's go-to insults is to demean and delegitimize his detractors or critics of the Terra Tokens by dismissing them as "poor."

35. For example, on July 1, 2021, Kwon mocked a British economist, Frances Coppola, who criticized the algorithmic stablecoin model.  Instead of addressing the concerns raised by Coppola, in particular, the charge that the algorithmic stablecoin model could not defend against a bank run, Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment."[9]

36. On December 30, 2021, the co-founders of a rival stablecoin, Maker DAO, posted a thread discussing predictions for the crypto sector in 2022.  In particular, they predicted that "UST will collapse in a death spiral with LUNA hyper-inflating to try to cover the peg"[10] and gave the following tongue-in-cheek remarks:  "Look, UST and MIM are solid ponzis and I respect that. You can make good money off them for sure.  But they are not built for resilience and they are going to 0 once the market turns for real . . . .  Now stop trying to scam users looking for actual stability into being ur exit liquidity."[11]  When asked if he was willing to place a bet that the MakerDAO founders were wrong, Kwon simply replied "I don't gamble against the poor."

---

[7]    *See* Kevin Helms, *Do Kwon Dissolved Terraform Labs Korea Days Before Collapse of Terra LUNA, UST*, BITCOIN (May 19, 2021), https://news.bitcoin.com/dokwon-dissolved-terraform-labs-korea-days-before-collapse-of-terra-luna-ust/.

[8]    David Yaffe-Bellany and Erin Griffith, *How a Trash-Talking Crypto Founder Caused a $40 Billion Crash* (May 18, 2022), https://www.nytimes.com/2022/05/18/technology/terra-luna-cryptocurrency-do-kwon.html.

[9]    https://twitter.com/stablekwon/status/1410491186196795398?s=20&t=WhXnvJmqblLyJePqlaNsDQ.

[10]    https://twitter.com/hexonaut/status/1476649894479753238?s=20&t=2n6IPnOxhcpLu7CoEnDtOg.

[11]    https://twitter.com/RuneKek/status/1478166276979793922?s=20&t=2n6IPnOxhcpLu7CoEnDtOg.

37.     In addition, UST/LUNA is not Kwon's first trip around the failed stablecoin block. Kwon has had similar failures with previous attempts to market and sell a stablecoin and thus he knew or should have known that his conduct with UST/LUNA was likely to mislead investors and cause them financial harm.  For example, in 2021, Kwon launched the Basis Cash ("BAC") token, another algorithmic stablecoin project that sought and failed to maintain a $1 peg.  A former engineer at Terraform Labs, Hyungsuk Kang, claimed that Basis Cash was a side project created by him and Do Kwon.  Since Kwon's previous algorithmic stablecoin failed, it is possible that he could have anticipated UST's failure to maintain the peg.[12]

### 3.     The Luna Foundation

38.     On or around January 19, 2022, TFL announced the formation of the Luna Foundation Group – a Singapore-based non-profit organization – for the purpose of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."[13]

39.     The announcement noted previous criticisms directed towards algorithmic stablecoins like UST, but the Luna Foundation Guard downplayed the "misconception" that algorithmic Stablecoins are "unsustainable."  The Luna Foundation Guard went on to state that a previous depegging that occurred in May 2021 was not a sign that UST was more unstable than disclosed, but rather, a learning opportunity that UST was able to capitalize on:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, *UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy*.  Still, *questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on*.
>
> *          *          *
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions.  These include everything from technical developer tooling to capital backing projects, educational materials

---

[12]     Sam Kessler and Danny Nelson, *UST's Do Kwon Was Behind Earlier Failed Stablecoin, Ex-Terra Colleagues Say*, COINDESK (May 11, 2022), https://www.coindesk.com/tech/2022/05/11/usts-do-kwon-was-behind-earlier-failed-stablecoin-ex-terra-colleagues-say/.

[13]     The Intern, *Formation of the Luna Foundation Guard (LFG)*, MEDIUM (Jan. 19, 2022), https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b#:~:text=We're%20pleased%20to%20announce,sustainability%20and%20stability%20of%20Terra's.

10

helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.

[Emphasis added.]

40.     The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem.  Building reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins . . . ."

41.     In addition to deploying "capital backing" to prop up TFL's stablecoins and Anchor Protocol, the Luna Foundation Guard also was tasked with providing funding and grants for builders, researchers, community members, and developers working "in the interest of the Terra economy categorized into 3 primary groups:  Open-Source Technology Development, Research & Education, and Community Growth."

42.     The Luna Foundation Guard is overseen and operated by a "Governing Council, initially comprised of the following leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem."  The founding members of the Luna Foundation Guard's Governing Council included: Defendants Do Kwon and Nicholas Platias from TFL; Kanav Kariya, the President of Jump Crypto (one of the six venture capital groups comprising the Luna Foundation Guard); Remi Tetot, co-founder of RealVision TV; Jonathan Caras, the Project Lead at Levana Protocol; and José Maria Delgado co-founder of Delphi Digital.

43.     The Luna Foundation Guard was initially funded with a 50 million LUNA gift on January 22, 2022, from TFL to "help bootstrap its stabilizing reserves and grants framework."

44.     In February 2022, TFL announced that the Luna Foundation Guard closed a $1 billion private token sale for "use in establishing a UST Forex Reserve denominated in Bitcoin" to serve as collateral for the TFL stablecoins.[14]  This was the first of several rounds of funding that the Luna Foundation Guard provided to the Terra ecosystem.

---

[14]     Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a_ Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022),

### 4.     The Terra Tokens

45.    These various Terra Tokens are described further as follows:

#### a.     Native and Governance Tokens

- LUNA – launched in or around April 2019, LUNAa tokens are the native token for TFL.  The Terra protocol runs on a Proof of Stake (PoS) blockchain, where miners need to stake the native token Luna to mine Terra transactions.  Luna tokens are also the pair to the UST algorithmic stablecoin.

- ANC – is the governance token for the Anchor Protocol and it is minted by TFL on the Terra blockchain.  ANC "is designed to *capture a portion of Anchor's yield, allowing its value to scale linearly with Anchor's assets under management (AUM)*.  Anchor distributes protocol fees to ANC stakers pro-rata to their stake, benefitting stakers as adoption of Anchor increases . . . ."[15]  ANC tokens are also "used as incentives to bootstrap borrow demand and provide initial deposit rate stability."  Notably, 100M ANC tokens have been "allocated to the creators of Anchor" (including Kwon and Platias).  Investors in the Anchor Protocol receive their 20% APY on their UST deposits in ANC tokens, which can be subsequently exchanged for other cryptocurrencies.

- $WHALE – Whale tokens are a "social" digital asset that is backed by both tangible and rare NFTs.

- ASTRO – Astro is a governance token for a DeFi protocol built on the Terra ecosystem.

- APOLLO – Apollo is a governance token for a DAO that "governs a War Chest for meta-governance and capital investments in decentralized ecosystems" like the Terra ecosystem.

---

https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm.

[15]     Anchor Token (ANC) whitepaper,  https://docs.anchorprotocol.com/protocol/anchor-token-anc (last visited June 15, 2022).

- XDEFI – XDEFI is a token associated with a non-custodial wallet/digital asset wallet company that supports the Terra ecosystem.

- $MINE – MINE tokens are the native token for the Pylon Protocol, a suite of decentralized finance savings and payments products powered by yield redirection on the Terra blockchain.

- aUST – A token provided when UST tokens are deposited into Achor Protocol.

- vUST – An arbitrage UST token that aims to enforce the UST peg by exploiting arbitrage opportunities.

- MIR – Mirror Token functions as a governance-type token for the Mirror Protocol. It allows investors to interact with Mirrored Assets (discussed below).

46.      Cryptocurrency markets are notoriously volatile, with intraday price and/or exchange rate swings of 10% in a few hours occurring regularly.  These wild fluctuations make cryptocurrencies generally less suitable as a medium of exchange for routine transactions like purchases.  Stablecoins purport to solve this problem by attempting to tie or "peg" their market value to an external collateral with less volatility, such as another currency (*e.g.*, U.S. dollars), commodity (*e.g.*, gold), or financial instrument (*e.g.*, stocks, cryptocurrencies, etc.).  The price of a stablecoin (including those developed by TFL) is supposed to always remain at $1, and developers of these digital assets have devised two primary ways to maintain price stability:  over-collateralization with fiat reserves[16] and algorithmic stablecoins.

### b.      Stablecoins

- <u>UST</u> – TerraUS is an algorithmic stablecoin that operates through a pair of tokens (the stablecoin itself and another digital asset that backs the stablecoin) and a smart contract that regulates the relationship between the two (*i.e.*, the algorithm).  Instead of swapping UST for $1 in dollar reserves in with over-collateralized stablecoins, investors could exchange one UST stablecoin for $1 worth of TFL's LUNA.  But in order to maintain UST's 1:1 parity with the U.S. dollar, TFL's algorithm mints

---

[16]      Over-collateralized stablecoins maintain fiat reserves with enough cash or cash equivalents on hand to cover each respective stablecoin on a 1-to-1 basis.  Similar kinds of stablecoins operate by using a cryptocurrency like Ether ("ETH") deposited into its smart contracts as the collateral.

CLASS ACTION COMPLAINT

and burns UST and LUNA to control the supply and keep the value of UST steady at $1, while at the same time incentivizing arbitrageurs to trade the UST back to its peg of $1 if it deviates.  This latter mechanism creates an arbitrage opportunity meant to encourage arbitrageurs to trade the UST/LUNA pair in order to trigger the mint/burn process and thus, a return to $1.

- <u>KRT</u> – TerraKRT is a stablecoin pegged to the South Korean won.

### c. *Mirrored Assets*

47.    TFL also promotes and sells so-called "mirrored" or synthetic assets (a/k/a "mAssets"), which are essentially derivative products that track the price of a particular underlying asset.  The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Tesla, Inc. stock or the VIX etf, in that they are designed so that their value rises and falls with the value of those securities.  The mAssets corresponding to those equities have been named as "mTesla" or "mVIXY."  According TFL's website, "mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."[17]  Concurrently, TFL sells a MIR governance token to interact with the Mirrored Assets.

48.    TFL's Mirrored Assets include, but are not limited to, the following:

- <u>mBTC</u> – Mirrored Bitcoin is a synthetic asset tracking the price of Bitcoin.  It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- <u>mETH</u> – Mirrored Ether is a synthetic asset tracking the price of Ethereum's native token, Ether.  It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- <u>mVIXY</u> – Mirrored ProShares VIX is a synthetic version of the VIX etf that tracks stock market volatility.

---

[17]    https://terra.mirror.finance; What is Mirror? whitepaper, https://docs.mirror.finance (last visited June 15, 2022).

49.     The SEC has already opened an investigation into TFL and Do Kwon over the sale of Mirrored Assets and the MIR token.  *See SEC v. Terraform Labs PTE, Ltd.,* No. 1:21-mc-00810 (S.D.N.Y.).  According to the SEC's court filings:

> The Commission's Mirror Protocol Investigation concerns, among other things, whether persons or entities have engaged in acts constituting violations of various provisions of the federal securities laws, including, but not limited to, Section 5 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e], prohibiting the unregistered offer or sale of securities; Section 6(l) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78f(l)], prohibiting any person from effecting transactions in a security-based swap with or for a person that is not an eligible contract participant unless such transaction is effected on a national security exchange; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], prohibiting acting as an unregistered broker or dealer; and Section 7(a) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a–7], prohibiting securities transactions by unregistered investment companies, in connection with Terraform's involvement with the Mirror Protocol, including Terraform's participation in the creation, promotion, and offer to sell mAssets and MIR tokens to U.S. investors.[18]

### d.     LP Tokens

50.     In some instances, TFL created an entirely new token derivative to the mirrored asset (or other digital assets in the Terra ecosystem) after a pair of digital assets is combined and staked with a protocol via a smart contract.  Once the two assets are locked in, a new token gets minted often called a liquidity pool ("LP") token.  These LP tokens are created for the purpose of providing liquidity for trading and funding for operations.  TFL's LP tokens include, but are not limited to, the following:

- UST-mVIXY-LP – a LP token developed for staking UST with mirrored VIXY tokens.

- bLUNA-LUNA-LP – a LP token developed for staking bonded LUNA tokens with LUNA.

- XDEFI-UST-LP – a LP token developed for staking XDEFI with UST.

- MINE-UST-LP – a LP token developed for staking MINE with UST.

---

[18]     *See* n.6, ¶3, *supra*.

CLASS ACTION COMPLAINT

e.    *Bonded Assets*

51.    As described in the Bonded Assets whitepaper on the Anchor Protocol website, one of Anchor's core products is the bAsset (bonded asset) – "liquid, tokenized representations of staked (bonded) assets in a [Proof-of-Stack] blockchain.  They allow stakers to gain liquidity over their staked assets, enabling the locked value in staked assets to be utilized in financial applications such as Anchor."[19]

52.    According to TFL's Head of Research and author of the LUNA and Anchor Protocol whitepapers, Platias "bAssets play a key role in Anchor towards offering a stable interest rate to Terra deposits."[20]  And as the bAsset whitepaper clarified "Anchor's deposit rate subsidies are funded by bAsset rewards.  bAsset rewards should be given out without interruption, as subsidies must be constantly distributed."[21]

53.    The bAssets developed and sold by TFL include the following:

- bETH – bETH tokens accrue UST rewards, funded from the Ethereum staking rewards of stETH.  "Every 24 hours, Ethereum staking rewards (in the form of stETH) are sold for UST, which are then transferred over to Terra and distributed to holders of bETH."[22]  However, the bETH tokens must be staked within the Terra ecosystem to accrue those rewards.

- bLUNA – Bonded Luna tokens are bonded assets ("bAssets") built for the Terra blockchain, with their value backed by underlying LUNA delegations.  "Delegation rewards, collected in various native token denominations (TerraUSD, TerraSDR, Luna, etc.), are swapped for [UST].  Swapped [UST] is then distributed pro-rata to bLuna holders."[23]

---

[19]    Bonded Asset (bAsset) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets (last visited June 15, 2022).

[20]    *See* n.4, *supra*.

[21]    *See* n.19, *supra*.

[22]    Bonded ETH (bETH) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets/bonded-eth-beth (last visited June 15, 2022).

[23]    Bonded Luna (bLUNA) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets/bonded-luna-bluna (last visited June 15, 2022).

5.      **The Anchor Protocol**

54.     As for the protocols on the Terra ecosystem, TFL developed, among others, the Mirror Protocol (a trading platform for TFL's Mirror Assets launched around December 2020) and the Anchor Protocol, which launched in August 2020.

55.     Anchor is by far the most popular protocol in the Terra ecosystem.  In exchange for staking their UST with TFL in the Anchor Protocol, investors are promised a steady and reliable 20% interest rate return on their investments.  TFL, in turn, lends out the staked UST to interested borrowers for interest payments and use of the borrowers' collateral.

56.     Anchor's whitepaper states, in relevant part, the following regarding the "savings product" offered by TFL:

> Anchor implements a liquidation protocol designed to **guarantee the principal of depositors.  Deposits are safe insofar as all debts against them remain over-collateralized.**
>
> *            *            *
>
> Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure.  Anchor offers a solution with Terra stablecoin money markets.  Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets.  **Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns**.[24]

[Emphasis added.]

57.     TFL sells an algorithmic stablecoin called TerraUS ("UST") along with its native digital asset LUNA.  These are two of TFL's largest digital assets by market capitalization, together reaching approximately $40 billion in worth.

58.     In effort to continue to promote the stability of UST as a stablecoin, TFL announced the formation of the Luna Foundation Guard whose task it was to "defend the peg" of UST and maintain the stability of the Terra ecosystem.

---

[24]     Nicholas Platias, *et al*., Anchor: Gold Standard for Passive Income on the Blockchain (June 2020), https://www.anchorprotocol.com/docs/anchor-v1.1.pdf.

CLASS ACTION COMPLAINT

59.     The Luna Foundation Guard is funded by six venture capital firms:  Jump Crypto, Tribe Capital, Republic Capital, GSR, DeFinance Capital, and Three Arrows Capital.  The Luna Foundation Guard collectively raised $1 billion in an initial coin offering round from TFL.

60.     On February 22, 2022, TFL announced the formation of the Luna Foundation Guard: Announcement of the $1 billion private token sales led by Jump Crypto and Three Arrows Capital, with participation from DeFinance Capital, Republic Capital, GSR, Tribe Capital, etc.

> 1/ One common criticism of algorithmic stablecoins is their reflexive nature and the hypothetical risk of a "bank run" scenario where demand to sell the stable outstrips supply in a way that causes compounding price decreases in both native tokens.
>
> 2/ Although the widespread adoption of $UST as a consistently stable asset through market volatility should already refute this, a decentralized Reserve can provide an additional avenue to maintain the peg in contractionary cycles that reduces the reflexivity of the system.[25]

**B.     The Terra Tokens Are Securities that the TFL Failed to Register Before Selling**

**1.     Terra Tokens Are Securities**

61.     Under §2(a)(1) of the Securities Act, a 'security' is defined to include an "investment contract."  15 U.S.C. §77b(a)(1).  An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  *W.J. Howey*, 328 U.S. at 299 (citation omitted).  Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis

---

[25]    Terra    Powered    by    LUNA    (@terra-money),    Twitter    (Feb.    22,    2022), https://twitter.com/terra_money/status/1496162890369404933?lang=en.

should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

62.     As a threshold matter, TFL has not registered any offering of securities pursuant to the Securities Act, nor has it registered the Terra Tokens as a class of securities under the Exchange Act.  TFL has also not registered with the SEC as a broker or dealer under §15(a) of the Exchange Act, or as an investment company under §7(a) of the Investment Company Act.

63.     Investors who bought Terra Tokens invested money or other valuable consideration, in a common enterprise:  namely, the Terra ecosystem.  Investors had a reasonable expectation of profit based upon the efforts of the Defendants, including, among other things, Defendants obtaining favorable listings of their Terra Tokens on U.S.-based cryptocurrency exchanges, maintaining the stability of the Terra ecosystem.

64.     In addition, the Terra Tokens qualify as a security under the *Howey* test for the reasons below.

### a.     Terra Token Investors Invested Money

65.     Plaintiff and the Class invested fiat, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens.

66.     The Terra Tokens were listed on U.S.-based cryptocurrency exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other digital currencies.

67.     Defendants sold Terra Tokens to the general public through global, online cryptocurrency exchanges during its so-called launch.

68.     Every purchase of Terra Tokens by a member of the public is an investment contract.

### b.     Terra Token Investors Were Intertwined in a Common Enterprise with Defendants

69.     Additionally, investors were passive participants in the Terra Tokens' launch and the profits of Plaintiff and the Class were intertwined with those of Defendants and of other investors.

70.     Defendants also were responsible for supporting the Terra Tokens, pooled investors' assets, and controlled those assets.

71.     Further, Defendants held and/or hold a significant stake in the Terra Tokens, and thus shared in the profits and risk of the project.

**c.     Investors Purchased the Terra Tokens with a
Reasonable Expectation of Profit from Owning Them**

72.     Investors in the Terra Tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The Terra Tokens were sold to investors prior to the Terra ecosystem being fully developed and able to handle the scale and scope of TFL's operations.  For pre-functional tokens, the primary purpose for purchasing Terra Tokens was to make a profit or accumulate additional Terra Tokens from various rewards programs, rather than to utilize the Terra Tokens themselves for a task.

**d.     Investors Expected Profits from the Terra Tokens to Be
Derived from the Managerial Efforts of Defendants**

73.     Investors' profits in the Terra Tokens were to be derived from the managerial efforts of others – specifically, the Company and the Luna Foundation Guard.  Terra Token investors relied on the managerial and entrepreneurial efforts of the Individual Defendants to manage, oversee, and/or develop the projects funded by sale of the Terra Tokens.

74.     Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

75.     Each of the Terra Tokens was a security at issuance because profit from the Terra Tokens would be derived primarily from the managerial efforts of Luna's teams developing the associated networks on which the Terra Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

76.     Investors in Terra Tokens relied on the managerial and entrepreneurial efforts of the Luna Foundation Guard, the Company, and Defendants Kwon and Platias to manage, market, and develop the Terra ecosystem.

77.     Defendants typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Terra Tokens reasonably expected TFL and the Luna Foundation Guard to provide significant managerial efforts to support the functionality and promotion of TFL's algorithmic stablecoin UST and LUNA.

78.     Investors in Terra Tokens thus reasonably expected the Company and Individual Defendants to provide significant managerial efforts after the token launch.

79.     This dependency, however, on the managerial efforts of the Company and Individual Defendants was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Terra Tokens were designed and intended to operate, if such an investor was even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Terra Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens she had acquired were securities.  It was only after certain revelations that provided more information about Defendants' intent and UST/LUNA's algorithmic vulnerabilities that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

**2.      Investors Would Not Reasonably Have Understood that Terra Tokens Were Securities**

80.     In connection with the sale of Terra Tokens, the Company and Luna Foundation Guard made statements that reasonably led Plaintiff and Class members to conclude that the Terra Tokens were not securities.

81.     As a threshold matter, the Company refused to register Terra Tokens with the SEC, which indicated to investors that these were not securities.  No such valid exemption from registration requirements exists for Terra Tokens.

82.     Additionally, TFL created and developed numerous decentralized applications designed to create a use for the Terra Tokens, suggesting to investors that Terra Tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).

83.     At the time of the Terra Token launch, Defendants took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects – particularly decentralized finance projects involving algorithmic stablecoins – work.  Considering the new technology at issue and the Company's other statements, many investors were understandably unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.

84.     Moreover, the UST/LUNA project was advertised as developing revolutionary and cutting edge blockchain technology and algorithmic stablecoins that were equally safe and reliable to other over-collateralized stablecoins on the market.

85.     In addition to claiming UST/LUNA's technical superiority over other cryptocurrencies, the Company also indicated that it would benefit financially and use the funds raised through Terra Tokens to continue to enhance the Terra ecosystem-related products and support the growth of the project.

86.     At the time of the Terra Tokens respective launches, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Terra Tokens would be better than other cryptocurrencies, many individuals were unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all Terra Tokens were issued by Kwon and the Company at creation at very little economic cost – and enormous potential upside – to them.

87.     The creation of Terra Tokens by Defendant Kwon occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management to arise that a

reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that the Terra Tokens were something other than a security when they were a security.

88.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Terra Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

**C.    TFL and the Luna Foundation Guard Misled U.S. Investors Concerning the Stability of UST and LUNA, as Well as the Sustainability of Anchor**

89.    TFL and the Luna Foundation Guard promoted the Terra Tokens and Anchor Protocol through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media.  The promotions all had the same talking points: stability and sustainability.

90.    For example, on April 2019, Defendants Kwon and Platias released the LUNA whitepaper, which outlined TFL's blueprint for its algorithmic stablecoin and repeatedly claimed the TFL stablecoin is both price-stable and growth-driven.[26]  Notably, the whitepaper concludes that LUNA's "stable rewards are designed to absorb volatility from changing economic cycles."[27]

91.    In June 2020, TFL's Head of Research, Defendant Platias, released the Anchor Protocol whitepaper, which discussed the features and rewards of the protocol.  The whitepaper described Anchor as:

> [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate.  To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked PoS assets from major blockchains as collateral (bAssets).  Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to the depositor.  It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs.[28]

---

[26]    Terra Whitepaper, https://whitepaper.io/document/587/terra-whitepaper (last visited June 15, 2022).

[27]    *Id.*

[28]    *See* n.24, *supra.*

92.     In plain English, Anchor offered depositors a fixed annual return of 20% by redistributing fees from borrowers and rewards from other assets staked in Anchor. The whitepaper repeatedly refers to this 20% interest rates as "stable."

93.     Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by TFL on July 6, 2020.[29]  In this post, Platias claimed that the Decentralized Finance ("DeFi") sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives."  In response to this "pressing need," Platias introduced "Anchor, a savings protocol on the Terra blockchain," which offered investors "a ***principle-protected*** stablecoin savings product that accepts Terra deposits and pays a ***stable interest rate***."[30] Again, Platias promoted Anchor as "becom[ing] the gold standard for passive income on the blockchain."

94.     Throughout the post, Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return."

95.     Similarly, on March 17, 2021, the official Twitter account for the Anchor Protocol bragged that "Anchor is not your ordinary money market.  ***The protocol offers stable, 20% APY interest to depositors*** and only accepts liquid staking derivatives as posted collateral by borrowers."[31]  [Emphasis added.]

96.     On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up ☺ Stable 20% APY is a high-yield safe-haven in uncertain market conditions."[32]

97.     On May 11, 2021, Anchor posted the following series of four tweets[33] promoting Anchor as the "gold standard for savings" and its "stable" 20% yields:

---

[29]     *See* n.4, *supra*.

[30]     *Id.* (emphasis in original).

[31]     Anchor Protocol (@anchor-protocol), Twitter (Mar. 17,2021, 3:59 AM), https://twitter.com/anchor_protocol/status/1372140647268806658?s=20&t=_Up3bEZF-ILN48s5RmkoPQ.

[32]     Anchor Protocol (@anchor-protocol), Twitter (Apr. 22, 2021, 10:48 PM), https://twitter.com/anchor_protocol/status/1385470521165242368?lang=en.

[33]     Anchor Protocol (@anchor-protocol), Twitter (May 11, 2021, 7:48 PM), https://twitter.com/anchor_protocol/status/1392310768276676611.

24

1/ We're thrilled to announce the release of the Anchor Earn SDK – allowing third parties to seamlessly integrate ***20% yields on $UST to expand stable savings opportunities to a greater audience!***

\*      \*      \*

2/ The Anchor Earn SDK significantly expedites the integration process for teams who want to bring ***the benefit of stable Anchor savings*** to users on their crypto-based platforms.  End-to-end integration possible in 7 lines of code or less."

\*      \*      \*

3/ Keep in mind that for teams who want to go beyond savings integrations and build out additional features on Anchor (e.g., dashboards), Anchor.js is still the way to go."

\*      \*      \*

4/ ***Anchor is the gold standard for savings – 20% yield for all***.

[Emphasis added.]

98.    The Anchor Twitter account continued to promote Anchor that same day, remarking that TLF "Would love to see all Revolut users benefiting from ***stable Anchor yields***."[34] [Emphasis added.]

99.    On December 26, 2021, Su Zhu, co-founder of Three Arrows, bragged about the future growth prospects of TFL's algorithmic stablecoin products:  "We're seeing some of the earliest and most ambitious ideas in crypto starting to unfold.  Crosschain decentralized stablecoin backed entirely by digitally native assets was the holy grail in 2016.  Bless $BTC $LUNA."[35]  Zhu went on to state that "Ppl down 50x more from selling early than from buying top this yr, and it's not even close.  Sol, luna, avax, matic, axs, doge, shib, ftm list goes on.  Tops are emotionally memorable bc plebs snapshot themselves to a portfolio ath, yet nobody buys top while everyone sells early."[36]

---

[34]    Anchor Protocol (@anchor-protocol), Twitter (Mar 28, 2022, 5:35 PM), https://twitter.com/anchor_protocol/status/1392318396956438529.

[35]    Zhu Su (@zhusu), Twitter (Dec. 25, 2021, 9:49 PM), https://twitter.com/zhusu/status/1508603726143328256.

[36]    Zhu Su (@zhusu), Twitter (Dec. 25, 2021, 9:49 PM), https://twitter.com/zhusu/status/1474980708951027712.

CLASS ACTION COMPLAINT

100.     On January 28, 2022, Jump's President, Kanav Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning UST and the possibility that the Anchor yield could be impacted if a depegging event occurred.  "It's difficult to imagine a sustained mass exodus to UST given the circumstances.  In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.  Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."[37]   Kariya further stated, "A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project.  Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."[38]

101.     The promise of fixed high-double-digit yields drove rapid growth for both Anchor and TFL.  However, when Anchor's revenues were lower than 20%, TFL mobilized funds from the Anchor Yield Reserve to pay out investors.

102.     Anchor has consistently represented at least half of TFL's combined total value locked ("TVL").  This TVL had grown to $15B from $540M when Anchor first launched.  The figure made Anchor the largest DeFi protocol by TVL in the Terra ecosystem and the fourth largest DeFi protocol across all blockchains, according to data from DeFi Llama.  However, Anchor's Yield Reserve – the funding that TFL and the Luna Foundation Guard kept in reserve in case the fees Anchor received could not cover interest payments due to depositors – was depleting rapidly as demand for stablecoin yields rose and borrowing activity declined.

103.     On February 8, 2022, a researcher at the crypto-related venture capital firm, Hashe, warned Anchor at its own governance forum that its Yield Reserve would only sustain the Anchor Protocol until roughly February 20, 2022, at which point a top-up of at least $436 million will be required to maintain the protocol's current yields until November 2022.  This top-up is "a short-term solution to allow sufficient time for growth" while developers work on its v2 iteration "with improved ANC tokenomics and mechanism to incentivize borrows."

---

[37]     Zhu Su (@Zhusu), Twitter (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/status/1486930299711897605.

[38]     Zhu Su (@Zhusu), Twitter (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/status/1486930300773056516.

104.    Two days later, on February 10, 2022, Defendant Kwon announced that the Luna Foundation Guard's Governing Council had voted to capitalize the Anchor Yield Reserve by 450 million UST.

105.    On February 22, 2022, the Luna Foundation Guard issued a press release announcing the closing of a private sale of $1B in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem . . . .  The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[39]

106.    Defendant Platias also bragged that with the creation of the Luna Foundation Guard's UST Forex Reserve, "'the primary counter-argument for the sustainability of algorithmic stablecoins is eliminated.'"[40]  Platias was further quoted in the February 22, 2022 press release, stating that the "'UST peg is supported by a pool of decentralized liquid assets, which operate as a dynamic backstop driven by a transparent mechanism design and arbitrage forces during periods of sharp UST demand contraction.'"[41]

107.    Jump President and Luna Foundation Guard Governing Council member Kariya proclaimed in the press release that:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST . . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[42]

108.    That same day Jump endorsed Kariya's comments, stating: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."[43]

---

[39]    *See* n.14, *supra*.

[40]    *Id.*

[41]    *Id.*

[42]    *Id.*

[43]    jump-crypto (@jump-), TWITTER (Feb 22, 2022, 10:05 AM), https://mobile.twitter.com/jump_/status/1496184268976013319.

CLASS ACTION COMPLAINT

109.    Jump also promoted its relationship with TFL and the future prospects of UST on February 22nd:  "We're excited to share our latest collaboration with @terra_money. . . .  Our goal is to make DeFi more accessible and meaningful for everyone. . . .  By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."[44]

110.    Defendant Kwon and Tribe Capital's co-founder, Arjun Sethi, were also actively promoting UST/LUNA on Twitter on February 22, 2022.  Kwon touted the "$1B BTC reserve for $UST" as the "[l]argest ever cap formation in crypto" and how the Luna Foundation Guard had "plans to scale reserve to larger numbers."[45]  Sethi reposted a thread from the Luna Foundation Guard official account announcing the $1 billion reserve funding, which stated, among other things, that UST was "a consistently stable asset through market volatility" and that the "hypothetical risk of a 'bank run'" was mitigated by the Forex Reserve's creation.[46]

111.    On March 5, 2022, Three Arrows' Su Zhu posted the following message on his Twitter account:  LFG $LUNA – "We are burning these 5m $Luna btw! . . . $ust #LUNAtics [3 rocket emojis],"[47] suggesting to investors that the burning of Luna would increase its scarcity and, in turn, its price.

112.    On March 8, 2022, Kariya announced that "UST is in high demand atm and is generally trading at a premium."[48]

113.    On or about March 10, 2022, two of TFL's early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol.  Luna Foundation Guard Governing Council members Kanav Kariya of Jump and José Marie Macedo of Delphi Digital, rejected the

---

[44]    jump-crypto (@jump-), TWITTER (Feb 22, 2022, 9:02 AM), https://mobile.twitter.com/jump_/status/1496168648356028420.

[45]    Do Kwon (@stablekwon), TWITTER (Feb. 22, 2022, 8:59 AM), https://twitter.com/stablekwon/status/1496167757494501378?s=20&t=9ZHug_qPYc9X 2QZ8xjD16g.

[46]    Terra   Powered   by   LUNA   (@terra-money),   TWITTER   (Feb   22,   2022), https://twitter.com/terra_money/status/1496162889085902856?s=20&t=USr52P30b_S0T0 of15Ewaw.

[47]    Zhu Su (@zhusu), TWITTER (Mar. 5, 2022, 12:34 AM), https://twitter.com/zhusu/status/1500026883408158721.

[48]    Kanav Kariya (@KanavKariya), TWITTER (Mar 8, 2022, 5:33 AM), https://twitter.com/KanavKariya/status/1501189252075429891.

CLASS ACTION COMPLAINT

proposal.  Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post voicing objections to the proposal.

114.    Around the same time as Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod") publicly criticized LUNA as being a "[p]onzi" and disclosed his plan to short LUNA "with size."  Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and LUNA, noting that "more ust = = more pressure on Luna."[49]

115.    As usual, instead of addressing a concern from a community member, Defendant Kwon used *ad hominem* attacks to deflect the criticism and to obscure the validity of the concern from investors.  Among other things, Kwon repeatedly attempted to demean Algod as being "poor," presumably as a way to delegitimize Algod in the eyes of investors who may listen to Algod's criticisms.  In particular, Kwon and Algod had the following exchange on Twitter on March 9, 2022:



49   Algod   (@AlgodTrading).   Twitter   (Mar.   9.   2022).   https://twitter.com/ AlgodTrading/status/1501478496148803584?s=20&t=G1G6a0eShwc83i8-1iHV1Q.

CLASS ACTION COMPLAINT



116.    Kwon did not disclose that Algod was, in fact, correct that Kwon and the other Defendants could not "keep fuel[ing] anchor."  Kwon instead sought to undermine the prophetic criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not LUNA's price would be higher in a year.

117.    Luna Foundation Guard member, Three Arrows via its co-founders Davies and Zhu, also made misleading statements regarding UST and the Anchor Protocol around the same time.  For example, on March 17, 2022, Davies promoted UST, along with an implicit promotion of Anchor high interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield."[50]  Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stable coin of significant size."[51]  Davies, however, failed to also advise investors that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem.

[50]    Kyle Davies (@KyleLDavies), TWITTER (Mar. 16, 2022, 10:14 PM), https://twitter.com/KyleLDavies/status/1504325336439619586.

[51]    Kyle Davies (@KyleLDavies), TWITTER (Mar. 21, 2022, 9:23 PM), https://twitter.com/KyleLDavies/status/1506124383827656708.

118.    While not as crude as Kwon, Three Arrows' Zhu apparently shared Kwon's disdain for investors, calling those that sold for a loss "plebs" and chastising them for "selling early.[52] Zhu's suggestion to investors that they should continue hold their LUNA is particularly foul given that the Luna Foundation Governing Council, Three Arrows, and by extension, Zhu all knew well before March 2022 that LUNA, UST, and the Anchor Protocol was unstable and could not be sustained by the various reserve funds that the Luna Foundation Guard supposedly set up.  Anyone that followed Zhu's advice would have suffered catastrophic losses only six weeks later when the collapse occurred.

119.    On March 28, 2022, the head of research at the investment fund Arcane Crypto, Eric Wall, posted a thread on Twitter discussing how the 50 million LUNA that served as the initial funding for the Luna Foundation Guard came from the initial coin offering and why choosing to use non-renewable liquidity sources like the funding for the LUNA launch could be problematic for a so-called algorithmic stablecoin since it was "inherently unsustainable."[53]  In the opening post of that thread, Wall stated:

> Don't mean to be a party pooper but I think Terra is making a mistake to use LUNA funds that originated from the ICO to build the [Luna Foundation Guard] reserve.
>
> The goal of $UST is to be (i) decentralized and (ii) sustainable.
>
> This reserve is neither of those two things.[54]

Kwon smugly retorted "I like to say things that are true and well informed, and i think after all this we can both agree this is neither of those things:  But you know, you do you."

120.    On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX tokens to "help bolster its UST Decentralized Forex Reserve."[55]  According to Defendant Platias, the purpose of the UST Reserve is "'to provide a backstop against UST peg

---

[52]    *See* n.36, *supra*.

[53]    Eric Will (@ericwill), TWITTER (Mar. 28, 2022, 4:15 PM), https://twitter.com/ercwl/status/1508583607195082753?s=20&t=OUkuXvf42G8Inqg9vJe M6w.

[54]    *Id.*

[55]    Sarah Cohen, *LFG to Acquire $100M in Avax to Strategically Align Terra and Avalanche Ecosystems,* PRWEB (Apr. 7, 2022), https://www.prweb.com/releases/lfg_to_acquire_100m_in_avax_to_strategically_align_ terra_and_avalanche_ecosystems/prweb18577009.htm.

deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By diversifying the base of non-correlated assets to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives.'"[56]

121.    On April 29, 2022, Davies of Three Arrows, proclaimed that "Memecoins may exhibit a Pareto distribution, but stablecoins are winner take all based on liquidity.  There will be distribution only by significant differentiation.  ***And for the holy grail, the decentralized stablecoin, the winner will be $UST $LUNA***."[57]  [Emphasis added.]

122.    On May 3, 2022, Zhu of Three Arrows even encouraged his Twitter following to take out loans using their Bitcoin as collateral, and he advised investors to then use the proceeds to buy UST and stake it in Anchor for the 20% yield.  Seven days later, immediately following the UST collapse, this post was deleted.  As noted in the article *Luna backer Su Zhu says UST collapse is 'Terra's DAO hack moment*,' "[a]nyone who had followed this advice and had not sold would have lost practically all of their money and would not be able to pay back the loan."[58]

123.    Around the same time, Defendant Kwon himself continued to taunt "poor" crypto investors, making jokes during a May 3rd interview about how he reveled in idea of watching cryptocurrency project failed: "95% [of coins] are going to die, but there's also entertainment in watching [them] die too."

124.    Four days later, the UST/LUNA death spiral began.

**D.    The Truth Emerges**

125.    Both the size of the deposits in Anchor and the ballooning interest payments owed to investors became too much for the Terra ecosystem to bear.  In early May 2022, the house of cards came tumbling down after structural vulnerabilities within the Terra ecosystem precipitated a massive selloff of both UST and LUNA.

---

[56]    *Id.*

[57]    Kyle Davies (@KyleLDavies), TWITTER (April 29, 2022, 4:44 PM), https://twitter.com/KyleLDavies/status/1520006203861913600.

[58]    Tim Copeland, *Luna backer Su Zhu says UST collapse is 'Terra's DAO hack moment'*, THE BLOCK (May 13, 2022), https://www.theblock.co/post/146783/luna-backer-su-zhu-says-ust-collapse-is-terras-dao-hack-moment.

126.    The price of UST and LUNA Tokens dropped by 91% and 99.7% between May 7, 2022 and May 12, 2022, after it was revealed that TFL's largest digital assets were unstable and unsustainable.

127.    As the following chart from CoinDesk[59] shows, the Anchor Protocol saw its total value locked ("TVL") *fall by $11 billion* between May 9, 2022 and May 11, 2022:



*DeFi platform Anchor saw TVL drop $11 billion. (DeFiLlama)*

128.    LUNA's price crashed over 99.7% in less than a week, with the most violent drops occurring between May 9th and May 12th, as the following chart[60] demonstrates:



*LUNA hovers above 10 cents at writing time. (TradingView)*

[59]    Shaurya Malwa, *Terra's LUNA Drops to Almost $1 After 90% Weekly Plunge*, COINDESK (May 11, 2022), https://www.coindesk.com/markets/2022/05/11/terras-luna-drops-to-under-8-after-90-weekly-plunge/.

[60]    Shaurya Malwa, *Terra's LUNA Has Dropped 99.7% in Under a Week. That's Good for UST*, COINDESK (May 12, 2022), https://www.coindesk.com/markets/2022/05/12/terras-luna-has-dropped-997-in-under-a-week-thats-good-for-ust/.

33

129.     UST faced similarly steep drops in price.  Starting with the depegging between May 7, 2020 and May 9, 2020, UST fell from $1 to just $0.07 by May 25, 2022.

130.     In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member, Remi Tetot, admitted what TFL had denied all along – that the Anchor Protocol's 20% yield was not sustainable or stable despite constant statements to the contrary up until the collapse.  Worse still, Defendants knew all along there was a significant risk of a death spiral if new investors were not continually brought in.  Tetot revealed that the 20% yield was a marketing ploy to increase investment in the Terra ecosystem.  The growth was too much and too fast for Anchor to handle, and TFL and the Luna Foundation Guard were unable to scale their hyped-up defense mechanisms sufficiently.  Some of these defenses, like reserve pools, were not even ready despite promises otherwise.  As a result of these failures, UST's vulnerability was increased, exposing it to exactly the type of collapse of UST that TFL's CEO Kwon previously scoffed at.  In particular, Tetot candidly confessed:

> They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%.  Unfortunately, It didn't have time to make it . . . *20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable*, but I think it was acceptable for the time being, yield should have been dynamic as the system grow.
>
> \*        \*        \*
>
> Looking back at it, the 20% yield was a mistake because it increased UST demand too quickly, and *the defence mechanisms were not scaling at the same pace or were not ready yet* (BTC Reserves, 4Pool); *that growth didn't give time to the system to adjust accordingly and increased weaknesses*.
>
> I was too confident in 4Pool and BTC reserves; *while the strategic moves were made, they were not technically ready, leaving room for what happened*.

[Emphasis added.]

131.     Tetot later attempted to deflect the blame of the failure of TFL's algorithmic stablecoin to "human behavior" instead of the failures of Defendants.  Tetot acknowledged that he had been "very vocal about LUNA" and "became an easy target once Luna crashed, and to be fair I earned it, so no hard feeling about it."  Despite his own role in the misleading promotion of the

34

CLASS ACTION COMPLAINT

Terra ecosystem, Tetot still chastised "smaller investors" with "heartbreaking stories" about the fall of UST/LUNA:  "It looks like many people put all their savings or took debt to participate in Anchor, which is insane, crypto is very risky and I would never recommend such behaviour (and never have!)."  But this was precisely what Three Arrows' CEO Zhu advised investors to do just days before the collapse.[61]  Just as hypocritically, while after the fact he called such behavior "insane," Tetot himself earlier admitted that "my entire crypto portfolio was into Luna, and I watched it melt from 8 digits to 0."

**E.      Guidance from the Regulators**

**1.      The SEC's Investigation of TFL**

132.    As noted above, the SEC is already investigating TFL for, among other things, the sale of unregistered securities regarding TFL's Mirrored Assets and the MIR token.  On May 7, 2021, the SEC issued an order directing TFL and Kwon to produce documents and provide testimony concerning the Mirror Protocol and its related tokens.  In a declaration in support of the SEC's subsequent motion to comply with subpoenas, the SEC's investigating attorney, Roger J. Landsman, stated that, when asked by the U.S. counsel for TFL and Defendant Kwon what the Commission's "intentions" were with respect to the SEC's requests for information and documents, he disclosed the following:

> I explained that the SEC staff was investigating whether MIR tokens and mAssets were securities and ***had concerns these potential securities were being offered and sold in the United States in violation of the federal securities laws***, and further pointed out Terraform's contacts with the United States.  For example, I explained that Terraform employees continued to promote the Mirror Protocol and its associated assets (the MIR tokens and mAssets) to investors located in the United States.

**2.      The SEC's 2019 Framework**

133.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

---

[61]      *See* n.58, *supra*.

134.   The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

135.   In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature"?

136.   The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"

137.   The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

138.   At the time of the Terra Tokens' respective launches, Defendants actively marketed the token launch and the Terra ecosystem, thereby necessitating the continued managerial efforts of the Company and Individual Defendants.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

139.   Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through for example, buybacks, "burning," or other activities."

140.   As noted above, all of the Terra Tokens in circulation were created at the direction of Kwon and TFL.  Additionally, Kwon and Platias also created the protocols by which the Terra Tokens are burned.

141.   The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"

142.   Here, the Company and Individual Defendants have discussed the long-term prospects on years-long time frames, continually noting how the Luna ecosystem will "evolve" in the future.

143.   The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."

144.   Here, LUNA's whitepaper focuses extensively on the ability of the Terra Token smart contract to engineering trading of the Terra Token.

145.   Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."

146.   Here, the Company, along with the Luna Foundation Guard, readily admitted that they are the arbiters of funding for Terra ecosystem, making other managerial judgments or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

147.   The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."

CLASS ACTION COMPLAINT

148.    Here, several Defendants – including but not limited to Kwon, the Luna Foundation Guard, and Platias – retain a significant interest in the Terra Tokens.

**3.      SEC's Previous Statements and Findings**

149.    On May 7, 2021, on CNBC's "'Squawk Box'" television program, chairman of the SEC, Gary Gensler, stated that "'a lot of crypto tokens – I won't call them cryptocurrencies for this moment – *are indeed securities* . . . . ""[62]   [Emphasis added.]   In addition to being the Chairman of the SEC, Mr. Gensler is also a world-renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[63]

150.    In a June 14, 2018 speech entitled "Digital Asset Transactions:  When Howey Met Gary (Plastic)" that is available on the SEC's website, the following observations were made on "when a digital asset transaction may no longer represent a security offering:"[64]

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

---

[62]    Jesse Pound, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/ 2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[63]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[64]    William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic): Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

CLASS ACTION COMPLAINT

A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[65]

151.    As discussed above, the circumstances surrounding the creation of the Terra Token demonstrate that an exceedingly small number of centralized insiders maintained exclusive control over the Luna project.

152.    Finally, the SEC also already concluded that another virtual currency (*i.e.*, DAO tokens) that are substantially similar to Terra Tokens are "securities and therefore subject to the federal securities laws."  As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[66]

### 4.    Other Commentary from Regulators

153.    Stablecoins, in particular, have come under scrutiny by regulators recently, given the rapid growth of the $130 billion market.

154.    For example, in June 202, Representative Warren Davidson from Ohio, one of crypto's loudest advocates on Capitol Hill, said that in his view, not all stablecoins should be treated as securities, but stablecoins that specifically are backed by securities should fall under the same sort of regulatory regime:  "'if you've got a stablecoin that is essentially backed by securities, it gets hard to say that it's not a security.'"[67]

## CLASS ALLEGATIONS

155.    Plaintiff brings this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Luna's Terra Tokens and were subsequently damaged thereby.

---

[65]    *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[66]    Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov/ news/press-release/2017-131.

[67]    Nikhilesh De, *State of Crypto: Stablecoin Rules are Coming*, COINDESK (July 20, 2021), https://www.coindesk.com/policy/2021/07/20/state-of-crypto-stablecoin-rules-are-coming/.

156.    The Class Period is defined as the period between May 20, 2021 and May 25, 2022.[68]

157.    Excluded from the Class are:  (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiff's counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

158.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Luna and/or third parties and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that the Class consists of at least hundreds of people.  The number of Class members can be determined based on TFL's and other third party's records.

159.    **Commonality**: Common questions of law and fact exist as to all members of the Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

    a.    whether the Terra Tokens are securities under the Securities Act;

    b.    whether the sale of Terra Tokens violates the registration of the Securities Act;

    c.    whether Defendants improperly and misleadingly marketed Terra Tokens;

    d.    whether Defendants' conduct violates the state consumer protection statutes asserted herein;

    e.    whether Luna Foundation Guard Defendants aided and abetted violations of the state consumer protection statutes asserted herein;

    f.    whether Individual Defendants conspired to artificially inflate the price of the Terra Tokens and then sell their Terra Tokens to unsuspecting investors;

---

[68]    Plaintiff reserves the right to expand or amend the Class Period based on discovery produced in this matter.

g.   whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

h.   whether the proceeds that Defendants obtained as a result of the sale of Terra Tokens, rightfully belongs to Plaintiff and Class members;

i.   whether Defendants should be required to return money they received as a result of the sale of Terra Tokens to Plaintiff and Class members;

j.   whether Individual Defendants breached the implied covenant of good faith and fair dealing; and

k.   whether Plaintiff and Class members have suffered damages, and, if so, the nature and extent of those damages.

160.   **Typicality**: Plaintiff has the same interest in this matter as all Class members, and Plaintiff's claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiff's and the Class members' claims all arise out of TLF's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Terra Tokens.

161.   **Adequacy**: Plaintiff has no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiff has retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiff and his counsel will fairly and adequately protect the interests of the Class.

162.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action

41

CLASS ACTION COMPLAINT

device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

163.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

164.     California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

165.     California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

166.     Two of the Defendants (Platias and Tribe Capital) primarily reside in and operate out of California.  In particular, upon information and belief, all of the promotional activities of Platias on behalf of TFL and the Luna Foundation Guard described above originated in, and were disseminated from, California.   Additionally, Platias developed the Anchor Protocol and UST/LUNA tokens – which, as discussed in further detail above, was the subject of numerous misleading statements from Platias – entirely in California.

167.     On information and belief, the decision-making regarding the parameters of the marketing strategy for the Terra Tokens occurred in, and/or emanated from California, where Platias and Tribe Capital are located.  As such, the conduct complained of herein emanated from California.  This conduct similarly injured and affected Plaintiff and all other Class members.

168.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

**FIRST CAUSE OF ACTION**

**Section 10(b) and Rule 10b-5**
**(Against All Defendants)**

169.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

170.    Plaintiff incorporates the allegations above.

171.    Plaintiff brings this claim for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

172.    Plaintiff brings this claim on behalf of all Class members who purchased Terra Tokens from May 20, 2021 to May 25, 2022.

173.    The Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).   Defendants sold these securities to Plaintiff and the other Class members during and after the Terra Tokens respective launches.

174.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

175.    Defendants carried out a plan, scheme, and course of conduct that Luna intended to and did deceive the retail investors – Plaintiff and the other Class members – who acquired Terra Tokens pursuant to the March 2021 launch offering and thereby caused them to purchase Terra Tokens at artificially inflated prices.

176.    In connection with the March 2021 launch of Terra Tokens, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not materially misleading.

177.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Terra Tokens in connection with the March 2021 launch, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Misrepresentations and Omissions**

178.    Defendants' untrue statements and omissions of material facts in connection with the sale of Terra Tokens include at least the following:

a)    on March 17, 2021, the official Twitter account for the Anchor Protocol stated that "Anchor is not your ordinary money market.  The protocol offers stable, 20% APY interest to depositors and only accepts liquid staking derivatives as posted collateral by borrowers." In order to make this statement not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

b)    On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up ☺ Stable 20% APY is a high-yield safe-haven in uncertain market conditions."[69]  In order to make this statement not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

c)    On May 11, 2021, in a series of four posts on the Anchor Protocol's official Twitter account, Defendants touted Anchor as the "gold standard for savings" and its "stable" 20%

[69]    *See* n.32, *supra*.

yields.  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

d)      On February 22, 2022, in a LFG press release, the Luna Foundation Guard announced the closing of a private sale of $1 billion in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem . . . .  The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[70]  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

e)      In same press release, Defendant Platias stated that, with the creation of the Luna Foundation Guard's UST Forex Reserve, "the primary counter-argument for the sustainability of algorithmic stablecoins is eliminated."[71]  Platias further stated that the "UST peg is supported by a pool of decentralized liquid assets, which operate as a dynamic backstop driven by a transparent mechanism design and arbitrage forces during periods of sharp UST demand contraction."  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that the Forex Reserve Fund would be unable to defend the UST/LUNA peg.

f)      Also in that same press release, Kanav Kariya, President of Jump Crypto and member of the Luna Foundation Guard's Governing Council stated:

---

[70]      *See* n.14, *supra*.

[71]      *Id.*

45

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[72]

In order to make this statement not misleading, the Luna Foundation Guard was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and causing the "stressful conditions" that would (and did) precipitate the de-pegging of UST and LUNA.

g)    Luna Foundation Guard member, Three Arrows, via its co-founders Davies and Zhu, also made misleading statements regarding UST and the Anchor Protocol around the same time.  On March 17, 2022, Luna Foundation Guard member, Three Arrows via its co-founder Davies promoted UST, along with an implicit promotion of Anchor high interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield."[73]  Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stablecoin of significant size."[74]  In both instances Davies failed to also advise investors that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem.  In order to make these statements not misleading Davies was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

h)    On March 28, 2022, in an exchange on Twitter and in response to a direct criticism about the sustainability of TFL's algorithmic stablecoin, Kwon flatly denied that UST was unstainable, saying such claims were neither true nor well-informed.  In order to make these statements not misleading, Defendant Kwon should have (but did not) disclose that UST was not

---

[72]    *Id.*

[73]    *See* n.50, *supra*.

[74]    *See* n.51, *supra*.

as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

i)       On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX tokens to "help bolster its UST Decentralized Forex Reserve." Additionally, Defendant Platias stated that the purpose of the UST Reserve was "to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . .  By diversifying the base of non-correlated assets to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives."[75]   In order to make these statements not misleading, Davies was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Forex Reserve Fund.

**Materiality**

179.   The forgoing misrepresentations and omissions were each material.

180.   These misrepresentations and omissions related to: (i) the stability of the UST/LUNA algorithmic stablecoin pair, the Anchor Protol's yield rate, and the Terra ecosystem itself; (ii) the ability for the Luna Foundation Guard to defend and maintain the peg of UST/LUNA during periods of high volatility in the market; and (iii) the inability for TFL to support Anchor's yield rate the Anchor Yield Reserve fund.

181.   Information regarding whether approximately the founders and Company Individuals could, intended to, and did sell their UST/LUNA Tokens, as Defendants' own public statements illustrate, are material – and they had a significant impact on the market price and trading volume for LUNA Tokens.

---

[75]       *See* n.55, *supra*.

182.   If a reasonable investor knew that TFL and its insiders collectively could and intended to sell a substantial percentage of the UST/LUNA Tokens in the event of a death spiral of the algorithmic stablecoin, then that investor would reasonably expect the price of UST/LUNA Tokens to be significantly lower than if Defendants could not or did not intend to sell their UST/LUNA Tokens on and immediately following a collapse.  Indeed, Defendants' assurances that were continuing to hold their UST, LUNA, and other Terra Tokens reflect these Defendants' own admission of their materiality.  Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

**Scienter**

183.   Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

184.   As one of the members of the Luna Foundation Guard's Governing Council, Remi Tetot, explicitly admitted, all of the Defendants knew before the May 2022 collapse that the algorithmic stablecoin pair UST and LUNA, along with the Anchor Protocol, was entirely unstable and unsustainable.

185.   Defendants' failure to disclose such information demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of UST/LUNA Tokens at significant profits while the price was artificially inflated on and during the weeks and months that followed their respective launches.  These Defendants executed on that plan, too, by selling billions worth of LUNA Tokens on the market during that period.

186.   Defendants knew that they had sold UST/LUNA Tokens on the market on and in the months that followed their respective launches.  They likewise know that their current and former team members sold UST/LUNA Tokens.

187.   Defendants had the motive not to disclose these facts because such disclosure would have been self-defeating – it would have massively lowered the selling price of the UST

and LUNA Tokens and thus effectively precluded TFL from using it in conjunction with UST as its algorithmic pair, Luna and its insiders from generating the profit they subsequently made. Defendants had the opportunity thus to generate ill-gotten gains because they controlled the distribution of the- UST/LUNA Tokens to themselves and their insiders and the extent to which any restrictions would be placed on such tokens.

**Reliance, Economic Loss, and Loss Causation**

188.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the UST/LUNA Tokens upon issuance, and for a period of time thereafter, was artificially inflated.

189.    In ignorance of the fact that the price of UST /LUNA Tokens were artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the UST/LUNA Tokens were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statement, Plaintiff and the other Class members acquired LUNA Tokens at artificially high prices and were damaged thereby.

190.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with the respective purchases of LUNA Tokens and are entitled to an award compensating them for such damages.

191.    Indeed, the price of LUNA TOKENS dropped significantly as Defendants disclosed, and the market discovered, that:  (1) UST was not as "stable" as promoted; (2) the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and (3) that both the UST/LUNA algorithmic stablecoin pair and Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund:

(a)    The price of UST and LUNA Tokens dropped by 91% and 99.7% in a week when it was revealed that TFL's largest digital assets were unstable and unsustainable.

192.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class Members have suffered damages in connection with their purchase or acquisition of UST/LUNA Tokens during the Class Period.

193.   In addition, as a direct and proximate result of Defendants' wrongful conduct, Defendants has generated and retained ill-gotten in connection with the May 2022 collapse of UST/LUNA Tokens, such that Plaintiff and the other Class members are entitled to the disgorgement of Luna's ill-gotten gain from such misconduct.

**SECOND CAUSE OF ACTION**

**Unregistered Offering and Sale of Securities in
Violation of Sections 5 and 12(a)(1) of the Securities Act
(Against TFL and the Individual Defendants)**

194.   Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

195.   Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

196.   Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

197.   Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

198.   Plaintiff and members of the Class purchased Terra Token securities.

199.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

200.   SEC Rule 159A provides that, for purposes of §12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. §230.159A(a).  The

Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  TFL is an issuer of Terra Tokens.

201.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 647 (1988); *accord, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  TFL and the Controlling Defendants are all statutory sellers.

202.    By reason of the foregoing, TFL and the Individual Defendants violated §§5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

203.    As a direct and proximate result of TFL's and the Individual Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their Terra Token purchases.

## THIRD CAUSE OF ACTION

### Violation of Sections 15 of the Securities Act
### (Against all Defendants)

204.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference, each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

205.    This Count is asserted against TFL, the Luna Foundation, and Individual Defendants Platias and Kwon (collectively, the "Control Person Defendants") under §15 of the Securities Act, 15 U.S.C. §77o.

206.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act.  The

1    Control Person Defendants, and each of them, had the power and influence and exercised the same

2    to cause the unlawful offer and sale of Terra Tokens securities as described herein.

3           207.    The Control Person Defendants, separately or together, possess, directly or

4    indirectly, the power to direct or cause the direction of the management and policies of TFL and

5    the Luna Foundation Guard, through ownership of voting securities, by contract, subscription

6    agreement, or otherwise.

7           208.    The Control Person Defendants also have the power to direct or cause the direction

8    of the management and policies of TFL and the Luna Foundation Guard.

9           209.    The Control Person Defendants, separately or together, have sufficient influence to

10    have caused Terra Tokens and/or the Company to submit a registration statement.

11           210.    The Control Person Defendants, separately or together, jointly participated in

12    Luna's failure to register Terra Tokens.

13           211.    By virtue of the conduct alleged herein, the Control Person Defendants are liable

14    for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for

15    rescission and/or damages suffered.

16                                    **FOURTH CAUSE OF ACTION**

17                                    **Aiding and Abetting**

                                      **California Common Law**

18             **(Against the Luna Foundation Guard Defendants)**

19           212.    Plaintiff restates and realleges all preceding allegations above as if fully set forth

20    herein.

21           213.    Under California law, aiding and abetting requires not agreement, but simply

22    assistance.  The elements of aiding and abetting liability have cited the elements of the tort, as they

23    are set forth in the RESTATEMENT (SECOND) OF TORTS §876, and have omitted any reference to an

24    independent duty on the part of the aider and abettor.

25           214.    Under California law, '"[l]iability may . . . be imposed on one who aids and abets

26    the commission of an intentional tort if the person (a) knows the other's conduct constitutes a

27    breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

28    substantial assistance to the other in accomplishing a tortious result and the person's own conduct,

separately considered, constitutes a breach of duty to the third person.'" *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citations omitted).

215. "Unlike a conspirator, an aider and abettor does not 'adopt as his or her own' the tort of the primary violator. Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort." *Id.* at 1134 (footnote omitted; citation omitted).

216. The Luna Foundation Guard are sophisticated, well-capitalized venture capitalists, and, as such, knew or should have known that the marketing strategy employed by the TFL and the Individual Defendants for the Terra Tokens was unlawful, deceitful, fraudulent, and/or violated the terms of the California state statutes described in this Complaint.

217. By promoting the Terra Tokens on their social media platforms and through their reported conduct, the Luna Foundation Guard and its agents provided assistance that was a substantial factor causing the UST/LUNA Tokens' price to both surge and do so long enough to allow all Defendants to sell their Terra Tokens for huge profits at the expense of their followers and investors. Without the help of the Luna Foundation Guard's activities, TFL and the Individual Defendants would have been unable to use the misleading marketing strategy devised by Kwon, and Defendants would not have been able to commit the violations of federal securities laws and California state consumer protection statutes alleged herein.

218. As a direct and proximate result of Promotor Defendants' unlawful, unfair, and deceptive practices, Plaintiff and Class members suffered damages. TFL and the Individual Defendants' activities with the Luna Foundation Guard caused Plaintiff and the Class members to purchase and/or hold the Terra Tokens when they otherwise would not have done so.

219. Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Luna, to obtain monetary damages, restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California law.

**FIFTH CAUSE OF ACTION**

**Common Law Conspiracy**
**(Against All Defendants)**

220.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

221.     Beginning in April 2020, and continuously thereafter up to and including the date of the filing of the Complaint, the Individual Defendants and the agents and/or representatives of TFL did engage in the formation and operation of a conspiracy with the Luna Foundation Guard Defendants to misleadingly promote the Terra Tokens (in particular UST and LUNA Tokens) and Anchor Protocol to retail investors in order to artificially inflate the price and trading volume so that Defendants could sell their respective Terra Tokens for substantial profits.

222.     As alleged above, each Defendant acted in furtherance of the conspiracy by, among other things, falsely promoting the Terra Tokens as sound investments with significant stability, sustainability, and growth potential while, in truth, the Defendants were selling their Terra Tokens for substantial profits without disclose the risk to investors.

223.     As a proximate result of said conspiracy, as described in the foregoing paragraphs, Plaintiff suffered, continues to suffer, and will suffer in the future, the damages alleged herein.

224.     For Defendants' conduct in the alleged conspiracy, Plaintiff seeks compensatory damages against all Defendants, and each of them, jointly and severely, in an as-yet undetermined amount; punitive damages, injunctive relief enjoining Defendants from continuing to falsely and misleadingly promote the Terra Tokens; and divestiture of all money wrongfully obtained, whether directly or indirectly, as part of the alleged conspiracy.

**SIXTH CAUSE OF ACTION**

**Violation of the Racketeer Influenced**
**and Corrupt Organizations Act ("RICO")**
**18 U.S.C. §§1961, *et seq*.**
**(Against all Defendants)**

225.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

CLASS ACTION COMPLAINT

226.     This claim is brought on behalf of the class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. §1964 for violations of 18 U.S.C. §1962, *et seq.*  Defendants are "person[s]" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

227.     Plaintiff and the members of the Class are each "persons," as that term is defined in 18 U.S.C. §1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

**The TerraTerra Token Enterprise**

228.     Under 18 U.S.C. §1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

229.     Defendants formed such an association-in-fact enterprise, namely, the Terra Token Enterprise that included Kwon and Platias, along with TFL and the Luna Foundation Guard (and their respective agents).  For the purpose of this claim, these Defendants are collectively referred to as the "RICO Defendants."

230.     The Terra Token Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. §1961(3) that created and maintained systematic links for a common purpose: to ensure that the RICO Defendants could sell off their Terra Token holdings to retail investors at artificially inflated prices without their fraud being detected.

231.     To accomplish this purpose, the Terra Token Enterprise periodically and systematically promoted the Terra Tokens – either affirmatively or through half-truths and omissions – to retail investors, including Plaintiff and the Class, that the Terra Tokens had real utility (as opposed to pure speculation).  The Terra Token Enterprise concealed from investors, like Plaintiff and the Class members, that the Terra Tokens were not the sound investment that the RICO Defendants claimed.  This scheme of the Terra Token Enterprise translated into increased

volume and more Terra Token investors buying at artificially inflated prices (and therefore, more profits) for the RICO Defendants.

232. The persons engaged in the Terra Token Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the Individual Defendants and the Luna Foundation Guard. There is regular communication between the RICO Defendants, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which RICO Defendants share information regarding various timing and content of promotional activities for the Terra Tokens. The RICO Defendants through their administration, funding, and execution of the scheme to misleadingly market the Terra Tokens each functioned as a continuing unit for the purposes of implementing, respectively, the Terra Token pump and dump scheme and, as set forth above, when issues arise during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

233. At all relevant times, Individual Defendants were aware of the conduct of TFL and the Luna Foundation Guard, were knowing and willing participants in that conduct, and reaped profits from that conduct. Individual Defendants concealed the members of the TFL leadership and founding team, which allowed the unidentified co-conspirators to sell their portion of the Float without any scrutiny or complaint. Individual Defendants represented to investors that UST/LUNA had staying power, long term value, and tremendous growth potential. But they knew that the conduct of the Luna Foundation Guard was artificially inflating the price of the Terra Tokens. Individual Defendants also knew, but did not disclose, that both the trading volume and price action for the Terra Tokens would plummet if the promotional activities ceased. The Luna Foundation Guard and TFL also knew that their promotional activities artificially caused spikes in the Terra Token price and trading volume, but likewise would not disclose the fraud. By failing to disclose this information, the RICO Defendants perpetuated the Terra Token Enterprise's scheme, and reaped substantial profits.

234. During the time that the Terra Tokens were being launched and first publicly marketed to retail investors it, the Individual Defendants were aware of the promotional activities

of the Luna FoundationGuard, were knowing and willing participants in that conduct, and reaped profits from that conduct.  The Individual Defendants knew that using misleading marketing would result in lawsuits and even criminal charges.  Accordingly, the Individual Defendants concealed the identities of the TFL insiders in order to escape detection and punishment for their participation in the Terra Token Enterprise.  The RICO Defendants knew, but did not disclose, that they were promoting the Terra Tokens, then turning around and selling off their holdings as retail investors, like Plaintiff and the Class members, were buying in.  The Individual Defendants and TFL knew, but did not disclose, that they were allowing the Luna Foundation Guard to engage in this fraud to the detriment of retail investors.

235.    The RICO Defendants participated in the conduct of the Terra Token Enterprise, sharing the common purpose of inflating the price and trading volume of Terra Tokens in order to sell their respective portion of the Float for substantial profit, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. §1341, and multiple instances of wire fraud in violation of 18 U.S.C. §1343.  In the Terra Token Enterprise, the RICO Defendants knowingly made material misstatements to retail investors in furtherance of the fraudulent scheme regarding:

a.    the ownership interests and identities of the TFL founders and insiders;

b.    the timing and amount of Terra Token sales made by the RICO Defendants; and

c.    the RICO Defendants' intent to sell their Terra Tokens after artificially inflating the price.

236.    The Individual Defendants and TFL alone could not have accomplished the purpose of the Terra Token Enterprise without the assistance of the Luna Foundation Guard.  For the Individual Defendants and TFL to profit from the scheme, the Luna Foundation Guard needed to use their influence to mislead investors into buying the Terra Tokens.  And the Luna Foundation Guard Defendants did so.  They then, through misrepresentations and failures to disclose material information, failed to disclose to investors that the Defendants were simultaneously selling their

Terra Tokens at inflated prices.  Without these misrepresentations, the Terra Token Enterprise could not have achieved its common purpose.

237.    The Terra Token Enterprise engaged in and affected interstate commerce because, *inter alia*, it created the Terra Tokens that were paid for by thousands of Class members throughout the United States.

238.    The foregoing evidences that the RICO Defendants were each willing participants in the Terra Token Enterprise, that the Terra Token Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through the Individuals' creation of the Terra Tokens, coupled with the Luna Foundation Guard's misleading promotion of the Terra Tokens.

239.    During the Relevant Period, the RICO Defendants exerted control over the Terra Token Enterprise and participated in the operation or management of the affairs of the Terra Token Enterprise, directly or indirectly, in the following ways:

        a.      Controlling the burning and minting processes and mechanisms for the UST and LUNA liquidity pool;

        b.      The RICO Defendants concealed the identities of the leadership team behind TFL in order to get away with improperly promoting the Terra Tokens to investors;

        c.      The RICO Defendants concealed that they were causing the Terra Token price to artificially inflate in order to allow themselves to sell off their respective Terra Token holdings at that inflated price; and

        d.      The Individual Defendants and TFL expected and intended that the Luna Foundation Guard Defendants would (and did) distribute through the U.S. Mail and interstate wire facilities, communications that failed to disclose that the RICO Defendants were pumping up price and trading volume of Terra Tokens artificially.

240.    The scheme had a hierarchical decision-making structure that was headed by the Individual Defendants and TFL.  They controlled the minting of the Terra Tokens and directed the Luna Foundation Guard Defendants to misleadingly promote the Terra Tokens to their social media audiences.

241.    The scheme devised and implemented by the RICO Defendants, as well as other members of the Terra Token Enterprise, amounted to a common course of conduct intended to (a) allow the RICO Defendants to artificially inflate the price of and trading volume for the Terra Tokens; and (b) sell their respective portion of the Float for a profit at the expense of Plaintiff and the Class members.

**RICO Defendants' Pattern of Racketeering Activity**

242.    The RICO Defendants conducted and participated in the conduct of the affairs of the Terra Token Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud.  The pattern of racketeering activity by the Terra Token Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful HSP pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §1961(5), through which the RICO Defendants intended to defraud Plaintiff, members of the Class, and other intended victims.

243.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the class.  The RICO Defendants calculated and intentionally crafted the Terra Token Enterprise to ensure their own profits remained high, without regard to the effect such behavior had on Plaintiff and members of the Class who would were buying the Terra Tokens at artificially inflated prices.

244.    By intentionally and artificially inflating the Terra Token prices, and then subsequently failing to disclose such practices to the investors, the RICO Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

245.    The pattern of racketeering activity alleged herein was continuing until June 27, 2021.

**The RICO Defendants' Use of the U.S. Mail and Interstate Wire Facilities**

246.    The Terra Token Enterprise engaged in and affected interstate commerce because it transmitted and published false and misleading information concerning the growth potential for Terra across state lines.

247.    During the Class Period, the Terra Token Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. Mail and interstate wire facilities.

248.    The nature and pervasiveness of the fraudulent token promotion scheme, which was orchestrated by Individual Defendants, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

249.    Many of the precise dates of the Terra Token Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Individual Defendants' or the Luna Foundation Guard Defendants.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.  However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiff describes this below.

250.    The RICO Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the Class Period including, *inter alia*:

       a.    Communications on official TFL, Luna Foundation Guard, and Anchor Protocol accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiff and Class members purchased Terra Tokens;

       b.    Written representations and telephone calls between Defendants regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

CLASS ACTION COMPLAINT

c.      Written representations and telephone calls between any of the RICO Defendants and any cryptocurrency exchanges regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

d.      Written representations and telephone calls between the RICO Defendants and the moderators of the TFL, Luna Foundation Guard, and Anchor Protocol social media accounts regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

e.      Emails between the Defendants agreeing to or effectuating the implementation of the Terra Token fraud scheme;

f.      Written and oral communications directed to retail investors that fraudulently misrepresented the growth potential for the Terra Tokens that were designed to conceal the scheme and deter investigations into the Terra Token Enterprise; and

g.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities – the wrongful proceeds of the scheme.

251.    In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendants would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that the Terra Token price was fraudulently inflated.

**Motive and Common Purpose**

252.    The RICO Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that they could sell off their portion of the Float for grossly inflated prices.  Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity.

**Damages Caused by the RICO Defendants' Marketing Fraud**

253.    The RICO Defendants violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff and Class members to be financially injured as a result of purchasing the Terra Tokens.

254.    As described above, when the RICO Defendants executed the Terra Token promotional scheme, the result was an artificial increase in both price and trading volume of the Terra Tokens and Anchor protocol, respectively.  When the Terra Token price and trading volume is artificially inflated, investors like Plaintiff and the Class overpay due to a fraudulent price.

255.    Plaintiff's injuries, and those of the Class members, were proximately caused by the RICO Defendants' racketeering activity.  But for the misleading statements and omissions made by the RICO Defendants, Plaintiff and others similarly situated would have paid less for the Terra Tokens.

256.    Plaintiff's injuries were directly caused by the RICO Defendants' racketeering activity.  The RICO Defendants' racketeering activity inflated the Terra Token price, which was ultimately paid for by Plaintiff and the other Class members.

257.    Plaintiff and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the RICO Defendants' fraudulent scheme.

258.    By virtue of these violations of 18 U.S.C. §1962(c), the RICO Defendants are liable to Plaintiff for three times the damages he has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### SEVENTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, in the Alternative)**
**(Against All Defendants)**

259.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

260.    Plaintiff and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Terra Tokens, which allowed Defendants to sell their Terra Tokens to Plaintiff and Class members at inappropriately and artificially inflated prices.

261.    Defendants received a financial benefit from the sale of their Terra Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiff and members of the Class.

262.    Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the Terra Tokens and the price those Terra Tokens sold for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.    Appoint Plaintiff as a representative of the Class and his counsel as Class counsel;

C.    Declare that TFL and Individual Defendants offered and sold unregistered securities in violation of §§5(a), 12(a), and 15 of the Securities Act;

D.    Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

E.    Award post-judgment interest on such monetary relief;

F.    Grant appropriate injunctive and/or declaratory relief;

G.    Award reasonable attorneys' fees and costs; and

H.    Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED:  June 17, 2022          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ *John T. Jasnoch*
John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sean T. Masson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
smasson@scott-scott.com

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Nick Patterson, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this matter and authorize Scott+Scott Attorneys at Law LLP to file lead plaintiff papers on my behalf.

2.      I am willing to serve as a representative party on behalf of those who purchased or otherwise acquired unregistered LUNA and UST tokens and other Terra ecosystem securities during the Class Period (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

3.      During the Class Period, I purchased and/or sold the securities that are the subject of the Complaint, as set forth in the Attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934.

5.      I have not sought to serve as a representative party on behalf of a class in the 3-year period preceding the date on which this certification is signed.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at _____ on _____, 2022.

DocuSigned by:

*nick patterson*

869768BA70364EB...

_____
Nick Patterson

**SCHEDULE A OF TRANSACTIONS**

| Date | Transaction | Asset | Amount | Price Per Token/ SWAP Cost | Dollar Estimate |
|---|---|---|---|---|---|
| 1/31/2022 | Buy | LUNA | 3.99 | $51.97 | $207.40 |
| 3/4/2022 | Buy | LUNA | 8 | $91.03 | $728.30 |
| 3/5/2022 | Buy | LUNA | 2.89 | $82.44 | $238.27 |
| 3/5/2022 | Buy | LUNA | 5 | $82.37 | $411.87 |
| 3/5/2022 | Buy | LUNA | 16.1 | $87.14 | $1,403.01 |
| 3/5/2022 | Swap | UST | 1058.92 | 13 LUNA | $1,058.93 |
| 3/5/2022 | Swap | aUST | 414.77 | 500 UST | $500.00 |
| 3/5/2022 | Swap | ANC | 50.79 | 278.25 UST | $278.25 |
| 3/5/2022 | Swap | ANC-UST_LP | 58.78 | 50.79 ANC | $278.25 |
| 3/5/2022 | Swap | ANC-UST_LP | 58.78 | 277.41 UST | $278.25 |
| 3/5/2022 | Swap | UST | 657.96 | 8.11 LUNA | $657.97 |
| 3/5/2022 | Swap | XDEFI | 223.23 | 162.73 UST | $162.74 |
| 3/5/2022 | Swap | XDEFI-UST_LP | 928.09 | 223.23 XDEFI | $162.74 |
| 3/5/2022 | Swap | XDEFI-UST_LP | 928.09 | 162.26 UST | $162.74 |
| 3/5/2022 | Swap | aUST | 276.23 | 333 UST | $333.00 |
| 3/5/2022 | Swap | UST | 1374.09 | 16 LUNA | $1,374.09 |
| 3/5/2022 | Swap | MINE | 3118.85 | 150.22 UST | $150.22 |
| 3/5/2022 | Swap | MINE-UST_LP | 341.12 | 3118.85 MINE | $150.22 |
| 3/5/2022 | Swap | MINE-UST_LP | 341.12 | 149.77 UST | $150.22 |
| 3/5/2022 | Swap | aUST | 580.43 | 700 UST | $700.00 |
| 3/10/2022 | Buy | LUNA | 40 | $101.50 | $4,060.24 |
| 3/10/2022 | Buy | LUNA | 16 | $96.49 | $1,543.97 |
| 3/10/2022 | Swap | aUST | 307.77 | 372 UST | $372.00 |
| 3/10/2022 | Swap | UST | 3976.02 | 40.27 LUNA | $3,976.02 |
| 3/10/2022 | Swap | aUST | 3288.35 | 3976 UST | $3,976.00 |
| 3/15/2022 | Swap | UST | 500 | 412.42 aUST | $500.00 |
| 3/15/2022 | Swap | LUNA | 5.42 | 500 UST | $500.00 |
| 3/18/2022 | Swap | UST | 12.48 | 13 APOLLO | $12.49 |
| 3/18/2022 | Swap | aUST | 9.58 | 11.63 UST | $11.63 |
| 3/18/2022 | Reward | LUNA | 0.0022 | -- | $0.19 |
| 3/20/2022 | Swap | UST | 505 | 415.34 aUST | $505.00 |

| 3/20/2022 | Swap | UST | 6.01 | 6.1 APOLLO | $6.02 |
|---|---|---|---|---|---|
| 3/20/2022 | Swap | LUNA | 1.04 | 95 UST | $95.00 |
| 3/21/2022 | Swap | UST | 1511.19 | 16 LUNA | $1,511.20 |
| 3/21/2022 | Swap | UST | 586.14 | 34.67 mVIXY | $586.15 |
| 3/21/2022 | Swap | mVIXY | 32.34 | 550 UST | $550.00 |
| 3/21/2022 | Swap | UST-mVIXY_LP | 62.52 | 542.60 UST | $542.61 |
| 3/21/2022 | Swap | UST-mVIXY_LP | 62.52 | 32 mVIXY | $542.61 |
| 3/21/2022 | Swap | aUST | 674.77 | 820.72 UST | $820.72 |
| 3/21/2022 | Swap | UST | 7.59 | 7.37 APOLLO | $7.60 |
| 3/24/2022 | Buy | LUNA | 20 | $95.84 | $1,916.99 |
| 3/24/2022 | Swap | UST | 1881.24 | 19.99 LUNA | $1,881.24 |
| 3/24/2022 | Swap | aUST | 1530.45 | 1864.01 UST | $1,864.01 |
| 3/24/2022 | Swap | MINE | 190.36 | 10.01 UST | $10.01 |
| 3/24/2022 | Swap | MINE-UST_LP | 21.74 | 190.36 MINE | $10.01 |
| 3/24/2022 | Swap | MINE-UST_LP | 21.74 | 9.98 UST | $10.01 |
| 3/25/2022 | Reward | LUNA | 0.0061 | -- | $0.57 |
| 4/4/2022 | Swap | aUST | 4.26 | 5.22 UST | $5.23 |
| 4/11/2022 | Swap | UST | 6.88 | 4.97 APOLLO | $6.88 |
| 4/11/2022 | Swap | UST | 12.36 | 9.10 APOLLO | $12.37 |
| 4/11/2022 | Swap | aUST | 487.84 | 600 UST | $600.00 |
| 4/11/2022 | Swap | LUNA | 0.18 | 9.53 MIR | --- |
| 4/12/2022 | Buy | LUNA | 15 | $86.25 | $1,293.78 |
| 4/12/2022 | Swap | bLUNA | 7.5 | 7.5 LUNA | --- |
| 4/12/2022 | Swap | bLUNA-LUNA_LP | 3.71 | 7.5 BLUNA | --- |
| 4/12/2022 | Swap | BLUNA-LUNA_LP | 3.71 | 7.41 LUNA | --- |
| 4/15/2022 | Reward | LUNA | 0.0061 | -- | $0.50 |
| 4/20/2022 | Buy | LUNA | 2.1 | $94.45 | $198.35 |
| 4/20/2022 | Swap | UST | 196.77 | 2.1 LUNA | $196.77 |
| 4/20/2022 | Swap | UST | 7.79 | 5.31 APOLLO | $7.79 |
| 4/20/2022 | Swap | aUST | 163.77 | 202.40 UST | $202.41 |

| 4/22/2022 | Reward | LUNA | 0.0061 | -- | $0.57 |
| 4/25/2022 | Buy | LUNA | 5 | $96.53 | $482.69 |
| 4/27/2022 | Swap | UST | 6.31 | 3.77 APOLLO | $6.31 |
| 4/27/2022 | Swap | UST | 43.80 | .5 LUNA | $43.80 |
| 4/27/2022 | Swap | WHALE | 526.01 | 48.62 vUST | --- |
| 4/27/2022 | Swap | vUST | 39.05 | 425 WHALE | --- |
| 4/27/2022 | Swap | UST | 40.72 | 32.83 vUST | $40.72 |
| 4/27/2022 | Swap | UST | 200 | 161.2 aUST | $200.00 |
| 4/28/2022 | Swap | UST | 556.23 | 62.52 UST-mVIXY_LP | $556.24 |
| 4/28/2022 | Swap | mVIXY | 31.68 | 62.52 UST-mVIXY_LP | $556.24 |
| 4/28/2022 | Swap | UST | 10.60 | 9.02 MIR | $10.60 |
| 4/28/2022 | Swap | UST | 560.48 | 32.02 mVIXY | $560.49 |
| 4/28/2022 | Swap | vUST | 6736.15 | 8365.72 UST | $8,365.72 |
| 4/29/2022 | Buy | UST | 497.58 | $1.0048 | $500 |
| 4/29/2022 | Reward | LUNA | 0.0061 | --- | $0.52 |
| 4/29/2022 | Swap | mVIXY | 0.57 | 10 UST | $10.00 |
| 4/29/2022 | Swap | mVIXY | 0.57 | 10 UST | $10.00 |
| 5/3/2022 | Swap | ASTRO | 8.06 | 25 UST | $25.00 |
| 5/4/2022 | Swap | mETH | 0.0154 | 50 UST | $50.00 |
| 5/4/2022 | Swap | aUST | 804.714 | 1002 UST | $1002 |
| 5/4/2022 | Swap | aUST | 1591.76 | 1982 UST | $1982 |
| 5/5/2022 | Buy | UST | 11,624.31 | $0.9956 | $11,675 |
| 5/6/2022 | Reward | LUNA | 0.0061 | --- | $0.49 |
| 5/8/2022 | Swap | mBTC | 0.000848 | 35 UST | -- |
| 5/11/2022 | Buy | LUNA | 60 | $7.86 | $471.77 |
| 5/12/2022 | Swap | UST | 1251.30 | 1001.39 vUST | -- |
| 5/12/2022 | Swap | UST | 7184 | 5749.18 aUST | -- |
| 5/12/2022 | Swap | UST | 1.58 | 5.57 APOLLO | -- |
| 5/12/2022 | Swap | UST | 0.83 | 1.75 LUNA | -- |
| 5/12/2022 | Swap | UST | 5.08 | 9.9 APOLLO | -- |
| 5/12/2022 | Swap | UST | 45.07 | 0.015464 mETH | -- |

| 5/12/2022 | Swap | UST | 30.86 | 0.000848 mBTC | -- |
|---|---|---|---|---|---|
| 5/12/2022 | Swap | UST | 2994 | 2396.03 aUST | -- |
| 5/12/2022 | Swap | mETH | 1.00568 | 2986.07 UST | -- |
| 5/12/2022 | Sell | UST | 12,121.90 | $0.4566 | $5,534.93 |
| 5/13/2022 | Reward | LUNA | 0.0061 | --- | <$0.01 |
| 5/14/2022 | Swap | ANC | 145.08 | 61.42 ANC-UST_LP | -- |
| 5/14/2022 | Swap | UST | 110.58 | 61.42 ANC-UST_LP | -- |
| 5/14/2022 | Swap | UST | 110.58 | 145.08 ANC | -- |
| 5/14/2022 | Swap | MINE | 6498.90 | 417.03 MINE-UST_LP | -- |
| 5/14/2022 | Swap | UST | 107.80 | 417.03 MINE-UST_LP | -- |
| 5/14/2022 | Swap | UST | 107.47 | 6498.9 MINE | -- |
| 5/14/2022 | Swap | XDEFI | 159.93 | 1084.66 XDEFI-UST_LP | -- |
| 5/14/2022 | Swap | UST | 314.59 | 1084.66 XDEFI-UST_LP | -- |
| 5/14/2022 | Swap | UST | 313.55 | 159.93 XDEFI | -- |
| 5/14/2022 | Swap | UST | 1.25 | 6.66 APOLLO | -- |
| 5/14/2022 | Swap | UST | 0.009 | 0.01 ANC | -- |
| 5/14/2022 | Swap | UST | 2.16 | 1.17 MIR | -- |
| 5/14/2022 | Swap | UST | 22.55 | 1.14 mVIXY | -- |
| 5/14/2022 | Swap | bETH | 0.035674 | 635.71 UST | -- |
| 5/14/2022 | Swap | bETH | 0.0348 | 700 UST | -- |
| 5/14/2022 | Swap | kUST | 1497.41 | 0.070528 bETH | -- |
| 5/14/2022 | Swap | UST | 1404.67 | 1497.41 kUST | -- |
| 5/14/2022 | Swap | bETH | 0.004653 | 100 UST | -- |
| 5/14/2022 | Swap | bETH | 0.32206 | 7000 UST | -- |
| 5/14/2022 | Swap | wETH | 0.003271 | 60 UST | -- |

| 5/14/2022 | Swap | kUST | 6030.94 | 0.326713 bETH | -- |
|---|---|---|---|---|---|
| 5/14/2022 | Swap | UST | 5657.10 | 6030.94 kUST | -- |
| 5/14/2022 | Swap | bETH | 0.043317 | 700 UST | -- |
| 5/14/2022 | Swap | ANC | 428.33 | 500 UST | -- |
| 5/14/2022 | Swap | bETH | 0.293131 | 4500 UST | -- |
| 5/14/2022 | Swap | bETH | 0.035723 | 428.33 ANC | -- |
| 5/14/2022 | Swap | UST | 5271.24 | 0.372171 bETH | -- |
| 5/14/2022 | Swap | ANC | 72.48 | 100 UST | -- |
| 5/14/2022 | Swap | bETH | 0.007863 | 100 UST | -- |
| 5/14/2022 | Swap | bETH | 0.000722 | 10 UST | -- |
| 5/14/2022 | Swap | kUST | 2125.51 | 2000 UST | -- |
| 5/14/2022 | Swap | mETH | 0.724003 | 2000 UST | -- |
| 5/14/2022 | Swap | bETH | 0.153702 | 0.724003 mETH | -- |
| 5/14/2022 | Swap | ANC | 1450.13 | 0.154474 bETH | -- |
| 5/14/2022 | Swap | UST | 1.03 | 2.01 ASTRO | -- |
| 5/14/2022 | Swap | UST | 2022.16 | 2125.51 kUST | -- |
| 5/14/2022 | Swap | bETH | 0.203191 | 3050 UST | -- |
| 5/14/2022 | Swap | ANC | 1909.33 | 0.203191 bETH | -- |
| 5/14/2022 | Swap | UST | 5260.03 | 3431.95 ANC | -- |
| 5/14/2022 | Swap | bETH | 0.006806 | 100 UST | -- |
| 5/14/2022 | Swap | ANC | 33.36 | 50 UST | -- |
| 5/14/2022 | Swap | UST | 100.11 | 0.006806 bETH | -- |
| 5/14/2022 | Swap | UST | 49.02 | 33.36 ANC | -- |
| 5/14/2022 | Swap | UST | 33.13 | 0.003271 wETH | -- |
| 5/14/2022 | Swap | mETH | 0.211441 | 600 UST | -- |
| 5/14/2022 | Swap | bETH | 0.040938 | 0.211411 mETH | -- |
| 5/14/2022 | Swap | kUST | 622.92 | 0.040938 bETH | -- |
| 5/14/2022 | Swap | ANC | 399.87 | 622.92 kUST | -- |
| 5/14/2022 | Swap | bETH | 0.015176 | 150 ANC | -- |
| 5/14/2022 | Swap | bETH | 0.009901 | 100 ANC | -- |

| 5/14/2022 | Swap | UST | 379.86 | 0.025077 bETH | -- |
|---|---|---|---|---|---|
| 5/14/2022 | Swap | ANC | 295 | 445 UST | -- |
| 5/14/2022 | Swap | bETH | 0.041626 | 444.88 ANC | -- |
| 5/14/2022 | Swap | UST | 659.40 | 0.041626 bETH | -- |
| 5/14/2022 | Swap | ANC | 430.90 | 660 UST | -- |
| 5/14/2022 | Swap | bETH | 0.039925 | 430.9 ANC | -- |
| 5/14/2022 | Swap | UST | 634.60 | 0.039925 bETH | -- |
| 5/14/2022 | Swap | ANC | 398.88 | 600 UST | -- |
| 5/14/2022 | Swap | bETH | 0.038109 | 398.88 ANC | -- |
| 5/14/2022 | Swap | UST | 565.31 | 0.038109 bETH | -- |
| 5/14/2022 | Swap | ANC | 375.38 | 550 UST | -- |
| 5/14/2022 | Swap | bETH | 0.036111 | 375.38 ANC | -- |
| 5/14/2022 | Swap | UST | 517.61 | 0.036111 bETH | -- |
| 5/14/2022 | Swap | LUNA | 3466.59 | 10 UST | -- |
| 5/14/2022 | Swap | LUNA | 189119.6 | 550 UST | -- |
| 5/20/2022 | Reward | LUNA | 0.0061 | --- | <$0.01 |