# EXHIBIT D

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
COMPLEX BUSINESS LITIGATION DIVISION

......................................................................./

JASON CYRULNIK,

        Plaintiff,

   v.

KYLE ROCHE, DEVIN FREEDMAN,
AMOS FRIEDLAND, NATHAN HOLCOMB
EDWARD NORMAND, and ROCHE
CYRULNIK FREEDMAN LLP (a/k/a
ROCHE FREEDMAN LLP),

        Defendants.

......................................................................./

## VERIFIED COMPLAINT

Plaintiff Jason Cyrulnik, for his Verified Complaint against defendants Kyle Roche,

Devin Freedman, Amos Friedland, Nathan Holcomb and Edward Normand (the "Individual

Defendants") and Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP) ("RCF" or the

"Firm," and together with the Individual Defendants, "Defendants"), upon knowledge as to

Cyrulnik and otherwise upon information and belief, alleges as follows:

## INTRODUCTION

1.     This action to dissolve a Florida law firm arises from a deplorable scheme

orchestrated by two lawyers, Roche and Freedman, to illegally oust Cyrulnik from the firm they

jointly founded, RCF, so that they could try to take for themselves his rightful share of the Firm,

including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the

Firm's clients that only days before had suddenly appreciated exponentially to more than $250

million.  The Firm's governing agreement expressly prohibits the removal of a Founding Partner

without cause, so Roche and Freedman, together with certain other partners they secretly

recruited to their scheme, concocted an absurd and purely pretextual "cause" — their principal claim was that Cyrulnik had raised his voice during two telephone conversations months earlier — and then, jeopardizing his ability to represent his clients in active ongoing litigation, they cut his access to the Firm's client files, emails, electronic systems and bank accounts, and terminated his and his family's access to the Firm's health insurance.

2.      What makes Defendants' greedy and unlawful scheme even more egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who had spent months convincing Cyrulnik, a highly accomplished lawyer with a long-standing, robust and growing practice, to leave his equity partnership at a prominent national law firm to transform their fledgling firm into a stable and respected litigation practice.  They convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Defendants are now trying to deprive him of.

3.      Roche, who graduated law school in 2016, and Freedman, who graduated in 2012, had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF").  Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm focusing on cryptocurrency and other specialized practice areas.  Shortly thereafter, realizing that they needed an experienced lawyer with an established and successful practice and cash flow to fund the firm's operations and help procure lead counsel appointments in their class-action cases, they approached Cyrulnik about his leaving BSF to join their firm.  After fifteen years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to found a new law firm with Roche and Freedman in January 2020.  As the Individual Defendants knew, in doing so,

2

Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing lucrative offers to join other national law firms.  As the Individual Defendants also knew, Cyrulnik did so in reliance on the negotiated and unambiguous terms of the new Firm's governing agreement that provided him with fixed and guaranteed significant equity interests in the new Firm's contingency and alternative fee matters, with substantial financial upside.

4.     Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases, and his practice, which Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

5.     Then, in late January 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and in just a few days' time in February 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

6.     The Individual Defendants seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the cryptocurrency and keep it for themselves.  To circumvent the hurdle that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency, Roche and Freedman manufactured transparently false reasons to remove him for "cause" — centered on his allegedly raising his voice on two phone calls concerning certain questionable actions Roche and Freedman (and two other partners) had taken that threatened to endanger the Firm — and then argued that Cyrulnik was suddenly no longer entitled to the guaranteed equity and cryptocurrency interests expressly granted to him by the

3

parties' agreement.  They then invited handpicked partners, the other Individual Defendants, to a

secret meeting, and excluded anyone they knew would not participate in their improper scheme,

at which meeting these co-conspirators held a self-serving "vote" to "remove" him from the

Firm.  They then took the position that Cyrulnik was no longer entitled to the cryptocurrency and

other interests expressly granted to him by the parties' agreement – even though nothing in the

agreement provides for such a forfeiture.

7.      Defendants' unconscionable misconduct is in flagrant violation of their

contractual, fiduciary and ethical duties to Cyrulnik and their professional responsibilities to the

Firm's clients.  Cyrulnik's conduct was consistently exemplary, in contrast to several Individual

Defendants (whose missteps Cyrulnik was addressing in the very discussions about which they

now complain and seek to use as the purported basis for their scheme), including with respect to

Roche's lax attitude toward timekeeping and billing practices and Freedman's problematic

referral-fee arrangements with other firms.

8.      Accordingly, Cyrulnik brings this action seeking, among other things, dissolution

of the Firm and distribution of its assets in accordance with Florida law and the parties'

unambiguous governing agreement and recovery of the damages Defendants' egregious conduct

has caused.

## **THE PARTIES**

9.      Plaintiff Jason Cyrulnik is a citizen of New Jersey and a co-founding named

equity partner of RCF.

10.     Defendant RCF is a Florida limited liability partnership, with offices in Miami,

Florida and New York, New York.

11.     Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

12.     Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

13.     Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

14.     Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

15.     Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

## **JURISDICTION**

16.     This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees and costs.

17.     This Court has personal jurisdiction over Defendants because Defendant RCF is a Florida limited liability partnership, registered in Florida and with an office in Florida; the Individual Defendants are equity partners of RCF, a Florida limited liability partnership; this dispute arises out of the internal affairs of a Florida limited liability partnership (of which the Individual Defendants are equity partners); and Defendant Freedman is a citizen of Florida.

18.     Venue is proper pursuant to Chapter 47 of the Florida Statutes because RCF is a Florida limited liability partnership that is registered in Florida with an address in Miami-Dade County; RCF's principal place of business is in Miami-Dade County; and Defendant Freedman resides in Miami-Dade County.

## FACTS

I. **DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FOREGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

A. **Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF**

19.    Cyrulnik graduated Yale Law School in 2004 and joined BSF.  With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

20.    Cyrulnik rose through the ranks quickly.  He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

21.    Cyrulnik's steadfast commitment to clients generated a substantial following and client base.  He has led bet-the-company litigations for a growing base of core clients for almost a decade.  He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

22.    He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly.  He mentored associates, brought in partners in to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

23.    Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters.  Particularly in 2019, Cyrulnik was aggressively recruited by several major national law firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

B. **Roche And Freedman Recruit Cyrulnik To Join RCF**

24.    In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP.  Roche was a third-year associate who had expertise in the

cryptocurrency space.  Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel.  Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

25.     Cyrulnik had interacted with both Roche and Freedman at BSF.  Indeed, Freedman regularly sought advice from Cyrulnik during 2019 about case management, legal strategy and general guidance as Freedman embarked on his new venture.

26.     During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman.  Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate platform (in quality and size) to service his growing client base, which was his top priority.

27.     Freedman continued to press over the course of several months, ultimately bringing Roche into the conversation.  The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many client's needs.  Roche and Freedman promised Cyrulnik significant stakes in their contingency work and in certain assets that they had secured in exchange for his agreement to leave BSF to co-found a firm with them.  The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue that would help finance Roche and Freedman's contingency and alternative fee arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

7

28.     After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to co-found the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

C.     **The Parties Negotiate And Execute The MOU**

29.     On December 27, 2019, RCF's founding partners — named partners Cyrulnik, Roche and Freedman, together with Defendants Friedland, Holcomb and Normand (defined in the MOU as the "Founding Partners") — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

30.     Section II of the MOU sets forth the partners' equity positions in the Firm.  In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%).  Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies for revenue earned through hourly and contingency matters.  Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

31.     Section IV of the MOU lists a series of "assets" that were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched), excludes those assets from the Compensation Model, and instead sets forth the agreed-upon fixed allocations of those assets to the Founding Partners in different formulas and percentages that varied by asset.

32.     One of the key assets allocated in the MOU was cryptocurrency (referred to as "Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the

"Startup Client"), had conveyed to Roche Freedman LLP (and then RCF) in payment for the

Firm's representation of that client.  The MOU expressly granted each of the Founding Partners a

fixed allocation of the Tokens, as follows:  Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and

Normand, Friedland, and Holcomb, 5% each.

33.     Section VI of the MOU addresses the management of the Firm.  In particular, the

parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

34.     The MOU has two separate provisions governing the departure of a partner from

the Firm.  The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who

voluntarily elects to withdraw from the Firm within 18 months would have his or her

compensation limited to the amount to which he or she would have been entitled under the

Compensation Model, and would be required to return his or her equity in the Firm to the other

equity partners.

35.     The second, Section VI(G), entitled "Partner Removal," expressly provides that a

"Founding Partner cannot be removed without cause" and that removal of a Founding Partner

requires an affirmative vote of at least two-thirds of the Firm's equity partners.  In contrast to the

voluntary withdrawal provision, however, such an involuntary removal (for "cause") does not

result in the forfeiture of any compensation, interests or assets owed or allocated to the Founding

Partner under the MOU.

36.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate

agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter,"

attached as Exhibit B).  Given his reputation, seniority, and equity stake in the new Firm,

Cyrulnik was the natural choice for the "first-named" partner.  But Roche — consumed with

securing that recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be

listed as the first named partner at RCF.  The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model.  Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

37.     In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

      a.     27% of the Firm's equity, which could not be diminished at any time without his consent;

      b.     25% of the cryptocurrency Tokens from the Firm's Startup Client;

      c.     a 25% interest in a specified contingency matter; and

      d.     an $850,000 cash payment from Roche (to be paid in specified installments).

38.     In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

## II.     CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

39.     Cyrulnik's many clients all elected to follow him from BSF to RCF.  During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice.  Specifically, Cyrulnik was singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

40.     As Freedman stated at the end-of-year partner's meeting in January 2021, and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

10

41.     Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions.  Cyrulnik also devoted tireless efforts to managing the Firm and overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease.  Roche and Freedman, separately and together, and as recently as January 2021, told Cyrulnik how much they enjoyed working with him to build the Firm, that his contributions were instrumental to the Firm's success and that his performance and successes were remarkable.  Normand told Cyrulnik in or about December 2020 that Cyrulnik was "the leader" of the Firm.

42.     While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections.  Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they said would bring enormous revenue to the Firm over time.  That was particularly applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

**III.    THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD**

43.     The Named Partners met regularly to discuss Firm administration matters.  Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements.  Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success and that they could not have accomplished what they had without Cyrulnik.  Freedman actually remarked to Cyrulnik on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this

lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running the Firm.

44.     With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues.  Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense.  Roche and Freedman were content to downplay such problems, or to push off resolution of the matter "for another day."  Cyrulnik repeatedly expressed the view that the Firm had to address such issues promptly and definitively to ensure that the Firm was complying with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try to ensure that the partners would do so.

## IV.     CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM

45.     As the senior member of the group meeting regularly to administer the Firm, Cyrulnik addressed serious concerns that had come to his attention regarding, among other things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation Model.

46.     First, in or about April 2020, Cyrulnik reviewed reports showing that Roche had not recorded the hours he had worked on client matters and instructed Roche to remedy that serious deficiency.  Roche apologized and told Cyrulnik that he had hired his mother to "reconstruct" his time by scrolling through his emails and guesstimating time entries.  Cyrulnik instructed Roche that he needed to ensure that he was keeping accurate time records.  Roche

exhibited the same amateurish attitude towards client bills when he boasted to Cyrulnik and

Freedman that he needed to line up associates on his matters because he would need to "pound

the lodestar" in order to position himself to obtain a better percentage of fee awards being split

with the Firm's co-counsel in class matters.  Cyrulnik again told Roche that he needed to take his

obligations to clients and class representations seriously.

47.     Second, Freedman engaged in self-dealing by manipulating the Firm's

Compensation Model to enrich himself at the Firm's expense.  Specifically, Freedman struck a

deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to

pay Schall a 20% referral fee.  Instead of paying that referral fee out of Freedman's 30%

origination credit pursuant to the Compensation Model, Freedman demanded the Firm absorb

that referral fee.  Freedman's non-economic, "pay to play" origination strategy put the Firm in an

unsustainable financial position; namely, the Firm was paying as much as 50% — as compared

to the typical 30% for other partners — of all client revenue from Freedman's clients merely to

"originate" the matters, and then paying the attorneys who worked on the case as much as 45%

of the remaining revenue pursuant to the Compensation Model.  In other words, after paying

associates and partners their shares, virtually nothing would be left to cover Firm expenses and

pay partnership distributions.  Incongruously, Freedman's referral scheme was not only

objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting

himself.  Thus, when partner Katherine Eskovitz sought a similar arrangement, Freedman

rejected her proposal as a "money grab," a non-starter, and wholly unacceptable.

## V.     THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM A STARTUP CLIENT

48.     Cyrulnik's many stable clients and billable hour matters substantially funded

many of the Firm's alternate fee arrangement representations of other clients.

49.     For example, as discussed above, the Firm was retained by the Startup Client, which planned to distribute digital cryptocurrency assets in the form of Tokens and build a platform of decentralized assets and applications.  The purpose of the representation was to assist the Startup Client and its officers during the growth and development of their business.

50.     Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all Tokens issued by the Startup Client in connection with all future distributions.

51.     Under the engagement letter, the Firm was to receive a flat percentage of all Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any Token Distribution."  Further, under the engagement letter, the Tokens functioned as a non-refundable advance, meaning "any unused portion of the Billable Hour Advance will expire on the fourth anniversary of this agreement's execution."

52.     Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

53.     At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be.  Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

54.     In mid-July 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors.  The sale ascribed real value to the Tokens.  More importantly though, it validated the Startup's Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

14

## VI.   ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION

55.     Roche understood that addressing Firm sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik.  Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm.  To that end, Roche and Cyrulnik had worked for months to update the Compensation Model used to calculate credits to try and mitigate the effects of the exploitation and disincentivize the practices that were problematic and in which Freedman in particular was engaged.  But when Roche presented the idea to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him was.

56.     In late-July 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that.  But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long to create.  Roche later admitted to Cyrulnik that Roche was scared of Freedman, that Freedman "sometimes acts irrationally" and is selfish, and that Roche did not think it was "worth it" to stand up to him. Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants." Cyrulnik told both Roche and Freedman that it was critical to the Firm's success that they look beyond their own individual interests to devise a formula fix that ensured that the Firm was sustaining itself and doing so fairly.

57.     Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates.  Roche uniquely understood how the Startup Client's July 2020 Token sale foreshadowed their enormous potential value, and sensed an opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens.  To that end, he wrote to Cyrulnik following the meeting with Freedman that "I agree with the economics of the proposed formula comp. change," but that, "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU."  More specifically, Roche demanded 40% of Cyrulnik's Tokens (10% of the total Tokens) in exchange for Roche's support.

58.     Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands.  He flatly rejected any such change to his Token stake and explained that looking out for the Firm was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was entirely unjust and unethical.  As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

## VII.    THE PARTNERS PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS

59.     Throughout January 2021, the partners continued to interact as they had in the past.  Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, and they discussed a host of Firm planning issues.

60.     Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

61.     Defendant Friedland reached out to Cyrulnik on January 2, 2021:  "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a

16

draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

62.     On January 22, 2021 — less than three weeks before their bad-faith "removal" — Freedman was arranging to finalize adding Cyrulnik as a registered owner on the Firm's Chase bank accounts — something that was supposed to take place one year prior at inception of the Firm but was delayed due to the pandemic.  Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York given a family conflict Freedman had to navigate that day.

63.     Days later, the value of the Tokens exploded.

## VIII.   DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF IN ORDER TO MISAPPROPRIATE CYRULNIK'S INTERESTS IN THE FIRM'S ASSETS

64.     In September 2020, the Tokens began trading publicly for the first time.  Between September 2020 and December 2020, the price of the Tokens remained relatively stable.

65.     In January 2021, however, the Tokens experienced a precipitous rise in value. Between January 1, 2021 and February 10, 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between February 6, 2021, and February 10, 2021.  The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in July 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the five days leading up to Cyrulnik's purported "removal" for cause.

66.     Below is a chart of the Tokens' price between September 2020 and the day of the Individual Defendants' secret meeting to expel Cyrulnik from the Firm:



67.     As the chart shows, as of February 10, 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than $59 per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million.  But that was not enough for Roche and Freedman, who once remarked that his goal was to be 'super rich,' not just rich.

68.     Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters.  With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

69.     Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with equity partners Friedland, Holcomb and Normand, held a secret meeting

on or about February 10, 2021, without two of the Firm's equity partners (including Cyrulnik), to

concoct the pretext for his removal.  Cyrulnik was not informed of the meeting, and was not

given the opportunity to address the false allegations being levied against him — at the meeting

or at any other time prior to his purported (and unlawful) "removal."

70.    Also excluded from the meeting was equity partner Paul Fattaruso, likely because

the Individual Defendants knew that Fattaruso would never agree to their scheme or vote in favor

of their unlawful "removal" plan.  Fattaruso was deliberately and unjustifiably excluded so that

the Individual Defendants could falsely mischaracterize the vote to oust Cyrulnik as

"unanimous," when in fact, they did not even include two of the Firm's seven equity partners

(constituting almost 30% of the Firm's equity votes) as contemplated by the MOU.

71.    The meeting not only breached the fiduciary duties owed by the Individual

Defendants to Cyrulnik, but directly breached the MOU.  As the Firm's co-chairperson, only

Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to

order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting

of those meetings."  Cyrulnik's right to initiate and conduct Firm meetings could not be altered

without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik,

which of course never happened.

72.    Two days after the meeting, on February 12, 2021, the Individual Defendants sent

Cyrulnik a "removal" email that was riddled with errors, misstatements, and

mischaracterizations, purporting to remove Cyrulnik from the Firm for "cause."  The fictitious

bases set forth in the email had not even occurred, much less constituted proper "cause."

IX.    **DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY
OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS**

A.    **Defendants Indisputably Lacked "Cause" To Expel Cyrulnik**

73.    Defendants indisputably lacked anything close to "cause" — which, under

applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of

his job — to remove Cyrulnik.

74.    Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from

associate to partner to equity partner as quickly as anyone in BSF's history.  All of the Firm's

equity partners, including all of the Individual Defendants, had worked for years at BSF with

Cyrulnik.  He has never before had any complaints lodged against him for any improper

interactions with any colleague — associate, partner, or otherwise.  Cyrulnik is highly respected

by scores of colleagues with whom he works and has worked.  Because there was no record of

misconduct by Cyrulnik and, of course, no actual misconduct, the Individual Defendants had no

substance upon which to base their pretextual removal for cause.  Instead, they contrived a

removal email that not only was false and devoid of substance, but failed to describe any actual

cause.

75.    For example, Defendants' purported "removal" email asserts that Cyrulnik

screamed, "spoke over" other partners, refused to listen and was antagonistic at meetings.

Setting aside that "screaming" cannot and does not constitute cause, it in any event

mischaracterizes two instances throughout 14 months of Cyrulnik's tenure.  For example, in July

2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of

Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on

Cyrulnik and coordinated matching e-mails, alleging Cyrulnik had "screamed" at them,

accompanied by a misleading recounting of events.  These emails were a misguided effort to

20

pressure Cyrulnik into conceding financial rights.  When Roche and Freedman realized that

Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

76.     The other allegations in the email are equally misguided.  The email vaguely

asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other

founding partners."  Yet, it provides no context or support for these accusations (because they

are false).  And the email includes a vague and nebulous accusation that Cyrulnik created

"unsustainable environments for associates," which is completely false.  To the contrary,

Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who

has spoken ill of him.

77.     As the email evidences, the actions by the Individual Defendants are about one

thing only: greed.  They had no problem working with Cyrulnik at BSF — actively recruiting

him to leave his hard-earned position and lead the Firm — and no problem working with

Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue

base), until a few days before his removal, when his Tokens suddenly appreciated to more than

$60 million in value.  Then, without any precipitating incident, the Individual Defendants felt

compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an

opportunity for him to respond to their pretextual and baseless allegations.

78.     Following their wrongful attempted removal of Cyrulnik, the Individual

Defendants have stopped at nothing in their quest to defame him.  In a truly cynical effort, the

Individual Defendants attempt to exploit the legal community's rightful concerns over diversity

and inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit

themselves — *i.e.*, five white males.  Cyrulnik has never expressed anything other than outright

support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Individual Defendants are manifestly false.

79.    Accordingly, after receiving the Individual Defendants' email on February 12, 2021, Cyrulnik expressly placed the Individual Defendants on notice that their purported removal was "in bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

**B.    Defendants Breached The MOU By Denying Cyrulnik The Compensation They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause**

80.    Even if the Individual Defendants had grounds for removing Cyrulnik for cause (they had none), that would not have impacted Cyrulnik's core compensation rights under the MOU.

81.    In Section VI of the MOU ("Firm Management"), the MOU provided two methods for a Founding Partner's departure from the Firm.  The partner could withdraw voluntarily under Section VI(C), or could be removed involuntarily for cause under Section VI(G).

82.    The Individual Defendants intentionally conflate the provisions in a misguided attempt to treat their improper and involuntary removal of Cyrulnik as a "withdrawal."  In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an involuntary removal and voluntary withdrawal separately, and the intent of the parties (including the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily agreed to change their economics).

83.     The MOU unambiguously provides for certain ramifications in the event of voluntary withdrawal.  It unequivocally does not set forth any of those ramifications for involuntarily removal, and Defendants' attempt to do so is baseless and improper.

X.     **DEFENDANTS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS**

84.     Since perpetrating their scheme and purporting to remove Cyrulnik as a partner, Defendants have egregiously breached their duties to and mistreated the Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik.

A.     **Defendants Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets**

85.     After sending Cyrulnik their "removal" email, the Individual Defendants pressured him to agree to sign a confidential mediation and binding arbitration agreement to facilitate an "amicable" re-division of his assets and rights under the MOU.  Cyrulnik told the Individual Defendants that a necessary predicate for any discussion about splitting the Firm was their commitment to provide him all of the compensation he is owed under the MOU.

86.     On February 19, Defendants sent Cyrulnik a proposal in which he proposed that Cyrulnik give them 75% of his Tokens.  Through his counsel, Cyrulnik told Defendants that, if Defendants did not agree to provide Cyrulnik everything to which he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens, Cyrulnik would be forced to commence litigation.  Defendants' counsel stated that his clients were looking to resolve the matter, and that he would speak with them and revert on Sunday morning, February 28, 2021.

87.     Instead, it appears that Defendants deployed the stall tactic to prepare their own anticipatory pleading and rush into court, in the hope that publicizing a false narrative would force Cyrulnik to give them what they wanted.  Without providing any further response to

23

Cyrulnik, Defendants filed a declaratory relief lawsuit in federal court in New York late on the night of Saturday, February 27, 2021.

88.     Concurrent with their late-night filing, Defendants suddenly cut Cyrulnik's access to client files without notice.  Cyrulnik was in the process of working on active matters with multiple court hearings and depositions scheduled the next business day and throughout the ensuing week, and Defendants' actions materially hindered Cyrulnik's ability to work on these matters – as Defendants intended all along, as further leverage to force Cyrulnik to give up his rights.  Cyrulnik rejected Defendants' extortionate actions, and demanded that his access to client files be restored so that he could continue representing and protecting the interests of his clients – clients who, at the time, remained Firm clients to whom each of the Defendants owed fiduciary duties.  Ultimately, Defendants agreed to provide Cyrulnik access to his clients' files – although only after he was forced to scramble and waste significant time and effort to protect his clients' interests.

**B.      Defendants Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Sticking With Cyrulnik**

89.     As noted above, Cyrulnik's clients have generated the vast majority of the Firm's revenue since inception.  Faced with the imminent prospect of losing most of their core clients and revenue, Defendants sought to leverage deadlines in active matters to pressure clients to execute new engagement letters with the Firm or else be left without adequate staffing for their matters on virtually no notice at all.  Indeed, in many cases, Defendants' letters to clients demanded responses within just a few business hours.

90.     When the clients informed the Firm that they wanted Cyrulnik to lead their matters but expected an appropriate and non-prejudicial transition of their active matters, the Firm scrambled to punish those clients by removing the associates who had been staffed on those

cases for months, with imminent deadlines fast approaching, and against the request and

recommendation of the other Firm partner who had been running the case with Cyrulnik (and

who remains at the Firm).

91.     Defendants also enlisted newly hired partner Eric Rosen to send harassing letters

to Cyrulnik's clients, in which Rosen threatened to file notices of withdrawal in less than two

days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to

continue handling your matter"  Indeed, even as this action is being commenced, Cyrulnik

continues to field daily phone calls from clients who are receiving Rosen's emails threatening to

prejudice their cases by filing withdrawal notices in their active cases.

## COUNT 1
### (Dissolution pursuant to Florida Statutes § 620.8801)

92.     Cyrulnik repeats and realleges each and every allegation contained in

paragraphs 1 through 91 herein.

93.     This is an action for judicial dissolution of RCF pursuant to Florida Statutes

§§ 620.8405 and 620.8801.

94.     RCF is a limited liability partnership, as defined by the Florida Revised Uniform

Partnership Act, and as governed by the MOU.

95.     Defendants breached the MOU by purporting to remove Cyrulnik as a partner of

RCF, notwithstanding that they lacked cause to do so.  The purported "cause" cited by

Defendants is plainly insufficient as a matter of law, indisputably pretextual, in bad faith and

based on lies and mischaracterizations of the events.  Accordingly, the Individual Defendants

lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any

and all actions they have taken based on and/or in reliance on their purported removal of

Cyrulnik, breached the MOU and is ultra vires and void *ab initio*. Accordingly, Cyrulnik

remains a Founding Partner and Co-Chairperson of RCF.

  96. Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and

management rights in RCF.

  97. By virtue of the Individual Defendants' improper removal of Cyrulnik,

deprivation of his management and financial rights, and additional misconduct as set forth above,

the economic purpose of the partnership has been unreasonably frustrated by the actions of the

Individual Defendants, and likely will continue to be unreasonably frustrated, within the meaning

of Florida Statutes § 620.8801(5)(a).

  98. By virtue of the Individual Defendants' improper removal of Cyrulnik,

deprivation of his management and financial rights, and additional misconduct as set forth above,

it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the

Individual Defendants, within the meaning of Florida Statutes § 620.8801(5)(b).

  99. By virtue of the Individual Defendants' improper removal of Cyrulnik,

deprivation of his management and financial rights, and additional misconduct as set forth above,

it is not reasonably practical to carry on the activities of the limited liability partnership in

conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

  100. Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

  101. WHEREFORE, Cyrulnik respectfully requests that this Court enter a judgment

dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited

liability partnership; directing that within a reasonable period of time RCF wind up its activities

in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in

the winding up of RCF's activities, ordering judicial supervision of the winding up, including the

appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting

him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just

and proper.

**COUNT 2**
**(Buyout under Florida Statutes § 620.8701 in the Alternative)**

102.     Cyrulnik repeats and realleges each and every allegation contained in

paragraphs 1 through 101 herein.

103.     RCF is a limited liability partnership, as defined by the Florida Revised Uniform

Partnership Act, and as governed by the MOU.

104.     Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-

Chairperson of RCF.

105.     Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and

management rights in RCF.

106.     Should judicial dissolution be found inappropriate or inequitable, in the

alternative, the Individual Defendants' actions to expel Cyrulnik from RCF entitle him to a

buyout pursuant to Florida Statutes § 620.8701.

107.     Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

108.     WHEREFORE, in the alternative to dissolution, Cyrulnik respectfully requests

that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest

in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and

reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and

proper.

**COUNT 3**
**(Accounting Pursuant to Florida Statutes § 620.8403)**

109.    Cyrulnik repeats and realleges each and every allegation contained in

paragraphs 1 through 108 herein.

110.    The Individual Defendants have taken control of RCF, have unlawfully excluded

Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the

Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused

to allow Cyrulnik any say in the operation of RCF and have otherwise abused their status as

partners of the Firm.

111.    An accounting of the assets, profits and losses of RCF is necessary and

appropriate at this time.

112.    Florida Statutes § 620.8403 requires a limited liability partnership to provide its

current (and former) partners access to the Firm's records that are required to be kept by all

limited liability partnerships.

113.    Cyrulnik has been denied access to RCF's books and records notwithstanding

numerous requests for access to the Firm's financial records and accounts.

114.    WHEREFORE, Cyrulnik demands judgment in his favor, requiring Defendants to

account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception

through present; find and determine the amount due to Cyrulnik from RCF and enter a judgment

or decree in favor of Cyrulnik for his compensatory damages, prejudgment interest, cost, and

such further relief as this Court deems just and proper.

**COUNT 4**
**(Breach of Contract)**
**(Against the Individual Defendants)**

115.    Cyrulnik repeats and realleges each and every allegation contained in
paragraphs 1 through 114 herein.

116.    The MOU is a valid and binding agreement between Cyrulnik and the Individual
Defendants.

117.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and
Freedman.

118.    Cyrulnik has fully performed and is ready, willing, and able to continue to
perform his obligations under the MOU and the Side Letter.

119.    Defendants breached the MOU by purporting to remove Cyrulnik as a partner of
RCF, notwithstanding that they lacked cause to do so.  The "cause" cited by Defendants was
indisputably pretextual, in bad faith, based on Defendants' lies and mischaracterizations of the
events, and in any case did not rise to the level of "cause" under the law.  Accordingly, the
Individual Defendants did not have the authority to remove Cyrulnik as a partner, and their
attempt to do so, as well as any and all actions they have taken based on and/or in reliance on
their purported removal of Cyrulnik, breached the MOU.

120.    Even if Defendants had "cause" to expel Cyrulnik from the Firm, Defendants
further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying
Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU,
including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity.
Although the MOU limits the ability of a partner who has *withdrawn* from the Firm to retain his
equity, it does not provide any such limitation on a partner who was *removed*.  Accordingly, by

29

citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Individual Defendants have breached their obligations under the MOU.

121.    Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

122.    Defendants unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

123.    Defendants Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Defendants Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

124.    The Individual Defendants' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

125.    WHEREFORE, Cyrulnik demands judgment against the Individual Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper. Cyrulnik will seek leave at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

## COUNT 5
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against the Individual Defendants)

126.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 125 herein.

127.     The MOU is a valid and binding agreement between Cyrulnik and the Individual Defendants.

128.     The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

129.     Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

130.     The Individual Defendants breached this implied covenant by taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity, and by denying Cyrulnik access to files, documents, Firm bank accounts and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

131.     WHEREFORE, Cyrulnik demands judgment against the Individual Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper.

Cyrulnik will seek leave at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

**COUNT 6**
**(Breach of Fiduciary Duty)**
**(Against the Individual Defendants)**

132.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 131 herein.

133.    As partners in a professional service limited liability partnership, the Individual Defendants at all relevant times owed, and still owe, fiduciary duties to Cyrulnik.  These duties include the duties of care and loyalty.

134.    The Individual Defendants breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

135.    WHEREFORE, Cyrulnik demands judgment against the Individual Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper.

32

Cyrulnik will seek leave at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

## COUNT 7
### (Conversion)

136.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 135 herein.

137.    Defendants knowingly and intentionally converted Cyrulnik's specific and identifiable membership interest in RCF and his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

138.    Defendants, without authority, deprived Cyrulnik of such membership interest and substantial equity interest for their own use.

139.    Defendants' deprivation of Cyrulnik's partnership and equity interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

140.    Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests.  Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

141.    As a direct and proximate result of Defendants' conversion, Cyrulnik has suffered damages.

142.    WHEREFORE, Cyrulnik demands judgment against Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper.  Cyrulnik will seek leave

at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

**COUNT 8**
**(Unjust Enrichment)**

143.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 142 herein.

144.    Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Individual Defendants.

145.    Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik.  Indeed, Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

146.    The circumstances are such that it would be inequitable for Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

147.    Cyrulnik is entitled to damages as a result of Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Defendants from Cyrulnik.

148.    WHEREFORE, Cyrulnik demands judgment against Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper.  Cyrulnik will seek leave at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

## COUNT 9
### (Civil Conspiracy)

149.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 148 herein.

150.     The Individual Defendants are parties to a civil conspiracy.

151.     The Individual Defendants conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

152.     Each of the Individual Defendants committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

153.     As a direct and proximate result of the Individual Defendants' civil conspiracy, Cyrulnik has suffered damages.

154.     WHEREFORE, Cyrulnik demands judgment against the Individual Defendants, jointly and severally, and award Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal, as well as interest, costs and attorneys' fees, and such other and further relief that this court deems to be just and proper.

Cyrulnik will seek leave at the appropriate time to plead a claim for punitive damages pursuant to Florida Statutes § 768.72(1).

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Cyrulnik demands a judgment against Defendants:

(a)     dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801- 8807; directing that Cyrulnik shall participate in the winding up of RCF's activities, ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF;

(b)     in the alternative to dissolution, awarding Cyrulnik the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870;

(c)     requiring Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present, as well as the amount due to Cyrulnik from RCF;

(d)     against the Individual Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens) as of the date of his improper removal;

(e)     prejudgment and postjudgment interest at the maximum possible rate;

(f)    Cyrulnik's costs in the prosecution of this action, including reasonable attorneys'
fees; and

(g)    such other and further relief as is just and proper.

Dated this 9th day of March, 2021.

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: s/ Maria H. Ruiz
Maria H. Ruiz (MRuiz@kasowitz.com)
Florida Bar No. 182923
1441 Brickell Avenue, Suite 1441
Miami Florida 33131
Tel.:    (786) 587-1044
Fax:    (305) 675-2601

Marc E. Kasowitz (mkasowitz@kasowitz.com)
*Pro Hac Vice Application Forthcoming*
Michael A. Hanin (mhanin@kasowitz.com)
*Pro Hac Vice Application Forthcoming*
Gavin D. Schryver (gschryver@kasowitz.com)
*Pro Hac Vice Application Forthcoming*
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Plaintiff Jason Cyrulnik*

37

## **VERIFICATION**

I, Jason Cyrulnik, have personal knowledge of the facts set forth herein, and if called upon to testify, I would competently testify as to the matters stated herein.  I verify under penalty of perjury under the laws of the State of Florida that the factual statements in this Verified Complaint are true and correct.

JASON C. CYRULNIK

BEFORE ME, this 9th day of March, 2021, personally appeared Jason Cyrulnik, who is known to me personally or else who has produced a  Driver's License , as identification of his person, and has sworn to the verification above.

NOTARY PUBLIC
Cody Nathaniel Myers
Registration No.: 02MY6381602
Qualified in New York County
Commission Expires 10/09/2022

EXHIBIT A

**Memorandum of Understanding**
December 26, 2019

This Memorandum of Understanding ("MOU") is dated as of December 26, 2019, and establishes the intent to form a partnership between Jason Cyrulnik, Velvel Freedman, Amos Friedland, Nathan Holcomb, Edward Normand, and Kyle Roche (together, the "Founding Partners").

## I.   PURPOSE

This MOU sets out the basic terms upon which the Founding Partners will enter into a definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-orientated law firm to be named Roche Cyrulnik Freedman LLP (the "Firm") that is it be branded and marketed as "RCF".

The terms of this MOU are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the "Partnership Agreement") to be negotiated and to be made effective on or around January 1, 2020.

It is mutually agreed upon and understood by and among the Founding Partners that the Founding Partners agree to work together and co-operate in good faith and to fully participate to develop the Firm and to work towards the finalization of the Partnership Agreement.

## II.   EQUITY IN THE FIRM

The Founding Partners understand that equity in Roche Freedman LLP is currently split 50/50 between Kyle Roche and Velvel Freedman.  After execution of the Partnership Agreement, and effective January 2020, the equity division in the Firm will be the following:

> Jason Cyrulnik – 27%
> Velvel Freedman – 24%
> Amos Friedland – 10%
> Nathan Holcomb – 10 %
> Edward Normand – 10 %
> Kyle Roche – 19 %

The allotment of equity to additional partners, anticipated to include at least Paul Fattaruso, will be made by the Equity Committee in accordance with the procedures specified below.  The Founding Partners understand that at the Firm meeting at the end of 2020, the Founding Partners will sit down to review their contributions to the Firm and discuss whether any equity revisions amongst the six of them should be made.

## III.   DISTRIBUTION OF FIRM REVENUE

The Founding Partners understand that the Firm will distribute revenue to its partners according to the Firm's Partnership Compensation Model (attached as Exhibit C).

The Firm will endeavor to distribute revenue to its partners based on this Model on at least a semi-annual basis.

The Founding Partners shall take the following draws (1/12 every month) against their expected formula compensation:

- Jason – 300k
- Vel – 300k
- Kyle – 300k
- Amos – 420k
- Nathan – 300k
- Ted – 420k

These draws are not final, and draws may be adjusted going forward.

## IV.    ASSIGNMENT AND EXCLUSION OF ROCHE FREEDMAN LLP ASSETS AND RIGHTS

The Founding Partners understand that Kyle Roche and Velvel Freedman formed a law firm called Roche Freedman LLP in August 2019. Roche Freedman LLP will be merged into the Firm in January 2020. Not all rights and assets of the Roche Freedman LLP will be shared according to the equity percentages of the Firm in January 2020. An exhaustive list of assets that will not be shared pro-rata will be prepared in connection with the Partnership Agreement, but the list of core assets being excluded or not divided according to the Firm's equity allocations is set forth below, along with a description of how they are excluded from the assignment (the "Excluded Assets").

### A.    The Finance Agreement

To facilitate the founding of Roche Freedman LLP, Kyle Roche and Velvel Freedman raised $7.5 million[1] in litigation finance (the "Finance Agreement"). A copy of that agreement is attached to this MOU as Exhibit A. The Founding Partners understand that, prior to founding of Roche Freedman LLP, Kyle Roche and Velvel Freedman agreed to certain distributions of $3.5 million of the Finance Agreement.

The $4 million balance of funds available from the Finance Agreement will be paid to the Firm on the schedule set forth therein and allocated as follows:

1. $1.75M for Tether lodestar/expenses;
2. $1.75M for ICO lodestar/expenses;[2]

---

[1] In addition to the initial $7.5 million raised, the Finance Agreement contemplates a possible additional $2.5 million payment in August 2021, which is addressed below.

[2] The Partnership understands that RF incurred hours and expenses billed to Tether and ICO prior to January 2020. These expenses will be removed from these allocations. While some of this funding might

    3.  $500K for Kleiman expenses/lodestar

       **$750k of the Finance Agreement will be allocated toward paying firm draws and expenses for the first 90 days. However, this allocation is only for the purposes of funding the Firm's operations during its startup and shall be reallocated to the above matters after 90 days.

Should the investor exercise his right to put an additional $2.5M into the firm's resources, that $2.5M shall be divided as follows:

1. $1.25M to pay lodestar/expense for Tether
2. $1.25M to pay lodestar/expense for ICO
3. In the event the full $1.25M is not needed to pay lodestar/expense for either of these two respective cases, all remaining funds shall be allocated to the other matter.  In the event funds remain after lodestar/expense is paid for both matters, those funds will be added to any contingency recovery for either or both matters and distributed through the Firm's waterfall.

    *B.*    *Ava Labs Tokens*

The Founding Partners understand that Roche Freedman LLP represents Ava Labs.  Ava Labs is a startup company that plans to distribute a certain amount of Digital Assets (the "Tokens") as part of its plans of building a new platform for decentralized assets and applications.  In exchange for legal services, Ava Labs has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019.  A copy of the Roche Freedman LLP / Ava Labs retention agreement is attached to this MOU as Exhibit B.  Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its Ava Labs Tokens according to the following breakdown:

| | |
|---|---|
| Jason Cyrulnik | 25% |
| Velvel Freedman | 32% |
| Amos Friedland | 5% |
| Nathan Holcomb | 5% |
| Edward Normand | 5% |
| Kyle Roche | 28% |

The Founding Partners understand that Kyle Roche will be the Originating Attorney for Ava Labs (i.e., he will have 100% of the Origination Credit) and any further consideration paid by Ava Labs for the Firm's services will be subject to the Firm's Partnership Compensation Model.

The Founding Partners further understand that notwithstanding the fact that all Founding Partners will have an interest in the Ava Labs Tokens, Kyle Roche, Velvel Freedman, and Jason Cyrulnik will be the only partners expected to bill to the Ava Labs matter.  In the event that

---

also be allocable to prior hours, Kyle and Velvel agree to run these hours through the firm's formula compensation so as to share this benefit through the firm's equity pool.

further partner resources are required, the Firm will revisit the above distribution of the Ava Labs Tokens.

### C.    *Kleiman Contingency*

The Founding Partners understand that Roche Freedman LLP represents the estate of David Kleiman and W&K Info Defense Research LLC in  active litigation against Craig Wright. As part of that representation, Roche Freedman LLP maintains a contingency interest in any recovery. Any proceeds the Firm recovers from this contingency shall be distributed according to a distribution agreement Kyle, Velvel, and Jason previously negotiated.

### D.    *Bill's Nursery Contingency*

The Founding Partners understand that Roche Freedman LLP represents Bill's Nursery in active litigation with Privateer.  As part of that representation, Roche Freedman LLP already holds an equity interest in the company (1%) called the "Velvel & Kyle Equity."  The Firm shall not have any interest in the Velvel & Kyle Equity.  Further equity earned over the course of litigation shall belong to the Firm and be distributed according to the formula governing Firm revenue.

### E.    *PartnerRe Contingency Cases*

The Founding Partners understand that Amos Friedland, Ted Normand, and Nathan Holcomb represent PartnerRe in two contingency/partial contingency cases, in which Friedland, Normand, and Holcomb have invested significant time and effort, including LFR Collections LLP (full contingency – 30-50% of recoveries) ("LFR") and PartnerRe v RPM/LendUS (partial contingency – 50% rack rates, plus 20-25% of any recovery).  The Founding Partners agree that to the extent any settlement or settlements for LFR are received on or before March 1, 2020, without significant litigation, the Firm will receive 10% of any fee proceeds from same, and Friedland, Normand, and Holcomb will receive 90% of any fee to apportion among themselves in proportions they determine are appropriate.  The Founding Partners agree that to the extent any settlement is reached in RPM on or before March 1 and absent summary judgment briefing or trial, the Firm will receive 10% of any fee proceeds from same, and Friedland, Normand, and Holcomb will receive 90% of any fee to apportion among themselves in proportions they determine are appropriate.  For the avoidance of doubt, any partial rack rate hourly fees generated in RPM shall belong to the Firm and be distributed according to the formula governing Firm revenue.  For further avoidance of doubt, any settlement reached in LFR or RPM on or after March 2, 2020, shall belong to the Firm and be distributed according to the Firm's compensation system, subject to any adjustments for the apportionment of revenue among Friedland, Normand, and Holcomb that they may unanimously agree to among themselves.


## V.    TREATMENT OF EXISTING CASES

The following client/cases are already part of Roche Freeman LLP's cases, and origination credit has been allocated as follows:

1. Kleiman: 50/50 Vel and Kyle
2. Tether: 50/40/10 Kyle/Vel/Joe Delich
3. ICO: 60/40 (for funded portion of lodestar) and 55/45 for contingent recovery: Kyle and Vel
4. Bill's 50/50 Vel and Kyle
5. Ava Labs[3]: Kyle
6. JPay: Vel (all cases)
7. OJC: Vel (all cases)
8. Harvest: Vel (all cases)
9. Weiss: Vel
10. Meridian: Vel
11. Bossel: Vel
12. Privatbank: 50/50 Vel/Jason
13. Just Energy Securities Litigation:  Jason
14. Just Energy Consumer Action Litigation:  Jason
15. In re Straight Path:  Jason
16. W 66th Street:  Jason
17. Fifth Avenue Developer:  Jason
18. Elie Schwartz/Nightingale:  Jason
19. Skye Mineral Investors:  Jason
20. Genie Energy/Residents Energy General:  Jason
21. Genie Energy TCPA:  Jason
22. ESCO Litigation:  Jason
23. PartnerRe v. RPM/LendUS: Amos (originator; credits apportionment to be determined)
24. WPP v. PartnerRe: Amos (originator; credits apportionment to be determined)
25. Novolex/Carlyle Group v. PartnerRe / PartnerRe v. Newell Brands: Amos (originator; credits apportionment to be determined)
26. PartnerRe – LFR Collections matter: Amos (originator; credits apportionment to be determined)
27. Everard Findlay v. Republic of Suriname: Amos (originator; credits apportionment to be determined)
28. US Fuel Cell Corp. v. US Hybrid Cell et al.: Amos (originator; credits apportionment to be determined)

## VI.    FIRM MANAGEMENT

### A.    *New Clients / Matters*

All new billable hour representations that an attorney wishes to bring into the Firm will be presented to the Firm's partnership.  Equity partners can voice any objections to the proposed representation as soon as practicable.  All prospective representations will be approved by 75% of the members of the New Matter Committee, which shall consist of Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Ted Normand.  The New Matter Committee shall vote as soon as

---

[3] The Token Consideration the Firm received for Ava Labs shall be distributed as set forth in Section VI.

practicable after the New Matter Memorandum and Conflict Check and after allowing time for views, concerns or feedback from the Firm's partnership.

### B.    New Associate / Partner Hires

All lawyer hires will be subject to a vote amongst the Firm's Founding Partners requiring 2/3 approval.

### C.    Withdrawal from Firm

If any Partner withdraws from the firm within 18 months from the Firm's formation, the following shall occur: That Partner shall return to the firm any amount of payments received that exceed what that Partner was entitled to under the Firm's formula compensation model. If the Firm owes that Partner funds under the formula, that amount shall be paid to that Partner at the next quarterly distribution, but the Firm shall not owe that Partner any additional compensation going forward. That Partner's equity shall be returned to the balance of the firm's equity partners pro-rata.

### D.    Firm Marketing

Kyle Roche will head up the Firm's marketing efforts.  This means that Kyle Roche must circulate any marketing plan or decision to the Founding Partners and provide reasonable time for them to provide comments, input, and ultimately vote to approve or disapprove any marketing decisions.

### E.    Approval over Lodestar

All lodestar calculations must be approved by the Originating Lawyer.

### F.    Firm Name

Any change in the Firm's name requires unanimous vote of the Named Partners.

### G.    Partner Removal

A Founding Partner cannot be removed without cause. A Founding Partner can be removed for cause only on the affirmative vote of 2/3 of the Firm's equity partners.

### H.    Death of Partner

If a Partner dies, or becomes severely disabled, he/her or her/his estate is entitled to any unpaid lodestar accrued to him/her under the Firm's then existing formulas. If a Founding Partner dies, or becomes severely disabled, in addition to the payment of lodestar contemplated above, the Firm shall make best efforts to buy out the value of that partner's equity (as valued by an

independent 3rd party). That Partner's equity will then be reallocated according to the vote of the Equity Committee.

     *I.*     *Firm Equity*

Any change in the Firm Equity will be decided by an Equity Committee consisting of the following four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Ted Normand. Any change in Firm equity shall require a unanimous vote of the Equity Committee. Notwithstanding the above, Roche, Freedman, and Cyrulnik may, any time following six months after the Founding Partners join the Firm, terminate Normand from the Equity Committee if (1) Roche, Freedman, and Cyrulnik unanimously vote to do so; and (2) Roche, Freedman, and Cyrulnik provide all the Founding Partners with three months' notice of such termination. Additional members may be appointed to the Equity Committee by the Equity Committee's members by unanimous vote.  The Equity Committee will make no changes to the pro-rata equity levels of the Founding Partners prior to December 2020; any changes to the pro-rata levels of the Founding Partners thereafter shall only take place following 90 days' notice by the Equity Committee to the Founding Partners, provided that no notice will be required if the Founding Partners unanimously agree to a change to such pro rata distribution levels.

     *J.*     *Firm Expenses*

The Firm shall have an Expense Committee consisting of four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Amos Friedland. Any expense to be borne by the Firm must be approved by at least 1 member of the Expense Committee if it is below $500, 2 Expense Committee members if it exceeds $500, and 3 Expense Committee members if it exceeds $5,000.

     *K.*     *Compensation Formulas*

The Firm shall have a Compensation Formula Committee consisting of four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Nathan Holcomb. Any change to the compensation formulas must be approved by 3 of the 4 members of the Compensation Formula Committee and can only be effected on six months' notice to the full partnership, unless the Founding Partners approve an early effective date by 2/3 vote.

     *L.*     *Benefits/Admin:*

The benefits offered by the firm, insurance policies the firm carries, salaries and bonuses of admin staff shall be determined by Velvel Freedman and Jason Cyrulnik. The Expense Committee must approve any such Benefit / Admin expenses according to the procedure set forth in Section VIII(J).

     *M.*     *Firm Co-Chairpersons*

The Firm shall have two co-chairpersons serving at all times. The job and powers of the chairpersons shall be to propose ideas, opportunities, and additional partners to the Firm's governing committees and partnership to help lead the firm and provide direction for the Firm's

future development. They shall call the firm's meetings to order and be responsible for the orderly conducting of those meetings. The chairpersons shall be named "co-chairman (or chairwoman)" on the Firm's website and shall be entitled to use that title in public facing communications.

The Firm's partnership shall hold an election every two years to elect the chairpersons. One chairperson must be based in the New York office, the other must be based in the Miami office.

To be eligible for chairperson, the candidate must be a partner of the Firm holding at least 8% of the Firm's equity.

At inception, and for the first term only, the New York chairperson shall be Ted Normand for the first year, followed by Jason Cyrulnik for the second year. The Miami chairperson shall be Vel Freedman.

The Firm may only alter these obligations and requirements upon the affirmative vote of 100% of the Firm's Founding Partners.

    *N.*       *Bank Account Access*

All Founding Partners will have access to view the Firm's bank accounts. Kyle Roche, Velvel Freedman, and Jason Cyrulnik will have full access to the Firm's bank accounts.

By: *Jason Cyrulnik*
    Jason Cyrulnik (Dec 27, 2019)
Name: Jason Cyrulnik

Date: Dec 27, 2019

By: *[signature]*
    Velvel Freedman (Dec 27, 2019)
Name: Velvel (Devin) Freedman

Date: Dec 27, 2019

By: *Amos Friedland*
    Amos Friedland (Dec 27, 2019)
Name: Amos Friedland

Date: Dec 27, 2019

By: *[signature]*
    Nathan Holcomb (Dec 27, 2019)
Name: Nathan Holcomb

Date: Dec 27, 2019

By: *Edmd*
    Edward Normand (Dec 27, 2019)
Name: Ted Normand

Date: Dec 27, 2019

By: *Kyle Roche*
Name: Kyle Roche

Date: Dec 27, 2019

# EXHIBIT B

Memorandum of Understanding
January 4, 2019

This Memorandum of Understanding ("MOU") is dated and made effective as of 1/4/20 and establishes the terms of agreement between the named partners of Roche Cyrulnik Freedman ("RCF") – Kyle Roche, Jason Cyrulnik, and Devin "Vel" Freedman (the "Parties").

**Payments**: The Parties understand that to facilitate the founding of Roche Freedman LLP, Roche and Freedman raised $7.5 million in litigation finance (the "Finance Agreement"). At that time, Freedman and Roche agreed that Roche would receive $1.5 million of the cash proceeds from the Finance Agreement, of which $250,000 was immediately paid and the remaining $1,250,000 would be paid over a 30-month period as the funding from the Finance Agreement was drawn down. In consideration for being first named partner, Roche shall forfeit his right to the remaining $1,250,000, $850,000 of which will be distributed to Cyrulnik and $400,000 of which shall be distributed to Freedman, which shall be paid out from the Finance Agreement to Cyrulnik and Freedman pro rata on the following schedule:

1. January 12, 2020 - $300,000
2. July 12, 2020 - $300,000
3. January 12, 2021 - $300,000
4. July 12, 2021 - $350,000

As additional consideration from Roche to Freedman, Freedman shall be entitled to the first $100,000 out of Roche's RCF formula compensation payment at the end of 2020 and the first $150,000 out of Roche's RCF formula compensation payment at the end of 2021.

Should Freedman or Cyrulnik voluntarily leave the firm or be terminated for cause before any of the foregoing payments is scheduled to be paid, the departing partner's remaining payments hereunder will be forfeited back to Roche. Should Freedman or Cyrulnik voluntarily leave the firm or be terminated for cause before January 1,2021, the departing partner shall return the 2020 payments received hereunder to Roche.

**Kleiman**: should Roche, Freedman, Roche Freedman LLP, or RCF be entitled to any contingent recovery in connection with the *Kleiman v. Wright* litigation, Freedman, Roche, and Cyrulnik agree to split the recovery as follows:

1. Freedman: 50% of any recovery
2. Roche: 25% of any recovery
3. Cyrulnik: 25% of any recovery

Kyle Roche: _*Kyle W Roche*_
Kyle W Roche (Jan 27, 2020)
Dated:_____Jan 27, 2020_____

Devin Freedman: _*Devin Freedman*_
Dated: 1/21/20

Jason Cyrulnik:_____
Jason Cyrulnik (Jan 22, 2020)
Dated: Jan 22, 2020_____