**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated, | Case No. 22-cv-03600-TLT |
| Plaintiff, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, AND VIOLATIONS OF CALIFORNIA LAW** |
| TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON, | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Michael Tobias and named plaintiff Nick Patterson (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, including, among other things, a review of court filings, various press releases, and public statements issued by Defendants, analyst and media reports, and other commentary analysis and publicly disclosed reports and information about Defendants. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE OF THE CASE

*This collapse was one of the most violent collapses in a long time,*
*only comparable to Lehman's collapse in 2008!*
Remi Teto (Member of the Governing Council of the Luna Foundation Guard)

1. Plaintiffs bring this Class Action Complaint ("Complaint") under §§5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act"), as well as under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Defendants TerraForm Labs Ptd Ltd. ("TFL" or "Terraform" or "Company"), Jump Trading LLC by, through, in conjunction with, and with the participation of its business unit and/or division, Jump Crypto (together, "Jump"), Tribe Capital, DeFinance Capital/Definance Technologies Oy, and Three Arrows Capital Ptd Ltd. (collectively, the "Luna Foundation Guard Defendants"), and Individual Defendants Nicholas Platias and Do Kwon (together with the Luna Foundation Guard Defendants and TFL, the "Defendants"). This action is brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Terra Tokens between March 17, 2021, and May 25, 2022, inclusive ("Class Period"), and who were damaged thereby ("Class").

2. Calling Defendants' conduct in the offer, sale, and promotion of unregistered crypto securities "a multi-billion dollar crypto asset securities fraud," and sketching substantially similar

SECOND AMENDED CLASS ACTION COMPLAINT

1   conduct as Plaintiff Patterson detailed in his June17, 2022, initial complaint, (Dkt. No. 1), the U.S.

2   Securities and Exchange Commission (SEC) sued Defendants TFL and its Chief Executive Officer

3   Do Kwon for selling unregistered securities and deceiving investors with respect to "a host of

4   crypto asset securities, most notably []LUNA and Terra USD."[1]   Announcing the charges on

5   February 16, 2023, SEC Chair Gary Gensler continued that TFL and Do Kwon "committed fraud

6   by repeating false and misleading statements to build trust before causing devastating losses for

7   investors." The SEC's Complaint, *SEC v. Terraform Labs PTE LTD.*, 23-cv-01346 (S.D.N.Y.),

8   (Dkt. No. 1) ("SEC Compl.") is attached as Exhibit 1 and incorporated by reference in its entirety

9   herein. The SEC first alleges that Terra Tokens constitute unregistered securities under the test

10  that the Supreme Court established in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  In addition,

11  the SEC accuses TFL and Do Kwon of orchestrating a massive, multi-billion dollar fraud on

12  investors in their securities.

13          3.      TFL is a company that operates the Terra blockchain and its related protocol,[2]

14  which hosts, supports, and funds a community of decentralized financial applications and products

15  known collectively as the Terra ecosystem.  TFL's primary focus is developing, marketing, and

16  selling a suite of digital assets and financial products within the Terra ecosystem, including the

17  native and governance tokens[3] within the Terra ecosystem, so-called "stablecoins," a bevy of

18  financial products such as "mirrored assets," bonded assets, liquidity pool tokens, along with

19

20  _____

[1]      *SEC Charges Terraform and CEO Do Kwon with Defrauding Investors in Crypto Schemes*. Available at: https://www.sec.gov/news/press-release/2023-32.

[2]      Akin to a company's charter, a "blockchain protocol" is a piece of code that operates as a set of regulations and guidelines that govern the functioning of various parts of a blockchain company's technology.  Investors in TFL's digital assets can gain governance rights over the Terra blockchain protocol by purchasing and staking those assets much in the same way that an investor gains voting rights in a public corporation by owning that corporation's stock and voting at the shareholders' meeting.

[3]      A "token" is a financial product that is contractually based (via a "smart" contract) and is created and uploaded permanently to a given blockchain.  When investors purchase these products/contracts on a given blockchain, their expectation is that the general buying, selling, and exchanging of these tokens will function according to the terms of the original smart contract and in a manner similar to other tokens on the same blockchain.  Thus, when a token owner transfers assets from one wallet address to another new wallet address, on the same blockchain, the owner reasonably expects that those assets will actually be transferred to the new wallet address.  This expectation is much like an industry standard in that the same expectation applies to all current blockchains and tokens, not just the Terra blockchain.

various protocols (*e.g.*, Anchor, Mirror, etc.) to support and facilitate their sale. These digital assets are collectively referred to herein as "Terra Tokens" and were once worth tens of billions of dollars in total market cap.  All of TFL's decentralized applications are designed to manufacture a reason to use the Terra Tokens since there is no purpose for these digital assets other than as investments.

4.      Plaintiffs and the Class paid fiat and/or cryptocurrencies in exchange for the Terra Tokens with the expectation of profit from either an increase in the price of particular Terra Tokens like Luna and the mirrored assets or from receiving interest payments for staking UST or other TFL governance tokens.  This expectation was based on the efforts of Defendants to maintain the Terra ecosystem.  Defendants sell or sold the Terra Tokens from the retained supply and used the proceeds from the sales to fund TFL, to reward investors, and as governance tokens.  Even though the Terra Tokens bear all the hallmarks of being investment contracts and, thus, securities under the *Howey* test, no registration statements have been filed with the SEC with respect to the various Terra Tokens.

5.      On top of selling unregistered securities in the form of Terra Tokens, Defendants made a series of false and misleading statements regarding the largest Terra ecosystem digital assets by market cap, UST and LUNA, in order to induce investors into purchasing these digital assets at inflated rates.

6.      TFL repeatedly touted the stability of UST as an "algorithmic" stablecoin that is paired to the Terra ecosystem's native token LUNA and the sustainability of the Anchor Protocol ("Anchor") – a type of high-yield savings account whereby investors can "stake" or deposit UST with TFL in exchange for a guaranteed 20% APY interest rate.  As a part of this promotional campaign, TFL formed the Luna Foundation Guard – a group of six venture capital groups that promised to support and fund the Terra ecosystem and to "defend the peg" in the event that high volatility caused the UST/LUNA pair to become untethered from one another. Certain members of the Luna Foundation Guard, including Defendants Jump, Tribe Capital, DeFinance Capital, and Three Arrows Capital acted on behalf of TFL to promote the stability of UST and mislead investors into believing that (1) the Luna Foundation Guard's reserve pool would be sufficient to defend the peg against a proverbial run on the bank by UST/LUNA investors, and (2) that the Luna

Foundation Guard would be able to maintain interest payments from the Anchor Protocol through a well-capitalized "Anchor Yield Reserve" fund.

7.      These promotions, along with the announcement of financial backing of major venture capitalists in the sector, were a siren song to both veteran and rookie crypto investors alike, luring them in with a purportedly "stable" digital asset in UST that would nevertheless provide outsized returns on investment via Anchor.  The marketing of UST and Anchor was so effective that approximately $14 billion of UST's market cap (75%) was deposited into Anchor at its peak.

8.      Understanding that the Terra project was unsustainable and seeing its imminent collapse, several months before UST's de-pegging, Kwon and the other Defendants began pulling 100 billion won[4]—the equivalent of $80 million—per month out of Terraform Labs' funds and siphoning it off to multiple cryptocurrency wallets.

9.      In June 2022, reports emerged regarding allegations that Do Kwon quietly sold $2.7 billion worth of UST over the span of mere months using a separate borrowing protocol, Degenbox, that purchases stablecoin on a loop. In other words, "through it, people can stake collateral to buy UST, deposit it into anchor and then use the aUST to borrow more UST, repeating the process as often as they want."[5] It was further alleged that Degenbox was "the perfect mechanism to drain liquidity out of the LUNA & UST system and into hard money like USDT" and that Kwon abused the abundant liquidity created by that protocol to "cash out roughly $2.7 billion through the MIM/ UST pool, without affecting the peg of the UST.[6]

10.      Between May 6, 2022, and May 9, 2022, however, structural infirmities specific to the Terra ecosystem exposed a crack in UST's ability to maintain its peg to $1.  The truth regarding the stability and sustainability of the UST/LUNA pair and the Anchor Protocol could not be hidden any longer from investors, and within a week, the price of UST and LUNA collapsed by approximately 91% and 99.7%, respectively.

---

[4]      The won is the Korean fiat currency worth approximately $0.00081 per dollar.

[5]      https://beincrypto.com/new-allegations-against-do-kwon-surface/

[6]      *Id.*

11.     Soon thereafter, Police in the Republic of Korea ("Korea"), instituted a flight ban on all TFL employees. High-ranking executives had already located themselves in Singapore. For example, TFL founder, Defendant Kwon, faces criminal charges in the Republic of Korea ("Korea") from which he has fled. Defendant Kwon remains a fugitive. In September, Korean prosecutors issued a warrant for his arrest. According to Korean authorities, however, Defendant Kwon's location became unclear after Korean authorities issued the warrant. Again, according to Korean authorities, Korea has voided Defendant Kwon's passport after demanding its return. Defendant Kwon is the subject of an Interpol "red notice." Again, according to Korean authorities, Defendant Kwon is in Serbia from which Korean authorities are seeking cooperation. Kwon has taunted authorities on social media accounts purportedly attributable to him but has not revealed his location. Reports quote Defendant Kwon as claiming "an extremely high bar of integrity" and that he "look[ed] forward to clarifying the truth. . . ." Korean authorities, however, refute that claim, indicating that Defendant Kwon has refused to cooperate with investigators and has conveyed, through his lawyers, that he has no plan to appear for questioning.

12.     Choi Sung-kook, prosecutor at Korea's Seoul Southern District Prosecutor's Office, told reporters that Korean prosecutors have obtained private messages of Do Kwon allegedly telling a Terraform Labs employee to manipulate the market price of the Terra stablecoin and the associated Luna cryptocurrency, now Luna Classic.

13.     Korean authorities are also investigating Defendant Platias and have issued a warrant for his arrest and for the arrest of TFL employee Han Mo. Defendant Platias has fled to his native Greece. Similarly, after executing a search warrant of his residence, Korean prosecutors have issued an arrest warrant for TFL co-founder Daniel Shin, alleging that he illegally profited before the collapse of UST/LUNA.

14.     Notwithstanding, Defendant Kwon has launched Terra 2.0/LUNA2 shortly after the collapse of UST/LUNA, eliminating the idea of a stablecoin. Exchanges, such as Binance, list LUNA2, but warn users that they are transacting tokens launched by a fugitive and require an affirmative click, indicating that users "understand."

## PARTIES

*Plaintiffs*

15.    Lead Plaintiff Michael Tobias ("Tobias") is a resident and citizen of the state of New York, living in New York. As set forth in the certification he submitted to the Court (Dkt. Nos. 19-3 and 19-4) Lead Plaintiff Tobias purchased at least that number of Terra Tokens during the Relevant Period and suffered investments losses as a result of Defendants' conduct.

16.    Plaintiff Nick Patterson ("Patterson") is a resident and citizen of Illinois, living in Chicago, Illinois. As set forth in the certification he previously submitted to the Court (Dkt. Nos. 1, 25-3), Plaintiff Patterson purchased Terra Tokens, including UST, LUNA, ANC, Mirrored Assets, and Bonded Assets during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

*Defendants*

17.    Defendant TerraForm Labs Pte. Ltd. ("TFL") is a Seoul-based company with its headquarters located at 80 Raffles Place, #32-01, UOB Plaza, Singapore 048624.

18.    Defendant Jump Trading LLC is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654, acting by, through, in conjunction with, and with the participation of its business unit and/or division, Jump Crypto (together, "Jump"). In addition to providing funding to TFL and the Luna Foundation Guard, Jump also helped develop Wormhole, an exchange that acts as a bridge between blockchains, which can be used to transfer digital assets from one blockchain to another. Wormhole unleashes Terra assets, particularly UST, into the Solana blockchains' burgeoning DeFi ecosystem and presents a trust-minimized conduit for users to send assets between Terra and Ethereum as well.  Upon information and belief, Jump used its relationship with Wormhole to secure a favorable exit from its UST/LUNA holdings prior to the complete collapse of the Terra ecosystem.

19.    Defendant Tribe Capital ("Tribe") is a limited liability company with its headquarters located at 2700 19th Street, San Francisco, California 94110.

20.     Defendant DeFinance Capital/DeFinance Technologies Oy ("DeFinance") is a Finnish limited liability company with its headquarters located at Lönnrotinkatu 36 K 22, 00180 Helsinki, Finland.

21.     Defendant Three Arrows Capital Pte. Ltd. ("Three Arrows") is a Singapore-based company with its headquarters located at 7 Suntec Tower One 038987, 21-04 Temasek Blvd., Singapore.

22.     Defendant Nicholas Platias is the Head of Research and a "founding member" of TFL, a member of the Governing Council of the Luna Foundation Guard, and one of the co-founders/creators of the Anchor Protocol.  Platias served as a consultant and spokesman for TFL, the Luna Foundation Guard, and the Anchor Protocol, has exercised control over TFL and directed and/or authorized, directly or indirectly, the sale and/or solicitations of the Terra Tokens to the public.

23.     Defendant Do Kwon is the co-founder and Chief Executive Officer of TFL and has been since 2018.  Kwon is a resident of the Republic of Korea.  Since its inception, Kwon has exercised control over TFL and directed and/or authorized, directly or indirectly, the sale and/or solicitations of the Terra Tokens to the public.  Kwon graduated with a Bachelor of Science degree in computer science from Stanford University in California and travelled to the United States to conduct business on behalf of TFL, including to a digital asset and blockchain conference held in New York City in September 2021.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 15 U.S.C. §78aa, and 15 U.S.C. §77v(a). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. Alternatively, this Court has jurisdiction under 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because Plaintiffs and at least one Defendant are citizens of different states.

SECOND AMENDED CLASS ACTION COMPLAINT

25.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint and the SEC Compl., subjecting themselves to personal jurisdiction in this District and rendering this Court's exercise of jurisdiction proper and necessary.

26.     TFL actively conducted business in the United States and within this District. Significantly, Defendant Platias – a resident of California before fleeing to Greece – is a founding member of TFL and serves as its Head of Research.  Platias, along with Defendant Kwon, authored the April 2019 LUNA whitepaper[7] on behalf of TFL and serve as two of six members on the Luna Foundation Guard's Governing Council.  The June 2020 whitepaper for the Anchor Protocol was also co-authored by Platias.  Relatedly, Platias wrote the "Introducing Anchor" opening statement that was published by TFL on July 6, 2020.[8]  As discussed at length below, the Anchor Protocol was at the primary driver of the Terra ecosystem's collapse. Thus, the source of the alleged misconduct related to the Anchor Protocol, UST, and LUNA, as well as numerous misleading statements made on behalf of TFL, occurred within California and impacted its residents.

27.     TFL sold directly to and through U.S. entities and otherwise made the unregistered securities they sold available to U.S. investors. *See* SEC Compl. 104-117.

28.     For example, from at least April 2018 through September 2018, Terraform sold nearly 200 million LUNA to institutional investors, including at least one U.S. entity, and offshore entities controlled by U.S. entities. The terms of these sales imposed no restrictions on when the LUNA tokens could be resold. Terraform distributed LUNA to some of the investors less than a year after the executed agreements, and Kwon signed the purchase agreements. The terms of the agreements reflect the expectation that most, if not all, of these purchasers would sell their LUNA

---

[7]     A "whitepaper" is a document created by blockchain companies that describe the project and the terms of its launch and operations.  While whitepapers contain vastly less information than what is required in an SEC registration statement, they do represent the primary offering document for a blockchain-related project.

[8]     Nicholas Platias, *Introducing Anchor*, MEDIUM (July 6, 2020), https://medium.com/terra-money/introducing-anchor-25d782cbb509.

into public markets. In essence, TFL and Kwon were embarking on a large-scale unregistered public distribution of LUNA. *See* SEC Compl. ¶106.

29.    Between January and late February 2019, Terraform also sold approximately $60,000 worth of LUNA in a sale that was advertised on Terraform's publicly available messaging channels and through email. The offering involved general solicitations to United States investors. TFL and Do Kwon also contracted with a company to make the LUNA available to investors worldwide online. TFL and Do Kwon told the investors in these sales that they would receive the tokens for a discount to market prices three months after the token launch. The LUNA tokens did not restrict purchaser resales into the United States or elsewhere. *See* SEC Compl. ¶107.

30.    Later, in November 2019, Terraform and its wholly owned subsidiary loaned 30 million LUNA to a U.S.-based proprietary trading firm that the SEC refers to as the "U.S. Trading Firm," *see* SEC Compl. ¶108, that worked closely with TFL and Kwon to sell unregistered Terra Tokens in the United States. According to numerous media reports, the "U.S. Trading Firm" is Defendant Jump. Plaintiffs refer to the U.S. Trading Firm as Jump throughout this complaint.

31.    Kwon emailed a small group of investors, informing them that the purpose of the November 2019 loan to Jump was to "improve liquidity" of LUNA, because of the "lackluster [ ] performance of the LUNA token." In July 2020, Jump began selling LUNA into the market, allowing investors to purchase LUNA through transactions in secondary markets. *See* SEC Compl. ¶108.

32.    In September 2020, Terraform and its wholly owned subsidiary "loaned" an additional 65 million LUNA to Jump. To receive the LUNA, Jump had to meet certain thresholds related to trading in UST. Jump met the first threshold and began receiving LUNA pursuant to the loan from TFL in January 2021. Jump subsequently began continuously selling LUNA into the market, including through a major U.S. crypto asset trading platform, once that platform began listing LUNA in August 2021. Terraform's "loan" to Jump and Jump's subsequent sales thus allowed public investors, including U.S. investors, to acquire LUNA through transactions in the secondary market, and generated speculative interest in LUNA.  *See* SEC Compl. ¶109.

33.     These two transactions between Terraform, its subsidiary, and Jump, were, in essence, public distributions of LUNA on the part of Terraform. With Terraform's and Do Kwon's knowledge and expressed intent that Jump would distribute the LUNA they provided to "improve liquidity," Jump acquired the LUNA directly from Terraform and its subsidiary and sold it into the market. *See* SEC Compl. ¶110.

34.     TFL also made LUNA available on multiple crypto asset trading platforms. From at least August 2019, through at least February 2022, TFL sold billions of dollars of LUNA directly into secondary markets through transactions on crypto asset trading platforms, including those available to U.S. investors. *See* SEC Compl. ¶111.

35.     In addition, as noted in court filings by the SEC concerning TFL's Mirrored Assets (discussed below), TFL's financial products "are offered and available for purchase by U.S. investors through Terraform's web application" as well as on digital asset trading platforms.  TFL and Individual Defendants Kwon and Platias promoted the Terra Tokens and related protocols through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media.[9]

36.     TFL's origins are firmly rooted in California and began, upon information and belief, during Defendant Kwon's time at Stanford.  For example, TFL has had several funding rounds since its inception in 2018.  According to TFL, the majority of the "Early VC" and "Seed" investors were California businesses.  For example, TFL received millions of dollars of start-up and maintenance funding from the following California entities:

a.     Pantera Capital located in Menlo Park, California;

b.     Lightspeed Venture Partners located in Menlo Park, California;

c.     Blockchain.com Ventures located in Palo Alto, California;

d.     TransLink Capital located in Palo Alto, California;

---

[9]     *See, e.g.*, Michael P. Reagan, *Fake Tesla, Apple Stocks Have Started Trading on Blockchains*, BLOOMBERG NEWS (July 6, 2021), https://www.bloomberg.com/news/articles/2021-07-06/fake-teslaapple-stocks-have-started-trading-on-blockchains; *Our mission is to bring decentralized monies to as many blockchains as possible: Terraform Labs CEO*, YAHOO! NEWS (July 12, 2021), https://news.yahoo.com/mission-bring-decentralized-monies-many171201969.html.

e.      Coinbase Ventures located in San Francisco, California;

f.      Polychain Capital located in San Francisco, California; and

g.      Synapse Capital located in San Francisco, California.

37.      Anchor Protocol has similarly received millions of dollars in start-up funding from the following California entities:

a.      Alameda Research located in Berkeley, California;[10]

b.      Dragonfly Capital Partners located in San Francisco, California;

c.      Pantera Capital located in Menlo Park, California; and

d.      Naval Ravikant, an investor located in Palo Alto, California.

38.      Likewise, one of the members of the Luna Foundation Guard – Defendant Tribe Capital – is also located in and operates out of San Francisco.

39.      Defendant Three Arrows Capital was initially established and headquartered in San Francisco, California, and maintains investments in several California-based cryptocurrency projects and businesses.

40.      Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

**FACTUAL ALLEGATIONS**

A.      **The Terra Ecosystem**

1.      **TFL**

41.      TFL is a Seoul-based company founded in 2018 by Defendant Do Kwon and Daniel Shin that, as noted by the SEC in its own investigation into TFL's digital assets, "regularly transacts business in the United States, included by contracting with U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of [TFL] appear to reside in the United States, including Terraform's General Counsel (located in

---

[10] On December 7, 2022, Defendant Kwon made a series of posts on Twitter suggesting that Alameda and its former CEO, Sam Bankman-Fried, caused the depeg of UST in order to profit from a short position. Should discovery reveal that parties other than the named Defendants were also culpable for the misleading statements and conduct alleged herein, Plaintiffs reserve the right to add any such individuals or entities.

SECOND AMENDED CLASS ACTION COMPLAINT

1    Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Defendant

2    Platias] (located in California), and its Director of Special Products (located in New York)."[11]

3    42.    TFL operates the Terra blockchain, a platform upon which the Terra ecosystem's

4    decentralized financial products and services are developed and supported. These products and

5    services take the form of "decentralized applications" and protocols built by TFL. With respect to

6    financial products, TFL has three main types of digital assets that it created: (1) tokens that are

7    native to the Terra ecosystem; (2) stablecoins; and (3) the various Mirrored Assets, Bonded Assets,

8    and LP Tokens.

9    43.    According to South Korea's Supreme Court Registry Office court documents, Do

10   Kwon dissolved TFL's headquarters on May 4, 2022, and the Seoul branch on May 6, 2022. The

11   decision came following a general shareholder meeting on April 30, 2022, with Do Kwon acting

12   as the liquidator.[12]

13   **2.    Do Kwon**

14   44.    *The New York Times* described Defendant Kwon as "a trash-talking entrepreneur"

15   that caused a "$40 Billion Crash."[13] One of Kwon's go-to insults is to demean and delegitimize

16   his detractors or critics of the Terra Tokens by dismissing them as "poor."

17   45.    For example, on July 1, 2021, Kwon mocked a British economist, Frances Coppola,

18   who criticized the algorithmic stablecoin model. Instead of addressing Coppola's concerns,  in

19   particular, the charge that the algorithmic stablecoin model could not defend against a bank run,

20

21

22

---

23   [11]    *SEC v. Terraform Labs PTE, Ltd.*, No. 1:21-mc-00810 (S.D.N.Y. Nov. 12, 2021),
     Declaration of Roger J. Landsman in Support of U.S. Securities and Exchange Commission's
24   Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas,
     ECF No. 4.
25
     [12]    *See* Kevin Helms, *Do Kwon Dissolved Terraform Labs Korea Days Before Collapse of
26   Terra LUNA, UST*, BITCOIN (May 19, 2021), https://news.bitcoin.com/dokwon-dissolved-
     terraform-labs-korea-days-before-collapse-of-terra-luna-ust/.
27   [13]    David Yaffe-Bellany and Erin Griffith, *How a Trash-Talking Crypto Founder Caused a
     $40 Billion Crash* (May 18, 2022), https://www.nytimes.com/2022/05/18/technology/terra-luna-
28   cryptocurrency-do-kwon.html.

1    Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I

2    don't have any change on me for her at the moment."[14]

3          46.    On December 30, 2021, the co-founders of a rival stablecoin, MakerDAO, posted

4    a thread discussing predictions for the crypto sector in 2022.  In particular, they predicted that

5    "UST will collapse in a death spiral with LUNA hyper-inflating to try to cover the peg"[15] and gave

6    the following tongue-in-cheek remarks:  "Look, UST and MIM are solid ponzis and I respect that.

7    You can make good money off them for sure. But they are not built for resilience, and they are

8    going to 0 once the market turns for real . . . .  Now stop trying to scam users looking for actual

9    stability into being ur exit liquidity."[16]  When asked if he was willing to place a bet that the

10   MakerDAO founders were wrong, Kwon simply replied "I don't gamble against the poor."

11         47.    In addition, UST/LUNA is not Kwon's first trip around the failed stablecoin block.

12   Kwon has had similar failures with previous attempts to market and sell a stablecoin and thus he

13   knew or should have known that his conduct with UST/LUNA was likely to mislead investors and

14   cause them financial harm. For example, in 2021, Kwon launched the Basis Cash ("BAC") token,

15   another algorithmic stablecoin project that sought and failed to maintain a $1 peg. A former

16   engineer at Terraform Labs, Hyungsuk Kang, claimed that Basis Cash was a side project created

17   by him and Do Kwon.  Since Kwon's previous algorithmic stablecoin failed, it is possible that he

18   could have anticipated UST's failure to maintain the peg.[17]

19                    **3.    The Luna Foundation**

20         48.    On or around January 19, 2022, TFL announced the formation of the Luna

21   Foundation Group – a Singapore-based non-profit organization – for the purpose of "facilitating

22

23

_____

24   [14]    https://twitter.com/stablekwon/status/1410491186196795398?s=20&t=WhXnvJmqblLyJePq
     laNsDQ.

25   [15]    https://twitter.com/hexonaut/status/1476649894479753238?s=20&t=2n6IPnOxhcpLu7CoEn
     DtOg.

26   [16]    https://twitter.com/RuneKek/status/1478166276979793922?s=20&t=2n6IPnOxhcpLu7CoEn
     DtOg.

27   [17]    Sam Kessler and Danny Nelson, *UST's Do Kwon Was Behind Earlier Failed Stablecoin,
     Ex-Terra Colleagues Say*, COINDESK (May 11, 2022), https://www.coindesk.com/tech/2022/05/
28   11/usts-do-kwon-was-behind-earlier-failed-stablecoin-ex-terra-colleagues-say/.

1    the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's

2    algorithmic stablecoins."[18]

3        49.    The announcement noted previous criticisms directed towards algorithmic

4    stablecoins like UST, but the Luna Foundation Guard downplayed the "misconception" that

5    algorithmic stablecoins are "unsustainable." The Luna Foundation Guard went on to state that a

6    previous depegging that occurred in May 2021 was not a sign that UST was more unstable than

7    disclosed, but rather, a learning opportunity that UST was able to capitalize on:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, **UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy**.    Still, **questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on**.
>
> *        *        *
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions.   These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.[19]

[Emphasis added.]

17        50.    According to its website:

> **The Luna Foundation Guard ("LFG")** is a nonprofit organization established in the Republic of Singapore dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting the research and development of various aspects enveloping open-source software and applications, the LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.
>
> **A decentralized economy needs a decentralized currency**
>
> The LFG is primarily focused on Terra. Terra is a decentralized, open-source public blockchain built to support a suite of fiat-pegged, algorithmic stablecoins. Primarily, this includes **TerraUSD ("UST")** – the flagship stablecoin of the Terra network and the leading decentralized stablecoin in DeFi by market cap.

---

[18]    The Intern, *Formation of the Luna Foundation Guard (LFG)*, MEDIUM (Jan. 19, 2022), https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b#:~: text=We're%20pleased%20to%20announce,sustainability%20and%20stability%20of%20Terra's.

[19]    Defendants' public statements attributing UST's recovery from the May 2021 depegging to the resiliency of algorithmic stablecoins – rather than an infusion of capital – are materially misleading, and feature prominently in the SEC's fraud allegations.  *See* SEC Compl. ¶¶152-68,

Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. **This is primarily accomplished by the Terra protocol design**, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless arbitrage incentives and counter-cyclical monetary policy levers to maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins.

In connection with its stewardship and support of the Terra ecosystem in general, **LFG is establishing a decentralized UST Reserve protocol** – a non-profit initiative to provide a further layer of support to ensure that UST maintains its peg. In an event where the market price of UST materially deviates from the USD peg, holders of UST will be able to close the arbitrage and bring the market price of UST back to the peg by swapping UST for major, non-correlated assets like BTC that capitalize the reserve. The reserve functions as a release valve for swelling pressure to exit UST to LUNA on-chain, dampening the reflexivity of the system by reducing the dilution of the LUNA supply during severe contractions and restoring the peg in real-time and maintaining an alternative arbitrage opportunity outside of the Terra protocol itself.

The UST Reserve serves as **a perpetual decentralized asset reserve** for members of the community. Neither LFG nor any other entity that assisted with the UST Reserve protocol profit from it.

51.     The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem. Building reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins . . . ."

52.     In addition to deploying "capital backing" to prop up TFL's stablecoins and Anchor Protocol, the Luna Foundation Guard also was tasked with providing funding and grants for builders, researchers, community members, and developers working "in the interest of the Terra economy categorized into 3 primary groups: Open-Source Technology Development, Research & Education, and Community Growth."

53.     The Luna Foundation Guard is overseen and operated by a "Governing Council, initially comprised of the following leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem." The founding members of the Luna Foundation Guard's Governing Council included: Defendants Do Kwon and Nicholas Platias from TFL;

1    Kanav Kariya, the President of Jump Crypto; Remi Tetot, co-founder of RealVision TV; Jonathan

2    Caras, the Project Lead at Levana Protocol; and José Maria Delgado co-founder of Delphi Digital.

3        54.    The Luna Foundation Guard was initially funded with a 50 million LUNA gift on

4    January 22, 2022, from TFL to "help bootstrap its stabilizing reserves and grants framework."

5        55.    In February 2022, TFL announced that the Luna Foundation Guard closed a

6    $1 billion private token sale for "use in establishing a UST Forex Reserve denominated in Bitcoin"

7    to serve as collateral for the TFL stablecoins.[20] This was the first of several rounds of funding that

8    the Luna Foundation Guard provided to the Terra ecosystem.

9        **4.    Jump**

10       56.    Jump has been backing TFL and Kwon since at least 2019.[21] According to both

11   Kwon and Kariya, they first met in 2019 and discussed Terra and UST.[22] Notably, this is well

12   before Jump Trading announced the formal launch of its crypto division, Jump Crypto, on

13   September 14, 2021.[23] In congratulating Jump Crypto – a "consummate Terra partner"[24] – on its

14   public launch, Terra stated "Thrilling to see @JumpCryptoHQ officially launch! Jump has quietly

15   played a pivotal role in the Terra ecosystem for a long time . . . ."[25] "The Terra economy is

16   magnified significantly with Jump Crypto by its side. #LUNAtics, please give them a follow, offer

17   your support, and help amplify their bold new endeavor into crypto. Institutions are here, and

18   @JumpCryptoHQ . . . is leading the way on Terra."[26] Kariya replied that "It's been a real pleasure

19   working with @stablekwon and the Terra team over the last couple years. A+ folks."[27]

20   _____

21   [20]    Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-
     Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022),
22   https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_
     denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm.

23   [21]    https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-
     fiasco-3082509

24   [22]    https://terraspaces.org/transcriptions/transcript-the-ship-show-ep-1-kanav-kariya-and-do-
     kwon-talk-defi/

25   [23]    https://twitter.com/jump_/status/1437774885703594002?s=20

26   [24]    https://twitter.com/terra_money/status/1437786236601708544?s=20

     [25]    https://twitter.com/terra_money/status/1437786233485266945?s=20
27   [26]    https://twitter.com/terra_money/status/1437786243295764501?s=20

28   [27]    https://twitter.com/KanavKariya/status/1437822736693407745?s=20

57.     Jump, a member of the Luna Foundation Guard with its crypto division (i.e. Jump Crypto) president Kanav Kariya sitting on the Luna Foundation Governing Council, has had previous experience (and struggles) with using algorithmic trading. In particular, Jump engages in algorithmic trading of a variety of asset classes, including digital and traditional assets. In May 2018, one of its trading algorithms malfunctioned, triggering deficiencies in Jump's capital requirements. On September 12, 2019, the NYSE Chicago announced that it had reached a settlement with Jump related to these issues.[28]  Notably, NYSE Chicago determined that Jump had failed to maintain sufficient risk management controls intended to reduce the risk of erroneous orders and that the controls present "were not reasonably designed to address the risks presented by Jump's business." The Jump Trading Order further noted that Jump had "generally failed to sufficiently document" how its ineffective controls were implemented. As a result, NYSE Chicago found that Jump had violated Exchange Act Rules 15c3-1, 15c3-5(b) and 15c3-5(c)(1) and NYSE Chicago, Article 6, Rule 5 & Article 7, Rule 3(a)(1)(A).  Under the terms of the settlement, Jump was ordered to pay a $250,000 fine.

58.     Jump's devil-may-care approach to risk is even greater when it comes to its crypto division led by Kariya, who is reported to be "upbeat despite [the] Terra fiasco."[29] As noted in this article on Kariya and Jump: "industry players say Jump is widely seen as a bigger risk-taker than most traditional trading firms when it comes to crypto. Competitors like Jane Street and Susquehanna International Group also have venture capital arms that make crypto-related investments. But none of them operates on Jump's scale or integrate trading and incubating startups the way Jump does."[30]

59.     One of the startups that Jump worked on with TFL was Certus One, which is the developer of Wormhole and was acquired by Jump in August 2021. Ever on brand, Jump took a

---

[28]     Order Instituting Proceedings, Accepting Settlement, Making Findings, and Imposing Sanctions, *In Matter of: Jump Trading, LLC*, No. 2018-11-00017 (September 12, 2019) (the "Jump Trading Order").

[29]     https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-fiasco-3082509

[30]     https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-fiasco-3082509

SECOND AMENDED CLASS ACTION COMPLAINT

lax approach to internal oversight over its crypto-related investments like Wormhole, which, as usual for the risk-chasing venture capital firm, led to problems for retail investors. In particular, despite being previously dubbed by Wormhole as the "Guardian of the Wormhole network,"[31] in February 2022, Wormhole's smart contract was hacked resulting in the theft of over $340M in various digital assets. Without taking responsibility for the lack of security that led to the hack, Jump sought to spin itself as being philanthropic to the "community members" by announcing it had "replaced" the missing funds.[32] In truth, Jump had bailed itself out. As one cryptocurrency investor more succinctly noted: "Jump and SBF were in bed together. Jump owns Certus. Certus builds Wormhole. Wormhole gets hacked. Jump "bails out" the wormhole hack (bailing out themselves). Jump raises $187M for HOLE token. SBF gives Jump $67 million of customer funds."[33] Notably, Kwon claims that he "collaborat[ed] as builders" with Jump and Kariya to "take Terra assets across multiple chains and for Wormhole to connect all the blockchains together."[34] Upon information and belief, Jump leveraged its knowledge of Wormhole and relationships with Certus One to secure a favorable exit from its UST/LUNA holdings prior to the complete collapse of the Terra ecosystem.

60.     Jump has previously been accused of similarly using its connections to front run a multibillion-dollar cryptocurrency collapse. Specifically, Jump is alleged to have used its relationship with the now-defunct cryptocurrency exchange FTX and its notorious trading firm Alameda Research (the latter of which, notably, was an early backer of the Anchor Protocol) to flee the sinking FTX ship before retail investors were completely wiped out. An article titled "A look at Jump Crypto and its shady past" reported that "Jump and FTX go way back and the relationship is a deep one. However, the links haven't always been viewed favorably. Indeed, Jump was accused of colluding with Sam Bankman-Fried's Alameda Research on seed funding rounds

---

[31] https://twitter.com/wormholecrypto/status/1437775731917037574?s=20

[32] https://twitter.com/jump_/status/1489301013408497666?s=20

[33] https://twitter.com/bradmillscan/status/1602483390946709507?s=20

[34] https://terraspaces.org/transcriptions/transcript-the-ship-show-ep-1-kanav-kariya-and-do-kwon-talk-defi/

and yield farming investments. It's also been alleged that Jump withdrew $300 million in assets from FTX the day before the exchange paused withdrawals."[35]

### 5.    The Terra Tokens

61.    These various Terra Tokens are described further as follows:

#### a.    *Native and Governance Tokens*

- LUNA – launched in or around April 2019, LUNAa tokens are the native token for TFL.  The Terra protocol runs on a Proof of Stake (PoS) blockchain, where miners need to stake the native token Luna to mine Terra transactions. Luna tokens are also the pair to the UST algorithmic stablecoin.

- ANC – is the governance token for the Anchor Protocol and it is minted by TFL on the Terra blockchain.  ANC "is designed to ***capture a portion of Anchor's yield, allowing its value to scale linearly with Anchor's assets under management (AUM)***. Anchor distributes protocol fees to ANC stakers pro-rata to their stake, benefitting stakers as adoption of Anchor increases . . . ."[36] ANC tokens are also "used as incentives to bootstrap borrow demand and provide initial deposit rate stability."  Notably, 100M ANC tokens have been "allocated to the creators of Anchor" (including Kwon and Platias). Investors in the Anchor Protocol receive their 20% APY on their UST deposits in the form of ANC tokens, which can be subsequently exchanged for other cryptocurrencies.

- $WHALE – Whale tokens are a "social" digital asset that is backed by both tangible and rare NFTs.

- ASTRO – Astro is a governance token for a DeFi protocol built on the Terra ecosystem.

---

[35]    https://protos.com/a-look-at-jump-crypto-and-its-shady-past/

[36]    Anchor Token (ANC) whitepaper,  https://docs.anchorprotocol.com/protocol/anchor-token-anc (last visited June 15, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT

- APOLLO – Apollo is a governance token for a DAO that "governs a War Chest for meta-governance and capital investments in decentralized ecosystems" like the Terra ecosystem.

- XDEFI – XDEFI is a token associated with a non-custodial wallet/digital asset wallet company that supports the Terra ecosystem.

- $MINE – MINE tokens are the native token for the Pylon Protocol, a suite of decentralized finance savings and payments products powered by yield redirection on the Terra blockchain.

- aUST – A token provided when UST tokens are deposited into Anchor Protocol.

- vUST – An arbitrage UST token that aims to enforce the UST peg by exploiting arbitrage opportunities.

- MIR – Mirror Token functions as a governance-type token for the Mirror Protocol. It allows investors to interact with Mirrored Assets (discussed below).

62. Cryptocurrency markets are notoriously volatile, with intraday price and/or exchange rate swings of 10% in a few hours occurring regularly. These wild fluctuations make cryptocurrencies generally less suitable as a medium of exchange for routine transactions like purchases. Stablecoins purport to solve this problem by attempting to tie or "peg" their market value to an external collateral with less volatility, such as another currency (*e.g.*, U.S. dollars), commodity (*e.g.*, gold), or financial instrument (*e.g.*, stocks, cryptocurrencies, etc.). The price of a stablecoin (including those developed by TFL) is supposed to always remain at $1, and developers of these digital assets have devised two primary ways to maintain price stability: over-collateralization with fiat reserves[37] and algorithmic stablecoins.

### *b.* *Stablecoins*

- UST – TerraUS is an algorithmic stablecoin that operates through a pair of tokens (the stablecoin itself and another digital asset that backs the stablecoin) and a smart contract that regulates the relationship between the two (*i.e.*, the algorithm). Instead

---

[37] Over-collateralized stablecoins maintain fiat reserves with enough cash or cash equivalents on hand to cover each respective stablecoin on a 1-to-1 basis. Similar kinds of stablecoins operate by using a cryptocurrency like Ether ("ETH") deposited into its smart contracts as the collateral.

SECOND AMENDED CLASS ACTION COMPLAINT

of swapping UST for $1 in dollar reserves in with over-collateralized stablecoins, investors could exchange one UST stablecoin for $1 worth of TFL's LUNA.  But in order to maintain UST's 1:1 parity with the U.S. dollar, TFL's algorithm mints and burns UST and LUNA to control the supply and keep the value of UST steady at $1, while at the same time incentivizing arbitrageurs to trade the UST back to its peg of $1 if it deviates.  This latter mechanism creates an arbitrage opportunity meant to encourage arbitrageurs to trade the UST/LUNA pair in order to trigger the mint/burn process and thus, a return to $1.

- KRT – TerraKRT is a stablecoin pegged to the South Korean won.

### c. Mirrored Assets

63.     TFL also promotes and sells so-called "mirrored" or synthetic assets (a/k/a "mAssets"), which are essentially derivative products that track the price of a particular underlying asset. The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Tesla, Inc. stock or the ProShares VIX Short-Term Futures ETF (ticker "VIXY") , in that they are designed so that their value rises and falls with the value of those securities. The mAssets corresponding to those equities have been named, for example, "mTesla" or "mVIXY."  According TFL's website, "mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."[38] Concurrently, TFL sells a MIR governance token to interact with the Mirrored Assets.

64.     TFL's Mirrored Assets include, but are not limited to, the following:

- mBTC – Mirrored Bitcoin is a synthetic asset tracking the price of Bitcoin.  It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- mETH – Mirrored Ether is a synthetic asset tracking the price of Ethereum's native token, Ether.  It can be minted on TFL's Mirror Protocol, which references on-chain prices.

---

[38]     https://terra.mirror.finance; What is Mirror? whitepaper, https://docs.mirror.finance (last visited June 15, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT

- <u>mVIXY</u> – Mirrored ProShares VIX is a synthetic version of the VIXY, which tracks stock market volatility.

### d.      LP Tokens

65.     In some instances, TFL created an entirely new token derivative to the mirrored asset (or other digital assets in the Terra ecosystem) after a pair of digital assets is combined and staked with a protocol via a smart contract. Once the two assets are locked in, a new token gets minted often called a liquidity pool ("LP") token. These LP tokens are created for the purpose of providing liquidity for trading and funding for operations. TFL's LP tokens include, but are not limited to, the following:

- UST-mVIXY-LP – a LP token developed for staking UST with mirrored VIXY tokens.
- bLUNA-LUNA-LP – a LP token developed for staking bonded LUNA tokens with LUNA.
- XDEFI-UST-LP – a LP token developed for staking XDEFI with UST.
- MINE-UST-LP – a LP token developed for staking MINE with UST.

### e.      Bonded Assets

66.     As described in the Bonded Assets whitepaper on the Anchor Protocol website, one of Anchor's core products is the bAsset (bonded asset) – "liquid, tokenized representations of staked (bonded) assets in a [Proof-of-Stack] blockchain. They allow stakers to gain liquidity over their staked assets, enabling the locked value in staked assets to be utilized in financial applications such as Anchor."[39]

67.     According to TFL's Head of Research and author of the LUNA and Anchor Protocol whitepapers, Platias "bAssets play a key role in Anchor towards offering a stable interest rate to Terra deposits."[40] And as the bAsset whitepaper clarified "Anchor's deposit rate subsidies

---

[39]    Bonded Asset (bAsset) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets (last visited June 15, 2022).

[40]    See n.4, supra.

are funded by bAsset rewards. bAsset rewards should be given out without interruption, as subsidies must be constantly distributed."[41]

68.    The bAssets developed and sold by TFL include the following:

- bETH – bETH tokens accrue UST rewards, funded from the Ethereum staking rewards of stETH. "Every 24 hours, Ethereum staking rewards (in the form of stETH) are sold for UST, which are then transferred over to Terra and distributed to holders of bETH."[42] However, the bETH tokens must be staked within the Terra ecosystem to accrue those rewards.

- bLUNA – Bonded Luna tokens are bonded assets ("bAssets") built for the Terra blockchain, with their value backed by underlying LUNA delegations. "Delegation rewards, collected in various native token denominations (TerraUSD, TerraSDR, Luna, etc.), are swapped for [UST].  Swapped [UST] is then distributed pro-rata to bLuna holders."[43]

### 6.    The Anchor Protocol

69.    As for the protocols on the Terra ecosystem, TFL developed, among others, the Mirror Protocol (a trading platform for TFL's Mirror Assets launched around December 2020) and the Anchor Protocol, which launched in August 2020.

70.    Anchor is by far the most popular protocol in the Terra ecosystem.  In exchange for staking their UST with TFL in the Anchor Protocol, investors are promised a steady and reliable 20% interest rate return on their investments. TFL, in turn, lends out the staked UST to interested borrowers for interest payments and use of the borrowers' collateral.

71.    Anchor's whitepaper states, in relevant part, the following regarding the "savings product" offered by TFL:

---

[41]    *See* n.19, *supra*.

[42]    Bonded ETH (bETH) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets/bonded-eth-beth (last visited June 15, 2022).

[43]    Bonded Luna (bLUNA) whitepaper, https://docs.anchorprotocol.com/protocol/bonded-assets-bassets/bonded-luna-bluna (last visited June 15, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT

1
2
3

> Anchor implements a liquidation protocol designed to **guarantee the principal of depositors. Deposits are safe insofar as all debts against them remain over-collateralized.**
>
>                *       *       *
>
> Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure. Anchor offers a solution with Terra stablecoin money markets. Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets. **Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns**.[44]

[Emphasis added.]

72.    TFL sells an algorithmic stablecoin called TerraUS ("UST") along with its native digital asset LUNA. These are two of TFL's largest digital assets by market capitalization, together reaching approximately $40 billion in worth.

73.    In an effort to continue to promote the stability of UST as a stablecoin, TFL announced the formation of the Luna Foundation Guard whose task it was to "defend the peg" of UST and maintain the stability of the Terra ecosystem.

74.    The Luna Foundation Guard is funded by six venture capital firms: Jump, Tribe Capital, Republic Capital, GSR, DeFinance Capital, and Three Arrows Capital. The Luna Foundation Guard collectively raised $1 billion in an initial coin offering round from TFL.

75.    On February 22, 2022, TFL announced the formation of the Luna Foundation Guard: Announcement of the $1 billion private token sales led by Jump Crypto and Three Arrows Capital, with participation from DeFinance Capital, Republic Capital, GSR, Tribe Capital, etc.

> 1/ One common criticism of algorithmic stablecoins is their reflexive nature and the hypothetical risk of a "bank run" scenario where demand to sell the stable outstrips supply in a way that causes compounding price decreases in both native tokens.
>
> 2/ Although the widespread adoption of $UST as a consistently stable asset through market volatility should already refute this, a decentralized Reserve can

---

[44]    Nicholas Platias, *et al*., Anchor: Gold Standard for Passive Income on the Blockchain (June 2020), https://www.anchorprotocol.com/docs/anchor-v1.1.pdf.

provide an additional avenue to maintain the peg in contractionary cycles that reduces the reflexivity of the system.[45]

**B.     The Terra Tokens Are Securities that the TFL Failed to Register Before Selling**

**1.     Terra Tokens Are Securities**

76.     Under §2(a)(1) of the Securities Act, a 'security' is defined to include an "investment contract."  15 U.S.C. §77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *W.J. Howey*, 328 U.S. at 299 (citation omitted). Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

77.     As a threshold matter, TFL has not registered any offering of securities pursuant to the Securities Act, nor has it registered the Terra Tokens as a class of securities under the Exchange Act. TFL has also not registered with the SEC as a broker or dealer under §15(a) of the Exchange Act, or as an investment company under §7(a) of the Investment Company Act.

78.     In the SEC Compl., the SEC, the regulatory agency with jurisdiction over the registration of securities, alleged (similarly to the initial complaint in this case, (Dkt. No. 1)) that

---

[45]     Terra    Powered    by    LUNA    (@terra-money),    TWITTER    (Feb.    22,    2022), https://twitter.com/terra_money/status/1496162890369404933?lang=en.

SECOND AMENDED CLASS ACTION COMPLAINT

Terra Tokens were offered, promoted, and sold as unregistered securities under the *Howey* test, and detailed the reasons why. *See* SEC Compl. ¶¶39-103.[46]

79.     TFL and Kwon repeatedly stated that the crypto assets would increase in value based on Terraform's development, maintenance, and promotion of its blockchain, protocols, and the entire Terraform ecosystem. They also promoted the ability to trade Terraform's crypto assets on the secondary market, with the success of the investment again depending on their efforts. *See* SEC Compl. ¶39.

80.     TFL and Kwon further touted the expertise and success of the Terraform team, including Kwon, claiming that Terraform was "led by serial entrepreneurs" and was a team with "deep relevant expertise," and provided biographies or links to LinkedIn profiles that highlighted TFL employees' and Kwon's expertise in crypto assets, finance, and technical experience with software coding, engineering, and development. *See* SEC Compl. ¶40.

81.     TFL and Kwon also advertised their considerable efforts to ensure that UST – the "lynchpin of the [Terraform] ecosystem" – maintained its $1.00 peg. These efforts included when, in January 2022, TFL and Kwon announced the creation of the Luna Foundation Guard, which had no employees and was controlled by Kwon, with the purpose of serving as an "asset reserve [] to back the UST." The Luna Foundation Guard was funded with a "gift" of 50 million LUNA (at the time, worth billions of dollars) directly from TFL. *See* SEC Compl. ¶41.

82.     Defendants also aggressively marketed TFL's crypto asset securities to U.S. investors, by posting information and promotional materials to accounts on several publicly accessible online social media platforms, such as Twitter accounts, blog posts, YouTube, and messaging applications like Telegram. Kwon and other TFL employees also gave interviews to the media promoting TFL's crypto assets, including U.S.-based media outlets. *See* SEC Compl. ¶42.

---

[46]     It is well-established that "if an agency's interpretation of a statute or regulation is not clearly outside its authority, then the courts should defer to the agency's expertise." *See, e.g., Good Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 954 (9th Cir. 1979) (citations omitted).

SECOND AMENDED CLASS ACTION COMPLAINT

83.     In addition, Kwon and other TFL employees traveled to the United States to meet with existing and potential investors in order to solicit investment in Terraform's crypto asset securities, including holding meetings in San Francisco and New York, and to attend and speak at an industry conference and events in New York. These U.S.-based promotional efforts also included a partnership with the Washington Nationals, which resulted in the word "Terra" being placed on every seat behind home plate and elsewhere around the stadium in Washington, D.C. TFL and Do Kwon also arranged to have several of their crypto assets listed for trading on several major crypto asset trading platforms, including a prominent U.S.-based trading platform. *See* SEC Compl. ¶43.

84.     Investors who bought the Terra Tokens invested money or other valuable consideration in a common enterprise:  namely, the Terra ecosystem. Investors had a reasonable expectation of profit based upon the efforts of the TFL and Do Kwon, including, among other things, these Defendants obtaining favorable listings of their Terra Tokens on U.S.-based cryptocurrency exchanges, and maintaining the stability of the Terra ecosystem.

85.     In addition to the reasons provided in the SEC's analysis, the Terra Tokens qualify as a security under the *Howey* test for the reasons below.

**a.     Terra Token Investors Invested Money**

86.     Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens.

87.     The Terra Tokens were listed on U.S.-based cryptocurrency exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other digital currencies.

88.     Defendants sold Terra Tokens to the general public through global, online cryptocurrency exchanges during its so-called launch.

89.     Every purchase of Terra Tokens by a member of the public is an investment contract.

1

2

      **b.**  **Terra Token Investors Were Intertwined in a Common Enterprise with Defendants**

3    90.  Additionally, investors were passive participants in the Terra Tokens' launch and

4 the potential profits of Plaintiffs and the Class were intertwined with those of Defendants and of

5 other investors.

6    91.  Defendants also were responsible for supporting the Terra Tokens, pooled

7 investors' assets, and controlled those assets.

8    92.  TFL and Kwon pooled the funds received from investors to develop the Terraform

9 ecosystem and increase the value of LUNA. LUNA investors shared equally in LUNA price

10 increases, or suffered LUNA price decreases equally, so that if one investor profited, all investors

11 did as well. Because LUNA is fungible, the fortunes of LUNA purchasers were tied to one another,

12 and each depended on the success of the Defendants' efforts and strategy and the Terraform

13 ecosystem as a whole. *See* SEC Compl. ¶46.

14    93.  Specifically, TFL sent proceeds of its sales of LUNA to crypto asset wallet

15 addresses that it controlled, in order to fund TFL's efforts to develop its operations. In fundraising

16 presentations, TFL and Kwon explained how TFL would use the proceeds from LUNA sales to

17 help grow and expand the Terraform ecosystem. For example, in August 2018, when TFL

18 announced its first raise of capital of $32 million, it noted that "Terra will invest the initial seed

19 capital in building the modern financial system on the blockchain." In fact, TFL's presentations to

20 investors stated that at least 20% of the initial billion LUNA tokens would be used for development

21 and operations. *See* SEC Compl. ¶47.

22    94.  In addition, throughout the Relevant Period, TFL and Do Kwon held a significant

23 amount of LUNA, tying their fortunes with LUNA investors' fortunes. TFL owned hundreds of

24 millions of LUNA tokens through the Relevant Period. In 2020, Kwon tweeted that he had

25 purchased 50 million LUNA, in addition to the 70 million LUNA that he owned from the time that

26 the blockchain launched in 2019. *See* SEC Compl. ¶48.

27

28

### c. Investors Purchased the Terra Tokens with a Reasonable Expectation of Profit from Owning Them

95.     Investors in the Terra Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The Terra Tokens were sold to investors prior to the Terra ecosystem being fully developed and able to handle the scale and scope of TFL's operations.  For pre-functional tokens, the primary purpose for purchasing Terra Tokens was to make a profit or accumulate additional Terra Tokens from various rewards programs, rather than to utilize the Terra Tokens themselves for a task.

### d. Investors Expected Profits from the Terra Tokens to Be Derived from the Managerial Efforts of Defendants

96.     Investors' profits in the Terra Tokens were to be derived from the managerial efforts of others – specifically, the Company and the Luna Foundation Guard. Terra Token investors relied on the managerial and entrepreneurial efforts of the Individual Defendants to manage, oversee, and/or develop the projects funded by sale of the Terra Tokens.

97.     Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

98.     Each of the Terra Tokens was a security at issuance because profit from the Terra Tokens would be derived primarily from the managerial efforts of Luna's teams developing the associated networks on which the Terra Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

99.     Investors in Terra Tokens relied on the managerial and entrepreneurial efforts of the Luna Foundation Guard, the Company, and Defendants Kwon and Platias to manage, market, and develop the Terra ecosystem.

100.    TFL and Kwon promoted LUNA as an investment that would increase in value with the increased usage of the Terraform blockchain that could result from their continued

development and maintenance. They stated publicly that as the Terraform ecosystem grew, based on their efforts, the value of LUNA would grow as well. As Kwon explained in an April 7, 2021 thread on Twitter (referring to LUNA as "moon"): "A bet on the moon is very simple:… The moon's fate in the long run is tied to how widely the money gets used and transacted." *See* SEC Compl. ¶50.

101.    In that same April 7, 2021 thread, Kwon touted that the value of LUNA could grow as the Terraform "ecosystem" grows, specifically tying the potential growth to his own efforts (which he promised would be successful by touting that he would "kick ass") while investors remained passive (or "s[a]t back") in the enterprise. *See* SEC Compl. ¶51.

102.    As one Terraform employee stated in Terraform's publicly-available Telegram messaging application, the "[v]alue of Luna grows as Terra [ecosystem] gets adopted and used." Another Terraform employee noted in an online Ask-Me-Anything interview on Reddit: "[i]n the long-run … Terra's transaction volume will be the main determinant of Luna's value." *See* SEC Compl. ¶52.

103.    According to an action by the New York State Attorney General filed on February 22, 2023 (*New York v. Vino Global Limited d/b/a Coinex*) concerning the sale of unregistered securities (including LUNA) by a cryptocurrency exchange:[47]

> LUNA is a cryptocurrency created by Terraform Labs ("Terraform"). Metz Aff. ¶ 28. The Website provides investors with information about the LUNA token, including Luna's distribution scheme, an introduction to the Terraform network, and links to the Terraform network's official website and whitepaper. *See* Ex. 17 to Metz Aff. From its inception, the LUNA token was promoted as an investment that would increase in value as a result of the development of other Terraform applications. Metz Aff. ¶ 29. The Terraform whitepaper issued in April 2019 explains that LUNA was "growth-driven" and further discussed the creation of applications to create demand and encourage its use. *See* Ex. 19 to Metz Aff.

> Terraform founder Do Kwon frequently spoke about LUNA's growth potential and value as an investment. For instance, on March 22, 2021, using his publicly known Twitter handle, Do Kwon described LUNA as being "designed to defend Terra stability at a diverse array of market conditions and accrue value to the moon at all of those market conditions." Metz Aff. ¶ 30. Do Kwon further used

---

[47]    Plaintiffs incorporate by reference herein the allegations in paragraphs 45-48 of the Verified Petition and Order to Show Cause, *New York v. Vino Global Limited d/b/a Coinex* (February 22, 2023) as well as the Metz Affidavit in Support of the Verified Complaint and related exhibits.

SECOND AMENDED CLASS ACTION COMPLAINT

Twitter to promote the ability of LUNA token holders to earn double-digit returns by staking their assets, as he did on November 20, 2021. *Id*. Additionally, on March 9, 2022, in a Tweet exchange with a critic, Do Kwon argued that people who purchased LUNA were not poor precisely because they had purchased LUNA, propagating the notion that buying LUNA would generate profit for purchasers. *Id*.

The price of LUNA increased substantially once Terraform projects launched. *See* Exs. 21.1 – 21.2 to Metz Aff. The creation of demand for LUNA was largely dependent upon Terraform, which drove the growth of LUNA by creating other applications and platforms such as its Mirror Protocol, which allowed users to invest in "synthetic stocks," using tokens that tracked the prices of stocks and allowed users to purchase and sell tokens and its Anchor Protocol, which also allowed users to make a token deposit and receive 20% annual yields (which were heavily subsidized by Terraform). Id. The growth and adoption of the LUNA token remained largely dependent upon Terraform projects. Terraform told investors that, if they used LUNA on these platforms, they would earn returns upwards of 20% interest. Id. As expected, the price of LUNA saw a substantial increase with the launch of these other Terraform applications and platforms. *Id*.

Terraform used sales of LUNA to raise funds for its operations, including its other projects. Metz Aff. ¶ 32. In a blog post titled Introducing Project Dawn, Do Kwon publicly announced that Terraform committed to "unlock at most 3 million LUNA per month for all operating costs . . . " and that those LUNA would cover expenditures "for critical infrastructure improvements and core technologies to supplement the accelerating growth of the Terra ecosystem" and would also finance "all other [Terraform] operating costs such as employee token distribution." Metz Aff. ¶ 32. The blog post, and other communications by Terraform, were available to CoinEx users because CoinEx provided a link to the Terraform website. *See* Ex. 17 to Metz Aff.

104.    Additionally, in marketing materials distributed to potential investors in January 2019, TFL described purchases of LUNA as "investments" and LUNA buyers as "investors." The same materials noted that "top global exchanges and funds" had already "invested in" TFL (referring to their purchase of LUNA), and that TFL had raised $32 million in July 2018 from an "elite group of VCs" referring to venture capital firms. *See* SEC Compl. ¶53.

105.    Defendants typically held themselves out to investors as experts in the blockchain and crypto field. Investors in the Terra Tokens reasonably expected TFL and the Luna Foundation Guard to provide significant managerial efforts to support the functionality and promotion of TFL's algorithmic stablecoin UST and LUNA.

106.    Defendants also worked to develop, support, and grow the Terraform ecosystem. Defendants publicly touted these efforts through a variety of forums, including widely accessible online social media platforms, such as accounts on Twitter and Medium, messaging applications with public channels like Telegram, and YouTube. TFL's stated efforts to grow the Terraform ecosystem included four substantial version upgrades of the Terraform blockchain, adding new back-end technical features and front-end user applications, entering into partnerships with collaborators, and otherwise extensively and publicly promoting the Terraform ecosystem. *See* SEC Compl. ¶55.

107.    TFL and Kwon also provided monthly "Community Updates" on publicly available Medium blog posts, which discussed their coding and development of the Terraform ecosystem. Relatedly, TFL employees including Kwon touted their efforts to develop and support the Terraform ecosystem in monthly investor emails that they distributed called "Terraform Labs Investor Update" (later renamed to "Terraform Labs Ecosystem Update"). The recipients of these "Updates" had email addresses that included, for example, an email group "investment@terra.money." These emails highlighted TFL's engineering, coding, and the integration of applications into the Terraform ecosystem. These emails also announced that TFL was hiring for positions "key" to the ecosystem's development. *See* SEC Compl. ¶57.

108.    Investors in Terra Tokens thus reasonably expected the Company and Individual Defendants to provide significant managerial efforts after the token launch.

109.    This dependency on the managerial efforts of the Company and Individual Defendants, however, was not apparent at issuance to a reasonable investor. Considering the limited available information about how these Terra Tokens were designed and intended to operate, if an investor was even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Terra Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop. In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens they had acquired were securities.  It was only after certain revelations that provided more information about Defendants' intent and UST/LUNA's algorithmic vulnerabilities that an investor could

SECOND AMENDED CLASS ACTION COMPLAINT

reasonably determine that a token that was advertised as something other than a security was a security all along.

### 2. Investors Would Not Reasonably Have Understood that Terra Tokens Were Securities

110. In connection with the sale of Terra Tokens, the Company and Luna Foundation Guard made statements that reasonably led Plaintiffs and Class members to conclude that the Terra Tokens were not securities.

111. As noted above, the Company refused to register Terra Tokens with the SEC, which indicated to investors that these were not securities. No such valid exemption from registration requirements exists for Terra Tokens.

112. Additionally, TFL created and developed numerous decentralized applications designed to create a use for the Terra Tokens, suggesting to investors that Terra Tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).

113. At the time of the Terra Token launch, Defendants took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects – particularly decentralized finance projects involving algorithmic stablecoins – work. Considering the new technology at issue and the Company's other statements, many investors were understandably unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.

114. Moreover, the UST/LUNA project was advertised as developing revolutionary and cutting edge blockchain technology and algorithmic stablecoins that were equally safe and reliable to other over-collateralized stablecoins on the market.

115. In addition to claiming UST/LUNA's technical superiority over other cryptocurrencies, the Company also indicated that it would benefit financially and use the funds raised through Terra Tokens to continue to enhance the Terra ecosystem-related products and support the growth of the project.

116.    At the time of the Terra Tokens respective launches, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked. With promises that Terra Tokens would be better than other cryptocurrencies, many individuals were unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all Terra Tokens were issued by Kwon and the Company after being minted at very little economic cost – and enormous potential upside – to them.

117.    The creation of Terra Tokens by Defendant Kwon occurred through a centralized process, in contrast to Bitcoin and Ethereum. This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that the Terra Tokens were something other than a security when they were a security.

118.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Terra Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

**C.    TFL and the Luna Foundation Guard Misled U.S. Investors Concerning the Stability of UST and LUNA, as Well as the Sustainability of Anchor**

119.    TFL and the Luna Foundation Guard promoted the Terra Tokens and Anchor Protocol through, among other means, TFL's website, web application, social media accounts, podcast interviews, and through U.S. media. The promotions all had the same talking points: stability and sustainability.

120.    For example, in April 2019, Defendants Kwon and Platias released the LUNA whitepaper, which outlined TFL's blueprint for its algorithmic stablecoin and repeatedly claimed

the TFL stablecoin is both price-stable and growth-driven.[48] Notably, the whitepaper concludes that LUNA's "stable rewards are designed to absorb volatility from changing economic cycles."[49]

121.   In June 2020, TFL's Head of Research, Defendant Platias, released the Anchor Protocol whitepaper, which discussed the features and rewards of the protocol. The whitepaper described Anchor as:

> [A] savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate.  To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked PoS assets from major blockchains as collateral (bAssets).  Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to the depositor.  It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs.[50]

122.   In plain English, Anchor offered depositors a fixed annual return of 20% by redistributing fees from borrowers and rewards from other assets staked in Anchor. The whitepaper repeatedly refers to this 20% interest rates as "stable."

123.   Platias subsequently authored the introductory blog post "Introducing Anchor," which was published by TFL on July 6, 2020.[51] In this post, Platias claimed that the Decentralized Finance ("DeFi") sector had "yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives." In response to this "pressing need," Platias introduced "Anchor, a savings protocol on the Terra blockchain," which offered investors "a ***principle-protected*** stablecoin savings product that accepts Terra deposits and pays a ***stable interest rate***."[52] Again, Platias promoted Anchor as "becom[ing] the gold standard for passive income on the blockchain."

124.   Throughout the post, Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return."

---

[48]   Terra Whitepaper, https://whitepaper.io/document/587/terra-whitepaper (last visited June 15, 2022).

[49]   *Id.*

[50]   *See* n.24, *supra*.

[51]   *See* n.4, *supra*.

[52]   *Id.* (emphasis in original).

125.     Similarly, on March 17, 2021, the official Twitter account for the Anchor Protocol bragged that "Anchor is not your ordinary money market. ***The protocol offers stable, 20% APY interest to depositors*** and only accepts liquid staking derivatives as posted collateral by borrowers."[53]  [Emphasis added.]

126.     On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up ☺ Stable 20% APY is a high-yield safe-haven in uncertain market conditions."[54]

127.     On May 11, 2021, Anchor posted the following series of four tweets[55] promoting Anchor as the "gold standard for savings" and its "stable" 20% yields:

> 1/ We're thrilled to announce the release of the Anchor Earn SDK – allowing third parties to seamlessly integrate ***20% yields on $UST to expand stable savings opportunities to a greater audience!***
>
> *        *        *
>
> 2/ The Anchor Earn SDK significantly expedites the integration process for teams who want to bring ***the benefit of stable Anchor savings*** to users on their crypto-based platforms.  End-to-end integration possible in 7 lines of code or less."
>
> *        *        *
>
> 3/ Keep in mind that for teams who want to go beyond savings integrations and build out additional features on Anchor (e.g., dashboards), Anchor.js is still the way to go."
>
> *        *        *
>
> 4/ ***Anchor is the gold standard for savings – 20% yield for all***.

[Emphasis added.]

---

[53]     Anchor Protocol (@anchor-protocol), Twitter (Mar. 17,2021, 3:59 AM), https://twitter.com/anchor_protocol/status/1372140647268806658?s=20&t=_Up3bEZF-ILN48s5RmkoPQ.

[54]     Anchor Protocol (@anchor-protocol), Twitter (Apr. 22, 2021, 10:48 PM), https://twitter.com/anchor_protocol/status/1385470521165242368?lang=en.

[55]     Anchor Protocol (@anchor-protocol), Twitter (May 11, 2021, 7:48 PM), https://twitter.com/anchor_protocol/status/1392310768276676611.

128.    The Anchor Twitter account continued to promote Anchor that same day, remarking that TLF "Would love to see all Revolut users benefiting from **stable Anchor yields**."[56] [Emphasis added.]

129.    On October 11, 2021, in a now-deleted blog on the Insights portion of Jump's website titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market," Jump touted Terra as one of the future "winners" for stablecoins. Specifically, Jump told investors that UST was a "prominent example" of algorithmic stablecoins, insisting: "We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."[57]

130.    On December 26, 2021, Su Zhu, co-founder of Three Arrows, also bragged about the future growth prospects of TFL's algorithmic stablecoin products, stating: "We're seeing some of the earliest and most ambitious ideas in crypto starting to unfold. Crosschain decentralized stablecoin backed entirely by digitally native assets was the holy grail in 2016.  Bless $BTC $LUNA."[58]  Zhu went on to state that "Ppl down 50x more from selling early than from buying top this yr, and it's not even close.  Sol, luna, avax, matic, axs, doge, shib, ftm list goes on.  Tops are emotionally memorable bc plebs snapshot themselves to a portfolio ath, yet nobody buys top while everyone sells early."[59]

131.    On January 28, 2022, Jump's President, Kanav Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning MIM and UST tokens and the possibility that the Anchor yield could be impacted if a depegging event occurred.  "It's difficult to imagine a

---

[56]    Anchor Protocol (@anchor-protocol), TWITTER (Mar 28, 2022, 5:35 PM), https://twitter.com/anchor_protocol/status/1392318396956438529.

[57]    https://web.archive.org/web/20220518222646/https://jumpcap.com/insights/stablecoins-the-impending-rise-of-a-multi-trillion-dollar-market

[58]    Zhu Su (@zhusu), TWITTER (Dec. 25, 2021, 9:49 PM), https://twitter.com/zhusu/status/1508603726143328256.

[59]    Zhu Su (@zhusu), TWITTER (Dec. 25, 2021, 9:49 PM), https://twitter.com/zhusu/status/1474980708951027712.

SECOND AMENDED CLASS ACTION COMPLAINT

sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."[60] Kariya further stated, "A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."[61]

132.    The promise of fixed high-double-digit yields drove rapid growth for both Anchor and TFL. However, when Anchor's revenues were lower than 20%, TFL mobilized funds from the Anchor Yield Reserve to pay out investors.

133.    Anchor has consistently represented at least half of TFL's combined total value locked ("TVL"). This TVL had grown to $15B from $540M when Anchor first launched.  The figure made Anchor the largest DeFi protocol by TVL in the Terra ecosystem and the fourth largest DeFi protocol across all blockchains, according to data from DeFi Llama.  However, Anchor's Yield Reserve – the funding that TFL and the Luna Foundation Guard kept in reserve in case the fees Anchor received could not cover interest payments due to depositors – was depleting rapidly as demand for stablecoin yields rose and borrowing activity declined.

134.    On February 8, 2022, a researcher at the crypto-related venture capital firm, Hashe, warned Anchor at its own governance forum that its Yield Reserve would only sustain the Anchor Protocol until roughly February 20, 2022, at which point a top-up of at least $436 million will be required to maintain the protocol's current yields until November 2022. This top-up is "a short-term solution to allow sufficient time for growth" while developers work on its v2 iteration "with improved ANC tokenomics and mechanism to incentivize borrows."

135.    Two days later, on February 10, 2022, Defendant Kwon announced that the Luna Foundation Guard's Governing Council had voted to capitalize the Anchor Yield Reserve by 450 million UST.

---

[60]    Zhu Su (@Zhusu), TWITTER (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/status/1486930299711897605.

[61]    Zhu Su (@Zhusu), TWITTER (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/status/1486930300773056516.

SECOND AMENDED CLASS ACTION COMPLAINT

136.    On February 22, 2022, the Luna Foundation Guard issued a press release announcing the closing of a private sale of $1B in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem . . . . The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[62]

137.    Defendant Platias also bragged that with the creation of the Luna Foundation Guard's UST Forex Reserve, "'the primary counter-argument for the sustainability of algorithmic stablecoins is eliminated.'"[63] Platias was further quoted in the February 22, 2022, press release, stating that the "'UST peg is supported by a pool of decentralized liquid assets, which operate as a dynamic backstop driven by a transparent mechanism design and arbitrage forces during periods of sharp UST demand contraction.'"[64]

138.    Jump President and Luna Foundation Guard Governing Council member Kariya proclaimed in the press release that:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST . . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[65]

139.    That same day Jump endorsed Kariya's comments, stating: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."[66]

140.    Jump also promoted its relationship with TFL and the future prospects of UST on February 22nd:  "We're excited to share our latest collaboration with @terra_money. . . . Our goal

---

[62]    *See* n.14, *supra.*

[63]    *Id.*

[64]    *Id.*

[65]    *Id.*

[66]    jump-crypto (@jump-), Twitter (Feb 22, 2022, 10:05 AM), https://mobile.twitter.com/jump_/status/1496184268976013319.

SECOND AMENDED CLASS ACTION COMPLAINT

is to make DeFi more accessible and meaningful for everyone. . . . By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."[67]

141.   Defendant Kwon and Tribe Capital's co-founder, Arjun Sethi, were also actively promoting UST/LUNA on Twitter on February 22, 2022. Kwon touted the "$1B BTC reserve for $UST" as the "[l]argest ever cap formation in crypto" and how the Luna Foundation Guard had "plans to scale reserve to larger numbers."[68] Sethi reposted a thread from the Luna Foundation Guard official account announcing the $1 billion reserve funding, which stated, among other things, that UST was "a consistently stable asset through market volatility" and that the "hypothetical risk of a 'bank run'" was mitigated by the Forex Reserve's creation.[69]

142.   On March 1, 2022, Kwon appeared with Jump's Kariya on the Ship Show and promoted stability and security of the UST and LUNA peg as Terra's two most "attractive" features.

143.   On March 5, 2022, Three Arrows' Su Zhu posted the following message on his Twitter account: LFG $LUNA – "We are burning these 5m $Luna btw! . . . $ust #LUNAtics [3 rocket emojis],"[70] suggesting to investors that the burning of Luna would increase its scarcity and, in turn, its price.

144.   On March 8, 2022, Kariya announced that "UST is in high demand atm and is generally trading at a premium."[71]

145.   On March 10, 2022, Jump promoted an article on the Jump Crypto website, titled "Yield Farming for Serious People," which purports to "illuminate" the concept of "yield farming"

---

[67]     jump-crypto (@jump-), TWITTER (Feb 22, 2022, 9:02 AM), https://mobile.twitter.com/jump_/status/1496168648356028420.

[68]     Do Kwon (@stablekwon), TWITTER (Feb. 22, 2022, 8:59 AM), https://twitter.com/stablekwon/status/1496167757494501378?s=20&t=9ZHug_qPYc9X2QZ8xjD16g.

[69]     Terra Powered by LUNA (@terra-money), TWITTER (Feb 22, 2022), https://twitter.com/terra_money/status/1496162889085902856?s=20&t=USr52P30b_S0T0 of15Ewaw.

[70]     Zhu Su (@zhusu), TWITTER (Mar. 5, 2022, 12:34 AM), https://twitter.com/zhusu/status/1500026883408158721.

[71]     Kanav Kariya (@KanavKariya), TWITTER (Mar 8, 2022, 5:33 AM), https://twitter.com/KanavKariya/status/1501189252075429891.

(i.e. earning compounding returns on crypto assets) for investors.[72] Jump instructs investors on the "first major form of yield farming" – delegating tokens to transaction validators in exchange for a share of the proceeds. Importantly, Jump provides the following solicitation for Terra securities: "There are many examples, but consider two prominent ones that are more retail-facing. First, traders on Coinbase have the option to stake their Ether on the platform, i.e., delegate their Ether to Coinbase as it participates in upgrading the Ethereum network to Ethereum 2.0, in exchange for interest of around 5% (at the time of writing). Second, Terra traders can use the Terra Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards."[73] This promotion provides a link to an article "Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem,"[74] which encourages investors to stake LUNA directly through the Terra Station wallet.

146.    Around the same time, two of TFL's early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol.  Luna Foundation Guard Governing Council members Kanav Kariya of Jump and José Marie Macedo of Delphi Digital rejected the proposal. Similarly, the Anchor Protocol's official Twitter account publicly endorsed another post voicing objections to the proposal.

147.    Around the same time as Kariya was promoting the demand for UST and voting against reducing the Anchor Protocol's yield rate, a popular crypto trading personality on Twitter, @AlgodTrading ("Algod") publicly criticized LUNA as being a "[p]onzi" and disclosed his plan to short LUNA "with size." Importantly, Algod pointed out the vulnerabilities regarding the sustainability of UST and LUNA, noting that "more ust = = more pressure on Luna."[75]

148.    As usual, instead of addressing a concern from a community member, Defendant Kwon used *ad hominem* attacks to deflect the criticism and to obscure the validity of the concern from investors. Among other things, Kwon repeatedly attempted to demean Algod as being "poor,"

---

[72]      https://twitter.com/jump_/status/1502008785166290944?s=20;

[73]      https://jumpcrypto.com/yield-farming-for-serious-people/

[74]      https://chaindebrief.com/how-to-stake-luna-earn-rewards-terra/

[75]      Algod    (@AlgodTrading),    Twitter    (Mar.    9,    2022),    https://twitter.com/AlgodTrading/status/1501478496148803584?s=20&t=G1G6a0eShwc83i8-1iHV1Q.

1   presumably as a way to delegitimize Algod in the eyes of investors who may listen to Algod's

2   criticisms. In particular, Kwon and Algod had the following exchange on Twitter on March 9,

3   2022:



SECOND AMENDED CLASS ACTION COMPLAINT

149.     Kwon did not disclose that Algod was, in fact, correct that Kwon and the other Defendants could not "keep fuel[ing] anchor." Kwon instead sought to undermine the criticism with mockery and bravado, even going so far as to place a $1 million bet with Algod on whether or not LUNA's price would be higher in a year.

150.     Luna Foundation Guard member, Three Arrows via its co-founders Davies and Zhu, also made misleading statements regarding UST and the Anchor Protocol around the same time. For example, on March 17, 2022, Davies promoted UST, along with an implicit promotion of Anchor high interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield."[76] Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stable coin of significant size."[77] Davies, however, failed to also advise investors that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem.

151.     While not as crude as Kwon, Three Arrows' Zhu apparently shared Kwon's disdain for investors, calling those that sold for a loss "plebs" and chastising them for "selling early."[78] Zhu's suggestion to investors that they should continue hold their LUNA is particularly egregious given that the Luna Foundation Governing Council, Three Arrows, and by extension, Zhu all knew well before March 2022 that LUNA, UST, and the Anchor Protocol was unstable and could not be sustained by the various reserve funds that the Luna Foundation Guard supposedly set up. Anyone that followed Zhu's advice suffered catastrophic losses only six weeks later when the collapse occurred.

152.     On March 28, 2022, the head of research at the investment fund Arcane Crypto, Eric Wall, posted a thread on Twitter discussing how the 50 million LUNA that served as the initial funding for the Luna Foundation Guard came from the initial coin offering and why choosing to use non-renewable liquidity sources like the funding for the LUNA launch could be problematic

---

[76]     Kyle Davies (@KyleLDavies), TWITTER (Mar. 16, 2022, 10:14 PM), https://twitter.com/KyleLDavies/status/1504325336439619586.

[77]     Kyle Davies (@KyleLDavies), TWITTER (Mar. 21, 2022, 9:23 PM), https://twitter.com/KyleLDavies/status/1506124383827656708.

[78]     *See* n.36, *supra*.

for a so-called algorithmic stablecoin since it was "inherently unsustainable."[79] In the opening post of that thread, Wall stated:

> Don't mean to be a party pooper but I think Terra is making a mistake to use LUNA funds that originated from the ICO to build the [Luna Foundation Guard] reserve.
>
> The goal of $UST is to be (i) decentralized and (ii) sustainable.
>
> This reserve is neither of those two things.[80]

Kwon smugly retorted "I like to say things that are true and well informed, Ind i think after all this we can both agree this is neither of those things: But you know, you do you."

153.    On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX tokens to "help bolster its UST Decentralized Forex Reserve."[81] According to Defendant Platias, the purpose of the UST Reserve is "'to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . . By diversifying the base of non-correlated assets to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives.'"[82]

154.    On April 29, 2022, Davies of Three Arrows, proclaimed that "Memecoins may exhibit a Pareto distribution, but stablecoins are winner take all, based on liquidity.  There will be distribution only by significant differentiation. ***And for the holy grail, the decentralized stablecoin, the winner will be $UST $LUNA***."[83]  [Emphasis added.]

155.    On May 3, 2022, Zhu of Three Arrows even encouraged his Twitter following to take out loans using their Bitcoin as collateral, and he advised investors to then use the proceeds to buy UST and stake it in Anchor for the 20% yield. Seven days later, immediately following the

---

[79]    Eric Will (@ericwill), TWITTER (Mar. 28, 2022, 4:15 PM), https://twitter.com/ercwl/status/1508583607195082753?s=20&t=OUkuXvf42G8Inqg9vJe M6w.

[80]    *Id.*

[81]    Sarah Cohen, *LFG to Acquire $100M in Avax to Strategically Align Terra and Avalanche Ecosystems,* PRWEB (Apr. 7, 2022), https://www.prweb.com/releases/lfg_to_acquire_100m_in_avax_to_strategically_align_ terra_and_avalanche_ecosystems/prweb18577009.htm.

[82]    *Id.*

[83]    Kyle Davies (@KyleLDavies), TWITTER (April 29, 2022, 4:44 PM), https://twitter.com/KyleLDavies/status/1520006203861913600.

UST collapse, this post was deleted.  As noted in the article *Luna backer Su Zhu says UST collapse is 'Terra's DAO hack moment*,' "[a]nyone who had followed this advice and had not sold would have lost practically all of their money and would not be able to pay back the loan."[84]

156.    Around the same time, Defendant Kwon himself continued to taunt "poor" crypto investors, making jokes during a May 3rd interview about how he reveled in idea of watching cryptocurrency project failed: "95% [of coins] are going to die, but there's also entertainment in watching [them] die too."

157.    Four days later, the UST/LUNA death spiral began.

**D.    The Truth Emerges**

158.    Both the size of the deposits in Anchor and the ballooning interest payments owed to investors became too much for the Terra ecosystem to bear. In early May 2022, structural vulnerabilities within the Terra ecosystem precipitated a massive selloff of both UST and LUNA.

159.    The price of UST and LUNA Tokens dropped by 91% and 99.7% between May 7, 2022, and May 12, 2022, after it was revealed that TFL's largest digital assets were unstable and unsustainable.

160.    As the following chart from CoinDesk[85] shows, the Anchor Protocol saw its total value locked ("TVL") ***fall by $11 billion*** between May 9, 2022, and May 11, 2022:



---

[84]    Tim Copeland, *Luna backer Su Zhu says UST collapse is 'Terra's DAO hack moment'*, THE BLOCK (May 13, 2022), https://www.theblock.co/post/146783/luna-backer-su-zhu-says-ust-collapse-is-terras-dao-hack-moment.

[85]    Shaurya Malwa, *Terra's LUNA Drops to Almost $1 After 90% Weekly Plunge*, COINDESK (May 11, 2022), https://www.coindesk.com/markets/2022/05/11/terras-luna-drops-to-under-8-after-90-weekly-plunge/.

161.   LUNA's price crashed over 99.7% in less than a week, with the most precipitous drops occurring between May 9th and May 12th, as the following chart[86] demonstrates:



LUNA hovers above 10 cents at writing time. (TradingView)

162.   UST faced similarly steep drops in price. Starting with the depegging between May 7, 2022, and May 9, 2022, UST fell from $1 to just $0.07 by May 25, 2022.

163.   In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member, Remi Tetot, admitted what TFL had denied all along – that the Anchor Protocol's 20% yield was not sustainable or stable despite constant statements to the contrary up until the collapse. Worse still, Defendants knew all along there was a significant risk of a death spiral if they did not continually attract new investors to the Terra ecosystem. Tetot revealed that the 20% yield was a marketing ploy to increase investment in the Terra ecosystem. The growth was too much and too fast for Anchor to handle, and TFL and the Luna Foundation Guard were unable to scale their hyped-up defense mechanisms sufficiently.  Some of these defenses, like reserve pools, were not even ready despite promises otherwise. As a result of these failures, UST's vulnerability was increased, exposing it to exactly the type of collapse of UST that TFL's CEO Kwon previously dismissed. In particular, Tetot candidly confessed:

> They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%.  Unfortunately, it didn't have time to make it . . . ***20% yield was essentially***

---

[86]     Shaurya Malwa, *Terra's LUNA Has Dropped 99.7% in Under a Week. That's Good for UST*, CoinDesk (May 12, 2022), https://www.coindesk.com/markets/2022/05/12/terras-luna-has-dropped-997-in-under-a-week-thats-good-for-ust/.

*the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable*, but I think it was acceptable for the time being, yield should have been dynamic as the system grow.

\* \* \*

Looking back at it, the 20% yield was a mistake because it increased UST demand too quickly, and *the defence mechanisms were not scaling at the same pace or were not ready yet* (BTC Reserves, 4Pool); *that growth didn't give time to the system to adjust accordingly and increased weaknesses*.

I was too confident in 4Pool and BTC reserves; *while the strategic moves were made, they were not technically ready, leaving room for what happened*.

(Emphasis added).

164.    Tetot later attempted to deflect the blame of the failure of TFL's algorithmic stablecoin to "human behavior" instead of the failures of Defendants.  Tetot acknowledged that he had been "very vocal about LUNA" and "became an easy target once Luna crashed, and to be fair I earned it, so no hard feeling about it." Despite his own role in the misleading promotion of the Terra ecosystem, Tetot still chastised "smaller investors" with "heartbreaking stories" about the fall of UST/LUNA: "It looks like many people put all their savings or took debt to participate in Anchor, which is insane, crypto is very risky and I would never recommend such behaviour (and never have!)." But this was precisely what Three Arrows' CEO Zhu advised investors to do just days before the collapse.[87] Just as hypocritically, while after the fact he called such behavior "insane," Tetot himself earlier admitted that "my entire crypto portfolio was into Luna, and I watched it melt from 8 digits to 0."

**E.    The SEC Concludes that Terra Tokens are Unregistered Securities, and Sues TFL and Kwon, Alleging A Multi-Billion Dollar Securities Fraud**

165.    In addition to alleging that Terra Tokens are unregistered securities, the SEC's Complaint alleges a scheme to deceive and mislead investors. *See* SEC Compl. ¶118.

166.    In particular, from at least mid-2019 through at least March 2022, TFL and Kwon misled investors and prospective investors into believing that retail consumers in Korea were using the Terraform blockchain to process and settle real world purchases. In addition, when, in May

---

[87]    *See* n.58, *supra*.

2021, UST briefly de-pegged from the U.S. dollar, TFL and Kwon falsely represented that the peg had been restored due to the success of UST's algorithm, which, according to TFL, was the "lynchpin of the entire [Terraform] ecosystem." However, TFL and Do Kwon misleadingly omitted the real reason for the re-peg – the deliberate intervention by Defendant Jump, which Jump had discussed with TFL and Do Kwon, to buy large amounts of UST to restore its value. *See* SEC Compl. ¶118.

167.    TFL and Kwon's statements were materially false and misleading and made during a time when they were actively offering, selling, and/or marketing Terraform's crypto assets, including LUNA and UST. TFL and Kwon knew or were reckless in not knowing that these representations were false when they were made. *See* SEC Compl. ¶119.

168.    As one TFL employee stated in a chat with another employee on September 1, 2021, "working at terra has reinforced my belief in conspiracy theories . . . just the white lies to prop up anchor and mirror and the illusion of decentralization and true extent of chai adoption . . . all from the armchair of a single man sipping whisky" – the reference to a man sipping whisky being Kwon. *See* SEC Compl. ¶120.

## 1.    TFL and Kwon Mislead Investors About Chai

169.    TFL and Kwon falsely marketed the Terraform blockchain as having a real-world use. Specifically, TFL and Kwon claimed repeatedly that a Korean company, Chai Corporation ("Chai"), used the Terraform blockchain to process and settle millions of transactions for Korean consumers at retail establishments, such as online stores, movie theaters, and convenience stores. These statements were materially false and misleading, because Chai transactions were neither processed nor settled on the Terraform blockchain. *See* SEC Compl. ¶121.

170.    In order to deceive investors, TFL and Kwon recorded completed Chai transactions onto the Terraform blockchain to make it look like they were processed on the blockchain when, in fact, they were not. Accordingly, the purported "real-world use" of the Terraform blockchain was a fabrication. *See* SEC Compl. ¶122.

171.    Chai is a mobile payment service provider in Korea, similar to PayPal or Venmo, which Kwon launched, along with TFL's co-founder, in or around June 2019. *See* SEC Compl. ¶123.

172.    Until early 2020, Chai and TFL were closely associated with one another, sharing an office space and overlapping personnel. During that time, Kwon sat on Chai's board of directors and was kept up to date on Chai's activities. *See* SEC Compl. ¶124.

173.    In early 2020, Kwon and TFL's co-founder took steps to separate TFL's business from Chai. Kwon took control of TFL and moved its offices to a new location. At the same time, the majority of TFL's employees began working solely for TFL. Until approximately May 2022, however, Kwon continued to sit on Chai's board, and TFL and Kwon continued to represent publicly that TFL was connected to Chai. *See* SEC Compl. ¶125.

174.    From mid-2019 through at least March 2022, TFL and Kwon made numerous and repeated statements falsely representing that the "backend" of Chai transactions were processed and settled using the Terraform blockchain. TFL and Kwon also falsely stated that Chai's use of the Terraform blockchain provided incentives to both Korean merchants and consumers to use Chai. Specifically, TFL and Kwon claimed that Chai's use of the Terraform blockchain meant that merchants experienced faster processing times and lower transaction fees through Chai than through other mobile payment service providers. Likewise, TFL and Kwon maintained that Chai customers would benefit from discounts flowing from the lower costs associated with Chai's purported use of the Terraform blockchain. With these misrepresentations, TFL and Kwon misleadingly used Chai's growth as a proxy for the growth and success of the Terraform ecosystem. *See* SEC Compl. ¶126.

175.    TFL and Kwon made these false and misleading statements in presentations to solicit investments in Terraform's crypto asset securities including LUNA, from investors in the

U.S. and abroad. TFL made and disseminated these false and misleading statements in public interviews, Terraform-sponsored podcasts, and social media posts, which were available to U.S. investors and prospective investors. *See* SEC Compl. ¶127.

176.    For instance, in a presentation aired on CNBC Africa that TFL made available to U.S. investors when it posted it to YouTube on October 14, 2019, Kwon discussed Chai in depth, stating:

> [I]n the backend, it uses Terra's blockchain technology to solve some major pain points and problems for the merchants.
>
> * * *
>
> But in the backend is where the real magic starts to happen. And I contend that Terra solves two of the biggest roadblocks to the adoption of digital payments in Asia and the rest of the world. So the first is slow settlement periods.
>
> * * *
>
> Terra settles in six seconds. So every block for every transaction that has been made, we batch it up and then send it to the merchant so they can have easy and early access to working capital should they choose to do so. The second problem that we solve is high transaction fees.
>
> * * *
>
> So in the thirteen weeks in which we have been operational, early response hasbeen quite explosive. Up - up to today we have had 430,000 shoppers over the Chai gateway, and most of them coming in the last month. And we've processed nearly 2,000,000 transactions up to date. And we think that this number will continue to grow. In terms of daily active users, Terra and Chai has already surpassed some of the most popular tokens. Our daily active user numbers today currently stand at around 58,000 users. . .
>
> * * *
>
> So, basically what we are going for is to facilitate everyday retail transactions that are powered by Terra.

SEC Compl. ¶128.  TFL and Do Kwon made numerous similar statements as well.  *See* SEC Compl. ¶¶129-32.

177.    In addition to making and disseminating these materially false and misleading statements, TFL and Kwon engaged in other deceptive acts, including entering transactions onto the Terraform blockchain using "KRT" (another algorithmic stablecoin offered by TFL that was

pegged to Korean currency, the Won), which purported to reflect Chai transactions. Specifically, from June 2019 through at least May 12, 2022, the Terraform blockchain appeared to reflect that Chai transactions were being settled on the blockchain in KRT, when, in reality, Chai payments were being processed in Korean Won. *See* SEC Compl. ¶133.

178.    To carry out this deception, TFL programmed a server, referred to internally as the "LP Server," to receive and process data about Chai transactions, and then issue instructions to the TFL blockchain to replicate those transactions as if the transactions had originally "settled" on the Terraform blockchain. *See* SEC Compl. ¶134.

179.    Analysis of Terraform blockchain data reflects that, in replicating the Chai transactions, TFL used one wallet address ("Terraform Master Wallet") to fund up to 2.7 million other wallets. TFL controlled each of these wallets and used them to execute batched or "multisend" transfers that would replicate multiple Chai transactions together in a single transaction, based on data received by the LP Server. Analysis of Terraform blockchain data further reflects that TFL used the Terraform Master Wallet to originate each batch of transactions that replicated the real transactions that Chai was processing in Korean Won. *See* SEC Compl. ¶135.

180.    In reality, Chai did not process or settle transactions on the Terraform blockchain, but rather used traditional payment methods in receiving Korean Won from its customers and paying Korean Won to participating merchants. Neither Chai consumers nor Chai merchants were transacting in KRT. The transactions executed by the LP Server on the Terraform blockchain merely recorded transactions that had already occurred in the real-world using Korean Won. *See* SEC Compl. ¶141.

181.    In emails to its own investors, Chai has denied that it used a blockchain to process its payments, and claimed that doing so would not have been legally permitted in Korea. *See* SEC Compl. ¶143.

182.    TFL employees who knew of the deception also knew to maintain its secrecy. For example, one TFL employee wrote in a chat with another employee on October 9, 2021, "btw we don't want to say stuff about LP server too much . . . it breaks the perception that chai depends on

Terra . . . Basically chai doesn't need Terra to work . . . It's what copies chai's transactions from their data base to create tx activity." *See* SEC Compl. ¶144.

183.    As a founder and former director of Chai, Kwon (and through Kwon, TFL) knew or were reckless in not knowing that Chai did not actually process or settle transactions on the Terraform blockchain. In fact, Kwon personally wrote much of the Terraform blockchain code from its genesis through two version upgrades, and was primarily responsible for TFL's coding and engineering strategy decisions. Moreover, at the time of Chai's development and launch, Kwon held the most senior technical position at TFL. *See* SEC Compl. ¶145.

184.    TFL and Kwon's misleading statements and omissions, and their deceptive acts, with respect to the non-existent Chai transactions, were material to investors in Terraform's crypto asset securities. *See* SEC Compl. ¶147.

185.    These deceptive efforts worked. U.S.-based retail and institutional investors believed that Chai operated on the Terraform blockchain and found it significant in deciding to invest in Terraform crypto assets, including LUNA. For instance, on December 3, 2020, the CEO of a U.S.-based institutional investor posted to Twitter: "Terra's payment app Chai is up to 80k daily active users. Koreans are fast adopters. Watch this grow. $LUNA." On May 18, 2022, the same CEO posted a memo to Twitter purporting to explain the basis for investing in LUNA. In the memo, the CEO highlighted as one significant factor, Chai's use of the Terra blockchain, describing it as "crypto finding a real-world use case." *See* SEC Compl. ¶149.

186.    From December 27, 2019, to March 10, 2022, U.S.-based institutional investors (either directly or through offshore affiliates) purchased approximately $656 million of LUNA tokens from TFL (or a wholly-controlled subsidiary). Moreover, from September 2021 through May 2022, retail investors, including investors in the U.S., purchased billions of dollars of LUNA and wLUNA on crypto asset trading platforms. *See* SEC Compl. ¶151.

### 2.    TFL and Kwon Mislead Investors about the May 2021 De-peg

187.    TFL and Kwon also engaged in a scheme to mislead investors and potential investors about the stability of Terraform's stablecoin "UST" (including as offered and sold with the Anchor Protocol) and the algorithm that purportedly pegged UST's price to the U.S. dollar.

Specifically, in May 2021, when the value of UST became "unpegged" from the U.S. dollar, TFL, through Kwon, secretly discussed plans with Defendant Jump, to buy large amounts of UST in order to restore its value. *See* SEC Compl. ¶152.

188.    When the price of UST rose as a result of these efforts, TFL and Kwon falsely and misleadingly represented to the public that UST's algorithm had successfully re-pegged UST to the dollar, misrepresenting that the re-peg had occurred without human intervention and misleadingly omitting the real reason for the re-peg: Jump's intervention. *See* SEC Compl. ¶153.

189.    Starting on or about November 2019, Jump and TFL or its subsidiaries entered into a series of agreements that Kwon, himself, negotiated and signed on TFL's behalf, whereby Jump was to provide TFL market-making services with respect to LUNA, and eventually UST, in exchange for compensation (generally by receiving LUNA at a significant discount to market prices). These agreements generally provided for Jump to receive LUNA after achieving certain benchmarks in its trading of UST. *See* SEC Compl. ¶154.

190.    From 2019, when UST was first coded onto the Terraform blockchain, until mid-May 2021, UST experienced no significant market disruptions. *See* SEC Compl. ¶155.

191.    But on May 19, 2021, UST began to de-peg from the U.S. dollar. On May 23, 2021, UST's price declined sharply, dropping to nearly $0.90. That morning and throughout the day, Kwon communicated repeatedly with Jump. In these communications, Kwon expressed concern over UST's value and discussed with Jump how to restore UST's peg to the dollar. *See* SEC Compl. ¶156.

192.    Jump responded by purchasing large quantities of UST throughout the day on May 23 and continuing through May 27, in an effort to restore UST's peg. Ultimately, Jump made net purchases of over 62 million UST over at least two crypto asset trading platforms. UST's market

SECOND AMENDED CLASS ACTION COMPLAINT

price began to rise shortly after Jump's purchases, and eventually was restored to near $1. *See* SEC Compl. ¶157.

193.    Shortly thereafter, Kwon, on behalf of TFL, agreed to remove the loan agreement conditions requiring Jump to achieve the requisite benchmarks to receive the loaned LUNA tokens. Instead, TFL agreed to deliver on specified dates, without conditions, specific amounts of the remaining 61,458,334 LUNA tokens to Jump under the agreements. Under the modified terms of the agreements, the final LUNA delivery to Jump was to occur by September 1, 2025. *See* SEC Compl. ¶158.

194.    These modifications were subsequently reduced to writing in a July 21, 2021, agreement signed by Kwon. Under the terms of the modified agreement, Jump received LUNA tokens at $0.40 per token, even during periods when LUNA was trading at more than $90 in the secondary market. *See* SEC Compl. ¶159.

195.    Jump ultimately profited by approximately $1.28 billion by selling the LUNA acquired from TFL under the terms of the 2019 and 2020 loan agreements, as modified. *See* SEC Compl. ¶160.

196.    Almost immediately upon UST's recovery in May 2021, TFL and Kwon began to make materially misleading statements about how UST's peg to the dollar was restored. Specifically, TFL and Kwon emphasized the purported effectiveness of the algorithm underlying UST in maintaining UST's peg to the dollar – misleadingly omitting the true cause of UST's re-peg: Jump's deliberate intervention to restore the peg that TFL and Kwon engineered. *See* SEC Compl. ¶161.

197.    For instance, on May 24, 2021, TFL published a 29-post thread on its official Twitter account, discussing the de-peg.[88] At no point did TFL disclose that UST's peg to the dollar

---

[88]    https://twitter.com/terra_money/status/1396780917314621444?s=20

SECOND AMENDED CLASS ACTION COMPLAINT

was restored as the result of Jump's efforts, and not the success of the algorithm.  For example, in posts #23-25, TFL stated:

> On-chain swap spread are healing (ranging between 3-4%) as liquidations on Anchor wind down, arb opportunities on third-party venues incentivize buying UST, the market for LUNA becomes oversold and diamond hands, gloriously holding the line, glean a profitable opportunity. The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense a stress test in live conditions as can ever be expected. We just experienced a black swan.  Despite sharp dislocations, the on-chain swap spreading is mending, UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed – buttressing the growth of the Terra economy as the system bounces back from distress.[89]

198.    Later on in post # 28, TFL even mentions Jump by name,[90] but still fails to disclose Jump's instrumental role in temporarily propping up the price of UST so that it could re-peg to the dollar.

199.    Additionally, during a March 1, 2022, Twitter talk show, Kwon discussed UST's de-peg in May 2021, stating:

> … it took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.

SEC Compl. ¶164; *see also* SEC Compl. ¶162-63.

200.    These statements were materially false and misleading. Despite the statements to the contrary, UST did not "automatically self-heal[]." UST's "[a]lgorithmic, calibrated adjustments of economic parameters" failed. In fact, UST's peg to the dollar was not restored until after TFL and Do Kwon planned and executed  with Jump a plan to deploy capital to restore UST's price to one dollar. While the statements above led investors to believe UST's peg was restored by

[89]    https://twitter.com/terra_money/status/1396780959899344896?s=20
[90]    https://twitter.com/terra_money/status/1396781211595407360?s=20

the algorithm, in fact,  it was only the deliberate actions of "human agents," including TFL, Kwon, and Jump, that ultimately led to the restoration of the peg. *See* SEC Compl. ¶165.

201.    TFL and Kwon knew or were reckless in not knowing that these statements were materially false and misleading. They knew that Jump had intervened to buy up UST, because they discussed it with Jump at the time. In fact, Jump was rewarded for its role in restoring the peg by having the terms of its loan agreements modified to Jump's benefit. *See* SEC Compl. ¶166.

202.    Defendants never disclosed that it was the conduct of TFL, Kwon and Jump, and not the algorithm, that restored UST's peg. Instead, they misled investors who were actively buying and trading UST to believe that the algorithm had "self-heal[ed]" to restore the peg without any human involvement. *See* SEC Compl. ¶167.

203.    TFL and Kwon's misrepresentations and omissions about the May 2021 depeg were material because an objective investor would find that the fact that human intervention – rather than simply the normal working of the algorithm – was necessary to re-peg UST would alter the total mix of information about the security.  However, numerous U.S.-based retail and institutional investors remained unaware that any third party had intervened to restore the peg, and continued to buy and hold UST (including as offered and sold with Anchor Protocol) on the belief that the algorithm, not a manipulative scheme, had worked to restore the peg to the dollar. *See* SEC Compl. ¶168.  Many of these investors were holding Terra Tokens in May 2022, when the UST de-pegged from the U.S. dollar again and did not recover, leading to the collapse of the entire Terraform ecosystem.

### 3.    Defendants Profit from the Fraud

204.    Jump was not the only Defendant to profit from the fraud.  By the end of May 2022 – after the Terra Tokens were rendered essentially worthless and more than $40 billion in

combined market value had evaporated – Defendants still retained valuable proceeds from the Terraform ecosystem.

205.    In particular, TFL and Do Kwon transferred over 10,000 Bitcoin from TFL and Luna Foundation Guard crypto asset platform accounts to an un-hosted wallet, or "cold" wallet (*i.e.*, a self-custody wallet not on any exchange). On a periodic basis since May 2022, TFL and Kwon have transferred – and continue to transfer – Bitcoin from this wallet to a financial institution based in Switzerland, and have converted the Bitcoin to cash. Between June 2022 and February 16, 2023, over $100 million in fiat currency has been withdrawn from that Swiss bank. *See* SEC Compl. ¶172.

### F.    The SEC's 2019 Framework

206.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" ("Framework") in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

207.    The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

208.    In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature"?

209.    The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"

210.    The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly

if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

211.    At the time of the Terra Tokens' respective launches, Defendants actively marketed the token launch and the Terra ecosystem, thereby necessitating the continued managerial efforts of the Company and Individual Defendants.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

212.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through for example, buybacks, "burning," or other activities."

213.    As noted above, all of the Terra Tokens in circulation were created at the direction of Kwon and TFL.  Additionally, Kwon and Platias also created the protocols by which the Terra Tokens are burned.

214.    The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"

215.    Here, the Company and Individual Defendants have discussed the long-term prospects on years-long time frames, continually noting how the Terra ecosystem will "evolve" in the future.

216.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework. For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."

217.    Here, LUNA's whitepaper focuses extensively on the ability of the Terra Token smart contract to engineer trading of the Terra Token.

218.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions. This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."

219.    Here, the Company, along with the Luna Foundation Guard Defendants, readily admitted that they are the arbiters of funding for Terra ecosystem, making other managerial judgments or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

220.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset." According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."

221.    Here, several Defendants – including but not limited to Kwon, the Luna Foundation Guard, and Platias – retain a significant interest in the Terra Tokens.

1.      **SEC's Previous Statements and Findings**

222.    On May 7, 2021, on CNBC's "'Squawk Box'" television program, chairman of the SEC, Gary Gensler, stated that "'a lot of crypto tokens – I won't call them cryptocurrencies for this moment – ***are indeed securities*** . . . . "[91]   [Emphasis added.]  In addition to being the Chairman of the SEC, Mr. Gensler is also a world-renowned expert on cryptocurrencies and

---

[91]    Jesse Pound, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/ 2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[92]

223.    In a June 14, 2018, speech entitled "Digital Asset Transactions:  When Howey Met Gary (Plastic)," then director of the SEC's division of corporation finance, William Hinman, observed about "when a digital asset transaction may no longer represent a security offering:"[93]

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

> A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[94]

224.    As discussed above, the circumstances surrounding the creation of the Terra Token demonstrate that a small group of centralized insiders maintained exclusive control over the Luna project.

225.    Finally, the SEC has earlier concluded that another virtual currency (*i.e.*, DAO tokens) that are substantially similar to Terra Tokens are "securities and therefore subject to the federal securities laws." As stated by the SEC, "issuers of distributed ledger or blockchain

---

[92]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[93]    William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic): Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[94]    *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

technology-based securities must register offers and sales of such securities unless a valid exemption applies."[95]

### 2. Other Commentary from Regulators

226. Stablecoins, in particular, have come under scrutiny by regulators recently, given the rapid growth of the $130 billion market.

227. For example, in June 2021, Representative Warren Davidson from Ohio, one of crypto's loudest advocates on Capitol Hill, said that in his view, not all stablecoins should be treated as securities, but stablecoins that specifically are backed by securities should fall under the same sort of regulatory regime: "'if you've got a stablecoin that is essentially backed by securities, it gets hard to say that it's not a security.'"[96]

228. More recently, in February of 2023, the SEC set its sights on another stablecoin, the Binance-branded, dollar-pegged stablecoin, BUSD. As publicly reported, the issuer of the stablecoin has received a Wells notice from the SEC, and has been ordered by the New York State Department of Financial Services to stop minting the token.[97]

## CLASS ALLEGATIONS

229. Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Terra Tokens and were subsequently damaged thereby.

230. The Class Period is defined as the period between March 17, 2021, and May 25, 2022.[98]

---

[95]     Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov/ news/press-release/2017-131.

[96]     Nikhilesh De, *State of Crypto: Stablecoin Rules are Coming*, COINDESK (July 20, 2021), https://www.coindesk.com/policy/2021/07/20/state-of-crypto-stablecoin-rules-are-coming/.

[97]     https://www.wsj.com/articles/crypto-firm-paxos-faces-sec-lawsuit-over-binance-usd-token-8031e7a7;      https://www.reuters.com/technology/binance-stablecoin-backer-ordered-stop-issuing-token-binance-ceo-2023-02-13/.

[98]     Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

231. Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

232. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Luna and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that the Class consists of at least hundreds of people. The number of Class members can be determined based on TFL's and other third party's records.

233. **Commonality**: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.    whether the Terra Tokens are securities under the Securities Act;

    b.    whether the sale of Terra Tokens violates the registration of the Securities Act;

    c.    whether Defendants improperly and misleadingly marketed Terra Tokens;

    d.    whether Defendants' conduct violates the state consumer protection statutes asserted herein;

    e.    whether Luna Foundation Guard Defendants aided and abetted violations of the state consumer protection statutes asserted herein;

    f.    whether Individual Defendants conspired to artificially inflate the price of the Terra Tokens and then sell their Terra Tokens to unsuspecting investors;

    g.    whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

    h.    whether the proceeds that Defendants obtained as a result of the sale of Terra Tokens, rightfully belongs to Plaintiffs and Class members;

i.      whether Defendants should be required to return money they received as a result of the sale of Terra Tokens to Plaintiffs and Class members;

j.      whether Individual Defendants breached the implied covenant of good faith and fair dealing; and

k.      whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

234.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and the Class members' claims all arise out of TLF's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Terra Tokens.

235.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

236.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

237.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

238.    California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

239.    California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

240.    Two of the Defendants (Platias and Tribe Capital) primarily reside in and operate out of California.  In particular, upon information and belief, all of the promotional activities of Platias on behalf of TFL and the Luna Foundation Guard described above originated in, and were disseminated from, California.   Additionally, Platias developed the Anchor Protocol and UST/LUNA tokens – which, as discussed in further detail above, was the subject of numerous misleading statements from Platias – entirely in California.

241.    On information and belief, the decision-making regarding the parameters of the marketing strategy for the Terra Tokens occurred in, and/or emanated from California, where Platias and Tribe Capital are located.  As such, the conduct complained of herein emanated from California. This conduct similarly injured and affected Plaintiffs and all other Class members.

242.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

# FIRST CAUSE OF ACTION

### Section 10(b) and SEC Rule 10b-5(b)
### (Against All Defendants)

243.    Plaintiffs restate and realleges all preceding allegations above as if fully set forth herein.

244.    Plaintiffs bring this claim for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

245.    Plaintiffs bring this claim on behalf of all Class members who purchased Terra Tokens from March 17, 2021, to May 25, 2022.

246.    The Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). Defendants sold these securities to Plaintiffs and the other Class members during and after the Terra Tokens respective launches.

247.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

248.    In connection with the March 2021 launch of Terra Tokens, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

249.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Terra

Tokens in connection with the March 2021 launch, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Misrepresentations and Omissions**

250.    Defendants' untrue statements and omissions of material facts in connection with the sale of Terra Tokens include at least the following:

a)    on March 17, 2021, the official Twitter account for the Anchor Protocol stated that "Anchor is not your ordinary money market. The protocol offers stable, 20% APY interest to depositors and only accepts liquid staking derivatives as posted collateral by borrowers." In order to make this statement not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

b)    On April 23, 2021, the Anchor Twitter account again promoted the stability of Anchor's 20% interest yields: "Markets go down, $UST deposits on Anchor go up ☺ Stable 20% APY is a high-yield safe-haven in uncertain market conditions."[99]  In order to make this statement not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

c)    On May 11, 2021, in a series of four posts on the Anchor Protocol's official Twitter account, Defendants touted Anchor as the "gold standard for savings" and its "stable" 20% yields.  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Anchor Yield Reserve fund.

---

[99]    *See* n.32, *supra*.

SECOND AMENDED CLASS ACTION COMPLAINT

d)      On February 22, 2022, in an LFG press release, the Luna Foundation Guard announced the closing of a private sale of $1 billion in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem . . . .  The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[100]  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

e)      In same press release, Defendant Platias stated that, with the creation of the Luna Foundation Guard's UST Forex Reserve, "the primary counter-argument for the sustainability of algorithmic stablecoins is eliminated."[101]  Platias further stated that the "UST peg is supported by a pool of decentralized liquid assets, which operate as a dynamic backstop driven by a transparent mechanism design and arbitrage forces during periods of sharp UST demand contraction."  In order to make these statements not misleading, Defendants were required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that the Forex Reserve Fund would be unable to defend the UST/LUNA peg.

f)      Also in that same press release, Kanav Kariya, President of Jump Crypto and member of the Luna Foundation Guard's Governing Council stated:

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[102]

---

[100]  *See* n.14, *supra*.

[101]  *Id.*

[102]  *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

In order to make this statement not misleading, the Luna Foundation Guard was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and causing the "stressful conditions" that would (and did) precipitate the de-pegging of UST and LUNA.

g)     Luna Foundation Guard member, Three Arrows, via its co-founders Davies and Zhu, also made misleading statements regarding UST and the Anchor Protocol around the same time.  On March 17, 2022, Luna Foundation Guard member, Three Arrows via its co-founder Davies promoted UST, along with an implicit promotion of Anchor high interest yield, stating that UST is "backed by [Bitcoin], hardest money known to humanity, and has a nice fat yield."[103]  Then on March 22, 2022, Davies stated that "UST is the only substantially decentralized stablecoin of significant size."[104]  In both instances Davies failed to also advise investors that UST's growth and Anchor's yield were unsustainable and would likely cause a breakdown of the Terra ecosystem. In order to make these statements not misleading Davies was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

h)     On March 28, 2022, in an exchange on Twitter and in response to a direct criticism about the sustainability of TFL's algorithmic stablecoin, Kwon flatly denied that UST was unstainable, saying such claims were neither true nor well-informed.  In order to make these statements not misleading, Defendant Kwon should have (but did not) disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

---

[103]     *See* n.50, *supra*.
[104]     *See* n.51, *supra.*

SECOND AMENDED CLASS ACTION COMPLAINT

i)     On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX tokens to "help bolster its UST Decentralized Forex Reserve." Additionally, Defendant Platias stated that the purpose of the UST Reserve was "to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model . . . .  By diversifying the base of non-correlated assets to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives."[105]  In order to make these statements not misleading, Davies was required to, but did not, disclose that UST was not as "stable" as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and that Anchor's staking rewards program was unstainable and could not be maintained with the Forex Reserve Fund.

j)     Defendants' misrepresentations include the multiple false and misleading statements telling investors that the Terraform blockchain processed retail transactions for the mobile payment service, Chai.  *See* SEC Compl. ¶121-151.

k)     Defendants' misrepresentations include the multiple false and misleading statements telling investors that the algorithm had succeeded in restoring UST's peg to the dollar after the de-pegging in May 2021, when in reality the peg was only restored after the deliberate intervention involving Defendants TFL, Do Kwon and Jump.  *See* SEC Compl. ¶152-68.

**Materiality**

251.    The forgoing misrepresentations and omissions were each material.

252.    These misrepresentations and omissions related to: (i) the stability of the UST/LUNA algorithmic stablecoin pair, the Anchor Protol's yield rate, and the Terra ecosystem itself; (ii) the ability for the Luna Foundation Guard to defend and maintain the peg of UST/LUNA during periods of high volatility in the market; and (iii) the inability for TFL to support Anchor's yield rate the Anchor Yield Reserve fund.

---

[105]    *See* n.55, *supra*.

253.    Information regarding whether approximately the founders and Company Individuals could, intended to, and did sell their UST/LUNA Tokens, as Defendants' own public statements illustrate, are material – and they had a significant impact on the market price and trading volume for LUNA Tokens.

254.    If a reasonable investor knew that TFL and its insiders collectively could and intended to sell a substantial percentage of the UST/LUNA Tokens in the event of a death spiral of the algorithmic stablecoin, then that investor would reasonably expect the price of UST/LUNA Tokens to be significantly lower than if Defendants could not or did not intend to sell their UST/LUNA Tokens on and immediately following a collapse.  Indeed, Defendants' assurances that were continuing to hold their UST, LUNA, and other Terra Tokens reflect these Defendants' own admission of their materiality.   Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

**Scienter**

255.    Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

256.    As one of the members of the Luna Foundation Guard's Governing Council, Remi Tetot, explicitly admitted, all of the Defendants knew before the May 2022 collapse that the algorithmic stablecoin pair UST and LUNA, along with the Anchor Protocol, was entirely unstable and unsustainable.

257.    Defendants' failure to disclose such information demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of UST/LUNA Tokens at significant profits while the price was artificially inflated on and during the weeks and months that followed their respective launches.  These Defendants executed on that plan, too, by selling billions worth of LUNA Tokens on the market during that period.

258.    Defendants knew that they had sold UST/LUNA Tokens on the market on and in the months that followed their respective launches.  They likewise know that their current and former team members sold UST/LUNA Tokens.

259.    Defendants had the motive not to disclose these facts because such disclosure would have been self-defeating – it would have massively lowered the selling price of the UST and LUNA Tokens and thus effectively precluded TFL from using it in conjunction with UST as its algorithmic pair, Luna and its insiders from generating the profit they subsequently made. Defendants had the opportunity thus to generate ill-gotten gains because they controlled the distribution of the- UST/LUNA Tokens to themselves and their insiders and the extent to which any restrictions would be placed on such tokens.

**Reliance, Economic Loss, and Loss Causation**

260.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the UST/LUNA Tokens upon issuance, and for a period of time thereafter, was artificially inflated.

261.    In ignorance of the fact that the price of UST /LUNA Tokens were artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the UST/LUNA Tokens were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statement, Plaintiffs and the other Class members acquired LUNA Tokens at artificially high prices and were damaged thereby.

262.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of LUNA Tokens and are entitled to an award compensating them for such damages.

263.    Indeed, the price of LUNA TOKENS dropped significantly as Defendants disclosed, and the market discovered, that:  (1) UST was not as "stable" as promoted; (2) the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and (3) that both the UST/LUNA algorithmic stablecoin pair and Anchor's staking rewards

program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund:

(a)     The price of UST and LUNA Tokens dropped by 91% and 99.7% in a week when it was revealed that TFL's largest digital assets were unstable and unsustainable.

264.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class Members have suffered damages in connection with their purchase or acquisition of UST/LUNA Tokens during the Class Period.

265.     In addition, as a direct and proximate result of Defendants' wrongful conduct, Defendants has generated and retained ill-gotten in connection with the May 2022 collapse of UST/LUNA Tokens, such that Plaintiffs and the other Class members are entitled to the disgorgement of Luna's ill-gotten gain from such misconduct.

## SECOND CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act
And Rule 10b-5(a) and (c) Promulgated Thereunder
(Against Defendants TerraForm Labs Ptd. Ltd.,
Do Kwon, and Jump Trading LLC)**

266.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

267.     This Count is asserted against Defendants TerraForm, Kwon, and Jump, and  is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder.

268.     During the Class Period, Defendants TerraForm Labs Ptd Ltd, Do Kwon, and Jump, individually and in concert, directly or indirectly, employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Terra Tokens from March 17, 2021 through May 25, 2022.

269.     Critical to TerraForm's offering was the stablecoin that TFL and Kwon stated was pegged to the U.S. dollar. The failure of the purported algorithm to quickly restore to $1.00US the peg would materially and adversely impact the Terraform ecosystem. In May 2021, the stablecoin

fell materially below $1.00US. the purported algorithm did not restore the stablecoin to the peg. Instead, Defendants TFL and Kwon on the one hand and either or both of Jump Crypto and Jump Trading on the other secretly colluded to restore the peg by-passing the algorithm. Jump Crypto and Jump Trading purchased "massive amounts" of the stablecoin, executing these purchases for the purpose of restoring the peg when the purported algorithm had failed. In the face of the stablecoin's acting as "the lynchpin for the entire [TerraForm] ecosystem," and TFL's claims that the purported algorithm had "self-healed" where human decisions may have failed, these acts, practices, device, scheme, artifice, and course of business operated as a fraud or deceit upon plaintiffs and others similarly situated.

270.    Defendants acted with scienter in that they knew or were severely reckless in not knowing that (a) the purported algorithm had failed, (b) they resorted to human intervention to re-peg the stablecoin, and (c) in the absence of their acts, practices, device, scheme, artifice, and course of business, the entire TerraForm ecosystem was in danger of was in danger of collapse. By virtue of their knowledge or severely reckless disregard of the collusive agreement to intervene to re-peg the stablecoin to $1.00US when the purported algorithm had failed.

271.    As a result of the foregoing, the market price Terra Tokens was artificially inflated during the Class Period. In ignorance of these Defendants' acts, practices, device, scheme, artifice, and course of business, Plaintiffs and the other members of the Class purchased Terra Tokens at prices that were artificially inflated as a result of Defendants' false and misleading statements.

272.    Had Plaintiffs and the other members of the Class been aware that these Defendants' conduct and not the algorithm had re-pegged the stablecoin to $1.00US, they would not have purchased Terra Tokens at the artificially inflated prices that they did, or at all.

273.    As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

274.    By reason of the foregoing, Defendants TerraForm Labs Ptd Ltd, Do Kwon, and Jump Trading LLC have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for

substantial damages which they suffered in connection with their purchase of Terra Tokens from March 17, 2021, through May 25, 2022.

### THIRD CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act**
**(Against The Luna Foundation Guard Defendants**
**and Defendants Kwon and Platias)**

275.    Plaintiffs restate and realleges all preceding allegations above as if fully set forth herein.

276.    This Count is asserted against the Lunda Foundation Guard Defendants, Kwon and Platias (collectively, the "Control Person Defendants") under § 20(a) of the Exchange Act, 15 U.S.C. §78(t).

277.    During the Class Period, the Defendants TFL, Kwon, Platias, Jump, Tribe and participated in the operation and management of TFL and Luna Foundation Guard, and conducted and participated, directly and indirectly, in the conduct of their business affairs. Because of their positions, they knew the material misrepresentations and the adverse non-public information about the statements described above and about the wrongful conduct in which they caused TFL and Luna Foundation Guard to engage.

278.    As officers and/or directors of entities that issues securities, these Defendants had a duty to disseminate accurate and truthful information, to correct promptly any public statements that had become materially false or misleading, and to avoid devices, schemes, artifices to defraud, acts, practices, and/or courses of business conduct that would act as a fraud or deceit on investors.

279.    Because of their positions of control and authority these Defendants were able to, and did, control the contents of the various reports, press releases and public statements cand course of conduct during the Relevant Period. These Defendants exercised their power and authority to cause TFL and Luna Foundation Guard to engage in the wrongful acts complained of herein. These Defendants, therefore, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TFL securities.

280.    Each of these Defendants, therefore, acted as a controlling person of TFL and Luna Foundation Guard.  Each of these Defendants had the power to direct the actions of, and exercised the same, to cause TFL and Luna Guard to engage in the unlawful acts and conduct complained of herein.  Each of these Defendants possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the members of the Class complain.

281.    By reason of the above conduct, these Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TFL and the Luna Foundation Guard Defendants.

### FOURTH CAUSE OF ACTION

**Unregistered Offering and Sale of Securities in
Violation of Sections 5 and 12(a)(1) of the Securities Act
(Against TFL and the Individual Defendants)**

282.    Plaintiffs restate and realleges all preceding allegations above as if fully set forth herein.

283.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

284.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

285.    Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

286.    Plaintiffs and members of the Class purchased Terra Token securities.

287.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

288.     SEC Rule 159A provides that, for purposes of §12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.   17 C.F.R. §230.159A(a).   The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  TFL is an issuer of Terra Tokens.

289.     The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 647 (1988); *accord, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc*., No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner. *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  TFL and the Controlling Defendants are all statutory sellers.

290.     By reason of the foregoing, TFL and the Individual Defendants violated §§5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

291.     As a direct and proximate result of TFL's and the Individual Defendants' unregistered sale of securities, Plaintiffs and the Class have suffered damages in connection with their Terra Token purchases.

## FIFTH CAUSE OF ACTION

### Violation of Sections 15 of the Securities Act
### (Against all Defendants)

292.     Plaintiffs, on behalf of himself and all others similarly situated, reallege and incorporate herein by reference, each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

293.     This Count is asserted against TFL, the Luna Foundation Guard Defendants and Defendants Platias and Kwon (collectively, the "Control Person Defendants") under §15 of the Securities Act, 15 U.S.C. §77o.

294.     The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and

as set forth herein, controlling persons within the meaning of §15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Terra Tokens securities as described herein.

295.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of TFL and the Luna Foundation Guard, through ownership of voting securities, by contract, subscription agreement, or otherwise.

296.   The Control Person Defendants also have the power to direct or cause the direction of the management and policies of TFL and the Luna Foundation Guard.

297.   The Control Person Defendants, separately or together, have sufficient influence to have caused Terra Tokens and/or the Company to submit a registration statement.

298.   The Control Person Defendants, separately or together, jointly participated in Luna's failure to register Terra Tokens.

299.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## SIXTH CAUSE OF ACTION

**Aiding and Abetting
California Common Law
(Against the Luna Foundation Guard Defendants)**

300.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

301.   Under California law, aiding and abetting requires not agreement, but simply assistance.  The elements of aiding and abetting liability have cited the elements of the tort, as they are set forth in the RESTATEMENT (SECOND) OF TORTS §876 and have omitted any reference to an independent duty on the part of the aider and abettor.

302.   Under California law, '"[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'" *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citations omitted).

303.    "Unlike a conspirator, an aider and abettor does not 'adopt as his or her own' the tort of the primary violator.  Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort." *Id.* at 1134 (footnote omitted; citation omitted).

304.    The Luna Foundation Guard are sophisticated, well-capitalized venture capitalists, and, as such, knew or should have known that the marketing strategy employed by the TFL and the Individual Defendants for the Terra Tokens was unlawful, deceitful, fraudulent, and/or violated the terms of the California state statutes described in this Complaint.

305.    By promoting the Terra Tokens on their social media platforms and through their reported conduct, the Luna Foundation Guard and its agents provided assistance that was a substantial factor causing the UST/LUNA Tokens' price to both surge and do so long enough to allow all Defendants to sell their Terra Tokens for huge profits at the expense of their followers and investors. Without the help of the Luna Foundation Guard's activities, TFL and the Individual Defendants would have been unable to use the misleading marketing strategy devised by Kwon, and Defendants would not have been able to commit the violations of federal securities laws and California state consumer protection statutes alleged herein.

306.    As a direct and proximate result of Promotor Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. TFL and the Individual Defendants' activities with the Luna Foundation Guard Defendants caused Plaintiffs and the Class members to purchase and/or hold the Terra Tokens when they otherwise would not have done so.

307.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Luna, to obtain monetary damages, restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California law.

SECOND AMENDED CLASS ACTION COMPLAINT

## SEVENTH CAUSE OF ACTION

### Common Law Conspiracy
### (Against All Defendants)

308.     Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

309.     Beginning in April 2020, and continuously thereafter up to and including the date of the filing of the Complaint, the Individual Defendants and the agents and/or representatives of TFL did engage in the formation and operation of a conspiracy with the Luna Foundation Guard Defendants to misleadingly promote the Terra Tokens (in particular UST and LUNA Tokens) and Anchor Protocol to retail investors in order to artificially inflate the price and trading volume so that Defendants could sell their respective Terra Tokens for substantial profits.

310.     As alleged above, each Defendant acted in furtherance of the conspiracy by, among other things, falsely promoting the Terra Tokens as sound investments with significant stability, sustainability, and growth potential while, in truth, the Defendants were selling their Terra Tokens for substantial profits without disclose the risk to investors.

311.     As a proximate result of said conspiracy, as described in the foregoing paragraphs, Plaintiffs suffered, continues to suffer, and will suffer in the future, the damages alleged herein.

312.     For Defendants' conduct in the alleged conspiracy, Plaintiffs seek compensatory damages against all Defendants, and each of them, jointly and severely, in an as-yet undetermined amount; punitive damages, injunctive relief enjoining Defendants from continuing to falsely and misleadingly promote the Terra Tokens; and divestiture of all money wrongfully obtained, whether directly or indirectly, as part of the alleged conspiracy.

## EIGHTH CAUSE OF ACTION

### Violation of the Racketeer Influenced
### and Corrupt Organizations Act ("RICO")
### 18 U.S.C. §§1961, *et seq*.
### (In the Alternative, Against all Defendants)

313.     Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

314.     This claim is brought in the alternative should this Court find that the Terra Tokens are <u>not</u> securities subject to the disclosure and reporting requirements under federal securities laws.

315.   Plaintiffs bring this claim on behalf of the class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. §1964 for violations of 18 U.S.C. §1962, *et seq*.

316.   Defendants are "person[s]" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

317.   Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. §1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

**The Terra Token Enterprise**

318.   Under 18 U.S.C. §1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

319.   Defendants formed such an association-in-fact enterprise, namely, the Terra Token Enterprise that included Kwon and Platias, along with TFL and the Luna Foundation Guard (and their respective agents).  For the purpose of this claim, these Defendants are collectively referred to as the "RICO Defendants."

320.   The Terra Token Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. §1961(3) that created and maintained systematic links for a common purpose: to ensure that the RICO Defendants could sell off their Terra Token holdings to retail investors at artificially inflated prices without their fraud being detected.

321.   To accomplish this purpose, the Terra Token Enterprise periodically and systematically promoted the Terra Tokens – either affirmatively or through half-truths and omissions – to retail investors, including Plaintiffs and the Class, that the Terra Tokens had real utility (as opposed to pure speculation).  The Terra Token Enterprise concealed from investors, like Plaintiffs and the Class members, that the Terra Tokens were not the sound investment that the RICO Defendants claimed.  This scheme of the Terra Token Enterprise translated into

increased volume and more Terra Token investors buying at artificially inflated prices (and therefore, more profits) for the RICO Defendants.

322.    The persons engaged in the Terra Token Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the Individual Defendants and the Luna Foundation Guard.  There is regular communication between the RICO Defendants, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which RICO Defendants share information regarding various timing and content of promotional activities for the Terra Tokens.  The RICO Defendants through their administration, funding, and execution of the scheme to misleadingly market the Terra Tokens each functioned as a continuing unit for the purposes of implementing, respectively, the Terra Token pump and dump scheme and, as set forth above, when issues arise during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

323.    At all relevant times, Individual Defendants were aware of the conduct of TFL and the Luna Foundation Guard, were knowing and willing participants in that conduct, and reaped profits from that conduct.  Individual Defendants concealed the members of the TFL leadership and founding team, which allowed the unidentified co-conspirators to sell their portion of the Float without any scrutiny or complaint.  Individual Defendants represented to investors that UST/LUNA had staying power, long term value, and tremendous growth potential.  But they knew that the conduct of the Luna Foundation Guard was artificially inflating the price of the Terra Tokens.  Individual Defendants also knew, but did not disclose, that both the trading volume and price action for the Terra Tokens would plummet if the promotional activities ceased.  The Luna Foundation Guard and TFL also knew that their promotional activities artificially caused spikes in the Terra Token price and trading volume, but likewise would not disclose the fraud.  By failing to disclose this information, the RICO Defendants perpetuated the Terra Token Enterprise's scheme, and reaped substantial profits.

324.    During the time that the Terra Tokens were being launched and first publicly marketed to retail investors it, the Individual Defendants were aware of the promotional activities

of the Luna Foundation Guard, were knowing and willing participants in that conduct, and reaped profits from that conduct.  The Individual Defendants knew that using misleading marketing would result in lawsuits and even criminal charges.  Accordingly, the Individual Defendants concealed the identities of the TFL insiders in order to escape detection and punishment for their participation in the Terra Token Enterprise.  The RICO Defendants knew, but did not disclose, that they were promoting the Terra Tokens, then turning around and selling off their holdings as retail investors, like Plaintiffs and the Class members, were buying in.  The Individual Defendants and TFL knew, but did not disclose, that they were allowing the Luna Foundation Guard to engage in this fraud to the detriment of retail investors.

325.    The RICO Defendants participated in the conduct of the Terra Token Enterprise, sharing the common purpose of inflating the price and trading volume of Terra Tokens in order to sell their respective portion of the Float for substantial profit, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. §1341, and multiple instances of wire fraud in violation of 18 U.S.C. §1343.  In the Terra Token Enterprise, the RICO Defendants knowingly made material misstatements to retail investors in furtherance of the fraudulent scheme regarding:

a.    the ownership interests and identities of the TFL founders and insiders;

b.    the timing and amount of Terra Token sales made by the RICO Defendants; and

c.    the RICO Defendants' intent to sell their Terra Tokens after artificially inflating the price.

326.    The Individual Defendants and TFL alone could not have accomplished the purpose of the Terra Token Enterprise without the assistance of the Luna Foundation Guard.  For the Individual Defendants and TFL to profit from the scheme, the Luna Foundation Guard needed to use their influence to mislead investors into buying the Terra Tokens.  And the Luna Foundation Guard Defendants did so.  They then, through misrepresentations and failures to disclose material information, failed to disclose to investors that the Defendants were simultaneously selling their

Terra Tokens at inflated prices.   Without these misrepresentations, the Terra Token Enterprise could not have achieved its common purpose.

327.   The Terra Token Enterprise engaged in and affected interstate commerce because, *inter alia*, it created the Terra Tokens that were paid for by thousands of Class members throughout the United States.

328.   The foregoing evidences that the RICO Defendants were each willing participants in the Terra Token Enterprise, that the Terra Token Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through the Individuals' creation of the Terra Tokens, coupled with the Luna Foundation Guard's misleading promotion of the Terra Tokens.

329.   During the Relevant Period, the RICO Defendants exerted control over the Terra Token Enterprise and participated in the operation or management of the affairs of the Terra Token Enterprise, directly or indirectly, in the following ways:

   a.   Controlling the burning and minting processes and mechanisms for the UST and LUNA liquidity pool;

   b.   The RICO Defendants concealed the identities of the leadership team behind TFL in order to get away with improperly promoting the Terra Tokens to investors;

   c.   The RICO Defendants concealed that they were causing the Terra Token price to artificially inflate in order to allow themselves to sell off their respective Terra Token holdings at that inflated price; and

   d.   The Individual Defendants and TFL expected and intended that the Luna Foundation Guard Defendants would (and did) distribute through the U.S. Mail and interstate wire facilities, communications that failed to disclose that the RICO Defendants were pumping up price and trading volume of Terra Tokens artificially.

330.   The scheme had a hierarchical decision-making structure that was headed by the Individual Defendants and TFL.   They controlled the minting of the Terra Tokens and directed the Luna Foundation Guard Defendants to misleadingly promote the Terra Tokens to their social media audiences.

331.     The scheme devised and implemented by the RICO Defendants, as well as other members of the Terra Token Enterprise, amounted to a common course of conduct intended to (a) allow the RICO Defendants to artificially inflate the price of and trading volume for the Terra Tokens; and (b) sell their respective portion of the Float for a profit at the expense of Plaintiffs and the Class members.

**RICO Defendants' Pattern of Racketeering Activity**

332.     The RICO Defendants conducted and participated in the conduct of the affairs of the Terra Token Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud.  The pattern of racketeering activity by the Terra Token Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful HSP pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §1961(5), through which the RICO Defendants intended to defraud Plaintiffs, members of the Class, and other intended victims.

333.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.   The RICO Defendants calculated and intentionally crafted the Terra Token Enterprise to ensure their own profits remained high, without regard to the effect such behavior had on Plaintiffs and members of the Class who would were buying the Terra Tokens at artificially inflated prices.

334.     By intentionally and artificially inflating the Terra Token prices, and then subsequently failing to disclose such practices to the investors, the RICO Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

335.     The pattern of racketeering activity alleged herein was continuing until June 27, 2021.

SECOND AMENDED CLASS ACTION COMPLAINT

**The RICO Defendants' Use of the U.S. Mail and Interstate Wire Facilities**

336.    The Terra Token Enterprise engaged in and affected interstate commerce because it transmitted and published false and misleading information concerning the growth potential for Terra across state lines.

337.    During the Class Period, the Terra Token Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. Mail and interstate wire facilities.

338.    The nature and pervasiveness of the fraudulent token promotion scheme, which was orchestrated by Individual Defendants, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

339.    Many of the precise dates of the Terra Token Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Individual Defendants' or the Luna Foundation Guard Defendants.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

340.    The RICO Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the Class Period including, *inter alia*:

    a.    Communications on official TFL, Luna Foundation Guard, and Anchor Protocol accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiffs and Class members purchased Terra Tokens;

    b.    Written representations and telephone calls between Defendants regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

SECOND AMENDED CLASS ACTION COMPLAINT

c.      Written representations and telephone calls between any of the RICO Defendants and any cryptocurrency exchanges regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

d.      Written representations and telephone calls between the RICO Defendants and the moderators of the TFL, Luna Foundation Guard, and Anchor Protocol social media accounts regarding the promotion of Terra Tokens and the financial benefits to the RICO Defendants for doing so;

e.      Emails between the Defendants agreeing to or effectuating the implementation of the Terra Token fraud scheme;

f.      Written and oral communications directed to retail investors that fraudulently misrepresented the growth potential for the Terra Tokens that were designed to conceal the scheme and deter investigations into the Terra Token Enterprise; and

g.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities – the wrongful proceeds of the scheme.

341.    In addition to the above-referenced RICO predicate acts, it was foreseeable to the Defendants would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that the Terra Token price was fraudulently inflated.

**Motive and Common Purpose**

342.    The RICO Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that they could sell off their portion of the Float for grossly inflated prices.  Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity.

**Damages Caused by the RICO Defendants' Marketing Fraud**

343.    The RICO Defendants violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and Class members to be financially injured as a result of purchasing the Terra Tokens.

344.    As described above, when the RICO Defendants executed the Terra Token promotional scheme, the result was an artificial increase in both price and trading volume of the Terra Tokens and Anchor protocol, respectively. When the Terra Token price and trading volume was artificially inflated, investors like Plaintiffs and the Class overpaid due to a fraudulent price.

345.    Plaintiffs' injuries, and those of the Class members, were proximately caused by the RICO Defendants' racketeering activity.  But for the misleading statements and omissions made by the RICO Defendants, Plaintiffs and others similarly situated would have paid less for the Terra Tokens.

346.    Plaintiffs' injuries were directly caused by the RICO Defendants' racketeering activity.  The RICO Defendants' racketeering activity inflated the Terra Token price, which was ultimately paid for by Plaintiffs and the other Class members.

347.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the RICO Defendants' fraudulent scheme.

348.    By virtue of these violations of 18 U.S.C. §1962(c), the RICO Defendants are liable to Plaintiffs for three times the damages he has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## NINTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, in the Alternative)**
**(Against All Defendants)**

349.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

350.    Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Terra Tokens, which allowed Defendants to sell their Terra Tokens to Plaintiffs and Class members at inappropriately and artificially inflated prices.

351.    Defendants received a financial benefit from the sale of their Terra Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

352.    Plaintiffs seek restitution in the form of the monetary value of the difference between the purchase price of the Terra Tokens and the price those Terra Tokens sold for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.    Appoint Plaintiffs as a representatives of the Class and The Rosen Law Firm, P.A. as class counsel;

C.    Declare that TFL and Individual Defendants offered and sold unregistered securities in violation of §§5(a), 12(a), and 15 of the Securities Act;

D.    Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

E.    Award post-judgment interest on such monetary relief;

F.    Grant appropriate injunctive and/or declaratory relief;

G.    Award reasonable attorneys' fees and costs; and

H.    Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED:  February 23, 2023

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
Pronouns: he/him/his
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

1      and

2      Jacob A. Goldberg (*pro hac vice*)
       Pronouns: he/him/his
3      Michael Cohen
       Pronouns: he/him/his
4      275 Madison Avenue, 40th Floor
       New York, NY 10016
5      Telephone: (212) 686-1060
       Facsimile: (212) 202-3827
6      Email: jgoldberg@rosenlegal.com
              mcohen@rosenlegal.com
7

8      *Lead Counsel for Plaintiffs and the Putative Class*

9      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

10     John T. Jasnoch (CA 281605)
       jjasnoch@scott-scott.com
11     600 W. Broadway, Suite 3300
       San Diego, CA 92101
12     Telephone: 619-233-4565
       Facsimile: 619-236-0508
13

14     and

15     Sean T. Masson (*pro hac vice*)
       The Helmsley Building
16     230 Park Avenue, 17th Floor
       New York, NY 10169
17     Telephone: 212-223-6444
       smasson@scott-scott.com
18
       *Additional Counsel*
19

20

21

22

23

24

25

26

27

28