KOBRE & KIM LLP

Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Leif T. Simonson (admitted *pro hac vice*)
Tapan R. Oza (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
leif.simonson@kobrekim.com
tapan.oza@kobrekim.com

Daniel A. Zaheer (SBN 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel.: +1 415 582 4800
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS and DO KWON,<br><br>Defendants. | Case No. 22-cv-3600-TLT<br><br>**JUMP TRADING, LLC'S MOTION TO COMPEL ARBITRATION OR STAY PENDING RESOLUTION OF ARBITRATION PROCEEDINGS**<br><br>Honorable Trina L. Thompson<br>Hearing Date: September 19, 2023 |

1

**TABLE OF CONTENTS**

2  NOTICE OF MOTION ....................................................................................... VIII

3  PRELIMINARY STATEMENT ............................................................................ 1

4  STATEMENT OF RELEVANT FACTS AND ALLEGATIONS ........................... 2

5      I.      The "Anchor Protocol" Explained. ............................................. 2

6      II.     Lead Plaintiff and Other Users of the Anchor Protocol's Interface

7               All Agreed to be Bound by Its Terms of Service, Including Its Broad

8               Arbitration Clause. .................................................................. 2

9      III.    The Anchor Protocol is Central to Lead Plaintiff's Theory of Fraud. ............ 3

10      IV.   Lead Plaintiff Alleges Jump Trading and TFL Colluded in the Purported

11               Scheme to Defraud Him. ........................................................... 3

12  STATEMENT OF ISSUES ................................................................................... 5

13  ARGUMENT ....................................................................................................... 5

14      I.      Questions About Arbitrability Are For The Arbitrator. .................... 6

15      II.     In Any Event, Lead Plaintiff Must Arbitrate His Claims Against Jump

16               Trading. ............................................................................... 11

17           A.    Jump Trading Can Enforce the Arbitration Agreement Against Lead

18                 Plaintiff Under the Doctrine of Equitable Estoppel. ................................. 11

19                1.     Lead Plaintiff's State Law Claims Must Also be Arbitrated Even

20                      Under California's Alternative Equitable Estoppel Test. ............. 14

21           B.    All of Lead Plaintiff's Claims Against Jump Trading Fall Within the

22                 Arbitration Agreement's Broad Scope. .................................... 16

23      III.   The Court Should Stay Any Remaining Claims Pending Resolution of the

24               Arbitration. ........................................................................... 17

25  CONCLUSION ................................................................................................... 20

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adema Technologies Inc. v. Wacker Chemical Corp.*,
   657 F. App'x 661 (9th Cir. 2016) ........................................................................... 6

*Ambercroft Trading Ltd. v. Biddy*,
   2020 WL 1820599 (N.D. Cal. Apr. 10, 2020) .................................................. 18, 19

*Amisil Holdings Ltd. v. Clarium Capital Management*,
   622 F. Supp. 2d 825 (N.D. Cal. 2007) ................................................................. 13

*Apollo Computer, Inc. v. Berg*,
   886 F.2d 469 (1st Cir. 1989) ................................................................................. 8

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ........................................................................................... 12

*AT&T Technologies, Inc. v. Communications Workers of America*,
   475 U.S. 643 (1986) ........................................................................................... 17

*Bard v. Moe*,
   2016 WL 1166329 (Cal. Ct. App. Mar. 23, 2016) ................................................ 15

*Bossart v. General Motors LLC*,
   2022 WL 3573855 (E.D. Mich. Aug. 19, 2022) .................................................... 9

*Boston Telecommunications Group, Inc. v. Deloitte Touche Tohmatsu*,
   278 F. Supp. 2d 1041 (N.D. Cal. 2003), *aff'd*, 249 F. App'x 534 (9th Cir. 2007) ................... 13

*Brown v. General Steel Domestic Sales, LLC*,
   2008 WL 2128057 (C.D. Cal. May 19, 2008) .................................................. 12, 13

*Caremark, LLC v. Chickasaw Nation*,
   43 F.4th 1021 (9th Cir. 2022) ............................................................................... 8

*Casa Arena Blanca LLC v. Rainwater by Estate of Green*,
   2022 WL 839800 (10th Cir. Mar. 22, 2022) ......................................................... 8

1  *CMAX, Inc. v. Hall,*

2    300 F.2d 265 (9th Cir. 1962) .................................................................. 18

3  *Coast Plaza Doctors Hospital v. Blue Cross of California,*

4    83 Cal. App. 4th 677 (Ct. App. 2000) ...................................................... 17

5  *Costa v. Postmates Inc.,*

6    2019 WL 13207628 (N.D. Cal. Oct. 3, 2019) .......................................... 11

7  *Cruz v. PacifiCare Health Systems, Inc.,*

8    66 P.3d 1157 (Cal. 2003).......................................................................... 17

9  *Cunningham v. Ford Motor Co.,*

10    2022 WL 2819115 (E.D. Mich. July 19, 2022) ......................................... 9

11  *De Angelis v. Icon Entertainment Group Inc.,*

12    364 F. Supp. 3d 787 (S.D. Ohio 2019) ...................................................... 9

13  *Donovan v. Coinbase Global, Inc.*

14    --- F. Supp. 3d ---, 2023 WL 2124776 (N.D. Cal. Jan. 6, 2023) ................... 10, 12, 17

15  *Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC,*

16    756 F.3d 1098 (8th Cir. 2014) ................................................................... 8

17  *Esguerra-Aguilar, Inc. v. Shapes Franchising, LLC,*

18    2020 WL 3869186 (N.D. Cal. July 9, 2020) ............................................ 15

19  *Finsa Portafolios, S.A. de C.V. v. OpenGate Capital LLC,*

20    769 F. App'x 429 (9th Cir. 2019)............................................................... 6

21  *Fireman's Fund Insurance Co. v. M.V. DSR Atlantic,*

22    131 F.3d 1336 (9th Cir. 1997) ................................................................... 6

23  *Ford-Allemand v. Piedmont Natural Gas Co., Inc.,*

24    2022 WL 3576227 (S.D. Ohio Aug. 19, 2022) ......................................... 9

25  *Forrest v. Spizzirri,*

26    62 F.4th 1201 (9th Cir. 2023) ................................................................... 17

27  *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC,*

28    140 S. Ct. 1637 (2020)............................................................................. 12

*Grabowski v. Platepass, L.L.C.,*
   2021 WL 1962379 (N.D. Ill. May 17, 2021) .................................................... 9

*Hansen v. KPMG, LLP,*
   2005 WL 6051705 (C.D. Cal. Mar. 29, 2005) ............................................... 14

*Henry Schein Inc. v. Archer & White Sales, Inc.,*
   139 S. Ct. 524 (2019) ........................................................................ 7, 9, 10

*Henry v. Vantage Credit Union,*
   2021 WL 2187908 (E.D. Mo. May 28, 2021) ................................................. 9

*Holden v. Deloitte & Touche LLP,*
   390 F. Supp. 2d 752 (N.D. Ill. 2005) ........................................................... 14

*In re Intuniv Antitrust Litigation,*
   2021 WL 517386 (D. Mass. Feb. 11, 2021) ................................................... 9

*Ireland v. Charles Dunn Co., Inc.,*
   2017 WL 3614223 (Cal. Ct. App. Aug. 23, 2017) .......................................... 17

*Isernia v. Danville Regional Medical Center, LLC,*
   2022 WL 4076113 (W.D. Va. Sept. 6, 2022) .................................................. 8

*Jacobsen Gravel Co. v. IronPlanet, Inc.,*
   2016 WL 10879837 (D. Minn. Nov. 10, 2016) ............................................... 9

*Kramer v. Toyota Motor Corp.,*
   705 F.3d 1122 (9th Cir. 2013) ............................................................... 10, 12

*Krystal, Inc. v. China United Transportation, Inc.,*
   2017 WL 6940544 (C.D. Cal. Apr. 12, 2017) ................................................. 6

*Landis v. North American Co.,*
   299 U.S. 248 (1936) ............................................................................... 17

*Loewen v. Lyft, Inc.,*
   129 F. Supp. 3d 945 (N.D. Cal. 2015) .......................................................... 7

*M/S Bremen v. Zapata Off–Shore Co.,*
   407 U.S. 1 (1972) .................................................................................... 6

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*,

  708 F.2d 1458 (9th Cir. 1983) ........................................................................ 16, 17

*Metalclad Corp. v. Ventana Environmental Organizational Partnership*,

  109 Cal. App. 4th 1705 (Ct. App. 2003) ............................................................... 14

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,

  2013 WL 1995208 (N.D. Cal. May 13, 2013) .......................................................... 19

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,

  473 U.S. 614 (1985) ............................................................................................ 16

*Mohamed v. Uber Technologies, Inc.*,

  848 F.3d 1201 (9th Cir. 2016) ............................................................................... 7

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,

  460 U.S. 1 (1983) ............................................................................................... 17

*National Union Fire Insurance Co. of Pittsburg, PA v. Rudolph & Sletten, Inc.*,

  2020 WL 4039370 (N.D. Cal. July 17, 2020) .......................................................... 18

*Newman v. Plains All American Pipeline, L.P.*,

  44 F.4th 251 (5th Cir. 2022) ................................................................................ 10

*Oberstein v. Live Nation Entertainment, Inc.*,

  60 F.4th 505 (9th Cir. 2023) .................................................................................. 8

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,

  2022 WL 2643936 (11th Cir. July 8, 2022) ............................................................ 11

*Phillips-Harris v. BMW of North America., LLC*,

  2022 WL 72355 (9th Cir. Jan. 7, 2022) ................................................................. 12

*Pilot Inc. v. TYC Brother Industrial Co., Ltd.*,

  2020 WL 3833597 (C.D. Cal. July 8, 2020) ............................................................. 7

*Portland General Electric Co. v. Liberty Mutual Insurance Co.*,

  862 F.3d 981 (9th Cir. 2017) ................................................................................. 7

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*,

  388 U.S. 395 (1967) ........................................................................................... 16

*Rent-A-Center, West, Inc. v. Jackson*,

  561 U.S. 63 (2010) ................................................................................ 11

*Roberts v. Obelisk, Inc.*,

  2019 WL 1902605 (S.D. Cal. Apr. 29, 2019) ........................................ 13

*Robertson v. Enbridge (U.S.) Inc.*,

  2020 WL 9211171 (W.D. Pa. Aug. 4, 2020) ........................................... 9

*Setty v. Shrinivas Sugandhalaya LLP*,

  3 F.4th 1166 (9th Cir. 2021) ................................................................... 12

*Sharp Corp. v. Hisense USA Corp.*,

  2017 WL 6017897 (N.D. Cal. Dec. 5, 2017) .......................................... 19

*Shearson/American Express, Inc. v. McMahon*,

  482 U.S. 220 (1987) ............................................................................... 17

*Simula, Inc. v. Autoliv, Inc.*,

  175 F.3d 716 (9th Cir. 1999) ................................................................. 16

*Swiger v. Rosette*,

  989 F.3d 501 (6th Cir. 2021) ............................................................... 7, 8

*Symonds v. Credico (USA) LLC*,

  2020 WL 7075028 (D. Mass. Dec. 3, 2020) ............................................ 9

*Turner v. PillPack, Inc.*,

  2019 WL 2314673 (W.D. Ky. May 30, 2019) .......................................... 9

*Visibility Corp. v. Schilling Robotics, LLC*,

  2011 WL 5075816 (D. Mass. Oct. 25, 2011) ........................................... 9

*Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*,

  940 F.2d 513 (9th Cir. 1991) ................................................................. 17

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*,

  2006 WL 2473665 (Del. Ch. Aug. 22, 2006) ......................................... 15

*Williams v. Staffmark Investment LLC*,

  2022 WL 910859 (D. Kan. Mar. 29, 2022) ............................................. 9

*Zoran Corp. v. DTS, Inc.*,

   2009 WL 160238 (N.D. Cal. Jan. 20, 2009)............................................................................ 16

**Statutes**

9 U.S.C. § 2........................................................................................................................................ 6

9 U.S.C. § 3.................................................................................................................................. 6, 17

9 U.S.C. § 201.................................................................................................................................... 7

9 U.S.C. § 202.................................................................................................................................. 12

15 U.S.C. § 78a................................................................................................................................ 15

**Rules**

Arbitration Rules of the Singapore International Arbitration Centre, 6th ed. (2016)

   4.1 ............................................................................................................................................... 18

   19.1 ............................................................................................................................................. 18

   28.1 ............................................................................................................................................... 7

   28.2 ............................................................................................................................................... 7

**Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,

   330 U.N.T.S. 3 (June 10, 1958).................................................................................................... 7

1

**NOTICE OF MOTION**

2    **PLEASE TAKE NOTICE** that on September 19, 2023, at 2:00pm, or at such other date

3    as may be agreed upon or ordered in the United States District Court for the Northern District of

4    California, Courtroom of the Honorable Trina L. Thompson, Courtroom 9, 19th Floor, 450 Golden

5    Gate Avenue, San Francisco, CA 94102, Defendant Jump Trading, LLC ("Jump Trading") will

6    and hereby does move this Court to (1) compel arbitration of the claims set forth by Lead Plaintiff

7    against Jump Trading in this matter and (2) stay any claims that are not compelled to arbitration

8    pending resolution of the arbitration.  By its motion, Jump Trading does not waive any Rule

9    12(b)(2) or 12(b)(6) defenses to these or any related actions by not asserting such defenses in this

10   Motion.

11   This Motion is based upon this Notice of Motion, the accompanying Proposed Order,

12   arguments to be made by counsel, any other matter properly considered by the Court, and the

13   following points and authorities in support of the Motion.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

Lead Plaintiff's action in this Court violates the plain language of his agreement to arbitrate.[1]  Lead Plaintiff was a user of a "high yield savings account" on the Terra blockchain called the Anchor Protocol (explained further below).  To use that protocol, Lead Plaintiff agreed to be bound by the Anchor Terms of Service ("Anchor TOS"), which included a broad arbitration clause requiring him to arbitrate in Singapore all claims arising out of or related to use of the Anchor Protocol Interface or the Anchor TOS.  Now, despite the clear and enforceable language of the Anchor TOS, he has brought just such a case here.  He should not be permitted to do so.  Lead Plaintiff's claims against Jump Trading should be dismissed, and he should be compelled to arbitrate.

Because the arbitration provision clearly and unmistakably delegates to the arbitrator, among other things, "any claim or controversy as to arbitrability," Lead Plaintiff should be compelled to arbitrate once the Court determines that a valid arbitration exists (and one unquestionably does).  Any remaining questions, including whether Jump Trading, as a nonsignatory, can enforce the arbitration clause against Lead Plaintiff or whether his claims fall within the agreement's scope, are for the arbitrator to decide.

But even if this Court were to conclude that it, and not the arbitrator, should resolve threshold arbitrability questions, it should find that Jump Trading can enforce the provision pursuant to the doctrine of equitable estoppel because Lead Plaintiff's theory of liability rests on allegedly collusive conduct between Jump Trading and a signatory, Defendant Terraform Labs ("TFL").  It should also find that all of Lead Plaintiff's claims against Jump Trading fall within the arbitration provision's broad scope.

Moreover, to the extent that the Court believes it should apply a *forum non conveniens* analysis here, the case should still be dismissed for the reasons addressed below and in TFL's Motion to Compel Arbitration.

---

[1] Jump Trading does not concede that Mr. Patterson is a proper plaintiff, as explained in Terraform Labs' Motion to Compel Arbitration.  Therefore, this Motion to Compel addresses Lead Plaintiff's agreement to arbitrate.  Jump Trading reserves the right to move to compel Mr. Patterson to arbitrate in the future should he properly assert claims.

1    Finally, even if this Court does not compel Lead Plaintiff to arbitrate some or all of his

2  claims against Jump Trading, the non-arbitrable claims should be stayed pending arbitration in

3  order to promote judicial efficiency and avoid largely duplicative proceedings and potentially

4  inconsistent judgments.

5              **STATEMENT OF RELEVANT FACTS AND ALLEGATIONS[2]**

6  **I.      The "Anchor Protocol" Explained.**

7    Anchor was a "protocol" designed on the Terra blockchain that functioned like a "high

8  yield savings account."  Second Am. Compl. ¶ 6, ECF No. 102 (hereafter, "SAC" or "Complaint").

9  A "protocol" is a set of rules that permits information sharing between computers.  *Cf. id.* at 3 n.2.

10  The Anchor Protocol allowed users either to deposit a particular cryptocurrency, TerraUSD

11  ("UST"), into the protocol and earn interest on that deposit or to borrow UST by posting collateral

12  and paying interest on that loan.  *See id.* at ¶ 70.  UST was a "stablecoin" that operated on the Terra

13  blockchain and was designed to maintain its value at US $1 by allowing traders to always exchange

14  one UST token for US $1 worth of its sister cryptocurrency, LUNA, and vice versa.  The Anchor

15  Protocol generated interest for UST deposits by collecting interest from UST borrowers.  *See*

16  Declaration of Douglas Henkin ("Henkin Decl.") Ex. C (Anchor Whitepaper).  As alleged in the

17  Complaint, persons who deposited UST in the Anchor Protocol earned 20% interest on those

18  deposits.  *See* SAC ¶ 6.

19  **II.     Lead Plaintiff and Other Users of the Anchor Protocol's Interface All Agreed to Be**

20  **Bound by Its Terms of Service, Including Its Broad Arbitration Clause.**

21    As set forth in TFL's Motion to Compel Arbitration, which is incorporated by reference

22  herein, Lead Plaintiff used the Anchor Protocol and thus agreed to be bound by the Anchor TOS.

23    The Anchor TOS includes a quintessential commercial arbitration provision that is broad

24  and delegates threshold questions of arbitrability to the arbitrator:

25      **Any claim or controversy arising out of or relating to the Interface, this
     Agreement,** including any question regarding this Agreement's existence, validity
26     or termination, or any other acts or omissions for which you may contend that we
     are liable, **including (but not limited to) any claim or controversy as to
27     arbitrability ("Dispute"), shall be referred to and finally resolved by**

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[2] To the extent that this Motion relies on any allegations in the Complaint, Jump Trading does not
concede the truth of those allegations, many of which are demonstrably false.

**arbitration** in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules").

Declaration of Chris Amani ("Amani Decl.") Ex. A § 18 (emphasis added). The "Interface" referenced is a website that allows users to access the Anchor Protocol. *See id.* at Preamble. As TFL's Motion to Compel Arbitration explains, holders of UST who wished to use Anchor could deposit their tokens through the Interface by first agreeing to the Anchor TOS.

## III.   The Anchor Protocol Is Central to Lead Plaintiff's Theory of Fraud.

Lead Plaintiff alleges that the Anchor Protocol was crucial to the alleged scheme to defraud him and other UST purchasers. *See, e.g.*, SAC ¶ 26 (stating that the Anchor Protocol was "the primary driver of the Terra ecosystem's collapse"). According to the SAC, the Anchor Protocol and its 20% interest rate were critical to driving up demand for LUNA and UST, because the high interest rate attracted investors to the Terra Ecosystem. *See id.* at ¶ 163. Lead Plaintiff alleges that the 20% rate was so attractive that "approximately $14 billion of UST's market cap[italization] (75%) was deposited into Anchor at its peak." *See id.* at ¶ 7; *see also id.* at ¶ 133 (noting that "Anchor has consistently represented at least half of TFL's combined total value locked"). Indeed, the purported misrepresentations on which Lead Plaintiff relies for his federal securities law claims are premised largely on statements related to the Anchor Protocol. *See id.* at ¶¶ 250, 252. Lead Plaintiff alleges he and others invested in UST because they were misled about the sustainability of the 20% interest rate. *See id.* ¶ 163 (alleging that the 20% yield was a "marketing ploy"). Lead Plaintiff's theory is that the entire Terra Ecosystem was a "Ponzi" scheme that was "fueled" by the high interest rates offered on deposits on the Anchor Protocol. *See id.* at ¶¶ 147–49.

## IV.   Lead Plaintiff Alleges Jump Trading and TFL Colluded in the Purported Scheme to Defraud Him.[3]

Lead Plaintiff's case against Jump Trading rests largely on the theory that Jump Trading colluded with TFL and its employees (and other Defendants) to defraud him, including with respect to the Anchor Protocol. This premise is most obvious in both the conspiracy count, in which Lead Plaintiff alleges that Defendants operated a conspiracy to promote the Anchor Protocol,

---

[3] Although, as explained herein, Lead Plaintiff alleges collusion between Jump Trading and TFL, those allegations are deficient for reasons explained in Jump Trading's concurrently filed motion to dismiss.

*see id.* at ¶¶ 309–10, and also in the aiding and abetting count, in which Lead Plaintiff alleges that the Luna Foundation Guard Defendants (in which Plaintiff includes Jump Trading) provided "assistance" or "encouragement" to help TFL commit wrongs. *See id.* at ¶¶ 301–05. But allegations of collusion pervade the SAC. Lead Plaintiff claims that in executing the fraud, Defendants acted "individually and in concert," *see id.* at ¶ 268; *see also id.* at ¶ 269 (alleging TFL, Kwon, and "either or both of Jump Crypto and Jump Trading . . . secretly colluded"), and that the Defendants together participated in the "operation and management of TFL and Luna Foundation Guard." *See id.* at ¶ 277; *see also id.* at ¶¶ 295–96. Similarly, the RICO count alleges a common "enterprise" that the Defendants allegedly formed and alleges that the Defendants comprising the enterprise "are systematically linked through contractual relationships, financial ties, and continuing coordination of activities." *See id.* at ¶¶ 318–19, 322.

Indeed, Lead Plaintiff specifically alleges that Defendants worked together or even on behalf of one another or TFL. *See, e.g.*, *id.* at ¶ 6 (claiming that the Luna Foundation Guard Defendants "acted on behalf of TFL"); *id.* at ¶ 30 (claiming Jump Trading "worked closely with TFL and Kwon"); *id.* at ¶ 56 ("Jump has been backing TFL and Kwon since at least 2019"); *id.* at ¶ 140 (claiming "Jump also promoted its relationship with TFL"); *id.* at ¶ 142 (claiming Kwon and Kanav Kariya, alleged head of "Jump Crypto," appeared together to promote UST); *id.* at ¶¶ 191–93, 200 (claiming Kwon and TFL coordinated with Jump Trading during the May 2021 depegging event). Further, the SAC frequently treats Jump Trading and TFL (and other Defendants) as essentially one and the same, often grouping Defendants together without distinguishing the conduct of any particular defendant. *See, e.g.*, *id.* at ¶ 4 (claiming they expected profits "based on the efforts of Defendants to maintain the Terra ecosystem."); *id.* at ¶ 82 (alleging that "Defendants also aggressively marketed" Terra tokens); *id.* at ¶ 88 (alleging "Defendants sold Terra Tokens"); *id.* at ¶ 92 (claiming "Defendants' efforts" were required to make the Terra Ecosystem succeed); *id.* at ¶ 106 ("Defendants also worked to develop, support, and grow the Terraform ecosystem. Defendants publicly touted these efforts . . . ."); *id.* at ¶ 163 (claiming "Defendants knew all along there was a significant risk of a death spiral"); *id.* at ¶¶ 246, 248–50, 255–59, 270 (using the term "Defendants" without distinction and group pleading scienter allegations); *id.* at ¶ 277 (pleading

1   that Defendants—without distinguishing among them—were control persons of TFL and the Luna
2   Foundation Guard and "conducted and participated, directly and indirectly, in the conduct of their
3   business affairs"); *see also id.* at ¶ 279 (pleading "Defendants were able to, and did, control the
4   contents of the various reports, press releases and public statements []and course of conduct during
5   the Relevant Period"); *see also id.* at ¶¶ 332–41 (alleging predicate acts by Defendants without
6   specifying who committed which act).

7                           **STATEMENT OF ISSUES**

8          Lead Plaintiff agreed to resolve any dispute arising out of or relating to the Anchor Protocol
9   through arbitration in Singapore.  Lead Plaintiff is bound to that agreement.  The Court must decide
10  in the present motion (1) if Lead Plaintiff's agreement to delegate threshold arbitrability questions
11  to an arbitrator requires the arbitrator to decide both whether Jump Trading may enforce the clause
12  against Lead Plaintiff and whether his claims fall within the clause's broad scope, (2) if the Court
13  decides issues related to arbitrability, whether Lead Plaintiff must arbitrate his claims against Jump
14  Trading, and (3) whether to dismiss the action in favor of arbitration or, in the alternative, stay any
15  remaining non-arbitrable claims pending resolution of the arbitration.

16                               **ARGUMENT**

17         Lead Plaintiff must arbitrate his dispute against Jump Trading.  As a threshold matter, Lead
18  Plaintiff agreed to a clear and unmistakable delegation clause in the Anchor TOS that specifies
19  that the arbitrator, rather than a court, should resolve any questions concerning arbitrability.
20  Therefore, an arbitrator must determine any questions about whether Jump Trading can enforce
21  the arbitration agreement or about that agreement's scope, and this Court should stay this action
22  in the interim.  But were this Court to decide the threshold arbitrability questions, it should find
23  that Jump Trading can compel Lead Plaintiff, who alleges Jump Trading colluded with TFL and
24  others to engage in fraudulent conduct that caused his alleged harm, to arbitrate his claims against
25  Jump Trading.

26         Moreover, if the Court believes that a *forum non conveniens* analysis is appropriate on the
27  grounds that an agreement to arbitrate in a foreign jurisdiction should be analyzed as if it is a forum
28  selection clause, the case should still be sent to arbitration for the reasons addressed in TFL's

Motion to Compel Arbitration.  As discussed in TFL's Motion to Compel Arbitration, a forum selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Fireman's Fund Ins. Co. v. M.V. DSR Atlantic*, 131 F.3d 1336, 1338 (9th Cir. 1997) (citation omitted).[4]  Lead Plaintiff cannot meet this burden.  The SAC does not plead fraud or overreaching in connection with the Anchor TOS. It was Lead Plaintiff's choice to use the Anchor Protocol and to accept the Anchor TOS before connecting his wallet to the Interface.  The Anchor TOS highlighted the forum-selection clause in its introductory paragraphs, so there is no plausible argument that it was a surprise.  And as demonstrated in TFL's Motion to Compel Arbitration, enforcement would not be unreasonable or unjust.

Finally, the claims that are not compelled to arbitration, if any, should be stayed pending resolution of the arbitration.

**I.    Questions About Arbitrability Are For The Arbitrator.**

The Anchor TOS clearly and unmistakably delegates threshold questions of arbitrability to the arbitrator.  Those threshold "arbitrability" questions include the question whether Jump Trading, a nonsignatory, may enforce the arbitration clause against Lead Plaintiff, a signatory, under the doctrine of equitable estoppel.[5]  Specifically, the clause's plain language provides that

---

[4] S*ee also Finsa Portafolios, S.A. de C.V. v. OpenGate Capital LLC*, 769 F. App'x 429, 430–31 (9th Cir. 2019).  A plaintiff must meet a "heavy burden" to establish that such a clause is invalid. *See Krystal, Inc. v. China United Transp., Inc.*, 2017 WL 6940544, at *5 (C.D. Cal. Apr. 12, 2017). Courts thus refuse to enforce forum-selection clauses only under extraordinary circumstances, and the inconvenience to the parties is not such a circumstance.  *See Adema Techs. Inc. v. Wacker Chem. Corp.*, 657 F. App'x 661, 662 (9th Cir. 2016).  A party resisting a forum-selection clause must "clearly show that enforcement would be unreasonable and unjust."  *M/S Bremen v. Zapata Off–Shore Co*., 407 U.S. 1, 15 (1972).  "Enforcement is unreasonable and unjust if the clause results from fraud or overreaching; if enforcing the clause would effectively deprive [plaintiff] of its day in court; or if enforcement would contravene a strong public policy of California."  *Adema Techs.*, 657 F. App'x at 663 (internal quotations omitted).

[5] The Federal Arbitration Act ("FAA") provides that agreements to arbitrate "shall be valid, irrevocable and enforceable."  9 U.S.C. § 2.  The FAA not only requires courts to enforce such arbitration provisions but also provides that courts "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Moreover, with respect to arbitration agreements involving, as here,

---

"any question regarding this Agreement's existence, validity or termination" and "any claim or controversy as to arbitrability . . . shall be referred to and finally resolved by arbitration."  Amani Decl. Ex. A § 18.  Courts have found substantially similar delegation clauses to be "clear and unmistakable."  *See, e.g.*, *Swiger v. Rosette*, 989 F.3d 501, 506 (6th Cir. 2021) (finding clause that stated "any issue concerning the validity, enforceability or scope of this . . . Agreement to Arbitrate" to be a clear and unmistakable delegation clause); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (finding clear and unmistakable a clause that delegated to arbitrators issues concerning "enforceability, revocability or validity of the Arbitration Provision"); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 954 (N.D. Cal. 2015) (finding clause that required arbitration of questions of "the arbitrability of any dispute" to be a clear and unmistakable delegation clause), *abrogated on other grounds by Henry Schein Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019).[6]

Because the delegation clause is clear and unmistakable, the Court should compel the parties to arbitrate once it determines that it is a valid contract.  *See Henry Schein, Inc. v. Archer*

---

international tribunals, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S. 3 (the "New York Convention") similarly requires courts to enforce such provisions and to compel arbitration whenever a party attempts to litigate such claims in court.  *See* 9 U.S.C. § 201 (providing that the New York Convention "shall be enforced in United States courts in accordance with this chapter").

[6] The incorporation of the Singapore International Arbitration Centre's ("SIAC") rules provides an additional basis to determine that the parties delegated threshold questions of arbitrability to the arbitrator.  Rule 28.1 states that the SIAC Court of Arbitration has the power to resolve questions regarding, or challenges to, the "existence or validity of the arbitration agreement or to the competence of SIAC."  *See* SIAC Rules 2016, SINGAPORE INTERNATIONAL ARBITRATION CENTRE (last visited May 2, 2023), https://siac.org.sg/siac-rules-2016.  Similarly, Rule 28.2 states that the "Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity or scope of the arbitration agreement."  *See id.*  Courts have found that the incorporation of arbitral rules such as these constitutes a clear and unmistakable delegation of authority to the arbitrator to resolve such disputes.  *See Pilot Inc. v. TYC Brother Indus. Co., Ltd.*, 2020 WL 3833597, at *4 (C.D. Cal. July 8, 2020) (finding incorporation of SIAC rules was a clear and unmistakable delegation of threshold arbitrability questions to the arbitrator); *cf. Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017) (finding clear and unmistakable delegation to arbitrators where agreement incorporated similar ICC rules stating that the tribunal could rule on "the existence, validity or scope of the arbitration agreement" or of "jurisdiction").

*& White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("This Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence. . . . [B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." (internal citations omitted)).    As explained in TFL's Motion to Compel Arbitration, the Anchor TOS, including the arbitration agreement, is a valid contract because the user who connected his wallet had to click to manifest his assent to the Anchor TOS, which was also hyperlinked and set off in a different color than the surrounding webpage to notify the user. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515–16 (9th Cir. 2023) (finding binding arbitration agreement where terms of service were hyperlinked in a separate color and user had to confirm by clicking); *see also supra* n.4 (citing cases).  Accordingly, the Court should compel arbitration and permit the arbitrator to determine any arbitrability questions. *See, e.g.*, *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029–30 (9th Cir. 2022) (stating that "[t]he presence of a delegation clause further limits the issues that a court may decide" and "all arguments going to the scope of enforceability of the arbitration provision are for the arbitrator to decide in the first instance").

The arbitrator's authority includes determining whether Jump Trading as a nonsignatory may enforce the arbitration clause pursuant to the doctrine of equitable estoppel. *Casa Arena Blanca LLC v. Rainwater by Est. of Green*, 2022 WL 839800, at *3 (10th Cir. Mar. 22, 2022) (concluding that contract was formed between signatories and issue of whether agreement could be enforced against nonsignatory was a question for the arbitrator); *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) (finding whether nonsignatory could enforce arbitration clause was an issue delegated to the arbitrator because "[w]hether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant" (citation omitted)); *Eckert/Wordell Architects, Inc. v. FJM Props. Of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (finding "[w]hether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability" that was delegated to the arbitrator); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 472–73 (1st Cir. 1989) (finding arbitrator must resolve whether assignment of right to arbitrate was valid); *Isernia v.*

*Danville Reg'l Med. Ctr., LLC*, 2022 WL 4076113, at *5, *7 n.5 (W.D. Va. Sept. 6, 2022) (concluding that "an arbitrator . . . must decide whether [nonsignatories] . . . can enforce [the] arbitration provision . . . under either a theory of equitable estoppel or as third-party beneficiaries").[7]

---

[7] Numerous district courts around the country have come to the same conclusion. *See, e.g.*, *Ford-Allemand v. Piedmont Nat. Gas Co., Inc.*, 2022 WL 3576227, at *3 (S.D. Ohio Aug. 19, 2022) (arbitrator, not court, was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Bossart v. Gen. Motors LLC*, 2022 WL 3573855, at *3–4 (E.D. Mich. Aug. 19, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Cunningham v. Ford Motor Co.*, 2022 WL 2819115, at *5–6 (E.D. Mich. July 19, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Williams v. Staffmark Inv. LLC*, 2022 WL 910859, at *3–4 (D. Kan. Mar. 29, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory as a third-party beneficiary); *Henry v. Vantage Credit Union*, 2021 WL 2187908, at *7 (E.D. Mo. May 28, 2021) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Grabowski v. Platepass, L.L.C.*, 2021 WL 1962379, at *2–4 (N.D. Ill. May 17, 2021) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory as a third-party beneficiary); *In re Intuniv Antitrust Litig.*, 2021 WL 517386, at *3–8 (D. Mass. Feb. 11, 2021) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory under an equitable estoppel theory); *Symonds v. Credico (USA) LLC*, 2020 WL 7075028, at *5–6 (D. Mass. Dec. 3, 2020) (arbitrator was required to decide whether defendant non-signatory could enforce arbitration provision against plaintiff signatory either as a third-party beneficiary or under an equitable estoppel theory); *Robertson v. Enbridge (U.S.) Inc.*, 2020 WL 9211171, at *3–4 & n.3 (W.D. Pa. Aug. 4, 2020) (arbitrator was required to decide whether defendant nonsignatories could enforce arbitration provision against plaintiff signatory under an equitable estoppel theory) (R. & R.); *Turner v. PillPack, Inc.*, 2019 WL 2314673, at *3–6 (W.D. Ky. May 30, 2019) (pending a threshold determination that the plaintiff signatory assented to the relevant arbitration provision, arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory either as a third-party beneficiary or "under an estoppel theory"); *De Angelis v. Icon Ent. Grp. Inc.*, 364 F. Supp. 3d 787, 794–97 (S.D. Ohio 2019) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Jacobsen Gravel Co. v. IronPlanet, Inc.*, 2016 WL 10879837, at *1–3 (D. Minn. Nov. 10, 2016) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Visibility Corp. v. Schilling Robotics, LLC*, 2011 WL 5075816, at *1, *3–5 (D. Mass. Oct. 25, 2011) (arbitrator was required to decide whether defendant nonsignatories could enforce arbitration provision against plaintiff signatory under an assignment theory).

This Court's decision in *Donovan v. Coinbase Global, Inc.* does not compel a different result for at least two reasons. *See* --- F. Supp. 3d ---, 2023 WL 2124776 (N.D. Cal. Jan. 6, 2023). *First*, the arbitration clause in *Donovan* (and in *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), on which *Donovan* relied) was narrower than the language in the arbitration clause at issue here. *Id.* at *1.  In fact, this Court noted in *Donovan* that the contract there contained explicit language limiting the arbitration clause to disputes between "you" (i.e., a signatory) and "Coinbase."  *See Donovan*, 2023 WL 2124776, at *6; *Kramer*, 705 F.3d at 1128 (noting the clause only concerned disputes between "you and us").  Here, by contrast, the arbitration (and delegation) clause is broader.  It expressly covers any dispute arising out of or relating to the "Interface" or "Agreement," including questions about arbitrability, and does not limit its scope to disputes between signatories.[8]

Moreover, the structure of the clause evidences that the parties plainly contemplated that others, such as Jump Trading, might invoke the benefit of the arbitration clause of the contract. The clause covers disputes relating to *any of* the "Interface," the "Agreement," *or* disputes about "acts or omissions for which [the user] may contend that [TFL is] liable."  Amani Decl. Ex. A § 18.  If the arbitration provision was only intended to cover disputes between TFL and a user, then the first two provisions covering the Interface and the Agreement would be unnecessary, as all such disputes would be covered by the third prong.  By including all three parts, the clause itself contemplates other users would be covered for disputes regarding the Interface or Agreement. Thus, the threshold question concerning the enforceability of the arbitration clause over Lead Plaintiff's claims against Jump Trading should be sent to the arbitrator.

---

[8] In any event, the *Kramer* line of authority is—at least after *Henry Schein*—of doubtful validity. By determining whether the arbitration clause to which the parties agreed includes disputes with nonsignatories, a court does what *Henry Schein* says it should not: substitute its judgment for that of the arbitrator.  *See* 139 S. Ct. at 530 ("[I]f a valid agreement exists, and if the agreement delegates arbitrability to the arbitrator, a court may not decide the arbitrability issue."); *see also Newman v. Plains All Am. Pipeline, L.P.*, 44 F.4th 251, 253 (5th Cir. 2022) (Jones, J., dissenting from denial of rehearing en banc) (stating that the panel's opinion not to send enforcement by nonsignatory question to arbitration "contravenes . . . this court's precedent" and "[e]qually distressing, the panel's opinion puts this court out of step with at least five (if not more) of our sister circuits").

*Second,* and likely because the clause was narrower, the nonsignatory there did not present the Court with the substantial authority (cited above) of sister circuits and district courts finding that where, as here, a contract contains a delegation clause, the question of whether a nonsignatory can compel arbitration should be resolved by an arbitrator.

Similarly, the arbitrator must decide whether Lead Plaintiff's claims against Jump Trading fall within the provision's broad scope.  *See, e.g.*, *Costa v. Postmates Inc.*, 2019 WL 13207628, at *2 (N.D. Cal. Oct. 3, 2019) (noting parties may "delegate gateway questions of arbitrability, such as . . . whether their agreement covers a particular controversy" (internal quotations omitted) (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010))).

## II.   In Any Event, Lead Plaintiff Must Arbitrate His Claims Against Jump Trading.

Were this Court to conclude that it, rather than an arbitrator, should decide questions of arbitrability, the Court should compel arbitration here because the doctrine of equitable estoppel requires Lead Plaintiff to arbitrate his claims against Jump Trading.

In addition, the claims asserted by Lead Plaintiff against Jump Trading are arbitrable and encompassed by the broad arbitration clause in the Anchor TOS.  Thus, this Court—if it determines that it rather than the arbitrator must determine that arbitrability question, too—should find that the claims are arbitrable.

### A.   Jump Trading Can Enforce the Arbitration Agreement Against Lead Plaintiff Under the Doctrine of Equitable Estoppel.

Though Jump Trading is a nonsignatory to the Anchor TOS, it nevertheless is entitled to compel Lead Plaintiff, a signatory, to arbitrate his claims against it under the doctrine of equitable estoppel.  Equitable estoppel permits Jump Trading to enforce the arbitration clause because Lead Plaintiff alleges collusive misconduct by Jump Trading and a signatory (TFL) related to the Anchor TOS.

Equitable estoppel requires signatories to arbitrate disputes with nonsignatories to arbitration agreements where, as relevant here, "the signatory raises allegations of collusive misconduct between the nonsignatory and other signatories to the contract."  *See Outokumpu Stainless USA, LLC v. Coverteam SAS*, 2022 WL 2643936, at *7 (11th Cir. July 8, 2022) (Tjoflat,

J., concurring) (internal quotations and citations omitted).  This equitable estoppel test applies to both Lead Plaintiff's federal claims[9] and his state law claims.[10]  It is "appropriate to compel arbitration where claims allege substantially interdependent and concerted misconduct by a signatory and non-signatory."  *See Brown v. Gen. Steel Domestic Sales, LLC*, 2008 WL 2128057, at *7 (C.D. Cal. May 19, 2008) (internal quotations omitted); *see also Boston Telecomms. Grp. Inc. v. Deloitte Touche Tohmatsu*, 278 F. Supp. 2d 1041, 1048 (N.D. Cal. 2003) ("A non-signatory can invoke the protections of an arbitration clause when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract" (internal quotations and citations omitted)), *aff'd*, 249 F. App'x 534 (9th Cir. 2007).  This is particularly appropriate

---

[9] Courts in the Ninth Circuit apply "federal common law" to determine whether nonsignatories may enforce international arbitration agreements subject to the New York Convention when seeking to compel arbitration on federal claims.  *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021); *see also GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644–45 (2020) (finding equitable estoppel doctrines that permit nonsignatories to enforce arbitration agreements consistent with the New York Convention). An agreement is subject to the New York Convention if it is not entirely between U.S. citizens. *See* 9 U.S.C. § 202.  The Anchor TOS is a contract between, at least, TFL, which is a Singapore entity, and the Lead Plaintiff, who is alleged to be a resident of the United States.  *See* SAC ¶¶ 15–17.  Thus, the arbitration agreement in the Anchor TOS is subject to the New York Convention. Therefore, federal common law applies to the question of whether Lead Plaintiff can be compelled by a nonsignatory to arbitrate his federal claims against the nonsignatory.

[10] State law, rather than federal common law, applies to Lead Plaintiff's state-law based claims. *See Phillips-Harris v. BMW of N. Am., LLC*, 2022 WL 72355, at *1 (9th Cir. Jan. 7, 2022) ("To determine whether a non-signatory to an arbitration agreement may compel arbitration, we apply state law."); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (allowing nonsignatories to enforce arbitration agreement pursuant to "traditional principles of state law" (internal quotations omitted)).  However, the test under California law for application of equitable estoppel is substantially similar to the federal version of the equitable estoppel test.  *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1132 n.6 (9th Cir. 2013) (noting that "the California Court of Appeal . . . adopted the . . . [federal] equitable estoppel analysis as California state law"); *see also Donovan v. Coinbase Glob., Inc.*, --- F. Supp. 3d ---, 2023 WL 2124776, at *6 (N.D. Cal. Jan. 6, 2023) ("[A] nonsignatory may compel arbitration under the doctrine of equitable estoppel where a plaintiff's claims against the non-signatory are 'based on the same facts and are inherently inseparable' to those against a signatory." (citation omitted)).  Therefore, the same arguments that apply to the federal claims are applicable to the state law claims here, which must also be sent to arbitration.

1  where the "lawsuit against the non-signatory is inherently bound up with the claims against the

2  signatory." *Brown*, 2008 WL 2128057, at *7 (internal alterations and citations omitted).

3        As numerous courts have held, "[t]he key question in such cases is the degree to which the

4  plaintiff's claims against the signatory are intertwined with the plaintiff's claims against the non-

5  signatory. . . . [A]llowing the plaintiff to evade arbitration with the non-signatory would

6  undermine the efficiency of arbitration and run the risk of duplicative decisions." *See Roberts v.*

7  *Obelisk, Inc.*, 2019 WL 1902605, at *7 (S.D. Cal. Apr. 29, 2019) (finding that nonsignatory

8  defendants could compel arbitration where "[p]laintiffs refer to '[d]efendants' as a collective

9  throughout the Complaint" and made "no effort to differentiate" the actions of defendants); *see*

10 *also Amisil Holdings Ltd. v. Clarium Cap. Mgmt.*, 622 F. Supp. 2d 825, 840 (N.D. Cal. 2007)

11 (describing the "interdependent . . . conduct" test as requiring arbitration "to avoid denying the

12 signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which

13 undermines the efficiency of arbitration" (citation omitted)).

14       Equitable estoppel applies here because Lead Plaintiff alleges collusive conduct between

15 Jump Trading and TFL.  The entire theory of the SAC is that Jump Trading and TFL worked

16 together to sustain demand for UST (and, in turn, inflate the price of its sister coin LUNA).  *See*

17 SAC ¶¶ 132, 147–49, 163 (including assertion that UST was a "Ponzi" because the 20% yield on

18 Anchor was to acquire new customers and drive growth).  And at the center of the alleged scheme

19 are supposed misrepresentations about the sustainability of the yields offered by the Anchor

20 Protocol.  *See, e.g.*, *id.* at ¶ 147 (alleging Kanav Kariya "promot[ed] the demand for UST and

21 vot[ed] against reducing the Anchor Protocol's yield rate" as LUNA was attacked as a "Ponzi");

22 *see also id.* at ¶ 7 (calling the stability and "outsized returns" on UST using Anchor a "siren song"

23 to purchasers); *id.* at ¶¶ 122–28 (alleging, among other things, that the Anchor Whitepaper referred

24 to the 20% interest rate "repeatedly" as "stable").  As explained above, the claims in the SAC rest

25 on the premise of and allege intertwined, conspiratorial conduct by Jump Trading, TFL, and other

26 Defendants.  In fact, Lead Plaintiff apparently believes that Jump Trading and TFL are so

27 intertwined that he alleges that "Defendants" were responsible for making these "untrue statements

28 and omissions of material facts," often without distinguishing among them.  *See id.* at ¶ 250, *see*

*also supra* at Statement of Relevant Facts and Allegations, Section IV.   Indeed, the term "Defendants" (or some variation) is used frequently by Lead Plaintiff to group-plead allegations throughout the SAC.  For example, claiming violations of Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78a *et seq.*, Lead Plaintiff pleads collectively that "Defendants" "conducted and participated, directly and indirectly, in the conduct." *See* SAC ¶ 277; *see also id.* at ¶ 279 (pleading "Defendants were able to, and did, control the contents of the various reports, press releases and public statements []and course of conduct during the Relevant Period.").  This undifferentiated language pervades the SAC.  *See, e.g., id.* at ¶ 163 (claiming "Defendants knew" about the unsustainability of the Anchor Protocol and UST); *id.* at ¶¶ 332–41 (alleging predicate acts by Defendants without specifying who committed which act).

Compelling arbitration similarly makes sense in cases involving, as here, claims of conspiracy and claims such as those predicated on the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *See, e.g., Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 764–65 (N.D. Ill. 2005) (applying federal law and finding "concerted misconduct" where the complaint alleged conspiratorial conduct and alleged the RICO predicate acts had the same goal).  In *Holden*, the court compelled arbitration and explained that it was appropriate to do so as all defendants' conduct allegedly shared the central goal of "effectuation of the S[tock] P[urchase] A[greement]." *Id.* at 766; *see also Hansen v. KPMG, LLP*, 2005 WL 6051705, at *3 (C.D. Cal. Mar. 29, 2005) (finding equitable estoppel applied to allow defendant nonsignatories to compel arbitration where plaintiffs alleged conspiracy to fraudulently induce investment).  Likewise here, Lead Plaintiff has alleged RICO and conspiracy claims, and he alleges concerted conduct by Defendants to induce market participants to want to purchase UST to deposit on the Anchor Protocol.

> 1. *Lead Plaintiff's State Law Claims Must Also Be Arbitrated Even Under California's Alternative Equitable Estoppel Test.*

Some California courts hold that, under that state's version of the equitable estoppel test, the allegations of collusive conduct between a signatory and nonsignatory must also be "intimately founded in and ***intertwined with*** the underlying contract obligations."  *See, e.g., Metalclad Corp.*

1   *v. Ventana Env't Org. P'ship*, 109 Cal. App. 4th 1705, 1713 (Ct. App. 2003) (emphasis added)

2   (citation omitted).  But that standard is easily met here in any event, because portions of the Anchor

3   TOS are crucial to potential defenses in this case.  For example, Lead Plaintiff's theory is that he

4   was defrauded into thinking that the Anchor Protocol's 20% interest rate was sustainable.  Yet the

5   Anchor TOS explicitly states that the Anchor Protocol's 20% interest rate "is not a promise" or

6   "guarantee" and is "a forward-looking projection based on a good faith belief of how to reasonably

7   project results over the relevant period, but such belief is subject to numerous assumptions, risks

8   and uncertainties (including smart contract security risks and third-party actions) which could

9   result in a materially different (lower or higher) token-denominated Rate."  *See* Amani Decl. Ex.

10   A § 10.

11         Jump Trading and the other Defendants will surely rely on that provision at least in part as

12   an absolute defense, because it expressly conflicts with Lead Plaintiff's claim that he reasonably

13   relied on and was defrauded by the marketing of the Anchor Protocol's interest rate.[11]  Thus, any

14   analysis of whether users who agreed to the contract could have reasonably relied on the purported

15   marketing scheme is "intertwined with" with the terms of the contract itself (i.e., Lead Plaintiff

16   will have to prove reasonable reliance despite having entered into a contract in which he

17   acknowledged the 20% return was uncertain).  *See Bard v. Moe*, 2016 WL 1166329, at *3–5 (Cal.

18   Ct. App. Mar. 23, 2016)  (finding claims intertwined with contract because resolution of the claims

19   would "require[] an analysis of the terms of the . . . agreement"); *see also Esguerra-Aguilar, Inc.*

20   *v. Shapes Franchising, LLC*, 2020 WL 3869186, at *6–7 (N.D. Cal. July 9, 2020) (finding

21   allegations concerning fraudulent inducement satisfied this standard "[b]ecause the claims against

22   [signatory] and Individual Defendants are so intertwined and connected with the sale of the

23   franchises"); *accord Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, at *5 (Del.

24   Ch. Aug. 22, 2006) (finding equitable estoppel applied under collusive misconduct test because

25   resolution of claim to preclude use of name "must address whether [plaintiff] gave that right away

26   in the Agreement").

27   _____

28   [11] Likewise, the Anchor TOS contains a "Release of Claims" that explicitly indicates that Lead
Plaintiff "assume[d] all risks in connection with [his] access and use of the Interface *and [his]
interaction with the Protocol.*"  *See* Amani Decl. Ex. A § 15 (emphasis added).

1  **B.  All of Lead Plaintiff's Claims Against Jump Trading Fall Within the**
2     **Arbitration Agreement's Broad Scope.**

3      As explained above, an arbitrator should decide whether the claims brought by Lead
4  Plaintiff against Jump Trading are arbitrable.  But if this Court takes up the question, it should find
5  that the claims are arbitrable.[12]

6      The arbitration clause here covers all disputes "arising out of or relating to the Interface,
7  this Agreement . . . or any other acts or omissions for which you may contend that we are liable."
8  *See* Amani Decl. Ex. A § 18.  Courts have interpreted similar clauses expansively to require
9  arbitration of claims, even those that merely "touch" arbitrable matters.  *See Zoran Corp. v. DTS,*
10 *Inc.*, 2009 WL 160238, at *2 (N.D. Cal. Jan. 20, 2009); *see also Prima Paint Corp. v. Flood &*
11 *Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (calling "broad" an arbitration clause covering
12 disputes "arising out of or relating to this Agreement"); *Mediterranean Enters., Inc. v. Ssangyong*
13 *Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (noting courts have found that "arising out of or relating
14 to this agreement" is a "broad arbitration clause.").  Thus, the factual allegations in the complaint
15 "need only 'touch matters' covered by the contract . . . and all doubts are to be resolved in favor
16 of arbitrability."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (quoting
17 *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)).

18     Here, the claims Lead Plaintiff levels at Jump Trading relate to the contract and touch
19 arbitrable matters.  As explained above, the Anchor TOS contains several clauses to which Jump
20 Trading will point to refute Lead Plaintiff's claims, including claims about reasonable reliance.
21 Thus, the claims against Jump Trading are "related to" the Agreement.  Further, Lead Plaintiff
22 contends that he (and others) was fraudulently induced into depositing tokens in the Anchor
23 Protocol, which was accessible through the Interface.  Moreover, the claims are "related to" the
24 "acts or omissions" that Lead Plaintiff claims as the basis of liability for TFL.  As explained above,
25 the Lead Plaintiff's entire theory as against Jump Trading hinges on the notion of its interrelated
26 and collusive conduct with TFL.  Were there any doubt, the "presumption of arbitrability" that

27

28 [12] Similarly, Jump Trading joins TFL's arguments that the class waiver is enforceable and requires
dismissal of the claims here.

1  applies to broad arbitration clauses requires arbitration here "unless it may be said with positive

2  assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted

3  dispute.  Doubts should be resolved in favor of coverage."  *See AT&T Techs., Inc. v. Commc'ns.*

4  *Workers of Am.*, 475 U.S. 643, 650 (1986) (citations omitted); *Westinghouse Hanford Co. v.*

5  *Hanford Atomic Metal Trades Council*, 940 F.2d 513, 517 (9th Cir. 1991) (noting the presumption

6  "carries particular force where the arbitration clause is phrased in broad and general terms").[13]

7  **III.    The Court Should Stay Any Remaining Claims Pending Resolution of the Arbitration.**

8           Because all of the foregoing issues should be arbitrated, this case should be dismissed.  *See*

9  *Forrest v. Spizzirri*, 62 F.4th 1201, 1204–05 (9th Cir. 2023) (noting the district court may dismiss

10  the case "when, as here, the court determines that all of the claims raised in the action are subject

11  to arbitration").  But even if this Court were to find that only some claims were arbitrable, it should

12  exercise its discretion to promote judicial efficiency and stay the entirety of the action rather than

13  allow the non-arbitrable claims to be litigated at the same time other claims are arbitrated.  *See* 9

14  U.S.C. § 3; *Donovan v. Coinbase Glob., Inc.*, --- F. Supp. 3d ---, 2023 WL 2124776, at *7 (N.D.

15  Cal. Jan. 6, 2023) (staying case against nonsignatory).[14]

16

17  [13] Moreover, the Supreme Court has found federal securities law and RICO claims arbitrable, *see*

18  *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 242 (1987), and state law tort causes of action are similarly arbitrable, *see Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1168 (Cal.

19  2003) (finding unjust enrichment claim arbitrable); *Ireland v. Charles Dunn Co., Inc.*, 2017 WL

20  3614223, at *5–9 (Cal. Ct. App. Aug. 23, 2017) (finding conspiracy claims and unjust enrichment claims arbitrable); *see also Coast Plaza Drs. Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677,

21  686 (Ct. App. 2000) (noting state policy in favor of arbitration and also stating that "[i]t has long been the rule in California that a broadly worded arbitration clause . . . may extend to tort claims

22  that may arise under or from the contractual relationship").

23  [14] *See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)

24  (holding that when a court compels arbitration, as "a matter of its discretion to control its docket," it may stay litigation among non-arbitrating parties pending the outcome of arbitrable claims or a

25  parallel arbitration); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the

26  causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see*

27  *also Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (stating that "trial court[s] may . . . find it is efficient for its own docket and the fairest course for the parties

28  to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." (citation omitted)).

In deciding whether to stay a case in such a setting, courts weigh (1) the damage from granting a stay, (2) the hardship or inequity in requiring a party to move forward, and (3) the orderly course of justice to simplify the issues. *See Ambercroft Trading Ltd. v. Biddy*, 2020 WL 1820599, at *7 (N.D. Cal. Apr. 10, 2020) (citing *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).  All those factors would favor staying the case here.

*First,* the damage to Lead Plaintiff—if any—would be minimal.  To the extent Lead Plaintiff may claim to be damaged by a delay in litigating his non-arbitrable claims (assuming there are any), such damage would be minimal and, in any event, heavily outweighed by both the damage to Jump Trading absent a stay and the efficiencies gained from granting a stay.  The SIAC Rules provide for quick and efficient resolution of disputes in Singapore, so any delay would be slight.  For example, the Response to a Notice of Arbitration is due within 14 days, *see* Rule 4.1, SIAC Rules 2016, Singapore International Arbitration Centre (last visited May 2, 2023), https://siac.org.sg/siac-rules-2016, and the arbitral tribunal must "conduct the arbitration in such manner as it considers appropriate, after consulting with the parties, to ensure the fair, expeditious, economical and final resolution of the dispute," *see id.* Rule 19.1.  This is consistent with the goal of arbitration: to provide for a quick and efficient method to resolve disputes.  Moreover, relative to the extensive discovery and briefing that this case would require were it to be litigated (including but not limited to motions involving class certification, summary judgment, and the currently pending motions to dismiss), the delay pending completion of the arbitration proceedings—if any—would be minimal.

*Second,* it would be inequitable to require Jump Trading to defend against claims that overlap significantly with claims that are arbitrable.  For example, if the Court compelled arbitration of the federal securities fraud claims but not the aiding and abetting or conspiracy claims, both of which relate to the same underlying facts, Jump Trading would be forced to defend against claims on two fronts.  *See Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Rudolph & Sletten, Inc.*, 2020 WL 4039370, at *8 (N.D. Cal. July 17, 2020) ("There is no doubt prejudice to Defendants in having to fight a 'two-front war.'" (citation omitted)).

*Third,* a stay would promote efficiency for both the Court and the parties, whereas not granting a stay poses the real risk of inconsistent findings. As noted above, many of the facts and legal issues material to Lead Plaintiff's claims overlap. Absent a stay, the Court and the arbitrator may make conflicting findings and orders, which would impose (otherwise avoidable) additional, and potentially significant, costs on the parties, the Court, and the arbitrator to resolve such conflicts. By contrast, staying this litigation pending arbitration would permit the orderly resolution of factual and legal issues—such as whether Defendants conspired, whether Defendants' actions were the cause of Lead Plaintiff's losses, or whether Lead Plaintiff reasonably relied on any of Defendants' statements—by a single tribunal. *See Ambercroft Trading*, 2020 WL 1820599, at *7 (finding it would be "inefficient and ineffectual" to not stay case where one defendant's actions were at the core of the plaintiff's action). This is particularly so where the conduct alleged is intertwined with the arbitrable claims (which, as explained above, it is). *See Sharp Corp. v. Hisense USA Corp.*, 2017 WL 6017897, at *5 (N.D. Cal. Dec. 5, 2017). Moreover, if the arbitrator were to decide those issues against Lead Plaintiff, he would be estopped from relitigating those issues before this Court, *cf. Nat'l Union Fire Ins. Co.*, 2020 WL 4039370, at *7 ("In the typical . . . stay case, a federal court postpones resolution of the case pending some related proceeding [that] typically serves only to narrow the factual or legal issues for the federal court" (citation omitted)); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2013 WL 1995208, at *7 (N.D. Cal. May 13, 2013) ("Federal courts permit non-mutual collateral estoppel, also known as defensive collateral estoppel, which occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff previously litigated and lost against another defendant" (internal citations omitted)), saving time and expense for the Court and the litigants (Jump Trading, of course, would not be bound by an arbitration in which it did not participate).

Thus, if the Court finds that at least some claims are not arbitrable, any remaining claims that Lead Plaintiff is not compelled to arbitrate should be stayed pending arbitration of the claims Lead Plaintiff is compelled to arbitrate.

**CONCLUSION**

For the foregoing reasons, Jump Trading respectfully requests that the Court compel Lead Plaintiff to arbitrate all of his claims against Jump Trading and dismiss this action.  If there are any claims that Lead Plaintiff is not compelled to arbitrate, Jump Trading requests this Court exercise its discretion and stay this action.

Dated: May 2, 2023

Respectfully submitted,

KOBRE & KIM LLP

/s/ Jonathan D. Cogan

Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Leif T. Simonson (admitted *pro hac vice*)
Tapan R. Oza (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Tel.: +1 212 488 1206
Fax: +1 212 488 1231
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
leif.simonson@kobrekim.com
tapan.oza@kobrekim.com

Daniel Zaheer (Bar ID 237118)
150 California Street, 19th Floor
San Francisco, California 94111
Tel.: +1 415 582 4751
Fax: +1 415 582 4811
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC*