1   JOEL D. SIEGEL (SBN 155581)
    joel.siegel@dentons.com
2   ANDREW M. PENDEXTER (SBN 310752)
    andrew.pendexter@dentons.com
3   DENTONS US LLP
    601 South Figueroa Street, Suite 2500
4   Los Angeles, California 90017-5704
    Tel: 213.623.9300 / Fax: 213.623.9924
5
    DOUGLAS HENKIN (Admitted *Pro Hac Vice*)
6   douglas.henkin@dentons.com
    DENTONS US LLP
7   1221 Avenue of the Americas
    New York, New York 10020-1089
8   Tel: 212.768.6700 / Fax: 212.768.6800
9   STEPHEN J. SENDEROWITZ (Admitted *Pro Hac Vice*)
    stephen.senderowitz@dentons.com
10  DENTONS US LLP
    233 South Wacker Drive, Suite 5900
11  Chicago, Illinois 60606-6361
    Telephone: 312.876.8141
12
    Attorneys for Defendants
13  TERRAFORM LABS, PTE. LTD. and
    DO KWON
14
15              UNITED STATES DISTRICT COURT
16             NORTHERN DISTRICT OF CALIFORNIA
17               SAN FRANCISCO DIVISION

18  NICK PATTERSON, Individually and on Behalf    Case No. 3:22-cv-03600
    of All Others Similarly Situated,
19                                                **DECLARATION OF DOUGLAS W.
                Plaintiffs,                        HENKIN IN SUPPORT OF
20        v.                                       TERRAFORM LABS, PTE. LTD. AND
                                                   DO KWON MOTION TO (I) DISMISS
21  TERRAFORM LABS, PTE. LTD., JUMP              FOR LACK OF PERSONAL
    CRYPTO, JUMP TRADING LLC, REPUBLIC          JURISDICTION PURSUANT TO FED.
22  CAPITAL, REPUBLIC MAXIMAL LLC,              R. CIV. P. 12(B)(2), (II) COMPEL
    TRIBE CAPITAL, DEFINANCE                     ARBITRATION PURSUANT TO THE
23  CAPITAL/DEFINANCE TECHNOLOGIES OY,          FEDERAL ARBITRATION ACT AND
    GSR/GSR MARKETS LIMITED, THREE              STRIKE THE CLASS ALLEGATIONS,
24  ARROWS CAPITAL PTE. LTD., NICHOLAS          AND (III) DISMISS ANY REMAINING
    PLATIAS, AND DO KWON,                        CLAIMS PURSUANT TO FED. R. CIV.
25                                                P. 12(B)(6)**
                Defendants.
26
27
28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    I, Douglas W. Henkin declare, pursuant to 28 U.S.C. § 1746, as follows:

2        1.    I am an attorney admitted *pro hac vice* to practice law before this Court and a

3    partner with the law firm of Dentons U.S. LLP, counsel for Defendants Terraform Labs Pte. Ltd

4    ("TFL") and Do Kwon in the above-captioned action. I submit this Declaration in support of

5    TFL's and Mr. Kwon's Motion to Dismiss Lead Plaintiff's Second Amended Complaint. This

6    declaration is based on my personal knowledge except as otherwise indicated.

7        2.    Attached as **Exhibit A** is a true and correct copy of the whitepaper entitled "Terra

8    Money: Stability and Adoption," by Evan Kereiakes, et al., April 2019 retrieved from

9    https://whitepaper.io/document/587/terra-whitepaper (last visited May 1, 2023).

10       3.    Attached as **Exhibit B** is a true and correct copy of a Twitter Thread by

11   "FatManTerra" dated May 24, 2022 retrieved from

12   https://twitter.com/FatManTerra/status/1529229283356549121 (last visited May 2, 2023).

13       4.    Attached as **Exhibit C** is a true and correct copy of the whitepaper entitled

14   "Anchor: Gold Standard for Passive Income on the Blockchain," by Nicholas Platias et al., June

15   2020 retrieved from https://www.anchorprotocol.com/docs/anchor-v1.1.pdf (last visited May 1,

16   2023).

17       5.    Attached as **Exhibit D** is a true and correct copy of the whitepaper entitled "Mirror

18   Protocol V2," by Stanford Liu and Irene Lee, June 15, 2021 retrieved from https://730577551-

19   files.gitbook.io/~/files/v0/b/gitbook-x-prod.appspot.com/o/spaces%2F-

20   MLRzugf7mxc4ryNhTuq%2Fuploads%2F0t3znySsjF6CiLrcT0mI%2FMirror_Protocol_V2.pdf?

21   alt=media&token=b5728c7d-7f12-4f41-8ce6-8347da02b9ff (last visited May 1, 2023).

22       6.    Attached as **Exhibit E** is a true and correct copy of the article entitled "Luna

23   Foundation Guard (LFG) Officially Formed as Non-Profit Organization Dedicated to Supporting

24   The Terra Ecoystem and Open-Source Technology," by PRWeb, January 19, 2022 retrieved from

25   https://www.prweb.com/releases/luna_foundation_guard_lfg_officially_formed_as_non_profit_or

26   ganization_dedicated_to_supporting_the_terra_ecosystem_and_open_source_technology/prweb1

27   8447530.htm (last visited May 1, 2023).

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1        7.      Attached as **Exhibit F** is a true and correct copy of a Twitter Thread by LFG dated

2  May 16, 2022 retrieved from https://twitter.com/LFG_org/status/1526126703046582272 (last

3  visited May 1, 2023).

4        8.      Attached as **Exhibit G** is a true and correct copy of a Twitter Thread by TFL dated

5  May 12-16, 2022 retrieved from  https://twitter.com/terra_money/status/1524654726432043008

6  (last visited May 1, 2023).

7        9.      Attached as **Exhibit H** is a true and correct copy of the article entitled "Luna

8  Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's

9  UST Stablecoin," by PRWeb, February 22, 2022 retrieved from

10  https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_den

11  ominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm (last visited May 1,

12  2023).

13        10.      Attached as **Exhibit I** is a true and correct copy of the article entitled "LFG to

14  Acquire $100M in AVAX to Strategically Align Terra and Avalanche Ecosystems," by PRWeb,

15  April 7, 2022 retrieved from

16  https://www.prweb.com/releases/lfg_to_acquire_100m_in_avax_to_strategically_align_terra_and

17  _avalanche_ecosystems/prweb18577009.htm (last visited May 1, 2023).

18        11.      Attached as **Exhibit J** is a true and correct copy of "Digital Asset Transactions:

19  When Howey Met Gary (Plastic)," by William Hinman, Director, Div. of Corp. Fin., SEC, June

20  14, 2018 retrieved from https://www.sec.gov/news/speech/speech-hinman-061418 (last visited

21  May 1, 2023).

22        12.      Attached as **Exhibit K** is a true and correct copy of the Letter to Ted Budd,

23  Congressman, from Jay Clayton, SEC Chair, March 7, 2019 retrieved from

24  https://d3h0qzni6h08fz.cloudfront.net/Budd-et-al-Digital-Tokens-ES157408-Response-002.pdf

25  (last visited May 1, 2023).

26        13.      Attached as **Exhibit L** is a true and correct copy of "Luna – The fall of a giant, My

27  personal post-mortem analysis," by Remi Tetot, June 2, 2022 retrieved from

28  https://medium.com/@remi.tetot/luna-the-fall-of-a-giant-af0244cce8e5 (last visited May 1, 2023).

14.     Attached as **Exhibit M** is a true and correct copy of a Twitter thread by LUNCDAO dated October 23, 2022 retrieved from https://twitter.com/LUNCDAO/status/1584129107201118208 (last visited May 1, 2023).

15.     Attached as **Exhibit N** is a true and correct copy of a Twitter Thread by Mr. Kwon dated November 16, 2022 retrieved from https://twitter.com/stablekwon/status/1592874492224999424 (last visited May 1, 2023).

16.     Attached as **Exhibit O** is a true and correct copy of a public Discord message by "FatMan" posted on July 26, 2022 (last visited February 23, 2023).

17.     Attached as **Exhibit P** is a true and correct copy of public Discord messages by "FatMan" posted on September 2, 2022 (last visited February 23, 2023).

18.     Attached as **Exhibit Q** is a true and correct copy of a public Discord message by "FatMan" posted on January 13, 2023 (last visited February 23, 2023).

19.     Attached as **Exhibit R** is a true and correct copy of a public Discord message posted by "Ghostizbud," on January 4, 2023, which included a copy of an email from Sean Masson of Scott+Scott; the message is reproduced here as posted (the redactions were in the original post) (last visited February 1, 2023).

20.     Attached as **Exhibit S** is a true and correct copy of a public Discord message by "FatMan" posted on July 25, 2022 (last visited February 23, 2023).

21.     Attached as **Exhibit T** is a true and correct copy of a Twitter thread by "Freddie Raynolds" dated November 25, 2021 retrieved from https://twitter.com/FreddieRaynolds/status/1463960623402913797 (last visited May 2, 2023).

22.     Attached as **Exhibit U** is a true and correct copy of the article entitled "The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are not Securities," by Lewis R. Cohen, Gregory Strong, Freeman Lewin, and Sarah Chen, November 10, 2022 retrieved from https://ssrn.com/abstract=4282385 (last visited May 2, 2023).

23.     Attached as **Exhibit V** is a true and correct copy of Terraform Labs, Pte. Ltd and Do Kwon's Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

1    Complaint, in the *Securities and Exchange Commission v. Terraform Labs, Pte. Ltd, et al.*, Civil

2    Action No. 1:23-cv-01346-JSR (S.D.N.Y.), filed April 21, 2023 (ECF No. 29).

3        I declare under penalty of perjury under the laws of the United States that the

4    foregoing is true and correct to the best of my knowledge.

5        Executed on May 2, 2023 in New York, New York.

6
                                        */s/ Douglas W. Henkin*
7                                       Douglas W. Henkin
                                        DENTONS US LLP
8                                       1221 Avenue of the Americas
                                        New York, New York 10020
9                                       Telephone: 212.768.6832
                                        Facsimile: 212.768.6800
10                                      douglas.henkin@dentons.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# Exhibit A

# Terra Money:

# Stability and Adoption

Evan Kereiakes, Do Kwon, Marco Di Maggio, Nicholas Platias

April 2019

## Abstract

While many see the benefits of a price-stable cryptocurrency that combines the best of both fiat and Bitcoin, not many have a clear plan for the adoption of such a currency. Since the value of a currency as a medium of exchange is mainly driven by its network effects, a successful new digital currency needs to maximize adoption in order to become useful. We propose a cryptocurrency, Terra, which is both price-stable and growth-driven. It achieves price-stability via an elastic money supply, enabled by stable mining incentives. It also uses seigniorage created by its minting operations as transaction stimulus, thereby facilitating adoption. There is demand for a decentralized, price-stable money protocol in both fiat and blockchain economies. If such a protocol succeeds, then it will have a significant impact as the best use case for cryptocurrencies.

# 1   Introduction

The price-volatility of cryptocurrencies is a well-studied problem by both academics and market observers (see for instance, Liu and Tsyvinski, 2018, Makarov and Schoar, 2018). Most cryptocurrencies, including Bitcoin, have a predetermined issuance schedule that, together with a strong speculative demand, contributes to wild fluctuations in price. Bitcoin's extreme price volatility is a major roadblock towards its adoption as a medium of exchange or store of value. Intuitively, nobody wants to pay with a currency that has the potential to double in value in a few days, or wants to be paid in a currency if its value can significantly decline before the transaction is settled. The problems are aggravated when the transaction requires more time, e.g. for deferred payments such as mortgages or employment contracts, as volatility would severely disadvantage one side of the contract, making the usage of existing digital currencies in these settings prohibitively expensive.

At the core of how the Terra Protocol solves these issues is the idea that a cryptocurrency with an elastic monetary policy would maintain a stable price, retaining all the censorship resistance of Bitcoin, and making it viable for use in everyday transactions. However, price-stability is not sufficient for the wide adoption of a currency. Currencies inherently have strong network effects: a customer is unlikely to switch over to a new currency unless a critical mass of merchants are ready to accept it, but at the same time, merchants have no reason to invest resources and educate staff to accept a new currency unless there is significant customer demand for it. For this reason, Bitcoin's adoption in the payments space has been limited to small businesses whose owners are personally invested in cryptocurrencies. Our belief is that while an elastic monetary policy is the solution to the stability problem, an efficient fiscal policy can drive adoption. In addition, the Terra Protocol offers strong incentives for users to join the network with an efficient fiscal spending regime, managed by a Treasury, where multiple stimulus programs compete for financing. That is, proposals from community participants will be vetted by the rest of the ecosystem and, when approved, they will be financed with the objective to increase adoption and expand the potential use cases. The Terra Protocol with its balance between fostering stability and adoption represents a meaningful complement to fiat currencies as a means of payment and store of value.

The rest of the paper is organized as follows. We first discuss the protocol and how stability is achieved and maintained, through the calibration of miners' demand and the use of the native

mining Luna token. We then dig deeper into how stable mining incentives are adopted to smooth out economic fluctuations. Lastly, we discuss how Terra's fiscal policy can be used as an efficient stimulus to drive adoption.

## 2   Multi-fiat peg monetary policy

A stable-coin mechanism must answer three key questions:

- **How is price-stability defined?** Stability is a relative concept; which asset should a stable-coin be pegged to in order to appeal to the broadest possible audience?

- **How is price-stability measured?** Coin price is exogenous to the Terra blockchain, and an efficient, corruption-resistant price feed is necessary for the system to function properly.

- **How is price-stability achieved?** When coin price has deviated from the target, the system needs a way to apply pressures to the market to bring price back to the target.

This section will specify Terra's answers to the above questions in detail.

### 2.1   Defining stability against regional fiat currencies

The existential objective of a stable-coin is to retain its purchasing power. Given that most goods and services are consumed domestically, it is important to create crypto-currencies that track the value of local fiat currencies. Though the US Dollar dominates international trade and forex operations, to the average consumer the dollar exhibits unacceptable volatility against their choice unit of account.

Recognizing strong regionalities in money, Terra aims to be a family of cryptocurrencies that are each pegged to the world's major currencies. Close to genesis, the protocol will issue Terra currencies pegged to USD, EUR, CNY, JPY, GBP, KRW, and the IMF SDR. Over time, more currencies will be added to the list by user voting. TerraSDR will be the flagship currency of this family, given that it exhibits the lowest volatility against any one fiat currency (Kereiakes, 2018). TerraSDR is the currency in which transaction fees, miner rewards and stimulus grants will be denominated.

It is important, however, for Terra currencies to have access to shared liquidity. For this reason, the system supports atomic swaps among Terra currencies at their market exchange rates.   A

user can swap TerraKRW for TerraUSD instantly at the effective KRW/USD exchange rate. This allows all Terra currencies to share liquidity and macroeconomic fluctuations; a fall in demand by one currency can quickly be absorbed by the others. We can therefore reason about the stability of Terra currencies in a group; we will be referring to Terra loosely as a single currency for the remainder of this paper. As Terra's ecosystem adds more currencies, its atomic swap functionality can be an instant solution to cross border transactions and international trade settlements.

## 2.2   Measuring stability with miner oracles

Since the price of Terra currencies in secondary markets is exogenous to the blockchain, the system must rely on a decentralized price oracle to estimate the true exchange rate. We define the mechanism for the price oracle as the following:

- For any Terra sub-currency in the set of currencies C = TerraKRW, TerraUSD, TerraSDR... miners submit a vote for what they believe to be the current exchange rate in the target fiat asset.

- Every n blocks the vote is tallied by taking the weighted medians as the true rates.

- Some amount of Terra is rewarded to those who voted within 1 standard deviation of the elected median. Those who voted outside may be punished via slashing of their stakes. The ratio of those that are punished and rewarded may be calibrated by the system every vote to ensure that a sufficiently large portion of the miners vote.

Several issues have been raised in implementing decentralized oracles, but chief among them is the possibility for voters to profit by coordinating on a false price vote. Limiting the vote to a specific subset of users with strong vested interest in the system, the miners, can vastly decrease the odds of such a coordination. A successful coordination event on the price oracle would result in a much higher loss in the value of the miner stakes than any potential gains, as Luna stakes are time-locked to the system.

The oracle can also play a role in adding and deprecating Terra currencies. The protocol may start supporting a new Terra currency when oracle votes for it satisfies a submission threshold. Similarly, the failure to receive a sufficient number of oracle votes for several periods could trigger the deprecation of a Terra currency.

## 2.3   Achieving stability with consistent mining rewards

Once the system has detected that the price of a Terra currency has deviated from its peg, it must apply pressures to normalize the price. Like any other market, the Terra money market follows the simple rules of supply and demand for a pegged currency. That is:

- Contracting money supply, all conditions held equal, will result in higher relative currency price levels. That is, when price levels are falling below the target, reducing money supply sufficiently will return price levels to normalcy.

- Expanding money supply, all conditions held equal, will result in lower relative currency price levels. That is, when price levels are rising above the target, increasing money supply sufficiently will return price levels to normalcy.

Of course, contracting the supply of money isn't free; like any other asset, money needs to be bought from the market. Central banks and governments shoulder contractionary costs for pegged fiat systems through a variety of mechanisms including intervention, the issuance of bonds and short-term instruments thus incurring interest expenses, and hiking of money market rates and reserve ratio requirements thus losing revenue. Put in a different way, central banks and governments absorb the volatility of the pegged currencies they issue.

Analogously, Terra miners absorb volatility in Terra supply.

- **In the short term, miners absorb Terra contraction costs** through mining power dilution. During a contraction, the system mints and auctions more mining power to buy back and burn Terra. This contracts the supply of Terra until its price has returned to the peg, and temporarily results in mining power dilution.

- **In the mid to long term, miners are compensated with increased mining rewards.** First, the system continues to buy back mining power until a fixed target supply is reached, thereby creating long-run dependability on available mining power. Second, the system increases mining rewards, which will be explained in more detail in a later section.

In summary, miners bear the costs of Terra volatility in the short term, while being compensated for it in the long-term. Compared to ordinary users, miners have a long-term vested interest in

the stability of the system, with invested infrastructure, trained staff and business models with high switching cost. The remainder of this section will discuss how the system absorbs short-term volatility and creates stable long-term incentives for Terra miners.

## 2.4   Miners absorb short-term Terra volatility

The Terra Protocol runs on a Proof of Stake (PoS) blockchain, where miners need to stake a native cryptocurrency Luna to mine Terra transactions. At every block period, the protocol elects a block producer from the set of staked miners, which is entrusted with the work required to produce the next block by aggregating transactions, achieving consensus among miners, and ensuring that messages are distributed properly in a short timeframe with high fault tolerance.

The block producer election is weighted by the size of the active miner's Luna stake. Therefore, **Luna represents mining power in the Terra network.** Similar to how a Bitcoin miner's hash power represents a pro-rata odds of generating Bitcoin blocks, the Luna stake represents pro-rata odds of generating Terra blocks.

Luna also serves as the most immediate defense against Terra price fluctuations. The system uses Luna to make the price for Terra by agreeing to be counter-party to anyone looking to swap Terra and Luna at Terra's target exchange rate. More concretely:

- When TerraSDR's price < 1 SDR, users and arbitragers can send 1 TerraSDR to the system and receive 1 SDR's worth of Luna.

- When TerraSDR's price > 1 SDR, users and arbitragers can send 1 SDR's worth of Luna to the system and receive 1 TerraSDR.

The system's willingness to respect the target exchange rate irrespective of market conditions keeps the market exchange rate of Terra at a tight band around the target exchange rate. An arbitrageur can extract risk-free profit when 1 TerraSDR = 0.9 SDR by trading TerraSDR for 1 SDR's worth of Luna from the system, as opposed to 0.9 SDR's worth of assets she could get from the open market. Similarly, she can also extract risk-free profit when 1 TerraSDR = 1.1 SDR by trading in 1 SDR worth of Luna to the system to get 1.1 SDR worth of TerraSDR, once again beating the price of the open market.

The system finances Terra price making via Luna:

- To buy 1 TerraSDR, the protocol mints and sells Luna worth 1 SDR

- By selling 1 TerraSDR, the protocol earns Luna worth 1 SDR

As Luna is minted to match Terra offers, volatility is moved from Terra price to Luna supply. If unmitigated, this Luna dilution presents a problem for miners; their Luna stakes are worth a smaller portion of total available mining power post-contraction. The system burns a portion of the Luna it has earned during expansions until Luna supply has reached its 1 billion equilibrium issuance. Therefore, Luna can have steady demand as a token with pro-rata rights to Terra mining over the long term. The next section discusses how the system offers stable mining incentives to keep the market for mining and demand for Luna long-term stable through volatile macroeconomic cycles.

## 2.5   Miners are compensated with long-term stable rewards

Miners play a foundational role in the security and stability of Terra. They provide the former by participating in PoS consensus. They provide the latter by absorbing short-term volatility in Terra demand. **Stable demand for mining is a core requirement for both security and stability.** To achieve this, the protocol aims to offer stable and predictable rewards in all economic conditions, booms and busts alike. The network is best off when it can consistently compensate those that protect it.

The protocol has two ways of rewarding miners for their work:

- **Transaction fees**: All Terra transactions pay a small fee to miners. Fees default to 0.1% and are capped at 1%, meaning that transacting with Terra in e-commerce will be much cheaper than transacting with traditional payment options such as credit cards[1].

- **Seigniorage (Luna burn)**: When demand for Terra increases, the system mints Terra and earns Luna in return. This is called seigniorage — the value of newly minted currency minus the cost of issuance (which in this case is zero). The system burns a portion of earned Luna, which makes mining power scarcer. The remaining portion of seigniorage goes to the Treasury to fund fiscal stimulus.

To understand rewards from the perspective of a miner, we look at the basic calculus one has to go through to determine the viability of a long-term commitment to mining on the Terra network.

---

[1]The fee per transaction is capped at 1SDR (1.39 USD at the time of writing), meaning that larger transactions also pay considerably less than traditional wire transfers

After fixed costs, the profit (or loss) from a mining operation for a single unit of mining power (1 Luna) comes down to rewards minus cost of work for that unit. A bit more formally, during a future work period $t$, profit or loss for a unit of mining power equals

$$P(t) = \frac{TotalRewards(t)}{LunaSupply(t)} - UnitMiningCost(t)$$

Frequent alternations between profit and loss – positive and negative $P(t)$ – would create highly unstable mining demand. The goal of the protocol is to make this calculus easier and more predictable. With that in mind, most of the uncertainty in $P(t)$ comes down to the first term, ie *unit mining rewards*. As a consequence, unit mining rewards are the primary consideration for making a long-term commitment to the network. Stable unit mining rewards produce stable demand for mining, while volatile unit mining rewards produce the opposite.

By default, there is uncertainty both in total rewards (from fees) and in the supply of Luna, so both terms contribute to the volatility in unit rewards. First, rewards from fees tend to increase when the economy grows and tend to decrease when the economy shrinks. Second, Luna supply tends to decrease when the economy grows (because Luna is burned from seigniorage), and it tends to increase when the economy shrinks (because new Luna is issued to buy back Terra). The implication is that unit mining rewards have a tendency to move strongly in the direction of the economy, either up or down. By extention this also applies to mining demand.

So in order to create mining demand that is long-term stable, **the protocol creates predictable rewards in all economic conditions.** To achieve this, the protocol uses transaction fees and the rate of Luna burn as levers to *oppose* changes in unit mining rewards. Transaction fees affect total rewards, while the rate of Luna burn affects Luna supply – the two determinants of *unit mining rewards*. The basic logic is the following:

- if unit mining rewards are *increasing*:

  - *decrease* fees

  - *decrease* Luna burn

- if unit mining rewards are *decreasing*:

  - *increase* fees

    – *increase* Luna burn

While working to smooth out fluctuations in miner compensation, the protocol also targets stable growth in line with the long-term growth of the Terra economy. This is a natural reward for their long-term commitment to serving the network.

To formalize those ideas, we discuss the mechanism to smooth out unit mining rewards in more detail [2]. Fees and the rate of Luna burn – the "stability levers" – are adjusted every week in response to changes in unit mining rewards. We define the rate of Luna burn as follows: what portion (%) of seigniorage does the protocol use to buy back and burn Luna, as opposed to depositing to the Treasury? Let $f_t$, $b_t$ and $R_t$ be transaction fees, the rate of Luna burn and *unit* mining rewards at time $t$ respectively. Then the rule for adjusting the values of $f$ and $b$ is the following:

$$f_{t+1} = (1 + g) \cdot \frac{R_{t-1}}{R_t} \cdot f_t$$

$$b_{t+1} = (1 + g) \cdot \frac{R_{t-1}}{R_t} \cdot b_t$$

The update rules should now make clear what we mean when we say that fees (and Luna burn rate) *oppose* changes in unit mining rewards: the current value, $f_t$, is multiplied by the *inverse change* in unit mining rewards, $\frac{R_{t-1}}{R_t}$. For example, if unit mining rewards were cut in half then fees would double in response, and conversely if unit mining rewards were to double fees would be cut in half in response. The result is scaled by a small growth factor, $1 + g$, that permits gradual growth in unit mining rewards commensurate with the *long-term* growth rate of the economy.

How well does the mechanism work in practice? We have run extensive simulations to stress-test and refine it under a breadth of assumptions. In what follows we share and discuss a representative example that applies significant stress to the mechanism and sheds light on how it achieves its objective. We consider a simulated 10 year period during which the Terra economy experiences both rapid growth and severe turbulence. We demonstrate how the protocol adjusts its stability levers in response to economic conditions, and how those adjustments in turn shape unit mining rewards.

---

[2]The mechanism we present is slightly simplified. We omit a few details, eg the protocol uses moving averages in mining rewards for robustness and ensures consistent contribution of buybacks relative to fees in all situations.







The first graph shows simulated weekly **transaction volume** and its annual moving average. Transaction volume can be thought of as the GDP of the Terra economy. The economy experiences rapid growth followed by a severe multi-year recession that wipes out 93% of GDP over 3 years and requires 6 years for full recovery. This scenario is a stern test – if it were describing the price of Bitcoin it would be by far the longest bear market in its history and tied for worst in terms of drawdown (equal to the 93% drop between June and November 2011). While we think that Terra's adoption-driven demand will be far more stable than Bitcoin's speculation-driven demand, the stability mechanism has been designed to confidently withstand Bitcoin-level volatility.

The second graph shows **transaction fees and the Luna burn rate**, the two levers used by the protocol to smooth out fluctuations in unit mining rewards. We observe that both move *opposite* to the direction of the economy (which is also the default direction of unit mining rewards).

The third graph shows the annual moving average of **unit mining rewards.** The growth target we have set in this example is 15% annually. As was designed, unit mining rewards experience steady growth with low volatility, unpurturbed by the cycles in Terra's GDP. The adjustments in fees and the Luna burn rate have successfully absorbed the expected volatility in unit mining rewards and created predictable growth. This is achieved with fees that average less than 0.5% (with a momentary peak at the 1% maximum) and a Luna burn rate that averages roughly 50% (meaning that on average 50% of seigniorage is granted to the Treasury).

Stable demand for mining is a core requirement for the security and stability of Terra. Unit mining rewards are the primary consideration and the biggest source of risk for miners. They are by default highly cyclical, hence highly uncertain. Reducing that uncertainty in the face of volatile conditions is the key to stable mining demand. We have outlined a simple mechanism that uses transaction fees and Luna burn as levers to achieve this, and demonstrated its effectiveness in the most severe economic conditions.

# 3   Growth-driven fiscal policy

Despite their enormous potential, smart contracts have faced roadblocks in adoption due to the price volatility of their underlying currency. Price volatility makes smart contracts unusable for most mainstream financial applications, as most users are accustomed to valuing determinate payouts in insurance, credit, mortgage, and payroll. Terra will offer a stable dApp platform oriented to building

financial applications that use Terra as their underlying currency, thus allowing smart contracts to mature into a useful infrastructure for mainstream businesses. Terra Platform DApps will help to drive growth and stabilize the Terra family of currencies by diversifying its use cases. In this section we discuss how the protocol subsidizes the growth of the more successful applications through its growth-driven fiscal policy.

National governments use expansionary fiscal spending with the objective of stimulating growth. The hope of fiscal spending is that the economic activity instigated by the original spending results in a feedback loop that grows the economy more than the amount of money spent in the initial stimulus. This concept is captured by the spending multiplier — how many dollars of economic activity does one dollar of fiscal spending generate? The spending multiplier increases with the marginal propensity to consume, meaning that the effectiveness of the expansionary stimulus is directly related to how likely economic agents are to increase their spending.

In a previous section, we discussed how Terra seigniorage is directed to both miner rewards and the Treasury. At this point, it is worth describing how exactly the Treasury implements Terra's fiscal spending policy, with its core mandate being to stimulate Terra's growth while ensuring its stability. In this manner, Terra achieves greater efficiency by returning seigniorage not allocated for stability back to its users.

The Treasury's main focus is the allocation of resources derived from seigniorage to decentralized applications (dApp). To receive seigniorage from the Treasury, a dApp needs to register for consideration as an entity that operates on the Terra network. dApps are eligible for funding depending on their economic activity and use of funding.

The funding procedure for a dApp works as follows:

- A dApp applies for an account with the Treasury; the application includes metadata such as the Title, a url leading to a detailed page regarding the use of funding, the wallet address of the applicant, as well as auditing and governance procedures.

- At regular voting intervals, Luna validators vote to accept or reject new dApp applications for Treasury accounts. The net number of votes (yes votes minus no votes) needs to exceed 1/3 of total available validator power for an application to be accepted.

- Luna validators can exercise control over which dApps may open accounts with the Treasury.

The funding itself is determined by validator voting for each funding period in accordance with a weight that is assigned to each dApp. This allows the Treasury to prioritize dApps that earn the most funding.

- At each voting session, Luna validators have the right to request that a dApp be blacklisted, for example because it behaves dishonestly or fails to account for its use of Treasury funds. Again, the net number of votes (yes votes minus no votes) needs to exceed 1/3 of total available validator power for the blacklist to be enforced. A blacklisted dApp loses access to its Treasury account and is no longer eligible for funding.

The motivation behind assigning funding weights to dApps is to maximize the impact of the stimulus on the economy by rewarding the dApps that are more likely to have a positive effect on the economy. The Treasury uses two criteria to determine spending allocations: (1) **robust economic activity** and (2) **efficient use of funding**. dApps with a strong track record of adoption receive support for their continued success, and dApps that have grown relative to their funding are rewarded with more seigniorage, as they have a successful track record of efficiently using their resources.

Those two criteria are combined into a single weight which determines the relative funding that dApps receive from the aggregate funding pool. For instance, a dApp with a weight of 2 would receive twice the amount of funding of a dApp with a weight of 1.

We lay out the funding weight equation, followed by a detailed explanation of all the parts: For a time period t, let $TV_t$ be a dApp's transaction volume and $F_t$ be the Treasury funding received. Then, the protocol determines the funding weight $w_t$ for the period as follows:

$$w_t = (1 - \lambda) \, TV_t^* + \lambda \frac{\Delta TV_t^*}{F_{t-1}^*}$$

The notation * denotes a moving average, so $TV_t^*$ would be the moving average of transaction volume leading up to time period t, while $\Delta TV_t^*$ would be a difference of moving averages of different lengths leading up to time period t. One might make the averaging window quarterly for example. Finally, the funding weights among all dApps are scaled to sum to 1.

- **The first term** is proportional to $TV_t^*$, the average transaction volume generated by the dApp in the recent past. This is an indicator of the dApp's **economic activity**, or more

simply the size of its micro-economy.

- **The second term** is proportional to $\Delta TV *_t / F *_t -1$. The numerator describes the trend in transaction volume — it is the difference between a more and a less recent average. When positive, it means that the transaction volume is following an upward trajectory and vice versa. The denominator is the average funding amount received by the dApp in the recent past, up to and including the previous period. So the second term describes how economic activity is changing relative to past funding. Overall, larger values of this ratio capture instances where the dApp is fast-growing for each dollar of funding it has received. This is in fact the spending multiplier of the funding program, a prime indicator of **funding efficiency**.

- The parameter λ is used to determine the relative importance of economic activity and funding efficiency. If it is set equal to 1/2 then the two terms would have equal contribution. By decreasing the value of λ, the protocol can favor more heavily dApps with larger economies. Conversely, by increasing the value of λ the protocol can favor dApps that are using funding with high efficiency, for example by growing fast with little funding, even if they are smaller in size.

An important advantage of distributing funding in a programmatic way is that it is simpler, objective, transparent and streamlined compared to open-ended voting systems. In fact, compared to decentralized voting systems, it is more predictable, because the inputs used to compute the funding weights are transparent and slow moving. Furthermore, this system requires less trust in Luna validators, given that the only authority they are vested with is determining whether or not a dApp is honest and makes legitimate use of funding.

Overall, the objective of Terra governance is simple: fund the organizations and proposals with the highest net impact on the economy. This will include dApps solving real problems for users, increasing Terra's adoption and as a result increasing the GDP of the Terra economy.

# 4   Conclusion

We have presented Terra, a stable digital currency that is designed to complement both existing fiat and cryptocurrencies as a way to transact and store value. The protocol adjusts the supply of Terra in response to changes in demand to keep its price stable. This is achieved using Luna, the

mining token whose stable rewards are designed to absorb volatility from changing economic cycles. Terra also achieves efficient adoption by returning seigniorage not invested in stability back to its users. Its transparent and democratic distribution mechanism gives dApps the power to attract and retain users by tapping into Terra's economic growth.

If Bitcoin's contribution to cryptocurrency was immutability, and Ethereum expressivity, our value-add will be usability. The potential applications of Terra are immense. Immediately, we foresee Terra being used as a medium-of-exchange in online payments, allowing people to transact freely at a fraction of the fees charged by other payment methods. As the world starts to become more and more decentralized, we see Terra being used as a dApp platform where price-stable token economies are built on Terra. Terra is looking to become the first usable currency and stability platform on the blockchain, unlocking the power of decentralization for mainstream users, merchants, and developers.

## References

Liu, Yukun and Tsyvinski, Aleh, Risks and Returns of Cryptocurrency (August 2018). NBER Working Paper No. w24877. Available at https://ssrn.com/abstract=3226806.

Makarov, Igor and Schoar, Antoinette, Trading and Arbitrage in Cryptocurrency Markets (April 30, 2018). Available at SSRN: https://ssrn.com/abstract=3171204.

Kereiakes, Evan, Rationale for Including Multiple Fiat Currencies in Terra's Peg (November 2018). Available at https://medium.com/terra-money/rationale-for-including-multiple-fiat-currencies-in-terras-peg-1ea9eae9de2a

Taylor, John B. (1993). "Discretion versus Policy Rules in Practice." Carnegie-Rochester Conference Series on Public Policy. 39: 195–214.

# Exhibit B

https://twitter.com/FatManTerra/status/1529229283356549121



← **Thread**

**FatMan** ✔ ···
@FatManTerra

I would like to have a little heart-to-heart with you guys about the status of our potential class action against Terraform Labs, Do Kwon et al. seeking restitution for UST victims. As you may have heard, we were exploring a community litigation fund to be released soon. (1/17)

6:34 PM · May 24, 2022

178 Retweets    44 Quotes    1,221 Likes    79 Bookmarks

T   Tweet your reply                                        Reply

**FatMan** ✔ @FatManTerra · May 24, 2022 ···
This fund already existed – it was pitched to me by two trusted lawyers (both real; one public, one anon) and a supposed fund manager (anon). This happened several days ago, and it looked like the perfect solution as it was cheaper for the victims and ready-made. (2/17)

💬 3       ↻ 5       ♡ 206      ▥      ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022 ···
Donors could buy tokens and vote on DAO decisions. The fund would only take 2x back as profit when we win, as opposed to 4x or higher from traditional litigation funding. All funds raised would be held by these three individuals in a multisig wallet. (3/17)

💬 1       ↻ 4       ♡ 170      ▥      ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

And then, something a little unexpected happened: my Twitter account got a lot more followers. I realized at this stage that anything I put out would likely get a lot in donations fairly quickly, so I decided security had to be made far more robust than it currently was. (4/17)

💬 3          ⇄ 4          ♡ 179          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

Firstly, I insisted that someone trusted and public-facing should be added to the multisig. I suggested Cobie or a US law firm. The fund contacted a fourth lawyer (a legitimate one) and he was added as a multisig holder. I was relieved, and things were looking good. (5/17)

💬 2          ⇄ 3          ♡ 176          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

Sadly, today I learned some things about their structure that I didn't previously know - some things were misrepresented to me and some, admittedly, I didn't check up on due to being very busy at the time. One - the fee would not just be 2x - lawyers may take a cut too. (6/17)

💬 2          ⇄ 3          ♡ 153          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

Two - 50% of the tokens raised would be given to the multisig holders to 'slowly distribute' to the community. I assumed that all tokens would go to donors, and this part didn't really make sense to me - a legitimate DAO would not have this level of centralization. (7/17)

💬 2          ⇄ 5          ♡ 156          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

Three - proposals made on Snapshot for the DAO would be 'filtered'. This was revealed today, and it confused me - shouldn't DAO holders have a final say on what happens with their donations? Why should an internal group control proposals? (This reminds me of someone...) (8/17)

💬 1          ⇄ 2          ♡ 160          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022 · · ·

Over the past few days, they pressured me to release their links to the public ASAP. I was patient and I told them I needed some time to think. I'm glad I did. Due to these new facts, I have decided not to share their link with the public. There were too many red flags. (9/17)

💬 9          ⇄ 6          ♡ 216          ᴵᴸᴵ          ⤴

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

This may sound like bad news, but there's a happy ending to this story that makes it all worth it. My Twitter account receiving this much exposure caught the attention of several high profile law firms and litigation funders from across the world, mostly the US. (10/17)

💬 4          ⟲ 6          ♡ 244          �ili          ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

I believe this case will be historic, and I believe combining our research with legal discovery will lead to the most shocking court battle in all of crypto history. Law firms seem to agree – I am in talks with a select few and we will release more information soon. (11/17)

💬 3          ⟲ 11          ♡ 275          ili          ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

I am happy to announce that three law firms have offered to commit over $15m (maybe more) to this historic fight for justice – they are looking to fund the case and will collect fees on a contingency basis. This could never have happened without all of you. (12/17)

💬 5          ⟲ 18          ♡ 398          ili          ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

I'm currently brokering the best deal possible for UST victims within our class of retail investors – right now, the haircut range is expensive (a traditional cut going to lawyers), but optimistically this should come down – I'm verifying claim data and working hard BTS. (13/17)

💬 7          ⟲ 10          ♡ 268          ili          ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

The best part of all? This action will be free for our class of victims to join. They pay nothing upfront & nothing if we lose – if we win, they are given their UST debt (minus legal fees) straight into their pocket. Contingency, although expensive, is quite neat. (14/17)

💬 11          ⟲ 9          ♡ 311          ili          ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022  ···

In jurisdictions like Singapore where contingency is less prevalent, we are also in touch with litigation funders interested in helping out in a similar manner, and I'm working on ironing out non-predatory terms that best represent victims' interests. (15/17)

💬 3          ⟲ 7          ♡ 238          ili          ⬆



**FatMan** ✔ @FatManTerra · May 24, 2022 ···

Overall, I'm very pleased that things have played out this way. Even though the initial DAO pitched to me did not involve me being on the multisig (of my own volition), once my account became this popular, I realized that a 0.05% risk-of-rug was 0.05% too high. (16/17)

💬 9      ↻ 3      ♡ 239      �),ı      ⬆

**FatMan** ✔ @FatManTerra · May 24, 2022 ···

At stakes this high, things need to be watertight, so I'm overjoyed that everything is now moving to a secure structure that's risk-free backed by some of the best legal minds and law firms on the planet. What happens next is going to be really exciting. Stay tuned. (17/17)

💬 55      ↻ 24      ♡ 541      ),ıl      ⬆

# Exhibit C

# Anchor:
# Gold Standard for Passive Income
# on the Blockchain

Nicholas Platias, Eui Joon Lee, Marco Di Maggio

June 2020

## Abstract

Despite the proliferation of financial products, DeFi has yet to produce a savings product simple and safe enough to gain mass adoption. The price volatility of most cryptoassets makes staking unfit for the vast majority of consumers. On the other end of the spectrum, the cyclical nature of stablecoin interest rates on DeFi staples like Maker and Compound makes those protocols ill-suited for a household savings product. To address this pressing need we introduce Anchor, a savings protocol on the Terra blockchain that offers yield powered by block rewards of major Proof-of-Stake blockchains. Anchor offers a principal-protected stablecoin savings product that pays depositors a stable interest rate. It achieves this by stabilizing the deposit interest rate with block rewards accruing to assets that are used to borrow stablecoins. Anchor will thus offer DeFi's benchmark interest rate, determined by the yield of the PoS blockchains with highest demand. Ultimately, we envision Anchor to become the gold standard for passive income on the blockchain.

# 1   Introduction

In the past few years we have witnessed explosive growth in Decentralized Finance (DeFi). We have seen the launch of a wide range of financial applications covering a broad range of use cases, including collateralized lending (Compound), decentralized exchanges (Uniswap) and prediction markets (Augur). Despite early success and a robust influx of brains and capital, DeFi has yet to produce a simple and convenient savings product with broad appeal outside the world of crypto natives. We believe that the path to mass adoption for decentralized finance is the savings product.

Anchor is a savings protocol that accepts Terra deposits, allows instant withdrawals and pays depositors a low-volatility interest rate. To generate yield, Anchor lends out deposits to borrowers who put down liquid-staked PoS assets from major blockchains as collateral (bAssets). Anchor stabilizes the deposit interest rate by passing on a variable fraction of the bAsset yield to the depositor. It guarantees the principal of depositors by liquidating borrowers' collateral via liquidation contracts and third-party arbitrageurs.

We believe that the provision of a stable interest rate to depositors is a necessary feature of a savings product with broad appeal. Anchor thus overcomes one of the key limitations of Compound and Maker as savings products: the highly cyclical nature of deposit interest rates. Beyond offering low-volatility yield, Anchor is an attempt to give the main street investor a single, reliable rate of return across all blockchains. The plethora of staking products, each with varying terms and yields, makes DeFi inaccessible and unappealing to average investors. By aggregating block rewards from all major PoS blockchains, Anchor aspires to set the blockchain economy's benchmark interest rate.

The rest of the paper is organized as follows. We start by introducing the concept of a tokenized stake in a PoS blockchain (bAsset). In the following section we cover the basics of the Anchor money market, which serves as the building block for the savings protocol. Next we introduce the Anchor Rate as a benchmark interest rate, and propose a mechanism that stabilizes the deposit interest rate at that benchmark. After that we cover the liquidation mechanism that implements Anchor's principal protection. In the last section we discuss a number of applications of Anchor money markets beyond savings.

# 2   Tokenized Stakes (bAssets)

One of Anchor's core primitives is the bAsset (bonded asset) — a tokenized stake on a PoS blockchain. A bAsset is a token that represents ownership of a staked PoS asset. Like the underlying staked asset, a bAsset pays the holder block rewards. Unlike the staked asset, a bAsset is both transferable and fungible. Users can therefore transact with bAssets with the same ease as the underlying PoS asset. In summary, a bAsset allows the holder to earn block rewards while maintaining the liquidity and fungibility that staked assets forego. bAssets are broadly usable – they can be generated on any PoS

1

blockchain that supports smart contracts. bAssets are a central component of Anchor – we will soon explain their key role in offering a stable interest rate to Terra deposits.

The precise mechanism of bAssets involves intricacies that are beyond the scope of this paper. We will be releasing a separate technical specification for bAssets that will cover the precise mechanics. For the purposes of Anchor we assume the existence of a tokenized staking smart contract that adheres to the above properties.

## 3    The Terra Money Market

The core building block of the Anchor savings protocol is the Terra money market – a WASM (Web Assembly) smart contract on the Terra blockchain that facilitates depositing and borrowing of Terra stablecoins (TerraUSD, for instance). The money market is defined by a pool of Terra deposits that earns interest from borrowers. Borrowers put down digital assets as collateral to borrow Terra from the pool. The interest rate is determined algorithmically as a function of borrowing demand and supply, which is encoded by the pool's utilization ratio (fraction of Terra in the pool that has been borrowed).



Anchor Money market structure

### 3.1    Debt Positions

Borrowing from the Terra money market is as straightforward as locking up collateral in exchange for a loan. The main parameter of a debt position is its *borrowing capacity*: the maximum amount of debt an account can accrue. An account's borrowing capacity is determined by the amount and quality of locked-up collateral. Anchor defines a *loan-to-value ratio* (LTV) for each type of collateral, which indicates the fraction of a collateral

2

asset's value that contributes to a debt position's borrowing capacity. LTV ratios range from 0 to 1 and are a function of an asset's volatility and liquidity. Stable, liquid assets will have high LTV ratios, while volatile illiquid assets will have low LTV ratios. If an account holds an asset X with an LTV ratio of 80%, then 80% of X's value contributes to the account's borrowing capacity. The Anchor smart contract sums the value of all collateral assets multiplied by their LTV ratios to determine an account's total borrowing capacity. In the following section we discuss how Anchor determines the interest rate for debt positions.

## 3.2   Algorithmic Interest Rates

Anchor uses an algorithmic interest rate algorithm to determine depositor and borrower rates for Terra based on borrowing demand and supply. The key input to the algorithm is the Terra pool utilization ratio. The utilization ratio represents what fraction of Terra in the pool is borrowed. More precisely:

$$u(t) = \frac{borrowedDeposits(t)}{totalDeposits(t)}$$

The interest rate algorithm charges borrowers more and pays depositors more as the utilization ratio increases. On the other hand, as the utilization ratio decreases, the borrower pays less interest, resulting in lower interest for the depositor. The algorithm lowers borrower interest to incentivize borrowing when the utilization ratio is low, and increases borrower interest to disincentivize borrowing when the utilization ratio is high. This algorithm can be formulated generally as follows:

$$depositRate(t) = u(t) \cdot borrowRate(t)$$

$$borrowRate(t) = f(u(t))$$

where $f$ is a continuous increasing function.

This formulation has a key shortcoming – one that is shared by the Compound protocol which first introduced the idea: both rates are increasing functions of the utilization ratio, and therefore both are highly sensitive to market cycles. A pattern that emerges clearly from historical data on Compound is that the utilization ratio on stablecoin money markets is highly correlated with Ethereum price movements. Upswings in Ethereum's price increase demand for leveraged long positions on Ethereum, which results in increased borrowing from stablecoin money markets. The opposite is true during Ethereum price downswings: a decrease in leveraged long demand, in combination with liquidations of Ethereum debt positions, results in less stablecoin borrowing. See the Appendix for data on this pattern collected from the past 12 months of stablecoin borrowing on Compound. The interest rate equations demonstrate that cyclicality in utilization ratio directly trans-

lates to cyclicality in borrower and depositor rates. We believe that cyclicality of interest rates on DeFi protocols is a key barrier to broad adoption. To solve this problem, we propose a benchmark interest rate and a stabilization mechanism to achieve it in the following section.

## 4    Interest Rate Stabilization

We define an interest rate benchmark, the Anchor Rate, and propose a mechanism to stabilize the deposit interest rate to the benchmark.

### 4.1    The Anchor Rate

There is a plethora of staking and savings products, each with its own risk/return profile, and each with a rate that fluctuates over time. Given all those options, what interest rate does the main street investor keep track of, and how much confidence does she have in its stability? There is no good answer to this question at the time of writing. Anchor aspires to be the answer by setting DeFi's benchmark intest rate.

Unlike central banks, which control the supply of money to set interest rates, Anchor takes a different approach. In the absence of a printing press, Anchor uses block rewards across blockchains to derive DeFi's benchmark rate. With Anchor, the return that depositors can expect is a function of borrowers' on-chain income. The Anchor money market is a unique enabler of "yield transfer" from borrower to depositor by accepting bAssets as collateral. The resulting diversified yield, the **Anchor Rate**, reflects the market's preferred sources of yield on the blockchain. For this reason the Anchor Rate has the potential to be more stable than any individual yield, or any *fixed* collection of yields.

We define the Anchor Rate formally by considering the bAssets used as collateral for borrowing from Anchor's Terra money market. Let $a_1, a_2, ..., a_n$ be those assets, with yields $y_1, y_2, ..., y_n$ and collateral value locked up in open debt positions $c_1, c_2, ..., c_n$, where yields and value are Terra-denominated. The Anchor smart contract computes 12 month moving averages for the yields $\tilde{y_1}, \tilde{y_2}, ..., \tilde{y_n}$. The Anchor Rate at time $t$ is defined as follows:

$$AR(t) = \frac{\sum\limits_{i=1}^{n} c_i(t) \cdot \tilde{y}_i(t)}{\sum\limits_{i=1}^{n} c_i(t)}$$

The Anchor Rate is the average of the rolling yields of all bAssets used as collateral for borrowing the stablecoin, weighted by the aggregate (Terra-denominated) collateral value of each asset. Collateral values are a natural choice of weight, as they determine the amount of block rewards that are eligible for transfer from borrowers to depositors. We therefore weigh yields by the potential for contribution to the depositor. For instance, if 3mm UST worth of bLuna and 1mm UST worth of bAtom were held as collateral in

UST's money market, with yields of 15% and 10% respectively, the Anchor Rate would be 13.75%.

## 4.2  Interest Rate Stabilization Mechanism

The Anchor Rate plays a foundational role in the Anchor protocol: it is the interest rate target for Terra deposits. The Anchor smart contract dynamically distributes block rewards from collateral bAssets between borrower and depositor to achieve the target rate. This is achieved via a time-varying parameter $\alpha(t)$ between 0 and 1:



By introducing the dynamic contribution of block rewards to the depositor, the equations from the previous section become:

$$depositRate(t) = u(t) \cdot \Big(borrowRate(t) + C \cdot y(t) \cdot \alpha(t)\Big)$$

$$borrowRate(t) = f(u(t))$$

$$netBorrowRate(t) = C \cdot y(t) \cdot (1 - \alpha(t)) - borrowRate(t)$$

where $y(t)$ is the staking yield of the bAsset, $C$ is the average collateral ratio and $\alpha(t)$ is the fraction of the staking yield paid to depositors. Intuitively, the rate paid by the borrower to the depositor is supplemented by a dynamic fraction of the bAsset's block rewards multiplied by the collateral ratio. We also note the $netBorrowRate(t)$, which includes the portion of the bAsset yield paid to the borrower (inflow), as well as the rate paid by borrower to depositor (outflow). $netBorrowRate(t)$ may be either positive or negative.

An important component of dynamic yield distribution is liquidation of block rewards. The deposit interest rate is denominated in Terra, while block rewards can be denominated in arbitrary PoS assets. To solve this, Anchor liquidates the block rewards that are

5

directed to the depositor at regular intervals. This is done via the liquidation mechanism outlined in Section 5.

The key to the stabilization mechanism is the adjustment of $\alpha(t)$ to maintain a deposit interest rate that is close to the Anchor Rate $AR(t)$. The calibration algorithm for $\alpha(t)$ takes place in discrete time steps as follows:

$$\alpha(t+1) = h\left(\frac{AR(t)}{depositRate(t)}\right) \cdot \alpha(t)$$

where $h$ is a continuous monotonically increasing concave function with a fixed point of 1 ($h(1) = 1$), square root being a simple example.

For instance, continuing the earlier example where the Anchor Rate is 13.75%, assume that the deposit rate is 10% and $\alpha(t)$ is 50%, i.e. 50% of the yield from bLuna and bAtom collateralizing Terra loans is paid to depositors. The deposit rate is undershooting the Anchor Rate, therefore a larger fraction of the collateral's yield needs to be paid to depositors. Using the square root for $h$, $\alpha(t+1)$ would increase to roughly 59%, thereby increasing the deposit rate and closing the gap to the Anchor Rate. On the other hand, if the deposit rate was higher than the Anchor Rate, the value of $\alpha(t+1)$ would decrease to achieve the opposite effect.

The key idea here is that the value of $\alpha$ *increases* when the deposit rate lags the Anchor Rate to offer a boost using part of the block rewards, and *decreases* when the deposit rate exceeds the Anchor Rate to reduce contribution of the block rewards. The value of $\alpha$ remains unchanged when the deposit rate equals the Anchor Rate. We note that there is a number of constraints in this calibration that are beyond the scope of this paper, such as the maximum change of $a(t)$ in a given time step.

Why is this stabilization possible? In lieu of a formal argument, we note that in the trivial case where borrowers pay depositors only via block rewards, i.e. do not contribute additional interest, the deposit interest rate equation becomes

$$depositRate(t) = C \cdot u(t) \cdot \alpha(t) \cdot AR(t)$$

In this case it is sufficient for $C \cdot u(t) \cdot \alpha(t)$ to be equal to 1 for the target rate to be achieved, which would be the case if e.g. $C = 2$, $u(t) = 0.5$ and $\alpha(t) = 1$. This will naturally not always be possible, in which case additional interest from the borrower will be necessary to meet the target.

# 5   Principal Protection

Anchor implements a liquidation protocol designed to guarantee the principal of depositors. Deposits are safe insofar as all debts against them remain over-collateralized. The function of the Anchor liquidation protocol is to maintain deposit safety by paying off debts that are at risk of violating collateral requirements. The Anchor liquidation

6

protocol is outside the scope of this paper – we will be releasing a separate technical specification that covers the mechanism in depth. In what follows we offer a very brief overview.

To ensure that all Anchor loans are sufficiently collateralized, the liquidation protocol pays back "at risk" loans using "liquidation contracts". A liquidation contract undertakes the task of paying back debt in exchange for collateral plus a fee – the "liquidation fee". Liquidation contracts can be written by anyone, are aggregated in a pool and tapped "on demand" when a loan needs to be liquidated in ascending order of liquidation fee. In addition to the liquidation fee, contracts earn a passive premium charged to borrowers that is calibrated to ensure full coverage of outstanding loans.

The structure and incentives built into liquidation contracts enable them to provide higher robustness and solvency guarantees compared to a traditional "keeper" system. Keeper systems rely on arbitrageurs to finance liquidations on a discretionary basis, which can result in a liquidity crunch at times of high market volatility. This risk has materialized in practice in Maker's keeper system, resulting in huge losses for borrowers. Liquidation contracts, on the contrary, are fully collateralized and enforce a lengthy withdrawal period. Liquidation demand is therefore predictable and stable in the face of temporary shocks, thus protecting both depositors and borrowers.

# 6   Applications

Beyond the savings product, Anchor's money market can support more financial applications than the authors can envision. A few immediate applications that we see, starting with the savings product itself:

## 6.1   Savings product

Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure. Anchor offers a solution with Terra stablecoin money markets. Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets. Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns.

## 6.2   Price and staking yield leverage

Users can leverage their positions by putting their assets as collateral to borrow stablecoins and buy more of the same asset. Users can similarly take advantage of low-rate periods by borrowing stablecoin cheap and purchasing bAssets whose yield exceeds their borrowing cost. Users who seek extra stablecoin liquidity can do so while paying little to no additional interest, given the deposit interest rate is subsidized by their assets' block rewards.

### 6.3   Liquidation contracts

If users are not interested in depositing or borrowing, they can participate in the Anchor liquidation pool which is a higher-risk, higher-return product that provides liquidation financing for Anchor debt positions. Liquidation contract writers can profit from passive premiums, as well as from liquidation fees earned on contract execution.

## 7   Conclusion

We have presented Anchor, a savings protocol on the Terra blockchain powered by a money market that is collateralized by tokenized stakes (bAssets). The protocol defines the Anchor Rate, derived from the yield of the market's highest-demand PoS assets, as the blockchain economy's interest rate benchmark. Anchor utilizes the block rewards of bAssets to offer depositors a stable return equal to the Anchor Rate. We believe that Anchor's simplicity and robustness make it a fitting answer to the search for a household savings product powered by cryptocurrency.

## Appendix



Utilization ratio on stablecoin money markets on Compound is highly correlated with Ethereum price movements. The graph above shows Sai and USDC money market utilization ratios vs Ethereum price over the last 12 months.

# References

[1]  Compound API. https://compound.finance/docs/api

[2]  Compound White Paper. https://compound.finance/documents/Compound.Whitepaper.pdf

[3]  MakerDAO White Paper. https://makerdao.com/en/whitepaper/

[4]  Terra White Paper. https://terra.money/Terra_White_paper.pdf

# Exhibit D

# MIRROR PROTOCOL V2

STANFORD LIU, IRENE LEE

ABSTRACT. The Mirror Protocol has seen significant increases in adoption due to the various benefits described in the first version of the whitepaper. This paper will aim to give an brief overview of the existing protocol, describe various improvements to the mechanisms utilized by Mirror, and lastly outline open problems that will be addressed in future versions of the protocol.

## 1. INTRODUCTION

The Mirror Protocol is a protocol that allows for the minting of synthetic asset tokens [4]. To mint a mirrored asset (hereby called "mAsset"), a user must submit a form of collateral to the protocol. In essence, this process is equivalent to the mechanics of ab over-collateralized debt position that is commonly seen in Maker [2]. As a supplement to the protocol, liquidity providers to the trading pairs in the form of mAsset/UST are incentivized through inflationary rewards in MIR tokens. The whitepaper for Mirror V1 that outlines the basic motivations and protocol structure is attached in Appendix C.

While the Mirror Protocol has taken a big step in allowing users to gain price exposure from synthetic assets that have prices tied to a real world exchange-traded security in a decentralized manner, it was a skeleton proof of concept designed to show that real assets could be traded on the blockchain. In Mirror V2, we aim to introduce several features that will introduce new asset types, incentivize active governance, diversify protocol risks, and sufficiently incentivize all user cohorts on the protocol.

## 2. NEW FEATURES

2.1. **Pre-IPO Assets.** In this past year, we have seen one of the biggest cryptocurrency IPOs in the market. Coinbase shares opened at a price of $389 and reached a first-day high of $429.54 per share. However, the majority of trading done pre-listing occurs during pre-IPO placement, which is a private sale of large blocks of shares before the initial listing. Buyers tend to be private equity firms, hedge funds, and other large institutions willing to buy significant stakes in the firm. As a result, the individual investor is not able to gain access to these types of transactions.

Various places have made large strides in allowing the typical retail investor to make a pre-IPO investment. FTX, a cryptocurrency derivative exchange, saw volumes of over $2.2 million in the span of several hours after its initial release for its pre-IPO Coinbase derivative product [5]. The ability for users to conveniently trade derivative products that would correspond to a pre-IPO asset was a step in the direction of finance moving into the cryptocurrency industry. Mirror V2 brings an innovative mechanism that will allow users to bet on both sides of the trade for pre-IPO assets in a *decentralized* manner.

*Date*: 2021-06-15.

During the period between in which a company announces an IPO and the filling of the final prospectus, several price range estimations are published. Any individual is able to start a governance vote to whitelist the pre-IPO asset with a fixed minting price rationally decided externally by the community. Once passed, any user is able to mint, trade, and provide liquidity for the asset. Unlike regular mAssets, pre-IPO assets have a fixed price feeder that provides the governance-voted price. In order to allow for natural price discovery, the minting of pre-IPO assets will be limited to a specific time window, after which the asset may no longer be minted. Once the underlying asset is listed on the exchange, the mPre-IPO asset goes through the standard migration process utilized in Mirror V1. Any person holding an mPre-IPO asset can burn it against any corresponding CDP at the first trading price (in the underlying market) to receive the position's collateral.

2.2. **Governance Voting Incentivization.** There were two major problems with governance in the first version of the protocol, (1) lack of incentivization to actively vote and (2) 'dynamic' quorums.

In Mirror V1, all users who staked MIR into the governance contract were given a pro-rata share of rewards generated by the CDP closure fees. In addition, these MIR staked in governance could also be used as voting power in on-going polls with the downside that the MIR would be non-withdrawable until the poll was over. Users who simply wanted a place to receive MIR rewards without experiencing potential impermanent loss placed their MIR in governance staking without actively voting. As a result, quorums were harder to meet due to low voter participation, and active participants in the Mirror governance system were insufficiently rewarded. Mirror V2 introduces a system where users are rewarded for their participation in on-going polls. If there are $m$ number of MIR to be distributed to governance stakers, $(1-\alpha)m$ will be allocated to all MIR stakers in governance where $\alpha \in [0,1]$. The remaining $\alpha m$ will be distributed evenly across the $n$ number of current on-going polls where $n \in \mathbb{Z}_+^*$. Thus each poll will be allocated $\frac{\alpha m}{n}$ MIR. A passive voter will receive at most

$$\Pi_{passive} = \frac{u}{U}(1-\alpha)m$$

where $u$ and $U$ represent the individual and total number of MIR staked in the governance contract. As an active voter, the total reward is a function of both the passive voter rewards as well as the rewards accrued to each on-going poll.

$$\Pi_{total} = \Pi_{passive} + \Pi_{active}$$

$$= \frac{u}{U}(1-\alpha)m + \sum_{i=1}^{n} \frac{v_i}{V_i}\frac{\alpha m}{n}$$

where $v_i$ and $V_i$ represent the number of individual and total MIR utilized for the $i$th poll. Note that if all stakers in the governance contract are active voters and utilize all their MIR in each vote, then

$$\Pi = \frac{u}{U}(1-\alpha)m + \sum_{i=1}^{n} \frac{v_i}{V_i}\frac{\alpha m}{n}$$

$$= \frac{u}{U}\Big[(1-\alpha)m + \alpha m\Big]$$

$$= \frac{u}{U}m$$

which shows that rewards are split pro-rata based on the amount of MIR staked as expected.

The second problem arose due to the calculation of the quorum. Quorum is calculated as the number of MIR used in a vote as a fraction of the total MIR staked. However, this has the side effect that as users withdraw and deposit MIR from governance, the denominator changes. This can result a poll being over quorum but drop to under quorum if a significant amount of MIR is staked in the governance contract. To resolve this seesaw problem, the total amount of staked MIR will be snapshotted within a time window occurring near the end of the poll. This value of MIR staked will be fixed for the quorum calculation of the corresponding poll.

2.3. **Mint Collateral Diversification.** One of the main advantages of the Mirror Protocol is that all mAssets are backed by stable collateral (UST) that allows for relatively lower levels of collateralization. However, we would not want to preclude users from utilizing other forms of collateral. Instead, Mirror V2 will allow users to utilize LUNA, MIR, ANC, bLUNA, and aUST as collateral for minting mAssets (in addition to the current UST and mAsset collaterals currently allowed). To retrieve accurate prices for all collaterals, a collateral price feeder will be added to retrieve prices. In addition, pricing for bLuna, aUST, and other future 'derivative' collaterals will draw their prices directly from Terraswap and/or prices provided by the requisite smart contracts. For stability, bLuna prices pulled directly from Terraswap are adjusted by the Luna on-chain to Terraswap price ratio. That is to say,

$$p_{\text{bLuna}} = \frac{p_{\text{bLuna, terraswap}}}{p_{\text{Luna, terraswap}}} p_{\text{Luna, on-chain}}.$$

With the introduction of new collaterals, a new parameter modifying the 'UST value' of the collateral will be added. Consider a collateral with price $p_{collateral}$ and mintable asset (mAsset) with oracle price $p_{mAsset}$ and minimum collateral ratio $r$. Then following the existing calculations, a mint position with $c$ units of collateral is able to mint $m$ units of mAsset. $m$ is given by,

$$m = \frac{c}{r} \frac{p_{collateral}}{p_{mAsset}}.$$

Given that non-stable collaterals are much more volatile (as seen in the recent cryptocurrency market crash that wiped out over $1 trillion dollars [3]), we introduce an additional 'collateral effectiveness' parameter, $\zeta$, which will dampen risks of under-collateralization. Applying this to the equation above, we have

$$m = \zeta \frac{c}{r} \frac{p_{collateral}}{p_{mAsset}}.$$

where $\zeta \in \mathbb{R}_+$. In general, $\zeta$ will fall between 0 and 1. For example, UST and aUST will have the parameter set as 1. If MIR has $\zeta = 0.5$, it implies that for every dollar supplied in MIR, the corresponding amount attributed to the position as collateral is $0.50.

The optionality of a diverse set of collaterals as well as multi-collateral positions[1] allows users to utilize interest bearing aUST to mint assets that the mAsset accrues interest. More sophisticated participants can modify their mint positions so that the total exposure (minted asset and collateral) is variable. For example, if the collateral

---

[1]Coming soon.

and minted asset are perfectly negatively correlated, then a delta hedged position can be constructed by adding both the volatile collateral and UST in appropriate ratios.

2.4. **Short Minting.** During the early stages of the protocol, the relatively high levels of APR for mAsset liquidity provision rewards resulted in a large premium in the mAsset Terraswap price relative to its underlying oracle price. Moreover, there were relatively little incentives for a user to mint an asset and provide liquidity compared to outright purchasing the mAsset despite the high premiums. Given that liquidity pools consist of pairs of mAsset and UST, any person seeking to earn MIR had to inadvertently take on a long position.

To simultaneously solve the above problems, Mirror V2 will be introducing a new minting and inflationary reward distribution structure. Note that this new minting (let us call it 'short minting'[2]) procedure will co-exist with the existing minting procedure. When opening a short mint position, an amount of collateral is provided in order to mint the mAsset. During this process, an additional *un-tradable* token is minted. This 'short LP token', sLP, can be staked to receive a portion of the MIR that is allocated to the given mAsset-UST LP pool.

As soon as the mAsset is minted, the asset is automatically sold (with a user-defined slippage tolerance) to Terraswap, the mAsset AMM DEX. The UST received from this automatic sell-off is locked for a governance-voted period before being claimable by the user. By immediately selling the minted mAsset, the mAsset supply is increased relatively to the UST in the pool pair. Thus some of the upward pressure on the mAsset prices due to MIR staking demand is alleviated. In addition, the user ultimately receives their UST after the lock-up period which allows for greater capital efficiency. The lock-up period is advantageous to the overall Terra ecosystem for three reasons: (1) the average total value locked in both Terra and Mirror is increased, (2) prevents the minter from immediately buying back the sold mAsset, and (3) decreases the velocity of Terra stablecoins and increasing average seigniorage.

The percentage of rewards going to sLP stakers versus the total allocated MIR is adjusted as a function of the premium. The premium is defined to be the percent difference between the AMM DEX price and the oracle price.
Note that this is applied to each mAsset separately and capped at 40% (cf. Appendix A and B).

## 3. OPEN PROBLEMS

Mirror V2 brings about many changes to the underlying mechanisms, but there still exist a multitude of problems to be solved for future versions. We outline some of the remaining major tasks to be accomplished below.

While the new changes for governance should incentivize active votership turnout, the fact those with an extensive amount of MIR have a linear relationship with voting power, causing the ecosystem to be potentially more centralized than anticpated. Proposals of similar nature (such as new listings of similar classes of assets) could be potentially first grouped together to employ a quadratic voting procedure. Ideally, votes would be equally distributed to each unique protocol participant, but the largest obstacle would be expected exploitation voting procedure by utilizing multiple addresses. However, there is the classical 'skin in the game' counter-argument that could be made as well.

---
[2]Taking name suggestions.

TABLE 1. Premium & Short Reward Ratio

| Premium | Short Reward Ratio | Premium | Short Reward Ratio |
|---------|-------------------|---------|-------------------|
| 0.00 | 0.0091001 | 3.25 | 0.3577401 |
| 0.25 | 0.0160237 | 3.50 | 0.3732771 |
| 0.50 | 0.0267229 | 3.75 | 0.3839763 |
| 0.75 | 0.0422599 | 4.00 | 0.3909000 |
| 1.00 | 0.0634621 | 4.25 | 0.3951102 |
| 1.25 | 0.0906509 | 4.50 | 0.3975161 |
| 1.50 | 0.1234150 | 4.75 | 0.3988081 |
| 1.75 | 0.1605175 | 5.00 | 0.3994600 |
| 2.00 | 0.2000000 | 5.25 | 0.3997692 |
| 2.25 | 0.2394825 | 5.50 | 0.3999070 |
| 2.50 | 0.2765850 | 5.75 | 0.3999646 |
| 2.75 | 0.3093491 | 6.00 | 0.3999873 |
| 3.00 | 0.3365379 | 6.25 | 0.3999957 |

MIR inflationary rewards given to Ethereum side users will also be undergoing re-evaluation given the relatively low trading volume compared to the Terra-side pools. Based on various community-decided KPIs, effective strategic partnerships with other Ethereum-based AMMs to incentivize liquidity should be considered. For example, trading volume, total market share, and potential for other protocol benefits is as possible non-exhaustive list. Active liquidity and fee diversification on Uniswap, combined rewards on Sushiswap (MIR+SUSHI), impermanent loss protection on Bancor, cross-chain liquidity pools on Thorchain, multi-asset pools on Balancer, proactive market makers on DODO, etc are competitive advantages that should be considered.

Lastly, new classes of derivative products built ontop of existing mirrored assets and contractual agreements between minters and third parties for collateralization will be extensively considered for Mirror V3.

## APPENDIX A. SHORT MECHANISM DERIVATION

We apply techniques commonly used by the data acquisition systems in particle accelerators. Suppose there is an estimator, $x$, that represents the current premium of a given asset. However, given the large amount of trades that can happen in a single moment as well as uncertainty of the exact time of the queued trades, we have a signal that is not perfect. Let us denote the perfect signal as $y$. In addition, suppose that the short staking incentives should rapidly increase at some trigger premium $\theta_x$. That is to say that when $x > \theta_x$, the short rewards should be increased, and very small (almost 0) if not.

Let us consider the set of data $(x, y)$ for each possible random event. In this case, both $x$ and $y$ represent the premium at a given point in time. Consider a histogram, $I(x, y)$, of $x$ and $y$ for many events. Note that since $x$ and $y$ describe the same quantity, they are correlated and the data will form a 'band' in this 2-dimensional space. The data has spectrums of

$$I(x) = \int_{-\infty}^{\infty} I(x,y)dy \quad \text{and} \quad I(y) = \int_{-\infty}^{\infty} I(x,y)dx \qquad \text{(A.1)}$$

for $x$ and $y$. Given that we know that the short rewards should start to change as a function of $x$, we want to look at the efficiency of this as a function of the real signal, $y$. We can define the efficiency as $\varepsilon(y)$. To find such a curve in $y$, we can utilize the following process:

(1) Normalize the histogram $I(x, y)$ such that $I(x) = 1$ for $x \geq \theta_x$. Note that this can by done by dividing each bin $(x, y)$ in the histogram by $I(x)$. Denote this as $I_x(x, y)$. After normalization, $I_x(x)$ is equivalent to the efficiency curve in $x$.

(2) We have that $I_x(y) = \int_{-\infty}^{\infty} I_x(x, y) dx$. For values of $y$, where all possible values of $x$ are above the trigger threshold, a constant plateau arises. For values $y$ where some of the possible $x$ values are below this threshold, the spectrum is diminished by that fraction of $x$ values which lies below the threshold.

(3) The height of the plateau is determined by a fit with a straight line.

(4) Finally, $I_x(y)$ is divided by the plateau height. The resulting curve, is an estimate of the efficiency turn-on function.

The crucial feature necessary for this method to work is the constant plateau in $I_x(y)$. In other words, (1) forces the spectrum $I_x(y)$ to be uniform. A constant plateau arises when $I_x(y)$ does not depend on $x$ or $y$ until the trigger threshold is introduced. That is, $\hat{I}_x(y) = c$ where the hat indicates the absence of the trigger, and $c$ is a constant plateau height. Any value in the actual $I_x(y)$ histogram not equal to $c$ then indicates that the influence of the trigger and the difference $c - I_x(y)$ is proportional to the number of events missing at $y$ due to the trigger efficiency.

Now let us assume that $y$ follows a Gaussian distribution for any given $x$. Note that the shape parameters of a Gaussian distribution are functions of $x$, and the data has spectrum $N(x)$[3]. Then this means that

$$I(x, y) = \begin{cases} N(x) \dfrac{1}{\sqrt{2\pi}\sigma(x)} e^{-(y-\mu(x))^2/(2\sigma(x)^2)} & x \geq \theta_x, \\ 0 & x < \theta_x. \end{cases}$$

Division by $N(x)$ gives $I_x(x, y)$ which by construction is already normalized so that $I_x(x) = 1$. In order to obtain $I_x(y)$, shape parameters must be assumed *a priori*. In the simplest case, we take $\sigma(x) = \sigma$ and $\mu(x) = ax$. Thus we have that

$$I(x, y) = \begin{cases} \dfrac{1}{\sqrt{2\pi}\sigma} e^{-(y-ax)^2/(2\sigma^2)} & x \geq \theta_x, \\ 0 & x < \theta_x. \end{cases}$$

We also note that

$$\hat{I}_x(y) = \int \frac{1}{\sqrt{2\pi}\sigma(x)} e^{-(y-ax)^2/(2\sigma^2)} dx$$
$$= \frac{1}{a}$$

---

[3]The spectrum is explicitly chosen to be $N(x)$, and by integration, we have that $I(x) = \int I(x, y) dy = N(x)$.

The spectrum in $y$ is a constant if no trigger condition is applied. This implies that the critical condition for the method to work is met, i.e. that for values of $y$ well above the trigger region, $I_x(y)$ forms a constant plateau.

The analytic shape of the turn-on curve can be obtained by including the trigger condition in the integral. That is,

$$\hat{I}_x(y) = \int \frac{1}{\sqrt{2\pi}\sigma(x)} e^{-(y-ax)^2/(2\sigma^2)} H(x - \theta_x) dx$$
$$= \frac{1}{2a}\left[\text{erf}\left(\frac{y - a\theta_x}{\sqrt{2}\sigma}\right) + 1\right]$$

This integral is simply the convolution of a Gaussian with a step function, and describes the fraction of events that pass the trigger for each value of $y$ relative to some plateau height of $\frac{1}{a}$ that is reached for $y \gg a\theta_x$.

## Appendix B. Error Function Approximation

Given that integral and exponential expressions are not easy to compute on the blockchain, a polynomial approximation is necessary for the error function calculations in the short mechanism. The polynomial approximation utilized is defined by

$$\text{erf}(x) \approx 1 - \frac{1}{(1 + a_1 x + a_2 x + \cdots + a_6 x^6)^{16}},\ x \geq 0$$

where $a_1 = 0.0705230784$, $a_2 = 0.0422820123$, $a_3 = 0.0092705272$, $a_4 = 0.0001520143$, $a_5 = 0.0002765672$, and $a_6 = 0.0000430638$. This gives a maximum error of $3 \times 10^{-7}$ [1]. Note that the Terra blockchain holds up to only six decimal digits, so any potential error resulting from the approximation will not affect actual on-chain requirements. As such, all $x$ values causing the short reward to be less than 0.000001 or greater than 0.400000 are additionally rounded to 0.000000 and 0.400000 respectively.

## Appendix C. Mirror Protocol V1 Whitepaper

Abstract. Traditional asset classes have yet to enter the transparent, censorship resistant and globally accessible universe of public blockchains. Geographical barriers, high transaction costs and liquidity constraints make it hard for the average person to invest a small amount in assets like stocks and real estate. Asset tokenization has the potential to break down many of those barriers via blockchain reflections of traditional assets that are globally accessible, infinitely divisible and cheap to transact in. We present Mirror, a protocol that allows anyone to issue and trade synthetic assets that track the price of arbitrary real world assets without physical backing. Mirror enables two markets with well-balanced incentives: a market for minters to safely issue overcollateralized synthetic assets, and a market for traders to gain exposure to them. Mirror has the potential to democratize finance by making assets of all shapes and forms accessible to anyone, anywhere in the world.

C.1. **Introduction.** Blockchain technology has been adopted in a wide variety of industries thanks to its core properties of accessibility, transparency and immutability. Public blockchains, meaning those accessible by virtually anyone with an internet connection, have enabled unprecedented access to capital and to non-sovereign assets such as Bitcoin. Despite those developments, the financial industry remains closed and inaccessible, only experimenting with private blockchains which restrict access to specific parties. Indeed, access to financial assets such as stocks, bonds and derivatives

remains a challenge for most of the world outside of America and Europe. We believe that a necessary requirement for an open financial system is open, unfettered access to financial assets.

In this paper we discuss how asset tokenization can be an avenue for democratization of financial assets and propose an implementation via synthetic tokens - tokens that track the prices of real-world assets without physical backing. We present Mirror, a protocol that allows anyone to issue synthetic assets that track arbitrary real-world assets using public blockchain technology. In the latter half of the paper we discuss the core mechanisms that enable Mirror and argue that the protocol will play a crucial role in expanding the audience of traditional finance.

## C.2. **Asset Tokenization.**

C.2.1. *Motivization.* Let us first consider a simple problem where an individual wants to invest in a piece of real estate but only has a portion of the total required capital necessary to make the purchase. It may be in the investor's best interest to invest a portion of the total amount every month (known as dollar cost averaging) and slowly build up the investment capital. However, this would be an unusual concept in the real estate industry as it does not make sense to buy, say $10m^2$ of a piece of property. In a similar vein, the reverse scenario where an individual would like to procure $50,000 worth of liquidity but only has a piece of real estate worth $100,000 must necessarily sell the whole piece of real estate. It would be absurd to only sell half the house. However, we can view this as capital inefficiency as the individual would be left with an excess of $50,000 if they were to sell the entire house.

C.2.2. *Tokenization on a Public Ledger.* An elegant solution to the above problem would be to introduce asset tokenization. To put it simply, we would convert the ownership rights, an asset, into a digital token. We can arbitrarily say that our $100,000 property converts to 100,000 "tokens", each corresponding to an equal share of ownership. If an individual seeks to control 50% of property ownership, it would be necessary and sufficient to purchase 50,000 of those tokens. A requirement for this solution to work is agreement among all parties on a point of reference for assessing the current state of ownership division. The introduction of blockchain to this framework provides a public ledger where ownership is verifiable by all parties and cannot be forged nor revoked. Users can transfer rights through explicit contractual agreements that are publicly verifiable and are free of counterparty risk. Blockchains are by design a natural fit for asset tokenization.

C.2.3. *Tokenizable Assets.* While almost anything is "tokenizable" in theory, we expect the main tokenization demand drivers to be the following categories of assets:

- **Physical Assets** - This would include types of goods such as real estate, commodities, precious metals, famous paintings and a long tail of illiquid assets.
- **Abstract Assets** - This would include the majority of investment asset classes such as stocks, bonds, investment funds, derivatives etc.

We review the advantages of tokenizing those types of assets in the following section.

C.2.4. *Advantages of Asset Tokenization.*

(1) **Reduced Geographical Barriers** - As all the relevant information and records of previous transactions are stored on a permissionless blockchain, individuals can transact from anywhere in the world.

(2) **Reduced Reliance on Middlemen** - The traditional need of a middleman trusted by involved parties to validate and facilitate transactions is eliminated thanks to the blockchain's immutability and transparency.

(3) **Enhanced Accessibility through Fractional Ownership** - Tokenization allows assets to be divided into as many units (tokens) as desired, thereby enabling wider investment participation for high-value assets such as real estate and expensive stocks. While fractional ownership for stocks is becoming increasingly popular in brokerages, it comes with operational overhead that does not exist with tokenized stocks.

(4) **Improved Asset Liquidity** - Assets that are hard to transfer/trade tend to suffer in terms of liquidity. The use of blockchain to track and transfer ownership substantially reduces friction and therefore permits higher liquidity.

(5) **Increased Transaction Efficiency** - Blockchain transactions can dramatically improve efficiency of traditional settlements by reducing time and cost. Complex transactions can be automated via smart contracts, thereby reducing legal and operational costs and minimizing the risk of disputes.

(6) **Expanded Investor Base** - Flexible fractional ownership improves access to investment opportunities by allowing investors to partake in transactions that were previously inaccessible to them due to capital or liquidity constraints.

The above is undoubtedly only a subset of the vast advantages of asset tokenization.

C.2.5. *Implementations of Asset Tokenization.* We present the two primary implementations of asset tokenization and discuss the advantages of each:

(1) **Asset-backed tokens** are tokens which are backed one-to-one by the the physical or abstract good that they represent. For instance, an asset-backed gold token representing 1 ounce of gold would need to be backed by 1 ounce of physical gold stored in a vault.

(2) **Synthetic tokens** are tokens that provide "synthetic" exposure to the physical or abstract good that they represent without requiring one-to-one backing. For instance, a synthetic gold token representing 1 ounce of gold would be exchangeable for the price of 1 ounce of physical gold. Synthetic tokens can be issued either by a centralized party, e.g. a bank whose credit "backs" the token, or a decentralized network whose incentives guarantee that the synthetic token is always exchangeable for the price of the asset it represents.

The primary advantage of asset-backed tokens is **simplicity**: the design is easy for anyone to understand, and risk is limited to the custodian - if they are trustworthy then the token should be safe to hold. Synthetic tokens can be more complicated to implement. We see a number of important advantages of synthetic vs asset-backed tokens. First, the **accessibility** afforded by tokenization is typically wider for synthetic tokens: while anybody with an internet connection can access synthetic tokens on a public blockchain, asset-backed tokens may face restrictions imposed by the custodians backing them. Second, synthetic tokens tend to be more **affordable** to hold as they typically charge no holding fee. Custodians for asset-backed tokens will typically charge custody fees which can be high, particularly for physical assets such as

gold or oil. Third, synthetic tokens provide complete **censorship resistance** which asset-backed tokens often cannot due to restrictions faced by custodians.

We see a market developing for both asset-backed tokens and synthetic tokens. Assetbacked tokens will certainly increase the transparency and liquidity of assets held by custodians, and we believe will become increasingly common. In the following section we introduce a protocol for synthetic asset tokenization, as we believe it has greater potential to democratize access to financial assets for a global audience.

C.3. **The Mirror Protocol.** Mirror unleashes the full power of asset tokenization to offer globally accessible, transparent and affordable access to financial assets.

C.3.1. *Basic Operations.* A synthetic asset issued on Mirror is said to be an mAsset. For instance, a synthetic version of real-world asset X would be called mX. The following are the main operations enabled by the Mirror Protocol:

- **Mint:** Anyone can mint an mAsset by locking up collateral, either in the form of a stablecoin or a different mAsset. The required collateral is at least a minimum multiple of the asset's value (150% for stablecoin collateral, 200% for mAsset collateral). For instance, if stock X is reported to be trading at $100, minting 1 mX would require at least $150 in stablecoin, or $200 in a different mAsset.
- **Burn:** To burn an mAsset, the issuer must burn the amount initially issued to receive the locked stablecoin collateral.
- **Trade:** mAssets are tradable on automated market makers (AMMs) on public blockchains like Terra and Ethereum, making it easy for issuers as well as investors to buy and sell them.

C.3.2. *Mirror Participants.* We expect Mirror to enable two types of markets involving different participants:

- **Minters:** Minters are those who mint mAssets and effectively take the opposite position of the asset's natural direction. For instance, an issuer of mXAU (gold) is effectively taking a short position on XAU. The minter's counterparty is the system itself.
- **Minters:** Minters are those who mint mAssets and effectively take the opposite position of the asset's natTraders: Traders are those who buy and sell mAssets on the decentralized exchanges supported by Mirror. Virtually anyone with an internet connection can gain exposure to mAssets via a Mirror-supported decentralized exchange.

The Mirror protocol creates incentives for minters to mint assets and provide liquidity for traders. We discuss those incentives in the following section.

C.3.3. *Liquidity, Governance and the Mirror Token.* The Mirror protocol utilizes AMMs (automated market makers) to facilitate mAsset trading against stablecoins. For instance, trading against an mXAU/UST pool on Uniswap would be the easiest way for a trader to get access to XAU. Minting and liquidity provision are essential services without which Mirror would not be able to function. It would therefore be natural for traders to compensate liquidity providers. To incentivize minting and liquidity provision, the Mirror protocol rewards liquidity providers with:

- **Trading Fees:** All mAsset trades that go through the AMM pay a small commission to that mAsset's liquidity providers.

- **The native Mirror Token:** Mirror defines a native token with a deterministic inflation schedule that rewards mAsset liquidity providers

In addition to providing liquidity incentives, the Mirror Token has a core governance role for the Mirror protocol. Mirror Token holders stake their tokens to vote on key issues including:

- **Whitelisting Assets:** Enabling/disabling assets that can be minted.
- **Key Parameter Changes:** Changing key protocol parameters such as the minimum collateral ratio and trading fees.

The Mirror Token is therefore foundational for the Mirror protocol, acting as both an incentive for liquidity providers and the primary governance vehicle.

C.3.4. *Oracles, Liquidations and Peg Incentives.* A critical function of the Mirror protocol is the ingestion of asset price data external to the blockchain. This is necessary for determining the amount of collateral required for minting an mAsset, and for assessing whether or not sufficient collateral is locked for existing mAssets. The protocol achieves this via an on-chain oracle similar in design to Terra's: Mirror Token holders submit votes on each asset, which the protocol aggregates to compute a median weighted by each holder's Mirror Token stake. The Mirror oracle submits prices at a high frequency to accommodate real-time pricing of exchange-traded assets.

The Mirror oracle facilitates solvency of mAssets by triggering collateral liquidations whenever the collateral ratio of an mAsset (collateral value/asset value) drops below the governance-mandated minimum. For instance, if $150 worth of stablecoin have been locked by a minter to issue an mAsset worth $90, and the minimum collateral ratio is 150%, an increase in the asset's value to $101 would trigger a liquidation. When the collateral ratio drops below the minimum, the Mirror protocol needs a way to retrieve and burn the respective mAssets. It does so by seizing a portion of the collateral and initiating an auction at a discount for anyone willing to sell the mAsset in exchange. This process is performed recursively until the collateral ratio is above the minimum threshold. The liquidation procedure implemented by Mirror for mAssets is similar to the procedure Maker implements for CDPs.

In addition, the Mirror oracle facilitates a key property of mAssets: that their onchain price is pegged to the price of the real-world assets they represent, as supplied by the oracle. This is achieved by incentives naturally created by the Mirror protocol. In particular, if the price of an mAsset trades at a discount to the oracle price, minters are incentivized to purchase and burn it, thereby profiting by paying back their debt at a discount. Conversely, if the price of an mAsset trades at a premium to the oracle price, market participants are incentivized to mint and sell it at the premium price, thereby profiting from the difference. In both cases, a drift of the mAsset's price away from the price of the real-world asset creates arbitrage that market participants will exploit until the peg is restored.

C.4. **Conclusion.** Asset tokenization on public permissionless blockchains has the potential to break down the financial and geographic barriers that hold back traditional asset classes from global accessibility. Mirror is a protocol that allows anyone to issue and trade synthetic assets that track the price of arbitrary real world assets. Mirror's wellcalibrated system of incentives creates a market for minters to safely issue synthetic assets and for traders to gain exposure to them from anywhere in the world. Mirror unleashes the full power of asset tokenization to democratize access to financial assets of all shapes and forms.

## References

[1] Abramowitz, Milton; Stegun, Irene Ann, eds. (1983) [June 1964]. "Chapter 7". Handbook of Mathematical Functions with Formulas, Graphs, and Mathematical Tables. Applied Mathematics Series. 55 (Ninth reprint with additional corrections of tenth original printing with corrections (December 1972); first ed.). Washington D.C.; New York: United States Department of Commerce, National Bureau of Standards; Dover Publications. p. 297. ISBN 978-0-486-61272-0. LCCN 64-60036. MR 0167642. LCCN 65-12253.

[2] MakerDAO. (2020). The Maker Protocol: MakerDAO's Multi-Collateral Dai (MCD) System [White paper]. MakerDAO. https://makerdao.com/en/whitepaper/.

[3] Ponciano,    J.    (2021,    May    23).    Crypto    Crash    Intensifies    As    Losses    Eclipse $1.3    Trillion    Just    Two    Weeks    After    Market's    All-Time    High.    Forbes. https://www.forbes.com/sites/jonathanponciano/2021/05/23/crypto-crash-intensifies-as-losses-eclipse-12-trillion-just-two-weeks-after-markets-all-time-high/?sh=53cd08287407.

[4] Terraform   Labs.   (2020).   Mirror:   Reflecting   Asset   Value   On-Chain   [White   paper]. https://mirror.finance/MirrorWP.pdf.

[5] Voell, Z. (2020, December 22). FTX Coinbase Futures Soar 140% in First Hour of Trading. CoinDesk. https://www.coindesk.com/ftx-coinbase-futures-trading-price-ipo.

# Exhibit E



# Luna Foundation Guard (LFG) Officially Formed as Non-Profit Organization Dedicated to Supporting The Terra Ecosystem and Open-Source Technology

*The Luna Foundation Guard (LFG) has announced its formation as a non-profit organization in Singapore supporting greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy.*

SINGAPORE (PRWEB) January 19, 2022 -- The Luna Foundation Guard (LFG), a non-profit organization based in Singapore, has announced its formation and mission objective to support and sustain the growth and development of open-source technology, facilitating the realization of a decentralized economy. The entity, whose first prerogative is to focus on building reserves to better safeguard the UST peg during adverse market conditions, and second, allocating grants funding the development of the Terra ecosystem. LFG will receive an initial gift allocation of 50 million LUNA from Terraform Labs (TFL) to launch its intended initiatives.

"The LFG mandate to continuously support the peg stability of Terra's stablecoins and ecosystem development powered by Terra's best builders offers a new pathway for the growth and sustainability of decentralized money," says Do Kwon, Co-Founder and CEO of Terraform Labs. "A decentralized economy needs decentralized money, and LFG provides another nexus of resources to achieve that goal."

Initial target areas of the LFG include driving awareness of blockchain technology, building out educational programs, allocating grants funding product development, and providing transparency to online communities about ongoing activities and projects.

LFG's cardinal focus will be the Terra economy, specifically funding DeFi projects that envelop demand for Terra's algorithmic stablecoins and pioneer the emergence of decentralized money at the base layer of an emerging DeFi technology stack. Initiatives that qualify for grants include open-source development, research and education, and community growth.

In particular, the LFG will prioritize the peg stability and sustainability of Terra's flagship stablecoin, TerraUSD (UST). The UST stablecoin is currently the 4th overall stablecoin by market cap in the crypto industry, and the market's leading decentralized stablecoin with an outstanding supply of nearly 11 billion UST.

"LFG's mission is going to reshape how the industry views algorithmic stablecoins and their long-term sustainability," says Nicholas Platias, Founder of Chronos Finance. "The LFG offers another lever for closing the demand loop of Terra stablecoins, building a vibrant economy around their usage across Web 3 applications and providing more robust peg defenses during volatility."

The LFG will be advised and overseen by an international Council and will continue to add builders to its members from the Terra ecosystem moving forward. Initially, the Council will include the industry experts and leaders below:
- Do Kwon (Co-Founder and CEO of Terraform Labs)
- Nicholas Platias (Founder of Chronos Finance)
- Kanav Kariya (President of Jump Crypto)
- Remi Tetot (Co-Founder of RealVision)
- Jonathan Caras (Project Lead at Levana Protocol)

PRWeb ebooks - Another online visibility tool from PRWeb



- Jose Maria Delgado (Co-Founder of Delphi Digital)
- Bill Chin (Head of Binance Labs Fund)

The formation of LFG represents the first step in Terra's highly anticipated {REDACTED} announcement, which has stoked interest and speculative discussions on social media over the past month. The LFG is currently seeking to hire highly motivated individuals with deep experience in the industry as it ramps up its grants framework this year. Moving forward, the LFG will serve as a hub of activity for the Terra ecosystem and beyond – reviewing proposals and allocating grants that advance its mission.

About the Luna Foundation Guard

The Luna Foundation Guard ("LFG") is a nonprofit organization dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting the research and development of various aspects enveloping open-source software and applications, the LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears* here *- PRWeb ebooks - Another* online visibility tool from PRWeb



**Contact Information**
**Nick Rodriguez**
Melrose PR
(310) 260-7901


**Online Web 2.0 Version**
You can read the online version of this press release here.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*

# Exhibit F



**LFG | Luna Foundation Guard**
@LFG_org                                                    ...

1/ As of Saturday, May 7, 2022, the Luna Foundation
Guard held a reserve consisting of the following assets:
· 80,394 $BTC
· 39,914 $BNB
· 26,281,671 $USDT
· 23,555,590 $USDC
· 1,973,554 $AVAX
· 697,344 $UST
· 1,691,261 $LUNA

9:05 AM · May 16, 2022 · Twitter Web App

**3,925** Retweets   **1,153** Quote Tweets   **12.1K** Likes



**LFG | Luna Foundation Guard** @LFG_org · May 16    ...
Replying to @LFG_org
2/ Consistent with its non-profit mission & focus on the health of the Terra
ecosystem, beginning on May 8, when the price of $UST began to drop
substantially below one dollar, the Foundation began converting this
reserve to $UST.

○ 90          �e 200          ♡ 1,477          ↑

**LFG | Luna Foundation Guard** @LFG_org · May 16    ...
3/ The Foundation did so by directly executing on-chain swaps and
transferring $BTC to a counterparty to enable them to enter trades with the
Foundation in large size & on short notice.

○ 69          �e 173          ♡ 1,178          ↑



**LFG | Luna Foundation Guard** @LFG_org · May 16                    ···
4/ LFG:
· Directly sold 26,281,671 $USDT & 23,555,590 $USDC for an aggregate
50,200,071 $UST
· Transferred 52,189 $BTC to trade with a counterparty, net of an excess of
5,313 $BTC that they have returned, for an aggregate 1,515,689,462 $UST

  ○ 187            �)⌃ 352           ♡ 1,382           ⬆

**LFG | Luna Foundation Guard** @LFG_org · May 16                    ···
5a/ On May 10, when $UST had fallen to $0.75, pursuant to a Master
Services Agreement dated January 10, 2022 through which TFL managed &
executed all finance, administrative & operational functions & support as
requested,

  ○ 31             �)⌃ 135           ♡ 925             ⬆

**LFG | Luna Foundation Guard** @LFG_org · May 16                    ···
5b/ TFL, on behalf of the Foundation, executed the following exchange
trades in a last ditch effort to defend the peg:

  ○ 35             �)⌃ 136           ♡ 879             ⬆

**LFG | Luna Foundation Guard** @LFG_org · May 16                    ···
6/ Sold 33,206 $BTC for an aggregate 1,164,018,521 $UST

  ○ 108            �)⌃ 325           ♡ 1,069           ⬆



**LFG | Luna Foundation Guard** @LFG_org · May 16      ···

7/ On May 12, LFG swapped 883,525,674 $UST to 221,021,746 $LUNA & staked this across a range of validators to protect against a possible governance attack as the amount of $LUNA continued to increase.

All transactions described above have now been completed.

○ 112          ⟲ 197          ♡ 1,117          ⬆



**LFG | Luna Foundation Guard** @LFG_org · May 16      ···

8/ As of now, the Foundation's remaining reserves consist of the following assets:
· 313 $BTC
· 39,914 $BNB
· 1,973,554 $AVAX
· 1,847,079,725 $UST
· 222,713,007 $LUNA (of which 221,021,746 is currently staked with validators)

○ 968          ⟲ 2,563          ♡ 3,632          ⬆



**LFG | Luna Foundation Guard** @LFG_org · May 16      ···

9/ All assets will be returned to wallets tagged in dashboard.lfg.org shortly - the $LUNA previously staked is unbonding, and will be returned in 20 days.



dashboard.lfg.org
LFG Reserves
Luna Foundation Guard Reserves

○ 274          ⟲ 385          ♡ 1,639          ⬆

# Exhibit G



**Terra 🌍 Powered by LUNA** 🟡 ✓
@terra_money

1/ The prevailing peg pressure on $UST from its current supply overhang is rendering severe dilution of $LUNA.

The primary obstacle is expelling the bad debt from UST circulation at a clip fast enough for the system to restore the health of on-chain spreads.

7:36 AM · May 12, 2022 · Twitter Web App

**3,370** Retweets   **415** Quote Tweets   **14K** Likes



**Terra 🌍 Powered by LUNA** 🟡 ✓
@terra_money

2/ To expedite this goal, several measures are being taken. First, the current Prop 1164 will expand the base pool size and accelerate the burn rate of UST – helping deflate on-chain spreads.

station.terra.money/proposal/1164

7:36 AM · May 12, 2022 · Twitter Web App

**252** Retweets   **8** Quote Tweets   **2,253** Likes





**Terra** 🌐 **Powered by LUNA** 🟡 ✅
@terra_money

3/ TFL is also initiating three more emergency actions:

1. Proposal to burn the remaining UST in the community pool.
2. TFL will burn the remaining 371 million UST cross-chain on Ethereum.
3. TFL just staked 240 million $LUNA to defend from network governance attacks.

7:36 AM · May 12, 2022 · Twitter Web App

367 Retweets   50 Quote Tweets   2,824 Likes



**Terra** 🌐 **Powered by LUNA** 🟡 ✅
@terra_money

4/ You can find the full Agora proposal for burning the remainder of the community pool UST in the link below, including the proposal to burn the cross-chain UST. The vote will go live shortly.



agora.terra.money
Commonwealth
Discuss, organize, and grow decentralized communities

7:36 AM · May 12, 2022 · Twitter Web App

241 Retweets   11 Quote Tweets   1,927 Likes



Terra 🌍 Powered by LUNA 🟡 ✔
@terra_money

5/ TFL will port the remainder of the UST deployed as liquidity incentives on Ethereum (371 million UST) over the past few months back to Terra and burn it all using the burn module pending the result of the governance proposal.

7:36 AM · May 12, 2022 · Twitter Web App

223 Retweets   7 Quote Tweets   1,791 Likes



Terra 🌍 Powered by LUNA 🟡 ✔
@terra_money

6/ TFL is currently exploring the best avenue to burn the remainder of its UST holdings, much of which has been accrued in recent days to absorb the sell-offs of UST in various open markets.

7:36 AM · May 12, 2022 · Twitter Web App

253 Retweets   4 Quote Tweets   1,971 Likes



Terra 🌍 Powered by LUNA 🟡 ✔
@terra_money

7/ Overall, approximately 1,388,233,195 will be eliminated from the UST supply upon executing the three proposed items above. This equates to roughly 11% of the outstanding supply.

7:36 AM · May 12, 2022 · Twitter Web App

310 Retweets   16 Quote Tweets   2,270 Likes



Terra 🌍 Powered by LUNA 🟡 ✓
@terra_money

8/ Expelling the system's bad debt with the above items should help restore the on-chain swap spreads to a meaningful level where the peg pressure on UST is significantly alleviated. Once the new base pool proposal passes, this will also expedite the process.

7:36 AM · May 12, 2022 · Twitter Web App

311 Retweets   3 Quote Tweets   2,253 Likes



Terra 🌍 Powered by LUNA 🟡 ✓
@terra_money

9/ Please note that TFL is in the war room and has been non-stop for the past four days working on solutions and potential avenues to help affected users and stop the bleeding.

Publicly, we will continue to release updates as developments unfold.

7:36 AM · May 12, 2022 · Twitter Web App

554 Retweets   26 Quote Tweets   4,499 Likes





Terra 🌏 Powered by LUNA 🟡 ✔
@terra_money

10/ Outside of Twitter, we're active with our moderators on Discord and Telegram, where you can get assistance with many of the moving parts due to the past day's events.

More to come. Please bear with us.

7:36 AM · May 12, 2022 · Twitter Web App

495 Retweets   21 Quote Tweets   3,807 Likes



Terra 🌏 Powered by LUNA 🟡 ✔
@terra_money

Please see the tweet from @LFG_org below for transparency on LFG activities & reserves



> 🌑 LFG | Luna Foundation Guard @LFG_org · May 16
> 1/ As of Saturday, May 7, 2022, the Luna Foundation Guard held a reserve consisting of the following assets:
> · 80,394 $BTC
> · 39,914 $BNB
> · 26,281,671 $USDT
> · 23,555,590 $USDC
> · 1,973,554 $AVAX
> · 697,344 $UST
> · 1,691,261 $LUNA
> Show this thread

3:22 PM · May 16, 2022 · Twitter for iPhone

2,558 Retweets   175 Quote Tweets   9,678 Likes

# Exhibit H



# Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin

*LFG has announced that it has closed a $1 billion OTC token sale for a Forex Reserve for Terra's UST stablecoin, led by Jump Crypto and Three Arrows Capital (3AC).*

SINGAPORE ([PRWEB](#)) February 22, 2022 -- [The Luna Foundation Guard](#) (LFG), a recently formed non-profit organization to support decentralization, economic sovereignty, and to foster the growth of the Terra ecosystem, has unveiled the closing of a $1B private token sale, one of the cryptocurrency industry's largest sales to-date, for use in establishing a UST Forex Reserve denominated in Bitcoin.

The sale was led by Jump Crypto and Three Arrows Capital (3AC), with participation from DeFiance Capital, Republic Capital, GSR, Tribe Capital, and many others.

The UST Forex Reserve is an initiative to provide a further layer of support using assets that are considered less correlated to the Terra ecosystem, initially with Bitcoin but with plans to expand to other major non-correlated assets within the market moving forward. The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives.

"The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST," says Kanav Kariya, President of Jump Crypto. "It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions."

As an algorithmic stablecoin, UST's peg is maintained by a series of open market operations, arbitrage incentives, and countercyclical levers within the Terra protocol to offset market forces pushing the UST peg above or below one USD. LUNA, Terra's reserve, staking, and governance asset, retains an elastic supply to help neutralize directional market pressures impacting the peg. One of the common criticisms of algorithmic stablecoins is their reflexive nature during extreme volatility, where the arbitrage incentives to bring the peg back to parity can potentially deteriorate. The UST Forex Reserve provides an additional avenue to maintain the stability of the peg in contractionary cycles that reduces the reflexivity of the system.

The UST Forex Reserve functions as a release valve for the redemptions of UST → LUNA on the Terra protocol during periods of significant UST demand contraction, offering additional pathways for arbitrage incentives to remain intact exogenous to the Terra protocol.

"With the UST Forex Reserve, the primary counter-argument for the sustainability of algorithmic stablecoins is eliminated," says Nicholas Platias, Founder of Chronos Finance. "The UST peg is supported by a pool of decentralized liquid assets, which operate as a dynamic backstop driven by a transparent mechanism design and arbitrage forces during periods of sharp UST demand contraction."

The $1 billion from the sale will initially capitalize the UST Forex Reserve, with buyers locking up the purchased LUNA over a 4-year vesting period. More details of the Reserve's function and design will be released in the coming weeks.



About Luna Foundation Guard
The Luna Foundation Guard ("LFG") is a non-profit organization dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting the research and development of various aspects enveloping open-source software and applications, the LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears* here *- PRWeb ebooks - Another* online visibility tool from PRWeb



**Contact Information**
**Nick Rodriguez**
Melrose PR
(310) 260-7901


**Online Web 2.0 Version**
You can read the online version of this press release here.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*

# Exhibit I



# LFG to Acquire $100M in AVAX to Strategically Align Terra and Avalanche Ecosystems

*The Luna Foundation Guard (LFG), a recently formed non-profit to support decentralization, economic sovereignty, and foster the growth of the Terra ecosystem, will add AVAX to its new UST Decentralized Forex Reserve.*

SINGAPORE (PRWEB) April 07, 2022 -- LFG has announced a deal with the Avalanche Foundation to acquire $100 million of the Avalanche network's native AVAX token to help bolster its UST Decentralized Forex Reserve and strategically align the two ecosystems. The move comes after the original $1 billion private token sale by LFG to bootstrap its UST Reserve with BTC – a separate transaction announced last month.

The LFG and the Avalanche Foundation agreement is for an OTC token purchase of $100 million in AVAX, which will add AVAX as the second non-correlated asset in the UST Reserve after BTC. The Avalanche Foundation will receive UST in return.

"The premise of the UST Reserve is to provide a backstop against UST peg deviations in instances of sharp contractions of UST demand exogenous to Terra's algorithmic model," says Nick Platias, a Governing Council Member of LFG. "By diversifying the base of non-correlated assets to major assets like BTC and AVAX, the UST Reserve offers a more robust asset pool to defend against volatility and alleviate pressure on the Terra protocol's open market arbitrage incentives."

Avalanche users will be able to swap UST for AVAX on-chain on Avalanche, meaning they will have a fully native experience interacting with UST swaps directly with the primary asset (i.e., AVAX) on the Avalanche network. AVAX is the first non-BTC asset to be added to the UST Reserve, a key step marking the collaboration between the Terra and Avalanche communities.

"We are thrilled that our partners at LFG will be adding AVAX to their fast-growing UST reserve," said Emin Gün Sirer, director of the Avalanche Foundation. "Decentralized stablecoins like UST are proving vital to crypto ecosystems, and AVAX provides a great reserve asset next to BTC. We also look forward to collaborating on projects that will continue to grow both the Terra and Avalanche ecosystems."

Moving forward, several applications natively built on Terra will be launching native versions on Avalanche as part of the ongoing collaboration. The first example is Anchor Protocol, Terra's flagship money market and savings protocol with more than $19.4 billion in TVL, which recently launched xAnchor – a cross-chain implementation of Anchor on other major layer ones, beginning with the Avalanche version that is already live.

Further details of AVAX's inclusion in the UST Reserve, such as the precise mechanism of the UST Reserve functions, plans for provisioning more AVAX to the UST Reserve, and the UI flow for Avalanche users, will be released at a later date.

About the LFG
The Luna Foundation Guard ("LFG") is a non-profit organization dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting



the research and development of various aspects enveloping open-source software and applications, LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.

About Avalanche
Avalanche is the fastest smart contracts platform in the blockchain industry, as measured by time-to-finality, and has the most validators securing its activity of any proof-of-stake protocol. Avalanche is blazingly fast, low cost, and green. Any smart contract-enabled application can outperform its competition by deploying on Avalanche. Don't believe it? Try Avalanche today. https://www.avax.network/

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*



**Contact Information**
**Sarah Cohen**
Melrose PR
310-260-7901


**Online Web 2.0 Version**
You can read the online version of this press release here.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*

# Exhibit J

## Speech

# Digital Asset Transactions: When Howey Met Gary (Plastic)



**William Hinman**
*Director, Division of Corporation Finance*

**San Francisco, CA**

**June 14, 2018**

## Remarks at the Yahoo Finance All Markets Summit: Crypto

Thank you Andy. I am pleased to be here today.[1] This event provides a great opportunity to address a topic that is the subject of considerable debate in the press and in the crypto-community – whether a digital asset offered as a security can, over time, become something other than a security.[2]

To start, we should frame the question differently and focus not on the digital asset itself, but on the circumstances surrounding the digital asset and the manner in which it is sold. To that end, a better line of inquiry is: "Can a digital asset that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?" In cases where the digital asset represents a set of rights that gives the holder a financial interest in an enterprise, the answer is likely "no." In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "token," will not take it out of the purview of the U.S. securities laws.

But what about cases where there is no longer any central enterprise being invested in or where the digital asset is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes." I would like to share my thinking with you today about the circumstances under which that could occur.

Before I turn to the securities law analysis, let me share what I believe may be most exciting about distributed ledger technology – that is, the potential to share information, transfer value, and record transactions in a decentralized digital environment. Potential applications include supply chain management, intellectual property rights licensing, stock ownership transfers and countless others. There is real value in creating applications that can be accessed and executed electronically with a public, immutable record and without the need for a trusted third party to verify transactions. Some people believe that this technology will transform e-commerce as we know it. There is excitement and a great deal of speculative interest around this new technology. Unfortunately, there also are cases of fraud. In many regards, it is still "early days."

But I am not here to discuss the promise of technology – there are many in attendance and speaking here today that can do a much better job of that. I would like to focus on the application of the federal securities laws to digital asset transactions – that is how tokens and coins are being issued, distributed and sold. While perhaps a bit dryer

Case 5:22-cv-03600-PCP  Document 122-2  Filed 05/08/23  Page 77 of 350

than the promise of the blockchain, this topic is critical to the broader acceptance and use of these novel instruments.

I will begin by describing what I often see. Promoters,[3] in order to raise money to develop networks on which digital assets will operate, often sell the tokens or coins rather than sell shares, issue notes or obtain bank financing. But, in many cases, the economic substance is the same as a conventional securities offering. Funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the promoters create something of value with the proceeds and the value of the digital enterprise increases.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in *SEC v. Howey*.[4] That test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of *Howey*. A hotel operator sold interests in a citrus grove to its guests and claimed it was selling real estate, not securities. While the transaction was recorded as a real estate sale, it also included a service contract to cultivate and harvest the oranges. The purchasers could have arranged to service the grove themselves but, in fact, most were passive, relying on the efforts of Howey-in-the-Hills Service, Inc. for a return. In articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed upon economic reality."[5] So the purported real estate purchase was found to be an investment contract – an investment in orange groves was in these circumstances an investment in a security.

Just as in the *Howey* case, tokens and coins are often touted as assets that have a use in their own right, coupled with a promise that the assets will be cultivated in a way that will cause them to grow in value, to be sold later at a profit. And, as in *Howey* – where interests in the groves were sold to hotel guests, not farmers – tokens and coins typically are sold to a wide audience rather than to persons who are likely to use them on the network.

In the ICOs I have seen, overwhelmingly, promoters tout their ability to create an innovative application of blockchain technology. Like in *Howey*, the investors are passive. Marketing efforts are rarely narrowly targeted to token users. And typically at the outset, the business model and very viability of the application is still uncertain. The purchaser usually has no choice but to rely on the efforts of the promoter to build the network and make the enterprise a success. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as a coin or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, some believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labeling might have been used to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of that sizzle may now be more of a potential warning flare for investors.

Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. The digital assets are then exchanged – for some, to help find the market price for the new application; for others, to speculate on the venture. As I will discuss, whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer. This

allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in, it is probably not a security.[6] But under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, if the housing unit is offered with a management contract or other services, it can be a security.[7] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument can be part of an investment contract that is a security.[8]

The same reasoning applies to digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop the enterprise – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need to make an informed investment decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosures required under the federal securities laws nicely complement the *Howey* investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake and so forth – is a prerequisite to making an informed investment decision. Without a regulatory framework that promotes disclosure of what the third party alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception. Applying the disclosure regime of the federal securities laws to the offer and resale of Bitcoin would seem to add little value.[9] And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value. Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.

I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument.[10] Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security. Similarly, investment

contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[11] I recognize that the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[12] But, the economic substance of the transaction always determines the legal analysis, not the labels.[13] The oranges in *Howey* had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[14] Promoters sold the receipts to U.S. investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments, and the purchasers were expecting a return from the promoters' efforts.

Promoters and other market participants need to understand whether transactions in a particular digital asset involve the sale of a security. We are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no-action guidance about the proper characterization of a digital asset in a proposed use.[15] In addition, we recognize that there are numerous implications under the federal securities laws of a particular asset being considered a security. For example, our Divisions of Trading and Markets and Investment Management are focused on such issues as broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation. We understand that market participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, consider whether a third party – be it a person, entity or coordinated group of actors – drives the expectation of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

3. Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

4. Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

5. Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?

6. Do persons or entities other than the promoter exercise governance rights or meaningful influence?

While these factors are important in analyzing the role of any third party, there are contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security. Again, we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other,

possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2. Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?

3. Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?

4. Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?

5. Is the asset marketed and distributed to potential users or the general public?

6. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

7. Is the application fully functioning or in early stages of development?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

---

[1] The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner. This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff.

[2] Section 2(a)(1) of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78c(a)(10)] define "security." These definitions contain "slightly different formulations" of the term "security," but the U.S. Supreme Court has "treated [them] as essentially identical in meaning." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[3] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" see 5 U.S.C. § 77n(a)(4)) that is working actively to develop or guide the development of the infrastructure of the network. This person or group could be founders, sponsors, developers or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

[4] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Depending on the features of any given instrument and the surrounding facts, it may also need to be evaluated as a possible security under the general definition of security – see footnote 2 – and the case law interpreting it.

[5] *Id.* at 298.

[6] *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975).

[7] *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, SEC Rel. No. 33-5347 (Jan. 4, 1973).

[8] *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985).

[9] Secondary trading in digital assets by regulated entities may otherwise implicate the federal securities laws, as well as the Commodity Exchange Act. In addition, as SEC Chairman Jay Clayton has stated, regulated financial entities that allow for payment in cryptocurrencies, allow customers to purchase cryptocurrencies on margin or otherwise use cryptocurrencies to facilitate securities transactions should exercise caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations. *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017). In addition, other laws and regulations, such as IRS regulations and state money servicing laws, may be implicated.

[10] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

[11] "[T]he name given to an instrument is not dispositive." *Forman*, 421 U.S. at 850.

[12] *Forman*, 421 U.S. at 853.

[13] *See* footnotes 10 and 11.

[14] SEC Rel. No. 33-5018 (Nov. 4, 1969); *Investment in Interests in Whisky*, SEC Rel. No. 33-5451 (Jan 7, 1974).

[15] For example, some have raised questions about the offering structure commonly referred to as a Simple Agreement for Future Tokens, or "SAFT." Because the legal analysis must follow the economic realities of the particular facts of an offering, it may not be fruitful to debate a hypothetical structure in the abstract and nothing in these remarks is meant to opine on the legality or appropriateness of a SAFT. From the discussion in this speech, however, it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction. I expect that some, perhaps many, may not. I encourage anyone that has questions on a particular SAFT structure to consult with knowledgeable securities counsel or the staff.

# Exhibit K



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF
THE CHAIRMAN

March 7, 2019

The Honorable Ted Budd
U.S. House of Representatives
118 Cannon House Office Building
Washington, DC  20515

Dear Representative Budd:

Thank you for your October 1, 2018 letter regarding the application of the federal securities laws to digital assets.  The SEC has been focusing a significant amount of attention and resources on digital assets and initial coin offerings (ICOs).  Overall, I believe we have taken a balanced regulatory approach that fosters responsible innovation in this area, while also protecting investors and the markets.

Your letter urges the Commission to clarify the criteria used to determine whether a digital token is offered or sold as an investment contract, and therefore is an offer or sale of a security.  As the Commission stated in the July 2017 Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (DAO Report), whether a particular transaction involves the offer and sale of a security—regardless of the terminology used to identify the digital asset—will depend on the facts and circumstances, including the economic realities of the transaction.

Generally, we look at whether the digital asset fits the definition of a security as set forth in the federal securities laws.  The Securities Act of 1933 and the Securities Exchange Act of 1934 define "security" broadly to encompass virtually any instrument that may be sold as an investment.   We also apply tests developed through case law, including the well-established "investment contract" test articulated by the Supreme Court in *SEC v. Howey* and its progeny, including *United Housing Found., Inc. v. Forman*.  As those cases explain, the "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  The determination of whether a digital asset is an "investment contract" depends on the application of *Howey* and its progeny to the particular facts and circumstances of the digital asset transaction.

I believe that the Commission has been transparent with the criteria used to determine whether a digital asset is offered or sold as an investment contract.  The DAO Report included detailed legal analysis applying *Howey* to the facts and circumstances specific to the DAO tokens.  Additionally, as your letter notes, Bill Hinman, the Director of the Division of Corporation Finance, delivered a speech in June 2018 that outlined factors for market participants to consider when evaluating whether a digital asset is a security.  Moreover, in November 2018, the Divisions of Corporation Finance, Investment Management, and Trading

The Honorable Ted Budd
Page 2

and Markets issued a statement on digital assets issuance and trading, which included details about how a company that conducted an unregistered securities offering through an ICO might remediate and move forward.

At the same time, I understand the desire for further dialogue on the subject. The Commission and its staff actively engage with innovators, developers and entrepreneurs in the field of distributed ledger technology. Issuing public statements on the subject is an important part of that engagement, and I, along with Commission staff, have issued statements, delivered speeches, and provided Congressional testimony, which can be found at www.sec.gov/ICO. The staff also is developing additional guidance designed to aid participants in determining whether a digital asset is offered or sold as a security.

Your letter also asks whether I agree with certain statements concerning digital tokens in Director Hinman's June 2018 speech. I agree that the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument. A digital asset may be offered and sold initially as a security because it meets the definition of an investment contract, but that designation may change over time if the digital asset later is offered and sold in such a way that it will no longer meet that definition. I agree with Director Hinman's explanation of how a digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts. Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework.

Lastly, the SEC has implemented a number of initiatives designed to aid innovators, including those in the distributed ledger technology space. In October 2018, the SEC announced the formation of the Strategic Hub for Innovation and Financial Technology (FinHub), which serves as a public resource for FinTech-related issues at the SEC, including matters dealing with distributed ledger technology. The FinHub provides a portal for industry and the public to engage directly with SEC staff on innovative ideas and technological developments. Additionally, the FinHub is a warehouse of information regarding the SEC's activities and initiatives involving FinTech and will serve as a platform and clearinghouse for SEC staff to acquire and disseminate information and FinTech-related knowledge within the agency. The FinHub replaced and built upon the work of several internal working groups at the SEC that have been focused on similar issues for some time and were similarly engaging with the public.

In addition to statements, testimony, speeches, and the DAO Report, the SEC has sought to educate investors on ICOs through a number of Investor Bulletins warning of the risks of such investments, as well as through our "launch" of "HoweyCoins.com"—a mock ICO website design to attract potential investors and direct them to the SEC's educational materials. We have published a collection of these materials at investor.gov, on a spotlight page for ICOs and digital assets.

As these initiatives demonstrate, the Commission's efforts to address the application of the federal securities laws to the offer and sale of digital assets have not been limited to

The Honorable Ted Budd
Page 3

enforcement actions.  Unfortunately, while some market participants have engaged with our staff constructively and in good faith with questions about the application of our federal securities laws, others have sought to prey on investors' excitement about cryptocurrencies and ICOs to commit fraud or other violations of the federal securities laws.  The Division of Enforcement has brought a number of important cases in this area, and I have asked the Division's leadership to continue to police these markets vigorously and recommend enforcement actions against those who conduct ICOs or engage in other actions relating to digital assets in violation of the federal securities laws.  The Commission acted swiftly to crack down on allegedly fraudulent activity in this space, particularly where the misconduct has targeted Main Street investors.  Regardless of the promise of distributed ledger technology, those who invest their hard-earned money in opportunities that fall within the scope of the federal securities laws deserve the full protections afforded under those laws.

Thank you again for your letter.  Please do not hesitate to contact me at (202) 551-2100, or have a member of your staff contact Bryan Wood, Director of the Office of Legislative and Intergovernmental Affairs, at (202) 551-2010, if you have any questions or comments.

Sincerely,

Jay Clayton
Chairman

# Exhibit L



Open in app ↗

Sign up    Sign In

🔍 Search Medium

Remi Tetot    Follow

Jun 2 · 8 min read · ▶ Listen

🔖 Save    🐦  📘  in  🔗

# Luna — The fall of a giant

My personal post-mortem analysis



*Before going into this, I want to clarify that this is my personal opinion; I am trying to be as clear as possible, but my emotions are strong, so it might feel messy sometimes; I apologize for this in advance if this* 👏 338 | 💬 2 *icle is meant to acknowledge why*

*own mistakes along the Luna journey, not to put the blame on anyone or analyze TFL or LFG actions during the collapse.*

It has been more than three weeks since Luna/UST started to collapse and spiral into death.

This collapse was one of the most violent collapses in a long time, only comparable to Lehman's collapse in 2008!

Like I said before, my entire crypto portfolio was into Luna, and I watched it melt from 8 digits to 0.

I am certainly not trying to be a victim here, so there is no need to feel sorry for me; I knew the risks, played, and lost.

Nevertheless, the entire saga has been depressing and broke me down. My confidence is gone, and it will take time to rebuild myself (which I explain below).

In retrospect, I realize how much I have been vocal about Luna, maybe too much, but I never "shilled" to pump my bags, as Maxis insinuated.

I believed in the project; I resigned from my ten-year-old job to join builders and make a difference (This is how much I believed in it!).

I became bullish on Luna when I wrote my thesis (35 pages!) in October 2021 (lune price was $37 back then); I did a lot of research and must have interviewed at least twenty people (builders, analysts, community members, etc.) to form an educated opinion about it.

The risks were clear, de-peg, and death spiral; it happened in May 2021, but while interviewing people, I realized that many smart developers were working on different systems to minimize the risks Unfortunately, it still happened!

When you look back on things, everything is always obvious, but when you are in the middle of it, your bias might blind you from time to time; I have to admit that it happened to me.

I became a full-time Lunatic, it was fun, and the community was vibrant and smart but sometimes a little too loud (and we can say disrespectful). After the repeated attacks from other communities, Lunatics (including myself) became over defensive and even aggressive at times, making us deaf when people constantly Fud about it, and ignoring valid weaknesses.

I always say that the delivery of a message is as important as the message itself; sometimes, that was the case.

We were arrogant, and this is why so many people cheered during Luna's collapse; that was our price to pay as a community. Seeing so many people happy about Luna's collapse made me realize that we have done that to ourselves; I am not the kind of person that enjoys other's misery, so I found all this very sad, and it helped me to understand the role I played in this, I regret it, I remember having a chat with José Maria Macedo, he was so adamant that Lunatics should tone down and stop to fight so much...he was dead spot on.

**Lesson 1: We were too arrogant and cocky as a community, making too many enemies along the way.**

While people were constantly pointing out Luna/ust weaknesses, they were bluntly ignoring everything being worked on to fix these weaknesses.

They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%. Unfortunately, It didn't have time to make it...

20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't sustainable, but I think it was acceptable for the time being, yield should have been dynamic as the system grow.

**Side note: There is some irony to hear Ethereum maxi calling Luna a Ponzi when literally so many ponziesque protocols were launched on Ethereum...but hey, it inflated ETH demand (i.e. price), so I guess it was tolerable then...**

Looking back at it, the 20% yield was a mistake because it increased UST demand too quickly, and the defence mechanisms were not scaling at the same pace or were not

ready yet (BTC Reserves, 4Pool); that growth didn't give time to the system to adjust accordingly and increased weaknesses.

I was too confident in 4Pool and BTC reserves; while the strategic moves were made, they were not technically ready, leaving room for what happened.

**Lesson 2: We (as a community) should have worked on a yield adjusting system much earlier.**

The value proposition of Terra was UST; I found the narrative of a decentralized stable coin very appealing and, more importantly, needed so that crypto could be censorship-resistant.

I had my concerns about a pure algo stable coin, but as collateral like BTC was added, and more work was being done to make it safe, I felt more and more confident, clearly I was wrong.

I have been thinking about the algo mechanism for weeks now, and I don't believe that a pure algo stablecoin will ever work because the mechanism relies on human behaviour (i.e. human greed & fear).

Using bitcoin as collateral means, it will need to be overcollateralized due to volatility in bitcoin price.

Using USDC or USDT as collateral means that it is exposed to censorship.

Currently, there is no decentralized stablecoin model that is efficient or scalable. However, it doesn't mean that there will never be one.

**Lesson 3: Algo stablecoins will not succeed in their current form, because the actual collateral is human behaviour.**

Like I said earlier, I was very vocal about Luna, and became an easy target once Luna crashed, and to be fair I earned it, so no hard feeling about it.

I have been criticized for my sizing and how I was all in.

I saw an opportunity in Luna, one that had asymmetric rewards it if works, so I decided to make a concentrated bet on it; this is the kind of bet to create real generational wealth; this was my high conviction bet, and it worked as I did 5X during a bear market (using leverage)...unfortunately it failed epically after...

In the past two years, I had four convictions bets (that I shared on Twitter) that would have created decent profits if managed well.

1. I was long Ethereum at $233 in May 2020...peaked at $4,815

2. I was long NXM in August 2020 in the $30s, ended up going to $75 before correcting and rallying back to $150 the year after...and more after.

3. I was long RUNE at $3 in January 2021...peaked above $22... before crashing...

4. I was long $luna at $37 (I was late to the party)...peaked at $122

While I nailed my analysis and entry prices, I didn't manage my positions well, especially the first three times, so I went for it with solid conviction and size when I saw Luna's opportunity, and this time greed got in the way and I failed to manage it well, like the previous three, although being part of the community, it was almost impossible to take profit yet, it didn't feel morally right.

One of the reasons for my mismanagement was that every single time I tried to be part of the community so I could help the projects I believed in, I ended up emotionally attached to my bags, which got in the way when there was any correction and I ended up going down with the ship every single time! (Except for Ethereum, I was new, I simply fucked up the trade although I had my strategy designed in advance, I got lost in DeFi summer...)

I also realized that if people rely on my work to enter a position, they will also depend on my work to manage or exit the same position, which is not right.

So many people were grateful when Luna was going up to $120, the same people who lost it all once Luna was worth pennies, this shows that risk management is critical, and people to be taught how to manage risks.

I don't have the same risk tolerance as smaller investors, yet reading all the heartbreaking stories about Luna/ust fall, It looks like many people put all their savings or took debt to participate in Anchor, which is insane, crypto is very risky and I would never recommend such behaviour (and never have!).

Risk management is very important and seems to be ignored too much in crypto, while analysing my failures I came up with a few ideas to avoid repeating them:

1. Take my initial out after 3 or 4X (based on market dynamic) — On a big position

2. I will not let greed and emotions take over my investment strategy

3. I will not use leverage again (or on a very short timeframe)

4. Diversify and always have some Bitcoin or Ethereum

5. Use stops on CEX, ie once my position is up add a stop loss to protect my gain in case of correction (although this one is tricky because crypto can be very volatile) — I would say this one is for my daily trading strategy.

**Lesson 4: As appealing as a project can be, it will "only" be a trade for me going forward. I will not share my positions publicly, recommend a project or join a community.**

**Side note:** Because of my involvement with the community, I got proposed to join LFG as an adviser.

**I will not comment on LFG, as there are still legal implications to clear.**

I have some serious PTSD about crypto right now, but I am trying to rebuild myself, and I will need to take some time off for that, I need to finalize my transition out of GMI first.

I hope people affected by this collapse will be resilient enough to find the path to recovery, nobody deserved what happened.

As of Terra 2, unless there is some real value proposition, I am not interested and will not invest in it (I am already stuck with a lot of vesting Luna coming in 2 years); also,

let's not forget about the coming lawsuits and class actions against TFL (this could affect Luna price action).

However, I believe that if builders find the right concept, Terra 2 could surprise more than one person and rise again. It will take time to gain confidence again, but greed is strong, and if there is an opportunity, you can be sure that people will come back and invest in it.

The path to redemption is possible but will be complicated and while people hate Do and TFL and choose them as scapegoats, let's not forget all the builders and people working on making Terra 2 great again; with the right product, they deserve a chance.

**Remember that crypto is still at an experimental phase and that it is very risky to participate. Only invest money you can afford to lose, do not take debt, max up credit cards or remortgage your property to invest in crypto, and finally have a strategy with return goals and stick to it.**

About    Help    Terms    Privacy

Get the Medium app

 

# Exhibit M

 **LUNC DAO** @LUNCDAO

Oct 23 · 26 tweets · LUNCDAO/status/1584129107201118208

1/ Q "Why do you support $LUNA?"

Many people urgently need to understand $LUNA, enough is enough

I was a $LUNA community member for 2 years and lost millions of dollars in May. If anyone is motivated to blame, it's people like me who lost the most

RT SO EVERYONE CAN LEARN

2/ But during our entire time in the community, we never saw anything indicating fraud or bad intentions

We all understood that it was an ambitious project aiming to solve a huge problem: to make $UST the decentralized money forming the foundation of decentralized web3 economies

3/ Why was this important?

Because:
- economies need stable money. Nobody wants to pay or be paid in an asset that can halve / double in value next week
- centralized stablecoins like $USDC/ $USTD can be frozen and blacklisted by governments. They inherit the risks of fiat money

4/ This is the highest vision of crypto that unites everyone here: complete financial sovereignty

$UST as money was intended to be a stable medium of exchange and store of value— that would ultimately be free of all centralized control, censorship, and regulation

5/ The deep importance of this dream was why so many intelligent people united behind it

The $LUNA community was composed of many of the smartest people I've ever met. We were not easily fooled. The tokenomics + blockchain data was there for all to see

We understood the risks

6/ The "death spiral" / bank run risk of failure was known by everyone and repeated consistently over time. $LUNA was referred to as an experiment by Do Kwon in interviews again and again

Risks are also implicit: it was a new model / financial primitive in a decade-old domain

7/ It was not that we thought there were no risks

It's that we considered the potential upside worth the risk of failure: if $UST could have captured the multi-trillion dollar future stablecoin market, then this value would accrued to $LUNA, giving an almost unfathomable upside

8/ Many in the old community did develop an almost religious conviction + started to believe it was too big to fail

There was heartbreak and suffering— but after the dust settled, also a sober recognition that both the upside + catastrophic risk of failure were clearly explained

9/ Innovation and technological progress is very risky

If you want to take giant leaps forward, you are by definition going to be open to giant risks of failure

At the level of individual crypto investors, there simply are no 1000X upsides without cataclysmic risks of failure

10/ It's very funny when people run to regulators / the law only when things fail

Those demanding compensation needs to ask themselves: if $LUNA had reached $10K, would they have donated 95% of their profits to TFL/Do Kwon?

I don't think so: you accept the risk/reward going in

11/ After the crash and massive losses, the $LUNA Community was faced with the challenge of how to rebuild themselves

The first misunderstanding is that the old $LUNA community could have rebuilt themselves with $LUNC, or that Do Kwon/TFL somehow "abandoned" the $LUNC community

12/ This narrative is one of the common falsehoods circulating twitter. It's also the most heartless + dumb

Understand: we lost everything

If someone had 50,000 $LUNA staked at peak of $119, they had ~$6M USD

50,000 $LUNA, AKA now $LUNC, is worth $11 USD. Even after a 10X gain

13/ The old community never had any hope to rebuild their holdings in $LUNC because they lost everything

Someone new could buy what was $6M worth of $LUNA for $1 in May

The only way to preserve the community was to create a new chain that fairly reflected the prior distribution

14/ of wealth prior to the crash, as well rewarded those who believed enough (at peak FUD) to buy into the airdrop snapshot for post-crash holders

There was no better solution

The second thing to understand is that this doesn't have anything to do with the potential in $LUNC

15/ The entire reason I started the $LUNC revival movement by initiating $LUNC burning in May is because I deeply believed in the potential of the chain

Read my message to others now on the $LINC DAO team from May 23rd, just after the crash

We worked to make my vision a reality



16/ Fundamentally, I believed:

A) That $LUNC had tremendous value + was woefully undervalued at <$200M MCap. This was true. The exact valuation now depends on factors like Terra Rebels ability to organize themselves

B) $LUNA is the hope for the heartbroken community to rebuild

17/ Please fully understand this and do not confuse the 2 points

There is no "abandonment"

There is no "war". $LUNA is not in competition to $LUNC

It's the community of people who lost the most time, money and emotional investment in building + investing in what is now $LUNC

18/ When you are antagonistic and express contempt for $LUNA, you are attacking those who suffered the most by far, for doing what was the 100% logical/only choice to create a new blockchain that preserved the old community

It's extremely stupid and heartless to think otherwise

19/ Unfortunately, a lot of the attitudes now prevalent on Twitter have been perpetuated by (1) liars like FatMan (2) bots funded by shorters (3) low quality journalism without fact checking and (4) the human sheep who believe anything they read, despite doing no actual research

20/ After the crash, it was interesting to watch an assortment of engagement farmers like FatMan turn up:

- Claiming he had information that nobody else did
- Promising everyone compensation for huge losses
- Making categorical judgments of criminality prior to any legal process

21/ Guess what drives engagement and gets you followers when people are heartbroken and emotional?

Claiming certainty and promising them the return of funds

He proceeded to get 100K followers overnight by manipulating people's emotions with low effort unsubstantiated rhetoric

22/ Fortunately, people are now realizing how much he lied to get engagement, grift and scam everyone. E.g.

- In creating a $LUNA validator to profit from his following (fortunately, it failed)

- Scamming victims out of $100K (no proof he returned any of the funds he scammed)

 



23/ Sadly, the lies of this person and other cockroaches still proliferate through twitter

They have been recycled by low quality media sites intent to maximize engagement

And even given reputable platforms like @CoinDesk + @laurashin no matter how baseless the content has been

24/ In the end, the truth always comes out. The problem is only that people are scarcely willing to hear it when they are entrenched in judgments on the basis of lies they've swallowed

Do Kwon's real fight now is with the average level of human intelligence: failure is not fraud

25/ We've also lost 50% of potential stakers due to speaking the truth. When I mention $LUNA, people say "HoW cAn YoU sUpPorT tHaT sCaM i Am UnStAkIng"

But I will always choose the truth over popularity and profit:

Long term, I believe both $LUNA and $LUNC can thrive together

@threadreaderapp unroll

. . .

# Exhibit N

Ad by CRITEO

Report this ad

Ad choices ▷

**Do Kwon** 🌕

Follow @stablekwon · 1.04M followers

Nov 16 · 13 tweets · 3 min read

Bookmark    Save as PDF    + My Authors

## 1/ A third party audit of LFG and TFL's peg defense activity during May 2022 has been published:

Unroll available on Thread Reader



**LFG | Luna Foundation Guard**
@LFG_org · Follow

1/ Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022.

4:08 AM · Nov 16, 2022

Read the full conversation on Twitter

♥ 1.9K    💬 Reply    ⬆ Share

Read 297 replies

2/ Before we get into the audit,

Many of you lost a lot of money in UST - for this I am sorry. While the system was transparent and open source, _I_ as its creator should have understood and communicated its risks better.

3/ I believed that the most important use case of crypto is to become decentralized money that transcends politics and nation states.

I still believe this today (what is DeFi with centralized money?) - and I hope others succeed in this mission where we have failed.

Follow Us on Twitter!    Tweet    Share

Ad by CRITEO

Report this ad

Ad choices ▷

4/ UST was my life's work - this combined with seeing it gain more lindy effects and holders every day and eventually become one of the largest cryptos by market cap blinded me to its potential risks and focused me on what seemed like its inevitable rise.

5/ There are rumors of certain currently beleaguered agents "causing" the UST depeg - on this, while I hope more facts come out over the next few months, ultimately it doesn't matter.

The decentralized money of the future should be able to withstand all possible attacks.

6/ While I was wrong (and terribly so), I maintain there was no fraud.

TFL donated what was then >$3B to establish @LFG_org to diversify UST's collateral backing, and focused our investments to grow Terra's ecosystem.

We wouldn't have done this if we thought UST were to fail.

7/ The audit report published by JS Held today addresses many of the allegations around the use of LFG's funds, primarily:

- Were there any misuse of funds? (embezzlement, insider benefit etc)
- Did LFG have any other funds not publicly disclosed? And were those funds frozen?

Ad by CRITEO

Report this ad

Ad choices ▷

8/ The audit concluded that:

▪️ LFG spent $2.8B (80,081 $BTC and 49.8M in stablecoins) to defend $UST's peg, consistent with LFG's tweets on May 16th, 2022

▪️ Additionally, TFL went above and beyond and spent $613M of its own capital to defend the $UST peg

9/ The report shows that all LFG funds were spent to defend $UST's peg parity with the Dollar as declared, and that LFG's remaining balances are the only funds remaining.

🐦 Follow Us on Twitter!

🐦 Tweet    f Share

11/ So why does this even matter?

It is natural to suspect fraud when something goes wrong, but if we sweep all failures in crypto as scams and say, "there are some bad apples but everything else is fine", then we never have opportunities to learn from our mistakes.

12/ Terra was not a centralized platform gone bust through misuse of funds or fraud - it was one of the largest layer 1 blockchains, with two native assets in the CMC top 10.

How to prevent other failures like it will take more than anger and sweeping bans of similar protocols.



← Ad by CRITEO

Report this ad

Ad choices ▷

13/ For those of you whose minds I have not been able to change, I accept your judgement.

I continue to think about learnings in #12 and apply it to the systems I work on. Hopefully we can find ways to understand each other at some point.

• • •

Missing some Tweet in this thread? You can try to force a refresh

Tweet    Share    Email



⚡ Keep Current with Do Kwon 🌕

Stay in touch and get notified when new unrolls are available from this author!

+ Add to "My Authors"    Read all threads



🚫 This Thread may be Removed Anytime!

Twitter may remove this content at anytime! Save it as PDF for later use!

Save this thread as PDF

## Try unrolling a thread yourself!



1. Follow @ThreadReaderApp to mention us!

2. From a Twitter thread mention us with a keyword "unroll"

@threadreaderapp unroll


Follow Us on Twitter!

Tweet    Share

# Exhibit O

**FatMan#7712**  7/26/2022 6:53:39 AM

Sign up for the Scott+Scott class action lawsuit here: https://scott-scott.com/cryptocurrency-cases/terra-ust-luna/

@here

The Scott+Scott class action will act as a general catch-all action that all UST victims should join regardless of where you bought your UST from, as it is against Terraform Labs et al.

Terra – UST/LUNA

# Exhibit P




**FatMan#7712**  9/2/2022 9:10:07 AM

Scott+Scott will be working under them



**FatMan#7712** 9/2/2022 9:10:01 AM

Roche Freedman filed for lead in the US Terra case and won since they had a higher claims figure

# Exhibit Q



**FatMan#7712** 1/13/2023 5:04:32 AM

Patterson was the lead plaintiff of the Scott+Scott action. Rosen sniped lead for that case by coming in with a plaintiff that had a larger claim. Unfortunately that was out of our control.

# Exhibit R

ghostizbud#6061   1/4/2023 12:09:41 PM
Here you are! Here is the email I got from Sean, Scott + Scott on July 5, well after the filing. I blurred my name, though most know it already.

Case 5:22-cv-03600-PCP   Document 122-2   Filed 05/08/23   Page 113 of 350

**SM**   **Sean Masson**                                              July 5, 2022 at 17:31

RE: External: Re: Good news, you are eligible to join the Terra-UST/LUNA claim

To:    Cc: John Jasnoch                                **Details**

Hi 

Thanks for reaching out. I'm not sure what the UST Restitution Group is or who its members are, but their concern is unfounded. And, frankly, the criticism of Nick Patterson is unfair. He was the one who initially stepped up, filing the broadest case possible to both preserve everyone's claims and cover everyone's losses. In my opinion, Terra investors should be grateful for what he has done to recover funds for the class. Any issues with the facts, claims, time period, etc will all be fixed in the Amended Complaint. It was most important for us to get on file quickly so that defendants could not run and hide. And good thing that we filed our case before Three Arrows filed for bankruptcy. Now the class at least has the chance of being an actual creditor in that bankruptcy instead of just sitting on the outside looking in.

With all that said, Mr. Patterson will likely not be submitted as the "lead plaintiff," since that is determined by the court solely on whoever has the largest losses. We knew this going into it and already have someone else with very significant losses that we plan to submit as the lead when the time comes. However, we are still interested in speaking with investors that have *8 figure losses or higher*. To the extent that anyone in your group fits those criteria, please feel free to have them contact me directly to discuss the possibility of them serving as lead plaintiff. Thanks!

Best,
Sean



**Sean Masson,** Attorney
212.519.0522
smasson@scott-scott.com
www.scott-scott.com
The Helmsley Building + 230 Park Avenue, 17th Fl
New York, NY 10169

NEW YORK+LONDON+AMSTERDAM+BERLIN+CALIFORNIA+CONNECTICUT+VIRGINIA+OHIO+ARIZONA

This e-mail may contain confidential or privileged information. If you believe you have received it in error, please notify the sender immediately and delete this message without copying or disclosing it.

# Exhibit S

**FatMan#7712**   7/25/2022 12:44:02 PM

We are looking for lead plaintiffs for our lawsuit against Terraform Labs. These plaintiffs will be representing our class.

Requirements:
- Must have suffered a loss due to the UST depeg
- Must have bought UST *before* the depeg
- [Important] Must have a high loss amount (at least $1.5m)
- Must be willing to be interviewed or to have a call with the legal team
- Must be willing to have their name on court documents
- Must have a clean background (no fraud convictions etc., and please don't be a TFL ex-employee, that would be awkward)

If you meet these requirements, please email smasson@scott-scott.com with the subject "Lead Plaintiff Candidate".

For all other claimants, there will be an announcement within the next two days about how to sign up for this class action, so sit tight - if you're not interested in being a lead plaintiff or if you have a claim amount under $1.5m, there's nothing for you to do yet. Again, please do not send an email if you do not meet those requirements or are not interested in being a lead plaintiff. Your announcement will come within 48 hours. Thank you!

# Exhibit T





**FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021    ...
3. Sell your initial $100M $LUNA from step 1. Since there has been
$500M of $LUNA market bought in step 2 looking at the current order
books/PA I think a reasonable estimate here is +30% or $30M profit.

PnL impact: +$30M
Net PnL: +$27.5M

💬 3        🔁 10        ♡ 278        ᴜ|ᴜ        ⬆

**FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021    ...
4. Deposit $200M worth of bETH on @Anchor_Protocol and take a loan
out for 100M $UST

PnL impact: $0
Net PnL: +$27.5M

💬 1        🔁 11        ♡ 220        ᴜ|ᴜ        ⬆

**FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021    ...
5. Short $100M of $LUNA

PnL impact: $0
Net PnL: +$27.5M

💬 3        🔁 9        ♡ 201        ᴜ|ᴜ        ⬆

**FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021    ...
6. In $100k chunks use seignorage again to convert 500M $UST (step 2)
and 100M $UST (step 4) to $LUNA. After each conversion dump the
$LUNA. Conversion fee 0.5% and the rate limit means this step will take a
week. 600M UST sold for ~$597M.

PnL impact: -$3M
Net PnL: +$24.5M

💬 1        🔁 8        ♡ 233        ᴜ|ᴜ        ⬆

**FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021    ...
7. Close the $LUNA short from step 5. Since there has been $600M of
$LUNA market sold in step 6 I think a reasonable estimate here is -30%
for $LUNA price or $30M profit.

PnL: $30M
Net PnL: +$54.5M

💬 5        🔁 10        ♡ 218        ᴜ|ᴜ        ⬆







# Exhibit U

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

**DISCUSSION DRAFT**

PRESENTED BY

## DLx LAW

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

LEWIS RINAUDO COHEN
GREGORY STRONG
FREEMAN LEWIN
SARAH CHEN

## ABSTRACT

*Securities regulators in the United States have repeatedly asserted that most fungible blockchain-based crypto assets are clearly securities under current law. This perspective may at first seem understandable. Much of the interest in crypto assets to date has been driven by their investment potential, and the judicial adoption of this position would give U.S. securities regulators jurisdiction over nearly all activity taking place with these assets. But this assertion is incorrect. An exhaustive review of the relevant appellate case law and the related legal scholarship demonstrates that this position is inconsistent with the Supreme Court's definition of the term "investment contract" as developed by federal appellate courts for nearly a century.*

*This Article addresses the federal securities law status of fungible crypto assets not intended to be a type of traditional security, with a focus on secondary transactions in these assets, such as those effected on a centralized crypto asset marketplace, like Coinbase, or through the use of a smart contract-based protocol, like Uniswap. Such crypto assets lack the ineluctable hallmarks of a security – (i) they neither create nor represent the necessary legal relationship between an identifiable person or entity and the owner of the asset and (ii) marketplace-based secondary transfers of these assets do not create investment contract transactions. Moreover, treating these fungible crypto assets as securities implies a need for the development of an entirely new concept in federal securities law: "issuer-independent securities".*

*Capital raising from investors, whether involving sales of crypto assets or anything else of value, is incontrovertibly subject to the protections provided by U.S. securities laws, as has been demonstrated through numerous successful enforcement actions by securities regulators. Expanding the reach of federal securities law to characterize fungible crypto assets as securities is both unnecessary and misguided. Instead, the legitimate policy concerns raised by non-capital raising activity involving crypto assets should be addressed by Congress. We examine these concerns and discuss the approaches adopted in several Congressional bills introduced during 2022, which the authors believe could form the basis of a reasonable and balanced solution to the unique issues raised by the trading of fungible crypto assets in non-fundraising transactions.*

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

LEWIS RINAUDO COHEN*
GREGORY STRONG**
FREEMAN LEWIN***
SARAH CHEN****

*We waited the whole morning and made the best of it, watching the seals come up in hundreds to bask upon the seashore, till at noon the old man of the sea came up too, and when he had found his fat seals he went over them and counted them. We were among the first he counted, and he never suspected any guile, but laid himself down to sleep as soon as he had done counting. Then we rushed upon him with a shout and seized him; on which he began at once with his old tricks, and changed himself first into a lion with a great mane; then all of a sudden he became a dragon, a leopard, a wild boar; the next moment he was running water, and then again directly he was a tree, but we stuck to him and never lost hold, till at last the cunning old creature became distressed, and said, 'Which of the gods was it, Son of Atreus, that hatched this plot with you for snaring me and seizing me against my will? What do you want?'*

Homer, *The Odyssey*, Book IV.

* Lewis Rinaudo Cohen is a graduate of the Benjamin N. Cardozo School of Law and co-founder of DLx Law, a law firm focusing on clients engaged in the use of crypto assets and blockchain technology. Mr. Cohen dedicates this Article to the loving memory of his father, Sydney Wolfe Cohen, 1927-2022.
** Gregory Strong is a graduate of Temple University Beasley School of Law and a Partner at DLx Law where he focuses on advising entities on legal issues associated with the adoption of blockchain technology.
*** Freeman Lewin is a graduate of Benjamin N. Cardozo School of Law and a Lawyer at DLx Law where he focuses his practice on transactions involving the use of crypto assets and blockchain technology.
**** Sarah Chen is a graduate of Columbia Law School and a Lawyer at DLx Law where she advises clients on corporate, securities and financial regulatory matters relating to the use of crypto assets and blockchain technology.

The authors collectively wish to thank David M. Adlerstein, Olta Andoni, Angela Angelovska-Wilson, Marc Boiron, Bradley Bourque, Carmen Brugman, Claire Cohen, Patrick Daugherty, Alexander Drylewski, Erin Engelmann, Brandon Ferrick, Coy Garrison, Jason Gottlieb, Yuliya Guseva, Jed Halfon, Joseph Hall, Eric Hess, Miles Jennings, Kayla Joyce, David Kerr, Joshua Klayman, Gregory Lisa, TuongVy Le, Jill Lewin, Nada Ljubinovic, Jai Massari, Tom Momberg, Charles W. Mooney, Jr., John Pullman, Ron Quaranta, Mark Radcliffe, Donna Redel, Rebecca Rettig, Gabriel D. Rosenberg, Kayvan Sadeghi, Lee Schneider, Rodrigo Seira, Gabriel Shapiro, Ori Shimony, Colleen Sullivan, Andrea Tinianow, Stephen Wink, Eamon Wizner and Gregory E. Xethalis for their invaluable contributions to this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The subject of the applicability of federal securities law to crypto assets[1] has received extensive coverage from regulators,[2] academics,[3] practitioners[4] and others.[5]  Historically, much of this attention focused on transactions referred to as initial coin offerings (also known as ICOs).[6] ICOs, which reached their zenith in 2018 and then, within the U.S. at least, largely disappeared from sight, are a type of fundraising transaction in which blockchain-based crypto assets are sold to investors, usually to raise funds intended to develop or promote a new technology platform, constructed around a finite or provably scarce number of fungible crypto assets.[7]

---

[1] Throughout this Article, we use the term "crypto asset" to refer to an asset that is uniquely identifiable through the use of cryptography and blockchain technology.  In various places, the term "token" is also used to refer to a crypto asset that conforms to a certain industry standard, such as ERC-20.  *See* Section I.B. *infra*.

[2] *See, e.g.,* William Hinman, Director, Division of Corporation Finance, U.S. Securities and Exchange Commission (the "SEC" or the "Commission"), Remarks at the Yahoo Finance All Markets Summit: Crypto (entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" (June 14, 2018) (the "Hinman Speech"), available at https://www.sec.gov/news/speech/speech-hinman-061418; *see also, Framework for "Investment Contract" Analysis of Digital Assets*, SEC Division of Corporation Finance (Apr. 3, 2019), available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (the "SEC Token Framework").

[3] *See, e.g.,* Primavera De Filippi & Aaron Wright, *Blockchain and the Law: The Rule of Code* (2018).

[4] *See, e.g.,* Joseph Hall and Jai Massari, *Regulating Crypto Shouldn't Hinge on Securities Status*, Law360 March 17, 2022, available at, https://www.law360.com/articles/1474636/regulating-crypto-shouldn-t-hinge-on-securities-status; *see also,* Gabriel Shapiro, *S.E.C. v. Telegram—Three Deeper Takeaways*, Medium (May 21, 2020), available at https://lex-node.medium.com/sec-v-telegram-three-deeper-takeaways-423b197f76d6.

[5] *See, e.g.,* Anna Baydakova, *Digital Chamber Asks Court to Draw Line Between Investment Contracts and Assets in Telegram Case*, CoinDesk (Jan. 22, 2020), https://www.coindesk.com/policy/2020/01/22/digital-chamber-asks-court-to-draw-line-between-investment-contracts-and-assets-in-telegram-case/.

[6] For these purposes, we also include within the term "ICO" arrangements in which a centralized crypto asset marketplace is used to facilitate a distribution of crypto assets (sometimes referred to as an "initial exchange offering" or "IEO") or where a "decentralized exchange is used for the same purpose (sometimes referred to as an "initial decentralized exchange offering" or "IDO").  More recently, some similar arrangements have been referred to as "initial farm offerings" or "IFOs", which may also have characteristics of ICOs, IEOs or IDOs.  Although most of these transactions are no longer made in the style and format of 2018-era ICOs, few of the platforms used effectively block U.S. persons able to master the minimal technology skills required to utilize the services of a virtual private network (known as VPN).

[7] This Article focuses primarily on fungible crypto assets created substantially all at one time using blockchain technology (usually referred to as a "pre-mine") and intended to be a functional part of a "decentralized" protocol of automated code that responds deterministically to validly formatted instructions (such protocols are referred to herein as a "project").  These are the crypto assets, like ether ("ether") that are most widely traded and discussed and are the assets that can be found listed among the "Top 100" crypto assets on sites like coinmarketcap.com and coingecko.com.  Separately, there is also increasing interest in crypto assets commonly known as "stablecoins" (*see infra* note [89] and accompanying text)—digital assets whose value is generally directly or indirectly pegged to a major fiat currency, some of which have indicia of money markets instruments or other types of securities—and non-fungible crypto assets (often referred to as "non-fungible tokens" or "NFTs") which can be very fluid in form and exhibit a range of characteristics.

3

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The nature of ICOs and their brief, wild run of popularity for fundraising in the U.S. has obscured a critical distinction between the status of a crypto asset sold in the transaction under federal securities law[8], on one hand, and the status of the fundraising transaction of which that crypto asset was a part, on the other.   Thus, we see regulators,[9] commentators[10] and private litigants[11] alike asserting that the subject crypto assets are themselves securities, at least temporarily.

Commentators considering crypto assets and federal securities law[12] have generally recognized[13] that most crypto assets do not fall directly within one of the enumerated categories in the definition of the term "security" in either the Securities Act of 1933, as amended (the "Securities Act")[14] or the Securities Exchange Act of 1934, as amended

---

Although there are cases where the issues discussed herein can also apply to stablecoins or NFTs, unless specifically identified, references to "crypto assets" or "tokens" herein should be read to apply to fungible, provably scarce blockchain-based crypto assets not purporting to have an intrinsic fiat money value.  Finally, the original and most popular crypto asset, bitcoin, along with a small number of largely derivative crypto assets like litecoin, are generally not discussed as "securities" and outside the scope of this Article.

[8] This Article is generally limited to the application of the U.S. federal securities laws to crypto assets and transactions in these assets.  Although state securities laws (generally known as "Blue Sky laws") are also relevant to transactions in crypto assets, a thorough consideration of the similarities and differences between these laws and the federal securities laws is beyond the scope of this Article.

[9] *See, e.g.*, SEC Chair Gary Gensler, Speech: "Kennedy and Crypto", September 8, 2022, available at https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities" (footnote omitted)) ("Kennedy and Crypto").

[10] *See, e.g.,* Thomas L. Hazen, *Tulips, Oranges, Worms, and Coins – Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & Tech. 493 (2019) ("This article concludes that under most, if not all, circumstances, crypto currencies are likely to be securities.")

[11] *See, e.g.,* Complaint*, Risley v. Universal Navigation Inc. et al.,* 1:22-cv-02780-KPF (S.D.N.Y.) ("Risley") ("From April 5, 2021 through the present…Uniswap has offered and sold unregistered securities, including EthereumMax, Bezoge Earth, Matrix Samurai, Alphawolf Finance, Rocket Bunny, and BoomBaby.io…throughout the United States on its Exchange, without registering as a national securities exchange or as a broker-dealer, and without there being any registration statements in effect for the Tokens it was selling, all in violation of applicable law.")

[12] There has already been extensive legal scholarship on securities laws and crypto assets, including: Shaanan Cohney *et al.*, *Coin-Operated Capitalism*, 119 Colum. L. Rev. 591 (2019); Carol R. Goforth, *Cinderella's Slipper: A Better Approach to Regulating Cryptoassets as Securities*, 17 Hastings Bus. L.J. 271 (2021); Yuliya Guseva, *A Conceptual Framework for Digital-Asset Securities: Tokens and Coins as Debt and Equity*, 80 Md. L. Rev. 166 (2021); Thomas L. Hazen, *Tulips, Oranges, Worms, and Coins -- Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & Tech. 493 (2019); Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis*, 22 Stan. Tech. L. Rev. 52 (2019) ("ICOs to Security Tokens"); James J. Park and Howard H. Park, *Regulation by Selective Enforcement: The SEC and Initial Coin Offerings*, 61 Wash. U. J. L. & Pol'y 99 (2020); and Usha Rodrigues, *Semi-Public Offerings?  Pushing the Boundaries of Securities Law* (2018) ("Semi-Public Offerings"); however, throughout all of this and other scholarship on securities law and crypto assets, much less focus has been placed on the particular characteristics of, and unique issues arising from, secondary transactions in these assets, as discussed in this Article.

[13] *See, e.g*., ICOs to Security Tokens and Semi-Public Offerings, *supra* note [12] (both applying the concept of "investment contract" to their analysis of ICOs and crypto assets).

[14] 15 U.S. Code § 77a et seq.

4

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

(the "Exchange Act"[15] and, collectively with the Securities Act, the "Securities Acts").[16]   Instead, they have trained their focus on the

---

[15] 15 U.S. Code § 78a et seq.

[16] The Securities Act defines "security" as follows:

> (a)  When used in this title, unless the context otherwise requires-
>   (1)  The term ''security'' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a ''security'', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

Securities Act § 2(1), 15 U.S.C. § 77b(a)(1).

Alternatively, the Exchange Act defines "security" as follows:

> (a)  When used in this title, unless the context otherwise requires-
>   (10) the term "security" means any note, stock, treasury stock, security future, security-based swap, bond debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a ''security''; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

Securities Exchange Act of 1934 §3(a)(10), 15 U.S.C. §78(c)(a)(10).

Although the statutory definition of a security differs slightly between the Securities Act and the Exchange Act, courts generally recognize them as being functionally equivalent. *See, e.g.*, *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 847 (1974) ("Forman") (noting that the definitions of "security" in the Securities Act and Exchange Act are "virtually identical and, for present purposes, coverage of two Acts may be considered the same").  The most notable difference in the definition of the term "security" for purposes of the federal securities laws can be found in the Investment Company Act of 1940 (15 U.S.C. § 80a *et seq*.) which scopes in a much broader range of instruments within its ambit, including accounts receivable and commercial loans.  However, because all of these exhibit

---

5

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

applicability of one of the statutory catch-all categories found in both Acts: "investment contract".[17]  This has led many to ask: "Is this crypto asset an investment contract?".  As we demonstrate below, this flawed question has resulted in significant confusion as to how federal securities law applies to crypto assets, resulting in inevitably flawed outcomes.[18]

This Article provides a robust examination of crypto assets under the Securities Acts, focusing on the regulatory framework applicable to the exchange of these assets in true secondary[19] transactions.  The correct analytical approach asks whether a given *contract, transaction, or scheme* involving the purchase or sale of a crypto asset would be considered an investment contract transaction—taking into account the full judicially-mandated definition of an "investment contract" as set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co*.[20]  This definition, in a case famously dealing with a sale of land parcels used as orange groves, known

---

the same characteristics (*i.e.*, the necessity of a clear legal relationship between an "issuer" and an owner of the "security") as the somewhat narrower set found in the definition in the Securities Acts, we do not need to address that definition here.

[17] Where a crypto asset is intended by the seller to constitute a "security" of another type enumerated in the Securities Act or the Exchange Act (such as shares of stock or other identified equity interests, a bond, a voting-trust certificate, or a fractional undivided interest in oil, gas, or other mineral rights), that crypto asset is generally referred to as a "security token" and is outside the scope of this Article as the securities law status of the crypto asset is not in dispute.  In addition, depending on their design and features, stablecoins may raise additional issues that are also beyond the scope of this Article.  Likewise, if a crypto asset were to be "commonly known as a security" by users of the asset in the marketplace, other considerations would apply; however, to our knowledge, this is not currently the case with most crypto assets.  Finally, there are a limited number of cases that involve an instrument that is not one of the enumerated types of "securities" in the Securities Acts, but which would, but for the name given to the instrument or inconsequential features, be considered a "security".  We refer to these instruments as "securities equivalents" (*see infra* text at note [131])  Nevertheless, we recognize that because the definition of the term "security" is principles based, some case-by-case examination will always be required; the goal of this Article is to set out a framework for considering the federal securities law status of most fungible crypto assets, with a particular focus on when these assets are sold in secondary transactions.

[18] The conclusion that most crypto assets are *not* properly characterized as securities under current law should not be read to suggest that the authors believe that those who fundraise through sales of crypto assets and companies that are operators of marketplaces for secondary transactions in crypto assets should be free from disclosure obligations and regulatory oversight.  To the contrary, the authors support the implementation of a strong but appropriate regulatory framework – *see* Section [V.B], *infra*.

[19] We consider most sales of crypto assets by affiliates and persons acting, or deemed to be acting, as an agent of the person or entity that created the crypto asset as equivalent to a sale by the asset creator themselves.  References herein to "secondary" transactions in crypto assets refer to transactions in these assets by persons other than the person or entity that created the crypto asset, by affiliates of that person or entity, or by persons acting, or deemed to be acting, as an agent of that person or entity.  *See* discussion of the *Telegram* case, Section [III.C.1] *infra*.

[20] *S.E.C. v. W.J. Howey Co*., 328 U.S. 293 (1946) ("Howey").  Because Congress chose not to define the term "investment contract" in either the Securities Act or the Exchange Act, it was left to the courts to define the parameters of this term.  In *Howey*, the Supreme Court first articulated the test used to determine whether an investment contact is present.  Although this standard has been subject to considerable interpretation since 1946, its basic elements continue to be applied to this day.

6

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

as the *Howey* test", looks to whether the "circumstances"[21] of a given contract, transaction or scheme involves: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely from the efforts of the promoter or a third party.[22]  Treating most crypto assets as securities without examining whether the circumstances in which these assets are offered or sold create investment contract transactions is not supported by current law.[23]

To better understand the correct application of federal securities law to crypto assets we will focus on first principles.  Under federal securities law, the proper status of crypto assets themselves, as well as transactions in crypto assets, can only be ascertained, *first*, through an understanding of what, exactly, a crypto asset is and *then*, by applying this understanding to the extensive case law and legal scholarship on investment contract transactions.

Accordingly, we begin by examining crypto assets in some detail, both in terms of the technology used to create them and the legal rights, if any, that flow from them.  This description takes into account the authors' direct experience advising a wide range of market participants about activities involving the use of crypto assets.  We then examine relevant case law and legal scholarship in detail, concluding that that most crypto assets are not securities under the Securities Acts.  Our conclusions are based on an analysis of 266 relevant federal appellate and Supreme Court

---

[21] *Id*. at p. 297.  Justice Frankfurter's dissent adds further gloss on the majority's use of the term "circumstances": "'Investment contract' is not a term of art; it is conception dependent upon the circumstances of a particular situation." *Id*. at p. 301 (Frankfurter, J., dissenting). Later cases interpreting the term "investment contract" have repeatedly emphasized that the evaluation must be made based on all of the "facts and circumstances" of the transaction. *See, e.g., Lino v. City Investing Co*., 487 F.2d 689 (3d Cir. 1973) (considering the written agreement that governed the relationship at issue as well as the "facts and circumstances surrounding the agreement"); *Vincent et al. v. Moench, et al., 473* F.2d 430, 435 (10th Cir. 1973) (noting that "[w]hether a particular investment is a security depends upon the facts and circumstances of the case."); *Goodman v. Epstein*, 582 F.2d 388, 406 (7th Cir. 1978) ("…the existence or non-existence of an "investment contract" must be determined from the actual facts and circumstances of the investment arrangement and not from the existence or non-existence of a 'stock certificate' alone.").

[22] The last prong of the *Howey* test is generally regarded as having been modified by subsequent case law to require an expectation of profits derived from the essential entrepreneurial or managerial efforts of others.  *See S.E.C. v. Glenn W. Turner Enter., Inc*., 474 F.2d 476, 482 (9th Cir. 1973), *cert. denied*, 414 U.S. 821 (1973), although it should be noted that while the Supreme Court acknowledged this position in footnote 16 of *Forman*, 421 U.S. 852 n. 16, (1975), it expressed no view in that respect, nor has it ever unequivocally adopted the position.  The application of the law on investment contracts to crypto assets is made all the more challenging because it is based on constantly evolving judge-made rules around the definition and the inclusiveness of the term "investment contract", making it one of the most complex subjects in the field of securities law and itself the subject of extensive legal scholarship long before the advent of crypto assets. *See, e*.g., Rodney L. Moore, *Defining an Investment Contract: The Commonality Requirement of the Howey Test*, 43 Wash. & Lee L. Rev. 1057 (1986).

[23] As will be seen in Section I.A., *infra*, whether dealing with crypto assets within scope of this Article (*see, supra,* note [17]), *Howey's* orange groves, or seeds for an entirely new type of fruit with characteristics more similar to those exhibited by crypto assets, none of these items are themselves securities.

7

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

decisions[24] which considered whether a particular contract, transaction, or scheme should be deemed to constitute an investment contract transaction. A discussion and statistical analysis of these cases can be found in Annex A.  Schedules 1 through 3 break out the relevant decisions based on whether the court found an investment contract to be present (Schedule 1), whether no investment contract was found to be present (or the decision was superseded by statute) (Schedule 2), or, generally, whether the court reversed, remanded, found a security, or determined that the question at issue related to the status of a "note" (Schedule 3).  As an additional resource, Schedule 4 lists notable early "investment contract" decisions, state court decisions, and decisions discussing the applicability of securities laws to crypto assets and not otherwise discussed in this Article. For the convenience of readers, Schedule 5 sets out the complete list of cases reviewed in alphabetical order.  We also reviewed substantially all of what we considered the most relevant legal scholarship on the topic of investment contracts and the definition of the term "security", a bibliography of which is contained in Annex B.  The authors are not aware of any other equivalent comprehensive analysis in the published academic scholarship on this topic.

This is not to say that federal securities law has no role in providing investor protection in transactions involving crypto assets. Indeed, for the reasons frequently articulated by the staff and Commissioners of the SEC, we concur that many, if not most, ICOs and similar fundraising sales of crypto assets comfortably fit the mold of "contracts, transactions or schemes" that constitute investment contract transactions (and thus securities transactions).[25]  There have been a variety of proposals to address concerns with fundraising sales of crypto assets as a practical means for sponsors of crypto asset-based projects intended not to be bound to a group of traditional equity investors to raise funds from the general public.[26]  The most notable and well-developed of these is the Safe Harbor 2.0 proposal made by SEC Commissioner Hester Peirce.[27]

---

[24] Both Circuit Court and Supreme Court decisions were considered.  To the best of the authors' knowledge, this constitutes a complete set of all relevant appellate decisions to date examining whether an investment contract was present in the matter before the relevant court.  Those cases in which the concept of "investment contracts" arose tangentially, but was not relevant to the court's conclusions, are not cited (but nonetheless were reviewed).

[25] This will be the case regardless of whether the offers and sales are made by the legal entity seeking to raise funds or by other entities found effectively to be acting as agents of, or in concert with, the fundraising entity.  *See, e.g.*, *S.E.C. v. Telegram Group, Inc*., 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ("Telegram").

[26] In the authors' experience, presently, substantially all fundraising sales of crypto assets conducted within the United States occur in transactions with accredited investors that qualify for the exemption from registration contained in Section 4(a)(2) of the Securities Act.

[27] *See* Hester Peirce, "Token Safe Harbor Proposal 2.0" (April 13, 2021), available at https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0.  *See also*, LeXpunK Army, "Reg-X-Proposal-An-Exempt-Offering-Framework-for-

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The question we are interested in here, however, is not the regulatory treatment of these fundraising transactions, which is reasonably clear. Rather, what concerns us is the applicability of federal securities law to the crypto assets themselves.[28] Despite frequent incantations to the contrary by regulators[29] (and periodic obfuscations by defendants in these suits), the Securities Acts apply to transactions involving crypto assets *only* if: (i) the offer or sale of the crypto asset constituted or was part of an identifiable investment contract transaction meeting the four prongs of the *Howey* test at the time that the transaction occurred or (ii) the crypto asset itself constituted some type of security independent of the circumstances of the transaction in which it is sold.

The appropriate application of the Securities Acts thus encompasses the types of fundraising activities those laws were intended to address as well as those crypto assets that have the character of a security. At the same time, this application inherently avoids much of the unnecessary confusion regarding the status of crypto assets themselves in secondary transactions and custodial situations that has arisen from the varied approaches taken by regulators in enforcement actions thus far.[30]

Unfortunately, the relatively clear two-part analytic path we set out in the penultimate paragraph above has so far not been pursued by regulators or the private plaintiff's bar. Instead, three different approaches have been taken in securities law-based enforcement actions and private litigation involving crypto assets. First, some statements made by the SEC suggest that the Commission may in fact take position set out in our prong

---

Token-Issuances" available at https://github.com/LeXpunK-Army/Reg-X-Proposal-An-Exempt-Offering-Framework-for-Token-Issuances.

[28] This distinction generally arises (i) in *non-fundraising transactions* involving crypto assets, such as those taking place on crypto asset marketplaces or facilitated by dealers or other intermediaries between parties other than the person or entity raising funds to develop the project to which the asset relates (or those acting on their behalf) and (ii) *custodial relationships* involving third parties holding crypto assets on behalf of others. We consider most sales of crypto assets by affiliates and persons acting, or deemed to be acting, as an agent of the person or entity that created the crypto asset as equivalent to a sale by the asset creator themselves. References in this Article to "secondary" transactions in crypto assets refer to transactions in these assets by persons other than the person or entity that created the crypto asset, by affiliates of that person or entity, or by persons acting, or deemed to be acting, as an agent of that person or entity. *See* discussion of the *Telegram* case Section [III.C.1] *infra*.

[29] *See, e.g.,* Gary Gensler, SEC Chair, *Kennedy and Crypto, supra* note [9]; Prepared Remarks at the Penn Law Capital Markets Association Annual Conference (April 4, 2022) ("My predecessor Jay Clayton said it, and I will reiterate it: Without prejudging any one token, most crypto tokens are investment contracts under the *Howey* Test."); and Gurbir Grewal, Director of the Division of Enforcement, SEC, "2021 Regulation Outside the United States, Scott Friestad Memorial Keynote Address" (Nov. 8, 2021), available at: https://www.sec.gov/news/speech/grewal-regulation-outside-united-states-110821 (stating that "[t]he threshold issue in each of [the enforcement] cases is whether the crypto asset or token is a security, and therefore subject to the registration and disclosure requirements of the federal securities laws.").

[30] The failure by regulators to articulate a clear and consistent doctrine that underlies these approaches has also resulted in significant "coattail" private litigation in which putative class action lawsuits have been brought against companies developing blockchain technology by plaintiffs mimicking SEC statements. *See, e.g., Risley, supra* note [11]).

9

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"(i)" above and agree that a separate examination of the circumstances of each transaction is required whenever crypto assets are exchanged between a buyer and a seller to see if all four elements of the *Howey* test have been met *in that transaction*.[31]   However, because of the particular enforcement circumstances in which this position has been taken, we have not yet seen the SEC's complete analysis of how this approach should be applied to other real-world situations that market participants may encounter.  For example, while relatively straightforward when applied to fundraising sales of crypto assets (at least as far as *Howey* analyses go), in the context of secondary transactions, this approach necessitates a dispositive determination that all four *Howey* prongs were met *at the particular time the relevant secondary transaction takes place*.[32]

Second, on other occasions, we see fungible crypto assets referred to simply as "securities" without any further modification or clarification.[33]   In these cases, the Commission's position appears to be that, once sold in an unregistered investment contract transaction in violation of Section 5 of the Securities Act, the crypto asset itself *becomes* a security such that any subsequent transfer of the crypto asset will also be a securities transaction, irrespective of the circumstances of that transaction or future circumstances.[34]

Apparently cognizant of analytic challenges both alternatives present, in at least one court filing the SEC combined these two ideas into a novel hypothesis: if a crypto asset is initially sold in an ICO or other investment contract transaction then, *so long as the original investment scheme is ongoing*, the crypto asset represents or "embodies" that investment scheme.[35]   This third approach, which we refer to as the

---

[31] *See, e.g.*, Complaint, *S.E.C. v. Ishan Wahi, Nikhil Wahi, and Sameer Ramani* (the "Wahi Complaint") at para. 94 ("These hallmarks of the definition of a security continue to be true for the nine crypto asset securities that are the subject of the trading in this complaint, including continuing representations by issuers and their management teams regarding the investment value of the tokens, the managerial efforts that contribute to the tokens' value, and the availability of secondary markets for trading the tokens.  *Thus, at all times relevant to the conduct alleged in this complaint*, a reasonable investor in the nine crypto asset securities would continue to look to the efforts of the issuer and its promoters, including their future efforts, to increase the value of their investment."). (Emphasis added.)

[32] *See, infra,* Section IV for a discussion of this idea.

[33] *See, e.g.*, *In the Matter of Poloniex, LLC*, Exchange Act Release No. 92607, August 9, 2021, at p. 1 ("Poloniex operated a digital asset trading platform (the 'Poloniex Trading Platform') that meets the definition of an 'exchange' under the federal securities laws.  The Poloniex Trading Platform displayed a limit order book that matched the orders of multiple buyers and sellers in digital assets, including digital assets that were investment contracts under *S.E.C. v. W.J. Howey Co.* … and therefore securities …" (citation omitted).

[34] We refer to this as the "original sin" theory inasmuch as it posits that a flaw in the manner in which the asset is initially distributed will continue to impact the characterization of the asset for all time.  The main benefit of this approach is that it at least provides a type of unwelcomed certainty.

[35] Pl. Mem. of Law in Opp'n to Mot. to Intervene at 24, *S.E.C. v. Ripple Labs, Inc.* (20 CIV. 10832 (AT)(SN)) (May 3, 2021), where the Commission acknowledged that the purported security in the case is not "simply" the crypto asset at issue, known as XRP, and instead asserting that the crypto asset is the "embodiment" of the facts, circumstances,

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"Embodiment Theory", would effectively treat crypto assets as securities on a temporary basis. That is, the crypto asset is a security, but only for so long as it is deemed to "embody" the original investment scheme. However, this position requires one to accept that, like the mythical Proteus, Homer's "old man of the sea" in *The Odyssey*, a crypto asset can transform, or "morph", out of being a security (and maybe back again) based solely on events extrinsic to the asset itself. This has led to well-intentioned but mistaken efforts on the part of numerous market participants to divine the moment when a crypto asset has "morphed" from a security to a "non-security".[36]

Based upon our review of the relevant case law and legal scholarship, neither treating crypto assets as *permanently* or, under the Embodiment Theory, *temporarily*, securities is supported by current *Howey* jurisprudence. Due to the absence of a legal relationship between

---

promises, and expectations that constitute the purported investment contract and therefore that the crypto asset *represents* the purported investment contract). Specifically, the Commission explained:

> Movants claim they must intervene to convince the Court that XRP is not "per se" a security. (Movant Br. at 8–9.) But this case presents no such question. "While helpful as a shorthand reference, the security in this case is not *simply* the [XRP], which is little more than alphanumeric cryptographic sequence," Telegram Grp., 448 F. Supp. 3d at 379 (emphasis added), it is all the facts and circumstances surrounding the crypto asset and the manner in which it is offered and sold (including the entirety of the representations Ripple made and purchasers' resulting expectations) that made the offers and sales of XRP the offers and sales of an investment contract. Id. The XRP traded, even in the secondary market, *is the embodiment of those facts, circumstances, promises, and expectations, and today represents that investment contract*. And, incorrectly reframing the inquiry from the legally correct view of what the investment contract is (the XRP's offer and sale in the particular context) to Movants' narrower view (the XRP itself) makes no difference to what Movants really care about—crypto asset trading platforms' listing of XRP. (Latter emphasis added by the authors.)

[36] *See, e.g.*, The National Law Review, "SEC Hints at Path for Digital Assets to Morph Into Non-Securities", August 18, 2022, available at https://www.natlawreview.com/article/sec-hints-path-digital-assets-to-morph-non-securities (noting that a statement in an enforcement action brought by the SEC against the sponsors of a digital asset project "… appears to be an admission by the SEC of a belief held by many practitioners in the digital asset industry – that a token that was once a security could, under the right circumstances, cease to be a security at some point in the future"); Robert M. Crea, *et al.*, "Metamorphosis: Digital Assets and the U.S. Securities Laws", June 27, 2018, available at https://www.lexology.com/library/detail.aspx?g=0358e48d-aa15-44d8-9c67-cb6c73b9c85d (quoting Franz Kafka's *The Metamorphosis* to explain the idea that digital assets can "morph" from being a security); Jacqueline Hennelly, "The Cryptic Nature of Crypto Digital Assets Regulations: The Ripple Lawsuit and Why the Industry Needs Regulatory Clarity", 27 Fordham J. Corp. & Fin. L. 259 (2022), available at https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1508&context=jcfl ("Digital assets may be issued as a security but after time, as the crypto assets are transferred between users and the network decentralizes, they begin to function more like a consumer token."); and Web3 Foundation, "Less Trust, More Truth: Polkadot's Native Token (DOT) Has Morphed and Is Not a Security. It Is Software," November 4, 2022, available at https://medium.com/web3foundation/less-trust-more-truth-polkadots-native-token-dot-has-morphed-and-is-not-a-security-b2a8847a70cc ("Less Trust, More Truth").

11

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

most crypto assets and an identifiable legal entity or individual, adoption of either approach would require the creation of a completely new concept under federal securities law: what we refer to as "issuer-independent" securities.  In addition, without more, marketplace-based secondary transfers of these assets do not create investment contract transactions.

Rather, under current jurisprudence, the majority of crypto assets are neither inherently and ineluctably securities themselves nor the transferrable "embodiment" of an investment scheme in any cognizable sense.[37]  Moreover, we argue that, even taking into account the broad remedial purposes of the Securities Acts, the Embodiment Theory would be neither an appropriate nor an effective extension or modernization of that jurisprudence as a matter of public policy.  Because the Embodiment Theory of necessity considers that the embodied scheme can both cease (at which point there is no longer a scheme for the crypto asset to embody) and re-commence (which would presumably "flip" the crypto asset back into being the embodiment of the scheme again), all "circumstances" relevant to determining the presence or absence of an investment scheme would need to be available for all market participants to evaluate at all times.  Yet, at any given time, all of the "circumstances" relevant to a full determination of the matter under the *Howey* case law will likely be *not* generally known (and, more importantly, likely will be unknowable) to the general public – neither crypto asset users nor market participants currently[38] have a way to require sponsors of projects to disclose to them the type of private information essential to determining whether an investment contract transaction occurred.  This is not an issue in primary transactions where the parties are dealing directly with each other.

---

[37] An alternative position is that fungible crypto assets should be characterized as commodities (that are not securities) under the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. (the "CEA").  Section 1(a)(9) of the CEA defines the term "commodity" as follows:

    (a)   As used in this chapter:
      (9)  The term The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

However, whether fungible crypto assets should be properly be considered "commodities" under the CEA is a separate and complex question and one that is beyond the scope of this Article.

[38] *See*, *infra*, Section V.B. for a discussion of how legislation pending in Congress would address this gap.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

However, in secondary transactions, without access to this private information, market participants would be left to guess whether under the Embodiment Theory a given token does, or does not, "embody" an investment scheme at a particular time.  Given that the Securities Acts provide for strict liability for violations of various provisions, this is simply an unacceptable result.

Nevertheless, regulators,[39] policymakers,[40] and commentators[41] have articulated legitimate and unaddressed policy concerns regarding the use and ownership of crypto assets.  A particular concern has been the potential for information asymmetries in transactions involving crypto assets.[42]  These can arise between the entities sponsoring and developing crypto asset-based projects (or their personnel),[43] who may have privileged access to non-public information about the project,[44] and everyday holders

---

[39] *See, e.g.*, SEC Division of Examinations, "Risk Alert: The Division of Examinations' Continued Focus on Digital Asset Securities", February 26, 2021, available at https://www.sec.gov/files/digital-assets-risk-alert.pdf ("a number of activities related to the offer, sale, and trading of crypto assets1 that are securities … present unique risks to investors").

[40] Most notably, in March 2022 the Biden Administration issued an Executive Order entitled "Ensuring Responsible Development of Digital Assets" establishing a "whole-of-government" approach to addressing the risks and harnessing the potential benefits of crypto assets and their underlying technology.  *See*, Exec. Order No. 14067, 87, Fed. Reg. 14143, 14143 (Mar. 9, 2022).  The Fact Sheet announcing the results of various fact findings from the Executive Order on September 16, 2022, stated that "[d]igital assets pose meaningful risks for consumers, investors, and businesses.  Prices of these assets can be highly volatile … [;] sellers commonly mislead consumers about crypto assets' features and expected returns, and non-compliance with applicable laws and regulations remains widespread."  *See* "Fact Sheet: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets" available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets.

[41] *See, e.g.*, KPMG, "Assessing Crypto and Digital Asset Risks – Actions Amidst Evolving Regulation", updated May 2022, available at https://advisory.kpmg.us/content/dam/advisory/en/pdfs/2022/assessing-crypto-and-digital-asset-risks.pdf (noting risks including cybersecurity and systems failure; compliance with regulatory obligations, including risk management and AML/CFT programs; customer due diligence (KYC); tax implications; macroprudential economic risk and financial stability; and resource and energy consumption).

[42] *See, e.g.*, Moran Ofir and Ido Sadeh, "ICO vs. IPO: Empirical Findings, Information Asymmetry, and the Appropriate Regulatory Framework", 53 Vanderbilt Law Review 525 (2021), available at: https://scholarship.law.vanderbilt.edu/vjtl/vol53/iss2/3 (finding that a high degree of information asymmetry exists in ICOs, identifying sources of these asymmetries, and discussing the role of signaling theory and rating websites in mitigating these asymmetries); and Joyce Shen, "Information Asymmetry in Crypto", Medium, August 2, 2022, available at https://medium.com/@joycejshen/information-asymmetry-in-crypto-58c6a0b5fb9f (noting that one of the biggest problems of the crypto/crypto asset industry is information asymmetry).

[43] These persons are referred to as "Active Participants" by the SEC.  *See* SEC Token Framework, *supra* note [2].

[44] Although the underlying code base of crypto asset-based projects is almost always made publicly available for scrutiny by interested persons on websites like GitHub (www.github.com) and all activity on the platform created by the project is likewise available through a separate "block explorer" program like Etherscan (https://etherscan.io/) that provides user-friendly access to transaction data stored on a blockchain network, many

---

13

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

or users of the relevant crypto asset,[45] including persons who acquired the asset, especially those who acquired the asset with investment intent.[46] These information asymmetries can lead to manipulative or exploitive trading of the relevant assets by those who benefit from this information, at the expense of those who do not. These information gaps are also breeding grounds for "rug pull" scams.[47]

In addition, legitimate concerns have also been raised about "spoofing", "wash trading", "pump and dump" schemes[48] and a wide variety of other potentially manipulative practices by parties conducting secondary trading in crypto asset marketplaces that are not generally subject to comprehensive federal regulation. Outright Ponzi schemes and other more garden-variety fraud are also frequently seen.[49] Hacking intrusions, "exploits" of smart contract code (*i.e.*, permitted use of the code in ways that were, ostensibly at least, not intended by the code's developers),[50] and protocol design failures[51] are also matters of concern.

---

project companies employ large teams of software developers, community managers and partnership coordinators whose non-public managerial efforts can play an important role in the success of the project (and thus the value of the related crypto asset).

[45] Even in the absence of traditional information asymmetries, project teams may have a much higher level of technological sophistication relative to day-to-day users of, or investors in, these assets and their related smart contracts, which may limit these users' practical ability to effectively understand the software code or nuances that may exist therein and leave these users potentially vulnerable to exploitation.

[46] It is important to recall that any asset, whether real estate, a commodity, a collectable, or some other form of property, can be acquired expressly for investment purposes without triggering a requirement of securities law compliance so long as the entity acting as the seller of the asset to the buyer has not been deemed to have created an "investment contract" between that seller and the buyer under *Howey*. *See* discussion of *Hocking v. Dubois* in Section II.C *infra*.

[47] This scam, which gets its name from the expression "pulling the rug out", is when a fraudster attracts victims to purchase digital assets in a new cryptocurrency project and then disappears before the project or digital asset is completed or even started, leaving investors with a worthless token.

[48] *See, e.g.*, Josh Kamps and Bennett Kleinberg, "To the Moon: Defining and Detecting Cryptocurrency Pump-and-Dumps", Crime Science, Volume 7, Article number: 18 (2018), available at https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-018-0093-5 (examining information on pump-and-dump schemes from classical economic literature, synthesizing this with data concerning cryptocurrencies, and proposing criteria that can be used to define and detect a cryptocurrency pump-and-dump scheme).

[49] *See, e.g.*, *Securities and Exchange Commission v. BitConnect, et al.*, No. 1:21-cv-07349 (S.D.N.Y., filed September 1, 2021) and Investor Alert, "Ponzi Schemes Using Virtual Currencies", SEC.gov, available at https://www.sec.gov/files/ia_virtualcurrencies.pdf This fraud is not limited to securities transactions, and other regulatory bodies have engaged as well. Particularly relevant is the Federal Trade Commission (the "FTC"), whose mission includes protecting the public from deceptive or unfair business practices. *See* FTC, "What to Know About Cryptocurrency and Scams", available at https://consumer.ftc.gov/articles/what-know-about-cryptocurrency-and-scams.

[50] *See, e.g.*, Tomio Geron, "Crypto Bridges Are Coming Under Attack", Protocol, July 18, 2022, available at https://www.protocol.com/fintech/crypto-bridge-wormhole-hack (noting that, in one smart-contract-related incident, a security problem in the code of a bridge protocol known as "Wormhole" was exploited resulting in a loss of crypto assets valued at $325 million).

[51] *See, e.g.*, Rob Mannix, "Designed to Fail: Terra and the Limits of Arbitrage", Risk.net, May 22, 2022, available at https://www.risk.net/investing/7949321/designed-to-fail-terra-and-the-limits-of-arbitrage.

14

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Even in the absence of primary or secondary market abuses and technical issues, crypto assets, when purchased for investment purposes, have historically demonstrated a level of volatility associated with new or emerging technologies,[52] such that coherent investor protection is desirable as a policy matter.[53]

Because existing federal regulatory law does not adequately address the issues applicable to the creation, dissemination, and trading of crypto assets that are not securities, rather than attempting to mischaracterize these assets as "issuer-independent" securities through regulation or unlitigated enforcement actions, this gap should be definitively addressed through an act of Congress, complemented by increased engagement by other relevant regulatory bodies, including the FTC, the Commodity Futures Trading Commission (the "CFTC"), the Department of Justice and state attorneys general.[54]

The last section of this Article examines the gaps in the current regulatory framework and discusses the approaches adopted in (i) the Digital Commodities Consumer Protection Act of 2022 (the "DCCPA"),[55] introduced in August 2022 in the Senate Committee on Agriculture, Nutrition, and Forestry by Senators Debbie Stabenow and John Boozman, along with Senators Cory Booker and John Thune, (ii) the Digital Commodity Exchange Act of 2022 (the "DCEA"),[56] introduced in the House Committee on Agriculture by Rep. GT Thompson (for himself and Rep. Ro Khanna, Rep. Darren Soto, and Rep. Thomas Emmer) and (iii) Title III of the Lummis-Gillibrand Responsible Financial Innovation Act (the "RFIA"),[57] introduced by Senators Cynthia Lummis and Kirsten Gillibrand, which the authors believe together provide the basis for a reasonable and balanced solution to the unique issues raised by the trading of crypto assets in secondary transactions.[58]

---

[52] See, e.g., "Healthy Volatility and Its Implications for Crypto Markets", Cryptopedia, June 28, 2022, available at https://www.gemini.com/cryptopedia/volatility-index-crypto-market-price.

[53] The SEC's conservative stance with respect to the holding and trading of crypto assets, frequently a source of friction with proponents of their use, can be better understood when viewed through the lens of the Commission's historic investor protection mandate. See, e.g., Martin Lipton et al., "Wachtell Lipton Discusses Cryptoassets and the SEC's Mandate", available at https://clsbluesky.law.columbia.edu/2022/10/19/wachtell-lipton-discusses-cryptoassets-and-the-secs-mandate/.

[54] We note that the U.S. Department of Justice has effectively used the federal wire fraud statute (18 U.S.C. § 1343), among other enforcement tools, to address a variety of criminal wrongdoing that has occurred in the crypto asset space.

[55] Available at https://www.congress.gov/bill/117th-congress/senate-bill/4760/all-actions?s=1&r=3&overview=closed.

[56] Available at https://www.congress.gov/bill/117th-congress/house-bill/7614/committees.

[57] Available at https://www.congress.gov/bill/117th-congress/senate-bill/4356?s=1&r=8.

[58] Also outside the scope of this Article is the regulatory treatment of the uses of crypto assets. One of the most intriguing and popular of these uses is known as decentralized finance (or DeFi). DeFi is a fascinating field that has already attracted significant academic study (see, e.g., Campbell R. Harvey, Ashwin Ramachandran, and Joseph Santoro, "DeFi and the Future of Finance" (April 5, 2021), available at https://ssrn.com/abstract=3711777).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

# TABLE OF CONTENTS

I.   WHAT ARE CRYPTO ASSETS?
    A.   The Parable of the Strowrange Seeds
    B.   Crypto Assets under the Hood
    C.   The Uses of Crypto Assets
    D.   The Exchange and Trading of Crypto Assets
    E.   Crypto Assets as Speculative Investments
    F.   Some Conclusions on Crypto Assets

II.  WHAT ARE INVESTMENT CONTRACTS?  A REVIEW OF THE *HOWEY* CASE LAW
    A.   Identifying Investment Contract Transactions Using the *Howey* Test
        1.   The Basics of *Howey* and the Critical Importance of a Transaction's Facts and Circumstances
        2.   Some Examples of Potential Investment Contract Transactions
        3.   The Common Element in "Common Enterprise"
        4.   Concluding Thoughts
    B.   Investment Schemes and Their "Objects" in the *Howey* Case Law
    C.   Secondary Sales under *Howey* and the *Hocking* Case
    D.   The Ineluctable Element of a Security: A Legal Relationship between an Issuer and an Owner
        1.   The Essential Element of a Security – A Bundle of Rights Created by an Issuer
        2.   Securities as Instruments
        3.   Application to Crypto Assets
        4.   Conclusion

III. THE SEC'S POSITION ON FUNDRAISING THROUGH THE SALE OF CRYPTO ASSETS
    A.   The Early Cases
    B.   The ICO Boom (and Bust)
    C.   *Telegram*, *Kik Interactive*, *Ripple Labs* and *LBRY*
        1.   *Telegram Group, Inc.*
        2.   *Kik Interactive, Inc.*
        3.   *Ripple Labs, Inc.*
        4.   *LBRY, Inc.*
        5.   Conclusion

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

IV. APPLYING *HOWEY* CASE LAW TO SECONDARY
    TRANSACTIONS IN CRYPTO ASSETS AND THE SEC'S
    "EMBODIMENT" THEORY
    A.   "Morphing"
         1.   The "When *Howey* Met *Gary (Plastic)*"
              Speech
         2.   The Response to XRP Holders' Motion
              to Intervene in *SEC v. Ripple Labs, Inc.,
              et al.*
         3.   The Embodiment of Rights under Law
         4.   Conclusion
    B.   The *Wahi* Complaint and the Common
         Enterprise Problem
    C.   Why the Idea of a Security "Morphing" and
         the Embodiment Theory Should Not Be
         Adopted
V.  THE PROBLEM AND A SOLUTION
    A.   The Inadequacy of the Current Regulatory
         Framework for Secondary Markets in Crypto
         Assets
    B.   Legislative Responses
VI. CONCLUSION

## I.   WHAT ARE CRYPTO ASSETS?

Although blockchain, the technology on which the creation of crypto assets is based, is relatively new, significant legal scholarship on the topic has emerged, including foundational descriptions of how blockchain technologies function.[59]   However, less abundant in the legal literature are a succinct discussions of what a blockchain-based crypto asset is, how these assets are created, and how they are exchanged. Because the creation and use of crypto assets can be misunderstood, we begin instead with a more relatable idea – a story about the development of a new type of fruit.

### A.   The Parable of the Strowrange Seeds[60]

A horticulturalist had an idea for a new type of fruit, which she called the "strowrange" because it combined elements of the strawberry

---

[59] *See, e.g.*, Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4 HASTINGS SCI. & TECH. L. J. 159 (2012).

[60] Like any parable, the story that follows does not map perfectly to the underlying concept which we seek to illustrate – the nature of crypto assets.  Our starting point is the frequently heard observation that "oranges are not securities".  While this statement is unquestionably true in itself, the implied analogy of oranges to crypto assets does not address the most important differences between most "natural" commodities (including oranges) and crypto assets.  Unlike most commodities, crypto assets are almost universally created "artificially"

17

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

and the orange.   She developed a technology to produce seeds that would grow into strowrange trees, which would bear the wonderful new fruit.   After some effort, the horticulturalist was ready to commercialize her idea, imaging a future world in which the strowrange would be as well-known and well-loved as the banana, the pineapple, or the watermelon – popular in its own right without the need for her support to maintain its place in the pantheon of great fruits.

The horticulturalist founded a new company ("Strowrange Labs LLC", which she usually referred to as just "Labs") and raised $15 million of … seed capital.   In exchange for the funding, the horticulturalist offered each of her early funders equity in Labs along with a warrant agreement for 1 million strowrange seeds, once the seeds were produced.   She told her funders that each seed could produce only one strowrange tree and the stowrange fruit themselves were seedless.   Projections of the possible price of the seeds, once available, were created and discussed.

Since Labs was creating a fixed supply of 1 billion seeds, there would be a fixed supply of stowrange trees.   Labs would informally agree to retain 400 million of these seeds to, as the horticulturalist told the funders in a pre-closing negotiation, "align their interests".   Labs also expected to create value for its equity holders by developing revenue-producing products and services relating to the stowrange fruit.   A further portion of seeds would be reserved for early partners that Labs planned to bring into the effort.   Some additional seeds were earmarked for a separate not-for-profit foundation (to be known as the Strowrange Foundation or just the "Foundation") that would have the sole purposes of supporting the anticipated community of strowrange tree growers, strowrange fruit product producers, and other strowrange aficionados, and promoting the many anticipated benefits of the strowrange fruit.

From a legal perspective, the seed capital fund raise involved a straightforward sale of equity securities by Labs to investors, along with a

---

by an identifiable person or legal entity in a finite or deterministically limited number, resulting in very different economic characteristics when compared to natural commodities (these characteristics of crypto assets are discussed in detail further below).   In addition, unlike natural commodities, new crypto assets can be created with very little cost or expertise, resulting in a vast multiplicity of marginally distinguishable crypto assets available in the marketplace.   Accordingly, even after crypto assets have been created, significant marketing efforts generally need to be expended to allow potential users to become aware of the crypto asset and its potential uses and the only persons likely to undertake these efforts are those who created the asset and often continue to own significant amounts of the asset.   Unlike oranges though, the strowrange seeds in our parable exhibit both of these key characteristics, which the authors hope will help readers better understand the nature of crypto assets.   However, because strowrange seeds, if real, would exist in the physical world, there are still some important differences between them and crypto assets.   Among the notable differences are that many crypto assets can be "staked" – transferred or delegated to a different address on a blockchain network and locked there in exchange for the later return of more of the same (or another) crypto asset to the original sender.   In addition, unlike strowrange seeds, which once produced do not change their nature, the code governing a smart contract-based protocol may be altered or "upgraded" by a vote of community members in certain circumstances.   While these are fascinating characteristics, they do not fundamentally alter the primary points we seek to illustrate and so, regretfully, we must leave exploration of these and other unique elements of crypto assets to a future article.

18

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

warrant that constituted an investment contract. That is, the warrants issued by Labs to its investors comprised an investment of money (the funding the investor provided) in a common enterprise (Labs was pooling the funds raised from all investors and using it to build the business they had all invested in) with an expectation of profit on the part of the investors from the entrepreneurial and managerial efforts of Labs. The investors acquired the warrants from Labs, not because they were in the agriculture business and planned to grow strowrange trees with their seeds but rather because they believed that the horticulturalist and Labs would be successful in making the seeds more valuable. Thus, the horticulturalist and Labs conducted the funding round as a private placement securities transaction.

The project went well and, in due course, the 1 billion strowrange seeds had been created by Labs. As promised in the warrants, Labs delivered 1 million seeds to each of the early investors. Labs also rewarded its early employees with an allocation of seeds. Each seed, when properly planted and cared for in the right climate, could produce a strowrange tree that would bear fruit within 12 to 18 months of planting, but Labs did not inquire whether the employees were able to grow strowrange trees or had any interest in doing so. Ownership of the seeds was based on general principles of property law; broadly speaking, the person in rightful possession of any of the seeds would be considered the owner. In this sense, the seeds could be thought of as bearer-like assets in that the real-life identity of owners was not recorded or tracked anywhere.

Labs also worked hard to promote the strowrange "ecosystem", using funds from the financing to tell the world about the strowrange and create demand for the new fruit. This was no small task. In the early days, before word-of-mouth interest in strowranges spread and the Foundation was able to develop a community interested in the strowrange and its uses, promotion of the strowrange and its uses fell almost entirely on the horticulturalist and her employees at Labs. Any value that the seeds might acquire would clearly have to come from the horticulturalist and Labs' entrepreneurial and managerial efforts.

After some time, it became clear that Labs would need more money to fulfill the promise of the stowrange. Instead of another traditional financing, Labs wanted to sell the product they had developed—the stowrange seeds—directly to the public on a website. This approach, they reasoned, would have the benefit of building demand for the fruit from the ground up, one retail customer at a time, by giving individuals an economic incentive to promote the new fruit and act as "brand ambassadors".

Labs' lawyer advised the horticulturalist that there was real securities law risk in selling stowrange seeds to the public in the United States. The lawyer explained that, if Labs were to sell small numbers of seeds to what Labs liked to call backyard horticulturalists who had the knowledge and practical ability to actually grow strowrange trees and consume the strowranges themselves, then this would likely not be a problem. But if Labs instead sold large numbers of strowrange seeds to

19

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

anyone who came to the website, they would create speculative interest in the seeds, raising money from buyers who shared with Labs an economic interest in price increases in the seeds (which the buyers would inevitably expect were to come from Labs' entrepreneurial and managerial efforts). The risk was especially serious at this early stage because almost no one else knew much about strowranges yet.

Our horticulturalist and the Labs team took this advice seriously and decided not to sell stowrange seeds through their website—at least not to buyers in the United States.  According to the lawyer, many other countries did not take the same view of the sale of seeds.  Labs thus made stowrange seeds available through their website to customers outside the United States at a price of $0.10 each.  Labs did give away small numbers of the seeds to early consumers of strowrange-based products produced by Labs (like strowrange tea).  This sparked early demand for these products, even if those first attempts were not particularly enticing in their own right.  After a while, seeds also became available for sale through third parties inside the United States as a result of sales of the seeds by the initial investors, who had not been restricted in selling the seeds they had received through their warrants.

All this activity caused interest in the strowrange to grow, even in the highly crowded global fruit market.  Soon, both individuals and businesses in the United States wanted to get their hands on strowrange seeds and become part of the phenomenon.  Every town seemed to have at least a few strowrange trees growing, taxi drivers were chatting about the strowrange with their passengers, and social media influencers were taking up an interest – there was even a popular Tik-Tok "strowrange dance".  The strowrange started to become hip – people wanted to own some strowrange seeds, not to grow strowrange trees (who has time for that!?) but to speculate in the anticipated increase in demand for strowrange products that people had convinced themselves was sure to come.

Meanwhile, Labs continued to be the engine behind the growth in interest in the strowrange, using funds from the sales of their stockpile of strowrange seeds to run ads on broadcasts of major sporting events, signing partnerships with fast food companies, and developing new products, like strowrange-flavored shakes (which everyone seemed to love).  The price of a single strowrange seed had skyrocketed up to nearly $5.00.

Labs had become profitable and continued to develop products and services like new stowrange-based foods and special containers to store both stowrange seeds and harvested fruit.  Labs was well on its way toward fulfilling its goal of creating an independent strowrange ecosystem – one where there were enough unaffiliated persons interested in the strowrange fruit that Labs itself could became just one of many participants, rather than the sole driving force behind the value of strowrange seeds.

The horticulturalist believed that she was on the cusp of achieving her dream (and along the way becoming fabulously wealthy).  But she still harbored a desire to sell some of the many seeds Labs retained directly to

20

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the public in the United States.  However, Labs' lawyer noted that despite the good work of the Foundation, the increasing *bona fide* word of mouth engagement about strowranges on social media sites, and overall growing interest in all things strowrange, in the lawyer's judgment the value of strowrange seeds was still highly dependent on the efforts of Labs to continue building interest.  Although the seeds would likely retain some value if Labs abandoned the project, it seemed likely that the expectations which had developed around the strowrange might take much longer to manifest (or perhaps interest in the strowrange would just wither away).

As a result, the lawyer continued to explain, fundraising sales of strowrange seeds to the general public in bulk amounts would likely be considered *investment contract transactions,* a type of securities offering. The lawyer laid out the process of conducting a public offering in the U.S. The horticulturalist was mortified – she had no interest in filing a registration statement with the SEC and going through perhaps a year-long process and $1 million or more in expenses to get the registration statement to be effective, as required by Section 5 of the Securities Act (not to mention subjecting herself and Labs to all the stories she heard about the risks of private securities litigation).  More confusingly, the lawyer explained, it was possible that the stowrange seeds could themselves be considered securities of Labs, at least according to some statements by the regulator, and Labs could wind up being required to become a public reporting company if there were 2,000 or more U.S. owners of the seeds, or 500 or more non-accredited U.S. owners.

This result struck the horticulturalist as very odd.  Weren't seeds of all types sold in markets, stores, in bulk, and to retail all the time in the United States?  What had changed?  Her lawyer simply shrugged and said, "the law is in a state of flux, and maybe this will be resolved someday. But for now, better that you don't sell your seeds in the United States."

Thus, it is with the imperfect but hopefully enlightening parable of the strowrange in mind that we turn back to our main concern – the nature of digital assets and their use in capital-raising transactions and decentralized protocols.

### B.      Crypto Assets under the Hood

Not all crypto assets are created, stored, or managed in the same way.  The Bitcoin blockchain network is designed to perform a single function – it maintains an immutable distributed ledger of unspent transaction outputs (known as "UTXOs").  Other blockchain networks based on Bitcoin technology, including Litecoin, Bitcoin Cash, and Dash, use similar systems.

In these networks, the native crypto assets (*e.g.,* bitcoin in the case of the Bitcoin network) are the UTXOs – simply numbers representing amounts of the relevant crypto asset associated with a public address on the common ledger maintained by all nodes running the agreed-upon core client software.  UTXOs are said to be owned by the person who rightfully has the ability to control the UTXO through knowledge of another number,

<div align="center">21</div>

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

known as a private key, that is associated with a public address on the ledger with a positive balance of UTXOs. Like dollar bills, although UTXOs are generally considered fungible, each UTXO has its own distinct provenance that can be traced deterministically back to what is referred to as the coinbase transaction[61] in which its predecessor UTXO was originally created.

Like the distributed ledger model used by Bitcoin and other single-purpose blockchain networks, the Ethereum network has its own native crypto asset, ether, that follows very similar rules. However, the Ethereum network also enables the Ethereum Virtual Machine (the "EVM"), which can be thought of as a distributed state machine (rather than as a distributed ledger).[62] At any given point in time, the Ethereum network maintains a large data structure which holds not only all accounts and balances, but also the machine state of the EVM, which changes from block to block according to a pre-defined set of rules.

The EVM can execute software code, referred to as smart contracts,[63] which has been deployed to a public address on the network.[64] Unlike with privately owned commercial cloud computing services, like Amazon Web Services, no permissions are needed to deploy smart contract code to the Ethereum network other than the need to pay a "gas" charge denominated in sub-units of ether, known as gwei. In addition, anyone with access to the Internet can examine all code deployed to the Ethereum network as well as the outcome of each state transition occurring in each validated block.

Among other things, smart contract code deployed to the Ethereum network can be used to create an unlimited number of distinct crypto assets, each relating to particular code deployed to the network. Most Ethereum-based fungible crypto assets are created using some form

---

[61] *See* Bitcoin Wiki, "Coinbase", available at https://en.bitcoin.it/wiki/Coinbase. It is indeed from this technical term that the well-known digital asset marketplace takes its name.

[62] For a description of a "state machine", *see* Wikipedia, "Finite-state machine", available at https://en.wikipedia.org/wiki/Finite-state_machine.

[63] "Smart contracts", as used in the context of their applicability to blockchain protocols, can essentially be thought of as small, inert computer programs maintained within blockchain-based protocols. Using information inputs provided by network nodes, smart contracts can be "called" by users of the network to efficiently automate processes and increase outcome certainty. *See* De Filippi, P. & Wray, C. & Sileno, G., "Smart Contracts", Internet Policy Review, 10(2), available at https://doi.org/10.14763/2021.2.1549.

[64] As has been observed many times, the choice of the word "contract" in the term "smart contract" is unfortunate because the code comprising a "smart contract" does not comprise a "contract" in the legal sense any more than such code would if it were maintained on a series of "punch cards" used by mainframe computers in the 1960s and 1970s. *See generally* James Grimmelmann, *All Smart Contracts are Ambiguous*, 2 J.L. & Innovations 1 (2019); Quinn DuPont, *Ledgers and Law in the Blockchain*, King's Review, June 23, 2015, https://www.kingsreview.co.uk/essays/ledgers-and-law-in-the-blockchain; Stuart D. Levi & Alex B. Lipton, *An Introduction to Smart Contracts and Their Potential and Inherent Limitations*, Skadden (May 7, 2018), https://www.skadden.com/insights/publications/2018/05/an-introduction-to-smart-contracts.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of the ERC-20 Token Standard.[65] This standard is used to create smart contract code that will maintain a list of public addresses and corresponding balances of the relevant token associated with those addresses.

When code that creates a new token is deployed to the Ethereum network, that code will provide functionalities allowing users to transfer the tokens (*i.e.*, change numbers of units) from one public address to another in the record maintained by that code, among other actions. Thus, although the relevant smart contract contains a ledger of amounts of crypto asset units, because these amounts are associated only with a public address, crypto assets are said to be pseudonymous. While usually possible with significant effort to associate a public address with a real-world identity, the ability to do this is far from certain and often depends on some level of carelessness on the part of the person who controls the address.

Thus, in a legal sense, ownership of a token on the Ethereum network means only that the owner has the rightful knowledge of the related private key associated with a public address that has a positive balance of the token associated with it in the relevant smart contract. That private key is used to give an instruction to the network of computers maintaining the relevant smart contract to reduce the number of units of the token associated with the owner's public address and increase the number of units associated with another public address in the smart contract (which second address may also be controlled by that same owner).[66]

As a result, these crypto assets are quite distinct from the native tokens of the Bitcoin, Ethereum and other blockchain networks: it is the specific smart contract code that maintains the record of balances and related public addresses, not the overall network protocol code. This means that the crypto asset created by a given smart contract is subject to all of the features, and vulnerabilities, of that code and may behave very differently from other crypto assets maintained on the same network.[67] In

---

[65] *See* "ERC-20 Token Standard", https://ethereum.org/en/developers/docs/standards/tokens/erc-20/ (last visited May 15, 2022).

[66] Similar to the strowrange seeds, this makes tokens effectively "bearer" assets. Although the law may differentiate between persons who have rightful (versus improper) knowledge of a private key that controls one or more tokens, the network nodes that effect a transfer instruction are unaware of the person or entity giving the instruction and whether that instruction is being made either improperly (*i.e.,* by an unauthorized person) or by mistake by the rightful owner. For a detailed discussion of the bearer nature of crypto assets and the implications of their bearer status, *see* Lyn Alden, "Why Gold and Bitcoin are Popular (An Overview of Bearer Assets)", available at https://www.lynalden.com/gold-and-bitcoin/.

[67] Of particular note is that a given smart contract can have an "administration key", a private key that allows a person with knowledge of the key to give instructions to the Ethereum network that would alter parameters of the smart contract. *See infra* text at note [74].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

addition, the amounts of token balances in a given smart contract are truly fungible in that there is no provenance to the balances; they are simply numbers recorded by the relevant smart contract code that move up or down when a valid instruction concerning a balance is provided to the Ethereum network by a user.

Users of the Ethereum network, however, do not control the process of actually changing the state of the EVM (including transferring tokens through instructions to change the balance of an address maintained by the relevant contract). Only full nodes[68] of the Ethereum network can do this. To incentivize the operators of network nodes to include a given user's instructions in a block that will change the state of the EVM in a manner desired by the user, the user must pay a transaction fee in ether, thus resulting in the real-world economic value of the token – without it, use of the EVM cannot be paid for.[69] This effectively results in an open bidding process for network resources in each block, with those willing to pay the highest transaction fee most likely to have their instructions executed in priority to others, something that may have significant value to the user.

Since most crypto assets that have been deemed to be securities are maintained on Ethereum or similar networks,[70] we focus our discussion in this Article on crypto assets or tokens not intended to represent stock, debt or another type of security identified in the Securities Acts' definitions. As an example of the smart contract code used to create crypto assets on the Ethereum network, *Figure 1* shows an implementation of the ERC-20 token standard, as developed by crypto asset company, ConsenSys:

---

[68] In the Ethereum network, a "node" is any instance of Ethereum client software running on a privately owned or operated computer that is connected to other privately owned or operated computers also running Ethereum software. A "client" is an implementation of one of any number of distinct open-source software packages (written in distinct computing languages for purposes of resilience) implementing a version of the Ethereum protocol and running on a node that verifies data received by the relevant computer against the protocol rules to keep the network secure. Currently, Ethereum consists of two parts: an execution layer and a consensus layer. Both layers are run by different client software. The execution client listens to new transactions broadcasted in the network, executes them in the EVM, and holds the latest state and database of all current Ethereum data. (The consensus client implements Ethereum's new proof-of-stake consensus algorithm, which enables the network to achieve agreement based on validated data from the execution client). *See* Ethereum.org, "What Are Nodes and Clients?", available at https://ethereum.org/en/developers/docs/nodes-and-clients/.

[69] Despite suggestions to the contrary, many other tokens also have some similar tie to the real world, permitting in one way or another direct engagement with a blockchain-based protocol or dApp. Nevertheless, given the ease with which new tokens can be created, the only "utility" of other tokens is the ability to transfer then control of them from one wallet to another, causing these tokens to resemble digital poker chips. The absence of real world value of some crypto assets and its impact on the matters covered in this Article is discussed below. *See infra* text at note [72].

[70] *See, e.g.,* Georgios Dimitropoulos, *The Law of Blockchain*, 95 Wash. L. Rev. 1117 (2020); Lianos, Ioannis *et al.,* Regulating Blockchain: Techno-Social and Legal Challenges, Oxford University Press (2019).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

```
1   /*
2   Implements EIP20 token standard: https://github.com/ethereum/EIPs/blob/master/EIPS/eip-20.md
3   .*/
4
5
6   pragma solidity ^0.4.21;
7
8   import "./EIP20Interface.sol";
9
10
11  contract EIP20 is EIP20Interface {
12
13      uint256 constant private MAX_UINT256 = 2**256 - 1;
14      mapping (address => uint256) public balances;
15      mapping (address => mapping (address => uint256)) public allowed;
16      /*
```

*Figure 1.  ConsenSys ERC-20 Implementation*[71]

This basic implementation, a mere six lines of code, forms the underpinning of many of the world's most prominent crypto asset projects.[72]  For those seeking further customization, *Figure 2* highlights some simple customizations (described in English in the annotations):

```
18      The following variables are OPTIONAL vanities. One does not have to include them.
19      They allow one to customise the token contract & in no way influences the core functionality.
20      Some wallets/interfaces might not even bother to look at this information.
21      */
22      string public name;                //Fancy name: eg Simon Bucks
23      uint8 public decimals;             //How many decimals to show.
24      string public symbol;              //An identifier: eg SBX
25
26      function EIP20(
27          uint256 _initialAmount,
28          string _tokenName,
29          uint8 _decimalUnits,
30          string _tokenSymbol
31      ) public {
32          balances[msg.sender] = _initialAmount;    // Give the creator all initial tokens
33          totalSupply = _initialAmount;             // Update total supply
34          name = _tokenName;                        // Set the name for display purposes
35          decimals = _decimalUnits;                 // Amount of decimals for display purposes
36          symbol = _tokenSymbol;                    // Set the symbol for display purposes
37      }
38
```

*Figure 2.  ConsenSys ERC-20 Implementation.*[73]

Absent a legally enforceable off-chain agreement (which could include terms and conditions on a website, if properly structured), ownership of such a token simply allows the person with knowledge of a private key that controls one or more tokens to be able to control the blockchain-based ledger maintained in the relevant smart contract by giving an instruction that will be recognized as valid to the network of

---

[71] ConsenSys/Tokens/contracts/eip20/EIP20.sol, https://github.com/ConsenSys/Tokens/blob/fdf687c69d998266a95f15216b1955a4965a0a6d/contracts/eip20/EIP20.sol.

[72] Most tokens are either "native" to a particular blockchain protocol itself (such as the ether token is to the Ethereum network, the SOL token is to the Solana network, and the ADA token is to the Cardano network) or form part of a "decentralized application" (often referred to as a "dApp") that is a "project" built on top of a given blockchain protocol that allows communities of users to interact with each other without the need for an intermediary entity.  Both types of tokens generally require the use of much more complex and involved smart contract code in addition to the specific code that manages the token itself.  The value of most tokens generally comes from the requirement that a user hold some number of tokens in order to *access* and utilize the relevant protocol or dApp.

[73] *See supra* note [71].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

computers which maintains that smart contract – that's it.[74] Crucially, the smart contract ledger maintaining the balance of token units associated with public addresses will remain available regardless of whether the company or person that raised funds through the sale of that token continues to exist or has been voluntarily or involuntarily dissolved.[75]  A discussion of specific illustrative tokens is included as Annex C.

When seeking to understand crypto assets, it is important also to understand the nature of the larger protocol of which the smart contract that creates a given crypto asset may only be part.  For these purposes, a "protocol" can be generalized as a set of rules (implemented as an integrated set of smart contracts) that govern the operation of a blockchain-based computer network (or, in the case of a smart contract-based token, a dApp deployed on that network).  That set of smart contracts – the software code which implements the protocol – can be replicated and altered (in blockchain parlance, forked), but to the extent the original smart contracts remain deployed, for example, on the Ethereum network, the EVM will behave deterministically (*i.e.*, in exactly the same way, reaching the exact same outcome, in response to the same set of instructions).

The vast majority of smart contract code used to implement blockchain protocols is made available under one or another type of open-source license[76] and, as a result, is generally available to be copied and

---

[74] For example, such an "instruction" might be to transfer the token to another address at a predetermined time or upon the occurrence of an event.  That address may be "owned" by a separate smart contract which, triggered by the transfer, executes further transactions.  Because of the deterministic nature of blockchain networks, once an instruction is given, the instructing party can have a very high degree of confidence that the network will execute the instruction as submitted.  In addition, these instructions can be combined in myriad ways involving multiple dApps to create complex logic that would be difficult or impossible to replicate without the use of blockchain technology and token-based instructions.  However, it is crucial to understand that there is no intrinsic "legal layer" to smart contracts – the relevant network will respond in an identical way regardless of whether an instruction came from the "lawful" owner of the token or a person who illicitly gained access to a relevant private key and wrongfully provided the instruction, although depending on the facts and circumstances, traditional legal remedies could apply to identifiable individuals or entities that utilized smart contract code.  *See, e.g.*, Andrew M. Hinkes, *Throw Away the Key, or the Key Holder?  Coercive Contempt for Lost or Forgotten Cryptocurrency Private Keys, or Obstinate Holders*, 16 Nw. J. Tech. & Intell. Prop. 225 (2019).

[75] Or at least so long as the smart contract code remains deployed to an address on a blockchain network, and that network continues to be maintained by a sufficient number of nodes (we refer to this as "unlimited existence").

[76] Opensource generally refers to software that uses a license which complies with what is known as the open-source definition and is approved by the Open Source Initiative.  *See* https://opensource.org/.  The terms of open-source licenses vary dramatically and are outside the scope of this Article but generally fall into three categories: "permissive", "copyleft", and "other".  *See, generally,* Greg R. Vetter, *"Infectious" Open Source Software: Spreading Incentives or Promoting Resistance?*, 36 Rutgers L. J. 53 (2004).  Although provided under an open-source license, smart contract code is still subject to copyright, which rights are often held by a non-profit entity, such as a foundation, that manages those rights.  The owner of a token who uses this smart contract code may not implicate rights under copyright, but if the interaction does implicate such rights, the token

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

altered by anyone,[77] and will continue to exist so long as a minimum number of nodes are running the relevant code and participating in the network.  By way of an example of a non-computer-based protocol, one can think of card games.  The 18th Century card game, whist[78] is rarely played today but, so long as the rules are known, groups can get together, follow those rules, and play the game.  The same holds true for computer protocols – so long as the codebase for the protocol is available, computers can be programmed to run that protocol, even if the protocol had not been run for some period of time.

## C.      The Uses of Crypto Assets

Tokens are best understood as technological *tools* that, once created, continue to exist and function with unlimited existence.  Although they generally provide the token owner an *ability* to take certain actions with respect to a blockchain network – for example, sending one type of token to a contract address that will return another type of token to the original address or calling a pre-coded "vote" function send instructions to a network of computers, most tokens do not in and of themselves confer, or purport to confer,[79] to the owner any *rights* against an identifiable third party cognizable under current law.[80]  Delivery of a token that is not itself a type of legal instrument is not currently recognized as a means of conveying legal rights that will be recognized in a court of law.[81]  Accordingly, to the extent that any judicially recognizable rights are

---

owner may benefit from an explicit or implicit grant of a license to engage with the relevant smart contract code by the copyright holder.  However, these are rights that *benefit* the copyright holder and *may impose duties or obligations* on a token holder – the opposite of the legal relationship between a securities issuer and a securities holder, where the security *grants rights to the holder* and *imposes duties or obligations* on the issuer.  *See infra* text and notes at [103 and 104] and Section II.D for a further discussion of this concept.

[77] Use of open source-licensed software may still be subject to certain conditions, such as "copy-left" requirements.  *See, e.g.*, "What is Copyleft?", GNU Operating System (available at https://www.gnu.org/licenses/copyleft.en.html).

[78] *See* Wikipedia, "Whist" available at https://en.wikipedia.org/wiki/Whist.

[79] Some "governance tokens" provide the owner with the *ability* to "vote" as to various matters by sending messages to the address of a smart contract which ensures that a given token-holding address only votes once for all tokens held.  The smart contract may then aggregate all votes and, potentially, give instructions to another smart contract based on the value created by the number of these "votes" recorded.  However, when such tokens are sold, it may be suggested by the seller that the token conveys not just an *ability* to vote but the *right* to vote – a right that may purport to be able to be enforceable against an identified entity, such as a foundation company (whether the transfer of a token is sufficient to create such a right under applicable law is another matter).  Tokens sold on this basis present more challenging analytic questions that are out of the scope of this Article and could potentially be considered as an equity interest in the related entity.  *See* discussion of The DAO Report, *supra,* Section III.A, *infra*.

[80] The function of a token can be analogized to a physical key that may give the holder the *ability* to open the associated lock, but not any *right* to do so.  That is, if the physical key fails to open the associated lock, in the absence of some legally cognizable promise by an identifiable person or entity (which, of necessity, would be extrinsic to the physical key), the owner of the physical key would be "out of luck", with no legal or economic recourse against anyone for the key's failure to open the lock.

[81] *See* discussion of "instruments" in Section [II.D.2] *infra*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

purported to be associated with a token, they would need to be created under a separate enforceable agreement or instrument, under an existing statute, or by operation of law, and be transferable by valid assignment of the agreement, physical delivery of the instrument, or by other valid recognition of the transfer by the related obligor or issuer.[82]

It may be tempting to view tokens as similar to paper-based certificates that evidence securities or other tradable financial instruments because they are often purchased for speculative purposes, can be easily transferred, and may be purchased on an exchange, among other reasons. However, current commercial law in the United States contemplates that securities and other financial instruments either be in physical (paper) form or, in the case of certain securities, be uncertificated -- *i.e.*, have no embodiment of the relevant legal rights between the parties.[83]  Crypto assets however are not in paper form, and, as discussed below, there is no support in current securities law jurisprudence that crypto assets in and of themselves may be used to "embody" legal rights between counterparties.[84]  This does not mean that there isn't some interesting

---

[82] The obverse is the case as well – any legally enforceable *duties* applicable to the person or entity that deployed the relevant smart contract code would need to be imposed by a separate enforceable agreement or instrument, under a statute, or by operation of law.

[83] U.C.C. § 8-102(15) defines a "security" in part as: "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer: (i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and (iii) which: (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (B) is a medium for investment and by its terms expressly provides that it is a security governed by [Article 8]."; U.C.C. § 8-102(16) defines a "security certificate" to mean a "certificate representing a security."; an "uncertificated security" is defined in U.C.C. § 8-102(18) as a "security that is not represented by a certificate."  U.C.C § 8-301 provides delivery of a security certificate occurs upon physical delivery of said certificate, and thus a security certificate must exist in physical form.  The U.C.C. defines "instruments" as negotiable instruments or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.  *See* U.C.C. § 9-102(a)(47) (emphasis added).

[84] *See* discussions in Section [IV.C] *infra*.  U.C.C. § 8-102(15) defines a "security" in part as "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer: (i) which is *represented* by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and (iii) which: (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (B) is a medium for investment and by its terms expressly provides that it is a security governed by [Article 8]."  (Emphasis added); U.C.C. § 8-102(16) defines a "security certificate" to mean a "certificate representing a security."; an "uncertificated security" is defined in U.C.C. § 8-102(18) as a "security that is not represented by a certificate." U.C.C. § 8-301 provides delivery of a security certificate occurs upon physical delivery of said certificate, and thus a security certificate must exist in physical form.  The U.C.C. defines "instruments" as negotiable instruments *or any other writing* that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.  *See* U.C.C. § 9-102(a)(47) (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

experimentation currently being undertaken where crypto assets are being contractually associated with off-chain rights or interests, but those use cases would have some identifiable off-chain agreement.

Nevertheless, crypto assets are still a type of property[85].  At a minimum they are a type of resource capable of being owned or controlled by a business or person and have a financial value based on what a seller of that crypto asset would expect to receive in return for validly transferring control of that crypto asset to another person.[86]

Why would one want to own a crypto asset?  Many crypto assets are referred to colloquially as cryptocurrencies (or crypto for short), implying a use as a real-world payment or settlement asset.  Although bitcoin and a few other crypto assets were created with the specific expectation that they would be used as a general tool for all payments, that use case, while possible[87] has a number of drawbacks[88] and has not yet become significant.  Instead, crypto assets whose value is directly or indirectly pegged to a major fiat currency, such as the U.S. dollar (known as stablecoins), have taken over this role.[89]  Another use of crypto assets is to allow users of a particular blockchain-based service to pay for that service.  A good example of this use is the Ethereum blockchain network, which requires the native crypto asset of that network, ether, to be used to pay for the number of computing cycles a particular smart contract will consume to effect a transaction (although there is no correlation between these transaction costs and the price of ether).

Most commonly, though, like the horticulturalist's desire to sell strowrange seeds in bulk in order to create early interest in the success of

---

[85] The exact parameters of property law when applied to crypto assets are still under development.  *See* James Grimmelmann and Cristina Mulligan, "Data Property" (October 18, 2022), AMERICAN UNIVERSITY LAW REVIEW, Forthcoming, available at https://ssrn.com/abstract=4251825 ("Bitcoin are possessed by the person who knows the private key needed to sign a transaction transferring them").  *See also* the UK Law Commission Consultation on Digital Assets, available at https://www.lawcom.gov.uk/project/digital-assets/ (considering principles of private English law, and particularly private property law, in relation to crypto assets).

[86] Note that the Uniform Law Commission recently approved amendments to the U.C.C. that add a new Article 12 on "controllable electronic records" (such as virtual currencies, electronic money, and nonfungible tokens).  These amendments also update the U.C.C. to account for digital records, electronic signatures, and distributed ledger technology, provide rules for electronic negotiable instruments, and clarify the rules for U.C.C. applicability to hybrid transactions involving both goods and services.  These amendments will not be effective, however, until adopted by the various states.  *See* "ULC Wraps Up 131st Annual Meeting: Five New Acts Approved", available at https://www.uniformlaws.org/discussion/ulc-wraps.

[87] *See, e.g.*, New York Digital Investment Group's program for paying salaries in bitcoin, available at https://nydig.com/lp/savings-plan.

[88] *See* Izabella Kaminska, "Busting the myth that bitcoin is actually an efficient payment mechanism", Financial Times, December 13, 2017, available at https://www.ft.com/content/c7c80d08-a5e4-397c-b027-91fda883737a.

[89] *See* Alyssa Hertig, "What Is a Stablecoin?", CoinDesk, updated September 16, 2022, available at https://www.coindesk.com/learn/what-is-a-stablecoin/.  Some stablecoins may have characteristics of a security and are beyond the scope of this Article.  *See, supra*, note [7].

29

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the strowrange ecosystem, crypto assets are often sold at an early stage to bootstrap interest in a new blockchain-based protocol by rewarding early adopters or supporters of the protocol with native tokens.  While early-stage buyers of tokens understand that most new blockchain protocols will probably not gain much traction (and the associated tokens will likely lose most, if not all, of their value), some protocols, like the Ethereum network, will become tremendously popular, producing vastly outsized returns for those smart (or lucky) enough to "get in early" on owning the associated tokens.[90]

### D.    The Exchange and Trading of Crypto Assets

Crypto assets, once created, are generally transferred either through a centralized crypto asset marketplace (*i.e.*, one like Coinbase[91] that is operated by a company or other identifiable legal entity) or on a peer-to-peer basis, either directly between buyer and seller, or indirectly, through the use of decentralized exchange applications, such as Uniswap v3.[92]  Centralized crypto asset markets initially grew up around the trading of bitcoin[93] and have since expanded into the trading of a wide variety of other crypto assets, as well as providing custody, analytics, and other services to customers.[94]  In the United States, so long as the assets traded in a centralized crypto asset market are not considered securities, these markets are not subject to federal securities oversight or regulation, a state of affairs that has raised concerns for many.[95]

---

[90] *See, e.g.*, Alex Gailey, "How to Evaluate Any Cryptocurrency: A Guide for Investors", Time, July 19, 2022, available at https://time.com/nextadvisor/investing/cryptocurrency/how-to-evaluate-any-crypto-coins-potential/.  *Cf.* Lori Schock, "Thinking About Buying the Latest New Cryptocurrency or Token?", Investor.gov, available at https://www.investor.gov/additional-resources/spotlight/directors-take/thinking-about-buying-latest-new-cryptocurrency-or.

[91] *See* https://www.coinbase.com/.

[92] The smart contract code for Uniswap v3 is available at https://github.com/Uniswap/v3-core.

[93] *See, e.g.*, "Coinbase Strategy Teardown: How Coinbase Grew into The King Midas of Crypto", CB Insights (October 19, 2021), available at: https://www.cbinsights.com/research/report/coinbase-strategy-teardown/.

[94] The most prominent U.S.-based centralized crypto asset exchange, Coinbase, went public in 2021 and is now a reporting company under the Exchange Act.  *See* Michelle Chapman, Alex Veiga, "Coinbase soars in market debut, valued near $86 billion", AP News (April 14, 2021), available at: https://apnews.com/article/coinbase-stock-ipo-price-c3b802074ce4349b5bccf9ba43022800.  Because centralized crypto asset markets frequently provide multiple services to customers, including custodial and staking services, and have benefit from the leverage of rehypothecated customer assets, they have proven to be vulnerable to customer "runs".  In 2022 a number of crypto asset marketplaces have suffered setbacks, either filing for bankruptcy protection or, in the case of FTX, a prominent non-U.S. market, entering into a distress sale to a competing market, Binance.  *See* Hannah Lang and Tom Wilson, "Binance Plans to Buy Rival FTX in Bailout as Crypto Market Crumbles", Reuters, November 8, 2022, available at https://www.reuters.com/markets/currencies/cryptocurrencies-slide-concerns-over-ftx-exchange-rattle-markets-2022-11-08/.

[95] *See, e.g.*, Letter of Sen. E. Warren to Gary Gensler, Chair, U.S. Securities and Exchange Commission, July 7, 2021, at p. 2 ("Although they describe themselves as cryptocurrency

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In addition, to the extent that such markets do not allow trading in commodity interests (generally, derivatives contracts), they will also not be subject to supervision by the CFTC.[96]   Generally centralized crypto asset marketplaces are considered money transmitters, a type of money service business that is subject to registration with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), which entails developing and maintaining a comprehensive anti-money laundering program, as well as implementing a variety of reporting and record-keeping requirements. These entities are also required to obtain licenses in most states under local money transmission statutes.  However, these entities are not currently subject to any form of comprehensive federal supervision or oversight.[97]

The process of locating other parties with whom to trade crypto assets on a purely peer-to-peer basis can be time-consuming, impractical, and risky.  At the same time, the desire of many crypto asset owners not to use (and be obliged to trust) centralized markets led to the development of so-called decentralized exchanges.   These platforms, commonly referred to as DEXes, are smart contract-based protocols deployed on blockchain networks that are designed to carry out functions similar to those performed by centralized crypto asset marketplaces, but programmatically and without the need for an entity to act as intermediary or operator.

Although there are different models for decentralized exchanges, as of this writing, most DEXes use automated market maker (of "AMM") technology.   In these systems, one or more persons act as liquidity providers by sending at least two crypto assets (a "pair") to the address of a smart contract.  The smart contract locks the crypto assets and, in exchange, returns to the sender a new crypto asset, representing the ability to retrieve a certain amount of the original assets from the smart contract at a later date.[98]  Other persons interested in trading for one of the assets

---

'exchanges,' these platforms lack the same types of basic regulatory protections as traditional national securities exchanges like the New York Stock Exchange or Nasdaq" (footnote omitted).), available at: https://www.warren.senate.gov/oversight/letters/warren-asks-sec-chair-gensler-about-risks-posed-by-cryptocurrency-exchanges.

[96] Although, to the extent that the assets traded on these exchanges are considered "commodities", the CFTC would have antifraud enforcement authority in accordance with 7 U.S.C. § 6b(a)(2), 7 U.S.C. § 9(1), and 17 CFR § 180.1(a)(1)-(3).

[97] Some crypto asset marketplace providers are structured as limited purpose trust companies, generally formed under state law.  *See, e.g.*, "Paxos – About Us", available at https://paxos.com/company/.

[98] AMM-based DEXes allow for peer-to-peer exchange of crypto assets through the use of smart contracts known as liquidity pools and AMM algorithms. Users known as liquidity providers send two or more crypto assets they control in in a variable ratio to smart contracts that create "liquidity pools".  Then, other users can exchange the assets within a given pool and the AMM algorithm adjusts the relative amount (and, hence, the price) of the assets in the pool depending on the size of the trade and the number of assets in the pool prior to the trade.  The addresses to which liquidity providers have sent assets are subsequently sent a small amount of the crypto assets from each trade in the pool.  If a lack

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

in that pair will send a quantity of one of the crypto assets they control to that same contract and simultaneously receive back a certain amount of the other asset in the pair.[99]  The ratio of the two assets to each other is determined algorithmically based on the supply and demand of the two assets in the pair.

### E.    Crypto Assets as Speculative Investments

While any tokens that have been deployed to a blockchain network and are active have at least some inherent and present utility,[100] it must be recognized that, like the strowrange seeds, many tokens are purchased by a buyer, not for anticipated consumptive use of the relevant utility by that buyer but rather as an investment – an asset anticipated to be in greater demand in the future than it is currently (or at least to hold its value relative to the anticipated depreciation of alternative investment assets).  Again, like the strowrange seeds, because most tokens have a predetermined finite supply, an increase in the demand for the relevant functionality of the token or related dApp or network at some point in the future with a (relatively) constant supply of the tokens would be expected to lead to an increase in the price of the token.[101]  This characteristic allows users of the relevant technology to bypass purchasing an equity interest in a corporate owner of a given platform or technology and instead participate directly in the success or failure of the technology through direct ownership of the means by which the technology is used – the tokens.    This blending of consumptive use and potential for price appreciation has proven to be of great interest to market participants around the world.

Many crypto assets currently in the market relate to a technology platform that has not yet matured and may still depend on an identifiable entity or group of related entities (which we refer to generally as the "founders", irrespective of the exact time they enter the project).  These

---

of liquidity in a specific pool causes a large amount of slippage and a resulting price difference relative to external markets, the price should be restored by traders due to the arbitrage opportunity.  *See* Jiahua Xu *et al.*, *Decentralized Exchanges (DEX) with Automated Market Maker (AMM) Protocols*, arXiv (Jan. 14, 2022), available at https://arxiv.org/pdf/2103.12732.pdf.

[99] That is, the blockchain network executes both sides of a transaction instruction or neither are executed.  This is generally known as an "atomic swap" when the transaction involves an exchange of crypto assets between two or more addresses.

[100] That is, an instruction can be given to the relevant network, moving a balance of the token from one address to the other.

[101] However, as noted above, unlike the strowrange seeds, crypto assets can be "staked" – sent to an address on a blockchain network not directly controlled by the sender, where the sender receives more of the same asset or a different as a result of "locking" (or "staking") her original tokens.  For a discussion of the securities law aspects of staking ether tokens, *see* Rodrigo Seira, Amy Aixi Zhang and Jake Chervinsky, "Ethereum's New 'Staking' Model Does Not Make ether a Security", October 5, 2022, available at https://www.paradigm.xyz/2022/10/ethereums-new-staking-model-does-not-make-eth-a-security.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

founders often promote the use of the platform, address bugs or exploits that may arise in the codebase of the platform, develop new elements that enhance the desirability of the platform for users, and undertake other activities that are intended to foster platform growth.  In theory at least, over time, a sufficiently large community of individuals or legal entities with a personal or economic stake in the success of the platform will form—a network effect—supporting the platform without a high level of reliance on those founders.[102]

Critically, though, except in the uncommon case of tokens associated with a promise of profit interests in an off-chain business or with other off-chain undertakings associated with traditional securities, tokens and the on-chain abilities they may facilitate do not in and of themselves provide their owners with any actual or implied rights against, or interests in, these founder individuals or entities.[103]   Instead, the activities of the platform founder(s) are better understood in economic terms as a positive externality: the possibility of the founder(s) undertaking one or more activities may create an expectation of a benefit but not an entitlement to that benefit.[104]

However, crypto assets are not the only speculative asset not representing an interest in a business or a contractual right to a return. Land in undeveloped (if not barren) areas has frequently been seen as providing the potential for outsized returns.[105]   Many other examples

---

[102] This rather amorphous, inchoate, and potentially impermanent state is now commonly referred to in the blockchain world as "sufficiently decentralized".  For a further discussion of this concept and its relationship to the federal securities laws, *see infra* text at note [301].

[103] Another way to understand this is that the absence of a legal relationship between the owners of the tokens and the founders means that the founders cannot be compelled to undertake any particular activities and any legal entities that they may have formed may be dissolved without reference to the interests of the owners of the tokens.  This highly unusual dynamic is one factor that has allowed token-based projects to scale very rapidly and evolve in ways that would be difficult or impossible for traditional companies to mimic.  It has also flung open a door to unscrupulous founders who exploit the good faith of early backers that buy tokens and find themselves without the type of statutory or contractual recourse they would have had if they had supported the founders with traditional equity or debt securities.  We note that, in certain circumstances, token purchasers may impose contractual (*i.e.*, legally binding) obligations on project founders (such as those often found in so-called "Simple Agreements for Future Tokens" (*see infra* note [246] and accompanying text)).  However, arrangements of this type are extrinsic to the tokens themselves and evidenced by traditional legal agreements.

[104] An "externality" is a positive or negative outcome of a given economic activity that affects a third party that is not directly related to that activity.  *See* International Institute for Sustainable Development, "What Is an Externality?", available at https://www.iisd.org/savi/faq/what-is-an-externality/ ("Erosion and chemical runoff caused by building roads, which causes water pollution further downstream, is an example of a negative externality.  By comparison, an increase in high-earning taxpayers, resulting from a university being built in a low-income area with limited higher education opportunities, is an example of a positive externality.").

[105] Unsurprisingly, undeveloped land has also frequently been the subject of investment contract litigation, accounting for approximately 10% of all appellate cases we reviewed. Moreover, despite occasional statements from courts and regulators about land having

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

abound, including art created by as-yet-unknown artists,[106] the offspring of thoroughbred horses,[107] limited edition vinyl records,[108] and even sports contracts provided to young athletes yet to prove themselves at the professional level.[109]  All of these assets have significant potential for a large or even total loss and only a small chance of an outsized return. Speculative interest in assets can of course also be found be found in the traditional equity markets.[110]

Nevertheless, this speculative economic characteristic *does not change the nature of the asset itself*.  In particular, some assets may be viewed as having primarily speculative value (*i.e.,* little or no value to the real economy).  A frequently offered modern example of this are the "Beanie Baby" series of plush toys from the 1990s created by Ty, Inc. which were sold in retail outlets and then "whimsically" withdrawn from circulation to create artificial scarcity.  This resulted in highly speculative secondary markets developing with rapid price increases, leading to an inevitable crash.[111]  As we will see, depending on how Beanie Babies were offered and sold, investment contract transactions may have been formed, but by no measure were the plush toys themselves securities.

---

"inherent value", to the contrary, land sold in investment schemes can have zero or even negative value.  For a good example, *see* "Visiting Our New Mexico Land Scam - Airstream RV Travel" available at https://www.youtube.com/watch?v=KzHzOqOBaoI. Interestingly, this video relates to a well-known investment contract case in the Southern District of New York, *Davis v. Rio Rancho Estates, Inc*., 401 F. Supp. 1045 (S.D.N.Y. 1975).

[106] *See, e.g.*, Milica Jovic, "*How Art Collectors Can Increase the Value of their Collection*", Artacacia, January 17, 2019, available at https://www.artacacia.com/blogs/posts/how-art-collectors-can-increase-the-value-of-their-collection ("It's not a secret that collectors like to invest in promising young artists that are expected to shoot to stardom in the years to come.").

[107] *See, e.g.*, John J. Kropp, J. Jeffrey Landen, and Daniel C. Heyd, *Horse Sense and the UCC: The Purchase of Racehorses*, 1 Marq. Sports L. J. 171 (1991) ("Less than two percent of all horses ultimately become stakes winners.  Forty percent of the thoroughbreds ultimately win at least one race, and sixty-five percent of the thoroughbreds at least make it to the starting gate.  But approximately thirty-five percent of each year's crop of thoroughbred foals never make it to the track.  Therefore, the purchase of a horse for racing purposes is a transaction that involves significant financial risk." (footnotes omitted)).

[108] *See, e.g.*, Stefan Von Imhof, "Investing in Vinyl Records", November 16, 2021, available at https://alts.co/investing-in-vinyl-records/.

[109] *See, e.g.*, Joseph Stromberg, "How NFL Teams Ignore Basic Economics and Draft Players Irrationally" *Vox*, May 7, 2014, available at https://www.vox.com/2014/5/7/5683448/how-nfl-teams-ignore-basic-economics-and-draft-players-irrationally ("[Drafting college players is] basically a coin flip, … but teams are paying a great deal for the right to call which side of the coin.").

[110] *See, e.g.*, Shaun Davies, "Speculation Sentiment" (December 19, 2020), available at https://ssrn.com/abstract=3063551 (exploring demand from uninformed equity market traders and characterizing this as "speculation sentiment" – an uninformed belief about the future direction of the market similar to the beliefs of the gambler looking at the roulette wheel).

[111] *See* Zac Bissonnette, *The Great Beanie Baby Bubble*, Portfolio/Penguin (2015) at p. 165 (noting that increasing demand in Beanie Babies led to ever-rising secondary market prices, with certain Babies trading hands at prices as high as $625 each in May of 1997).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Adding to the speculative interest in crypto assets is their effective bearer status and ease of transferability.  Although this status can support legitimate privacy concerns, particularly among persons subject to hostile or exploitive governmental actors, it can also facilitate the use of these assets for illicit purposes, including money laundering or sanctions evasion.  For some, the possibility of outsized returns, coupled with an ability to obfuscate the identity of the person or entity benefitting from those gains, can be a powerful incentive for ownership.   The pseudonymous nature of assets also allows unscrupulous parties to engage in wash trading or other activity that can artificially inflate the market price of the asset, leading to pump-and-dump schemes that can cause serious financial harm to others.  Under current law, however, none of this activity brings either the Beanie Babies or crypto assets within the ambit of federal securities law.

### F.      Some Conclusions on Crypto Assets

Because fungible crypto assets created using the ERC-20 standard (or an equivalent) of the type we are discussing are simply ledger entries in a smart contract recording numerical units, these assets by themselves neither create nor provide their owner with any right against, or interest in, any other person.  As a granular unit of a technology platform, these assets will have as much or as little value as another party is willing pay for them at any time.  In this way, they allow for a new form of technology ownership where profit potential and functional utility are inextricably linked.  Because crypto assets are pseudonymous, or bearer-like, in nature,[112] they can also be used for a range of illicit or unscrupulous purposes.[113]   While these *uses* of crypto assets are appropriately concerning, they do not alter the *nature* of the crypto assets themselves, which is the subject of our inquiry here.

---

[112] A "bearer" financial instrument is similar to cash in that it is transferred (or "negotiated") exclusively through the physical delivery of the instrument by the holder (or "bearer" of the instrument); there is no ledger or record of ownership maintained by the issuer of the instrument.  *See* U.C.C. Section 1-201(5) ("'Bearer'" means a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or indorsed in blank.")  Like cash, if a bearer instrument is lost or stolen, it may be difficult or impossible to recover.  The pseudonymity of blockchain address and the complete responsibility of the owner of a crypto asset to main the seed phrase that allows the owner to control their wallet, gives crypto assets much of the same character as bearer instruments.

[113] The same is true for a variety of other bearer or quasi-bearer assets, like art and antiquities, as well.  *See, e.g.*, U.S. Department of the Treasury, "Study of the Facilitation of Money Laundering and Terror Finance Through the Trade in Works of Art" (February 4, 2022), available at https://home.treasury.gov/system/files/136/Treasury_Study_WoA.pdf.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## II.   WHAT ARE "INVESTMENT CONTRACTS"?  A REVIEW OF THE *HOWEY* CASE LAW[114]

Long before Congress enacted the Securities Act in 1933, the law recognized that the common good would benefit from the application of regulatory protections to certain commercial arrangements in which one party entrusted another with capital for the purpose of entering into, or funding, some sort of profit-seeking venture.  As has been well-covered elsewhere,[115] the Securities Acts were developed following the Stock Market Crash of 1929 and the ensuing Great Depression, taking elements of existing state securities laws to develop a federal regulatory regime. The definition of the term "security" in the Securities Act was intended to be "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the concept of a security."[116]  Thus, it should come as no surprise that the foundational question of exactly *which* commercial arrangements should be regulated as transactions in securities, and which should not, has been one of the most important, and also most controversial, questions in U.S. securities law.[117]

In this section, we briefly explore the history and purpose of the inclusion of the concept of "investment contract" in the definition of the term security in the Securities Acts.  Importantly, that term has been used by courts to refer both to *instruments* with substantially all of the economic characteristics of a security, but which do not fall within an enumerated category in the statutory definition, and, more commonly, to ostensibly commercial *transactions or schemes* that are not based on a single legal instrument but which nevertheless are deemed to fall within the policy ambit of the Securities Acts.[118]  We then examine the well-known *Howey* test, observing the importance placed by courts on the "facts and circumstances" of each potential investment contract transaction.

Following this, we delve into the specific fact patterns that may create an investment contract transaction, illustrating these with examples from the Strowrange Labs hypothetical and drawing parallels with transactions involving crypto assets in both primary and secondary transactions.  Finally, we focus more closely on the "common enterprise" prong of the *Howey* test and how it has been applied in various contexts.

---

[114] A complete list of the federal appellate investment contract cases reviewed for this Article is included in Annex A.

[115] *See, e.g.,* Louis Loss, Joel Seligman & Troy Paredes, "Securities Regulation" (Internet Ed.) (hereinafter, the "*Loss Treatise*"), Chapter 3.  *See also,* James M. Landis, *Legislative History of the Securities Act of 1933*, 28 Geo. Wash. L. Rev. 29 (1959).

[116] H.R. Rep. No. 85, 73d Cong., 1st Sess. 11 (1933).

[117] A bibliography of academic scholarship and other leading work on this topic over the years is included in Part I of Annex B.

[118] *See S.E.C. v. SG Ltd.,* 265 F.3d 42 (1st Cir. 2001) ("We do not gainsay the obvious correctness of the … observation that investment contracts lie within the commercial world.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

### A.   Identifying Investment Contract Transactions Using the *Howey* Test

The Securities Acts define the term "security" to include an enumerated list of interests and instruments.[119]   These enumerated instruments are *prima facie* securities and, unless the context otherwise requires, if an interest or instrument falls within one of the enumerated categories, that interest or instrument will be considered a security.[120]   To effectuate the broad Congressional intent noted above, the term "investment contract" was borrowed from state Blue Sky laws without further definition and included in the definition of the term "security" in both the Securities Act and the Exchange Act.[121]   It is a catch-all category, intended to cover "novel, uncommon, or irregular devices, whatever they appear to be."[122]

Congress recognized that, to effect fully the remedial purposes of the Securities Acts, a rigid statutory definition involving only then-existing types of instruments or interests would not suffice.   Inclusion of the term "investment contract" and its open-ended definition in *Howey* facilitates these remedial purposes by providing flexible framework capable of encompassing a multitude of schemes, arrangements, or instruments which courts conclude fall within the principles of the Securities Acts and the ambit of the *Howey* test, even though the instrument or scheme created by the parties is not otherwise identified within one of the enumerated categories in the statutory definitions or otherwise commonly known as a security.[123]

---

[119] The Securities Act provides an enumerated list of 21 types of interests and instruments, whereas the Exchange Act enumerates 17 types of interests and instruments which while closely reflective of the Securities Act definition, does not include several interests and instruments, including, notably, "evidence of indebtedness". *See also* FitzGibbon, *What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*, 64 Minn. L. Rev. 893 at 914 (1980) ("[t]he instruments listed in the statutory definition of "security" are the primary vehicles of [the public and major financial markets]—that is, they are, or represent, bundles of financial claims and liabilities.").

[120] *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985).

[121] For an excellent and thorough discussion of the state law underpinnings of the federal definition of the term "investment contract", *see* Joseph C. Long, *An Attempt to Return 'Investment Contracts' to the Mainstream of Securities Regulation*, 24 Okla. L. Rev. 135 (1971).

[122] *S.E.C. v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir. 1973), citing *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943).  *See also A.T. Brod Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir. 1967) ("Novel or atypical methods should not provide immunity from the securities laws.").

[123] The Supreme Court has clarified that this latter clause should not be read as a limitation on the definition of "security", stating in *Tcherepnin v. Knight* that:

> We view the … conclusion [of the appellate court below] that the petitioners' withdrawable capital shares are not securities as a product of misplaced emphasis.  After reviewing the definition of security in § 3(a)(10), the Court of Appeals stated that "[t]he type of interest now before us, if it is covered by this definition, must be an instrument commonly known as a 'security.'".  Thus, the Court of Appeals read the words an "instrument commonly known as a

37

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Because "investment contract" is generally not a term parties utilize in the context of commercial arrangements,[124] it is left to courts in hindsight following a dispute between the parties or upon an enforcement action brought by the SEC to discern whether a given contract, transaction or scheme entered into by parties should be treated as an investment contract. Investment contracts are thus best understood as a tool utilized by courts to impose situation-specific *constructive* securities transactions on commercial parties in the context of the facts and circumstances of that specific transaction.[125]  This means that an investment contract analysis is inherently and necessarily a *retrospective* concept – a remedial provision intended to address a wide variety of fraudulent, abusive or evasive schemes.[126]  In short, the inquiry is whether there a securities transaction should be deemed to have occurred despite the fact that the parties did not label their arrangements this way.

A review of the federal appellate jurisprudence reveals that there are two basic types of arrangements which have been found to constitute investment contracts by courts – (i) those in which a legal instrument creating a financial relationship between the parties exists, but the relationship created is not one that contains all of the features of a type of enumerated security and (ii) those that involve one or more contractual agreements, often along with marketing materials, oral statements and other indicia of the parties' intent, but nothing that resembles a legal instrument of a type typically associated with a security.[127]

In the first group of cases, the entirety of the relationship is contained within the relevant instrument and the question presented is whether the instrument itself constitutes an investment contract.  Examples

---

'security'" in § 3(a)(10) as a limitation on the other descriptive terms used in the statutory definition.  This, of course, is contrary to our decision in *Joiner* where we rejected the respondents' invitation to "constrict the more general terms substantially to the specific terms which they follow."

*Tcherepnin v. Knight,* 389 U.S. 332, 343 (1967) (internal citations omitted).

[124] If a contract was identified by the parties as an "investment contract" then it would be clear to all concerned that a securities transaction was intended, and the entirety of the transaction would presumably be documented as such (failure to do so would be a clearly illegal transaction).

[125] *See generally*, Loss Treatise, Section 3.A.1.

[126] One of the most challenging jobs for a securities regulator is to determine when to bring an enforcement action in the absence of demonstrable fraudulent or abusive actions.  And yet, if left unchecked through an absence of vigorous enforcement, there is a risk of a "race to the bottom" as possibly well-intentioned but likely increasingly reckless fundraisers find innovative ways of evading what is often perceived as the costly, time-consuming and "pointless" requirements of the federal registration process for public offerings of securities.  At the same time, excessive enforcement actions against good faith actors can diminish the perception of securities regulators in the mind of the public.  A further examination of this tension is outside the scope of this Article.

[127] The Loss Treatise subdivides "investment contracts" into six general categories: (i) dispositions of property with management agreements; (ii) partnerships; (iii) real estate with a collateral arrangement; (iv) franchises and distributorships; (v) membership plans; and (vi) installment and when-issued securities contracts.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of this type of arrangement include *S.E.C. v. United Benefit Life*,[128] in which an insurance company offered customers a product it called a Flexible Fund Annuity, and *Tcherepnin v. Knight*,[129] which concerned nonnegotiable capital shares in a state-chartered savings and loan association. As courts have frequently observed, parties cannot avoid the reach of the Securities Acts through the nomenclature given to an instrument or by including (or removing) terms in the instrument that do not change the substance of the relationship between the parties.

In cases like these, where a court finds the instrument in question to constitute an investment contract, it would be wholly appropriate to characterize the instrument as itself a security such that the Securities Acts would apply equally to any transferee of that instrument, regardless of the "circumstances" of the transaction. We refer to these as "securities equivalents". As will be seen, this type of arrangement is not of interest to our inquiry because, in these cases, a legal, still often paper-based instrument exists and the terms of that instrument provide all the information needed by a court to determine the instrument's status – something that is not the case with crypto assets. For example, in *United Benefit Life*, the Supreme Court focused on the fact that the contract entered into by customers of United Life contained "[t]wo entirely distinct promises" and evaluated each of the elements of the instrument, concluding that "the provisions to be examined are less difficult of classification than ones presented in VALIC" (an earlier case involving annuity contracts).[130] Likewise, in *Tcherepnin*, the Court focused its inquiry on "the legal character imparted to [the capital] shares by the [state] statute" concluding that it had "little difficulty fitting the … shares … into that expansive concept of a security".[131]

The other, and significantly more common, category of investment contract transaction is that exemplified by the *Howey* case itself (discussed in detail below). In these cases, rather than a legal instrument the character of which may be examined on its own terms, there is a more general transaction or scheme, typically involving one or more contractual agreements, along with written marketing or sales materials, oral statements or assurances, and assertions of unstated expectations (we refer to these generally as "investment schemes").

---

[128] 387 U.S. 202 (1967).
[129] 389 U.S. 332 (1967).
[130] *United Benefit Life*, 387 U.S. at pp. 387-88. *See also Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) (charitable gift annuity agreements create investment contracts where the annuity agreements, financial instruments that are not of a type specifically enumerated as securities in the Securities Acts, are marketed as investments and not merely as vehicles for philanthropy).
[131] *Tcherepnin*, 389 U.S. 336-338. *See also S.E.C. v. The Infinity Group*, 212 F.3d 180 (3d Cir. 2000) (offer of "property transfer agreements" and related guarantees which were each legal instruments).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In these cases, the capital providers, funders, or investors are often couched as ostensible "purchasers" of some commercial good, service or asset from the person or entity seeking to deploy that capital (referred to generally here as a "sponsor" of the scheme) in an arrangement intended to create profit for the funders based on the efforts of the sponsor (or, occasionally, some third party), along with some economic benefit for the sponsor.  In the case of investment schemes involving crypto assets, the typical fact pattern is fairly consistent.  Like the horticulturalist in our parable considering raising funds through bulk sales of strowrange seeds her company created, developers of crypto asset-based platforms will often seek to raise funds through sales of the crypto asset they create, falling into this second category.  It is this type of "investment contract transaction" on which we focus our attention.[132]

1.  *The Basics of* Howey *and the Critical Importance of a Transaction's Facts and Circumstances*

The four-part test to determine whether a particular contract, transaction or scheme should properly be considered an "investment contract" within the meaning of the Securities Acts was established by the Supreme Court in *S.E.C. v. W.J. Howey Co.*[133] and has come to be known as the "*Howey* test".[134]  The *Howey* case not only established the namesake test for assessing whether a particular contract, transaction or scheme constituted an investment contract,[135] it also featured a paradigmatic fact pattern.

In *Howey*, a Florida company operating a local hotel encouraged guests to tour nearby orange groves, also owned by the company.  Guests

---

[132] There is a third case in which a legal instrument is part of the scheme, but other promises are required in addition to the terms of the instrument in order to trigger all four *Howey* prongs (*i.e.*, the instrument without the additional promises would not constitute a "security").  Examples of this pattern include *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir.1974) (where the instruments, warehouse receipts for whiskey, were coupled with additional services, including storing the whisky in casks during maturation; procuring insurance policies on the whiskey while being stored; and, without charge, assisting purchasers in selling the whiskey when it matured) and *Gary Plastic Packaging v. Merrill Lynch Pierce Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985) (where the instruments, bank certificates of deposit, were coupled with, among other things, professional selection and negotiation of terms by a financial advisor and a buy-back guarantee if liquidity was desired by the investor prior to maturity).  In neither of these cases would the relevant instrument, the warehouse receipts or the bank certificates of deposit, be "securities" unless the instruments were transferred along with a legal entitlement to the other benefits of the scheme in question.

[133] 328 U.S. 293 (1946)

[134] As set out above, the "*Howey* test", looks to whether the circumstances of a given contract, transaction or scheme involves: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely from the efforts of the promoter or a third party.  *Howey*, 328 U.S. at 299.  We will be most concerned with the second prong of the test here – whether and how a "common enterprise" is formed in secondary transactions of crypto assets.

[135] The *transaction-by-transaction* nature of a *Howey* analysis of a scheme (not involving a "securities equivalent") flows directly from a court's need to evaluate all the facts and

---

40

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

were given a sales pitch and offered the opportunity to acquire a modest patch of land containing orange trees.  In a separately documented transaction, purchasing guests were also given the opportunity to have a Howey company affiliate manage the groves, harvest the oranges, and send the purchaser the net profits, if any.  The purchasers, mostly out-of-state residents, as a practical matter could not have utilized the purchased land themselves due to the small size of the plots.  It was only if the plots were combined into commercially feasible citrus groves and centrally managed that the purchasers could reasonably expect any return on their investment.  Given these facts, the Supreme Court agreed with the SEC that the economic realities of the arrangements were that the guests were *functionally* investing in a business enterprise managed by the two Howey companies and therefore deserved the protections of the Securities Acts for these transaction to the same extent they would have received had they been offered shares of stock in the enterprise.

So long as each element of the *Howey* test is present, a commercial transaction will be deemed to involve an investment contract (and therefore be treated as a securities transaction).  This will be true even though the transaction does not involve a type of security enumerated in one of the definitional sections of the Securities Acts (other than an "investment contract") or an instrument or interest commonly known as a security.  Since 1946, federal courts have found all manner of arrangements involving ostensibly commercial transactions that do not, in and of themselves, purport to be offers of an otherwise enumerated type of security to nevertheless be investment contracts.[136]  This has included schemes involving the sale of crypto assets.[137]

---

circumstances applicable to a given transaction or scheme at the time the transaction took place or value was otherwise provided in order to determine whether the federal securities laws should apply.

[136] *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985)(finding a scheme to offer bank certificates of deposit for sale to be an investment contract scheme due to the nature of the arrangement, despite the fact that the Supreme Court had determined that conventional certificates of deposit issued by a bank, in and of themselves, are not securities); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974)(finding that a pyramid selling scheme constituted an investment contract scheme); *S.E.C. v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974)(finding that the offer and sale of an investment package involving the sale of whisky warehouse receipts to be an investment contract scheme within the ambit of the Securities Act).

[137] *See, e.g., S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting the SEC's request for a preliminary injunction against Telegram Group Inc. and TON Issuer Inc. and finding that the SEC had "shown a substantial likelihood of success in proving that the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the [i]nitial [p]urchasers, including the intended and expected resale of [the crypto asset known as] Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5."); *see also, S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (granting the SEC's request for summary judgment on its claims that Kik Interactive Inc. had violated Section 5(a) and 5(c) of the Securities Act by offering and selling its own "Kin" tokens without a registration statement or an exemption from registration and finding that Kik's public sale of Kin was

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The Supreme Court and the federal appellate courts have frequently admonished us that a determination that an investment contract scheme is present will be based on all of the facts and circumstances involved. Because this determination is of necessity made in hindsight and in the context of a specific transaction or scheme with parties that have already entered into some sort of commercial arrangement, courts almost always take into account private matters that would be known only to those parties. This frequently includes testimony about oral statements, informal writings or other communications, marketing brochures, websites and other materials that may change from time to time.[138] These circumstances mean that, except in cases involving "securities equivalents", courts do not – and cannot – rely solely on the contractual agreements between the parties to evaluate whether the arrangement constituted an investment contract transaction or scheme.[139] In fact, the *transaction-by-transaction* nature of the *Howey* analysis of a scheme (not involving a "securities equivalent") flows directly from a court's need to evaluate all the applicable facts and circumstances at the time the transaction took place or value was otherwise provided in order to determine whether the federal securities laws apply.

---

a security offering, and its pre-public sale was part of an integrated offering with the public sale, and thus both constituted an unregistered offering of securities under Section 5 of the Securities Act.)

[138] *See, e.g., Baroi, et al. v. Platinum Condominium Development, LLC*, 914 F. Supp. 2d 1179 (D. Nev. 2012) (in determining whether an investment scheme was present in a condominium sale program, "the Court considers the applicable agreements, any other documents which structure the investment, any promotional materials, *the promoter's oral representations, the investor's experience and knowledge, the promoter's managerial skill, and the investor's practical ability to exercise powers possessed by virtue of the agreements*" (emphasis added)).

[139] This is well illustrated in an *amicus curiae* brief filed by the SEC in *Salameh, et al. v. Tarsadia Hotel et al.*, 726 F.3d 1124 (9th Cir. 2013), a case involving purchases of condominiums in the Hard Rock Hotel San Diego alleged to be a disguised securities transaction by the plaintiffs (the Ninth Circuit did not find these claims to be supported). In its *amicus* brief, the SEC stated:

> The district court, in concluding that the purchasers lacked an expectation of profits at the time they entered into the Purchase Contract, erroneously relied on disclaimers in the Purchase Contract that stated the purchasers were not acquiring the rooms "as an investment" and that Tarsadia had not "represented or offered the property as an investment opportunity." The district court placed dispositive weight on these representations and, in doing so, *failed to fully consider the broader realities* of the overall transaction. This was error because, as the Supreme Court has admonished, the economic reality of a transaction or scheme controls the investment contract analysis, irrespective of legal terminology or formalisms that may attempt to disguise it. *See, e.g., Howey*, 328 U.S. at 298-301. *See also, e.g*., *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 524-25 (9th Cir. 1989) ("It is well established that courts look beyond contractual language to economic realities in determining whether a transaction is an investment contract."). *This is particularly so where, as here, the representations and disclaimers are false.*

SEC Brief at pp. 16-17 (emphasis added). However, persons not involved in the original transaction would be unable to ascertain whether statements made by one or more parties are in fact true or false.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

2. *Some Examples of Potential Investment Contract Transactions*

The process of retrospectively identifying whether a purportedly commercial sale would be deemed an investment contract transaction based on its specific facts and circumstances can best be illustrated by a few examples using the facts from our strowrange parable.

a. *Private Sale of Seeds to a Commercial Party*

First, let's say that, during its first year of operation, Strowrange Labs needs to raise additional funds to run its business. Labs may choose to undertake a one-off bulk commercial sale of strowrange seeds it reserved for itself to an agricultural company ("BigAg") with land available and appropriate for planting the seeds, documenting the transaction on a standard form of Supply Agreement which BigAg also uses for purchases of seeds and agricultural products from other suppliers. BigAg evaluates the value of the seeds on its own in the context of its business, taking into account its cost of planting the strowrange seeds, growing strowrange trees from them, and bringing the harvested strowranges to market. BigAg provides funding to Labs through the purchase price it pays and has a "consumptive" interest in the seeds. BigAg makes clear to Labs that they have no intention of holding the seeds any longer than the time needed to plant them in the next planting cycle.

This commercial sale would raise funds for Labs but is unlikely to be considered an investment contract transaction if challenged in court. This is because BigAg has a consumptive interest in using the seeds it acquired in its agriculture business and has a practical use for the quantity of seeds it is acquiring. In addition, there is no suggestion that BigAg is relying on the managerial efforts of Labs to make money from the seeds. As a result, if BigAg later believed that misrepresentations had been made to it by Labs or that Labs had failed to provide it with information that may have impacted the price BigAg was willing to pay for the seeds, their primary avenue for recourse would be to enforce the contractual provisions in the Supply Agreement or to make state law fraud claims[140] – federal securities law protections would (appropriately) not be available to them.

b. *Private Sale of Seeds to a Financial Party*

Alternatively, Labs could offer the same number of strowrange seeds to a venture capital fund ("Fund") that made it clear to Labs that Fund believed in the work the horticulturalist and her team were doing and saw huge opportunities for its investors in the anticipated price appreciation of the strowrange seeds. In this scenario, Fund plans to warehouse a portion of the seeds for at least four years for long-term gains and provide the remainder of the seeds back to Labs for planting to create

---

[140] It is possible that BigAg could also pursue a claim that they were subject to unfair or deceptive acts and practices and endeavor to get the FTC interested in investigating.

43

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

more current income.  To effect this, Fund and Labs also document their relationship as a purely commercial one and enter into two legally binding agreements: a Strowrange Seed Sale Agreement and a Strowrange Seed Management Agreement.  Pursuant to the second of these, Labs agrees with Fund to plant a portion of the strowrange seeds sold in the Strowrange Seed Sale Agreement, cultivate the trees, and harvest and sell the fruit, remitting 80% of the net proceeds of all strowrange fruit sales to Fund and retaining 20% of the proceeds as a commission.

Unlike the first example however, the sale of seeds to Fund, coupled with the Strowrange Seed Management Agreement, would likely result in a court finding that the sale and management arrangement (but not the seeds themselves) constituted an investment contract transaction as the result of arrangement meeting all four prongs of the *Howey* test. This is the case notwithstanding that the agreements which parties entered into on their face appeared to be purely commercial in nature – there was no suggestion of a securities offering anywhere to be found in the relevant documentation.

This conclusion is reached because Fund is not only providing economic value to Labs – an "investment of money" but is also expecting a profit to come, not from its "consumptive" use of the seeds, but from the entrepreneurial and managerial efforts of Labs, on which it is relying.[141] The presence of the Strowrange Management Agreement creates a *legal relationship* between the parties and, at least in certain Circuits,[142] also confirms that Fund and Labs are collaborating in a "common enterprise". Fund is anticipating a dramatic increase in the price of the seeds they purchased as demand for strowranges increases over time.  The gains made from later sales of the seeds will benefit Fund's investors (who are simply looking for a high cash-on-cash return on capital deployed, not to get into the fruit business).

Although this arrangement would very likely be considered a securities transaction, assuming that Labs did not make a public offering of the opportunity to buy seeds from it on similar terms and took care in determining that Fund qualified as an accredited investor, the *transaction* would likely be exempt from registration under Section 4(a)(2) of the Securities Act as a transaction "by an issuer not involving any public offering".  The question of whether the strowrange seeds were themselves "securities" for purposes of the Securities Acts would not be relevant to the outcome of this analysis.  However, the transaction would still be

---

[141] Here we see an example of where strowrange seeds differ from crypto assets in important ways.  Unlike the seeds, for which a financial party like Fund would be unlikely to have a consumptive use, had we instead been considering a crypto asset that functioned as the native asset of a proof-of-stake "layer 1" blockchain network, Fund might well have elected to hold that asset for its intended consumptive use—staking to help secure the network.

[142] *See*, *also*, text at notes [149] to [160].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

subject to the antifraud rules in the Securities Acts.[143] As a result, no addition to state law remedies for fraud or a possible state of federal investigation by the attorney general's office or the FTC, Fund may be able to pursue claims of material misrepresentations made by Labs in federal court and may be able to take advantage of other provisions of federal securities law.

### c. *Direct Public Sale by Labs*

In a third alternative, the horticulturalist does not heed the advice of her counsel and announces on Twitter that what she calls a "once in a lifetime" opportunity will soon be presented in which anyone can join the "strowrange craze" and buy some strowrange seeds for themselves. The Twitter post goes on to talk about "democratizing the fruit market" and putting power back into the hands of fruit eaters by widely distributing strowrange seeds. A link to Strowrange Labs' website is provided that has a clock counting down to the time when the sale will start. The website also hosts a "mauve paper" (in honor of the color of the strowrange fruit) that explains what it heralds as the many benefits of growing and consuming strowranges. The paper extolls the many academic degrees and real-world experience of the horticulturalist and her team and provides a "roadmap" of steps Labs plans to take to develop the strowrange market over the next several years using the proceeds of the seed sale. The sale of seeds is open to anyone who has gone through a know-your-customer check, but no effort is made to limit the number of seeds that any given purchaser can buy, to determine what purchasers intend to do with their seeds, or to ascertain whether purchasers are accredited investors. Labs even offers to hold (or custody) purchased seeds for those customers who do not have the right equipment for this. Social media posts are made by Labs implying that they are hard at work getting established seed marketplace providers to make strowrange seeds available for purchase and sale so that purchasers seeking to dispose of their seeds would have what Labs refers to as "liquidity".

This fact pattern differs from the prior one in two important ways. First, although Labs published the mauve paper, which contains a great deal of puffery but makes no concrete promises, and posted Terms of Service on its website, which addresses the terms of the seed sale and contain numerous disclaimers but does not provide any ongoing undertakings, there is no equivalent to the Strowrange Management Agreement present in the prior example. The disclaimers provided by Labs make clear that seed purchasers are expressly not to rely on Labs to undertake any particular "efforts" at all and that any plans mentioned in the mauve paper may be discontinued at any time.

---

[143] *See* Exchange Act Section 10(b) (15 U.S.C. § 78j(b) and Commission Rule 10b-5 (17 C.F.R. § 240.10b-5).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Second, unlike in the prior example, care was not taken by Labs to avoid offering the seed purchase opportunity to the general public in the United States.  In fact, casting caution to the wind, U.S. residents were welcomed by Labs as seed purchasers with open arms.  Many of these U.S. persons were retail individuals who had heard chatter about strowranges and other so-called "new fruits" that were emerging in the wake of the strowrange on social media but who had little understanding of the risks involved in buying and holding these new types of seeds.  The mauve paper had only the lightest of risk factors and did not come close to providing the level of detailed information that would have been required in a public offering of securities.  Unlike Fund however, which was highly sophisticated with access to specialists in the science of horticulture as well as unlimited direct contact with the Labs leadership team to help guide them in their decision-making, it was reasonable to conclude that these retail purchasers were mostly unsophisticated in matters of horticulture and whose purchases were likely mostly driven by market hype.

While this arrangement unquestionably raises important consumer protection issues, is it an investment contract transaction?  Purchasers are paying for the seeds and the proceeds of those sales are being used by Labs to help them develop the strowrange "ecosystem", so the investment of money prong of the *Howey* test should be easily met.  Likewise, seed purchasers almost certainly had a reasonable expectation of profit arising from the efforts of Labs.  Strowrange seeds were being sold by Labs in large quantities and required a fair amount of expertise to plant and grow – factors that make it unlikely that many purchasers had a "consumptive interest" in the seeds (*i.e.,* a desire to plant the seeds themselves and use them for their intended purpose).  Moreover, the prospect of liquidity through an ability to resell the seeds on secondary markets provided purchasers an easy path to realize profit.  As to the final prong needed to establish an investment contract transaction – "common enterprise" – the position is less clear.  We will look much more closely at this prong of the *Howey* test in the next section.

Regardless of the ultimate conclusion, the question of whether this third arrangement constitutes an investment contract transaction takes on much greater import in comparison with the two prior examples.  In the privately negotiated sale of strowrange seeds to Fund the consequences of the arrangement being considered an investment contract transaction were relatively limited – no registration of the transaction with the SEC would be required either way.  In the third example, however, an exemption from the registration requirements of the Securities Act is likely not available. If a court were to conclude that the offer and sale of the strowrange seeds constituted an investment contract transaction, then Labs' failure to register the transaction would be a violation of Section 5 of the Securities Act.  The SEC would be entitled to seek an injunction stopping the sale,

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

disgorgement of amounts unable to be returned, and civil penalties.[144]
Those purchasers who did acquire seeds would benefit from a right of
rescission as well as the antifraud protections of the Exchange Act.[145]

### d. Some Observations about Facts and Circumstances in a Howey Analysis

All three of the above transactions were ostensibly commercial
sales of strowrange seeds – the documentation used by the parties did not
in any way refer to the Securities Acts or suggest that the expectation of
the parties was that the transaction was subject to the protections of those
laws.  In the absence of a subsequent dispute or concern coming to light,
the question of whether any of these arrangements should properly be
recharacterized as investment contract transactions – *i.e.*, "constructive"
securities offerings – simply does not arise.

It is only when things go wrong commercially between the parties
or a regulator identifies and determines to investigate and, ultimately,
pursue a violation that courts are charged with looking backwards and
examining all of the facts and circumstances *of the particular transaction
in question* to determine whether the federal securities laws should
properly be applied to that transaction under the *Howey* jurisprudence.  For
example, we noted in looking at Labs' sale of seeds to BigAg that there
did not appear to be any reason to conclude that BigAg was relying on
Labs for their expectation of profit or that the other factors of the *Howey*
test were present.

But what if there were additional facts?  For example, what if after
completing the sale, BigAg became disenchanted with their purchase.
Let's say that the chief of procurement for BigAg was ready to testify that,
at a meeting he had with Labs shortly before agreeing to the seed purchase,
the horticulturalist stated that Labs was "weeks away" from inking a joint
promotional deal with a major fast-food chain to roll out strowrange-
flavored milkshakes nationwide and that Labs needed the proceeds of the
seed sale to BigAg to fund the completion of the development of a secret
formula crucial for making these shakes.  Let's say that this statement was
a gross exaggeration and that no deal for strowrange shakes emerged with
any fast-food chains.   In fact, shortly after BigAg's purchase, the
strowrange seed bubble burst and prices, as well as interest, in the
strowrange evaporated.  Perhaps the procurement chief was also ready to
testify that BigAg had based their purchase entirely in reliance on the
horticulturalist's statements at that meeting?   Would this be enough to
allow BigAg to get past a motion to dismiss in federal court that their
transaction with Labs was actually an investment contract transaction?
Would it make a difference if BigAg negotiated an additional provision in

---

[144] *See, e.g.*, *S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[145] *See*, *supra*, note [143].

47

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

their standard Supply Agreement containing a covenant on the part of Labs to use the proceeds of the sale to develop the secret formula?

Similarly, in the third scenario, what if Labs had been more circumspect, eliminating all promotional activity referencing anything other than the nutritional and taste benefits of the strowrange and making no references to "roadmaps" or other ongoing activities on the part of Labs? Perhaps Labs also limited sales to 10 seeds per customer unless the customer submitted information to Labs demonstrating a legitimate consumptive need for more than that number of seeds. Would these facts and circumstances tip the scales away from investment contract transaction status? Alternatively, let's say that the terms of the sale on Labs' website contained a promise that the first 1,000 seed purchasers would be entitled to a "kicker" equal to 3% of all of Labs' revenue divided ratably based on the number of seeds purchased. If a potential seed purchaser became concerned and complained to the SEC, would the Commission be entitled to an injunction to stop the sale?

As we can see from our examples, the *Howey* process is inherently backwards looking and fact dependent. Small changes in the facts can significantly change the outcome. Before we move from the facts in our parable to the facts in the various investment contract cases, we take a closer look at the "common enterprise" prong as this will prove to be essential when we examine secondary transactions in crypto assets.

### 3. *The Common Element in "Common Enterprise"*

Our review of the appellate jurisprudence on investment contracts focused in particular on those decisions addressing the "common enterprise" prong of the test.[146] Of the total of 266 relevant federal appellate and Supreme Court decisions reviewed, approximately 62 had more than a cursory reference to the concept of "common enterprise". Of those, 37 decisions either found that an investment contract transaction or scheme was present or remanded for further fact finding. In each of these decisions, the one constant, even in the decisions taking the most plaintiff-friendly position that *any* significant reliance on the part of the participant on the sponsor — irrespective of the nature of the sponsor's benefit from participating — would be sufficient to give rise to commonality (known as "broad vertical commonality"), was that the common enterprise was

---

[146] This prong has probably been the most controversial in the area of investment contract analysis, with many disputes and scholarly articles turning on how to correctly interpret the *Howey* Court's meaning. There is a significant unresolved split in the Circuits on this issue between Circuits that require "horizontal" commonality to be shown in order for an investment contract to be present and those that will also accept either broad or narrow "vertical" commonality as well, which is easier for individual plaintiffs to establish. *See generally Loss Treatise,* Chapter 3 at pp. 21-23 (discussing the difficulties of each of these approaches to common enterprise); James D. Gordon III, *Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes*, Colum. Bus. L. Rev. 635 (1988) ("Defining Investment Contracts") (evaluating the different approaches to common enterprise and proposing a novel "multiple investors test" which is "an enterprise that is in common among the promoter and multiple parallel investors.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

based on a direct business relationship between the sponsor and the participant.[147]

As we have seen, the *Howey* test is applied retrospectively to obtain the policy objective of providing a federal remedy to participants in "uncommon, irregular and unusual" investment schemes[148] who a court concludes merit the protections of federal securities law. Accordingly, it should come as no surprise that some of the widest readings of the common enterprise element of *Howey* have been applied in the context of obviously fraudulent endeavors where courts have sought result-oriented interpretations. Thus, we see the Fifth Circuit developing the "broad vertical commonality" test in the context of a Ponzi-like multi-level marketing scheme of independent distributorships, purportedly for the sale of cosmetics, operated by the infamous Glenn W. Turner.[149]

Nevertheless, broad vertical commonality has also been applied by courts in more traditional business settings. A good example of this is *Villeneuve v. Advanced Business Concepts Corp.*[150] In *Villeneuve*, the defendant, Advanced Business Concepts Corp. ("ABC"), sold area distributorships of self-watering planters, providing the planters, display merchandise, and a display rack as well as selecting the retail locations at which the planters would be sold. The purchaser of the distributorship was expected periodically to check and restock the displays and received one-half of the proceeds planter sales (the remaining profits going to the retailer). The rights and obligations of ABC and the distributor were set out in an "area purchaser agreement". After approving the broad vertical commonality position taken in *Koscot*, the *Villeneuve* court concluded that "commonality" for purposes of the *Howey* test did exist between ABC and the plaintiff and was "evidenced by the obligation [in the area purchase agreement] of ABC to provide advertisements, training, products, and to select the areas where products are sold. The failure to provide any of these services would definitely determine the success or failure of the scheme."[151]

---

[147] A good example of this is *Shaw v. Hiawatha Inc.*, an unpublished Fifth Circuit decision, in which the court noted that the plaintiffs alleged that the defendants' agents told them that they "would be in business together" coupled with a letter from an officer of the defendant stating that he was looking forward to a "long and profitable relationship" with the defendants. *Shaw v. Hiawatha Inc.*, 884 F.2d 582 (9th Cir. 1989).

[148] *See* Defining Investment Contracts, *supra* note [146] at p. 658 (footnotes omitted).

[149] *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) (finding that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the Koscot meetings."). For more on Glenn Turner, *see* Molly Ivins, "*Dare to Be Great*", The New York Times, Feb. 20, 1977, available at https://www.nytimes.com/1977/02/20/archives/dare-to-be-great-a-sincere-con-man.html#:~:text=Glenn%20W.,called%20Dare%20to%20Be%20Great; *see also* Raji Isa Mas, "That's What Friends Are For", 56 Duke L. J. 111 (2007).

[150] 698 F.2d 1121 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir.1984) (rejecting a finding of an "investment contract" due to a lack of a sufficient reliance of the plaintiffs on the efforts of ABC).

[151] *Id.* at 9.

49

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Another relevant example is *Long v. Shultz Cattle Co.,*[152] a case involving the sale of cattle embryos.  In *Schultz Cattle*, the Fifth Circuit focused on the relationship between the plaintiffs and the Shultz Cattle Company, Inc. ("SCCI"), emphasizing the "vertical commonality" between each of the plaintiffs and SCCI and noting that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon the promoter expertise."[153]  Nonetheless, the *Schultz Cattle* decision cites to the SCCI's cattle feeding consulting agreements.  Pursuant to  these agreements SCCI "received substantial 'consulting fees' from its clients in exchange for its services in constructing and administering effective tax shelters through the cattle feeding business,"[154] thus demonstrating that there was an inextricable contractual and business link between the plaintiffs and SCCI.

The Fifth, Ninth, and Eleventh Circuits' adoption of a "vertical commonality" standard,[155] differs from that of the majority of the Circuits, which have rejected – or at least not (yet) recognized – that a showing of vertical commonality alone is sufficient to establish the common enterprise element of an investment contract transaction.  The horizontal commonality approach instead looks for a pooling of assets from multiple investors so that all investors share in the profits and risks of the enterprise.[156]  The cases focusing on the need for horizontal commonality also turn on a direct business relationship between the person or entity deemed to be the "investor" and the sponsor.

This is illustrated in *S.E.C. v. SG Ltd.*[157] a case in which the First Circuit was tasked with determining whether virtual shares of eleven different "virtual companies" fell within the purview of federal securities laws.  In affirming that the SEC had alleged sufficient facts to state a triable claim, the court applied the horizontal commonality test.  In addition to the "unambiguous" representation on the defendants' website that pooling of investors' money was occurring, the court observed that the "requisite" profit-and-risk sharing necessary to support a finding of horizontal commonality was also present.[158]  Critically, the *SG* court highlights the specific promises made by the defendants on their website to the new participants as being indicative of a finding of horizontal

---

[152] 881 F.2d 129 (5th Cir. 1989).

[153] *Id.* at 140, quoting *S.E.C. v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974).

[154] *Id.* at 142.

[155] The Ninth Circuit follows narrower version of vertical commonality, instead focusing on whether the fortunes of investors are linked with those of the promoters, as opposed to the vertical commonality of the Fifth and Eleventh Circuit, which focuses on the dependency of the investor on the promoter's expertise.

[156] *See Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001 (6th Cir. 1984) ("Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture.  In fact, a finding of horizontal commonality requires a sharing or pooling of funds." (internal citation omitted)).

[157] 265 F.3d 42 (1st Cir. 2001).

[158] *Id.* at 52.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

commonality.[159]   Indeed, even if those elements were not present, that court goes on to say that the defendants' "promise to pay referral fees to existing participants who induced others to patronize the virtual exchange provides an alternative basis for finding horizontal commonality."[160]

There has been an ongoing question as to whether a *written* contract is required to establish the presence of an investment contract transaction.  This issue recently came to a head in an exchange of memoranda in support of the plaintiff's and defendants' motions for summary judgment in *S.E.C. v. Ripple Labs, Inc. et al.* where the defendants took the position that the presence of a legal agreement was a necessary element of the *Howey* test – a position the SEC strongly disagreed with.[161]  Interestingly, our survey of the appellate jurisprudence found in Annex A demonstrates the contrary conclusion: a traditional written contract *is indeed present* in almost every instance where an investment contract transaction or scheme has been found by an appellate court.

In fact, appellate courts have frequently focused specifically on this issue and *declined* to find an investment contract scheme in cases where the plaintiff was not able to allege the presence of a written agreement that went beyond the sale of a non-financial asset, such as land. For example, in *Woodward v. Terracor*,[162] a land development case from

---

[159] The Defendant's "promise to divert a portion of its profits from website operations to support the privileged company's shares [is] a bond that ties together the collective fortunes of those who have purchased the shares". *Id*. at 51.

[160] *Id.*

[161] In support of its position that courts applying *Howey* do not require the existence of a written contract, the SEC stated that "many such cases exist, stretching back decades", citing quoted dicta in *Canadian Imperial Bank of Comm. Tr. Co. v. Fingland*, 615 F.2d 465 (7th Cir. 1980).  Notably, however, in *Fingland*, the court found that the plaintiff, a bank acting as trustee and seeking to demonstrate the presence of an investment contract with a bankrupt sub-trustee, failed to present a physical document or clear evidence of an oral agreement that evidenced the existence of an instrument that should be considered a "security", but nonetheless stated in dicta in a footnote that "oral agreements have been held to be securities".  Also cited were *Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014), a decision in which there was no *determination* that investment contracts existed based on unwritten agreements in a fraud case because the defendants had previously stipulated that certain transactions involving rare coins they had entered into with the plaintiff had constituted "investment contracts" and thus "securities transactions" in exchange for plaintiffs dropping related RICO claims; *S.E.C. v. SG Ltd*., 265 F.3d 42 (1st Cir. 2001), a case involving virtual shares purchased from defendant's website which expressly promised a guaranteed return (albeit without a formal written agreement); and *S.E.C. v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), in which the court found that sales of certain "adpacks" by the defendants met the *Howey* test, after noting that there was no document explaining how revenue is shared between the platform users and the defendant. However, in both of these latter two cases, the court was readily able to determine and identify the specific promises made by the defendants to platform users and there existed a direct business relationship between the parties.  *See* Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J at 19-21, *S.E.C. v. Ripple Labs, Inc*. (20 CIV. 10832 (AT)(SN)) (Oct 21, 2022).

[162] *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the Fifth Circuit, the plaintiffs alleged fraudulent misrepresentations by the defendants as to the defendants' financial ability to carry the real estate project to final completion, causing the plaintiffs to sustain a loss. The court stated that "We particularly fail to see any common venture or common enterprise between the plaintiffs and Terracor."[163] Elaborating on the issue, the court pointedly addressed the issue of whether a written contract was needed:

> Terracor itself was involved in a business venture. Terracor was developing a new residential community. As part of its venture Terracor sold lots to persons who either intended to build houses thereon, or intended to resell to others who would so build. But the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor. The only contractual agreement between plaintiffs and Terracor was the Uniform Real Estate Contract. Terracor was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met. *Unlike Howey, Terracor was not under any collateral management contract with the purchasers of its land.* In short, the record in the instant case simply shows the purchase by the plaintiffs of lots in a real estate development. Though it is possible that the plaintiffs may have a common-law remedy against the defendants arising out of the purchase of the lots, such does not mean that the transaction itself is an "investment contract," thereby invoking the provisions of the federal securities laws.[164]

Nevertheless, there are a small number of notable exceptions[165] and it is the authors' view that the broad remedial objectives of the Securities Acts do not support a formalistic requirement that a written agreement always be present in every investment contract scheme if the "facts and circumstances" of the particular transaction merit otherwise.[166]

---

[163] *Id.* at 1025.

[164] *Id.,* at p. 1026.

[165] The most significant of these, ironically, is *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344 (1943), the very first Supreme Court case looking at the concept of an investment contract. In *Joiner,* the Court found an implied contract to drill test wells for oil to be present in a scheme in which leasehold interests in small parcels of land were sold along with a marketing brochure that promised the potential for high returns if oil was discovered, even though a traditional contractual promise was not part of the parties' bargain.

[166] An example of the unusual facts that need to be present such that the absence of a formal agreement is not considered an impediment to a potential investment contract finding is *McKinney v. Panico,* 2022 U.S. Dist. LEXIS 178068; 2022 WL 4551695 (N.D. Ill 2022). *McKinney* involved an alleged multi-year conspiracy in which the victim (since deceased) was alleged to have been defrauded out of over $20 million in a series of eight separate fraudulent business ventures over 10 years. The defendants stipulated as to the presence of securities law violations to induce the plaintiff to drop RICO claims relating to the same activity. However, the plaintiff (the son of the deceased victim) later had second thoughts and sought to argue that there was no securities transaction in fact because the arrangements

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

However, in those very limited appellate cases in which an investment contract was found without there being a written contract between the parties that related to the investment contract transaction, the elements of an implied-in-fact contract are always present.[167]

As discussed above, whether there is a written agreement or facts which would support the finding of an implied-in-fact contract, the one constant across all appellate cases finding an investment contract scheme is the presence of some form of *business relationship* between the parties. This point is further driven home by the Supreme Court's very use of the term "common enterprise".  Although, as discussed above, courts have debated the type of common enterprise that is required to be shown (*i.e.,* "horizontal", or broad or narrow "vertical"), some sort of enterprise or business relationship between the parties is a constant in the *Howey* case law finding an investment contract.  To this end, the definition of the word "enterprise" in Black's Law Dictionary is instructive: "1.  An organization or venture, esp. for business purposes. … 3.  One or more persons or organizations that have related activities, unified operation or common control, and a common business purpose."[168]  Although parties connected by a written contract or other arrangement that would support an implied-in-fact contract may have a "common business purpose", no appellate decision has found or suggested that the ownership of a non-financial asset, without some business relationship, would be in a "common enterprise".

4.  *Concluding Thoughts*

---

between the parties constituted a general partnership.  In these convoluted facts, the court declining to grant a motion to dismiss request by the defendants, nevertheless did not allow the absence of written agreements for the ventures to prevent the finding of sufficient support for the stipulated securities law violations, thus barring the plaintiff's RICO claims, citing dicta in *Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465 (7th Cir. 1980).

[167] A contract implied in fact requires the same elements as an express contract and differs only in the method of expressing mutual assent.  The Supreme Court has defined an implied in fact contract as one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding".  *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923).  For examples of federal appellate courts finding the presence of an investment contract transaction based on an implied-in-fact contract (rather than a traditional written contract), *see, e.g., SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344 (1943) (finding that sales and assignments of oil leases were not merely the sale of naked leasehold rights but an investment contract, as the terms of the offering suggests "an implied agreement to complete the wells" without which the instruments had no value*)* and *S.E.C. v. MacElvain*, 417 F.2d 1134 (5th Cir. 1969) (finding that the second offer of interests in underwater mining claims created an investment contract because the defendants "impliedly, but clearly and definitely, promised" to contest the U.S. Department of Interior's interest in the land with the money received from the purchasers, inuring to the benefit of all purchasers, despite the disclaimer of any "collateral offer, promise, or assurance of any nature whatsoever").

[168] Black's Law Dictionary, 11th Ed. (omitting definitions relation to government and RICO enterprises).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

We have seen that the term investment contract as used in the Securities Acts was borrowed from state Blue Sky laws to effectuate Congress' broad remedial intent of providing remedies for investment fraud. Although the term has been used by courts to refer to certain instruments with terms outside of those of any other enumerated category in the statutory definition, it has been more commonly applied to ostensibly commercial transactions or schemes that are deemed to fall within the policy ambit of the Securities Acts.

A *post facto* application by a court of investment contract status on a commercial arrangement is of necessity dependent on the specific facts and circumstances present at a particular point in time. Moreover, regardless of the type of common enterprise involved in the investment scheme, courts consistently look for a direct business relationship between the parties in the "enterprise". In addition, in those rare cases where an investment contract is found without there being a written contract, the elements of an implied-in-fact contract between the party providing the "investment of money" and the party either undertaking the "entrepreneurial or managerial efforts" driving the funder's expectation of profits or otherwise soliciting the investment from the funder are present.

Critically, contrary to the frequent suggestion that the *Howey* test is somehow "outdated",[169] the development of crypto assets did not fundamentally change the test's application or render it unfit for purpose for transactions involving crypto assets. Long before the advent of blockchain technology, significant uncertainty existed as to when a court would retrospectively apply federal securities law to an ostensibly commercial arrangement.

What becomes clear upon an examination of the *Howey* appellate jurisprudence is the blurring of a clear investor protection sentiment, particularly in those cases brought by the SEC (which historically has focused its enforcement efforts on circumstances where sponsor behavior has resulted in broad investor harm), with other cases in which one party to a commercial dispute seeks to impose *post facto* the application of the federal securities laws to gain an advantage in litigation. Zealous counsel are well aware that there are the myriad substantive and procedural advantages available to a disgruntled party to a business arrangement if they are able successfully to assert the retrospective application of federal securities law.

---

[169] *See, e.g.*, Curt Levey, "For Clarity on Cryptocurrency, Look to Congress or the Supreme Court", The Federalist Society, Aug. 1, 2022, available at https://fedsoc.org/commentary/fedsoc-blog/for-clarity-on-cryptocurrency-look-to-congress-or-the-supreme-court ("90-year-old statutes [do] not include anything like crypto—that is, crypto assets existing only on a decentralized ledger ... that's distributed across disparate computers—in their definition of a security. ... Like the definition of a security in the statutes, the *Howey* test is a poor fit for crypto.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Where the parties to a given transaction do not at the outset document that transaction as an offer and sale of securities of some type (thus clearly invoking federal jurisdiction), it is inevitable that disputes will arise – this the direct result of the policy choice made by Congress to utilize a broad, principles-based definition of the term "security" in the Securities Acts. Our survey shows that a significant majority (56%) of these relevant disputes taken to the appellate level end either in a conclusion by courts that no investment contract was present and thus that the Securities Acts should not apply to the transaction (42%) or remand the dispute for further fact finding (12%). These failed attempts to bring a commercial transaction within the ambit of the Securities Acts demonstrate the challenges of a principles-based definition of the term "security" and, regardless of whether crypto assets are involved, makes it difficult to argue that the applicability of the *Howey* test is clear as to any given fact pattern, even where all of the "facts and circumstances" and "economic realities" of commercial arrangement are known to both parties.

### B.      Investment Schemes and Their Objects in the *Howey* Case Law

We have seen that a wide range of circumstances can, in hindsight, be deemed to constitute an investment contract transaction or scheme that triggers the application of the Securities Acts. A large number of these cases involve the purported sale of an underlying non-financial asset[170] which functions as the *object* of the scheme.[171] These cases uniformly highlight a critical distinction between the documents, marketing materials or oral statements that create the required "common enterprise" at the

---

[170] *See, e.g., Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) (sales of beavers coupled with service agreements to house, feed, and otherwise care for the beavers were investment contracts); *Albanese v. Florida Nat. Bank of Orlando*, 823 F.2d 408 (11th Cir. 1987) (in a scheme to sell nonexistent ice machines, the court found that the right of the investors to enforce a preference as to the location of the ice machines leased back to the lessee was insufficient to disqualify the agreements as "securities"); *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918 (4th Cir. 1990) (a cattle breeding program comprised of a purchase agreement and management contract was found to be an investment contract where the investor had limited control over the program and relied on the efforts of the defendants for essential functions such as the expert selection of embryos and crossbreeding).

[171] Other investment contract cases involve some other type of purportedly commercial contract between the scheme's sponsor and the participants in the scheme. Examples include a purportedly commercial distributorship arrangement that is found, in retrospect, to be little more than a disguised means of attracting investment capital from the participants (*see, e.g., S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982)) or an advisory agreement, usually involving purchases by the participant of commodities or commodity interests, where a court finds a "common enterprise" to exist between the participant and the advisor, usually due to the participant's reliance on the advisor and a shared economic interest in the success of the participant's trading activity (*see, e.g., S.E.C. v. Continental Com. Corp.*, 497 F.2d 516 (5th Cir. 1974)). However, these types of investment contract arrangements have not, to date at least, applied to crypto assets and so are not discussed here.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

center of a *Howey* analysis and the "object" being sold pursuant to the purported investment scheme.

In these cases, our highest courts have thus far focused solely on the character of the underlying commercial arrangements and the expectations of the parties, and not the nature of the object purportedly being sold (which is generally considered irrelevant to the legal analysis).[172]   The inconsequential nature of the object of an alleged investment scheme was recently reacknowledged in a motion for summary judgement by the SEC in *S.E.C. v. LBRY, Inc.*,[173] a case involving sales of crypto assets to fund LBRY, Inc., the developer of a blockchain-based media platform known as "LBRY".  In its memorandum of law in support of its motion, the SEC correctly concludes that, "If crypto assets, *or anything else*, are offered in a way that meets the three prongs of *Howey*, an investment contract exists, and the securities laws apply".[174]

We can see this distinction play out in key investment contract cases, starting with *Howey* itself.  The investment scheme at issue in *Howey* involved two separate agreements: a land sale contract for the purchase of orange groves paired with a separate service contract for the harvesting and sale of the oranges.[175]  The orange groves were the object of the *Howey* investment scheme, with the overall contractual arrangement involving the land sale, the management agreement, and the right to proceeds together constituting the transaction that resulted in the finding of an investment contract scheme.  There is no suggestion in the Supreme Court's decision that the outcome of the *Howey* case would have been different if the Howey company had instead been selling lemon groves, other fruit tracts, or indeed just about anything else.  What was relevant to the Supreme Court was not the object sold but the terms of the sales and associated contractual undertakings made.

Similarly, in *Blackwell v. Bentsen*,[176] another orange grove case decided a few years after *Howey*, investors were invited to purchase land

---

[172]   *Compare S.E.C. v. Edwards*, 540 U.S. 389 (2004) (considering the "investment contracts" which promised a fixed return in finding that a scheme to sell and leaseback payphones was an investment contract), and *S.E.C. v. Int'l Loan Network, Inc.*, 968 F.2d 1304 (D.C. Cir. 1992) (examining the promoter's marketing scheme along with promotional literature to find that there was a reasonable expectation of profits to be had by investors in certain chain letter schemes), *with United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) (despite the plaintiffs' characterization of the purchase of shares in a cooperative housing development as involving "stock" creating a federal subject matter dispute, the Supreme Court found that this was not a securities transaction since there was a clear "consumptive use for the apartment and there was no reasonable expectation of profit in the form of either capital appreciation or participation in earnings").
[173]   Memorandum of Law in Support of Motion for Summary Judgment, *S.E.C. v. LBRY, Inc.,* No. 21-cv-00260 (D.N.H.) (May 4, 2022) (the "SEC LBRY Summary Judgment Memorandum").
[174]   SEC LBRY Summary Judgment Memorandum at p. 19 (emphasis added).  Note that the SEC will sometimes condense the *Howey* test in to three prongs, combining "reasonable expectation of profits" with "efforts of others".
[175]   *Howey*, 328 U.S. 293, 295 (1946).
[176]   203 F.2d 690 (5th Cir. 1953).

56

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

from, and enter into management contracts with, a development company for the purpose of cultivating citrus groves. The Fifth Circuit found that the scheme involved an investment contract transaction. Significantly, the court very clearly separated the investment scheme from its object, the land being sold, stating explicitly that "[i]f [the plaintiffs] merely purchased land, without more, such a purchase would not constitute an investment contract within the meaning of the Securities Act."[177] Clearly, the object of the purportedly commercial transaction that gave rise to an investment contract was not, in and of itself, considered a security.

There are, of course, many additional cases in which it is clear that the object of the transaction or scheme which was alleged to give rise to an investment contract was not, in and of itself, a security. For example, it was the agreements for the sale and leaseback of payphones in *S.E.C. v. ETS Payphones, Inc*.[178] which were found to be investment contracts, not the payphones being leased; it was the sale and management agreements with respect to chinchillas in *Miller v. Cent. Chinchilla Grp., Inc*.[179] and earthworms in *Smith v. Gross*,[180] which were found to be investment contracts, not the chinchillas or earthworms, respectively; it was the lease and security agreements of printing plates for foreign postage stamps in *Newmyer v. Philatelic Leasing, Ltd*.,[181] that were the investment contracts, not the stamp plates themselves.

We are able to draw similar conclusions from the 70-plus year history of *Howey* jurisprudence which reveals a long line of cases in which courts distinguish transactions involving the sale of real estate, oil drilling rights, animals and sundry other objects of a purported commercial arrangement[182] from the business arrangements and other facts and circumstances that gave rise to a finding that there exists an investment contract. Indeed, in those transactions a sales agreement was almost always accompanied by an expectation of profit on the part of the purchaser, based on the seller or an affiliated entity performing post-purchase functions (such as picking, bundling and selling oranges,

---

[177] *Id*. at 693.
[178] 408 F.3d 727 (11th Cir. 2005).
[179] 494 F.2d 414 (8th Cir. 1974).
[180] 604 F.2d 639 (9th Cir. 1979).
[181] 888 F.2d 385 (6th Cir. 1989).
[182] *See, e.g., Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) ("The mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor."); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co*., 608 F.2d 1297 (9th Cir. 1979) (holding that when seller's only obligation is to transfer title to land, no security is involved); *Rice v. Branigar Org., Inc*., 922 F.2d 788 (11th Cir. 1991) (holding that the purchase of lots in a beach-club development were not investment contracts for purposes of the Act, noting that appellants purchases purchased the lots primarily to use them, rather than to derive profits from the entrepreneurial efforts of the developer); and *Lynn v. Caraway*, 379 F.2d 943 (5th Cir. 1967) (finding no investment contract where there was no additional promise or agreement made in addition to the sale of the naked leasehold right).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

husbanding cattle and their embryos, or maturing whiskey in casks).[183] And, in each of these cases, the investment package (*i.e.*, the set of formal or informal agreements or understandings between the seller and the purchaser) is clearly distinguishable from the object of the scheme itself. Moreover, there is no suggestion in any of the appellate cases that the transfer of the relevant object to another "investor" *without an assignment or transfer of the benefit of the underlying promises*, would result in another securities transaction.

### C.   Secondary Sales under *Howey* and the *Hocking* case.

For purposes of this Article, "secondary sales" of crypto assets are those that do not involve the original seller of the crypto assets[184] in a fundraising transaction (that itself constitute an investment contract transaction). These secondary transactions acutely raise the question of whether the object of the investment contract transaction—the crypto asset—are themselves securities or not. This is because if the crypto asset is a security, the secondary transaction will of necessity be subject to federal securities law. Alternatively, if the crypto asset is not a security, then the secondary transaction will not be subject to federal securities law unless a separate investment contract transaction has been formed by that sale. However, many secondary transactions involving crypto assets, particularly transactions conducted on centralized marketplaces or on DEXes or other DeFi platforms, lack the characteristics of investment contract transactions and, therefore, would not be considered a securities transaction if, in fact, crypto assets are not considered securities under *Howey*.

Of the many federal appellate and Supreme Court decisions in which the *Howey* analysis is applied, none directly dealt with secondary transactions in the objects of investment contracts by the original buyer. In fact, we are aware of only one case analyzing a transaction under *Howey* that did *not* directly involve as a party the entity that would normally be

---

[183] *See, e.g., Rodriguez v. Banco Cent.*, 990 F.2d 7 (1st Cir. 1993) (finding that "a security *might* exist if the defendants had promised, along with the land sales, to develop [a thriving residential] community themselves," but that "[a] simple sale of land, whether for investment or use, is not a "security."); *Roe v. United States*, 287 F.2d 435 (5th Cir. 1961) (oil leases sold with sales pitches which promised extraordinary returns were more than offerings of naked leasehold rights and were investment contracts because the returns were garnered through the activities of persons other than the purchasers and as such, "if credited" would constitute the sale or delivery of an investment contract); and *Bamert v. Pulte Home Corp.*, 445 F. App'x 256 (11th Cir. 2011) (rejecting the plaintiffs contention that purchase agreements for at least one Orlando condominium unit were investment contracts because the plaintiffs were under no contractual obligation to join an offered rental pool or otherwise contract with the defendant's proposed rental agent, but that the plaintiff had sufficiently alleged the possible existence of an investment contract as to the exclusive rental agreements, if the rental agents were to be found to be affiliates of the condominium seller.

[184] Where the seller of the crypto assets is a legal entity established exclusively for this purpose, we also include the entity directing the establishment of the seller and receiving all or most of the proceeds of the sale here.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

considered the "sponsor" of the alleged investment contract scheme.  In that case, *Hocking v. Dubois*,[185] Hocking, an individual investor looking for an income-producing property, through the encouragement of his real estate broker, Dubois, purchased a rentable condominium unit in a Hawaii resort from the condominium's original purchasers, the Libermans, in a secondary transaction (rather than buying another condominium unit directly from the developer of the resort).  Following a review of written information provided to Hocking by the broker, Dubois, including information about the anticipated range of daily average rental income, shortly after the closing of the condo sale, Hocking entered into a rental pool agreement with HCP, a company acting as the rental pool operator for the resort.

When a balloon payment on Hocking's condominium mortgage came due, he defaulted, losing his condo unit.  Aggrieved about this turn of events, Hocking then sought to recover his loss by bringing a lawsuit against Dubois (the real estate broker), claiming that the combination of the condominium purchase and his entry into the rental pool agreement constituted an unregistered securities transaction because he entered into both the sale agreement and the rental pool agreement so he could generate yield from the condominium as a rental property and was dependent on the "efforts" of the rental pool operator.[186]  The District Court, holding that the condominium resale and rental pool agreement did not constitute an investment contract transaction because the condominium purchase was not conditioned on Hocking's participation in the pooling agreement, rejected Hocking's claims.[187]

On appeal, a tribunal of the Ninth Circuit reversed, finding that an "offering of a condominium with [a rental pool agreement] *automatically* makes the [transaction an investment contract]."'[188]  However, in light of the broad holding of the tribunal, the full Ninth Circuit agreed to rehear the case *en banc*.  The SEC took the highly unusual step of submitting an *amicus* brief to the court arguing that the facts did *not* warrant the finding of an investment contract transaction.  A 5-4 majority of the Ninth Circuit disregarded the SEC however and held that, although the combination of the condominium purchase and the rental pool agreement did not *automatically* constitute an investment contract transaction, such a conclusion was still a possibility and thus, there was evidence of triable issues of material fact to deny summary judgment, remanding the case to the lower court for further fact finding.[189]  In doing so, the *Hocking* majority on rehearing reasoned:

---

[185] *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ("*Hocking II*"), *cert. denied* 494 U.S. 1078 (1990).

[186] *Id.*

[187] *See Hocking v. Dubois*, No. 83-823, slip op. at 3 (D. Nev. Mar. 20, 1985).

[188] *Hocking v. Dubois*, 839 F.2d 560, 565 (9th Cir.) (emphasis in original), withdrawn, 863 F.2d 654 (1988).

[189] *Id.* at 1462.

59

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

We agree with defendants and *amici* that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security.  Such a *per se* rule would be ill-suited to the *examination of the economic reality of each transaction required by Howey*.  In the context of isolated resales, each case requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreements.   The investor's intentions and expectations as communicated to the broker would be relevant in determining what investment package was actually offered.[190]

The majority went on to explain how this case can be distinguished from *Howey*:

> There is no doubt that, had Hocking purchased the condominium and the rental pool directly from the developer and an affiliated rental pool operator, and had the rental pool been for a long term without any provision for early termination, Hocking would have purchased a security.

> Hocking, however, did not purchase the condominium in the initial offering from the developer. He purchased in the secondary market from the Libermans.  Further, Hocking entered into the rental pool agreement with HCP [an entity not affiliated with the real estate broker, Dubois], and has, defendants argue, failed to demonstrate any link between HCP and the developer. Finally, unlike the investors in *Howey*, Hocking could legally terminate the [rental pool agreement] according to its terms and regain control over the condominium.  We must determine therefore whether these differences from *Howey* make Hocking's alleged transaction into an ordinary real estate purchase or whether it nevertheless could prove to be the purchase of a security.[191]

Critically, the majority in *Hocking* did not assume that because the purchase of the condominium and the rental pool agreement directly from the developer would have constituted an investment contract transaction, that the purchase of those same items from a secondary seller through the broker should *automatically* be treated as an investment contract transaction as well.[192]   Rather, the majority's analysis relied on an application of the *Howey* test to the specific facts and circumstances

---

[190] *Hocking II, supra* note [185] at p. 1462 (emphasis added).
[191] *Id.*
[192] *Id.* at 1456.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

surrounding Hocking's (secondary market) purchase of the condominium and the rental purchase agreement before them.

Moreover, the *Hocking* court's inquiry as to whether an investment contract transaction had been created by Dubois was "not limited to the contract or other written instrument."[193]  All of the facts and circumstances at issue, including those facts that would be known only to the parties, were important to the analysis.  That is because the Ninth Circuit reached what should be a self-evident conclusion: since the *Howey* test by its terms applies to "contracts, transactions or schemes", rather than assets, each time a court seeks to determine retrospectively whether an investment contract was present, they must analyze the facts and circumstances of a specific *transaction*.

### D.        The Ineluctable Element of a Security: A Legal Relationship between an Issuer and an Owner

To better understand the application of the Securities Acts to secondary transactions in crypto assets we have examined the unique characteristics of investment contract transactions, established that clearly non-financial objects of an investment contract transaction are not themselves securities as a result of being sold as part of such a transaction, and concluded that the *Howey* test is correctly applied on a transaction-by-transaction basis.

However, it could be argued that crypto assets are best understood as a new type of *instrument or interest* that itself constitutes a security independent of character the transactions in which it is transferred.  To address this proposition, we take a closer look at the most foundational question of all: what makes an instrument or interest a security in the first place?[194]

---

[193] *Id.* at 1457 ("Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale.  Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case" (quoting *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) (citations omitted)).

[194] This topic has been much discussed by scholars over the last several years.  *See, e.g.*, Ronald J. Coffey, *The Economic Realities of a "Security" – Is There a More Meaningful Formula?*, 18 W. Res. L. Rev. 367 (1967); FitzGibbon, *What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*, *supra* note [119]; Michael P. Malloy, *The Definition of Security: Marine Bank v. Weaver*, 24 B.C. L. Rev. 1053 (1983); Williamson B.C. Chang, *Meaning, Reference, and Reification in the Definition of a Security*, U.C. Davis. Vol. 19:403 (1986); and Philip F. Franklin, Note, *Definition of a Security: Landreth Timber Co. v. Landreth*, 40 Sw L.J. 879 (1986).  A selected bibliography of scholarly articles on the definition of the term "security" under the federal securities laws and the subject of investment contracts more generally is provided in Annex B, grouped between pre- and post-crypto asset scholarship.  In addition, the leading treatise on federal securities law, the *Loss Treatise,* devotes over 230 pages and over 500 footnotes exclusively to assisting practitioners and others answer the question "What is a security?".

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

1. *The Essential Element of a Security – A Bundle of Rights Created by an Issuer*

As noted earlier, the Securities Acts enumerate a wide variety of instruments and interests that are considered *prima facie* securities (unless the context requires otherwise, of course), plus the catch-all categories of investment contract and "any interest commonly known as a security".[195] The one critical quality that can be found across each of the enumerated categories is the presence of a *legal relationship* volitionally established by an identifiable legal entity that acts as the *issuer* of the security and the various other parties who, from time to time, are *owners* of that security.

A review of the enumerated categories of security in the Securities Act provides detail on the nature of the types of legal relationship that can characterize a "security". Taken generally in the order listed in the Securities Act:

- A "note" is created through a legal relationship established by a writing containing a promise to pay a sum certain on a specified date allowing the holder to collect that debt at maturity or earlier, if acceleration is contemplated;
- "Stock", "treasury stock" and "transferable shares" are created by the board of directors of a corporation adopting a resolution that complies with applicable state law for the issuance of stock with any shares of stock issued creating a legal relationship between the issuer and the stockholder providing the stockholder with the rights prescribed by statute, as may be permissibly modified by the terms of the particular type of stock authorized;
- "Securities futures" and "securities-based swaps" are contractual arrangements that creates a legal relationship by providing the counterparties with rights to payment and other rights against the issuer negotiated for in the relevant documentation;
- "Bonds" and "indentures", like notes, are written documents that provide specifically enumerated rights to their holders, creating a legal relationship with the issuer;
- Although it is less clear what form an "evidence of indebtedness" could take, since of necessity some form of indebtedness is required, it is plain that the owner of the evidence of indebtedness would have a contractual claim for, and a legal relationship with, the person or entity that was subject to the indebtedness;
- A "certificate of interest or participation in any profit-sharing agreement" will provide the holder with the enumerated rights

---

[195] *See* Section II.D.3 *infra*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

set out in the relevant governing document, creating a legal relationship with the issuer;

- "Collateral-trust certificates" are a type of secured debt obligation and thus provide negotiated rights and create legal relationships;

- A "preorganization certificate or subscription" is described in the Loss Treatise as "stock in a corporation as yet unborn", which further notes that "preorganization certificates or subscriptions are securities distinct from the ultimate stock, and their issuers are the promoters", confirming that these instruments as well provide the owner with distinct rights against, and create a legal relationship with, an identified issuer;[196]

- A "voting-trust certificate" is an interest in a voting trust – a contractual arrangement created expressly to allocate voting rights among shareholders of a corporation thus also creating a legal relationship among these shareholders;

- A "certificate of deposit for a security" allows a security owner to create fractional interests in the security or to create a new security that references the underlying security and, in either event provides negotiated rights to the owner by the depositor entity thus creating a legal relationship between the owner and the depositor;

- A "fractional undivided interest in oil, gas, or other mineral rights" likewise is created to provide contractual rights to investors by the issuer of the interests – the individual or entity that owns the underlying rights and who thereby forces a legal relationship with the issuer;

- A final group of derivative rights, including a "put, call, straddle, option" or other similar interests, each of which are created in advance by a contract that sets out the investors' specific rights and that create a legal relationship with that issuer; and

- Any "certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase" any of the enumerated types of security, all of which will clearly prescribe a set of rights that the holder will benefit from and create a legal relationship between the holder and the issuer.

On its face, necessary presence of a legal relationship between the issuer of a security and its owners should not be surprising. Throughout the Securities Acts it is assumed that all securities will have an "issuer"— an identifiable person or entity that creates the security and against whom

---

[196] See Loss Treatise Chapter 1 at pp. 40-41.

63

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

a securityholder's rights can be exercised.[197]  By way of example, in the case of a debt security, the issuer enters into an indenture or similar agreement and executes a note or other instrument that carries with it the various rights and benefits set out therein or in the associated agreement, such as the ability to receive a return of principal on a date certain as well as periodic interest on the principal balance.  Rights of the noteholder in a default will also be specified.[198]  These obligations on the part of the issuer (and rights of the noteholder) are readily discernible from an examination of the written documentation.  Likewise, in the case of equity, as a shareholder in a company, certain rights, such as the ability to vote in elections of board members and the ability to receive dividends, when declared, and a ratable share of the company's assets, if any, in a winding up of the company will be created by statute (which may be modified in some cases through the organizational documents of the issuer, such as a charter, by-laws or operating agreement in the case of a limited liability company).

The Exchange Act defines the term "issuer" as the "person who issues or proposes to issue any security"[199] – with the meaning of "issue

---

[197] In some circumstances, identifying the correct entity to be treated as the "issuer" can be complex.  For example, the definition of "asset-backed issuer" for purposes of Regulation AB under the Securities Act is "an issuer whose reporting obligation results from either the registration of an offering of asset-backed securities under the Securities Act, or the registration of a class of asset-backed securities under Section 12 of the Exchange Act". Regulation AB, 17 C.F.R. § 229.1101(b).  Nevertheless, there is still a clearly determinable legal relationship between the issuer and the relevant security, even if that relationship is imposed by rule or regulation.

[198] The definition of "note" in the most current version of Black's Law Dictionary reflects the written nature of notes, providing that a note is "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer."  In the same edition, "promissory notes" are defined as "[a]n unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person."  Black's Law Dictionary (11th ed. 2019) "Note" and "Promissory Note".  Only a small number of cases have undertaken to define a note at common law, perhaps on account of its well understood nature. *See*, *e.g.*, *Latino Enters. v. Taco Maker, Inc.*, No. 1:17-cv-649-TCB, 2018 U.S. Dist. LEXIS 231757 (N.D. Ga. Feb. 9, 2018)(quoting *Kirkland v. Bailey*, 115 Ga. App. 726, 728, 155 S.E.2d 701, 703 (1967) (citing to Webster's Unabridged Dictionary as a note being defined as "a written paper acknowledging a debt and promising payment.")); *Almond v. Gilmer*, 188 Va. 1, 20, 49 S.E.2d 431, 442 (1948) (citing to the definition in Webster's New International Dictionary, Second Edition, "[t]he common and accepted definition of a note is a written acknowledgment of a debt and a promise to pay.").

[199] Exchange Act Section 3(a)(8).  In contrast, in the context of Section 5 of the Securities Act, the term "issuer" has been more flexibly construed by courts "as issuers devise new ways to issue their securities and the definition of a security itself expands."  *Doran v. Petroleum Mgmt. Corp*., 545 F.2d 893, 909 (5th Cir. 1977).  An illustrative example of the challenge of defining the term "issuer" in even the Section 5 context can be found in *S.E.C. v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980).  In *Murphy*, the court in considering whether the private offering exemption applied to offers and sales of securities in the form of limited partnership interests first had to determine the appropriate entity acting as the "issuer" and looked to the entity that "organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed".  *Id.* at 644.  However, the court also notes the importance of identifying a particular entity as an "issuer", stating:

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

any security" left undefined, as presumably self-evident.  When a security has been issued, many different obligations and potential liabilities are imposed by the Securities Acts on the issuer of that security, including the responsibility for filing periodic reports where the security or issuer has registered with the SEC,[200] a wide range of corporate governance obligations on the part of the issuer under the Sarbanes-Oxley Act of 2002[201] (generally arising where the issuer has securities registered under the Exchange Act or is required to file reports under Section 15(d) of the Exchange Act) and other obligations in the event that a tender offer for the relevant securities is commenced.  It is essential that all parties concerned with a given security, including not only the owner but also intermediaries, like clearing agencies, broker-dealers, national exchanges that have listed the security, and self-regulatory organizations, are able to determine with certainty who the issuer of that security is and what rights or duties that issuer may have in respect of those securities.

This point is particularly well illustrated in *What is a Security? -- A Redefinition Based on Eligibility to Participate in the Financial Markets*.[202]  Focusing on the long-running challenge courts have had in setting forth a definitive rule to assist market participants in determining whether a particular transaction is one "whose characteristics distinguish it from the generality of transactions so as to create a need for the special fraud procedures, protections and remedies provided by the securities laws" (citing an earlier article by Professor John Coffee), Professor FitzGibbon proposes a broad new test to determine whether an interest or instrument should fall within the definition of "security" for purposes of the Securities Acts.  This proposed new definition turns on whether the interest in question is a "financial instrument" eligible to participate in a public market.  In this context, Prof. FitzGibbon defines "instrument" as "a set of *rights and duties* conferred (or purported to be conferred) by one

---

It is important to understand the limits of this conclusion.  We recognize that securities regulation "is often a matter of the hound chasing the hare as issuers devise new ways to issue their securities and the definition of a security itself expands." [*Doran* at 909] … We insert a cautionary note because, like the Fifth Circuit in *Doran*, "(w)e are conscious of the difficulty in formulating black letter law in this area in light of the multiplicity of security transactions and their multifarious natures."  *Id*.  Accordingly, we note that our holding today does not mean that anyone who has information material to an investment decision is transformed into an issuer.  We hold only that when a person organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer for purposes of determining the availability of the private offering exemption.

*Id.* at 644.

[200] 15 U.S.C. 78m.
[201] 15 U.S.C. § 7241
[202] FitzGibbon, "*What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*", 64 Minn. L. Rev. 893 (1980).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

party upon another, under circumstances such that the rights and duties would normally be treated as a unit and would normally be transferred, if at all, as a unit".[203]

In all cases, these rights or duties that constitute the "security" cease to exist when the issuer of the security ceases to exist, whether as the result of a dissolution following a bankruptcy proceeding or a voluntary winding up.  During this wind-down process, attempts are required to be made to satisfy the issuer's obligations to its creditors (in appropriate priority order) and, where that can occur in full, any remaining assets of the issuer are distributed to its owners and other equity holders, as provided for in the company's organizational documents.  Once a company no longer exists, it no longer does any business, all of its contractual obligations will have been satisfied or discharged and any remaining assets distributed to its shareholder or other owners.  Any securities issued by the company will no longer exist.  From that point onwards, although a physical certificate (or set of written agreements) created by that issuer to represent those rights may continue to exist, these pieces of paper are merely mementos of solely historical interest -- they no longer convey any rights or represent any duties.

Thus, under current law, there is simply no such thing as an "issuer-independent security" – a security that exists independently of an identifiable entity that, under law, is dispositively considered its "issuer".  Occasionally a security may be deemed to have more than one issuer,[204] but whether one or several, those entities must be clearly identifiable.  This is not a concern with investment contract fundraising transactions, as we have seen, as investment contract status is a remedial measure retrospectively imposed by a court where the prospective wrong-doer(s) have been identified by the plaintiff at the start of the proceeding – it is then left to the court to decide whether they agree.  However, the individuals or companies upon whose entrepreneurial efforts purchasers may rely with respect to non-financial assets like tokens have no such necessary relationship with the asset and thus these assets lose the quality of "securityness" when re-sold in secondary transactions by persons who are not promoters.

### 2.   *Securities as Instruments*

The principle that to have a security there must be a counterparty against which rights can be enforced is further supported by the use of the term "instrument" in the definition of the term "security" in the Securities

---

[203] *Id.*, at 919.

[204] *See, e.g.*, General Instructions to SEC Form D ("If more than one issuer has sold its securities in the same transaction, all issuers should be identified in one filing with the SEC").

66

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Acts.[205]  For example, the definition of "security" in the Securities Act includes the phrase ". . . or, in general, any interest or *instrument* commonly known as a 'security'".[206]  The Exchange Act definition likewise includes the phrase ". . . or, in general, any *instrument* commonly known as a 'security'".[207]  When describing these definitions, the Supreme Court and many other courts refer to the specifically enumerated types of securities collectively as "instruments", highlighting the inherent legal relationships present in a writing deemed to constitute a security.  For example, in *Marine Bank*, the Supreme Court wrote, "Congress intended the securities laws to cover those *instruments* ordinarily and commonly considered to be securities in the commercial world."[208]  Similarly, the SEC has described the enumerated types of securities as "instruments" as well.[209]  The Exchange Act also makes frequent reference to the term "instrument" as a catch-all description for securities.[210]

Although frequently used in the Securities Acts, the term "instrument" is undefined there and presumably considered a term with a commonly understood meaning.  Black's Law Dictionary defines an instrument as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate."[211]  Other commentators have noted that "[a]n 'instrument' seems to embrace contracts, deeds, statutes, wills, Orders in Council, orders, warrants, schemes, letters patent, rules, regulations, by-laws, whether in writing or in print, or partly in both; in fact, any written or printed document that may have to be interpreted by the Courts."[212]  Thus, an essential element of an instrument is the existence of some writing that evidences a legal arrangement, the parameters of which are capable of being interpreted by one who is not a party to the original

---

[205] Indeed, of all the federal appellate and Supreme Court cases considering whether or not a particular scheme or arrangement an investment contract transaction, only two, both of which resulted in the court finding that there lacked evidence for a finding of an investment contract, were brought without a physical instrument.  *See Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465 (7th Cir. 1980) (holding that the trial court's subject matter jurisdiction depended on the existence of securities and that appellant failed to present a physical document or an oral agreement skrimshaw that evidenced the existence of a security); *see also*, *Mason v. Unkeless*, 618 F.2d 597 (9th Cir. 1980) (rejecting plaintiff's allegations that he entered into an oral limited partnership agreement which formed the basis of a security as inadequate to form the basis of a federal securities fraud claim).

[206] *See* Securities Act of 1933 § 2(a)(1), 15 U.S.C. § 77b(a)(1) (2018).

[207] *See* Securities and Exchange Act of 1934 § 3(a)(10), 15 U.S.C. §78(c)(a)(10) (2012).

[208] *Marine Bank v. Weaver*, 455 U.S. at 559 (1982) (emphasis added).  *See also S.E.C. v. Edwards*, 540 U.S. 389, 393-94 (2004) (explaining that a security includes "virtually any *instrument* that might be sold as an investment." (emphasis added))

[209] *See, e.g.,* "Framework for "Investment Contract" Analysis of Digital Assets" ("The term 'security' includes an 'investment contract,' *as well as other instruments* such as stocks, bonds, and transferable shares." and "The focus of the *Howey* analysis is not only on the *form and terms of the instrument* itself.") (emphasis added).

[210] *See generally* Exchange Act of 1934, 15 U.S.C. § 78a (1934) (referring to the term "instrument" frequently throughout the Act to describe investment contracts).

[211] Black's Law Dictionary (11th ed. 2019).

[212] Edward Beal, *Cardinal Rules of Legal Interpretation* 55 (A.E. Randall ed., 3d ed. 1924).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

arrangement, including a court, an arbitrator or a prospective transferee, such that these third parties can understand and reach an objective understanding of the details and character of the arrangement.[213]

Accordingly, the legal arrangement that provides a security holder with a "bundle of rights" is inevitably evidenced by one or more writings including, for example, stock certificates, notes, and certificates of deposits, all of which are written instruments.  These instruments allow courts to understand the associated legal arrangement intended and negotiated for by the parties in the event of a dispute.  The instrument also allows a prospective transferee to understand what rights she may receive and puts her on notice of the nature of the legal arrangement between the issuer of the security and the initial purchaser or holder.  Even where a security is uncertificated, it will reference identifiable and definitive rights and duties created either by statute or by contract that can be examined by courts and prospective purchasers alike.[214]

### 3.  Application to Crypto Assets

As we see from the above, under current law, for a secondary transaction in a crypto asset to be a securities transaction, either (i) the asset itself would need to convey a bundle of rights and obligations sufficient to be considered a security or (ii) a new investment contract

---

[213] Black's Law Dictionary, Second Edition, published in 1910 prior to the enactment of the Securities Acts, defined "instrument" as:

> A written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease.  *State v. Phillips*, 157 Ind. 4S1, 62 N. E. 12; *Cardenas v. Miller*, 108 Cal. 250, 39 Pac. 783, 49 Am. St Rep. 84; *Benson v. McMahon*, 127 U. S. 457, 8 Sup. Ct. 1240, 32 L. Ed. 234; *Abbott v. Campbell*, 60 Neb. 371, 95 N.W. 592.

*Cf.* Black's Law Dictionary, Third Edition, published in 1933, which defined "instrument" as:

> A document or writing which gives formal expression to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right; a writing executed and delivered as the evidence of an act or agreement.

*Cf.* Bouvier's Law Dictionary's (1853), which defines "instrument" as:

> The writing which contains some agreement, and is so called because it has been prepared as a memorial of what has taken place or been agreed upon. The agreement and the instrument in which it is contained are very different things, the latter being only evidence of the existence of the former. The instrument or form of the contract may be valid, but the contract itself may be void on account of fraud.

[214] While state commercial law contemplates the ability of an issuer to create "uncertificated securities" (*see* U.C.C. Section 8-102(18)) where the relevant rights are not evidenced by an "instrument", in these cases there is still an underlying agreement (*e.g.*, an Indenture) or other writing (*e.g.*, a corporate charter), such as a certificate of incorporation or operating agreement, that spells out the inchoate rights being created.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

transaction would need to be formed based on the specific circumstances of that transaction.

In the context of our hypothetical, if Fund concluded that it was overexposed to the giant stockpile of strowrange seeds in their warehouse and decided to sell some of those seeds, along with an assignment of its rights under the Strowrange Seed Management Agreement with Labs, to other investment funds, there is little doubt that those subsequent transactions would also be securities transactions. Although Fund was selling strowrange seeds (a non-security), they were also conveying specific rights against a third party (Labs) and fulfilling all four *Howey* prongs. If Fund made a public offer of its willingness to undertake this transaction with prior registration with the SEC, Fund may well violate Section 5 of the Securities Act (even if Fund ultimately only transacts with a single fund that was an accredited investor). Likewise, if Fund gave its limited partners a chance to receive strowrange seeds in exchange for a discharge of some of their investment in Fund, telling the LPs that the seeds were a "sure thing" and "a more tax efficient way of realizing gains in the strowrange space", this too would likely be considered a new investment contract transaction requiring registration with the SEC or the satisfaction of an exemption from registration.

However, in an alternative scenario, if some of the seeds Labs originally sold to BigAg were resold through various offshore seed dealers and others, and a portion thereof eventually wound up packaged for retail purchase by Tractor Supply Company (known as "TSC"),[215] we would not expect TSC to have to assess whether their customers were buying strowrange seeds to plant in their backyard ("consumptive use") or to hold onto in hopes of a later retail profit ("speculative use").[216] Nor, in order to avoid the threat of having to register as a national securities exchange, would we expect TSC to be required to review Strowrange Labs' Twitter feed, the activity in Labs' Discord server and conduct diligence on Labs to determine the presence and significance of non-public statements that could bear on whether the strowrange seeds they were reselling were originally sold in investment contract transactions (such as the statements made by the horticulturist to BigAg concerning the supposed deal she had with the fast-food chain to develop strowrange-flavored milkshakes).

In the same way, a crypto asset that neither creates, nor is intended to represent, a legal relationship between an identifiable issuer and the persons who, from time to time, own that asset cannot be an "instrument" (or any other type of security, for that matter) regardless of whether the transaction in which the asset is sold is an investment contract transaction. That is, there is usually nothing in the smart contract code that creates a

---

[215] *See* https://www.tractorsupply.com/.
[216] *See Allison v. Ticor Title Ins. Co.,* 907 F.2d 645, 648 (7th Cir. 1990) ("A [securities] violation does not stick to the instruments like tar.")

69

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

token or in any associated metadata that enables any set of legal rights or duties on the part of any person or entity.[217]

As a result, many separate individuals or legal entities typically can have, and often do have, varying degrees of responsibility for determining that value. For example, Strowrange Labs might want to run a "lean ship" and limit their business just to the science of the strowrange. A college friend of the horticulturalist, intrigued by the opportunity, might set up a separate company to develop and promote strowrange recipes, making money by charging fees for the recipes. One of the friend's former employees may have developed a particularly tasty recipe for strowrange health bars and decided to go out on her own with that business. Some others who got to know the horticulturalist when she was in discussions with Fund realize that seed storage can be greatly enhanced with a new "nano-fiber" technology and set off to take this on, directly competing with Labs' own proprietary strowrange seed solution. The horticulturalist's elderly Aunt Hildy, always good with her hands, decides to start an online crafts site selling products made exclusively from dried strowranges and material from strowrange trees. All of these new contributors to the strowrange ecosystem, as big believers in the future demand for strowranges, personally own significant amounts of strowrange seeds which they all announce one way or the other to the general public through press releases, blog posts and, in the case of Aunt Hildy, her Facebook page. All of them are contributing to demand in the market for the seeds and have a vested economic interest in the financial success of the seeds. Who matters more? This is not always going to be obvious. If Aunt Hildy winds up featured on the cover of Time Magazine with guest turns on Oprah and Late Night with Seth Meyers, she could well have a bigger impact on the market demand for strowrange seeds than the others.

Moreover, those individuals or entities frequently change over time, coming and going, or varying in importance, as their economic interests, their competing personal and commercial objectives, or simply their whims, change. For example, after a bitter dispute with her co-founder, the horticulturalist might decide to dissolve Labs, split the assets and liabilities with her (former) friend and move on in a new direction. The seed storage technology company might get bought by TSC and become a division of a much larger entity much less reliant on the strowrange for its success, diversifying its bets by developing tech for

---

[217] We note that a party deploying the relevant smart contracts *could* create legal rights related to ownership of a token. For example, a traditional company that deployed a smart contract that created a token intended to act as a so-called "stablecoin" could provide in the company's terms of service that an owner of the token that met certain designated criteria would be entitled send the token back to the company and receive an equal amount of fiat currency. While in this case, there would be a legally cognizable *right* associated with the token, this right would stem from the promises made by the company in its terms of service and could be identified and evaluated as potentially the type of promises that could be the basis of a "security".

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

storing seeds for other types of "new fruits". Aunt Hildy, flush with her success and notoriety, could form a new company, raise capital, and even conduct an IPO. None of this activity would in any way subject to the consent or approval of the community of seed owners, nor would it directly impact the "functionality" of the seeds.

This distributed responsibility, not driven by the presence of a legal relationship with any of these actors, coupled with the inherent fluidity of their engagement, makes it almost impossible at any given time to attribute the type of relationship between a particular entity, individual or group of individuals involved with a crypto asset project, on the one hand, and one or more owners or users of a crypto asset, on the other, that, as of necessity, exists between the issuer of a security and the holders of the relevant securities, who are legally bound together.[218] Even basing a conclusion on the size of the stake in the underlying assets owned (be they strowrange seeds or crypto assets) can be misleading. The size of the stake held by a given actor does not need to corollate in any way with the relevance that actor has in driving the financial expectations of "retail" holders of related non-financial assets. Aunt Hildy could well have had the smallest stake of the various actors noted above but the biggest impact on the success of the demand for strowranges (and thus the price of the seeds). Moreover, the size of an actor's stake can change over time, both on its own (*i.e.*, the absolute amount held by the actor may increase or decrease) or relative to others who may have accumulated an increased stake or sold down over time. Without knowing *all of the facts and circumstances applicable at the time a given transaction in an asset occurs*, it is simply not possible to apply *Howey*.

Further, rather than taking their value from the bundle of rights and duties manifested in the legal relationship between an owner and an identified issuer, most crypto assets take their value from a combination of the economic value of the asset's present utility or functionality (whatever that may–or may not–be)[219] and the asset's provable scarcity, allowing owners to take a view as to the demand for that asset in the future (and, hence, the potential for price appreciation).[220]

---

[218] Even in token-based projects that currently exhibit a high degree of centralization – *i.e.*, reliance on the "efforts" of a single entity, the absence of a legal obligation or relationship between that entity and the owner of a token is a fundamental distinction between a token and any type of security.

[219] For example, in the case of ether, the utility is the ability of the owner to use the tokens to pay network validators a fee to deploy smart contract code to the Ethereum network, known as "gas".

[220] As discussed above under "Crypto Assets as Speculative Investments", this potential for expectation-driven price appreciation also encourages not only purely speculative activity (*i.e.,* activity that does not contribute to general economic growth), but also outright illicit activity, such as "pump-and-dump" schemes that take advantage of the unwary and gullible. While clearly a deeply concerning by-product of the technology, these characteristics do not convert a non-financial asset into a "security" under current law.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

By way of example, a smart contract creating a token could be deployed and sold by a company that dissolves immediately after the token is distributed.  The token and the abilities (if any) that the token enables will continue to exist so long as the smart contract remains deployed to the associated blockchain network, even though the entity that sold the token no longer does.  Absent idiosyncratic facts (such as particular obligations of a bankruptcy estate), this would not be the case with a security.[221]

### 4.   Conclusion

Absent a finding that a given token is intended by the seller to represent an obligation of, or an interest in, a business enterprise with identifiable rights or benefits in, or related to, that business,[222] tokens should not themselves be characterized as securities under current jurisprudence interpreting the Securities Acts.  Owning a token has the effect of aligning the economic interests of all owners.  However, simply owning a token, without more, does not create any sort of *legal relationship* between the token owner and the entity that deployed the smart contract creating the token or that raised funds from other parties through sales of the tokens.  Any such token would be effectively "issuer independent" – a concept wholly foreign to federal securities law.

---

[221] Some have raised concerns that *not* treating crypto assets as securities would give a "free pass" not just to bad actors who use crypto assets to raise money in fraudulent schemes (and who are already subject to our securities laws) but also to opportunistic third-party participants in fraudulent schemes who are not part of the group initiating the fraud, but who recognize the fraud and seek to benefit from it (or who create a separate fraudulent scheme with otherwise valid crypto assets).  First, this would only be the case if the fraud involved transactions in crypto assets that did not create or represent a legal relationship with a third party and meet the other elements of the *Howey* test (or are not another enumerated type of security).  As discussed herein, transactions constituting sales of crypto assets for capital raising purposes will very likely be properly considered investment contract transactions.  The same would be true for secondary transactions in crypto assets in which the elements of *Howey* are in fact met at the time of the transaction.  The federal securities laws do, and should, apply to those transactions to protect investors.  To the extent secondary transactions in crypto assets do *not* come within the purview of the securities laws (*i.e.,* because the crypto assets are not themselves securities or the elements of *Howey* are not meet for a given transaction in those assets), there are a variety of other regulatory schemes that might apply to address such misconduct.  To the extent the conduct rises to the level of criminal activity, criminal charges for theft, fraud or similar crimes may apply to such conduct.  Fraud that is not criminal in nature may be addressed by consumer protection laws, which are broad and flexible and have successfully been applied by regulators to address a wide variety of activity harmful to consumers.  Fraud, unfortunately, happens every day in a host of different non-securities markets and sectors markets and there are a variety of remedies to address frauds.  Even if the securities laws do not apply to a particular fraudulent transaction, there are other regulatory schemes that do and that are more than sufficient to address these issues.

[222] For an example of a crypto asset intended to represent an interest in a business enterprise with identifiable rights or benefits in that business, *see* Amendment 11 to INX Limited Registration Statement on Form F-1 ("each INX Token held by parties other than the Company, shall entitle its holder to receive a Pro Rata Portion … of an aggregate amount which equals 40% of our cumulative Adjusted Operating Cash Flow, net of Adjusted Operating Cash Flows that have already formed a basis for a prior distribution") available at https://www.sec.gov/Archives/edgar/data/0001725882/000121390020023078/ea125736-f1a11_inxlimited.htm#a_014.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

### III.   The SEC's Position on Fundraising Through the Sale of Crypto Assets

#### A.   The Early Cases

Much of the discussion of the applicability of securities law to crypto assets arose from the way in which crypto assets have been distributed.  Unlike most crypto assets offered and sold today, bitcoin and a handful of other very early crypto assets that followed it came into existence exclusively through the process of proof-of-work "mining".  For example, in the case of bitcoin, launched in early 2009, new bitcoins are created programmatically approximately every 10 minutes by the protocol code as a reward for those who expend energy and capital to verify the validity of proposed transactions.  This process takes a significant amount of time even where, as with bitcoin, the rate of new assets created starts out at a relatively high level and gradually slows over time.[223]

This changed significantly when Mastercoin was launched in 2013.  The Mastercoin launch is generally regarded as the first time a large number of crypto assets were created *prior* to the commencement of operation of the network (a process known as a "pre-mine") and then sold to fund the development of the related network.[224]  This process, known as an ICO, quickly gained popularity following the sale in 2015 of so-called "pre-mined" ether tokens.  Proceeds from the ether pre-mine and ICO were used to fund the development of the Ethereum Network.  By early 2018, the concept of ICOs had captivated the general public, with expectations of easy riches to be had if only the right tokens could be purchased.[225]  Promoters touted a new type of crowdfunding without all the messy securities law compliance obligations.  Unfortunately, the idea of making easy money through speculative investment in nascent blockchain projects (many of which consisted of nothing more than a brief "white paper" and marketing website) led to rampant fundraising abuse often at best

---

[223] *See* Satoshi Nakamoto, "Bitcoin: A Peer-to-Peer Electronic Cash System", available at https://bitcoin.org/bitcoin.pdf.

[224] *See* Vitalik Buterin, "Mastercoin: A Second-Generation Protocol on the Bitcoin Blockchain", Bitcoin Magazine, November 4, 2013 ("The project started off with a month-long fundraiser, in which anyone could buy mastercoins by sending bitcoins to the Mastercoin Exodus address … 1 BTC … would get you 100 MSC, and an additional 10 more for every week between the end of the fundraising period and the time at which you bought the mastercoins, encouraging investors to buy earlier."), available at https://bitcoinmagazine.com/technical/mastercoin-a-second-generation-protocol-on-the-bitcoin-blockchain-1383603310.

[225] *See, e.g.*, David Floyd, *$6.3 Billion: 2018 ICO Funding Has Passed 2017's Total*, COINDESK (April 19, 2018), https://www.coindesk.com/markets/2018/04/19/63-billion-2018-ico-funding-has-passed-2017s-total/; *see also*, "The SEC Has an Opportunity You Won't Want to Miss: Act Now!", U.S. SEC. & EXCH. COMM'N (May 16, 2018) available at https://www.sec.gov/news/press-release/2018-8.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

characterized by unjustified and exuberant optimism and at worst, by outright fraud.[226]

In one of the first SEC-led investigations into the application of U.S. federal securities law into fundraising through the offer and sale of crypto assets, the SEC applied the *Howey* test to sales of tokens in its July 2017 "Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO" (the "DAO Report").[227]  The DAO Report related to an attempt to construct a purportedly decentralized equivalent of a venture fund (called "The DAO"), where participants could pool funds in the form of ether to purchase tokens of The DAO.  The tokens would allow owners to vote on the projects in which The DAO would invest its "treasury" of ether.  The tokens would also be the vehicle for the token owners to realize anticipated gains from the success of these investments.

Although no enforcement action was taken by the SEC, the DAO Report expressed the SEC's view that the sale of these tokens, the value of which the SEC concluded was significantly dependent on the efforts of the sponsor, involved an unregistered offering of an investment contract, stating that "[b]ecause DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied …".[228]  The SEC noted that "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction."[229]

Since the DAO Report, the SEC has actively sought to establish regulatory authority over fundraising transactions using tokens through

---

[226] *See, e.g.*, David Adlerstein, "The ICO Governance Deficit", CoinDesk (Sept. 10, 2017), https://www.coindesk.com/markets/2017/09/10/the-ico-governance-deficit/ (describing lack of investor protections in ICOs) and Daniel Dupuis, Deborah Smith, Kimberly Gleason, *Old Frauds with a New Sauce: Digital Assets and Space Transition*, Journal of Financial Crime, December 14, 2021 (describing the evolution of fraud schemes historically conducted with fiat money in physical space to the crypto assets in digital space).
[227] Exchange Act Rel. No. 34-81207, July 25, 2017.
[228] *Id.* at p. 16.
[229] The DAO Report, at 17-18.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

enforcement,[230] guidance,[231] and rulemaking.[232]  Further, the current Chair of the SEC, Gary Gensler, and its current Director of Enforcement, Gurbir Grewal, have each made statements suggesting that they plan to aggressively pursue enforcement actions targeting perceived violations of federal securities law in the context of transactions involving crypto assets and potential investment contracts, even where the violations are technical in nature (*i.e.*, not involving allegations of intentional fraud, recklessness or other willful misconduct).[233]

### B.      The ICO Boom (and Bust)

The lion's share of the SEC's enforcement actions relating to crypto assets to date have targeted fundraising transactions where the activity comfortably fit the model of pre-crypto asset enforcement actions. Similar to the public sale of strowrange seeds by Strowrange Labs in our prior example, *something* was sold in a purportedly commercial transaction, but the "economic reality" alleged was that the purchasers had no *bona fide* consumptive interest in the thing sold but rather sought to profit by later resale with the expectation that the seller would be driving the increase in value of whatever was being sold.  For the purposes of these actions, it is irrelevant whether the thing sold, be it a physical item, like the strowrange seeds or an intangible item, like crypto assets, was or was not a security for purposes of the Securities Acts (even though the SEC asserted in many of these complaints and related consent orders that the crypto assets were themselves securities).

Instead, as with the prior *Howey* cases, what was legally relevant to the outcome was the nature of the economic relationship between the buyer and seller.  Although many of these enforcement actions involved allegations of outright and knowing frauds, such as enforcement actions

---

[230] *See, e.g., BlockFi Lending LLC*, Securities Act Release No. 11029 (February 14, 2022); *In the Matter of Paragon Coin, Inc*., Release No. 33-10574 (November 16, 2018); *CarrierEQ, Inc., d/b/a Airfox*, Securities Act Release No. 33-10575 (November 16, 2018); *In the Matter of Munchee Inc*., SEC Release No. 10445 (Dec. 11, 2017), available at https://www.sec.gov/litigation/admin/2017/33-10445.pdf.

[231]  FinHub, *Framework for "Investment Contract" Analysis of Digital Assets* (the "Framework"), April 3, 2019, available at: https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.  It is important to keep in mind that the Framework is guidance and is not binding on the SEC in any way.  It explicitly expresses the views of the FinHub Staff and not of the SEC itself, who did not formally approve the Framework guidance.  Although non-binding, the Framework is the most encompassing affirmative guidance provided to date by the SEC.  As a result, we believe it is still important that it be carefully considered.

[232] *See, e.g.,* the Proposed Rule 3b-16 Amendments; Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer (March 28,        2022)         ("Proposed        Rule        3a5-4"),        available        at https://www.sec.gov/rules/proposed/2022/34-94524.pdf.

[233] *See, e.g.,* Gary Gensler, "Remarks Before the Aspen Security Forum", (Aug. 3, 2021), available at: https://www.sec.gov/news/public-statement/gensler-aspen-security-forum-2021-08-03; *see also,* Gurbir Grewal, Director, Division of Enforcement, 2021 SEC Regulation Outside the United States - Scott Friestad Memorial Keynote Address, (Nov. 8, 2021), available at: https://www.sec.gov/news/speech/grewal-sec-speaks-101321.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

against PlexCorps, which promised purchasers extravagant returns,[234] and AriseBank, which promised daily profits to token holders,[235] other actions focused on the more technical violation of failure to comply with Section 5 of the Securities Act, as a result of soliciting funds from the general public without registration, without alleging other fraudulent action.[236] Particularly notable are the successful enforcement actions for violations of Section 5 of the Securities Act brought by the SEC against Canadian social media company, Kik Interactive Inc.[237] and messaging giant Telegram Group Inc.,[238] as well as the currently ongoing enforcement actions against Ripple Labs, Inc. and LBRY Inc. (discussed in the next section below).[239]

## C.      *Telegram, Kik Interactive, Ripple Labs* and *LBRY*

Many of the SEC's early enforcement actions regarding fundraising sales of crypto assets were resolved without litigation, generally as a result of a consent decree being entered.[240] However, in the

---

[234] SEC Complaint, *S.E.C. v. PlexCorps*, 17-cv-7007 (filed Dec. 1, 2017), available at https://www.sec.gov/litigation/complaints/2017/comp-pr2017-219.pdf (alleging misrepresentations about the size and scale of PlexCorps' operations, the use of funds raised in an ICO, and the amount of funds raised in the ICO).

[235] SEC Complaint, *S.E.C. v. AriseBank* (filed Jan. 25, 2018), available at https://www.sec.gov/litigation/complaints/2018/comp-pr2018-8.pdf (alleging "many" materially false statements and omissions in connection with an ICO transaction).

[236] *See, e.g.,* In the Matter of Munchee Inc., SEC Release No. 10445 (Dec. 11, 2017), available at https://www.sec.gov/litigation/admin/2017/33-10445.pdf.; In the Matter of Bloom Protocol, LLC, SEC Release No. 11089 (Aug. 9, 2022), available at https://www.sec.gov/litigation/admin/2022/33-11089.pdf.

[237] *See* Complaint, *S.E.C. v. Kik Interactive Inc.*, 19-cv-5244 (June 4, 2019).

[238] *S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).

[239] *S.E.C. v. Ripple Labs, Inc., et al.*, No. 20-10832 (S.D.N.Y.).  Ripple Labs, along with a number of other companies that have raised funds through the sale of crypto assets and become the subject of an SEC enforcement action have raised concerns that they were not given "fair notice" that their fundraising sales of crypto assets might be considered "investment contracts" and thus required to be registered in order to be offered to the general public, pointing to some of the unique features of crypto assets.  However, the *Howey* case law makes clear that these allegations are largely unfounded, at least with respect to a distinction based on whether the asset sold in the alleged investment scheme was a token or some more conventional asset.  What is at issue in the enforcement actions involving fundraising through sales of crypto assets is not whether the crypto asset (*i.e.,* the "object" of the purported investment scheme) itself is a "security" (that has never been an issue in prior *Howey* cases).  Rather, the question is whether it reasonable to conclude that the offered asset was being purchased for *bona fide* consumptive use.  Should a court conclude that the "economic realities" were that purchasers were buying with a reasonable expectation of profit based the entrepreneurial or managerial efforts of others, a securities transaction will be present.  As discussed in the prior section, the principles-based Howey test leaves room for differences of opinion on which ostensibly commercial transactions constitute "investment contracts".  The principles applied by courts have and continue to remain the same regardless of whether the object sold is a cow embryo, a cask of whiskey or a crypto asset.  The unique elements of crypto assets should not be and are not a distinguishing factor for "fair notice" purposes.

[240] *See, e.g.*, In the Matter of Munchee Inc., SEC Release No. 10445 (December 11, 2017); *In the Matter of Zachary Coburn,* SEC Release No. 84553 (November 8, 2018); *In the Matter of Paragon Coin, Inc.,* SEC Release No. 33-10574 (November 16, 2018); *CarrierEQ, Inc., d/b/a Airfox*, SEC Release No. 33-10575 (November 16, 2018); and *In the Matter of Block.one.*, SEC Release No. 10714 (September 30, 2019).

76

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

last several years a few of these enforcement cases went before a court in a fully contested proceeding and were resolved with a judicial decision. The holdings in these cases provide insight into the evolution of *Howey*-related jurisprudence where crypto assets are the object of a purported investment contract transaction.

As non-appellate cases, the first two decisions from the Southern District of New York regarding fundraising sales of tokens —*S.E.C. v. Telegram Group Inc.*,[241] and *S.E.C. v. Kik Interactive Inc.*,[242] are outside our historical review of *Howey*-related appellate jurisprudence. Nonetheless, the courts' reasoning in these cases may act as important harbingers for what may come as and when the disputes move to the appellate level. In addition, two major enforcement actions remain in litigation at the time of this writing, *S.E.C. v. Ripple Labs, Inc. et al.*[243] and *S.E.C. v. LBRY, Inc.*,[244] with the former pending a decision on competing motions for summary judgment by the SEC and the defendants and an order granting the SEC's motion for summary judgment recently entered in the latter.

Critically, each of these cases involve some form of fundraising transaction by the entity that was responsible for the creation of the crypto assets. As a result, all four cases fall comfortably in the mainstream of *Howey* jurisprudence, as discussed in Section II above, in which the nature of the object sold is not germane to the determination of whether an investment contract transaction is present. Nevertheless, in all four of these actions, the SEC took pains to characterize the crypto asset sold as a "security" (sometimes referred to a as "crypto asset security" or, more recently—perhaps to distinguish these assets from crypto assets intended by their issuer to be securities, as a "crypto asset security"). Although not relevant for the successful prosecution of these actions, this nomenclature strongly suggests that a "marker" is being laid for the SEC's position on transactions in crypto assets outside of fundraising transactions. The validity of this position will be discussed below.

### 1. Telegram Group, Inc.

In the *Telegram*, Judge Kevin Castel granted the SEC's request for a permanent injunction against Telegram Group Inc. and TON Issuer Inc. (collectively, "Telegram") finding that the SEC had "shown a substantial likelihood of success in proving that the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the [i]nitial [p]urchasers, including the intended and expected resale of [the crypto asset known as] Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5."[245] In doing so, Judge Castel addressed what had then become a common form

---

[241] 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[242] 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[243] *S.E.C. v. Ripple Labs, Inc. et al.* No. 20-10832 (S.D.N.Y.).
[244] *S.E.C. v. LBRY, Inc.* No. 21-cv-00260 (D.N.H.).
[245] *Telegram* at 381.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of alternative fundraising with crypto assets—the Simple Agreement for Future Tokens (a "SAFT").[246]

In January 2018, Telegram, a private company known for its eponymous encrypted messaging application, Messenger, began raising funds in order to finance its operations and develop its own blockchain network, known as the "TON Blockchain". From January until March 2018, Telegram sold contractual rights to acquire approximately 2.9 billion crypto assets called "Grams" to 175 U.S. and international initial purchasers through a series of SAFTs, referred to as Gram Purchase Agreements.[247] Under these agreements, delivery of the Grams (and the launch of the TON Blockchain) was supposed to occur no later than October 31, 2019, at which time, after the launch of the TON Blockchain, the SAFT holders would have a contractual right to receive Grams, and members of the public would have the ability to purchase Grams for an active network. Telegram argued that the sale of the SAFTs, and the sale of Grams to the public after the launch of the TON Blockchain, were two distinct sets of transactions—the first which was subject to securities laws, and exempt from registration under Regulation D, and the second which was simply a purchase of a "utility token" due to their function and consumptive use.

Judge Castel rejected Telegram's argument—instead finding that, upon examination of the totality of the evidence and considering the economic realities, that the SEC had established a substantial likelihood of success in showing that (a) "at the time of the offers and sales to the [i]nitial [p]urchasers, a reasonable investor expected to profit from Telegram's continued support for Grams and the underlying TON Blockchain through the distribution of Grams by the [i]nitial [p]urchasers to the public" and (b) "Telegram's present plan to distribute Grams is an offering of securities under the *Howey* test to which no exemption applies."[248]

The *Telegram* decision collapses the initial sales of Gram tokens by Telegram to the initial purchasers and the proposed resales of Grams by these same persons (presumably to members of the general public) into one single "scheme" to distribute the Grams to the public. In doing so, the decision looks closely at the nature of investment contract transactions using tokens and rebuffs the SEC's claim that the Grams tokens were themselves securities. In their complaint, the SEC had alleged that Grams

---

[246] For a detailed review of the SAFT framework and its apparent shortcomings, *see* Juan Batiz-Benet, Marco Santori, and Jesse Clayburgh, The SAFT Project: Toward a Compliant Sale Framework, (October 2, 2017), http://www.saftproject.com/static/SAFT-Project-Whitepaper.pdf; *Cf.* Cardozo Blockchain Project, "Not So Fast—Risks Related to the Use of a "SAFT" for Token Sales" (2017) available at https://larc.cardozo.yu.edu/cgi/viewcontent.cgi?article=1000&context=blockchain-project-reports.

[247] *See S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).

[248] *Id.* at 358-9.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

were securities "because the [i]nitial [p]urchasers and subsequent investors expect to profit from Telegram's work: the development of a TON "ecosystem," integration with Messenger, and implementation of the new TON Blockchain…. [and] there is an expectation on the part of investors that they will profit if Telegram builds out the functionalities it has promised."[249]  Telegram, however, argued that the Grams were distinct from the Gram Purchase Agreement (acknowledged by Telegram to be a security), and therefore must be evaluated separately under *Howey*.

In his decision, Judge Castel distinguishes between the two positions, and while he does not go so far as to reject the SEC's argument, he does not adopt the position that the Grams standing alone are securities, instead writing that "the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence," and highlighting that the transaction at issue is the "scheme" which "consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram."[250]  In doing so, Judge Castel highlights the importance of focusing on all of the facts and circumstances associated with fundraising sale transactions involving crypto assets, rather than on the crypto asset alone.  Nonetheless, given that it is irrelevant to the ultimate outcome of the case, the *Telegram* decision falls short of fully recognizing the jurisprudential importance of distinguishing between fundraising transaction and the asset sold.

Shortly after issuing his main order, Judge Castel made this position even more clear in a subsequent ruling, noting:

> [O]ne of the central points of the Court's [March 24, 2020] Opinion and Order [was], specifically, that the "security" was neither the Gram Purchase Agreement nor the Gram but *the entire scheme* that comprised the Gram Purchase Agreements and the accompanying understandings and undertakings made by Telegram, including the expectation and intention that the Initial Purchasers would distribute Grams into a secondary public market.[251]

### 2.  Kik Interactive, Inc.

Kik Interactive, Inc. ("Kik"), the Canadian developer of Kik Messenger, a messaging app, sought to develop a "digital ecosystem" using digital tokens called Kin as the digital currency.  During 2017, through a private SAFT "pre-sale" sale, and a subsequent public token distribution event ("TDE") Kik offered and sold one trillion Kin tokens to more than 10,000 purchasers for approximately $100 million dollars, with over half of this sum alleged to have come from persons located in the United States.  The proceeds of these sales were intended to fund Kik's

---

[249] Complaint, at 2, *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[250] 448 F. Supp. 3d (S.D.N.Y. 2020) at 379.
[251] *S.E.C. v. Telegram Group*, Inc., 19-cv-9439 (PKC) (S.D.N.Y. Apr. 1, 2020)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

operations and create, develop, and support a "Kin Ecosystem" in which Kin tokens, at a future date, could be used to buy goods and services.[252] The SEC claimed that the offer and sale of Kin through the SAFT and at the TDE, should be characterized as an investment contract transaction—which was sold without a registration statement being in effect, and without an exemption from registration—thereby violating Section 5(a) and 5(c) of the Securities Act.

Kik denied these allegations, arguing in a fashion similar to Telegram that the pre-sale transactions were exempt from registration as "private placements" that qualified for the safe harbor provided by Regulation D under the Securities Act, and that at the time of the TDE, the Kin tokens were not themselves "securities", but rather a medium for consumptive and functional use by users of Kik's social media platform."[253] The only contractual agreement with Kin users was a Terms of Use Agreement, which in part provided that the Kin tokens were provided on an "As Is and As Available basis without warranties or conditions of any kind, either express or implied."[254] Both the SEC and Kik moved for summary judgement on that basis.

In granting summary judgment to the SEC, the court agreed with the SEC's position that Kik had offered and sold unregistered securities through investment contract transactions involving sales of the Kin token. In particular, the court asserted that a common enterprise was present based on the pooling of proceeds from sales of Kin tokens for construction of the digital ecosystem promoted by Kik which the court stated was crucial to the "success of the ecosystem [which] drove demand for Kin and thus dictated investors' profits".[255] Finding that "Kik recognized and repeatedly emphasized this,"[256] the court stated that "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract."[257]

---

[252] Complaint, at 2-3, *S.E.C. v. Kik Interactive Inc*., 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[253] Answer to Complaint, at 16, *S.E.C. v. Kik Interactive Inc*., 492 F. Supp. 3d 169 (S.D.N.Y. 2020). Kik's focus on functionality of the Kin token demonstrates the confusion present in this area. As discussed in detail in Section II, in virtually all of the *Howey* cases involving asset sales, the assets in question had some functionality or "utility". The existence of some sort of functionality is also irrelevant to the whether an investment contract was present. Rather, attention should be focused on what a reasonable purchaser would have expected from her purchase. Did the "facts and circumstances" of the transaction suggest that the assets were being acquired for consumptive purposes (unlikely to give rise to an investment contract transaction) or were the purchasers likely primarily motivated by the prospect of a financial gain from the later resale of the asset (more likely that there would be an investment contract transaction present)?
[254] 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[255] *Id*. at p. 178.
[256] *Id*.
[257] *See, infra*, Section [167] for a discussion of the relationship between contractual privity between the parties and presence of an investment contract transaction. As noted there, in the context of a fundraising transaction, we believe that the position taken in *Kik* (*i.e.,* that

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Notwithstanding that the only question before the court was whether the fundraising sales by Kik of the Kin tokens constituted investment contract transactions, making the status of the Kin token irrelevant to the matter in dispute, the court nevertheless wrote in *dicta* that "Purchasers in the [private and public] sales received the same class of securities, fungible Kin that were equal in value. It is true that they received them via different instruments with different rights. However, the ultimate result was distribution of identical assets."[258] While the finding of investment contract transactions in *Kik* is consistent, philosophically at least, with prior *Howey* jurisprudence, the additional statement regarding the nature of Kin tokens, made without analysis or consideration of the factors discussed above, demonstrates how easy it is to conflate an investment contract transaction with its non-security object.

### 3. Ripple Labs, Inc.

In December 2021, the SEC filed a complaint[259] against Ripple Labs, Inc. and two of its senior executives, Brad Garlinghouse and Chris Larson (together, the "Ripple Defendants"). The substance of the SEC's complaint against the Ripple Defendants was a "garden variety" claim of a violation of Section 5 of the Securities Act by them resulting from long-running fundraising sales of a crypto asset, known as XRP. These sales were conducted in a variety of ways, however, some of the sales were made to the general public in the United States without registering those transactions with the SEC.

Nevertheless, the first paragraph of the SEC's complaint against Ripple Labs states that "[f]rom at least 2013 through the present, Defendants sold over 14.6 billion units *of a crypto asset security called "XRP,"* in return for cash or other consideration worth over $1.38 billion U.S. Dollars ("USD"), to fund Ripple's operations and enrich Larsen and Garlinghouse."[260] This assertion regarding the securities law status of XRP tokens, irrelevant to the actual alleged violations by the Ripple Defendants, resulted in most U.S.-based crypto asset marketplaces to preemptively delisting XRP tokens, immediately and predictably

---

the absence of contractual privity between the fundraising party and the investor providing the funds should not prohibit the finding of an investment contract transaction), while very limited in precedent, and is the right policy outcome and one likely to be followed by subsequent courts.
[258] *Id.* at p. 182. Given that this statement is made in *dicta*, it is possible to construe the court's reference to Kin tokens as "securities" as mere shorthand for a conclusion that the sales of these assets constitute securities transactions, although reasonable people could differ on this.
[259] Complaint, *S.E.C. v. Ripple Labs, Inc. et al.*, No. 20-10832 (S.D.N.Y. Dec. 22, 2020), ECF No. 4 (the "Ripple Labs Complaint").
[260] Ripple Labs Complaint at p. 1 (emphasis added).

81

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

removing a significant amount of the liquidity support for XRP causing in a significant decline in the price of the token.[261]

In response, the well-funded Ripple Defendants have mounted a vigorous and aggressive defense, alleging that they were not provided with "fair notice" of their potential violations and requesting extensive discovery about the inner workings of the SEC's decision-making as it developed its response to the proliferation of transactions involving crypto assets.[262]  The discovery issues, which have continued for over a year as of this writing, were referred to a federal magistrate judge and created a great deal of discussion among observers of the crypto asset space.[263]  In addition, as will be discussed below, following the price declines in the XRP token, a large group of disgruntled XRP owners unsuccessfully attempted to intervene in the case, alleging that they had been harmed as a result of the SEC's actions.[264]  At the time of this writing, both the SEC and Ripple Labs have filed motions for summary judgment, requesting the judge to make a ruling based on the arguments already made, and have subsequently filed their oppositions to the other party's summary judgment motion.

### 4.   LBRY, Inc.

Most recently, the SEC commenced an action against LBRY, Inc., a company that developed what it refers to as a popular decentralized digital content marketplace (known as "LBRY") that runs on blockchain technology.  LBRY, Inc. asserts that it did not conduct an ICO (generally understood here as a public sale of pre-functional crypto assets) and that it developed its blockchain network using traditional funding, rather than through the sale of any digital tokens (which it claims it only sold well after the blockchain was fully launched and operational).  Nevertheless, in March of 2021, the SEC filed a complaint against LBRY, Inc. claiming that, starting in 2016 LBRY, Inc. had offered and sold unregistered securities in the form of a crypto asset called LBRY Credits ("LBC"), which it said LBRY, Inc. had told investors was to be used to fund its business and build its product.

---

[261] Olga Kharif, *Cryptocurrency XRP is in free fall with exchanges delisting coin*, Bloomberg News (Dec. 30, 2021) available at: https://www.bnnbloomberg.ca/cryptocurrency-xrp-is-in-free-fall-with-exchanges-delisting-coin-1.1542141.

[262] *See* Kara Kapp, "The 'Ripple Effect': A Striking Development on Defending Digital Asset Securities Litigation" (Reuters April 21, 2022), available at https://www.reuters.com/legal/legalindustry/ripple-effect-striking-development-defending-digital-asset-securities-litigation-2022-04-21/.  For a discussion of Ripple Labs' fair notice defense, *see supra* note [239].

[263] *See* Holly Barker, "Ripple Discovery Would Chill All Agency Debate, SEC Says (1)" (Bloomberg Law Aug. 2, 2022), available at https://news.bloomberglaw.com/litigation/ripple-discovery-threatens-to-chill-all-agency-debate-sec-says.

[264] *See* Motion to Intervene, *S.E.C. v. Ripple Labs, Inc., et al.*, No. 20-10832 (S.D.N.Y. March 14, 2021) (the "XRP Holder Motion").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In their motion for summary judgement, however, the SEC equivocated. Most of the SEC's motion appears to acknowledge the scheme/object distinction, stating at one point that, "If crypto assets, *or anything else*, are offered in a way that meets the three prongs of *Howey*, an investment contract exists and the securities laws apply".[265]  On the other hand, elsewhere in the motion the SEC refer to the LBC tokens sold by LBRY as "LBC investment contracts".  Nevertheless, in order to draw support for a finding that LBRY Inc. had had "fair notice" of the application of the federal securities laws to LBRY Inc.'s fundraising transactions in LBC, the SEC described the *Howey* test as having been "satisfied for interests in: orange groves…payphone leases...investment packages to secure EB-5 visas…online ad services…licenses to sell dental products…films…multi-level marketing…chinchillas…and virtual shares…,"[266] and cited to the statement in *Kik* that "the law regarding the definition of investment contract gives a reasonable opportunity to understand what conduct and devices it covers."[267]

Of course, the various objects enumerated by the SEC in their summary judgment motion were not themselves found to be "investment contracts", but rather it was the specific transactions through which these non-financial assets were sold that constituted the relevant "security".  The SEC did not cite any significant authority that would support the idea that the LBC tokens themselves were "securities".  In fact, if that had been clearly asserted, such a position would almost certainly merit a finding of a lack of "fair notice" on the part of the defendants.

Notwithstanding the apparent recognition by the SEC in its briefing that the object of an investment scheme is not itself a security, the District Court in New Hampshire in a recent memorandum and order appears to characterize LBC itself as a security, ruling that the offer and sale of LBC tokens (apparently, *all* offers and sales, regardless of the specific circumstances of the transaction) violated Section 5 of the Securities Act and therefore granting the SEC's motion for summary judgment.[268]  The LBRY Order frames the dispute as follows: "the issue to be decided is whether the economic realities surrounding LBRY's offerings of LBC led investors to have 'a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others'".  The court then goes on to repeatedly say that "LBRY offered LBC *as a security*."[269]

Critically, while the court refers to it as "uncontested" that some unknown number of purchasers of LBC from LBRY acquired the token "at least in part" to use the token for its intended purpose, rather than to hold as an investment, no attempt is made in the LBRY Order to

---

[265] SEC, LBRY Summary Judgment Motion at p. 19 (emphasis added).
[266] *Id.* at p. 22.
[267] *Id.* at p. 23 (emphasis added).
[268] *See* Memorandum and Order at 18, *SEC v. LBRY, Inc.*, No. 21-cv-00260-PB (D.N.H. Nov. 7, 2022), ECF No. 86 ("LBRY Order").
[269] *Id.*

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

distinguish among the sales that were made to purchasers that had a *bona fide* consumptive intent and those who were offered, and who purchased, LBC tokens with a reasonable expectation of profit from the efforts of LBRY, Inc.[270]  In terms of finding a violation of Section 5, this distinction is not necessary.  So as long as there were at least *some* offers and sales of LBC tokens to the public as investments (and the record as presented in the LBRY Order suggests that there were), then *those* offers and sales would be illegal (as they were not registered with the SEC or otherwise exempt from registration).  Whether there were some *other* sales of LBC that did not violate Section 5 would be irrelevant to a finding that a violation occurred.

The LBRY Order continues, "Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract."  This is indeed correct.  To apply this to our strowrange parable, Strowrange Labs can sell some of the seeds in small amounts in a seed catalog that offers a wide variety of different seeds, and which is mailed to at-home gardeners (even though this may be considered a "public offering".  Some purchasers may even be aware of the hype around the seeds and thing that it might be "fun" to own some.  These transactions would not be occurring in a manner that in any way suggests an investment opportunity and there is nothing in *Howey* jurisprudence that suggests that sales made through the catalog should be considered investment contract transactions.

However, other of the strowrange seeds could be offered by Labs to investors like Fund with promises of value creation in transactions which are properly treated as securities offerings.  What matters in making this distinction are the *economic realities of the transaction*, not (as the SEC themselves observed) the nature of the object sold.  Unfortunately, the *LBRY* court did not correctly apply *Howey* and failed to assess the economic realities of each of the various transactions in LBC tokens conducted by LBRY Inc. – instead, it appears to have concluded that *all* transactions in LBC should be treated as investment contract transactions.

The *LBRY* court seems to thereby apply a new test not found in existing *Howey* jurisprudence – what we referred to above as the "original sin" theory.  Rather than applying *Howey* to particular transactions, the LBRY court makes the same mistake that the original Ninth Circuit appellate tribunal did in *Hocking*.  There, the tribunal misconstrued *Howey*, finding that the *potential* for a transaction to have investment character (*i.e.*, the availability of a rental pool agreement offered by the operator of the condominium development at issue) *automatically* resulted in the plaintiff's purchase being characterized as an investment contract transaction without examining the facts and circumstances of a specific transaction.[271]  As discussed above, the full Ninth Circuit in a rehearing *en banc*[272] strongly disagreed with the tribunal's position and reversed,

---

[270] *Id.*
[271] *Hocking v. Dubois*, 839 F.2d 560 (9th Cir.), *withdrawn*, 863 F.2d 654 (1988).
[272] *Hocking II*, *supra* note [185].

84

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

remanding the case for fact-finding on the specific circumstances applicable to the transaction in question.

Demonstrating the difficulty in getting this right at the District Court level – something we observed in the relatively frequent appellate reversals in our survey, the LBRY Order continues:

> Despite LBRY's insistence to the contrary, I cannot reject the SEC's contention that LBRY offered LBC as a security simply because some LBC purchases were made with consumptive intent. Were it otherwise, the Securities Act would be unable to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" wherever a token held some consumptive utility. … Accordingly, statements from a subset of LBC holders that they purchased LBC for use on the LBRY Blockchain is of limited relevance in determining whether LBRY offered it as a security. *See Warfield*, 569 F.3d at 1021 ("[W]hile the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised.").

> In summary, what the evidence in the record discloses is that LBRY promoted LBC as an investment that would grow in value over time through the company's development of the LBRY Network. While some unknown number of purchasers may have acquired LBC in part for consumptive purposes, this does not change the fact that the objective economic realities of LBRY's offerings of LBC establish that it was offering it as a security.[273]

In articulating its position, the *LBRY* court demonstrates the underlying flaw in its reasoning by relying on a case involving fraudulent sales of annuity contracts, *Warfield v. Alaniz*.[274] *Warfield* concerned a criminal Ponzi scheme in the form of purported "charitable gift annuities" (no money was ever given to charity and the promoter wound up serving jail time). The plaintiff, an individual named Warfield, was a court-appointed receiver for what was left of the investors' assets. Warfield sued agents of the foundation that was used as the vehicle to operate the scheme, seeking to recover commissions paid to those agents from monies raised from investors. One issue the receiver faced in its pursuit of a Madoff-like recovery was whether the annuity contracts were "securities". The defense sought to counter this allegation by asserting that the ostensibly charitable nature of the arrangement defeated *Howey*'s "investment of money" prong.

Unsurprisingly, the *Warfield* court did not buy this argument, particularly in the context of a criminal Ponzi scheme. To reach this

---

[273] LBRY Order at pp.18-19.
[274] 569 F.3d 1015 (9th Cir. 2009).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

conclusion, the court focused its inquiry on what the annuity purchasers were offered or promised, which the court stated was "an objective inquiry into *the character of the instrument or transaction* offered based on what the purchasers were 'led to expect'".[275]  *Warfield*, however, involved an "instrument" – the charitable annuity contract – which proposed the same (fraudulent) arrangement for everyone by its terms.  The only slim reed to be batted away by the court was the suggestion by the defense that because the word "charitable" was used in the product, purchasers had no present expectation of financial gain.  This was easily dismissed by the court where the record showed that purchasers' returns were repeatedly being favorably compared to what could be earned in the stock market.

In contrast, given that the *LBRY* court acknowledged both that LBC had a *bona fide* consumptive use (something not the case with the purported financial contracts in *Warfield*) and that there were significant numbers of people acquiring LBC for that consumptive use, it was incumbent on the court not to fall into the same trap as the original *Hocking* tribunal who were reversed.  In fact, the court in *LBRY* made the very same assumption as that *Hocking* tribunal – that because the purchase of a non-financial asset *could* have been based on an expectation of profit or on the presence of financial inducements provided by others that the asset was *automatically* a security based on those considerations without any investigation into the circumstances of specific transactions.[276]  This is the exact opposite of the learnings from over 70 years of *Howey* jurisprudence.

The *LBRY* court lost sight of the question properly before it: were there one or more identifiable sales of LBC to persons that did not have a *bona fide* consumptive interest in the assets and instead were looking to profit through price increases reasonably expected to come from LBRY's efforts?  Instead, the court answered the wrong question – are LBC tokens themselves securities?  Because as we have seen, LBC tokens, like most other crypto assets, are not instruments and do not create a legal relationship between the owner and any other person, the proper inquiry is transaction-based; not asset-based.

*5.  Conclusion*

To date, *Telegram*, *Kik*, and *LBRY* are the only thoroughly briefed and decided cases relating to fundraising sales of crypto assets and none

---

[275] *Id*. at 1021 (emphasis added; footnotes omitted).

[276] The SEC in a recent complaint filed against Hydrogen Technology Corporation alleged that some means of distributing a particular crypto asset, known as Hydro, are securities transactions while other means of distributing the very same crypto asset were *not* alleged to constitute securities transactions.  *See*, Complaint, *U.S. Securities and Exchange Commission v. The Hydrogen Technology Corporation, Michael Ross Kane, and Tyler Oster*, Case No. 1:22-cv-08284-LAK (SDNY September 29, 2022) (describing four means of distributing the Hydro token: through bounty programs, employee compensation, sales in the open market, and airdrops – free giveaways –  and alleging that the transactions involving the first three were investment contract transactions but not alleging that the distributions via airdrop were investment contract transactions).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of these decisions are yet to have been appealed beyond the district court level. As a result, there is limited material to work with from a jurisprudential perspective when applying *Howey* to the crypto assets themselves. Nevertheless, we can observe the seeds of judicial tensions emerging. On the one hand, we see in Judge Castel's two *Telegram* decisions a clear skepticism about linking investment contract transactions to the crypto assets being sold.

Alternatively, although there is the *dicta* noted in the *Kik* decision, because that is not accompanied by any reasoning that would not also be applicable to the investment contract transactions found to be present, it is difficult to know whether much can be made of the court's statement, which can also be read as mere shorthand. Similarly, the thesis underlying the LBRY Order is difficult to decipher on this point. We will learn more when the remedies for the Section 5 violation found are determined. At that point, we may see a court for the first time fully embrace the Embodiment Theory, although the support such an approach would receive at the appellate level is unclear at best. For the time being at least, we are left with the 70-plus years of extant *Howey* jurisprudence from which to draw conclusions about the application of this law to non-fundraising secondary transactions in crypto assets.

## IV.    Applying *Howey* Case Law to Secondary Transactions in Crypto Assets and the SEC's "Embodiment" Theory

Although the application of the *Howey* case law to fundraising sales of crypto assets is reasonably straightforward, the SEC has consistently implied that it is not just the fundraising transaction that is an "investment contract". Across a range of formal and informal statements, the crypto asset itself is referred to as an "investment contract" or even just a "security", a "crypto asset security" or a "crypto asset security" akin to a share of stock or a bond or other debt instrument. In particular, the SEC's current Chair, Gary Gensler, has taken this position even more aggressively than his predecessor, Jay Clayton, for example stating that "[w]ithout prejudging any one token, most crypto tokens are investment contracts under the Supreme Court's *Howey* Test."[277] By way of contrast, former SEC Chair Jay Clayton chose his words more carefully. When testifying before Congress in February 2018, he simply stated that "[e]very ICO I've seen is a security," clearly referring to the transactions pursuant

---

[277] *See* Gary Gensler, "Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference" (April 4, 2022), available at: https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

to which the relevant crypto assets were being sold rather than to the crypto assets themselves.[278]

This approach of proposing to treat a non-financial crypto asset (*i.e.,* one that is not a "securities equivalent")[279] as a security is notably in contrast with that of a number of other major jurisdictions, such as the European Union,[280] Switzerland,[281] and Singapore,[282] all of which generally do not consider non-financial crypto assets to be "securities".

What distinguishes tokens from the myriad of other assets that featured in earlier SEC "investment contract" enforcement actions are their ready transferability and the fact that, unlike the failed schemes that lead to many of the earlier enforcement actions (where investor loss was often the proximate cause of an SEC investigation), many tokens managed

---

[278] *See* Stan Higgins, *SEC Chief Clayton: 'Every ICO I've Seen Is a Security'*, COINDESK (Feb. 7, 2018), available at https://www.coindesk.com/sec-chief-clayton-everyico-ive-seen-security?amp.

[279] *See, infra,* text at note [131].

[280] In September 2020, the European Commission published a draft of the Markets on Crypto-assets (the "MiCA Regulation"). The MiCA Regulation limits its scope to those "crypto-assets" that do not qualify as financial instruments, deposits or structured deposits under the EU financial services legislation. Under the MiCa Regulation, the categorization of non-financial crypto assets includes "crypto asset[s]" "utility token[s]", "asset-referenced token[s]", and "electronic money token[s]". On June 30, 2022, the European Council presidency and the European Parliament announced that they had reached a provisional agreement on scope of the MiCA Regulation. *See* Council of the EU Press release "*Digital finance: agreement reached on European crypto-assets regulation (MiCA)*", June 30, 2022, available at https://www.consilium.europa.eu/en/press/press-releases/2022/06/30/digital-finance-agreement-reached-on-european-crypto-assets-regulation-mica/.

[281] In February 2018, the Swiss Financial Market Supervisory Authority ("FINMA") published guidance on how to apply Swiss financial markets laws in its guidelines regarding the regulatory framework for ICOs (the "ICO Guidelines"). According to the ICO Guidelines, FINMA distinguishes between "Payment tokens" which have no further functionality or links to other development projects, "Utility tokens" which are intended to provide digital access to an application or service, and "Asset tokens" which represent assets such as participations in real physical underlyings, companies, earning stream, or an entitlement to dividends or interest payments. *See FINMA Publishes ICO Guidelines,* FINMA (Feb. 16, 2018)*,* available at https://www.finma.ch/en/news/2018/02/20180216-mm-ico-wegleitung/.

[282] In May 2020, the Monetary Authority of Singapore (the "MAS") published the "Guide to Digital Token Offerings" which details the regulations surrounding crypto assets and their applicability to securities, collective investments, and derivative contracts. In doing so, the MAS described the characteristics of crypto assets which would constitute capital markets products, and thus be regulated under Singapore's Securities and Futures Act ("SFA"), stating that the "MAS will examine the structure and characteristics of, including the rights attached to, a digital token in determining if the digital token is a type of capital markets product under the SFA." Monetary Authority of Singapore, "A Guide to Digital Token Offerings", 2 (May 26, 2020), available at https://www.mas.gov.sg/regulation/explainers/a-guide-to-digital-token-offerings. In April 2022, Ravi Menon, Managing Director of MAS stated during an interview that MAS "regulates crypto assets-related services and service providers on an activity basis rather than an entity-based approach," and clarified that crypto assets which represent securities, such as a share or a bond, are regulated under the Securities and Futures Act, and that "[i]f the crypto asset is used as a means of payment, then it is regulated as a digital payment token under the Payment Services Act." MAS Approach to the Crypto Ecosystem, MAS (April 27, 2022), available at https://www.mas.gov.sg/news/speeches/2022/mas-approach-to-the-crypto-ecosystem.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

to sustain or even increase their value when traded in secondary markets. The presence of vibrant secondary markets for tokens led to a completely unique type of SEC enforcement action – unprecedented in the investment contract jurisprudence to date: the pursuit of parties not involved in the original fundraising scheme for violations of the securities laws resulting from secondary dealings in tokens.  These enforcement actions required a leap from a focus on fundraising schemes to a focus on activities by infrastructure providers to the crypto asset community, such as operators of trading platforms.

Prior to the filing of the *Wahi* Complaint,[283] the two most notable such enforcement actions were taken against Zachary Coburn, the developer of a computer protocol for a DEX, known as "EtherDelta,"[284] and Poloniex, LLC, the operator of a centralized crypto asset marketplace.[285]  In the case of Coburn, he had no relationship with the original fundraising by any token project; rather, he was charged in connection with the operation of an unregistered national securities exchange based in part on the fact that he continued to benefit from trading fees extracted by the EtherDelta protocol from the protocol's users.  The SEC alleged that EtherDelta "operated as a marketplace for bringing together orders of multiple buyers and sellers in [crypto assets] that included securities…"[286]  This statement underlined the SEC's position that at least some of the crypto assets traded constituted securities.[287]

Similarly, the SEC alleged that Poloniex operated a crypto asset trading platform that met the definition of an "exchange" under federal securities law.  The platform displayed a limit order book that matched the orders of multiple buyers and sellers in crypto assets, including crypto assets that the SEC alleged were themselves "investment contracts" and thus "securities".  However, in neither the *Coburn* nor the *Poloniex* consent orders did the SEC specify which crypto assets it believed were securities, denying market participants the opportunity to evaluate the specific facts and circumstances related to the transactions in each of those assets to determine how such a conclusion may have been reached.

The status of secondary markets in crypto assets came into even greater focus in January 2022, when the SEC proposed a major overhaul of Exchange Act Rule 3b-16.[288]  The proposed amendments would bring

---

[283] *See, infra,* Section [IV.B].
[284] *In the Matter of Zachary Coburn,* S.E.C. Release No. 34-84553 (November 8, 2018).
[285] *In the Matter of Poloniex, LLC*, S.E.C. Release No. 34-92607 (August 9, 2021).
[286] *In the Matter of Zachary Coburn, supra* note [284] at 9.
[287] There is no suggestion in the SEC's complaint that Mr. Coburn was creating a new "investment contract" by allowing various crypto assets to be exchanged by third parties through the EtherDelta protocol.  For an article addressing the status of crypto asset exchanges under the federal securities laws, *see* Michael J. O'Connor, *Overreaching its Mandate?  Considering the SEC's Authority to Regulate Cryptocurrency Exchanges*, 11 Drexel L. Rev. 539 (2019) (distinguishing between the contractual promises that bind issuers of crypto assets, which may result in the formation of an investment contract, and the relationship between exchanges and their customers, which are not accompanied by the contractual promises of the issuer).
[288] Securities Exchange Act Release No. 94062 (Jan. 26, 2022) (Proposing Release), available at https://www.sec.gov/rules/proposed/2022/34-94062.pdf.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"Communication Protocol Systems", a term not formally defined in the proposal, within the Exchange Act's definition of the term "national securities exchange".  As a result, an entity deemed to be operating a Communication Protocol System that was not registered as a national securities exchange under Section 6 of the Exchange Act would be required to register with the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer and comply with the SEC's existing Regulation ATS.[289]   To the extent that the position currently being advocated by the SEC were to prevail – *i.e.*, that most crypto assets are deemed to constitute either permanent securities (under the "original sin" theory) or temporary securities (under the Embodiment Theory), then secondary transactions in these assets would be severely constrained.  For example, many tools used by market participants to exchange crypto assets (sometimes referred to as "decentralized exchanges" or "DEXes") could meet the proposed broad definition of Communication Protocol System and would likely be required to impose a centralized intermediary (eliminating any possibility of operating on a decentralized basis) or find a practicable way to exclude or U.S. persons.[290]

        In this section, we trace the SEC's approach to the characterization of crypto assets and transactions therein outside of the fundraising context (*i.e.,* in secondary transactions between parties not directly or indirectly involved in the original fundraising scheme).  This begins with the SEC's first major statement on the topic, the "When Howey Met Gary (Plastic)" speech.[291]   As noted above, the subsequent *Coburn* and *Poloniex* enforcement actions did not identify those crypto assets which the SEC believed were themselves securities.  It was not until 2022 and the *Wahi* complaint that the SEC identified nine specific crypto assets that it alleged were securities, even when sold in a transaction that did not involve fundraising.  Accordingly, we look closely at the arguments asserted there, concluding that current *Howey* jurisprudence does not support the position that these assets are securities.  This section ends with a look at the policy reasons why such a position should not be adopted as a new interpretation of *Howey*.

---

[289] 17 CFR § 242.301, et seq.

[290] *See, e.g.,* Jamie Crawley, *Hester Peirce Warns Proposed SEC Reform of Securities Trading Platforms Could Threaten DeFi,* CoinDesk (Feb. 1, 2022), https://www.coindesk.com/policy/2022/02/01/hester-peirce-warns-proposed-sec-reform-of-securities-trading-platforms-could-threaten-defi/; ConsenSys Software, Inc., Comment Letter on Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"; Regulation ATS for ATSs That Trade U.S. Government Securities, NMS Stocks, and Other Securities; Regulation SCI for ATSs That Trade U.S. Treasury Securities and Agency Securities (April 14, 2022), available at https://www.sec.gov/comments/s7-02-22/s70222-20123694-279940.pdf- ("We write out of concern that some language in the proposed rule may inadvertently designate decentralized systems, such as some of those built on Ethereum, as exchanges within the meaning of the Exchange Act of 1934 … if those systems are used to transact in cryptocurrencies that are misconstrued as securities.").

[291] William Hinman, "Digital Asset Transactions: When Howey Met Gary (Plastic)" (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418 (the "Hinman Speech").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

### A. "Morphing"

*1. The "When Howey Met Gary (Plastic)" Speech*

In the summer of 2018, with ICO mania at full throttle and new crypto assets being introduced on a seemingly daily basis, the SEC's then Director of Corporation Finance, William Hinman, gave a speech in which he sought to introduce a general framework for determining when crypto assets initially sold in a transaction that would be considered an investment contract transaction (such as an ICO) could later be offered and sold without creating securities transactions.[292]  Highlighting the challenge in this effort, Director Hinman noted that "whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis".

The specific context of the speech was the rapidly growing interest in ether, the native token of the Ethereum network.  As discussed in Section I, ether is needed to pay the transaction fees to deploy smart contract code to the network (known as gas).  Similar to patterns seen with many other commodities, market participants acquired ether in secondary market transactions in anticipation that growing demand for the Ethereum network would drive demand (and therefore price) of ether.

However, it was recognized that if the SEC were to assert that ether tokens were securities, the consequences would be quite significant. All secondary transactions in ether, regardless of the specific facts and circumstances, would then be securities transactions and it would not be possible to list ether on the same marketplaces that allowed trading in bitcoin and other non-security crypto assets.  Numerous other restrictions would also apply.  Many thought that such a determination could stifle, if not destroy, the nascent blockchain industry in the U.S.

Clearly sensitive to these concerns and eager to carve out a position that avoided this adverse outcome without giving a license to the rapidly proliferating token sales being used for fundraising, Director Hinman stated: "Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not."[293]

---

[292] Hinman Speech.  As is almost universally the case with public discourse by the Staff and Commissioners of the SEC, the Hinman Speech included an important disclaimer: "The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner.  This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners, or other members of the staff."  This disclaimer took on much greater import after the defendants in Ripple Labs sought to gain access to internal SEC documents relating to the deliberation process that preceded the speech as part of their fair notice defense during the discovery phase of *S.E.C. v. Ripple Labs, Inc. et al.  See S.E.C. v. Ripple Labs, Inc. et al.*, 20-CV-10832 (AT) (SN) (S.D.N.Y. June 15, 2021) .

[293] *Id.*

91

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Using an apt example, Director Hinman illustrated the difference between a non-security asset and an investment contract transaction involving that asset. A housing unit purchased as a residence is not itself a security, he observed. However, under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others (for example, as the result of a rental pool agreement also being offered). Thus, in these circumstances, whether what is being sold is a residence or a crypto asset, where the primary diver of the purchase is not its consumptive use and, *so long as a common enterprise has been formed between the parties to that transaction*, the offer and sale of the property would likely be considered an investment contract transaction. All this is a straightforward application of *Howey* jurisprudence. Clearly, it is not the housing unit that is the "security" in this example, as we saw with *Hocking*. The housing unit is and remains just that – a property interest, and not a financial instrument. However, when that property interest is sold in a transaction in which all four *Howey* factors are present, that transaction will be a type of securities transaction (that is, an investment contract transaction).

Things become more interesting when Director Hinman considered the bank certificates of deposit that were the object of an investment contract transaction in *Gary Plastic*.[294] Unlike housing units (and crypto assets), certificates of deposit are very much financial assets and properly classified as "instruments" – they represent a legal right against an identifiable entity (the ability to receive interest at a stated rate and a return of principal from the bank that issued the certificate).[295] However, in a separate case, *Marine Bank v. Weaver*,[296] the Supreme Court held that, although financial instruments, federally insured bank certificates of deposit were *not* securities for purposes of the Securities Acts. This led Director Hinman to observe:

> [W]hen a CD, exempt from being treated as a security …, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument *can be part of* an investment contract that is a security.[297]

This is exactly right: the object of the investment contract transaction in *Gary Plastic* was a type of financial instrument that entitled the original owner – as well as any transferee of the owner – to specifically identifiable rights against the bank issuer. More importantly, the separate promises

---

[294] *Gary Plastic Packaging Corporation v. Merrill Lynch Pierce Fenner & Smith Inc.*, 756 F.2d 230 (2d Cir. 1985).
[295] *See, infra*, text at note [131].
[296] *Marine Bank v. Weaver*, 455 U.S. 551 (1982).
[297] Hinman Speech (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

made by Merrill Lynch for the benefit of its customers were clearly defined in a "Money Market Information Bulletin", the key provisions of which the court set out in detail in its decision. There is no suggestion in *Gary Plastic* that a non-customer of Merrill Lynch who bought a bank certificate of deposit previously in the program but without any of the express additional rights provided by Merrill Lynch would own a "security". As a result, market participants always had *an objective and observable means* of determining whether they were engaging in an investment contract transaction.

However, this comparison to *Gary Plastic* led Director Hinman to state that "the same reasoning applies to digital assets", concluding that a [crypto] asset itself "can be, … and most often is, a security – *because it evidences an investment contract*." This approach can be viewed as a laudable attempt to balance competing policy goals. On the one hand, this allowed Director Hinman to clear the air on the questions swirling around use of the Ethereum blockchain at the time by confirming that secondary transfers of ether tokens in the present day were not investment contract transactions. On the other hand, this also allowed Director Hinman to avoid unequivocally stating that ether tokens were simply "not securities", something that would have likely been perceived as a potential "opening of the floodgates" to all sorts of questionable new crypto assets that may have been initially sold in unregistered investment contract transactions in violation of Section 5 of the Securities Act and then traded in true secondary transactions before the original violations could be addressed by the SEC's enforcement staff.

If it had been left there, this would have been an effective and practical means of addressing the immediate issue. In hindsight, though, the analogy to the *Gary Plastic* case was an unfortunate reference point to build from. No case law was cited in the speech for the proposition that a *non-financial asset* can "evidence" an investment contract. In fact, a review of the case law demonstrates that this is not something found elsewhere in the entirety of *Howey* appellate jurisprudence.

Yet, in the absence of a more appropriate solution from Congress,[298] this concept has gone on to become a backbone of the SEC's approach to enforcement in the area of crypto assets and introduced the idea that a crypto asset can transition (commonly referred to as "morphing") from something that evidences an investment contract to something that does not. The speech goes on to develop this idea further, stating:

> [T]his also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which

---

[298] Subsequent to the speech, Congress has indeed taken up the mantle of addressing the legitimate policy concerns that may have originally driven Director Hinman's approach to applying the Securities Acts to crypto assets. *See* Section V, *infra*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the token or coin is to function is *sufficiently decentralized* – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.[299]

By retrospectively applying this new concept of "sufficient decentralization" to the Ethereum blockchain network, it was not necessary or relevant for Director Hinman to explain how market participants could determine the moment in time when *other* crypto assets might "morph" from a security to a non-security – something critical to third parties' ability to comply with the Securities Acts with respect to those assets.  The introduction of the morphing concept subsequently gave rise to a near obsessive focus in the crypto asset community on the idea of a blockchain network or dApp becoming "sufficiently decentralized" as the skeleton key for unlocking the Holy Grail of "non-security" status for the related crypto asset.[300]

However, the absence of any case law authority for the idea that a non-financial asset that was initially treated as a security could later "morph" into a non-security based upon events extrinsic to the asset lead to a multitude of theories, ideas, and conjectures among members of the bar seeking to provide guidance to their clients.  This leaves crypto asset market participants without *an objective and observable means* of determining with any reasonable certainty when and under what circumstances such a morphing "out of" security status might occur.  It also left open the very real issue of what market participants were supposed to do to monitor whether a given crypto asset might later "return to" security status (a possibility clearly left open by the morphing hypothesis).[301]

---

[299] *Id.* (emphasis added).
[300] *See, e.g.*, Blockchain Association, "*Understanding the SEC's Guidance on Digital Tokens: The Hinman Token Standard*" Jan. 10, 2019, available at https://blockchainassoc.medium.com/understanding-the-secs-guidance-on-digital-tokens-the-hinman-token-standard-dd51c6105e2a.
[301] Notwithstanding the absence of any relevant jurisprudence applicable to "sufficient decentralization" in the context of federal securities law, a number of thoughtful attempts to elaborate on this concept have been made.  *See, e.g.*, Gabriel Shapiro, "*Defining Decentralization for Law*", April 15, 2020, available at https://lex-node.medium.com/defining-decentralization-for-law-58ca54e18b2a;  Marc Boiron, "*Sufficient Decentralization: A Playbook for web3 Builders and Lawyers*", available at https://variant.fund/wp-content/uploads/2022/08/Sufficient-Decentralization-by-Marc-Boiron.docx.pdf; and Jesse Walden, "*Progressive Decentralization: A Playbook for Building Crypto Applications*", available at https://a16z.com/2020/01/09/progressive-decentralization-crypto-product-management/.

94

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Illustrating these issues, the Web3 Foundation recently announced that they believe DOT, the native cryptoasset to the Polkadot blockchain network, has morphed into something other than a security as of the three-year anniversary of their initial outreach to FinHub at the SEC regarding the status of DOT.[302]   The vision for Polkadot never contemplated DOT being a security, but the team understood that the SEC was likely to view DOT as a security.  The team also wanted to do anything they could to ensure DOT was or became a non-security in the eyes of the SEC, so they began a process of engagement with the SEC in order to reach that goal. Eventually, after three years of engagement, the Web3 Foundation was comfortable announcing that DOT had morphed from security to non-security.

While the Web3 Foundation likely never viewed DOT as a security, the implication of this announcement is that the SEC did, and, since the SEC has not commented, we do not know whether they still do or whether they agree that DOT has morphed from security to non-security.  This is practically unworkable because it does not provide market participants with a reliable basis to treat DOT as a non-security. An announcement from a sponsor entity that a crypto asset is no longer a security without confirmation from the SEC that they agree does not assuage regulatory concerns for those engaging in transactions in the crypto asset. Given that failure to register as either a broker, dealer, or exchange are strict liability violations of the Exchange Act and the obligation to register is triggered by activities involving securities, it is of critical importance that market participants have clear means of determining when a crypto asset is or is not a security.

Nevertheless, since most of enforcement actions at the time had properly related to addressing issues in ICO-era fundraising transactions that were conducted in violation of Section 5 of the Securities Act, the bellicose statements from the SEC about most crypto assets being securities, even if sold by third parties in secondary transactions, has generally not been examined closely by legal scholars.[303]

### 2. The Response to XRP Holders' Motion to Intervene in SEC v. Ripple Labs, Inc., et al.

In connection with their litigation with Ripple Labs, the SEC was required to respond to the request to intervene raised by the XRP Holder Motion.  A large group of holders of XRP tokens, aggrieved as to the price

---

[302] *See* Web3 Foundation Team, *Less Trust, More Truth: Polkadot's Native Token (DOT) Has Morphed and Is Not a Security. It Is Software.*, Medium (November 4, 2022), available at https://medium.com/web3foundation/less-trust-more-truth-polkadots-native-token-dot-has-morphed-and-is-not-a-security-b2a8847a70cc.

[303] Until the *Wahi* Complaint, the SEC had not brought an enforcement action directly alleging that a secondary transaction in an identified crypto asset itself constituted a securities transaction.  Prior to the *Wahi* Complaint, the only SEC-led enforcement cases with respect to secondary transactions in crypto assets had involved non-litigated consent orders with intermediary entities that had facilitated trading of one or more unidentified crypto assets that the SEC deemed securities without further analysis.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

declines resulting from the sudden unavailability of XRP in U.S. marketplaces, initially sought to sue the SEC for their losses. When that attempt failed, they tried a new approach to getting their grievances against the SEC heard in court – they attempted to interplead in the case as defendants.

In doing so, in addition to making many of the expected arguments (*e.g.*, the need for prosecutorial discretion), the SEC also addressed its view with respect to the nature of secondary transactions in crypto assets originally sold in an investment contract transaction.[304] Similar to the approach taken in the Hinman Speech, the SEC wrote in their response that the security at issue in its litigation with the Ripple Defendants was *not* XRP, the crypto asset, but rather all the facts and circumstances surrounding the crypto asset and the manner in which XRP was *initially* offered and sold, asserting that the XRP token "is the *embodiment* of those facts, circumstances, promises, and expectations and today represents that investment contract."[305] Notably, the SEC cited no case law in support of this novel "embodiment" theory.

The SEC's Embodiment Theory is, however, inconsistent with post-*Howey* appellate jurisprudence and presents likely insurmountable difficulties for market participants in the U.S. seeking to buy, hold or sell crypto assets. As discussed above, the *Howey* test is applied retrospectively and intended to address circumstances in which parties to an ostensibly commercial transaction have direct dealings with each other and thus are aware of both contractual and non-contractual circumstances relevant to the *Howey* analysis. In contrast, the purchaser of a crypto asset in a secondary market transaction (*e.g.*, whether on a centralized or decentralized exchange) has no way of knowing or determining all of the "facts, circumstances, promises, and expectations" might be deemed by a court in hindsight to be "embodied" in any given crypto asset, many of which may not be matters of the public record and capable of discovery by third parties.

Unlike assets which constitute instruments (including what we refer to as "securities equivalents"[306]), where all relevant legal characteristics can be examined by a buyer or seller solely through the review of definitive written documentation, the "facts and circumstances" related to the finding of a constructive legal relationship that is imputed onto parties in direct dealings with each other under *Howey*'s "investment contract" doctrine when applied to investment schemes *are not capable* of

---

[304] Memorandum of Law in Opposition to Motion to Intervene, *S.E.C. v. Ripple Labs, Inc. et al.*, No. 20-10832 (S.D.N.Y. May 3, 2021), ECF No. 153 (the "Ripple Labs Memorandum of Law").

[305] *Id.* (emphasis in original). This "embodiment" hypothesis differs from the position taken by the SEC in the Ripple Labs Complaint, where the very first line states: "From at least 2013 through the present, Defendants sold over 14.6 billion units of *a digital asset security called 'XRP' … "*.

[306] *See, infra*, text at note [131].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

being determined with certainty on an ongoing basis by persons not part of the original scheme.[307]

Moreover, not only has the SEC not provided any means for third parties to "weigh" the relevance of various facts that may suggest that an original transaction met the *Howey* test against other facts that may suggest the contrary, such a weighting scheme is simply impossible to construct based on the diverse approaches taken by courts around the country over the past 70 years.

This is compounded by the reality that many relevant "facts and circumstances" may be private matters between the original parties and not capable of discovery by third parties who lack the SEC's subpoena power to access e-mail messages, Discord servers, and intra-company Slack channels (holding aside the rather obvious problem that these facts and circumstances are constantly changing and third parties seeking to own, use and transfer crypto assets do not have the economic resources or incentive to constantly monitor this information).  Finally, *Hocking* and other cases teach us that the evaluation of whether an investment contract transaction is present must be made at the time the transaction takes place.  Thus, to correctly apply *Howey*, a party would have to make their evaluation at the time each specific transaction takes place.

With the embodiment theory, the SEC is ignoring the correct application of *Howey* to each transaction and attempting to create a *de facto* presumption that all (or most) crypto assets are themselves investment contracts in the same way that "notes" are presumed to be securities.  A note is presumed to be a security because it is enumerated as a type of security in both Securities Act (that presumption may be rebutted for notes entered into for certain commercial and personal purposes, which are excluded from the coverage of the securities laws).[308]  In addition, a note is itself is legally enforceable of the relevant the issuer – *a readily determinable person or entity*.  The issuer is the one responsible for making payments in accordance with the written promise to pay set forth in the note.  If the issuer does not meet its payment obligations under the note, the holder of the note can present the note in court as evidence of those obligations and seek the remedies available under the circumstances.

---

[307] The SEC recently revalidated in this point in its Memorandum of Law in Support of its Motion for Summary Judgement  in *S.E.C. v. Ripple Labs, Inc. (Oct. 21, 2022),* writing: "

> The use of [the words "transaction" and "scheme" in *Howey*] contemplates that "the security not be formed of one neat, tidy certificate, but [by] a general 'scheme' of profit seeking activities."  *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989).  Thus, courts have held that in applying *Howey* a 'written contract does not control.'  *Baroi v. Platinum Condo Dev., LLC*, 914 F. Supp. 2d 1179, 1192 (D. Nev. 2012) (citing *Hocking*, 885 F.2d at 1457).

Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J at 17, *S.E.C. v. Ripple Labs, Inc*. (20 CIV. 10832 (AT)(SN)) (Oct 21, 2022).

[308] *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

97

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

But crypto assets are *not* in the enumerated list of instruments in the definition of security and are very different than notes. Crypto assets are not written instruments that set forth the obligations of an issuer and the rights of a holder. Instead, crypto assets are merely strings of numbers that allows the person controlling the private key associated with the public blockchain address to which some number of the crypto assets are credited to interact with the relevant blockchain. Crypto assets do not generally provide the holder with specific legally enforceable rights and they do not impose obligations on an identifiable issuer.

Under these circumstances, there is no legal or logical basis for a presumption that crypto assets are securities. Instead, one must evaluate the facts and circumstances of each transaction in which a crypto asset is transferred to determine whether that transaction should be treated as an investment contract and subject to securities law compliance. To presume that crypto assets are all securities would require a legislative change recognizing crypto assets as a new category of issuer-independent securities and setting forth how such a presumption can be rebutted and by whom.

### 3. The Embodiment of Rights Under Law

Unlike the Embodiment Theory with respect to crypto assets and federal securities law, in other areas, a well-developed concept of the "embodiment" of rights under law does exist. For example, state commercial law provides for certain documents, such as "chattel paper" to embody rights. This formal embodiment concept results from centuries of common law developed by judges, codified over decades by state legislatures in the Uniform Commercial Code and other statutes.[309]

### 4. Conclusion

The SEC's morphing hypothesis, if adopted, could also be devastating for intermediaries involved in crypto asset transactions. In particular, because many elements of federal securities law impose strict liability on those who violate them (for example, operating an unregistered exchange for the transfer of securities or acting as an unregistered "broker" or "dealer" in securities), if a court were to adopt and apply the SEC's Embodiment Theory to secondary transactions in crypto assets, third parties dealing in such crypto assets might face significant consequences and penalties without ever having notice of the facts, circumstances, promises, and expectations giving rise to a determination that a particular asset is in hindsight deemed to "embody" a security.

---

[309] *See,* Thomas H. Jackson (1983) "Embodiment of Rights in Goods and the Concept of Chattel Paper", UNIVERSITY OF CHICAGO LAW REVIEW, Vol. 50: Iss. 3, Article 3 (1983), available at https://chicagounbound.uchicago.edu/uclrev/vol50/iss3/3/.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

B.      **The *Wahi* Complaint and the Common Enterprise Problem**

The Wahi Complaint was filed by the SEC in July 2022 in conjunction with a related criminal indictment filed by the U.S. Department of Justice.[310]  The Wahi Complaint provided the first insights into the SEC's reasoning as to why specifically enumerated crypto assets were themselves "crypto asset securities".  Rather than following the well-settled jurisprudence and applying the *Howey* test to an identified "contract, transaction or scheme", the Wahi Complaint instead states flatly that the defendants "traded in securities subject to federal securities law *because these crypto assets were investment contracts*", going on to state that these assets "were offered and sold to investors who made an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others".[311]

Similar to complaints filed by the SEC against fundraising sellers of crypto assets in well-understood investment contract transactions, in the Wahi Complaint the SEC asserts:

> [E]ach of the nine crypto asset securities were offered and sold by an issuer to raise money that would be used for the issuer's business.  In the offerings, the issuers directly sold crypto asset securities to investors in return for consideration ….  The crypto asset securities then were issued and distributed to the investors' blockchain addresses.  [T]he issuers and their promoters solicited investors by touting the potential for profits to be earned from investing in these securities based on the efforts of others.  These statements focused on, among other things, the value of the token at issue and the ability for investors to engage in secondary trading of the token, with the success of the investment depending on the efforts of management and others at the company. … [E]ach of the nine companies that offered these crypto asset securities and their promoters further emphasized, among other things, their efforts to get their crypto asset securities listed on secondary trading platforms, and the critical role that executives and others at the company played in turning the company into a success, thereby increasing the value of the crypto asset security.  In other words, each of the nine companies invited people to invest on the promise that it would expend future efforts to improve the value of their investment.[312]

The Wahi Complaint refers to the above as the "hallmarks" of the definition of a security without further explanation as to how they reach this conclusion.  It would appear that the SEC's theory is that the mere

---

[310] *See* Sealed Indictment, *United States v. Wahi,* No. 22 Crim. 392 (S.D.N.Y. filed Jul. 21, 2022).
[311] Wahi Complaint at p. 21 (emphasis added).
[312] *Id*. at p. 22.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

purchase of a crypto asset that was sold in an original investment contract transaction,[313] even if only very briefly held (as was the case in the purchases by the defendants in Wahi Complaint), is sufficient to put the asset holder in the position of being in a "common enterprise" with the original asset seller and that this relationship would be sufficient to support a finding that the crypto asset itself is a security.

As discussed above, this position relies on a court adopting the SEC's Embodiment Theory (since purchasers and sellers of crypto assets in secondary transactions are not providing funding to the original asset seller). Moreover, before radically expanding 70 years of *Howey* jurisprudence to embrace such a theory and creating a risk of violations of federal law due to strict liability regimes, it is incumbent both on the SEC and any court considering the matter to take into account how such a theory would be applied as a practical matter and how market participants would be able to determine at any point in time whether a given crypto asset did, or did not, "embody" a particular scheme.

At the conclusion of this Article, we suggest an alternative and substantially more practical way of achieving the SEC's desired policy outcome.

### C.    Why the Idea of a Security "Morphing" and the Embodiment Theory Should Not Be Adopted

As noted above, it is perfectly appropriate for the SEC to propose new conceptual approaches to changes brought on by technology-driven developments, especially where the relevant enabling statutes (the Securities Acts) have a recognized remedial purpose. However, the Embodiment Theory would not only change existing law, it would also upset the delicate balance currently present in the construction of the Securities Acts. As we have observed, "investment contract" is a status imposed in retrospect by a court on a purportedly commercial transaction to remediate an attempt by one of the parties to circumvent required compliance with the Securities Acts. As a remedial provision intended to address prior wrongdoing, the inherent uncertainties of the precise application of the *Howey* test to any given situation are generally considered an acceptable trade-off for the protections it provides to the unwary.

However, applying the same approach to *secondary transactions* in non-financial assets creates a completely new set of incentives and risks. Rather than simply imposing a high degree of diligence on a single party indirectly raising money or inducing participation in a questionable business venture, adopting the Embodiment Theory would impose nearly insurmountable burdens on virtually all market participants dealing with

---

[313] An assertion not able to be disputed by the asset sellers in question since these entities were not named parties in the Wahi Complaint.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

crypto assets, since in order to ensure compliance with the Securities Acts an assessment of whether a given crypto asset is at the time – in fact, the exact moment – of the secondary transaction in fact "embodying" an investment scheme would need to be made.  It appears that the SEC's response to this concern is that, at the moment, the vast majority of crypto assets "embody" an investment scheme and so market participants should just assume all crypto assets are "securities" to be on the safe side.

We do not believe that this is an adequate or appropriate position. Even if the Embodiment Theory were to be adopted, it is not at all clear that, if a properly presented case with a full fact finding were to be brought before a court that the court would agree that there was an ongoing investment scheme of the type contemplated by the *Howey* test.[314]

Moreover, it is widely recognized that developments in the crypto asset space are happening very quickly[315] and the state of affairs that might give rise to a conclusion that a given crypto asset does "embody" an investment scheme could change at any time (and in either direction – with the relevant morphing being out of, but potentially also into, "security status"[316]), making the entire process beyond unwieldy.  Add to this, a variety of facts relevant to a full determination of the matter under the *Howey* case law will likely not be known (or knowable) to the general public, users of crypto assets, and other market participants, such as those facilitating exchanges of these assets or custodying the assets for users. These persons have no way to require sponsors of projects to disclose the relevant private information about their involvement in a project to them. Although this is not an issue in primary transactions where the parties are dealing directly with each other, in a secondary transaction, without access to this private information, market participants are left to guess about whether a given token does, or does not, embody a scheme at a particular

---

[314] In the Wahi Complaint, for reasons unclear, the SEC only claimed that nine of the 25 total crypto assets it said were traded by the defendants were "crypto assets".  (The SEC has previously used the term "digital asset securities" for crypto assets it maintains "are" securities.  It is unclear if this change in nomenclature is intended to have substantive significance.)  There is some uncertainty as to the overlap between the remaining unnamed assets referred to in the SEC's complaint and those covered by the Department of Justice in the related criminal complaint.  We note that, in our survey of appellate cases, a significant majority were determined by the court *not* to involve an investment scheme under *Howey*.  *See* Section [II.A.4] *infra*.

[315] *See, e.g.*, BNY Mellon, "*Digital Assets: From Fringe to Future*", September 2021, available at https://www.bnymellon.com/us/en/insights/all-insights/digital-assets-from-fringe-to-future.html ("Just as traditional markets have evolved by means of collaboration among stakeholders, we believe the same must be true for crypto assets, albeit more quickly.  Decentralization is a built-in feature of the distributed technologies that underly crypto assets. … This new ecosystem, which must be grounded in both trust and innovation, will provide significant opportunities for growth.").

[316] *See, e.g.*, Frederick Munawa, "What's at Stake: Will the Merge Turn Ether into a Security?"   (CoinDesk   Aug.   10,   2022)   available   at https://www.coindesk.com/tech/2022/08/10/whats-at-stake-will-the-merge-turn-ether-into-a-security/.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

time.   Given that the Securities Acts provide for strict liability for violations of various provisions, this is simply an unacceptable result.

Finally, in a similar context considering whether a subjective test should be applied when the security in question was 100% of the shares of stock in a business being sold, the Supreme Court expressly rejected an analogous "morphing" concept, stating:

> More importantly, however, if applied to this case, the sale of business doctrine would also have to be applied to cases in which less than 100% of a company's stock was sold.  This inevitably would lead to difficult questions of line drawing.  The Acts' coverage would in every case depend not only on the percentage of stock transferred, but also on such factors as the number of purchasers and what provisions for voting and veto rights were agreed upon by the parties.  As we explain more fully in *Gould v. Ruefenacht*, … decided today as a companion to this case, *coverage by the Acts would in most cases be unknown and unknowable to the parties at the time the stock was sold.*  These uncertainties attending the applicability of the Acts would hardly be in the best interests of either party to a transaction.  *Cf. Marine Bank v. Weaver*, 455 U.S. at 455 U. S. 559, n. 9 (*rejecting the argument that the certificate of deposit at issue there was transformed, chameleon-like, into a "security" once it was pledged*).[317]

## V.   THE PROBLEM AND A SOLUTION

### A.      The Inadequacy of the Current Regulatory Framework for Secondary Markets in Crypto Assets

If most crypto assets are not securities, then the most likely categorization of these assets would be as "commodities" under the CEA.  However, under current law, spot transactions in commodities are subject only to limited oversight by the CFTC as, historically, such spot transactions have generally been wholesale commercial transactions (such as direct trade in crude oil, wheat, or pork bellies) and not practically available to the retail market (and certainly not through anonymous, order book-based trading platforms that provide analogous services as traditional securities intermediaries).

Although centralized crypto asset marketplaces are required to register with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, as money service businesses and obtain state money transmission licenses in those states in which they operate (to

---

[317] *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 696 (1985) (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the extent so required), this regulation is designed for those businesses temporarily entrusted with customer funds and focuses mainly on the safety and soundness of the "money transmitter" and their adoption and implementation of the broad anti-money laundering and know-your-customer requirements found in the Bank Secrecy Act.  Left unaddressed are matters relating to the fairness and integrity of the marketplaces themselves, including prohibitions on manipulative behavior by the marketplace operators and participants and addressing the inevitable conflicts of interest that arise from trading businesses.

Also lacking are requirements that persons or entities that raised money in a private fundraising sale of crypto assets (and thus not required to register the sale with the SEC) provide any ongoing disclosures to the marketplaces about their continued involvement with the project.  Although there may not be a legally enforceable obligation on the part of a project sponsor to utilize the proceeds raised in a fundraising sale for a particular purpose, owners of crypto assets do indeed often rely on a select group of individuals to cause a project to grow and develop, thus driving up demand for the crypto asset and, most likely, the asset's price.

### B.  Legislative Responses

A number of important pending legislative initiatives in Congress aim to address these gaps.[318]  Bills looking at these issues from the commodities perspective have emerged from both the Senate and the House.  The Digital Commodities Consumer Protection Act of 2022 (the "DCCPA"), introduced in August 2022 by Senators Debbie Stabenow, Chairwoman of the Senate Committee on Agriculture, Nutrition, and Forestry, and John Boozman, Ranking Member, along with Senators Cory Booker and John Thune, would give the CFTC new tools and authorities to regulate crypto asset commodities and would go a long way toward filling the current regulatory gap.  However, in its current form, this bill does not provide a practical framework that would allow market participants to distinguish crypto assets that are securities from those that are not.

The DCEA, re-introduced in April 2022 by members of the House Agriculture Committee, would create a definition of "digital commodity".  Consistent with our discussion above concerning the proper application of *Howey* jurisprudence to crypto assets, this definition would exclude crypto assets which purport to create obligations between an issuer and the holder of the asset.  This definition does not contemplate "morphing" through some form of decentralization, as posited by the SEC.  The DCEA definition of digital commodity is focused solely on the potential obligations between the issue and the holder.

---

[318] Pending legislation with respect to stablecoins is beyond the scope of this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Spot transactions in digital commodities would then fall within under the CFTC's regulatory regime.  The DCEA would also create a new regulatory framework for digital commodity developers, dealers, and exchanges.  In the event of a "digital commodity presale" when a developer delivers a digital commodity as part of a securities offering, holders of such pre-sold digital commodities would only have limited options for secondary sale, among which they could sell on a digital commodity exchange registered with the CFTC.  "Presold digital commodity tokens" generally would include those received by an early investor, those given to developers (or relatives thereof), or those reserved for a development foundation.  Generally, those tokens received by individuals or entities which can be considered "insiders".  A registered digital commodity exchange would be subject to a self-certification process in order to list new digital commodities for trading.

Between the introduction of these two bills, Senators Cynthia Lummis and Kirsten Gillibrand announced the introduction of the Lummis-Gillibrand Responsible Financial Innovation Act (the "RFIA").  The RFIA provides a comprehensive and holistic approach to crypto asset activity and would tackle many of the issues arising at the intersection of traditional financial regulation and crypto assets, including taxation, custody, consumer protection, commodities regulation, and securities regulations, among other things.

The RFIA also takes an approach to providing a legislative answer to the question of when transactions involving crypto assets will be governed by federal securities law and when the federal commodities laws properly apply and has similarities to the current form of the DCEA.  In particular, Title III of the RFIA addressees the information asymmetry concerns raised by the SEC by imposing new SEC-governed disclosure obligations on companies that raise funds through the sale of crypto assets, even where the funds were raised in private placement transactions.

The RFIA introduces a new term, "ancillary asset" and various additional related provisions to what would be a new Section 41 of the Exchange Act to create a disclosure regime tailored to the needs of users of crypto assets.  The term "ancillary asset" in the RFIA is used to describe a fungible intangible asset (which is not necessarily a crypto asset) that is offered, sold or otherwise provided to a person in connection with the purchase and sale of an "investment contract" , but which does not provide the holder of the asset with: (i) a debt or equity interest in that entity, (ii) a profit or revenue share derived from that entity, (iii) an entitlement to an interest or dividend payment from that entity, (iv) a profit or revenue share in that entity derived solely from the entrepreneurial or managerial efforts of others, or (v) any other financial interest in that entity.

The concept of "ancillary assets" in the RFIA allows statutory law to align better with existing *Howey* jurisprudence by providing a clear way of distinguishing between assets sold in investment contract transactions

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

which are not otherwise "securities", and the transactions by which these assets are sold, which sometimes are.  The large majority of major crypto assets currently in the market would likely be considered "ancillary assets" under the RFIA, since very few of these assets provide the holder with equity or debt-like rights in a separate "business entity" – they simply allow for instructions to be given to a network of computers.

The proposed new Section 41 of the Exchange Act would introduce a presumption that ancillary assets are not "securities".  For a seller of ancillary assets (and certain of its affiliates) this presumption is conditional – for those persons to benefit from it, the seller must be in compliance with the above-mentioned tailored disclosure requirements, to the extent that they are applicable.  On the other hand, persons simply using the relevant crypto assets and not otherwise affiliated with the asset seller are provided with an unconditional presumption that the ancillary asset is not a "security", promoting liquidity but also bringing these assets within the newly expanded jurisdiction of the CFTC, which in Title IV of the RFIA is given jurisdiction over spot markets in fungible crypto assets.  With the CFTC in charge of secondary markets in most crypto assets[319] and the SEC charged with overseeing the disclosure regime applicable to sellers of crypto assets, the RFIA seeks to balance the competing policy concerns in a way that provides much enhanced protections to the market while allowing offering technologists seeking to build new projects in the U.S. a viable path forward.

At the same time, the RFIA recognizes that there is a broad design space available when crypto assets are created.  Where a crypto asset does create (or at least purports to create) actual legal rights that can be enforced in a traditional judicial proceeding (as would be the case with equity or debt rights), then the parties would need to carefully consider whether a "security" had been created.  This determination is left to existing *Howey* and related jurisprudence.

Under the RFIA, if a company with jurisdictional ties to the U.S. offers, sells, or otherwise executes investment contract transactions that provide their counterparty with an "ancillary asset", that company will be subject to the periodic disclosure requirements targeted at the asset sold and the involvement of the seller beginning on the date that is 180 days after the first date on which the investment contract is offered, sold, or otherwise provided by the company.  However, the disclosure is conditional upon there being an active trading market for the asset and the seller (or certain affiliated entities) remaining the driving force in determining the value of the relevant assets.  Said differently, the disclosure obligations under the RFIA continue until the project to which the relevant assets relate is "sufficiently decentralized".  Every six months this is tested again and when the seller entities are no longer actively

---

[319] How the CFTC would do this is outside the scope of this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

involved, the requirement for them to provide disclosure to the market ceases.

Although this Article does not endorse any of these legislative initiatives on their own, we do believe that these three legislative initiatives, taken together, form a strong starting point for a discussion of potential federal regulation of crypto asset marketplaces and uses that is wholly consistent with the conclusions of our work. Critically, it is the job of Congress, not unelected regulators, to balance the competing policy considerations and craft a solution that would address the current absence of required disclosures by crypto asset-based project sponsors necessary for fulsome consumer protection, without taking the untenable position that most tokens are themselves securities.

Such legislation could bring crypto asset marketplaces under a coordinated federal regulatory umbrella and ensure that these marketplaces had a level of oversight and supervision similar to other "designated contract markets" for commodity interests. In addition, by distinguishing between the "contract, transaction, or scheme" comprising an investment contract transaction, and the crypto asset sold as the "object" of that scheme, new legislation would codify existing jurisprudence while balancing the real need to protect consumers through added disclosure. This would provide a practical and balanced solution to a very real and expensive problem for participants in the crypto asset sector.

We are encouraged by the steps taken by Congress in 2022 and look forward to seeing an ongoing and transparent dialogue with all stakeholders as all of the work that has been done, together with significant and constructive work undertaken elsewhere in Congress (most notably the bi-partisan efforts made in the House Financial Services Committee to address the issuance, holding and use of stablecoins) eventually crystalize into one or more laws that set the U.S. on a course for sustainable leadership in the use of crypto assets.

## VI.   CONCLUSION

Securities regulators in the U.S. have attempted to address the many issues raised from the advent of crypto assets through a range of policy statements and enforcement actions, generally through an application of the *Howey* test to transactions in these assets. However, in their understandable efforts to protect those who have been the direct or indirect victims of fraudulent or misleading fundraising schemes utilizing crypto assets, regulators have gone beyond current jurisprudence to suggest that most fungible crypto assets are themselves "securities", a position that would provide them with jurisdiction over nearly all activity taking place with these assets.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

As we have demonstrated, there is no current basis in the law relating to "investment contracts" to classify most fungible crypto assets as "securities" when transferred in secondary transactions because an investment contract transaction is generally not present and these assets neither create nor represent the necessary cognizable legal relationship between an identifiable legal entity on the one hand and the owner of the crypto asset on the other that is the hallmark of a security.

Although it is perfectly appropriate for securities regulators to suggest new approaches to new "devices" that fall within their remit, we have endeavored to show that there are strong policy reasons against judicially or legislatively adopting the Embodiment Theory and the idea of securities "morphing" into and out of being a "security" due to the uncertainty it would bring to the marketplace and the near-impossible duty it would impose on market participants to constantly monitor changes to the "facts and circumstances" that might result in a court asserting that a given investment scheme was ongoing and "embodied" in a crypto asset. This would greatly disadvantage market participants in the United States in light of the regulatory approaches being taken in other major jurisdictions around the world. The "morphing" of things should be left to Proteus and the stuff of Greek myths – modern market participants require an *objective and observable* means of determining at any particular point in time whether they may be engaging in securities activity, *i.e.,* certain rules that are rooted in the more than 70 years of existing *Howey* jurisprudence which can be applied clearly and plainly by good faith actors, something the SEC's current theory would simply foreclose.

At the same time, the authors acknowledge that changes are needed to address legitimate concerns about the protections currently available to market participants that own, and trade in, crypto assets. Accordingly, the authors argue that this gap should be addressed legislatively, through an act of Congress. Aspects of the proposed legislation discussed above provide a basis to develop a constructive, insightful, and bi-partisan approach to the concerns raised by regulators and others and, together, point the way toward a practical solution without creating unworkable legal fictions that will inevitably cause the U.S. to fall behind the rest of the world in this critical technology infrastructure.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

**Annex A**

## ABOUT OUR SURVEY

In the course of researching for this Article, we examined whether there might exist jurisprudential precedents in the United States, particularly in federal appellate courts and the Supreme Court, to support the suggestion that non-financial assets that are the "object" of an investment scheme but which contain no contractual terms, such as crypto assets, oranges grove parcels, aging whiskey, animal pelts, and the like, could themselves be found to be "securities" when sold on the secondary market without an assignment of the related contractual promises that were a necessary part of the finding of an "investment contract". In order to undertake this examination, we identified each federal circuit court and Supreme Court decision[320] that raises the question of whether a particular "*contract, transaction, or scheme*" was an investment contract. To do this, we compiled a set of every such decision citing to *S.E.C. v. W.J. Howey Co.* along with the phrase "investment contract" (in order to isolate investment contract decisions citing to *Howey* from those which cite to *Howey* for other reasons). Additionally, because a handful of relevant cases cite to *United Hous. Found., Inc. v. Forman* but not *Howey* and use the term "common venture" rather than "common enterprise" we expanded our review to include relevant decisions citing to *Forman*. In total, we found 253 relevant federal appellate court decisions and 13 Supreme Court decisions as of November 7, 2022. The following summarizes certain trends and highlights several particularly relevant cases with respect to crypto assets. A detailed list of all decisions reviewed is set forth in Schedules 1-5.

SUPREME COURT AND FEDERAL APPELLATE COURT DECISIONS ASSESSING THE EXISTENCE OF AN "INVESTMENT CONTRACT"



Figure 1: Annual distribution of federal appellate and Supreme Court cases assessing the existence of an "investment contract".

Although the word "investment contract" has been a part of the United States jurisprudential lexicon since as early as 1868,[321] the first published reference to it in our highest court was in 1941 in the respondent's argument in *Helvering v. Le Gierse*, 312 U.S. 531 (1941), which was soon followed by the primary precursor to *Howey*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943). Since this time, the

---

[320] We limited our review to federal appellate and Supreme Court decisions both due to practicality (there are at least 1,600 district court cases on the topic), as well as jurisprudential significance.
[321] A LexisNexis search indicates that the first reference of the term was in 1868 in *Nicoll v. Mason*, 49 Ill. 358 (1868).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

majority of federal appellate and Supreme Court decisions have found that there lacked an investment contract or remanded the case for further proceedings on that question (*see* Figure 2).



Figure 2: Decisional outcomes of federal appellate and Supreme Court cases assessing the existence of an "investment contract".

In totality, of the 266 relevant federal appellate and Supreme Court decisions reviewed, courts have found an absence of an investment contract in approximately 42% of decisions, with a further 12% of cases being remanded back to the lower court for additional fact finding. 36% of the cases reviewed found the presence of an investment contract. (Opinions of the remaining cases either did not specifically discuss whether the transaction at issue constituted an "investment contract or were later withdrawn and substituted with a subsequent decision.)

The period between 1973 and 1996, the most active period for investment contract cases at the appellate level, saw decisions dealing primarily with interests in the real estate, banking, investment services and lending sectors. This is in contrast to the prior 25-year period, in which the primary interests at issue were associated with the oil and gas sector. Since 1997, the primary interests giving rise to disputes have been in the real estate sector, but this is closely followed by cases involving sale and leaseback arrangements, including *Cooper v. King*, 114 F.3d 1186 (6th Cir. 1997), *S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003), and *S.E.C. v. Edwards*, 540 U.S. 389 (2004). Overall, the primary interests at issue have been limited and general partnership interests, real estate, and leasehold interests (inclusive of leasehold interests in the oil and gas sector), discretionary trading account interests, and franchise interests across a variety of industries. What we see across all cases is a combination of promoters of capital-intensive businesses seeking to raise funds without committing to the process of a public offering of securities intermixed with more modest business ventures gone awry, with a disgruntled party seeking to avail itself through a remedy under federal securities law where one may not have been available in state court.

As has been discussed throughout the Article, in all circuit court and Supreme Court decisions which found an investment contract to be present, there existed some sort of business relationship between the parties.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

FEDERAL APPELLATE DECISIONS ASSESSING THE EXISTENCE OF AN "INVESTMENT CONTRACT"



Figure 3: Annual distribution of federal appellate cases assessing the existence of an "investment contract".



Figure 4: Distribution of federal appellate decisions assessing the existence of an investment contract since *Howey*, by circuit.

The Ninth Circuit, which has thus far been responsible for 27% of all federal appellate investment contract cases, has found no investment contract, or remanded for further proceedings, in 53% of all decisions. This approximately mirrors the Fifth Circuit, which has thus far been responsible for 17% of all federal appellate investment contract cases, and has similarly found no investment contract, or remanded for further proceedings, in 55% of all its decisions.

In the first 25 years following the Supreme Court's decision in *Howey* (1946-71), federal appellate courts issued just 18 opinions with respect to the status of certain schemes alleged to be investment

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

contracts.  Of those, the courts found an investment contract to have been formed in nine cases, which dealt primarily with interests related to the oil and gas industry,[322] but also two cases stemming from the sales of beaver interests (animal sales),[323] and real estate[324] and distributorships & franchises,[325] respectively.  In all 18 cases, the decisions referenced a written contractual relationship between the parties.



Figure 5: Distribution of industries at issue in the during the first 25-year period after *Howey*.

The Fifth Circuit, the single most active circuit with respect these 18 decisions, with a total of five opinions, focused primarily on issues related to oil and gas interests.  For example, in *Roe v. United States*, 287 F.2d 435 (5th Cir. 1961), the Fifth Circuit remanded the case for further proceedings after finding that that oil leases sold via a "high-pitched, hard-sell extravagant solicitation campaign" which promised extraordinary returns garnered through the activities of persons other than the purchasers were more than offerings of naked leasehold rights and as such, "if credited," would constitute the sale or delivery of an investment contract.  Contrast *Roe* with *Lynn v. Caraway*, 379 F.2d 943 (5th Cir. 1967) in which the court specifically differentiated the sale of certain fractional undivided interests in an oil and gas lease from *Roe* on account of there being no evidence to support a finding that the seller made any promise or agreement in addition to selling the naked leasehold right.  The courts' differentiation between those sales of property rights which are coupled with additional contractual promises, and those which are not reverberates throughout the jurisprudence on investment contracts.

---

[322] *Cross v. Pasley*, 270 F.2d 88 (8th Cir. 1959); *Moses v. Michael*, 292 F.2d 614 (5th Cir. 1961); *S.E.C.  v. MacElvain*, 417 F.2d 1134 (5th Cir. 1969), *cert. denied, 397* U.S. 972 (1970); *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124 (4th Cir. 1970).

[323] *Cont'l Mktg. Corp. v. S.E.C.*, 387 F.2d 466 (10th Cir. 1967); *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971).

[324] *Blackwell v. Bentsen*, 203 F.2d 690 (5th Cir. 1953).

[325] *United States v. Herr*, 338 F.2d 607 (7th Cir. 1964).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent



Figure 6: Types of interests sold during the first 25-year period after *Howey*.

Between 1972 and 1996, federal appellate courts issued what is thus far the majority of the opinions with respect to the presence of an investment contract. During this period, federal appellate courts disseminated 177 opinions discussing investment contracts, of which the leading type of transaction or scheme at issue were those associated with the status of partnerships, whether limited or general, in the real estate industry.[326] Other notable interests at issue related to discretionary trading accounts, for which the courts generally found that the business relationships at issue lacked the essential element of a "common enterprise."[327]



Figure 7: Top 10 types of interests sold during the second 25-year period after *Howey*.

The Ninth Circuit issued the most decisions during this time, finding investment contracts 35% of the time, and either finding no investment contract, or remanding for future fact finding 58% of the decisions during this time. The remaining 7% of decisions dealt with notes, or in the case of *Hocking v.*

---

[326] *See, e.g., Reeves v. Teuscher*, 881 F.2d 1495 (9th Cir. 1989); *Rodeo v. Gillman*, 787 F.2d 1175 (7th Cir. 1986); *Maritan v. Birmingham Properties*, 875 F.2d 1451 (10th Cir. 1989); and *Koch v. Hankins*, 928 F.2d 1471 (9th Cir. 1991).

[327] *See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 622 F.2d 216 (6th Cir. 1980); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459 (3d Cir. 1982); *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir. 1982); and *Lopez v. Dean Witter Reynolds, Inc*., 805 F.2d 880 (9th Cir. 1986).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

*Dubois*, 839 F.2d 560 (9th Cir. 1988), was withdrawn.[328]   A close runner up, the Fifth Circuit found instances of an investment contract in 16% of decisions during this period, and either found no investment contract, or remanded for further fact finding in 60% of the decisions during this time. The remaining 24% of decisions dealt with one or more of the enumerated types of securities set forth in the Securities Acts, other than an investment contract, or in the case of *Williamson v. Tucker*, 632 F.2d 579 (5th Cir. 1980), was withdrawn.[329]

In addition to the *Hocking* line of cases, described in Part II.C, notable amidst these 177 opinions is the Ninth Circuit's opinion in *S.E.C. v. Belmont Reid & Co.,* 794 F.2d 1388 (9th Cir. 1986).  In *Belmont Reid & Co.,* the SEC brought antifraud actions against salesmen who sold contracts for gold coins to investors on behalf of a Nevada natural resources developer who, in an effort to raise capital, sought to sell its gold directly to investors, with the option to either purchase the coins thirty days in advance of delivery, or prepay for the coins at a fixed price.  The SEC alleged only that the pre-payment plan was a security, as the prepayment price embodies a discount of between 33% and 48% of the prevailing market price of gold. In finding that the case failed to meet the "solely from the efforts of others" prong of *Howey*, the court found, along with the district court, that the profits of the coin buyer "depended upon the fluctuations of the gold market," not the seller, and therefore declined to accept that the contracts at issue were investment contracts.[330]

Finally, in the last 25 years, from 1997 through 2022, there have been 59 federal appellate opinions with respect to the status of certain schemes as investment contracts, 35 of which were decided by either the Ninth, Eleventh, or Fifth Circuits. During this time, the notable schemes at issue have included payphone leases packaged together with service contracts,[331] and a handful schemes involving virtual in-game shares, condominium interests, employee stock option plans, and recently, digital assets.[332]

---

[328] Withdrawn at 885 F.2d 1449 (1989).
[329] Withdrawn at 645 F.2d 404 (1981).
[330] 794 F.2d 1388 (9th Cir. 1986).
[331] *See, e.g.*, *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005); *S.E.C.  v. ETS Payphones, Inc.*, 300 F.3d 1281 (11th Cir. 2002), *rev'd sub nom.*, *S.E.C.* v. Edwards, 540 U.S. 389 (2004); *S.E.C. v. Ross*, 504 F.3d 1130 (9th Cir. 2007); *S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003).
[332] *Fedance v. Harris,* 1 F.4th 1278 (11th Cir. 2021).

113

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent



Figure 8: Distribution of industries at issue in the during the third 25-year period after *Howey*.

Of those opinions, the federal appellate courts found investment contracts in 33 instances. Notable decisions during this period include *S.E.C. v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) and *S.E.C. v. Edwards*, 540 U.S. 389 (2004), among others.

In *S.E.C. v. SG Ltd.*, the First Circuit was tasked with determining whether virtual shares in an enterprise existing only in cyberspace fell within the purview of federal securities law. In finding that the SEC alleged sufficient facts to state a triable claim, and thus reversing the lower court's decision, the First Circuit gave great weight to the economic realities of the situation, holding that the SEC had sufficiently proven that the offer to sell virtual shares in various "virtual companies" listed on a "virtual stock exchange" while promising a risk free investment, amounted to an invitation to enter into an investment contract, and was thus within the jurisdictional reach of federal securities law.

In *Edwards*, the Supreme Court was asked to decide whether a payphone sale-and-leaseback arrangement was excluded from the term "investment contract" because the scheme offered a contractual entitlement to a fixed, rather than a variable, return. There, the defendant sold payphones to the public packaged with a site lease, a five-year leaseback and management agreement, and a buyback agreement. The purchasers of the packages were not involved in the day-to-day operations of the payphones they owned and were promised a 14% annual return. As the payphones did not generate enough revenue to make payment under the leaseback agreements, the company became dependent on funds from investors to meet its obligations.

While the district court held that the arrangement was an investment contract, the Eleventh Circuit reversed on two grounds. First, the court read that an "investment contract" was an offer of either capital appreciation, or participation in the earning of the enterprise, thereby excluding schemes which offered a fixed rate of return. Second, the court held that "efforts of others" prong was not satisfied when the purchasers had contractual entitlement to the return. The Supreme Court concluded that the Eleventh Circuit erred on both accounts and held that an investment scheme promising a fixed rate of return can be an investment contract subject to federal securities law. In doing so, the Court analyzed the judicial history

114

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of the *Howey* test, citing to the state courts interpretation of their "blue sky" laws to explain the meaning of the word "profit" within the definition set forth in *Howey* in order to find that there is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the test.

What the *Edwards* court did not do was directly opine on whether or not there was a "common enterprise" involved in the investment contract at issue.  Nor did the Supreme Court relieve courts from having to find a common enterprise.  Notwithstanding the foregoing, the SEC took that silence to mean that the Supreme Court supported their interpretation of the "common enterprise" prong of the *Howey* test to be all but nullified.  Addressing the issue in footnote 10 of the Framework, the SEC cites to the Opinion of the SEC in *In re Barkate*, 57 S.E.C. 488, 496 n.13 (Apr. 8, 2004), where the SEC lowered the bar for the finding of an investment contract by rejecting the "common enterprise" element of *Howey* and embracing the prior standards elucidated in state "blue sky" laws, thus redefining the traditional investment contract test as those adopted prior to *Howey*.  In furtherance of the foregoing, in the same footnote 10 of the Framework, the SEC cited to their Supplemental Brief in *Edwards* in which the SEC writes:

> *Edwards* not only confirms broad vertical commonality as the correct interpretation of "common enterprise," but also supports the Commission's original interpretation of "investment contract" – first articulated in 1941 and recently reiterated in a post-*Edwards* adjudicatory opinion.  As the Commission clarified in that recent opinion, a "common enterprise" does not impose "a distinct requirement for an investment contract." [333]

Accordingly, it appears that the SEC's definition of "investment contract" is notably broader than what is otherwise seen in the *Howey* jurisprudence.  Specifically, the SEC cites to *In re Natural Resources Corp.*, 8 S.E.C. 637 (1941) in the aforementioned brief as describing an investment contract as being "transactions which in substance…involve the laying out of money by the investor on the assumption and expectation that the investment will return a profit without any active effort on his part, but rather as a result of the efforts of someone else."  Nevertheless, courts considering questions of the application of *Howey* to transactions involving crypto assets continue to apply all four *Howey* prongs.

---

[333] Appellee Supplemental Br, *S.E.C. v. Edwards*, 540 U.S. 389, 14-15 (2004).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## SCHEDULE 1

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST- *SEC V. W.J. HOWEY CO.* IN WHICH THE COURT FOUND AN INVESTMENT CONTRACT.**

| Object Key | |
|---|---|
| Yes | Means that the court found that there was, or that the allegations were sufficient to determine that, the contract, transaction, or scheme at issue in the case was an investment contract. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344 (1943)[334] | Yes | Leasehold Interest | Oil & Gas | Finding the sale and assignment of an oil lease to be not merely the sale of naked leasehold rights but an "investment contract," because the exploration enterprise was woven into the oil lease enterprise. |
| 2. | S.E.C. v. Howey Co., 328 U.S. 293 (1946) | Yes | Real Estate Interest | Real Estate | Finding an offer for the sale of units of a citrus grove for real estate development to be an "investment contract" when coupled with a service contract for cultivating, marketing, and remitting net proceeds to purchasers. Establishing the *Howey* test, which is used to determine the existence of an "investment contract" when a given contract, transaction, or scheme involves (1) an investment of money (2) in a common enterprise (3) with an expectation of profits (4) solely from the efforts of the promoter or a third party. |
| 3. | Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953) | Yes | Real Estate Interest | Real Estate | Finding, post *Howey,* the sale of citrus groves coupled with a management contract to be an "investment contract" within the meaning of the term as defined in *Howey*. Finding "[i]f they merely purchased land, without more, such a purchase would not constitute an investment contract within the meaning of the Securities Act." |
| 4. | Cross v. Pasley, 270 F.2d 88 (8th Cir. 1959) | Yes | Leasehold Interest | Oil & Gas | Concluding that consideration paid for the cost of drilling in an oil and gas venture is consideration for an "investment contract," because the investor has an expectation of passive returns on the basis that existing and future drilling expenses are covered. |
| 5. | Los Angeles Trust Deed & Mortgage Exch. v. S.E.C., 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919 (1961) | Yes | Promissory Note | Trust Sales | Finding the economic inducement of prospective investors to be an offer to enter an "investment contract" under the Securities Act where resulting investor profits are inextricably linked to the efforts of managers in a common enterprise in exercising independent judgment to find and purchase discounted trust deeds secured by real estate. See Schedule 3 at 2 for prior history. |

---

[334] Decided prior to *S.E.C. v. W.J. Howey Co.*, 328 U. S. 293 (1946) included as notable precedent for purposes of empirical accuracy.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 6. | Moses v. Michael, 292 F.2d 614 (5th Cir. 1961) | Yes | Leasehold Interest | Oil & Gas | Concluding the assignment of an undivided working interest in oil and gas leases constitutes an investment contract under the Securities Act. |
| 7. | United States v. Herr, 338 F.2d 607 (7th Cir. 1964) | Yes | Distributorship Rights | Sales Training Materials | Concluding a distributor agreement does not create a vendor-purchaser relationship but an investment contract where the purchasers were led to expect large profits through no efforts of their own. |
| 8. | S.E.C. v. United Benefit Life Ins. Co., 387 U.S. 202 (1967) | Yes | Variable Annuities | Insurance | Finding an annuity contract to be an "investment contract," unexcepted by the insurance exemption, under the Securities Act where policy payments accumulate as part of a flexible fund arrangement and establish an expectation of growth through sound investment management. |
| 9. | Cont'l Mktg. Corp. v. S.E.C., 387 F.2d 466 (10th Cir. 1967), *cert. denied*, 391 U.S. 905 (1968) | Yes | Beaver Interests | Animal Sales | Concluding the collection of investments in a scheme for the sale, care, management, replacement, and resale of live beavers for breeding creates an investment contract within the meaning of the Securities Act where returns are predicated on the efforts not of investors but of others. |
| 10. | S.E.C. v. MacElvain, 417 F.2d 1134 (5th Cir. 1969), *cert. denied*, 397 U.S. 972 (1970) | Yes | Title Interests | Oil & Gas | Finding the sale of interests in underwater mining claims to create an investment contract where the land promoter promised to contest the U.S. Department of Interior's interest in the land, impliedly to inure to the benefit of all purchasers, despite the promoter's disclaimer of any "collateral offer, promise, or assurance of any nature whatsoever." |
| 11. | Johns Hopkins Univ. v. Hutton, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916 (1974) | Yes | Production Payment Interest | Oil & Gas | Holding a production payment representing mineral rights to oil and gas reserves to be an "investment contract" where extraction of those reserves is limited to specified wells maintained by efforts of persons other than the purchaser. |
| 12. | Kemmerer v. Weaver, 445 F.2d 76 (7th Cir. 1971) | Yes | Beaver Interests | Animal Sales | Affirming that the sale of live beavers constitutes an "investment contract" when coupled with a service agreement to house, feed, and otherwise care for the beavers. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 13. | S.E.C. v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 419 U.S. 900 (1974) | Yes | Promotions Agreement | Multi-Level Marketing | Finding the interests in a multi-level marketing scheme to create an "investment contract," broadening interpretation of the word "solely" under the fourth prong of the *Howey* test to be inclusive of the scheme's creation of an expectation of returns only primarily from the efforts of others. |
| 14. | Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir. 1973), *cert. denied*, 415 U.S. 977 (1973) | Yes | Leasehold Interest | Oil & Gas | Affirming that transactions involving investment in fractional undivided oil and gas interests create an "investment contract" where investors were led to expect profits as a result of the promoter's efforts. |
| 15. | Andrews v. Blue, 489 F.2d 367 (10th Cir. 1973) | Yes | Joint Venture Interests | Real Estate | Finding the award of an interest in a real estate venture to an investor to be a security where, although under contract as a "consultant" to the venture, the investor was a consultant in name only and relied only on the efforts of others in anticipation of profits. |
| 16. | Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974) | Yes | Warehouse Receipts | Commodities | Concluding the sale of warehouse receipts for whiskey creates an "investment contract" where the seller provides additional services, such as insuring the whiskey, storing the whiskey barrels to maturity, and, without additional charge, assisting purchasers with selling the whiskey upon maturity. |
| 17. | El Khadem v. Equity Sec. Corp., 494 F.2d 1224 (9th Cir. 1974) | Yes | Promissory Note | Banking, Investment Services & Lending | Finding that an investment plan involving the investor's contribution of cash and securities as collateral in exchange for a line of credit under an assignable promissory note is an investment contract where the creditor rehypothecates the investor's collateral, uses it to capitalize its own business, and allows the investor to gain investment leverage and tax benefits. |
| 18. | Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974) | Yes | Chinchilla Interests | Buy-Back Sales | Concluding that the interests in a multi-level marketing scheme involving chinchilla breeding create an "investment contract" where the expectation of profits is dependent not on the interest holders' own initial efforts but on the efforts of their recruits to persuade additional retail investment in the enterprise. |
| 19. | Forman v. Cmty. Servs., Inc., 500 F.2d 1246 (2d Cir. 1974), *rev'd*, 421 U.S. 837 (1975). | Yes | Cooperative Apartment Stock | Real Estate | Holding that jurisdiction existed to hear plaintiff's Securities Act allegations because plaintiff's ownership of stock in a housing cooperative constituted an investment contract within the meaning of the Securities Acts due to residents' expectation of profit by income derived from reduced carrying charges, tax benefits, and saved expenses.  Overturned at 421 U.S. 837 (1975). See Schedule 2 at 12 for subsequent history. |
| 20. | 1050 Tenants Corp. v. Jakobson, 503 | Yes | Housing Co-Op Stock Interests | Real Estate | Determining that the interests of homeowners in a cooperative housing corporation are securities where cooperative sponsors tout the tax benefits of incorporation to |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | F.2d 1375 (2d Cir. 1974) | | | | prospective residents, rents from commercial spaces are used to reduce maintenance charges, and the sponsors exercise control over the enterprise. |
| 21. | S.E.C. v. Koscot Inter., Inc., 497 F.2d 473 (5th Cir. 1974) | Yes | Promotions Agreement | Investment Marketing Scheme | Finding that a pyramid selling scheme constituted an investment contract where the promoters retained immediate control over the essential managerial conduct of the enterprise and investors' ability to profit was inextricably tied to defendants' recruitment meetings, guidelines, and sales. |
| 22. | S.E.C. v. Continental Com Corp., 497 F.2d 516 (5th Cir. 1974) | Yes | Commodities Options | Commodities Trading | Finding the scheme of trading on discretionary commodities accounts to create an investment contract where a common enterprise is established by traders' investment in an array commodity options and futures for different investors. |
| 23. | Safeway Portland Employees' Fed. Credit Union v. C. H. Wagner & Co., 501 F.2d 1120 (9th Cir. 1974) | Yes | Certificates of Deposit & Bonus Interest | Banking, Investment Services & Lending | Determining a certificate of deposit to be a non-exempt investment contract under the Securities Act where the terms of deposit included bonus payments create an expectation of profit reliant on the continued success and solvency of the issuer's business. |
| 24. | S.E.C. v. Commodity Options Int'l, Inc., 553 F.2d 628 (9th Cir. 1977) | Yes | Commodities Options | Commodities Trading | Finding the sale of naked double options for investment in a common venture to create an investment contract where purchasers have a reasonable expectation of profits derived from the entrepreneurial efforts of the venture. |
| 25. | Daniel v. International Bd. of Teamsters, 561 F.2d 1223 (7th Cir. 1977), *rev'd*, 439 U.S. 551 (1979). | Yes | Pension Interest | Pension Plans | Holding that union members' interest in a pension fund managed by trustees with exclusive control over investment decisions was an investment contract under the Securities Acts where union members contributed via employer contributions and expected capital appreciation. Overturned at 439 U.S. 551 (1979). See Schedule 2 at 26 for subsequent history. |
| 26. | Melton v. Unterreiner, 575 F.2d 204 (8th Cir. 1978) | Yes | Trust Interest | Trust Sales | Affirming the lower court's conclusion that the sale of "revocable inter vivos trusts" creates an investment contract where the sale proceeds are used to invest in real estate mortgages and contracts from which the purchaser can expect passive returns. |
| 27. | United States v. Carman, 577 F.2d 556 (9th Cir. 1978) | Yes | Loan Sale Interests | Education | Finding the sale of federally insured student loan debt to create an investment contract when coupled with a service contract and repurchase agreement as part of an integrated investment package. |

119

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 28. | Goodman v. Epstein, 582 F.2d 388 (7th Cir. 1978) | Yes | Limited Partnership Interests | Real Estate | Remanding for new trial on error but finding that plaintiff's limited partnership interest was an investment contract under the Securities Acts by reason that, as a limited partner, plaintiff was precluded from participating in essential management decisions affecting the profit-seeking business venture. |
| 29. | Smith v. Gross, 604 F.2d 639 (9th Cir. 1979) | Yes | Earthworm Interests | Buy-Back Sales | Finding an investment in an earthworm farming venture to be an investment contract, because the promoter promised that its instructions would enable investors to reap profits with little effort, and that it would buy back all bait-sized worms at a set price per pound. |
| 30. | United States v. Farris, 614 F.2d 634 (9th Cir. 1979) | Yes | Real Estate Interest | Real Estate | Affirming that the sale of real estate mortgage notes establishes an investment contract where noteholders are led to place substantial trust in the management skill and solvency of the issuer. |
| 31. | Cameron v. Outdoor Resorts of America, Inc, 608 F.2d 187 (5th Cir. 1980) | Yes | Rental Income | Real Estate | Finding the sale of condominium campsite blocks to create an investment contract when coupled with a rental arrangement that promises rental income relying on the promoter's management efforts and materially restricts the investor's independent involvement. |
| 32. | S.E.C. v. Murphy, 626 F.2d 633 (9th Cir. 1980) | Yes | Limited Partnership Interests | Partnerships | Determining the sale of shares in a limited partnership in a cable television system to create an investment contract where investors assume no managerial role but expect profit solely based on the efforts of others. |
| 33. | Rosenberg v. Collins, 624 F.2d 659 (5th Cir. 1980) | Yes | Cash Interests | Commodities | Finding commodity trading accounts sold by a bankrupt trader to create an investment contract where investors' fortunes were inextricably linked with and dependent upon the company's solvency and trading efforts. |
| 34. | Kosnoski v. Bruce, 669 F.2d 944 (4th Cir. 1982) | Yes | Limited Partnership Interests | Real Estate | Concluding limited partnership interests in two real estate ventures to be securities where the limited partner's role is almost entirely passive. |
| 35. | S.E.C. v. G. Weeks Secur., Inc., 678 F.2d 649 (6th Cir. 1982) | Yes | Mortgage Interests | Government Securities | Finding that the court could, as a matter of law, preliminarily determine that the pair-off contract sold by appellants was an investment contract and thus a security subject to registration because, unlike standard forward contracts, purchasers were guaranteed a return in the form of interest generated by appellants' own investing efforts, and affirming the District Court's order enjoining appellants from further violating the registration provisions of the Securities Act. |
| 36. | S.E.C. v. Aqua-Sonic Prods. Corp., 687 F.2d 577 (2d Cir. 1982) | Yes | Distributorship Rights | Distributorships & Franchises | Concluding that a licensing scheme for promotion and distribution of new dental devices creates an investment contract when coupled with an optional sales agency agreement, at least where the licensor makes economic inducements and expects licensees to enter the optional agreement to rely primarily on the efforts of others. |

120

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 37. | United States v. Jones, 712 F.2d 1316 (9th Cir. 1983) | Yes | Sale/Leaseback Interests | Leaseback Arrangement | Finding that a tractor trailer sale and leaseback arrangement creates an investment contract where investors make minimal down payments, finance the remaining balances using bank loans, receive monthly payments on the lease obligations, and assume a purchase option at the end of each lease. |
| 38. | Mayer v. Oil Field Sys. Corp., 721 F.2d 59 (2d Cir. 1983) | Yes | Limited Partnership Interests | Oil & Gas | Concluding that a limited partnership interest constitutes a security where limited partners exercise no managerial role in partnership affairs. |
| 39. | Siebel v. Scott, 725 F.2d 995 (5th Cir. 1984) | Yes | Limited Partnership Interests | Partnerships | Finding a limited partnership interest to create an investment contract where the holder relies not his own entrepreneurial talents but on the managerial efforts of the general partners for profit. |
| 40. | S.E.C. v. Prof'l Assocs., 731 F.2d 349 (6th Cir. 1984) | Yes | Escrow, Trust & Joint Venture Interests | Phonographic Record Master Tapes | Applying the "horizontal commonality" test under the "common enterprise" prong of the *Howey* test to conclude that a beneficiary trust account interest creates an investment contract where, citing *Union Planters Nat'l Bank*, the "fortunes of each investor in a pool of investors" are tied "to the success of the overall venture." Finding contributions to a joint venture designed to exploit master record leases to create an investment contract where at least some investors are passive and contribute money in reasonable reliance on the promoters' skills and efforts. |
| 41. | Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985) | Yes | Certificate of Deposit | Banking, Investment Services & Lending | Finding that the sale of certificates of deposit, although conventionally not in and of themselves securities, creates an investment contract when coupled with, among other things, the depositor's (1) buy-back right to retrieve his deposit before maturity, and (2) reliance on a financial advisor to select and negotiate terms of investments. |
| 42. | S.E.C. v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459 (9th Cir. 1985) | Yes | Ore Purchase Program Interests | Mining & Refining | Finding interests in an ore sale and processing arrangement to create an investment contract where the promoter used investors' contributions to fund a common enterprise from which the investors expect to reap profit as a result of the efforts of the promoter to process ore using proprietary techniques. |
| 43. | San Francisco-Oklahoma Petro. v. Carstan Oil, 765 F.2d 962 (10th Cir. 1985) | Yes | Leasehold Interest | Oil & Gas | Concluding that a fractional interest in a producing oil well to be an investment contract where the investor does not have a bare leasehold but relies exclusively on the promoter's efforts to maintain the oil well and extract and sell its production in anticipation of profit. |

121

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 44. | United States v. Morse, 785 F.2d 771 (9th Cir. 1986) | Yes | Tax Shelter Interests | Various | Affirming conviction for securities fraud and rejecting contention that "common enterprise" and "efforts of others" prongs of Howey were not met. The court found the "solely through the efforts of others" prong of Howey to have been met because "the efforts made by those other than the investor [we]re the undeniably significant ones." Further, common enterprise was met because the fortunes of the investor [we]re dependent upon the efforts and success of the party seeking the investment. |
| 45. | Albanese v. Florida Nat. Bank of Orlando, 823 F.2d 408 (11th Cir. 1987) | Yes | Sale/Leaseback Interests | Leaseback Arrangement | Determining that a fraudulent ice machine sales and leaseback scheme creates an investment contract where the promoter sells and agrees to lease the machines back from investors under various agreements to place them in commercial establishments, service them, collect rents, and distribute earnings to the investors. |
| 46. | Waterman v. Alta Verde Indus., 833 F.2d 1006 (4th Cir. 1987) | Yes | Cattle Interests | Animal Sales | Affirming that interests in a cattle-feeding operation create an investment contract where the failure or success of the enterprise, and therefore investors' expected profit, relies on the efforts of third parties to purchase, care for, and sell cattle. |
| 47. | Buhler v. Audio Leasing Corp., No. 86-4162, 1988 U.S. App. LEXIS 21714 (9th Cir. Feb. 26, 1988) | Yes | Audio Leasing Program | Master-Recording Leasing | Finding interests in an audio leasing scheme to be securities where the promoter sells those interests to investors together with a distribution agreement to manage leasing functions, creating an expectation for passive returns. |
| 48. | United States v. Kessi, 868 F.2d 1097 (9th Cir. 1989) | Yes | Profit-Sharing Interests | Commodities Trading | Affirming the appropriateness of a jury instruction asserting that profit-sharing agreements are securities, because profit-sharing agreements would naturally meet all prongs of the *Howey* test. |
| 49. | Long v. Shultz Cattle Co., Inc., 881 F.2d 129 (5th Cir. 1989) | Yes | Cattle Poundage Interests | Animal Sales | Finding a cattle-feeding consulting agreement to create an investment contract where investors retain little to no control over operations, have no experience in the cattle business, and can only reasonably expect to receive profits based on the promoter's ability to raise and market cattle. See entry 52 for subsequent history. |
| 50. | Reeves v. Teuscher, 881 F.2d 1495 (9th Cir. 1989) | Yes | Limited Partnership Interests | Real Estate | Finding a partnership's limited partner but not general partner interests to be securities where limited partners only supply capital and expect returns based on the expertise of general partners, and the general partnership interests not to be securities where exclusively general partners control and supervise enterprise operations. |

122

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 51. | Davis v. Metro Prods., Inc., 885 F.2d 515 (9th Cir. 1989) | Yes | Tax Shelter Interests | Tax Shelter Scheme | Finding that the videotape sales agreements were investment contracts. Rejecting that only the four corners of a video tape sales agreement can supply evidence of the existence of a "common enterprise" without examining the underlying economic realities. |
| 52. | Long v. Shultz Cattle Co., 896 F.2d 85 (5th Cir. 1990) | Yes | Cattle Poundage Interests | Animal Sales | Denying petition for rehearing and request to reconsider the holding of Continental Com Corp. and the 5th Circuit's approach to the "common enterprise" prong of the Howey test; holding that cattle feeding operation agreements are investment contracts where investors have an ownership interest in a business where the promoter solicits and pools together contributions from hundreds of investors to support the enterprise and its profitability depends on defendants. See entry 49 for prior history. |
| 53. | Eberhardt v. Waters, 901 F.2d 1578 (11th Cir. 1990) | Yes | Cattle Embryo Interests | Cattle Breeding | Finding an interest in a scheme for the sale of cattle embryos to establish an investment contract where investors with no knowledge or experience in the cattle industry must rely on the promoter's efforts and technical know-how to purchase, manage, and sell the embryos and care for calves. |
| 54. | Bailey v. J.W.K. Props., Inc., 904 F.2d 918 (4th Cir. 1990) | Yes | Cattle Embryo Interests | Cattle Breeding | Concluding that a cattle purchase agreement coupled with a management contract creates an investment contract where investors' expectations of profit from cattle breeding operations are dependent on the promoter performing essential functions as an expert in embryo selection and crossbreeding. |
| 55. | Uselton v. Commercial Lovelace Motor Freight, 940 F.2d 564 (10th Cir. 1991) | Yes | Employee Stock Option Plan | ESOP | Concluding interests in an employee stock ownership program to be securities where employees' purchases are contributory and voluntary, contributions are pooled to fund the employer's operations, and employees could reasonably anticipate profit from dividend distributions and stock appreciation in stock resulting from the efforts of the employer's managers. |
| 56. | McCoy v. Hilliard, 940 F.2d 660 (6th Cir. 1991) | Yes | Limited Partnership Interests | Barges | Finding an investment in a barge operation to be a security where investors cannot realistically expect to exert any control over the barge. |
| 57. | In re United Energy Corp., 944 F.2d 589 (9th Cir. 1991) | Yes | Production Payment Interest | Solar Farming | Discussing that the overall scheme perpetuated under a model purchase agreement and power sale agreement creates an investment contract where investors agree to purchase solar energy production modules and sell power back to the promoter, because the purchase and resulting profits from power sales are intimately intertwined. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 58. | S.E.C. v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125 (9th Cir. 1991) | Yes | Managed Account, Promissory Note, and Gold Refining Interests | Investment Program | Finding that interests, both in an investment account and in a gold refining venture, are securities under the *Howey* test, because investors reasonably expect passive profit based on the efforts of others and underlying contributions are pooled to support the enterprise on which the expectation of profit depends. |
| 59. | S.E.C. v. International Loan Network, Inc., 968 F.2d 1304 (D.C. Cir. 1992) | Yes | Payment Interests | Multi-Level Marketing | Determining that interests sold in a chain-letter marketing scheme are securities where sales are solicited using promotional literature from which investors could discern a reasonable expectation of profit. |
| 60. | Stone v. Kirk, 8 F.3d 1079 (6th Cir. 1993) | Yes | Tax Shelter Interests | Investment Program | Finding contributions to a joint venture to be the sale of securities under *Howey* where the venturers pool their funds together to jointly empower the promoter to act as their agent to maintain tax shelters for their benefit. |
| 61. | S.E.C. v. Eurobond Exchange, Ltd., 13 F.3d 1334 (9th Cir. 1994) | Yes | Eurobond Interests | Investment Program | Finding interests in a Eurobond investment program to create an investment contract where investors share in the risk of loss and depend on the promoter's efforts and expertise to manage certain interest-bearing treasury bonds issued by foreign governments in expectation of profit from the spread in interest rates. |
| 62. | United States v. Brooks, 62 F.3d 1425 (9th Cir. 1995) | Yes | Gold Mining Interests | Mining & Refining | Affirming that the sale of "units" in a gold mining operation does not constitute the sale of goods but instead creates an investment contract where the promoter's efforts were the "undeniably significant ones" necessary to make the investment a success. |
| 63. | United States SEC v. Better Life Club of Am., Inc., No. 98-5079, 1999 U.S. App. LEXIS 7319 (D.C. Cir. Mar. 24, 1999) | Yes | Payment Interests | Multi-Level Marketing | Affirming the district courts finding that the advertising of pooled notes in a multi-level marketing scheme is not a purely commercial transaction and instead constitutes the offer of securities where investors contribute substantial funds to a common enterprise, and where the promoter promises to double investors' money, and analyzing the same notes under *Reves*. |
| 64. | S.E.C. v. Unique Fin. Concepts, Inc., 196 F.3d 1195 (11th Cir. 1999) | Yes | Forex Interests | Forex | Concluding the sale of foreign exchange contracts to create an investment contract where the promoter pools investors' funds to apply toward advertising, salary, and finding new investors. |

124

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 65. | Jeanne Piaubert, S.A. v. Sefrioui, 208 F.3d 221 (9th Cir. 2000) | Yes | Limited Partnership Interests | Cosmetics | Summary judgment reversed and case remanded because plaintiff Fragrance Group, Ltd pled sufficient facts to prove that limited partnership interest it purchased in JP Limited Partnership was an investment contract. |
| 66. | S.E.C. v. Banner Fund International, 211 F.3d 602 (D.C. Cir. 2000) | Yes | Arbitrage Interests | Arbitrage Trading | Determining the beneficial interests in a banner fund program to be securities where the promoter pools investors' funds and investors expect passive returns. |
| 67. | SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000) | Yes | Property Transfer Interests | Investment Program | Finding a property transfer contract to create an investment contract where investors contribute money in common to investment trusts in anticipation of returns resulting from the efforts of others. |
| 68. | S.E.C. v. SG Ltd., 265 F.3d 42 (1st Cir. 2001) | Yes | Virtual In-Game Shares | Entertainment | Concluding that the opportunity to invest in the virtual shares in a fantasy game enterprise existing only in cyberspace is an offer for the sale of securities under the *Howey* test. |
| 69. | S.E.C. v. Alliance Leasing Corp., 28 F. App'x 648 (9th Cir. 2002) | Yes | Equipment Leasing Program | Leaseback Program | Affirming that the sale of investments in an equipment leasing program marketed by a third party creates an investment contract. |
| 70. | S.E.C. v. Rubera, 350 F.3d 1084 (9th Cir. 2003) | Yes | Telephone Investment Program | Payphone & Service Contracts | Finding interests in a payphone investment program to create an investment contract where the sale of payphones accompanies a service agreement placing management in the hands of the promoter and promising a return. |
| 71. | S.E.C. v. Edwards, 540 U.S. 389 (2004) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | Sale of payphones with leaseback agreement for a fixed monthly payment representing a 14 percent annual return where Purchasers were not involved in the day to day operation of the payphones they owned, as the company (1) selected the site for the phone, (2) installed the equipment, (3) arranged for connection and long-distance service, (4) collected coin revenues, and (5) maintained and repaired the phones, could be properly considered an investment of contract. Fixed returns sufficient profit to satisfy expectation of profit prong of Howey test. See Schedule 2 at 99 for prior history and entry 73 for subsequent history. |
| 72. | United States v. Dale, 374 F.3d 321 (5th Cir. 2004), vacated & remanded | Yes | Trading Program Interests | Investment Program | Concluding that investment programs offered to investors, although fraudulent, meet the *Howey* test. Vacated & Remanded at 543 U.S. 1113 (2005) |

125

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
|  | 543 U.S. 1113 (2005) |  |  |  |  |
| 73. | S.E.C. v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | On remand after the Supreme Court clarifies that investments with a fixed rate of return could constitute an "investment contract", finding that the SEC meets its burden of showing a reasonable probability of success in finding that a payphone sale and leaseback agreement creates an investment contract. See Schedule 2 at 99 and entry 71 for prior history. |
| 74. | S.E.C. v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005) | Yes | Viatical Settlement Interests | Insurance | Holding that investments in viatical settlement contracts are securities. |
| 75. | S.E.C. v. Merchant, 483 F.3d 747 (11th Cir. 2007) | Yes | Limited Partnership Interests | Consumer Debt | Finding limited partner interests in a registered limited liability partnership to be securities after applying the *Williamson* factors, because the partners have no real ability to remove the firm and are completely inexperienced in the debt purchasing industry. |
| 76. | S.E.C. v. Ross, 504 F.3d 1130 (9th Cir. 2007) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | Maintaining that an "investment opportunity" offered by Alpha Telcom is the offer of a security. |
| 77. | United States v. Leonard, 529 F.3d 83 (2d Cir. 2008) | Yes | LLC Interests | Entertainment | Concluding that the interests in limited liability companies formed to finance the production and distribution of motion pictures could create an investment contract given that the members play only a passive role in the management of the companies, despite the organizational agreements. |
| 78. | S.E.C. v. U.S. Reservation Bank and Trust., 289 F. App'x 228 (9th Cir. 2008) | Yes | Profit Interests | Banking, Investment Services & Lending | Holding a two-part investment to be a security when consisting of a certificate of deposit and a leveraged profit-sharing agreement. |
| 79. | Warfield v. Alaniz, 569 F.3d 1015 (9th Cir. 2009) | Yes | Annuity Interests | Annuity Sales | Finding the sale of charitable gift annuities to create an investment contract where the annuities are marketed as investments and not merely as vehicles for philanthropy. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 80. | Liberty Prop. Tr. v. Republic Props. Corp., 388 U.S. App. D.C. 70, 577 F.3d 335 (2009) | Yes | Limited Partnership Interests | Real Estate | Holding that certain investors do not exercise sufficient control of a limited partnership (when disregarding corporate form) to disqualify their units from being considered securities. |
| 81. | Affco Invs. 2001 LLC v. Proskauer Rose L.L.P., 625 F.3d 185 (5th Cir. 2010) | Yes | LLC Interests | Tax Shelter Scheme | Holding that membership interests in a limited liability company operating a tax shelter scheme are securities, because the investors are passive investors who depend on the efforts of others for their profits. |
| 82. | U.S. v. Wetherald, 636 F.3d 1315 (11th Cir. 2011) | Yes | Limited Partnership Interests | Telecommunications | Finding partnership interests in the competitive local exchange carriers to be securities under the *Williamson* factors. |
| 83. | Minn. Lawyers Mut. Ins. Co. v. Ahrens, 432 F. App'x 143 (3d Cir. 2011) | Yes | Investment Interests | Commodities Trading | Noting that a lawyer's solicitation of an investment would likely meet the *Howey* test and would not be covered under the attorney's malpractice policy. |
| 84. | Bamert v. Pulte Home Corp., 445 F. App'x 256 (11th Cir. 2011) | Yes | Condominium Interests | Real Estate | Rejecting the plaintiffs contention that purchase agreements for at least one Orlando condominium unit were investment contracts because the plaintiffs were under no contractual obligation to join an offered rental pool or otherwise contract with the defendant's proposed rental agent, but finding that the plaintiff had sufficiently alleged facts to establish the existence of an investment contract as to the exclusive rental agreements, if the rental agents were to be found to be affiliates of the condominium seller. |
| 85. | S.E.C. v. Merklinger, 489 F. App'x 937 (6th Cir. 2012) | Yes | LLC Interests | Recycling | Finding that the membership interests in a limited liability company are securities where the promoter fraudulently raises funds from investors and purports to be in the business of collecting, shredding, and recycling used tires. |
| 86. | United States v. Wosotowsky, 527 F. App'x 207 (3d Cir. 2013) | Yes | Variable Annuities | Annuity Sales | Affirming that the fraudulent sale of variable annuities meets the *Howey* test. |

127

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 87. | S.E.C. v. Radical Bunny LLC, 532 F. App'x 775 (9th Cir. 2013) | Yes | Loan Interests | Investment Program | Affirming that contracts with investors in the form of "directions to purchase" are securities, because the investments are made in a common enterprise to purchase loans from another company and all profits are derived from the promoter's efforts. |
| 88. | United States v. Rowzee, 550 F. App'x 452 (9th Cir. 2013) | Yes | Loan Interests | Banking, Investment Services & Lending | Finding that an investment in a bridge loan enterprise is a security where investors could typically expect returns within a few months without exercising any control over the loans. |
| 89. | United States v. McKye, 638 F. App'x 680 (10th Cir. 2015) | Yes | Investment Notes | Real Estate | Finding strong evidence that investment notes are securities under both the "investment contract" theory and "note theory" where investors contribute money to a common enterprise with the expectation of receiving payments based on the promoter's efforts. |
| 90. | S.E.C. v. Schooler, 905 F.3d 1107 (9th Cir. 2018) | Yes | General Partnership Interests | Real Estate | Concluding general partner interests to be securities under the *Williamson* factors where partners relinquish near-total control over the investments to a single person to manage and trade on underlying investments. |
| 91. | S.E.C. v. Liu, 754 F. App'x 505 (9th Cir. 2018), vacated and remanded, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) | Yes | EB-5 Immigrant Investor Program | EB-5 Investment Program | Affirming membership interests in a limited liability company to be securities when sold as part of the EB-5 immigrant investor program, under which investors are promised an opportunity to earn profit, even if profits are not investors' primary motivation. |
| 92. | S.E.C. v. Sethi, 910 F.3d 198 (5th Cir. 2018) | Yes | Joint Venture Interests | Oil & Gas | Concluding that partnership interests in an oil and gas joint venture create an investment contract where contractual powers in the partnership are illusory in practice. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 93. | S.E.C. v. Scoville, 913 F.3d 1204 (10th Cir. 2019) | Yes | Revenue Interests | Internet | Finding the sale of "adpacks," when bundled with internet advertising services, to establish an investment contract where the advertising services agreement allows a purchaser to share in some of the promoter's revenue. |
| 94. | Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.), 916 F.3d 528 (5th Cir. 2019) | Yes | Life Settlements | Insurance | Finding that life insurance settlements create an investment contract where the investor relies on the promoter's substantial expertise and pre-purchase efforts to profit from the investments in the underlying life settlements. |
| 95. | Masel v. Villarreal, 924 F.3d 734 (5th Cir. 2019) | Yes | Limited Partnership Interests | Medical Billing | Finding a limited partner interest to create an investment contract where, despite having the power to block certain enumerated business decisions, limited partners rely solely on general partners to operate and manage the enterprise. |
| 96. | S.E.C. v. Hui Feng, 935 F.3d 721 (9th Cir. 2019) | Yes | EB-5 Immigrant Investor Program | EB-5 Investment Program | Affirming that EB-5 immigrant investor program interests create an investment contract where corresponding contributions fund the operations of the limited partnership in anticipation of a promised fixed rate of return. |
| 97. | Fedance v. Harris, 1 F.4th 1278 (11th Cir. 2021) | Yes | Digital Asset Interests | Digital Assets | Affirming lower court and finding token sale satisfied "expectation of profits" element where issuers sold tokens pursuant to an ICO and the tokens had no utility at the time of sale—"any supposed *future* utility of the tokens on FLiK's 'end-to-end entertainment ecosystem' is beside the point" |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## SCHEDULE 2

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST- *SEC V. W.J. HOWEY CO.* IN WHICH THE COURT FOUND <u>NO</u> INVESTMENT CONTRACT (OR THE DECISIONS WERE SUPERSEDED BY STATUTE).**

| Object Key | |
|---|---|
| **No** | Means that the court did not find that the contract, transaction, or scheme at issue in the case at issue was an investment contract. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959) | No | Leasehold Interest | Oil & Gas | Finding that a sale of an oil and gas lease created fractional undivided interests in oil and gas within the meaning of securities under the Securities Act, but rejecting the argument that the lease assignment constituted an investment contract because plaintiffs retained dominant and controlling interest in the property. |
| 2. | Tcherepnin v. Knight, 371 F.2d 374 (7th Cir. 1967), *rev'd*, 389 U.S. 332 (1967). | No | Capital Shares & Capital Interest | Banking, Investment Services & Lending | Determining that a savings and loan association's acceptance of deposits in a withdrawable capital account does not constitute the sale of securities according to the contemplated meaning and legislative history of the Securities Exchange Act of 1934. Reversed at 389 U.S. 332 (1967). See Schedule 3 at 6 for subsequent history. |
| 3. | Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967) | No | Leasehold Interest | Oil & Gas | Finding the sale of naked leasehold rights not to be an investment contract where no additional promise or agreement is made by the seller. |
| 4. | Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969) | No | Distributorship Rights | Distributorships & Franchises | Concluding a distributorship agreement not to be an investment contract where the distributor must assume efforts to market products under the agreement and therefore does not rely exclusively on the efforts of others within the meaning of the fourth prong of the *Howey* test. |
| 5. | Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250 (10th Cir. 1969) | No | Insurance Interests | Insurance | Finding that neither the sale of an additional premium on a life insurance policy bearing an endorsement nor the special fund created by the additional premium under the policy constitutes a "security" where the purchaser "was not investing his money in a security, speculative or otherwise, from which he might receive much, little, or no benefit." |

130

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 6. | Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir. 1972), *cert. denied*, 409 U.S. 887 (1972) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Finding that a discretionary trading account lacks the requisite qualities of commonality under the second prong of the *Howey* test where funds are not pooled for a common purpose and separate accounts or customers are not contractually tied. |
| 7. | Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973) | No | Partnership Interest | Family Fund | Holding that the sale of a partnership interest from one family member to another in a family partnership is not the sale of a security under the Securities Exchange Act of 1934. |
| 8. | Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973) | No | Franchise Interests | Distributorships & Franchises | Holding a franchise agreement not to be an investment contract where the franchisee is required to perform vital duties in connection with the agreement, including opening and staffing a sales center and devoting significant time and best efforts to the business. |
| 9. | Nash & Assocs., Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973) | No | Franchise Interests | Distributorships & Franchises | Holding a fast food chain's franchise agreement not to be an investment contract where "nothing more than assistance [from the franchisor] was contemplated and … the ultimate responsibility for local success rested with the franchisee." |
| 10. | Bitter v. Hoby's Int'l, Inc., 498 F.2d 183 (9th Cir. 1974) | No | Franchise Interests | Distributorships & Franchises | Finding a restaurant franchise agreement not to create an investment contract where, despite franchise guidelines, the franchisee is responsible for day-to-day restaurant management and operations. |
| 11. | Bellah v. First Natl. Bk. of Hereford, Texas, 495 F.2d 1109 (5th Cir. 1974) | No | Certificate of Deposit | Banking, Investment Services & Lending | Finding that a promissory note, together with an ancillary deed of trust securing the note, does not create an investment contract, where no evidence exists to indicate the creditor sought to profit from the noteholders' enterprise; also holding that a certificate of deposit issued in exchange for cash only involves currency and therefore does not create an investment contract. Adopting a distinction between commercial and investment banking to determine whether a loan transaction is a security. |
| 12. | United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975) | No | Cooperative Apartment Stock | Real Estate | Finding the purchase of "stock" from an apartment lessor not to be a securities transaction where the instrument merely represents a leasehold interest in an apartment and residents have "no reasonable expectation of profit in the form of either capital appreciation or participation in earnings." See Schedule 1 at 19 for prior history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 13. | Grenader v. Spitz, 537 F.2d 612 (2d Cir. 1976) | No | Cooperative Apartment Stock | Real Estate | Following *Forman* in holding that the private sale of non-transferable apartment stock does not create an investment contract where the funds from the sale are not intended for anything other than for purchasing and maintaining the apartment building. |
| 14. | Fargo Partners v. Dain Corp., 540 F.2d 912 (8th Cir. 1976) | No | Partnership Interest | Real Estate | Finding a real estate transaction involving a management contract not to create an investment contract where the investor does not substantially rely on the efforts of the seller or third parties in expectation of a return. |
| 15. | Ballard & Cordell Corp. v. Zoller & Danneberg Expl., Ltd., 544 F.2d 1059 (10th Cir. 1976) | No | Leasehold Interest | Oil & Gas | Concluding that the sale of a 50% interest in a group of oil and gas lease units does not establish an investment contract where the operator offers the units in whole and evidence indicates that with the expectation of profits, the investor would be relying not only on the operator's efforts but on his own knowledge and skill. |
| 16. | Hirk v. Agri-Research Council, Inc., 561 F.2d 96 (7th Cir. 1977) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Affirming that a discretionary trading agreement is not an investment contract because it falls short of the *Howey* test's "common enterprise" prong, even where the trader may be interacting with other trading accounts, because these actions do not transform the purchaser's trading account into a joint account with other holders |
| 17. | McGovern Plaza Joint Ven. v. First of Denver, 562 F.2d 645 (10th Cir. 1977) | No | Loan Commitment | Real Estate | Finding that neither a construction loan commitment nor permanent loan commitment create an investment contract, because a real estate developer's interest in obtaining financing are purely commercial, and the developer is in no way relying on the efforts of others to gain profit. |
| 18. | Schultz v. Dain Corp., 568 F.2d 612 (8th Cir. 1978) | No | Real Estate Interest | Real Estate | Finding an investor's interest in an apartment complex not to create an investment contract where, despite delegating responsibility to a managing agent, the investor retains ultimate control over the apartment enterprise and did not rely on the efforts of third parties with the expectation of profit. |
| 19. | Crowley v. Montgomery Ward Co., Inc., 570 F.2d 877 (10th Cir. 1978) | No | Franchise Interests | Distributorships & Franchises | Finding a catalog sales agreement not to be an investment contract where catalog franchisees are required to establish and maintain stores at their own expense and devote substantial time and best efforts to support the venture. See Schedule 3 at 9 for prior history. |
| 20. | Moody v. Bache Co., Inc., 570 F.2d 523 (5th Cir. 1978) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Rejecting that commodities futures contracts are investment contracts in and of themselves. |
| 21. | Woodward v. Terracor, 574 F.2d 1023 (10th Cir. 1978) | No | Real Estate Interest | Real Estate | Concluding that a developer's sale of residential real estate does not create an investment contract where the developer has no contractual obligations to the |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | purchasers other than to deliver good title upon satisfaction of the purchase terms. |
| 22. | Commander's Palace Park Assocs. v. Girard & Pastel Corp., 572 F.2d 1084 (5th Cir. 1978) | No | Real Estate Interest | Real Estate | Finding that the sale of park land coupled with a management contract does not create an investment contract where the seller does not lead the purchaser to expect profits solely as a result of the services provided under the management contract. |
| 23. | Robertson v. Humphries, No. 77-1156., 1978 U.S. App. LEXIS 9196 (10th Cir. Sept. 7, 1978) | No | Oil & Gas Leases | Oil & Gas | Affirming the lower court's finding that the sale of oil and gas leases do not create fractional interests to be sold as part of an investment contract, despite retention of an overriding royalty interest. |
| 24. | Peyton v. Morrow Electronics, Inc., 587 F.2d 413 (9th Cir. 1978) | No | Employee Stock Option Plan | ESOP | Determining that an employment contract and memorandum do not establish an investment contract where the employee believes he is compensated for less than what he is worth and the employee is himself the marketing manager of the purported "promoter." |
| 25. | United Sportfishers v. Buffo, 597 F.2d 658 (9th Cir. 1978) | No | Real Estate Interest | Banking, Investment Services & Lending | Finding that notes and land sales contracts given as consideration for two boats are not "securities" but mere commercial arrangements, because the seller of the boats did not induce the buyer into any expectations of returns on the investment. |
| 26. | Teamsters v. Daniel, 439 U.S. 551 (1979) | No | Pension Interest | Pension Plans | Finding a noncontributory, compulsory pension plan not to create an investment contract, because employer plan contributions are not equitable with an investment by the employee and therefore do not constitute an "investment of money" under the *Howey* test. See Schedule 1 at 25 for prior history. |
| 27. | Black v. Payne, 591 F.2d 83 (9th Cir. 1979) | No | Pension Interest | Pension Plans | Determining that participation in a contributory pension plan does not create an investment contract, because participation does not involve a "reasonable expectation of profits" derived from the efforts of others. |
| 28. | Brodt v. Bache Co., Inc., 595 F.2d 459 (9th Cir. 1979) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Concluding a discretionary commodities trading account does not satisfy the "common enterprise" prong of the *Howey* test and therefore does not establish an investment contract under the Securities Act. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 29. | De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co., 608 F.2d 1297 (9th Cir. 1979) | No | Real Estate Interest | Real Estate | Finding a land sale contract not to be an investment contract where the seller is obligated to do no more than transfer title to the land and otherwise makes no representations that it would develop, improve, or manage the land sold. |
| 30. | Canadian Imperial Bank of Commerce v. Fingland, 615 F.2d 465 (7th Cir. 1980) | No | Certificate of Deposit | Banking, Investment Services & Lending | Affirming dismissal and determining the complaint does not allege sufficient facts to conclude that a certificate of deposit issued by an offshore bank and trust entity is a security under the Securities Exchange Act. |
| 31. | Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Affirming that facts must be proven to establish the presence of a "common enterprise" among commodity trading account investors to conclude whether an investment contract exists. |
| 32. | Mason v. Unkeless, 618 F.2d 597 (9th Cir. 1980) | No | Limited Partnership Interests | Photocopy Venture | Rejecting an oral limited partnership agreement as any adequate basis for a federal securities fraud claim. |
| 33. | United Am. Bank v. Gunter, 620 F.2d 1108 (5th Cir. 1980) | No | Loan Interests | Banking, Investment Services & Lending | Finding a loan participation agreement not to be an investment contract where participation is part of a routine commercial loan transaction in which the debtor does not rely on the entrepreneurial efforts of the creditor. |
| 34. | Noa v. Key Futures, Inc., 638 F.2d 77 (9th Cir. 1980) | No | Silver Interests | Buy-Back Sales | Finding the sale of silver bars not to create an investment contract where profits are dependent only on fluctuations in the silver market and not on the seller's managerial efforts. |
| 35. | Westchester Corp. v. Peat, Marwick, Mitchell & Co., 626 F.2d 1212 (5th Cir. 1980) | No | Real Estate Interest | Real Estate | Determining that land sold under an installment contract does not create an investment contract where no common enterprise exists. |
| 36. | Martin v. T. V. Tempo, Inc., 628 F.2d 887 (5th Cir. 1980) | No | Franchise Interests | Distributorships & Franchises | Concluding a franchise agreement that requires the franchisee to sell advertisements and manage magazine distribution within in a defined area does not create an investment contract, because the franchisee has immediate control over essential management of the enterprise, which is significantly determinative of resulting profits or losses. |
| 37. | Am. Fletcher Mortg. Co. v. U. S. Steel Credit Corp., 635 F.2d 1247 (7th Cir. 1980) | No | Loan Interests | Loan Syndication | Holding that loan participations are not securities where the loans bare a particular rate of interest, mature in a relatively short time, and do not accompany "a reasonable expectation of profits but rather a commercial real estate loan transaction." |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 38. | Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174 (6th Cir. 1981) | No | Loan Interests | Loan Syndication | Finding a loan participation agreement not to be an investment contract because, even where the lead lender had "practically unlimited discretion" in servicing the loan, the arrangement has no common enterprise and does not depend on the lender's entrepreneurial or managerial efforts. |
| 39. | Frazier v. Manson, 651 F.2d 1078 (5th Cir. 1981) | No | Limited Partnership Interests | Real Estate | Precluding a limited partner from characterizing his partnership interest as a security where the partner's rights and responsibilities sufficiently distinguish his status from that of a "passive" investor. |
| 40. | Marine Bank v. Weaver, 455 U.S. 551 (1982) | No | Certificate of Deposit | Banking, Investment Services & Lending | Finding that a certificate of deposit issued by a federally regulated bank, which is subject to a comprehensive set of regulations, is different from other long-term debt obligations commonly deemed securities, and the protections afforded to the depositor make federal securities laws unnecessary. Finding that a separate business agreement providing the creditor a share of the company's profits is also not in itself sufficient to create a security. See Schedule 3 at 20 for prior history. |
| 41. | Bd. of Trade v. S.E.C., 677 F.2d 1137 (7th Cir. 1982), *vacated as moot*, 459 U.S. 1026 (1982). | No (Superseded by Statute) | Mortgage Options | Government Securities | Rejecting that Ginnie Mae options contracts are securities where specifically exempted under the Securities Act and Securities Exchange Act and carved out exclusively under the Commodity Futures Trading Commission's jurisdiction.  Vacated at 459 U.S. 1026 (1982). |
| 42. | Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459 (3d Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Determining that a commodity trading account does not satisfy the "common enterprise" prong of the *Howey* test where it is not part of a pooled group of trading funds. |
| 43. | Coward v. Colgate-Palmolive Co., 686 F.2d 1230 (7th Cir. 1982) | No | Pension Interest | Pension Plans | Finding participation in a pension plan not to create an investment contract where employee participants bear no real economic risk and do not depend on the efforts of plan managers in expectation of a return. |
| 44. | Gordon v. Terry, 684 F.2d 736 (11th Cir. 1982) | No | Real Estate Interest | Real Estate | Reversing the grant of summary judgment with respect to one defendant and holding that it could not be determined whether that defendant had unique knowledge and expertise warranting dependence by investors such that the real estate syndication fell within a special exception resulting in definition as |

135

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | a security, and affirming the grant of summary judgment for the rest of the defendants on the grounds that the real estate syndications were not securities. |
| 45. | Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc., 686 F.2d 818 (9th Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Rejecting any meaningful presence of a "common enterprise" in a discretionary commodities trading account where the promoter takes quarterly commissions as part of a set fee structure, because the promoter profits even when the account loses value and cannot withdraw profits as they accrue. |
| 46. | Mordaunt v. Incomco, 686 F.2d 815 (9th Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Citing *Brodt* to conclude that a discretionary commodities trading account does not satisfy the "common enterprise" prong of the *Howey* test because there is no vertical commonality between the investor and the promoter merely where the success or failure of investments is essentially and collectively dependent on the promoter's expertise. See Schedule 3 at 29 for subsequent history. |
| 47. | Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121 (11th Cir. 1983) | No | Distributorship Rights | Distributorships & Franchises | Holding a distributorship contract not to be an investment contract where purchasers exercise extensive control over their profit potential. See entry 52 for subsequent history. |
| 48. | Odom v. Slavik, 703 F.2d 212 (6th Cir. 1983) | No | Limited Partnership Interests | Real Estate | Finding that the interest of a general partner with expertise in a partnership does not create an investment contract merely because the partner voluntarily reduces his participation and therefore no longer relies on his own efforts in expectation of profit distributions. |
| 49. | LTV Fed. Credit Union v. UMIC Gov't Sec., Inc., 704 F.2d 199 (5th Cir. 1983) | No | Mortgage Interests | Government Securities | Determining a forward standby commitment for a mortgage loan not to be a security because it is not the product of a commercial endeavor. |
| 50. | Landreth Timber Co. v. Landreth, 731 F.2d 1348 (9th Cir. 1984), *rev'd*, 105 S. Ct. 2297 (1985) | No | Stock | Stock Sale | Affirming under the sale of business doctrine that the sale of 100% of a company's stock does not create an investment contract. Reversed at 105 S. Ct. 2297 (1985). See Schedule 3 at 30 for subsequent history. |
| 51. | Goodwin v. Elkins Co., 730 F.2d 99 (3d Cir. 1984) | No | General Partnership Interests | General Partnership | Finding a general partner interest not to be a security, because a general partner is naturally and unavoidably personally involved in the enterprise's management, even if unwilling. |
| 52. | Villeneuve v. Advanced Bus. Concepts Corp., 730 F.2d 1403 (11th Cir. 1984) | No | Distributorship Rights | Distributorships & Franchises | Affirming that the rights of a purchaser under a distributorship agreement do not create an investment contract where the distributor does not sufficiently rely on the principal's efforts in anticipation of profit. See entry 47 for prior history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 53. | Hart v. Pulte Homes of Mich. Corp., 735 F.2d 1001 (6th Cir. 1984) | No | Sale/Leaseback Interests | Real Estate | Finding a real estate sale and lease-back arrangement not to create an investment contract where the investor's contribution is not involved in a common scheme or inextricably intertwined with the investments of others, therefore lacking any sense of a "common enterprise." |
| 54. | Kan. State Bank v. Citizens Bank of Windsor, 737 F.2d 1490 (8th Cir. 1984) | No | Loan Participation Certificates | Banking, Investment Services & Lending | Finding participation interests in a standard commercial loan not to be securities, because the participant has no prospect of capital appreciation and the creditor's entrepreneurial and managerial efforts are limited to remitting the participant's share of principal and interest. |
| 55. | Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144 (7th Cir. 1984) | No | Art | Art Sales | Determining that the sale of a painting, accompanied by an appraisal and contractual return and repurchase right, does not to create an investment contract, because proceeds are not invested in any "common enterprise" under either the horizontal or vertical commonality tests. |
| 56. | Paulsen v. Commissioner, 469 U.S. 131 (1985) | No | Mutual Association Shares | Banking, Investment Services & Lending | Rejecting the petitioner's characterization of mutual association shares as securities following *Tcherepnin*. |
| 57. | Futura Development Corp. v. Centex Corp., 761 F.2d 33 (1st Cir. 1985) | No | Promissory Note | Real Estate | Determining that a promissory note does not create an investment contract, even where the parties negotiate a custom sales agreement with predetermined rates of interest, because the lender does not depend on the entrepreneurial efforts of others in anticipation of profit and the nature of the transaction is purely commercial. |
| 58. | Phillips v. Kaplus, 764 F.2d 807 (11th Cir. 1985) | No | Joint Venture Interests | Real Estate | Finding a joint venture interest not to be an investment contract where evidence suggests only that the interest is compensation to the holder for his efforts supporting the enterprise and not that the interest is awarded in exchange for an investment of money or services with the hope of making a profit. |
| 59. | S.E.C. v. Belmont Reid & Co., 794 F.2d 1388 (9th Cir. 1986) | No | Prepaid Gold Coin Interests | Prepaid Gold Coin Contracts | Finding that expected profits from the sale of gold coins do not meet the "efforts of others" prong of the *Howey* test where profits are realized not as a result of the seller's efforts but due to market movements. |
| 60. | Lopez v. Dean Witter Reynolds, Inc., 805 F.2d 880 (9th Cir. 1986) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Finding a discretionary commodities trading account to lack any sense of "common enterprise" necessary to establish an investment contract solely where the commodities broker has discretionary trading authority over the account. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 61. | Deutsch Energy Co. v. Mazur, 813 F.2d 1567 (9th Cir. 1987) | No | Partnership Interests | Oil & Gas | Finding interests in a general partnership connected to oil lease sales not to create an investment contract where the partners possess significant managerial powers and a high degree of business acumen and therefore could not rightfully expect their profits to result solely from the efforts of anyone other than themselves. |
| 62. | Meyer v. Dans un Jardin, S.A., 816 F.2d 533 (10th Cir. 1987) | No | Franchise Interests | Distributorships & Franchises | Concluding a perfumery franchise agreement does not to create an investment contract, because franchisees cannot anticipate profit resulting solely from the franchisor's efforts where the franchise's economic success depends on functions controlled by franchisees. |
| 63. | First Fin. Fed. Sav. & Loan Assoc. v. E.F. Hutton Mortg. Corp., 834 F.2d 685 (8th Cir. 1987) | No | Mortgage Loans | Banking, Investment Services & Lending | Applying the *Howey* test to conclude that a mortgage sale, even where accompanied by a mortgage servicing agreement, is not a sale of securities under Arkansas law, because mortgage servicing activities are merely administrative, the purchaser could assume control over those activities at other time, and the purchaser therefore could not be said to reasonably rely on the servicer's efforts to generate a return. |
| 64. | Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th Cir. 1988) | No | General Partnership Interests | Commercial Fishing | Finding that partnership interests in a general partnership engaged in commercial fishing do not create an investment contract where partners retain and exercise express authority to manage the enterprise's investments. Maintaining the presumption that partnership interests in a general partnership are not securities, which may only be rebutted by evidence that partners could not in practice exercise control over the enterprise or its investments. |
| 65. | Stuckey v. Geupel, 854 F.2d 1317 (4th Cir. 1988) | No | General Partnership Interests | Mining & Leasing | Affirming that the sale of a general partnership interest does not create an investment contract, even where a single managing partner is appointed to manage primary operations related to the partnership's mineral interests, because all partners assume an active role in partnership management and mineral interests are not divided among partners for speculative purposes. |
| 66. | Secon Service System v. St. Joseph Bk. Trust, 855 F.2d 406 (7th Cir. 1988) | No | Purchase Agreement | Transportation | Finding that a unique purchase agreement entitling the purchaser to 2% of the seller's gross revenue for 6 years creates an ordinary extension of credit outside the Securities Act's reach, because the purchaser does not invest funds that are pooled to support a common enterprise and cannot reasonably expect gains solely from the efforts of others. |
| 67. | Sparks v. Baxter, 854 F.2d 110 (5th Cir. 1988) | No | Joint Venture Interests | Oil & Gas | Applying the *Howey* test to conclude that an interest in a joint venture that manages oil and gas leases does not create an investment contract under Texas law where the holder is entitled to exercise considerable power over the oil and gas enterprise. |

138

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 68. | Danner v. Himmelfarb, 858 F.2d 515 (9th Cir. 1988) | No | Promissory Note | Forex | Finding a promissory note not to create an investment contract where the purchaser does not expect profits from capital appreciation and is not awarded a share in the enterprise formed using the borrowed capital. |
| 69. | Mace Neufeld Productions, Inc. v. Orion Pictures Corp., 860 F.2d 944 (9th Cir. 1988) | No | Joint Venture Interests | Entertainment | Determining a privately negotiated production agreement not to create an investment contract where the producer is required to consult with the investor and obtain his approval over all substantial matters and therefore does not instill a reasonable expectation of profit in the investor resulting solely from the producer's efforts. |
| 70. | Matek v. Murat, 862 F.2d 720 (9th Cir. 1988) | No | General Partnership Interests | Fish Processing | Affirming that a general partnership interest in a partnership engaged in a fish processing operation does not establish an investment contract where all partners possess sufficient power to protect their investments and no evidence suggests that power is hindered in any way. |
| 71. | Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. 1989) | No | Limited Partnership Interests | Oil & Gas | Determining that the sale of limited partner interests in a partnership engaged in oil and gas exploration does not create an investment contract where the interest holder's only expectation of profit is from a fixed rate of interest. |
| 72. | Deckebach v. La Vida Charters, Inc., 867 F.2d 278 (6th Cir. 1989) | No | Yacht Interests | Yachting | Concluding the sale of a yacht, even when coupled with a management agreement, not to create an investment contract where the seller has no other investors or joint purchasers, which would be necessary to establish "horizontal commonality." |
| 73. | Maritan v. Birmingham Properties, 875 F.2d 1451 (10th Cir. 1989) | No | Joint Venture Interests | Real Estate | Finding an interest in a housing development project not to create an investment contract where the governing agreement's terms provide the investor with substantial managerial powers uncharacteristic of a passive investor. |
| 74. | Crawford v. Glenns, Inc., 876 F.2d 507 (5th Cir. 1989) | No | Limited Partnership Interests | Pork Brokerage | Rejecting that someone can be considered the seller of a security where that person has no title to or ownership interest in the security or the assets or enterprise underlying the security and did not pass title to the commodity fund investment contract to the purchaser. |
| 75. | Banghart v. Hollywood Gen. P'ship, 902 F.2d 805 (10th Cir. 1990) | No | General Partnership Interests | General Partnership | Finding a partner interest in a general partnership not to create an investment contract were the governing partnership agreement does not restrict the customary powers of the general partners. |
| 76. | Boldy v. McConnell's Fine Ice Creams, Inc., | No | Franchise Interests | Distributorships & Franchises | Determining that a fast food franchise agreement does not create an investment contract where franchisees have clearly defined obligations that are essential to the franchise's success. |

139

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 904 F.2d 710 (9th Cir. 1990) | | | | |
| 77. | First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A., 919 F.2d 510 (9th Cir. 1990) | No | Loan Interests | Real Estate | Finding a loan participation agreement not to establish an investment contract, even where the lender is obligated to administer and service the loan with the same degree of care as if it is servicing and administering the loan on its own account, because the participants do not rely on the lender's managerial skills for a fixed rate of return, making the transaction primarily commercial in nature. |
| 78. | Harman v. Harper, 914 F.2d 262 (9th Cir. 1990) | No | Real Estate Interest | Real Estate | Finding that an interest in a joint venture invested in real property does not create an investment contract where the interest holder cannot reasonably expect to reap profits based solely on the other venturers' managerial efforts and the successes of the underlying investments in no way depend on the entrepreneurial efforts of third parties. |
| 79. | Stewart v. Ragland, 934 F.2d 1033 (9th Cir. 1991) | No | General Partnership Interests | Oil & Gas | Working interests in oil and gas wells were not "investment contracts" because investors retained sustained managerial powers under operating agreement to receive results of title examinations, to remove the operator and secure successor operator, to have access to drilling site and documents pertaining to operator's work, and to decide that wells should be reworked, etc. |
| 80. | Klaers v. St. Peter, 942 F.2d 535 (8th Cir. 1991) | No | General Partnership Interests | Real Estate | Finding partner interests in a general partnership not to create an investment contract where the partners are personally liable for the partnership's debts and retain voting power to affect the partnership's affairs. |
| 81. | Rice v. Branigar Org., Inc., 922 F.2d 788 (11th Cir. 1991) | No | Real Estate Interests & Country Club Memberships | Real Estate | Concluding that the sale of lots in a beach club development do not establish an investment contract where the purchasers merely intend to enjoy use of the property and do not expect to retain profit from the developer's entrepreneurial efforts. |
| 82. | Guidry v. Bank of LaPlace, 954 F.2d 278 (5th Cir. 1992) | No | Checks | Ponzi Scheme | Finding that an oral agreement and sale of post-dated checks made as part of a ponzi scheme does not create an investment contract, because the investor could expect no more than the face value of the post-dated checks, therefore failing to meet the "expectation of profit" prong of the *Howey* test. |
| 83. | Cty. of Santa Cruz v. Cal. Health Facilities Fin. Auth., No. 91-15309, 1992 U.S. App. LEXIS | No | Lease Agreement | Real Estate | Affirming that a loan does not create an investment contract where borrowed funds are used merely to acquire property and not for investment. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 18213 (9th Cir. July 30, 1992) | | | | |
| 84. | Holden v. Hagopian, 978 F.2d 1115 (9th Cir. 1992) | No | General Partnership Interests | Horsebreeding | Maintaining *Williamson*'s three-prong test to determine whether the general partnership interests in a thoroughbred association can satisfy the "efforts of others" prong of the *Howey* test.  Affirming that appellants failed to plead allegations sufficient to establish that general partnership interests were investment contracts. |
| 85. | Rodriguez v. Banco Cent. Corp., 990 F.2d 7 (1st Cir. 1993) | No | Real Estate Interest | Real Estate | Discussing that "a security *might* exist" if a developer promises to create a thriving residential community together with its sale of land but that the "simple sale of land, whether for investment or use, is [typically] not a security." |
| 86. | Resolution Trust Corp. v. Stone, 998 F.2d 1534 (10th Cir. 1993) | No | Loan Receipts | Banking, Investment Services & Lending | Determining that the purchase and resale of car loans does not establish an investment contract where the purchaser receives specialized interest payments rather than dividends. |
| 87. | Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994) | No | Condominium Interests | Real Estate | Concluding that a condominium purchase contract does not create an investment contract where there is "simply no indicia of horizontal commonality" when the rents and expenses attributable to each unit are the exclusive responsibility of the unit owner. |
| 88. | Wals v. Fox Hills Development Corp., 24 F.3d 1016 (7th Cir. 1994) | No | Condominium Interests | Real Estate | Finding interests in a time-share condominium unit not to be securities when holders separately arrange to share certain income from the unit with the developer, because no horizontal commonality exists to support the "common enterprise" prong of the *Howey* test where the holders do not own an undivided share of the entire complex but a single condominium unit, and where holders do not receive a share of profit from a pool of rents but in the rental income of a single apartment. |
| 89. | Pamaco P'ship Mgmt. Corp. v. Enning, 27 F.3d 563 (4th Cir. 1994) | No | Limited Partnership Interests | Car Wash | Finding that interests in touchless carwash technology fail to meet the "efforts of others" prong under the *Howey test,* because the terms of each holder's agreement show that holders retain partnership interests necessary to practically exercise control over the venture. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 90. | Berry v. Carnaco Transp., 43 F.3d 1478 (9th Cir. 1994) | No | Financing Interests | Transportation | Affirming that trucker financing and driver contracts do not create investment contracts where financiers do not rely on the management or control efforts of others. |
| 91. | S.E.C. v. Life Partners, 87 F.3d 536 (D.C. Cir. 1996) | No | Viatical Settlement Interests | Insurance | Distinguishing between pre- and post-purchase efforts by the promoter and holding that pre-purchased services as a finder-promoter and the largely ministerial post-purchase services is not enough to satisfy the "efforts of others" prong under Howey. |
| 92. | Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996) | No | Lawsuit Interests | Insurance | Determining that a plan to reinsure prior obligations and discharge preexisting obligations fails to meet the "expectation of profit" prong of the *Howey* test such that corresponding interests in a reconstruction and renewal plan are not considered securities. |
| 93. | S.E.C. v. Life Partners, 102 F.3d 587 (D.C. Cir. 1996) | No | Viatical Settlement Interests | Insurance | "Viatical settlement" investment contracts, where payment is made to terminally ill insureds at discount based upon anticipated life expectancy, were not "investment contracts":  limitation of prepurchase services to finder function and absence of any but ministerial post-purchase services combined to support conclusion that investors' profits did not flow predominantly from efforts of others. |
| 94. | Cooper v. King, 114 F.3d 1186 (6th Cir. 1997) | No | Sale/Leaseback Interests | Leaseback Arrangement | Finding that interests in a payphone sale and leaseback program are not "inextricably intertwined" by contractual or financial arrangements among investors and therefore fail to meet the "common enterprise" prong under the *Howey* test. |
| 95. | Steinhardt Grp. v. Citicorp, 126 F.3d 144 (3d Cir. 1997) | No | Limited Partnership Interests | Structured Products | Finding a limited partner interest in a partnership not to be a security where the limited partner retains powers "far afield of the typical limited partnership agreement," including the power to remove the general partner without notice, propose and approve a new business plan, and veto the business plan of the general partners if proposed. |

142

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 96. | Teague v. Bakker, 139 F.3d 892 (4th Cir. 1998) | No | Partnership Interests | Lifetime Partnerships | Affirming the lower court's jury instruction that the sale of a vacation park does not create an investment contract where purchasers seek only to use the park and are not motivated by any expectation of financial returns on their investment. Reversed at 35 F.3d 978 (4th Cir. 1994). See Schedule 3 at 54 for prior history. |
| 97. | Matassarin v. Lynch, 174 F.3d 549 (5th Cir. 1999) | No | Employee Stock Option Plan | ESOP | Holding that an employee stock ownership plan does not create an "investment contract" where employee investment is optional and employer funding is mandatory. |
| 98. | Great Rivers Cooperative v. Farmland Industries, Inc., 198 F.3d 685 (8th Cir. 1999) | No | Cooperative Interests | Agricultural Cooperative | Holding that capital credits in a regional agricultural cooperative fail to meet the *Howey* test where there is no investment of money and the only distribution of profit is from patronage refunds. |
| 99. | S.E.C. v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002), *rev'd sub nom.* S.E.C. v. Edwards, 540 U.S. 389 (2004) | No | Sale/Leaseback Interests | Payphone & Service Contracts | Holding that interests in a payphone sale and leaseback arrangement are not securities where the returns are contractually guaranteed and derived not from the efforts of others but from the contractual bargain. Reversed at 540 U.S. 389 (2004). See Schedule 1 at 71 and 73 for subsequent history. |
| 100. | Robinson v. Glynn, 349 F.3d 166 (4th Cir. 2003) | No | Membership Interests | Telecommunications | Determining an individual membership interest in a technology company not to be a security where the investor is not merely passive but has the power to appoint board members, participate as a member of the executive committee, and affect control of management. |
| 101. | Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007) | No | Bond Interests | Insurance | Concluding that municipal bonds do not create an investment contract where the purchaser does not acquire any "profit to come solely from the efforts of others and expected profits come from the consideration paid for the issuance of an insurance policy rather than from the bonds. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 102. | Nunez v. Robin, 415 F. App'x 586 (5th Cir. 2011) | No | LLC Interests | Mining & Leasing | Affirming that the partners in a sand and gravel mining facility together controlled the scope and course of their joint venture such that the partners are not passive investors and their interests are not securities. |
| 103. | Alunni v. Dev. Res. Grp., 445 F. App'x 288 (11th Cir. 2011) | No | Condominium Interests | Real Estate | Holding that the purchase of fee simple interests in real estate do not create an investment contract because neither the "common enterprise" prong, nor the "efforts of others" prong of *Howey* are satisfied where the purchasers are free to control the units themselves after existing long-term leases expire, at which time there is no longer a rent guarantee. |
| 104. | Salameh v. Tarsadia Hotel, Corp., 726 F.3d 1124 (9th Cir. 2013) | No | Condominium Interests | Real Estate | Affirming that the sale of condominiums, together with a subsequent rental management agreement, does not create an investment contract, because the rental management agreement is not shown to be promoted at the time of the sale, and because no evidence suggests investors are induced to purchase the condominiums, meaning these are two distinct transactions. |
| 105. | Goldberg v. 401 North Wabash Venture LLC, 755 F.3d 456 (7th Cir. 2014) | No | Condominium Interests | Real Estate | Determining a condominium purchase agreement not to meet the "common enterprise" prong of the *Howey* test where the seller does not pool investors' assets and no revenue generation is contemplated by the terms of the agreement. |
| 106. | Rossi v. Quarmley, 604 F. App'x 171 (3d Cir. 2015) | No | LLC Interests | Manufacturing | Finding no investment contract where the managerial prerogatives of an enterprise's operating agreement give investors sufficient leverage and ability to participate in enterprise management, and where the investor's dissatisfaction with the majority's decisions do not convert his participation as a partner to an investment contract. |
| 107. | Iguaçu, Inc. v. Filho, 637 F. App'x 407 (9th Cir. 2016) | No | LLC Interests | Banking, Investment Services & Lending | Affirming that membership interests in the Brazilian equivalent of a limited liability company are purchased with the full expectation of shared management and operation of the enterprise and therefore do not create an investment contract. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 108. | Keeton v. Flanagan (In re Flanagan), 642 F. App'x 784 (9th Cir. 2016) | No | Loan Interests | Real Estate | Finding that investors' financial interests in a loan are not "inextricably interwoven" with the interests of the promoter or third party such that there is an investment in any sense of a "common enterprise." |
| 109. | Ave. Capital Mgmt. II, Ltd. P'ship v. Schaden, 843 F.3d 876 (10th Cir. 2016) | No | LLC Interests | Franchise and Distributorship | Finding that where investors collectively control the profitability of their investments in the enterprise (considering their contribution of time and effort to the success of the enterprise, their contractual powers, their access to information, the adequacy of financing, the level of speculation, and the nature of the business risks), no investment contract exists. |
| 110. | NE. Revenue Servs., LLC v. Maps Indeed, Inc., 685 F. App'x 96 (3d Cir. 2017) | No | Technology Interests | Transportation | Finding an investor's interest in a technology and marketing agreement not to create an investment contract where the investor is contractually required to contribute "significant efforts" to support the underlying venture. |
| 111. | Lampkin v. UBS Fin'l Servs., Inc., 925 F.3d 727 (5th Cir. 2019) | No | Employee Stock Option Plan | ESOP | Affirming that grant of options under the employee stock option plan is not a sale of securities because employees' participation is compulsory and non-contributory. |
| 112. | N. Am. Wellness Ctr. Holdings, LLC v. Temecula Valley Real Estate, Inc., 771 F. App'x 793 (9th Cir. 2019) | No | Land Sale | Real Estate | Affirming that a land sale agreement, together with an advisory agreement, does not create an investment contract where purchasers fail to present evidence they have a reasonable expectation of profit from the efforts of others. |
| 113. | Foxfield Villa Assocs., LLC v. Robben, 967 F.3d 1082 (10th Cir. 2020) | No | LLC Interests | Real Estate | Adopting the six *Schaden* factors to determine that the investors have sufficient control in their membership interests in the joint venture investments in real estate developments. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## SCHEDULE 3

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST- SEC V. W.J. HOWEY CO. IN WHICH THE COURT REVERSED, REMANDED, FOUND A "SECURITY" OR DETERMINED THAT THE QUESTION AT ISSUE RELATED TO THE STATUS OF A "NOTE" OR THE QUESTION OF WHETHER THERE WAS AN INVESTMENT CONTRACT WAS IMMATERIAL OR "NOT RELEVANT" TO THE DECISION.**

| Object Key | |
|---|---|
| NR and NR* | Means that the decision in the case was immaterial or not relevant to whether there was an investment contract. Notations with an asterisk "*" mean that the court withdrew or substituted the decision with a subsequent decision, or the relevant analysis was found in the courts dissenting opinion—these decisions are included in our analytical review as relevant. |
| Remand | Means that the court remanded the matter for further proceedings consistent with their decision in order to determine whether the contract, transaction, or scheme was an investment contract, independent of other issues raised or decided in the case. |
| Security | Means that the court determined that the question at issue related to one of the enumerated types of securities set forth in the Securities Acts (with the exception of "notes" and "investment contracts"), and did not opine on its status as an "investment contract". |
| Note Case | Means that the court determined that the question at issue related to the status of a "note" and examined it pursuant to the related jurisprudence. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | Jung v. K. & D. Mining Co., 260 F.2d 607 (7th Cir. 1958) | Remand | Stock | Oil & Gas | Finding that the complaint alleged facts, which if proven upon the trial, would establish that the plaintiffs invested their money in a common enterprise whereby they were led to expect profits solely from the efforts of the defendants as the promoters and not from any effort or activity on the part of the plaintiffs except their financial contribution, and thus would constitute an investment contract. |
| 2. | L.A. Tr. Deed & Mortg. Exch. v. S.E.C., 264 F.2d 199 (9th Cir. 1959) | Remand | Promissory Note | Trust Sales | Remanding for further fact finding to determine whether sale of promissory notes secured by deeds of trusts which include collections undertakings by the defendants was an investment in a "common enterprise" and whether the purchaser was led to expect profits solely from the efforts of the promoter or a third party. See Schedule 1 at 5 for subsequent history. |
| 3. | SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65 (1959) | Security | Variable Annuities | Insurance | Holding that "variable annuity" contracts are securities not falling within the insurance exemption under the Securities Act, since the issuer assumes no underwriting risks and such contracts are not insurance policies or annuity contracts. |
| 4. | Roe v. United States, 287 F.2d 435 (5th | Remand | Leasehold Interest | Oil & Gas | Finding that the sale of oil leases as part of a "high-pitched, hard-sell extravagant solicitation campaign" promising extraordinary returns, if credited, would constitute an investment contract, because the returns are not |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | Cir.), *cert. denied*, 368 U.S. 824 (1961) | | | | made possible solely under the naked leasehold rights but as a result of the activities of others. Remanding for jury determination if the evidence is credited. See entry 5 for subsequent history. |
| 5. | Roe v. U.S., 316 F.2d 617 (5th Cir. 1963) | NR | Leasehold Interest | Oil & Gas | Affirming district court decision to permit admission of promotional materials as evidence, where promotional materials were sufficient to establish that mineral leases were investment contracts because purchasers would expect a return on investment from the activities of others.  See entry 4 for prior history. |
| 6. | Tcherepnin v. Knight, 389 U.S. 332 (1967) | Security | Capital Shares & Capital Interest | Banking, Investment Services & Lending | Holding that withdrawable capital shares in a savings and loan association are securities within the meaning of the Securities Act and emphasizing that form should be disregarded for substance and the emphasis of the Securities Act analysis should be based on economic reality. See Schedule 2 at 2 for prior history. |
| 7. | Ahrens v. Am.-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970) | Remand | Beaver Interests | Animal Sales | Finding that the jury question of whether contracts relating to beavers are investment contracts under the Securities Act was improperly submitted and noting that the court resolved the question in the affirmative in a previous case against the same defendant. |
| 8. | Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1973) | Remand | Discretionary Trading Account | Banking, Investment Services & Lending | Remanding due to dispute of material fact as to whether seller of copper contracts promised returns based on his managerial efforts. |
| 9. | Crowley v. Montgomery Ward & Co., 570 F.2d 875 (10th Cir. 1975) | Remand | Franchise Interests | Distributorships & Franchises | Reversing and remanding the question of whether a catalog sales agency agreement is an investment contract under the Securities Acts for a factual inquiry into the economic reality of the transaction. See Schedule 2 at 19 for subsequent history. |
| 10. | McGreghar Land Co. v. Meguiar, 521 F.2d 822 (9th Cir. 1975) | Remand | Limited Partnership Interests | Partnerships | Remanding for further fact finding and reversing the lower court's finding that a limited partnership interest does not establish an investment contract where the interest holder was induced to make capital contributions, because the general partners made misrepresentations about the value and permanency of their own contributions and other partnership assets. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 11. | McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975) | Remand | Real Estate Interest | Real Estate | Holding that there is a factual question as to whether the sale of Timberlake lots constitutes sales of securities, and allowing purchasers of undeveloped land to amend complaint to allege security law violations where purchasers had no control over improvement of the land and promoters committed to performing meaningful post-purchase functions. |
| 12. | Hector v. Wiens, 533 F.2d 429 (9th Cir. 1976) | Remand | Promissory Note | Banking, Investment Services & Lending | Remanding for further consideration of the existence of an investment contract where plaintiff invested money via transfer of a promissory note and holding that genuine dispute of material fact existed regarding the existence of a common enterprise and which party had control of essential managerial efforts of the enterprise. |
| 13. | Exch. Nat. Bank, Chicago v. Touche Ross Co., 544 F.2d 1126 (2d Cir. 1976) | Note Case | Promissory Note | Banking, Investment Services & Lending | Dismissing the second prong *Howey* test as unhelpful and dubious when determining whether a loan transaction constitutes an investment contract, because the mere existence of a debt relationship does cannot be deemed to establish a "common enterprise." |
| 14. | Emisco Indus., Inc. v. Pro's, Inc., 543 F.2d 38 (7th Cir. 1976) | Note Case | Promissory Note | Asset Sale | Considering the issuance of a promissory note in exchange for purchased assets to amount not to a security but to no more than a cash substitute. |
| 15. | Bell v. Health-Mor, Inc., 549 F.2d 342 (5th Cir. 1977) | Remand | Referral Fee Interests | Consumer Sales | Sustaining plaintiffs' Securities Acts claims where there was a factual question of whether the vendee undertook significant efforts to produce a referral fee, which may have indicated that the referral sales scheme was an investment contract. |
| 16. | United Cal. Bank v. THC Fin'l Corp., 557 F.2d 1351 (9th Cir. 1977) | Note Case | Promissory Note | Banking, Investment Services & Lending | Finding that a put letter requiring a debtor to enter promissory notes underlying a line of credit with the creditor does not involve a security. |
| 17. | Piambino v. Bailey, 610 F.2d 1306 (5th Cir. 1980) | Remand | Distributorship Rights | Multi-Level Marketing | Remanding question of whether the sale of distribution contracts was an investment contract under the Securities Act where there was genuine dispute of material fact as to whether reasonable investors did (or did not) believe they were buying into an enterprise. |
| 18. | Aldrich v. McCulloch Props., Inc., 627 F.2d 1036 (10th Cir. 1980) | Remand | Real Estate Interest | Real Estate Interests | Reversing and remanding the securities laws claims because the determination of whether or not they purchased an investment contract in a real estate development scheme where allegations included that defendants |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | promised post-purchase efforts to provide development, amenities, and a trust for their common benefit, could not be made based on pleadings. |
| 19. | Williamson v. Tucker, 632 F.2d 579 (5th Cir. 1980), *withdrawn*, 645 F.2d 404 (1981)* | NR* | Joint Venture Interests | Real Estate | Remanding for further proceedings as to a material issue of fact related to whether the plaintiffs were so dependent on the expertise of one of the partners for the management, sale, or development of a real estate property such that they could not effectively exercise their partnership powers. Withdrawn at 645 F.2d 404 (1981). See entry 21 for subsequent history. |
| 20. | Weaver v. Marine Bank, 637 F.2d 157 (3d Cir. 1980), *rev'd*, 455 U.S. 551 (1982) | Remand | Certificates of Deposit & Profit Interests | Banking, Investment Services & Lending | Holding that trier of fact could find that both a certificate of deposit and a related business agreement involving the pledge of a certificate of deposit in exchange for profit-sharing could be an investment contract, and remanding for determination. See Schedule 2 at 40 for subsequent history. |
| 21. | Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981) | Remand | Joint Venture Interests | Real Estate | Considering whether a joint venture interest in undeveloped real estate is a security by applying three factors, the venturers' (1) contractual power, (2) knowledge or expertise, and (3) dependence on the managerial ability of the developer and promoter. See entry 19 for prior history. |
| 22. | Meason v. Bank of Miami, 652 F.2d 542 (5th Cir. 1981) | Remand | Certificate of Deposit | Banking, Investment Services & Lending | Remanding issue of whether certificates of deposit were an investment contract under the Securities Act and emphasizing the importance of considering the economic realities of the transaction. |
| 23. | Golden v. Garafalo, 678 F.2d 1139 (2d Cir. 1982) | Security | Stock | Stock Sale | Holding that conventional stock in business corporations are a security within the meaning of the Securities Acts, noting that the investment contract analysis is of "little help" in determining the meaning of "stock" which refers to an instrument with commonly agreed upon characteristics. |
| 24. | Seagrave Corp. v. Vista Res., Inc., 696 F.2d 227 (2d Cir. 1982) | Security | Stock | Stock Sale | Remanding for further proceedings to determine whether subsidiary corporations' stock purchased by plaintiff corporation as part of an asset buy-out had sufficient characteristics of stock to be considered securities under the rule that the instruments themselves, and only if the instruments lack the ordinarily accepted attributes of stock need the court ascertain whether these instruments may be an uncommon form of securities, such as an investment contract. |
| 25. | Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320 (7th Cir. 1983) | Remand | Annuity Interest | Insurance | Remanding for further fact finding to determine whether a group deposit administration annuity contract is an investment contract, noting that an "investment contract" is a "catch-all" phrase meant to include instruments that "have the functional attributes of stock and other formal securities but are not so denominated". |

149

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 26. | Daily v. Morgan, 701 F.2d 496 (5th Cir. 1983) | Security | Stock | Stock Sale | Holding that a business' stock may still be considered a security if a purchaser buys 100 percent of it with the intent to operate and manage the business and the *Howey* criteria does not apply to all securities. |
| 27. | Ruefenacht v. O'Halloran, 737 F.2d 320 (3d Cir. 1984) | Security | Stock | Stock Sale | Holding that the Howey test does not apply to the sale of all or part of a business via a transaction involving stock with the traditional characteristics of stock ownership, which qualifies as the sale of securities. |
| 28. | Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484 (7th Cir. 1984) | Note Case | Fixed Interest Notes | Banking, Investment Services & Lending | Reversing and remanding to the lower court to look not just to the four corners of a fixed-interest promissory note but to the distribution plan and transaction terms, noting that an instrument failing to satisfy all four requirements of the *Howey* test may still fall under one of the other statutory terms in the definitional sections of the Securities Act. |
| 29. | Mordaunt v. Incomco, 469 U.S. 1115 (1985) | NR* | Discretionary Trading Account | Banking, Investment Services & Lending | Justice White, joined by Chief Justice Burger and Justice Brennan, dissenting from denial of certiorari of a case that asked the Supreme Court to consider whether discretionary futures contracts qualify as securities and resolve a circuit split regarding whether the "common enterprise" prong of *Howey* required horizontal or vertical commonality.  See Schedule 2 at 46 for prior history. |
| 30. | Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985) | Security | Stock | Stock Sale | Holding that the common stock of a closely held lumber business possessed all of the characteristics traditionally associated with common stock and thus was a security within the definition of the Acts by declining to adopt the sale of business doctrine and limiting *Howey* to determine investment contracts only. See Schedule 2 at 50 for prior history. |
| 31. | Underhill v. Royal, 769 F.2d 1426 (9th Cir. 1985) | Note Case | Promissory Note | Banking, Investment Services & Lending | Affirming the lower court's application of the six-factor "risk capital" test to conclude that a mortgage lender's collateralized loan agreement is a security. Citing *Howey* to emphasize that, if a particular transaction is an investment, it is within the scope of securities laws. |
| 32. | McGill v. American Land Exploration Co., 776 F.2d 923 (10th Cir. 1985) | Remand | Joint Venture Interests | Real Estate | Finding that Plaintiff's investment in a joint real estate venture satisfied the "common enterprise" element of *Howey* based on the economic realities of the transaction because plaintiff expected to passively receive a share of the profits of the venture. |
| 33. | Penturelli v. Spector, Cohen, Gadon Rosen, 779 F.2d 160 (3d Cir. 1985) | Security | Coal Mine Interests | Mining & Refining | Holding that following *Landreth*, fractional undivided working interests in a coal mining operation were securities for federal securities law purposes regardless of *Howey*. |

150

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 34. | Rodeo v. Gillman, 787 F.2d 1175 (7th Cir. 1986) | Remand | Limited Partnership Interests | Real Estate | Remanding for further fact finding to determine whether limited partnership interests in form are securities or, perversely, do not fall under federal securities laws because they are not limited partnership interests in practice because their sale may only be part of a sham transaction designed to preserve existing mortgage financing, especially where general partners retain the unilateral right to require limited partners to purchase additional partnership units. |
| 35. | Less v. Lurie, 789 F.2d 624 (8th Cir. 1986) | Remand | Partnership Interests | Oil & Gas | Finding that Plaintiff investors had stated a claim for relief under Rule 10b-5 by alleging that a partnership was itself formed as part of a scheme to defraud them and noting that even when a partnership agreement provides the partners with control over the activities of the partnership, under Williamson v. Tucker if the partners lack actual expertise and bargaining power to exercise such control in the operations of the enterprise the efforts of others prong of Howey may still be satisfied. |
| 36. | Youmans v. Simon, 791 F.2d 341 (5th Cir. 1986) | Remand | General Partnership Interests | Real Estate | Finding that a general partnership interest in one partnership was not an investment contract under Howey because the purchasers retained substantial power and exercised expertise over the venture as general partners and affirming grant of summary judgment dismissing claims, but reversing the grant of summary judgment with respect to interests in a different general partnership where questions of fact remained with respect to whether the purchasers were deprived of the power to replace the Managing Venturer and did not have the power to manage the venture and therefore relied "on the efforts of others." |
| 37. | Schaafsma v. Morin Vermont Corp., 802 F.2d 629 (2d Cir. 1986) | Security | Stock | Real Estate | Rejecting the "sale of business" doctrine consistent with Landreth and finding that the purchase of 100 percent of the stock of a corporation in order to obtain control of corporate assets was a purchase of securities. The instruments at issue were stock as a matter of law and it was error to submit to the jury the question of whether the federal securities laws applied. Remanded for a new trial on the federal securities law claim. |
| 38. | Hocking v. Dubois, 839 F.2d 560 (9th Cir. 1988), *withdrawn*, 885 F.2d 1449 (1989)* | NR* | Condominium Interests | Real Estate | Reversing and remanding to the lower court to determine whether secondary condominium sales coupled with a rental pool "option" create an investment contract. Suggesting that as long as a rental pool "option" exists, all secondary market condominium sales would necessarily meet the "efforts of others" prong of the *Howey* test.  Withdrawn at 885 F.2d 1449 (1989). See entry 46 for subsequent history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 39. | One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988) | Security | Stock Options | Restaurants | Holding that an option to purchase stock is a security under the reasoning of Landreth - options to purchase stock are such traditional securities instruments that they may be shown by proving the document itself without need to look beyond the character of the instrument and without need to apply the Howey investment contract test. Although the District Court  incorrectly applied the Howey test to determine that the option to purchase stock  was not a security, this only provided an alternative basis to dismiss the securities claim and the error by the District Court does not alter the outcome of the appeal. |
| 40. | Arthur Young Co. v. Reves, 856 F.2d 52 (8th Cir. 1988), rev'd sub nom. Reves v. Ernst & Young, 494 U.S. 56 (1990) | Note Case | Promissory Note | Agricultural Cooperative | Finding promissory notes payable on the holder's demand not to be securities where they merely provide for a short-term loan with a fixed interest rate, more akin to a commercial lending arrangement than an investment transaction.  Reversed at 494 U.S. 56 (1990). |
| 41. | Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242 (5th Cir. 1988) | Security | Fractional Undivided Oil & Gas Interests | Oil & Gas | Holding that undivided fractional interests in oil and gas are securities explicitly provided for in the definition of security and under Landreth the economic reality test does not apply and a Howey analysis was not required. |
| 42. | Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989) | NR | Investment Interests | Banking, Investment Services & Lending | Holding, inter alia, that predispute agreements to arbitrate claims arising under the '33 Act are enforceable. Investors opened brokerage accounts and alleged their money was invested in unauthorized and fraudulent securities giving rise to violations of the Securities Act and Exchange Act.  There is no allegations that the investments did not constitute securities. |
| 43. | Holloway v. Peat, Marwick, Mitchell Co., 879 F.2d 772 (10th Cir. 1989),  vacated & remanded, 494 U.S. 1014 (1990), reaffirmed on reconsideration, 900 F.2d 1485 (10th Cir. | Note Case | Debt Instruments | Banking, Investment Services & Lending | After remand from the Supreme Court instructing the Court of Appeals to consider its decision in light of Reves, the Court of Appeals found that the passbook savings certificates and thrift certificates offered and sold to the general public were securities because they were "notes" under Reves and did not meet the family resemblance test. The court relied on its prior analysis, which overlapped substantially with the four factors in the Reves family resemblance test and noted that the Supreme Court rejected the application of Howey to "notes".  Vacated & Remanded, at 494 U.S. 1014 (1990), Reaffirmed on Reconsideration, 900 F.2d 1485 (10th Cir. 1990), |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 1990), *cert. denied*, 498 U.S. 958 (1990) | | | | |
| 44. | Shaw v. Hiawatha, Inc., 884 F.2d 582 (9th Cir. 1989) | Remand | Sale/Leaseback Interests | Lottery Machines & Sales Rights | Reversed district court's order dismissing case for lack of subject matter jurisdiction and remanded for factual determination regarding whether the common enterprise and efforts of others prongs of the Howey test were satisfied. |
| 45. | Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir. 1989) | NR | Cattle Embryo Interests | Cattle Breeding | This case involves cross appeals and 8 different issues on appeal in total. Finding that in a dispute over the "efforts of others" prong of Howey, the essential question is whether the investor retained ultimate control over his property, not whether he actually exercised such control, and that is a question of fact that should be submitted to a jury so the district court acted properly in refusing to direct a verdict on this issue. Further finding that whether the investment was classified as a security was a question of fact for the jury. |
| 46. | Hocking v. Dubois, 885 F.2d 1449 (9th Cir. 1989) | Remand | Condominium Interests | Real Estate | Summary judgement for appellee reversed. There were issues of material fact as to whether  the sale of a condominium by Dubois, the appellee real estate broker, to Hocking, the appellant purchaser, and the related components of the package offered to Hocking were part of one scheme or transaction, whether there was a common enterprise, and whether there was the expectation of profits produced by the efforts of others. Hocking claimed that the condominium was promoted by Dubois "with an emphasis on the economic benefits to be derived from the managerial efforts of third parties designated or arranged for by Dubois," and by including with the condominium an offer for a rental arrangement or rental pool arrangement the entire package constituted a security. Dubois argued that the sale of the condominium was separate and distinct from the rental pooling arrangement and there was no investment of money in the RPA and that the RPA allowed Hocking to control the condominium such that he was not reliant on the efforts of others.  See entry 38 for subsequent history. |
| 47. | Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385 (6th Cir. 1989) | Remand | Tax Shelter Interests | Tax Shelter Scheme | Whether plaintiffs could show that their investments  were securities because they were investment contracts under Howey is a question of material fact where lessees received leasehold interest in plates for printing postage stamps, right to sell specified numbers of stamps, and right to claim investment tax credit in return for lease payments of a fixed amount, and |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | where certain contracts for printing and distribution were arguably related to the lessor. |
| 48. | L & B Hosp. Ventures, Inc. v. Healthcare Int'l, Inc., 894 F.2d 150 (5th Cir. 1990) | Remand | Limited Partnership Interests | Hospital Development | Summary judgment reversed and case remanded because an issue of material fact existed as to whether Howey elements met when psychiatrists, who were limited partners in psychiatric treatment facility, held essential managerial functions in the partnership or depended on the managerial efforts of general partners. |
| 49. | Reves v. Ernst & Young, 494 U.S. 56 (1990) | Note Case | Promissory Note | Agricultural Cooperative | Holding that demand notes sold by farmer's co-op to members and non-members fell under the "note" category of instruments in the definition of security and they did not resemble categories of notes that should not be treated as securities. Setting forth the family resemblance test for determining when notes, which are presumptively securities because they are a specifically enumerated instrument in the definition of security, should not be treated as securities. |
| 50. | Allison v. Ticor Title Ins. Co., 907 F.2d 645 (7th Cir. 1990) | NR | Leasehold Interests | Real Estate | Investors sued Title company claiming they did not get good title to land that they leased with a related rental pool agreement because that arrangement instead constituted an investment contract that was an unregistered security. The court found that whether the arrangement constituted an investment contract or not, it did not make the leasehold itself any less of an interest in real property and any violation of Section 5 of the securities act does not negate the existence of title. |
| 51. | Koch v. Hankins, 928 F.2d 1471 (9th Cir. 1991) | Remand | General Partnership Interests | Real Estate | Under Williamson v. Tucker, the court finds that question of material fact exists as to investors' participation in control over 2700-acre plantation to produce income from smaller general partnership acreage and as to investors' ability to affect decision making regarding the larger plantation. |
| 52. | DCD Programs, Ltd. v. Hill, Farrer & Burrill, No. 90-55523, 1991 U.S. App. LEXIS 19723 (9th Cir. Aug. 15, 1991) | Remand | Limited Partnerships | Banking, Investment Services & Lending | Holding that, at a minimum, plaintiff had raised a genuine issue of material fact that the agreements could be construed as investment contracts where money was raised by means of limited partnerships for investment in a larger venture; there was a "direct correlation" between the larger venture and the monies received from the limited partnerships; and general partner had "contractual power" to delegate significant managerial functions |
| 53. | Zolfaghari v. Sheikholeslami, 943 F.2d 451 (4th Cir. 1991) | Remand | Mortgage Interests | Investment Program | Reversing summary judgment where participation interests in managed pool of mortgage notes could be "securities," considering profits depend on the managerial efforts of those who run the pool and make decisions such as determining which mortgages should be in the pool, how the individual notes will be serviced and managed, and other fund decisions. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 54. | Teague v. Bakker, 35 F.3d 978 (4th Cir. 1994) | Remand | Partnership Interests | Lifetime Partnerships | Court reversed judgment as a matter of law for defendants with respect to securities claims finding that the lifetime partnership interests could not be excluded from the definition of security as a matter of law where promotional materials used to market "lifetime partnership"(LTP) in hotel emphasized its profit potential, referred to the LTP as investments, and offered purchasers the possibility of realizing capital appreciation; references to increasing value of partnership and records tabulating transfers of partnership also indicated that partnerships could be transferred. See Schedule 2 at 96 for subsequent history. |
| 55. | Webster v. Omnitrition Intern., Inc., 79 F.3d 776 (9th Cir. 1996) | Remand | Payment Interests | Multi-Level Marketing | In a scheme involving distributors of health and skin care products that could become "supervisors" by purchasing specified large amount of product after which they would be entitled to commissions earned by bringing more participants into the scheme, the court found that the record contained sufficient evidence to present a genuine issue of disputed material fact as to whether Omnitrition promoted a pyramid scheme, reversing the grant of summary judgement. |
| 56. | Nolfi v. Ohio Ky. Oil Corp., 675 F.3d 538 (6th Cir. 2012) | Security | Joint Venture & Limited Partnership Interests | Oil & Gas | Finding the *Howey* test to be inapplicable, as the statute specifically lists "fractional undivided interests in oil, gas, or other mineral rights" as a security. |
| 57. | S.E.C. v. Thompson, 732 F.3d 1151 (10th Cir. 2013) | Note Case | Promissory Note | Investment Program | Finding that certain unsecured promissory notes are securities under the family-resemblance test articulated in *Reves*, and despite the district court also finding that the notes were investment contracts, declining to reach that conclusion in light of their finding that the notes were "notes" under *Reves*. |
| 58. | S.E.C. v. Shields, 744 F.3d 633 (10th Cir. 2014) | Remand | Joint Venture Interests | Oil & Gas | Remanding for further fact finding after holding that the SEC's allegations in the complaint were sufficient to rebut the presumption that the purported general partnerships were not securities where the allegations demonstrated that investors were locked into turnkey drilling and completion contracts with business as contractor, so that even if they exercised their power to remove business as managing venturer, they were still required to rely on business for success of joint venture, and managing partner allegedly marketed interests to investors with little to no experience in oil and gas industry and was their sole source of access to information. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 59. | Chadbourne & Parke LLP v. Troice, 571 U.S. 377 (2014) | NR | Certificate of Deposit | Investment Program | Held that a fraudulent misrepresentation or omission was not made "in connection with" a purchase or sale of a covered security unless it was material to a decision to buy or sell a covered security. |
| 60. | S.E.C. v. Arcturus Corp., 912 F.3d 786 (5th Cir. 2019), *withdrawn*, 928 F.3d 400 (2019)* | NR* | Oil & Gas Interests | Oil & Gas | Finding issues of material fact as to whether investors in six oil and gas well drilling projects called joint ventures were so inexperienced and unknowledgeable in business affairs that they were incapable of intelligently exercising their powers with regards to projects; were so dependent on some unique entrepreneurial or managerial ability of managers of Florida and Texas consulting limited liability companies (LLC) which offered projects that they could not replace managers or otherwise exercise meaningful powers. Withdrawn and substituted at 928 F.3d 400 (5th Cir. 2019). See entry 62 for subsequent history. |
| 61. | Lorenzo v. S.E.C., 587 U.S. ___, 2019 WL 1369839 (Mar. 27, 2019) | NR | Convertible Debt | Banking, Investment Services & Lending | Concluding that limited partnership interests between medical service entities and billing and management companies were investment contracts; declining to expand the law to state that veto powers to block certain enumerated business decisions, standing alone, would suffice to negate the existence of an investment contract. |
| 62. | S.E.C. .v. Arcturus Corp., 928 F.3d 400 (5th Cir. 2019) | Remand | Oil & Gas Interests | Oil & Gas | Finding issues of fact as to whether the investors were given significant control over the drilling projects, utilized their powers, the voting structure's impact on the investors' power, and the communication among the investors. See entry 60 for prior history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

## SCHEDULE 4

**NOTABLE PRE-** *SEC V. W.J. HOWEY CO.* **"INVESTMENT CONTRACT" DESCISIONS, STATE COURT DECISIONS, AND DECISIONS DISCUSSING THE APPLICABILITY OF SECURITIES LAWS TO CRYPTO ASSETS AND NOT OTHERWISE DISCUSSED IN THIS ARTICLE.**[335]

1. State v. Summerland, 150 Minn. 266, 185 N.W. 255 (1921)
2. State v. Ogden, 154 Minn. 425, 191 N.W. 916 (1923)
3. People v. McCalla, 63 Cal. App. 783 (Dist. Ct. App. 1923)
4. State v. Swenson, 172 Minn. 277, 215 N.W. 177 (1927)
5. Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904 (1927)
6. Barrett v. Gore, 88 Cal. App. 372 (Dist. Ct. App. 1928)
7. Gracchi v. Friedlander, 93 Cal. App. 770 (Dist. Ct. App. 1928)
8. State v. Code, 178 Minn. 492, 227 N.W. 652 (1929)
9. Barnhill v. Young, 46 F.2d 804 (S.D. Cal. 1931)
10. Black v. Solano Co., 114 Cal. App. 170, 299 P. 843 (Dist. Ct. App. 1931)
11. O'Connell v. Union Drilling & Petroleum Co., 121 Cal. App. 302, 8 P.2d 867 (Dist. Ct. App. 1932)
12. People v. Craven, 21 P.2d 459 (Cal. Dist. Ct. App. 1933)
13. W. Oil & Ref. Co. v. Venago Oil Corp., 218 Cal. 733, 24 P.2d 971 (1933)
14. People v. Reese, 136 Cal. App. 657, 29 P.2d 450 (Dist. Ct. App. 1934)
15. S.E.C. v. Crude Oil Corp., 93 F.2d 844 (7th Cir. 1937)
16. S.E.C. v. Universal Serv. Asso., 106 F.2d 232 (7th Cir. 1939)
17. S.E.C. v. Bailey, 41 F. Supp. 647 (S.D. Fla. 1941)
18. Atherton v. United States, 128 F.2d 463 (9th Cir. 1942)
19. Penfield Co. of Cal. v. Sec. and Exch. Com'n, 143 F.2d 746 (9th Cir. 1944)
20. United States v. Zaslavskiy, No. 17CR647(RJD), 2018 U.S. Dist. LEXIS 156574 (E.D.N.Y. Sep. 11, 2018)
21. Hodges v. Monkey Capital, Ltd. Liab. Co., No. 17-81370-CV-MIDDLEBROOKS, 2018 U.S. Dist. LEXIS 229669 (S.D. Fla. Aug. 14, 2018)
22. Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340 (S.D.N.Y. 2019)
23. S.E.C. v. Blockvest, LLC, No. 18CV2287-GPB(BLM), 2019 U.S. Dist. LEXIS 24446 (S.D. Cal. Feb. 14, 2019)
24. Beranger v. Harris, No. 1:18-CV-05054-CAP, 2019 U.S. Dist. LEXIS 195107 (N.D. Ga. Apr. 23, 2019)
25. In re BitConnect Sec. Litig., No. 18-cv-80086, 2019 U.S. Dist. LEXIS 231976 (S.D. Fla. Aug. 23, 2019)
26. Shea v. Best Buy Homes, 533 F. Supp. 3d 1321 (N.D. Ga. 2021)
27. Diamond Fortress Techs., Inc. v. EverID, Inc., 274 A.3d 287 (Del. Super. Ct. 2022)
28. S.E.C. v. Pacheco, No. EDCV 19-958-MWF (AFMx), 2022 U.S. Dist. LEXIS 93459 (C.D. Cal. Apr. 4, 2022)
29. Audet v. Fraser, No. 3:16-cv-940 (MPS), 2022 U.S. Dist. LEXIS 99304 (D. Conn. June 3, 2022)

---

[335] The enumerated decisions in this list have not been included in the empirical calculations referenced throughout this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

## SCHEDULE 5

**ALL FEDERAL APPELLATE AND SUPREME COURT DECISIONS REVIEWED FOR ANNEX A IN CHRONOLOGICAL ORDER.**

1. SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344 (1943)
2. SEC v. Howey Co., 328 U.S. 293 (1946)
3. Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953)
4. Jung v. K. & D. Mining Co., 260 F.2d 607 (7th Cir. 1958)
5. L.A. Tr. Deed & Mortg. Exch. v. Sec. & Exch. Com., 264 F.2d 199 (9th Cir. 1959)
6. Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959)
7. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65 (1959)
8. Cross v. Pasley, 270 F.2d 88 (8th Cir. 1959)
9. Los Angeles Trust Deed & Mortgage Exch. v. SEC, 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919 (1961)
10. Moses v. Michael, 292 F.2d 614 (5th Cir. 1961)
11. Roe v. United States, 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824 (1961)
12. Roe v. US, 316 F.2d 617 (5th Cir. 1963)
13. United States v. Herr, 338 F.2d 607 (7th Cir. 1964)
14. Tcherepnin v. Knight, 371 F.2d 374 (7th Cir. 1967), rev'd, 389 U.S. 332 (1967).
15. SEC v. United Benefit Life Ins. Co., 387 U.S. 202 (1967)
16. Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967)
17. Tcherepnin v. Knight, 389 U.S. 332 (1967)
18. Cont'l Mktg. Corp. v. Sec. & Exch. Com., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905 (1968)
19. Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969)
20. Securities and Exchange Comm. v. MacElvain, 417 F.2d 1134 (5th Cir. 1969), cert. denied, 397 U.S. 972 (1970)
21. Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250 (10th Cir. 1969)
22. Johns Hopkins Univ. v. Hutton, 422 F.2d 1124 (4th Cir. 1970), cert. denied, 416 U.S. 916 (1974)
23. Ahrens v. Am.-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970)
24. Kemmerer v. Weaver, 445 F.2d 76 (7th Cir. 1971)
25. Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir. 1972), cert. denied, 409 U.S. 887 (1972)
26. Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973)
27. SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973), cert. denied, 419 U.S. 900 (1974)
28. Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1973)
29. Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir. 1973), cert. denied, 415 U.S. 977 (1974)
30. Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973)
31. Nash & Assocs., Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973)
32. Andrews v. Blue, 489 F.2d 367 (10th Cir. 1973)
33. Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974)
34. El Khadem v. Equity Sec. Corp., 494 F.2d 1224 (9th Cir. 1974)
35. Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974)
36. Bitter v. Hoby's Int'l, Inc., 498 F.2d 183 (9th Cir. 1974)
37. Forman v. Cmty. Servs., Inc., 500 F.2d 1246 (2d Cir. 1974), rev'd, 421 U.S. 837 (1975).
38. Bellah v. First Natl. Bk. of Hereford, Texas, 495 F.2d 1109 (5th Cir. 1974)
39. 1050 Tenants Corp. v. Jakobson, 503 F.2d 1375 (2d Cir. 1974)
40. Securities Exch. Com. v. Koscot Inter., Inc., 497 F.2d 473 (5th Cir. 1974)
41. Sec. Exchange Com'n v. Continental Com Corp., 497 F.2d 516 (5th Cir. 1974)
42. Safeway Portland Employees' Fed. Credit Union v. C. H. Wagner & Co., 501 F.2d 1120 (9th Cir. 1974)
43. Crowley v. Montgomery Ward & Co., 570 F.2d 875 (10th Cir. 1975)
44. United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

45. McGreghar Land Co. v. Meguiar, 521 F.2d 822 (9th Cir. 1975)
46. McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975)
47. Hector v. Wiens, 533 F.2d 429 (9th Cir. 1976)
48. Grenader v. Spitz, 537 F.2d 612 (2d Cir. 1976)
49. Exch. Nat. Bank, Chicago v. Touche Ross Co., 544 F.2d 1126 (2d Cir. 1976)
50. Fargo Partners v. Dain Corp., 540 F.2d 912 (8th Cir. 1976)
51. Emisco Indus., Inc. v. Pro's, Inc., 543 F.2d 38 (7th Cir. 1976)
52. Ballard & Cordell Corp. v. Zoller & Danneberg Expl., Ltd., 544 F.2d 1059 (10th Cir. 1976)
53. Bell v. Health-Mor, Inc., 549 F.2d 342 (5th Cir. 1977)
54. SEC v. Commodity Options Int'l, Inc., 553 F.2d 628 (9th Cir. 1977)
55. United Cal. Bank v. THC Fin. Corp., 557 F.2d 1351 (9th Cir. 1977)
56. Daniel v. International Bd. of Teamsters, 561 F.2d 1223 (7th Cir. 1977), rev'd, 439 U.S. 551 (1979).
57. Hirk v. Agri-Research Council, Inc., 561 F.2d 96 (7th Cir. 1977)
58. McGovern Plaza Joint Ven. v. First of Denver, 562 F.2d 645 (10th Cir. 1977)
59. Schultz v. Dain Corp., 568 F.2d 612 (8th Cir. 1978)
60. Crowley v. Montgomery Ward Co., Inc., 570 F.2d 877 (10th Cir. 1978)
61. Moody v. Bache Co., Inc., 570 F.2d 523 (5th Cir. 1978)
62. Woodward v. Terracor, 574 F.2d 1023 (10th Cir. 1978)
63. Commander's Palace Park Assocs. v. Girard & Pastel Corp., 572 F.2d 1084 (5th Cir. 1978)
64. Melton v. Unterreiner, 575 F.2d 204 (8th Cir. 1978)
65. United States v. Carman, 577 F.2d 556 (9th Cir. 1978)
66. Goodman v. Epstein, 582 F.2d 388 (7th Cir. 1978)
67. Robertson v. Humphries, No. 77-1156., 1978 U.S. App. LEXIS 9196 (10th Cir. Sep. 7, 1978)
68. Peyton v. Morrow Electronics, Inc., 587 F.2d 413 (9th Cir. 1978)
69. United Sportfishers v. Buffo, 597 F.2d 658 (9th Cir. 1978)
70. Teamsters v. Daniel, 439 U.S. 551 (1979)
71. Black v. Payne, 591 F.2d 83 (9th Cir. 1979)
72. Smith v. Gross, 604 F.2d 639 (9th Cir. 1979)
73. Brodt v. Bache Co., Inc., 595 F.2d 459 (9th Cir. 1979)
74. United States v. Farris, 614 F.2d 634 (9th Cir. 1979)
75. De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co., 608 F.2d 1297 (9th Cir. 1979)
76. Cameron v. Outdoor Resorts of America, Inc, 608 F.2d 187 (5th Cir. 1980)
77. Piambino v. Bailey, 610 F.2d 1306 (5th Cir. 1980)
78. Canadian Imperial Bank of Commerce v. Fingland, 615 F.2d 465 (7th Cir. 1980)
79. Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980)
80. Mason v. Unkeless, 618 F.2d 597 (9th Cir. 1980)
81. United Am. Bank v. Gunter, 620 F.2d 1108 (5th Cir. 1980)
82. Noa v. Key Futures, Inc., 638 F.2d 77 (9th Cir. 1980)
83. SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980)
84. Aldrich v. McCulloch Props., Inc., 627 F.2d 1036 (10th Cir. 1980)
85. Rosenberg v. Collins, 624 F.2d 659 (5th Cir. 1980)
86. Westchester Corp. v. Peat, Marwick, Mitchell & Co., 626 F.2d 1212 (5th Cir. 1980)
87. Martin v. T. V. Tempo, Inc., 628 F.2d 887 (5th Cir. 1980)
88. Am. Fletcher Mortg. Co. v. U. S. Steel Credit Corp., 635 F.2d 1247 (7th Cir. 1980)
89. Williamson v. Tucker, 632 F.2d 579 (5th Cir. 1980),  withdrawn, 645 F.2d 404 (1981)*
90. Weaver v. Marine Bank, 637 F.2d 157 (3d Cir. 1980), rev'd, 455 U.S. 551 (1982)
91. Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174 (6th Cir. 1981)
92. Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981)
93. Frazier v. Manson, 651 F.2d 1078 (5th Cir. 1981)

159

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

94. Meason v. Bank of Miami, 652 F.2d 542 (5th Cir. 1981)

95. Kosnoski v. Bruce, 669 F.2d 944 (4th Cir. 1982)

96. Marine Bank v. Weaver, 455 U.S. 551, 102 S. Ct. 1220 (1982)

97. Bd. of Trade v. SEC, 677 F.2d 1137 (7th Cir. 1982), vacated as moot, 459 U.S. 1026 (1982).

98. Golden v. Garafalo, 678 F.2d 1139 (2d Cir. 1982)

99. SEC v. G. Weeks Secur., Inc., 678 F.2d 649 (6th Cir. 1982)

100. SEC v. Aqua-Sonic Prods. Corp., 687 F.2d 577 (2d Cir. 1982)

101. Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459 (3d Cir. 1982)

102. Coward v. Colgate-Palmolive Co., 686 F.2d 1230 (7th Cir. 1982)

103. Gordon v. Terry, 684 F.2d 736 (11th Cir. 1982)

104. Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc., 686 F.2d 818 (9th Cir. 1982)

105. Mordaunt v. Incomco, 686 F.2d 815 (9th Cir. 1982)

106. Seagrave Corp. v. Vista Res., Inc., 696 F.2d 227 (2d Cir. 1982)

107. Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320 (7th Cir. 1983)

108. Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121 (11th Cir. 1983)

109. Odom v. Slavik, 703 F.2d 212 (6th Cir. 1983)

110. Daily v. Morgan, 701 F.2d 496 (5th Cir. 1983)

111. LTV Fed. Credit Union v. UMIC Gov't Sec., Inc., 704 F.2d 199 (5th Cir. 1983)

112. United States v. Jones, 712 F.2d 1316 (9th Cir. 1983)

113. Mayer v. Oil Field Sys. Corp., 721 F.2d 59 (2d Cir. 1983)

114. Siebel v. Scott, 725 F.2d 995 (5th Cir. 1984)

115. Landreth Timber Co. v. Landreth, 731 F.2d 1348 (9th Cir. 1984), rev'd, 105 S. Ct. 2297 (1985)

116. Goodwin v. Elkins Co., 730 F.2d 99 (3d Cir. 1984)

117. SEC v. Prof'l Assocs., 731 F.2d 349 (6th Cir. 1984)

118. Villeneuve v. Advanced Bus. Concepts Corp., 730 F.2d 1403 (11th Cir. 1984)

119. Hart v. Pulte Homes of Mich. Corp., 735 F.2d 1001 (6th Cir. 1984)

120. Ruefenacht v. O'Halloran, 737 F.2d 320 (3d Cir. 1984)

121. Kan. State Bank v. Citizens Bank of Windsor, 737 F.2d 1490 (8th Cir. 1984)

122. Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144 (7th Cir. 1984)

123. Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484 (7th Cir. 1984)

124. Mordaunt v. Incomco, 469 U.S. 1115 (1985)

125. Paulsen v. Commissioner, 469 U.S. 131 (1985)

126. Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985)

127. Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985)

128. S.E.C. v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459 (9th Cir. 1985)

129. Futura Development Corp. v. Centex Corp., 761 F.2d 33 (1st Cir. 1985)

130. San Francisco-Oklahoma Petro. v. Carstan Oil, 765 F.2d 962 (10th Cir. 1985)

131. Phillips v. Kaplus, 764 F.2d 807 (11th Cir. 1985)

132. Underhill v. Royal, 769 F.2d 1426 (9th Cir. 1985)

133. McGill v. American Land Exploration Co., 776 F.2d 923 (10th Cir. 1985)

134. Penturelli v. Spector, Cohen, Gadon Rosen, 779 F.2d 160 (3d Cir. 1985)

135. United States v. Morse, 785 F.2d 771 (9th Cir. 1986)

136. Rodeo v. Gillman, 787 F.2d 1175 (7th Cir. 1986)

137. Less v. Lurie, 789 F.2d 624 (8th Cir. 1986)

138. Youmans v. Simon, 791 F.2d 341 (5th Cir. 1986)*

139. SEC v. Belmont Reid & Co., 794 F.2d 1388 (9th Cir. 1986)

140. Schaafsma v. Morin Vermont Corp., 802 F.2d 629 (2d Cir. 1986)

141. Lopez v. Dean Witter Reynolds, Inc., 805 F.2d 880 (9th Cir. 1986)

142. Deutsch Energy Co. v. Mazur, 813 F.2d 1567 (9th Cir. 1987)

143. Meyer v. Dans un Jardin, S.A., 816 F.2d 533 (10th Cir. 1987)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

144. Albanese v. Florida Nat. Bank of Orlando, 823 F.2d 408 (11th Cir. 1987)
145. Waterman v. Alta Verde Indus., 833 F.2d 1006 (4th Cir. 1987)
146. First Fin. Fed. Sav. & Loan Asso. v. E.F. Hutton Mortg. Corp., 834 F.2d 685 (8th Cir. 1987)
147. Hocking v. Dubois, 839 F.2d 560 (9th Cir. 1988), withdrawn, 885 F.2d 1449 (1989)*
148. Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th Cir. 1988)
149. Buhler v. Audio Leasing Corp., No. 86-4162, 1988 U.S. App. LEXIS 21714 (9th Cir. Feb. 26, 1988)
150. One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988)
151. Stuckey v. Geupel, 854 F.2d 1317 (4th Cir. 1988)
152. Secon Service System v. St. Joseph Bk. Trust, 855 F.2d 406 (7th Cir. 1988)
153. Arthur Young Co. v. Reves, 856 F.2d 52 (8th Cir. 1988), rev'd sub nom. Reves v. Ernst & Young, 494 U.S. 56 (1990)
154. Sparks v. Baxter, 854 F.2d 110 (5th Cir. 1988)
155. Danner v. Himmelfarb, 858 F.2d 515 (9th Cir. 1988)
156. Mace Neufeld Productions, Inc. v. Orion Pictures Corp., 860 F.2d 944 (9th Cir. 1988)
157. Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242 (5th Cir. 1988)
158. Matek v. Murat, 862 F.2d 720 (9th Cir. 1988)
159. Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. 1989)
160. Deckebach v. La Vida Charters, Inc., 867 F.2d 278 (6th Cir. 1989)
161. United States v. Kessi, 868 F.2d 1097 (9th Cir. 1989)
162. Maritan v. Birmingham Properties, 875 F.2d 1451 (10th Cir. 1989)
163. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989)
164. Crawford v. Glenns, Inc., 876 F.2d 507 (5th Cir. 1989)
165. Holloway v. Peat, Marwick, Mitchell Co., 879 F.2d 772 (10th Cir. 1989), vacated & remanded, 494 U.S. 1014 (1990), reaffirmed on reconsideration, 900 F.2d 1485 (10th Cir. 1990), cert. denied following reconsideration on remand, 498 U.S. 958 (1990)

166. Long v. Shultz Cattle Co., Inc., 881 F.2d 129 (5th Cir. 1989)
167. Reeves v. Teuscher, 881 F.2d 1495 (9th Cir. 1989)
168. Shaw v. Hiawatha, Inc., 884 F.2d 582 (9th Cir. 1989)
169. Davis v. Metro Prods., Inc., 885 F.2d 515 (9th Cir. 1989)
170. Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir. 1989)
171. Hocking v. Dubois, 885 F.2d 1449 (9th Cir. 1989)
172. Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385 (6th Cir. 1989)
173. L & B Hosp. Ventures, Inc. v. Healthcare Int'l, Inc., 894 F.2d 150 (5th Cir. 1990)
174. Reves v. Ernst & Young, 494 U.S. 56 (1990)
175. Long v. Shultz Cattle Co., 896 F.2d 85 (5th Cir. 1990)
176. Banghart v. Hollywood Gen. P'ship, 902 F.2d 805 (10th Cir. 1990)
177. Eberhardt v. Waters, 901 F.2d 1578 (11th Cir. 1990)
178. Bailey v. J.W.K. Props., Inc., 904 F.2d 918 (4th Cir. 1990)
179. Boldy v. McConnell's Fine Ice Creams, Inc., 904 F.2d 710 (9th Cir. 1990)
180. First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A., 919 F.2d 510 (9th Cir. 1990)
181. Allison v. Ticor Title Ins. Co., 907 F.2d 645 (7th Cir. 1990)
182. Harman v. Harper, 914 F.2d 262 (9th Cir. 1990)
183. Koch v. Hankins, 928 F.2d 1471 (9th Cir. 1991)
184. Stewart v. Ragland, 934 F.2d 1033 (9th Cir. 1991)
185. Uselton v. Commercial Lovelace Motor Freight, 940 F.2d 564 (10th Cir. 1991)
186. McCoy v. Hilliard, 940 F.2d 660 (6th Cir. 1991)
187. DCD Programs, Ltd. v. Hill, Farrer & Burrill, No. 90-55523, 1991 U.S. App. LEXIS 19723 (9th Cir. Aug. 15, 1991)
188. Klaers v. St. Peter, 942 F.2d 535 (8th Cir. 1991)
189. Zolfaghari v. Sheikholeslami, 943 F.2d 451 (4th Cir. 1991)
190. In re United Energy Corp., 944 F.2d 589 (9th Cir. 1991)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

191. S.E.C. v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125 (9th Cir. 1991)

192. Rice v. Branigar Org., Inc., 922 F.2d 788 (11th Cir. 1991)

193. Guidry v. Bank of LaPlace, 954 F.2d 278 (5th Cir. 1992)

194. S.E.C. v. International Loan Network, Inc., 968 F.2d 1304 (D.C. Cir. 1992)

195. Cty. of Santa Cruz v. Cal. Health Facilities Fin. Auth., No. 91-15309, 1992 U.S. App. LEXIS 18213 (9th Cir. July 30, 1992)

196. Holden v. Hagopian, 978 F.2d 1115 (9th Cir. 1992)

197. Rodriguez v. Banco Cent. Corp., 990 F.2d 7 (1st Cir. 1993)

198. Resolution Trust Corp. v. Stone, 998 F.2d 1534 (10th Cir. 1993)

199. Stone v. Kirk, 8 F.3d 1079 (6th Cir. 1993)

200. Securities & Exchange Commission v. Eurobond Exchange, Ltd., 13 F.3d 1334 (9th Cir. 1994)

201. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994)

202. Wals v. Fox Hills Development Corp., 24 F.3d 1016 (7th Cir. 1994)

203. Pamaco P'ship Mgmt. Corp. v. Enning, 27 F.3d 563 (4th Cir. 1994)

204. Teague v. Bakker, 35 F.3d 978 (4th Cir. 1994)

205. Berry v. Carnaco Transp., 43 F.3d 1478 (9th Cir. 1994)

206. United States v. Brooks, 62 F.3d 1425 (9th Cir. 1995)

207. Webster v. Omnitrition Intern., Inc., 79 F.3d 776 (9th Cir. 1996)

208. Securities Exch. Comm. v. Life Partners, 87 F.3d 536 (D.C. Cir. 1996)

209. Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996)

210. S.E.C. v. Life Partners, 102 F.3d 587 (D.C. Cir. 1996)

211. Cooper v. King, 114 F.3d 1186 (6th Cir. 1997)

212. Steinhardt Grp. v. Citicorp, 126 F.3d 144 (3d Cir. 1997)

213. United States SEC v. Better Life Club of Am., Inc., No. 98-5079, 1999 U.S. App. LEXIS 7319 (D.C. Cir. Mar. 24, 1999)

214. Teague v. Bakker, 139 F.3d 892 (4th Cir. 1998)

215. Matassarin v. Lynch, 174 F.3d 549 (5th Cir. 1999)

216. SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195 (11th Cir. 1999)

217. Great Rivers Cooperative v. Farmland Industries, Inc., 198 F.3d 685 (8th Cir. 1999)

218. Jeanne Piaubert, S.A. v. Sefrioui, 208 F.3d 221 (9th Cir. 2000)

219. Securities & Exchange Commission v. Banner Fund International, 211 F.3d 602 (D.C. Cir. 2000)

220. SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000)

221. Securities & Exchange Commission v. SG Ltd., 265 F.3d 42 (1st Cir. 2001)

222. SEC v. Alliance Leasing Corp., 28 F. App'x 648 (9th Cir. 2002)

223. Securities & Exchange Commission v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002), rev'd sub nom. SEC v. Edwards, 540 U.S. 389 (2004)

224. Robinson v. Glynn, 349 F.3d 166 (4th Cir. 2003)

225. Securities and Ex. Com. v. Rubera, 350 F.3d 1084 (9th Cir. 2003)

226. SEC v. Edwards, 540 U.S. 389 (2004)

227. United States v. Dale, 374 F.3d 321 (5th Cir. 2004), vacated & remanded  543 U.S. 1113 (2005)

228. SEC v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005)

229. S.E.C. v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005)

230. S.E.C. v. Merchant, 483 F.3d 747 (11th Cir. 2007)

231. Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007)

232. S.E.C. v. Ross, 504 F.3d 1130 (9th Cir. 2007)

233. United States v. Leonard, 529 F.3d 83 (2d Cir. 2008)

234. S.E.C. v. U.S., 289 F. App'x 228 (9th Cir. 2008)

235. Warfield v. Alaniz, 569 F.3d 1015 (9th Cir. 2009)

236. Liberty Prop. Tr. v. Republic Props. Corp., 388 U.S. App. D.C. 70, 577 F.3d 335 (2009)

237. Affco Invs. 2001 LLC v. Proskauer Rose L.L.P., 625 F.3d 185 (5th Cir. 2010)

238. Nunez v. Robin, 415 F. App'x 586 (5th Cir. 2011)

239. U.S. v. Wetherald, 636 F.3d 1315 (11th Cir. 2011)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

240. Minn. Lawyers Mut. Ins. Co. v. Ahrens, 432 F. App'x 143 (3d Cir. 2011)

241. Bamert v. Pulte Home Corp., 445 F. App'x 256 (11th Cir. 2011)

242. Alunni v. Dev. Res. Grp., 445 F. App'x 288 (11th Cir. 2011)

243. Nolfi v. Ohio Ky. Oil Corp., 675 F.3d 538 (6th Cir. 2012)

244. United States SEC v. Merklinger, 489 F. App'x 937 (6th Cir. 2012)

245. United States v. Wosotowsky, 527 F. App'x 207 (3d Cir. 2013)

246. United States Securities & Exchange Commission v. Radical Bunny LLC, 532 F. App'x 775 (9th Cir. 2013)

247. Salameh v. Tarsadia Hotel, Corp., 726 F.3d 1124 (9th Cir. 2013)

248. Sec. & Exch. Comm'n v. Thompson, 732 F.3d 1151 (10th Cir. 2013)

249. United States v. Rowzee, 550 F. App'x 452 (9th Cir. 2013)

250. Sec. & Exch. Comm'n v. Shields, 744 F.3d 633 (10th Cir. 2014)

251. Chadbourne & Parke LLP v. Troice, 571 U.S. 377 (2014)

252. Goldberg v. 401 North Wabash Venture LLC, 755 F.3d 456 (7th Cir. 2014)

253. Rossi v. Quarmley, 604 F. App'x 171 (3d Cir. 2015)

254. United States v. McKye, 638 F. App'x 680 (10th Cir. 2015)

255. Iguaçu, Inc. v. Filho, 637 F. App'x 407 (9th Cir. 2016)

256. Keeton v. Flanagan (In re Flanagan), 642 F. App'x 784 (9th Cir. 2016)

257. Ave. Capital Mgmt. II, Ltd. P'ship v. Schaden, 843 F.3d 876 (10th Cir. 2016)

258. Ne. Revenue Servs., LLC v. Maps Indeed, Inc., 685 F. App'x 96 (3d Cir. 2017)

259. U.S. Sec. & Exch. Comm'n v. Schooler, 905 F.3d 1107 (9th Cir. 2018)

260. SEC v. Liu, 754 F. App'x 505 (9th Cir. 2018), vacated and remanded, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020)

261. Sec. & Exch. Comm'n v. Sethi, 910 F.3d 198 (5th Cir. 2018)

262. SEC v. Arcturus Corp., 912 F.3d 786 (5th Cir. 2019), withdrawn, 928 F.3d 400 (2019).

263. SEC v. Scoville, 913 F.3d 1204 (10th Cir. 2019)

264. Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.), 916 F.3d 528 (5th Cir. 2019)

265. Lorenzo v. SEC, 139 S. Ct. 1094 (2019)

266. Masel v. Villarreal, 924 F.3d 734 (5th Cir. 2019)

267. Lampkin v. UBS Fin. Servs., Inc., 925 F.3d 727 (5th Cir. 2019)

268. N. Am. Wellness Ctr. Holdings, LLC v. Temecula Valley Real Estate, Inc., 771 F. App'x 793 (9th Cir. 2019)

269. SEC v. Arcturus Corp., 928 F.3d 400 (5th Cir. 2019)

270. U.S. Sec. & Exch. Comm'n v. Hui Feng, 935 F.3d 721 (9th Cir. 2019)

271. Foxfield Villa Assocs., LLC v. Robben, 967 F.3d 1082 (10th Cir. 2020)

272. Fedance v. Harris, 1 F.4th 1278 (U.S. 11th Cir. 2021)

163

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

In the course of researching for this Article, we reviewed approximately 256 articles, law reviews, and practitioner publications on the subject of investment contracts and the definition of the term "security" under federal securities laws, many of which were not directly cited in this Article.  The following list comprises those articles which we found relevant to our review, grouped in alphabetical order by the first listed author's last name, and separated into two groups: First, scholarship which did not contemplate crypto assets, and second, scholarship which focused on the application of the investment contract doctrine to crypto assets.

---

### Selected Bibliography of Non-Crypto Asset Scholarship

1. Harlan S. Abrahams, Commercial Notes and Definition of "Security" under Securities Exchange Act of 1934: A Note Is a Note Is a Note?, 52 Neb. L. Rev. 478 (1973).

2. Miriam Albert, The Future of Death Futures: Why Viatical Settlements Must be Classified as Securities, 19 Pace L.Rev. 345 (1999).

3. Miriam R. Albert, The Howey Test Turn 64: Are the Courts Grading This Test on A Curve?, William and Mary Business Law Review, volume 2, issue 1 (February 2011).

4. Robin Jackson Allen, Continuing Confusion In The Definition Of A Security: The Sale Of Business Doctrine, Discretionary Trading Accounts, And Oil, Gas And Mineral Interests, 40 Wash. & Lee L. Rev. 1255 (1983).

5. Tom Arnold, The Definition of a Security Under the Federal Securities Law Revisited, 34 Clev. St. L. Rev. 249 (1985).

6. Tom Arnold, "When is a Car a Bicycle?"" and Other Riddles: The Definition of a Security Under the Federal Securities Laws, 33 CLEV. ST. L. REV. 449 (1984).

7. Ian Ayres and Robert Gernter, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, The Yale Law Journal, vol. 99. no. 1 (1989).

8. Lloyd J. Bandy Jr., Securities Regulation--Investment Contracts and the Common Enterprise Requirement--Hirk v. Agri-Research Council, Inc. , 43 MO. L. REV. (1978).

9. Barbara Black, Is Stock a Security? A Criticism of the Sale of Business Doctrine in Securities Fraud Litigation, (1982). Faculty Articles and Other Publications. Paper 74.

10. Jerry C. Bonnett, How Common Is a Common Enterprise, 1974 ARIZ. St. L.J. 339 (1974).

11. Ryan Borneman, Why the Common Enterprise Test Lacks a Common Definition: A Look into the Supreme Court's Decision of SEC v. Edwards, 5 U.C. Davis Bus. L.J. 16 (2005).

12. Christopher L. Borsani, A "Common" Problem: Examining the Need for Common Ground in the "Common Enterprise" Element of the Howey Test. Duq Bus. Law. Journal. Volume 10 (2012).

13. Steven C. Bradford, Crowdfunding and the Federal Securities Laws, Columbia Business Law Review, Vol. 2012, No. 1, (2012).

14. Steven C. Bradford, Shooting the Messenger: The Liability of Crowdfunding Intermediaries for the Fraud of Others, 83 University of Cincinnati Law Review 371 (2015).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

15. Steven C. Bradford, Online Arbitration as a Remedy for Crowdfunding Fraud, 45 Fla. St. U. L. Rev. (2018).

16. Robert B. Brannen Jr., The Economic Realities of Condominium Registration under the Securities Act of 1933,  19 GA. L. Rev. 747, 759 (1985).

17. Douglas M. Branson, Collateral Participant Liability under the Securities Laws - Charting the Proper Course, 65 OR. L. REV. 327 (1986).

18. Douglas M. Branson and Karl Shumpei Okamoto, The Supreme Court's Literalism And The Definition Of "Security" In The State Courts, 50 Wash. & Lee L. Rev. 1043 (1993).

19. Alan R. Bromberg, Are There Limits to Rule 10b-5?, 29 Bus. LAW. 167 (1974).

20. Chris Brummer, How International Financial Law Works (and How it Doesn't), 99 Geo. L.J. 257 (2011).

21. Naran Uchur Burchinow, Liabilities of Lead Banks in Syndicated Loans under the Securities Acts, 58 B.U. L. REV. 45 (1978).

22. William J. Carney & Barbara G. Fraser, Defining a Security: Georgia's Struggle with the Risk Capital Test, 30 EMORY L. J. 73 (1981).

23. William J. Carney, Defining a Security: The Addition of a Market-Oriented Contextual Approach to Investment Contract Analysis, 33 EMORY L. J. 311 (1984).

24. Woodward L. Carter Jr., Bank Loans and Bank Credit Agreements: Federal Securities Laws Status, 93 BANKING L.J. 1020 (1976).

25. William L. Case II. and Jack D. Jester, Securities Regulation of Interstate Land Sales and Real Estate Development - A Blue Sky Administrator's Viewpoint: Part I, 7 URB. LAW. 215 (1975).

26. William L. Case II. and Jack D. Jester, Securities Regulation of Interstate Land Sales and Real Estate Development - A Blue Sky Administrator's Viewpoint: Part II, 7 URB. LAW. 385 (1975).

27. Eric C. Chaffee, Securities Regulation in Virtual Space, 74 Wash. & Lee L. Rev. 1387 (2017).

28. Williamson B.C. Chang, Meaning, Reference, and Reification in the Definition of a Security, U.C. Davis. Vol. 19:403 (1986).

29. Eric A. Chiappinelli, Reinventing A Sec urity: Arguments For A Public Interest Definition, 49 Wash. & Lee L. Rev. 957 (1992).

30. Glenn Willett Clark, Genealogy and Genetics of Contract of Sale of a Commodity for Future Delivery in the Commodity Exchange Act, 27 Emory L. J. 1175 (1978)

31. Cochran, Dare to be Great, Inc.!: A Case Study of Pyramid Sales Plan Regulation, 33 Ohio St. L.J. 676 (1972).

32. John C. Cody, The Dysfunctional "Family Resemblance" Test: After Reves v. Ernst & Young, When Are Mortgage Notes "Securities"?, 42 Buff. L. Rev. 761 (1994).

33. John C. Coffee Jr., The Rise of Dispersed Ownership: The Role of Law in the Separation of Ownership and Control, YALE LAW JOURNAL, VOL. 111, P. 1, 2001; COLUMBIA LAW & ECONOMICS WORKING PAPER NO. 182 (2000).

34. John C. Coffee Jr., Market Failure and the Economic Case for a Mandatory Disclosure System, 70 VA. L. REV. 717 (1984).

35. Ronald J. Coffey and James d'A. Welch, Federal Regulation of Land Sales: Full Disclosure Comes Down to Earth, 21 Case W. Res. L. Rev. 5 (1969).

36. Ronald J. Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 W. RES. L. Rev. 367 (1967).

37. Manuel F. Cohen, Federal Legislation Affecting the Public Offering of

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

Securities, 28 GEO. Wash. L. REV. 119 (1959).

38. Manuel F. Cohen & Robert C. Hacker, Applicability of the Investment Company Act of 1940 to Real Estate Syndications, 36 OHIO St. L.J. 482 (1975).

39. Stuart R. Cohn, Keep Securities Reform Moving: Eliminate the SEC's Integration Doctrine, 44 Hofstra L. Rev. 3 (2015).

40. J. Thomas Cookson, Loan Participation Agreements as Securities: Judicial Interpretations of the Securities Act of 1933 and the Securities Exchange Act of 1934, 24 Wm. & Mary L. Rev. 295 (1983).

41. Patrick M. Creaven, Inside Outside Leave Me Alone: Domestic and Ec Motivated Reform in the UK Securities Industry, 60 FORDHAM L. REV. S285 (1992).

42. Kenneth D. Crews, Real Estate As Securities: Sales of Residential Subdivision Lots, 1979 Wash. U. L. Q. 0965 (1979).

43. Leslie J. Crocker, Investment Contracts under Federal and State Law, 17 W. Rsrv. L. Rev. 1108 (1966).

44. Timothy P. Davis, Should Viatical Settlements be Considered Securities under the 1933 Securities Act, 6 KAN. J.L. & PUB. POL'y 75 (1996).

45. William B. Dawson, Securities Regulation - A Promissory Note Evidencing Commercial Indebtedness Is Not a Security Nor Is Its Issuance a Purchase or Sale within the Meaning of the Securities Exchange Act of 1934, 5 TEX. TECH L. REV. 200 (1973).

46. Leonard J. De Pasquale, Helping to Ameliorate the Doctrine of Caveat Emptor in the Securities Market: Reves v. Ernst & (and) Young, 26 NEW ENG. L. REV. 893 (1992).

47. John Deacon and James D. Prendergast, Defining a" Security" after the Forman Decision, 11 Pac. L. J. 213 (1980).

48. C. Drew DeMaray, When Is A Security Not A Security? Promissory Notes, Loan Participations, And Stock In Close Corporations, 39 Wash. & Lee L. Rev. 1123 (1982).

49. Reza Dibadj, Reconceiving the Firm, 26 Cardozo Law Review 1459 (2005).

50. Reza Dibadj, Crowdfunding Delusions, 12 Hastings Bus. L.J. 15 (2015).

51. Reza Dibadj, Disclosure as Delaware's New Frontier, Hastings Law Journal (2019).

52. William O. Douglas & George E. Bates, The Federal Securities Act of 1933, 43 YALE L.J. 171 (1933).

53. Nathan W. Drage, Are Limited Partnership Interests Securities? A Different Conclusion under the California Limited Partnership Act, 18 Pac. L. J. 125 (1986).

54. Stephen J. Easley, Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional Context-Based Analysis for Federal Securities Jurisdiction, 39 Bus. LAW. 929 (1984).

55. Frank H. Easterbrook & Daniel R. Fischel, "Mandatory Disclosure and the Protection of Investors," 70 Virginia Law Review 669 (1984).

56. Alan L. Feld, The Control Test for Limited Partnerships, 82 HARV. L. REV. 1471 (1969).

57. Allen Ferrell, The Case for Mandatory Disclosure In Securities Regulation Around the World, 2 Brook. J. Corp. Fin. & Com. L. (2007).

58. FitzGibbon, "What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets", 64 Minn. L. Rev. 893 (1980).

59. Bernard Forseter, Rule 10b-5 Violations in the Ninth Circuit: I Know It When I See It, 30 Bus. LAW. 773 (1975).

60. Merritt B. Fox, Regulating Public Offerings of Truly New Securities: First Principles, 66 Duke L.J. 673 (2016).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

61. Merritt B. Fox, Lawrence R. Glosten & Gabriel V. Rauterberg, Stock Market Manipulation and Its Regulation, 35 Yale J. on Reg (2018).

62. Philip F. Franklin, Note, Definition of a Security: Landreth Timber Co. v. Landreth, 40 Sw L.J. 879 (1986).

63. Thomas Roe II Frazer, Catch-All Investment Contracts: The Enomomic Realities Otherwise Require, 14 CUMB. L. REV. 135 (1983).

64. Douglas M. Fried, General Partnership Interests as Securities Under the Federal Securities Laws: Substance over Form, 54 Fordham L. Rev. 303 (1985).

65. Renee M. Friedman, Regulation of Interstate Land Sales: Is Full Disclosure Sufficient?, 20 Urb. L. Ann. 137 (1980).

66. Theresa A. Gabaldon, A Sense of a Security: An Empirical Study, 25 J. CORP. L. 307 (2000).

67. David J. Gilberg, Regulation of New Financial Instruments Under the Federal Securities and Commodities Laws, 39 Vanderbilt Law Review 1599 (1986).

68. Ronald J. Gilson, Engineering a Venture Capital Market: Lessons from the American Experience, 55 STAN. L. REV. 1067 (2003).

69. Carol R. Goforth, Why Limited Liability Company Membership Interests Should Not be Treated as Securities and Possible Steps to Encourage this Result, 45 Hastings L.J. 1223 (1994).

70. James D. Gordon III, Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes, Colum. Bus. L. Rev. 635 (1988).

71. James D. Gordon III, Essay: Interplanetary Intelligence About Promissory Notes as Securities, 69 Tex. L. Rev. 383 (1990).

72. Zohar Goshen & Gideon Parchomovsky, The Essential Role of Securities Regulation, 55 Duke Law Journal 711-782 (2006).

73. Matthew W. Goulding, Making It Easier to Milk the Cow: The Southern District of New York Collapses the Culpable Participation Doctrine and Sidesteps the Private Securities Litigation Reform Act, 49 Vill. L. Rev. 551 (2004).

74. Joseph M. Green,  John F. Coyle, Crowdfunding and the Not-So-Safe SAFE, 102 Virginia Law Review Online 168 (2016).

75. Kevin S. Haeberle and M. Todd Henderson, Making a Market for Corporate Disclosure, 35 Yale J. on Reg. (2018).

76. Thomas A. Halleran and John N. Calderwood, Effect of Federal Regulation on Distribution of and Trading in Securities, 28 GEO. Wash. L. REV. 86 (1959).

77. Harold D. Hammett, Any Promissory Note: The Obscene Security-A Search for the Non-Commercial Investment, 7 Tex. Tech L. Rev. 25 (1975-1976).

78. Kenneth V.  Handal, The Commercial Paper Market and the Securities Acts, The University of Chicago Law Review, vol. 39, no. 2, (1972).

79. J. Thomas Hannan and William E. Thomas, "The Importance of Economic Reality and Risk in Defining Federal Securities", 25 Hastings L.J. 219 (1974)"

80. Thomas L. Hazen, Taking Stock of Stock and the Sale of Closely Held Corporations: When Is Stock Not a Security, 61 N.C. L. Rev. 393 (1983).

81. Joan MacLeod Heminway, Selling Crowdfunded Equity: A New Frontier, 70 OKLA. L. REV. 189 (2017).

82. JW Hicks, Commercial Paper: An Exempted Security Under Section 3 (a) (3) of the Securities Act of 1933, (1976).

83. B.L. Hoisington, Condominiums and the Corporate Securities Law, 14 Hastings L.J. 241 (1963).

84. M.E. Hughes Jr, William J. Howey and His Florida Dreams, Florida Historical

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

Quarterly: Vol. 66: No. 3, Article 3. (1987).

85. Robert S. Hunt and Madame El Khadem, The Ninth Circuit, and the Risk Capital Approach, 57 OR. L. REV. 3 (1977).

86. Christine Hurt, Pricing Disintermediation: Crowdfunding and Online Auction IPOs, ILL. L. REV. 217 (2015).

87. Darian M. Ibrahim, Crowdfunding Signals, 53 Ga. L. Rev. 197 (2019).

88. Benjamin F. Jackson, Danger Lurking in the Shadows: Why Regulators Lack the Authority to Effectively Fight Contagion in the Shadow Banking System, 127 Harv. L. Rev. 729 (2013).

89. David S. Jeans, Country Club Memberships: Are They Securities under the Federal Securities Laws, 26 U. KAN. L. REV. 439 (1978).

90. Bradley D. Johnson, Discretionary Commodity Accounts as Securities: An Application of the Howey Test, 53 Fordham L. Rev. 639 (1984).

91. Ronald A. Johnston, The Interstate Land Sales Full Disclosure Act: An Analysis of Administrative Policies Implemented in the Years 1968-1975, 26 CATH. U. L. REV. 348 (1977).

92. Stephen Jurman, Bank Loan Participations as Securities: Notes, Investment Contracts, and the Commercial/Investment Dichotomy, 15 DUQ. L. REV. 261 (1976).

93. George D. Kappus Jr., The Franchise as a Security: Application of the Securities Laws to Owner-Operated Franchises, 11 B.C. Indus. & COM. L. REV. 228 (1970).

94. Elisabeth Keller, Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934, Ohio State Law Journal 49 (1988).

95. Edmund H. Kerr, The Inadvertent Investment Company: Section 3(a)(3) of the Investment Company Act, 12 Stan. L. REV. 29 (1959).

96. Janet Kerr and Karen M. Eisenhauer, Reves Revisited, 19 Pepp. L. Rev. Iss. 3 (1992).

97. Michael S. Knoll, The Ancient Roots of Modern Financial Innovation: The Early History of Regulatory Arbitrage, 87 OR. L. REV. 93 (2008).

98. Anzhela Knyazeva, Regulation A+: What Do We Know So Far?, SEC, Staff White Paper, Dec. 7, 2016.

99. Arthur B Laby, The Definition of 'Security' Under the Federal Securities Laws, Research Handbook on Securities Regulation in the United States (2014).

100. James M. Landis, Legislative History of the Securities Act of 1933, 28 GEO. Wash. L. REV. 29 (1959).

101. Patricia Hureston Lee, Access to Capital or Just More Blues? Issuer Decision-Making Post SEC Crowdfunding Regulation, Tenn. J. Bus. L. 19 (2016).

102. Mark A. Lemley and Nathan Myhrvold, How to Make a Patent Market, 36 Hofstra L. REV. 257 (2007)

103. Martin Lipton and George A. Katz, Notes are (are Not) Always Securities - A Review, 29 Bus. LAW. 861 (1974).

104. Joseph C. Long, An Attempt to Return Investment Contracts to the Mainstream of Securities Regulation, 24 OKLA. L. REV. 135 (1971)

105. Joseph C. Long, Partnership, Limited Partnership, and Joint Venture Interests As Securities, 37 MO. L. REV. (1972).

106. Joseph C. Long, Don't Forget the Securities Acts, 26 OKLA. L. REV. 160 (1973).

107. Louis Loss, Joel Seligman & Troy Parades, "Securities Regulation" (Internet Ed.)

108. Lewis D. Lowenfels and Alan R. Bromberg, What Is a Security under

168

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

the Federal Securities Laws, 56 ALB. L. REV. 473 (1993).

109.     M.A.L., International Loan Syndications, The Securities Acts, and the Duties of a Lead Bank, 64 Va. L. REV. 897 (1978).

110.     Michael C. Macchiarola, Securities Linked To The Performance of Tiger Woods? Not Such A Long Shot, 42 Creighton L. Rev. 29 (2008-2009).

111.     Jonathan Macey and Hideki Kanda, Stock Exchange as a Firm: The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges , 75 Cornell L. Rev. 1006 (1990).

112.     Jonathan R. Macey and Geoffrey P. Miller, Article: Orgin of Blue Sky Laws, Texas L.R. Vol 70, No. 2 (1991).

113.     Lawrence G. Mackowiak, Securities Regulation--Securities Covered--Shares in Cooperative Housing Corporation as Securities under the Federal Securities Acts, 26 Case W. Res. L. Rev. 735 (1976).

114.     Michael P. Malloy, The Definition of Security: Marine Bank v. Weaver, 24 B.C. L. Rev. 1053 (1983).

115.     Corey Matthews, Using a Hybrid Securities Test to Tackle the Problem of Pyramid Fraud, 88 Fordham L. Rev. 2045 (2020).

116.     Therese H. Maynard, What is an Exchange--Proprietary Electronic Securities Trading Systems and the Statutory Definition of an Exchange, 49 Wash. & LEE L. REV. 833 (1992).

117.     Frederick H. C. Mazando, The Taxonomy of Global Securities: is the U.S. Definition of a Security too Broad?, 33 Nw. J. Int'l L. & Bus. 121 (2012).

118.     Thaddeus A. Mazurek Jr., Securities: Defining Investment Contracts - Alternatives for Arizona, 1984 ARIZ. St. L.J. 489 (1984).

119.     Park McGinty, What is a Security?, 3 WIS. L. REV. 1033, 1035 (1993).

120.     Donald E. Miehls, The Applicability of the Federal Securities Law to Transfers of Stock Appurtenant to the Sale of a Business--The Golden Opportunity Lost: Golden v. Garafalo, St Johns Law Rev Vol 57 (1983).

121.     Walter H. Miller Jr., Cooperative Apartments: Real Estate or Securities, 45 B.U. L. REV. 465 (1965).

122.     James S. Mofsky, Some Comments on the Expanding Definition of "Security", 27 U. Miami L. Rev. 395 (1973).

123.     Maura K. Monaghan, An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis, 63 Fordham L. Rev. 2135 (1995).

124.     Rodney L. Moore, Defining An "Investment Contract": The Commonality Requirement Of The Howey Test, 43 Wash. & Lee L. Rev. 1057 (1986).

125.     Marc H. Morgenstern, Real Estate Joint Venture Interests as Securities: The Implications of Williamson v. Tucker, 59 Wash. U. L. Q. 1231 (1982).

126.     Susan K. Mosich, The Qualification of Loan Participations as Securities - The Potential for Lead Bank Liability under Rule 10B-5 and Section 12(2): An Impact with International Ramifications, 8 CAL. W. INT'L.J. 510 (1978).

127.     Aidan D. Mulry, A True Sense of Security: How Kirschner v. J.P. Morgan Chase Illustrates the Failings of the Reves Family-Resemblance Test and the Need to Recognize Some Syndicated Loans as Securities for the Sake of the Financial System, 87 Brook. L. Rev. 979 (2022).

169

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

128.    Robert H. Mundheim and Gordon D. Henderson, Applicability of the Federal Securities Laws to Pension and Profit-Sharing Plans, 29 LAW & CONTEMP. Probs. 795 (1964).

129.    Craig W. Murray, Definition of a Security: Long-Term Promissory Notes, 35 La. L. Rev. (1975).

130.    John B. Nesbitt, Bank Loan Participations: The Affirmative Duty to Disclose under SEC Rule 10b-5, 27 Syracuse L. REV. 807 (1976).

131.    William H. Newton II., What Is a Security: A Critical Analysis, 48 Miss. L.J. 167 (1977).

132.    William J. Ohle, Hocking v. Dubois: The Ninth Circuit Finds a Security in the Secondary Resort Condominium Market, 27 Willamette L. Rev. 147 (1991).

133.    Seth C. Oranburg, Democratizing Startups, 68 Rutgers U. L. Rev. 1013 (2015).

134.    Lawrence Page, Even after Reves, Securities Do Not Have Families: Returning to Economic and Legal Realities through a Connotative Definition of a Security, 1992 U. ILL. L. REV. 249 (1992).

135.    Sergio Pareja, Sales Gone Wild: Will the FTC's Business Opportunity Rule Put an End to Pyramid Marketing Schemes?, 39 McGeorge Law Review 83 (2008).

136.    James J. Park, The Competing Paradigms of Securities Regulation, 57 Duke Law Journal 625-689 (2007).

137.    James J. Park, Rule 10b-5 and the Rise of the Unjust Enrichment Principle, 60 Duke Law Journal 345-409 (2010).

138.    James J. Park, Rules, Principles, and the Competition to Enforce the Securities Laws, 100 Cal. L. Rev. 115, 159 (2012).

139.    Janet G. Perelson, State Securities Law: A Valuable Tool for Regulating Investment Land Sales, 7 N.M. L. REV. 265 (1977).

140.    Robert Pitofsky, Beyond Nader: Consumer Protection and the Regulation of Advertising, 90 Harv. L. Rev. 661 (1977).

141.    Eric Posner, There Are No Penalty Default Rules in Contract Law, 33 Fla. St. U. L. Rev. 563 (2006).

142.    Cheryl B. Preston and Eli W. McCann, Unwrapping Shrinkwraps, Clickwraps, and Browsewraps: How the Law Went Wrong from Horse Traders to the Law of the Horse, 26 BYU J. Pub. L. 1 (2011).

143.    Randall W. Quinn and Paul Gonson, Development of the Securities Law in the Supreme Court: The Definition of Security and the Implication of Private Rights of Action, 35 HOWARD L.J. 319 (1992).

144.    Curtis R. Reitz, Reflections on the Drafting of the 1944 Revision of Article 8 of the US Uniform Commercial Code, 10 UNIF. L. REV. n.s. 357 (2005).

145.    Larry E. Ribstein, Form and Substance in the Definition of a "Security": The Case of Limited Liability Companies, 51 Wash. & Lee L. Rev. 807 (1994).

146.    Larry E. Ribstein, Private Ordering and the Securities Laws: The Case of General Partnerships, 42 Case W. Res. L. Rev. 1 (1992)

147.    David Rich, Betting the Farm: The TIC Turf War and Why TICs Constitute Investment Contracts Under Federal Securities Laws, 1 Wm. & Mary Bus. L. Rev. 451 (2010).

148.    Morgan Ricks, A Regulatory Design for Monetary Stability, 65 VAND. L. REV. 1287 (2012).

149.    Michael Risch, Patent Portfolios as Securities, 63 Duke Law Journal 89-154 (2013).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

150. Anne P. Ritchey, "A Definition of 'Investment Contracts' and Equitable Defenses to Suit for Rescission for Nonregistration under the Arkansas Securities Act, 1 U. ARK. LITTLE ROCK L. REV. 366 (1978)

151. Usha Rodrigues, Entity and Identity, 60 Emory L.J. 1257 (2011).

152. Usha Rodrigues, Securities Law's Dirty Little Secret , 81 Fordham L. Rev. 3389 (2013).

153. Margaret V. Sachs, Judge Friendly and the Law of Securities Regulation: The Creation of a Judicial Reputation (1997).

154. Mark A. Sargent, Are Limited Liability Company Interests Securities?, 19 Pepp. L. Rev. Iss. 3 (1992).

155. Dennis Scholl & Ronald L. Weaver, Loan Participations: Are They Securities, 10 FLA. St. U. L. REV. 215 (1982).

156. Jeanne L. Schroeder, Is Article 8 Finally Ready This Time: The Radical Reform of Secured Lending on Wall Street, COLUM. Bus. L. REV. 291 (1994).

157. Andrew A. Schwartz, Article: The Digital Shareholder, 100 Minn. L. Rev. 609 (2015).

158. Irving P. Seldin, When Stock Is Not a Security: The Sale of Business Doctrine under the Federal Securities Laws, 37 Bus. LAW. 637 (1982).

159. Jerome M. Selvers, Investment Contracts: Expanding Effective Securities Regulation, 48 St. John's L. Rev. 525 (1973-1974)

160. Ronald M. Shapiro, The Expanding Definition of a Security (Or Scotch Whisky Isn't Always Scotch Whisky), 61 A.B.A. J. 1504 (1975).

161. Jonathan E. Shook, The Common Enterprise Test: Getting Horizontal or Going Vertical in Wals v. Fox Hills Development Corp., 30 Tulsa L. J. 727 (2013).

162. H. Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 239 (1933).

163. John G. Sobieski, What is a Security?, 25 MERCER L. REV. 381 (1974).

164. Edward Sonnenschein Jr., Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus. LAW. 1567 (1980).

165. Travis Stegemoller, Refocusing Commonality: An Economic Approach that Shares Something in Common with Howey, 46 Val. U. L. Rev. 657 (2012).

166. Marc I. Steinberg and William E. Kaulbach, The Supreme Court and the Definition of "Security": The "Context" Clause, "Investment Contract" Analysis, and Their Ramifications, 40 Vand. L. Rev. 489 (1987).

167. Marc I. Steinberg, Notes as Securities: Reves and Its Implications, 51 Ohio St. L.J. 675 (1990).

168. Mark I. Steinberg and Karen L. Conway, The Limited Liability Company as a Security, 19 Pepp. L. Rev. Iss. 3 (1992).

169. Michael E. Stevenson and John J. O'Leary, III, Definition of a Security: Risk Capital and Investment Contracts in Washington, 3 SEATTLE U. L. REV. 83 (1979).

170. Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 HARV. L. REV. 405 (1989).

171. Jeffrey Allen Tew and David Freedman, In Support of SEC v. W.J. Howey Co.: A Critical Analysis of the Parameters of the Economic Relationship Between an Issuer of Securities and the Securities Purchaser, 27 U. Miami L. Rev. 407 (1973).

172. Steve Thel and Harvey E. Bines, Investment Management Arrangements and the Federal Securities Laws, 58 Ohio St. L. J. 459 (1997-1998).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

173.	Robert B. Thompson, The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction, 57 N.Y.U. L. REV. 225 (1982).

174.	The Expanding Definition of Security: Sale-Leasebacks and Other Commercial Leasing Arrangements, 1972 DUKE L.J. 1221 (1972).

175.	Interstate Land Sales Regulations, 1974 Wash. U. L. Q. 123 (1974).

176.	Cooperative Housing Corporations and the Federal Securities Laws, 71 COLUM. L. REV.118 (1971).

177.	Cooperative Apartments and the UCC, 29 Wash. & Lee L. Rev. 189 (1972).

178.	Stuart J. Vogelsmeier, Evaluating Bank Commercial Paper Placement Activity Under the Glass-Steagall Act, 65 WASH. U. L. Q. 615 (1987).

179.	Manning Gilbert Warren III, The Treatment of Reves "Notes" and Other "Securities" under State Blue Sky Laws, The Business Lawyer Vol. 47, No. 1 (November 1991).

180.	William C. Whitford, The Functions of Disclosure Regulation in Consumer Transactions, 1973 Wis. L. REV. 400 (1973).

181.	Gene H. Williams, The Continued Demise of the Howey Test: The Supreme Court Adopts the Family Resemblance Test for Identifying Notes as Securities, 20 Stetson L. REV. 613 (1991).

182.	Jack Wroldsen, Crowdfunding Investment Contracts, 11 Virginia Law & Business Review 543 (2017).

183.	John S. Zieser, Security Under the Glass-Steagall Act: Analyzing the Supreme Court's Framework for Determining Permissible Bank Activity , 70 CORNELL L. REV. 1194 (1984-1985).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

**Selected Bibliography of Crypto Asset Scholarship**

1. Digital and Digitized Assets: Federal and State Jurisdictional Issues, ABA (Dec. 2020).
2. Miriam Albert & J. Scott Colesanti, Cryptocurrency Meets Bankruptcy Law: A Call for Creditor Status for Investors in Initial Coin Offerings, 36 GA. ST. U. L. REV. (2020).
3. Shlomit Azgad-Tromer, Crypto Securities: On the Risks of Investments in Blockchain-Based Assets and the Dilemmas of Securities Regulation, 68 AM. U. L. REV. 69 (2018).
4. Andrew Bull and Tyler Harttraf, Article: Cryptocurrency and Blockchain Law: SEC's Heightened Enforcement Against Digital Assets, 27 Rich. J.L. & Tech. 1 (2021).
5. Lewis R. Cohen, "Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens", WAYNE LAW REVIEW, Vol. 65, No. 1, (2019).
6. Shaanan Cohney et al., Coin-Operated Capitalism, 119 Colum. L. Rev. 591, 595-98 (2019).
7. J. Scott Colesanti, Article: Sorry, They Were on Mute: The SEC's "Token Porposal 2.0" as Blueprint for Regulatory to Cryptocurrency, 3 Corp. & Bus. L.J. (2022).
8. Nate Crosser, Comment, Initial Coin Offerings as Investment Contracts: Are Blockchain Utility Tokens Securities?, 67 U. KAN. L. REV. 379 (2018).
9. Primavera De Filippi & Aaron Wright, Blockchain and the Law: The Rule of Code (2018)
10. Marco Dell'Erba, Note, Initial Coin Offerings: The Response of Regulatory Authorities, 14 N.Y.U. J.L. & BUS. 1107 (2018).
11. Georgios Dimitropoulos, The Law of Blockchain, 95 Wash. L. Rev. 1117 (2020).
12. Quinn DuPont, Ledgers and Law in the Blockchain, King's Review, June 23, 2015.
13. Daniel Dupuis, Deborah Smith, Kimberly Gleason, Old Frauds with a New Sauce: Digital Assets and Space Transition, Journal of Financial Crime, December 14, 2021.
14. Douglas S. Eakeley et al. Article: Crypto-Enforcement Around the World, 94 S. Cal. L. Rev. Postscript 99 (2021).
15. Nareg Essaghoolian, Comment, Initial Coin Offerings: Emerging Technology's Fundraising Innovation, 66 UCLA L. REV. 294 (2019).
16. Carol R. Goforth, ARTICLE: Cinderella's Slipper: A Better Approach to Regulating Cryptoassets as Securities, 17 Hastings Bus. L.J. 271 (2021).
17. Carol R. Goforth, Article: SEC v. Telegram: A Global Message, 52 U. Mem. L. Rev 199 (2021).
18. Carol Goforth, Neither a Borrower nor a Lender Be* – Analyzing the SEC's Reaction to Crypto Lending, 18 U. Mass L. Rev. ___ (2023) (forthcoming).
19. Gary B. Gorton, and Jeffery Zhang, Taming Wildcat Stablecoins University of Chicago Law Review, Vol. 90, Forthcoming.
20. James Grimmelmann, Article: All Smart Contracts are Ambiguous, 2 J.L. & Innovations 1 (2019).
21. Reuben Grinberg, Bitcoin: An Innovative Alternative Digital Currency, 4 HASTINGS SCI. & TECH. L. J. 159 (2012).
22. Yuliya Guseva, A Conceptual Framework for Digital-Asset Securities: Tokens and Coins as Debt and Equity, 80 Md. L. Rev. 166 (2021).
23. Yuliya Guseva, Article: The SEC, Digital Assets, and Game Theory, 46 Iowa J. Corp. L. 629 (2021).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

24. Yuliya Guseva, Article: When the Means Undermine the End: The Leviathan of Securities Law and Enforcement in Digital-Asset Markets, 5 Stan J. Blockchain L. & Pol'y 1 (2022).

25. Thomas L. Hazen, Tulips, Oranges, Worms, and Coins -- Virtual, Digital, or Crypto Currency and the Securities Laws, 20 N.C. J.L. & TECH. 493 (2019).

26. M. Todd Henderson and Max Raskin, A Regulatory Classification of Digital Assets: Toward an Operation Howey Test for Cryptocurrencies, ICOs, and Other Digital Assets, Colum. Bus. L. Rev. 433 (2019).

27. Jacqueline Hennelly, "The Cryptic Nature of Crypto Digital Assets Regulations: The Ripple Lawsuit and Why the Industry Needs Regulatory Clarity", 27 Fordham J. Corp. & Fin. L. 259 (2022).

28. Justin Henning, "The Howey Test: Are Crypto-Assets Investment Contracts?", 27 U. Miami Bus. L. Rev. 51 (2018).

29. Kristin N. Johnson, Article: Decentralized Finance: Regulating Cryptocurrency Exchanges, 62 Wm. & Mary L. Rev. 1911 (2021).

30. Lindsay Sain Jones, Article: Beyond the Hype: A Practical Approach to CryptoReg, 25 Va. J.L. & Tech. 175 (2022).

31. Josh Kamps & Bennett Kleinberg, "To the Moon: Defining and Detecting Cryptocurrency Pump-and-Dumps", Crime Science, Volume 7, Article number: 18 (2018).

32. Patricia H. Lee, Crowdfunding Capital in the Age of Blockchain-Based Tokens, 92 St. John's L. Rev. 833 (2018).

33. Stuart D. Levi & Alex B. Lipton, An Introduction to Smart Contracts and Their Potential and Inherent Limitations, Skadden (May 7, 2018).

34. H. M. Liu, , "Why do People Invest in Initial Coin Offerings (ICOs)?," Joseph Wharton Scholars (2019).

35. William Magnuson, Financial Regulation in the Bitcoin Era, 23 STAN. J.L. BUS. & FIN. 159 (2018).

36. Michael Mendelson, From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis, 22 STAN. TECH. L. REV. 52 (2019).

37. Joel Monegro, Stop Burning Tokens - Buyback and Make Instead, Placeholder VC (Sept 1. 2020).

38. Joseph D. Moran, Comment, The Impact of Regulatory Measures Imposed on Initial Coin Offerings in the United States Market Economy, 26 CATH. U.J.L. & TECH. 7 (2018).

39. Michael J. O'Connor, Overreaching its Mandate?  Considering the SEC's Authority to Regulate Cryptocurrency Exchanges, 11 Drexel L. Rev. 539 (2019).

40. Moran Ofir and Ido Sadeh, "ICO vs. IPO: Empirical Findings, Information Asymmetry, and the Appropriate Regulatory Framework", 53 Vanderbilt Law Review 525 (2021).

41. Ori Oren, Note, ICO's, DAO's, and the SEC: A Partnership Solution, 2018 COLUM. BUS. L. REV. 617 (2018).

42. Troy A. Paredes & Scott H. Kimpel, From Orange Groves to Cryptocurrency: How Will the SEC Apply Longstanding Tests to New Technologies?, Hunton Andrews Kurth, (March 29, 2019).

43. James J. Park, When Are Tokens Securities? Some Questions from the Perplexed, Lowell Milken Institute Policy Report (Dec. 2018).

44. James J. Park and Howard H. Park, Regulation by Selective Enforcement: The SEC and Initial Coin Offerings, 61 Wash. U. J. L. & Pol'y 099 (2020).

45. James J. Park, The Rise of Fintech: Regulation by Selective Enforcement:

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

The SEC and Initial Coin Offerings, 61 Wash. U. J.L. & Pol'y 99 (2020).

46. Jay Preston, Note, Initial Coin Offerings: Innovation, Democratization and the SEC, 16 DUKE L. & TECH. REV. 318 (2018).

47. Lee Reiners, Cryptocurrency and the State: An Unholy Alliance, 30 S. CAL. INTERDISC. L.J. 695 (2021).

48. Carla L. Reyes, (Un)Corporate Crypto-Governance, 2021 RUSS. J. ECON. & L. 135 (2021).

49. Lachlan Robb et al., The Blockchain Conundrum: Humans, Community Regulation and Chains, 13 L. INNOVATION & TECH. 355 (2021).

50. Randolph A. Robinson II, The New Digital Wild West: Regulating the Explosion of Initial Coin Offerings, 85 Tenn. L. Rev. 897 (2018).

51. Usha Rodrigues, "Semi-Public Offerings? Pushing the Boundaries of Securities Law" (2018).

52. Usha Rodrigues, Law and the Blockchain , 104 Iowa L. Rev. 679 (2018).

53. Usha Rodrigues, Financial Contracting with the Crowd, 69 Emory L. J. 397 (2019).

54. Usha Rodrigues, Embrace the SEC, 61 Wash. U. J. L. & Pol'y 133 (2020).

55. Jonathan Rohr and Aaron Wright, Blockchain-Based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets, 70 HASTINGS L.J. 463 (2019).

56. Sonija Šafro, Regulation of security tokens as financial instruments in the EU: is there a need for amendments?, Riga Graduate School of Law (2022)

57. Darren J. Sandler, Citrus Groves in the Cloud: Is Cryptocurrency Cloud Mining a Security?, 34 SANTA CLARA HIGH TECH. L.J. 250 (2018).

58. Rodrigo Seira et al. Ethereum's New 'Staking' Model Does Not Make ETH A Security, Paradigm (2022)

59. Gabriel Shapiro, Debunking Securities Law Myths About Tokens, Lexnode.Substack (Sept 6. 2020).

60. Gabriel Shapiro, Why YFI Are Not Investment Contracts , Lexnode.Substack (Oct 18. 2020).

61. Gabriel Shapiro, How SEC vs. Ripple Stems from an Age-Old Philosophical Debate, Lexnode.Substack (May 10. 2021).

62. Gabriel Shapiro, SEC v. Telegram— Three Deeper Takeaways, MEDIUM (May 21, 2020).

63. Nathan J. Sherman, Note, A Behavioral Economics Approach to Regulating Initial Coin Offerings, 107 GEO. L.J. ONLINE 17 (2018).

64. Carol W. Sherman, What to Expect from New SEC Chair Gary Gensler on Cryptocurrency, 138 BANKING L.J. 502 (2021).

65. Christian Smith-Bishop, "A Ripple-Turned-Tidal Wave: SEC v. Ripple Labs as an Inflection Point in the Regulatory Approach to Innovation in Complex Systems", 44 CAMPBELL L. REV. 335 (2022).

66. Ximeng Tang, Seventy Years After Howey: An Overview of the SEC's Developing Jurisdiction over Digital Assets, ABA BUS. L. TODAY (Oct. 12, 2018).

67. Benjamin Van Adrichem, Howey Should be Distributing New Cryptocurrencies: Applying the Howey Test to Mining, Airdropping, Forking, and Initial Coin Offerings, 20 COLUM. SCI. & TECH. L. REV. 388, 399 (2019).

68. Alfonso Osorio Vassalo, Initial Coin Offerings (ICO): Legal challenges from an Investor Protection Perspective, Tilburg University (2019).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

69. Fennie Wang et al. Financing Open Blockchain Ecosystems: Toward Compliance and Innovation in Initial Coin Offerings. [Research Report] Blockchain Research Institute and COALA. (2018).

70. Kevin Werbach and Nicolas Cornell, Contracts Ex Machina, 67 Duke L.J. 313-382 (2017).

71. Amy D. Westbrook, Digital Finance Platforms: Toward a New Regulatory Paradigm, 23 J. BUS. L. 505 (2021).

72. Dirk A. Zetzsche et al, The ICO Gold Rush: It's A Scam, It's a Bubble, It's a Super Challenge for Regulators, UNSWLRS 83 (2018).

73. Lianos, Ioannis et al., Regulating Blockchain: Techno-Social and Legal Challenges, Oxford University Press (2019)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

<div align="right">**Annex C**</div>

<div align="center">A Closer Look at "Governance Tokens"</div>

Drawing inspiration from the basic ERC-20 token standard,[336] several protocols have introduced their own crypto asset token standards, some of which include governance-related features as part of their functionality.  Colloquially described as "governance" tokens, crypto assets which allow token owners to "vote" or delegate others to vote on their behalf.

Compound Labs, a software development company supporting the Compound Protocol, created one of the first widely adopted standards for "governance tokens" when it launched the crypto asset known as "COMP" in July 2020.[337]  The COMP token is a particularly useful example as its design inspired the development of other similar crypto assets, such as UNI, the native token of the Uniswap Protocol, AAVE, the native token of the Aave protocol, as well as Gitcoin's GTC and the Ethereum Name Service's ENS token.

The COMP token is part of the overall Compound protocol which allows for simple token voting and vote delegation.  As illustrated in Figure 1, the COMP token contract allows for token-weighted voting—a function which enables proposals to ensure that votes are weighted only in reference to the voter's balance at the moment the proposal was created, rather than at a voter's balance at the time of voting.  This voting structure is intended to enhance perceived fairness by ascertaining that token owners are not able to vote multiple times by moving their tokens between different blockchain addresses—indeed, without this feature, it is likely that token transfers would have to be paused every time there was a new voting proposal. COMP's delegation feature is similarly highlighted in Figure 2, which allows token owners to indefinitely, and freely, delegate their ability to vote to another address.

However, unlike voting shares in a corporation (which is based on the legal rights provided to shareholders under applicable state law and the corporation's governing legal documents), all that happens with "voting" with the COMP tokens is that the protocol checks for inputs from addresses holding one or more COMP tokens at the relevant time and responds with a pre-determined action to the aggregate of those inputs.  The protocol codebase is oblivious to whether the person initiating a related instruction for a given address holding COMP was entitled to do so (had any "rights") and is unable to alter the outcome of the collective instruction if it was later established that one or more of the inputs was provided "wrongfully".

---

[336] *See* Section [I.B.] *infra*.
[337] *See* "Compound Governance Token Begins Its First Day of Trading", Celia Wan, The Block, June 15, 2020, available at https://www.theblock.co/linked/68369/compound-governance-tokens-begin-its-first-day-of-trading.   *See also*   "Compound Protocol", available at https://github.com/compound-finance/compound-protocol.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385

Figure 1: Token weighted voting feature as set forth in the COMP token.



Figure 2: Vote delegation feature as set forth in the COMP token.

Another common variant of the ERC-20 token standard is the "vote escrow". As pioneered by Curve Finance in August 2020, vote escrows allow protocols to incentivize liquidity providers by rewarding them for their continued participation in liquidity pools. Using Curve Finance as an example, users owning CRV tokens are rewarded with veCRV tokens, *i.e.*, vote-escrowed CRV, for holding, "locking" or staking CRV tokens for a period of time—sometimes as long as four years. The longer a holder locks its CRV, the more veCRV the protocol allocates to it. veCRV tokens are non-transferable governance tokens which have an added feature of allowing the address at which the tokens are held to receive a share of the Curve Finance platform fees. Other decentralized liquidity platforms have similarly implemented this "vote escrow" model due to the popularity of distributing voting rights amongst active users and providing an incentive for greater commitment to the protocol. For example, in February 2022, Balancer, a protocol for programmable liquidity, forked the Curve model by shortening the maximum lock time to one year (as opposed to four years with Curve), and requiring users to lock up Balancer's BAL token, along with wrapped ETH (WETH).

178

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Electronic copy available at: https://ssrn.com/abstract=4282385



Copyright 2022 DLx Law.  All rights reserved.

DLXLAW.COM

Electronic copy available at: https://ssrn.com/abstract=4282385

# Exhibit V

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                 Plaintiff,<br><br>    v.<br><br>TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON,<br><br><br><br>                Defendants. | Civil Action No. 1:23-cv-01346-JSR<br><br><br>Hon. Jed S. Rakoff |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

STANDARD OF REVIEW .................................................................................................... 4

ARGUMENT .......................................................................................................................... 5

I.      THE AC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ............................................................................................................ 5

II.     THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES ....................................... 7

       A.      The Major Questions Doctrine Forecloses The SEC's Claims .............................. 7

       B.      The Due Process Clause Forecloses the SEC's Claims ...................................... 10

       C.      The APA Forecloses the SEC's Claims .............................................................. 11

       D.      Even If *Howey* Applies to Digital Assets, The Digital Assets At Issue Are Not Securities .......................................................................................... 12

III.    THE REGISTRATION COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES ............................................................................................... 20

       A.      The SEC Has Not Plead a Violation of '33 Act Sections 5(a) and (c) ................ 20

       B.      The SEC Has Not Plead a Violation of '33 Act Section 5(e) or '34 Act Section 6(I) .................................................................................................. 25

IV.    THE FRAUD COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES ............................................................................................... 27

       A.      The SEC Has Not Pled a Violation of '33 Act Section 17(a)(2) or (a)(3) ........... 27

       B.      The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act Section 17(a)(1). ............................................................................................. 34

       C.      The SEC Has Not Pled a Violation of '34 Act Section 20(a). ............................ 37

CONCLUSION .................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
    09 civ. 8862 (GBD), 2013 U.S. Dist. LEXIS 45883 (S.D.N.Y. Mar. 28, 2013) ......................6

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
    No. 18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) ...................................7

*In re Alstom SA Sec. Litig.*,
    406 F.Supp.2d 433 (S.D.N.Y.2005).......................................................................................37

*In re Aluminum Warehousing Antitrust Litig.*,
    No. 13-md-2481 (KBF), 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015)...............................4, 5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................5, 29, 33

*Axon Enterprise, Inc. v. FTC*,
    No. 21-86, Slip Op. (Gorsuch, J. concurring in the judgment) (U.S. Apr. 14,
    2023) ....................................................................................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................5, 29, 33

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021)......................................................................................6

*Bittner v. U.S.*,
    143 S. Ct. 713 (2023).........................................................................................................10, 11

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)...............................................................................................................5

*CFTC v. Rashawn Russell*,
    Civil Action No. 23-cv-2691 (filed Apr. 11, 2023), ECF No. 1 ...............................................9

*CFTC v. Wilson*,
    No. 13 CIV. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)..............................25

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018)......................................................................................................6

*Chiarella v. United States*,
    445 U.S. 222 (1980)..............................................................................................................31

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ..................................................................................................10

*Cmty. Television of S. Cal. v. Gottfried*,
    459 U.S. 498 (1983) ..................................................................................................11

*Debruin v. Andromeda Broad. Sys., Inc.*,
    465 F. Supp. 1276 (D. Nev. 1979) ............................................................................23

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ..................................................................................................10

*Gen. Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995) ..................................................................................10

*George v. McDonough*,
    142 S. Ct. 1953 (2022) ..............................................................................................13

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................................15

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) ........................................................................................5

*Jones v. Tyson*,
    No. 00 Civ. 7382 (CM), 2001 WL 401438 (S.D.N.Y. 2001) .....................................5

*Keady v. J.P. Morgan Chase & Co.*,
    No. 07 CIV 9896JSR, 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008) (Rakoff, J.),
    *aff'd*, 328 F. App'x 23 (2d Cir. 2009) .........................................................................2

*Landsgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ..................................................................................................27

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ......................................................................15

*McBoyle v. United States*,
    283 U.S. 25 (1931) ....................................................................................................11

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) ......................................................................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................................11

*NLRB v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974) ..................................................................................................12

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ...................................................................................18

*Patel v. INS*,
    638 F.2d 1199 (9th Cir. 1980) ...............................................................................12

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015)....................................................................31

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*,
    88 F.3d 739 (9th Cir. 1996) .............................................................................11, 12

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
    761 F. Supp. 2d 103 (S.D.N.Y. 2011)......................................................................6

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
    586 F. Supp. 2d 172 (S.D.N.Y. 2008)....................................................................36

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)................................................................................12, 15

*Reves v. Ernst & Young*,
    949 U.S. 56 (1990)...................................................................................................7

*Rice v. Branigar Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) ........................................................................15, 16

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994).......................................................................................5

*Royalty Network v. Dishant.com*,
    638 F.Supp.2d 410 (S.D.N.Y. 2009).........................................................................7

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ........................................................................17, 18

*SEC v. City of Victorville*,
    No. EDCV1300776JAKDTBX, 2013 WL 12133651 (C.D. Cal. Nov. 14,
    2013) ......................................................................................................................36

*SEC v. DiMaria*,
    207 F. Supp. 3d 343 (S.D.N.Y. 2016)....................................................................34

*SEC v. Espuelas*,
    698 F. Supp. 2d 415 (S.D.N.Y. 2010)....................................................................34

*SEC v. Ginder*,
    752 F.3d 569 (2d Cir. 2014)...................................................................................34

iv

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) ...........................................................................16, 17, 18, 19

*SEC v. Lyon*,
  529 F. Supp. 2d 444 (S.D.N.Y. 2008) ......................................................................20, 34

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
  296 F.R.D. 241 (S.D.N.Y. 2013) ....................................................................................35

*SEC v. Ralston Purina Co.*,
  346 U.S. 119 (1953) ........................................................................................................24

*SEC v. Rio Tinto, plc*
  41 F.4th 47, 53 (2d Cir. 2022) .......................................................................................34

*SEC v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020) ......................................................................37, 38

*SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013) ............................................................................33

*SEC v. Telegram Grp. Inc.*,
  No. 19-CV-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) .................................13

*SEC v. Thompson*,
  238 F. Supp. 3d 575 (S.D.N.Y. 2017) ............................................................................35

*SEC v. W.J. Howey, Co.*,
  328 U.S. 293 (1946) ............................................................................................. *passim*

*SEC v. Wahi*,
  No. 2:22-cv-01009-TL (W.D. Wa.) ...................................................................................6

*SEC v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................................33

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017) ......................................................................................10

*Spy OSUS Ltd. v. UBS AG*,
  114 F. Supp. 3d 161 (S.D.N.Y. 2015) (Rakoff, J.) ...........................................................5

*State v. Heath*,
  153 S.E. 855 (N.C. 1930) ................................................................................................13

*Troma Entm't Inc. v. Centennial Pictures Inc.*,
  729 F.3d 215 (2d Cir. 2013) .............................................................................................5

*Underwood v. Coinbase Glob., Inc.*,
   No. 21 CIV. 8353 (PAE), 2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023).................................26

*United Housing Foundation, Inc. v. Forman*,
   421 U.S. 837 (1975)..........................................................................................15, 18

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014)........................................................................................................7

*W. Virginia v. Env't Prot. Agency*,
   142 S. Ct. 2587 (2022)....................................................................................................7

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001)........................................................................................................9

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000)..............................................................................................6

**United States Constitution**

U.S. Const. Amend. V ................................................................................................1, 10, 11

**Statutes**

Securities Act of 1933
   Section 2...........................................................................................................7, 13, 14, 23
   Section 4(a) ............................................................................................................21, 23, 24
   Section 5................................................................................................................... *passim*
   Section 17(a) ..........................................................................................................27, 33, 34, 35

Securities Act of 1934
   Section 3...............................................................................................................8, 13, 14, 16
   Section 6(l)...........................................................................................................................25
   Section 10(b)............................................................................................................34, 35, 37
   Section 20(a)......................................................................................................................37
   Section 39...............................................................................................................................9
   Section 23...........................................................................................................................12

**Rules and Regulations**

Federal Rules of Civil Procedure
   Rule 8(a)..............................................................................................................................20
   Rule 12(b)(6).........................................................................................................................5

SEC Regulations
   Regulation D.................................................................................................................21, 24
   Regulation S............................................................................................................21, 22, 24
   Rule 10b-5............................................................................................................................35

Rule 144 ...............................................................................................................21

Rule 144A ............................................................................................................21

**Other Authorities**

Lewis R. Cohen, Gregory Strong, Freeman Lewin, and Sarah Chen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022), https://ssrn.com/abstract=4282385 ...............................................14

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008) https://bitcoin.org/bitcoin.pdf ...............................................................................8

SEC, *In re Plutus Financial Inc.*, Securities Act Release No. 33-10801 (July 13, 2020) .................................................................................................................25, 26

SEC, Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange," Release No. 34-97309 (Apr. 14, 2023) ...............................................10

Terra Docs, *Fees on Terra*, https://docs.terra.money/learn/fees ....................................................................28

*Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission .......................................................................................9

*What is batch credit card processing?*, NCR (Apr. 12, 2021), https://www.ncr.com/blogs/payments/batch-credit-card-processing......................30

# GLOSSARY

| '33 Act | Securities Act of 1933 |
|---|---|
| '34 Act | Securities Exchange Act of 1934 |
| AC | Amended Complaint (ECF No. 24) |
| APA | Administrative Procedure Act |
| BTC | Bitcoin |
| Defendants | Terraform Labs Pte. Ltd. and Kwon Do Hyeong |
| ETH | Ether |
| Ex. __. | Exhibit __ to the Declaration of Douglas W. Henkin dated April 21, 2023 |
| ICO | Initial Coin Offering |
| KrT | TerraKR (stablecoin pegged to KrW) |
| KrW | Korean Won |
| LFG | Luna Foundation Guard |
| Mirror | Mirror Protocol |
| QIB | Qualified Institutional Buyer |
| SEC | Securities and Exchange Commission |
| TFL | Terraform Labs Pte. Ltd. |
| UST | TerraUSD (stablecoin pegged to U.S. dollar) |
| wLUNA | Wrapped LUNA |

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss the AC.

**<u>PRELIMINARY STATEMENT</u>**

TFL created UST, a stablecoin designed to maintain a price equal to one dollar, and LUNA, a companion digital asset, to support a new decentralized financial system on the Terra blockchain. UST is a currency—not a security—and TFL and other members of the Terra community developed decentralized applications providing additional use cases for UST and LUNA, including the Mirror Protocol and the Anchor Protocol. The AC asserts violations of the registration and antifraud provisions of the federal securities laws with respect to UST, LUNA, wLUNA, mAssets, and MIR tokens. According to the AC's own allegations, as well as the materials incorporated by reference, those claims fail.

*First*, the SEC has failed to plead facts sufficient to support personal jurisdiction over Defendants. The alleged "U.S. sales" were private sales to institutional purchasers made by a non-U.S. entity not named as a defendant. Every product or protocol the SEC complains about was available to the world and not directed at U.S. persons.

*Second*, the major questions doctrine, the Due Process clause, and the APA prohibit the SEC from using federal securities law to assert jurisdiction over the digital assets in this case. Moreover, the digital assets at issue are not "securities" under the test articulated in *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946).

*Third*, TFL conducted no public offerings requiring SEC registration. The AC does not allege that Defendants solicited any sales of digital assets to the general public anywhere. The challenged LUNA and MIR token sales were exempt from registration under multiple exemptions. And Defendants had no involvement in the programmatic minting of mAssets by the Mirror Protocol nor did they solicit transactions on the protocol by U.S.-based persons.

*Fourth*, the SEC fails to plead material misrepresentations or omissions. The SEC concludes without sufficient factual allegations, that statements that Chai, a Korean mobile payment service, used KrT stablecoins were false. The SEC also claims that after UST depegged in May 2021, Defendants failed to disclose the supposed "real reason" UST repegged. The SEC

1

does not allege sufficient facts to support either claim.

The Court should dismiss the AC in its entirety with prejudice.

## STATEMENT OF FACTS

<u>TFL Is Founded</u>:  TFL is a Singaporean open-source software development firm.  AC ¶ 15.  Mr. Kwon served as TFL's CEO and lived outside the U.S. at all relevant times.  AC ¶ 16. TFL was founded to address the fact that the price volatility of cryptocurrencies like BTC interfered with the ability to use them as a medium of exchange.[1]  Beginning in 2018, TFL developed a novel approach to this problem by creating the Terra protocol, a decentralized and open-source application for algorithmic stablecoins, and the Terra blockchain on which the protocol would operate.  Terra stablecoins targeted a 1:1 exchange rate to fiat currencies through smart contracts operating on the blockchain, with the open-source code for those contracts adjusting money supply in response to changes in demand.  TFL did not operate a market (like FTX) or have customers or customer funds (like FTX, Celsius, or Voyager).

<u>UST Launches</u>:  In September 2020, TFL announced the launch of UST.  AC ¶ 35.  UST served as a store of value and could be used as payment for goods and services.  As explained in the April 2019 white paper, the Terra protocol would stabilize UST and other Terra stablecoin prices through an "elastic money supply."  Ex. A.  If the market price of UST fell below $1, then decreasing the supply of UST should move its price back up towards $1.  *Id.* at 4.  Conversely, if the market price of UST rose above $1, increasing the supply of UST should move its price back down towards $1.  *Id.*  Thus "[t]he protocol adjusts the supply of [UST] in response to changes in demand to keep its price stable," *Id.* at 13, and uses the price and supply of LUNA to do so.

The supplies of UST and LUNA are adjusted through transactions between users and Terra protocol smart contracts using a mint-burn mechanism.  *Id.* at 4.  When UST falls below $1, UST holders can burn UST and receive $1 of minted LUNA, and when UST is above $1, LUNA holders can mint UST by burning $1 worth of LUNA.  *Id.* at 5-6.  The opportunity to

---

[1] *See* Ex. A at 1.  Documents relied on in the AC may be considered on this motion.  *See Keady v. J.P. Morgan Chase & Co.*, No. 07 CIV 9896JSR, 2008 WL 638444, at *2 (S.D.N.Y. Mar. 3, 2008) (Rakoff, J.), *aff'd*, 328 F. App'x 23 (2d Cir. 2009).

arbitrage between the price of UST and $1 incentivizes users to interact with the protocol to decrease and increase the supplies of UST and LUNA to normalize the price of UST relative to $1. *Id.* All these interactions are between users and the Terra protocol, not users and TFL.

LUNA tokens, in addition to serving as a stabilizer of UST, were the staking and governance token of the Terra blockchain. Terra is a proof-of-stake blockchain: transactions are recorded and verified on the blockchain by consensus of validators. To process transactions on the blockchain, validators are required to stake LUNA tokens. Validators, and those who delegate their LUNA to validators to be staked, earn rewards from staking. LUNA stakers can also vote their tokens on governance proposals for the network. Additional uses for the tokens were later developed in connection with the Mirror and Anchor Protocols.

The SEC does not allege that TFL earned fees or commissions from user activity on the Terra protocol. Although UST, LUNA, and MIR were later traded on global markets, TFL did not operate a market for such trading or earn any remuneration from third party trading.

<u>Mirror Launches</u>: In December 2020, TFL announced the launch of Mirror. Mirror allowed users to choose any real-world asset with a live price feed and create a digital asset that mirrored its price movements. AC ¶ 37; Ex. OO at C.3.1. Users created mirrored assets, or "mAssets," referencing a range of financial assets, including U.S. equities, indices, and cryptocurrencies. mAssets could be traded in peer-to-peer transactions and on trading platforms.

The Mirror community decided which mAssets to create through governance proposals. Users who staked MIR tokens (Mirror's governance token) could make and vote on proposals. The protocol granted MIR tokens to users for activities such as providing liquidity for mAsset trading and voting on governance proposals. Users minted mAssets by depositing collateral with the protocol, which locked the collateral and delivered the mAsset to the user. The SEC does not allege that TFL earned fees or commissions from Mirror Protocol user activity or that TFL maintained custody or control over digital assets deposited in the protocol.

<u>Anchor Launches</u>: In March 2021, TFL announced the launch of the Anchor Protocol. AC ¶ 35. The protocol accepted deposits from staking users in the form of UST stablecoins, and lent out UST deposits to users who wished to borrow UST, with those borrowers pledging digital

assets as collateral for the loans.  Ex. B at 1.  The yield earned by the protocol from its programmatic use of that collateral was paid to the staking users as "interest."  *Id.* at 1, 4; AC ¶ 35.  The SEC does not allege that TFL earned fees or commissions from Anchor Protocol user activity or maintained custody or control over digital assets staked in the Anchor Protocol.

May 2021 Depeg:  In May of 2021, the market price of UST had declined from its peg, but then recovered.  Almost immediately following the May 2021 depeg, there was public discussion of the risk of UST losing its price peg as a result of market activity and public calls for external support of the UST price peg.  *See* Ex. P.

On January 19, 2022, a non-profit organization called LFG announced its formation to help address the publicly-discussed risk that UST might lose its peg again and require additional support to prevent its collapse.  AC ¶ 41; Ex. C at 1.  LFG built reserve fund of several billion dollars to purchase UST and support the peg "where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."  Ex. D at 1.

May 2022 Depeg:  In May 2022, the publicly-known risk of another depeg materialized. UST experienced a market event and lost its peg.  While this was happening, and as it had promised to do, LFG expended roughly $2.8 billion to defend the UST peg.  *See* Ex. E.  TFL also spent hundreds of millions of its own dollars trying to defend the peg.  *See* Ex. F.

SEC Files Suit:  In May 2021, the SEC issued a formal order of investigation commencing an investigation into potential securities registration issues relating to Mirror.  *See* Ex. G.  Without obtaining an order expanding the scope of its Mirror investigation, the SEC began investigating the Anchor protocol, UST, LUNA tokens, and other matters.  The SEC questioned Mr. Kwon for more than 15 hours and collected hundreds of thousands of documents and communications from more than 60 parties.  On February 16, 2023, the SEC filed this action without having provided TFL or Mr. Kwon a Wells notice.

**STANDARD OF REVIEW**

In assessing personal jurisdiction, the Court may "look beyond the pleadings to affidavits and supporting materials submitted by the parties."  *In re Aluminum Warehousing Antitrust*

*Litig.*, No. 13-md-2481 (KBF), 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015). To survive under Rule 12(b)(6), the AC must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), or accept as true "a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

## ARGUMENT

## I. THE AC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

The SEC bears the burden of establishing that Defendants have the necessary contacts with the U.S. to support the exercise of specific jurisdiction. *See Troma Entm't Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013).[2] A defendant cannot be subject to specific jurisdiction unless the litigation results from alleged injuries that "arise out of or relate to" activities the defendant purposefully *directed* at the U.S. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Spy OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 169 (S.D.N.Y. 2015) (Rakoff, J.).[3] The AC's allegations fail to meet this requirement:

- The alleged token sales to U.S.-based firms do not show purposeful availment by TFL or Mr. Kwon. The counterparty on those sales (AC ¶ 18) was not TFL, but a BVI entity that is not a defendant, as the SEC acknowledges. *See* AC ¶ 152.

- The SEC fails to distinguish among the individuals it alleges traveled to the U.S., broadly alleging that "Kwon and other Terraform employees" attended meetings to make sales and "to speak at an industry conference and events." AC ¶ 43. The SEC does not plead how many such events there supposedly were, which ones Mr. Kwon attended, or which events related to the sale of which digital assets at issue (if any). Infrequent trips unrelated to the alleged violations cannot establish jurisdiction, *Jones v. Tyson*, No. 00 Civ. 7382 (CM)(MDF), 2001 WL 401438, at

---

[2] Because SEC does not suggest that Defendants are subject to general jurisdiction, this memorandum does not address general jurisdiction.

[3] Unless otherwise indicated, internal citations and quotation marks are omitted.

*2 -3 (S.D.N.Y. 2001), and trips allegedly related to an asserted violation regarding one asset cannot support jurisdiction with respect to a different asset, *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021).

- The SEC does not allege that either Defendant made any materially false or misleading statements to any actual or prospective purchaser of digital assets while in the U.S. *See, e.g., Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 09 civ. 8862 (GBD), 2013 U.S. Dist. LEXIS 45883, *36 (S.D.N.Y. Mar. 28, 2013) ("These trips did not '[give] rise to the episode-in suit' because neither [defendant] made any fraudulent statement to the [plaintiffs] on these trips … .").

- Allegations that "several" of the assets at issue were listed on "major crypto asset trading platforms, including a prominent U.S.-based trading platform" (AC ¶ 43) cannot support personal jurisdiction. Even with respect to equity securities, courts have consistently held that activities related to listing on a stock exchange cannot, without more, support personal jurisdiction. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000). The SEC concedes that all but one of the platforms discussed in the AC were not U.S. entities. *See* AC ¶ 43. As for the one platform the SEC describes as "U.S.-based," it is Coinbase, which operates a *global* trading platform.[4]

For these reasons, the SEC's allegations do not establish specific jurisdiction.[5]

It is not sufficient, as the SEC alleges, that conduct abroad by a defendant had a "foreseeable substantial effect" in the United States (AC ¶ 19), because a defendant must have "expressly aimed" its conduct at the U.S. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018). The SEC's allegations all concern conduct aimed at the world, not

---

[4] As Coinbase has explained, it does "Does Not List Securities, Period." *See SEC v. Wahi*, No. 2:22-cv-01009-TL (W.D. Wa.), Brief of Amicus Curiae Coinbase, Inc. in Support of Defendants Ishan Wahi and Nikhil Wahi's Motion to Dismiss at 12 (ECF No. 78-2). Moreover, an agreement to *allow* one token (MIR) to be listed on a global trading platform is not purposeful availment. And the agreement the SEC relies on is not remotely similar to the sort of agreement that governs equity securities being listed on a U.S. securities exchange. *Compare* Ex. V *with* Ex. T. The former is a consent for tokens to be listed on Coinbase's platform, whereas the latter is a request for statutorily enumerated securities to be listed on a registered securities exchange. If the latter is not purposeful availment (*Wiwa*, 226 F.3d at 97), then neither is the former.

[5] The SEC's claims do not arise out of an agreement to have the word "Terra" placed on seats at a baseball stadium (AC ¶ 43). The alleged token sales and misrepresentations occurred *prior to* the agreement's announcement in February 2022, and thus the agreement does not support specific jurisdiction. *See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103, 106-07 (S.D.N.Y. 2011).

conduct expressly aimed at the United States.[6]  Not even the alleged loans of LUNA to what the SEC calls the "U.S. Trading Firm" suffice, not least because the loans themselves have no U.S. nexus—*both* parties were outside the U.S.  *See* Ex. H.

Because it cannot allege a public token sale through an ICO, the SEC alleges that these loans were "in essence, public distributions of LUNA" (AC ¶ 110), but that allegation fails because it is not supported by the loan agreements, the SEC does not allege that TFL directed the firm to resell LUNA into U.S. markets, and when the loans were entered into LUNA was not listed on U.S. platforms.  *See* AC ¶¶ 108–109.  The SEC has failed to plead specific jurisdiction.

## II.     THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES

### A.     The Major Questions Doctrine Forecloses The SEC's Claims

Congress has not granted the SEC the power to regulate the digital assets at issue here. "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line."  *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022).  When an agency "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," it must come bearing "clear congressional authorization."  *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014); *see also W. Virginia*, 142 S. Ct. at 2607–09.  The "major questions doctrine" reins in "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *Id*. at 2609.

Whether something is a security is determined by the text of the '33 and '34 Acts.  Both define "security" by enumerating lists of instruments such as "stocks" and "bonds," and those lists are functionally equivalent.  *See* 15 U.S.C. § 77b *et seq.*; *Reves v. Ernst & Young*, 949 U.S. 56, 61 n.1 (1990).  But neither contains any phrase remotely like "digital asset," which is not a surprise given that the first general purpose digital computer was not built until over a decade

---

[6] *Compare* AC ¶ 114 (alleging that the "website for the Mirror Protocol … could be accessed in the U.S.") *with Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) *and Royalty Network v. Dishant.com*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009).

later.  *See* Ex. U.  Lacking relevant statutory text or a rule, the SEC relies on the catch-all term

"investment contract," which appears in both statutes but is defined in neither, and takes the

position that whether a digital asset is a "security" should be decided using the interpretation of

"investment contract" set forth in *Howey* in 1946, decades before the Internet and technology

underpinning cryptocurrencies could have been contemplated by the SEC or the courts.[7]

      The cryptocurrency industry is a large and innovative part of the global and American

economies,[8] and there is no evidence that the 1930s statutory structure contemplated it.  SEC

commissioners disagree about *how* to regulate cryptocurrencies, executive agencies disagree *who*

should regulate *which* cryptocurrencies, and Congress has not decided what to do about any of it:

- Not all members of Congress believe the '33 and '34 Acts gave the SEC authority to regulate digital assets.  *See Hearing: Oversight of the Securities and Exchange Commission*, U.S. House Financial Services Committee (Apr. 18, 2023) at 5:43:20-5:44:18, https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=408690 ("Congress has never given you a framework for regulating digital assets."); Ex. HH.

- The current SEC chairman has taken inconsistent positions regarding whether the SEC needs additional Congressional authority to regulate digital assets.  *Compare* Ex. W (asserting the need for additional legislation) *with* Ex. GG at 4–5 (opposite).

- SEC Commissioner Peirce stated that the *Howey* test may not apply to any secondary transactions at all.  Ex. X.  She noted that the statutory definition of "exchange" is based on the concept of a "stock exchange as that term *is* generally understood," 15 U.S.C. § 78c(a)(1) (emphasis added), meaning when the '34 Act was enacted, whereas the SEC's new definition "seems to extend to systems well beyond anything generally understood to be an exchange, an impression heightened by the Commission's refusal … to provide any clarity around what the outer bounds of the amended definition might be."  Ex. Y at n.12.

---

[7] The first cryptocurrency was defined in 2008.  *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008) (https://bitcoin.org/bitcoin.pdf).  It took more than 60 years after the first general purpose digital computer was developed because cryptocurrencies depend on developments in both computer technology and mathematics (with respect to the latter, cryptocurrencies use public key cryptography, which was invented in 1976, *see id.* at 2, 7, 9).

[8] Michelle Neal, Advances in Digital Currency Experimentation, Fed. Res. Bank N.Y. (Nov. 4, 2022), https://tinyurl.com/d4bfkeb4; Cristina Polizu et al., *A Deep Dive Into Crypto Valuation*, S&P Global (Nov. 10, 2022), https://tinyurl.com/yc6h9k79 ("As of August 2022, $1.1 trillion); COINMARKETCAP, https://tinyurl.com/bdkc6dta  (last visited Feb. 3, 2023).

- The CFTC Chairman has changed his mind about whether cryptocurrencies are securities, and currently asserts that stablecoins (like UST) are not. *See* Ex. Z; *see also CFTC v. Rashawn Russell*, Civil Action No. 23-cv-2691 (filed Apr. 11, 2023), ECF No. 1 ¶ 62 (alleging that certain stablecoins are commodities).

- A presidential working group recommended that stablecoins be regulated by federal bank regulators and the Federal Reserve. *See* Ex. AA.

- Congress has at least 7 committees and subcommittees evaluating how and by whom cryptocurrencies should be regulated without stifling innovation. *See, e.g.,* Exs. BB & CC. There are pending legislative proposals that would make cryptocurrencies expressly not subject to federal securities laws. *See* Ex. DD. The SEC's Investor Advisory Committee recently "encourage[d]" the SEC to oppose such legislative proposals, *see* Ex. EE, an odd position for a statutory committee (15 U.S.C. § 78pp) to take if the agency thinks its authority is "clear."

Some of the SEC's arguments here are the inverse of prior public statements. In 2019 Chairman Clayton stated that "the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument" and "[a] digital asset may be offered and sold initially as a security ... but that designation may change over time … ." Ex. FF. Here the SEC asserts the opposite—that the launch of the Anchor Protocol seven months after UST became available made UST a security (*see infra* at 14). But the SEC has never asserted that stocks or bonds—enumerated in the statutory definition—can ever not be securities. Just as Congress "does not hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001), it does not hide boundless executive agency powers in hoary statutes.

The application of the major questions doctrine to prohibit the SEC's attempt to regulate digital assets with 1930s statutes is even clearer here, where (a) the executive agencies disagree about what should be considered a "security," (b) the leaders of the executive agencies have frequently changed their stances about that issue, (c) the executive branch overall has conflicting ideas about which agency should regulate which assets, and (d) Congress, which has been considering the issue for years,[9] has not acted. The SEC's improper assertion of power here by trying to shoehorn all cryptocurrencies into its definition of a "security" fails.

---

[9] *E.g., Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-

**B.      The Due Process Clause Forecloses the SEC's Claims**

The Due Process Clause prevents the SEC from bringing this enforcement action because it has not provided Defendants with fair notice of its retroactive application of the interpretation of securities laws it now asserts in this case.  Because "clarity in regulation is essential to the protections provided by the Due Process Clause," an agency cannot punish a regulated party if the agency "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

Fair notice is particularly implicated when an agency announces and enforces a new policy in an enforcement proceeding where it seeks to apply that view retroactively.  *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012).  In *Bittner v. U.S.,* 143 S. Ct. 713 (2023), the IRS took a litigation position inconsistent with prior proposed rulemakings, instructions issued with the forms for the type of reporting at issue in that case, and related "Fact Sheets."  *Id*. at 721-22.  As Justice Gorsuch explained in rejecting the IRS's position, the agency's prior "warnings, fact sheets, and instructions" expressed one view of the relevant law, whereas the IRS sought to penalize Bittner based on an inconsistent theory it had never before announced and thus violated Bittner's due process rights.  *See id*. at 722.[10]

*Bittner* presents similar problems for the SEC:  The SEC has never previously taken the position that all cryptocurrencies other than BTC are securities, nor has it promulgated any regulations that do so.  To the contrary, it suggested, including in written guidance similar to *Bittner*, that cryptocurrencies were *not* all securities, a position it reiterated as recently as *April 14, 2023* in revising a proposed rule amendment and calling for additional comments.[11]  And

---

role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission.

[10] The SEC's "considerable difficulty" in interpreting its organic statute over many years, and the "considerable uncertainty" that has resulted from that, "heighten[s] the fair-notice problem here. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017).

[11] *See* Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange," Release No. 34-97309 at 10 n.26 (Apr. 14, 2023).

other agencies have publicly expressed the view that not all cryptocurrencies are securities. *See supra* at 9. This case thus presents the same fair notice problems as *Bittner*.

The SEC also argues that UST is a security because it could be used to buy LUNA. But the SEC has not previously asserted that something is a security merely because it can be used to buy something else the SEC calls a security. Putting aside that this position would enable the SEC to assert that nearly anything that could be traded for a "security" should be under its jurisdiction, this position poses the same "fair notice" problem Justices Gorsuch and Jackson discussed in *Bittner*: Nowhere do the securities laws give a hint of such an interpretation, no regulations address the issue, and the SEC's prior "guidance" does not suggest so broad a view. Due Process bars the SEC's attempt to use this enforcement action to apply retroactively this definition of "security." *See* 143 S. Ct. at 725; *McBoyle v. United States*, 283 U.S. 25, 27 (1931). Because the SEC has failed to provide fair notice to the Defendants, the Due Process clause requires that the AC be dismissed.

## C. The APA Forecloses the SEC's Claims

Notice-and-comment rulemaking "give[s] notice of proposed changes before they occur," *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 n.4 (9th Cir. 1996), and is the "better, fairer, and more effective method of implementing" a "new industry-wide policy" for cryptocurrencies, *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983). Rulemaking allows for input from a wide range of stakeholders and judicial review of proposed rules before they go into effect, facilitates transparent and orderly policy development, and results in clear rules and fair notice to all market participants. *See Pfaff*, 88 F.3d at 748 n.4. An agency must consider all important aspects of a purported problem before asserting jurisdiction over an entire industry, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), which can only be done properly through notice-and-comment rulemaking. *Cf.* Ex. Y ("I wish we had proceeded differently. Given … our still limited understanding of the area we are regulating (which the release repeatedly acknowledges), we should have gone back to square one and issued a concept release instead.").

11

An agency's reliance on adjudication can be an abuse of discretion under the APA.  *See NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974).  When an agency purporting to interpret a statute tries to take a "great lea[p] forward," "prospectively pronounce[] a broad, generally applicable requirement," and none of the traditional justifications for adjudication apply, it is an abuse of discretion to use adjudication instead of rulemaking.  *See Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980).  This is particularly so when the new standard proposed via adjudication departs from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation and practice, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application.  *See Pfaff*, 88 F.3d at 748.  That is this case.

As demonstrated more fully below, *see infra* at 14–20, the effect of the definitions of "security" that the SEC seeks to pursue here make clear that the SEC is trying to achieve rulemaking without going through the APA notice-and-comment process.  Many commenters, *including SEC Commissioners*, have expressed the view that the SEC has not provided sufficient guidance regarding how it determines what digital assets it considers securities, and have specifically asserted that the SEC's approach does not provide such guidance.  *See, e.g.,* Ex. Y ("The Commission does seem to anticipate that its interpretation will drive decentralized protocols toward centralization, extinction, or expatriation.").  That violates the '34 Act and the APA.  Rules of wide and general application—a rule that would make all cryptocurrencies "securities" is definitely such a rule—are precisely what the notice-and-comment rulemaking provisions of 15 U.S.C. § 78w(a) and the APA are designed for:  To examine the boundaries of a proposed rule, including its potential effects on markets, *before* such a rule is put into effect.

### D.    Even If *Howey* Applies to Digital Assets, The Digital Assets At Issue Are Not Securities

The SEC argues that the digital assets in this case are "investment contracts" (*see* AC ¶ 23), which are "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *Howey*, 328 U.S. at 298–99.  But the SEC's arguments fail.

### 1.    The Proper Understanding of *Howey*

*Howey* involved a transaction that included (a) the sale of a land in an orange grove *plus* (b) the seller's contractual promise to cultivate that land and give a share of profits *created by the seller's cultivation* to the purchaser; the Supreme Court held that that *transaction* was an "investment contract" and thus a security.  *See* 328 U.S. at 295-96, 299.  But the fact that an asset is, at some point, part of a transaction that constitutes an investment contract does not make *the asset* a security.  Indeed, the Supreme Court explained that had the orange groves in *Howey* been resold on their own, without the associated rights to have the groves cultivated and receive profits from that cultivation, they would *not* have been securities.  *See id.* at 295-96, 299; *SEC v. Telegram Grp. Inc.*, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (the "security" was neither the token purchase agreement nor the token).

That *Howey* requires a "contract" is plain from the text of 15 U.S.C. §§ 77b(a)(1) and § 78c(a)(10).  And it is compelled by the meaning of "investment contract" that Congress imported into the '33 and '34 Acts.  Congress did not invent the term "investment contract," it incorporated a well-understood term from state blue sky laws whose meaning had been "crystallized" and was "uniformly applied by state courts."  328 U.S. at 298; *see generally State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) ("The term … implies the apprehension of an investment as well as of a contract.").  By choosing that term, Congress brought its settled meaning with it.  *See George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.").  *Howey* thus did not abandon the contract requirement; indeed it emphasized that the "contract" requirement was satisfied by multiple agreements between the promoter and his purchasers, "land sales contracts, warranty deeds and service contracts."  328 U.S. at 300.

Until recently, this was how the SEC discussed *Howey*.  In 2018, the Director of the Division of Corporate Finance stated that "the token … all by itself is not a security, *just as the orange groves in Howey were not*," because "[t]he digital asset itself is simply code" and whether it is a security depends on how it is sold.  *See* Ex. II (emphasis added).  In a 2019 letter, the then-Chairman expressed the same position.  *See supra* at 9.  This made clear the SEC's

recognition that the developers of digital assets do not necessarily owe continuing legal obligations to the asset holders or any secondary-market purchasers, and secondary-market purchasers lack any legal entitlement to a share in the developers' "profits" (if there are any).

One thing thus ties together all enumerated categories of "security":  The presence of a legal relationship voluntarily established by an identifiable legal entity acting as the "issuer" of the security and various other parties who, from time to time, own that security.  *See* Lewis R. Cohen, Gregory Strong, Freeman Lewin, and Sarah Chen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* at 62 (Nov. 10, 2022), https://ssrn.com/abstract=4282385 ("Cohen").  IBM common stock is always a security because it was issued by IBM and includes whatever obligations run from IBM to owners of IBM stock. But including digital assets would require the federal securities laws to include the concept of a "security" that is not dependent on an issuer, *see id*. at 12, which they do not do.

## 2.    UST Are Not Securities

UST are not securities because stablecoins are currency and thus specifically exempt from the federal securities laws.  *See* 15 U.S.C §§ 78c(a)(10), 77b(a)(1).  Like other currencies, UST served as a unit of account, a store of value, and a medium of exchange.  *See supra* at 2–3. Indeed, the expectation that UST would remain stable and not fluctuate significantly in value precludes alleging any expectation of "profit" from UST (as opposed to from an individual, extrinsic use of UST), which is essential to something being an "investment contract."  The SEC's theory that UST *later became* an investment contract when deposited in the Anchor Protocol (AC ¶ 71) fails.  *First*, Anchor is legally irrelevant to what UST was when it launched. Anchor could not have been the transaction related to the launch of UST that would need to be examined under *Howey* because Anchor launched seven months *after* UST launched.

*Second*, UST was never required to be deposited in Anchor, and vast quantities of UST were used for other purposes.  Anyone who deposited UST into Anchor (a) made that decision on their own and (b) either acquired it in a separate transaction or purchased it on a secondary market, which can never satisfy *Howey* because, as demonstrated above, *Howey* does not apply

14

to secondary market token purchases. The only relationship an Anchor depositor had was with the protocol (and perhaps the governance community), not Defendants.

That means that the SEC has failed to allege that UST purchasers who elected to deposit their UST in Anchor were invested in a common enterprise. A common enterprise can be demonstrated through "horizontal commonality," the pooling of investor assets into an investment such that investors share in profits and losses pro rata, or through "strict vertical commonality," the tying of the defendant's financial compensation to the fortunes of the investors. *Revak*, 18 F.3d at 87; *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011). The SEC fails to explain how any one UST depositor's interest was dependent on the deposits of any other depositor such that they were joined in a pooled investment. The SEC must also distinguish Anchor depositors from brick-and-mortar bank depositors, which it has not done; if being able to deposit UST into Anchor makes UST a security, then why does being able to deposit US dollars into bank accounts and CDs not make U.S. dollars securities? The SEC's argument is overbroad. Likewise, allegations that Defendants deposited UST in Anchor as users (AC ¶ 72) cannot establish vertical commonality. Vertical commonality typically requires that a defendant earn a performance fee equal to a percentage of the profits of an investor's account. *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011). The SEC does not allege that Defendants earned fees or commissions from Anchor user activity.

Nor has the SEC pled that Anchor depositors had a reasonable expectation of profits derived primarily from TFL's managerial efforts. *First*, the SEC has not plausibly alleged that users acquired UST primarily with an investment intent specific to Anchor rather than for its other consumptive uses, which is fatal. *See Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790 (11th Cir. 1991) ("Where those who purchase something with the primary desire to use or consume it, the securities laws do not apply.") (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975)). UST could be used as a means of payment, to mint mAssets on the Mirror protocol, in other protocols developed by other developers, or simply as a store of value for later uses. Alleging that at a single point in time, "[j]ust prior to the collapse of [UST] in May 2022," more UST was deposited in Anchor than used for other purposes (AC ¶ 75) does not establish

that UST was used primarily for Anchor deposits from the time of UST's launch in September 2020, particularly because Anchor did not become available until March 2021.  Likewise, a generalized allegation that "many" users—the SEC purports to identify five—acquired UST "for the sole purpose of earning a return on the Anchor Protocol" (AC ¶ 81) cannot suffice to establish that users in general acquired UST primarily for that purpose.

Even if five users acquired UST just to deposit it into Anchor, the SEC has not plausibly alleged that such users expected to earn a return on their deposits from the managerial efforts of *Defendants*.  A contract for investment is not an investment contract unless the defendant's managerial efforts are the primary, if not sole, driver of investor profits.  *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 546 (D.C. Cir. 1996).  TFL's efforts in initially "building out its front-end user access and back-end features" or "facilitating user access to the protocol" (AC ¶ 76) did no more than facilitate global users' choice to interact with the protocol or not, they did not drive profits and in any event were embedded in the system at the time of release.  *See Life Partners, Inc.*, 87 F.3d at 547.  Nor were one-time subsidies by TFL (AC ¶ 75) or a third party (AC ¶ 78) primary drivers of interest payments on Anchor.  *Despite all the focus on Anchor, at no point has any litigant, in any jurisdiction, alleged that the **protocol** failed to pay any scheduled interest on any deposits*.

Finally, the SEC alleges that UST are securities because they are like stock warrants (AC ¶ 84).  But a stock warrant is a security because it is specifically enumerated in the definition, *see* 15 U.S.C § 78c(a)(10), which does not help the SEC here.  *First*, unlike stock warrants (which are acquired for investment purposes and have no consumptive use), UST was designed for consumptive use and the SEC has not alleged that anyone acquired UST primarily to convert it into LUNA rather than for its consumptive uses.  *See Rice*, 922 F.2d at 790.  *Second*, the protocol mechanism that allowed users to burn UST to mint LUNA does not make UST a warrant because LUNA is not a security.  *See infra* Section II.B.3.  *Third*, this argument goes too far:  At its core, the SEC argues that if token A can be converted into token B and the SEC believes that token B is a security, then *ipso facto* so is token A.  Because any token can be converted into any other token, on some platform, in at most one exchange (for example,

*token A → stablecoin → token B*), the SEC could use this theory to argue that any token is a security, without engaging in the *Howey* analysis, simply by asserting that it could be converted into some other token the SEC deemed a security, even through a settled enforcement action.[12] But this theory is even inconsistent with the SEC's (current) view that BTC is not a security, because almost every token can be directly converted into BTC on one or more platforms. *See, e.g.*, Ex. JJ (showing all tokens directly exchangeable for BTC on Coinbase). If this is the SEC's operative theory, why is BTC not a security? And if BTC is not a security, why is anything exchangeable for BTC also not a security? The SEC has painted itself into a corner.

### 3. LUNA Tokens Are Not Securities

The SEC cannot satisfy vertical commonality between LUNA purchasers and TFL or Mr. Kwon on the basis that they all held LUNA at some point. *See* AC ¶ 48. Although their separate holdings may have "paralleled" one another in valuation, they were not "intertwined such that [their] fortunes *had* to rise and fall together," because the parties were free to hold or sell at their discretion. *Marini*, 812 F. Supp. 2d at 257–58. Similar reasoning precludes horizontal commonality among LUNA purchasers merely because they held the same digital asset. *See* AC ¶ 46. Like the SEC's other arguments, this one goes too far: Were it correct, purchasers of, for example, gold could be said to be holding assets in a common enterprise with other gold purchasers where there is plainly no enterprise. Some people buy gold to use it in manufacturing (a consumptive use), some buy it as an investment, and some buy it as a unit of exchange or storage. That precludes horizontal commonality.

Nor does horizontal commonality exist if some early LUNA sale proceeds were "pooled" by TFL and used to "fund operations" and develop new projects. *See* AC ¶¶ 46–47. Horizontal commonality requires more than the aggregation or "commingling" of sale proceeds or the use of proceeds to fund operations. *See Life Partners, Inc.*, 87 F.3d at 544; *SEC v. Belmont Reid & Co.*,

---

[12] This is an example of the one-way ratchet system that the SEC appears to be using to build its jurisdictional base through coerced settlements in ways not contemplated by Congress. *See Axon Enterprise, Inc. v. FTC*, No. 21-86, Slip Op. at 13 & n.4 (Gorsuch, J. concurring in the judgment) (U.S. Apr. 14, 2023) (discussing "regulatory extortion").

794 F.2d 1388, 1389 (9th Cir. 1986). There must be an "interdependency among investors" such that profits depend upon "completion of the larger deal" between other investors and the promoter. *Life Partners*, 87 F.3d at 544. The SEC has identified no such interdependency among LUNA purchasers.

The SEC also fails to plead that LUNA purchasers acquired their tokens with the requisite investment expectations. Mentioning the words "investment" or "investors" in a few sales (AC ¶ 53) is not enough. In *Forman*, for example, the Supreme Court held that an instrument labeled "stock" was not a security. 421 U.S. at 851-52. LUNA was created to stabilize UST, validate transactions on the Terra blockchain, and enable voting for governance proposals. *See supra* at 2–3. The SEC must do more to plead around those features.

Thus even if some LUNA purchasers acquired LUNA because they considered it an investment, that would not matter. Where purchasers acquire an asset to speculate on fluctuations in global market prices (or markets generally), courts hold that profits are not driven primarily by the managerial efforts of others.[13] *See Belmont Reid & Co.*, 794 F.2d at 1389-91; *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980).

### 4. wLUNA Are Not Securities

The SEC's inclusion of wLUNA (AC ¶¶ 59–68) is mystifying. wLUNA runs on the Ethereum blockchain, which was not developed by and is not affiliated with TFL. AC ¶ 60. The SEC does not and cannot allege that Defendants created wLUNA or even the concept of wrapping tokens. In any event, as the SEC concedes, wLUNA's status as a security stands or falls on whether LUNA is a security (AC ¶¶ 67–68)—and it falls, as LUNA is not a security.

### 5. MIR Tokens Are Not Securities

The SEC cannot establish horizontal commonality among MIR token holders by alleging that the proceeds from the sale of farmed MIR tokens were "pooled together to develop and fund … the Mirror Protocol," the success of which would determine their profits. AC ¶ 87. The AC

---

[13] That some tokens may have been sold at a discount to the then-prevailing market price (AC ¶ 54) is irrelevant, because any discount is incorporated into the price at the time of purchase. *See Life Partners*, 87 F.3d at 547; *Belmont Reid & Co.*, 794 F.2d at 1389.

contains no specific facts indicating that the Mirror Protocol required further development at the time of the sale or required funding. The SEC knows from its investigation that TFL used the sale proceeds solely to acquire MIR tokens through farming to satisfy the purchase agreements.

The SEC also fails to plead that users acquired MIR tokens with the expectation of profits, let alone profits from TFL's efforts. Nowhere does the SEC allege that users acquired MIR tokens primarily as an investment rather than for their use as the governance token for the Mirror Protocol. Even as to the small set of purchasers the SEC alleges purchased farmed MIR tokens from TFL for "investment purposes," the SEC has not alleged that they reasonably expected to reap profits primarily from the efforts of TFL. Allegations that TFL "engineered, launched, and upgraded versions of the Mirror Protocol" and posted relevant information online (AC ¶¶ 94–95) are pre-sale activities that are baked in at point of sale and "ministerial" post-sale activities, neither of which has the "predominant influence" on the investment's future value necessary for an investment contract. *Life Partners*, 87 F.3d at 546-47. The SEC does not allege that the Mirror Protocol was still in development at the time of the alleged purchases.

The SEC's allegation that TFL represented that it "would heavily promote the Mirror Protocol, which would increase the price of the MIR tokens" and increase profits for the token purchasers (AC ¶ 91) is misleading. One document this allegation is based on includes a single bullet point that read "Heavily marketed to users in Asia with low accessibility to US equities," and a separate document discussed how the value of MIR tokens might grow with greater usage of the Mirror Protocol. *See* Ex. I and J (emphasis added). In neither did TFL say it would expend efforts to drive the value of MIR tokens up as the SEC alleged. Isolated tweets about "being active contributors in the community to help mirror_protocol succeed" or "working hard to improve Mirror and rely[ing] on our brilliant community for feedback and ideas" (AC ¶¶ 96–97) are far too vague and refer to no specific projects that could be connected to purchaser expectation of profits. The SEC has thus not pleaded that MIR tokens are securities.

<p style="text-align:center">*       *       *       *</p>

Each of these four arguments is, independently, sufficient to preclude the digital assets at issue from being securities. Because the SEC cannot bring claims about things that are not securities and repleading cannot fix this, it requires dismissal of the AC with prejudice.

## III. THE REGISTRATION COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES

Even if the Court were to view any digital assets at issue as securities, this case is not about ICOs made to the public, and that critical distinction means that the legal analysis of the SEC's registration claims is significantly different than the SEC's prior ICO cases.[14]

### A. The SEC Has Not Plead a Violation of '33 Act Sections 5(a) and (c)

The Fourth Claim should be dismissed because the SEC has not pled that Defendants conducted a public offering of securities in violation of Section 5. A Section 5 violation requires (1) lack of a registration statement as to the subject securities, (2) the offer or sale of the subject securities, and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale. *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).

As an initial matter, the SEC only alleges that TFL offered or sold LUNA and MIR. With respect to UST, the SEC alleges that purchasers "tendered fiat currency or crypto assets in exchange for UST," but does not allege that anyone purchased UST *from TFL*. *See* AC ¶ 69. With respect to wLUNA, the SEC does not allege that TFL offered or sold it at all. UST and wLUNA are thus not included in the Fourth Claim, meaning that the Fourth Claim must be limited to LUNA and MIR. Even if LUNA or MIR could be considered securities (they cannot),[15] the AC does not allege that SEC registration was required.

#### 1. LUNA Tokens

The SEC's claim that TFL and Mr. Kwon violated Section 5 in 2018 by entering into private agreements to sell LUNA tokens (AC ¶ 107) fails. Those sales were exempt from

---

[14] And although the SEC alleges that UST, LUNA, wLUNA, MIR, and mAssets were securities, it does not specify which count applies to which tokens, which means that these claims fail under Fed. R. Civ. P. 8(a) because the SEC has not provided a "plain" statement of these claims.

[15] The SEC does not allege a registration violation in connection with UST or Anchor, further demonstrating that the combination is not a security.

registration under Section 4(a)(2) as transactions "not involving any public offering." 15 U.S.C. § 77d(a)(2). Rule 506(b) of Regulation D deems an offering to accredited investors, regardless of dollar value, an exempt private offering, so long as there is no general solicitation. 17 C.F.R. § 230.506(b). The SEC *pleads* that all purchasers it discusses were "institutional investors" (AC ¶ 107) but does not allege that TFL conducted a general solicitation.

Recognizing this, the SEC tries to transform an exempt private offering into a Section 5 violation by asserting that TFL and Mr. Kwon "expect[ed] that most, if not all, of these purchasers would sell their LUNA into public markets" such that "Defendants were *essentially* embarking on a large-scale unregistered public distribution of LUNA." AC ¶ 107 (emphasis added). This fails for two reasons. *First*, the SEC alleges no facts to support this theory, and its deliberate use of the word "essentially" makes clear that this is a conclusion, not a fact.

*Second*, if a private purchaser decided to resell LUNA tokens, it was the purchaser's obligation to do so in compliance with applicable rules. *See, e.g.*, 17 C.F.R. § 230.144. Indeed, the SEC's assertion that Defendants "expected" the tokens to be sold on public markets (AC ¶ 107) is directly contradicted by the transaction documents and other allegations in the AC:

- The vesting period precluded immediate resale, as did the fact that LUNA was not listed on any trading platform at the time of purchase. Ex. K at 23.

- To the extent a purchaser at some point intended to resell its tokens, it could have done so without violating Section 5. Purchasers could have sold on any of several foreign platforms under Regulation S's exemption for "offers and sales that occur outside the United States." 17 C.F.R. § 230.901. Indeed, that result would have been far more likely given that not until August 2021—three years after these sales—did LUNA become listed (and then not by TFL) on a "U.S.-based" trading platform. *See* AC ¶ 109.

- If for some reason a purchaser was intent on re-selling in the U.S., it could have sold to any QIB. *See* 17 C.F.R. § 230.144A.

The allegation that TFL "expected" a small group of institutional purchasers to sell LUNA to non-QIBs inside the U.S. in violation of the relevant law is not supported by well-pled facts and is contradicted by the documents the SEC relies on.

The SEC's claim that alleged sales between August 2019 and February 2022 "directly into secondary markets through transactions on crypto asset trading platforms, including those

available to U.S. investors" (AC ¶ 111) violated Section 5 also fails. Tellingly, the SEC does not allege that TFL ever sold LUNA on the one "U.S.-based" platform it alleges supported trading in LUNA. Any sales falling into this category were thus plainly trades on foreign markets exempt under Rule 901 of Regulation S as "offers and sales that occur outside the United States." 17 C.F.R. § 230.901. The SEC's contention that some foreign markets might have been "available to U.S. investors" does not change the analysis. Beyond the contention's speculative nature, U.S. investors can trade on the Hong Kong Stock Exchange, the London Stock Exchange, and numerous other non-U.S. trading venues. That does not make trading in stock not registered with the SEC on such venues a Section 5 violation. The SEC has no authority to regulate market activity outside the U.S., as Rule 901 of Regulation S expressly recognizes.

The SEC's claim that two agreements with a trading firm to facilitate secondary trading on foreign markets were "in *essence*, public distributions of LUNA" into the U.S. (AC ¶ 110, emphasis added) fails. *First*, the SEC once again uses the word "essence" to try to hide the lack of well-pled facts supporting this theory. *Second*, this was not a public offering. The SEC does not allege that TFL hired the Cayman Islands-registered trading firm (the "Trading Firm") to access U.S. capital markets or solicit purchases of LUNA. Rather, the SEC alleges that TFL transferred LUNA to the Trading Firm to "improve liquidity" (AC ¶ 110) in the aftermarket—that is, to provide market participants on non-U.S. markets who were already intent on buying and selling LUNA a ready counterparty to trade against and thereby reduce their cost to trade. The agreements also did not violate Section 5 because TFL did not direct the firm to resell into the U.S. market. Indeed, when these contracts were entered into, in November 2019 and September 2020, LUNA could be traded only on non-U.S. platforms. *See* AC ¶¶ 108-109. Not until a year later could LUNA be traded for the first time on a "U.S.-based" platform. *See id.* Thus any and all trading within the contemplation of the parties at the time of their agreement would have been foreign transactions exempt under Regulation S. If the Trading Firm made a unilateral decision to sell on a U.S. platform once that became possible, it was that firm's obligation to comply with any applicable law.

## 2. MIR Tokens

The allegation that TFL "made [MIR tokens] available on the Terraform-controlled website for the Mirror Protocol that could be accessed in the U.S." (AC ¶ 114) fails to state a Section 5 violation because, due to a misunderstanding of how the Mirror Protocol worked, it lacks the core element of an alleged offer or sale. The Mirror Protocol does not *sell* MIR tokens, it programmatically distributes them to users, and the SEC does not allege otherwise. Providing access to the Mirror Protocol is not an offer or sale of anything, let alone securities.

The allegations that TFL sold farmed MIR tokens to a small international group of purchasers in exchange for a few million dollars (AC ¶ 112) also cannot support a Section 5 violation for at least two reasons. *First*, the sales were exempt under Section 4(a)(1) as "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1):

- TFL was not an issuer because it owned no MIR tokens when the protocol launched. As the SEC concedes, TFL had to "farm" the tokens from the Mirror Protocol as an ordinary user of the Mirror Protocol. AC ¶ 89. Indeed, the SEC does not deny that any of these counterparties could have farmed the MIR tokens themselves by doing exactly what TFL did; none of the purchasers needed to purchase MIR tokens from TFL.

- TFL was not an underwriter pursuant to 15 U.S.C. § 77b(a)(11). TFL could not purchase MIR tokens from the Mirror Protocol, nor can it be said that it offered or sold MIR tokens for an issuer given that TFL received no allocation of MIR tokens at launch.

- TFL was not a dealer of MIR tokens pursuant to 15 U.S.C. § 77b(a)(12). The SEC alleges that TFL sold only the MIR tokens it acquired in connection with satisfying the SAFT agreements, *see* AC ¶ 89, which does not make it a dealer. *Debruin v. Andromeda Broad. Sys., Inc.*, 465 F. Supp. 1276, 1279 (D. Nev. 1979).

Section 4(a)(1) thus bars this claim in its entirety.

*Second*, the farmed MIR token sales were an exempt private offering. 15 U.S.C. § 77d(a)(2). The SEC speculates that some purchasers *may not* have been accredited investors, but does plead that any was not in fact an accredited investor. AC ¶ 113. Even if the SEC had tried to plead that, Rule 506(b) exempts sales to up to 35 non-accredited investors if there is no general solicitation. 17 C.F.R. § 230.506(b). The farmed MIR token sales satisfy Rule 506(b) because, as the SEC concedes, "there is no indication of general solicitation" (AC ¶ 113), and

23

there were fewer than 35 purchasers *in total*. The SEC, having all the SAFT agreements in its possession, does not allege otherwise. *See* AC ¶ 112. In addition to the Rule 506(b) safe harbor, the sales were exempt under Section 4(a)(2). Private offerings to persons with economic sophistication who have available to them the kind of information that a registration statement would disclose do not require a safe harbor from SEC registration requirements. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125-27 (1953). Each purchaser represented that it understood digital assets and their risks, the agreements disclosed risks specific to the Mirror Protocol, and TFL provided additional financial information. AC ¶ 91; Ex. K. Nothing more was required.

The SEC's scattershot allegations regarding the secondary market for MIR tokens have nothing to with whether there was a primary offering that required registration. The SEC alleges that after satisfying its obligations under the SAFT agreements TFL sold "excess" farmed MIR tokens "through crypto asset trading platforms." AC ¶¶ 89, 114. However, such transactions in already farmed MIR tokens are exempt under Section 4(a)(1) as ordinary trading. They were also exempt under Regulation S as "offers and sales that occur outside the United States," 17 C.F.R. § 230.901, as the SEC tacitly concedes that the "trading platforms" on which they occurred were foreign. The allegation that TFL "entered into a listing agreement with at least one U.S. crypto asset trading platform for the listing of MIR tokens on the platform" (AC ¶ 114) fails because the SEC does not connect it to an offer or sale requiring registration. Indeed, the SEC does not allege that TFL offered or sold any MIR tokens on that platform. And any sales by third parties would not support a claim because (a) TFL would not have been a party and (b) they would be exempt under Section 4(a)(1) as "transactions by persons other than an issuer, underwriter, or dealer." Finally, the allegation that TFL loaned MIR tokens to a market maker "who then sold the loaned MIR upon receipt on U.S.-based crypto asset trading platforms and other crypto asset trading platforms that are available to U.S. investors" (AC ¶ 114) does not involve an initial distribution requiring registration. And if TFL acquired MIR tokens in the secondary market, that would not support a Section 5 claim for the same reason.

**B.** **The SEC Has Not Pled a Violation of '33 Act Section 5(e) or '34 Act Section 6(I)**

The Fifth and Sixth Claims should be dismissed for failure to state a claim because the SEC has not pled that TFL or Mr. Kwon offered unregistered security-based swaps in violation of Section 5(e) of the '33 Act or Section 6(I) of the '34 Act. *See* 15 U.S.C. § 77e(e); 15 U.S.C. § 78f(l). The SEC has not plausibly alleged that mAssets qualify as security-based swaps, that they were sold by TFL or Mr. Kwon, or that they were sold to non-eligible contract participants.

An mAsset that mirrors an equity security's price is not a security-based swap because it does not function as a "swap." The SEC defines a security-based swap as a contract that (1) provides for one or more payments based on the value of a security (or securities) and (2) transfers the financial risk associated with a future change in value of the security without also conveying an ownership interest in the underlying security. *Plutus Financial Inc.*, Securities Act Release No. 33-10801, *9 (July 13, 2020).[16] The SEC tries to argue that mAssets meet this definition because users who minted mAAPL tokens "provided a payment in the form of collateral equal to at least 150%" of the share price of Apple, and the mAsset transferred financial risk without ownership by mirroring movements in Apple's share price. AC ¶¶ 101–102. That argument fails because the payment is not "as a result of" the future change in value of the reference security, and swaps require that linkage between the two elements in the definition, as the SEC's own guidance on security-based swaps makes clear. Ex. KK. A swap is a "contract in which two parties agree to exchange cash payments at predetermined dates in the future." *CFTC v. Wilson*, No. 13 CIV. 7884 (RJS), 2018 WL 6322024, at *2 (S.D.N.Y. Nov. 30, 2018). *In other words, every security-based swap has a counterparty.*

That is not how mAssets work. When a user mints an mAsset, the Mirror Protocol does not agree to make a cash payment to the user if at a predetermined date in the future the mAsset has increased in value. *Cf. Plutus Financial Inc.*, Securities Act Release No. 33-10801, *1-2

---

[16] As noted above, much of the "authority" the SEC relies on is in the form of settled enforcement actions (like *Plutus*), as opposed to judicial decisions based on full adversarial litigation. Defendants' citations to such resolutions to demonstrate the SEC's views are not agreements with the results in those cases or the way the SEC arrived at them.

(July 13, 2020) (when security-based swap reached its settlement date, "[i]f the market price for the reference asset had increased, then the customer would receive the collateral plus a payment (in Bitcoin) equivalent to the increase"). The protocol programmatically adjusts the price of the mAsset based on the price feed while the mAsset is outstanding, but no payments are made to the user (for example, if an mAsset mirrors a stock that pays a dividend, the user does not get a payment relating to the dividend, as the protocol documentation expressly states). The only ways a user can capture price change in an mAsset is by (a) selling it (in which case the transaction price reflects the price change, as determined by the price feed, between the original mint time and the time of the peer-to-peer transaction) or (b) burning the mAsset and recovering the collateral. But in neither case are payments *swapped* with a swap *counterparty*. Thus the SEC's theory that mAssets are security-based swaps fails under the SEC's own definition.

Even if mAssets could be considered security-based swaps, the SEC's allegation that Defendants "offered and sold mAssets" to U.S.-based persons (AC ¶ 115) fails. The Mirror Protocol mints mAssets programmatically, without involvement from Defendants, and users of mAssets exchange them on a peer-to-peer basis. None of developing the protocol, publishing accurate information about it, or providing an interface to it (AC ¶ 115) is equivalent to issuing, passing title to, or soliciting sales of mAssets. *See Underwood v. Coinbase Glob., Inc.*, No. 21 CIV. 8353 (PAE), 2023 WL 1431965, at *9 (S.D.N.Y. Feb. 1, 2023). Indeed, because the Mirror Protocol community decided what mAssets should exist, only that community could even plausibly be viewed as doing anything remotely resembling the "solicitation" requirement. In any event, the SEC has not alleged that any such activities were directed at U.S.-based persons. The Mirror Protocol was accessible globally and designed to address the interests of foreign investors who lack the same access to U.S. equity markets as U.S.-based investors.[17]

The Sixth Claim fails because mAssets were not security-based swaps. But it also fails because, as demonstrated above, neither TFL nor Mr. Kwon "effected" transactions in mAssets

---

[17] *See* Ex. R ("value proposition" includes "accessibility," as "[i]n most markets outside of Europe & North America, access to foreign equities and forex markets is highly limited.") & Ex. I ("Heavily marketed to users in Asia with low accessibility to US equities.").

with anyone; users purchased mAssets by interacting with the Mirror Protocol smart contracts, not TFL. The SEC pleads nothing about anyone who purchased mAssets, and thus has not pled that any of them were or were not "eligible contract participants." Finally, there is no requirement in the '34 Act that protocols like the Mirror Protocol register as a national securities exchange. The SEC has proposed rule amendments that would, *if enacted as proposed*, require certain protocols to register as exchanges or Alternative Trading Systems, but those proposed amendments have not been enacted.[18] And even if they were enacted in the future, they could not be applied retroactively to the Mirror Protocol. *See Landsgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). The SEC thus has not pled any of the elements of the Sixth Claim.

## IV.    THE FRAUD COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES

Even if the Court were to view any digital assets as securities, the "securities fraud" claims fail because the SEC has failed to satisfy the claims' pleading requirements.

### A.    The SEC Has Not Pled a Violation of '33 Act Section 17(a)(2) or (a)(3).

The SEC has not alleged facts establishing a material misrepresentation or omission under Section 17(a)(2) or a deceptive act under Section 17(a)(3).

#### 1.    The SEC Has Not Pled A Material Misrepresentation or Omission

The Chai Payment Service: The SEC fails to plead falsity with respect to any statement by TFL or Mr. Kwon regarding the TFL-Chai partnership. The SEC principally challenges the use of the word "settled" by Mr. Kwon in referring to Chai's use of the Terra blockchain.[19]  *See*

---

[18] *See* Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"; Regulation ATS for ATSs That Trade U.S. Government Securities, NMS Stocks, and Other Securities; Regulation SCI for ATSs That Trade U.S. Treasury Securities and Agency Securities, Rel. No. 34-94062, File No. S7-02-22.

[19] The AC discusses other statements regarding Chai but does not appear to challenge their veracity. For instance, the AC includes statements about the total number of Chai users and transaction volume (AC ¶¶ 129, 131), but does not allege that those figures were wrong. The AC also discusses statements that refer generally to Chai using the Terra blockchain (AC ¶¶ 131–33), but does not assert that such statements were false. Indeed, the SEC concedes that Chai transactions were recorded on the Terra blockchain. *See, e.g.*, AC ¶ 141.

27

AC ¶¶ 128–129.  But Chai transactions are "settled" on the Terra blockchain:  When a consumer purchases something using Chai, the consumer's digital wallet transacts with the merchant's digital wallet, the transaction is validated on the blockchain (which is, by definition, how value is transferred using cryptocurrency), and the merchant later receives the money it is owed.

The SEC insists that use of the word "settled" here is false because Chai "used traditional payment methods of receiving Korean Won from its customers and paying Korean Won to participating merchants."  AC ¶¶ 134, 142.  But those two things are not inconsistent because the publicly stated goal of Chai was to enable payments using the Terra blockchain without users having to interact with the blockchain directly.  *See* Ex. MM.

The SEC seems to believe that recording a transaction on the Terra blockchain could be something other than an actual transfer of value—this is the only way to understand the SEC's assertions that purchases were "accounted for" on the blockchain but "paid for" with KrW.  AC ¶¶ 135, 142.  But that was not how the Terra blockchain worked.  As the Terra protocol documentation made clear from the beginning, if a transaction appears on the blockchain, it means that value has been transferred from one wallet to another.  *See* Ex. LL.[20]  So the SEC's claim that Chai did not "settle" transactions using the blockchain requires the SEC to plead that (a) transactions recorded on the Terra blockchain were something other than a transfer of value from user to merchant and (b) merchants were paid in KrW through an entirely separate payment system that only ever took KrW from users and paid *that* KrW to merchants.  It has not done so.

*First*, (a) is inconsistent with the SEC's public statements about blockchain function.  As the SEC stated as recently as April 14, 2023, digital assets "generally" use blockchains "to record ownership and transfers."  *See* Release No. 34-97309 at 10.  The SEC has conspicuously *not* pled that the Terra blockchain functioned differently.

*Second*, when announcing its partnership with Chai in July 2019, TFL highlighted that Chai had "partnered up with 15 major local banks to facilitate convenient fiat on- and off-ramp,"

---

[20] *See also* https://docs.terra.money/learn/fees ("Gas is a small computational fee that covers the cost of processing a transaction.  ...  Any transaction that does not contain enough gas will not process.").

allowing it to receive KrW from customers (the "on-ramp") and pay KrW to merchants (the "off-ramp").  Ex. L.  And in April 2020, when describing Chai as "seamless user facing experiences built with our blockchain powered infrastructure," TFL again highlighted that Chai was built around a fiat on-ramp for consumers and a fiat off-ramp for merchants.  Ex. M.  Those public statements disclosed that Chai used KrW and KrT.

The SEC alleges that transactions were "replicated" on the blockchain "as if they had originally 'settled' on the Terraform blockchain" when in fact they "had *already happened* in the real world using Korean Won."  AC ¶¶ 135, 142.  But the SEC does not allege that Terra blockchain entries are not themselves transfers of value; when a KrT transaction appears in the Terra blockchain it means that KrT has moved from the user's wallet to the merchant's wallet.  That is a transfer of value from the user (who originally owned the KrT) to the merchant (who owns it after the transfer).  The SEC alleges nothing to contradict that, which is not surprising given that *after* the SEC commenced this case it reiterated that digital assets generally use blockchains "to record ownership and transfers."  *See* Release No. 34-97309 at 10.  The SEC also *assumes* that merchants were paid in KrW *prior to* transactions being recorded on the Terra blockchain, but does not plead any facts to support that assumption.  Moreover, the SEC concedes that the Terra blockchain confirms transactions in KrT in six seconds (AC ¶ 143) and that merchants are paid KrW later.  The SEC's allegations are thus consistent with (a) its previously expressed statements about blockchain operations and (b) Chai actually using the Terra blockchain to effect—"settle"—payments, meaning the fraud claim fails because it does not meet the *Iqbal/Twombly* standards.

As for the SEC's assertion that "no Chai transactions occurred on the blockchain" because in "five instances between October 2021 and March 2022, there were one or more days when no transactions whatsoever were confirmed on the blockchain" "[y]et there is no evidence that the Chai payment application was not functioning during those periods (AC ¶ 143), that is false.  The *public* blockchain data does *not* show one or more days when no transactions whatsoever were confirmed on the Terra blockchain, let alone "five instances."

29

Nor has the SEC shown that Mr. Kwon's tweets inviting users to identify "which wallet address belongs to which merchant" using Chai and confirming that a user had done so (AC ¶¶ 138–39) were false or misleading. The SEC does not dispute that the user did correctly identify which wallet belonged to which merchant. That the merchants' wallets were managed for them by TFL does not render Mr. Kwon's tweets that they belonged to the merchants false.[21] Because TFL disclosed that it managed all wallets for users and merchants to effectuate Chai's goal of allowing users and merchants to effect payments without themselves interacting directly with the blockchain, the tweets are consistent with that *disclosed* design specification for Chai.[22]

Finally, the SEC's reference to comments by third parties does not support its theory. The allegation that "Chai itself has denied in emails to its own investors that it used a blockchain to process its payments" (AC ¶ 144) is meaningless without context to explain what was meant by "to process"—assuming Chai used that phrase and it is not the SEC's inaccurate rendition. And the allegation that an unnamed TFL employee said "[b]asically chai doesn't need Terra to work" (AC ¶ 145) is irrelevant. Chai's payment system obviously worked on its own when the TFL partnership was announced in July 2019, so of course Chai did not "need" the Terra blockchain. But that says nothing about whether Chai chose to and did incorporate the Terra blockchain into its system. The only relevant issue is what Chai *did*, not what it "need[ed]."

The May 2021 Depeg: The SEC fails to plead any misstatement or omission regarding UST regaining its peg in May 2021. The SEC alleges that Defendants "falsely reported that the peg was restored due to the success of UST's algorithm" and "misleadingly omitted the real

---

[21] The SEC's focus on the Chai "LP server" allegedly batching Chai data before sending it to the Terra blockchain (AC ¶¶ 135, 142) is a red herring. The SEC identifies nothing misleading about batch processing payments, which is not surprising given that it is *normal* in the payment processing industry. *See, e.g,* https://www.ncr.com/blogs/payments/batch-credit-card-processing ("When it comes to credit card processing, there are a few different ways merchants can run their transactions. The two main types are real-time processing and batch payment processing.").

[22] The SEC's contention that because these were managed accounts "these blockchain transactions do not reflect real-world, arms-length transfers of KRT between consumers and merchants" (AC ¶ 141) is supported by no factual allegations and is a pure conclusion. Mr. Kwon's tweets did not assert that consumers sent KrT directly to merchants, and the Chai public disclosures discussed above made clear disclosure to the contrary.

reason for the re-peg—the deliberate intervention by a third party … to buy large amounts of UST to restore its value." AC ¶ 118. The SEC does not allege that Defendants omitted to state that the Trading Firm purchased UST in an effort to restore the peg in May 2021, nor could it. Prior to the May 2021 depeg, TFL publicly disclosed that open market purchases might be made to support stablecoin pegs in both 2020 and 2021. Ex. S at 2; Ex. N. Rather, the SEC alleges that Defendants failed to declare that the Trading Firm's purchasing of UST was the "the real reason" UST regained its peg, and that statements that "UST's algorithm" contributed to UST regaining its peg were false. The SEC's theory fails for several reasons.

*First*, there was no general duty to disclose any and all information about open market purchases that may have been made to support the peg in May 2021. "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak," and a duty to disclose does not arise "from the mere possession of nonpublic market information." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). The SEC must identify a material fact whose disclosure was "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). The SEC does not identify any statements by Defendants *regarding the depeg* that the SEC claims were rendered false or misleading by the alleged failure to disclose the alleged open market purchases.

Searching for a hook to hang its omission theory on, the SEC grasps at a few tweets and a podcast interview. *First*, the tweets did not address how UST regained its peg because they were posted on May 23 and early May 24, *one week before UST fully regained its peg on May 31. See* AC ¶¶ 158, 163–64. *Second*, none of the tweets are actionable:

- With respect to the May 23 tweet (AC ¶ 163), the SEC does not dispute that, as Mr. Kwon tweeted, TFL held a nominal amount of the total UST in circulation at the time ($59 million of over $2 billion).

- The other tweets (one by Mr. Kwon that "[b]uilding pure, unbiased and decentralized money is the long game," AC ¶ 163 and one by TFL that "[a]lgorithmic, calibrated adjustments of economic parameters are more effective than faxes and suits in meetings" among central bankers, AC ¶ 164) are non-actionable expressions of opinion, expectations, or declarations of intention. *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 647 (S.D.N.Y. 2015). Such "general statements of corporate optimism" that the

Terra protocol's "strategies would be successful" are not representations as to existing facts and are thus non-actionable. *Id.* at 648-49.

The SEC has also not pled that the third statement it challenges—made in March *2022*, during a podcast unrelated to the May 2021 depeg—was inaccurate. The SEC's assertion that Mr. Kwon falsely represented that UST recovered its peg without any human involvement when he said "the protocol automatically self-heals" (AC ¶ 165) takes Mr. Kwon's words entirely out of context. From the beginning, descriptions of the peg maintenance system explicitly relied on human intervention (the decentralized community of users) to support the peg by using the mint-burn mechanism supplemented by open market purchases. *See supra* at 2–3. And on that podcast, Mr. Kwon briefly reflected on the mint-burn mechanism a year earlier:

> Similar to what happened in May of 2021, where there were too many UST redemptions that we're looking to happen against LUNA, in which case the AMM slippage costs[23] rose the other way. And it took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.

Ex. O. The SEC has not alleged any facts to show that Mr. Kwon's actual statement was in any way false or explained why disclosure of alleged open market purchases was necessary to make his statement not misleading. The statement at issue did not purport to be a comprehensive description about how UST recovered its peg in May 2021, but was instead a narrowly focused comment on issues specific to the speed of the mint-burn mechanism. In any event, TFL did tweet an extensive analysis explaining why the algorithm did not provide instant recovery, *see* Ex. P, and the SEC has not alleged that anything therein was false or misleading.

The SEC's theory also fails because the allegedly omitted "fact"—that the Trading Firm caused UST to regain its peg—is the SEC's opinion, not a well-pled fact. *First*, publicly available blockchain data shows that users did burn UST in exchange for LUNA, which did

---

[23] "Slippage costs" generally refers to refers to the difference between the expected price of a transaction and the price actually received upon execution. In periods of high volatility, low liquidity, or increased demand, slippage can increase, which increases the transaction costs borne by traders. Slippage costs are a feature of nearly all financial markets.

contract the supply of UST, which did raise UST's price, during this period.  *See* Ex. NN.  From the date UST began to lose its peg to the date it regained its peg, circulating UST supply declined from $2.12 billion to $1.95 billion, reflecting the fact that users burned about $170 million of UST (net of minting).  The SEC's unsupported assertion that the mint-burn mechanism did not contribute to UST regaining its peg (AC ¶ 166) is thus insufficient to support the SEC's claim.

That the Trading Firm was the "exclusive cause" of UST regaining its peg is also not a well-pled fact, because even accepting the SEC's opinions as facts, the firm's alleged purchases were a fraction of total UST transactions at the time.  Publicly available blockchain data shows that users bought $861 million worth of UST on global markets and burned an additional net $139.3 million worth of UST on the Terra protocol while the Trading Firm was supposedly buying UST.  But the SEC alleges that the Trading Firm purchased just $60 million of UST.  *See* Ex. NN.  The SEC's allegation that the Trading Firm caused 100% of the price recovery with 6% of open market UST transactions is not plausible and thus does not satisfy *Iqbal* and *Twombly*.

## 2.    No Use of a Statement to Obtain Money or Property

The SEC's Section 17(a)(2) claim also fails because the SEC has not alleged that Defendants used alleged misrepresentations or omissions to obtain money or property.  "It must be plausibly alleged that the money was obtained 'by means of' the false statement."  *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting 15 U.S.C. § 77q(a)).  The SEC has pled no connection between any alleged false statement and any money made by Defendants.

The one instance in which the SEC alleges that Defendants mentioned Chai in a meeting with an institutional purchaser fails to plead that LUNA tokens were purchased as a result of any allegedly false statement.  The SEC merely alleges that Defendants "told the investor that the Terraform blockchain was being used to process Chai transactions" and that the purchaser cited "Chai's purported transactions on the Terra[] blockchain" in an internal memo.  AC ¶ 151.  That fails to plead falsity for the reasons demonstrated above.  But even if the SEC has alleged a misstatement, it does not allege that Mr. Kwon personally obtained any money from it; at most the SEC alleges that a private LUNA token purchase was correlated with an alleged misstatement, but that is not enough.  *See SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y.

2013); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016). Because the SEC does not even try to allege that Defendants used the alleged omission about the Trading Firm to obtain money or property, the Section 17(a)(2) claim fails.

### 3. No Deceptive Act Under Section 17(a)(3)

Alleged misstatements or omissions alone cannot support a claim for scheme liability; the SEC must allege a deceptive act. *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022). Here, the SEC has pled none. The one supposedly "deceptive act" alleged by the SEC is Chai's use of the Terra blockchain. *See* AC ¶ 134. The SEC's first problem is that it concedes that Chai did use the Terra blockchain, it just has a different opinion (unsupported by factual allegations) about *how* Chai used it. And the SEC offers no explanation for how anyone could have been deceived into thinking Chai did not use KrW when TFL publicly disclosed Chai's use of KrW. Because the SEC has not alleged any deceptive acts, it has not pled a Section 17(a)(3) claim.

### 4. No Requisite State of Mind Under Section 17(a)(2) or (a)(3)

Both Section 17 claims fail because the SEC has not alleged facts capable of establishing that anything was done with the requisite state of mind, which is at least negligence. *SEC v. Ginder*, 752 F.3d 569, 575 (2d Cir. 2014). The SEC's threadbare allegation that TFL and Mr. Kwon acted "negligently" (AC ¶ 175) is not enough. The AC contains no non-conclusory allegations articulating why any challenged statement or act was "sloppy or ill-calculated." *Ginder*, 752 F.3d at 575. Indeed, the SEC's only allegations of "knowledge" are made in connection with the claim asserted under Section 10(b), which fails for other reasons. *See infra* at 35–37. The SEC therefore has not adequately pled the requisite state of mind.

### B. The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act Section 17(a)(1).

"To state a claim pursuant to section 10(b) and Rule 10b–5, the SEC must adequately allege that a defendant '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *SEC v. Lyon*, 529 F. Supp. 2d 444, 450 (S.D.N.Y. 2008). This claim fails because the SEC does not adequately allege any misstatements or omissions.

The Second Claim—and the First Claim to the extent it asserts a claim for scheme liability under Section 17(a)(1), which mirrors Rule 10b-5(a), *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017)—should also be dismissed because the SEC has not pled scienter. To adequately plead scienter, the SEC must "allege facts that raise a strong inference" that a defendant knew or was reckless in not knowing that its conduct was deceptive. *SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 250 (S.D.N.Y. 2013). A reckless disregard for the truth is "highly unreasonable conduct that is an extreme departure from the standards of ordinary care." *Id.* The SEC has not carried that burden here.

Chai Payment Service: The SEC relies on near-miss allegations in the hope that the Court will infer more than those allegations can support:

| What The SEC Alleges | What The SEC Wants The Court To Infer |
|---|---|
| That Mr. Kwon "wrote much of the Terraform blockchain code." (AC ¶ 146) | That Mr. Kwon wrote some or all of the Chai codebase. |
| That Mr. Kwon "demonstrated knowledge of the location of Chai-related files." (AC ¶ 147) | That Mr. Kwon reviewed specific Chai-related files. |
| That Mr. Kwon supervised and instructed employees who programmed "the LP server." (AC ¶ 147) | That Mr. Kwon instructed employees in programming "the LP server." |
| That Mr. Kwon "held the most senior technical position at Terraform" and was "responsible for Terraform's coding and engineering strategy decisions." (AC ¶ 146) | That Mr. Kwon performed the same functions at Chai. |

If, after conducting a nearly two-year investigation, the SEC could have made specific factual allegations supporting the inferences in the righthand column, it would have, but "coming close" is not enough for a regulator that must allege fraud with particularity.[24] At best, the SEC

---

[24] *See, e.g., SEC v. Espuelas*, 698 F. Supp. 2d 415, 436 n.26 (S.D.N.Y. 2010) (dismissing Section 10(b) claims with prejudice because "the SEC ha[d] conducted a lengthy investigation" and thus "amendment would be futile"); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 186 (S.D.N.Y. 2008) ("The absence of any such allegations [of deceptive conduct] is particularly glaring since Capital Management (as well as other plaintiffs) already possesses the internal ... records necessary to plead a factually adequate claim."); *see also SEC v. City of Victorville*, 2013 WL 12133651, at *13 (C.D. Cal. Nov. 14, 2013) ("Given that the SEC has engaged in a three-year investigation into this matter, ... its decision to present no allegations to support of the request for disgorgement is significant and telling.").

alleges that Mr. Kwon had something more than secondhand knowledge about some parts of Chai's payment process. But the SEC makes no allegations that support inferences that anything Mr. Kwon said about Chai was untrue or that, if it was, he knew that it was.

The May 2021 Depeg: The SEC also fails to plead scienter with respect to the alleged misstatement or omission regarding the supposed true cause of UST regaining its peg in May 2021. The SEC's assertion that Defendants knew that the Trading Firm "had intervened to buy up UST because Terraform and Kwon discussed it with the U.S. Trading Firm at the time" (AC ¶ 167) does not suffice. *First*, the alleged omission is not that the Trading Firm tried to restore the peg by buying UST, it is that the Trading Firm was "the real reason" (AC ¶ 118) the peg was restored (as opposed to the 94% of UST transactions no one attributes to the Trading Firm). The AC alleges no facts establishing that Mr. Kwon knew that the Trading Firm restored the peg. It bears emphasis that the Trading Firm was subpoenaed in the SEC's investigation, and if the SEC had discovered facts that supported the allegation that the Trading Firm was "the real reason" the peg was restored, it would have pled them. That it did not speaks volumes.

*Second*, the AC contains no well-pled allegations establishing that Mr. Kwon knew that the Trading Firm had purchased UST or how much. All the SEC alleges is that on May 23, 2021 Mr. Kwon "discussed" with the Trading Firm how to restore the peg and then *concludes* that the Trading Firm "responded by purchasing large quantities of UST." AC ¶¶ 157–58. The SEC does not allege that the firm advised Mr. Kwon at any time that it would buy UST to restore the peg, that it had begun buying up UST (as the SEC's demonstrative tries to suggest), or that it advised Mr. Kwon it had done anything specific with respect to the peg. *See* AC ¶ 158. Again, if the SEC had such information from the Trading Firm, one would have expected a detailed recitation of what the Trading Firm did, when, how that was communicated to Mr. Kwon, and how it related to the price response of UST. Yet the AC is silent.

In the absence of relevant factual allegations, the SEC instead tries to raise suspicion by pointing to a transaction between TFL and the Trading Firm *after* UST regained its peg. *See* AC ¶¶ 159–60. But that transaction was a modification of a preexisting agreement by which TFL had loaned the firm LUNA tokens with an option to buy. The parties entered into the agreement

36

nearly a year earlier, and the agreement was subject to multiple re-negotiations, with the first modification occurring *seven weeks prior to* the May 2021 depeg.  Ex. H.  The second modification, signed a full *two months after* the May 2021 depeg, on July 21, 2021, was simply a continuation of these negotiations.  The SEC's suggestion that the modification "rewarded" the Trading Firm for restoring the peg is specious because the modification did not change the economics of the *pre-depeg* deal.  It did not give the Trading Firm more LUNA tokens, modify the option to buy the tokens, or change the $0.40 strike price that was initially agreed to (when LUNA was, as the SEC omits to mention, trading *at less than $0.30*).  Ex. Q.  But speaking of omissions, the *SEC's allegations* omit discussion of what the Trading Firm gave up in the renegotiation.  Rather than receiving the tokens in sets of 5 to 10 million when it achieved benchmarks over which it had absolute control, the modification forced the Trading Firm to accept distribution of 1 million tokens per month over a longer period of time.  Ex. Q.  The SEC's attempt to paint the modification as a sweetheart deal does not support scienter.

### C.    The SEC Has Not Pled a Violation of '34 Act Section 20(a).

 "To state a claim for control person liability, the SEC must plead facts showing: (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020).  This claim fails at the gate for lack of any primary violation of Section 10(b).  The claim also fails because the SEC has not pled facts sufficient to show that Mr. Kwon possessed the requisite control over, or was a culpable participant in, any challenged statements made or acts performed by others at TFL.

The SEC cannot establish control person liability simply by pointing to Mr. Kwon's title, because Section 20(a) demands "actual control over the transaction in question."[25]  The SEC's allegations do not establish that Mr. Kwon had actual control over any challenged statement by TFL, as he is not even alleged to have reviewed let alone approved any tweet published by TFL's

---

[25] *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 487 (S.D.N.Y.2005).

twitter feed.  Nor do the SEC's allegations establish that Mr. Kwon had actual control over the one challenged act by TFL employees.  The SEC does not allege that Mr. Kwon directed or approved how anyone integrated Chai's processes with the Terra blockchain.[26]

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the AC in its entirety with prejudice.

Dated:  April 21, 2023                    Respectfully submitted,

                                          /s/ Douglas W. Henkin
                                          **DENTONS US LLP**
                                          Douglas W. Henkin
                                          David L. Kornblau
                                          1221 Avenue of the Americas
                                          New York, New York 10020
                                          Tel: (212) 768-6700
                                          douglas.henkin@dentons.com
                                          david.kornblau@dentons.com

                                          Mark G. Califano
                                          Nicholas W. Petts (admission forthcoming)
                                          1900 K Street, NW
                                          Washington, DC 20006-1102
                                          Tel: (202) 496-7500
                                          mark.califano@dentons.com
                                          nicholas.petts@dentons.com

                                          Stephen J. Senderowitz (admitted *pro hac vice*)
                                          233 S. Wacker Drive
                                          Chicago, Illinois 60606
                                          Tel: (312) 876-8141
                                          stephen.senderowitz@dentons.com

                                          *Counsel for Defendants Terraform Labs Pte. Ltd.*
                                          *and Kwon Do Hyeong*

---

[26] Culpable participation requires "particularized facts of the controlling person's conscious misbehavior or recklessness"  *Sason*, 433 F. Supp. 3d at 514–15.  Because the SEC has not alleged that Mr. Kwon reviewed any tweets by TFL before they were published or reviewed or participated in writing any Chai code, it has not pled that he had the requisite state of mind with respect to such activities.