**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP CRYPTO, JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON,<br><br>        Defendants. | Case No. 22-cv-03600-TLT<br><br><br>**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO TFL DEFENDANTS' MOTION TO DISMISS UNDER 12(B)(2); MOTION TO DISMISS UNDER 12(B)6; AND MOTION TO COMPEL ARBITRATION**<br><br>Date: September 19, 2023<br>Time 2:00 p.m. |

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ........................................................... 1

III. THIS COURT HAS PERSONAL JURISDICTION ........................................ 5

    A.   Legal Standard ......................................................................................... 5

    B.   Argument .................................................................................................. 6

            1.   The TFL Defendants Purposefully Availed themselves of
                the U.S. ........................................................................................ 6

                    a.   A U.S. Court of Appeals Has Rejected the TFL
                          Defendants' Personal Jurisdiction Arguments ....................... 6

                    b.   TFL Contracted with U.S. Firms to Target U.S.
                          Investors ................................................................................. 7

                    c.   The TFL Defendants Traveled to the U.S.,
                          Promoted Terra Tokens to U.S. Investors, and
                          Maintained Numerous Employees in the United
                          States ...................................................................................... 9

                    d.   The TFL Defendants Defrauded U.S. Investors and
                          Used the U.S. Banking System in Their Fraud ..................... 11

                    e.   The Court has Personal Jurisdiction over Do Kwon ............. 12

             2.   The TFL Defendants Ignore the Allegations in the SAC ................. 12

IV. TFL DEFENDANTS' MOTION TO COMPEL ARBITRATION FAILS ............... 14

    A.   Legal Standard ....................................................................................... 15

    B.   Argument ................................................................................................ 16

            1.   The Anchor Terms of Service ......................................................... 16

            2.   Plaintiffs' Claims Do Not Touch Matters Covered by the
               Terms ............................................................................................ 18

                    a.   Unregistered Securities Claim Under the Securities
                        Act ......................................................................................... 18

                      b.   Fraud claims under the Securities Exchange Act ................. 19

             3.   TFL Defendants Gloss Over the Relevant Caselaw on the
               Scope of Arbitration Agreements .................................................. 19

i

V.      THE COURT SHOULD DENY TFL'S MOTION TO DISMISS
        UNDER 12(B)(6)..................................................................................... 23

        A.      Legal Standards................................................................................. 23

        B.      The Terra Tokens Are Securities Under *Howey* ............................... 23

                1.      Investment of Money in the Terra Tokens............................ 24

                2.      Common Enterprise ............................................................... 24

                3.      Reasonable Expectation of Profits......................................... 25

                4.      Managerial Efforts ................................................................. 27

        C.      The 12(a)(1) Claim Is Adequately Alleged ....................................... 28

        D.      Plaintiffs Sufficiently Pled 10b and 20 Violations .......................... 30

                1.      Scheme Liability Claims........................................................ 30

                2.      Misleading Statement Claims ................................................ 31

                        a.      Material Misstatements and Omissions ...................... 31

                        b.      *Scienter* ..................................................................... 35

                        c.      Reliance...................................................................... 36

                        d.      Loss Causation ........................................................... 36

                3.      Control Person Claims ........................................................... 36

        E.      The SAC Adequately Alleges RICO Claims in the Alternative.................. 37

                1.      Legal Standards...................................................................... 37

                1.      Plaintiffs' RICO Claim is Not Barred.................................... 38

                2.      Plaintiffs Have Standing to Pursue a RICO Claim ............... 38

                3.      The SAC Alleges Numerous Predicate Acts .......................... 38

                4.      The Alleged RICO Enterprise................................................ 40

                5.      The Pleadings Establish a Pattern or Continuity ................. 41

        F.      State Law Claims Are Sufficiently Pled............................................ 42

                1.      Aiding and Abetting and Conspiracy Claims ....................... 42

                2.      Unjust Enrichment ................................................................. 44

VI.       LEAVE TO AMEND ................................................................................45

VII.     CONCLUSION......................................................................................46

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

Cases

4

*19 Tao Vega LLC v. Holo Ltd.*,
   2019 WL 9607733 (N.D. Cal. Dec. 17, 2019) ................................................................. 10, 11

5

*Advideo, Inc. v. Kimel Broad. Grp., Inc.*,

6
   727 F. Supp. 1337 (N.D. Cal. 1989) .................................................................................. 8

7

*Alexis v. Rogers*,
   2016 WL 11707630 (S.D. Cal. Feb. 26, 2016) .................................................................. 10

8

9

*Allwaste, Inc. v. Hecht*,
   65 F.3d 1523 (9th Cir. 1995) ....................................................................................... 38, 39

10

*Ashbey v. Archstone Prop. Mgmt., Inc.*,

11
   785 F.3d 1320 (9th Cir. 2015) ........................................................................................... 15

12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................... 23

13

14

*ATBCOIN LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................................................ passim

15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

16
   493 F.3d 87 (2d Cir. 2007) ................................................................................................ 30

17

*Attia v. Google LLC*,
   983 F.3d 420 (9th Cir. 2020) ............................................................................................. 41

18

19

*Ballard v. Savage*,
   65 F.3d 1495 (9th Cir. 1995) ......................................................................................... 5, 8

20

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,

21
   1998 WL 42575 (S.D.N.Y. Feb. 4, 1998) ......................................................................... 39

22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 23

23

24

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ........................................................................................... 45

25

*Berson v. Applied Signal Tech., Inc.*,

26
   527 F.3d 982 (9th Cir. 2008) ............................................................................................. 32

27

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ........................................................................................... 23

28

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2021 WL 4503137 (N.D. Cal. Oct. 1, 2021)................................................................29

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2022 WL 2954937 (N.D. Cal. July 26, 2022)............................................................29

*Boyle v. United States*,
    556 U.S. 938 (2009)..................................................................................................37

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ..................................................................................15

*Brown v. 140 NM LLC*,
    2019 WL 118425 (N.D. Cal. Jan. 7, 2019) ...............................................................10

*Bryant v. Mattel, Inc.*,
    573 F. Supp. 2d 1254 (C.D. Cal. 2007) ....................................................................39

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)....................................................................................................6

*C&M Cafe v. Kinetic Farm, Inc.*,
    2016 WL 6822071 (N.D. Cal. Nov. 18, 2016) ..........................................................37

*Calder v. Jones*,
    465 U.S. 783 (1984)..................................................................................................11

*Calix Networks, Inc. v. Wi-Lan, Inc.*,
    2010 WL 3515759 (N.D. Cal. Sept. 8, 2010) .............................................................7

*Casey v. U.S. Bank Nat. Assn.*,
    127 Cal. App. 4th 1138 (2005) .................................................................................44

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)..................................................................................................30

*Chapman v. Rudd Paint & Varnish Co.*,
    409 F.2d 635 (9th Cir. 1969) ....................................................................................18

*CollegeSource, Inc.*,
    653 F.3d ......................................................................................................... 6, 10, 13

*Congdon v. Uber Techs., Inc.*,
    291 F. Supp. 3d 1012 (N.D. Cal. 2018) ....................................................................20

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)....................................................................................................5

*Davis v. Metro Prods., Inc.*,
    885 F.2d 515 (9th Cir. 1989) ....................................................................................12

*DeFrees v. Kirkland*,
    2012 WL 12885114 (C.D. Cal. July 20, 2012) .......................................................... 43

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ................................................................................ 36

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
    No. 20 CIV. 4650 (ER), 2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) ........................ 24

*Doan v. Singh*,
    617 F. App'x 684 (9th Cir. 2015) ........................................................................... 40

*Donovan v. Coinbase Glob., Inc.*,
    2023 WL 2124776 (N.D. Cal. Jan. 6, 2023) ...................................................... 22, 23

*Elias v. Superior Ct.*,
    2015 WL 1455910 (Cal. Ct. App. Mar. 30, 2015) ...................................................... 22

*Esparza v. SmartPay Leasing, Inc.*,
    2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) ...................................................... 21, 22

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ................................................................................ 32

*Fernandez v. Debt Assistance Network, LLC*,
    2020 WL 583973 (S.D. Cal. Feb. 6, 2020) ............................................................. 22

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ........................................................................................... 16

*Friel v. Dapper Labs, Inc.*,
    2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) ........................................... 24, 27, 37

*Garrison v. Ringgold*,
    No. 19CV244-GPC(RBB), 2019 WL 2089509 (S.D. Cal. May 13, 2019) ................... 34

*Gilbrook v. City of Westminster*,
    177 F.3d 839 (9th Cir. 1999) ................................................................................ 43

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
    972 F.3d 1101 (9th Cir. 2020) .............................................................................. 12

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ........................................................................................... 15

*Hanni v. Am. Airlines, Inc.*,
    2008 WL 5000237 (N.D. Cal. Nov. 21, 2008) ......................................................... 43

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003) ................................................................................ 8

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ................................................................. 24, 25

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) .................................................................. 40, 41

*Howard v. Goldbloom*,
    30 Cal. App. 5th 659 (2018) ......................................................................... 22

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ........................................................................ 32

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................... 30

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) .......................................................... 36

*In re Nat'l Golf Props. Inc. Sec. Litig.*,
    2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ............................................ 34

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) .......................................................... 31

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...................................................................... 34

*In re Safeway Tuna Cases*,
    2016 WL 3743364 (N.D. Cal. July 13, 2016) ............................................... 45

*In re Twitter Inc. Sec. Litig.*,
    326 F.R.D. 619 (N.D. Cal. 2018) .................................................................. 29

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    480 F. Supp. 3d 1050 (N.D. Cal. 2020) .......................................................... 5

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    No. LA ML19-02905 JAK, 2022 WL 522484 (C.D. Cal. Feb. 9, 2022) ......... 41

*Jackson v. Amazon.com, Inc.*,
    65 F.4th 1093 (9th Cir. 2023) ................................................................. 16, 21

*Jones v. Deutsche Bank AG*, No. C,
    04-05357 JW, 2005 WL 1683614 (N.D. Cal. July 19, 2005) ......................... 38

*Kidron v. Movie Acquisition Corp.*,
    40 Cal. App. 4th 1571 (1995) ....................................................................... 42

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008) ....................................................................... 46

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014) ........................................................................... 23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ............................................................................. 11

*Longyu Int'l Inc. v. E-Lot Elecs. Recycling Inc.*,
   2014 WL 1682811 (C.D. Cal. Apr. 29, 2014) ................................................. 11

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ........................................................................... 46

*Lutge v. Harrington*,
   No. 22-CV-00585-TLT, 2022 WL 18401350 (N.D. Cal. Dec. 20, 2022) ................................ 46

*Maksoud v. Williams*,
   2018 WL 1150721 (C.D. Cal. Jan. 19, 2018) ......................................... 45, 46

*Malhotra v. Copa de Oro Realty, LLC*,
   2015 WL 12656293 (C.D. Cal. Sept. 23, 2015) ............................................... 39

*Mattel, Inc. v. Greiner & Hausser GmbH*,
   354 F.3d 857 (9th Cir. 2003) ............................................................................. 5

*Matter of Munchee Inc.*,
   Release No. 10445 (Dec. 11, 2017) 2017 WL 10605969 .......................... 27, 28

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ........................................................................... 13

*McCluskey v. Hendricks*,
   2021 WL 4815938 (C.D. Cal. June 16, 2021) ................................................. 37

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   900 F.2d 576 (2d Cir. 1990) ............................................................................. 32

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ........................................................................... 32

*Morgan v. Sundance, Inc.*,
   142 S. Ct. 1708 (2022) ..................................................................................... 20

*N.Y. City Emps.' Ret. Sys. v. Berry*,
   616 F. Supp. 2d 987 (N.D. Cal. 2009) ............................................................. 30

*Neilson v. Union Bank of Cal., N.A.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003) ........................................................... 44

*Newton v. Am. Debt Servs., Inc.*,
   No. C-11-3228 EMC, 2013 WL 5592620 (N.D. Cal. Oct. 10, 2013) .................. 44

*Nguyen v. OKCoin USA Inc.*,
　2023 WL 2095926 (N.D. Cal. Feb. 17, 2023) ........................................ 23

*Nissan Motor Co. v. Nissan Comput. Corp.*,
　89 F. Supp. 2d 1154 (C.D. Cal. 2000) .................................................. 8

*Odom v. Microsoft Corp.*,
　486 F.3d 541 (9th Cir. 2007) ................................................ 37, 39, 42

*Okun v. Superior Court*,
　29 Cal. 3d 442 (1981) ........................................................ 42

*Owen v. Elastos Foundation*,
　2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ............................................ 9

*Pearl v. Coinbase Glob., Inc.*,
　2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) .......................................... 23

*People ex rel. Kennedy v. Beaumont Inv., Ltd.*,
　111 Cal. App. 4th 102 (2003) ...................................................... 43

*Picot v. Weston*,
　780 F.3d 1206 (9th Cir. 2015) ................................................... 5, 6

*Prodanova v. H.C. Wainwright & Co., LLC*,
　2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ........................................ 35

*Rainier Credit Co. v. W. All. Corp.*,
　171 Cal. App. 3d 255 (Cal. Ct. App. 1985) ........................................ 20

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
　2019 WL 281370 (N.D. Cal. Jan. 22, 2019) ......................................... 37

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
　845 F.3d 1268 (9th Cir. 2017) .................................................... 33

*Reves v. Ernst & Young*,
　507 U.S. 170 (1993) ............................................................. 40

*Rocawear Licensing LLC v. Pacesetter Apparel Grp.*,
　2007 WL 5289737 (C.D. Cal. Sept. 12, 2007) ....................................... 43

*S. Ferry LP, No. 2 v. Killinger*,
　542 F.3d 776 (9th Cir. 2008) ................................................. 35, 36

*S.E.C. v. W.J. Howey Co.*,
　328 U.S. 293 (1946) .......................................................... 23, 24

*Schwarzenegger v. Fred Martin Motor Co.*,
　374 F.3d 797 (9th Cir. 2004) ...................................................... 5

ix

*Sebastian Int'l, Inc. v. Russolillo*,
   186 F. Supp. 2d 1055 (C.D. Cal. 2000) ................................................................. 38

*SEC v. PlexCorps*,
   2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018).......................................................... 9

*SEC v. Strategic Glob. Invs., Inc.*,
   262 F. Supp. 3d 1007 (S.D. Cal. 2017).................................................................. 34

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................................................... 25

*SEC v. Terraform Labs Pte Ltd.*,
   2022 WL 2066414 (2d Cir. June 8, 2022) ...................................................... passim

*SEC v. Zandford*,
   535 U.S. 813 (2002) .............................................................................................. 30

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .............................................................................................. 37

*SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*,
   976 F.3d 849 (9th Cir. 2020) .......................................................................... 19, 20

*Senne v. Kansas City Royals Baseball Corp.*,
   105 F. Supp. 3d 981 (N.D. Cal. 2015) .................................................................. 10

*Sher v. Johnson*,
   911 F.2d 1357 (9th Cir. 1990) ................................................................................ 6

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) .............................................................................. 30

*Sinatra v. Nat'l Enquirer, Inc.*,
   854 F.2d 1191 (9th Cir. 1988) ................................................................................ 9

*So v. Land Base, LLC*,
   2009 WL 5088745 (C.D. Cal. Dec. 16, 2009) ...................................................... 22

*SolarCity Corp. v. Pure Solar Co.*,
   2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) ..................................................... 40

*Solis v. Latium Network, Inc.*,
   2018 WL 6445543 (D.N.J. Dec. 10, 2018) ............................................................ 26

*Spy Optic, Inc. v. AreaTrend, LLC*,
   843 F. App'x 66 (9th Cir. 2021) ............................................................................ 13

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .............................................................................. 28

*Temming v. Summus Holdings, LLC*,
   2021 WL 5014854 (N.D. Cal. Oct. 28, 2021)................................................................ 10

*Tompkins v. 23andMe, Inc.*,
   2014 WL 2903752 (N.D. Cal. June 25, 2014) .............................................................. 21

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019)............................................................................................ 7

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
   241 F.3d 135 (2d Cir. 2001)............................................................................................ 8

*United States v. Cagnina*,
   697 F.2d 915 (11th Cir. 1983) ...................................................................................... 41

*United States v. Christensen*,
   801 F.3d 970 (9th Cir. 2015) ........................................................................................ 40

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) ........................................................................................ 41

*United States v. Moreland*,
   622 F.3d 1147 (9th Cir. 2010) ...................................................................................... 44

*United States v. Zaslavskiy*,
   2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............................................................ 27

*Vance's Foods, Inc. v. Special Diets Eur. Ltd.*,
   2012 WL 1353898 (E.D. Cal. Apr. 16, 2012).............................................................. 8

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...................................................................................... 23

*Victor v. R.C. Bigelow, Inc.*,
   2015 WL 4104609 (N.D. Cal. July 7, 2015)................................................................ 44

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................................... 31, 34

*White v. Seabrooks*,
   2022 WL 2189637 (C.D. Cal. Feb. 4, 2022)............................................................... 41

*Wyatt v. Union Mortg. Co.*,
   24 Cal. 3d 773 (1979) ................................................................................................... 42

*Yi v. GTV Media Grp. Inc.*,
   2021 WL 2535528 (S.D.N.Y. June 18, 2021) ....................................................... 24, 29

*Zakinov v. Ripple Labs, Inc.*,
   2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ..................................................... 24, 28, 29, 36

**Statutes**

15 U.S.C. §77l(a)(1) .................................................................................................... 37

15 U.S.C. §§77z-2(b)(1)(C), 78u-5(b)(1)(C) ............................................................... 34

15 U.S.C. §78u-4(b)(1)(B) .......................................................................................... 32

15 U.S.C. §77l(o) ........................................................................................................ 36

18 U.S.C. §1961(4) ...................................................................................................... 40

18 U.S.C. §1961(5) ...................................................................................................... 41

18 U.S.C. §1962(c) ...................................................................................................... 37

Cal. Civ. Proc. Code § 410.10 ...................................................................................... 5

**Rules**

Fed. R. Civ. P. 4(k)(1)(A) ............................................................................................ 5

**Other Authorities**

Pub. L. 91-452, §904(a), 84 Stat. 947 .......................................................................... 37

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION

## I.    INTRODUCTION

Through a brazen criminal scheme, Defendants Terraform Labs, Pte. Ltd. ("TFL") and its Chief Executive Officer, Do Kwon (together, "TFL Defendants") sold billions of dollars in unregistered cryptocurrencies. Eventually, the scheme collapsed, leaving TFL in shambles and Kwon in jail awaiting extradition to the U.S. or South Korea to face criminal charges. The Securities and Exchange Commission has brought a related action in the Southern District of New York concerning the same alleged wrongdoing.[1] This Action provides investors their only hope to recover from the TFL Defendants for the staggering monetary damages their fraud has caused. The Second Amended Complaint ("SAC") (Dkt. No. 102) details with requisite particularity the TFL Defendants' scheme. With the reasonable inferences the Court will draw from those facts, the SAC plausibly states a claim for relief. The TFL Defendants' arguments for dismissal and avoiding class liability are without merit. The Court should reject each of their myriad reasons for dismissal, permitting instead this case to proceed to discovery.

## II.   STATEMENT OF RELEVANT FACTS

TFL operates and maintains the Terra blockchain, a platform upon which TFL's ecosystem of financial products and services are developed and supported. TFL and Kwon sold and offered to sell investors three types of digital assets: (1) tokens that are native to the Terra ecosystem (*e.g.*, LUNA); (2) stablecoins (*e.g.*, UST); and (3) the various Mirrored Assets, Bonded Assets, and LP Tokens. SAC ¶42.[2] Notably, the LUNA and UST tokens operated as a pair that were maintained by an algorithm that purportedly "pegged" UST to a $1 value. SAC ¶62 ("Instead of swapping UST for $1 in dollar reserves in with over-collateralized stablecoins, investors could exchange one UST stablecoin for $1 worth of TFL's LUNA. But in order to maintain UST's 1:1 parity with the

---

[1] *See SEC v. Do Kwon and Terraform Labs Pte. Ltd.*, 23-cv-01346 (S.D.N.Y.). The TFL Defendants moved to dismiss the SEC's complaint, including claims for the sale of unregistered securities, *see id.,* Dkt. Nos. 29, 32, 38, raising similar arguments to those they advance here. Plaintiffs attach as Exhibit 1 to the Declaration of Laurence M. Rosen in Support of Lead Plaintiff's Opposition to the TFL Defendants' Motion to Dismiss and Motion to Compel Arbitration ("Rosen Decl.") the June 15, 2023, motion to dismiss oral argument transcript in that case. Judge Rakoff rejected several defenses the TFL Defendants raise here.

[2] "¶" or "SAC ¶" refers to paragraphs in the SAC (Dkt. No. 102). The digital assets at issue are collectively referred to as the "Terra Tokens." *See* SAC ¶¶61-68. References to "MTD" are to Dkt. No. 122.

1  U.S. dollar, TFL's algorithm mints and burns UST and LUNA to control the supply and keep the

2  value of UST steady at $1, while at the same time incentivizing arbitrageurs to trade the UST back

3  to its peg of $1 if it deviates. This latter mechanism creates an arbitrage opportunity meant to

4  encourage arbitrageurs to trade the UST/LUNA pair in order to trigger the mint/burn process and

5  thus, a return to $1.").

6      TFL also developed various programs called "protocols" to support the sale and promotion

7  of the Terra Tokens, namely the Mirror and Anchor Protocols. In particular, TFL's Anchor

8  Protocol served as a "marketing ploy" that promised UST investors the ability to earn high-yield

9  interest on deposits into the protocol. SAC ¶163. The Terra Tokens, related protocols, and overall

10  Terra ecosystem were promoted by TFL Defendants through a variety of forums, including widely

11  accessible online social media platforms, such as accounts on Twitter and Medium, messaging

12  applications with public channels like Telegram, and YouTube. *See* SAC ¶82, 100-102, 106. TFL

13  Defendants also provided monthly "Community Updates" on publicly available blogs, which

14  discussed their coding and development of the Terraform ecosystem. Relatedly, TFL employees

15  including Kwon touted their efforts to develop and support the Terraform ecosystem in monthly

16  investor emails that they distributed called "Terraform Labs Investor Update" (later renamed to

17  "Terraform Labs Ecosystem Update"). The recipients of these "Updates" had email addresses that

18  included, for example, an email group "investment@terra.money." These emails highlighted

19  TFL's engineering, coding, and the integration of applications into the Terraform ecosystem. SAC

20  ¶107. TFL's efforts to grow and maintain the Terraform ecosystem also included four substantial

21  version upgrades of the Terraform blockchain, adding new back-end technical features and front-

22  end user applications, and entering into partnerships with collaborators. SAC ¶106.

23      Throughout the Class Period, TFL Defendants repeatedly promoted LUNA, UST, and the

24  ways in which the Terra ecosystem could support the continued growth and increase in value of

25  the Terra Tokens. For example, in April 2019, Kwon and TFL's Head of Research, Defendant

26  Platias, released the LUNA whitepaper, which outlined TFL's blueprint for its algorithmic

27  stablecoin and repeatedly claimed the TFL stablecoin is both price-stable and growth-driven.

28  Notably, the whitepaper concludes that LUNA's "stable rewards are designed to absorb volatility

from changing economic cycles." SAC ¶120; *see also* SAC ¶¶100-104 (detailing specific solicitations of investments in LUNA by Kwon and TFL). In June 2020, Platias released the Anchor Protocol whitepaper, which discussed the features of the protocol and the ways in which UST investors could receive a fixed annual return of 20% and repeatedly referred to this high interest rate as "stable." ¶¶121-22. TFL published an introduction to the Anchor Protocol on July 6, 2020. *See* ¶123 ("Anchor, a savings protocol on the Terra blockchain," offered investors "a principle-protected stablecoin savings product that accepts Terra deposits and pays a stable interest rate."); ¶124 ("Throughout the post, Platias described Anchor's interest rate as "stable" and offering a "low-volatility yield" with a "reliable rate of return."). TFL Defendants made similar promotions of the Terra Tokens and Anchor Protocol from March to May 2021. SAC ¶¶125-27.

In May 2021, the UST/LUNA pair temporarily depegged from the supposedly stable $1 value. The TFL Defendants claimed that UST's recovery was due to the resiliency of the Terra algorithm. SAC ¶49-50. In truth, TFL had engaged in a manipulative scheme to restore the peg by using an undisclosed influx of capital to purchase UST to return its price to $1. *See* SAC ¶¶49; 187-203. The scheme consisted of TFL and Do Kwon secretly negotiating with Defendant Jump Trading to buy large amounts of UST to prop up its price, while telling the market that the algorithmic nature of the stablecoin had succeeded in restoring the peg. ¶¶165-66, 187-203.

A few months later, TFL announced the formation of the Luna Foundation Group ("LFG") for the purpose of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins." SAC ¶48 "The announcement noted previous criticisms directed towards algorithmic stablecoins like UST, but [LFG] downplayed the 'misconception' that algorithmic stablecoins are 'unsustainable.'" SAC ¶49. LFG is overseen by a "Governing Council" comprised of Kwon and Individual Defendant Platias on behalf of TFL, Defendant Jump Trading's President, Kanav Kariya, and three others (including Remi Tetot who has subsequently admitted that LFG – and by extension Kwon and TFL – knew all along that the UST/LUNA peg was not stable and that the promise of high interest yields from the Anchor Protocol were unsustainable). SAC ¶¶51, 53-55, 163, 256. TFL also stated that LFG was tasked with providing funding and grants for builders, researchers, community members, and developers

working "in the interest of the Terra economy." SAC ¶52. Significantly, TFL Defendants via LFG told investors that the May 2021 depegging "was not a sign that UST was more unstable than disclosed, but rather, a learning opportunity that UST was able to capitalize on." SAC ¶49.

Plaintiffs further allege that Kwon repeatedly downplayed highly accurate and specific criticisms about the long-term viability of the Terra Tokens and Anchor Protocol in order to deceive investors regarding the stability of the UST peg and the sustainability of the Anchor yield promotions. *See, e.g.*, ¶¶135, 147-49. TFL Defendants (directly and indirectly via Defendant Platias and LFG) concurrently promoted the same message through April 2022. *See, e.g.*, SAC ¶136-37, 141, 152-53.

From at least August 2019, through at least February 2022, TFL "sold billions of dollars of LUNA directly into secondary markets through transactions on crypto asset trading platforms, including those available to U.S. investors." SAC ¶34. TFL Defendants misled investors in Terra Tokens by, among other things, falsely marketing the Terraform blockchain as having real-world use. ¶¶166, 169. While TFL and Kwon claimed repeatedly that a Korean company, Chai, used the Terraform blockchain to process and settle millions of transactions for Korean consumers at retail establishments, this was false. ¶¶169-86. The transactions on the Terra blockchain that TFL Defendants attributed to Chai were, in fact, sham transactions. ¶¶177-80.

In early May 2022, the UST/LUNA pairing broke, causing another depeg of UST from its $1 value. The revelation that UST and LUNA were not nearly as stable as previously promoted caused a massive selloff of both UST and LUNA. ¶158. In particular, the price of UST and LUNA tokens dropped by 91% and 99.7% between May 7, 2022, and May 12, 2022, after it was revealed that TFL's largest digital assets were unstable and unsustainable. ¶¶10, 159-62. Following the collapse of the entire Terra ecosystem, authorities in the United States and South Korea filed charges against Kwon. *See* SAC ¶¶2, 11-13. Announcing the charges on February 16, 2023, SEC Chair Gary Gensler stated that TFL and Do Kwon "committed fraud by repeating false and misleading statements to build trust before causing devastating losses for investors."  SAC ¶2.

## III.   THIS COURT HAS PERSONAL JURISDICTION

### A.  <u>Legal Standard</u>

Defendants TFL and Kwon assert that this Court cannot exercise personal jurisdiction over them in this case. Courts deny Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction where a complaint makes a *prima facie* showing that jurisdiction exists. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).[3] To make this showing, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). In evaluating such a motion, courts take as true the complaint's uncontroverted jurisdictional allegations, *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004), resolving in the plaintiff's favor "conflicts between the facts contained in declarations submitted by the two sides []." *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003).

Federal courts follow state law when determining the bounds of their personal jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Because "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution," the inquiry centers on whether exercising jurisdiction over a particular defendant comports with due process. *Id.*; *see also* Cal. Civ. Proc. Code § 410.10. "Due process requires that the defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 480 F. Supp. 3d 1050, 1065 (N.D. Cal. 2020)). In cases under the Securities Act of 1933, the relevant forum is the United States. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig*., 480 F. Supp. 3d 1050, 1065 (N.D. Cal. 2020).

Courts in this Circuit evaluate personal jurisdiction by determining whether: (1) the defendant performed some act by which they purposefully availed themself of the privilege of

---

[3] All citations are omitted and emphasis is added unless otherwise noted.

conducting activities in the forum, thereby invoking the benefits and protection of its laws; or purposefully directed their activities or consummated some transaction with the forum or resident thereof; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. *See Picot*, 780 F.3d at 1211. After the plaintiff establishes the first two prongs, the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *CollegeSource, Inc*., 653 F.3d at 1076 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Exercising jurisdiction is reasonable unless the defendant establishes that the litigation is 'so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to [its] opponent.'" *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) (citing *Burger King*, 471 U.S. at 478).

### B. <u>Argument</u>

#### 1.   The TFL Defendants Purposefully Availed themselves of the U.S.

In the companion SEC Action, the Second Circuit rejected the TFL Defendants' nearly identical personal jurisdiction arguments, applying a substantially similar analysis that the Court will apply here. *See SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414, at *1 (2d Cir. June 8, 2022) ("*Terraform*"). The SAC alleges that the TFL Defendants purposefully availed themselves of the privileges of U.S. markets and laws by, among other things, (i) contracting with U.S.-based entities to sell Terra Tokens, including on a U.S.-based trading platform (SAC ¶¶82-83; ¶¶27-30;); (ii) traveling to the U.S. to offer, promote, and sell Terra Tokens to U.S. investors, maintaining employees in the U.S., and directing promotional efforts specifically at the U.S. (SAC ¶23, ¶41 ¶¶82-83); and (iii) making and disseminating materially false and misleading statements to U.S. investors. SAC ¶¶169-176, 185-186.

##### a.   A U.S. Court of Appeals Has Rejected the TFL Defendants' Personal Jurisdiction Arguments

In the course of its investigation, the SEC served subpoenas on the TFL Defendants in New York, instituting an enforcement action when they refused to comply. *Terraform*, 2022 WL 2066414, at *1. Affirming the district court's rejecting the TFL Defendants' arguments of insufficient contacts, the Second Circuit found that the TFL Defendants "purposefully availed

1   themselves of the U.S.," listing a host of contacts subjecting them to personal jurisdiction. *Id*. at

2   *3. The TFL Defendants promoted Terra Tokens to "U.S. consumers and investors," "retained

3   U.S.-based employees, including a Director of Special Projects that has promoted these digital

4   assets in the U.S," and "entered into agreements with U.S.-based entities to facilitate the trade of

5   these same digital assets." *See id*. The SAC alleges these same contacts. *See* SAC ¶¶82; 174-176;

6   Rosen Decl. Ex. 2-7.[4]

7         Rather than parry the Second Circuit's reasoning, TFL Defendants argue, without any

8   support, that "the SEC's jurisdictional assertions were made in the context of a proceeding to

9   enforce investigative subpoenas, not a plenary action." MTD at 25.  However, the TFL Defendants

10  did not even bother raising the difference between an enforcement proceeding and a plenary action

11  in the SEC case currently proceeding before Judge Rakoff. *See* 23-cv-01346 (S.D.N.Y.), Dkt. No.

12  29. Nothing in law or logic suggests that the analysis of personal jurisdiction differs for an

13  investigation. Indeed, the Second Circuit engaged in its normal personal jurisdiction analysis, and

14  did not apply a less strenuous test by virtue of the matter at hand. *See Terraform*, 2022 WL

15  2066414 at 3-4.[5]

16         b.    **TFL Contracted with U.S. Firms to Target U.S. Investors**

17         Since at least 2018, TFL targeted the U.S. by selling Terra Tokens to U.S.-based entities

18  and by contracting to sell Terra Tokens to U.S. investors. SAC ¶¶ 27-31. For example, in July

19  2018, TFL, through Kwon, executed an agreement with a California firm under which TFL sold

20  the firm $3 million of LUNA tokens. Rosen Decl., Ex. 8-9 (contract and email between Do Kwon

21

22  [4] Attached to the Rosen Declaration are exhibits that the SEC filed in support of personal
    jurisdiction over the TFL Defendants in *SEC v. Terraform Labs Pte Ltd. and Do Kwon*, 23-cv-

23  01346 (S.D.N.Y.) ("SEC Action"). The SEC, whose Complaint is incorporated by reference into
    the SAC, has access to discovery tools that Plaintiffs lack, due in large part to the PSLRA discovery

24  stay. If the Court declines to consider these exhibits on a motion to dismiss, the Court should grant
    Plaintiffs jurisdictional discovery. *See Calix Networks, Inc. v. Wi-Lan, Inc.*, 2010 WL 3515759,

25  at *3-4 (N.D. Cal. Sept. 8, 2010) (courts may abuse discretion with denial of personal jurisdiction
    discovery where plaintiff has shown a "colorable basis for jurisdiction or some evidence'

26  constituting a lesser showing than a prima facie case"). The SEC's adducing facts supporting a
    finding of personal jurisdiction indicates that Plaintiff will discover the same if permitted.

27  [5] The Second Circuit found that personal jurisdiction existed over the TFL Defendants under its

28  three-part test, which is essentially identical to the three-part test used in the Ninth Circuit. *See id*.
    at 3 (citing *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019)).

and the California firm, stating California firm's address on Market Street in San Francisco). Four months later, in November 2018, TFL contracted with another California-based company to distribute LUNA tokens to investors. Rosen Decl., Ex. 10. In that contract, TFL agreed to submit to the personal jurisdiction of U.S. courts. *Id.* at §10.10. Alone, TFL's consenting to personal jurisdiction suffices to establish it purposefully availed itself of the privilege of conducting activities in the United States. *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1159 (C.D. Cal. 2000); *Advideo, Inc. v. Kimel Broad. Grp., Inc.*, 727 F. Supp. 1337, 1340–41 (N.D. Cal. 1989) (out-of-state party signing a contract with California governing law provision contributed to finding of personal availment); *Vance's Foods, Inc. v. Special Diets Eur. Ltd.*, 2012 WL 1353898, at *6 (E.D. Cal. Apr. 16, 2012) (similar).

In 2019 and 2021, TFL again contracted with U.S. parties to improve liquidity, SAC ¶¶ 30-31; Rosen Decl., Ex 11-12 (contract and email from Defendant Do Kwon to group of TFL investors describing arrangement as a "partnership with Jump Trading"), and to list MIR, UST, and wLUNA for sale in the U.S. SAC ¶¶ 61, 63-64; Rosen Decl. Ex. 3, 13. These contracts also stated that they shall be subject to the exclusive jurisdiction of the state and federal courts located in San Francisco, California. *See* Rosen Decl., Ex. 3 at § 14.2; Ex. 13 at § 13.2.

By executing these contracts that directly relate to Plaintiffs' claims, the TFL Defendants purposefully availed themselves of U.S. markets and laws, as the Second Circuit has already found. *See Terraform Labs*, 2022 WL 2066414, at *4 (TFL Defendants purposefully availed themselves of the U.S. forum by "enter[ing] into agreements with U.S.-based entities to facilitate the trade" of Terra Tokens[6]); *see also Ballard v. Savage*, 65 F.3d 1495, 1500-01 (9th Cir. 1995); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152-53 (2d Cir. 2001).[7]

---

[6] In fact, the exercise of personal jurisdiction is only more compelling here, as the exhibits attached to the Rosen Declaration constitute even more purposeful availing of the U.S. than the contacts the Second Circuit found sufficed. *See Terraform*, 2022 WL 2066414 at 3-4.

[7] In addition to the Defendants' sales to U.S. investors, the Complaint lists the numerous California entities from which Defendants successfully solicited investment funds. SAC ¶36. These contacts also constitute dealings with and ongoing obligations to California residents, further supporting personal availament on the part of the TFL Defendants. *See, e.g., Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003).

1

2

**c.   The TFL Defendants Traveled to the U.S., Promoted Terra Tokens to U.S. Investors, and Maintained Numerous Employees in the United States**

3      Targeted acts directed at the forum establish personal jurisdiction. *See Terraform Labs*,

4   2022 WL 2066414, at *3-4*; see also Owen v. Elastos Foundation*, 2021 WL 5868171, at *8

5   (S.D.N.Y. Dec. 9, 2021) (personal jurisdiction over defendant alleged to have "promot[ed] …

6   Elastos and ELA Tokens in the United States"); *Id. v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350

7   (S.D.N.Y. 2019) (personal jurisdiction over co-founders of digital asset company when they

8   "targeted the U.S. market in an effort to promote the sale of ATB coins, the very unregistered

9   security at issue"); *SEC v. PlexCorps*, 2018 WL 4299983 at *10, 19 (E.D.N.Y. Aug. 9, 2018)

10   (personal jurisdiction over a crypto asset company and founder that did "business while traveling

11   in the United States, utilizing United States–based payment services, and marketing their products

12   to United States consumers via the Internet"); *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1196–

13   97 (9th Cir. 1988) (advertisement at baseball stadium was targeted effort to attract customers from

14   the jurisdiction); *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1196-97 (9th Cir. 1988) (finding

15   personal availment based on targeted advertisements).

16      Here, Defendant Kwon traveled to the U.S., including to San Francisco and New York, to

17   meet with investors and solicit investments in Terra Tokens. SAC ¶¶ 23, 83. He appeared at a

18   conference in New York in 2021, where he promoted Terra Tokens to a New York audience. SAC

19   ¶83; Rosen Decl., Ex. 14 at 46-52 (transcript of Do Kwon promoting TFL in New York City on

20   September 21, 2021); *see also* https://www.youtube.com/watch?v=vKpKsoHGVow (video of Do

21   Kwon promoting Terra Tokens and discussing Chai in New York City in September of 2021).

22   Defendants targeted the U.S. in other marketing efforts as well, including a $40 million

23   sponsorship with the Washington Nationals, which involved the placement of "Terra"

24   advertisements around the stadium. SAC ¶83.[8] As the Second Circuit has already found, *see*

25   

---

26   [8]   *See*   https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-with-decentralized-autonomous-organization-20843cc704d3 (quoting Do Kwon discussing the Nationals sponsorship deal as a way for Terraform to "engage" the U.S. market);

27   https://medium.com/terra-money/washington-nationals-join-forces-with-terra-community-dao-in-a-first-of-its-kind-partnership-1a1307e9d4a9 (blogpost written by Terra's Head of

28   Communications, entitled *Washington Nationals Join Forces with Terra Community DAO in a*

1  *Terraform Labs*, 2022 WL 2066414, at *3-4, these targeted acts are exactly the sort of conduct

2  that supports personal jurisdiction.

3      Relying on inapposite cases,[9] the TFL Defendants suggest that Do Kwon's trips to the U.S.

4  are insufficient because of a purported lack of connection between the content of Do Kwon's

5  meetings and his comments at panels, on one hand, and the contents of Plaintiffs' allegations, on

6  the other. *See* MTD at 27-28. But the SAC alleges that Do Kwon traveled to the United States "in

7  order to solicit investment in Terraform's crypto asset securities," *see* SAC ¶83, and Plaintiffs now

8  attach the transcript to prove it. *See* Rosen Decl., Ex. 14. As for Defendant Do Kwon's comments

9  at a panel, Plaintiffs allege that the panel took place at "digital asset and blockchain conference,"

10  SAC ¶23, where he promoted Terra Tokens to U.S. investors. *See* Rosen Decl., Ex. 14. at 46-52

11  (transcript of Do Kwon promoting TFL in New York City on September 21, 2021); *see also*

12  https://www.youtube.com/watch?v=vKpKsoHGVow (video of Do Kwon promoting Terra Tokens

13  in New York City in September of 2021).

14      TFL's employees in the U.S. further support personal jurisdiction. Having multiple

15  employees in a jurisdiction suffices to find availment. *Senne v. Kansas City Royals Baseball Corp.*,

16  105 F. Supp. 3d 981, 1030 (N.D. Cal. 2015) (finding personal availment where out-of-state

17  defendant maintained five employees in forum); *Alexis v. Rogers*, 2016 WL 11707630, at *7 (S.D.

18  Cal. Feb. 26, 2016) (hiring California resident, allowing her to work from home, and

19

20  *First-of-its-Kind Partnership*, and stating that "These [Washington Nationals] fans represent a new market for Terra both on the individual and institutional level.").

21  [9] MTD at 27-28 (citing *19 Tao Vega LLC v. Holo Ltd.*, 2019 WL 9607733, at *5 (N.D. Cal. Dec.
22  17, 2019); *Brown v. 140 NM LLC*, 2019 WL 118425, at *9 (N.D. Cal. Jan. 7, 2019)). These cases
are inapposite because the defendants' visits to the United States were isolated. Here, TFL
23  employees' visits were not sporadic, and the visits are just part of the course of affirmative conduct
that establishes personal availment. *See Temming v. Summus Holdings, LLC*, 2021 WL 5014854,
24  at *5 (N.D. Cal. Oct. 28, 2021) ("Affirmative conduct [for purposeful availment] can include a
defendant's attendance and participation at a trade show. [Defendant] undisputedly purposefully
25  availed itself of the privilege of doing business in the forum by sending its employees to do
business here at the convention.") (Internal citations omitted); *accord CollegeSource*, 653 F.3d at
26  1075 (finding that, while a "single trip to a trade show," by an executive of a company that
otherwise had no ongoing contact with California was not enough to establish general jurisdiction,
27  specific jurisdiction had still been properly pled). Moreover, as discussed further below, TFL's
activities within the state went beyond just having its website available. These activities within
28  California are connected to the wrongdoing alleged in the SAC, thereby establishing personal
jurisdiction.

1   communicating with her via email and text were sufficient to establish personal jurisdiction).

2   During the relevant period, multiple TFL employees worked in the U.S., including its General

3   Counsel (located in New York), its Business Development lead (located in Texas), its Head of

4   Research (located in California), and its Director of Special Projects (located in New York). SAC

5   ¶41. Like Do Kwon, these U.S.-based employees repeatedly promoted Terra Tokens to U.S.

6   investors. *See, e.g.*, Rosen Decl., Ex. 15 (United States-based employees promoting TFL); *SEC v.*

7   *Do Kwon and Terraform Labs Pte. Ltd.*, 23-cv-01346 (JSR) (S.D.N.Y.), Dkt. No. 33 ¶26,

8   providing link to video of TFL's New York-based Director of Special Projects promoting Terra

9   Tokens at the June 2021 "DeFi Summit" conference: *Introducing the Terra Luna Defi Ecosystem*

10  *w/ SJ Park*, YouTube, https://www.youtube.com/watch?v=cU0Rv5jCjy0).[10]

11          d.      **The TFL Defendants Defrauded U.S. Investors and Used the**
                    **U.S. Banking System in Their Fraud**
12

13          More, the SAC's allegations of fraud, themselves, support imposition of personal

14  jurisdiction over the TFL Defendants. A person's directing of intentional and fraudulent acts at

15  U.S. investors further supports the exercise of personal jurisdiction. *See Calder v. Jones*, 465 U.S.

16  783, 789 (1984) (personal jurisdiction proper where the defendant took "intentional, and allegedly

17  tortious, actions [that] were expressly aimed" at the forum state); *see Licci ex rel. Licci v. Lebanese*

18  *Canadian Bank, SAL*, 732 F.3d 161, 172 n.7 (2d Cir. 2013) (use of forum banking system

19  constitutes purposeful availment); *Longyu Int'l Inc. v. E-Lot Elecs. Recycling Inc.*, 2014 WL

20  1682811, at *5 (C.D. Cal. Apr. 29, 2014).

21          The TFL Defendants purposefully directed their conduct toward the U.S., making

22  materially false and misleading statements to U.S. investors. SAC ¶¶169-176, 185-186. When

23  soliciting investments from U.S.-based firms, Defendant Kwon claimed, falsely, that Chai used

24

25  _____

    [10] The TFL Defendants suggest that "[w]ith the exception of one former employee (Nicholas
26  Platias), none [of the U.S-based employees] are identified as having participated in any alleged
    scheme within the U.S." MTD at 28-29. First, Defendants do not explain why Plaintiffs would be
27  required to identify U.S. employees other than Defendant Platias, who was the Head of Research
    and a founding member of TFL. SAC ¶22. In any event, the Complaint identifies numerous U.S.-
28  based TFL employees by title, including the Texas-based Business Development lead, whose job
    it was to grow TFL's business and promote Terra Tokens. SAC ¶¶41-43. These contacts are not
    "unrelated" to this matter. *See* MTD at 28.

1   the Terraform blockchain to process and settle transactions, and U.S.-based firms purchased

2   LUNA on that basis. SAC ¶¶169-176, 185-186. Kwon also made false and misleading statements

3   regarding Chai on his public Twitter and YouTube accounts available to U.S. investors, and in a

4   television interview broadcast in the U.S. SAC ¶¶174-176. In addition, in May 2021, the TFL

5   Defendants secretly negotiated with Jump, which used a U.S. bank account, to restore UST's price

6   back to $1. SAC ¶¶191-194. The negotiations culminated in a contract between TFL and Jump,

7   signed by Kwon. SAC ¶¶191-194. These targeted efforts to defraud U.S. investors establish

8   personal jurisdiction.

9                    **e.    The Court has Personal Jurisdiction over Do Kwon**

10          In a footnote, the TFL Defendants contend that imputing TFL's contacts to Kwon for the

11   purpose of showing purposeful availment would be improper. *See* MTD at 27, n. 13. The only case

12   they cite says the opposite, rejecting the argument that an individual is shielded from personal

13   jurisdiction by working for a corporate entity, and holding that the correct inquiry is whether the

14   corporate officer's contacts constitute sufficient personal availment. *See Davis v. Metro Prods.,*

15   *Inc.*, 885 F.2d 515, 520–24 (9th Cir. 1989) (personal jurisdiction over officers and directors who

16   purposefully directed their activities toward forum by soliciting business from forum residents);

17   *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1110

18   (9th Cir. 2020) (personal jurisdiction over officers and directors who were the "key players" in

19   business relationship, negotiated contracts with California resident, and directed

20   misrepresentations at California). Just as in those cases, Kwon is the "key player" here, where

21   Plaintiffs have alleged that Kwon personally traveled to the U.S., personally negotiated and signed

22   contracts with U.S. business, and personally made misrepresentations directed at U.S. investors.

23   *See* SAC ¶¶ 28, 79-83, 189, 194, 169-176, 184. These extensive contacts are more than sufficient

24   to establish personal jurisdiction over Kwon. *See Glob. Commodities Trading Grp., Inc.,* 972 F.3d

25   at 1110.

26              **2.    The TFL Defendants Ignore the Allegations in the SAC**

27          The TFL Defendants' jurisdictional arguments mischaracterize or simply ignore the

28   allegations in the SAC. Calling the SAC's jurisdictional arguments "boilerplate," Defendants

ignore all the specific business dealings the SAC alleges, and that are collaborated by the contracts that the SEC has obtained and that are attached as exhibits to the Rosen Declaration. *See* MTD at 26-27. Far from "boilerplate," the SAC specifically alleges numerous transactions between the TFL Defendants and U.S.-based entities, as well as promotional efforts targeting the U.S. in particular. SAC ¶¶ 27-30; ¶¶82-83.

Finally, the TFL Defendants rely on cases suggesting that a party does not purposefully avail itself of a certain jurisdiction solely by virtue of operating a website that is available worldwide. *See Spy Optic, Inc. v. AreaTrend, LLC*, 843 F. App'x 66, 68 (9th Cir. 2021) (noting that "[o]perating a universally accessible website alone cannot satisfy the express aiming prong," and finding that a defendant did not purposefully avail because, *inter alia*, it "does not advertise or market its products in California"). These cases stand for the proposition that "something more" than operating a passive website is required for personal jurisdiction, however, they are badly misplaced in a case where the Defendant maintains numerous U.S.-based employees, targets United States investors, and has paid $40 million to plaster its name all over a Major League Baseball stadium.[11] *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229–30 (9th Cir. 2011) (finding "something more" than operation of passive website where defendant, an internet sports betting operation, "specifically targeted consumers" in Nevada "by running radio and print advertisements in Las Vegas," the "capital of the gambling industry"); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229-30 (9th Cir. 2011) (finding "something more" where defendant, the publisher of a celebrity gossip website, "operated a very popular website with a specific focus on the California-centered celebrity and entertainment industries").[12]

Because the TFL Defendants purposely availed themselves of the U.S. by, among other

---

[11] *See* Andrew Cohen, *Swing and a Miss: Terra Logos Still Adorn Washington Nationals Ballpark*, DECRYPT (March 31, 2023), https://decrypt.co/125195/swing-miss-terra-logos-still-adorn-washington-nationals-ballpark ("Terra collapsed in May 2022, destroying billions of dollars' worth of value—but it's still an MLB team sponsor in the 2023 season.").

[12] Where, as here, a defendant has sufficient minimum contacts with the forum, the exercise of jurisdiction must also be reasonable. *See CollegeSource*, 653 F.3d at 1076. The TFL Defendants have the burden of setting forth a "compelling case" that the exercise of jurisdiction would not be reasonable, *see id.*, and the TFL Defendants have not even tried.

things, contracting with U.S. firms to promote and sell Terra Tokens to U.S. investors, consenting to U.S. jurisdiction repeatedly, maintaining employees in the U.S., targeting advertisements at the U.S., and directing its fraudulent statements at U.S. investors, the Court should deny the TFL Defendants' 12(b)(2) motion, and exercise personal jurisdiction over the TFL Defendants.

## IV.    TFL DEFENDANTS' MOTION TO COMPEL ARBITRATION FAILS

Relying on the Federal Arbitration Act ("FAA"), TFL insists that the Anchor Protocol Terms of Service ("Terms")—an agreement that some, but not all purchasers of Terra Tokens executed after purchasing the coins in question—compels plaintiffs and members of the Class to arbitrate their claims in Singapore. Not only does the Anchor Protocol's agreement compel arbitration in Singapore but it prohibits a class arbitration. For most, if not all purchases, therefore, if this Court compels arbitration, their cases will be cost prohibitive to pursue.[13]

Putting fairness considerations to the side, TFL's argument fails based on a plain reading of the Terms. TFL cannot immunize itself from the unregistered offer and sale of Terra Tokens – and from a raft of fraudulent statements connected to those sales – by inserting an arbitration clause and class action waiver provision into the Anchor Protocol Terms of Service. The reason is simple: Plaintiffs' purchase of Terra Tokens, to which all their claims relate, was a separate transaction that did not take place on the Anchor Protocol.

The Anchor Protocol (or "Protocol") is a protocol whereby owners of UST can deposit their UST into Anchor in exchange for interest. By connecting a digital wallet to the Protocol and depositing UST, holders execute a transaction with Anchor. The Terms govern that initial transaction, and all transactions between Plaintiffs and the Protocol that follow. Because the Terms contain a broad arbitration clause, reaching any claim arising out of or relating to the Anchor Interface or the Terms, the Terms require arbitration—but only as to claims relating to the

---

[13] In addition, had Defendants properly registered the Terra Tokens, any attempt to force an arbitration clause on public offering investors would have prevented successful registration. Indeed, it has been the SEC's policy for decades that companies may not compel public offering investors to arbitrate their claims, which would be contrary to the public policy underlying the securities laws. *See* Barbara Roper and Micah Hauptman, *A Settled Matter: Mandatory Shareholder Arbitration is Against the Law and the Public Interest*, Consumer Federation of America (Aug. 2018), https://secureoursavings.com/wp-content/uploads/2018/08/CFA-Mandatory-Shareholder-Arbitration-White-Paper-8.15.18.pdf, at 2-6.

1  transaction with the Anchor Protocol. Plaintiffs, however, base the SAC's allegations on their

2  purchases of UST—which are outside the Anchor Protocol and not subject to its Terms. The

3  Terms, therefore, do not govern the investment decisions of Plaintiffs and the Class to purchase

4  UST or any other Terra Token.

5      Defendants concede the point, writing that "the SAC does not contain a single allegation

6  that (a) Lead Plaintiff or anyone else lost money as a result of Anchor or (b) Anchor ever failed to

7  pay the expected return on staked tokens." MTD at 58. "Lead Plaintiff does not allege," Defendants

8  continue, "that any Anchor user (a) failed to receive the disclosed 'interest rate' on staked tokens

9  or (b) lost any staked tokens due to the operation of the Anchor Protocol; rather, Lead Plaintiff

10  alleges losses due to declines in the market (i.e., 'fiat-denominated') values of UST and LUNA."

11  MTD at 20. In fact, at the same time they try to rely on the Anchor Terms of Service to compel

12  arbitration of Plaintiffs' claims, Defendants characterize Plaintiffs' lack of allegations directed at

13  Anchor as a "deafening silence": "If any Anchor depositor had failed to receive the promised yield

14  at any time, there would be a prominent allegation to that effect in the SAC. Instead there is

15  deafening silence: No plaintiff, in any litigation, has alleged any failure to receive the promised

16  Anchor yield at any time." MTD at 47. As Defendants all but acknowledge, Plaintiffs' allegations

17  are outside the scope of the Anchor Protocol Terms of Service and the arbitration agreement that

18  it contains. Accordingly, TFL's motion to compel arbitration should be denied.

19          **A.  Legal Standard**

20      The FAA imposes on the TFL Defendants the burden of showing that the arbitration

21  agreement, in this case, the Terms, encompasses the dispute at issue in the case. *See Ashbey v.*

22  *Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Brennan v. Opus Bank*, 796

23  F.3d 1125, 1130 (9th Cir. 2015). "Arbitration is strictly a matter of consent, and thus is a way to

24  resolve … only those disputes … the parties have agreed to submit to arbitration." *Granite Rock*

25  *Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). "The federal policy favoring arbitration

26  is no substitute for party agreement, or lack thereof." *Id.*. That is, this Court should deny the TFL

27  Defendants' motion to compel arbitration because the Terms do not apply to Terra Token

28  purchases that investors made prior to transacting with the Anchor Protocol.

15

1      In the Ninth Circuit, "even under broad arbitration clauses like this one, factual allegations

2   must at least "'touch matters' covered by the contract containing the arbitration clause.'" *See*

3   *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023). "The issue is 'whether the

4   factual allegations underlying [the claims] are within the scope of the arbitration clause, whatever

5   the legal labels attached to those allegations.'" *Id*. (alteration in original). The Ninth Circuit has

6   further explained that arbitration agreements will be read to reach "every dispute between the

7   parties having a significant relationship to the contract and all disputes having their origin or

8   genesis in the contract." *See id*. at 1102. Moreover, when it comes to the threshold question of who

9   decides arbitrability, the presumption is that a court – not an arbitrator – decides. *First Options of*

10  *Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995). A provision delegating questions of

11  arbitrability to an arbitrator is enforceable only if it is "clear and unmistakable." *Id*. In making that

12  determination, courts are to construe any ambiguities against the drafting party. *Id*.

13      **B.  <u>Argument</u>**

14          **1.      The Anchor Terms of Service**

15      The contract matters. "To be arbitrable, the dispute must relate to the contract."

16  *Amazon.com*, 65 F.4th at 1101.

17      The Terms govern transactions whereby holders of UST deposit it into the Anchor Protocol

18  in exchange for interest. SAC ¶6; MTD at 19.[14] Depositors must already own the UST before

19  lending it to Anchor and executing the Terms, as the Anchor Protocol is not a crypto exchange

20  from which investors can buy UST. Dkt. No. 122-1 at 5 ("the Interface is not a broker or

21  intermediary"). Moreover, the Terms emphasize that the Anchor Protocol is a distinct Interface

22  that does not engage in transactions with other Interfaces in the Terra Ecosystem. *Id*. ("Unless

23  explicitly provided in writing, we do not host or maintain ecosystem partners accessible on our

24  services and do not participate in any transactions on such ecosystem partners, recommend,

25  endorse, or otherwise take a position on your use of these services").

26      Rather, the Anchor Protocol is a lending exchange, providing a platform through which to

27

28  _____

[14] The Amani Declaration attaches, in full, the Terms, containing the arbitration clause. Dkt. No. 122-1.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION

lend. *Id*. at 6 ("The Interface provides access to a decentralized protocol on the Terra blockchain that allows suppliers and borrowers of digital assets to interact with the Protocol and transact using smart contracts").  Likewise, the Terms disassociate the Anchor Interface from TFL, itself. *See id*. ("You acknowledge and agree that Terra has no control over any transactions over the Protocol, the method of payment of any transactions or any actual payments of transactions"). Similarly, the Terms contain a Release of Claims ("Release"), covering the depositor's interaction with Anchor, not with Terra Tokens or TFL in general. *See id*. at 10 ("You expressly agree that you assume all risks in connection with your access and use of the Interface and your interaction with the Protocol").  Finally, the Terms specifically disclaim responsibility for the value of the underlying UST that depositors stake in Anchor. *Id*. at 9 ("Even if the Rate is achieved as projected, you may still suffer a financial loss in fiat-denominated terms if the fiat-denominated value of the relevant tokens (your deposit and any tokens allocated or distributed to you pursuant to the Rate) declines during the deposit period.").

The Terms contain a dispute resolution mechanism, stating, "[i]f a potential dispute arises, you must contact us by sending an email to legal@anchorprotocol.com so that we can attempt to resolve it without resorting to formal dispute resolution." *Id*. at 11. The Terms further mandate that depositors arbitrate in Singapore all "claim[s] or controvers[ies] arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute") . . . ." *Id*. Finally, the Terms contain both a jury trial and class action waiver, stating, "[u]nless we agree otherwise, the arbitrator may not consolidate your claims with those of any other party." *Id*. at 12.

Noticeably absent from the Terms is any requirement that UST investors deposit their UST on the Anchor Protocol as part of any purchase of UST. The Terms do not mention the depositors' purchase of UST whatsoever. In truth, as Luna Foundation Guard Governing Council member Remi Tetot confessed after the Terra collapse, the Anchor Protocol's 20% yield was simply a "marketing ploy" used by TFL Defendants to attract new investors in the Terra ecosystem because Kwon and TFL "knew all along there was a significant risk of a death spiral" occurring with the

17

1  UST/LUNA pairing. *See* SAC ¶163.

2  **2.      Plaintiffs' Claims Do Not Touch Matters Covered by the Terms**

3  Understanding that the Terms limit their applicability to the transaction between depositors

4  and lenders on the Anchor Protocol, the Court must resolve whether the Terms govern Plaintiffs'

5  initial purchase of Terra Tokens. Plaintiffs' allegations here do not arise out of or relate to the

6  Protocol in any way whatsoever. Instead, Plaintiffs' claims are that the Terra Tokens are

7  unregistered securities and that Defendants sold them by making a series of materially misleading

8  statements and engaging in deceptive acts. These claims all relate to Plaintiffs' purchases of Terra

9  Tokens that the Terms expressly state could not have been made on the Protocol. In fact, all of

10 Plaintiffs' allegations and claims would be exactly the same, whether they decided to lend their

11 Terra Tokens to the Anchor Protocol or not.[15]

12 **a.      Unregistered Securities Claim Under the Securities Act**

13 Plaintiffs' claims for the unregistered offering and sale of securities under Sections 5 and

14 12(a)(1) of the Securities Act fall outside the Terms. On their face, these claims relate to Plaintiffs'

15 initial purchases of Terra Tokens—not to their subsequent decision to deposit UST into the

16 Protocol. Because "the Securities Act of 1933 prohibits the offer as well as the sale of unregistered

17 non-exempt securities," *see Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 640 (9th Cir.

18 1969), a case or controversy for violations of the Securities Act accrued upon TFL's offer and sale,

19 and Plaintiffs' purchase of, Terra Tokens. That in a separate, subsequent transaction Plaintiffs may

20 have deposited their tokens in the Protocol is irrelevant to Plaintiffs' claims for Securities Act

21 violations. Defendants try to brush all of this under the rug by claiming that "[b]ecause all of Lead

22 Plaintiff's claims relate to and arise out of his use of UST with Anchor, Lead Plaintiff must

---

23 [15] The TFL Defendants made this point repeatedly at oral argument on their motion to dismiss the
24 SEC action. *See* Rosen Decl., Ex. 1. There, where the TFL Defendants believed it helped them to
   distance UST from the Anchor Protocol, they assured the court that the decision to deposit UST
25 into Anchor was a "separate decision," *id.* at 22:01, and that the Anchor Protocol, which only
   became available "seven months" after UST became available, "just presents one option amongst
26 many for anybody who had actually purchased UST or was considering purchasing UST, but there
   are no package deals[.]" *Id.* at 22:13-19. In addition, they contended that conflating one's decision
27 to deposit UST into the Anchor Protocol and one's initial decision to purchase the UST would
   require "essentially time travel." *Id.* at 25:01. As the TFL Defendants recognize, the decision to
28 purchase UST is a separate transaction from the one depositing it into Anchor. This forecloses the
   TFL Defendants' attempt to compel arbitration here.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION

1   arbitrate all claims asserted in the SAC." MTD at 34. Defendants are simply closing their eyes to

2   the allegations in the SAC—that the Terra Tokens that Defendants offered and sold were

3   unregistered securities, whether Plaintiffs later deposited some of them in the Anchor Protocol or

4   not.

5   **b.      Fraud claims under the Securities Exchange Act**

6          Similarly, Plaintiffs' Exchange Act claims necessitate a purchase decision, and have

7   nothing whatsoever to do with Plaintiffs' subsequent decision to deposit the UST they purchased

8   into the Protocol. The SAC alleges false and misleading statements under Section 10(b) of the

9   Exchange Act which led Plaintiffs to invest in Terra Tokens. *See* SAC ¶5 ("On top of selling

10  unregistered securities in the form of Terra Tokens, Defendants made a series of false and

11  misleading statements regarding the largest Terra ecosystem digital assets by market cap, UST and

12  LUNA, in order to induce investors into purchasing these digital assets at inflated rates"). These

13  statements are relevant because they induced Plaintiffs to ***purchase*** Terra Tokens. Importantly,

14  these purchases are separate transactions and did not take place in the Anchor Protocol, as Anchor

15  does not offer Terra Tokens for sale. *See* Dkt. No. 122-1. Under the federal securities laws, it is

16  that purchase that gives rise to liability, and not any subsequent loan to the Anchor Protocol. *See*

17  *SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 855 (9th Cir. 2020); *see also* SAC

18  ¶272 ("Had Plaintiffs and the other members of the Class been aware that these Defendants'

19  conduct and not the algorithm had re-pegged the stablecoin to $1.00US, ***they would not have***

20  ***purchased Terra Tokens*** at the artificially inflated prices that they did, or at all.") (emphasis

21  added).[16]

22  **3.      TFL Defendants Gloss Over the Relevant Caselaw on the Scope of**
            **Arbitration Agreements**

23

24         In one paragraph, the TFL Defendants assure the Court that "Lead Plaintiff's Claims Fall

25  within the Scope of the Agreement to Arbitrate," and that, "to the extent there is any dispute

26  regarding the scope of the arbitration agreement, that dispute is for the arbitral forum to resolve."

27  MTD at 33-34, n.21-22. The Defendants are playing fast and loose with both the facts and the law,

28  _____

[16] Plaintiffs' RICO and state law claims are also aimed at Plaintiffs' purchase of Terra Tokens at
artificially inflated prices, which took place outside of the Anchor Protocol. *See* SAC ¶¶ 300-352.

1   and ignoring the relevant Ninth Circuit case law demarcating the outer bounds of arbitration

2   agreements.

3        First, Defendants are wrong that this dispute regarding the scope of the arbitration

4   agreement is for the arbitrator to decide. *See* MTD at 33, n.22. Rather, "except where the parties

5   *clearly and unmistakably* provide otherwise, it is the court's duty to interpret the agreement and to

6   determine whether the parties intended to arbitrate grievances concerning a particular matter." *See*

7   *SEIU Local 121RN v. Los Robles Regional Medical Center*, 976 F.3d 849, 855 (9th Cir. 2020)

8   (emphasis in original). Here, while the Terms relegate disputes about arbitrability to an arbitrator,

9   under the plain meaning of the Terms, the case or controversy must arise out of or relate to the

10  Protocol. This case does not, because it is about the TFL Defendants' offer and sale of unregistered

11  securities, and not the subsequent transaction by which Plaintiffs deposited the unregistered

12  securities into Anchor. As the Supreme Court has recently reaffirmed, the policy of the FAA "is

13  to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan v.*

14  *Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

15        Even if, however, doubt lingered, courts resolve such ambiguities against the contract's

16  drafters. While this result is compelled by the Supreme Court's holdings on arbitrability in

17  particular, it is also consistent with contract law in general, as any ambiguity as to the terms of the

18  Anchor Terms of Service must be construed in Plaintiffs' favor. *See Rainier Credit Co. v. W. All.*

19  *Corp.*, 171 Cal. App. 3d 255, 263 (Cal. Ct. App. 1985) (noting it is a "legal maxim that an

20  ambiguity in a contract will be construed against the drafter of the contract") (citing *Congdon v.*

21  *Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1022 (N.D. Cal. 2018)); *Congdon v. Uber Tech., Inc.*,

22  291 F. Supp. 3d 1012, 1022 (N.D. Cal. 2018) ("In the case of ambiguous terms within a form

23  contract, such terms would be construed against the drafter"). This Court should not read the Terms

24  – referring to claims or controversies arising out of or relating to the "Interface" or "this

25  Agreement" – and conclude that it is clear and unmistakable that the parties intended to delegate

26  the arbitrability of claims expressly ***outside the transaction with Anchor that is the reason for the***

27  ***Anchor Protocol Terms of Service in the first place.***

28        Finally, that the Anchor arbitration agreement references the Arbitration Rules of the

Singapore International Arbitration Centre is irrelevant to the question at hand: whether the arbitration provision in the Terms covers Plaintiffs' claims. *See Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *11-12 (N.D. Cal. June 25, 2014) ("[T]he Court agrees with Plaintiffs that a bare reference to the AAA rules in 23andMe's online contract does not show that the parties clearly and unmistakably intended to delegate arbitrability," and casting doubt on defendants' ability to incorporate the rules of their preferred arbitral forums into form contracts).

Moreover, in the Ninth Circuit, "even under broad arbitration clauses like this one, factual allegations must at least ''touch matters' covered by the contract containing the arbitration clause." *See Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023). There, Amazon tried to enforce an arbitration agreement with delivery drivers who sued, alleging that Amazon monitored and wiretapped the drivers' off-hours communications in closed Facebook groups. *Id.*. The arbitration clause at issue was broadly worded, applying to "'any dispute or claim ... arising out of or relating in any way to this Agreement, including ... participation in the program or ... performance of services.'" *Id*. But even though the arbitration clause was broad, the Ninth Circuit held that the arbitration clause did not apply because the plaintiffs' claims were "not dependent on the terms of the contract," explaining: "Of course, Jackson joined the Facebook groups because he was a Flex driver, but if other individuals who were not Flex drivers were permitted to join [the Facebook group], as for example spouses, union organizers or others interested in the subject matter of the discussions, then those persons could likely assert the same claims against Amazon." *Id*. The Ninth Circuit's reasoning applies here: Just as a member of the Facebook group who did not sign Amazon's terms of service could bring the same claims against Amazon as one who did, an investor in UST can bring the exact same claims against the TFL Defendants as Plaintiffs here, regardless of whether that investor subsequently deposited UST into the Protocol. This analogy clarifies that Plaintiffs' claims are not dependent on the terms of the Anchor Protocol Terms of Service in any way. As in the *Amazon.com* case, Plaintiffs' claims do not depend on the contract containing the arbitration clause. *See Amazon.com*, 65 F.4th at 1101-03. They are outside of its scope.

*Esparza v. SmartPay Leasing, Inc.*, 2017 WL 4390182 (N.D. Cal. Oct. 3, 2017), *aff'd*, 765

1    F. App'x 218 (9th Cir. 2019) is instructive as well. There, a defendant cell phone company tried

2    to look to the terms of its lease agreement to compel arbitration when a customer brought suit

3    alleging violations of the Telephone Consumer Protection Act (TCPA). *Id.* at 1-2. The arbitration

4    agreement in the lease agreement was broadly worded, providing that "'any claim or dispute

5    arising from or in any way related to the Agreement must be resolved by binding arbitration instead

6    of a lawsuit,' with 'Agreement' defined as the Lease-Purchase Agreement." *Id.* But the court

7    rejected the defendant's argument, noting that "the arbitration clause in the lease agreement

8    expressly applied to claims 'arising from or in any way related to the [lease] agreement,'" and

9    holding that "[s]ince Esparza's TCPA claims do not arise from or relate to her agreement to lease

10   a cell phone, the arbitration provision has no applicability[.]" *Id.* at 2. Here, the TFL Defendants'

11   attempt to extricate the arbitration clause from the Terms and apply it to Plaintiffs' claims aimed

12   at a preceding transaction runs into the same obstacles that the defendant hit in *SmartPay Leasing*:

13   Even broadly-worded arbitration clauses must arise from or relate to the relevant agreement. Just

14   like in *SmartPay Leasing*, Plaintiffs' claims do not.[17]

15       Finally, other cases enforcing arbitration agreements between cryptocurrency exchanges

16   and their customers do not support imposing arbitration on Plaintiffs here. For example, in

17   *Donovan v. Coinbase Glob., Inc.*, this Court compelled arbitration in an action that customers of

18   Coinbase brought against Coinbase, itself. 2023 WL 2124776 (N.D. Cal. Jan. 6, 2023). Because

19   Coinbase required its users to accept the terms of its user agreement as a condition of accessing

---

[17] Other, analogous cases reject compelling arbitration when claims fall outside of the arbitration clause at issue. *See Fernandez v. Debt Assistance Network, LLC*, 2020 WL 583973, at *11 (S.D. Cal. Feb. 6, 2020) ("Plaintiffs' claims address their relationship with Defendant outside of payment processing. Given Plaintiffs' allegations and the clear language of the arbitration clause within the context of the ACH Agreement [covering payment processing], the Court finds that there is no sufficient ambiguity in the contract that could otherwise result in finding in favor of arbitration"); *So v. Land Base, LLC*, 2009 WL 5088745, at *4 (C.D. Cal. Dec. 16, 2009) ("Although broad arbitration clauses should be read expansively, 'when an arbitration clause by its terms extends only to a specific type of dispute, ... a court cannot require arbitration on claims that are not included.'"… The present lawsuit is not a dispute regarding disclosure of confidential information; rather, it is a case alleging that Lopatin and others conspired to defraud Plaintiff out of $30 million. Plaintiff's claims fall outside of the scope of the arbitration clause") (citations omitted); *Howard v. Goldbloom*, 30 Cal. App. 5th 659, 667 (2018); *Elias v. Superior Ct.*, 2015 WL 1455910, at *7 (Cal. Ct. App. Mar. 30, 2015) (noting "Under SC Fuels' [] interpretation, the Arbitration Agreement would apply if it terminated Elias and she was injured 25 years later by an SC Fuels truck. Absent supporting language or evidence, we may not read the Arbitration Agreement so broadly").

and transacting on the exchange, the plaintiffs' claims there fell within the scope of the arbitration agreement. *See id*. *Pearl* and *OKCoin* are inapposite for the same reason, as they enforced arbitration clauses in cryptocurrency exchanges' user agreements against their own customers, in cases relating to transactions on the exchanges. *See Pearl v. Coinbase Glob., Inc.*, 2023 WL 1769190 (N.D. Cal. Feb. 3, 2023); *Nguyen v. OKCoin USA Inc.*, 2023 WL 2095926 (N.D. Cal. Feb. 17, 2023). Thus, the claims were covered by the arbitration clauses at issue. Conversely, the claims here are not. For these reasons, the Court should deny the TFL Defendants' motion to compel arbitration.

## V.   THE COURT SHOULD DENY TFL'S MOTION TO DISMISS UNDER 12(B)(6)

The TFL Defendants move to dismiss the entire SAC under 12(b)(6), but the SAC's allegations suffice to plead its multiple causes of action.

### A.   Legal Standards

A complaint must contain sufficient factual matter to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To overcome a Rule 12(b)(6) motion to dismiss, a plaintiff's "factual allegations [in the complaint] must ... suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). When determining plausibility the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

Rule 9(b) requires a complaint to plead fraud with particularity, requiring the "'who, what, when, where, and how'" of the fraud alleged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). To comply with Rule 9(b) the "allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct.'" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001).

### B.   The Terra Tokens Are Securities Under *Howey*

The Supreme Court established a four-pronged test to determine the existence of an

"investment contract" that requires compliance with federal securities laws. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Under the so-called *Howey* test, a transaction qualifies as a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; (4) to be derived from the entrepreneurial or managerial efforts of others.

As an initial, critical matter, the TFL Defendants point to no case analyzing cryptocurrencies under *Howey* that supports their arguments here. Conversely, federal courts have applied the *Howey* test "to determine that similar cryptocurrency tokens intended to be sold on a blockchain or in the general market were securities within the meaning of the Securities Act." *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20 CIV. 4650 (ER), 2022 WL 912965, at *11 (S.D.N.Y. Mar. 29, 2022).[18]

Instead, despite TFL Defendants' insistence to the contrary (*see* MTD at 39-42), the SAC sufficiently alleges that all of the Terra Tokens offered and sold by TFL Defendants satisfy each prong of the *Howey* test.

### 1.     Investment of Money in the Terra Tokens

The TFL Defendants cannot seriously contend that the SAC fails to plead investment of money. The SAC unambiguously alleges that "Plaintiffs and the Class invested fiat currency, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens." SAC ¶¶86-89; ¶¶15-16 (incorporating certifications listing transactions that Plaintiffs have filed with the Court). Using currency to purchase tokens suffices to establish *Howey*'s first prong.

### 2.     Common Enterprise

TFL Defendants argue that the SAC fails to allege a common enterprise for any Terra Token. MTD at 40. Not true. In the Ninth Circuit, a common enterprise exists where the investment scheme involves either "horizontal commonality" or "strict vertical commonality." *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989). "Horizontal commonality describes the relationship

---

[18] *See also*, *Friel v. Dapper Labs, Inc.*, 2023 WL 2162747, at *7–*22 (S.D.N.Y. Feb. 22, 2023); *Yi v. GTV Media Grp. Inc.*, 2021 WL 2535528, at *3 (S.D.N.Y. June 18, 2021); *Zakinov v. Ripple Labs, Inc.* ("*Ripple*"), No. 2020 WL 922815, at *15 (N.D. Cal. Feb. 26, 2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357-58 (S.D.N.Y. 2019).

1  shared by two or more investors who pool their investments together and split the net profits and

2  losses in accordance with their pro rata investments." *Id.* In contrast, vertical commonality

3  "requires that the fortunes of investors be tied to the fortunes of the promoter." *SEC v. Telegram*

4  *Grp. Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020). The SAC sufficiently pleads common

5  enterprise under both theories.

6        The SAC alleges the fortunes of each investor in a particular Terra Token were tied together

7  since they all stood to gain or lose profits pro rata based on their respective investments.

8  Additionally, investors were tied together in the fate of the Terra Tokens under the control of TFL

9  Defendants because potential profits from the future valuation of Terra Tokens were reliant on the

10 success of TFL's new blockchain and algorithmic stablecoin technology. These allegations are

11 enough to plead common enterprise under each theory. *See Balestra*, 380 F. Supp. 3d at 352–53.

12       The SAC also alleges vertical commonality. The TFL Defendants pooled proceeds from

13 the sale of LUNA purportedly to "fund operations" and develop/maintain the Terra ecosystem.

14 ¶¶92-93. Intertwining the Terra ecosystem's success with Plaintiffs' and investors' adequately

15 alleges vertical commonality. *See Telegram*, 448 F. Supp. 3d at 369 (finding vertical commonality

16 alleged where each purchaser's "anticipated profits were directly dependent on Telegram's success

17 in developing and launching the TON Blockchain"). More, contrary to TFL Defendants'

18 contention, vertical commonality can still exist after the launch of the Terra Tokens. *See, e.g.*,

19 *Dapper Labs*, 2023 WL 2162747, at *11 (finding pooling from allegation that early and later round

20 purchasers "would support the continued development of the blockchain, even once it launched,

21 because both rounds of purchasers were dependent upon the success of the [blockchain]");

22 *Telegram*, 448 F. Supp. 3d at 370 ("[I]f [the blockchain] failed, all Initial Purchasers would suffer

23 a diminution in the value of their [assets]"). For those reasons, the Court should find both

24 horizontal and vertical commonality.

25         **3.**      **Reasonable Expectation of Profits**

26       The Ninth Circuit has rejected a strict interpretation of this prong in favor of a more flexible

27 focus on "whether the efforts made by those other than the investor are the undeniably significant

28 ones, those essential managerial efforts which affect the failure or success of the enterprise."

*Balestra*, 380 F. Supp. 3d at 355–57. Nevertheless, the TFL Defendants assert that the SAC does not allege an expectation of profit with UST but only in relation to a subsequent investment of UST in the Anchor Protocol. *See* MTD at 39-40. The SAC, however, alleges that Plaintiffs had an expectation of profit from their purchases of UST, LUNA, and ANC, based on their reliance on statements that the Terra ecosystem was "able to handle the scale and scope of TFL's operations." ¶95. The SAC further alleges that the Terra Tokens, including UST, were sold to investors prior to the Terra ecosystem being fully developed and investors did not expect themselves to develop the technology needed to succeed and turn a profit. *See* ¶95. These allegations support the reasonable inference that Plaintiffs purchased the Terra Tokens in the belief that the TFL Defendants would continue to maintain the Terra ecosystem and that the value of their investment in the digital assets offered and sold by Defendants would increase as a result. These allegations likewise undermine TFL Defendants' contention that Plaintiffs did not plead an expectation of profits for LUNA, MIR, and ANC purchases. *See* MTD at 41.

Thus, the SAC pleads Plaintiffs' reasonable expectation of profit from purchases of each of the Terra Tokens, including UST and LUNA. *See, e.g.*, *Balestra*, 380 F. Supp. 3d at 355-57 (finding expectation of profit where allegations establish that "coins" would increase in value "based primarily on Defendants' entrepreneurial and managerial efforts" and "Defendants' . . . sole responsibility for developing and launching the ATB Blockchain – the performance of which largely dictated the value of ATB Coins[.]"); *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (factual allegations, including promotional and other materials promoting investment opportunity and the fact the blockchain-based tasking platform had only limited functionality and had not yet been launched, supported inference plaintiff purchased tokens "with expectation of profit rather than as a means of using the tasking platform.").

Additionally, despite TFL Defendants' claims to the contrary (*see* MTD at 39-41), the SAC alleges that investors had a reasonable expectation of profit that both predates and is entirely separate from the Anchor Protocol—for example, buying UST to convert into LUNA with the expectation of realizing profit from price appreciation or arbitrage. *See* SAC ¶62 (describing how the UST/LUNA pairing mechanism creates "arbitrage opportunity" meant to "incentiviz[e]" and

1    "encourage arbitrageurs to trade the UST/LUNA pair in order to trigger the mint/burn process and

2    thus, a return to $1."); SAC ¶50, 136-37, 153 (promoting the "arbitrage incentives" available to

3    the UST/LUNA purchasers); SAC ¶50 (highlighting the UST's "alternative arbitrage opportunity

4    outside of the Terra protocol itself").

5                              **4.      Managerial Efforts**

6          In *Balestra*, the court found that "the Complaint satisfactorily pleads that the success of

7    ATB Coins was entirely dependent on Defendants' following through on their promise to launch

8    and improve the ATB Blockchain." *See Balestra*, 380 F. Supp. 3d at 355–56. That reasoning

9    applies here. Notwithstanding any purported functionality of the Terra Tokens that TFL

10   Defendants now latch onto (*see* MTD at 40-42), the SAC sufficiently details the ways in which

11   TFL Defendants led investors to expect profit from the managerial efforts of others, namely, the

12   TFL Defendants who were building the Terra ecosystem and value for the Terra Tokens. *See* ¶¶95-

13   101. Nowhere is this more clear than the April 7, 2021 twitter thread where Do Kwon touted that

14   the value of LUNA would grow as the Terraform "ecosystem" grows, specifically tying the

15   potential growth to his own efforts (which he promised would be successful by touting that he

16   would "kick ass") while investors remained passive (or "s[a]t back") in the enterprise. ¶101.

17         The SAC's allegations regarding TFL Defendants' efforts to maintain the Terra blockchain

18   and ecosystem, the UST/LUNA algorithmic pairing, and the demand for the Terra Tokens establish

19   (or at the very least support the plausible inference) that Plaintiffs purchased Terra Tokens with

20   the expectation of profit from TFL's managerial efforts. *See* ¶¶96-108; *Balestra*, 380 F. Supp. 3d

21   at 356 (observing that while that ATB Coin purchasers "had complete control over [their ATB]

22   coins as soon as they were purchased, including the decisions of when and for how much to sell,"

23   purchasers had no control over whether the new ATB Blockchain technology worked); *see also*

24   *U.S. v. Zaslavskiy*, 2018 WL 4346339, at *7 (E.D.N.Y. Sept. 11, 2018) ("Though [defendant]

25   suggested that [ ] investors could trade [digital] coins on an external exchange and make more

26   profit, there is no indication that investors were to have any control over the management of

27   [defendant's business]."); *Dapper Labs*, 2023 WL 2162747, at *21 ("the type of control the

28   securities laws appear to care about is control over management of the scheme itself"); *Matter of*

1   *Munchee Inc.*, Release No. 10445 (Dec. 11, 2017) 2017 WL 10605969, at *7 (finding that

2   "[i]nvestors had little choice but to rely on Munchee and its expertise" to generate profits because,

3   "[a]t the time of the offering and sale of MUN tokens, no other person [but defendants] could make

4   changes to the Munchee App or was working to create an 'ecosystem' to create demand for MUN

5   tokens"); *id.* ("Investors' profits were to be derived from the significant entrepreneurial and

6   managerial efforts of others – specifically Munchee and its agents – who were to revise the

7   Munchee App, create the 'ecosystem' that would increase the value of MUN (through both an

8   increased demand for MUN tokens by users and Munchee's specific efforts to cause appreciation

9   in value, such as by burning MUN tokens), and support secondary markets").

10          Because the Terra Tokens meet every element of the *Howey* test, they are securities

11   required to be registered pursuant to the Securities Act.

12          **C.    The 12(a)(1) Claim Is Adequately Alleged**

13          TFL Defendants' argument on this issue (MTD at 42-43) avoids the facts pled in the SAC

14   and instead offers, once again, an alternative reading unsupported by fact and law. Specifically,

15   the TFL Defendants assert that the "Terra, Mirror, and Anchor Protocols mint and distribute tokens

16   programmatically, without any involvement from TFL or Mr. Kwon," arguing that Plaintiff "fails

17   to explain how globally accessible protocols can be viewed as having conducted a general

18   solicitation of sales to U.S.-based persons such that any transactions were required to be

19   registered." MTD at 43. First, these are improper offers of alternative facts and inferences that TFL

20   Defendants cannot rely on at the pleading stage to defeat Plaintiffs equally plausible allegations of

21   wrongdoing. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative

22   explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

23   plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

24          Second, the *Ripple* court expressly rejected this privity argument (MTD at 43) because the

25   plaintiff plausibly alleged that he "purchased XRP securities from defendants." *See Ripple*, 2020

26   WL 922815, at *16 (recognizing that "while the above allegations do not specify a direct purchase,

27   they also do not foreclose any inference of such purchase" and concluding that "at this stage in the

28   litigation, where the court may draw reasonable inferences and the relationship between

28

defendants, subsequent purchasers, and the exchange is unclear, the court concludes that plaintiff has adequately alleged privity"). Plaintiffs allege the same (*see* ¶¶27-35), and, thus, should likewise avoid dismissal of their 12(a)(1) claim.

Third, TFL Defendants' claim that the SAC does not plead that TFL or Kwon were statutory sellers of anything beyond UST (*see* MTD at 43) fails, as it is contingent upon ignoring the allegations in the SAC that additional plaintiff Patterson purchased "UST, LUNA, ANC, Mirrored Assets and Bonded Assets during the Relevant Period." ¶16. While TFL Defendants object to Plaintiff Patterson and his counsel, Scott+Scott, participating in this action (*see* MTD at 22-23), a defendant does not get to select who gets to bring claims against them. Having additional plaintiffs as named plaintiffs beyond the Court-appointed lead plaintiff is commonplace and entirely appropriate. *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2021 WL 4503137 (N.D. Cal. Oct. 1, 2021) (denying motion to dismiss the additional plaintiffs named in a PSRLA securities complaint beyond the court appointed Lead Plaintiff). Indeed, "the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class. Rather, the proposed class and Class Representatives are to be reviewed according to the standards of Rule 23, without any deference to the earlier determinations made in the appointment of Lead Plaintiffs." *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 627 (N.D. Cal. 2018); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2022 WL 2954937, at *4 (N.D. Cal. July 26, 2022) (certifying class, and appointing non-lead, additional plaintiffs as class representatives).

Finally, TFL Defendants' solicitation argument (MTD at 43) fares no better. The allegations that TFL Defendants systematically marketed Terra Tokens and financially benefitted from such efforts are adequate to pled solicitation. *See* ¶¶82-83, 169-86, 211. Indeed, "[n]othing more is required" to plead solicitation. *See GTV Media*, 2021 WL 2535528, at *3; *Ripple*, 2020 WL 922815, at *16 (allegations that defendants offered to sell the digital asset at issue in California based on a section on "How to Buy" the token on the company's website allowed for the reasonable inference that "such materials were accessible to individuals in this state" and "qualifie[d] as an offer via advertisement because the link invites the performance of a specific act (the purchase of [the token] on an exchange) without any further communication (because the guide explains how

to complete the purchase)"); *Balestra*, 380 F. Supp. 3d at 358 (finding dismissal "inappropriate" because the alleged "promotional statements trumpeting the potential of the ATB Coin and the ongoing opportunity to invest in the ATB ICO ... clearly reflect both Ng's and Hoover's efforts to solicit the sale of ATB Coins").

For those reasons, the Court should deny the TFL Defendants' Motion to Dismiss the SAC's Section 12(a)(1) claim.

### D.   Plaintiffs Sufficiently Pled 10b and 20 Violations

#### 1.   Scheme Liability Claims

A §10(b) and Rule 10b-5 violation can be found in the absence of a statement or omission because "[c]onduct itself can be deceptive." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).  For a Rule 10b-5(a) or (c) claim, a plaintiff must allege a device, scheme, or artifice to defraud, or an act, practice or course of business which would operate as a fraud, in addition to the standard elements of a §10(b) and Rule 10b-5 violation. *N.Y. City Emps.' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009). Even a "non-speaking actor who employs a manipulative device or makes a material misstatement (or omission) that is relied on by a purchaser or seller of securities may be liable as a primary violator under 10b-5." *Id.* (citing *Cent. Bank*, 511 U.S. at 191; *SEC v. Zandford*, 535 U.S. 813, 821-22 (2002)). So long as "a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008).

But since "'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation.'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not

1  plead manipulation to the same degree of specificity as a plain misrepresentation claim."); *In re*

2  *Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) (alleging "manipulation in

3  violation of Rule 10b-5(a) and (c) must specify 'what manipulative acts were performed, which

4  defendants performed them, when the manipulative acts were performed and what effect the

5  scheme had on the securities'").

6       The SAC adequately alleges that TFL Defendants, and other insiders, carried out a plan or

7  scheme to maintain the apparent stability of the UST/LUNA peg that was intended to, and did,

8  deceive investors and cause Plaintiffs and other Class members to purchase and/or continue to

9  hold Terra Tokens at artificially inflated and distorted prices. *See* ¶¶187-205. This conduct is

10  separate from the alleged misstatements and omissions, and it suffices to allege a §10(b) claim for

11  scheme liability. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. 2012) (finding

12  scheme liability where the conduct included "Defendants' ***actions*** in allegedly manipulating the

13  stock price, including Galena hiring [certain defendants], Galena paying them both significantly

14  above-market rates, . . . the planning and execution of well-timed social media posts and emails

15  with targeted content to artificially inflate the value of Galena's stock, the sale of significant

16  personally-held Galena stock by insiders at artificially inflated prices, the attempted cover-up of

17  those stock sales, and . . . of the full relationship between Galena and [certain defendants].")

18  (emphasis in original).

19       Here, TFL Defendants only offer a passing argument against Plaintiffs' claim under

20  Sections 10b-5(a) and (c), primarily contending that co-defendant Jump Trading's conduct was

21  not deceptive and that this claim "simply rehashes the First cause of Action, not an independent

22  claim for scheme." *See* MTD at 50-51. But as noted above, the scheme liability claim stands

23  regardless of whether the 10b-5(b) claim rises or falls. The SAC sufficiently alleges that TFL

24  Defendants' actions surrounding the May 2021 depegging event – and subsequent covering up of

25  the reason for it – was a manipulative scheme meant to defraud investors.

26              **2.    Misleading Statement Claims**

27                   **a.    Material Misstatements and Omissions**

28       At the pleading stage, to establish liability under Rule 10b-5(b), a plaintiff need only

31

1    "specify each statement alleged to have been misleading" and "the reason or reasons why the

2    statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Falsity is a mixed question of law and fact

3    for a jury; the Court should only dismiss a case if "'reasonable minds' could not disagree that the

4    challenged statements were not misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-82 (9th Cir.

5    1995). Here, the SAC adequately pleads falsity, alleging with particularity the who, what, when,

6    and where of each misstatement, as well as facts showing how each misstatement was misleading.

7    Notably, a statement or omission is misleading "if it would give a reasonable investor the

8    impression of a state of affairs that differs in a material way from the one that actually exists."

9    *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 985 (9th Cir. 2008). Each of the

10    misrepresentations must be considered as a whole, and in conjunction with the other misleading

11    statements made by TFL Defendants, whose words cannot be viewed "in complete isolation" but

12    must instead be "read in light of all the information then available to the market" to decide if they

13    "conveyed a false or misleading impression." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507,

14    512 (9th Cir. 1991). With that in mind, statements "literally true on their face may nonetheless be

15    misleading when considered in context." *Miller v. Thane Int'l, Inc*., 519 F.3d 879, 886 (9th Cir.

16    2008). Circumstance, setting, and even "manner of presentation" all matter. *McMahan & Co. v.

17    Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

18        Plaintiffs' allegations that Kwon and TFL inaccurately portrayed TFL's state of affairs

19    meet these standards. For example, the SAC alleges that TFL Defendants made a series of

20    misleading statements regarding the sustainability of the Anchor Protocol yields. *See* SAC ¶¶119-

21    127. Likewise, the SAC alleges that TFL and/or executives speaking on behalf of TFL made

22    misleading statements about the UST's peg parity and the sustainability of algorithmic stablecoins

23    like UST. *See* SAC ¶¶137, 141, 250(d)-(k). The SAC also contains allegations that on May 28,

24    2022, "in an exchange on Twitter and in response to a direct criticism about the sustainability of

25    TFL's algorithmic stablecoin, Kwon flatly denied that UST was unstainable, saying such claims

26    were neither true nor well-informed." SAC ¶250(h). Further, "[TFL] Defendants' public

27    statements attributing UST's recovery from the May 2021 depegging to the resiliency of

28    algorithmic stablecoins – rather than an infusion of capital – are materially misleading, and feature

prominently in the SEC's fraud allegations." SAC ¶49.  Finally, the SAC alleges that TFL Defendants marketed the Terraform blockchain as having a real-world use in the form of processing retail transactions in Korea for Chai, however, these statements were lies. ¶¶174-76.

TFL Defendants ignore these misstatements and instead characterize all of the alleged misleading statements as being either not actionable or immunized as a forward-looking statement under the PSLRA. MTD at 45. This mischaracterization is misguided and unreasonable based on the facts known to TFL and Kwon at the time. And when viewed in totality, the SAC's allegations set forth a course of misleading conduct which furthered the interests of the Terra Token enterprise. TFL Defendants' statements about the Terra ecosystem, the continuous financial incentives offered to investors that deploy their UST into the Anchor Protocol, and the growth of the market for Terra Tokens all conspicuously failed to reference the fact that Kwon and other TFL insiders were making large sales of the Terra Token allocations they received for free from the TFL Defendants and propping up the unstable and unsustainable UST/LUNA peg with secret purchases.

To the extent the Court delves into materiality, the SAC demonstrates that TFL Defendants' statements were material. As discussed, investors were specifically concerned about the stability of the UST/LUNA peg and the sustainability of the ability to earn high yields for investing in Terra Tokens. Kwon and TFL knew that investors were concerned, and that investors were looking to them for answers. Kwon's denials and deflections created a false impression of TFL's business operations and ability to maintain the UST/LUNA peg and Anchor yield payments. The SAC alleges that the misstatements and omissions contained therein misrepresented and/or failed to disclose material information, including that, (1) TFL Defendants, Jump, and other co-conspirators had secretly manipulated the price of UST/LUNA in order to artificially inflate their respective prices and temporarily restore the peg; and (2) the UST/LUNA peg was being maintained through TFL Defendants as opposed to the promoted stability of the algorithm.

Reasonable investors would have viewed those facts as altering the total mix of information about the state of TFL's business operations and current affairs as to ongoing sustainability. *See Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co*., 845 F.3d 1268, 1274 (9th Cir. 2017) ("The materiality of the misrepresentation or an omission depends upon

whether there is 'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available' for the purpose of decisionmaking [sic] by stockholders concerning their investments."). Moreover, the substantial decline of the Terra Tokens when the truth was revealed (*see* ¶¶158-162) confirms that investors viewed the undisclosed information about the stability of the Terra ecosystem and the UST/LUNA peg as material. *See Westley v. Oclaro*, Inc., 897 F. Supp. 2d 902, 914 (N.D. Cal. 2012) ("[D]ecline in stock price after a disclosure supports a finding of materiality."); *In re Nat'l Golf Props. Inc. Sec. Litig.*, 2003 WL 23018761, at *5 (C.D. Cal. Mar. 19, 2003) ("[Defendant]'s shares suffered a one-day decline in value of 13%" after the revelations and, so, "[i]t cannot be said, at least at the pleading stage, that these disparities would not be material to a reasonable investor."). Thus, TFL Defendants' challenge to materiality fails.

In addition, the PSLRA's safe harbor protections that TFL Defendants point to (*see* MTD at 45-46) do not shield them from liability. First, "Congress expressly excluded all issuers of penny stocks from the protections afforded by the Safe Harbor provisions." *SEC v. Strategic Glob. Invs., Inc.*, 262 F. Supp. 3d 1007, 1021 (S.D. Cal. 2017); *see* 15 U.S.C. §§77z-2(b)(1)(C), 78u-5(b)(1)(C) ("[T]his section shall not apply to a forward-looking statement . . . that is made with respect to the business or operations of the issuer, if the issuer . . . issues penny stock . . . ."); *accord Garrison v. Ringgold*, No. 19CV244-GPC(RBB), 2019 WL 2089509, at *2 (S.D. Cal. May 13, 2019) (recognizing the similarity between cryptocurrencies and penny stocks and finding that initial coin offerings "are the crypto-version of penny stocks, but worse"). The Terra Tokens are the functional equivalent of a "penny stock" under SEC Rule 15g-9, trading on various cryptocurrency exchanges. Therefore, TFL Defendants' statements should be excluded from the PSLRA's Safe Harbor. *See Strategic Glob.*, 262 F. Supp. 3d at 1020-21 (rejecting argument that misstatements were forward-looking statements protected by the Safe Harbor because the company's stock was a penny stock).

Second, TFL Defendants' statements and omissions related to then-current facts and thus, are not protected by the Safe Harbor in any event. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141–42 (9th Cir. 2017) (holding that statements of "current facts" are not protected even

1   when mixed with other, forward-looking statements); *Prodanova v. H.C. Wainwright & Co., LLC*,

2   2018 WL 8017791, at *12-*13 (C.D. Cal. Dec. 11, 2018) (PSLRA Safe Harbor does not apply

3   where statement is "misleading because it omitted a disclosure of a present fact."). As described

4   in detail above, TFL Defendants were at the center of the scheme to offer and sell Terra Tokens at

5   artificially inflated prices. With knowledge, or in reckless disregard of the reality that the

6   UST/LUNA peg was being artificially propped up by Defendants and that the high yields being

7   promoted were unsustainable, TFL Defendants told investors not to worry about the likelihood of

8   an imminent collapse of the Terra ecosystem. Thus, the statements at issue described ***current***

9   affairs – not a future plan – and Safe Harbor protections do not apply here.

10                                    **b.**      ***Scienter***

11          In assessing the allegations holistically, "courts certainly need not close their eyes to

12   circumstances that are probative of scienter viewed with a practical and common-sense

13   perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Here, the SAC

14   contains a candid admission by Luna Foundation Guard Governing Council Member, Reme Teto

15   that more than satisfies Rule 9(b)'s heightened pleading standard for scienter. In particular, the

16   SAC alleges that Teto "admitted what TFL had denied all along – that the Anchor Protocol's 20%

17   yield was not sustainable or stable despite constant statements to the contrary up until the collapse"

18   and "revealed that the 20% yield was a marketing ploy to increase investment in the Terra

19   ecosystem." ¶163 ("In particular, Tetot candidly confessed: They called Luna a Ponzi because of

20   the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make

21   the yield sustainable around 10–12%. Unfortunately, it didn't have time to make it . . . ***20% yield***

22   ***was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't***

23   ***sustainable*** . . . ."); *id*. ("Looking back at it, the 20% yield was a mistake because it increased UST

24   demand too quickly, and the defence mechanisms were not scaling at the same pace or were not

25   ready yet"); *id*. (confessing that "while the strategic moves were made, they were not technically

26   ready, leaving room for what happened.").

27          Scienter is further demonstrated by allegations that TFL was warned on February 8, 2022

28   that the Anchor Yield Reserve would not last without further contribution, and then two days later,

1    TFL and the Luna Foundation Guard's Governing Council voted to capitalize the Yield Reserve

2    by $450 million. ¶¶134-137. These allegations of scienter are at least as strong as any opposing

3    inference, thereby satisfying this element of a 10(b) claim. *See Killinger*, 542 F.3d at 785-86

4    ("[A]llegations regarding management's role in a company may . . . independently satisfy

5    [scienter] where they are particular and suggest that defendants had actual access to the disputed

6    information . . . ."); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011)

7    ("Defendants' purported access to certain information contradicting their public statements

8    provides additional support for finding . . . scienter.").

9                                   **c.       Reliance**

10          Similarly, the SAC contains sufficient allegations to plausibly infer reliance. Most notably,

11   Plaintiffs allege that investors repeatedly confronted Kwon, TFL, and members of the Luna

12   Foundation Guard about the stability of the UST/LUNA peg and sustainability of yield rewards.

13   Thus, Plaintiffs plausibly allege that TFL Defendants were aware that Terra Token investors,

14   including Plaintiffs, relied on Kwon's and the Company's representations when making

15   investment decisions. Furthermore, as TFL Defendants begrudgingly concede, the SAC does

16   contain allegations that Plaintiffs relied on TFL Defendants' statements. At the pleading stage, this

17   is enough. As the misrepresentations at issue are alleged to have "played a substantial part in the

18   [Plaintiffs'] investment decisions," Plaintiffs have sufficiently pled reliance. *Desai v. Deutsche

19   Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).

20                                  **d.       Loss Causation**

21          Plaintiffs have clearly alleged that a corrective disclosure beginning on May 7, 2022

22   demonstrated the falsity of TFL's repeated assurances regarding the stability of the UST/LUNA

23   peg and caused the alleged losses. ¶¶158-162. TFL Defendants' attempts to argue otherwise (MTD

24   at 49-50) are plain wrong.

25                          **3.       Control Person Claims**

26          Having established primary violations of Rule 10(b) and 10b-5, Plaintiffs' control person

27   claims against Defendant Kwon should likewise survive given his position as CEO of TFL. *See

28   Ripple*, 2020 WL 922815, at *13 (denying dismissal of control person claim under 15 USC §77l(o)

upon finding primary violation of §77l(a)(1)); *Dapper Labs*, 2023 WL 2162747, at *22 (same).

**E.      The SAC Adequately Alleges RICO Claims in the Alternative**

**1.      Legal Standards**

To state a civil claim for a federal Racketeer Influenced and Corrupt Organizations Act ("RICO") violation under 18 U.S.C. §1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Additionally, a plaintiff must establish that the defendant caused injury to the plaintiff's business or property. *McCluskey v. Hendricks*, 2021 WL 4815938, at *2 (C.D. Cal. June 16, 2021) (citing 18 U.S.C. §§1962(c), 1964(c)).

The Supreme Court has repeatedly emphasized the breadth of the RICO statute: RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purpose, Pub. L. 91-452, §904(a), 84 Stat. 947. The statute's remedial purposes are nowhere more evident than in the provisions of a private action for those injured by racketeering activity. *Sedima*, 473 U.S. at 497-98; *Boyle v. United States*, 556 U.S. 938, 944 (2009) (RICO is to be "'liberally construed to effectuate its remedial purposes'"). Similarly, the Ninth Circuit has held that, "[a]s Congress admonished and as the Court repeated in *Sedima*, RICO should 'be liberally construed to effectuate its remedial purposes.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima*, 473 U.S. at 497-98).

Where plaintiff's RICO claim is based on fraud, "the plaintiff is not required to show that ***it*** relied on defendant's misrepresentations, but it must show that ***someone*** relied on them to plaintiff's detriment." *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 2019 WL 281370, at *15 (N.D. Cal. Jan. 22, 2019) (emphasis in original); *see also C&M Cafe v. Kinetic Farm, Inc.*, 2016 WL 6822071, at *7 (N.D. Cal. Nov. 18, 2016) (concluding that a plaintiff (referred to as the "direct victim") adequately alleged RICO proximate cause where the defendant impersonated the plaintiff restaurant's website and induced customers to order delivery through the defendant, thus directly depriving the plaintiff of its ordinary delivery fee). Thus, when "'applying Rule 9(b)'s particularity requirements to RICO claims, courts have required Plaintiffs to plead the "time, place and nature"

of the claims, including the existence of the enterprise and the underlying racketeering activity.'" *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528–29 (9th Cir. 1995). But the Ninth Circuit advises district courts to be mindful to "not erect artificial barriers – metaphysical or otherwise – as a means of keeping RICO cases off the federal dockets." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528-29 (9th Cir. 1995).

### 1.      Plaintiffs' RICO Claim is Not Barred

Contrary to TFL Defendants' assertion (MTD at 52), Plaintiffs have sufficiently pled RICO claims in the alternative. It is entirely possible that Congress or the judiciary will determine that cryptocurrencies like the Terra Tokens are not securities. The genuine uncertainty on whether these financial products are securities warrants the pleading of a RICO claim in the alternative. *See Jones v. Deutsche Bank AG*, No. C 04-05357 JW, 2005 WL 1683614, at *6 (N.D. Cal. July 19, 2005) (holding that the status as a security question was better suited for summary judgment and denying motion to dismiss RICO claim while granting leave to amend PSLRA claim).

### 2.      Plaintiffs Have Standing to Pursue a RICO Claim

TFL Defendants raise the same lack of standing argument for Plaintiffs' RICO claim as they did with the securities claims. For the same reasons outlined above (*see supra*, Section V.C) the TFL Defendants' arguments of lack of standing fail.

### 3.      The SAC Alleges Numerous Predicate Acts

The SAC plausibly alleges "open-ended" continuity as part of Plaintiffs' RICO claim. Open-ended continuity is the threat that criminal conduct will continue into the future. It is established by showing either that the predicate acts "'include a specific threat of repetition extending indefinitely into the future'" or that the predicate acts were "'part of an ongoing entity's regular way of doing business.'" *Allwaste*, 65 F.3d at 1527. The standard for showing open-ended continuity is "extremely low." *Sebastian Int'l, Inc. v. Russolillo*, 186 F. Supp. 2d 1055, 1067 (C.D. Cal. 2000). For example, in *Allwaste*, on appeal of a 12(b)(6) order, the court similarly held that the defendants' "willingness to participate in the kickback scheme and their affirmative misrepresentations . . . demonstrate that if they had not been fortuitously interrupted by termination, the predicate acts could have recurred indefinitely." 65 F.3d at 1530.

1    Notably, as courts have previously observed, the "time span of the alleged racketeering

2 activities is not relevant to open-ended continuity." *Malhotra v. Copa de Oro Realty, LLC*, 2015

3 WL 12656293, at *12 (C.D. Cal. Sept. 23, 2015), *aff'd*, 673 F. App'x 666 (9th Cir. 2016); *Bank*

4 *Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 1998 WL 42575, at *5 (S.D.N.Y. Feb. 4, 1998)

5 (observing that "the period of time over which predicate acts extend is nevertheless not, by itself,

6 dispositive. The necessary inquiry is whether the racketeering activity 'at the time of Its

7 occurrence' threatened continuing racketeering activity."). Here, Plaintiffs allege that the Terra

8 Token Enterprise was an ongoing scheme to periodically pump up the trading volume and price of

9 the Terra Tokens in order to provide exit liquidity for Defendants. The SAC plausibly alleges that

10 the Terra Token Enterprise posed a "'specific threat of repetition extending indefinitely into the

11 future'" and that the predicate acts were "'part of an ongoing entity's regular way of doing

12 business'" for TFL Defendants. *See Allwaste*, 65 F.3d at 1527; ¶¶339-341. Significantly, the SAC

13 alleges that Kwon "launched Terra2.0/LUNA 2 shortly after the collapse of UST/LUNA." SAC

14 ¶14. That Kwon would solicit investments in another crypto project right after the Terra collapse

15 concurrently demonstrates a specific threat of repetition. Of course, whether predicate acts pose a

16 threat of future conduct is evaluated as of the time the acts are committed. *See Bryant v. Mattel,*

17 *Inc.*, 573 F. Supp. 2d 1254, 1263–64 (C.D. Cal. 2007) (finding open-ended continuity despite the

18 fact that scheme ended before any prosecution was commenced). The continuity requirement does

19 not, in itself, require that every member "be involved in each of the underlying acts of racketeering,

20 or that the predicate acts be interrelated in any way." *Odom*, 486 F.3d at 552-53. Instead, the

21 continuity requirement focuses on whether the associates' behavior was "ongoing" rather than

22 isolated activity. *Id.*

23    Here, the conduct alleged did not have any inherently terminable goal, such as a sale of

24 land. It could have gone on indefinitely with new "pumps" to allow the TFL Defendants to

25 continue their scheme to dump their prelaunch tokens at inflated prices. Accordingly, the

26 "'continuing unit'" requirement is satisfied. *Bryant v. Mattel, Inc*., 573 F. Supp. 2d 1254, 1263-64

27 (C.D. Cal. 2007). Indeed, "if they had not been caught, there is no reason why they would not have

28

1  continued this method of "'business.'" *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at

2  *7 (C.D. Cal. Dec. 27, 2016).

###### 4.  The Alleged RICO Enterprise

4  The RICO statute defines an "enterprise" as "any individual, partnership, corporation,

5  association, or other legal entity, and any union or group of individuals associated in fact although

6  not a legal entity." 18 U.S.C. §1961(4). The definition of a RICO enterprise has "wide reach" and

7  is to be "'liberally construed to effectuate its remedial purposes.'" *Howard v. Am. Online Inc.*, 208

8  F.3d 741, 749 (9th Cir. 2000); *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015)

9  ("This expansive definition is 'not very demanding.'"). To plausibly allege an association-in-fact

10  enterprise, "the complaint must describe "'a group of persons associated together for a common

11  purpose of engaging in a course of conduct" . . . [and] must provide both "evidence of an ongoing

12  organization, formal or informal," and "evidence that the various associates function as a

13  continuing unit." *Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir. 2015). At its core, enterprise

14  liability under the RICO statute "depends on showing that the defendants conducted or participated

15  in the conduct of the '***enterprise's*** affairs,' not just their ***own*** affairs." *Reves v. Ernst & Young*, 507

16  U.S. 170, 185 (1993) (emphasis in original). TFL Defendants' claims to the contrary

17  notwithstanding (MTD at 57), the SAC contains allegations sufficient to infer that the Terra Token

18  Enterprise's conduct was outside of the normal business of TFL.

19  Here, the SAC plausibly alleges that TFL Defendants: (1) had a common purpose of

20  increasing the price and trading volume for Terra Tokens; (2) each committed two or more

21  predicate acts as an ongoing organization with the other RICO Defendants; and (3) posed a threat

22  that their fraudulent promotions of Terra would continue into the future.

23  The SAC unambiguously states that TFL Defendants all shared the common purpose "to

24  ensure that the RICO Defendants could sell off their Terra Token holdings to retail investors at

25  artificially inflated prices without their fraud being detected." ¶320. In particular, the TFL

26  Defendants are alleged to have "shar[ed] the common purpose of inflating the price and trading

27  volume of Terra Tokens in order to sell their respective portion of the Float for substantial profit."

28  ¶325. The SAC further expanded that "motive and purpose in creating and conducting the scheme

and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that [these Defendants] could sell off their portion of the Float for grossly inflated prices.  Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity." ¶342.

Similar allegations as these have been found sufficient to establish the common purpose element of an association-in-fact enterprise. *See, e.g.*, *In re ZF-TRW Airbag Control Units Prods. Liab. Litig*., No. LA ML19-02905 JAK, 2022 WL 522484, at *47 (C.D. Cal. Feb. 9, 2022) (finding allegations that defendants had a common purpose of misleading consumers in order to "'maximize their revenue by selling as many [products at issue] as possible'" to be sufficient); *see also United States v. Cagnina*, 697 F.2d 915 (11th Cir. 1983) (noting that the enterprise may be an informal association with the common purpose of making money from the alleged schemes). Despite TFL Defendants' suggestion to the contrary, the SAC does not allege a mere a routine commercial relationship, but rather a scheme masquerading as an "entirely legitimate" cryptocurrency project that was "used by the defendant to line his or her pockets." *See United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988) (analyzing association-in-fact enterprise liability).

### 5.     The Pleadings Establish a Pattern or Continuity

The Ninth Circuit has long defined a "pattern" as being "'at least two acts of racketeering activity' within ten years of each other.'" *Attia v. Google LLC*, 983 F.3d 420, 427 (9th Cir. 2020); *see also Howard v. Am. Online, Inc*., 208 F.3d 741, 749 (9th Cir. 2000); 18 U.S.C. §1961(5). "'Where a plaintiff alleges RICO claims against multiple defendants, the 'plaintiff must allege at least two predicate acts by *each* defendant.'" *White v. Seabrooks*, 2022 WL 2189637, at *5 (C.D. Cal. Feb. 4, 2022). The SAC sufficiently does that. *See* ¶¶SAC49-55, 163, 256, 336-341. As Plaintiffs have clearly alleged the who, what, when, where, and why of the alleged RICO enterprise and the ongoing pattern of racketeering activity, this Court should reject TFL Defendants' arguments on this point.

An ongoing organization is "a vehicle for the commission of two or more predicate crimes." *Odom*, 486 F.3d at 552. As noted, the SAC alleges that the Terra Token Enterprise are "ongoing and continuing business organizations." ¶320. Further, the SAC details that the "persons engaged in the Terra Token Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the Individual Defendants and the Luna Foundation Guard" and that there is "regular communication between the RICO Defendants, in which information is shared." ¶322. Moreover, far from conclusory, the SAC alleges that the RICO Defendants "exerted control over the Terra Token Enterprise and participated in the operation or management of the affairs of the Terra Token Enterprise, directly or indirectly" and gives four different examples of such. *See* ¶329(a)-(d). The SAC further alleges that the "Individual Defendants and TFL alone could not have accomplished the purpose of the Terra Token Enterprise without the assistance of the Luna Foundation Guard." ¶326. These allegations sufficiently show the "relationships among those associated with the enterprise" were continuous and ongoing. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995).

## F.     State Law Claims Are Sufficiently Pled

### 1.     Aiding and Abetting and Conspiracy Claims

The California Supreme Court has recognized civil conspiracy as a cause of action, but "only when it alleges the commission of a civil wrong that causes damage." *Okun v. Superior Court*, 29 Cal. 3d 442, 454 (1981). The elements of civil conspiracy are: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995). "The conspiring defendants must . . . have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of it *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 784–86 (1979)purpose." *Id*. at 1582 (citing *Wyatt v. Union Mortg. Co*., 24 Cal. 3d 773, 784-86 (1979)).

California courts allow for the actual knowledge element of a civil conspiracy claim to be established by reasonable inference. "Because conspiracies are, by their very nature, secret

1   agreements, "[a] defendant's knowledge of and participation in a conspiracy may be inferred from

2   circumstantial evidence and from evidence of the defendant's actions." *Gilbrook v. City of*

3   *Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999) (quoting *Gilbrook v. City of Westminister*, 177

4   F.3d 839, 856-57 (9th Cir. 1999)). Further, knowledge can be alleged with facts that show the

5   conspiring parties "reached a unity of purpose or a common design and understanding, or a meeting

6   of the minds in an unlawful arrangement." *DeFrees v. Kirkland*, 2012 WL 12885114, at *23 (C.D.

7   Cal. July 20, 2012). Moreover, it is not necessary that each conspirator know all of the details of

8   the conspiracy. *Rocawear Licensing LLC v. Pacesetter Apparel Grp.*, 2007 WL 5289737, at *5

9   (C.D. Cal. Sept. 12, 2007). In the end, "'[k]nowledge of the scheme's unlawful purpose . . . may

10  be inferred from the surrounding circumstances, including the nature of the acts done, the relation

11  of the parties, and the interests of the defendants.'" *People ex rel. Kennedy v. Beaumont Inv., Ltd.*,

12  111 Cal. App. 4th 102, 137–38 (2003) (quoting *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111

13  Cal. App. 4th 102, 137-38 (Cal. Ct. App. 2003)); *see Hanni v. Am. Airlines, Inc.*, 2008 WL

14  5000237, at *5 (N.D. Cal. Nov. 21, 2008) (finding that an unlawful conspiracy claim must contain

15  "'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

16  agreement'").

17         Here, Plaintiffs alleged that, among other things, TFL Defendants took actions to hide the

18  instability of the UST/LUNA peg. ¶¶187-205. The creators of the Terra Tokens are also alleged to

19  have purposefully chosen to remain "undisclosed" in order to hide their identities. *See* ¶323

20  ("Individual Defendants concealed the members of the TFL leadership and founding team, which

21  allowed the unidentified co-conspirators to sell their portion of the Float without any scrutiny or

22  complaint."); *id.* (alleging that TFL Defendants agreed to take actions to hide the scheme and

23  continue its existence); ¶324 (alleging that TFL Defendants "concealed the identities of the TFL

24  insiders in order to escape detection and punishment for their participation" in the alleged

25  wrongdoing); ¶329(b) (TFL Defendants "concealed the identities of the leadership team behind

26  TFL in order to get away with improperly promoting the Terra Tokens to investors"); ¶329(c)

27  (TFL Defendants "concealed that they were causing the Terra Token prices to "artificially inflate

28  in order to allow themselves to sell off their respective Terra Token holdings at an inflated price").

1    Concealment after the fact can lead to the reasonable inference of the conspirator's

2 knowledge. *See, e.g.*, *United States v. Moreland*, 622 F.3d 1147, 1169 (9th Cir. 2010) (finding

3 knowledge of conspiracy sufficiently pled because of allegations that defendant had worked with

4 individuals who took steps to "hide their ill-gotten millions"); *Casey v. U.S. Bank Nat. Assn.*, 127

5 Cal. App. 4th 1138, 1145 (2005) (finding knowledge or intent could be reasonably inferred because

6 of allegations that certain defendants were "involved since the very beginning," transferred shares

7 to entities they controlled and owned, and had been involved in the communications with other

8 Defendants). Accordingly, Plaintiffs have plausibly alleged facts supporting the reasonable

9 inference that Defendants had actual knowledge of the conspiracy.

10    Similarly, under an aiding-and-abetting theory, those who provide substantial assistance

11 with actual knowledge of the wrongdoing are liable as co-tortfeasors for the wrongs committed by

12 codefendants. *Newton v. Am. Debt Servs., Inc.*, No. C-11-3228 EMC, 2013 WL 5592620, at *4

13 (N.D. Cal. Oct. 10, 2013). Unlike civil conspiracy, aiding-and-abetting does not require proof of

14 an agreement to commit the primary wrong. *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d

15 1101, 1134 (C.D. Cal. 2003). Accordingly, a party alleging aiding-and-abetting need only

16 establish: (1) defendant's actual knowledge of the specific primary wrong, and (2) defendant's

17 substantial assistance in its commission. *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138,

18 1145 (2005). Here, TFL Defendants are alleged to have been instrumental in assisting all

19 Defendants in carrying out the scheme to defraud investors, thereby satisfying the substantial

20 assistance element. Further, as noted above when discussing Plaintiffs' conspiracy claim,

21 Defendants' requisite knowledge can be inferred by their repeated efforts to conceal their identities

22 and wallet address information in order to effectuate the sale of the Terra Tokens without

23 restriction or scrutiny. This is enough to plead a claim for aiding and abetting.

24    ## 2.    Unjust Enrichment

25    A claim for unjust enrichment "broadly provides that a person who is unjustly enriched at

26 the expense of another is subject to liability in restitution." *Victor v. R.C. Bigelow, Inc.*, 2015 WL

27 4104609, at *2 (N.D. Cal. July 7, 2015). "The elements of unjust enrichment are 'receipt of a

28

1 benefit and unjust retention of the benefit at the expense of another.'" *Berger v. Home Depot USA,*

2 *Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014).

3      Here, Plaintiffs sufficiently plead that TFL Defendants were unjustly enriched when they

4 received a monetary benefit from the sale of the Terra Tokens to Plaintiffs and the class members

5 at inappropriately and artificially inflated prices. *See* ¶¶5, 94, 257, 184-186. Likewise, TFL

6 Defendants were unjustly enriched through their sale of "billions worth of LUNA Tokens" at

7 these artificially inflated prices. ¶257. These allegations more than adequately state a claim for

8 unjust enrichment. *See In re Safeway Tuna Cases*, 2016 WL 3743364, at *2 (N.D. Cal. July 13,

9 2016) (order allowing Plaintiff's unjust enrichment claim to stand "even if it were duplicative of

10 their other claims, at the pleading stage").

11      Plaintiffs provided a direct benefit to TFL Defendants by providing enough trading volume

12 and exit liquidity with their Terra Token purchases to allow TFL Defendants to sell their Terra

13 Token allocations to Plaintiffs and class members at inappropriately and artificially inflated prices.

14 And TFL Defendants have made off with hundreds of millions, if not billions, of dollars at the

15 expense of those like Plaintiffs and the class. Thus, in the event the Court dismisses the other

16 causes of action, it should nevertheless allow this one to proceed. It would be unjust for TFL and

17 Kwon to retain that benefit. *See Maksoud v. Williams*, 2018 WL 1150721, at *9–10 (C.D. Cal. Jan.

18 19, 2018). Further, should the other claims be deemed the inappropriate vehicle to address the

19 wrongdoing alleged herein, Plaintiffs will be without an adequate remedy at law.

20 **VI.    LEAVE TO AMEND**

21      In the event that this Court finds a deficiency with the allegations for any of the claims in

22 the SAC, Plaintiffs respectfully request leave to amend. This is the first pleading to be tested by a

23 motion to dismiss, and all of the defects that TFL Defendants complain about can be cured with

24 different phrasing and additional factual information currently available to Plaintiffs. For example,

25 Plaintiffs could include additional factual information that is contained in the recently-filed

26 criminal indictment of Defendant Kwon. And if the Court determines that the claims in the SAC

27 are not the correct causes of action to address the wrongdoing alleged, Plaintiffs could add, for

28 instance, a claim under California state law for market manipulation, which does not require

privity. *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008). As this Court recognized "the underlying purpose of Rule 15 is to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lutge v. Harrington*, No. 22-CV-00585-TLT, 2022 WL 18401350, at *3 (N.D. Cal. Dec. 20, 2022) (Thompson, J.) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)). In addition to the lack of futility, TFL Defendants do not point to any undue prejudice that would result from a grant of leave to amend. Likewise, TFL Defendants do not (nor can they) claim that Plaintiffs acted in bad faith in bringing the causes of action in the SAC. Thus, there is no basis to deny Plaintiff the opportunity to cure any pleading deficiencies. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

Consequently, it would not be futile to grant Plaintiffs leave to amend. *See Maksoud*, 2018 WL 1150721, at *7.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' omnibus motion to dismiss in its entirety or grant Plaintiffs leave to amend to cure any deficiencies with the allegations.

DATED:  July 7, 2023

**THE ROSEN LAW FIRM, P.A.**
*/s/ Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
Pronouns: he/him/his
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg (pro hac vice)
Pronouns: he/him/his
Michael Cohen (pro hac vice)
Pronouns: he/him/his
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
mcohen@rosenlegal.com

46

*Lead Counsel for Plaintiffs and the Putative Class*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

and

Sean T. Masson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
smasson@scott-scott.com

*Additional Counsel*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION

1

**<u>CERTIFICATE OF SERVICE</u>**

2   I, Laurence M. Rosen, hereby certify that on July 7, 2023, I caused the foregoing to be filed

3   with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4   to the email addresses denoted on the Electronic Mail Notice List.

5   Executed on July 7, 2023.

6               *s/ Laurence M. Rosen*

7               Laurence M. Rosen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO THE TFL DEFENDANTS'
MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION