# EXHIBIT 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                 Plaintiff,
 5
            v.                              23 CV 1346 (JSR)
 6
     DO HYEONG KWON and TERRAFORM
 7   LABS PTE LTD.,

 8             Defendants.                  Oral Argument
     ------------------------------x
 9                                          New York, N.Y.
                                            June 15, 2023
10                                          2:40 p.m.

11   Before:

12                     HON. JED S. RAKOFF,

13                                          District Judge

14                          APPEARANCES

15   DEVON STAREN
     JAMES P. CONNOR
16   LAURA E. MEEHAN
     CHRISTOPHER J. CARNEY
17        Attorneys for Plaintiff

18   DENTONS US LLP
          Attorneys for Defendants
19   BY:  DOUGLAS W. HENKIN
          DAVID L. KORNBLAU
20        CHARLES M. FARRELL
          ALYSSA LANDOW
21

22

23

24

25
```

```
 1                    (Case called)

 2                    MS. STAREN:  Devon Staren for the Securities and

 3      Exchange Commission.

 4                    MR. CONNOR:  James Connor for the SEC.

 5                    MS. MEEHAN:  Laura Meehan for the SEC.

 6                    MR. CARNEY:  Christopher Carney for the SEC.

 7                    MR. HENKIN:  Douglas Henkin from Dentons for the

 8      defendants, your Honor.

 9                    MR. KORNBLAU:  David Kornblau from Dentons, also for

10      the defendants.

11                    MR. FARRELL:  Charles Farrell from Dentons, also for

12      the defendants.

13                    MS. LANDOW:  Alyssa Landau from Dentons, also for the

14      defendants.

15                    THE COURT:  Good afternoon.  Please be seated.

16                    We are here to hear the argument on the motion to

17      dismiss.

18                    Let me hear first from moving counsel.

19                    MR. HENKIN:  Thank you, your Honor.

20                    Before I start substantive arguments, there is one

21      housekeeping matter I wanted to get your Honor's guidance on.

22                    THE COURT:  Hold on one second.

23                    Good help is hard to find these days.

24                    MR. HENKIN:  Thank you, your Honor.

25                    The housekeeping matter relates to the fact that it
```

1    has been kind of a busy week in crypto.  There have been a lot

2    of developments this week that we think relate to the merits of

3    the motion, including the major questions doctrine, the

4    due-process argument that we made, and also the fair-notice

5    argument that we have made.  These are developments that have

6    arisen quite literally this week, mostly on Tuesday in fact.

7          What happened on Tuesday was, there was a hearing in

8    the *Binance* matter before Judge Jackson in D.C.  There was a

9    filing by the SEC in the *Coinbase* mandamus proceeding in

10   response to -- it's a very unusual order, but the best way that

11   I can explain it is, it was an order to show cause by the Third

12   Circuit that we think is relevant for your Honor to consider,

13   and there was also a very large unsealing of documents in the

14   *Ripple* case, including emails, internal SEC emails relating to

15   the drafting of the Hinman speech which, as your Honor knows,

16   plays a pretty significant role in the motion to dismiss.

17         These are all in the nature of supplemental support

18   for various of our arguments, but I didn't want to drop a

19   filing without your Honor's permission, and I also didn't want

20   to sandbag the SEC either.

21         So my suggestion --

22         THE COURT:  I was busy Tuesday sitting on the Ninth

23   Circuit in Portland, so of course I didn't see any of this

24   because I had more important things to do.

25         Why is any of this relevant to a motion to dismiss,

1   which is based on the pleadings?

2          MR. HENKIN:  It's relevant, your Honor, or they are

3   relevant, your Honor, because they all relate to the SEC's

4   position regarding its authority, and, in particular, with

5   regard to the Hinman speech, it shows you what the intentions

6   were.

7          I will give you one example of one of the emails.

8   There was an email from the Office of General Counsel at the

9   SEC during the drafting process for the Hinman speech that

10   basically confirms our reading of how *Howey* is to be

11   interpreted and that investment contract requires a contract.

12   So it all relates to and supports many of the arguments.

13          THE COURT:  Maybe I'm still missing your point.

14          If someone at the SEC says, in my hypothetical, I

15   don't think this is a security, X, why would that matter to me?

16   I have to decide as a matter of law whether it's a security or

17   not based on the pleadings, yes?

18          MR. HENKIN:  What you have to decide -- I think one of

19   the issues that you need to decide is how to interpret the

20   *Howey* test and whether the *Howey* test even applies.

21          So the first question is, under the major questions

22   doctrine, whether the *Howey* test even applies, whether the SEC

23   has demonstrated that it has the relevant authority from

24   Congress.

25          By the way, I left out one set of documents, which was

1    that, on Tuesday, there was a hearing of the House Financial

2    Services Committee in which there were -- and some

3    correspondence to the SEC from the -- from that committee

4    asking the SEC not to front run -- those are the committee

5    members' words, not mine -- Congress with respect to all of

6    this.  These are issues --

7              THE COURT:  Again, so what?  Why does that matter to a

8    district judge who is determining whether or not, on the face

9    of the complaint, a case has been made as to whether these are

10   securities, etc.?

11             It might be nice to wait for Congress, although that

12   usually requires several lifetimes, but I am not sure why -- at

13   least I still don't see why it's relevance to me.

14             MR. HENKIN:  From our perspective, it's a matter of

15   making sure that your Honor has the full record.

16             And this is an unusual case from the perspective of

17   the major questions doctrine because, for example, getting a

18   little bit into the merits out of order, but unlike, for

19   example, the *West Virginia* case that was decided by the Supreme

20   Court last year, there is a very different kind of record here,

21   and you've got a record developing.

22             We pointed to quite a bit of this in the briefing, but

23   it has developed further even since the close of briefing with

24   regard to what Congress actually thinks and what Congress has

25   requested that the SEC do and, more importantly, not do.

1          I will give you one example --

2          THE COURT:  Go ahead.

3          MR. HENKIN:  Just for example, in the briefing, we

4    cited some of the proposed rule making by the SEC with regard

5    to changing some definitions in Rule 3b-16 with regard to the

6    definition of an exchange, and one of the things that happened

7    was that members of the house requested that the SEC withdraw

8    that proposed rule making because, again, they were concerned

9    about the SEC not front-running Congress with regard to the

10   regulatory status here.

11         My point is, to just make as complete a record as

12   possible with regard to the major questions doctrine and other

13   things that we have asked the Court to decide, if the Court --

14         THE COURT:  While I'm having difficulty seeing why any

15   of this is relevant to the instant motion, let's assume

16   hypothetically that it is.  Do you want to supplement the

17   record, in which case we ought to postpone oral argument a day

18   or two, or do you want to go forward now without reference to

19   any of that stuff and then supplement it later, which seems to

20   me to be not a prudent way to go forward?

21         It seems to me the choice is yours.

22         MR. HENKIN:  Your Honor, you actually kind of read my

23   mind.  One of the things that I was going to suggest is

24   postponing the argument a day or so for exactly that reason, so

25   that your Honor can see this and so that the SEC can respond.

 1                    THE COURT:  All right.

 2                    MR. HENKIN:  That would actually be my preference,

 3      because I do think this is important.

 4                    THE COURT:  I'll hear from your adversary in a minute.

 5                    Let me see what we have on tomorrow afternoon.

 6                    THE LAW CLERK:  Nothing, Judge.

 7                    THE COURT:  How about 2:00 tomorrow afternoon?

 8                    MR. HENKIN:  If you tell me to be here, your Honor, I

 9      will.

10                    THE COURT:  I think it's particularly good to have

11      lawyers here before a three-day weekend, make them earn their

12      pay.

13                    You would need to then send me tonight --

14                    MR. HENKIN:  Correct.

15                    THE COURT:  And the SEC would have to send me their

16      response by noon tomorrow.  Then we could have a full record

17      where we meet at 2:00 tomorrow.

18                    MR. HENKIN:  That would be fine with me, your Honor.

19                    THE COURT:  What about that?  Let me ask the SEC.

20                    MS. STAREN:  Your Honor, we object.  We think that we

21      are all here.  We are all ready to go forward today.  We have

22      already had a number of delays and adjournments.  And we don't

23      believe that any of these other cases have any impact or

24      relevance with respect to the motion --

25                    THE COURT:  I'm inclined to think you're likely right,

1   but I also don't see the harm in what is, in effect, a 23-hour

2   postponement so that there can be no question that the defense

3   got to put in everything they wanted to put in.

4           MS. STAREN:  Your Honor, I am unfortunately

5   unavailable tomorrow, so I would not be able to be here.

6           I think that our position is that the defendants have

7   already made their arguments with respect to major questions

8   doctrine, Administrative Procedures Act, and due process.  They

9   have already briefed it.

10          THE COURT:  Where are you going to be tomorrow?

11          MS. STAREN:  Your Honor, I'm in the D.C. office.  I

12  will be going back home.  I need to actually make a flight for

13  the long weekend.  I have a funeral to attend.

14          THE COURT:  Is there any time you could do it this

15  evening or early tomorrow?

16          MS. STAREN:  Your Honor, I could stay tonight.  I

17  could stay --

18          THE COURT:  I can't imagine anything better than

19  staying overnight in New York.  There are quite a few good

20  shows you could see.

21          MS. STAREN:  I have enjoyed my overnight in New York.

22          I think we could stay for a couple of hours.  I have a

23  6:00 train I am supposed to be --

24          THE COURT:  Here is what I'm thinking.  Obviously, if

25  you have to attend a funeral, that gets first priority.

 1          If we did it at 9:00 tomorrow morning, would that

 2    still be doable for you?

 3          MS. STAREN:  I was hoping to be able to make it back

 4    tomorrow for my son's fifth grade graduation at 1:00.  I know

 5    it's something sort of silly.

 6          THE COURT:  That's not silly at all.

 7          Let me go back to defense counsel.  How early this

 8    evening could you get in the materials that you want to

 9    supplement?

10          MR. HENKIN:  There are two that I only just received

11    while I was in the hallway, actually.  I would say 5:00.

12          THE COURT:  Let me ask the court reporter.

13          How about 8:00 tomorrow morning?  Then you could still

14    make your train.  How about that?

15          What time would you have to take a train tomorrow to

16    be at your son's graduation?

17          MS. STAREN:  I think I would have to be on a 9:00

18    train to be back at Union Station by 12:30 to make it to his

19    1:00 graduation.  That's assuming there is a 9:00 train.

20          THE COURT:  Is there a flight you could take, or is

21    that not going to save you any time?

22          MS. STAREN:  I don't know, your Honor.  I would have

23    to --

24          THE COURT:  Let me throw out a different possibility.

25          How about having the argument at 7:00 tonight?

1          MS. STAREN:  That would work, your Honor.  I think as

2    long as we get it done sometime this afternoon, evening, I can

3    stay and take an overnight train if I needed to get back.

4          THE COURT:  I may be wrong.  If I'm not mistaken, I

5    think the Yankees are not playing tonight, so I'm completely

6    free.

7          That would mean you could see their papers and either

8    you could put in a very short response or you can make an oral

9    response when we get together at 7:00.

10         Does that work for everyone?

11         MS. STAREN:  Yes, your Honor.

12         MR. HENKIN:  Your Honor, I will also endeavor to get

13   it in before 5.

14         THE COURT:  Terrific.

15         I am going to miss you, but I'll see you at 7:00 this

16   evening here in this courtroom.

17         Thanks very much.

18         (Recess)

19         (Case called)

20         MS. STAREN:  This is Devon Staren with the Securities

21   and Exchange Commission.

22         MR. CONNOR:  James Connor for the SEC.

23         MS. MEEHAN:  Lauren Meehan for the SEC.

24         MR. CARNEY:  Christopher Carney for the SEC.

25         MR. HENKIN:  Douglas Henkin for the defendants.

1          MR. KORNBLAU:  David Kornblau for defendants.

2          MR. FARRELL:  Charles Farrell for the defendants.

3          MS. LANDOW:  Alyssa Landau for the defendants.

4          THE COURT:  Good evening.  Glad to have you back.  You

5     may all be seated, and the further advantages, we lost most of

6     our audience.  That's a good thing, of course.

7          I'm ready to hear argument from moving counsel.

8          MR. HENKIN:  Thank you, your Honor.  Thank you again

9     for the Court's courtesy with regard to allowing the

10    submissions and for doing this at this late hour.  I will

11    endeavor to move quickly.

12         THE COURT:  Take your time.  I don't regard this as a

13    late hour.  I'm a New Yorker.

14         MR. HENKIN:  Your Honor, let me start by addressing

15    the major questions doctrine, which is both a substantive

16    limitation on agency power to address it as a basis for

17    dismissal.

18         The major questions doctrine, as it has now been

19    articulated by the Supreme Court, is the substantive limitation

20    on agency's power.  It's also a guide for the Court in

21    addressing how to interpret agency assertions of what statutes,

22    in this case the '33 and '34 Act mean.

23         As the Supreme Court has expressed it as recently as

24    the *West Virginia* case in 2022, if an agency asserts that it

25    has the power to do something, that power has to be clear from

1     the statutory text.

2           We are in a situation here where with respect to

3     asserting that UST, LUNA, mAssets, and MIR token are

4     securities, the SEC is relying on two words in the statute,

5     those two words being investment contract.  But the SEC only

6     wants to have one of them have any meaning.  They want to treat

7     the word contract because, as we will discuss with respect to

8     each of the assets that are at issue here, there is no

9     contract.

10          THE COURT:  I understand the arguments about whether

11    or not this is an investment contract.

12          I'm less clear as to why you think any of that is

13    subject to an exception under the major questions doctrine.  I

14    think there are like five cases where that doctrine has been

15    applied, and they all seem much more extreme situations than

16    this.

17          Congress passed the Securities Acts because it wanted

18    to give broad regulation of the kinds of investments that had

19    resulted in the great depression.  And if this is not an

20    investment contract, of course, that's a problem.  But

21    assuming, for the sake of argument, that it meets the

22    definition of investment contract, why isn't that the end of

23    the major questions doctrine?

24          MR. HENKIN:  I mean, that is getting to the

25    conclusion.

1          My point about the major questions doctrine is, when

2     you have a scenario -- and it's one of the reasons, for

3     example, that we put in Exhibit 9.  If you look at comments A16

4     and A13, those are acknowledgements by a member or a then

5     member, I should say -- I don't know whether it's a current

6     member -- of the SEC's Office of General Counsel, that there

7     is -- that there was a regulatory gap in connection with

8     digital assets.

9          So the question that we are really talking about here

10    is, how do you interpret what an investment contract is?  And,

11    more specifically, how do you interpret whether that definition

12    can be viewed as extending to assets that nobody could have

13    conceived of in 1933 and 1934 or 1946.

14          THE COURT:  I'm not totally sure I understand that

15    argument as well, although I know there is language along those

16    lines in some of the major questions doctrine cases.

17          Take, for example, the Fourteenth Amendment or take

18    the mail fraud statute maybe.  That's a better example, really

19    a precursor to the Securities Acts, and some of the language of

20    the Securities Acts comes right out of the mail fraud statute.

21    That was passed in, as I'm sure you remember, in 1872.  They

22    deal very specifically with a particular fraud, so-called green

23    goods fraud, which is described in the original form of the

24    statute.

25          But it had broader language about any scheme or

 1    artifice to defraud.  And the Supreme Court forever now has

 2    repeatedly held that that is broad language.  They have cut

 3    back the statute with respect when it went beyond money or

 4    property, for example.  Just as you could cut back securities

 5    regulation, if this was not a security or an investment

 6    contract, or whatever, but they have never suggested that

 7    because something new comes up through new technology or new

 8    sales techniques or whatever, that's not covered by the mail

 9    fraud statute, and I don't see the difference with the

10    securities fraud statute.

11              MR. HENKIN:  I think one of the ways of thinking about

12    the difference there is that the mail fraud statute that you

13    are describing is conduct based.

14              THE COURT:  That's not true.  It's anyone who

15    devises -- exact words are:  Anyone who devises a scheme or

16    artifice to defraud and then sends something through the mail;

17    in execution of it, commits a crime.

18              MR. HENKIN:  Right.  That's my point.  The words that

19    you just described -- the words that you just used, your Honor,

20    are a description of the conduct that would be deemed violative

21    of the statute.

22              THE COURT:  The jurisdictional element is the mailing.

23    That's what gives you federal jurisdiction.  But the fraud is

24    the scheme or artifice to defraud.

25              MR. HENKIN:  The other issue that distinguishes, I

1    think, the mail fraud statute here is that it's not -- we are

2    not talking about a delegation of authority to an executive

3    agency.  That's what the major questions doctrine is about.

4          The question is, so when someone is trying to -- when

5    the government asserts a mail fraud claim, for example, that is

6    a DOJ prosecution, this is a situation where you have an agency

7    asserting that certain things qualify under a definition in a

8    statute where it's an enumerated definition in the statute.

9    That's a delegation of power to an independent regulatory

10   agency as opposed to a criminal statute.

11         The other thing, by the way, that distinguishes it is

12   that you have the independent limit of the rule of lenity,

13   which I suspect is where your Honor was going with the

14   Fourteenth Amendment in connection with -- as a limitation on

15   the criminal statutes.

16         In a sense, analytically, you can think of the major

17   questions doctrine as the executive agency analogue of the rule

18   of lenity.

19         THE COURT:  That's intriguing.  I don't want to get

20   too far afield.  It's hard for me to think of any actual

21   Supreme Court decision which the rule of lenity was what made

22   the difference in the result.  The rule of lenity is usually

23   see also.  The usual Supreme Court cases in which that comes up

24   are, we decide for the following reason X., and this is

25   supported by the rule of lenity as well.

1          But we are not here to get that far afield, so go

2     ahead.

3          MR. HENKIN:  Just to follow along as to why it makes

4     sense that this would be deemed a gap and, therefore, the SEC's

5     action here not permissible by the major questions doctrine, if

6     you think about the reasons the SEC typically asserts or the

7     purposes of the securities laws, they are to regulate

8     disclosure, and, in a sense, that goes to the issue of trust

9     within a system.

10          The thing that makes digital assets different from all

11     other types of assets that have gone before them is, if you go

12     back to the original Bitcoin white paper, it was the

13     elimination of trust from transactions.  So what you have here

14     is a system in which the assets that the SEC is now attempting

15     to regulate using the investment contract catch-all phrase --

16     and the catch-all part is important.  I will come back to

17     that -- are systems in which the need for trust has been

18     written out of them by design.

19          That's the whole point of digital assets.  They are

20     trustless.  That's why you hear names like -- things like

21     trustless proofs and things like that bandied about, which I

22     will not get into the weeds of.  That is something that is a

23     very, very different type of asset, so needs to be looked at

24     carefully from the perspective of, does this fit into the set

25     of things that the definitions in the '33 Act and the '34 Act

1    of securities fit into.

2           The SEC's entire response --

3           THE COURT:  Just because I want to be sure I

4    understand what was being sold here, and, as always in these

5    situations, you are faced with two difficulties:  One, which is

6    of your client's making, which is the unusual language that

7    accompanies all this stuff.  The other is the inherent age of

8    the federal judge you're in front of.  The ancient is perhaps

9    an exaggeration.

10          As I understand it -- and this is why I want to make

11   sure I have it right.  So you're a prospective purchaser.

12   Let's say your company was still going strong.  You are told,

13   buy this coin for a dollar a coin, and you can then -- you can

14   just keep it as a coin and use it as a coin in other digital

15   purchases, or you can transfer it into what's called Anchor.

16          MR. HENKIN:  Yes.

17          THE COURT:  And then you will make a lot of money.

18          Do I have that right?

19          MR. HENKIN:  Yes and no.

20          THE COURT:  Yes and no.  Oh, my God.  You are a

21   lawyer.

22          MR. HENKIN:  Your Honor, I remember our first meeting.

23          Your Honor started by using the word sold.  That's a

24   really important place to start because these assets don't work

25   in the same way that, for example, a share of stock works where

1    it comes directly from, let's say, IBM, for the sake of

2    argument.  We can get into the details of this with UST.  UST

3    is the stable coin that a great deal of the complaint is about.

4    By design, it is to be pegged one to one to the dollar.

5         It's designed not to fluctuate, and we can talk about

6    the mechanism separately, but what it was was a stable coin.

7    And the purpose of that was for commerce, essentially a store

8    value or commerce.  That's a consumptive use.

9         We have cited a lot of cases talking about where

10   courts have held that when you buy something, whatever it is,

11   so in this case it's one UST, when you buy it primarily for

12   consumptive use, that's not an expectation of profit.  It's an

13   expectation of consumptive use.  You probably saw in the briefs

14   that we talked about gold, for example.  Some people buy gold

15   to use it.  Some people buy gold to store value.  Some people

16   buy gold to use it in transactions.  It's kind of an

17   across-the-board thing.

18         THE COURT:  If you're a federal judge, you can't

19   afford to buy gold, so there you go.

20         MR. HENKIN:  I didn't check the price today.

21         That is a separate thing from the Anchor protocol.

22         One of the things that is very interesting is that the

23   SEC doesn't assert that UST -- let's just assume that we are

24   talking about the *Howey* test for now.  I am going to jump

25   around a little bit just to respond to your Honor's questions.

1    Let's assume that we are talking about the *Howey* test.  Part

2    one of the *Howey* test is -- one part of the *Howey* test is

3    expectation of profit.  If what you are buying is a stable

4    coin --

5            THE COURT:  Am I right that something like 75 percent

6    of the people did use the Anchor protocol?

7            MR. HENKIN:  No.  Actually, your Honor, what is pled

8    in the complaint is that at the time of the May 2022 de peg, 75

9    percent -- that's a snapshot.  75 percent of the outstanding

10   UST had been deposited in the Anchor protocol.  UST predated

11   the launch of the Anchor protocol by seven months.  There is

12   nothing pled in the complaint about how much UST throughout its

13   lifetime was used for consumptive or other purposes.  It's not

14   in the complaint.

15           THE COURT:  Again, bear with my ignorance.  If the

16   complaint had said, we are only claiming it's a security for

17   those persons who deploy it in the Anchor protocol, when you

18   buy the coin, you may just stick with a coin, or you have the

19   option to go into the Anchor protocol, if it's limited to that

20   hypothetically, are you claiming that's not an investment

21   contract?

22           MR. HENKIN:  Yes.  Because the investment contract

23   is -- you'll notice that there is another thing missing from

24   the complaint.  They don't -- the SEC doesn't allege that

25   anyone bought UST from Terraform labs, from any of the

1    defendants.  There is no allegation to that effect.  In fact,

2    the allegations are that everyone who purchased UST did it

3    through various marketplaces, trading platforms, some in the

4    U.S., some not in the U.S.  That's not spelled out.  So there

5    is -- these are all secondary market transactions.

6           What somebody then does with it -- and one of our

7    arguments is the *Howey* test.  It can't be an investment

8    contract if it's acquired in a secondary market transaction.

9    So if you go back to the facts of *Howey*, for example, the

10   investment contracts were direct transactions with Mr. Howey's

11   farm and its various associated businesses.

12          The orange groves themselves were not the investment

13   contracts.  The investment contracts were separate.  Or if you

14   look at the *Whiskey Cask* case that the SEC cites, which

15   actually had more, I think, probably, than *Howey* did, the

16   investment contracts were many and varied, but they weren't the

17   whiskey casks themselves.

18          The decision to put something, the independent

19   decision to deposit something, in this case, UST, into the

20   Anchor protocol doesn't make UST an investment contract.

21          THE COURT:  Trying to analogize it to *Howey* a little

22   bit, supposing in my hypothetical you purchase an orange grove,

23   but the terms of the purchase were either you can keep the

24   trees and the oranges, or you can transform it, send it back,

25   and get a share in the company that operates the orange groves.

1  Would that be an investment contract?

2          MR. HENKIN:  The transaction itself might be, under

3  those circumstances, because now you are starting to come

4  closer to what actually happened in *Howey*.  Remember, that in

5  *Howey* there were -- the way the Supreme Court describes it is

6  in terms of percentages.  85 percent of the people who bought

7  the land, I think there were 42 people, 85 percent of the

8  people who bought the land also entered into the management and

9  profit-sharing contracts, but 15 percent didn't.  For those 15

10 percent, the purchase of the orange grove on its own, which

11 didn't have any of the strings attached like what you were just

12 talking about in your hypothetical, those were not securities.

13         THE COURT:  That's why I'm asking you.

14         What I want to know from you is, assuming, for the

15 sake of argument, that the purchase of the NST coin itself was

16 not a purchase -- the government is going to disagree with that

17 in a minute, but assume that for the sake of argument.  But

18 assume further that most people, however, don't stop there.

19 They use that because there is the added advantage, the option

20 to go into a profitable Anchor alternative where you are

21 guaranteed 18, 19 percent, or whatever it was, and that option

22 is only available to people that purchase the NST coin.

23         Is any of that then transformed into an investment

24 contract?

25         MR. HENKIN:  No, your Honor.  Because that's a

1    separate decision regarding the consumption or the use of the

2    UST tokens.

3              If I could give you an analogy or reverse analogy in

4    this case, one of the things that the SEC has said over the

5    years, although I think they are backing away from it now, is

6    that the utility of a token, meaning what you can use it for,

7    is something that could be determinative of whether or not a

8    token was a security.  So one of the things that, at least

9    until a few years ago, was discussed significantly was whether

10   something -- a token that had utility, you could use it for

11   something, in this instance for Anchor, is a security, and the

12   SEC's answer has been no.

13             What your Honor is describing is essentially the

14   inverse of the utility token test, because UST -- the sequence

15   of events here is, UST becomes available, seven months later

16   the Anchor protocol becomes available, and that just presents

17   one option amongst many for anybody who had actually purchased

18   UST or was considering purchasing UST, but there are no package

19   deals and there are none alleged in the complaint.

20             THE COURT:  For those people who take that second

21   step, are they purchasing an investment contract?

22             MR. HENKIN:  No.  Because you have to look at the

23   asset itself.  And the asset itself was not a security at the

24   time it came into existence.

25             One way -- another way of thinking about this is to

1    look at the --

2            THE COURT:  I am having a little trouble with that

3    answer.

4            Supposing you purchase -- I go back to the *Howey*

5    situation.  You purchase an orange grove and then you are made

6    an offer, in my hypothetical, that if you are one of these

7    folks who owns an orange grove, you can give it back to us and

8    we will give you instead a share in our ongoing business, or

9    something like that.

10           You say those latter people would not be purchasing an

11   investment contract or a security?

12           MR. HENKIN:  It would depend on what that exact offer

13   was.  If it was, for example -- you would have to look at what

14   they were getting a share in.  The transformational aspect of

15   what your Honor is asking I think is something that is

16   addressed by the *Marine Bank* Supreme Court case, which is not

17   one that has been cited by either side, but it is one that is

18   often cited by the SEC.

19           THE COURT:  We can postpone this another three hours

20   and --

21           MR. HENKIN:  This is something I am comfortable just

22   standing here talking about.

23           THE COURT:  Very good.

24           MR. HENKIN:  In the *Marine Bank* case, what happened

25   was, the plaintiffs, flipped parties when it got to the Supreme

1    Court, the plaintiffs purchased a certificate of deposit, a

2    six-year certificate of deposit.  That was then pledged in a

3    separate transaction, I think about a month later, to secure a

4    loan to a separate company, and there was a request.  It's all

5    detailed in the Supreme Court's decision.

6            And that deal, suffice it to say, and that -- the CD

7    was pledged essentially as collateral for the loan, in part.

8    And what went in part with that was kind of the share of the

9    business or a share in the profits exactly, as your Honor was

10   describing, and the Supreme Court said:  No.  That's not a

11   security.  That's not an investment contract.  Because the CD

12   was not a security itself when the two plaintiffs, husband and

13   wife, took it out or bought it from the bank, even though it

14   was in that case the same bank.

15           THE COURT:  I have forgotten about that case.  I'll

16   take a look at it.

17           MR. HENKIN:  That I think is the answer to your

18   Honor's hypothetical about whether there can be some sort of

19   transformation of something that is not a security into a

20   security.  It depends on the circumstances.  But there is

21   nothing like that alleged here.

22           Essentially what the SEC has alleged is that the

23   availability of an application or, in this case, a use case,

24   for UST somehow made UST into a security, but that's not the

25   way the law can work or should work.  I mean, it's essentially

1     time travel.  That's the reason that the effect of Anchor is

2     not something that the Court should take into consideration.  I

3     don't actually think that it's what the SEC has pled here.

4               THE COURT:  I understand.  My hypothetical went beyond

5     the terms of the complaint.

6               What else would you like to discuss?

7               MR. HENKIN:  Let me just end the discussion on the

8     major questions doctrine by discussing the SEC's response,

9     which is that there is a difference from the perspective of the

10    major questions doctrine between enforcement and regulation.

11              I would respectfully disagree with that.  I think the

12    Supreme Court has been quite clear in *West Virginia* that it's

13    about the exercise of power by an agency.  Both enforcement and

14    rule making are exercises of power by an executive agency.

15              In fact, what I would suggest to the Court is that the

16    exercise of power by enforcement is more deserving of higher

17    scrutiny under the major questions doctrine than prospective

18    rule making, because the only way that a defendant or

19    defendants can address that is after the fact.

20              THE COURT:  I understand that argument.  I think

21    that's an important argument.

22              I want to go back, though, to the point I was sort of

23    raising with you earlier.

24              I am looking at, for example, *SEC v. Edwards*, 540 U.S.

25    389, a 2004 decision of the Supreme Court, which says:

1   "Congress' purpose in enacting the securities laws was to

2   regulate investments in whatever form they are made and by

3   whatever name they are called."

4          I'm looking also at the well-known case of *SEC v. C.M.*

5   *Joiner Leasing Corporation*, 320 U.S. 344, a 1943 decision, that

6   Congress "necessarily employed general descriptive terms like

7   investment contract to ensure that the definition of security

8   reached novel devices."

9          I'm also looking at the equally famous case of *Reves*

10  *v. Ernst & Young*, 494 U.S. 56, that "congress painted with a

11  broad brush precisely because it recognized the virtually

12  limitless scope of human ingenuity, especially in the creation

13  of countless and variable schemes," that last one all in

14  reference to securities and mail fraud predicates through a

15  RICO cause of action.

16         What about all that?

17         MR. HENKIN:  With respect to all of those, your Honor,

18  what I would say is, and I'll look at *Edwards* first because

19  *Edwards* -- in *Edwards* there was in fact a contract.

20         And what's missing in this case is a contract.  There

21  are some contracts the SEC discusses, but they are private

22  sales of LUNA tokens and MIR tokens, but there are no contracts

23  that the SEC alleges between either of the defendants and any

24  purchasers -- and any open-market purchasers of LUNA.  That's

25  an important thing because the contract -- the word contract

1    can't be read out of the definition.  It's there.  If you could

2    delete the word contract, all that would have needed to be said

3    in 1933 and '34 is investments, period.  In fact you wouldn't

4    have needed the definition at all.  Congress could have just

5    said investments.  So contract has to have a meaning.

6          What I would say to your Honor is the two recent

7    Supreme Court cases, one being *Slack Technologies v. Pirani* and

8    the other being *Sackett v. EPA*, discuss in detail situations

9    where there are two words in a statute and somebody's proposal

10   is to read one of them out.  And in both of them the Supreme

11   Court said:  No, you can't do that as a matter of statutory

12   construction.

13         By the way, *Slack v. Pirani* was about the '33 Act in

14   fact.  There is some discussion in that case.  I'll just give

15   you the citation.  It is number 22-200.  It's a June 1

16   decision.

17         THE COURT:  Investment contract in the securities laws

18   is a term of art.  In *Howey* the Court says:  "An investment

19   contract for purposes of the Securities Act means a contract

20   transaction or scheme."

21         In *Howey* and also in the Second Circuit's decision in

22   *Revak*, investment contracts are defined as "an investment of

23   money in a common enterprise with profits to be derived solely

24   from the efforts of others."

25         This is not exactly contract in the first -- in the 1L

1    sense.  It's very broad.  As the Supreme Court said in *Howey*,

2    it could include investment schemes.

3            MR. HENKIN:  My response to that would be that I have

4    not seen a case, and I am not aware of a case -- let me back up

5    and say that I think the words after contract, so scheme or

6    artifice, are essentially dicta because I have not seen and the

7    SEC has not cited a case that does not involve an actual

8    contract in the privity sense, in the 1L sense, between the

9    defendants in whatever that case was and somebody who purchased

10   the token.

11           It's very interesting here that it's not -- this is

12   not a situation in which the SEC alleges that, for example --

13   and I am going to skip to the LUNA tokens because that's where

14   they do allege that there were private sale contracts, a small

15   number of them, and we can talk about the other issues with

16   regard to that.  But there are no allegations that any -- let

17   me put it a different way.

18           What the SEC says is, and this is essentially a way of

19   trying to bootstrap into a secondary market transaction, that

20   those private sales were, in essence -- and that's the words --

21   those are the words that are used in the complaint -- were, in

22   essence, a public offering.  That's how the SEC is trying to

23   get around the absence of a contract between anybody else who

24   bought LUNA tokens and the defendants.  They are trying to say,

25   OK, well, what you did is, you sold some to these private sale

1   purchasers.  We can talk about the arguments that we have made

2   about those separately, but what they are arguing is that that

3   was, in essence, a public distribution.

4           This is not like the *Telegram* case, for example, where

5   you had two offerings to a total of about 175 people, $1.7

6   billion.  There is nowhere near that much argued in terms of

7   the actual private sales here.

8           But the two sales, the two tranches of sales in the

9   *Telegram* case were very different.  Before I actually get into

10  what the differences were, the defendants in the *Telegram* case

11  conceded that the first offering was an investment contract

12  because there was a direct -- there was direct privity between

13  Telegram and those purchasers, so there was a concession in

14  that case that the first tranche was a set of investment

15  contracts.

16          The difference between the two tranches were that the

17  first set of tokens were locked up for a period of time.  They

18  unlocked at various stages.  The second set of tokens was not

19  subject to a lock provision.

20          So what the SEC argued in that case was that the

21  second set, which was the only one where it was disputed as to

22  whether it was actually an investment contract, was an

23  investment contract and therefore a security because they were

24  able to be sold into the market immediately, and there was an

25  economic incentive to sell them into the secondary market

1    immediately.

2         The contracts here are different and the allegations

3    are different.  Whereas there was an assertion that there was

4    an immediate economic incentive in Telegram on the second

5    tranche, there is no such allegation here and there can't be

6    because of the way the contracts -- the actual contracts for

7    the LUNA tokens were structured.  It's the same thing with

8    respect to the MIR tokens.  That's why we say that there is no

9    contract here for any of the tokens between any public

10   purchasers and any of the defendants.

11        The other thing that is important to note about all of

12   the cases that talk about these investment contracts is what

13   the contracts mean and what the contracts provide for, because

14   a purchase or a sale contract alone isn't enough.  There has

15   got to be some obligation that runs from the seller to the

16   purchaser, an obligation to do something, to take action to

17   benefit whoever the purchasers are of whatever the asset is.

18   And there are no allegations here of that and there can't be

19   because there isn't something like the orange grove

20   maintenance, the picking contracts, or the profit-sharing

21   agreements.

22        There also has to be an allegation that there is an

23   entitlement to share in the profits of whatever the enterprise

24   is that forms the investment that is -- that is part of the

25   investment contract.  It was obvious in *Howey* because there was

1    a profit-sharing contract in that case.

2          Here, there is no allegation that either of the

3    defendants made profits off of any of these alleged

4    transactions or that there was any right to share in whatever

5    monies TFL made, however TFL made them.  That's why the

6    existence of a contract is so important.

7          I mean, to give an analogy, and I think this is one

8    way to harmonize the *Howey* reading of investment contract, with

9    the inclusion of stocks or bonds, for example, in the

10   enumerated definition of securities, that with respect to a

11   stock or a bond, there is some contractual right.  With respect

12   to a bond, it's whatever the payment stream is.  With respect

13   to a stock, it's the right to residual profits and/or dividends

14   and whatever else is in the bylaws, which are a contract with

15   the shareholders.  That's how you harmonize them.

16         But the point is, in each case what the investment

17   contract term of art, as you put it, is standing in for is a

18   defined obligation from the entity that -- and issuer is an

19   interesting word here that I don't think applies in the same

20   way.  But in those cases it's a defined obligation from the

21   issuer to the purchaser of whatever it is that is deemed to be

22   an investment contract.  That's not alleged here.

23         THE COURT:  I am sure there are things you wanted to

24   cover, but we have gone for about 45 minutes.  I think we

25   should hear from your adversary, and then we will come back to

1    you.

2            She was so overwhelmed by your argument, she dropped

3    the papers.

4            MS. STAREN:  Good evening, your Honor, may it please

5    the Court.

6            I'd like to bring this case back to what we have

7    alleged and what this case is about, which is defendants'

8    efforts to take advantage of U.S. markets, to promote, offer,

9    and sell billions of dollars of crypto asset securities to U.S.

10   investors while engaging in a scheme to defraud those investors

11   about core aspects of the business.

12           Defendants told investors that Terraform crypto assets

13   were fundamentally different from other crypto assets because

14   they were supposedly being used in real-world consumer

15   transactions on a Korean payment platform called Chai.  In

16   fact, they were not.  This was false and defendants knew it.

17   Defendants also misled --

18           THE COURT:  Although they make an argument, which we

19   have not discussed, about, they claim insufficient allegations

20   of fraud, an argument that I'm frankly skeptical of their

21   argument in that regard, but it's not a focus right now.

22           They are saying their more fundamental arguments are

23   that even assuming there were fraudulent representations made,

24   or whatever, they are not something the SEC can do anything

25   about, either because of the major questions doctrine or

1    because of the proper definition of investment contract.

2    That's where I want you to focus your remarks.

3              MS. STAREN:  Sure, your Honor.

4              Obviously, we have spent a fair amount of time talking

5    about the major questions doctrine.

6              Let me just remind the Court that in the *West Virginia*

7    case, the Supreme Court held that the major questions doctrine

8    limits agency authorization to promulgate certain extraordinary

9    rules that would intrude on Congress' power to enact laws.

10             We are not promulgating any new rules, extraordinary

11   or otherwise, or taking any action that was not authorized by

12   Congress.  We are simply alleging that the five crypto assets

13   at issue in this case were promoted, marketed, offered, and

14   sold as securities.  Four of them were offered as investment

15   contracts.  One of them, the transactions involving the mAssets

16   were security based swaps.

17             Every argument that the defendants have made,

18   including the major questions doctrine, due process, and the

19   Administrative Procedures Act, seems to be based on some false

20   premise that we are enacting some new SEC policy to regulate

21   all crypto assets as securities.

22             What the defendants are really asking for, your Honor,

23   is special treatment.  They would like this Court to find that

24   crypto assets are exempt from the securities laws, that crypto

25   assets are exempt from the definition of a security as defined

1  by Congress in the 1933 and 1934 Acts, exempt from the same

2  investment contract analysis that has been applied across a

3  range of technologies, industries, and businesses since *Howey*

4  was decided in 1946.

5          Your Honor, we do not agree.  The investment contract

6  analysis has been applied to cattle embryos, to basketball

7  NFTs, to certificates of deposits, pay phones, condominiums,

8  supersonic dental products, and whiskey barrel receipts.  There

9  is nothing special about the asset.

10          The question, when you are evaluating whether

11  something is an investment contract, is how it was offered,

12  marketed, promoted, and sold.

13          THE COURT:  All right.  That's what I want to focus on

14  because -- and I don't mean to pass over their important

15  arguments on other matters.  But why is this a contract, let

16  alone an investment contract?

17          MS. STAREN:  Your Honor, we disagree with the

18  defendants.  We don't believe that there is a requirement of a

19  formal contract, as your Honor correctly pointed out.  *Howey*

20  itself expressly applied the investment contract analysis to

21  any contract, transaction, or scheme.  I would also --

22          THE COURT:  Funny use of words, however.  There is

23  that language in *Howey*, but, on the other hand, the actual term

24  in the law is investment contract.  So how can a scheme, for

25  example, be an investment contract unless it's a scheme to

1  promote an investment contract?

2          MS. STAREN:  Your Honor, I think that the -- again,

3  the focus sort of goes back on what is an investment contract.

4  And, again, it goes back to how it is marketed, offered, and

5  sold.  What are the promises, understandings, inducements,

6  expectations, and economic realities that surround the offer of

7  the asset.

8          As I mentioned, the investment contract analysis has

9  been applied to a range of assets.  In every situation, the

10  asset itself is virtually irrelevant.  You can offer gold or

11  coins or cattle embryo, which in and of themselves are not

12  securities.  But when you offer them in conjunction with a

13  promise of the potential for profits, and you offer them as an

14  investment in a common enterprise, and the expectation is that

15  the investors will get their returns from the efforts of the

16  promoters or the efforts of others, then you have an investment

17  contract, and it doesn't really matter.

18          THE COURT:  If I purchase a NST coin for a dollar a

19  coin and all I'm being told immediately in my hypothetical is,

20  we will make sure that it's always kept at a dollar, so you can

21  use it to buy anything you want digitally, and you won't have

22  to worry that it will be worth only 95 cents.  It will be worth

23  a dollar.

24          Is that alone an investment contract?

25          MS. STAREN:  No, your Honor.  I think --

1          THE COURT:  What makes this then an investment

2     contract?

3          MS. STAREN:  What makes UST an investment contract is,

4     again, the way that it was marketed, offered, and sold.  And it

5     was offered and marketed as a way to invest in the Anchor

6     protocol.

7          And, your Honor, the defendants are correct, that the

8     Anchor protocol didn't necessarily exist at the time that the

9     defendants started to market UST together with the Anchor

10    protocol.  But it is a review that that actually doesn't

11    matter.

12         Because when you evaluate an investment contract, what

13    you are evaluating is, what were the promises being made to the

14    purchaser of that asset?  If they were being promised the

15    potential for profits, a reasonable expectation of profits that

16    would derive from the efforts of others, then it is an

17    investment contract at the time that offer is made, even if the

18    ultimate thing doesn't exist.

19         THE COURT:  I hear what you are saying.  Translating

20    it into the facts of this case, are you saying that what made

21    these purchases of crypto coins an investment contract was the

22    promise that you could utilize them to make a profit through

23    the efforts of others by deploying them into other names, for

24    lack of a better word.  Is that the basic argument?  Do I have

25    that right?

1          MS. STAREN:  With respect to UST, yes.  It was the

2    promise that if you buy UST, you will have an opportunity to

3    stake it in the Anchor protocol and get up to 20 percent

4    returns.

5          THE COURT:  I thought you had alleged that that's what

6    most people did, although your adversary seemed to be

7    suggesting some nuance there.

8          MS. STAREN:  We did allege, just because you can only

9    pick a number from a particular point in time.  We picked the

10   number that existed at the point just before the Terraform

11   market crashed in May of 2022.  At that point in time,

12   approximately --

13         THE COURT:  Of course on a motion to dismiss I have to

14   take every reasonable inference in your favor, so the inference

15   would be that's what most people did.

16         MS. STAREN:  Yes, your Honor.  Although, let me just

17   be clear, that the evaluation of what the expectation was is

18   not necessarily based on what any individual investor may have

19   intended at any point in time.  We think that's an important

20   data point.

21         THE COURT:  That's fair enough.  But aren't you also

22   arguing that, nevertheless, the fact that most people did do

23   this showed their understanding from the getgo that this was

24   really an investment?

25         MS. STAREN:  Yes, your Honor.

1          THE COURT:  Go ahead.

2          MS. STAREN:  I'd like to go back and talk about the

3     other tokens at issue here.

4          Obviously, UST, we did allege that it was marketed

5     together with the Anchor protocol and could earn up to 20

6     percent returns.  This was actually a huge motivating factor

7     for a number of retail investors.  Countless retail investors

8     bought in and ended up losing the bulk of their investment when

9     the Terraform market crashed in May of 2022.

10         The same analysis applies to LUNA.  LUNA is an

11    investment contract because it involves an investment in a

12    common enterprise with an expectation of profits to be derived

13    from the efforts of others.  Specifically, we would point to

14    statements made by Do Kwon to LUNA holders on Twitter where he

15    tells people that LUNA grows as the ecosystem grows, quote, and

16    that to profit, a LUNA holder could simply, quote, sit back and

17    watch me kick ass.

18         And the same goes for the MIR token.  Defendants told

19    investors that MIR tokens would increase in value as the Mirror

20    protocol increased, and defendants promised investors that they

21    would support and promote the Mirror protocol in order to

22    generate that demand.

23         Moving on to the unregistered offerings, your Honor,

24    we have clearly alleged that the defendants engaged in a public

25    offering of its securities.

1          With respect to the initial sales of LUNA to the

2     intermediaries and the initial sales of MIR, there was a clear

3     expectation that those intermediaries would turn around and

4     resell into public markets.  In fact, Kwon told a group of

5     investors, as we laid out in your complaint, that his purpose

6     in loaning LUNA to the U.S. trading firm was to, quote, improve

7     liquidity of LUNA.  And in fact that U.S. trading firm did

8     exactly that.  It turned around and it resold that LUNA into

9     public markets.

10          The agreements themselves, as we made clear in our

11    complaint, contemplate a public trading market.  It is clear,

12    based on that language, that the parties to those agreements --

13    Terraform, Do Kwon, and the intermediaries -- intended that

14    they were going to turn around and resell those LUNA and MIR

15    into public trading markets.

16          Second, Terraform directly sold MIR and LUNA into

17    trading platforms, publicly accessible crypto asset trading

18    platforms.  They made no restriction.  They put no restriction

19    on those trades.  They put no restriction on who could purchase

20    those.  And they were accessible to U.S. people.

21          Finally, Terraform directly sold MIR and the

22    transactions involving mAssets to the public.  They offered it

23    to the public.  They sold it through a website that they

24    controlled.  Those are all public offerings.  None of them

25    contain any restriction.  It was fully expected that the tokens

1        at issue would end up in a hands of retail investors on public

2        trading platforms, and they made no efforts to restrict those

3        sales, either from retail investors or from U.S. markets.

4                Your Honor, I know that you didn't want to spend much

5        time on it, but just to mention, the defendants' challenges

6        with respect to our fraud allegations are merely improper

7        disputes over the facts, which are not appropriate on a motion

8        to dismiss.  We believe that the defendants' motion to dismiss

9        should be denied.

10               THE COURT:  Let's hear, in rebuttal, from moving

11       counsel.

12               MR. HENKIN:  Thank you, your Honor.

13               Let me address -- I am going to try to go in order,

14       although I will mix things up a little bit.

15               All of the cases that the SEC's counsel described --

16       the embryo cases, the condominium cases, the CD cases, the

17       whiskey cask case -- all of those were situations where

18       something was managed by somebody else.  Just like the orange

19       groves and *Howey*.  That's the common thing that ties all of

20       those cases together and it's the common thing that gives

21       meaning to both words of investment contract.

22               The tokens here, and particularly UST, because this

23       goes to the Anchor argument, are very different because in all

24       of the cases that were --

25               THE COURT:  Aren't they managed by someone else in the

1    sense of -- as I understand how it is supposed to work, to keep

2    it at a one dollar value, the various things had to happen, all

3    of which were managed by the sellers.

4              MR. HENKIN:  No.  That's wrong, your Honor.

5              If you look at the various documents, including the

6    Terra white paper, that's Exhibit A, for example, that

7    describes how the protocol works, the balancing protocol

8    between UST and LUNA.  In that case there is separate white

9    paper for the Mirror protocol that describes how that works.

10   We can talk about that in more detail because those are

11   separate issues.

12             All of those are situations in which the -- there are

13   two parts of this.  There is the algorithm, which is run by

14   smart contracts on the Terra blockchain, so it's automatic in a

15   sense.

16             THE COURT:  Let me just pause there.  No algorithm is

17   automatic in the sense that it exists in nature.  It's designed

18   by someone and all sorts of inputs go into it, and the person

19   designing it in this case was you, right, your clients?

20             MR. HENKIN:  It is true that algorithms are designed,

21   but it is also true that when this -- the algorithm here or the

22   blockchain became operational, control over it was turned over

23   to the community.

24             So one of the things that LUNA tokens do is, they

25   function as -- I am going to try not to get into the weeds --

1    they function as the mining and governance token of the Terra

2    blockchain.  What that does is, it makes determinations as to

3    who is entitled to vote on, for example, how the system

4    operates.

5         It's true that the original algorithm was coded by

6    TFL, for example.  But once it went into operation, it was

7    operated by the community, and that is a very different thing

8    than the situations like the whiskey casks, which were always

9    kept in the custody of the company that sold them, I think that

10   was the *Ayers* case, and the condominiums where somebody doesn't

11   take possession.

12        The difference between all of those cases and this

13   situation with respect to tokens is that purchasers of tokens

14   take possession of those tokens and then decide what to do with

15   them.  And in situations like this, and I will --

16        THE COURT:  Your adversary says what they are being

17   offered is, among other things, they can use them to get an

18   investment of guaranteed return of 18 or 19 percent or whatever

19   it was, 19 to 20, by deploying them into Anchor.

20        So what about that?

21        MR. HENKIN:  The point about that, your Honor, is that

22   that's a choice and it's a separate choice, and I want to go to

23   the tweet that Ms. Staren talked about where she said that

24   Mr. Kwon said:  You can sit back and watch me kick ass.  There

25   were two other parts to that tweet.  You could sit back and

1    watch me kick ass, number two; and the third was, you can

2    participate in the community and build decentralized

3    applications that add value to the ecosystem.

4          The point about all of this is that in each instance,

5    once the token had been purchased, there was a choice that was

6    inherent -- two things.  One, it was in the possession of the

7    purchaser and, two -- unlike all the investment contract cases

8    that have been cited; two, there was a choice about what to do

9    with it:  Use it for consumptive purposes, stake it in Anchor,

10   stake it as a validator, so that you can participate directly

11   in the operation of the blockchain network, all sorts of other

12   decentralized applications that were available as well.

13         The SEC ignores that choice.

14         THE COURT:  Let me just make sure I understand what

15   you are saying.

16         You are given several choices if you purchase, but

17   these are choices only available to those who purchase.  The

18   NST coin.  One of the options that is then available is an

19   investment option.  Why isn't the offer then of the coin that

20   includes, but is not exclusively limited to, that option an

21   offer of an investment contract?

22         MR. HENKIN:  Because there is no difference between

23   that and the choice that one has when you have a dollar bill or

24   a bank account.  When you have one dollar, you can choose it to

25   buy -- let's make it more reasonable.  Let's say you have $100.

1    You could choose to buy maybe a share of stock.  You can use it

2    to buy $100 face value of a bond.  You can leave it sitting in

3    a bank.  You can use it to buy food.  You can use it to buy all

4    sorts of other things.

5              THE COURT:  But the particular investment here is not

6    something that anyone with a dollar bill can take a dollar bill

7    and get; it's only someone who has purchased the NST coin,

8    right?

9              MR. HENKIN:  The UST coin.

10             THE COURT:  Yes.  I'm sorry.  My acronyms are in bad

11   shape.

12             Without that first step, you can't invest in the

13   second step.

14             MR. HENKIN:  There is no difference between that

15   scenario and the scenarios in all the other investment contract

16   cases.

17             I can take your Honor's hypothetical and say, the

18   opportunity to enter into the contracts with Mr. Howey's orange

19   grove management company and picking company were only

20   available to the people who purchased the orange groves from

21   Mr. Howey.  That doesn't mean that the orange groves were

22   securities.  In fact, the Supreme Court specifically said they

23   weren't, and that has been the SEC's internal understanding of

24   the *Howey* test ever since.  The orange groves aren't

25   securities.  It's the combination with a very specific offer

1   where there is a contract and obligations running from the

2   offeror to the purchaser that can create an investment

3   contract.  That's missing here.

4           You will notice, by the way --

5           THE COURT:  Let me ask a different kind of question.

6   Assuming for the moment that most people then put their -- went

7   into the Anchor alternative.

8           MR. HENKIN:  An alternative to Anchor?

9           THE COURT:  No.  Went into Anchor.

10          Is it not enough to say that was the expectation of

11  the defendants, that's why they made it so attractive with the

12  guaranteed return and all like that, so that the fact that

13  there were some people who didn't take that is neither here nor

14  there.

15          MR. HENKIN:  No.  Because, your Honor, what that does

16  is, it separates a choice of what to do -- a choice of what to

17  do with something that's a consumable from the consumable

18  itself, or actually what I should say is, it compresses the

19  choice with the consumable itself.

20          Here, what you have -- by the way, I want to go back

21  to a point your Honor was discussing with Ms. Staren about the

22  snapshot.  We are in a very interesting sort of a case here,

23  not just for all the reasons that we have been discussing, but

24  for two other reasons.  One is that --

25          THE COURT:  If it weren't interesting, I wouldn't be

1    here at 8:00.

2              MR. HENKIN:  I hope I'm holding your Honor's interest.

3              THE COURT:  Definitely.

4              MR. HENKIN:  The SEC conducted an investigation for a

5    little under two years here before bringing this case.  And the

6    system that we are looking at is open-source software,

7    operating on publicly accessible blockchain.

8              So Ms. Staren made the comment in response to your

9    Honor that they had to pick a number.  I would disagree with

10   that, and I don't think your Honor needs to accept that for the

11   purposes of this motion to dismiss for the reasons that are set

12   forth in the cases that we cited in which SEC enforcement

13   actions were dismissed.

14             The SEC could have looked at the blockchain, could

15   have looked at the usage of the Anchor protocol, could have

16   made other arguments with regard to that.  They picked the

17   snapshot number.

18             Your Honor only has to draw reasonable inferences

19   under *Iqbal* and *Twombly*.  It doesn't have to draw every

20   inference that the SEC would like.  That's particularly true

21   when the SEC has had time to investigate.  That's a separate

22   category of cases.  And we have cited several of them in

23   which --

24             THE COURT:  Let's take a much more extreme example,

25   but just to make sure I understand your argument.

1          Supposing I say to you, please buy my crypto coin, and

2     if you buy it, it will remain stable, and you can just leave it

3     as is and do what you want with it, but you will also have the

4     option that will only be offered to you, the purchasers of this

5     crypto coin, to invest in an investment where I will guarantee

6     you a million-dollar return in two months.

7          Putting aside the absurdity of that promise and, lo

8     and behold, in my hypothetical 99 percent of the people then

9     elect the option, the second option, is the fact that

10    theoretically there was still the option available keeping just

11    the coin enough to take the whole situation out of the coverage

12    of the SEC?

13         MR. HENKIN:  Yes, I do.  I think, your Honor, *Howey*

14    answers that directly because the coin that you are talking

15    about in your Honor's hypothetical -- it is just that the

16    numbers are different -- is the same as the orange groves and

17    *Howey*.  What the Supreme Court very clearly said was, the

18    orange groves were never securities.  The only thing that was

19    the security, or the investment contract in that case, was the

20    package deal.  It may very well be that the package deal that

21    your Honor is talking about could be a security.

22         THE COURT:  Let me then ask you this.  Even assuming

23    for the sake of argument you're right about that, wouldn't that

24    simply require a narrowing of this complaint, not the dismissal

25    of the complaint, because the complaint encompasses at least

1      all those folks who then went and elected the investment

2      option?

3              MR. HENKIN:  No.  And the reason for that is -- there

4      are several reasons for that.  One is that it doesn't change --

5      it doesn't make UST a security.  You will notice no -- and the

6      SEC talked about an offer or a promise.  There is no offer

7      alleged here.  Essentially, what is alleged here is that

8      amongst the things that could be done with UST after it had

9      already come into existence was that it could be used in

10     Anchor, but that doesn't make UST itself a security.

11             THE COURT:  Why isn't that an offer?  Buy my coin and

12     you will have the following three options.

13             MR. HENKIN:  Because -- and this is what I was

14     discussing earlier -- there is no allegation that anyone

15     purchased UST from Terraform labs.  The SEC is very careful to

16     say, to allege that everybody who purchased UST purchased it on

17     a secondary market.  So what's actually alleged in the

18     complaint is people making transactions on secondary markets

19     purchasing UST, and then seven months after UST first becomes

20     available, some of them deciding to use it in the Anchor

21     protocol when the Anchor protocol became available.

22             You will notice that there is not a separate

23     allegation that the Anchor protocol is a security.  The SEC has

24     alleged in some cases -- *Celsius*, for example, or *Gemini*.

25     *Gemini* is probably the better example -- that certain earnings

1    programs were securities offerings, were investment contracts.

2    That's not alleged here and they have not asked to amend.

3    That's a very important aspect of this.

4         Essentially, I go back to, how does the option,

5    because that's really what it is here.  It's not an offer.

6    It's an option.  How does the option make something a security?

7    The answer is, it doesn't.  It especially doesn't when the

8    option arises after the creation of whatever the asset is.

9         One example by analogy --

10        THE COURT:  Who created that option?

11        MR. HENKIN:  Who created the Anchor protocol?

12        THE COURT:  Yes.

13        MR. HENKIN:  Terraform did.

14        THE COURT:  I'm having a little trouble seeing why

15   that -- assuming for the sake of argument that that was an

16   investment, that's not a secondary market in the sense of, we

17   are talking about the application to the securities laws here.

18   It's something you created, that only people who had taken this

19   first step could take advantage of.

20        Now, I agree with you that there are allegations, take

21   a broader picture of that, and that may be a problem for them.

22   But I don't see why that's not a securities contract at that

23   point.

24        MR. HENKIN:  It's not a securities contract because

25   it's not a contract with TFL.  This, again, gets into the

1    operation of the protocol.  When somebody makes a deposit or

2    when somebody made a deposit into the Anchor protocol, that was

3    a contract with the protocol itself, if you can call it a

4    contract.  It was a deposit.  It was governed by various of

5    these computer programs that were governed by the Anchor

6    community.  So that in and of itself is not an investment

7    contract, and the SEC doesn't allege that it was.

8              Here, if I can give your Honor an analogy.

9              THE COURT:  Yes.

10             MR. HENKIN:  Suppose that I were, and I wish I would

11   do this, but suppose I were to invent a new use for gold

12   tomorrow that generated returns for people, and I offered it

13   into the market and said:  If you have gold, use it in this

14   process and you will make a lot of money.  That offer that I

15   would make might be an investment contract, but it wouldn't

16   make gold a security, and that's really the distinction that's

17   being made here or that needs to be made here because --

18             THE COURT:  Wouldn't the proper analogy be, give me

19   your gold, because I promise that this new process will

20   transform it into lead.  And that entire arrangement would be

21   limited, if we carry out the hypo, to people whose gold was

22   purchased from me, right, from the same seller?

23             MR. HENKIN:  That's one way of creating the

24   hypothetical, your Honor.  It's not the only way.  I think your

25   Honor -- I think your Honor was looking for the most extreme

1    example.  The most extreme example would be, I create a

2    process.  I obviously don't make gold.  I think we can all

3    agree on that.  And I make the offer --

4           THE COURT:  Although, as any many evilists would know,

5    who knows what you will come up with tomorrow.

6           MR. HENKIN:  Let's say I come up with the lead-to-gold

7    process and I say, give me your lead and I will transform it

8    into gold.  Under those circumstance, because the lead is a

9    naturally occurring element, that is not something that changes

10   lead into a security.  It may very well be that the deal that I

11   offer under those circumstances could be construed as some sort

12   of an investment contract, but it doesn't change the fact that

13   the lead is still lead, which is a commodity in that instance.

14   This is a circumstance --

15          THE COURT:  I think we probably pushed this analogy as

16   far as we can, but that's helpful.

17          Go ahead.

18          MR. HENKIN:  I think what I should probably do now is

19   talk about the Mirror protocol.  We have talked about -- let me

20   talk about LUNA just briefly.  LUNA is not a security for the

21   same reasons that UST is.  There is no expectation or profit.

22   It was designed as the native governance token for the Terra

23   blockchain.  Nothing about Anchor changed that.

24          If you look at the white paper, it explains very

25   clearly what the function of LUNA was.  It represents -- my

1   apologies for the technical term -- mining power on the Terra

2   blockchain, which is a proof-of-stake blockchain.  And miners

3   who wanted to mine transactions would stake their LUNA and they

4   would get rewards for doing so.  That's on pages 5 through 7 of

5   Exhibit A.

6           Now, let me talk about the Mirror protocol and the

7   mAssets because those are different.

8           Essentially, what the SEC alleges is that mAssets are

9   securities-based swaps.  And there are multiple reasons why

10  they are not securities-based swaps, from a definitional

11  perspective.

12          As your Honor will recall, swaps have counterparties

13  and swaps contemplate the exchange of cash flows.  An interest

14  rate swap fixed for floating, for example, contemplates

15  settlement on a periodic basis of cash flows paid by one payer

16  to another payer, depending upon what's going on in the markets

17  that month.

18          But the main point is, there is a counterparty to each

19  swap.  That's not the way mAssets operate.  The Mirror white

20  paper, which is Exhibit I, explains how they operate.  What

21  happens -- essentially, the Mirror community determines what

22  mAssets are what's known as white listed, meaning allowed to

23  exist and allowed to be traded.

24          How does that happen or how did that happen?  People

25  would make proposals to the community that could be voted on by

1    anybody who had MIR tokens.  If somebody wanted to mint an

2    mAsset, let's say it was mGold, for example, because that's one

3    of the ones that was available, then they would interact with

4    the protocol, deposit cryptocurrency into the protocol, and

5    they would get the asset -- they would get the mAsset back.

6            What's important about that is that there is no

7    counterparty with whom they would be exchanging cash flows.

8    Although the price of the mAsset in this case, mGold, would

9    fluctuate with the reference price of gold.  That's a

10   programmatic -- automatic feature of the protocol.  It's done

11   by operation of the protocol.  There is not a person -- there

12   wasn't a person at TFL who matched prices or did things like

13   that.  The price would change.

14           And to the extent there was a price fluctuation when

15   somebody held an asset, they didn't get a payment if it

16   increased in their favor.  They didn't pay something extra if

17   it decreased, if it went against them.

18           The only way they would realize that price difference

19   or that price change was by selling the mAsset -- there were

20   two ways.  One was by selling the mAsset to somebody else in a

21   peer-to-peer transaction.  That's not something that involved

22   TFL because it just happens on the blockchain on a peer-to-peer

23   basis, or by sending the mAsset back to the protocol and

24   burning it and getting back their collateral.  That's the only

25   way that works.  These aren't swaps under the SEC's own

1    definition of swaps.

2         THE COURT:  OK.

3         I know there are many other issues and, of course,

4    your paper covers the full spectrum, but I think, since we have

5    now gone about almost an hour and a half, we should hear final

6    remarks from your adversary.

7         MS. STAREN:  Thank you, your Honor.

8         I'd like to point out that, obviously, the SEC and the

9    defendants have a different view of the facts.  We have a

10   different view of how these assets were being offered, how they

11   were being promoted, what the understanding --

12        THE COURT:  For purposes of this motion, of course, I

13   have to take what's alleged in the complaint.

14        MS. STAREN:  Thank you, your Honor.

15        That is what I was going to return to and just make

16   sure that it is understood that we have alleged that, with

17   respect to UST, it was marketed, offered, and sold together

18   with the Anchor protocol.  That was the motivation.  That was

19   why people bought UST.  It can be analyzed objectively based on

20   what defendants told the market.  They told the market that UST

21   was an opportunity to get those 20 percent returns.

22        Whatever other possible hypothetical consumptive use

23   that may or may not have existed, number one, we didn't allege

24   it in the complaint, so it's not relevant; and, number two,

25   courts have held that you can have some consumptive use.  The

1    point of the investment contract analysis is to look at, what

2    were the objective motivations.  What were defendants telling

3    investors and the public about what they would get by buying

4    this asset.

5            THE COURT:  There is both the subjective and the

6    objective aspects.  The objective one is, having heard this,

7    how would a reasonable investor interpret it or reasonable

8    purchaser.

9            MS. STAREN:  Absolutely, your Honor.

10            THE COURT:  And then the subjective, which is clearly

11   not before me on this motion, is, did the defendants intend for

12   that allegedly misleading perception or that alleged invitation

13   to invest in a dubious investment?  Did they intend that for

14   fraudulent purposes?  That kind of issue we don't get to until

15   much later in the case.

16            MS. STAREN:  Yes, your Honor.

17            I actually wanted to point out too, because it seems

18   like there is actually something that we agree on, the defense

19   and the SEC, and that is that these crypto assets alone are not

20   investment contracts.  We don't say that LUNA -- by itself,

21   without an offer, without a promise, without an expectation of

22   profits, LUNA, by itself, is just a piece of code.  We don't

23   believe and we don't allege that LUNA alone is an investment

24   contract.

25            As I mentioned before, the analysis is looking at the

1    entirety of the scheme, the totality of the circumstances, how

2    was it offered, and that's where we come to our difference.  We

3    believe that the way these UST together with the --

4                THE COURT:  I do understand that, although of course

5    I'm terribly distressed to know there is something that you and

6    your adversary agree on.  What happened to the adversary

7    system.

8                MS. STAREN:  I always try to find places where we can

9    agree.

10               One thing I did want to point out, though, is I think

11   that there is a misunderstanding with respect to our

12   allegations involving the mAssets.  I do want to clarify that

13   our allegation is not that the mAsset itself is the

14   security-based swap.

15               As we alleged in paragraph 102 of our complaints, it

16   is that each transaction offering or selling an mAsset is the

17   security-based swap.  I recognize some of the issues that the

18   defense counsel raises with respect to trying to say that the

19   mAsset itself is the swap, but the transaction is because the

20   transaction does involve the investor having to deposit

21   collateral and getting an exchange of payment on an executory

22   basis.  They have to deposit more collateral as the value of

23   that underlying asset increases.  And the collateral is based

24   on the value of a single security and the financial risk of

25   that security is transferred to that investor without actually

1    transferring ownership of the security.  And the risk, of

2    course, comes in the form of having to deposit additional

3    collateral if the value of the mAsset goes up.  I just wanted

4    to make that clarification for your Honor and make sure the

5    record was clear there.

6            Finally, I think that I just want to get back to the

7    fact that we are not doing anything new here.  We are not doing

8    anything complex.  We are not doing anything novel.  We are

9    simply applying the securities laws as they have been in

10   existence since the 1933 and 1934 Acts, evaluating investment

11   contracts, as they have been consistently and repeatedly

12   evaluated and analyzed in a range of transactions, businesses,

13   industries, technologies, including certainly a variety of

14   technologies that did not exist at the time *Howey* was decided

15   in 1946.

16           And nothing we are doing is new.  It's absolutely

17   authorized.  We are acting pursuant to clear congressional

18   authority and consistent with cases that we have brought.

19           I would add, your Honor, one thing I didn't add to my

20   list of technologies to which the investment contract has been

21   applied is in fact crypto assets.

22           I know that defense counsel raised the *SEC v. Telegram*

23   case in which the Court there found that the crypto assets were

24   offered and sold as investment contracts.  Those cases have

25   been coming down around the country.

1          In *SEC v. Kik*, of course the Southern District there

2     found that the crypto assets were offered and sold as

3     investment contracts.

4          In *SEC v. LBRY*, the District of New Hampshire found

5     that the crypto assets there were offered and sold as

6     investment contracts.

7          In *SEC v. NAC Foundation*, the Northern District of

8     California found that the crypto assets there were offered and

9     sold as investment contracts.

10          Again, what we are doing is not new, novel, complex.

11     We are just applying the securities laws as they are today, and

12     we believe that the motion to dismiss should be denied.

13          THE COURT:  I want to thank both counsel.  This was

14     very helpful argument and certainly educated the Court much

15     more to the operation of the various options involved.

16          I want to make sure that I get you a decision

17     promptly.  I found it very useful to set time limits on myself,

18     but there are quite a few issues here that I need to think

19     about.

20          I will guarantee you an opinion and decision by July

21     14, about a month from now, which is why I picked it, although

22     I could have also picked it in honor of Bastille Day.

23          I didn't bring the case management plan with me.  If

24     there are things that need to be adjusted in the case

25     management plan, then give me a call.  We don't have to deal

1   with that today, but give me a call.  We will work around it.

2          There is also the possibility, if I have reached a

3   decision, even though I have not yet reduced it all to writing,

4   I could give you a bottom-line order even sooner than July 14,

5   but I think, in a case of this nature, it would be better to

6   give you the opinion at the same time that the decision is

7   made.  You will know exactly how the Court reached its

8   decision.  July 14, if not sooner, but no later than July 14.

9          You still have time for Turner Movie Classics and all

10  sorts of fun things, but I thank all counsel again.  The Court

11  will take the matter under advisement.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25