**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Tel.: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON,<br><br>Defendants. | Case No. 22-cv-03600-TLT<br><br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANT JUMP TRADING LLC**<br><br><br>Date: September 19, 2023<br>Time: 2:00 p.m. |

1

**<u>TABLE OF CONTENTS</u>**

2

I.      INTRODUCTION ................................................................................................ 1

3

II.     STATEMENT OF RELEVANT FACTS ............................................................ 2

4

III.    ARGUMENT ...................................................................................................... 9

5

        a.      Jump Committed Securities Fraud.......................................................... 9

6

                i.      Jump Committed a Litany of Manipulative and Deceptive Acts............... 9

7

                ii.     Jump Made Material Misstatements and Omissions ............................... 10

8

                iii.    The SAC Readily Establishes Jump's Scienter ........................................ 14

9

                iv.     Plaintiffs Adequately Allege Reliance...................................................... 17

10

                v.      Jump's Actions Caused Plaintiffs' Losses................................................ 19

11

                vi.     Jump's Fraud was in Connection with Securities ..................................... 20

12

                vii.    Jump was a Control Person of the LFG .................................................... 20

13

        b.      The SAC Adequately Alleges RICO Claims in the Alternative ........................... 20

14

                i.      Plaintiffs' RICO Claims Are Not Barred.................................................. 20

15

        c.      The State Law Claims are Sufficiently Alleged as to Jump ................................. 23

16

                i.      Aiding and Abetting and Conspiracy Claims ........................................... 23

17

                ii.     Jump was Unjustly Enriched .................................................................... 24

18

IV.     LEAVE TO AMEND SHOULD BE GRANTED ........................................... 25

19

V.      CONCLUSION.................................................................................................. 25

20

21

22

23

24

25

26

27

i

28

1

2

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ................................................................................................. 18

*Allwaste, Inc. v. Hecht*,
   65 F.3d 1523 (9th Cir. 1995) ................................................................................... 21

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
   785 F. Supp. 2d 799 (N.D. Cal. 2011) ..................................................................... 18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...................................................................................... 18

*Batuhan v. Assurity Fin. Servs., LLC*,
   2015 WL 7776470 (N.D. Cal. Dec. 3, 2015) ........................................................... 25

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011) ...................................................................... 15

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ................................................................................. 24

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................................ 11, 12

*Casey v. U.S. Bank Nat. Assn.*,
   127 Cal. App. 4th 1138 (2005) ................................................................................ 23

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ................................................................................... 16

*City of Providence v. Bats Global Mkts., Inc.*,
   878 F.3d 36 (2d Cir. 2017) ...................................................................................... 10

*Coplin v. United States*,
   88 F.2d 652 (9th Cir. 1937) ..................................................................................... 12

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ........................................................... 15

*Crane Co. v. Westinghouse Air Brake Co.*,
   419 F.2d 787 (2d Cir. 1969) ...................................................................................... 9

*De Ford v. Koutoulas*,
   2023 WL 2709816 (M.D. Fla. Mar. 30, 2023) ........................................................ 24

ii

*DH2, Inc. v. Athanassiades,*
  404 F. Supp. 2d 1083 (N.D. Ill. 2005) ........................................................... 19

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) ......................................................................................... 9

*Fezzani v. Bear, Stearns & Co. Inc.,*
  716 F.3d 18 (2d Cir. 2013)............................................................................. 18

*Gilbrook v. City of Westminster,*
  177 F.3d 839 (9th Cir. 1999) ......................................................................... 23

*In re BofI Holding, Inc. Sec. Litig.,*
  977 F.3d 781 (9th Cir. 2020) ................................................................... 19, 20

*In re En Pointe Techs., Inc. Secs. Litig.,*
  2003 WL 27392762 (S.D. Cal. Aug. 25, 2003) .............................................. 9

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................... 15

*In re Enron Corp.,*
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................... 19

*In re Galena Biopharma, Inc. Sec. Litig.,*
  117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................... 9

*In re GenesisIntermedia, Inc. Sec. Litig.,*
  2007 WL 1953475 (C.D. Cal. June 28, 2007) ............................................... 18

*In re Initial Pub. Offering Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)...................................................... 19, 20

*In re Questcor Sec. Litig.,*
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).................................................. 15

*In re Safeway Tuna Cases,*
  2016 WL 3743364 (N.D. Cal. July 13, 2016)................................................ 24

*In re VeriFone Holdings, Inc. Sec. Litig.,*
  704 F.3d 694 (9th Cir. 2012) ......................................................................... 14

*In re ZF-TRW Airbag Control Units Prod. Liab. Litig.,*
  601 F. Supp. 3d 625 (C.D. Cal. 2022) ........................................................... 22

*Janus Capital Grp., Inc. v. First Derivative Traders,*
  564 U.S. 135 (2011).......................................................................................13

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY DEFENDANT JUMP TRADING LLC
22-CV-03600-TLT

*John v. Whole Foods Mkt. Grp., Inc.*,
  858 F.3d 732 (2d Cir. 2017) ............................................................................................... 20

*Jones v. Deutsche Bank AG*,
  2005 WL 1683614 (N.D. Cal. July 19, 2005) ...................................................................... 20

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ............................................................................................ 11

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ............................................................................................ 25

*Lustiger v. United States*,
  386 F.2d 132 (9th Cir. 1967) .............................................................................................. 12

*Lutge v. Harrington*,
  No. 22-CV-00585-TLT, 2022 WL 18401350 (N.D. Cal. Dec. 20, 2022) ............................. 25

*Maksoud v. Williams*,
  2018 WL 1150721 (C.D. Cal. Jan. 19, 2018) ...................................................................... 24

*Mandalevy v. Bofl Holding, Inc.*,
  2021 WL 794275 (S.D. Cal. Mar. 2, 2021) ......................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .............................................................................................................. 12

*McCluskey v. Hendricks*,
  2021 WL 4815938 (C.D. Cal. June 16, 2021) ..................................................................... 21

*McGuire v. Dendreon Corp.*,
  2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ................................................................... 14

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................................................. 17

*Neilson v. Union Bank of California, N.A.*,
  290 F. Supp. 2d 1101 (C.D. Cal. 2003) .............................................................................. 23

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................................... 17

*Okun v. Superior Ct.*,
  29 Cal. 3d 442 (1981) ......................................................................................................... 23

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ................................................................................ 18

iv

*Rael v. New York & Co., Inc.*,
  2016 WL 7655247 (S.D. Cal. Dec. 28, 2016) ................................................................. 25

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) ......................................................................................................... 9

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................................................ 14

*SEC v. Drucker*,
  1983 WL 1369 (S.D.N.Y. Sept. 26, 1983) ...................................................................... 9

*SEC v. Lek Secs. Corp.*,
  276 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................................................................ 9

*SEC v. Martino*,
  255 F. Supp. 2d 268 (S.D.N.Y. 2003) ........................................................................... 10

*SEC v. Masri*,
  523 F. Supp. 2d 361 (S.D.N.Y. 2007) ........................................................................... 15

*SEC v. Nat'l Bankers Life Ins. Co.*,
  334 F. Supp. 444 (N.D. Tex. 1971) ............................................................................... 10

*SEC v. Rose*,
  2007 WL 9826042 (S.D. Tex. Sept. 5, 2007) .................................................................. 9

*SEC v. Santos*,
  355 F. Supp. 2d 917 (N.D. Ill. 2003) ............................................................................ 18

*SEC v. Sierra Brokerage Servs.*,
  *Co.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009) .................................................................... 9

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ....................................................................................................... 20

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ....................................................................................................... 21

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ......................................................................................... 15

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ............................................................................................ 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ....................................................................................................... 14

v

*Theodore v. Purecycle Techs., Inc.*,
   2023 WL 4035880 (M.D. Fla. June 15, 2023)...........................................................16

*United States v. Aulicino*,
   44 F.3d 1102 (2d Cir. 1995)..................................................................................21

*United States v. Cagnina*,
   697 F.2d 915 (11th Cir. 1983) ...............................................................................22

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) .................................................................................22

*United States v. Harder*,
   116 F. Supp. 3d 1197 (D. Or. 2015) .....................................................................13

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) .................................................................................12

*United States v. Lloyd*,
   807 F.3d 1128 (9th Cir. 2015) ...............................................................................12

*Walker v. Gates*,
   2002 WL 1065618 (C.D. Cal. May 28, 2002) ......................................................23

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................16

*White v. Seabrooks*,
   2022 WL 2189637 (C.D. Cal. Feb. 4, 2022)........................................................22

**Statutes**

15 U.S.C. § 78j(b) .............................................................................................................9

18 U.S.C. §1962(c) ..........................................................................................................21

Cal. Corp. Code §25400....................................................................................................25

**Rules**

Fed. R. Civ. P. 15..............................................................................................................25

Fed. R. Civ. P. 15(a) .........................................................................................................25

Fed. R. Civ. P. 8................................................................................................................20

Fed. R. Civ. P. 8(a) ...........................................................................................................20

Fed. R. Civ. P. 8(a)(2) .......................................................................................................19

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY DEFENDANT JUMP TRADING LLC
22-CV-03600-TLT

## I.       INTRODUCTION

Lead Plaintiff Michael Tobias and additional plaintiff Nick Patterson (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendant Jump Trading LLC (hereinafter, "Jump").

This case arises from Jump's lead role in the promotion and sale of the fraudulent Terraform tokens ("Terra Tokens") in the United States. Plaintiffs allege a litany of conduct by Jump that is actionable under the causes of action set forth in the Second Amended Complaint ("SAC").[1]

In exchange for lucrative payment, Jump was a principal participant in a fraudulent scheme artificially to re-peg UST to the dollar. In collusion Defendants Terraform Labs Pte. Ltd. ("TFL") and Do Kwon (together "TFL Defendants"), Jump surreptitiously purchased a large quantity of UST, ensuring the re-pegging through human intervention when TFL's algorithm had failed. Knowing that its participation in the re-pegging scheme hid material weaknesses in the Terra ecosystem, Jump vigorously promoted investment into the Terra ecosystem. Alongside the TFL Defendants and other members of the Luna Guard, Jump knowingly played a principal role in a scheme of deceptive practices, manipulating the re-pegging of UST as it fell below a dollar and making fraudulent misstatements and omissions that distorted the true nature of Terra Tokens and the underlying Terra ecosystem. Together, they promoted and sold unregistered securities known as Terra Tokens, fully aware of the fiction of the dollar peg as well as the crippling flaws that plagued the mechanics of the UST/LUNA algorithm. Because Jump knew that the dollar peg was the result of its secret bailout, its subsequent public statements concerning the algorithmic nature of the LUNA/UST peg were false and misleading.

In addition to Plaintiffs' complaint, Jump's conduct has also been seriously called into question by the Securities and Exchange Commission ("SEC") enforcement action currently

---

[1] Throughout, "¶" or "SAC ¶" refers to paragraphs in the SAC. Dkt. No. 102. The digital assets at issue are collectively referred to as the "Terra Tokens." *See* SAC ¶¶61-68. References to the SEC Compl. are to paragraphs in the SEC's Complaint in *SEC v. Do Kwon and Terraform Labs Pte. Ltd.*, 23-cv-01346 (S.D.N.Y.) that is incorporated by reference and attached to the SAC. Dkt. No. 102-1.

proceeding against the TFL Defendants. The SEC alleges, too, that Jump's statements were false and misleading, and its conduct a principal factor likewise demonstrating the false and misleading nature of Jump's statements and conduct.  Indeed, the public statements attributing UST's recovery from its May 2021 depegging to the supposed resiliency of algorithmic stablecoins – rather than Jump's infusion of capital – are materially misleading, and feature prominently in the SEC's fraud allegations. *See* SEC Compl. ¶¶152-68.

In the face of these specific allegations, Jump contends that the Plaintiffs have not alleged sufficient facts, taken as true (with all inferences drawn in Plaintiffs' favor), to state a claim for relief. Jump argues that its principal role in manipulating UST in 2021 was not manipulation at all, and that its statements touting the Terra ecosystem—with actual knowledge that the algorithm itself failed to re-peg UST—were "benign," and "merely expressing enthusiasm" for the Terra project. The SAC's allegations, however, set forth a compelling case that Jump's statements concerning the Terra Tokens were knowingly false, misleading, and incomplete, causing significant damages to Plaintiffs and class members. In its Motion, Jump minimizes Plaintiffs' key allegations, manipulates others where it benefits its position, and shirks any responsibility for the havoc its actions have wreaked on Plaintiffs and class members. Plaintiffs, however, have asserted a compelling *prima facie* case against Jump, exposing its deceitful misrepresentations and its active involvement in the Terra Token fraud. The audacity of Jump's arguments in its Motion to Dismiss stands as a testament to its continued disregard for the damage it has inflicted. Jump's motion to dismiss should be denied, allowing Plaintiffs the opportunity to advance their case towards class certification and trial.

## II.     STATEMENT OF RELEVANT FACTS

Defendant Jump Trading LLC is a U.S.-based proprietary trading firm. Jump is widely seen as a bigger risk-taker than most traditional trading firms when it comes to crypto. ¶58. To wit, in 2019, Jump was sanctioned by NYSE Chicago for failing to maintain sufficient risk management controls related to its algorithmic trading. ¶57. Jump worked closely with TFL and

Do Kwon to market and sell the unregistered Terra Tokens and was instrumental in furthering the fraudulent scheme in the United States. ¶¶187-195.

Jump's connection to TFL began in 2019, when Jump Crypto's President Kanav Kariya ("Kariya") met with Defendant Kwon to discuss TFL and UST. ¶56. In November 2019, TFL loaned 30 million LUNA tokens to Jump. ¶30. Kwon privately told investors that the purpose of the November 2019 loan to Jump was to "improve liquidity" of LUNA, because of the "lackluster [ ] performance of the LUNA token." ¶31. In July 2020, Jump began selling LUNA into the market, allowing investors to purchase LUNA tokens through transactions in secondary markets. *Id.; see also* SEC Compl. ¶108. In September 2020, TFL and its wholly owned subsidiary "loaned" an additional 65 million LUNA tokens to Jump. ¶32. To receive the LUNA tokens, Jump had to meet certain thresholds related to trading in UST. *Id.* Jump met the first threshold and began receiving LUNA tokens pursuant to the loan from TFL in January 2021. *Id.* Jump then began continuously selling LUNA into the market, including through a major U.S. crypto asset trading platform, once that platform began listing LUNA in August 2021. *Id.* TFL's "loan" of Terra Tokens to Jump and Jump's subsequent sales allowed U.S. investors like Plaintiffs to acquire Terra Tokens through transactions in the secondary market, and generated speculative interest in LUNA tokens. *Id.*

The UST stablecoin was promoted as having the ability to maintain its one-to-one peg to the U.S. dollar by virtue of an algorithm coded into the Terra blockchain tying its value to LUNA. *See* SEC Compl. ¶4. UST's price falling below its $1.00 "peg" and not quickly being restored by the algorithm would have spelled doom for the entire Terraform ecosystem, given that UST and LUNA had no reserve of assets or any other backing. SEC Compl. ¶6. On or around May 19, 2021, UST, the purported algorithmic stablecoin "pegged" to the U.S. Dollar, began to experience a "depegging" event. ¶191. On May 23, 2021, UST's price declined sharply, dropping the supposed dollar-pegged stablecoin to nearly $0.90 per token. *Id.* That morning and throughout the day, Jump communicated repeatedly with Kwon. *Id.* In these communications, Kwon expressed concern over UST's value and discussed with Jump a secret plan to restore UST's peg to the US dollar. *Id.*; SEC Compl. ¶156.

The plan had to be secret, because the whole premise of UST as an "algorithmic" stablecoin was that human intervention would be unnecessary in order to maintain the peg.  In particular, UST was supposed to remain pegged to the dollar by virtue of an algorithm that relied on arbitrage, minting and burning UST and LUNA to control the supply and keep the value of UST steady at $1. ¶62(b). That premise was a lie.  Human intervention was necessary, leading to the manipulation and deceptive statements described below.  ¶¶187-203.

Jump, seeking to protect its significant investment in the Terra ecosystem, responded to the depegging event and its communications with Kwon by purchasing large amounts of UST from May 23, 2021 through May 27, 2021 to secretly restore UST's dollar peg. ¶192. Jump ultimately purchased 62 million UST tokens. *Id.* As a result of this secret bailout, UST's price rose and was restored to the $1 level.  *Id.* In return for directly participating in the human intervention necessary to re-peg UST to USD, surreptitiously manipulating the peg when the algorithm failed, the TFL Defendants handsomely compensated Jump for its participation. The TFL Defendants removed the benchmark conditions which had been placed on Jump in order to receive the loaned LUNA tokens. ¶193. Following the secret bailout, TFL agreed to deliver the LUNA tokens to Jump on specified dates, without conditions. *Id.* This agreement was reduced to writing in a July 21, 2021 agreement signed by Do Kwon. ¶194. Under the terms of the modified agreement, Jump received LUNA tokens at only $0.40 per token, even during periods where LUNA tokens were trading at more than $90 per token. *Id.*; SEC Compl. ¶159. Although it spent tens of millions of dollars in conducting the secret bailout of the UST token, Jump ultimately profited by approximately $1.28 billion by selling the LUNA tokens from the 2019 and 2020 loan agreements, as modified after the secret bailout. ¶195.

Not only was the true cause of the re-peg never disclosed, but TFL's loans to Jump, and Jump's activity selling and propping up the price of Terra Tokens were also never disclosed to the investing public. Despite backing TFL and Kwon as early as 2019, Jump did not even publicly announce its foray into crypto until September 2021. ¶56.

On October 11, 2021, Jump published a blog entitled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market." ¶129. This blog post promoted TFL and UST, and misleadingly stated that "We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin." *Id.* This blog was materially misleading because it completely failed to disclose the secret loans Jump received, and the fact that Jump had spent tens of millions of dollars to bail out the UST peg just months earlier in May 2021. The blog also created the false impression that Jump was organically excited about TFL and UST, in contrast to the reality that Jump was highly incentivized to promote TFL due to the LUNA token loans it had received from TFL. Further, Jump attributed UST's ability to keep its dollar peg to a "most elegant solution", instead of the secret bailout that Jump had provided. Jump has since deleted the blog from its website. *Id.*

On January 28, 2022, Kariya posted a thread on Twitter falsely downplaying the possibility of a depegging event. ¶131. Kariya stated, "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." *Id.* Kariya continued, stating "A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA." *Id.* Once again, the January 28, 2022 Twitter thread failed to disclose that the algorithmic nature of the UST stablecoin had already failed once and required a secret bailout from Jump to maintain its dollar peg. The thread also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

In January 2022, the Luna Foundation Guard ("LFG") was formed. ¶48. Jump was a member of the Luna Foundation Guard, and Kariya sat on the LFG Governing Counsel. ¶¶6, 53. The LFG was an entity that was supposed to "defend the peg" of the UST stablecoin by establishing a reserve of assets. ¶6. Jump, through the LFG, made several false and misleading

public statements about "improving the sustainability and stability of TFL's algorithmic stablecoins" and repeatedly downplayed criticisms of the algorithmic nature of the purported stablecoin UST. ¶¶49-51, 136, 137, 153.

Jump, through the LFG, also made misleading statements that the previous May 2021 depegging was not a sign that the Terra ecosystem was more unstable than disclosed, but rather something that UST could capitalize on. ¶49. Jump, through the LFG, stated that "UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy." *Id.* Jump, through the LFG, went on to blatantly lie to investors concerning the Terra ecosystem, stating:

> Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. This is primarily accomplished by the Terra protocol design, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless arbitrage incentives and counter-cyclical monetary policy levers to maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins.

¶50. At no point did Jump or the LFG disclose the true facts that the UST peg was only reestablished through Jump's secret bailout.

Jump also made false statements to create a misleading impression about the stability of the UST dollar peg and otherwise creating a false equivalence between the LFG and governmental central banks. Indeed, Kariya proclaimed in a LFG press release that:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST . . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.

¶138. Jump itself also endorsed Kariya's comments, stating "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market

risks." ¶139. These statements were false and misleading because they once again failed to disclose the fact that Jump had secretly bailed out the UST peg in May 2021. They were also false and misleading because the reserve was not ready and was nowhere near sufficient size to protect the peg. ¶163. Furthermore, the LFG operated nothing like a governmental central bank as it was controlled by conflicted insiders like Jump and Kwon and was tasked with propping up the price of unregistered securities.

On March 1, 2022, Kariya falsely promoted the stability and security of the UST and LUNA peg as Terra's two most attractive features. ¶142. This reference to the purported stability of the UST/LUNA peg was false and misleading because, again, it failed to disclose the fact that Jump had secretly bailed out the UST peg in May 2021. On March 8, 2022, Kariya again promoted the unregistered Terra Tokens, stating that "UST is in high demand atm and is generally trading at a premium." ¶144. These statements likewise omitted the material fact that demand was only high because investors did not know the truth that UST's peg had already failed and had been secretly bailed out by Jump.

On March 10, 2022, Jump published an article on its website entitled "Yield Farming for Serious People" where it solicited investment in the unregistered Terra Tokens and gave instructions on staking LUNA tokens. ¶145. This promotion of the Terra ecosystem omitted the highly-material facts that Jump had entered into secret loan transactions with TFL and that Jump had secretly bailed out the UST peg in May 2021, resulting in Jump obtaining LUNA tokens for just $0.40 per token. ¶194. Likewise, when proposals were made to cut the yield payable through the Anchor protocol, Kariya publicly rejected the proposal to cut the yield rate in Anchor, a big indication to investors that the then-current rate could be safely maintained. ¶146.

Based on Jump's misleading and materially incomplete statements, numerous U.S.-based retail and institutional investors remained unaware that any third party had intervened to restore the peg and continued to buy and hold Terra Tokens on the false belief that the UST/LUNA algorithm itself, not a secret manipulative bailout scheme, had worked to restore the peg to the dollar. ¶203. Had Jump not bailed out the peg in May 2021, allowing UST to continue deviating

from $1, investors would have known about the inherent structural weaknesses in the UST/LUNA algorithm prior to the May 2022 death spiral.

Investors relied on the representations that the algorithm itself restored the UST peg to the dollar to their detriment. ¶261. Unfortunately for investors, the structural vulnerabilities in the Terra ecosystem that were temporarily masked by Jump's secret bailout in May 2021 could not be hidden indefinitely. In May 2022, those structural vulnerabilities led to a massive selloff of Terra related assets. ¶158. Between May 7, 2022 and May 12, 2022, the price of UST and LUNA tokens dropped by 91% and 99.7%, respectively. ¶159.

Despite Jump's public statements to the contrary and its favorable comparisons to governmental central banks, the LFG's purported reserve asset pools did nothing to stop the bleeding. Indeed, as LFG Governing Council member Remi Tetot later candidly confessed, the reserves purportedly established by Jump and the LFG were not ready and were not big enough. Tetot stated "the defence mechanisms were not scaling at the same pace or not ready yet", and admitted that the reserves "were not technically ready[.]" ¶163.

The fallout from the Terra meltdown has drawn much criticism of Jump and its co-Defendants here. Since the filing of this action, the SEC has brought an action against TFL and Kwon, alleging that the Terra Tokens are unregistered securities and describing a multifaceted scheme to fraudulently deceive and mislead investors. ¶2. Although not named as a Defendant, Jump is referenced throughout the SEC's complaint as being intimately involved in, and a big beneficiary of, the fraudulent scheme to sell Terra Tokens. And, as alleged in the SAC, numerous media reports have identified Jump as the "U.S. Trading Firm" in the SEC's complaint that made a concealed investment in the project, secretly bailed out the peg in May 2021, and realized profits of over $1 billion. ¶¶30, 195.

Yet, in the face of the unprecedented meltdown, and consistent with the tone advanced in Jump's motion to dismiss brief, Kariya was noted to be "upbeat despite [the] Terra fiasco." ¶58.

III.     **ARGUMENT**

    a.     **Jump Committed Securities Fraud**

       i.     **Jump Committed a Litany of Manipulative and Deceptive Acts**

The SAC adequately pleads a cause of action for scheme liability, given Jump's principal role in manipulating the re-peg. ¶¶187-203. The securities laws prohibit the actions taken by Jump through Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder. "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1195 (D. Or. 2015) (concluding that "manipulative conduct includes more than only wash sales, matched orders, or rigged prices"); *SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017). Market manipulation includes any "conduct 'designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *In re En Pointe Techs., Inc. Secs. Litig.,* 2003 WL 27392762, at *5 (S.D. Cal. Aug. 25, 2003) (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198–99 (1976)). That is exactly the conduct that Plaintiffs allege Jump engaged in with its co-conspirators Do Kwon and TFL.

Within this broad range of conduct, courts routinely find conduct designed to artificially affect the price of a security available on the market to be actionable. *Compare,* ¶¶187-202 *with SEC v. Sierra Brokerage Servs. Co.*, 608 F. Supp. 2d 923, 962-68 (S.D. Ohio 2009) (where defendants "attempted to control the supply of Bluepoint's shares by preventing mass sell-offs" through agreements with other shareholders). Courts have similarly found that secret market purchases which "inevitably distort[] the market picture" constitute market manipulation. *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 792–94 (2d Cir. 1969); *see also SEC v. Rose*, 2007 WL 9826042, at *13-14 (S.D. Tex. Sept. 5, 2007) (similar facts).

Jump's conduct here included secret transactions like the LUNA token loans from TFL and the undisclosed bailout of the dollar peg, that, like those in *Crane*, if accurately disclosed, would have caused the price of Terra Tokens to drop. *Crane* 419 F.2d at 792-94; *SEC v. Drucker*, 1983

WL 1369, at *22 (S.D.N.Y. Sept. 26, 1983) (defendants obtained "control over the supply of available stock" by orchestrating transfers from third parties).

Jump's conduct, intervening to re-peg when the TFL's algorithm had failed, prevented the price of UST from plummeting. It also enabled TFL and Jump to tout, falsely, that in real-world stress conditions the algorithm prevailed when it had not. The SAC, therefore, adequately alleges Jump's principal role in manipulative conduct. By effectuating the secret bailout, Jump caused a "corresponding rise" in Terra Token prices and thus harmed Plaintiffs, who continued to trust the Terra ecosystem. *SEC v. Nat'l Bankers Life Ins. Co.*, 334 F. Supp. 444, 446 (N.D. Tex. 1971); *see also SEC v. Martino*, 255 F. Supp. 2d 268, 287–88 (S.D.N.Y. 2003) (agreement to "control the flow of Titanic stock trading, to maintain Titanic's stock price").

As the Second Circuit has explained, where plaintiffs have alleged that they were deceived into "believing that prices at which they purchase[d] and s[old] securities are determined by the natural interplay of supply and demand, not rigged by manipulators," they have successfully alleged market manipulation. *City of Providence v. Bats Global Mkts., Inc.*, 878 F.3d 36, 50 (2d Cir. 2017). There, the court reasoned that "permitting such a case to proceed would be consistent with the 'fundamental purpose of the [Exchange] Act . . . of [ensuring] full disclosure,'" and held that "[t]he complaint sufficiently alleges conduct that 'can be fairly viewed as 'manipulative or deceptive' within the meaning of the [Exchange Act].'" *Id.* at 49. The Court here should likewise find that Jump's undisclosed conduct and collusions with TFL and Do Kwon manipulated the price of the Terra Tokens, and created a false pricing signal upon which the Plaintiffs relied.

### ii.    Jump Made Material Misstatements and Omissions

Jump and Kanav Kariya, in his capacity as President of Jump Crypto and as a Governing Council member of the Luna Foundation Guard, disseminated and/or approved public statements which Defendants knew or deliberately disregarded as being misleading and materially incomplete.  Given the positions held by both Jump and Kariya in the Terra ecosystem, they were in a unique position to understand the real risks and stability issues related to UST and LUNA. Despite their knowledge of undisclosed material facts about the Terra Tokens, they made

1   numerous public statements presenting a misleading picture of stability and security that was in

2   stark contrast to the reality that was hidden from investors. No later than May 2021 – the time of

3   the secret bailout – Jump knew that the algorithm supporting the Terra ecosystem was insufficient,

4   without human intervention, to support the peg. As such, it issued false statements thereafter,

5   knowing that the LUNA/UST algorithm alone was insufficient for UST to keep its dollar peg.

6   While Jump argues that it made "benign statements" that were "merely expressing enthusiasm"

7   for the Terra project, such arguments ignore the fact that even literally true statements "can be

8   misleading and thus actionable under the securities laws." *Brody v. Transitional Hosps. Corp.*, 280

9   F.3d 997, 1006 (9th Cir. 2002); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir.

10  2016) (the "veracity" of a statement depends not on "its literal truth, but by its ability to accurately

11  inform rather than mislead").

12      Public statements by Jump promoting Terra Tokens and the Terra ecosystem never

13  disclosed Jump's loan agreements with TFL, nor did they disclose the secret bailout of the UST

14  peg in May 2021. Through its direct involvement in the secret May 2021 bailout, Jump knew that

15  the UST/LUNA algorithm had severe structural vulnerabilities such that the purported

16  "algorithmic" peg was a fiction, and that propping it up would require infusions of real capital.

17  Similarly, Jump also made a series of false statements that the LFG's reserve pool would be

18  sufficient to defend the peg against a proverbial run on the bank by UST/LUNA investors, and

19  favorably comparing the LFG to a stable governmental central bank.

20      For example, on January 28, 2022, Kariya downplayed concerns about the stability of

21  UST/LUNA on Twitter. He falsely suggested that a "sustained mass exodus" from UST was

22  unlikely, and even if it did occur, it would be "manageable over a couple of days" and would not

23  impact the project's prospects. ¶131. However, given Jump's prior secret bailout of the UST peg

24  and the fact that Jump was set to realize significant profits from the sale of its discounted LUNA

25  tokens, these statements were highly misleading and incomplete. Despite Kariya's reassurances,

26  investors' views on the stability of UST and its potential impact on the price of LUNA would have

27  been significantly changed had the secret bailout been disclosed. Kariya's dismissive statements,

28

combined with the influential position he held within the Terra ecosystem, were likely to and did induce investors into a false sense of security about their Terra Token investments. Indeed, there is a substantial likelihood that a reasonable investor would have viewed the omitted facts concerning the secret bailout and Jump's loans as significantly altering the "total mix" of information made available. *See Brody*, 280 F.3d at 1006.

Jump next tries to sugarcoat its secret bailout of the UST peg as merely "making investments in a struggling business," and suggests and that it had no duty to disclose the secret bailout because there is no special relationship between Jump and Plaintiffs. But, as set forth in the SAC, Plaintiffs' claims against Jump are not based on Jump's complete silence as to the Terra Tokens and the UST peg and algorithm, but instead upon the misleading half-truths and the omissions of other material facts. By repeatedly making positive public statements about the dollar peg, the UST/LUNA algorithm, and the Terra Token ecosystem, however, Jump was required to speak the complete truth.

"Half the Truth is often a great Lie"[2], and in contrast to a pure omissions case, the duty to disclose arises when, as here, disclosure is necessary "to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Indeed, even in the absence of a special relationship or a duty to disclose, Jump's misleading and materially incomplete statements are actionable. As the Ninth Circuit has repeatedly observed, "'[a] broker cannot affirmatively tell a misleading half-truth about a material fact to a potential investor because the duty to disclose in these circumstances arises from the telling of a half-truth, independent of any responsibilities arising from a truth relationship.'" *United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015) (*quoting United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010)); *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967), *cert. denied*, 88 S. Ct. 1042 (1968) ("Moreover, deceitful statements of half truths or the concealment of material facts is actual fraud"); *see also Coplin v. United States*, 88 F.2d 652,

---

[2] Benjamin Franklin, *Poor Richard's Almanack*, July 7, 1758, available at Founders Online, https://founders.archives.gov/documents/Franklin/01-07-02-0146.

672 (9th Cir. 1937) (finding half-truth amounted to criminal securities fraud where defendants solicited victim to purchase stock by calling attention to its rising price without advising victim of the fact that the defendants themselves were causing the price to rise); *see also United States v. Harder*, 116 F. Supp. 3d 1197, 1206 (D. Or. 2015) ("Omissions of material fact and half-truths may be used to establish a scheme to defraud. Moreover, deceitful statements of half-truths or the concealment of material facts is actual fraud").

Furthermore, the LFG's false and misleading statements identified in the SAC (¶¶49-51, 136, 137, 153) can be attributed to Jump under binding Supreme Court authority. Indeed, Jump is rightfully considered one of the "makers" of the LFG's statements, an issue that the Supreme Court dealt with in its seminal *Janus* decision. In *Janus*, the Supreme Court faced the question of who "made" certain allegedly false statements contained in mutual fund prospectuses for purposes of determining primary liability under the federal securities laws. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Court held that "the maker of a statement is the person or entity with ultimate control over the statement, including its content and whether and how to communicate it." *Id.* Here, because Jump was a member of the LFG and because Kariya sat on the LFG Governing Counsel, Jump had ultimately authority over the statements made by the LFG. Thus, Jump was a "maker" of the LFG's fraudulent statement that UST purportedly "weathered a massive, reflexive drawdown" without mention of the secret bailout. *See* ¶49. In any event, Jump and Kariya both cosigned the LFG's statements and bolstered the LFG when they misleadingly touted the LFG as functioning like a governmental central bank. *See* ¶¶138-139.

Investors depend on accurate and complete disclosure of risks and potential returns when making their investments. Jump, however, exploited Plaintiffs by knowingly concealing critical information, information that would have deterred them from investing in Terra Tokens. Specifically, the failure of the UST/LUNA algorithm to maintain its dollar peg and the subsequent undisclosed bailout by Jump were consciously omitted. Aware that the full disclosure of the UST/LUNA algorithm's shortcomings would trigger a mass exodus from the Terra Token ecosystem, Jump, in collaboration with its co-conspirators, deliberately orchestrated a narrative

devoid of these essential facts. The concealed truth of the May 2021 peg bailout and the structural frailties in the UST/LUNA algorithm remained hidden, creating a false sense of security among investors. Rather than making the disclosures it was required to make when it chose to speak on the subject, Jump made the strategic choice to withhold this crucial information, using the omission to its advantage. Jump continued to entice investors to buy Terra Tokens and trust the Terra ecosystem, all the while profiting from the sales of the discounted LUNA tokens that Jump had acquired from the clandestine bailout.

### iii.    The SAC Readily Establishes Jump's Scienter

Jump wrongly asserts that Plaintiffs did not sufficiently allege that its misstatements and omissions were made with scienter. Courts must "assess 'all the allegations holistically' to determine whether the inference of scienter is 'cogent and compelling.'" *In re Alphabet, Inc. Securities Litig.*, 1 F.4th 687, 701 (9th Cir. 2021); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007) ("We reiterate . . . that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Allegations are sufficient as long as "a reasonable person" would find the inference of scienter "at least as compelling as any opposing inference." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701–02 (9th Cir. 2012). Here, there are a litany of facts alleged that demonstrate that Jump acted with scienter.

Jump cannot dispute that Plaintiffs have sufficiently alleged that Jump had knowledge of the facts omitted from their statements. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133–34 (N.D. Cal. 2020) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate is classic evidence of scienter."). Nor can Jump dispute the fundamental importance of the information that it concealed: that UST's peg to $1.00 was not the result of the algorithm, but instead the infusion of capital from Jump. *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *7 (W.D. Wash. Dec. 5, 2008) ("The concealment of material information from investors is probative of a 'deliberate recklessness.'").

Jump also had motive and opportunity to commit fraud. Jump's misstatements and omissions were one piece of a broader strategy to inflate the price of the discounted LUNA tokens

1   it obtained in conjunction with the May 2021 UST peg bailout. Plaintiffs have alleged that, while

2   privy to the confidential information that it had secretly bailed out the dollar peg, Jump profited

3   by over one billion dollars from its sale of the discounted LUNA tokens. ¶195. Although not

4   required to plead motive and opportunity, "insider trading represents a classic example of a

5   'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *Bd. of*

6   *Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853,

7   867 (S.D.N.Y. 2011). Allegations of insider trading "'meaningfully enhance the strength of the

8   inference of scienter.'" *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir.

9   2004).

10      Jump's timed trades indicate that it took full advantage of its false and incomplete

11   statements. *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013). Jump's

12   concealment of critical information furthered its pecuniary interests, by ensuring that demand for

13   Terra Tokens among retail investors like Plaintiffs did not evaporate so that Jump could sell the

14   discounted LUNA tokens it received for effectuating the secret bailout at artificially inflated prices.

15   *See Mandalevy v. Bofl Holding, Inc.,* 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) (scienter

16   sufficiently pleaded, where "false statements would ward off a drop in stock prices and prevent"

17   an investigation). This conduct is sufficient to show scienter because one simply does not

18   accidentally engage in such a complex strategy, as numerous courts have recognized. *See*

19   *generally, e.g., CP Stone Fort Holdings, LLC v. Doe(s),* 2016 WL 5934096, at *5 (N.D. Ill. Oct.

20   11, 2016) (features of transactions themselves can give rise to inference of manipulative intent);

21   *SEC v. Masri*, 523 F. Supp. 2d 361, 368-72 (S.D.N.Y. 2007) (same).

22      Jump's scienter is also demonstrated by its efforts to conceal its fraudulent activity and

23   misleading promotions of the purportedly stable UST. As the SAC alleges, Jump deleted the

24   misleading stablecoin-related blog from its website that misleadingly promoted the Terra

25   ecosystem. ¶129; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 696–

26   697 (S.D. Tex. 2002) (finding that efforts to conceal fraudulent activity can contribute to an

27   inference of scienter).

28

Jump's scienter of the algorithmic stablecoin fraud is likewise supported by its prior history with respect to algorithmic trading and its other bad acts related to cryptocurrency. As the SAC alleges, in May 2018, one of Jump's trading algorithms malfunctioned, triggering deficiencies in Jump's capital requirements. ¶57. On September 12, 2019, the NYSE Chicago announced that it had reached a settlement with Jump related to these issues. *Id*. Notably, NYSE Chicago determined that Jump had failed to maintain sufficient risk management controls intended to reduce the risk of erroneous orders and that the controls present "were not reasonably designed to address the risks presented by Jump's business." *Id*. The Jump Trading Order further noted that Jump had "generally failed to sufficiently document" how its ineffective controls were implemented. *Id*. Jump's lax internal oversight also led to the hack of Wormhole network, when a smart contract was hacked resulting in the theft of over $340 million in various digital assets. Jump then bailed itself out and spun it as a philanthropic gift to community members. ¶59. Jump has similarly been accused of colluding with defunct exchange FTX and the notorious trading firm Alameda Research to flee the sinking FTX ship before retail investors were completely wiped out. ¶60. Given that past regulatory actions and crypto-related accusations are "closely parallel to that of this suit", Jump was "more likely than not aware of the improper nature of the practice being alleged […] which puts it on notice[.]" *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005).

Moreover, that the SEC has brought an enforcement action concerning the same conduct alleged by the SAC also weighs in favor of the Court finding a strong inference of scienter. *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *7 (M.D. Fla. June 15, 2023); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114–15 (D. Mass. 2014) ("the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter"). And not only has the SEC brought

an enforcement action, recent media reports have indicated that federal prosecutors in the Southern District of New York are investigating Jump's role in the Terra fiasco.[3]

The importance of the Terra Tokens and the Terra ecosystem to Jump also weighs in favor of a finding of scienter. As the SAC alleges, Jump profited by more than $1 billion by selling LUNA, and the importance of a product to a company lends to the inference of scienter as to adverse facts regarding that product. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (endorsing the core operations doctrine as enhancing, if not independently supporting, an inference of scienter). Moreover, as Kanav's fellow member of the LFG Governing Council, Remi Tetot, confessed after the Terra collapse: the Anchor Protocol's 20% yield was simply a "marketing ploy" used by TFL Defendants to attract new investors in the Terra ecosystem because Kwon and TFL "knew all along there was a significant risk of a death spiral" occurring with the UST/LUNA pairing following the May 2021 depegging event. ¶163.

Finally, since the Terra collapse, the LFG has been either disbanded or abandoned. And Jump offers no innocent explanation for why, shortly after the misconduct came to light, its closest partner in the Terra endeavor, Do Kwon, fled Korea and became an international fugitive. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187–88 (C.D. Cal. 2007) (executive departures can support inference of scienter).

### iv.   Plaintiffs Adequately Allege Reliance

Contrary to Jump's attempt to deflect in its Motion, Plaintiffs directly allege that they relied on Jump and its statements and conduct regarding Terra Tokens. Plaintiffs plainly allege that investors in Terra Tokens relied on the managerial and entrepreneurial efforts of the Luna Foundation Guard (which included Jump) to manage, market, and develop the Terra ecosystem. ¶99. Similarly, Plaintiffs allege that, in ignorance of the fact that the price of UST /LUNA Tokens were artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in

---

[3] *See* Yueqi Yang, et al., *U.S. Prosecutors are Digging into Group Chats on Terra Bailout* (March 13, 2023), https://www.bloomberg.com/news/articles/2023-03-13/us-prosecutors-are-digging-into-jane-street-jump-trading-chats-on-terra-bailout#xj4y7vzkg.

which the UST/LUNA Tokens were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statement, Plaintiffs and the other Class members acquired LUNA Tokens at artificially high prices and were damaged thereby. ¶261.

Moreover, in a market manipulation case under Rule 10b-5(a) and (c), a plaintiff need only allege reliance on "an assumption of an efficient market free of manipulation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007); *see also Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1054 (N.D. Ill. 2016) (citing *ATSI* and explaining that "investors generally assume that they are trading on 'an efficient market free of manipulation'"); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 815–16 (N.D. Cal. 2011) (same).  The Second Circuit has also made clear that it does "not read *ATSI's* reference to 'reliance on an assumption of an efficient market free of manipulation' as referring to a liquid, efficient market with prices publicly reported in real time. We read *ATSI's* reference to an 'efficient' market to mean only a bona fide market free of manipulation." *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 23 (2d Cir. 2013). Thus, Plaintiffs' allegations here adequately plead reliance as to Jump.

Plaintiffs can also avail themselves of the fraud-on-the-market presumption. Under this presumption, plaintiffs who purchase or sell securities rely on the integrity of the market price, and thus on any material misrepresentations. "Although the fraud-on-the-market presumption was adopted in the context of misrepresentation claims, courts have uniformly held that the presumption is also applicable to market manipulation claims." *In re GenesisIntermedia, Inc. Sec. Litig.,* 2007 WL 1953475, at *10 (C.D. Cal. June 28, 2007).

Plaintiffs satisfy the reliance element in yet another way— through the presumption established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which applies in cases involving primarily a failure to disclose. Market manipulation "creates an independent duty to disclose," and that "duty to disclose falls on all parties aware of the manipulation, or who take advantage of it." *SEC v. Santos*, 355 F. Supp. 2d 917, 920 (N.D. Ill. 2003) (noting that "failure to disclose that market prices are being artificially depressed operates

as a deceit on the market place and is an omission of material fact"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 381–82 (S.D.N.Y. 2003) (noting that "participants in the securities market are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading"); *see also In re Enron Corp.*, 529 F. Supp. 2d 644, 739 (S.D. Tex. 2006) (same). Thus, Plaintiffs have adequately alleged reliance because Jump had a duty to disclose due to its systemic manipulation of the price of Terra Tokens.

Finally, the fact that Plaintiffs invested in the Terra Tokens at artificially high prices in ignorance of the true facts regarding their risk shows that Plaintiffs did in fact rely on Jump's misstatements and omissions.

### v.    Jump's Actions Caused Plaintiffs' Losses

Jump's misconduct caused Plaintiffs to invest in the Terra Tokens, which were overvalued and unregistered, and were far riskier than advertised because Jump failed to disclose the secret bailout it had conducted to maintain the dollar peg. It is black letter law that this is sufficient to show causation. *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97–98 (2d Cir. 2001) ("[P]laintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations and that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction.").

The price of Terra Tokens dropped significantly as the market discovered that UST tokens were not as stable as promoted and that the peg of UST/LUNA would be unable to be maintained during periods of high market volatility. ¶158. These were facts known to Jump through its secret bailout in May 2021. *See* SAC ¶163. When the truth was revealed to the market, the price of UST and LUNA Tokens dropped by 91% and 99.7% in a week. ¶159. At the pleading stage, the plaintiff need only "plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "Federal Rule of Civil Procedure 8(a)(2) governs a plaintiff's allegations of loss causation." *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083, 1097 (N.D. Ill. 2005). The Article III injury-in-fact

requirement poses a similarly "low threshold." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017). "[E]ven under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* "[T]o be corrective, a disclosure need not precisely mirror the earlier misrepresentation." *BofI Holding*, 977 F.3d at 790. Instead, it need only "reveal new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id.* The SAC more than clears these low thresholds.

### vi.     Jump's Fraud was in Connection with Securities

The SAC clearly establishes, for the purposes of this motion, that Jump's fraud was conducted in connection with unregistered securities. As set forth in Plaintiffs' Opposition to the TFL Defendants' Motion to Dismiss and Motion to Compel Arbitration, which is being filed contemporaneously herewith, the SAC adequately alleges that the Terra Tokens are securities under the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

### vii.    Jump was a Control Person of the LFG

Section 20(a) of the Exchange Act imposes joint and several liability on persons who are in "control" of those who violate federal securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5. Section 20(a) claims are subject only to the pleading requirements of Rule 8. Therefore, to state a claim under Section 20(a), Plaintiffs need only provide Defendants with fair notice of the claim and the basis of the allegations. *See In re Initial Pub. Offering*, 241 F. Supp. 2d at 395-96 (Section 20(a) claims are subject only to the pleading standards of Rule 8(a)).

### b.     The SAC Adequately Alleges RICO Claims in the Alternative

### i.      Plaintiffs' RICO Claims Are Not Barred

In the alternative, and to the extent the Court determines that the Terra Tokens are not securities, Plaintiffs have properly pled a RICO claim.  It is possible that Congress will determine that cryptocurrencies like the Terra Tokens are not securities, and the resulting uncertainty warrants the pleading of a RICO claim in the alternative. *See Jones v. Deutsche Bank AG*, 2005 WL 1683614, at *6 (N.D. Cal. July 19, 2005) (holding that uncertainty surrounding status as a

security presented question that was better suited for summary judgment, denying motion to dismiss RICO claim while granting leave to amend PSLRA claim).

To state a civil claim for a federal Racketeer Influenced and Corrupt Organizations Act ("RICO") violation under 18 U.S.C. §1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff must establish that the defendant caused injury to the plaintiff's business or property.  *McCluskey v. Hendricks*, 2021 WL 4815938, at *2 (C.D. Cal. June 16, 2021) (citing 18 U.S.C. §§1962(c), 1964(c)).

Here, Plaintiffs allege that the Terra Token Enterprise, of which Jump was a necessary participant, was an ongoing scheme to periodically pump up the trading volume (and price) of the Terra Tokens in order to provide exit liquidity for Defendants. Jump was an active participant and beneficiary of this enterprise as it profited by over $1.2 billion from the discounted LUNA tokens it received. The SAC plausibly alleges that the Terra Token Enterprise posed a "specific threat of repetition extending indefinitely into the future" and that the predicate acts were "part of an ongoing entity's regular way of doing business" for Jump.  *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995)¶332-42. These allegations demonstrate a specific threat of repetition by Jump.  Indeed, whether predicate acts pose a threat of future conduct is evaluated as of the time the acts are committed.  *See United States v. Aulicino*, 44 F.3d 1102, 1110–14 (2d Cir. 1995) (finding open-ended continuity despite the fact that scheme ended before any prosecution was commenced).

Here, the Complaint plausibly alleges that Jump and its co-conspirators: (1) had a common purpose of increasing the price and trading volume for Terra Tokens; (2) each committed two or more predicate acts as an ongoing organization with the other RICO Defendants; and (3) posed a threat that its fraudulent promotions of the Terra ecosystem would continue into the future. The SAC directly alleges that Jump and its co-conspirators all shared the common purpose "to ensure that the RICO Defendants could sell off their Terra Token holdings to retail investors at artificially inflated prices without their fraud being detected." ¶320. In particular, Jump and the other RICO

Defendants are alleged to have "shar[ed] the common purpose of inflating the price and trading volume of Terra Tokens in order to sell their respective portion." ¶325. The Complaint further expanded that the "motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the Terra Tokens so that [these Defendants] could sell off their portion of the Float for grossly inflated prices. Each person joined in that common purpose because each person made more money the higher the Terra Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity." ¶342.

Similar allegations have been found sufficient to establish the common purpose element of an association-in-fact enterprise. *See, e.g.*, *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625 (C.D. Cal. 2022) (finding allegations that defendants had a common purpose of misleading consumers in order to "maximize their revenue by selling as many [products at issue] as possible" to be sufficient); *see also United States v. Cagnina*, 697 F.2d 915 (11th Cir. 1983) (noting that the enterprise may be an informal association with the common purpose of making money from the alleged schemes). Despite TFL Defendants' suggestion to the contrary, the Complaint does not allege a mere routine commercial relationship, but rather a scheme masquerading as an "entirely legitimate" cryptocurrency project that was "used by the defendant to line his or her pockets." *See United States v. Feldman*, 853 F.2d 648, 657 (9th Cir. 1988) (analyzing association-in-fact enterprise liability).

Where, as here, a plaintiff alleges RICO claims against multiple defendants, the "plaintiff must allege at least two predicate acts by ***each*** defendant." *White v. Seabrooks*, 2022 WL 2189637, at *5 (C.D. Cal. Feb. 4, 2022). Given the extensive allegations in the SAC related to Jump's conduct, Plaintiffs have clearly alleged the who, what, when, where, and why of the alleged RICO enterprise and the ongoing pattern of racketeering activity as to Jump and its co-conspirators.

1            **c.**       **The State Law Claims are Sufficiently Alleged as to Jump**

2            **i.**     **Aiding and Abetting and Conspiracy Claims**

3       To the extent the Court finds that the Terra Tokens are not securities, Plaintiffs have

4 alternatively pled a *prima facie* case for common law conspiracy against Jump. The California

5 Supreme Court has recognized civil conspiracy as a cause of action, but "only when it alleges the

6 commission of a civil wrong that causes damage." *Okun v. Superior Ct.*, 29 Cal. 3d 442, 454

7 (1981).  California courts allow for the actual knowledge element of a civil conspiracy claim to be

8 established by reasonable inference. "Because conspiracies are, by their very nature, secret

9 agreements, "[a] defendant's knowledge of and participation in a conspiracy may be inferred from

10 circumstantial evidence and from evidence of the defendant's actions." *Walker v. Gates*, 2002 WL

11 1065618, at *5 (C.D. Cal. May 28, 2002) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839,

12 856–57 (9th Cir. 1999)).  Here, Plaintiffs alleged that Jump and its co-conspirators took actions

13 and made statements to hide the instability of the UST/LUNA peg, and to perpetuate the illusion

14 of UST as a functioning algorithmic stablecoin.  ¶¶187-205.

15       Likewise, to the extent the Court finds that the Terra Tokens are not securities, Plaintiffs

16 have alternatively pled a *prima facie* case for aiding and abetting under California common law.

17 Under an aiding-and-abetting theory, those who provide substantial assistance with actual

18 knowledge of the wrongdoing are liable as co-tortfeasors for the wrongs committed by

19 codefendants. *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1134 (C.D. Cal.

20 2003). Unlike civil conspiracy, aiding-and-abetting does not require proof of an agreement to

21 commit the primary wrong. *Neilson v. Union Bank of Cal., N.A.,* 290 F. Supp. 2d 1101, 1134 (C.D.

22 Cal. 2003). Accordingly, a party alleging aiding-and-abetting need only establish: (1) defendant's

23 actual knowledge of the specific primary wrong, and (2) defendant's substantial assistance in its

24 commission. *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1145 (2005). Here, Jump is

25 alleged to have been instrumental in assisting the TFL Defendants in carrying out the scheme to

26 defraud investors, thereby satisfying the substantial assistance element. Further, as noted above

27 when discussing Plaintiffs' conspiracy claim, Jump's requisite knowledge can be inferred from its

28

repeated efforts to conceal that the dollar peg was bailed out by human intervention rather than the algorithm.  This is enough to plead a claim for aiding and abetting.

### ii.    Jump was Unjustly Enriched

A claim for unjust enrichment "broadly provides that a person who is unjustly enriched at the expense of another is subject to liability in restitution." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014). "The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" *Berger v. Home Depot USA, Inc*., 741 F.3d 1061, 1070 (9th Cir. 2014).

Here, Plaintiffs sufficiently plead that Jump was unjustly enriched when it received a monetary benefit from the sale of the Terra Tokens to Plaintiffs and the class members at inappropriately and artificially inflated prices. *See* ¶¶350-52. *In re Safeway Tuna Cases*, 2016 WL 3743364, at *2 (N.D. Cal. July 13, 2016) (order allowing Plaintiff's unjust enrichment claim to stand "even if it were duplicative of their other claims, at the pleading stage").

Plaintiffs provided a direct benefit to Jump by providing enough trading volume and exit liquidity with their Terra Token purchases to allow Jump to sell its Terra Tokens to Plaintiffs and class members at inappropriately and artificially inflated prices. Indeed, the SAC alleges that Jump profited by over $1.2 billion in connection with its sales of inflated Terra Tokens at the expense of Plaintiffs and class members. *See De Ford v. Koutoulas*, 2023 WL 2709816, at *13 (M.D. Fla. Mar. 30, 2023) (denying motion to dismiss unjust enrichment claims (alongside securities claims), and ruling cryptocurrency purchasers plausibly alleged they conferred sufficiently direct benefit on token insiders who retained the benefit to investors' detriment).

Thus, in the event the Court dismisses the other causes of action, it should nevertheless allow this one to proceed.  It would be unjust for Defendants to retain that benefit. *See Maksoud v. Williams*, 2018 WL 1150721, at *9–10 (C.D. Cal. Jan. 19, 2018).  Should the other claims be deemed inappropriate vehicles to address the wrongdoing alleged herein, Plaintiffs will be without an adequate remedy at law.

## IV.    LEAVE TO AMEND SHOULD BE GRANTED

Although Plaintiffs believe that the SAC sufficiently alleges claims against Jump, if this Court were to find otherwise, Plaintiffs respectfully request leave to amend their complaint to cure any deficiencies. Plaintiffs have not yet had the benefit of a court ruling addressing the sufficiency of their allegations as to Jump or any other defendant. Plaintiffs will be able to add newly available facts relevant to their claims against Jump, including: (i) the Department of Justice's criminal indictment against Do Kwon, which alleges that Do Kwon and Jump (described as a United States trading and investment firm) "alter[ed] the market price of UST" in May 2021; (ii) media reports that federal prosecutors in New York are investigating Jump in connection with the Terra situation; and (iii) Jump ending its practice of selling unregistered securities in the form of crypto tokens in the United States. As Plaintiffs can add further clarity and particularity, leave to amend would not be futile and, thus, should be granted if these claims are dismissed. *See Batuhan v. Assurity Fin. Servs., LLC*, 2015 WL 7776470, at *3 (N.D. Cal. Dec. 3, 2015) ("[L]eave to amend should be freely given if it is possible that further factual allegations will cure any defect."); *Rael v. New York & Co., Inc.*, 2016 WL 7655247, at *7–8 (S.D. Cal. Dec. 28, 2016) ("As a general rule, a court freely grants leave to amend a complaint that has been dismissed 'when justice so requires.'") (*citing* Fed. R. Civ. P. 15(a)).  And if the Court determines that the claims in the SAC are not the correct causes of action to address the wrongdoing alleged, Plaintiffs could add, for instance, a claim under California state law for market manipulation, which does not require privity. *See* Cal. Corp. Code §25400. As this Court recognized "the underlying purpose of Rule 15 is to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lutge v. Harrington*, No. 22-CV-00585-TLT, 2022 WL 18401350, at *3 (N.D. Cal. Dec. 20, 2022) (Thompson, J.) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Jump's motion to dismiss in its entirety or grant Plaintiffs leave to amend to cure any deficiencies with the allegations.

Dated: July 7, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_/s/ Laurence M. Rosen_
Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel.: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

_Lead Counsel for Lead Plaintiff_

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

and

Sean T. Masson (_pro hac vice_)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
smasson@scott-scott.com

_Additional Counsel for Plaintiffs_

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On July 7, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel counsel of record.

*/s/ Laurence M. Rosen*
Laurence M. Rosen

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY DEFENDANT JUMP TRADING LLC
22-CV-03600-TLT