**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated, | Case No. 22-cv-03600-TLT |
| Plaintiff, | |
| v. | **LEAD PLAINTIFF'S OPPOSITION TO JUMP TRADING LLC'S MOTION TO COMPEL ARBITRATION** |
| TERRAFORM LABS, PTE. LTD., JUMP CRYPTO, JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON, | Dated: September 19, 2023 Time: 2:00 p.m. |
| Defendants. | |

1

## **TABLE OF CONTENTS**

2

I.      THE COURT SHOULD DENY JUMP'S MOTION TO COMPEL
        ARBITRATION ............................................................................................ 1

        A.      INTRODUCTION ............................................................................. 1

        B.      ARGUMENT ..................................................................................... 3

                1.      Because Neither *Goldman* Circumstance Applies Here,
                        the Court Should Deny Jump's Motion to Compel
                        Arbitration under the Terms ................................................ 5

                        a.      Plaintiffs' Claims Against Jump Do Not Rely on the
                                Anchor Terms of Service ........................................... 5

                        b.      Plaintiffs' Claims Do Not Allege Any Interdependent
                                Misconduct Founded in or Intimately Connected with
                                the Obligations Imposed by the Anchor Protocol
                                Terms of Service ...................................................... 10

                        c.      Jump's Attempt to Distinguish *Donovan v. Coinbase*
                                is Unavailing ............................................................ 11

                2.      A Stay Is Inappropriate ..................................................... 12

                        a.      The Equities Weigh Strongly in Favor of Continuing
                                with the Case ............................................................ 13

                        b.      Judicial Efficiency Weighs in Favor of Continuing
                                with Case .................................................................. 14

II.     CONCLUSION ............................................................................................ 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986) ........................................................................................... 3

5

*California Crane Sch., Inc. v. Google LLC*,
   621 F. Supp. 3d 1024 (N.D. Cal. 2022) ......................................................... 13, 14

6

7

*Chen v. Bank of Am., N.A.*,
   2020 WL 4561658 (C.D. Cal. Mar. 31, 2020) ..................................................... 14

8

9

*CMAX, Inc. v. Hall*,
   300 F.2d 265 (9th Cir. 1962) ......................................................................... 12, 13

10

*Congdon v. Uber Techs., Inc.*,
   226 F. Supp. 3d 983 (N.D. Cal. 2016) ................................................................. 15

11

12

*Crafty Prods., Inc. v. Michaels Companies, Inc.*,
   424 F. Supp. 3d 983 (S.D. Cal. 2019) ................................................................. 15

13

14

*DeMartini v. Johns*,
   693 F. App'x 534 (9th Cir. 2017) ................................................................... 13, 14

15

*Donovan v. Coinbase Glob., Inc.*,
   2023 WL 2124776 (N.D. Cal. Jan. 6, 2023) ..................................................... 4, 11

16

17

*Esparza v. SmartPay Leasing, Inc.*,
   2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) ......................................................... 9

18

19

*Goldman v. KPMG, LLP*,
   173 Cal. App. 4th 209 (2009) ............................................................................... 3

20

*Graham v. Scissor-Tail, Inc.*,
   28 Cal. 3d 807 (1981) ............................................................................................ 9

21

22

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) ............................................................................................ 4

23

24

*Hirst v. State of Cal.*,
   770 F.2d 776 (9th Cir. 1985) ............................................................................... 15

25

26

*In re Henson*,
   869 F.3d 1052 (9th Cir. 2017) ........................................................................... 3, 4

27

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,

28

LEAD PLAINTIFF'S OPPOSITION TO JUMP TRADING LLC'S
MOTION TO COMPEL ARBITRATION

847 F. Supp. 2d 1253 (S.D. Cal. 2012) ..................................................................... 9

*Jackson v. Amazon.com, Inc.*,
   65 F.4th 1093 (9th Cir. 2023) ........................................................................... 4, 7

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) ...................................................................... passim

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ........................................................................................... 13

*Martin v. Holiday Inns, Inc.*,
   199 Cal. App. 3d 1434 (Cal. Ct. App. 1988) ...................................................... 9

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013) ........................................................................ 3, 4

*Ngo v. BMW of N. Am., LLC*,
   23 F.4th 942 (9th Cir. 2022) ........................................................................ 4, 10

*Savage v. Citibank N.A.*,
   2015 WL 2214229 (N.D. Cal. May 12, 2015) ...................................................... 9

*Scott v. Snelling & Snelling, Inc.*,
   732 F. Supp. 1034 (N.D. Cal. 1990) ................................................................. 15

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
   46 F. App'x 412 (9th Cir. 2002) ....................................................................... 13

iii

# I. THE COURT SHOULD DENY JUMP'S MOTION TO COMPEL ARBITRATION

## A. INTRODUCTION

Seeking to avail itself of the Anchor Protocol Terms of Service ("Terms") and its arbitration clause, Jump insists that the Court either compel Plaintiffs to arbitrate against it or, alternatively, to stay the case against it until such time as Plaintiffs arbitrate their case with Defendants Terraform Labs, Pte. Ltd. ("TFL") and its Chief Executive Officer, Do Kwon (together, "TFL Defendants") in Singapore. The Court should deny Jump's Motion to Compel (Dkt. No. 114) or ("MTC"), in its entirety.

The Court should deny Jump's attempt to enforce the Terms' arbitration provision for two reasons. First, for the reasons Plaintiffs argue in their opposition to the TFL Defendants' motion to compel arbitration, Plaintiffs' claims all relate to their *purchase* of UST and other Terra Tokens, and not any subsequent decision to lend UST to the Anchor Protocol. Plaintiffs' purchase of Terra Tokens is a separate and distinct transaction from the transaction depositing UST into the Anchor Protocol, and the Terms do not reach the initial purchase. The Amani Declaration attaches, in full, the Terms, containing the arbitration clause at issue. Dkt. No. 122-1. As discussed at length in Plaintiffs' opposition to the TFL Defendants on this point, the Terms govern only the transaction in which owners of UST deposit UST into Anchor, the Terms expressly disclaim responsibility for the value of the underlying UST staked in Anchor, and the Terms do not even purport to reach the initial purchase of UST or any other Terra Token. Dkt. No. 122-1. As such, the arbitration clause in question is inapplicable to Plaintiffs' claims against any of the Defendants. The TFL Defendants acknowledge as much, conceding that "the SAC does not contain a single allegation that (a) Lead Plaintiff *or anyone else* lost money as a result of Anchor[.]" TFL MTD at 58 (emphasis in original). In fact, all of Plaintiffs' claims would be exactly the same – that the Terra Tokens they purchased

were unregistered securities, and that their purchases were induced by a raft of false and misleading statements and deceptive acts – whether Plaintiffs decided to loan their Terra Tokens to the Anchor Protocol or not.[1] Accordingly, because Plaintiffs' claims do not "arise out of or relat[e] to" the Anchor Interface or the Terms, the arbitration clause does not apply to their claims against Jump.

Second, generally, a non-signatory may not enforce an arbitration agreement to which it is not a party. Because Defendant Jump is a non-signatory to the Terms, therefore, it may not avail itself of the arbitration clause unless it demonstrates that this case falls within one of two "narrow" exceptions. This has been black letter law ever since the Ninth Circuit Court of Appeals adopted the two so-called *Goldman* circumstances. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013). The two *Goldman* circumstances are: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement. *Id.* Plaintiffs' claims, however, do not rely on the Terms at all, as they relate to their initial purchase of Terra Tokens, which is a separate

---

[1] The TFL Defendants made this point repeatedly at oral argument on their motion to dismiss the SEC action. *See SEC v. Do Kwon and Terraform Labs Pte. Ltd.*, 23-cv-01346 (S.D.N.Y.). The June 15, 2023, motion to dismiss oral argument transcript in that case is attached as Exhibit 1 to the Declaration of Laurence M. Rosen in Support of Lead Plaintiff's Opposition to the TFL Defendants' Motion to Dismiss and Motion to Compel Arbitration ("Rosen Decl."). There, the TFL Defendants assured the court that the decision to deposit UST into Anchor was a "separate decision," *see* Rosen Decl., Ex. 1 at 22:01, and that the Anchor Protocol, which only became available "seven months" after UST became available, "just presents one option amongst many for anybody who had actually purchased UST or was considering purchasing UST, but there are no package deals[.]" *Id.* 22:13-19. In addition, the TFL Defendants contended that conflating one's decision to deposit UST into the Anchor Protocol and one's initial decision to purchase the UST would require "essentially time travel." *Id.* 25:01. The reason is that the decision to purchase UST is a separate transaction from the one depositing it into Anchor. Accordingly, the Anchor Protocol Terms, and the arbitration clause it contains, does not apply.

2

1
2

transaction not governed by the Terms. Jump hardly argues otherwise, but urges the Court to

compel arbitration nevertheless. Jump is wrong.

3
4
5
6
7
8

Finally, in the event the Court compels Plaintiffs to arbitrate their claims against the TFL

Defendants but rejects Jump's attempt to leverage the Terms' arbitration clause, Jump seeks a

discretionary stay of this action against it, pending the outcome of arbitration with the TFL

Defendants. Because Jump has failed to meet its burden of showing both that the equities and

judicial efficiency support a stay, this Court should deny its request for a stay.

9

## B.   ARGUMENT

10
11
12
13
14
15
16
17
18
19

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration

any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of

Am.*, 475 U.S. 643, 648 (1986). Generally, courts preclude nonsignatories to arbitration agreements

from compelling arbitration of their disputes except in "narrowly confined" circumstances. *See

Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (citation omitted). Under California

law, a non-signatory, invoking the doctrine of equitable estoppel, may seek arbitration only in two

"limited circumstances." *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017). In *Kramer v. Toyota

Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013) (affirming the denial of a third party's attempt to

compel arbitration), the Ninth Circuit adopted the two "*Goldman* circumstances" for a non-

signatory's invoking equitable estoppel to compel arbitration.  They are:

20
21
22
23

> (1) when a signatory must rely on the **terms of the written agreement** in asserting
> its claims against the nonsignatory or the claims are intimately founded in and
> intertwined with the **underlying contract**, and (2) when the signatory alleges
> substantially interdependent and concerted misconduct by the nonsignatory and
> another signatory and the allegations of interdependent misconduct are founded in
> or intimately connected with the obligations of the **underlying agreement**.

24
25
26
27

*Id.* at 1128–29 (citing *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)) (emphasis

added). Importantly, references to the "agreement" and "contract" refer to the Terms, which is the

contract containing the arbitration clause. Courts apply equitable estoppel to prevent a plaintiff

28

LEAD PLAINTIFF'S OPPOSITION TO JUMP TRADING LLC'S
MOTION TO COMPEL ARBITRATION

from asserting liability against the non-signatory under the agreement's terms while simultaneously seeking to avoid arbitration that the agreement mandates. *In re Henson*, 869 F.3d at 1060 (quoting *Murphy*, 724 F.3d at 1229.

Citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) and calling the *Kramer* line of authority "of doubtful validity," Jump attempts to challenge the applicability of the *Goldman* factors. *See* Jump MTC at 10, n. 8. Three years after *Henry Schein*, however, the Ninth Circuit re-affirmed the applicability of the *Goldman* factors. *See, e.g., Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 948 (9th Cir. 2022). *Henry Schein* does not alter this Court's application of the *Goldman* circumstances, as the Ninth Circuit requires. Moreover, the Court should reject Jump's attempt to delegate the question whether the *Goldman* circumstances apply to an arbitrator, because whether one of the *Goldman* circumstances is present is a decision that courts – not arbitrators – make all the time. *See, e.g., BMW of N. Am., LLC*, 23 F.4th at 949; *Donovan v. Coinbase Glob., Inc.*, 2023 WL 2124776, at *6 (N.D. Cal. Jan. 6, 2023) (citing *Kramer*, 705 F.3d 1122 and *Murphy*, 724 F.3d at 1229–1230 ("We must analyze whether [non-signatory] Best Buy satisfies either of the two *Kramer/Goldman* exceptions to the general rule precluding nonsignatories from requiring arbitration of their disputes")). Nowhere in Jump's avalanche of caselaw is a case even suggesting that the *Goldman* analysis is for an arbitrator.[2]

---

[2] This makes sense because, as explained in Plaintiffs' response to the TFL Defendants' motion to compel arbitration, the question is whether Plaintiffs' claims are covered by the Terms' arbitration agreement, which is a question for the court – not an arbitrator – to decide. *See, e.g., Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) (affirming district court's denial of motion to compel arbitration, because the claim did not relate to the terms of the contract containing the arbitration clause and was therefore outside the scope of the clause).

1.   **Because Neither *Goldman* Circumstance Applies Here, the Court Should Deny Jump's Motion to Compel Arbitration under the Terms**

    a.   **Plaintiffs' Claims Against Jump Do Not Rely on the Anchor Terms of Service**

The first *Goldman* circumstance contemplates two situations: The signatory's claims against the non-signatory "must rely on the terms of the written agreement," or the signatory's claims must be "intimately founded in and intertwined with the underlying contract." *Kramer*, 705 F.3d at 1128–29. The written contract at issue here is the Terms. Dkt. No. 122-1. By their plain language, the Terms govern only transactions involving owners of UST lending UST to the Anchor Protocol in exchange for a rate of interest. SAC ¶6.[3] For equitable estoppel to apply, therefore, Plaintiffs' claims must involve their lending UST to the Anchor Protocol. They do not.

The lending of UST to Anchor is not what is at issue in this case. The TFL Defendants acknowledge that Plaintiffs' claims do not rely on the Terms, when they assert that "Lead Plaintiff does not allege that any Anchor user (a) failed to receive the disclosed 'interest rate' on staked tokens or (b) lost any staked tokens due to the operation of the Anchor Protocol; rather, Lead Plaintiff alleges losses due to declines in the market (*i.e.*, 'fiat-denominated') values of UST and LUNA." TFL MTD at 20. The TFL Defendants continue, asserting that "the SAC does not contain a single allegation that (a) Lead Plaintiff *or anyone else* lost money as a result of Anchor or (b) Anchor ever failed to pay the expected return on staked tokens[.]" TFL MTD at 58 (emphasis in original). Indeed, because Plaintiffs *do not even allege that they lost money because of their loan to Anchor*, it follows that Plaintiffs' claims do not rely on the Terms, nor are they "intimately founded in and intertwined with" those contractual terms. The express disassociation between

---

[3] References to "¶" or "SAC ¶" are to paragraphs of the Second Amended Complaint, Dkt. No. 102.

Plaintiffs' claims and the Terms eliminates Defendant Jump's appeal to equitable estoppel and should cause this Court to deny its motion to compel arbitration.

Seeking to avoid the unavoidable, Defendant Jump struggles to associate Plaintiffs' claims with the Terms that govern a transaction that is not at issue here. **_First_**, Jump elides both the Plaintiffs' claims – based on their purchases of UST – and the Terms it seeks to leverage, suggesting that "the Anchor Protocol is Central to Lead Plaintiff's Theory of Fraud," Jump MTC at 3, and "[t]he entire theory of the SAC is that Jump Trading and TFL worked together to sustain demand for UST . . . And at the center of the alleged scheme are supposed misrepresentations about the sustainability of the yields offered by the Anchor Protocol." *Id*. at 3, 13. With no support whatsoever from the Complaint or the Terms, Defendant Jump assumes the faulty premise that Plaintiffs' claims must rely on the Terms. According to Jump, the Terms apply because Plaintiffs purchased UST and, in separate and wholly discretionary transactions, may have lent their UST to the Anchor Protocol. In other words, Jump's premise is that, because Plaintiffs' claims and the Terms both relate to UST, they must be the same transaction. As a matter of law and fact that premise crumbles, because *Goldman* requires actual reliance on the **terms of the written agreement** – here, the Anchor Protocol Terms of Service.

While the SAC might allege that misstatements about the Anchor Protocol drove interest in UST and the Terra ecosystem generally, *see* SAC ¶ 26, it is nevertheless the case that, to quote the TFL Defendants, "the SAC does not contain a single allegation that (a) Lead Plaintiff *or anyone else* lost money as a result of Anchor[.]" TFL MTD at 58. Whatever may have driven interest in UST, practically and technically the transactions were separate, one not necessitating the other. Thus, it does not follow that Plaintiffs' claims – all directed at their purchase of UST – have anything to do with the terms of the transaction by which they subsequently loaned their UST to

6

Anchor. Those purchases of UST did not (and could not) take place within the Anchor Protocol, and were not subject to the Terms and their arbitration provision. Indeed, investors who purchased UST during the Class Period but did not lend them to the Anchor Protocol have the exact same claims as those who did, but are not subject to the Anchor Terms of Service. *See Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1102 (9th Cir. 2023) (explaining that claims did not depend on the terms of the contract where plaintiffs who did not sign the contract would have the same claims as those who did). Because all of Plaintiffs' claims here relate to their purchases of UST – which did not take place in the Anchor Protocol, or require a loan to the Anchor Protocol in any way[4] – they do not "rely on" the Terms.

**_Second_**, tacitly acknowledging its faulty premise – conflating transactions because both involved UST – Defendant Jump pivots, asserting that the Terms of Service are relevant to one if its defenses. In particular, it suggests that language in the Terms provides "an absolute defense, because it expressly conflicts with Lead Plaintiff's claim that he reasonably relied on and was defrauded by the marketing of the Anchor Protocol's interest rate." Jump MTC at 15. This is wrong because it again conflates Plaintiffs' initial purchase of Terra Tokens – that did not take place within the Anchor Protocol and were not subject to its Terms – with Plaintiffs' subsequent loan of UST to Anchor, the transaction for which Plaintiffs were asked to sign the Anchor Terms of Service. Jump is trying to look to the fine print of a contract that Plaintiffs were asked to sign

---

[4] Indeed, the Complaint explains how Plaintiffs could and did buy Terra Tokens for purposes unrelated to Anchor, for example, purchasing UST to convert into LUNA for exposure to price appreciation or arbitrage opportunities. *See* SAC ¶62 (describing how the UST/LUNA pairing mechanism creates "arbitrage opportunity" meant to "incentiviz[e]" and "encourage arbitrageurs to trade the UST/LUNA pair in order to trigger the mint/burn process and thus, a return to $1."); SAC ¶50, 136-37, 153 (promoting the "arbitrage incentives" available to the UST/LUNA purchasers); SAC ¶50 (highlighting the UST's "alternative arbitrage opportunity outside of the Terra protocol itself").

7

separate from and after purchasing UST, and claiming the contract is somehow relevant to Plaintiffs' frame of mind when they made the previous and distinct decision to purchase UST. That makes no sense. Jump's argument is inconsistent with the basic timeline of events, failing to transform Plaintiffs' claims into claims that "rely on" or are "intimately founded in and intertwined with" the Anchor Terms of Service. *See Kramer*, 705 F.3d at 1128–29.

   ***Third***, in a last-ditch effort to construe Plaintiffs' claims as relying on the terms of the written agreement, Jump misreads the Terms. Defendant Jump writes that "[t]he arbitration clause here covers all disputes 'arising out of or relating to the Interface, this Agreement . . . or any other acts or omissions for which you may contend that we are liable.'" Jump MTC at 16. Immediately after, Jump provides a string cite to cases construing arbitration agreements that use the phrase "arising out of or related to this Agreement" as broad arbitration clauses. *See* Jump MTC at 16. These cases do stand for the proposition that the phrase "arising out of or relating to" is broad and reaches all matters that touch the agreement in question—but, as Jump recognizes several times earlier in its brief, to be arbitrable, the claims must still "arise out of" or "relate to" the Interface or Agreement. *See* Jump MTC at 1 ("To use that protocol, Lead Plaintiff agreed to be bound by the Anchor Terms of Service ('Anchor TOS'), which included a broad arbitration clause requiring him to arbitrate in Singapore **all claims arising out of or related to use of the Anchor Protocol Interface or the Anchor TOS**") (emphasis added); Jump MTC at 10 (arbitration clause "expressly covers **any dispute arising out of or relating to the 'Interface' or 'Agreement**,' including questions about arbitrability") (emphasis added). That is the common sense reading of the agreement.

   To the extent Jump is reading the "or any other acts or omissions for which you may contend that we are liable" clause to include any possible claim against TFL, even those that do

not arise out of or relate to the Anchor Interface and Terms of Service, that is just the sort of "excessively broad and unnatural reading" that courts regularly reject. *See, e.g., Esparza v. SmartPay Leasing, Inc.*, 2017 WL 4390182, at *3 (N.D. Cal. Oct. 3, 2017), *aff'd*, 765 F. App'x 218 (9th Cir. 2019) ("reading the clause as applying to any and every claim arising between SmartPay and its customers, even including employment and tort claims, with no limiting principle would render the clause impermissibly overbroad, and therefore inoperable"); *Savage v. Citibank N.A.*, 2015 WL 2214229, at *3 (N.D. Cal. May 12, 2015) ("Accepting Defendants' interpretation that the 'our relationship' language extends to any interaction between Plaintiff and Citi would mean that one credit card agreement could be used to dictate the parties' 'relationship' *ad infinitum*, regardless of the subject matter of their future interactions. That is an absurd consequence."); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012) (similar).

Jump's overbroad reading would also render the other specific clauses in the paragraph superfluous and violate the canon of ejusdem generis. *See, e.g., Martin v. Holiday Inns, Inc.*, 199 Cal. App. 3d 1434, 1437 (Cal. Ct. App. 1988) ("The words 'other' or 'any other,' following an enumeration of particular classes, are therefore to be read as 'other such like,' and to include only others of like kind or character'" (citation omitted). In addition, this reading elides (twice) the word "including," which serves to emphasize that the clause in question is a subset of the main clause. *See SmartPay Leasing, Inc.*, 2017 WL 4390182, at *3 ("this clause is part of, and modifies, the section providing that customers agreed to arbitrate disputes *arising from the lease agreement.* The natural reading of the clause, therefore, is that it too applies to disputes arising from the lease agreement.") (emphasis in original). Finally, any ambiguity should be construed in Plaintiffs' favor, as "[t]he rule requiring the resolution of ambiguities against the drafting party 'applies with peculiar force in the case of a contract of adhesion.'" *See Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d

807, 819, n.16 (1981).

      **b.**    **Plaintiffs' Claims Do Not Allege Any Interdependent Misconduct Founded in or Intimately Connected with the Obligations Imposed by the Anchor Protocol Terms of Service**

The second *Goldman* circumstance is "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory **and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement**." *See Kramer*, 705 F.3d at 1128–29 (emphasis added).

While Plaintiffs allege plenty of interdependent misconduct between the TFL Defendants and Jump, none of Plaintiffs' allegations against Jump are "founded in or intimately connected with" the Anchor Protocol Terms of Service. Nor could they be. As explained above, Jump had nothing to do with the Anchor transaction at all, except in the highly general sense in which Jump conspired to make Plaintiffs buy UST out of the belief that UST was more stable and attractive than it was, and then, in a subsequent transaction governed by the Terms, that UST ended up in Anchor—but that appears to be Jump's best argument on the second *Goldman* circumstance. *See* Jump MTC at 14 ("Lead Plaintiff has filed alleged RICO and conspiracy claims, and he alleges concerted conduct by Defendants to induce market participants to want to purchase UST to deposit on the Anchor Protocol."). This is the sort of attenuated reasoning that courts have found to fall far short of both *Goldman* circumstances and, in fact, was rejected in *Kramer* itself. *See BMW of N. Am., LLC*, 23 F.4th at 949 ("BMW argues that if Ngo had not signed the purchase agreement with the dealership, she would not have been able to purchase her car; if she had not purchased her car, BMW would have issued no warranties; and if BMW had issued no warranties, Ngo could not bring statutory claims. But this 'attenuated chain of reasoning' has been rejected by California courts."); *Kramer*, 705 F.3d at 1130-31.

c.      **Jump's Attempt to Distinguish *Donovan v. Coinbase* is Unavailing**

Jump's attempt to distinguish *Donovan*, 2023 WL 2124776, at *5–6 fails. In *Donovan*, this Court denied a non-signatory's attempt to compel arbitration using equitable estoppel, noting "*Kramer* requires that there be clear and unmistakable evidence that a signatory agreed to arbitrate arbitrability with a nonsignatory." (citation omitted).

Jump argues that the arbitration agreement in *Donovan* contained narrow language limiting the definition of arbitrable disputes to disputes between the parties to the contract, while the language here is broader. Jump MTC at 10. This argument crumbles under scrutiny. Here is the language in *Donovan* that the Court deemed "clear-cut language showing an intent to arbitrate disputes between the signatories only":

> Subject to the terms of this Arbitration Agreement, **you and Coinbase** agree that any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any product sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, including claims and disputes that arose between us before the effective date of these Terms (each, a 'Dispute') will be resolved by binding arbitration, rather than in court ...."

*Donovan*, 2023 WL 2124776, at *6 (bold in original). The Court further explained that "[t]he bolded language indicates the arbitration obligation is binding between All Plaintiffs and **Coinbase**. The agreement does not state that the obligations and rights thereunder extend to a nonsignatory. At the very least, there is ambiguity as to whether All Plaintiffs agreed to arbitrate arbitrability with a nonsignatory." *Id.* (bold in original).

That language is functionally the same as the Terms' language here:

> If we aren't able to reach an informal resolution within sixty days of your email, **then you and we both agree to resolve the potential dispute according to the process set forth below.**
>
> **Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may**

11

**contend that we are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute**"), shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules").

Dkt. No. 122-1 at 11 (emphasis added).  The bolded language in the first paragraph makes it clear **who** the parties are that are agreeing to the arbitration clause. The bolded language in the second paragraph provides the definition of the disputes that they are agreeing to arbitrate. This is much like *Donovan* where – except for the final subset dealing with retroactivity (not present here) – the definition of "Dispute" was not limited to the parties and the limiting was done by the language identifying the parties to the agreement. The structure and language here are very similar. The result should be the same as well.

Finally, Jump suggests that the structure of the arbitration clause "evidences that the parties plainly contemplated that others, such as Jump Trading, might invoke the benefit of the arbitration clause of the contract." Jump MTC at 10. This is purportedly because, by including "disputes about acts or omissions for which [the user] may contend that [TFL is] liable," "the clause itself contemplates other users would be covered for disputes regarding the Interface or Agreement." Jump MTC at 10. Jump does not explain how anyone could read the above language and conclude that it "plainly contemplate[s]" third parties enforcing the arbitration clause. In any event, Jump's argument supports Plaintiffs' core contention that the Anchor arbitration clause is limited to claims regarding the Anchor Protocol Interface or the Anchor Terms of Service. Plaintiffs' claims are not so limited.

### 2.    A Stay Is Inappropriate

When a court compels arbitration only as to some claims or some defendants, the court also has discretion whether to stay the remaining case pending arbitration and would have to weigh the "competing interests which will be affected by the granting or refusal to grant a stay." *CMAX,*

*Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). These interests include: "[i] the possible damage which may result from the granting of a stay, [ii] the hardship or inequity which a party may suffer in being required to go forward, and [iii] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.* In the Ninth Circuit, "[t]he party who moves for a stay has the burden to 'make out a clear case of hardship or inequity in being required to go forward.'" *DeMartini v. Johns*, 693 F. App'x 534, 538 (9th Cir. 2017) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)). The Ninth Circuit has stated there is a preference for proceeding with non-arbitrable claims when feasible. *United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002). "A court should accordingly stay 'only when doing so would serve some legitimate interest of the parties or the court.'" *California Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024 (N.D. Cal. 2022) (citation omitted).

### a.   The Equities Weigh Strongly in Favor of Continuing with the Case

Should the Court compel arbitration solely as to the TFL Defendants but not Jump, the equities weigh strongly in favor of continuing with the case. First this case is – in the words of the SEC – "a multi-billion dollar crypto asset securities fraud." SAC ¶2. The Department of Justice agrees, because it charged Do Kwon with criminal securities fraud due to the same allegations in Plaintiffs' Complaint. Essentially all of the money invested in Terra Tokens – about $40 billion – is gone. *See* SAC ¶44. According to the publicly available news reports, Do Kwon is in a jail cell in Montenegro. The lion's share of TFL's assets were, presumably, in the form of Terra Tokens, which are now worthless. *See* SAC ¶161-62. Under these circumstances, it is unclear whether arbitration against the TFL Defendants is even possible.

Staying Plaintiffs' claims against Jump would prejudice Plaintiffs as it would delay their ability to conduct discovery and bring about efficient prosecution of their claims against Jump, from which Plaintiffs might be able to recover some of their losses. This hardship is particularly

1 acute with respect to investors who did not lend their UST to the Anchor Protocol and hence are

2 not even signatories to the arbitration clause in question. The risk that critical evidence could be

3 lost as time goes by is heightened here, due to the stunning collapse of TFL and the entire Terra

4 ecosystem.

5

6        Against all of this, Jump claims that it would face hardship if the Court compelled

7 arbitration of the federal securities claims but not the aiding and abetting or conspiracy claims,

8 forcing Jump to fight a "two-front war." *See* Jump MTC at 18. But that hardship would only apply

9 if the Court compels some of Plaintiffs' claims against Jump but not others and, in addition, is

10 undercut by Jump's arguments immediately above as to the purported speed and efficiency of

11 arbitrations in Singapore. *See id*. Jump's contentions fall far short of warranting a stay here,

12 especially because it is Jump's burden – not Plaintiffs' – to make a clear case for a discretionary

13 stay. *See DeMartini*, 693 F. App'x at 538.

14

15        **b.        Judicial Efficiency Weighs in Favor of Continuing with Case**

16        Jump's argument that judicial efficiency favors a stay is weak. Plaintiffs' Complaint

17 contains numerous statements from Jump's CEO, Kanav Kariya, that Plaintiffs allege to be

18 actionable misstatements. *See* SAC ¶¶131, 138, 139, 144, 250(f). It also alleges conduct by Jump

19 that Plaintiffs allege to be actionable manipulation. *See, e.g.*, ¶192. These statements and actions

20 will have to be adjudicated regardless of the outcome of any arbitration with the TFL Defendants,

21 so there is no judicial efficiency argument for delaying that adjudication. "[S]taying the non-

22 arbitrable claims would only serve to needlessly delay their resolution." *California Crane School,*

23 *Inc.*, 621 F. Supp. 3d at 1033–34; *Chen v. Bank of Am., N.A.*, 2020 WL 4561658, at *3 (C.D. Cal.

24 Mar. 31, 2020) ("given that the parties will need to litigate the non-arbitrable claims irrespective

25 of the arbitration outcome, proceeding with this litigation would not qualify as a waste of judicial

26

27

28                                                      14

resources").

Jump's nod to "non-mutual" or "defensive" collateral estoppel as a potential justification for a stay fares no better. The doctrine that Jump invokes would only be available when the issues are "identical." *See, e.g., Hirst v. State of Cal.*, 770 F.2d 776, 778 (9th Cir. 1985); *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034, 1039 (N.D. Cal. 1990); *Crafty Prods., Inc. v. Michaels Companies, Inc.*, 424 F. Supp. 3d 983, 989 (S.D. Cal. 2019) (no estoppel where the arbitrator had adjudicated a non-identical claim). Here, as mentioned, Jump's actions and the statements made by its CEO, Kanav Kariya, will still have to be adjudicated, so there is no good reason for a stay. *See Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 991 (N.D. Cal. 2016) (declining stay where defendant "has not presented the Court with any authority indicating that the decision of the arbitrators . . . would in some way bind the Court").

## II.      CONCLUSION

For the foregoing reasons, Jump's motion to compel arbitration or to stay the case pending resolution of arbitration should be denied.

DATED:  July 7, 2023                    **THE ROSEN LAW FIRM, P.A.**
                                        */s/ Laurence M. Rosen*
                                        Laurence M. Rosen, Esq. (SBN 219683)
                                        Pronouns: he/him/his
                                        355 South Grand Avenue, Suite 2450
                                        Los Angeles, CA 90071
                                        Telephone: (213) 785-2610
                                        Facsimile: (213) 226-4684
                                        Email: lrosen@rosenlegal.com

                                        and

                                        Jacob A. Goldberg (pro hac vice)
                                        Pronouns: he/him/his
                                        Michael Cohen
                                        275 Madison Avenue, 40th Floor
                                        New York, NY 10016
                                        Telephone: (212) 686-1060
                                        Facsimile: (212) 202-3827

1

Email: jgoldberg@rosenlegal.com
mcohen@rosenlegal.com

2

*Lead Counsel for Plaintiffs and the Putative Class*

3

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

4

John T. Jasnoch (CA 281605)

5

jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300

6

San Diego, CA 92101
Telephone: 619-233-4565

7

Facsimile: 619-236-0508

8

and

Sean T. Masson

9

The Helmsley Building
230 Park Avenue, 17th Floor

10

New York, NY 10169
Telephone: 212-223-6444

11

smasson@scott-scott.com

12

*Additional Counsel*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I, Laurence M. Rosen, hereby certify that on July 7, 2023, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Laurence M. Rosen*
Laurence M. Rosen

LEAD PLAINTIFF'S OPPOSITION TO JUMP TRADING LLC'S
MOTION TO COMPEL ARBITRATION