KOBRE & KIM LLP
Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Leif T. Simonson (admitted *pro hac vice*)
Tapan R. Oza (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
leif.simonson@kobrekim.com
tapan.oza@kobrekim.com

Daniel A. Zaheer (SBN 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel.: +1 415 582 4751
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NICK PATTERSON, Individually and On Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>vs.<br><br>TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFIANCE CAPITAL/DEFIANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS and DO KWON,<br><br>Defendants. | Case No. 3:22-cv-03600-TLT<br><br>**DEFENDANT JUMP TRADING, LLC'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO COMPEL ARBITRATION**<br><br>Honorable Trina L. Thompson<br>Hearing Date: September 19, 2023, 2:00pm |

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT........................................................................................................ 2

I.       **The Analysis Begins and Ends With the Delegation Clause.** ................................. 2

    A.    Under Supreme Court Precedent, the Existence of a Delegation Clause Requires Sending Plaintiff's Arbitrability Arguments to the Arbitrator. ............... 2

        1.   All of Plaintiff's Arguments About Arbitrability Must Go to the Arbitrator. ............................................................................................... 3

    B.    Whether Jump Trading Can Enforce the Arbitration Clause as a Nonsignatory Is Also a Question for the Arbitrator. ............................... 6

II.     **Even If the Court Were To Decide Whether Plaintiff's Claims Against Jump Trading Are Arbitrable, Plaintiff's Equitable Estoppel Analysis Is Wrong.** .................................................................................................... 9

    A.    The Federal Common Law of Arbitrability, Not California Law, Applies to Plaintiff's Claims. ................................................................................. 9

    B.    Under the Federal Common Law Test, Plaintiff Is Equitably Estopped From Resisting Arbitration With Jump Trading on His Claims............................ 10

    C.    Even if State Law Applies, Equitable Estoppel Requires Arbitration Because the Claims Are Founded in or Intimately Connected With the Underlying Agreement. ..........................................................................11

III.    **Plaintiff's Claims "Arise Out Of and Relate To" the Anchor TOS.** .................... 13

IV.    **A Stay of All Non-Arbitrable Claims Is Warranted.** ............................................. 14

CONCLUSION ................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barclay v. ICON Health & Fitness, Inc.*,
   2020 WL 6083704 (D. Minn. Oct. 15, 2020) ............................................................. 5

*BDK v. Escape Enterprises, Inc.*,
   106 F. App'x 535 (9th Cir. 2004) ........................................................................ 14

*Blanton v. Domino's Pizza Franchising LLC*,
   962 F.3d 842 (6th Cir. 2020) ............................................................................. 7

*Boatman v. Houzz, Inc.*,
   2022 WL 1528171 (N.D. Cal. Apr. 7, 2022) ........................................................... 3

*California Crane School, Inc. v. Google LLC*,
   621 F. Supp. 3d 1024 (N.D. Cal. 2022) ................................................................ 14

*Coinbase, Inc. v. Bielski*,
   143 S. Ct. 1915 (2023) ................................................................................... 15

*Congdon v. Uber Technologies, Inc.*,
   226 F. Supp. 3d 983 (N.D. Cal. 2016) ................................................................. 14

*De Angelis v. Icon Entertainment Group*,
   364 F. Supp. 3d 787 (S.D. Ohio 2019) ................................................................. 4

*Donovan v. Coinbase Global, Inc.*,
   --- F. Supp. 3d ---, 2023 WL 2124776 (N.D. Cal. Jan. 6, 2023) ......................... 2, 7, 8, 10, 15

*Evanston Insurance Co. v. Atain Specialty Insurance Co.*,
   254 F. Supp. 3d 1150 (N.D. Cal. 2017) ................................................................. 8

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019)............................................................................... passim

*Houtchens v. Google LLC*,
   --- F. Supp. 3d ---, 2023 WL 122393 (N.D. Cal. Jan. 6, 2023)........................................ 3

*In re Fortune Systems Securities Litigation*,

    680 F. Supp. 1360 (N.D. Cal. 1987) ........................................................................... 12

*In re Henson*,

    869 F.3d 1052 (9th Cir. 2017).......................................................................................... 10

*Installit, Inc. v. Carpenters 46 Northern California Counties Conference Board*,

    214 F. Supp. 3d 855 (N.D. Cal. 2016) ............................................................................ 13

*Isernia v. Danville Regional Medical Center, LLC*,

    2022 WL 4076113 (W.D. Va. Sept. 6, 2022) .................................................................... 6

*Jackson v. Amazon.com, Inc.*,

    65 F.4th 1093 (9th Cir. 2023)..................................................................................... 8, 13

*Kramer v. Toyota Motor Corp.*,

    705 F.3d 1122 (9th Cir. 2013) ........................................................................... 7, 8, 9, 11

*MHA, LLC v. Unitedhealth Group*,

    2017 WL 1095036 (D.N.J. Mar. 23, 2017) ...................................................................... 4

*Micheli & Shel, LLC v. Grubhub Inc.*,

    588 F. Supp. 3d 483 (S.D.N.Y. 2022) ............................................................................. 4

*MouseBelt Labs Pte. Ltd. v. Armstrong*,

    --- F. Supp. 3d ---, 2023 WL 3735997 (N.D. Cal. May 24, 2023)................................ 9, 10

*Mundi v. Union Security Life Insurance Co.*,

    555 F.3d 1042 (9th Cir. 2009)......................................................................................... 7

*Murphy v. DirecTV, Inc.*,

    724 F.3d 1218 (9th Cir. 2013) ....................................................................................... 10

*Ngo v. BMW of North America, LLC*,

    23 F.4th 942 (9th Cir. 2022).................................................................................... 8, 11

*Oldacre v. ECP-PF CT Operations*,

    --- F. Supp. 3d ---, 2023 WL 3451086 (W.D.N.Y. May 15, 2023)............................. 4, 5

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,

    2022 WL 2643936 (11th Cir. July 8, 2022) .................................................................. 10

*Parklane Hosiery Co. v. Shore*,

   439 U.S. 322 (1979) ........................................................................................ 14

*Rent-A-Center, West, Inc. v. Jackson*,

   561 U.S. 63 (2010) .......................................................................................... 8

*Royal Air Properties, Inc. v. Smith*,

   312 F.2d 210 (9th Cir. 1962) ......................................................................... 12

*Setty v. Shrinivas Sugandhalaya LLP*,

   3 F.4th 1166 (9th Cir. 2021) .......................................................................... 9

*Simula, Inc. v. Autoliv, Inc.*,

   175 F.3d 716 (9th Cir. 1999) ......................................................................... 13

*Sun v. Advance China Healthcare, Inc.*,

   901 F.3d 1081 (9th Cir. 2018) ....................................................................... 13

*Wanless v. Peloton Interactive, Inc.*,

   2023 WL 4086455 (E.D. Cal. June 20, 2023) ............................................... 4

MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO COMPEL ARBITRATION
CASE NUMBER: 3:22-CV-03600-TLT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiff's Opposition, ECF No. 131 ("Opp.") to Jump Trading, LLC's ("Jump Trading") Motion to Compel Arbitration, ECF No. 114 ("Motion" or "Mot."), errs in two fundamental ways. First, Plaintiff seeks to argue the merits of the scope of the arbitration clause. But, in light of the arbitration clause's delegation provision and Supreme Court precedent, it is the arbitrator rather than the Court who must decide the threshold question of whether the arbitration clause covers the claims at hand. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527–28 (2019). Therefore, this Court should refer to the arbitrator the question of whether Plaintiff's claims against Jump Trading are to be arbitrated. Second, glossing over that dispositive, antecedent issue, Plaintiff instead narrowly focuses on the equitable estoppel analysis under the wrong law. Plaintiff relies on California state law's "*Goldman*" factors, but it is federal common law, not California law, that controls.

For these reasons, Plaintiff is wrong in arguing that Jump Trading cannot compel him to arbitrate his claims because they are not sufficiently connected to the arbitration agreement in the Anchor Terms of Service ("Anchor TOS"). That is for the arbitrator to decide. In any event, Plaintiff's own Complaint, ECF No. 102 ("SAC"), belies his argument. While Plaintiff now attempts to distance himself from the Anchor Protocol to avoid arbitration, the SAC expressly alleges that the purported misconduct here "related to the Anchor Protocol." *See* SAC ¶ 26. Plaintiff's theory is that Defendants induced him and others to purchase UST based on the Anchor Protocol's supposed promise of a 20% return. Because Plaintiff used the Anchor Protocol and agreed to the Anchor TOS (which includes terms that undercut Plaintiff's allegations of fraud), the arbitration provision requires that all of Plaintiff's claims be conclusively resolved in arbitration because they "aris[e] out of or relat[e] to the Interface," the Anchor TOS, and other claims against TFL.

Moreover, Plaintiff's Opposition ignores and misconstrues Jump Trading's arguments.

*First,* to obfuscate the dispositive nature of the delegation clause, Plaintiff says virtually nothing about it—arguing only that "nowhere in Jump's avalanche of caselaw is even a case suggesting that the *Goldman* analysis is for an arbitrator." Opp. at 4. This is false. In fact, Jump

1

Trading cites multiple cases that explicitly state that the existence of a delegation clause means that an arbitrator, rather than the court, must decide whether a dispute with a nonsignatory is arbitrable.

*Second,* were the Court to consider the equitable estoppel analysis, Plaintiff ignores controlling Ninth Circuit precedent.  Contrary to Plaintiff's contentions, *federal* law, not *state* law, applies here.  The federal test sets forth two alternative circumstances in which a nonsignatory can equitably estop a signatory from avoiding arbitration.  One requires only that Plaintiff allege collusive misconduct between the nonsignatory and other signatories to the contract—and Plaintiff *concedes* that he has alleged such collusive misconduct.

*Third,* and finally, even if the Court were to refuse to compel arbitration, a stay—identical to the one entered by this Court for similar reasons in *Donovan v. Coinbase*—is warranted.  In fact, courts recognize that collateral estoppel is a valid basis on which to rely to narrow the issues or resolve non-arbitrable claims.  Thus, to preserve the resources of both the parties and the Court, a stay of non-arbitrable claims, if any, should be ordered.

## ARGUMENT

## I.     The Analysis Begins and Ends With the Delegation Clause.

### A.     Under Supreme Court Precedent, the Existence of a Delegation Clause Requires Sending Plaintiff's Arbitrability Arguments to the Arbitrator.

The presence of the delegation clause—i.e., the clause within the arbitration provision of the Anchor TOS that provides that disputes "as to arbitrability" must be arbitrated, Amani Decl. Ex. A § 18, ECF No. 116–1—means that the threshold question of whether Plaintiff's claims against Jump Trading must be arbitrated must be resolved by the arbitrator.  Plaintiff does not challenge the delegation clause.  In fact, Plaintiff *admits* (as he must) that the Anchor TOS contains a clear and unmistakable delegation clause.  *See* Pl.'s Omnibus Opp. to TFL Mots. Dismiss & Compel at 20, ECF No. 127 ("Opp. to TFL Mots.") (noting that the arbitration clause in the Anchor TOS "relegate[s] disputes about arbitrability to an arbitrator").  Under Supreme Court precedent, this is the end of the analysis.  Where, as here, a clear and unmistakable delegation clause exists, an arbitrator, rather than the court, must decide threshold questions of arbitrability, including

whether the parties have agreed to arbitrate and whether Plaintiff's claims fall within the arbitration provision's scope. *See Henry Schein*, 139 S. Ct. at 529 ("[W]e have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability *such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy*" (emphasis added) (cleaned up)).[1]

        1.    *All of Plaintiff's Arguments About Arbitrability Must Go to the Arbitrator.*

Plaintiff focuses solely on whether the arbitration clause in the Anchor TOS should be read to cover his claims against Jump Trading. Specifically, Plaintiff argues that (a) the clause is inapplicable to his claims against Jump Trading, (b) interpreting it otherwise would render it overbroad, and (c) the Anchor TOS only covers his later transaction to deposit UST in the Anchor Protocol rather than his decision to purchase UST. *See* Opp. at 1, 9. But courts have found each type of argument to be one of arbitrability that an arbitrator must decide if (as here) a valid delegation clause exists.

*First,* Plaintiff claims that "the arbitration clause in question is *inapplicable* to Plaintiff's claims against any of the Defendants" because his claims "do not arise out of or relate to" the Anchor TOS. *See, e.g.*, *id.* at 1–2 (emphasis added; cleaned up). But that is a quintessential arbitrability question (whether the clause covers the dispute), and where there is a delegation clause, courts routinely reject such arguments because they are for an arbitrator to decide. *See, e.g.*, *Houtchens v. Google LLC*, --- F. Supp. 3d ---, 2023 WL 122393, at *5 (N.D. Cal. Jan. 6, 2023) (finding Fitbit purchasers, who bought the product and afterwards agreed to an arbitration clause when setting up their Fitbit account, were compelled to make their claim that the agreement applied to "only information and software issues" to the arbitrator because the agreement contained a delegation clause); *Boatman v. Houzz, Inc.*, 2022 WL 1528171, at *4 (N.D. Cal. Apr. 7, 2022)

---

[1] In response to TFL's Motion to Compel Arbitration, Plaintiff attempts to evade application of the delegation clause by arguing that, to be delegated, "the case or controversy must arise out of or relate to the Protocol." Opp. to TFL Mots. at 20. That is wrong, because it is an argument about arbitrability. Making the "clear and unmistakable" interpretive rule regarding the clarity of the delegation mean "arise out of or relate to" would render the delegation clause meaningless and contravene clear Supreme Court case law as explained herein.

MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO COMPEL ARBITRATION
CASE NUMBER: 3:22-CV-03600-TLT

(whether a specific service offered by online platform was covered by Terms of Use could not be addressed by the Court because "the parties delegated questions of arbitrability to the arbitrator"); *see also Wanless v. Peloton Interactive, Inc.*, 2023 WL 4086455, at *1–2, *6 (E.D. Cal. June 20, 2023) (sending to arbitrator question whether products liability claim for cycling shoes that caused plaintiff's injury was covered by scope of arbitration clause in contract to create account on Peloton brand stationary bike even though plaintiff argued she agreed "only to arbitrate those claims that involved the use of services or content, not product liability claims").[2]

*Second,* Plaintiff's argument that interpreting the arbitration clause to cover his dispute with Jump Trading would render it "excessively broad and unnatural" is merely a restatement of his challenge to the arbitration clause's scope, which is a question of arbitrability that must go to an arbitrator.  *See* Opp. at 9 (citation omitted).  In fact, the Supreme Court has held that if the parties have delegated arbitrability questions to an arbitrator, "a court possesses no power to decide the arbitrability issue . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."  *Henry Schein*, 139 S. Ct. at 529; *see also MHA, LLC v. Unitedhealth Grp.*, 2017 WL 1095036, at *6 (D.N.J. Mar. 23, 2017) (argument that a result would be "absurd" was a question for the arbitrator because the argument "conflates *who* decides the question of arbitrability of [Plaintiff's] claims with whether its claims are arbitrable"). So too for arguments that an arbitration clause is unenforceable because it "constitutes an infinite arbitration clause."  *See Oldacre v. ECP-PF CT Operations*, --- F. Supp. 3d ---, 2023 WL 3451086, at *4 (W.D.N.Y. May 15, 2023) (holding that it is for the arbitrator to decide whether "no reasonable person would think that signing up for a gym membership would obligate them to

---

[2] *See also Micheli & Shel, LLC v. Grubhub Inc.*, 588 F. Supp. 3d 483, 490 (S.D.N.Y. 2022) ("Plaintiff's principal argument is that this dispute does not fall within the ambit of its arbitration agreements.  But whether its arguments on that score are valid is not for this Court to say because . . . the contract at issue plainly delegates the question of arbitrability to the arbitrator." (citation omitted)); *De Angelis v. Icon Ent. Grp.*, 364 F. Supp. 3d 787, 794 (S.D. Ohio 2019) ("[Plaintiff] has challenged the application of the arbitration agreement to her state constitutional claims, argued that the arbitration agreement makes her unable effectively to vindicate her rights, raised several challenges to the arbitration agreement based on contract law, and challenged the applicability of the arbitration agreement to nonsignatories.  These challenges pertain to the enforceability or validity of the arbitration agreement, and therefore . . . must be arbitrated.").

arbitrate claims . . . arising from their employment").  This is particularly so when plaintiff, as here, fails to challenge the delegation clause itself.  *Oldacre*, 2023 WL 3451086, at *4.

*Third,* even Plaintiff's iterative refrain (contrary to the allegations in the SAC) that the Anchor TOS do not apply to the purchase of Terra tokens because it is a "separate and distinct transaction" from his use of the Anchor Protocol, *see, e.g.*, Opp. at 1, ultimately is an argument for the arbitrator to resolve.  *Barclay v. ICON Health & Fitness, Inc.* considered a similar situation in which the plaintiffs bought a treadmill and later entered into an agreement to arbitrate disputes when they registered for a service that connected them with fitness coaches.  2020 WL 6083704, at *3 (D. Minn. Oct. 15, 2020).  The *Barclay* plaintiffs claimed that the treadmills did not have the advertised horsepower, *id.* at *2, and argued that "no reasonable consumer would interpret the . . . Terms to require arbitration of a dispute relating to a prior . . . treadmill purchase" and that a *prior* purchase could not be covered by a *subsequent* contract, *id.* at *14–15.  The *Barclay* court squarely rejected those arguments, explaining:

> Saying that no agreement to arbitrate exists because claims lack some relationship to, or some connection with, the agreement or contract . . . would impermissibly recast the "wholly groundless" exception rejected in *Henry Schein* as a question of contract formation.

*Id.* at *14 (cleaned up; citations omitted).  The court found the arbitrator had to resolve the plaintiffs' arguments that the contract could not cover their prior purchase and that no reasonable person would have understood it to do so in light of the delegation clause.  *Id.* at *14–15.

Plaintiff here alleges an even closer relationship than in *Barclay* between (i) his purchase of Terra tokens and (ii) his entry into the Anchor TOS and use of the Anchor Protocol.  Specifically, Plaintiff claims that he—and a large portion of the other proposed class members—purchased those tokens precisely because they were misled about the returns *on the Anchor Protocol*.  *See* Mot. at 3; SAC ¶¶ 6–7 (explaining the "promotions" of "outsized returns" were a "siren song" to investors).  By contrast, there is no suggestion in the *Barclay* opinion that plaintiffs there were misled about the fitness coaching service or that the existence of that service caused them to purchase the treadmills.  Nevertheless, the subsequent contract's delegation clause required the *Barclay* plaintiffs to go to an arbitrator to determine whether their claims that the treadmills did

5

not have the advertised horsepower were arbitrable. *See* 2020 WL 6083704, at *14–15. So too here.

In short, the Anchor TOS's delegation clause requires sending Plaintiff's arguments about the applicability of the arbitration clause to this dispute to the arbitrator.

**B.     Whether Jump Trading Can Enforce the Arbitration Clause as a Nonsignatory Is Also a Question for the Arbitrator.**

Plaintiff ignores the myriad cases cited in the Motion demonstrating that, where there is a delegation clause, the question of whether an arbitration clause covers a dispute with a nonsignatory must similarly be referred to the arbitrator. *See* Mot. at 6–9. Plaintiff claims that Jump Trading has offered no caselaw suggesting that the *Goldman* (i.e., equitable estoppel) analysis is for the arbitrator instead of the Court. *See* Opp. at 4. That is incorrect. *See* Mot. at 8–9 (citing, among numerous other cases, *Isernia v. Danville Reg'l Med. Ctr., LLC*, 2022 WL 4076113, at *5, *7 n.5 (W.D. Va. Sept. 6, 2022) (referring question about enforceability by nonsignatory, including equitable estoppel theory, to arbitrator)); *id.* at 9 n.7 (collecting cases).[3]

Plaintiff's Opposition only once mentions the term "delegate" (or any of its variants), and simply states that the Court should resolve the question of whether Jump Trading can enforce the arbitration provision as a nonsignatory because it is a decision "courts – not arbitrators – make all the time." Opp. at 4. But that is not true when there is a delegation clause; then, it is a decision for the arbitrator. *See* Mot. at 8–9 & n.7. Saying that a court can make that decision in the *absence* of a delegation provision hardly explains why the court has that similar power when there *is* a delegation clause.

In fact, the Supreme Court's ruling in *Henry Schein* forecloses any such argument. As the Court made clear: "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide

---

[3] To the extent Plaintiff is referring to California's specific version of equitable estoppel, it is inapplicable to the present dispute, which involves an international relationship governed by the New York Convention, as explained in the Motion and again below. Moreover, whether the state standard or federal standard applies, case law makes clear that where there is a delegation clause, issues of arbitrability are for the arbitrator to decide.

the arbitrability issue." *Henry Schein*, 139 S. Ct. at 529.  Courts after *Henry Schein* routinely hold that an arbitrator must resolve disputes about whether a nonsignatory can invoke an arbitration clause when the contract contains a delegation clause.  *See* Mot. at 8–9 & n.7 (collecting cases); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 851–52 (6th Cir. 2020).[4]

Plaintiff's reliance on *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), which was decided years before *Henry Schein*, is misplaced.  The court in *Kramer* undertook an analysis of the arbitration clause despite the existence of a valid delegation clause to determine whether it evidenced any intent to arbitrate disputes with nonsignatories.  *See id.* at 1127 (finding that the arbitration clause did not reflect an intent for disputes with nonsignatories to be arbitrated because "the *terms of the arbitration clauses* are expressly limited to Plaintiffs and the Dealerships." (emphasis added)).  *Kramer* even acknowledges that its analysis of whether the arbitration clause covers disputes with nonsignatories concerns the scope of the agreement, stating that the dispute with the nonsignatory "is simply *not within the scope of the arbitration agreement*."  *See id.* at 1128 (emphasis added) (citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009)).  But by analyzing the scope of the arbitration clause in the face of a delegation clause, the *Kramer* court did what *Henry Schein* now forbids.

Plaintiff also relies on this Court's decision in *Donovan v. Coinbase Global, Inc.*, but that case followed *Kramer's* logic and interpreted the scope of the arbitration clause to find that, because the clause clearly and expressly only required arbitration between the particular parties mentioned therein, the nonsignatory could not compel arbitration.  *See* --- F. Supp. 3d ---, 2023 WL 2124776, at *6–7 (N.D. Cal. Jan. 6, 2023).  Critically, however, the nonsignatory defendant in *Donovan* **nowhere argued** that the delegation provision required the arbitrator, rather than the Court, to decide whether the arbitration clause covered the dispute with a nonsignatory.  *See* GMO-

---

[4] In *Blanton,* a signatory to the agreement argued that allowing the arbitrator to decide whether a nonsignatory could enforce an arbitration clause could result in "*anyone*" forcing the signatory to arbitrate arbitrability.  962 F.3d at 851.  The Sixth Circuit rejected that argument, explaining that such concerns were "'overstate[d]' because arbitrators can quickly resolve frivolous motions and in some cases even impose sanctions for such motions."  *Id.* at 851–52 (alteration in original) (quoting *Henry Schein*, 139 S. Ct. at 531).

Z.com Trust Co. Mot. Compel Arbitration, *Donovan v. Coinbase Glob., Inc.*, No. 22-cv-02826-TLT (N.D. Cal. Jan 6, 2023), ECF No. 59 (not making this argument, and nowhere even citing *Henry Schein*). The fact that this Court in *Donovan* did not independently address whether *Henry Schein* required it to send to the arbitrator the question whether a nonsignatory could enforce the arbitration provision in no way detracts from the resolution required by *Henry Schein* here. *See Evanston Ins. Co. v. Atain Specialty Ins. Co.*, 254 F. Supp. 3d 1150, 1165 (N.D. Cal. 2017) (stating, "it is axiomatic that cases are not authority for propositions not considered").

Moreover, if courts had to analyze whether a delegation clause was clear and unmistakable as to specific disputes, such as with nonsignatories, it would undermine the parties' (clear and unmistakable) expectations that issues of scope were given to the arbitrator to decide. As the Supreme Court explained, the "clear and unmistakable" requirement is an "interpretative rule" that reflects "an assumption about the parties' expectations" that a court would decide gateway issues unless the parties state otherwise. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010). Here, the parties *did* state otherwise in clear and unmistakable terms, so the expectation of the contracting party (i.e., Plaintiff) is that an arbitrator would decide arbitrability (i.e., whether any of his claims are subject to the arbitration clause). There is no reason to delve further. And even if it were proper for the Court to consider the scope of the arbitration clause, the present case is materially different from *Donovan* (and *Kramer*) because the arbitration provision here is broader, for the reasons discussed in the Motion. *See* Mot. at 10.

Further, neither of the Ninth Circuit cases post-dating *Henry Schein* that Plaintiff cites— namely *Ngo v. BMW of North America, LLC* and *Jackson v. Amazon.com, Inc.*—help Plaintiff. *Ngo* did not concern a delegation provision at all, rendering its analysis inapposite. 23 F.4th 942 (9th Cir. 2022). Likewise, *Jackson* did not concern a delegation provision because the Ninth Circuit concluded that the applicable contract to which the parties agreed was a prior version that did not include a delegation provision (whereas a later, inapplicable version did include such a provision). 65 F.4th 1093, 1098 (9th Cir. 2023). Because the arbitration clauses at issue in *Ngo* and *Jackson* did not contain delegation provisions, it was appropriate, and consistent with *Henry*

*Schein*, for the Court itself to decide whether claims (against a nonsignatory in *Ngo*, and generally in *Jackson*) fell within the scope of the arbitration clause.  But that is not the case here.

In sum, when, as here, there is a delegation clause, the equitable estoppel issue must be resolved by the arbitrator.  To do otherwise would require the Court to resolve the scope of the clause, which the parties have delegated to the arbitrator.  Arbitration is accordingly compelled here.

## II.    Even If the Court Were To Decide Whether Plaintiff's Claims Against Jump Trading Are Arbitrable, Plaintiff's Equitable Estoppel Analysis Is Wrong.

### A.    The Federal Common Law of Arbitrability, Not California Law, Applies to Plaintiff's Claims.

As Jump Trading explained in the Motion, and as Plaintiff does not dispute, the arbitration clause in the Anchor TOS involves an international agreement governed by the New York Convention.  *See* Mot. at 12 n.9.  The Ninth Circuit has squarely held that in arbitration cases falling under the New York Convention and concerning federal claims, federal common law governs whether nonsignatories like Jump Trading may compel arbitration.  *See Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021).  Federal common law even applies to state law causes of action that implicate federal issues, such as where the arbitration agreement (as here) falls under the New York Convention.  *See MouseBelt Labs Pte. Ltd. v. Armstrong*, --- F. Supp. 3d ---, 2023 WL 3735997, at *5–7 (N.D. Cal. May 24, 2023).[5]

By contrast, Plaintiff's cases concerning nonsignatories all apply *state* law because they do not fall under the New York Convention.  *Kramer* explicitly states that it would "look to California contract law to determine whether [Defendant], as a nonsignatory, can compel arbitration."  705 F.3d at 1128.  But the plaintiffs in *Kramer* were U.S. purchasers who entered into contracts with their *local* dealerships.  *See id.* at 1124.  Likewise, *Ngo* applied state law under similar circumstances: where a U.S. purchaser had a contract from a local car dealership.  *See* 23 F.4th at

---

[5] *MouseBelt* was decided on May 24, 2023, and provides new authority that the Ninth Circuit's *Setty* decision applies "regardless of whether the claims to be arbitrated are state or federal."  *See* 2023 WL 3735997, at *6.

944–46.  *Donovan* also applied state law as the agreement there was between U.S. plaintiffs and a U.S. company (Coinbase).  *See* 2023 WL 2124776, at *6.  *Murphy v. DirecTV, Inc.* similarly involved a lawsuit by U.S. consumers against two U.S. corporations (BestBuy and DirecTV).  *See* 724 F.3d 1218, 1229 (9th Cir. 2013) ("We therefore examine the contract law of California").  And *In re Henson* also involved a suit by U.S. plaintiffs who contracted with a U.S. company (Verizon).  *See* 869 F.3d 1052, 1056, 1060 (9th Cir. 2017) ("We therefore look to California's equitable estoppel doctrine").  The governing law is different where, as here, an international party (TFL, a Singapore entity) is involved.  In such cases, the New York Convention, and therefore federal common law, apply.

**B.**     **Under the Federal Common Law Test, Plaintiff Is Equitably Estopped From Resisting Arbitration With Jump Trading on His Claims.**

The federal equitable estoppel test permits nonsignatories to compel arbitration if *either* (1) "the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory" *or* (2) "the signatory raises allegations of collusive misconduct between the nonsignatory and other signatories to the contract."  *See Outokumpu Stainless USA, LLC v. Coverteam SAS*, 2022 WL 2643936, at *7 (11th Cir. July 8, 2022) (Tjoflat, J., concurring) (internal quotation marks omitted); *accord MouseBelt Labs*, 2023 WL 3735997, at *9.  In other words, establishing either circumstance satisfies the federal standard for equitable estoppel.  Plaintiff does not dispute that this is the federal standard.

Here, there can be no real dispute that the second circumstance exists.  In fact, Plaintiff acknowledges that his claims allege interdependent and concerted conduct by Jump Trading alongside TFL, a signatory.  *See* Opp. at 10 ("Plaintiffs allege plenty of interdependent misconduct between the TFL Defendants and Jump"); *see also* Mot. at 3–5.  Because the second circumstance exists, the federal equitable estoppel test is satisfied.[6]  Thus, even on the merits, Jump Trading can invoke the arbitration clause pursuant to federal common law.

---

[6] Plaintiff spends a mere two paragraphs arguing that Jump Trading did not meet the collusive misconduct prong under *Goldman*, which is *state* law.  Opp. at 10.  Plaintiff's arguments about the state law equitable estoppel analysis are addressed in the alternative in the following section.

C.     **Even if State Law Applies, Equitable Estoppel Requires Arbitration Because the Claims Are Founded in or Intimately Connected With the Underlying Agreement.**

Even if California law were to apply (it does not), Jump Trading only needs to satisfy one of two circumstances to equitably estop Plaintiff from avoiding arbitration. *See Ngo*, 23 F.4th at 948–49 (explaining equitable estoppel under California law applies in two circumstances and analyzing each). Contrary to Plaintiff's argument, Jump Trading satisfies the second circumstance: that the allegations are of "substantially interdependent and concerted misconduct" with a signatory and those allegations "are founded in or intimately connected with the obligations of the underlying agreement." *See Ngo*, 23 F.4th at 949. As explained above, and as Plaintiff concedes, Plaintiff alleges concerted misconduct.[7] The second prong is also met here because the arbitrator would need to interpret the Anchor TOS to assess the veracity of Plaintiff's theory of fraud. For example, while Plaintiff claims the promised interest rate on the Anchor Protocol deposits drove interest in purchasing UST, *see* SAC ¶¶ 6–7, the Anchor TOS expressly states that the 20% rate on which Plaintiff allegedly relied "is not a promise" or "guarantee." *See* Mot. at 14–15.[8]

As detailed in the Motion, the Anchor Protocol and its returns are at the heart of Plaintiff's federal and state claims. *See id.* at 3 (referencing Plaintiff's allegations in the SAC about the Anchor Protocol and how it plays a central role in his claims and theory). Plaintiff cannot escape

---

[7] Because, as discussed above, the federal test applies, and that test does not impose the additional requirement that the allegations be "founded in or intimately connected with" the agreement, Plaintiff's concession should end the matter. In any event, the equitable estoppel standard makes more sense without requiring the second part of the test, as whether the allegations are "founded in or intimately connected with" the agreement containing the arbitration provision is just another way of raising whether the dispute is arbitrable. If claims against a nonsignatory involve collusion with a signatory, however, the arbitrator or court's decision that claims against the signatory are arbitrable also would determine whether the claims against the nonsignatory are arbitrable. In that instance, whether claims of collusive misconduct against the nonsignatory are arbitrable would properly rise and fall with the determination of the arbitrability of claims against the signatory.

[8] Plaintiff relies upon *Kramer* and *Ngo*, Opp. at 10, but neither case (unlike here) alleged collusion with a signatory. *Kramer* found no credible allegations of collusion. *See* 705 F.3d at 1133 ("We find unconvincing Toyota's claim that a pattern of denial or concealment by both Toyota and the dealers amounts to allegations of collusion or interdependent misconduct for purposes of equitable estoppel."). *Ngo* likewise found the plaintiff "did not allege any 'concerted misconduct' between the other signatory (the dealership) and either of the parties, so the second basis for equitable estoppel does not apply." 23 F.4th at 949.

MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO COMPEL ARBITRATION
CASE NUMBER: 3:22-CV-03600-TLT

his own allegations, including that over three quarters of the market capitalization of UST was invested in Anchor (i.e., using the Anchor Protocol). *See* SAC ¶ 7. Plaintiff says in his brief that Defendants made "Plaintiffs buy UST out of the belief that UST was more stable and attractive than it was, and then, in a subsequent transaction governed by the Terms, that UST ended up in Anchor." *See* Opp. at 10. But Plaintiff also expressly alleges in the SAC that Defendants made UST attractive by using the allure of "outsized returns" in the Anchor Protocol. SAC ¶ 7. In fact, by alleging that the statements about the Anchor Protocol are fraudulent misstatements on which he can pursue securities fraud claims, Plaintiff implicitly acknowledges that he purchased UST precisely because he claims to have relied on the promised returns of the Anchor Protocol.

In an attempt to minimize the significance of his own allegations, Plaintiff claims that because his purchase of UST was prior to his agreement to the Anchor TOS, the terms of the contract cannot be "relevant to [his] frame of mind when [he]" purchased UST. *See* Opp. at 8. Of course, Plaintiff offers no evidence of this timeline: it is entirely possible that his purchases were contemporaneous, or that he purchased more UST after he used the Anchor Protocol. But even if not, the fact remains that Plaintiff continued to hold UST after agreeing to the Anchor TOS (and its clear warning that the 20% return was not guaranteed, *see* Mot. at 15). As such, the contract provision containing that warning language is still highly relevant to assessing causation (i.e., if someone claims to buy in reliance on a supposed lie but then continues to hold on to the thing he purchased upon learning the truth, then that lie cannot be the proximate cause of later losses). *See Royal Air Props., Inc. v. Smith*, 312 F.2d 210, 213–14 (9th Cir. 1962) ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."); *see also In re Fortune Sys. Secs. Litig.*, 680 F. Supp. 1360, 1370–71 (N.D. Cal. 1987) (refusing to permit plaintiffs to recover damages after date they had "actual" or "reasonable" notice of fraud and noting, "[a] plaintiff . . . may not recover that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm." (internal quotation marks omitted)).

Therefore, even if state law applied, the equitable estoppel doctrine would still be satisfied.

III.     **Plaintiff's Claims "Arise Out Of and Relate To" the Anchor TOS.**

While Plaintiff appears to argue that his dispute with Jump Trading does not fall within the arbitration clause, *see, e.g.*, Opp. at 1, 8, the SAC says the opposite, *see* SAC ¶ 26 ("[T]he source of the alleged misconduct *related to the Anchor Protocol*, UST, and LUNA" (emphasis added)). Were this Court to also consider that issue (it should not, as it is delegated to the arbitrator as explained above), Plaintiff's claims are nevertheless arbitrable because they arise out of or relate to the Anchor TOS, which compels arbitration of any claims that even "touch matters" covered by the contract. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999); *see also Sun v. Advance China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) (explaining, in the analogous context of a forum selection clause covering disputes "arising out of related to" the agreement, that "[t]he dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract"). Plaintiff argues that because his claims concern the purchase of UST and not his deposit of UST in the Anchor Protocol, his claims are not subject to arbitration.

But the SAC belies Plaintiff's argument that his claims do not concern the Anchor TOS or that his entry into the Anchor TOS does not relate to his purchase of UST. As discussed above, the Anchor Protocol and its "outsized returns" feature prominently in the SAC as a primary factor that induced Plaintiff's purchase of UST. *See* SAC ¶¶ 6–7; *id.* at ¶ 163 (alleging the "20% yield" was meant to "increase investment"). And as explained in the Motion and above, the ultimate decision maker would have to interpret several provisions of the Anchor TOS to determine the validity of Plaintiff's claims, particularly concerning his reasonable reliance on allegedly fraudulent statements and causation. *See* Mot. at 16; *see also Installit, Inc. v. Carpenters 46 N. Cal. Cntys. Conf. Bd.*, 214 F. Supp. 3d 855, 864–65 (N.D. Cal. 2016) (arbitration warranted where defenses to statutory claim required interpreting provisions in agreement).

Plaintiff's citation to *Jackson v. Amazon.com, Inc.*, where contractors with Amazon sued it for spying and wiretapping their communications, does not help him establish that his claims are not related to the Anchor TOS. 65 F.4th 1093 (9th Cir. 2023). There, the Ninth Circuit found the claims were not covered by the arbitration clause because hypothetical plaintiffs who were *not* contractors, on whom Amazon could have also spied, could have brought the same claims and that

13

"[n]either Amazon's motive nor the violation of any provision of this contract would be an element of" the claims.  *Id.* at 1102–03.  But here, *Plaintiff's* motivation (and frame of mind) for buying UST and agreeing to the Anchor TOS is at issue.  Plaintiff's claims relate to the Anchor TOS precisely because he alleges that he was lured into buying UST by virtue of the Anchor Protocol and its returns, and the arbitrator will thus be required to interpret the Anchor TOS to determine whether he actually and reasonably relied on those promises.  *Cf. id.* at 1102 (noting a different case where the claims were arbitrable because the claims there would have required "interpreting the contract terms").  Thus, even under state law, arbitration is compelled.

## IV.    A Stay of All Non-Arbitrable Claims Is Warranted.

As Plaintiff acknowledges, a court should enter a stay "when doing so would serve some legitimate interest of the parties or the court."  *See* Opp. at 13 (citing *Cal. Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022)).  Here, the Court's legitimate interest is in the narrowing of issues presented for resolution and the potential that Plaintiff would be collaterally estopped on various issues.  *See BDK v. Escape Enters., Inc.*, 106 F. App'x 535, 537–38 (9th Cir. 2004) (applying collateral estoppel effect to franchisee's claims concerning one franchise location that both parties agreed were not submitted to arbitration concerning other franchise locations).  Plaintiff retorts that collateral estoppel would not apply because the issues are not "identical," *see* Opp. at 15, but he fails to explain how that is the case.

Even if Jump Trading had made different, actionable statements on which Plaintiff claims to rely for his securities claims, several underlying issues overlap, such as whether the underlying tokens are securities and what caused his losses.  The case Plaintiff cites simply states that the plaintiffs there had not demonstrated how the arbitral decision "would in some way bind the Court."  *See Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 991 (N.D. Cal. 2016).  But *Congdon* is distinguishable because the plaintiffs in court were different from those in arbitration, so collateral estoppel could not apply given that the doctrine does not preclude a claim by a plaintiff who was not in privity with the prior plaintiff against the same defendant.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to

14

be heard.").  But here the plaintiff who would be compelled to arbitrate against the signatory is the same one litigating in court against the nonsignatory, and therefore, collateral estoppel may apply.

In short, Plaintiff fails to articulate any reason why a stay would not be advantageous.  In fact, this Court previously issued a stay in a similar case to the one here: *Donovan*.  There, as here, Plaintiff brought claims against a signatory and a nonsignatory to an arbitration provision.  There, though this Court held that the nonsignatory could not invoke the arbitration provision given its express language, it nonetheless stayed the litigation against the nonsignatory pending the outcome of the arbitration involving the signatory.  *See Donovan*, 2023 WL 2124776, at *7.  At a minimum, the Court should follow the same path here, as a stay will allow the Court and the parties to, following the arbitration, narrow the potential issues for trial or even resolve the dispute.

There are substantial reasons to avoid simultaneous, overlapping adjudications in both arbitration and in court.  As the Supreme Court reiterated just last month, a stay of pending judicial proceedings secures the benefits of arbitration ("efficiency, less expense, less intrusive discovery and the like"), the avoidance of duplicative burden and expense, and mitigates the risk of the "potential for coercion . . . in class actions, where the possibility of colossal liability can lead to . . . blackmail settlements."  *Coinbase, Inc. v. Bielski*, 143 S. Ct. 1915, 1921 (2023) (internal quotation marks omitted) (requiring mandatory stays pending interlocutory appeals from denial of motions to compel arbitration).  Any adjudication by this Court involving Jump Trading can and should await the resolution of the arbitration in Singapore.  There is no need for simultaneous, overlapping, and potentially contradictory results.

## CONCLUSION

For the foregoing reasons, Jump Trading respectfully requests the Court compel Plaintiff to arbitrate this dispute in Singapore and dismiss this action.  If any non-arbitrable claims remain against it, Jump Trading respectfully requests the Court exercise its discretion to enter a stay.

Dated: August 2, 2023

Respectfully submitted,

KOBRE & KIM LLP

/s/ Jonathan D. Cogan

Jonathan D. Cogan (admitted *pro hac vice*)
Steven W. Perlstein (admitted *pro hac vice*)
Leif T. Simonson (admitted *pro hac vice*)
Tapan R. Oza (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Tel.: +1 212 488 1206
Fax: +1 212 488 1231
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
leif.simonson@kobrekim.com
tapan.oza@kobrekim.com

Daniel Zaheer (Bar ID 237118)
150 California Street, 19th Floor
San Francisco, California 94111
Tel.: +1 415 582 4751
Fax: +1 415 582 4811
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC*