```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   NICK PATTERSON, INDIVIDUALLY    )  CV-22-03600 PCP
     AND ON BEHALF OF ALL OTHERS     )
 6   SIMILARLY SITUATED,             )  SAN JOSE, CALIFORNIA
                                     )
 7                    PLAINTIFF,     )  OCTOBER 3, 2023
                                     )
 8              VS.                  )  PAGES 1-48
                                     )
 9   TERRAFORM LABS, PTE. LTD., JUMP )
     TRADING LLC, TRIBE CAPITAL      )
10   DEFINANCE CAPITAL/DEFINANCE     )
     TECHNOLOGIES OY, THREE ARROWS   )
11   CAPITAL PTE. LTD., NICHOLAS     )
     PLATIAS, AND DO KWON,           )
12                                   )
                     DEFENDANTS.     )
13   _____  )

14

15              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE P. CASEY PITTS
16              UNITED STATES DISTRICT JUDGE

17   A P P E A R A N C E S:

18   FOR THE PLAINTIFF:    THE ROSEN LAW FIRM, P.A.
                           BY:  JACOB A. GOLDBERG
19                         101 GREENWOOD AVENUE, SUITE 440
                           JENKINTOWN, PENNSYLVANIA  19046
20
```

21            APPEARANCES CONTINUED ON THE NEXT PAGE

```
22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1

2      APPEARANCES (CONTINUED)

3

4      FOR THE PLAINTIFF:      SCOTT + SCOTT
                              BY:  JOHN T. JASNOCH
5                              600 WEST BROADWAY, SUITE 3300
                              SAN DIEGO, CALIFORNIA  92101
6

7      FOR THE DEFENDANT:      KOBRE & KIM
                              BY:  JONATHAN D. COGAN
8                                   STEVEN W. PERLSTEIN
                              800 THIRD AVENUE
9                              NEW YORK, NEW YORK  10022

10

11     ALSO PRESENT:          MATTHEW HINERFELD

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1       SAN JOSE, CALIFORNIA                    OCTOBER 3, 2023

 2                        P R O C E E D I N G S

 3          (COURT CONVENED AT 10:32 A.M.)

 4             THE CLERK:  ALL RIGHT.  CALLING CASE NUMBER

 5     22-CV-03600, PATTERSON VERSUS TERRAFORM LABS, MOTION TO COMPEL

 6     ARBITRATION, MOTION TO DISMISS SECOND AMENDED COMPLAINT.

 7             WILL THE PARTIES PLEASE APPROACH AND STATE YOUR

 8     APPEARANCES FOR THE RECORD, BEGINNING WITH PLAINTIFF'S COUNSEL.

 9             MR. GOLDBERG:  GOOD MORNING, YOUR HONOR.

10         ON BEHALF OF MSSRS. TOBIAS AND PATTERSON, JACOB GOLDBERG

11     OF ROSEN LAW FIRM, AND WITH ME IS MY FRIEND AND COLLEAGUE,

12     JONATHAN JASNOCH OF THE SCOTT + SCOTT FIRM.

13             THE COURT:  GOOD MORNING.

14             MR. JASNOCH:  JUST JOHN.

15             MR. COGAN:  GOOD MORNING, YOUR HONOR.

16         JON COGAN FROM KOBRE & KIM ON BEHALF OF JUMP TRADING.

17     WITH ME TODAY IS MY COLLEAGUE, STEVE PERLSTEIN.

18         AND THEN ALSO IN COURT TODAY IS MATTHEW HINERFELD, THE

19     GENERAL COUNSEL OF JUMP TRADING.

20             THE COURT:  GOOD MORNING.

21             MR. COGAN:  SORRY.  BEFORE WE START, JUST A

22     LOGISTICAL QUESTION.  WE HAD SOME SLIDES THAT WE WERE HOPING TO

23     BE ABLE TO GO THROUGH WHENEVER THE COURT THINKS IT'S

24     APPROPRIATE.  CAN I JUST HAVE SOMEONE COME SET UP THE

25     ELECTRONIC HOOKUP?
```

1                    THE COURT:  SURE.

2              (PAUSE IN PROCEEDINGS.)

3                    THE COURT:  THIS IS DEFENDANTS' MOTION, THE REMAINING

4        DEFENDANTS' MOTION, SO I'LL START WITH DEFENDANTS' COUNSEL.

5                    MR. COGAN:  YOUR HONOR, SHOULD I ADDRESS THE COURT

6        FROM THE PODIUM?

7                    THE COURT:  PLEASE.

8                    MR. COGAN:  OKAY.

9          SO, YOUR HONOR, AS YOUR HONOR KNOWS, THERE ARE TWO MOTIONS

10       BEFORE THE COURT, BOTH A MOTION TO COMPEL ARBITRATION, AND A

11       MOTION TO DISMISS.

12         I WOULD PROPOSE, IF THE COURT IS OKAY WITH IT, THAT WE

13       START WITH THE MOTION TO COMPEL ARBITRATION SINCE,

14       ANALYTICALLY, IF THE COURT WERE TO COMPEL ARBITRATION, IT WOULD

15       AT LEAST RENDER MOOT FOR NOW THE DECISION ON THE MOTION TO

16       DISMISS.

17                   THE COURT:  THAT MAKES SENSE, I THINK.  YOUR POSITION

18        IS I SHOULDN'T BE THINKING ABOUT THE MERITS IN ANY WAY, SHAPE,

19        OR FORM.

20                   MR. COGAN:  THAT IS OUR FIRST POSITION.

21         COULD WE JUST ADVANCE TO -- AND CAN EVERYONE SEE THE

22       SLIDES ON THE SCREEN?  OKAY.  WONDERFUL.

23         SO, YOUR HONOR, AS IT RELATES TO THE MOTION TO COMPEL

24       ARBITRATION, IN OUR VIEW, THERE IS A, A VERY NARROW THRESHOLD

25       ISSUE THAT THE COURT CAN RESOLVE TO RESOLVE THE ENTIRE MOTION,

1    AT LEAST AT THIS STAGE.

2         OBVIOUSLY AT THIS STAGE, WE'RE NOT ASKING THE COURT TO

3    ADDRESS THE MERITS OF THE DISPUTE, AND IN FACT, ON THE MOTION

4    TO COMPEL, WE'RE NOT EVEN ASKING THE COURT IN THE FIRST

5    INSTANCE TO DECIDE WHETHER OR NOT THE MERITS OF THE DISPUTE

6    SHOULD BE ARBITRATED.

7         ALL WE'RE ASKING THE COURT TO DECIDE, AT LEAST AS AN

8    INITIAL MATTER, IS WHETHER AN ARBITRATOR OR THE COURT SHOULD

9    DECIDE WHETHER THE MERITS SHOULD BE ARBITRATED.

10         AND THE ANSWER TO THAT QUESTION IS THAT IN A SITUATION

11    LIKE THIS WHERE THE ARBITRATION AGREEMENT IN QUESTION CONTAINS

12    WITHIN IT A CLEAR AND UNMISTAKABLE DELEGATION CLAUSE, THE

13    ARBITRATOR AND NOT THE COURT SHOULD DECIDE ALL FURTHER

14    QUESTIONS AS TO WHETHER OR NOT A PARTICULAR DISPUTE FALLS

15    WITHIN THE SCOPE OF THE ARBITRATION CLAUSE AND, FOR EXAMPLE,

16    WHETHER OR NOT, AS A NON-SIGNATORY TO THE CONTRACT AT ISSUE,

17    JUMP TRADING IS ALLOWED TO ENFORCE THE AGREEMENT.

18         THE COURT:  THAT'S THE CORE ISSUE, ISN'T IT?  YOU'D

19    BE IN A STRONG POSITION HERE IF, IN FACT, THERE WAS AN

20    ARBITRATION AGREEMENT THAT YOU HAD WITH MR. PATTERSON IN THIS

21    CASE AND YOU WERE SEEKING -- AND, YOU KNOW, YOU HAD AN

22    ARBITRATION AGREEMENT THAT AT LEAST ARGUABLY DELEGATED

23    QUESTIONS OF ARBITRABILITY TO THE ARBITRATOR.

24         NOW, YOU'RE A THIRD PARTY TO THAT AGREEMENT HERE, AND

25    THAT'S A DIFFERENT CASE, AND I HAVE TROUBLE DISTINGUISHING THIS

1    CASE FROM THE NINTH CIRCUIT'S DECISION IN <u>KRAMER</u>, YOU KNOW.  AS

2    YOU KNOW, THE NINTH CIRCUIT RELIED SIGNIFICANTLY IN THAT CASE

3    ON THE FACT THAT THE AGREEMENT SAID IT WAS BETWEEN YOU AND WE,

4    WE AND YOU OR SOMETHING.

5           MR. COGAN:  SURE.

6           THE COURT:  AND AS THE SLIDE YOU HAVE UP

7    DEMONSTRATES, YOU KNOW, THE SENTENCE IMMEDIATELY BEFORE THE

8    HIGHLIGHTED LANGUAGE HAS THAT EXACT SAME PHRASE, YOU AND WE

9    AGREE TO THIS ARBITRATION.

10       SO I THINK -- I'M HAVING TROUBLE SEEING CLEAR AND

11   UNMISTAKABLE EVIDENCE THAT MR. PATTERSON AGREED TO HAVE THE

12   ARBITRATOR DECIDE WHETHER HE HAS TO ARBITRATE WITH YOU.

13          MR. COGAN:  YEAH.  SO I THINK THAT THE ANSWER TO THAT

14   QUESTION, YOUR HONOR, IS THAT AS A RESULT OF THE SUPREME

15   COURT'S DECISION SEVERAL YEARS AGO IN THE <u>HENRY SCHEIN</u> CASE --

16          THE COURT:  BUT THAT WAS A CASE BETWEEN THE PARTIES

17   TO AN ARBITRATION AGREEMENT.

18          MR. COGAN:  SO IT ACTUALLY WASN'T.  I APPRECIATE,

19   YOUR HONOR, THAT THE COURT'S DECISION, WHICH I'LL ADDRESS IN A

20   SECOND, DID NOT TURN ON THIS NON-SIGNATORY VERSUS SIGNATORY

21   QUESTION.

22       BUT HENRY SCHEIN WAS A NON-SIGNATORY TO THE ARBITRATION

23   AGREEMENT AT ISSUE IN THAT CASE.  AND IT SOUNDS LIKE YOUR HONOR

24   IS FAMILIAR WITH IT, BUT JUST TO SET IT UP FOR A SECOND --

25          THE COURT:  ALTHOUGH, IF THE -- THE ISSUE IN THE CASE

```
 1        WAS A CLAIM ARISING UNDER THE CONTRACT AT ISSUE?

 2                 MR. COGAN:  I'M SORRY, YOUR HONOR?

 3                 THE COURT:  WHAT WAS THE ISSUE IN THE CASE IN SCHEIN?

 4                 MR. COGAN:  SO HERE'S THE ISSUE OF THE CASE:  THERE

 5        WAS A DENTAL EQUIPMENT DISTRIBUTOR WHO SUED AN EQUIPMENT

 6        MANUFACTURER, AND OTHERS, INCLUDING HENRY SCHEIN AND COMPANY,

 7        SEEKING, AMONG OTHER THINGS, INJUNCTIVE RELIEF FOR, LIKE, AN

 8        ANTITRUST VIOLATION.

 9                 THE COURT:  UM-HUM.

10                 MR. COGAN:  AND SCHEIN, WHO WAS A NON-PARTY TO THE

11        AGREEMENT AT ISSUE, MOVED TO COMPEL ARBITRATION, AND WHAT THE

12        DENTAL EQUIPMENT DISTRIBUTOR SAID IN RESPONSE, IN OPPOSING THE

13        MOTION TO COMPEL ARBITRATION, WAS, HOLD ON A SECOND, THE

14        AGREEMENT AT ISSUE IN THIS CASE CARVES OUT FROM ARBITRATION

15        REQUESTS FOR INJUNCTIVE RELIEF, AND SO WHAT THE COURT SHOULD

16        DO, ARGUED THE DENTAL EQUIPMENT DISTRIBUTOR, IS JUST SAY THE

17        CLAIM THAT THIS DISPUTE SHOULD BE ARBITRATED IS WHOLLY

18        GROUNDLESS, AND THERE WAS A WHOLE -- I GUESS THERE IS A WHOLE

19        LINE OF AUTHORITY THAT SAID THE COURTS, IF THEY THINK THAT A

20        CLAIM FOR ARBITRATION IS WHOLLY GROUNDLESS, THEY DON'T HAVE TO

21        KICK IT TO THE ARBITRATOR, EVEN WHEN THERE'S A DELEGATION

22        CLAUSE, THEY CAN JUST DECIDE IT IN THE FIRST INSTANCE.

23                 THE COURT:  OKAY.

24                 MR. COGAN:  AND IT WAS IN THAT CONTEXT THAT THE

25        SUPREME COURT RULED THE WAY IT DID.
```

1          THE COURT:  SO THEY WERE -- AS YOU SAY, THEY WEREN'T

2     CONSIDERING THE QUESTION WE HAVE HERE.

3          MR. COGAN:  THAT'S ABSOLUTELY CORRECT, YOUR HONOR --

4          THE COURT:  OKAY.

5          MR. COGAN:  -- THEY WEREN'T CONSIDERING THE QUESTION

6     THAT WE HAVE HERE.

7          THE COURT:  SO I DO THINK THERE MIGHT BE SOME

8     TENSION, BUT MY UNDERSTANDING OF THE RULES THAT -- I HAVE TO

9     FOLLOW THE NINTH CIRCUIT'S PRECEDENCE UNLESS AND UNTIL --

10    UNLESS THEY'RE SQUARELY CONFLICTING WITH SUPREME COURT

11    AUTHORITY.  SO I THINK I'M WITHOUT THE POWER TO SAY KRAMER IS

12    NO LONGER GOOD LAW.  THAT'S NOT SOMETHING I CAN DO AS A

13    DISTRICT COURT JUDGE.

14         MR. COGAN:  SO I THINK, YOUR HONOR, A COUPLE THINGS.

15        ONE, IN OUR VIEW -- AND I THINK SOME OTHER COURTS HAVE

16    SUGGESTED THAT THE HENRY SCHEIN DECISION CLARIFIES WHAT IS

17    SUPPOSED TO HAPPEN IN A SITUATION WHERE THERE IS A CLEAR AND

18    UNMISTAKABLE DELEGATION CLAUSE, LAYING ASIDE THE QUESTION OF

19    WHETHER THE DELEGATION CLAUSE SPEAKS CLEARLY AND UNMISTAKABLY

20    ABOUT WHAT TO DO WITH THIRD PARTIES, AND WHAT THOSE COURTS HAVE

21    FOUND IS THAT IN THAT SITUATION, THE COURT IS, IN THE FIRST

22    INSTANCE, JUST SUPPOSED TO SEND IT TO THE ARBITRATOR TO DECIDE

23    THAT ISSUE.

24         THE COURT:  SO MR. PATTERSON'S LANDLORD WALKS INTO

25    THE COURTROOM AND DEMANDS TO ARBITRATE UNDER HIS, UNDER

1      MR. PATTERSON'S AGREEMENT WITH TFL, I HAVE TO SEND THAT CASE TO

2      THE ARBITRATOR IN THE FIRST INSTANCE UNDER YOUR THEORY?

3           MR. COGAN:  SO THAT WAS THE WHOLLY GROUNDLESS

4      EXCEPTION.

5           THE COURT:  WELL, THE WHOLLY GROUNDLESS WAS THAT IT

6      WAS ANALYZING THE SCOPE OF THE ARBITRATION AGREEMENT, WHETHER

7      THE CLAIMS FELL WITHIN THAT.

8      IT WAS NOT -- I DON'T KNOW -- THAT WAS THE ISSUE IN

9      HENRY SCHEIN.  CAN YOU CONCLUDE THAT THE ISSUE SO SQUARELY

10     FALLS OUTSIDE THE ARBITRATION AGREEMENT THAT YOU'RE NOT GOING

11     TO ENFORCE?  IT'S NOT THE SEPARATE QUESTION.  WE'RE STEPPING

12     BACK, WE NEED -- THERE NEEDS TO BE, IN THIS AGREEMENT, AN

13     AGREEMENT TO ARBITRATE THE DISPUTE WITH YOU, RIGHT?  WE ALWAYS

14     NEED THAT.  IT'S A CONTRACT.  ARBITRATION IS A FEATURE OF

15     CONTRACT, SO IF WE DON'T HAVE THAT, THERE'S NO OBLIGATION TO

16     ARBITRATE.

17     NOW, IN THIS CASE OBVIOUSLY THERE WAS AN AGREEMENT TO

18     ARBITRATE.  THE CLAIM WAS THAT THERE HADN'T BEEN AN AGREEMENT

19     TO ARBITRATE THAT PARTICULAR ISSUE, AND THE COURT SAID THAT

20     DOESN'T MATTER, YOU'VE AGREED TO ARBITRATE GENERALLY.

21     I'M JUST NOT SURE IT GOES -- THE THEORY HERE IS NOT ONLY

22     THAT THE IDEA WOULD BE WHOLLY GROUNDLESS, THE IDEA IS THAT

23     THERE'S NEVER BEEN AN AGREEMENT TO ARBITRATE WITH YOU,

24     ARBITRABILITY QUESTIONS WITH YOU.

25           MR. COGAN:  I COMPLETELY UNDERSTAND THE ISSUE AND I

1      SEE WHY THERE IS -- WHY IF YOUR HONOR LOOKS AT THE KRAMER

2      DECISION, THAT IS A WAY THAT YOU COULD ANALYZE THE ISSUE.

3           THE QUESTION REALLY IS WHETHER HENRY SCHEIN REQUIRES A

4      COURT TO LOOK JUST AT THE QUESTION OF, IS THERE -- IS THERE AN

5      AGREEMENT BETWEEN THE PARTIES TO THE CONTRACT THERE?  I THINK

6      THERE IS INDISPUTABLY A BINDING AGREEMENT BETWEEN THE PARTIES.

7           AND IF SO, DOES IT CONTAIN A CLEAR AND UNMISTAKABLE

8      DELEGATION CLAUSE?

9           AND THEN THE NEXT QUESTION, WHICH IS THE ONE THAT YOUR

10     HONOR IS WRESTLING WITH, I THINK, RIGHT NOW IS, BUT DOES THAT

11     CLEAR AND UNMISTAKABLE DELEGATION CLAUSE CLEARLY AND

12     UNMISTAKABLY DELEGATE DISPUTES BETWEEN THE SIGNATORY AND A

13     NON-SIGNATORY?

14          AND I THINK, YOUR HONOR, THAT HENRY SCHEIN SAYS ONCE YOU

15     DETERMINE THAT THERE'S A CLEAR AND UNMISTAKABLE DELEGATION

16     CLAUSE, YOU SHOULD LOOK NO FURTHER AND COURTS DON'T HAVE THE

17     POWER AT THAT POINT TO DETERMINE QUESTIONS LIKE WHO CAN ENFORCE

18     THE ARBITRATION CLAUSE?  CAN A NON-SIGNATORY DO IT, OR NOT?

19          AND THEN I THINK REALLY THE, THE OVERWHELMING TREND IN THE

20     CASE LAW -- AND WE'VE SUBMITTED A LOT OF CASES TO YOUR HONOR,

21     SO I'M SENSITIVE TO THE FACT THAT A LOT OF COURT CASES HAVE

22     BEEN PUT BEFORE YOUR HONOR -- BUT THE OVERWHELMING TREND IN THE

23     CASE LAW, PARTICULARLY POST-HENRY SCHEIN, IS TO SAY THAT THAT

24     QUESTION, CAN THE NON-PARTY ENFORCE THE ARBITRATION CLAUSE OR

25     IS IT REALLY JUST SOMETHING THAT ONLY THE SIGNATORIES TO THE

1    AGREEMENT CAN ENFORCE, IS A QUESTION THAT GETS DELEGATED TO THE

2    ARBITRATOR IN THE FIRST INSTANCE.

3         STEVE, IF YOU DON'T MIND?

4         I JUST PUT TOGETHER A SLIDE HERE.  THE TOP TWO CASES I

5    DON'T EVEN KNOW THAT, YOUR HONOR, ARE CONTAINED IN OUR BRIEFING

6    BECAUSE THEY WERE FROM THIS SUMMER.  BUT THEY ALL STAND FOR THE

7    GENERAL PROPOSITION THAT THIS QUESTION WHETHER OR NOT A

8    NON-PARTY CAN ENFORCE A DELEGATION CLAUSE BETWEEN TWO PARTIES

9    IS A QUESTION FOR THE ARBITRATOR TO DECIDE BECAUSE IT ALL GOES

10   TO THE QUESTION OF THE ENFORCEABILITY OF THE ARBITRATION

11   AGREEMENT.

12        THE COURT:  RIGHT.  ALTHOUGH OBVIOUSLY NONE OF THESE

13    ARE IN THE NINTH CIRCUIT AND THEY'RE NOT SUBJECT TO KRAMER.

14        MR. COGAN:  THEY'RE NOT THE NINTH CIRCUIT, THEY'RE

15    NOT SUBJECT TO KRAMER.

16    SO THE QUESTION IS -- AND, YOUR HONOR, I TAKE YOUR CONCERN

17   AND YOUR RESISTANCE TO THE POINT THAT I'M MAKING THAT

18   HENRY SCHEIN I THINK ABROGATES THE PART OF THE KRAMER DECISION

19   THAT SAYS THAT COURTS ARE SUPPOSED TO, AS SOON AS THEY

20   DETERMINE A CLEAR AND UNMISTAKABLE DELEGATION CLAUSE EXISTS,

21   KICK IT OVER TO ARBITRATION.

22        I GUESS THE ONLY OTHER --

23        THE COURT:  SO I JUST -- THE LANDLORD DOES GET TO

24    COMPEL ARBITRATION IN THE FIRST INSTANCE?  IS THAT RIGHT?

25        MR. COGAN:  YOUR HONOR, I WILL SAY, JUST TAKING A

1    STEP BACK, WHEN I FIRST STARTED STUDYING THIS SEVERAL MONTHS

2    AGO WHEN WE WERE PREPARING THE BRIEFS, I HAD THE SAME

3    QUESTION -- MAYBE I DIDN'T SAY LANDLORD -- BUT I HAD THE SAME

4    QUESTION, WHICH IS, WELL, THAT COULD LEAD TO ABSURD RESULTS.

5        AND THE COURTS SAY THAT IT'S OKAY, IN FACT, I THINK

6    HENRY SCHEIN EVEN SAYS IT'S OKAY, ARBITRATION HAS A WAY TO DEAL

7    WITH FRIVOLOUS CLAIMS, AND SO YOU SHOULDN'T WORRY ABOUT --

8        THE COURT:  BUT WE'RE CERTAINLY MOVING WELL BEYOND

9    THE WORLD OF CONTRACT ENFORCEMENT IF THE THEORY IS THAT IF

10   SOMEONE SIGNS AN ARBITRATION -- YOU KNOW, WHEN I REGISTER FOR

11   SOFTWARE AND I CLICK THE TERMS OF SERVICE AND THAT HAS AN

12   ARBITRATION AGREEMENT THAT INCLUDES, THAT DELEGATES THE

13   ARBITRABILITY TO THE ARBITRATOR, THAT NOW THE WORLD CAN INVOKE

14   THAT ARBITRATION AGREEMENT IF IT WANTS TO AND THAT WE'RE GOING

15   TO LET -- WE'RE GOING TO HOPE THAT THE ARBITRATORS DO THEIR JOB

16   IN LOOKING AT THOSE CLAIMS.

17       MR. COGAN:  I THINK THAT'S RIGHT.

18       AND JUST TO MAKE THE POINT IS THE REASON WHY COURTS THAT

19   HAVE SAID THAT THAT IS THE WAY THE LAW WORK S ARE COMFORTABLE

20   WITH IT IS BECAUSE THEY SAY ARBITRATORS CAN MAKE THOSE

21   DETERMINATIONS JUST AS WELL AS COURTS CAN.

22       THERE IS A --

23       THE COURT:  RIGHT.  BUT THE -- WE HAVE TO -- THIS IS

24   ABOUT -- AGAIN, THIS IS CONTRACT ENFORCEMENT AND, YOU KNOW, WE

25   SEEM -- MAYBE THE THEORY IS WE'VE GONE SO FAR BEYOND ENFORCING

1    REASONABLE EXPECTATIONS OF THE CONTRACTING PARTIES THAT IT

2    DOESN'T MATTER.

3         BUT IT'S HARD TO THINK -- FOR ME TO BELIEVE THAT ANYONE

4    HAS A REASONABLE EXPECTATION WHEN THEY'RE CLICKING A CLICKWRAP

5    AGREEMENT, FOR EXAMPLE, THAT THEY'RE ALLOWING THEIR LANDLORD TO

6    INVOKE THAT ARBITRATION.

7              MR. COGAN:  SURE.  SO CLEARLY IN THAT TYPE OF EXTREME

8    EXAMPLE, I THINK THE WAY COURTS WOULD ADDRESS IT IS TO SAY THAT

9    THAT'S A FRIVOLOUS CLAIM BY THE LANDLORD AND THE ARBITRATOR

10   WILL DEAL WITH THE FRIVOLOUS CLAIM.

11        I WILL SAY HERE -- AND THEN, YOUR HONOR, I'LL MOVE ON TO

12   THE OTHER MOTION -- THAT THE ARBITRATION CLAUSE HERE, WHILE

13   YOU'RE RIGHT, THE SENTENCE PRECEDING THE PIECE THAT WAS

14   HIGHLIGHTED IN THE SLIDE -- STEVE, IF YOU DON'T MIND SLIDING

15   BACK -- REFERS TO YOU OR WE, WE MAKE THIS POINT IN OUR PAPERS,

16   BUT JUST TO MAKE IT AGAIN, IT DOES, I THINK, CONTEMPLATE

17   DISPUTES BEYOND JUST YOU OR WE.

18        AND THE REASON I SAY THAT IS BECAUSE, JUST TO DIRECT YOUR

19   COURT -- YOUR HONOR TO WHERE I'M FOCUSSED, THE HIGHLIGHTED

20   LANGUAGE IN THE MIDDLE OF THE PAGE, IF IT WAS THE CASE THAT IT

21   WAS ONLY DISPUTES BETWEEN YOU OR WE, MEANING ONLY DISPUTES

22   BETWEEN THE SIGNATORIES, THAT THIS ARBITRATION PROVISION SAID

23   SHOULD BE SENT TO ARBITRATION, THEN THE FIRST PARTS OF THE

24   PROVISION WOULD BE, IN OUR VIEW, SUPERFLUOUS BECAUSE THE ANY --

25   THE LANGUAGE THAT SAYS "ANY OTHER ACTS OR OMISSIONS FOR WHICH

1   YOU MAY CONTEND THAT WE ARE LIABLE" WOULD CAPTURE THE DISPUTES

2   THAT ARE DESCRIBED IN THE FIRST PART.

3          THE COURT:  I THINK YOU WOULD HAVE A STRONGER

4   ARGUMENT IF IT SAID "ANY ACTS OR OMISSIONS FOR WHICH YOU

5   CONTEND WE ARE LIABLE."  IT SAYS "ANY OTHER," WHICH IS

6   PRESUMING -- AT LEAST CAN BE READ TO INCORPORATE THAT THE FIRST

7   COUPLE OF EXAMPLES ARE JUST ACTS FOR WHICH YOU THINK WE ARE

8   LIABLE.

9          MR. COGAN:  I THINK THAT'S RIGHT.

10   BUT AT LEAST FROM OUR PERSPECTIVE, THE POINT IS THAT IF

11   YOU JUST -- IF YOU -- IF THIS WAS ONLY TO CAPTURE DISPUTES

12   BETWEEN YOU OR WE, YOU WOULDN'T NEED THE FIRST SEVERAL -- THE

13   FIRST TWO CLAUSES IN THE CONTRACT BECAUSE YOU COULD JUST SAY

14   THAT ANY ACTS OR OMISSIONS FOR WHICH YOU MAY CONTEND THAT WE

15   ARE LIABLE ARE SUBJECT TO ARBITRATION.

16   THE FACT THAT THE AGREEMENT CONTEMPLATES OTHER TYPES OF

17   DISPUTES SUGGESTS -- AND I THINK THIS IS A DISTINCTION BETWEEN

18   KRAMER AND THIS CASE -- SUGGESTS THAT THIS ARBITRATION CLAUSE

19   IS BROADER THAN THAT ARBITRATION CLAUSE.

20          THE COURT:  I MEAN, I THINK YOU COULD ALSO SEE IT AS

21   ENCOMPASSING A BROADER SET OF DISPUTES WITH RESPECT TO TFL.

22   IF TFL WERE STILL IN THE ROOM TODAY, I THINK WE WOULD BE

23   HAVING A LONG DISCUSSION ABOUT WHETHER THAT LANGUAGE

24   ENCOMPASSED THE LANGUAGE AT ISSUE HERE.

25          AS A THIRD PARTY, I THINK YOU'RE MORE IN THE QUESTION --

1    AND THERE'S A LOT OF BRIEFING ON THIS SO WE DON'T NEED TO SPEND

2    A LOT OF TIME ON IT -- BUT IS THIS A CLAIM RELATING TO THE

3    INTERFACE OR THE AGREEMENT?  IS THAT -- YOU KNOW, THE PARTIES

4    HAVE BOTH ARGUED WHETHER THE CLAIMS THAT ARE AT ISSUE HERE

5    ARE CLAIMS RELATED -- IF I CONCLUDE THAT IT'S A QUESTION FOR

6    ME, THEN THE QUESTION I HAVE IS, ARE YOU ENTITLED, ON AN

7    EQUITABLE ESTOPPEL THEORY, TO INVOKE THIS ARBITRATION

8    AGREEMENT?  ISN'T THAT RIGHT?

9              MR. COGAN:  YES.

10             THE COURT:  IT SEEMS LIKE YOU'RE GOING TO HAVE TO TRY

11   TO GET YOURSELF IN THROUGH CLAIMS RELATING TO THIS INTERFACE

12   AGREEMENT.

13             MR. COGAN:  THAT'S RIGHT, YOUR HONOR.  THE ANALYTICAL

14   FRAMEWORK IS THAT IF YOUR HONOR DOES NOT KICK THE THRESHOLD

15   QUESTION OF ARBITRABILITY TO AN ARBITRATOR, THEN THE QUESTION

16   IS FOR THE COURT TO DECIDE, AND AS YOUR HONOR KNOWS, WE CONTEND

17   THAT UNDER THE DOCTRINE OF EQUITABLE ESTOPPEL AS A NON-PARTY,

18   WE CAN INVOKE THIS ARBITRATION CLAUSE.

19        I THINK THERE'S A THRESHOLD QUESTION EVEN THERE AS TO WHAT

20   IS THE LAW OF EQUITABLE ESTOPPEL THAT THE COURT SHOULD APPLY.

21        SO I THINK THE PAPERS MIGHT ACTUALLY BE A LITTLE BIT

22   CONFUSING ON THIS JUST BASED ON HOW THE PARTIES ARE ADDRESSING

23   EACH OTHER'S ARGUMENTS, AND THEN THERE'S A WHOLE OTHER SET OF

24   BRIEFING THAT WAS ON RELATED ISSUES.

25             BUT THE EQUITABLE ESTOPPEL TEST HERE IS NOT THE EQUITABLE

1     ESTOPPEL TEST THAT THE PLAINTIFFS DESCRIBE IN THEIR PAPERS, AND

2     THE REASON FOR THIS IS THAT THE CONTRACT HERE BETWEEN TFL AND

3     THE PLAINTIFF IS A CONTRACT BETWEEN INTERNATIONAL PARTIES, A

4     SINGAPORE ENTITY AND A U.S. PERSON, AND AS A RESULT, IT'S

5     GOVERNED BY THE NEW YORK CONVENTION, NOT BY STATE LAW.

6          AND SO UNDER THE NEW YORK CONVENTION, I THINK THE LAW IS

7     CLEAR IN THE NINTH CIRCUIT AND UNDER THE SETTY CASE THAT IN

8     THAT SITUATION, COURTS ARE SUPPOSED TO APPLY NOT CALIFORNIA

9     EQUITABLE ESTOPPEL LAW, BUT FEDERAL COMMON LAW ON EQUITABLE

10    ESTOPPEL.

11         AND SO IN THAT SITUATION, ALL THE COURT NEEDS TO DETERMINE

12    IS WHETHER ONE OF TWO FACTORS ARE SATISFIED, ONE OF WHICH IS --

13    AND I THINK THERE'S REALLY NO REAL DISPUTE HERE -- WHETHER OR

14    NOT THERE ARE ALLEGATIONS OF COLLUSIVE MISCONDUCT IN THE

15    COMPLAINT BETWEEN HERE A NON-SIGNATORY, JUMP, AND SIGNATORY TO

16    THE COMPLAINT, TFL.

17         AND SO THAT IS -- AND I DON'T SEE IN THEIR PAPERS ANY

18    DISPUTE THAT THAT IS THE OPERATIVE TEST.  AND --

19              THE COURT:  AGAIN, THOUGH, I HAVE -- I MEAN, I

20    NOTICED THAT.  I NOTICED THAT ISSUE, AND I HAVEN'T HAD A CHANCE

21    TO DO A DEEP DIVE INTO THE CASE LAW ON THIS, BUT IT DOES STRIKE

22    ME AS ODD TO SAY -- AGAIN, SORT OF THINKING ABOUT WHAT -- WE'RE

23    TALKING ABOUT CONTRACTS, WE'RE TALKING ABOUT EQUITY HERE -- TO

24    SAY, AND TAKE THE EXAMPLE, I CONTRACT WITH YOU TO REFURBISH MY

25    HOUSE, AND SEPARATELY, YOU AND ANOTHER PERSON ENGAGE IN SOME

1    COLLUSIVE ACTIVITY TO DEFRAUD ME IN THE SECURITIES MARKET, AND

2    THEN I ONLY SUE THAT OTHER PERSON.

3        I'M NOT CERTAIN THAT -- IT SEEMS LIKE A STRETCH THAT EVEN

4    THE FEDERAL COMMON LAW WOULD SAY, NO, YOU HAVE TO ARBITRATE

5    BECAUSE THERE WAS THAT CONTRACT ABOUT REDOING THE HOUSE THAT

6    HAD AN ARBITRATION AGREEMENT.

7            MR. COGAN:  THAT'S FAIR, BECAUSE THERE'S ACTUALLY A

8    THIRD ISSUE THAT I THINK YOUR HONOR IS TOUCHING ON HERE, WHICH

9    IS, DOES THE DISPUTE -- IS THE DISPUTE BETWEEN US AND THE

10   PLAINTIFF, DOES IT FALL WITHIN THE SCOPE OF THIS ARBITRATION

11   CLAUSE?

12       TO YOUR POINT, NOT EVERY SINGLE DISPUTE IN THE WORLD WOULD

13   FALL UNDER THE SCOPE OF THIS ARBITRATION CLAUSE AS IT'S

14   DESCRIBED HERE.

15       AND SO --

16           THE COURT:  BUT ALSO -- THERE'S A SCOPE ISSUE, BUT

17   ALSO SORT OF AN INTUITIVE SENSE THAT IN AGREEING TO -- I THINK

18   THAT THE REQUIREMENT THAT THE COLLUSION RELATE TO THE AGREEMENT

19   AT ISSUE, YOU KNOW, SEEMS TO REFLECT A COMMON SENSE

20   UNDERSTANDING, THAT ANYONE WOULD UNDERSTAND THE SCOPE OF WHAT

21   YOU'RE AGREEING TO DO, ESPECIALLY WITH RESPECT TO THIRD PARTIES

22   WHO AREN'T EVEN THERE, TO BE KIND OF DEFINED BY THE AGREEMENT

23   IN WHICH THE ARBITRATION CLAUSE APPEARS.

24       THAT SEEMS TO BE THE INTUITIVE THING THAT THIS, WHAT YOU

25   CALL THE CALIFORNIA COMMON LAW RULE AND NOT THE FEDERAL, BUT A

1    CALIFORNIA RULE AND NOT THE FEDERAL RULE IS GETTING AT.

2         WHAT'S WRONG WITH THAT APPROACH?

3              MR. COGAN:  WELL, I THINK THAT THE QUESTION IS JUST

4    WHETHER OR NOT -- AND I THINK THE CALIFORNIA RULE IS, FRANKLY,

5    STRICTER IN THAT IT REQUIRES US TO DEMONSTRATE THAT THE CLAIM

6    IS BOUND UP IN PROVISIONS OF THE AGREEMENT, RIGHT?

7         AND I THINK OBVIOUS -- I'M SORRY, YOUR HONOR.

8              THE COURT:  JUST SO I UNDERSTAND, SO YOU'RE SAYING --

9    YOU SEEM TO BE SAYING THAT, YOU KNOW, THERE'S -- IF I CONCLUDE

10   I GET TO DECIDE THE ISSUE, THEN THERE'S THE QUESTION, ARE YOU

11   POTENTIALLY ENTITLED TO INVOKE THE ARBITRATION AGREEMENT?

12        THAT DOESN'T RESOLVE THE FINAL ISSUE, WHICH IS, DOES THIS

13   CASE, IN FACT, FALL WITHIN THE LANGUAGE OF THIS ARBITRATION

14   AGREEMENT?

15             MR. COGAN:  I THINK THAT'S EXACTLY RIGHT, THOSE THREE

16   ISSUES, AND WHICH ORDER YOU DEAL WITH THE SECOND AND THIRD ONE

17   IS NOT 100 PERCENT CLEAR IN MY MIND, BUT YOU'LL GET TO THE SAME

18   PLACE EITHER WAY.

19        THE EQUITABLE ESTOPPEL TEST IS JUST, AS A NON-SIGNATORY,

20   AS LONG AS WE CAN DEMONSTRATE -- AND THERE REALLY IS NO DISPUTE

21   AS FAR AS I CAN TELL -- THAT THE CLAIMS AT ISSUE IN THE

22   COMPLAINT INVOLVE ALLEGATIONS OF COLLUSIVE MISCONDUCT BETWEEN A

23   SIGNATORY AND A NON-SIGNATORY, TFL AND JUMP TRADING, THAT IS

24   SUFFICIENT TO SATISFY THE ESTOPPEL TEST.

25        THERE IS THEN ANOTHER TEST THAT YOUR HONOR HAS TO, TO DO,

1    WHICH IS TO SAY, WELL, IS THE DISPUTE HERE ONE THAT FALLS

2    WITHIN THIS ARBITRATION CLAUSE TO BEGIN WITH?

3        IT'S WHAT WE SAY THE ARBITRATOR SHOULD DO, BUT IF YOUR

4    HONOR IS GOING TO DO IT, THEN YOUR HONOR WILL DO IT.

5        AND WE SAY THAT THE ARBITRATION CLAUSE -- AND STEVE, IF

6    YOU DON'T MIND JUST FLIPPING BACK TO THAT -- WE SAY THAT THIS

7    IS A CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THE

8    INTERFACE OR THIS AGREEMENT, AND IT'S CERTAINLY A CLAIM OR

9    CONTROVERSY ARISING OUT OF OR RELATING TO ACTS OR OMISSIONS FOR

10   WHICH THEY CONTEND TFL IS LIABLE.

11            THE COURT:  NO LONGER, ACTUALLY.

12            MR. COGAN:  WELL, THEY -- THEY CERTAINLY CONTEND THAT

13    THEY, THEY ARE LIABLE -- I TAKE YOUR POINT, THEY HAVE WITHDRAWN

14    THEIR COMPLAINT AS AGAINST THEM.

15        BUT THEY'VE CERTAINLY MADE ALLEGATIONS AGAINST THEM.

16        AND SO EVEN IF THEIR WITHDRAWAL AT THIS LATE STAGE OF THE

17   CLAIM AGAINST TFL WERE TO TAKE THAT PROVISION OFF THE TABLE,

18   THIS IS A DISPUTE THAT ARISES OUT OF OR RELATES TO THE

19   INTERFACE.

20        IT'S NOT DIRECTLY ABOUT THE PROVISIONS OF THE TERMS OF

21   SERVICE, ALTHOUGH THEY ARE RELEVANT IN WAYS THAT WE'VE

22   DESCRIBED IN OUR PAPERS.

23        BUT JUST TO TAKE A STEP BACK AND GET INTO THE MERITS FOR

24   JUST A MOMENT --

25            THE COURT:  YEAH, I WAS GOING TO SAY, I WOULD LIKE TO

```
 1        GIVE YOUR COLLEAGUE AN OPPORTUNITY TO ARGUE, BUT I WANT TO GIVE

 2        YOU SOME TIME FOR THE MERITS, SO IF YOU COULD SHIFT AND LET'S

 3        SPEND A FEW MINUTES ON THE MERITS.

 4                MR. COGAN:  SURE.  I THINK I CAN MAKE THIS BRIEF.

 5            THE COMPLAINT BOILS DOWN TO A CONTENTION, AMONG OTHER

 6        THINGS, THAT THE -- THAT TFL PUT INTO PLACE THIS THING CALLED

 7        THE ANCHOR PROTOCOL THAT IS ESSENTIALLY -- I'LL DRAW THE

 8        ANALOGY OF A SAVINGS ACCOUNT THAT, ACCORDING TO THE PLAINTIFFS,

 9        GUARANTEED PEOPLE WHO HELD UST -- THAT'S THE STABLECOIN AT

10        ISSUE HERE -- IF THEY DEPOSITED IT INTO THE PROTOCOL, THEY

11        WOULD BE, ACCORDING TO THE PLAINTIFFS, GUARANTEED A 20 PERCENT

12        RETURN, AND THE THRUST OF THE COMPLAINT IS THAT THAT WAS A BIG

13        PART OF WHAT INDUCED THE PLAINTIFFS AND OTHER MEMBERS OF THE

14        PUTATIVE CLASS TO BUY UST.

15                THE COURT:  I MEAN, I THOUGHT THE THRUST OF THE

16        COMPLAINT WAS THAT JUMP HAD, YOU KNOW, MADE THIS SORT OF SECRET

17        INVESTMENT IN UST IN ORDER TO HELP PROP UP UST WHEN IT WAS

18        BEING DE-PEGGED FROM THE DOLLAR, AND THEN, YOU KNOW, OVER A

19        PERIOD OF TIME EITHER FRAUDULENTLY MISREPRESENTED ISSUES WITH

20        RESPECT TO THAT PURCHASE, OR FAILED -- OR HAD AN OBLIGATION TO

21        DISCLOSE THAT AND INSTEAD TALKED ABOUT THE STABILITY OF THE UST

22        COIN.

23            I THOUGHT THAT WAS THE THRUST OF THE COMPLAINT, CERTAINLY

24        AS PRESENTED IN THEIR RESPONSE TO YOUR MOTION.

25                MR. COGAN:  WELL, LOOK, I THINK, YOUR HONOR, I WILL
```

1      CERTAINLY, WHEN WE GET TO THE MOTION TO DISMISS PART OF THIS,

2      ADDRESS THOSE ALLEGATIONS AND WHY THEY DON'T STATE A CLAIM.

3           BUT I DO THINK THEIR THEORY HERE IS THE REASON WHY UST AND

4      LUNA GOT SO BIG AND WHY SO MANY PEOPLE PUT THEIR MONEY INTO IT

5      WAS BECAUSE OF THE ANCHOR PROTOCOL.

6           I MEAN, IT IS -- THE COMPLAINT ITSELF SAYS THAT THIS

7      DISPUTE RELATES TO THE ANCHOR PROTOCOL.

8           SO I DON'T MEAN TO SUGGEST, AS I SUMMARIZE WHAT THEIR

9      THEORY IS, THAT THEY DON'T ALSO MAKE ALLEGATIONS AGAINST JUMP,

10     AND I'LL CERTAINLY DEAL WITH THAT AT THE APPROPRIATE TIME

11     TODAY.

12          BUT I DO THINK THAT A BIG PART OF WHAT THEY NOW CALL OF

13     THIS SUPPOSED FRAUD HERE WAS THEIR CLAIM THAT THE ANCHOR

14     PROTOCOL WAS A MARKETING PLOY, GOT A BUNCH OF PEOPLE TO PUT

15     LOTS OF MONEY INTO THE ANCHOR PROTOCOL SO THAT THEY COULD GET

16     THE SUPPOSED 20 PERCENT GUARANTEED RETURN.  LOTS OF THESE

17     TOKENS BEFORE THE EVENTUAL COLLAPSE WERE IN THE ANCHOR

18     PROTOCOL.  IN FACT, I THINK THE MAJORITY OF THEM WERE IN THE

19     ANCHOR PROTOCOL.

20               THE COURT:  WOULD THEIR CLAIM BE THE SAME EVEN IF

21     THEY, YOU KNOW, HAD A DIFFERENT THEORY ON HOW PEOPLE CAME TO

22     THINK THAT THIS WAS, YOU KNOW, THIS WAS A STABLE, RELIABLE

23     CRYPTOCURRENCY?

24               MR. COGAN:  WELL -- I'M SORRY, I'M NOT SURE --

25               THE COURT:  I'M TRYING TO -- YOU KNOW, THE FACT THAT

```
 1        THEY POINT TO THAT IS SOMETHING THAT DREW INTEREST.  I'M NOT

 2        SURE THAT THAT -- THAT'S SORT OF NOT NECESSARILY SAYING THAT

 3        THAT WAS THE SOURCE OF THE WRONGDOING.  I DON'T THINK THEY'RE

 4        SAYING -- THEY'RE NOT SAYING THAT ANCHOR WAS FRAUDULENT, THAT

 5        ANCHOR WAS A MISREPRESENTATION.

 6             AM I WRONG ABOUT THAT?

 7                  MR. COGAN:  I DO THINK THAT THEY'RE SAYING THAT THEY

 8        WERE MISLED INTO BELIEVING THAT THE 20 PERCENT RETURN WAS

 9        GUARANTEED WHEN, IN FACT, ACCORDING TO THEM, IT WASN'T

10        GUARANTEED.

11                  THE COURT:  AND WHAT WAS JUMP'S RELATIONSHIP TO

12        ANCHOR?

13                  MR. COGAN:  I MEAN, IT'S NOT ALLEGED TO HAVE, YOU

14        KNOW, CREATED THE ANCHOR PROTOCOL OR PROMOTED THE ANCHOR

15        PROTOCOL IN ANY WAY.

16             THERE ARE VARIOUS ALLEGATIONS IN THE COMPLAINT THAT TALK

17        ABOUT WHAT THE DEFENDANTS AS A GROUP DID.

18             BUT AS IT RELATES TO JUMP SPECIFIC, THERE ARE NOT

19        ALLEGATIONS SPECIFIC TO THE ANCHOR PROTOCOL, EXCEPT FOR THAT

20        THEY CLAIM THAT JUMP TRADING WAS PART OF A CONSPIRACY AND THAT

21        THE ANCHOR PROTOCOL'S PROMISE OF A 20 PERCENT RETURN WAS

22        ESSENTIALLY THE SIREN'S CALL TO PLAINTIFFS, OR TO MARKET

23        PARTICIPANTS, TO GET INVOLVED WITH THIS PARTICULAR TOKEN.

24                  AND SO I GUESS I'LL WRAP UP BECAUSE I KNOW YOUR HONOR --

25                       THE COURT:  YEAH, PLEASE, WHY DON'T YOU TURN TO THE
```

1    MERITS.

2            MR. COGAN:  I'LL WRAP UP AND I'LL SIT DOWN AND

3    ADDRESS ANY FURTHER QUESTIONS AFTERWARDS.

4            MR. GOLDBERG:  GOOD MORNING, YOUR HONOR.  MAY IT

5    PLEASE THE COURT.  I WILL BE BRIEF BECAUSE I THINK YOU'VE HIT

6    ALL THE NOTES.

7        SCHEIN, HENRY SCHEIN DISTINGUISHES BETWEEN THE WHO, WHICH

8    IS THE DELEGATION, AND THE WHETHER, WHICH IS THE COLLATERAL

9    ESTOPPEL.

10       AND HENRY SCHEIN UNEQUIVOCALLY SAYS BETWEEN PARTIES, IF

11   THERE IS A CLEAR AND UNMISTAKABLE DELEGATION, THE ARBITRATOR

12   DECIDES ARBITRABILITY.

13       THIS IS EXACTLY THE LANGUAGE OF KRAMER.  THERE IS NO

14   DAYLIGHT BETWEEN THE NINTH CIRCUIT AND THE SUPREME COURT ON

15   THIS QUESTION.

16       YOUR HONOR ALSO -- I LOOK AT THIS SLIDE AND I SEE THE

17   HIGHLIGHT WHICH IS NOT THE PART OF THE CLAUSE THAT MATCHES THE

18   TOYOTA -- THE DEALERSHIP CLAUSE IN KRAMER.

19       AS YOUR HONOR POINTS OUT, WE ARE ATTEMPTING TO RESOLVE

20   DISPUTES.  WE'RE GOING TO DESCRIBE THE DISPUTES.

21       BUT BETWEEN WHOM IS THIS, IT'S BETWEEN YOU AND WE.  "WE"

22   IS TFL AND TFL ALONE.

23       IF YOU LOOK AT PARAGRAPH 17 OF THE AGREEMENT, YOUR HONOR,

24   YOU'LL NOTE IT'S A BROAD RELEASE HAVING DEFINED "WE" AS TFL AND

25   TFL ALONE.

1          THE DRAFT PERSONS OF THIS CONTRACT KNEW EXACTLY HOW TO

2     INCLUDE MR. KWON, FOR EXAMPLE.  THEY DO NOT DO THAT IN THE

3     ARBITRATION CLAUSE.

4          SO, FIRST, THIS IS ON ALL FOURS WITH KRAMER AND,

5     THEREFORE, YOU DETERMINE ARBITRABILITY AS TO NON-SIGNATORIES

6     AND NON-SIGNATORIES ALONE.

7          THERE'S NO DAYLIGHT BETWEEN KRAMER AND SCHEIN, AND YOU

8     SHOULD DECIDE THIS QUESTION.

9          I'M HAPPY TO MOVE ON, UNLESS THE COURT HAS ANY QUESTIONS,

10    TO THE COLLATERAL ESTOPPEL ISSUE.

11               THE COURT:  PLEASE.

12               MR. GOLDBERG:  I BEG MY, MY FRIEND'S INDULGENCE, AND

13     I HOPE HE WILL FORGIVE ME, BECAUSE THE COMPLAINT IS DENSE AND

14     THERE ARE MOVING PARTS.

15          BUT STRIPPED BARE, THE COMPLAINT AGAINST JUMP ALLEGES:  A,

16    THAT UST IS A SECURITY; B, THAT IN VIOLATION OF 10(B)(5)(A) AND

17    (C), JUMP PARTICIPATED IN MANIPULATING THE PRICE OF THAT

18    SECURITY, AND THEN AFTER THAT MANIPULATION, MADE IT, ONE, FALSE

19    STATEMENT IN VIOLATION OF 10(B)(5)(B).

20          THAT HAS NOTHING WHATSOEVER TO DO WITH THIS AGREEMENT,

21    YOUR HONOR.

22          AND LET ME BE MORE CLEAR.  THIS AGREEMENT ITSELF MENTIONS

23    SOMETHING CALLED THE ANCHOR PROTOCOL.

24          BUT THIS AGREEMENT ITSELF, YOUR HONOR, IS NOT ABOUT THE

25    ANCHOR PROTOCOL.  IT'S ABOUT THE INTERFACE TO THE ANCHOR

1    PROTOCOL, WHICH IS WHY, WHEN THEY DESCRIBE THE NATURE OF

2    CERTAIN CLAIMS THAT COULD BE BROUGHT AGAINST TFL, THEY ADD THAT

3    CLAIM:  FIRST, IT'S THE INTERFACE; SECOND, IT'S THE AGREEMENT;

4    AND, THIRD, IT'S ANYTHING ELSE BETWEEN YOU AND US.

5        AND THE REASON FOR THAT, YOUR HONOR, IS THAT THE TERRAFORM

6    ECOSYSTEM IS WIDE AND ONE COULD WANT TO SUE TERRAFORM LABS FOR

7    THINGS NOT RELATED TO THE INTERFACE.  THAT'S WHY THEY INCLUDE

8    THAT.

9        BUT THIS, THIS AGREEMENT, YOUR HONOR, WHILE IT MENTIONS

10   THE ANCHOR PROTOCOL, EFFECTIVELY DISASSOCIATES TERRAFORM LABS

11   FROM THE ANCHOR PROTOCOL.  WE DON'T OWN IT.  WE DON'T CONTROL

12   IT.  YOU CAN'T SUE US FOR IT.

13       WHAT THIS IS ABOUT IS THE INTERFACE, WHICH IS A

14   NON-EXCLUSIVE MEANS OF ACCESSING THE ANCHOR PROTOCOL.

15       NOW, IN THAT CONTEXT, YOUR HONOR, THIS HAS ABSOLUTELY

16   NOTHING TO DO WITH JUMP'S PARTICIPATION IN MANIPULATING THE

17   PRICE OF UST AND ITS SUBSEQUENT FALSE STATEMENT ABOUT THE

18   STRENGTH OF THE STABILITY -- THE STRENGTH OF THE STABILITY OF

19   UST.

20           THE COURT:  HOW WOULD -- WOULD THE ANALYSIS WE'RE

21    FACING DIFFER IF TFL WAS STILL IN THE CASE?

22           MR. GOLDBERG:  I WOULD LOVE TO LOOK AT THE COURT AND

23    SAY NO COMMENT, BUT I DON'T THINK YOU'LL TAKE THAT FROM ME.

24       I THINK THE ANALYSIS AS TO TFL IS DIFFERENT IN THIS CASE,

25   YOUR HONOR, BECAUSE THAT IS BETWEEN YOU AND US.

1      NOW, I WOULD SAY, YOUR HONOR, THAT A DEFENDANT, A FORMER

2    DEFENDANT, KWON -- WHO LANGUISHES NOW I THINK IN A MONTENEGRO

3    PRISON, AND I DON'T RELISH THE NECESSITY OF CHASING HIM TO THE

4    COOK ISLANDS FOR THE MANY MILLIONS THAT HE PROBABLY HAS -- I

5    DON'T KNOW THAT THIS APPLIES TO HIM BECAUSE OF WHAT I SAID

6    ABOUT THE DIFFERENCE BETWEEN PARAGRAPHS 17 AND 18 WHERE

7    PARAGRAPH 18 SAYS WE AND PARAGRAPH 17 LISTS A WHOLE BUNCH OF

8    PERSONS WHOM TFL WANTED TO INCLUDE IN THE RELEASE.

9      BUT AS AGAINST TFL, I BELIEVE THAT YOU MIGHT SEND THIS TO

10    AN ARB -- YOU MIGHT DELEGATE THE ARBITRABILITY QUESTION TO AN

11    ARBITRATOR.

12      IN ANY EVENT, YOUR HONOR, ONE LAST POINT, NOT TO MAKE TOO

13    FINE OF A POINT OF ANYTHING, BUT MY FRIENDS CITE TO YOU

14    JUDGE TJOFLAT -- T-J-O-F-L-A-T -- JUDGE TJOFLAT'S --

15             THE COURT:  I'M AWARE OF JUDGE TJOFLAT.

16             MR. GOLDBERG:  I KNOW.

17             THE COURT:  I'VE ARGUED BEFORE HIM IN MY PRIOR LIFE.

18             MR. GOLDBERG:  THEY CITE JUDGE TJOFLAT'S CONCURRENCE

19    IN THE OUTOKUMPU CASE, AND THAT CONCURRENCE LEAVES OFF ONE VERY

20    IMPORTANT THING THAT KRAMER INSISTS UPON.  THAT CONCURRENCE

21    SAYS EITHER, ONE, IT MUST BE INTIMATELY CONNECTED TO THE TERMS

22    OF THE CONTRACT; OR, TWO, COLLUSION AMONG NON-SIGNATORY AND

23    OTHER SIGNATORY, PERIOD.

24      NOW, THE REASON WHY THAT'S IMPORTANT IS THAT'S NOT THE

25    STANDARD IN THE NINTH CIRCUIT.  SETTY -- MY FRIEND MENTIONS THE

1   NEW YORK CONVENTION VERSUS CALIFORNIA LAW, HAVING PUT IN HIS

2   BRIEF IN FOOTNOTE 10, I BELIEVE IT IS, THAT THERE'S NO DAYLIGHT

3   BETWEEN THE CALIFORNIA APPLICATION OF GOLDMAN AND THE NEW YORK

4   CONVENTION BECAUSE GOLDMAN ADOPTED FEDERAL LAW.

5        THE -- OH, FORGIVE ME, YOUR HONOR, I JUST LOST MY PLACE.

6        OUTOKUMPU.  THE SETTY CASE, WHICH APPLIED THE NEW YORK

7   CONVENTION, SAYS QUITE CLEARLY THAT IT MUST BE, EVEN IF THERE'S

8   COLLUSION, INTIMATELY, INTRICATELY, INEXTRICABLY CONNECTED TO

9   THE TERMS OF THE CONTRACT, SO NOT JUST MERELY ALLEGING

10  COLLUSION.

11       THAT'S YOUR LANDLORD EXAMPLE.  YOU CAN ALLEGE COLLUSION

12  AGAINST SOMEONE, BUT IF IT'S NOT INTIMATELY CONNECTED TO THE

13  CONTRACT, THEY ARE NOT ENTITLED TO EQUITABLE ESTOPPEL.

14       AND I NOTE IN SETTY, THE NINTH CIRCUIT SAYS -- AND I'M NOT

15  SURE HOW TO TAKE THIS -- WE HAVE NEVER GRANTED A NON-SIGNATORY

16  THE RIGHT TO ARBITRATION UNDER THE COLLATERAL ESTOPPEL

17  DOCTRINE.

18       YOUR HONOR, IF YOU HAVE ANY QUESTIONS, I'M HAPPY TO ANSWER

19  THEM ABOUT THIS MOTION TO COMPEL ARBITRATION.

20            THE COURT:  I'LL GIVE ANOTHER ONE MORE MINUTE AND

21   THEN LET'S TURN TO THE MOTION TO DISMISS.

22            MR. COGAN:  SO IN A MINUTE OR LESS.

23       THE RELEVANT STANDARD WHEN DETERMINING WHETHER OR NOT THIS

24  DISPUTE ARISES OUT OF OR RELATES TO EITHER THE INTERFACE OR THE

25  AGREEMENT OR A DISPUTE BETWEEN THE PARTIES IS A VERY LOW

1    STANDARD BECAUSE THE PHRASE -- THE LANGUAGE "ARISES OUT OF OR

2    RELATES TO" IN THE ARBITRATION CLAUSE IS CONSIDERED A BROAD

3    ARBITRATION CLAUSE, AND IT REQUIRES ONLY THAT THE DISPUTE TOUCH

4    ON MATTERS IN SOME WAY THAT ARE DESCRIBED IN THE ARBITRATION

5    CLAUSE.

6        SO THIS IS DESCRIBED IN A LITTLE BIT MORE DETAIL ON

7    PAGE 13 OF OUR REPLY BRIEF, BUT IT JUST HAS TO TOUCH MATTERS

8    RELATED TO THE ARBITRATION CLAUSE, AND WE THINK CERTAINLY

9    BECAUSE OF THE WAY THE PLAINTIFFS HAVE DESCRIBED THE ANCHOR

10   PROTOCOL, THIS MATTER CERTAINLY DOES TOUCH ON THOSE MATTERS AT

11   THE VERY LEAST.

12       ONE FINAL POINT BEFORE I SIT DOWN IS IN TERMS OF THE

13   DISTINCTION BETWEEN WHAT SETTY SAID THE TEST WAS AND WHAT I

14   BELIEVE THE ELEVENTH CIRCUIT COURT CASE THAT WAS BEING

15   DESCRIBED A MOMENT AGO SAID THAT THE --

16       THE COURT:  THE CONCURRENCE, AS I UNDERSTAND IT -- I

17   UNDERSTAND IT WASN'T AN OPINION, RIGHT?  IT WAS A CONCURRENCE

18   BY JUDGE TJOFLAT.

19       MR. COGAN:  YOU'RE RIGHT, THERE WAS AN ELEVENTH

20   CIRCUIT CONCURRENCE, AS WELL AS VARIOUS OTHER CIRCUIT COURTS

21   THAT HAVE DESCRIBED IT THE SAME WAY AS THE CONCURRENCE.

22       I WOULD JUST SUGGEST TO YOUR HONOR, AND I WON'T BELABOR IT

23   RIGHT NOW, THE MOUSEBELT LABS PTE VERSUS ARMSTRONG CASE, WHICH

24   CAME OUT JUST A FEW MONTHS AGO AND IS CITED IN OUR REPLY

25   PAPERS, IF YOUR HONOR LOOKS AT THE LAST PAGE OF THAT DECISION

1    RIGHT ABOVE THE CONCLUSION, YOU'LL SEE THAT THE COURT, AT LEAST

2    IN THAT CASE IN THIS DISTRICT, SAID IT'S THE SAME TEST BETWEEN

3    WHAT'S DESCRIBED IN THE ELEVENTH CIRCUIT CONCURRENCE AND

4    VARIOUS OTHER CIRCUIT COURT CASES AND WHAT IS DESCRIBED IN

5    SETTY.

6              THE COURT:  THANK YOU.

7         SO I -- DO YOU -- WE ALSO HAVE A MOTION TO DISMISS

8    PENDING.

9              MR. COGAN:  YES.

10             THE COURT:  SO THIS IS ALSO YOUR MOTION.  LET'S TRY

11    AND TAKE A LITTLE LESS TIME BECAUSE I KNOW MY COURT REPORTER

12    AND MY COURTROOM DEPUTY ARE WORKING HARD.

13        BUT IF YOU WOULD LIKE TO TAKE, SAY, FIVE MINUTES TO

14    PRESENT YOUR ARGUMENTS ON THAT, THAT'S FINE.

15             MR. COGAN:  SURE.

16        YOUR HONOR, I WILL THEN, GIVEN THE TIME, JUST VERY, VERY

17    BRIEFLY TOUCH ON THE SLIDE THAT IS BEFORE YOUR HONOR RIGHT NOW.

18        WE'RE IN AN UNUSUAL SITUATION IN THAT YOU HAVE A LONG

19    COMPLAINT THAT IS 90 PAGES LONG, 350-PLUS PARAGRAPHS, AND IT'S

20    ABOUT PEOPLE AND CONDUCT THAT IS ALMOST EXCLUSIVELY OTHERS AND

21    NOT JUMP TRADING, AND SO THERE'S ONLY A VERY SMALL PART OF THE

22    ALLEGATIONS IN THIS CASE THAT DEAL WITH JUMP TRADING.

23        CERTAINLY AS IT RELATES TO THE FRAUD ALLEGATION, SO THE

24    SUPPOSED FRAUDULENT MISREPRESENTATIONS AND OMISSIONS, THERE IS

25    VIRTUALLY NOTHING IN THE COMPLAINT.  GIVEN MY FIVE MINUTES THAT

1    YOU'VE GIVEN ME, I'M NOT GOING TO RUN THROUGH IT ALL RIGHT NOW

2    EXCEPT JUST TO SAY THAT PARAGRAPH 138 -- WE TALK ABOUT THIS IN

3    OUR PAPERS -- IS THE ONLY PARAGRAPH IN THE ENTIRE COMPLAINT

4    WHERE THEY CONTEND THAT JUMP TRADING MADE ANY SORT OF

5    MISLEADING STATEMENT AT ALL.

6         THEIR BRIEFING THEN PIVOTS A BIT, BUT THE COURT, AS THE

7    COURT KNOWS, IS BOUND BY WHAT'S IN THE COMPLAINT, AND IT'S

8    REALLY JUST THAT PARAGRAPH.

9         AND FOR REASONS THAT OUR PAPERS DESCRIBE AND THAT I'LL

10   JUST REST ON OUR PAPERS ON NOW GIVEN YOUR HONOR'S TIME

11   RESTRICTION, IT IS NOWHERE NEAR THE TYPE OF ALLEGATION ONE

12   WOULD NEED TO MAKE IN ORDER TO STATE A CLAIM FOR A FRAUDULENT

13   STATEMENT OR MISLEADING STATEMENT.

14        AND SO LET ME MOVE THEN TO THE MANIPULATION ALLEGATION

15   THAT YOUR HONOR ALLUDED TO EARLIER.

16        AND, STEVE, IF YOU COULD JUST JUMP TO THE NEXT SLIDE.  THE

17   ONE AFTER THAT, PLEASE.  SORRY.  KEEP GOING.  TWO MORE.

18        OKAY.  SO TWO THINGS AS IT RELATES TO MANIPULATION.  ONE

19   IS THIS IS ANOTHER AREA WHERE THE PLAINTIFF'S THEORY HAS

20   SHIFTED FROM WHAT THEY SAID IN THEIR COMPLAINT, WHICH OF COURSE

21   THEY'RE BOUND TO, AND WHAT THEY'VE NOW SAID IN THEIR BRIEFING.

22        BUT LET'S JUST GO WITH WHAT THEY SAY IN THEIR BRIEFING.

23   OKAY?

24             THE COURT:  UM-HUM.

25             MR. COGAN:  WHAT THEY SAY IN THEIR BRIEFING IS THAT

1       UNDER COUNT TWO, OR CAUSE OF ACTION NUMBER TWO OF THE

2       COMPLAINT, THAT JUMP MANIPULATED THE PRICE OF UST BACK IN

3       MAY OF 2021 TO TRY AND GET IT BACK ON THE PEG.  SO IT FELL OFF

4       THE PEG IN MAY OF '21, AND THEN JUMP TRADING BOUGHT A BUNCH OF

5       UST AND CAUSED IT TO GO BACK ON THE PEG -- I THINK THAT'S THE

6       THRUST OF WHAT THEY'RE CONTENDING -- WITHOUT TELLING PEOPLE.

7              AND I THINK THEY ACKNOWLEDGE WE HAD NO DUTY TO TELL PEOPLE

8       THAT.  WE DIDN'T OWE ANY DUTY TO THE PLAINTIFFS OR ANYONE ELSE

9       TO DESCRIBE OR TO DISCLOSE WHAT WE WERE DOING.

10             BUT THEY CONTEND NONETHELESS THAT THAT'S MANIPULATION, AND

11      I THINK THAT THAT FUNDAMENTALLY MISUNDERSTANDS THE LAW OF

12      MANIPULATION.

13             AND SO I'VE JUST PUT ON THE SCREEN HERE TWO CASES THAT I

14      THINK CAPTURE WELL WHAT A LOT OF DIFFERENT CASES SAY.  THE

15      FIRST IS DESAI.  IT SAYS, "HERE, INVESTORS ALLEGE MANIPULATIVE

16      CONDUCT AND OMISSIONS BY DEUTSCHE BANK.  'MANIPULATION,' THE

17      SUPREME COURT HAS RECOGNIZED, 'IS VIRTUALLY A TERM OF ART WHEN

18      USED IN CONNECTION WITH SECURITIES MARKETS.  THE TERM REFERS

19      GENERALLY TO PRACTICES, SUCH AS WASH SALES, MATCHED ORDERS, OR

20      RIGGED PRICES, THAT ARE INTENDED TO MISLEAD INVESTORS BY

21      ARTIFICIALLY AFFECTING MARKET ACTIVITY.'"

22             AND, STEVE, GO TO THE NEXT SLIDE.

23             SO THEN HERE'S ANOTHER CASE FROM THE SECOND CIRCUIT THAT

24      ANSWERS THE QUESTION, WELL, WHAT IS ARTIFICIALLY?  AND, AGAIN,

25      THERE'S MANY CASES THAT SAY THIS, BUT I JUST THINK THAT THIS

1    CAPTURES IT SUCCINCTLY.  "THE CRITICAL QUESTION THEN BECOMES

2    WHAT 'ARTIFICIALLY' AFFECTS A SECURITY'S PRICE IN A DECEPTIVE

3    MANNER.

4         "ALTHOUGH NOT EXPLICITLY DESCRIBED AS SUCH, CASE LAW IN

5    THIS CIRCUIT AND ELSEWHERE HAS REQUIRED A SHOWING THAT AN

6    ALLEGED MANIPULATOR ENGAGED IN MARKET ACTIVITY AIMED AT

7    DECEIVING INVESTORS AS TO HOW OTHER MARKET PARTICIPANTS HAVE

8    VALUED A SECURITY."

9         OTHER CASES DESCRIBE THAT AS SENDING A FALSE PRICE SIGNAL

10   TO THE MARKET.

11        THE CASES THAT PLAINTIFF CITES INCLUDE CASES, FOR EXAMPLE,

12   WHERE THE DEFENDANT IS PUBLICLY BUYING A STOCK AT $50 -- THIS

13   IS THE CRANE CASE THAT THEY TALK ABOUT IN THEIR BRIEFING --

14   WHEN THEY'RE ON THE SIDE SELLING IT PRIVATELY FOR $44.  SO YOU

15   HAVE A SITUATION THERE WHERE THERE'S VERY STRONG EVIDENCE IN

16   THAT CASE THAT THE DEFENDANT ACTUALLY BELIEVED THAT THE

17   SECURITY AT ISSUE THERE WAS ONLY WORTH $44, BUT WAS DRIVING THE

18   PRICE UP ARTIFICIALLY AND SENDING A FALSE PRICE SIGNAL TO THE

19   MARKET.

20        THE FUNDAMENTAL PROBLEM WITH THIS THEORY AS IT'S APPLIED

21   TO THIS CASE IS THAT THERE IS NO ALLEGATION IN THE COMPLAINT

22   AND THERE IS NO BASIS TO ALLEGE THAT JUMP TRADING DID NOT, IN

23   MAY OF 2021 WHEN IT ALLEGEDLY BOUGHT UST TO RESTORE THE PEG AS

24   THEY CLAIM, DID NOT GENUINELY THINK THAT UST WAS WORTH A

25   DOLLAR.

1     IF THE -- IF THIS PRODUCT WORKED THE WAY IT WAS SUPPOSED

2   TO WORK, IT WAS SUPPOSED TO BE WORTH A DOLLAR, AND THERE WAS AN

3   ARBITRAGE OPPORTUNITY SO THAT WHEN IT WENT BELOW A DOLLAR,

4   MARKET PARTICIPANTS WOULD HAVE AN OPPORTUNITY TO BUY UST IN

5   ORDER TO CAPTURE THE DIFFERENCE BETWEEN A DOLLAR THAT THEY

6   COULD THEN JUST TRADE THEIR UST IN FOR A DOLLAR'S WORTH OF LUNA

7   AND THE VALUE THAT THEY BOUGHT FOR.

8     WHEN UST BECAME TEMPORARILY UNPEGGED IN MAY OF '21, JUMP

9   ALLEGEDLY BOUGHT AT $.90, $.95, WHATEVER.

10    IN ORDER FOR THAT CONDUCT TO BE MANIPULATION, THOSE

11   PURCHASES HAVE TO BE INCONSISTENT WITH WHAT JUMP BELIEVED THE

12   VALUE OF UST WAS.

13         THE COURT:  ALTHOUGH I GUESS THE -- WHAT AM I TO DRAW

14   FROM THE ALLEGATION -- AND I TAKE YOUR POINT ABOUT WHAT'S IN

15   THE COMPLAINT.  I'M SAYING IT SOUNDS TO ME ULTIMATELY LIKE A

16   VERY FACTUAL ISSUE THAT MIGHT BE HARD TO RESOLVE, BUT I'M BOUND

17   BY THE COMPLAINT AND I'M CONSIDERING WHAT'S IN THE COMPLAINT

18   RIGHT NOW.

19    BUT SAY THAT WASN'T IN THE COMPLAINT.  I'M NOT SURE OF THE

20   QUESTION WHETHER THAT WOULD BE SUFFICIENT.

21    BUT WHAT AM I TO TAKE OF THE ALLEGATION THAT THERE WERE A

22   BILLION DOLLARS IN BENEFITS PROVIDED TO JUMP BY TFL AS A

23   CONDITION OF THIS PURCHASE, AS I UNDERSTAND IT, REMOVING THE

24   CONDITIONS ON THE LOANS OF LUNA TOKENS?

25         MR. COGAN:  YEAH, I DON'T THINK THAT THE ALLEGATION

1         IS THAT THERE WERE A BILLION DOLLARS WORTH OF INCENTIVES IN

2         EXCHANGE FOR REMOVING THOSE CONDITIONS.

3              BUT LET'S JUST ACCEPT FOR PURPOSES OF THIS ARGUMENT THAT

4         THERE WAS SOME SORT OF INCENTIVE THAT JUMP OBTAINED AS A RESULT

5         OF THAT TRADING, BECAUSE I THINK THAT'S ANALYTICALLY THE

6         QUESTION THAT YOU'RE ASKING.

7              THE COURT:  EXACTLY.  THAT WOULD SUGGEST THAT THEY

8         WERE DOING IT FOR SOME REASON OTHER THAN THAT THEY THOUGHT IT

9         WAS LOW -- IT WAS BELOW ITS MARKET VALUE.

10             MR. COGAN:  RIGHT.

11        SO THE QUESTION THEN IS, WHAT IS THE PRIMARY MOTIVATION?

12             AND THE CASE LAW SAYS THAT THAT DOESN'T MATTER, MEANING IN

13        OTHER WORDS, EVEN IF YOU ASSUME THAT JUMP TRADING, YOU KNOW,

14        MAYBE THEY WOULDN'T HAVE BOTHERED TO BUY AT $.95 BUT FOR THE

15        FACT THAT THEY HAD THIS INCENTIVE, UNLESS THERE IS A BASIS IN

16        THE COMPLAINT, OR IN SOME SORT OF BRIEF, THAT WOULD GIVE RISE

17        TO AN INFERENCE, A STRONG INFERENCE OF SCIENTER -- BECAUSE

18        THAT'S THE RELEVANT STANDARD HERE -- THAT JUMP TRADING DID NOT

19        BELIEVE THAT $.95 OR $.90 OR WHEREVER IT WAS ALLEGEDLY BUYING

20        WAS A GOOD PRICE, IT DOESN'T MATTER.

21             THERE COULD BE -- AND IT'S NOT ALLEGED HERE -- THERE COULD

22        BE SITUATIONS WHERE THAT COULD LEAD TO A FRAUD.  FOR EXAMPLE,

23        IF JUMP TRADING WERE TO HAVE SAID SOMETHING TO THE EFFECT OF, I

24        DIDN'T BUY, OR THE THING, YOU KNOW, HEALED ITSELF ALL ON ITS

25        OWN -- WHICH IS WHAT THEY ALLEGE OTHER PEOPLE, BUT NOT WE,

1    SAID -- THEN THAT COULD, UNDER CERTAIN CIRCUMSTANCES, BE A

2    MISLEADING STATEMENT.

3         BUT IN TERMS OF MARKET MANIPULATION, BUYING AT BELOW VALUE

4    CANNOT BE MARKET MANIPULATION, EVEN IF YOU WOULDN'T HAVE

5    BOTHERED TO DO IT HAD YOU NOT BEEN INCENTIVIZED.

6         AND, AGAIN, I'M MINDFUL OF YOUR FIVE MINUTES.

7         THE COURT:  YOU KNOW, I MEAN, I DO WANT TO GIVE YOUR

8    COLLEAGUE AN OPPORTUNITY TO ARGUE IN RESPONSE.

9         BUT I DO HAVE A QUESTION FOR YOU BEFORE THAT, THOUGH,

10   WHICH IS OBVIOUSLY WE ARE -- WE'RE IN A VERY DIFFERENT SORT OF

11   LEGAL WORLD NOW THAN WE WERE EVEN A FEW WEEKS AGO WITH THE TFL

12   AND KWON NO LONGER BEING DEFENDANTS HERE AND THIS BEING A CASE

13   THAT SEEMS TO NOW BE SOLELY ABOUT JUMP'S ACTIVITIES AND JUMP'S

14   CONDUCT IN THE MARKET.

15        AND MY QUESTION TO YOU IS, IS REALLY, YOU KNOW, ONE, IF I

16   DECIDE THAT THIS CASE IS PROPERLY BEFORE ME, WHICH IS A

17   PRELIMINARY QUESTION AND OBVIOUSLY I NEED TO RESOLVE THAT

18   BEFORE ANYTHING, BUT IF I DO DECIDE THE CASE IS PROPERLY BEFORE

19   ME, ONE PATH THAT WE COULD FOLLOW IS I RESOLVE THE MOTION TO

20   DISMISS AND SAY I AGREE WITH YOU ON THAT, IN PART BECAUSE

21   THERE'S A LOT OF GROUP ALLEGATIONS ABOUT DEFENDANTS AS OPPOSED

22   TO SPECIFIC ALLEGATIONS, BECAUSE THIS IS A CASE THAT STARTED

23   OUT AS A CASE AGAINST TFL PRIMARILY AND HAS NOW SORT OF MORPHED

24   INTO THIS DIFFERENT CASE.

25        SO IF I AGREE WITH YOU, BUT GRANT LEAVE TO AMEND, THEN --

```
 1    WHICH I UNDERSTAND YOUR ARGUMENT IS THAT THERE SHOULDN'T BE

 2    LEAVE TO AMEND HERE, BUT I HAVE TO SAY, YOU KNOW, THE STANDARD

 3    IS USUALLY LEAVE TO AMEND IS GRANTED GENEROUSLY, AND ALTHOUGH

 4    THIS IS THE THIRD COMPLAINT, IT'S REALLY KIND OF THE FIRST

 5    REAL -- YOU KNOW, OBVIOUSLY WE'VE GONE THROUGH THE PROCESS OF

 6    LEAD COUNSEL DESIGNATION AND THE LIKE, SO I TEND TO THINK OF IT

 7    AS THE FIRST POST-MOTION TO DISMISS LEAVE TO AMEND OPPORTUNITY,

 8    AND ESPECIALLY IF WE'RE TALKING ABOUT WHAT'S IN THE COMPLAINT,

 9    I WOULD BE INCLINED TO DO THAT.

10         ARE WE BETTER SERVED BY DOING THAT AND GETTING, YOU KNOW,

11    GETTING AN ORDER OUT, GOING THROUGH ALL THESE ISSUES, TALKING

12    ABOUT ANY DEFICIENCIES I IDENTIFY IN THE COMPLAINT, AND THEN

13    HAVING A NEW COMPLAINT FILED THAT IS MORE FOCUSSED, IS FOCUSSED

14    EXCLUSIVELY ON JUMP AND MAYBE PROVIDES A MUCH BETTER

15    OPPORTUNITY TO FOCUS ON THESE CORE ISSUES ABOUT WHAT

16    ALLEGATIONS ARE REQUIRED TO PROVE THE ISSUE AND WHATNOT?

17    THAT'S ONE APPROACH.

18         ANOTHER APPROACH IS IF THE PARTIES COULD AGREE THAT THERE

19    WOULD BE AN AMENDED COMPLAINT, A FURTHER AMENDED COMPLAINT THAT

20    WOULD REALLY FOCUS ON WHERE WE ARE TODAY AND LET US DEAL WITH

21    THAT, THEN THAT WOULD BE -- THAT COULD MOVE THIS CASE FORWARD

22    MORE QUICKLY AND GET US TO THE SAME POINT IF WE'RE GETTING

23    THERE.

24         I'M JUST CURIOUS ON YOUR THOUGHTS OF THE PROCEDURE ON

25    THAT.
```

1          MR. COGAN:  SO LET ME JUST MAKE SURE I UNDERSTAND THE

2     QUESTION.

3          SO OPTION NUMBER ONE MIGHT BE -- AND I KNOW YOU'RE NOT

4     OFFERING THIS -- BUT OPTION ONE WOULD BE TO DISMISS IT WITH

5     LEAVE TO AMEND; AND THEN OPTION TWO WOULD BE WE COULD JUST SKIP

6     THE PROCESS OF YOU WRITING A WHOLE DECISION AND THE PARTIES

7     COULD AGREE THAT THEY SHOULD AMEND AND ACTUALLY WRITE A

8     COMPLAINT ABOUT JUMP?

9          THE COURT:  SOMETHING ALONG THOSE LINES.

10         I MEAN, OBVIOUSLY I NEED TO RULE ON THE MOTION TO COMPEL

11    SEPARATELY, IN PART BECAUSE NONE OF THIS MAKES -- THERE'S NO

12    REASON FOR YOU TO AGREE TO ANY OF THIS WITHOUT AN ADVERSE

13    RULING ON THE MOTION TO COMPEL.

14         SO IF I DECIDE THAT THIS HAS TO GO TO AN ARBITRATOR, THEN

15    THAT'S THE ARBITRATOR'S PROBLEM TO WORRY ABOUT.

16         BUT WHAT'S BEFORE THAT?

17         MR. COGAN:  SO MY INITIAL REACTION -- AND I HATE TO

18    SUGGEST THAT THE COURT SHOULD DO WORK, AND SO I WANT TO THINK

19    ABOUT IT --

20         THE COURT:  IT'S MY JOB, SO DON'T HESITATE.  YOU HAVE

21    MOVED, YOU HAVE A RIGHT TO DO SO, YOU HAVE A RIGHT TO A RULING

22    ON YOUR MOTION.

23         MR. COGAN:  LOOK, I APPRECIATE SOLUTIONS TOWARDS

24    EFFICIENCY.

25         I THINK THAT, FUNDAMENTALLY, THE CONCERN I WOULD HAVE --

1    AND I'M MORE THAN HAPPY TO CONSIDER IT AND COME BACK TO THE

2    COURT -- IS WE THINK, FOR THE REASONS WE'VE SAID IN OUR PAPERS,

3    NOT THE LEAST OF WHICH IS THIS MANIPULATION POINT THAT I JUST

4    MADE, THAT THERE ARE MAJOR, MAJOR PROBLEMS WITH THIS COMPLAINT

5    AND ALL OF THE ALLEGATIONS, OR ALL OF THE CAUSES OF ACTION

6    AGAINST JUMP.

7        AND SO WHILE I APPRECIATE THAT YOUR HONOR MIGHT BE

8    INCLINED TO GRANT THEM LEAVE TO AMEND, I DON'T WANT TO HAVE A

9    SITUATION WHERE WE JUST SAY, ALL RIGHT, NEVER MIND, WRITE A NEW

10   COMPLAINT, AND NOW WE'RE BACK -- YOU KNOW, WE'RE BACK BEFORE

11   YOUR HONOR IN A NUMBER OF MONTHS FROM NOW, AND THEN YOUR HONOR

12   IS INCLINED TO SAY, WELL, OKAY, I DIDN'T REALLY RULE THE LAST

13   TIME, SO I'M GOING TO GIVE THEM A FOURTH OR FIFTH BITE OF THE

14   APPLE.

15       SO, AGAIN, THIS IS JUST ME KIND OF REACTING ON THE FLY.

16           THE COURT:  YEAH.

17           MR. COGAN:  BUT I THINK THAT WE WOULD, IF WE WERE TO

18   EVER GO DOWN THAT ROAD, WANT TO KNOW THAT IT WAS THE LAST BITE

19   AT THE APPLE, OR THAT IT WOULD BE A VERY, VERY HIGH STANDARD TO

20   GET ANOTHER BITE AT THE APPLE.

21       BUT I WOULD -- THOSE ARE MY INITIAL REACTIONS.

22           THE COURT:  I TAKE YOUR POINT.  I TAKE YOUR POINT.

23   THAT'S A FAIR POSITION.

24           MR. COGAN:  OKAY.

25           THE COURT:  THANK YOU.

1          I'LL HEAR FROM THE PLAINTIFF.

2              MR. GOLDBERG:  YOUR HONOR, WE ARE CONTENT TO ENJOY

3      EACH BITE OF THE APPLE.

4          AND IF THE COURT CHOOSES THAT, AS I -- AS I SAID TO MY

5      FRIEND, WE RECOGNIZE THAT GIVEN THE CIRCUMSTANCES IN THIS CASE,

6      THERE IS -- THERE ARE ALLEGATIONS IN THE COMPLAINT THAT, WHILE

7      SUPPORTING THE ALLEGATIONS AGAINST HIS CLIENT, MIGHT COME

8      OUT -- I'M SORRY -- THAT MIGHT NOT SUPPORT THE ALLEGATIONS

9      AGAINST HIS CLIENT, SUPPORTING ALLEGATIONS AGAINST ANOTHER

10     PARTY.

11         SO IF THAT'S WHAT THE COURT DECIDES, WE'RE HAPPY TO CLEAN

12     THIS UP.

13         BUT IF I MAY, WE SHOULDN'T HAVE TO.  MY FRIEND PUTS BEFORE

14     THE COURT THE ATSI CASE, WHICH SAYS MANIPULATION CONNOTES

15     INTENTIONAL OR WILLFUL CONDUCT DESIGNED TO DECEIVE OR DEFRAUD

16     INVESTORS BY CONTROLLING OR ARTIFICIALLY AFFECTING THE PRICE OF

17     SECURITIES.

18         IT IS PERFECTLY PROPER FOR JUMP TO MAKE A DECISION ABOUT

19     THE VALUE OF A SECURITY.  THAT'S WHY THEY'RE RICH.

20         HOWEVER, WHEN THE ALGORITHM IS THE STATED REASON FOR THE

21     STABILITY OF UST AND JUMP, IN COLLUSION WITH TFL, WITH

22     TERRAFORM LABS AND MR. KWON, AGREES TO PURCHASE THE UST AT

23     $.90, THEREFORE REMOVING AN AMOUNT OF TOKEN FROM THE MARKET AND

24     CAUSING THE PRICE TO RE-PEG TO A DOLLAR IN EXCHANGE FOR LUNA

25     TOKENS, IF MY MEMORY SERVES ME CORRECTLY, AT $.40 ON THE

1    DOLLAR, THAT IS MANIPULATION OF PRICE AND NOT A DECISION ON

2    JUMP'S PART TO USE ITS SAGACITY TO PROFIT.

3            THE COURT:  I MEAN, I UNDERSTAND YOUR THEORY.

4        I GUESS I DO HAVE CONCERNS THAT THAT'S NOT WELL STATED IN

5    THE COMPLAINT, YOU KNOW, THAT I HAVE CERTAINLY -- WITH RESPECT

6    TO SCIENTER, I THINK THERE ARE MAJOR CONCERNS ABOUT GROUP

7    PLEADING, THAT EVERYONE UNDERSTOOD THIS AND WE CAN'T PIECE OUT

8    WHAT SPECIFICALLY JUMP IS ALLEGED TO HAVE KNOWN AND WHEN AND

9    HOW.

10       I THINK THAT -- I HAVE CONCERNS THAT THE COMPLAINT DOES

11   NOT GET US THERE.  IT'S A NICE THEORY, BUT AS I SAID, I'M

12   CONCERNED ABOUT THE SCOPE OF THE COMPLAINT AS IT GOES TO A LOT

13   OF THESE QUESTIONS.

14           MR. GOLDBERG:  I'M MINDFUL OF THAT AND NOT WANTING TO

15   TAKE TOO MUCH TIME.

16       WITH RESPECT TO SCIENTER, YOUR HONOR, IN THIS PARTICULAR

17   CASE, IF THERE'S MANIPULATION, JUMP HAD ACTUAL KNOWLEDGE OF IT,

18   AND THAT'S VERY SIMPLE -- THE SCHEME CLAIM, COUNT TWO, IS VERY

19   NARROW AND TIGHT AND IT RELATES TO PARAGRAPHS -- FORGIVE ME FOR

20   GOING TO THE COMPLAINT, YOUR HONOR -- IT RELATES TO

21   PARAGRAPHS 187 AND FORWARD.

22       JUMP PARTICIPATED IN THIS MANIPULATION KNOWINGLY.  THEY

23   DISCUSSED IT WITH KWON, THEY RECEIVED A -- THE COMPLAINT

24   ALLEGES, I BELIEVE, A BILLION TWO IN PROFIT RELATED TO THE

25   REDUCED LUNA -- THE REDUCED PRICE LUNA TOKENS THAT IT RECEIVED,

1    AND THAT IS BOTH ACTUAL KNOWLEDGE OF WHAT MR. KWON AND

2    TERRAFORM LABS WANTED JUMP TO DO, AND MOTIVE AND OPPORTUNITY,

3    WHICH AS THE COURT KNOWS IS NOT ITSELF SUFFICIENT TO PLEAD

4    SCIENTER WITH REQUISITE PARTICULARITY, BUT CERTAINLY ADDS TO

5    THE STRONG INFERENCE.

6         WITH RESPECT TO THE STATEMENT THAT JUMP MADE IN THE COUNT,

7    PARAGRAPH 250F, I'M HAPPY TO TALK ABOUT THAT STATEMENT WITH THE

8    COURT.

9         BUT IN THAT STATEMENT, JUMP EXPRESSES THAT THE STABLECOIN

10   HAD STRENGTH AND THAT THE RESERVES WERE GOING TO GIVE IT EVEN

11   MORE STRENGTH, KNOWING THAT IN MAY OF 2021, HAD JUMP NOT

12   ASSISTED TERRAFORM LABS IN INTERVENING IN THE PRICE OF UST, IT

13   WOULD HAVE COLLAPSED.  AND THEY DID THAT KNOWINGLY AND WITH

14   MOTIVE.

15        SO, AGAIN, YOUR HONOR, ACKNOWLEDGING AND APOLOGIZING FOR

16   THIS COMPLAINT AGAINST THIS DEFENDANT, THAT PART OF THE

17   COMPLAINT, THOSE TWO PARTS OF THE COMPLAINT ARE ACTUALLY VERY

18   SIMPLE AND WE HAVE PLEADED IT ADEQUATELY.

19             THE COURT:  OKAY.  THE ONE QUESTION -- AND I -- THIS

20   HAS BEEN WELL BRIEFED, SO WE HAVE A LOT OF BRIEFING ON THESE

21   ISSUES.

22        THE ONE QUESTION I DID WANT TO ASK YOU ON THIS FRONT, YOU

23   KNOW, OBVIOUSLY THERE ARE CLAIMS STATED IN THE ALTERNATIVE FOR

24   AIDING AND ABETTING AND CONSPIRACY UNDER CALIFORNIA LAW AND

25   UNDER RICO, AND IT WAS UNCLEAR TO ME WHAT PREDICATE, IN RICO

1    LANGUAGE, WHAT PREDICATE ACTS YOU'RE RELYING ON FOR A RICO

2    CLAIM; AND FOR THE AIDING AND ABETTING AND CONSPIRACY LAW, WHAT

3    IS -- YOU KNOW, THOSE ARE -- AIDING AND ABETTING AND CONSPIRACY

4    ARE ONLY UNLAWFUL IF IT'S CONNECTED TO AN UNDERLYING WRONG.

5         SO IT WAS UNCLEAR TO ME WHAT THE UNDERLYING WRONG YOU WERE

6    ALLEGING IN CONNECTION WITH THOSE CLAIMS IS.

7              MR. GOLDBERG:  EACH PURCHASE THAT JUMP MADE OF UST,

8    IN CONJUNCTION WITH THE REQUEST -- IN RESPONSE TO THE REQUEST

9    FROM TERRAFORM LABS IS WIRE FRAUD.  EACH TRANSACTION.

10             THE COURT:  WHY IS THAT?

11             MR. GOLDBERG:  THERE HAS TO BE MORE THAN TWO.

12             THE COURT:  WHY IS IT FRAUDULENT?

13             MR. GOLDBERG:  BECAUSE IT IS A TRANSACTION IN SUPPORT

14   OF A SCHEME TO DEFRAUD.

15        NOW, PART OF THE PROBLEM WE HAVE HERE IS -- I WASN'T SURE

16   WHETHER WE WERE GOING TO DISCUSS THIS TODAY, BUT AS YOU KNOW --

17   AND THIS HAS NOTHING TO DO WITH MY FRIENDS -- JUDGE RAKOFF HAS

18   RULED THAT UST IS A SECURITY.  I'M HAPPY TO DISCUSS THAT WITH

19   YOU.  I KNOW THAT TIME IS SHORT.

20        BUT WE, WE SAY THAT THIS COURT SHOULD RULE IN ACCORDANCE

21   WITH JUDGE RAKOFF'S OPINION BECAUSE WHAT'S A SECURITY IN

22   NEW YORK SHOULD ALSO BE A SECURITY IN SAN JOSE.

23        THE RICO ISSUE ONLY COMES UP IF THE COURT FINDS THAT THESE

24   ARE NOT SECURITIES, BECAUSE THEN, IF THEY ARE SECURITIES --

25   THEY ARE SECURITIES.  NOT "IF."  THEY ARE SECURITIES -- THE

1      '34 ACT APPLIES AND RICO DOES NOT.

2          IF THE COURT RULES THAT UST IS NOT A SECURITY, THEN WE'RE

3      IN THE RICO SPECTRUM.  BUT I SUSPECT IF YOU RULE THAT WAY,

4      WE'RE GOING TO BE IN AN AMENDMENT CIRCUMSTANCE.

5          SO I'M HAPPY TO PLEAD WITH GREATER PARTICULARITY ABOUT THE

6      WIRE FRAUD, BECAUSE THEN IT'S NOT A SECURITIES VIOLATION.

7            THE COURT:  OKAY.  AND WHAT IS THE UNDERLYING WRONG?

8      IS THE ANSWER THE SAME WITH RESPECT TO THE CALIFORNIA STATE LAW

9      CLAIMS?

10           MR. GOLDBERG:  YES.  WITH RESPECT TO JUMP,

11      ABSOLUTELY.

12          PART OF THE PROBLEM HERE, AND I THINK WITH RESPECT TO THE

13      CALIFORNIA CLAIMS, BECAUSE OF THE BREADTH OF THE COMPLAINT,

14      THEY'RE NOT AS TIGHT AS THEY OTHERWISE COULD BE AGAINST JUMP.

15           THE COURT:  OKAY.

16           MR. GOLDBERG:  THE CONSPIRACY CLAIM I THINK IS THE

17      EASIEST TO UNDERSTAND.

18           THE COURT:  AGAIN, I'M STILL, WHAT IS THE -- IS IT A

19      CONSPIRACY TO VIOLATE FEDERAL SECURITIES LAWS?  IS IT A

20      CONSPIRACY TO ENGAGE IN FRAUD?  WHAT'S THE -- WHAT IS THE -- IT

21      WAS UNCLEAR TO ME WHAT THE UNDER -- THERE HAS TO BE AN

22      UNDERLYING WRONG.  WE CAN CONSPIRE TO GO TO THE MARKET, AND

23      THAT'S FINE.

24           MR. GOLDBERG:  YES, WE CAN, ALTHOUGH I'M NOT SURE

25      THAT'S A CONSPIRACY, BUT THAT'S OKAY.

1          IT IS A CONSPIRACY TO COMMIT FRAUD.  WE CAN PLEAD THAT

2     BETTER IF THE COURT --

3               THE COURT:  AND PROBABLY -- I THINK YOU HAVE TO UNDER

4     RULE 9(B).

5               MR. GOLDBERG:  THAT'S FINE.  YEAH, WE DO, 100

6     PERCENT.

7               THE COURT:  ANYTHING ELSE YOU'D LIKE TO OFFER TODAY?

8               MR. GOLDBERG:  WE'VE TALKED ABOUT THE -- THAT UST IS

9     A SECURITY.

10         AND NO, UNLESS THE COURT HAS ANY QUESTIONS, I'M OKAY.

11              THE COURT:  THANK YOU.

12              MR. GOLDBERG:  THANK YOU SO MUCH.

13              THE COURT:  I'LL GIVE JUMP ONE MORE OPPORTUNITY FOR

14     REBUTTAL.

15              MR. COGAN:  YOUR HONOR, JUST VERY BRIEFLY.

16     COUNSEL ALLUDED TO PARAGRAPH 250 OF THEIR COMPLAINT

17     DESCRIBING I THINK WHAT THEY CONTEND JUMP SAID THAT WAS

18     MISLEADING.

19         I JUST WANT TO PUT THE DISCUSSION IN PARAGRAPH 138 IN

20     CONTEXT, AND WE COULD -- ACTUALLY, WE HAVE A SLIDE ON THIS THAT

21     I SKIPPED OVER PREVIOUSLY, BUT IT'S IN FRONT OF YOUR HONOR NOW.

22         SO THIS PRESS RELEASE THAT'S BEING DESCRIBED HERE IN

23     PARAGRAPH 138 IS ISSUED, IT SAYS ELSEWHERE IN THE COMPLAINT, ON

24     FEBRUARY 22ND, 2022.

25         SO JUST TO ANCHOR THAT IN TIME, YOU HAVE THE MAY '21

1    DE-PEGGING EVENT THAT WE'VE JUST TALKED ABOUT.

2          YOU THEN HAVE, AS ALLEGED IN THE COMPLAINT AND TALKED

3    ABOUT EXTENSIVELY IN TFL'S BRIEFING, A LOT OF PUBLIC DEBATE

4    ABOUT, WELL, COULD THIS THING DE-PEG AGAIN?  WILL IT RE-PEG?

5    WHAT'S GOING TO HAPPEN?  IS THIS THING STABLE?  IS IT NOT

6    STABLE?

7          THERE WERE A LOT OF CRITICS THAT WERE SAYING THAT IT

8    WASN'T STABLE AND IT WAS GOING TO DE-PEG AGAIN.  DO KWON WAS

9    SAYING NOT, RIGHT?

10         AND THEN IN THAT CONTEXT, IN THE BEGINNING OF 2022, THE

11   LUNA FOUNDATION GUARD IS CREATED AND A RESERVE IS PUT IN PLACE.

12   SO THE RESERVE IS, BY THE PLAINTIFF'S OWN ALLEGATIONS, DESIGNED

13   TO BE DEPLOYED IF THERE ARE VOLATILE CONDITIONS AND UST LOSES

14   ITS PEG.

15         SO THE WHOLE IDEA THAT JUMP WAS SUGGESTING SOMEHOW,

16   THROUGH EITHER THIS STATEMENT OR ANYTHING ELSE, THAT IT'S

17   STABLE, THAT IT CAN'T BECOME DE-PEGGED, IS ACTUALLY JUST FLATLY

18   INCONSISTENT WITH WHAT WAS ACTUALLY BEING SAID, WHICH IS THAT

19   IT COULD BECOME DE-PEGGED IN VOLATILE CONDITIONS, AND IF THAT

20   WERE TO HAPPEN, THE RESERVE THAT IS BEING PUT IN PLACE IS GOING

21   TO BE ABLE TO HELP DEFEND THE PEG TO HOPEFULLY BRING IT BACK

22   INTO -- TO THE PEG.

23         AND SO THE SUGGESTION THAT THERE WAS ANYTHING MISLEADING,

24   AS DESCRIBED IN PARAGRAPH 250, BY WHAT MR. KARIYA, WHO WAS

25   JUMP CRYPTO'S PRESIDENT, SAYS IN PARAGRAPH 138, I THINK WE

1    DISAGREE WITH AND, IN FACT, THIS STATEMENT IS THE OPPOSITE OF

2    FRAUD IN THAT IT CANDIDLY DESCRIBES AND IS BEING MADE IN THE

3    CONTEXT WHERE PEOPLE ARE OPENLY ACKNOWLEDGING THAT THERE COULD

4    BE A DE-PEG, AND THAT IN THAT CASE MONEY, THIS TIME FROM THE

5    LUNA FOUNDATION GUARD, COULD BE DEPLOYED TO HELP RE-PEG IT.

6            THE COURT:  AND I UNDERSTAND YOUR ARGUMENT ON THAT.

7        I THINK, AS I UNDERSTAND IT, THE THEORY THAT'S REALLY

8    BEING PUSHED NOW IS THAT THIS IS -- YOU KNOW, WHAT WE'RE

9    TALKING ABOUT IS LESS ABOUT MISREPRESENTATION OR A FALSE

10   STATEMENT CLAIM THAN A DEVICE CLAIM, RIGHT?

11       I GUESS THAT GOES TO WHAT YOU WERE ARGUING ABOUT EARLIER,

12   BUT THAT THE ARGUMENT IS THIS IS FURTHER EVIDENCE OF SORT OF AN

13   INTENTIONAL MANIPULATION OF THE MARKET BY CONTINUING TO TELL

14   THE STORY THAT THIS IS SELF-REGULATING AND THEY'RE PUTTING SOME

15   ADDITIONAL GUARDS IN PLACE, BUT STILL FAILING TO DISCLOSE WHAT

16   REALLY -- THE REAL THING THAT HAPPENED, WHICH IS THAT IT WAS

17   THEIR INFUSION OF THEIR -- IT WAS AN INFUSION OF PURCHASES BY

18   JUMP THAT WAS THE REASON THAT IT RE-PEGGED IN THAT PRIOR TIME

19   PERIOD.

20           MR. COGAN:  RIGHT.  SO I GUESS MY FINAL THOUGHT FOR

21   YOUR HONOR IS I TAKE THE POINT ABOUT THE SUPPOSED MANIPULATION

22   IN MAY OF '21.

23       BUT HERE WE'RE TALKING ABOUT STATEMENTS MADE IN '22 THAT

24   THEY CONTEND ARE FRAUDULENT, AND I THINK WHAT THEY'RE TRYING TO

25   SAY IS, YOU SHOULD HAVE SAID MORE, YOU SHOULD HAVE SAID THAT

1   WE -- WE, JUMP TRADING -- ACTUALLY WERE THE ONES THAT

2   STABILIZED THE PEG BACK IN MAY 2021.

3           AND I THINK THE LAW IS CLEAR, WE CITED IN OUR PAPERS, AND

4   I'LL JUST MENTION THE CASE WITHOUT GETTING INTO IT, IT'S THE

5   BRODY CASE THAT I THINK THAT PLAINTIFFS CITE AS WELL, THERE IS

6   A HUGE DIFFERENCE BETWEEN NOT INCLUDING IN A PUBLIC STATEMENT

7   EVERY SINGLE POTENTIALLY RELEVANT FACT AND THEN -- ON THE ONE

8   HAND, WHICH IS NOT FRAUD AND IT'S NOT MISLEADING UNDER THE KIND

9   OF PARTIAL TRUTHS CASE LAW -- AND WHAT WE HAVE HERE, WHICH IS

10  AN ALLEGATION THAT WE AFFIRMATIVELY CREATED A MISUNDERSTANDING

11  ABOUT THE STATE OF AFFAIRS THAT IS MISLEADING.

12          AND SO IF WE HAD SAID SOMETHING LIKE, YOU KNOW, TFL NEVER

13  HAD TO DEPLOY CAPITAL TO RESTORE THE PEG BACK IN MAY OF 2021, I

14  WOULD UNDERSTAND HOW THAT MIGHT FALL INTO THE WORLD OF BRODY,

15  RIGHT, BECAUSE THAT WOULD BE A LITERALLY TRUE STATEMENT.  TFL,

16  ACCORDING TO THEM, DID NOT DEPLOY CAPITAL IN MAY OF 2021 TO

17  RESTORE THE PEG.  ACCORDING TO THEM, IT WAS JUMP TRADING.

18          BUT IT WOULD BE ARGUABLY MISLEADING BECAUSE YOU WOULD BE

19  CREATING AN IMPRESSION ABOUT WHAT HAPPENED AS, YOU KNOW,

20  CONSISTENT WITH WHAT THEY'VE CONTENDED OTHER PEOPLE SAID, THAT

21  THE PEG RESTORED ITSELF ON ITS OWN.

22          BUT THE POINT IS, AND THEN I'LL SIT DOWN, IS THAT THAT IS

23  NOT EVEN CLOSE TO WHAT MR. KARIYA SAID IN THIS PARAGRAPH THAT

24  THE PLAINTIFFS POINT TO, OR ANY OTHER PARAGRAPH IN THE

25  COMPLAINT.

1              THE COURT:  THANK YOU.

2         THE ARGUMENTS ARE WELL TAKEN AND WILL BE CONSIDERED, AND I

3    WILL ISSUE AN OPINION FORTHWITH.

4         THE CASE IS SUBMITTED.

5              MR. COGAN:  THANK YOU, YOUR HONOR.

6              MR. GOLDBERG:  THANK YOU, YOUR HONOR.

7              THE CLERK:  COURT IS CONCLUDED.

8         (THE PROCEEDINGS WERE CONCLUDED AT 11:39 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18              DATED:  OCTOBER 11, 2023

19

20

21

22

23

24

25