UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, | Case No.  22-cv-03600-PCP |
| Plaintiff, | |
| | **ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING MOTION TO DISMISS** |
| v. | |
| JUMP TRADING LLC, | |
| Defendant. | |

In this putative securities class action, lead plaintiff Michael Tobias and additional plaintiff Nick Patterson assert various securities fraud claims against defendant Jump Trading LLC for Jump's involvement in the promotion and sale of cryptocurrency tokens that dramatically dropped in price within a matter of days in May 2022. Jump moves to compel arbitration and to dismiss plaintiffs' second amended complaint for failure to state a claim. For the reasons that follow, the Court denies Jump's motion to compel arbitration and grants Jump's motion to dismiss with leave to amend.

## BACKGROUND

This case at one time involved multiple defendants. It now involves just one: Jump Trading LLC.[1] Jump Trading LLC, in conjunction with its business division Jump Crypto (together "Jump"), is a Delaware limited liability company that "engages in algorithmic trading of a variety of asset classes, including digital and traditional assets." Second Amended Complaint, Dkt. No.

---

[1] The plaintiffs initially brought the seconded amended complaint against TerraForm Labs Ptd Ltd., Jump Trading LLC, Tribe Capital, DeFinance Capital/Definance Technologies Oy, Three Arrows Capital Ptd Ltd., and individual defendants Nicholas Platias and Do Kwon. Second Amended Complaint, Dkt. No. 102 ("SAC") ¶ 1. The plaintiffs have since moved to voluntarily dismiss, without prejudice, defendants Nicholas Platias, Definance Capital/Definance Capital OY ("Definance"), Tribe Capital, and Three Arrows Capital Pte. Ltd., Dkt. No. 144, at 2, as well as defendants Terraform Labs, Pte. Ltd., and Do Kwon, Dkt. No. 146, at 2.

102 ("SAC") ¶¶ 18, 57. The plaintiffs allege that Jump colluded with and was a principal participant in a fraudulent scheme with former defendants including Terraform Labs Pte. Ltd. (TFL) and its Chief Executive Officer Do Kwon.[2]

In 2018, Mr. Kwon founded TFL, a company headquartered in Singapore that focuses on "developing, marketing, and selling a suite of digital assets and financial products." SAC ¶¶ 3,17, 41. Cryptocurrency tokens—one form of digital asset—are a kind of "financial product that is contractually based (via a 'smart' contract) and is created and uploaded permanently to a given blockchain." *Id.* ¶ 3 n.3. A "blockchain protocol" is computer code "that operates as a set of regulations and guidelines that govern the functioning of various parts of a blockchain company's technology." *Id.* ¶ 3 n.2. "Cryptocurrency markets are notoriously volatile." *Id.* ¶ 62. "Stablecoins" are a form of cryptocurrency that purport to solve the problem of "wild fluctuations … by attempting to tie or 'peg' their market value to an external collateral with less volatility, such as another currency (*e.g.*, U.S. dollars), commodity (*e.g.*, gold), or financial instrument (*e.g.*, stocks, cryptocurrencies, etc.)." *Id.* "The price of a stablecoin … is supposed to always remain at $1" (or the value of whatever other external collateral the coin is pegged to). *Id.* Stablecoin developers "have devised two primary ways to maintain price stability: overcollateralization with fiat reserves and algorithmic stablecoins." *Id.* ¶ 62.

TFL operates the "Terra" blockchain and protocol. SAC ¶ 3. "Terra Tokens" refer to the range of TFL's digital assets, including the UST and LUNA coins, which are TFL's "largest Terra ecosystem digital assets by market cap." *Id.* ¶ 5. The UST is "an algorithmic stablecoin that operates through a pair of tokens (the stablecoin itself and another digital asset that backs the stablecoin) and a smart contract that regulates the relationship between the two (*i.e.*, the algorithm)." *Id.* ¶ 62. The UST is pegged to $1 and backed by the LUNA, its companion coin. *Id.* ¶¶ 61–62. While an overcollateralized coin would allow swapping the coin for $1 in dollar reserves, the algorithmic UST stablecoin instead allows coin holders to "exchange one UST

---

[2] For the purposes of Jump's motion to dismiss, the Court assumes the truth of all facts alleged in plaintiffs' second amended complaint. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 n.1 (9th Cir. 1987).

United States District Court
Northern District of California

1   stablecoin for $1 worth of TFL's LUNA" coin. *Id.* ¶¶ 61–62. To "maintain UST's 1:1 parity with

2   the U.S. dollar, TFL's algorithm mints and burns UST and LUNA to control the supply and keep

3   the value of UST steady at $1, while at the same time incentivizing arbitrageurs to trade the UST

4   back to its peg of $1 if it deviates." *Id.* ¶ 62.

5       TFL never registered any offering of securities nor registered the Terra Tokens as a class

6   of securities pursuant to federal securities law. SAC ¶ 77. TFL and Mr. Kwon, however, "touted

7   the expertise and success of the Terraform team" and "aggressively marketed TFL's crypto asset

8   securities to U.S. investors." *Id.* ¶¶ 80, 82. Investors like Mr. Tobias and Mr. Patterson allegedly

9   invested fiat and digital currencies to purchase Terra Tokens with the expectation of profit.

10  *Id.* ¶ 86.

11      TFL also developed protocols to support the sale and promotion of Terra Tokens. SAC ¶ 3.

12  These protocols operate like company charters with "a set of regulations and guidelines that

13  govern the functioning of various" technologies. *Id.* ¶ 3 & n.2. TFL launched its most popular

14  protocol, the Anchor Protocol, in August 2020. *Id.* ¶¶ 69–70. The Anchor Protocol allegedly

15  functions like "a type of high-yield savings account whereby investors can 'stake' or deposit UST

16  with TFL in exchange for a guaranteed 20%" rate of return. *Id.* ¶ 6.

17      Users, including the lead plaintiff, accessed the Anchor Protocol through a web application

18  called the Anchor Protocol Interface ("Interface"). In order to connect to the Interface, users first

19  had to accept the Anchor Terms of Service (TOS) that "explain[] the terms and conditions by

20  which" users "may access and use the Interface." Amani Decl., Dkt. No. 122-1, at 5. The first

21  paragraph of the agreement states:

22          Welcome to https://anchorprotocol.com/, a website ("Site") that
23          provides access to https://app.anchorprotocol.com/, a website-hosted
            user interface (the "App") (collectively referred to as the
24          "Interface") provided by Terraform Labs PTE, Ltd. ("Terra", "we",
            "our", or "us"). The Interface provides access to a decentralized
25          protocol on the Terra blockchain that allows suppliers and borrowers
            of certain digital assets to participate in autonomous interest rate
26          markets (the "Protocol").

27  *Id.* Throughout the agreement, the TOS refers to users of the Interface as "you." *Id.* ("This

28  Agreement applies to you ('You') as a user of the Interface, including all the products, services,

tools, and information made available on app.anchorprotocol.com or on anchorprotocol.com.").
The TOS includes the following provisions regarding dispute resolution:

> Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute"), shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules")

> You understand that you are required to resolve all Disputes by binding arbitration. The arbitration shall be held on a confidential basis before one or three arbitrators, who shall be selected pursuant to SIAC Rules. The seat of the arbitration shall be determined by the arbitrator(s); the arbitral proceedings shall be conducted in English. The applicable law shall be Singapore law.

*Id.* at 11.

Jump has been involved with TFL since at least 2019, when Jump's President Kanav Kariya met with Mr. Kwon to discuss UST. SAC ¶ 56. In November 2019, TFL loaned Jump 30 million LUNA to "improve liquidity" because of LUNA's "lackluster … performance." *Id.* ¶¶ 30–31. Jump began to sell LUNA into the market in July 2020, thereby "allowing investors to purchase LUNA through transactions in secondary markets." *Id.* ¶ 31. In September of that year, TFL loaned Jump an additional 65 million LUNA. *Id.* ¶ 32. "To receive the LUNA, Jump had to meet certain thresholds related to trading in UST. Jump met the first threshold and began receiving LUNA pursuant to the loan from TFL in January 2021." *Id.* ¶ 32. The loan and Jump's sales of LUNA "allowed public investors, including U.S. investors, to acquire LUNA through transactions in the secondary market, and generated speculative interest in LUNA." *Id.* ¶ 32.

In late May 2021, the "UST began to de-peg from the U.S. dollar … dropping to nearly $0.90" by May 23, 2021. SAC ¶ 191. "That morning and throughout the day, Kwon communicated repeatedly with Jump" and "expressed concern over UST's value." *Id.* ¶ 191. After Mr. Kwon "discussed with Jump how to restore UST's peg to the dollar," Jump purchased "large quantities of UST throughout the day on May 23 and continuing through May 27." *Id.* ¶¶ 191–92. Following those purchases, "UST's market price began to rise" and "eventually was restored to

near $1." *Id.* ¶ 192. This conduct was allegedly central in efforts to mislead investors about the stability of the algorithm. *Id.* ¶ 202.

Subsequently, Mr. Kwon "agreed to remove the loan agreement conditions requiring Jump to achieve the requisite benchmarks to receive the loaned LUNA tokens" and agreed to deliver "the remaining 61,458,334 LUNA tokens to Jump." SAC ¶ 193. Those modifications were reduced to writing in a July 21, 2021 agreement, whose terms promised Jump LUNA tokens at $0.40 per token during a time when "LUNA was trading at more than $90 in the secondary market." *Id.* ¶ 194. In total, the plaintiffs allege that Jump generated profits of $1.28 billion as a result of its agreements with TFL. *Id.* ¶ 195.

The cause of the re-peg, TFL's loans to Jump, and Jump's role in increasing the price of Terra Tokens were not publicly disclosed to investors. Rather, the plaintiffs allege that Jump joined TFL and others in "mislead[ing] investors who were actively buying and trading UST to believe that the algorithm had 'self-heal[ed]' to restore the peg without any human involvement." SAC ¶ 202.

In January 2022, as part of its efforts to promote the stability of the algorithm, "TFL formed the Luna Foundation Guard—a group of six venture capital groups that promised to support and fund the Terra ecosystem and to 'defend the peg' in the event that high volatility caused the UST/LUNA pair to become untethered from one another." SAC ¶¶ 6, 48. Mr. Kariya served as a founding member of the Luna Foundation Guard's Governing Council. *Id.* ¶ 53. The plaintiffs allege that the Luna Foundation Guard and its members made a series of statements "attributing UST's recovery from the May 2021 depegging to the resiliency of algorithmic stablecoins—rather than an infusion of capital" without disclosing the nature of the intervention that restored the UST's peg. *Id.* ¶ 49 & n.19; *see id.* ¶ 250. In addition to those statements, the plaintiffs allege that Jump, without disclosing its role in stabilizing the peg, made a series of misleading statements and misrepresentations that are actionable under the securities laws.

First, on October 11, 2021, Jump published a "now-deleted" blog post on their website titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market" and stating:

United States District Court
Northern District of California

> We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin.

SAC ¶ 129.

Second, on January 28, 2022, Mr. Kariya posted the following statements about Terra Tokens on Twitter:

> It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M.
>
> …
>
> A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA.

SAC ¶ 131.

Third, in a Luna Foundation Guard press release issued on February 22, 2022, Mr. Kariya stated:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST…. It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.

SAC ¶¶ 136, 138, 250.

Fourth, on March 1, 2022, the plaintiffs allege that "Kwon appeared with Jump's Kariya on the Ship Show and promoted the stability and security of the UST and LUNA peg as Terra's two most 'attractive' features." SAC ¶ 142.

Fifth, on March 10, 2022, Jump promoted an article titled "Yield Farming for Serious People" on its website. The article "purports to 'illuminate' the concept of 'yield farming' (i.e.

earning compounding returns on crypto assets) for investors" and specifically "provides the following solicitation for Terra securities":

> There are many examples, but consider two prominent ones that are more retail-facing. First, traders on Coinbase have the option to stake their Ether on the platform, i.e., delegate their Ether to Coinbase as it participates in upgrading the Ethereum network to Ethereum 2.0, in exchange for interest of around 5% (at the time of writing). Second, Terra traders can use the Terra Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards.

SAC ¶ 145. The promotion of this article was purportedly accompanied by a link to another article titled "Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem," encouraging investors "to stake LUNA directly through the Terra Station wallet." *Id.* ¶ 145. "Around the same time, two of TFL's early investors, Polychain Capital and Area, proposed a cut to the yield rate in the Anchor Protocol," something Mr. Kariya rejected. *Id.* ¶ 146.

Plaintiffs allege that by May 2022, "structural vulnerabilities within the Terra ecosystem precipitated a massive selloff of both UST and LUNA." SAC ¶ 158. Between May 7 and May 12, 2022, "[t]he price of UST and LUNA Tokens dropped by 91% and 99.7% … after it was revealed that TFL's largest digital assets were unstable and unsustainable." *Id.* ¶ 159.

After purchasing 454,991 Terra Tokens on April 6, 2022 for $1 per token, Mr. Tobias lost $441,062.82 as a result of the selloff. SAC ¶ 15; Dkt. No. 19-4, at 2. Mr. Patterson purchased Terra Tokens in the first few months of 2022 as well, resulting in significant investment losses because of the same selloff. SAC ¶ 16; Dkt. No. 25-3, at 2–7.

On these allegations, lead plaintiff Mr. Tobias and co-plaintiff Mr. Patterson bring this putative class action alleging several violations of federal securities law. The plaintiffs also bring claims in the alternative under the Racketeer Influenced and Corrupt Organizations Act (RICO) and for aiding and abetting, conspiracy, and unjust enrichment under California state law.

Jump now moves to compel arbitration pursuant to the arbitration agreement between Mr. Tobias and TFL and to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**LEGAL STANDARDS**

### A.      Motion To Compel Arbitration

With limited exceptions, the Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce. 9 U.S.C. § 1 *et. seq.* Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the reconvocation of any contract." 9 U.S.C. § 2. The FAA reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up). When a party moves to compel arbitration pursuant to the FAA, the Court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The Court must enforce the agreement according to its terms if "the response is affirmative on both counts." *Id.* Unless parties have "clearly and unmistakably provide[d] otherwise," the "arbitrability of a particular dispute is a threshold issue to be decided by the courts." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

### B.      Motion To Dismiss

In order to comply with pleading requirements of Federal Rule of Civil Procedure 8(a)(2) and survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Alt. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). A claim is plausible on its face "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citing *Twombly*, 550 U.S. at 556). In evaluating a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 n.1 (9th Cir. 1987). The Court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

In any action alleging fraud, additional requirements apply. Under Federal Rule of Civil

1    Procedure 9(b), the plaintiff must state the circumstances constituting the alleged fraud with

2    particularity. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

3    Furthermore, in any securities class action challenging a defendant's alleged misrepresentations or

4    misleading omissions, the Private Securities Litigation Reform Act of 1995 (PSLRA) requires that

5    the complaint "specify each statement alleged to have been misleading, the reason or reasons why

6    the statement is misleading, and, if an allegation regarding the statement or omission is made on

7    information and belief, … all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). For

8    each alleged misstatement or omission, the complaint must also "state with particularity facts

9    giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

10   § 78u-4(b)(2)(A). "A litany of alleged false statements, unaccompanied by the pleading of specific

11   facts indicating why those statement were false, does not meet" PSLRA's standard. *Metzler Inv.*

12   *GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

13   **ANALYSIS**

14   **I.**     **Jump Cannot Compel Arbitration Under the Agreement between Tobias and TFL.**

15         When registering to use TFL's Anchor Protocol Interface, lead plaintiff Michael Tobias

16   and TFL agreed that they would arbitrate certain disputes that might arise between them. It is

17   undisputed that Jump was not a party to that agreement and has never entered into any other

18   arbitration agreement with Mr. Tobias. Jump nonetheless contends that it may invoke Mr.

19   Tobias's agreement with TFL to compel arbitration of Mr. Tobias's claims against Jump in this

20   lawsuit. Jump's motion presents two distinct issues: (1) whether Mr. Tobias has agreed that the

21   arbitrator, rather than this Court, must determine whether his claims against Jump are subject to

22   the TFL arbitration agreement, and, if not, (2) whether Mr. Tobias must arbitrate his claims

23   against Jump. For the reasons explained below, the Court answers both questions in the negative.

24        **A.**     **The Court Will Decide the Threshold Issue of Arbitrability.**

25         The threshold issue presented here is whether this Court has the power to decide whether

26   Mr. Tobias agreed to arbitrate his claims against Jump, or whether that determination must be

27   made by the arbitrator in the first instance.

28         Because arbitration is a matter of contract, "courts must enforce arbitration contracts

*United States District Court*
*Northern District of California*

according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). An "agreement to arbitrate a gateway issue" like arbitrability "is simply an additional, antecedent agreement the party seeking arbitration asks the federal courts to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* (quoting *Rent–A–Center*, 561 U.S. at 68–70). "To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.* at 530 (citing 9 U.S.C. § 2). "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.*

While the FAA requires courts to enforce an agreement to assign questions of arbitrability to the arbitrator, the Supreme Court has emphasized that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Henry Schein,* 139 S. Ct. at 531. The law therefore "treats silence or ambiguity about the question *who* (primarily) should decide arbitrability differently from the way it treats silence or ambiguity about the question *whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement—for in respect to this latter question the law reserves the presumption" favoring arbitration of the dispute. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (cleaned up).

Jump argues that the arbitrator, rather than the Court, must decide whether Jump can enforce the arbitration agreement between Mr. Tobias and TFL because Mr. Tobias agreed to "a clear and unmistakable delegation clause … that specifies that the arbiter, rather than a court, should resolve any questions concerning arbitrability." Dkt. No. 114, at 14. The provision in the arbitration agreement is not in dispute. It states:

> We will use our best efforts to resolve any potential disputes through informal, good faith negotiations. If a potential dispute arises, you must contact us by sending an email to legal@anchorprotocol.com so that we can attempt to resolve it without resorting to formal dispute resolution. If we aren't able to reach an informal resolution within sixty days of your email, then you and we both agree to resolve the potential dispute according to the process set forth below.

> Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute"), shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules").

Amani Decl., Dkt. No. 122-1, Ex. A ¶ 18; Dkt. No. 122, at 34.

Given the language of this agreement, there can be no dispute that Mr. Tobias and TFL agreed to assign at least some questions of arbitrability to the arbitrator. But Jump's position can prevail only if there is clear and unmistakable evidence that Mr. Tobias's agreement includes an agreement to arbitrate the question of whether a third party nonsignatory to the agreement like Jump is entitled to enforce the agreement.

Jump identifies no such evidence here. The arbitration clause contains no express reference to disputes with third parties like Jump, let alone to issues of arbitrability that might arise in connection with such disputes. To the contrary, the clause provides that "*you and we* both agree to resolve [any] potential dispute according to the [arbitration] process set forth" therein, defining you as Mr. Tobias and "we" as TFL alone. Further, the clause's provision requiring arbitration of "any claim or controversy as to arbitrability" at least arguably modifies "any acts or omissions for which you may contend that *we* are liable," with "we" once again defined to include only TFL. *See* Amani Decl., Dkt. No. 122-1, at 5 (clarifying that the Anchor TOS refers to "Terraform Labs PTE, Ltd. ('Terra', 'we', 'our', or 'us')").

Under binding Ninth Circuit precedent, this language is insufficient to demonstrate the parties' intent to assign the question of whether a third party may enforce the parties' arbitration agreement to the arbitrator. In *Kramer v. Toyota Motor Corp.*, the Ninth Circuit considered an arbitration clause that assigned questions of arbitrability to the arbitrator but also stated, before doing so, that "[e]ither you or we may choose to have any dispute between you and us decided by arbitration." 705 F.3d 1122, 1127 (2013). That language, the Ninth Circuit held, evidenced the parties' "intent to arbitrate arbitrability" with the other party to the arbitration agreement "and no one else." *Id.* That reasoning applies here, given that the agreement between TFL and Mr. Tobias contains "you and we" language (in the paragraph immediately preceding the language on which

Jump relies) that is legally indistinguishable from the language the Ninth Circuit found dispositive in *Kramer*.

Jump contends that this Court is not bound by *Kramer* because it is inconsistent with the Supreme Court's more recent decision in *Henry Schein*. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ("[A] published decision of this court constitutes binding authority which 'must be followed unless and until overruled by a body competent to do so.'") (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001)). But *Henry Schein* did not consider the circumstances presented in *Kramer*. Instead, the question addressed by the Court in *Henry Schein* was whether courts can decline to enforce delegation clauses and "decide the arbitrability question themselves if the argument that the arbitration agreement applies to the particular dispute is 'wholly groundless.'" *Henry Schein*, 139 S. Ct. at 528. The Court considered whether this "wholly groundless" exception was consistent with the Federal Arbitration Act and held that it was not, reiterating that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Id. Henry Schein* did not change the requirement that courts must determine whether a valid arbitration agreement exists and whether that agreement in fact contains "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability before compelling arbitration. *Id.* at 530–31. To the contrary, the Supreme Court remanded the case back to the lower courts to allow them to address "in the first instance" whether there was in fact "clear and unmistakable evidence" that "the parties agreed to arbitrate arbitrability," reiterating that "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" *Id.* at 531.

Unlike *Henry Schein*, in which the Court "express[ed] no view about whether the contract at issue in this case in fact delegated the arbitrability question to an arbitrator," 139 S. Ct. at 531, *Kramer* addressed that preliminary inquiry about the agreement to delegate arbitrability issues in the specific context presented here—namely, whether there was clear and unmistakable evidence that the parties to that agreement had agreed to arbitrate the arbitrability of disputes with third parties. Because *Kramer* addressed the issue now before the Court and was not overruled by

United States District Court
Northern District of California

1    *Henry Schein*, it remains binding precedent that this Court must follow. *Hart*, 266 F.3d at 1170

2    ("A district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on

3    his own court of appeals who have ruled on a controlling legal issue, or with Supreme Court

4    Justices writing for a majority of the Court. Binding authority within this regime cannot be

5    considered and cast aside; it is not merely evidence of what the law is. Rather, caselaw on point is

6    the law. … Binding authority must be followed unless and until overruled by a body competent to

7    do so.").

8         It also bears noting that Jump's interpretation of *Henry Schein* would lead to consequences

9    that would almost certainly fall well outside the understandings or expectations of the parties who

10   agree to such provisions, producing an outcome contrary to basic principles of contract law. *Cf.*

11   *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration

12   is a matter of contract and a party cannot be required to submit to arbitration any dispute which he

13   has not agreed so to submit."); *In re Holl*, 925 F.3d 1076, 1083 (9th Cir. 2019); *Liberty Surplus*

14   *Ins. Corp. v. Samuels*, 562 F. Supp. 3d 431, 438 (N.D. Cal. 2021) ("Under California law, [t]he

15   fundamental rules of contract interpretation are based on the premise that the interpretation of a

16   contract must give effect to the 'mutual intention' of the parties.").

17        Under Jump's proposed rule, once an individual entered into an arbitration agreement

18   assigning questions of arbitrability to the arbitrator, anyone anywhere in the world could insist

19   upon arbitrating a dispute with that individual and the courts would be required to grant a motion

20   to compel no matter how disconnected that dispute might be from the arbitration agreement. If

21   TFL and its landlord had a dispute over his TFL's rent payments, for example, TFL's landlord

22   could invoke the arbitration agreement between TFL and Mr. Tobias and insist that the

23   arbitrability of the rent dispute had to be determined by the arbitrator. This would be so even

24   though TFL certainly could not possibly have intended, in drafting the terms of service for users of

25   the Anchor Protocol, to send any dispute with its landlord to an arbitrator. To the contrary,

26   "[g]enerally, the contractual right to compel arbitration 'may not be invoked by one who is not a

27   party to the agreement and does not otherwise possess the right to compel arbitration.'" *Kramer*,

28   705 F.3d at 1126 (quoting *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993)).

United States District Court
Northern District of California

It is the parties to the agreement and their intentions in entering that agreement that matter and, in the absence of clear and unmistakable evidence, the Court is reluctant to conclude that the parties intended to arbitrate all questions of arbitrability arising in any dispute they might have with any third party anywhere else in the world, as Jump suggests. Under *Kramer*, the agreement between TFL and Mr. Tobias lacks clear and unmistakable evidence of the parties' intent to assign questions regarding the arbitrability of disputes with third parties to the arbitrator. That question must therefore instead be answered by the Court.

**B.      Jump May Not Compel Arbitration Because the Plaintiffs' Claims Against Jump Do Not Fall Within the Arbitration Agreement's Scope and Equitable Estoppel Does Not Require Arbitration Here.**

In moving to compel arbitration, Jump argues that the arbitration agreement itself encompasses this dispute and that it can enforce the agreement under the doctrine of equitable estoppel, which "allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration" under certain limited circumstances. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020). Jump's argument is without merit.

**1.      Federal Common Law Applies.**

At the outset, the Parties dispute whether federal common law or California state law should guide the court's analysis. Citing the Ninth Circuit's decision in *Setty v. Shrinivas Sugandhalaya LLP*, Jump argues that federal common law applies in determining the arbitrability of claims by a nonsignatory. 3 F.4th 1166, 1168 (9th Cir. 2021). By contrast, the plaintiffs argue that California law and the so-called "*Goldman* factors" should be applied in determining the arbitrability of claims by a nonsignatory.[3] Jump is correct.

---

[3] Under California law, a nonsignatory may compel arbitration under only two circumstances sometimes called the *Goldman* factors: "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 948–49 (9th Cir. 2022); *see Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 218 (2009) (articulating two circumstances).

14

United States District Court
Northern District of California

The plaintiffs do not dispute that the arbitration clause in the Anchor TOS involves an international agreement governed by the New York Convention, "a multilateral treaty that addresses international arbitration" and that is implemented in Chapter 2 of the FAA. *Outokumpu Stainless*, 140 S. Ct. at 1644. That is because TFL, a signatory to the agreement, is a foreign entity seeking to enforce arbitration in Singapore according to the Arbitration Rules of the Singapore International Arbitration Center. *See* 9 U.S.C. § 202 (explaining that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention" unless, with limited exception, the "agreement or award arising out of such a relationship … is entirely between citizens of the United States").

"In cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, [courts] apply 'federal substantive law,' for which [they] look to 'ordinary contract and agency principles.'" *Setty*, 3 F.4th at 1168. The Court will therefore apply federal substantive law to determine whether Jump can require Mr. Tobias to arbitrate the claims at issue here.

### 2.      Jump Cannot Enforce Mr. Tobias's Agreement with TFL.

Although Jump is correct that the arbitrability of Mr. Tobias's claims is governed by federal rather than state law, that conclusion does not help Jump because federal law permits third parties to enforce arbitration agreements only where the claims at issue are intertwined with the contract in which the arbitration agreement appears, a requirement that is not satisfied here.

Jump argues that equitable estoppel applies under federal law "because Lead Plaintiff alleges collusive conduct between Jump Trading and TFL." Dkt. No. 114, at 22. Relying upon a single-judge concurrence in an Eleventh Circuit opinion, Jump contends that the federal equitable estoppel test "permits nonsignatories to compel arbitration if *either* (1) 'the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory' *or* (2) 'the signatory raises allegations of collusive misconduct between the nonsignatory and other signatories to the contract.'" Dkt. No. 137, at 15 (citing *Outokumpu Stainless USA, LLC v. Coverteam SAS*, 2022 WL 2643936, at *7 (11th Cir.

July 8, 2022) (Tjoflat, J., concurring)); *see* Dkt. No. 114, at 20–21. This is not the law of the Ninth Circuit, however. To the contrary, *Setty* held that "[f]or equitable estoppel to apply, it is essential … that the subject matter of the dispute be intertwined with the contract providing for arbitration." 3 F.4th at 1169 (citing *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844 (9th Cir. 2013)). Where the plaintiff's claims "d[o] not arise out of or relate to the contract that contained the arbitration agreement," the nonsignatory defendant may not compel the plaintiff to arbitrate claims on the basis of equitable estoppel. *Rajagopalan*, 718 F.3d at 848. In *Rajagopalan*, for example, the plaintiff's claims against the non-signatory defendant were not related to the terms of any contract containing an arbitration agreement, but instead involved "statutory claims that [were] separate from the … contract itself." *Id.* at 847–48. The Ninth Circuit therefore found no basis to compel arbitration of the plaintiff's claims against the non-signatory defendant. *Id.* at 848.

Jump's argument fails for the same reason. Mr. Tobias is not relying on the terms of his written agreement with TFL to assert his claims against Jump or pursuing claims against Jump that are intertwined with the terms of his contractual agreement with TFL. Indeed, the subject of Mr. Tobias's overall agreement with TFL is rather limited and addresses only Mr. Tobias's use of TFL's Interface for accessing the Anchor Protocol.[4] Instead, Mr. Tobias alleges a series of statutory securities fraud claims arising from Jump's alleged conduct and statements surrounding the May 2021 repeg of UST. While the arbitration clause arguably encompasses a broader range of disputes that might arise *between Mr. Tobias and TFL*, that is of no assistance to Jump.[5]

Because Jump is not a party to Mr. Tobias's agreement with TFL and because Mr. Tobias's claims against Jump are not intertwined with that agreement, Jump's motion to compel arbitration of those claims is denied.

---

[4] Jump argues that the arbitration clause encompasses the claims here because it "covers all disputes 'arising out of or relating to the Interface, this Agreement … or any other acts or omissions for which you may contend that we are liable." Dkt. No. 114, at 25. But Mr. Tobias's claims do not involve the Interface or the terms of his Agreement to use the Interface, and the clause's third provision governing "other acts or omissions" applies only to claims against TFL.

[5] The Court need not consider whether a different analysis would apply if the arbitration agreement required arbitration of *all* disputes with *any* party involving LUNA or UST.

16

## II.     The Second Amended Complaint Fails to State a Claim for Relief.

Having denied Jump's motion to compel arbitration, the Court must address Jump's motion to dismiss the second amended complaint for failure to state a claim. In so moving, Jump argues that the plaintiffs have failed to allege that Jump committed securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5(b), failed to allege that Jump committed securities fraud under Section 10(b) of the Exchange Act and Rules 10(a) and 10(c), and failed to plead control person liability for TFL and the Luna Foundation Guard's actions. Additionally, Jump argues that the plaintiffs have failed to state alternative claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and for aiding and abetting, conspiracy, and unjust enrichment under California state law.

### A.     The Plaintiffs Have Adequately Pleaded that Terra Tokens Are Securities.

As an initial matter, the Court must consider whether the plaintiffs have sufficiently pleaded that the Terra Tokens are securities, because the plaintiffs' federal securities claims are all premised on that disputed contention.

Under Section 2(a)(1) of the Securities Act, "investment contracts" are securities. An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The Ninth Circuit has distilled that test into three parts: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009).

The plaintiffs have adequately pleaded that investors invested money in Terra Tokens. The first prong requires only "that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." *Id.* at 1021. The plaintiffs plead that they and putative class members "invested fiat, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens," SAC ¶ 86, and that the "Terra Tokens were listed on U.S. based currency exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other currencies," *id.* ¶ 87. These alleged facts are sufficient to satisfy the first prong.

United States District Court
Northern District of California

The plaintiffs have also adequately pleaded that Terra Token investors were part of a common enterprise. This second prong "has been construed by [the Ninth] Circuit as demanding either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989). The plaintiffs allege that "investors were passive participants in the Terra Tokens' launch and potential profits of Plaintiffs and the Class were intertwined with those of Defendants and of other investors." SAC ¶ 90. Specifically, the plaintiffs plead that TFL and Mr. Kwon "pooled funds received from investors to develop the Terraform ecosystem and increase the value of LUNA" and that "the fortunes of LUNA purchasers were tied to one another, and each depended on the success of the Defendants' efforts and strategy and the Terraform ecosystem as a whole." *Id.* ¶ 92. TFL and Mr. Kwon allegedly invested proceeds to grow and expand the Terra ecosystem and "held significant amount of LUNA, tying their fortunes with LUNA investors' fortunes." *Id.* ¶¶ 93–94. These alleged facts are sufficient to satisfy the second prong.

Third, the plaintiffs have adequately pleaded that investors purchased Terra Tokens with a reasonable expectation of profit from the efforts of TFL and others. The third prong requires that "the investor be 'led to expect profits solely from the efforts of the promotor or a third party.'" *S.E.C. v. Rubera*, 350 F.3d 1084, 1091 (9th Cir. 2003). The Ninth Circuit has specifically "rejected a strict interpretation of this prong in favor of a more flexible focus on whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 1092 (cleaned up). The third prong "involves two distinct concepts: whether a transaction involves any expectation of profit and whether expected profits are the product of the efforts of a person other than the investor." *Id.*

The plaintiffs plead that "Terra Tokens were sold to investors prior to the Terra ecosystem being fully developed and able to handle the scale and scope of TFL's operations" with "the primary purpose … to make a profit or accumulate additional Terra Tokens from various rewards programs, rather than to utilize the Terra Tokens themselves for a task." SAC ¶ 95. Investors did

so, they allege, with the expectation of profit to be derived from the managerial and entrepreneurial efforts of TFL and the Luna Foundation Guard. *Id.* ¶ 96. The plaintiffs further allege that TFL and Mr. Kwon, through social media, blog posts, and marketing materials, for example, promoted LUNA as an investment that would "increase in value with the increased usage of the Terraform blockchain that could result from their continued development and maintenance," and touted the "functionality and promotion of TFL's algorithmic stablecoin UST and LUNA." *Id.* ¶¶ 100–109. These facts are sufficient at this stage to satisfy the third prong.

Accordingly, the plaintiffs have adequately pleaded that their purchases of Terra Tokens were investment contracts constituting securities under federal law. *See also SEC v. Terraform Labs*, No. 23-cv-1346 (JSR), 2023 WL 8944860, at *13–14 (S.D.N.Y. Dec. 28, 2023) (holding that there is no genuine dispute that UST, LUNA, and other tokens are securities because they are investment contracts under the *Howey* test); *SEC v. Terraform Labs*, No. 23-cv-1346 (JSR), 2023 WL 4858299, at *10 (S.D.N.Y. July 31, 2023) (holding that the SEC asserted a plausible claim that Terra Tokens qualify as securities under the *Howey* test).

### B. The Second Amended Complaint Fails To Adequately Plead that Jump Made Material Misrepresentations.

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person:

> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5(b), a plaintiff must plead: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (quoting *Apollo Grp. Inc.*, 774 F.3d at 603).

The plaintiffs challenge several statements as materially false or misleading, relying primarily on an omissions theory of liability and arguing that Jump failed to disclose that it "knew that the algorithm supporting the Terra ecosystem was insufficient, without human intervention to support the peg." Dkt. No. 130, at 18. The Court addresses each challenged statement in turn.

### 1. October 11, 2021 "Stablecoins" Blog Post

The plaintiffs allege that on October 11, 2021, Jump published a blog post "on the Insights portion of Jump's website titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market." It stated:

> We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin.

SAC ¶ 129.

The plaintiffs do not meet their burden with respect to this purported misstatement or omission. "Under the PSLRA, to properly allege falsity, a securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed.'" *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). In order for an omission to be actionable, "an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

As Jump points out, plaintiffs have not "specifically alleged that *Jump Trading* made an

omission" with respect to this statement. Dkt. No. 115, at 19 n.7 (emphasis in original). Rather the second amended complaint merely pleads that the originally named defendants *as a group* "never disclosed that it was the conduct of TFL, Kwon and Jump, and not the algorithm, that restored UST's peg." *Id.* (quoting SAC ¶ 202). Even if this group allegation sufficiently identifies what information Jump purportedly omitted, that is insufficient on its own to satisfy the heightened pleading standards under the PSLRA, which requires that the plaintiffs actually "specify the reason or reasons why" *this statement* was "misleading or untrue." *Brody*, 280 F.3d at 1006 (holding that the plaintiffs' allegations failed to satisfy the heightened pleading standards of the PSLRA where they "specif[ied] what information" the defendant omitted but did "not indicate why the statement" the defendant "made was misleading"). Plaintiffs' complaint fails to provide any specific allegations as to why this first statement was misleading in the absence of the information plaintiffs contend was improperly omitted. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003); *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.") (emphasis in original).

Even if the plaintiffs had satisfied their pleading burden, the first statement appears to "concern[] expressions of opinion, as opposed to knowingly false statements of fact." *Apollo Grp.*, 774 F.3d at 606. Jump's statements that they "believe there will be several winners," that they "are particularly excited about Terra and their dollar stablecoin UST," and that they "believe" that the UST "is the most elegant solution" are not "capable of objective verification." *Id.* As a general rule, "optimistic" statements involving inherently "subjective assessments" are not actionable as securities violations. *Id.*

### 2.    January 28, 2022 Kariya Twitter Comment

The plaintiffs allege that on January 28, 2022, Mr. Kariya, Jump's President, posted the following statements on Twitter:

> It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.

> Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M.
>
> …
>
> A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA.

SAC ¶ 131. Jump concedes that "the portion of Mr. Kariya's January 28, 2022 tweet stating that '[c]razily enough, on this 'bearish' day, there has been a net burn of LUNA,'" may contain an alleged statement of fact. Dkt. No. 115, at 16. Jump argues, however, that the plaintiffs never allege that this statement was "actually false nor explain how" it could be false, "falling far short of Rule 9(b)'s and the PSLRA's specificity requirements." *Id.* Jump is correct.

The PSLRA requires that the plaintiffs actually "specify the reason or reasons why" *this statement* was "misleading or untrue." *Brody*, 280 F.3d at 1006. In their Response, the plaintiffs allege that this statement was misleading because of its failure to disclose "that the algorithmic nature of the UST stablecoin had already failed once and required a secret bailout from Jump to maintain its dollar peg." Dkt. 130, at 12. Additionally, they assert that the thread "omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens." *Id.*

But again, the Complaint must specify the reason why this particular statement was misleading, and it does not. Plaintiffs merely plead generally that Defendants as a group "never disclosed that it was the conduct of TFL, Kwon and Jump, and not the algorithm, that restored UST's peg." SAC ¶ 202. The plaintiffs cannot remedy their failure to specify why *this statement* attributed to Jump was misleading by trying to address it in the first instance in their opposition brief. "By requiring specificity, § 78u–4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

### 3. February 22, 2022 Kariya Statement in Luna Foundation Guard Press Release and Jump Tweet

The plaintiffs allege that on February 22, 2022 Jump President Kariya made the following statement in a Luna Foundation Guard press release:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST …. It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.

SAC ¶¶ 136, 138, 250. The plaintiffs also allege that on the same day Jump endorsed Mr. Kariya's statement by retweeting the following:

> As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks.

SAC ¶ 139.

With respect to Mr. Kariya's statement, the second amended complaint alleges that "the *Luna Foundation Guard* was required to, but did not, disclose that UST was not 'stable' as promoted, that the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market[,] and that Anchor's staking rewards program was unsustainable and causing the 'stressful conditions' that would (and did) precipitate the de-pegging of UST and LUNA." SAC ¶ 250(f) (emphasis added). But the Luna Foundation Guard is not a defendant here, and the second amended complaint is silent as to why these statements were misleading coming from Mr. Kariya, what duty if any Mr. Kariya and Jump had to disclose, and, if so, what Mr. Kariya and Jump specifically were required to disclose. The plaintiffs have thus failed to adequately plead the specific reason why this particular statement by Jump was misleading.

Further, even if the plaintiffs had satisfied their pleading burden, these statements also appear to "concern[] expressions of opinion, as opposed to knowingly false statements of fact." *Apollo Grp.*, 774 F.3d at 606.

### 4. March 1, 2022, Kariya Appearance on Ship Show

The plaintiffs allege that Jump's Mr. Kariya appeared on the Ship Show with Mr. Kwon

and "promoted stability and security of the UST and LUNA peg as Terra's two most 'attractive' features." SAC ¶ 142. The plaintiffs allege that "the reference to the purported stability of the UST/LUNA peg was false and misleading because, again, it failed to disclose the fact that Jump had secretly bailed out the UST peg in May 2021." Dkt. No. 130, at 14. But they do not identify any *specific* statement made by Mr. Kariya, nor facts indicating what statements or omissions can be attributed to him specifically. The plaintiffs therefore fail to plead any actionable statement by Mr. Kariya here. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 877 ("[A] securities fraud complaint must now 'specify each statement alleged to have been misleading.'").

### 5. March 10, 2022 "Yield Farming for Serious People" Article

The plaintiffs allege that on March 10, 2022, Jump published an article titled "Yield Farming for Serious People" on its Website. According to the second amended complaint:

> Jump instructs investors on the "first major form of yield farming"—delegating tokens to transaction validators in exchange for a share of the proceeds. Importantly, Jump provides the following solicitation for Terra securities: "There are many examples, but consider two prominent ones that are more retail-facing. First, traders on Coinbase have the option to stake their Ether on the platform, i.e., delegate their Ether to Coinbase as it participates in upgrading the Ethereum network to Ethereum 2.0, in exchange for interest of around 5% (at the time of writing). Second, Terra traders can use the Terra Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards."

SAC ¶ 145. "This promotion," the plaintiffs allege, "provides a link to an article 'Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem,' which encourages investors to stake LUNA directly through the Terra Station wallet." *Id.*

While Jump concedes that this statement "arguably" contains an alleged statement of fact, it argues that the plaintiffs neither plead that this statement is false "nor explain how they could be false." Dkt. No. 115, at 16. Accordingly, Jump argues that it "fall[s] far short of Rule 9(b)'s and the PSLRA's specificity requirements." *Id.*

In their Response, the plaintiffs allege that this statement omits that Jump "had entered into secret loan transactions with TFL and that Jump had secretly bailed out the UST peg in May 2021, resulting in Jump obtaining LUNA tokens for just $0.40 per token." Dkt. No. 130, at 14.

United States District Court
Northern District of California

Additionally, the plaintiffs point to SAC ¶ 146, where they alleged that "Luna Foundation Guard Governing Council member[] Kanav Kariya of Jump … rejected the proposal" to "cut to the yield rate in the Anchor Protocol." Dkt. No. 130, at 14.

Here too, the complaint fails to specify the reason why this particular statement was misleading. Plaintiffs merely plead that the originally named defendants as a group "never disclosed that it was the conduct of TFL, Kwon and Jump, and not the algorithm, that restored UST's peg." SAC ¶ 202. The second amended complaint does not provide a "particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv.*, 540 F.3d at 1061 (emphasis in original). The plaintiffs cannot remedy their failure to specify why *this statement* attributed to Jump was misleading by trying to address it in the first instance in their opposition brief.

### 6.     Luna Foundation Guard False and Misleading Statements

Finally, the plaintiffs seek to impute a series of purportedly false and misleading statements made by the Luna Foundation Guard to Jump. SAC ¶¶ 49–51, 136, 137, 139–53. The plaintiffs do not state with particularity how or why these statements can be imputed to Jump in the first instance. Without more, the plaintiffs fail to meet the pleading requirements of Rule 9(b) and the PSLRA.

In sum, the plaintiffs have failed to sufficiently plead a single actionable misrepresentation or omission under Section 10(b) and Rule 10b-5(b). The Court therefore grants Jump's motion to dismiss this claim with leave to amend.

### C.     The Second Amended Complaint Fails To Adequately Plead that Jump Committed a Manipulative or Deceptive Act.

The plaintiffs also allege that Jump committed a manipulative or deceptive act in violation of Rule 10b-5(a) and Rule 10b-5(c). Specifically, they assert that "Defendants TFL and Kwon on the one hand and either or both of Jump Crypto and Jump Trading on the other secretly colluded to restore the peg by-passing the algorithm. Jump Crypto and Jump Trading purchased 'massive amounts' of the stablecoin, executing these purchases for the purpose of restoring the peg when the purported algorithm had failed." SAC ¶¶ 192,

1    269.

2        "[M]anipulative conduct typically constitutes 'a scheme . . . to defraud' in violation of

3    Rule 10b–5(a) or a 'course of business which operates … as a fraud or deceit upon any person' in

4    violation of Rule 10b–5(c)." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009).

5    "Manipulation … is virtually a term of art when used in connection with securities markets. The

6    term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are

7    intended to mislead investors by artificially affecting market activity." *Id.* at 939 (quoting *Santa*

8    *Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)). Deception through omission, by contrast,

9    "generally refers to the failure to disclose material information about a company, as opposed to

10   affirmative manipulation." *Id.* (citation omitted). "The person who omitted the material

11   information must have had a duty to disclose it to the person supposedly harmed by the omission."

12   *Id.* (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996)).

13   That duty "may arise 'from a relationship of trust and confidence between parties to a

14   transaction.'" *Id.* (quoting *Chiarella v. United States*, 445 U.S. 222, 230 (1980)).

15       Plaintiffs' second amended complaint fails to plead with sufficient particularity that Jump

16   specifically, as opposed to the originally named defendants generally, engaged in manipulative

17   conduct, or that Jump itself had any duty to disclose its role in the re-peg. While the plaintiffs

18   plead that Jump did in fact purchase large quantities of UST during the May 2021 re-peg, Jump

19   correctly notes that the plaintiffs fail to allege that Jump "had a deceptive purpose at that time."

20   Dkt. No. 115, at 19 n.5. Even accepting the facts as true, the plaintiffs merely plead that Mr. Kwon

21   communicated with Jump on May 23, 2021, when the UST's price declined, and that Jump

22   "purchas[ed] large quantities of UST throughout the day on May 23 and continuing through May

23   27." SAC ¶¶ 191–92. Additionally, the plaintiffs plead that TFL's Mr. Kwon agreed to remove

24   loan conditions at some later dater and signed an agreement in writing in July 2021 that modified

25   that previous loan agreement, providing LUNA to Jump at $0.40 a token. SAC ¶¶ 193–194.

26       This is not enough to state a claim for manipulative or deceptive conduct. First, to be liable

27   for a scheme to defraud, "the defendant must have engaged in conduct that had the principal

28   purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not

enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008) (emphasis in original). The second amended complaint fails to allege that Jump's action— purchasing "massive amounts" of UST to help stabilize the UST in May 2021—was done in furtherance of the scheme or had any deceptive purpose and effect at that time. As Jump emphasizes, "According to the SAC and the SEC complaint on which it is based, the bulk of Jump Trading's purchase of UST in 'large quantities' were made on May 23, 2021, demonstrably before and not 'in the face of' TFL and Kwon's alleged misstatements …, and in March 2022." Dkt. No. 115, at 19. That conduct could reflect a benign business decision as opposed to manipulative or deceptive conduct if Jump truthfully believed it was purchasing the tokens below their real value, and plaintiffs fail to allege facts sufficient to attribute a deceptive purpose to those purchases.

The second amended complaint also fails to allege that Jump had any duty to disclose. "Rule 10b–5 is violated by nondisclosure only when there is a duty to disclose." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). In determining whether a party had a duty to disclose, courts consider several factors: "(1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction." *Id.* The second amended complaint, however, is devoid of any specific allegations that Jump had such a duty. In addition, as Jump notes, the second amended complaint impermissibly relies on group pleading with respect to this claim.

For both of these reasons, the Court grants Jump's motion to dismiss this claim with leave to amend.[6]

### III. The Court dismisses the plaintiffs' alternative RICO and state law claims without prejudice.

The plaintiffs also allege claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and for aiding and abetting, conspiracy, and unjust enrichment under California state law. Those claims are pleaded in the alternative and dependent on the Court finding that that Terra Tokens are not securities. Because the Court concludes that the plaintiffs have sufficiently pleaded that the Terra Tokens are securities, the Court grants Jump's motion to dismiss those claims without prejudice to their reassertion in the future should the Court's conclusion that Terra Tokens are securities be revisited and changed.

### CONCLUSION

For the foregoing reasons, Jump's Motion to Compel Arbitration is DENIED and Jump's Motion to Dismiss is GRANTED WITH LEAVE TO AMEND. Any amended complaint shall be filed within 21 days of the entry of this order and shall include a chart listing numerically each alleged false or misleading statement, the speaker, the date, and the arguments supporting plaintiffs' claim of falsity and scienter. The chart shall also cite the paragraphs in the amended complaint where the allegations are made.

**IT IS SO ORDERED.**

Dated: January 4, 2024

_____
P. Casey Pitts
United States District Judge

---

[6] With respect to claims one and two, Jump has also presented substantial arguments about the insufficiency of plaintiffs' pleading of scienter, control person liability, reliance, and loss causation. Because the Court grants the motion to dismiss on other grounds, it need not address those arguments at this time.

United States District Court
Northern District of California

28