**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:22-cv-03600-PCP |
| Plaintiff, | |
| v. | **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

1

**TABLE OF CONTENTS**

I.     NATURE OF THE CASE .................................................................................1

II.    PARTIES ......................................................................................................5

III.   JURISDICTION AND VENUE ...................................................................6

IV.    FACTUAL ALLEGATIONS .......................................................................7

       A.     Background on Jump and Its Role in the Terra Ecosystem .................7

       B.     The Terra Ecosystem ........................................................................13

              1.     TFL ........................................................................................13

              2.     Do Kwon ................................................................................14

              3.     The Terra Tokens ...................................................................14

                     a.     Native and Governance Tokens .................................14

                     b.     Stablecoins ................................................................16

                     c.     Mirrored Assets .........................................................16

              4.     The Anchor Protocol ..............................................................17

       C.     Jump Engaged in a Fraudulent Scheme in Connection with the May 2021 De-Peg..........................................................................18

       D.     Jump Knowingly Misleads U.S. Investors Concerning the Stability of UST and LUNA................................................................23

       E.     The Truth Emerges ...........................................................................42

       F.     Jump Profits from the Fraud .............................................................44

       G.     The Terra Tokens Are Unregistered Securities ...............................45

              1.     Terra Tokens Are Securities ...................................................45

                     a.     Terra Token Investors Invested Money .....................47

                     b.     Terra Token Investors Were Intertwined in a Common Enterprise with Defendants...............................48

                     c.     Investors Purchased the Terra Tokens with a Reasonable Expectation of Profit from Owning Them ......................49

                     d.     Investors Expected Profits from the Terra Tokens to Be Derived from the Managerial Efforts of Others............................49

i

2.      Investors Would Not Reasonably Have Understood that Terra Tokens Were Securities ................................................................53

3.      SEC's Previous Statements and Findings ..................................54

4.      Other Commentary from Regulators..........................................58

CLASS ALLEGATIONS ........................................................................................58

V.      COUNTS.........................................................................................................61

COUNT I ...............................................................................................................61

COUNT II ..............................................................................................................73

COUNT III .............................................................................................................75

COUNT IV..............................................................................................................76

VI.     PRAYER FOR RELIEF ..................................................................................76

VII.    JURY DEMAND .............................................................................................77

Lead Plaintiff Michael Tobias and named plaintiff Nick Patterson (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, including, among other things, a review of court filings, various press releases, and public statements issued by Defendants, analyst and media reports, and other commentary analysis and publicly disclosed reports and information about Defendants. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## I.   NATURE OF THE CASE

*This collapse was one of the most violent collapses in a long time,*
*only comparable to Lehman's collapse in 2008!*

Remi Teto (Member of the Governing Council of the Luna Foundation Guard)

1.   Plaintiffs bring this Class Action Complaint ("Complaint") under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §15 of the Securities Act of 1933 (the "Securities Act") against Defendants Jump Trading, President of Jump Trading subdivision/business unit Jump Crypto, Kanav Kariya, and Jump Trading founder, William Disomma (together, "Defendants"). This action is brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Terra Tokens between March 17, 2021, and May 25, 2022, inclusive ("Class Period"), and who were damaged thereby ("Class").

2.   On December 28, 2023, the Honorable Jed Rakoff of the United States District Court for the Southern District of New  York granted summary judgment to the United States Securities and Exchange Commission ("SEC") on its claim that Terraform Labs, Ltd. ("Terraform" or "TFL") and its CEO Do Kwon ("Kwon") violated §§5 and 12(a) of the Securities Act of 1933 by selling unregistered Terra Tokens, including UST, a crypto token pegged to the US dollar and

the foundation of the crypto ecosystem Terraform had created.[1]  Jump controlled Terraform at the time TFL sold unregistered securities, and participated in the sale and distribution of Terra Tokens to investors. In addition, Judge Rakoff denied Terraform's and Kwon's motions for summary judgment on the SEC's fraud claims that the parties will now try.

3.     One of the claims the SEC will now try relates to a fraudulent scheme that Defendants Jump, Kariya, and Disomma participated in and enabled. In discovery, the SEC questioned Defendants Kariya and Disomma about Defendant Jump's participation in this fraudulent scheme. In direct response to questions concerning this fraudulent scheme, Defendants Kariya and Disomma both invoked their fifth amendment right against self-incrimination.

4.     The fraudulent scheme that caused Defendants Kariya and Disomma to protect themselves from possible criminal prosecution for theirs and Jump's involvement concerned the foundation of the Terraform ecosystem—UST, a token pegged to the U.S. dollar. Terraform and Kwon claimed that a purported algorithm maintained the 1=1 ratio of UST to the U.S. dollar without the necessity of human intervention, releasing UST if the peg rose materially above $1 and burning UST if the peg fell below $1. In May 2021, UST began to de-peg, falling materially below the U.S. dollar. The purported algorithm Terraform and Kwon had touted to attract investors to the Terraform ecosystem failed to correct the de-peg event.

5.     In a surreptitious agreement between Terraform and Kwon and Defendants, with intent to manipulate the price of UST through human intervention, Jump agreed to purchase UST—and did purchase, engaging in large UST trades—removing it from the market and causing UST to re-peg with the U.S. dollar. With actual knowledge of their agreement and their scheme to intervene, manipulating the price of UST, Defendants were duty bound to refrain or disclose, to disclose their trading, its purpose, and the material information on which they based their agreement with TFL and Kwon. Given their trading, Defendants' omission is actionable.

---

[1]     Plaintiffs incorporate herein by reference in their entirety the complaint in *SEC v. Terraform Labs PTE LTD.*, 23-cv-01346 (S.D.N.Y.), (Dkt. No. 1) ("SEC Compl.") (attached as Exhibit 1) and Judge Rakoff's opinion on cross motions for summary judgment (Dkt. No. 149) ("SMJ Order") (attached as Exhibit 2).

6.      After May 2021, Defendants publicly touted the algorithm's success in accomplishing the re-peg. As a direct and proximate result of Defendants' fraudulent scheme to falsify the algorithm's success and in reliance thereon, Plaintiffs and members of the class poured assets, both fiat and crypto, into the Terraform ecosystem, purchasing UST and other Terraform Tokens. In exchange, Defendants received material benefits from Terraform, enabling them to sell Terra Tokens to investors from which they reaped hundreds of millions in trading proceeds. Once again, in response to the SEC's questions about this fraudulent scheme, Defendants Kariya and Disomma invoked their fifth amendment right against self-incrimination.

7.      In May 2022, once again, the purported algorithm failed to re-peg UST to the U.S. Dollar. This time, having reaped their own profit, Jump did not intervene. UST crashed completely, causing the entire Terraform ecosystem to collapse. As a direct and proximate result of Defendants' fraudulent scheme and fraudulent statements thereon, Plaintiffs and the Class suffered total loss of their investments in the Terraform ecosystem.

8.      Defendant Jump is one of the largest private trading firms in the world, and engages in algorithmic trading of a variety of asset classes, including digital and traditional assets.

9.      As relevant here, Jump operated as the "liquidity provider and general business partner"[2] of TFL and its CEO, Do Kwon. TFL is the company that operates the Terra blockchain and its related protocol, which hosts, supports, and funds a community of decentralized financial applications and products known collectively as the Terra ecosystem.  TFL's primary focus is developing, marketing, and selling a suite of digital assets and financial products within the Terra ecosystem, including the native and governance tokens within the Terra ecosystem, so-called "stablecoins," a bevy of financial products such as "mirrored assets," bonded assets, liquidity pool tokens, along with various protocols (e.g., Anchor, Mirror, etc.) to support and facilitate their sale. These digital assets are collectively referred to herein as "Terra Tokens." The partnership between Jump, TFL, and Kwon is what ultimately caused billions of dollars of damage to Terra Token investors and resulted in the SEC's action in which Judge Rakoff has now granted summary

---

[2]     *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Case No. 23-cv-01346 (S.D.N.Y.), ECF No. 100 at 5.

judgment to the SEC on its claim that TFL and Kwon had violated §§5 and 12(a) of the Securities Act of 1933 by selling unregistered Terra Tokens, and also denied Terraform's and Kwon's motions for summary judgment on the SEC's fraud claims.

10.     Judge Rakoff's SMJ Order further made evidentiary rulings that the account of a confidential witness formerly at Jump was admissible as statements against interest indicating Jump's, and those individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). SMJ Order at 57.

11.     The SMJ Order also ruled that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore UST's peg." Such statements are thus likewise admissible under Federal Rule of Evidence 803(3). *Id.* at 57-58.

12.     Moreover, the SEC's expert opined that Jump's trading activity inflated the price of the UST/LUNA peg by $0.62. *Id* at 20.

13.     In addition to the SEC's civil enforcement action, Kwon is facing criminal charges as a result of his misconduct with Jump. On March 23, 2023, Kwon was arrested in Montenegro attempting to board a flight at the Podgorica airport with a falsified documents.[3] That same day, the U.S. Department of Justice ("DOJ") indicted Do Kwon, charging him with conspiracy, wire fraud, and securities fraud. The indictment refers to Jump as "a United States trading and investment firm" that Kwon contacted to "obtain their assistance in altering the market price of UST."[4]

14.     On August 18, 2023, Defendant Kariya was deposed in the SEC's action. In response to questions regarding his communications with Do Kwon regarding the peg bailout in

---

[3]     Parikshit Mishra, Jack Schickler, *Do Kwon Arrested in Montenegro: Interior Minister*, CoinDesk (Mar. 23, 2023, updated May 9, 2023), https://www.coindesk.com/business/2023/03/23/do-kwon-arrested-in-montenegro-interior-minister/.
[4]     Indictment, *U.S.A. v. Do Hyeong Kwon*, No. 1:23-cr-00151 (S.D.N.Y.), available at https://downloads.coindesk.com/legal/United_States_v_Kwon.pdf.

2021, Defendant Kariya exercised his Fifth Amendment rights.  *See* Exhibit 59 to the Declaration of Douglas W. Henkin in Support of Defendants' Motion for Summary Judgment, *SEC v. Terraform Labs PTE LTD.*, No. 1:23-cv-01346 (S.D.N.Y. Oct. 28, 2023), ECF No. 103 ("Henkin Decl."); SMJ Order at 11, 57.  Jump's founder William Disomma was likewise deposed and similarly exercised his Fifth Amendment rights when questioned about Jump's role in assisting in the alleged fraud.  *See* Henkin Decl. at Ex. 45 (filed under seal); SMJ Order at 11, 57.

```
 3      Q    Did you tell Do Kwon that Jump would
 4   agree to step up and help restore the peg by buying
 5   up UST?
 6         MR. HENKIN:  Same objections.
 7   BY THE WITNESS:
 8         A    On the instruction of counsel I exercise
 9   my rights under the Fifth Amendment and decline to
10   answer the question at this time.
11   BY MS. STAREN:
12         Q    Did you tell Do Kwon that Jump would
13   step in and help restore the peg if Do Kwon agreed
14   to amend the LUNA loan agreement and lift the
15   vesting conditions?
16         MR. HENKIN:  Same objections.
17   BY THE WITNESS:
18         A    On the instruction of counsel I exercise
19   my rights under the Fifth Amendment and decline to
20   answer the question at this time.
```

## II.    PARTIES

### *Plaintiffs*

15.    Lead Plaintiff Michael Tobias ("Tobias") is a resident and citizen of the state of New York, living in New York. As set forth in the certification he submitted to the Court (Dkt. Nos. 19-3 and 19-4) Lead Plaintiff Tobias purchased at least that number of Terra Tokens during the Class Period and suffered losses as a result of Defendants' conduct.

16.    Plaintiff Nick Patterson ("Patterson") is a resident and citizen of Illinois, living in Chicago, Illinois. As set forth in the certification he previously submitted to the Court (Dkt. Nos. 1, 25-3), Plaintiff Patterson purchased Terra Tokens, including UST, LUNA, ANC, Mirrored Assets, and Bonded Assets during the Class Period and suffered losses as a result of Defendants' conduct.

*Defendants*

17.     Defendant Jump Trading LLC ("Jump") is a limited liability company incorporated in Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654, acting by, through, in conjunction with, and with the participation of its business unit and/or division, "Jump Crypto."

18.     According to the LinkedIn profile of, Defendant Kanav Kariya ("Kariya"), Kariya was a software engineering intern at Jump from January through August 2017.  From July 2018 through September 2020, Kariya served as a quantitative researcher at Jump.  From September 2020 through September 2021, Kariya served as the Director of Strategic Initiatives, Digital Assets for Jump.  From September 2021 through the present, Kariya serves as the President of Jump Crypto, the crypto-related arm of Jump.

19.     Defendant William Disomma ("Disomma") is a founder of Jump Trading. Defendant Disomma personally directed the trading of UST to reestablish the peg in May 2021.

## III.    JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 15 U.S.C. §78aa, and 15 U.S.C. §77v(a). Alternatively, this Court has jurisdiction under 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because Plaintiffs and at least one Defendant are citizens of different states.

21.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint and the SEC Compl., subjecting themselves to personal jurisdiction in this District and rendering this Court's exercise of jurisdiction proper and necessary.

22.     Most notably, Jump itself moved to have a separate class action – involving the same underlying facts alleged here – transferred to this District, notwithstanding that Kariya and Jump are located in Chicago, arguing, *inter alia*, that "the legally significant events in this case

occurred nationwide, if not worldwide, as the Terra ecosystem and related tokens were developed outside of Illinois. . . ." *See* Motion to Transfer Venue to the Norther District of California, *Kim v. Jump Trading, LLC*, No. 1:23-cv-02921 (N.D. Ill. June 9, 2023), ECF No. 28.  And on October 11, 2023, Jump filed an Update on Recent Developments in California Class Action.  In its reply to plaintiffs' opposition to this update, Jump further argued that its transfer motion in the Illinois case should still be granted even though TFL and Do Kwon were voluntarily dismissed from this Action because "the pertinent question for transfer is proper venue at the time of filing, not as the case develops."  Reply to Update on Recent Developments in California Class Action, *Kim v. Jump Trading, LLC*, No. 1:23-cv-02921 (N.D. Ill. Oct. 16, 2023), ECF No. 40.

23.    Furthermore, Jump actively conducted business throughout the United States and within this District in connection with the promotion and sale of Terra Tokens.

24.    TFL created the Terra tokens which were then loaned and sold to Jump for sale to investors in the United States.  Jump sold and otherwise made the unregistered securities they sold available to U.S. investors.

25.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Background on Jump and Its Role in the Terra Ecosystem

26.    Jump is one of the largest private trading firms in the world, focusing on algorithmic and high-frequency trading strategies.  In particular, Jump engages in algorithmic trading of a variety of asset classes, including digital and traditional assets.

27.    Jump has been active in the digital assets sector since 2017, being one of the first proprietary trading firms to begin trading Bitcoin and Ethereum.

28.    In 2018, Jump created a crypto startup incubator, Jump Labs, which invests seed capital in the companies accepted into Jump Labs' program.

29.    In 2019, Jump (through its affiliated entity Tai Mo Shan Ltd.) facilitated the move by Robinhood Market Inc. – an electronic trading platform that has commission-free trades of

1   stocks and ETFs – to add cryptocurrencies to the tradable assets on the Robinhood exchange and

2   then subsequently handle the order flow.

3        30.    As noted in an article from *Crain's Chicago Business* on Kariya and Jump:

4   "industry players say Jump is widely seen as a bigger risk-taker than most traditional trading firms

5   when it comes to crypto. Competitors like Jane Street and Susquehanna International Group also

6   have venture capital arms that make crypto-related investments. But none of them operates on

7   Jump's scale or integrate trading and incubating startups the way Jump does."[5]  Indeed, through

8   Jump Crypto, Jump took on an oversized position in the crypto industry, seeking to be much more

9   than a simple trading firm.  As noted in a March 25, 2022 article from *CoinDesk*, Jump "has

10  emerged as a uniquely powerful presence in the decentralized finance (DeFi) space, branching

11  further from its trading roots to become active builders, investors, governance voters and

12  community members. The firm even executed what some observers called DeFi's first bailout,

13  putting up $320 million that was exploited in a hack of the Jump-backed Wormhole cross-chain

14  bridge."[6]  As *CoinDesk* further reported: "[Jump] now dominates every aspect of the crypto

15  ecosystem – operating a market-making business, a venture capital arm and, increasingly, a team

16  of in-house developers who contribute to projects on several major blockchains."[7]

17       31.    According to Kariya, Jump viewed marketing as a particularly important

18  component of its emerging crypto-related business ventures.  "Before, there was no need for

19  marketing. . . .  But crypto is different – we're building a whole bunch of stuff. We made our first

20  marketing hire three months ago."[8]

21       32.    Jump's trading strategies have previously been the subject of governmental

22  investigation.  For example, in May 2018, one of Jump's trading algorithms malfunctioned,

23  triggering deficiencies in Jump's capital requirements.  On September 12, 2019, the NYSE

24

25

26  [5]   *Jump Trading prowls for edge with crypto winter hammering peers*, CHI. BUS. (Jun. 17, 2022),  https://www.chicagobusiness.com/finance-banking/jump-trading-prowls-edge-cryptocurrency-winter-hammering-peers.

27  [6]   *Jump Crypto Wants You to Know Its Name*, COINDESK (Mar. 25, 2022), https://www.coindesk.com/business/2022/03/25/jump-crypto-wants-you-to-know-its-name/.

28  [7]   *Id.*
   [8]   *Id.*

Chicago announced that it had reached a settlement with Jump related to these issues.[9]  Notably, NYSE Chicago determined that Jump had failed to maintain sufficient risk management controls intended to reduce the risk of erroneous orders and that the controls present "were not reasonably designed to address the risks presented by Jump's business."  The Jump Trading Order further noted that Jump had "generally failed to sufficiently document" how its ineffective controls were implemented. As a result, NYSE Chicago found that Jump had violated Exchange Act Rules 15c3-1, 15c3-5(b) and 15c3-5(c)(1) and NYSE Chicago, Article 6, Rule 5 & Article 7, Rule 3(a)(1)(A). Under the terms of the settlement, Jump was ordered to pay a $250,000 fine.

33.     At the same time its algorithmic trading strategies were being found unlawful, Jump began backing TFL and Kwon.[10]  According to both Kwon and Kariya, they first met in 2019 and discussed Terra and UST.[11]  In the SMJ Order, Judge Rakoff found that in November 2019 and September 2020, on behalf of TFL, Kwon negotiated and signed agreements with Jump to receive loans of 30 million and 65 million LUNA tokens, respectively.  *See* SMJ Order at 4-5.

34.     In a January 13, 2020, email to "Terra's leading investor group," demonstrating Defendants' participation in, and control over, TFL, Kwon announced that TFL had "agreed to enter a partnership with Jump," in which Jump would "deploy its own resources to improve liquidity of Terra and Luna."  *Id.* at 5.  Kwon stated that, until then, LUNA's liquidity had been "rather lackluster partly due to our team's inexperience with secondary markets & trading operations."  Kwon further explained that TLF's loan of LUNA tokens to Jump was "with the expectation that they are going to fill bids and offers to improve liquidity of LUNA in secondary trading markets."  *Id.*  Jump was thus more than a mere investor or lender to TFL, instead it participated in and/or controlled TFL by virtue of its expertise (which TFL and Kwon admittedly

---

[9]     Order Instituting Proceedings, Accepting Settlement, Making Findings, and Imposing Sanctions, *In Matter of: Jump Trading, LLC*, No. 2018-11-00017 (Sept. 12, 2019) (the "Jump Trading Order").

[10]     Katherine Doherty and Yueqi Yang, *Why Jump Crypto's Kanav Kariya is Upbeat Despite Terra Fiasco*, NDTV PROFIT (June 20, 2022), https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-fiasco-3082509.

[11]     *Transcript: The Ship Show Ep 1 Kanav Kariya and Do Kwon Talk DeFi*, TERRA SPACES, https://web.archive.org/web/20220529092539/https://terraspaces.org/transcriptions/transcript-the-ship-show-ep-1-kanav-kariya-and-do-kwon-talk-defi/ (last visited Jan. 24, 2024).

THIRD AMENDED CLASS ACTION COMPLAINT

1   lacked) in secondary markets and its ability to provide the required support and liquidity for Terra

2   Token sales.

3       35.   Moreover, Jump shared periodic reports to TFL of its trading on various crypto

4   asset trading platforms.  *Id.*

5       36.   Further evidencing Jump's participation in, and control of, Terraform's sales of

6   cypto assets to investors, the second loan agreement in September 2020 stemmed from a Jump

7   executive's e-mailing Kwon a proposal to obtain tens of millions of additional LUNA tokens at a

8   discounted price to "thicken up LUNA markets further."  *Id.*

9       37.   TFL also loaned as many as 4 million MIR tokens to Jump, in an agreement that

10  expressly required Jump to trade MIR tokens on crypto asset trading platforms and to provide

11  Terraform with reports of its trading.  *Id.* at 8.

12      38.   All of this activity occurred well before Jump Trading even announced the formal

13  launch of its crypto division, Jump Crypto, on September 14, 2021.[12]  In congratulating Jump

14  Crypto – a "consummate Terra partner" [13] – on its public launch, Terra stated "Thrilling to see

15  @JumpCryptoHQ officially launch! Jump has quietly played a pivotal role in the Terra ecosystem

16  for a long time. . . ."[14]  "The Terra economy is magnified significantly with Jump Crypto by its

17  side. #LUNAtics, please give them a follow, offer your support, and help amplify their bold new

18  endeavor into crypto. Institutions are here, and @JumpCryptoHQ . . . is leading the way on

19  Terra."[15]  Kariya replied that "It's been a real pleasure working with @stablekwon and the Terra

20  team over the last couple years. A+ folks."[16]

21      39.   One of the startups that Jump worked on with TFL was Certus One, the developer

22  of Wormhole, that Jump acquired in August 2021.  Ever on brand, Jump took a lax approach to

23

---

24  [12]     @jump_,     X     (F/K/A     Twitter)     (Sept.     14,     2021,     9:46     AM),
    https://twitter.com/jump_/status/1437774885703594002?s=20.

25  [13]     @terra_money,     X     (F/K/A     Twitter)     (Sept.     14,     2021,     10:32     AM),
    https://twitter.com/terra_money/status/1437786236601708544?s=20.

26  [14]     @terra_money,     X     (F/K/A     Twitter)     (Sept.     14,     2021,     10:32     AM),
    https://twitter.com/terra_money/status/1437786233485266945?s=20.

27  [15]     @terra_money,     X     (F/K/A     Twitter)     (Sept.     14,     2021,     10:32     AM),
    https://twitter.com/terra_money/status/1437786243295764501?s=20.

28  [16]     Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Sept. 14, 2021, 12:57 PM),
    https://twitter.com/KanavKariya/status/1437822736693407745?s=20.

internal oversight over its crypto-related investments like Wormhole, which, as usual for the risk-chasing venture capital firm, led to problems for retail investors.  In particular, despite being previously dubbed by Wormhole as the "Guardian of the Wormhole network,"[17] in February 2022, Wormhole's smart contract was hacked, resulting in the theft of over $340M in various digital assets.  Without taking responsibility for the lack of security that led to the hack, Jump sought to spin itself as being philanthropic to the "community members" by announcing it had "replaced" the missing funds.[18]  In a podcast interview published on *The Block* YouTube channel on March 2, 2022, Jump President and Chief Investment Officer, Dave Olsen ("Olsen"), endorsed this spin, touting the "transparency" of Jump public statements related to the Wormhole hack and subsequent bail out.  Olsen claimed that, following the Wormhole hack, Jump's decision to reimburse the lost customer funds was done because Jump believed that "tell[ing] everybody that their assets were backed one to one" would have a "bigger impact on the [crypto] community" and would favorably show Jump as acting as an industry leader acting to protect investors[19]  Olsen further claimed that Jump used its own cash reserves to purchase the ETH used to reimburse the Wormhole hack.  In truth, Jump had actually bailed itself out.  As one cryptocurrency investor more succinctly noted: "Jump and SBF were in bed together. Jump owns Certus. Certus builds Wormhole. Wormhole gets hacked. Jump 'bails out' the wormhole hack (bailing out themselves). Jump raises $187M for HOLE token. SBF gives Jump $67 million of customer funds."[20]  Notably, Kwon claims that he "collaborat[ed] as builders" with Jump and Kariya to "take Terra assets across multiple chains and for Wormhole to connect all the blockchains together."[21]  Upon information and belief, Jump leveraged its knowledge of Wormhole and relationships with Certus One to secure a favorable exit from its UST/LUNA holdings prior to the complete collapse of the Terra ecosystem.  Kariya

[17]     @wormholecrypto, X (F/K/A Twitter) (Sept. 14, 2021, 9:50 AM), https://twitter.com/wormholecrypto/status/1437775731917037574?s=20.
[18]     @jump_, X (F/K/A Twitter) (Feb. 3, 2022, 1:13 PM), https://twitter.com/jump_/status/1489301013408497666?s=20.
[19]     *Jump Trading's Dave Olsen on the key building blocks for a crypto market maker*, Youtube.com (Mar. 2, 2022), https://www.youtube.com/watch?v=sIJei5LlKfE.
[20]     @bradmillscan, X (F/K/A Twitter) (Dec. 12, 2022), https://twitter.com/bradmillscan/status/1602483390946709507?s=20.
[21]     https://terraspaces.org/transcriptions/transcript-the-ship-show-ep-1-kanav-kariya-and-do-kwon-talk-defi/

1    subsequently confirmed that Jump bailing out the Wormhole protocol was done to protect Jump's

2    investment in the underlying infrastructure of blockchain technologies: "Many people asked me,

3    'Why did you plug the $300 million dollar hole?' . . .  The default pieces of infrastructure that are

4    responsible for communication across chains are going to be highly value-creative. . . ."[22]  Kariya

5    and Kwon even promoted Wormhole as a way for the purportedly "interoperable" UST and

6    Anchor to gain adoption on other blockchains.

7         40.    Jump's control over TFL and its cash-out from the Terra ecosystem in advance of

8    its collapse fits a pattern of conduct of Jump's knowing participation in similar schemes to defraud

9    investors. For example, Jump has been accused of using its connections to front run another multi-

10   billion-dollar cryptocurrency collapse.  Specifically, Jump is alleged to have used its relationship

11   with the now-defunct cryptocurrency exchange FTX and its notorious trading firm Alameda

12   Research (the latter of which, notably, was an early backer of the Anchor Protocol) to flee the

13   sinking FTX ship before retail investors were completely wiped out.  An article titled "A look at

14   Jump Crypto and its shady past" reported that "Jump and FTX go way back and the relationship

15   is a deep one. However, the links haven't always been viewed favorably. Indeed, Jump was

16   accused of colluding with Sam Bankman-Fried's Alameda Research on seed funding rounds and

17   yield farming investments. It's also been alleged that Jump withdrew $300 million in assets from

18   FTX the day before the exchange paused withdrawals."  Exhibits in the Sam Bankman-Fried

19   criminal trial demonstrated that Jump executives and FTX executives had signal chats with auto-

20   deletion set to one week.  Kariya was in a signal chat with Sam Bankman-Fried and other FTX

21   executives entitled "Wormhole <> Alameda."  It began on April 11, 2022, with auto-deletion set

22   to 1 week.  Also on the chat was Jump personnel Anthony Ramirez, Jonathan Claudius, Daniel

23   Gerhardstein, Hendrik Hofstadt, and Csongor Kiss.  Jump's former director of digital asset direct

24   trading, Rob Sagurton, was also in a signal chat with Sam Bankman-Fried entitled

25   "Jump/FTX.com."  This pattern of conduct undermines the suggestion that Jump's conduct here

26   was merely unintentional or negligent behavior.  Rather, Jump's frontrunning misconduct fits

27

28   [22]    Tracy Wang, *Jump Crypto Wants You to Know Its Name*, COINDESK (Mar. 25, 2022),
     https://www.coindesk.com/business/2022/03/25/jump-crypto-wants-you-to-know-its-name/.

within its modus operandi and supports the plausible inference that Jump intentionally defrauded Terra Token investors.

## B.   The Terra Ecosystem

### 1.   TFL

41.     TFL is a Seoul-based company founded in 2018 by Kwon and Daniel Shin that, as noted by the SEC in its own investigation into TFL's digital assets, "regularly transacts business in the United States, included by contracting with U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of [TFL] appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Platias] (located in California), and its Director of Special Products (located in New York)."[23]

42.     TFL operates the Terra blockchain, a platform upon which the Terra ecosystem's decentralized financial products and services are developed and supported. These products and services take the form of "decentralized applications" and protocols built by TFL. With respect to financial products, TFL has created three main types of digital assets: (1) tokens that are native to the Terra ecosystem; (2) stablecoins; and (3) the various Mirrored Assets, Bonded Assets, and LP Tokens.

43.     According to South Korea's Supreme Court Registry Office court documents, Do Kwon dissolved TFL's headquarters on May 4, 2022, and the Seoul branch on May 6, 2022. The decision came following a general shareholder meeting on April 30, 2022, with Do Kwon acting as the liquidator.[24]

---

[23]     *SEC v. Terraform Labs PTE, Ltd.*, No. 1:21-mc-00810 (S.D.N.Y. Nov. 12, 2021), Declaration of Roger J. Landsman in Support of U.S. Securities and Exchange Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas, ECF No. 4.

[24]     *See* Kevin Helms, *Do Kwon Dissolved Terraform Labs Korea Days Before Collapse of Terra LUNA, UST*, Bitcoin (May 19, 2021), https://news.bitcoin.com/dokwon-dissolved-terraform-labs-korea-days-before-collapse-of-terra-luna-ust/.

**2.    Do Kwon**

44.    *The New York Times* described Defendant Kwon as "a trash-talking entrepreneur" that caused a "\$40 Billion Crash."[25]  One of Kwon's go-to insults is to demean and delegitimize his detractors or critics of the Terra Tokens by dismissing them as "poor."

45.    For example, on July 1, 2021, Kwon mocked a British economist, Frances Coppola, who criticized the algorithmic stablecoin model. Instead of addressing Coppola's concerns, in particular, the charge that the algorithmic stablecoin model could not defend against a bank run, Kwon was dismissive and condescending, stating "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment."[26]

46.    In addition, UST/LUNA was not Kwon's first trip around the failed stablecoin block.  Kwon has had similar failures with previous attempts to market and sell a stablecoin. For example, in 2021, Kwon launched the Basis Cash ("BAC") token, another algorithmic stablecoin project that sought and failed to maintain a \$1 peg. A former engineer at Terraform Labs, Hyungsuk Kang, claimed that Basis Cash was a side project created by him and Do Kwon.  Since Kwon's previous algorithmic stablecoin failed, it is possible that he could have anticipated UST's failure to maintain the peg.[27]

**3.    The Terra Tokens**

47.    These various Terra Tokens are described further as follows:

*a.    Native and Governance Tokens*

- LUNA – launched in or around April 2019, LUNA tokens are the native token for TFL.  The Terra protocol runs on a Proof of Stake (PoS) blockchain, where miners

---

[25]    David Yaffe-Bellany and Erin Griffith, *How a Trash-Talking Crypto Founder Caused a \$40 Billion Crash* (May 18, 2022), https://www.nytimes.com/2022/05/18/technology/terra-luna-cryptocurrency-do-kwon.html.

[26]    @stablekwon, X (F/K/A Twitter) (July 1, 2021, 2:51 AM), https://twitter.com/stablekwon/status/1410491186196795398?s=20&t=WhXnvJmqblLyJePq laNsDQ.

[27]    Sam Kessler and Danny Nelson, *UST's Do Kwon Was Behind Earlier Failed Stablecoin, Ex-Terra Colleagues Say*, Coindesk (May 11, 2022), https://www.coindesk.com/tech/2022/05/11/usts-do-kwon-was-behind-earlier-failed-stablecoin-ex-terra-colleagues-say/.

need to stake the native token LUNA to mine Terra transactions.  LUNA tokens are also the pair to the UST algorithmic stablecoin.

- ANC – is the governance token for the Anchor Protocol and it is minted by TFL on the Terra blockchain.  ANC "is designed to **capture a portion of Anchor's yield**, allowing its **value to scale linearly with Anchor's assets under management (AUM)**. Anchor distributes protocol fees to ANC stakers pro-rata to their stake, benefitting stakers as adoption of Anchor increases. . . ."[28]  ANC tokens are also "used as incentives to bootstrap borrow demand and provide initial deposit rate stability."  Notably, 100M ANC tokens have been "allocated to the creators of Anchor" (including Kwon and Platias).  Investors in the Anchor Protocol receive their 20% APY on their UST deposits in the form of ANC tokens, which can be subsequently exchanged for other cryptocurrencies.

- aUST – A token provided when UST tokens are deposited into Anchor Protocol.

- vUST – An arbitrage UST token that aims to enforce the UST peg by exploiting arbitrage opportunities.

- MIR – Mirror Token functions as a governance-type token for the Mirror Protocol. It allows investors to interact with Mirrored Assets (discussed below).

48.    Cryptocurrency markets are notoriously volatile, with intraday price and/or exchange rate swings of 10% in a few hours occurring regularly.  These wild fluctuations make cryptocurrencies generally less suitable as a medium of exchange for routine transactions like purchases.  Stablecoins purport to solve this problem by attempting to tie or "peg" their market value to an external collateral with less volatility, such as another currency (*e.g*., U.S. dollars), commodity (*e.g*., gold), or financial instrument (*e.g*., stocks, cryptocurrencies, etc.).  The price of a stablecoin (including those developed by TFL) is supposed to always remain at $1, and

---

[28]    Anchor    Token    (ANC)    whitepaper,    Anchor    Protocol, https://docs.anchorprotocol.com/protocol/anchor-token-anc (last visited Jan. 23, 2024) [emphasis in original].

developers of these digital assets have devised two primary ways to maintain price stability: over-collateralization with fiat reserves[29] and algorithmic stablecoins.

### b. Stablecoins

49.     UST – TerraUS ("UST"), TFL's flagship digital asset and the foundation of the entire Terra ecosystem, is an algorithmic stablecoin that operates through a pair of tokens (the UST stablecoin itself and another digital asset that backs the stablecoin, e.g. LUNA) and a smart contract that regulates the relationship between the two (*i.e.*, the algorithm). Instead of swapping UST for $1 in dollar reserves as with over-collateralized stablecoins, investors could exchange one UST stablecoin for $1 worth of TFL's LUNA. To maintain UST's 1:1 parity with the U.S. dollar, TFL claimed that its algorithm mints and burns UST and LUNA to control the supply and keep the value of UST steady at $1.

### c. Mirrored Assets

50.     Jump also promoted and sold so-called "mirrored" or synthetic assets (a/k/a "mAssets"), which are essentially derivative products that track the price of a particular underlying asset. The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Tesla, Inc., stock or the ProShares VIX Short-Term Futures ETF (ticker "VIXY"), in that they are designed so that their value rises and falls with the value of those securities. The mAssets corresponding to those equities have been named, for example, "mTesla" or "mVIXY." According to TFL's website, "mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."[30] Concurrently, TFL sells a MIR governance token to interact with the Mirrored Assets.

51.     The Mirrored Assets include, but are not limited to, the following:

---

[29]     Over-collateralized stablecoins maintain fiat reserves with enough cash or cash equivalents on hand to cover each respective stablecoin on a 1-to-1 basis. Similar kinds of stablecoins operate by using a cryptocurrency like Ether ("ETH") deposited into its smart contracts as the collateral.
[30]     https://terra.mirror.finance; What is Mirror? whitepaper, https://docs.mirror.finance (last visited June 15, 2022).

- <u>mBTC</u> – Mirrored Bitcoin is a synthetic asset tracking the price of Bitcoin. It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- <u>mETH</u> – Mirrored Ether is a synthetic asset tracking the price of Ethereum's native token, Ether. It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- <u>mVIXY</u> – Mirrored ProShares VIX is a synthetic version of the VIXY, which tracks stock market volatility.

52.     TFL also loaned as many as 4 million MIR tokens to Jump, in an agreement that expressly required Jump to trade MIR tokens on crypto asset trading platforms and to provide Terraform with reports of its trading. SMJ Order at 8.

**4.      The Anchor Protocol**

53.     As for the protocols on the Terra ecosystem, TFL developed and Jump promoted the Mirror Protocol (a trading platform for TFL's Mirror Assets launched around December 2020) and the Anchor Protocol, which launched in August 2020.

54.     Anchor was by far the most popular protocol in the Terra ecosystem and relied, in whole, on investors' purchasing UST. In exchange for staking their UST with TFL in the Anchor Protocol, TFL promised investors a steady and reliable 20% interest rate return on their investments. TFL, in turn, lends the UST investors deposit in the Anchor Protocol to borrowers in exchange for interest payments and use of the borrowers' collateral.

55.     Anchor's whitepaper states, in relevant part, the following regarding the "savings product" offered by TFL:

Anchor implements a liquidation protocol designed to ***guarantee the principal of depositors. Deposits are safe insofar as all debts against them remain over-collateralized.***

*             *             *

Given cryptoassets have high price volatility, they may not be the ideal choice for users who seek passive income with low price exposure. Anchor offers a solution with Terra stablecoin money markets. Users who deposit Terra stablecoins will get stablecoins in return, thereby avoiding the high volatility of most cryptoassets.

*Anchor's deposit interest rate stabilization mechanism offers additional protection from volatility by providing stable returns.*[31]

[Emphasis added.]

56.     TFL sells an algorithmic stablecoin called TerraUS (UST) along with its native digital asset LUNA.  These are two of TFL's largest digital assets by market capitalization, together reaching approximately $40 billion in worth.

57.     Starting on or about November 2019, Jump and TFL/Kwon entered into a series of agreements, whereby Jump was to provide TFL market-making services with respect to LUNA, and eventually UST, in exchange for compensation (such as receiving LUNA at a significant discount to market prices)  These agreements generally provided for Jump to receive LUNA after achieving certain benchmarks in its trading of UST.  *Id.* ¶154.

## C.     Jump Engaged in a Fraudulent Scheme in Connection with the May 2021 De-Peg

58.     Jump engaged in a manipulative scheme with TFL and Do Kwon to mislead investors and potential investors about the stability of Terraform's stablecoin, UST, (including as offered and sold with the Anchor Protocol) and the algorithm that purportedly monitored and automatically maintained the peg of UST's price to the U.S. dollar.  Specifically, in May 2021, when the value of UST became "unpegged" from the U.S. dollar, falling to $0.90, in exchange for LUNA that Jump intended to and sold to investors, Jump, with TFL and Kwon, secretly implemented a scheme for Jump to manipulate the price of UST.  Jump purchased large blocks of UST from investors, removing them from the market – effectively burning them – to cause the price of UST to rise, restoring its value.  *See* SEC Compl. ¶152.

59.     After the price of UST rose as a result of these efforts, with knowledge of its participation in the scheme to manipulate the price of UST when the algorithm had failed, Jump falsely and misleadingly touted to investors that UST's algorithm had successfully re-pegged UST

---

[31]     Nicholas Platias, et al., *Anchor: Gold Standard for Passive Income on the Blockchain*, Anchor Protocol (June 2020), https://www.anchorprotocol.com/docs/anchor-v1.1.pdf.

1  to the dollar, misrepresenting that the re-peg had occurred without human intervention and

2  misleadingly omitting the real reason for the re-peg: Jump's intervention.  *Id.* ¶153.

3      60.    From 2019, when UST was first coded onto the Terraform blockchain, until mid-

4  May 2021, UST experienced no significant market disruptions.  *Id.* ¶155.  But on May 19, 2021,

5  UST began to de-peg from the U.S. dollar.  On May 23, 2021, UST's price declined sharply,

6  dropping to nearly $0.90.  That morning and throughout the day, Jump communicated repeatedly

7  with Kwon.  In these communications, Kwon expressed concern over UST's value and discussed

8  with Jump how to restore UST's peg to the dollar.  *Id.* ¶156.  TFL/Kwon admitted in briefing that

9  there "were five Signal calls" between this day between Kariya and Kwon.  *See* SEC Action Defs.'

10  SMJ Mem. at 6.

11      61.    In collusion and coordination with TFL and Kwon, Jump responded by purchasing

12  large quantities of UST throughout the day on May 23 and continuing through May 27, 2021, in

13  an effort to restore UST's peg.  Ultimately, Jump made net purchases of over 62 million UST over

14  at least two crypto asset trading platforms.  UST's market price began to rise shortly after Jump's

15  purchases, restoring the peg to near $1.  *See* SEC Compl. ¶157.  The secret agreement between

16  TFL and Jump is clearly documented: Kariya first called Kwon at 9:10 AM CDT.  According to

17  its own trading records, Jump began actively trading at approximately 9:30 AM CDT, and Kariya

18  again called Mr. Kwon at 9:58 AM CDT.  Per the Call Log, at 3:22 PM CDT, Mr. Kwon called

19  Kariya, and called him again at 4:25 PM CDT and 4:55 PM CDT.  *See* SEC Action Defs.' SMJ

20  Mem. at 37-38.

21      62.    Jump's "active" trading was categorized in bookstacker_UST.  The Trading Firm's

22  records from May 23, 2021, show UST being accumulated from "9:25 CDT to 10:01 [AM] CDT,

23  after which time [the Trading Firm] pauses trading until [2]:30 CDT [PM]. From [2]:30 CDT to

24  [10]:40 CDT [PM], bookstacker_UST accumulates another 6.7 million in UST. By the start of the

25  day on May 24, bookstacker_UST held 19.5 million UST. From May 24 to May 25 6:03 CDT, the

26  time that UST reached $0.99, bookstacker_UST purchased another 4.4 million UST, ending its

27  position with a total of 24.0 million UST."  SEC Action Defs.' SMJ Mem. at 37-38 n.30.  Shortly

28  thereafter, Kwon, on behalf of TFL, agreed to remove the loan agreement conditions requiring

Jump to achieve the requisite benchmarks to receive the loaned LUNA tokens. Instead, TFL agreed to deliver on specified dates, without conditions, specific amounts of the remaining 61,458,334 LUNA tokens to Jump under the agreements. Under the modified terms of the agreements, the final LUNA delivery to Jump was to occur by September 1, 2025. *Id.* ¶158. On the day in question, May 23, 2021, a Jump executive told employees, "I spoke to Do [Kwon] and he's going to vest us." SMJ Order at 11, 56.

63. The same day, TFL's head of business development, Jeff Kuan ("Kuan") wrote to TFL's head of communications, Brian Curran, that he was "speaking to jump about a solution." *Id.* at 55. Curran took notes at a division head meeting that day, writing that Kwon announced that the "[p]eg had to be defended" and that "Jump was deploying $100 million to buyback UST." *Id.* at 12.

64. Indeed, Jump purchased large amounts of UST in bursts that day, and UST's market price was eventually restored to near $1.00. *Id.* Later that year, Kwon told Curran that if Jump had not stepped in, Terraform "actually might've been fucked." *Id.* Another Terraform employee added that "they [Jump] saved our ass." *Id.*

65. In another set of texts between Curran and Kuan discussing the de-peg, which were submitted as summary judgment evidence in the SEC action, Kuan wrote to Curran on May 23, 2021, "Do just randomly called me . . . [W]e're speaking to jump about a solution." *Id* at 55. Curran added, "Spoke with Do, we're gonna deploy $250 million from stability reserve through Jump to stabilize the peg." Curran followed up just over 20 minutes later, "Jump has already started buying . . . May not need entire $250 million." *Id.* A day later, Terraform's official then-Twitter account posted, "Terra's not going anywhere . . . $1 parity on UST already recovered. *Id* at 55-56.

66. Judge Rakoff found that the SEC's evidence of a scheme to deceive investors about UST's $1.00 peg, by secretly arranging for Jump to make bulk purchases of UST to drive the price back up to $1.00, is compelling but circumstantial, relying in large part on the testimony of Jump whistleblowers whose credibility the jury will need to determine. *Id.* at 54. Judge Rakoff referred to the rest of the SEC's evidence as "damning." *Id.* at 55.

67.     In a sworn declaration cited by the SMJ Order, an SEC whistleblower ("CW-1") stated that he worked at Jump in May 2021 and participated in a Zoom meeting on or about May 23, 2021, in which Jump officers were present. *Id.* at 56.  In that meeting, CW1 heard the executive tell Jump's co-founder, "I spoke to Do and he's going to vest us." *Id.*  Before that statement, Jump's co-founder had told CW-1 "that Terraform had made a deal with Jump to promote the adoption of UST." *Id.*  Later on or about May 23, 2021, CW-1 saw and heard Jump's co-founder direct traders "to adjust the parameters of the [Jump] trading models to control the price, quantity, and timing of UST orders." CW-1 saw automated alerts about Jump's UST trading. *Id.*  CW-1 also heard Jump's co-founder say that "he was willing for Jump to risk about $200 million to help restore the peg." *Id.*  In the aftermath, once UST's price returned to $1.00 a few days later, CW-1 "heard [Jump's co-founder] provide general feedback to the Jump Crypto trading team on the sale of UST, for example, advising them not to cause another depeg by selling too quickly." *Id.*

68.     In response to questions about the manipulation of the re-peg, Jump personnel whom the SEC deposed invoked their Fifth Amendment rights against self-incrimination, refusing to answer a single substantive question. *Id.* at 56-57.

69.     Although the exhibit itself is under seal, documents submitted in support of the summary judgment motions demonstrate that the Jump president referred to in the briefing was Defendant Kariya and the "co-founder" referred to in the SMJ Order is Defendant Disomma. *See* Henkin Decl. at Exs. 45 and 59.

70.     TFL/Kwon represented in its summary judgment briefing that Jump had "requested that communications be done through Signal." *See* SEC Action Defs.' SMJ Mem. at 37.  TFL further submitted that Kariya had "no Signal messages between him and Mr. Kwon on May 23, 2021, either because (a) there were no messages between the two or (b) they were deleted by the disappearing messages function in the President's Signal app, which the record demonstrates that he, not Mr. Kwon, turned on for their chat." *Id.*  TFL and Kwon also admitted that there "were five Signal calls" between Kariya and Kwon. *Id.* at 6.

71.     The SEC also submitted declarations from Keone Hon ("Hon"), another former Jump employee, and Brandon Ackley ("Ackley"), a current member of "ownership entities within

Jump Trading Group" and former employee of Jump Operations LLC.  SMJ Order at 58-59.  Both declarations state that Jump indeed made trades of UST on May 23, 2021.  For instance, Hon wrote that "[s]ometime over the weekend of May 22, 2021, . . . [he] was instructed to purchase UST for Jump Trading" even though he "was not responsible for trading crypto assets" at that time.  *Id.* at 59.  Hon also wrote that, "I believe, other Jump Crypto team members were also purchasing UST." *Id.*

72.     Judge Rakoff found that the Jump confidential witness accounts were admissible under Federal Rule of Evidence 804(b)(3) as statements against interest, reasoning that Jump's, and those individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  *Id.* at 57.

73.     Judge Rakoff also agreed with the SEC that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore UST's peg."  Such statements are thus likewise admissible under Federal Rule of Evidence 803(3). *Id.* at 57-58.

74.     The SMJ Order also rejected a challenge to the SEC's expert witness, Dr. Bruce Mizrach.  *See* SMJ Order at 14-21.  Dr. Mizrach found that Jump's trading increased UST's price by $0.62 over a particular half-hour period, when the actual price increased by just $0.03.  Dr. Mizrach's analysis showed that, in the absence of Jump's trading during that period, the price would have been $0.62 lower than it was.  In other words, had Jump not made its trades during that period, UST's price would have declined by $0.59 rather than increase by $0.03, as it did.  *Id.* at 20-21.

75.     The loan modifications between Jump and TFL/Kwon were subsequently reduced to writing in a July 21, 2021 agreement signed by Kwon.  Under the terms of the modified agreement, Jump received LUNA tokens at $0.40 per token, even during periods when LUNA was trading at more than $90 in the secondary market.  *See* SEC Compl. ¶159.

76.     Jump ultimately profited by approximately $1.28 billion by selling the LUNA acquired from TFL under the terms of the 2019 and 2020 loan agreements, as modified.  *Id.* ¶160.

77.     Summing up the SEC's case, Judge Rakoff stated the "evidence is compelling." SMJ Order at 60.  Jump is specifically mentioned in Judge Rakoff's SMJ Order more than 90 times.

**D.     Jump Knowingly Misleads U.S. Investors Concerning the Stability of UST and LUNA**

78.     Immediately after secretly intervening to restore UST's peg in May 2021, Jump began materially misleading investors about the repegging of UST to the US dollar that had occurred.  Specifically, Jump's statements and promotions all misleadingly omitted the true cause of UST's re-peg: Jump's deliberate intervention to restore the peg in exchange for vested tokens.

79.     Jump promoted the Terra Tokens and Anchor Protocol through, among other means, websites, web applications, social media accounts, podcast interviews, and through U.S. media.  The promotions all had the same talking points: the stability and sustainability of the UST peg and the ecosystem it supports.

80.     Immediately after the de-peg and repeg event, Jump, under the guise of submitting a new governance proposal in the Terra ecosystem, worked with TFL to sow misinformation into the market about the strength of the peg, the viability of the UST peg, and the strength of the Terra ecosystem.

81.     Jump's immediate proposal after the surreptitious peg bailout had the effect of misleading investors into believing that the algorithm held up in times of market volatility and that Jump's presence would improve stability, as evidenced by an investor within the Terra Network group on Signal stating in the chat: "I don't really see how UST has lost trust. In fact UST has held its peg amazingly well for an algorithmic stablecoin that has a marketcap of 2B USD (even in a black swan event of sorts) [. . .] Add to it that Jump liquidity has brought it a new proposal to improve on-chain liquidity which on implementation should work to further reduce UST deviations further"[32]

---

[32]     Ex. 40 to Henkin Decl. (ECF 103-40) at *11.

82.     Jump's authoring proposals for Terra' governance further gave investors misleadingly confidence in the peg and the Terra ecosystem.  For example, investors commenting on the news of Jump's proposal found it to be positive and optimistic for Terra's future prospects, stating that "Jump trading prop[osal] will make it 100x stronger," "Jump Trading is involved in terra? thats pretty big," and "Jump trading prop is mega bullish on top of that."[33]  These comments further establish that Jump's statements were material to investors.

83.     On May 24, 2021, TFL published a 29-post thread on its official Twitter account, discussing the de-peg.[34]  At no point did TFL disclose that UST's peg to the dollar was restored as the result of Jump's efforts, and not the success of the algorithm.  For example, in posts #23-25, TFL stated:

> On-chain swap spread are healing (ranging between 3-4%) as liquidations on Anchor wind down, arb opportunities on third-party venues incentivize buying UST, the market for LUNA becomes oversold and diamond sharp hands, gloriously holding the line, glean a profitable opportunity. The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense a stress test in live conditions as can ever be expected. We just experienced a black swan.  Despite sharp dislocations, the on-chain swap spreading is mending, UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed – buttressing the growth of the Terra economy as the system bounces back from distress.[35]

84.     Later on in post # 28, TFL mentions Jump by name,[36] still omitting that it was Jump's purchases of UST that restored the UST peg and not the algorithm TFL and Jump promoted.

85.     On June 9, 2021, Terra released a document that quoted Jump multiple times, linked to Jump's posts, and made false statements regarding the peg, stating "Understanding how various levers of the protocol and its ecosystem of apps interact at such a scale crystallizes during excessive volatility that spotlight points of pressure in the system. As the UST peg normalized, this was a

---

[33]     Ex. 40 to Henkin Decl. (ECF 103-40) at *322, *340.
[34]     @terra_money,   X   (F/K/A   Twitter)   (May   24,   2021,   6:51   AM), https://twitter.com/terra_money/status/1396780917314621444?s=20.
[35]     @terra_money,   X   (F/K/A   Twitter)   (May   24,   2021,   6:51   AM), https://twitter.com/terra_money/status/1396780959899344896?s=20.
[36]     @terra_money,   X   (F/K/A   Twitter)   (May   24,   2021,   6:52   AM), https://twitter.com/terra_money/status/1396781211595407360?s=20.

function of the on-chain liquidity absorbing the volatility off-chain gradually, and as we said, it would not happen overnight. Two weeks later, the Terra protocol is humming along once again, with the UST market cap growing 6% MoM despite the massive contraction induced by the extreme market volatility."[37]

86.     The foregoing statements were recklessly false and/or misleading because the algorithm did not restore the price; rather, Jump purposefully interfered and purchased large blocks of UST to restore the peg in exchange for being able to unload its considerable Terra Token holdings at a greater premium once the price rose after investor confidence returned under false pretenses. Further, despite being quoted in this June 9, 2021 document and having Jump's posts be included in the document, Jump took no steps to ever cure the misstatements made by Terra even though it was contemporaneously aware of the misleading statements and omissions being made.

87.     On August 9, 2021, TFL and Jump (through Wormhole) released a statement that "Terra Goes Live on Wormhole V2".  This statement falsely described UST as a "censorship-resistant, infinitely scalable, algo-pegged USD stablecoin."[38]

88.     On September 14, 2021, Jump formally announced its Jump Crypto division.  Terra tweeted that Jump has quietly played a pivotal role in the Terra ecosystem for a long time and is one of the most well-reputed, talented, and strategically important firms in the broader market. Defendant Kariya retweeted, stating "It's been a real pleasure working with @stablekwon and the Terra team over the last couple years. A+ folks."  Concurrently, Jump Crypto published the "Introducing Jump Crypto" blog post written by Kariya on its website.[39]  The blog highlighted "Terra's stability mechanism" as effective to "balance safety" and claimed that Jump's "data engineering pipelines and battle experience in the markets have uniquely enabled us to analyze

---

[37] The Intern, *Stablecoins — Defining the Terra Algorithmic Design*, MEDIUM (June 9, 2021), https://medium.com/terra-money/stablecoins-defining-the-terra-algorithmic-design-5d952fdf68d.
[38] The Intern, *Terra Goes Live on Wormhole V2*, MEDIUM (Aug. 9, 2021), https://medium.com/terra-money/terra-goes-live-on-wormhole-v2-12df49d446d2#:~:text=2-,Wormhole%20V2%20for%20Terra%20is%20here.,)%2C%20and%20now%20%E2%80%94%20Terra.
[39] *Introducing    Jump    Crypto*,    JUMP    (Sept.    13,    2021), https://jumpcrypto.com/writing/introducing-jump-crypto/ (last visited Jan. 23, 2024).

these complex systems and meaningfully contribute to the discussion."[40]  This blog also touted Jump as "one of the guardians helping secure the [Wormhole] network."[41]

89.     Also on September 14, 2021, with the price of LUNA tokens soaring, Kariya tweeted "We've tripled over the last year, have billions of dollars committed across space and we're aggressively growing".[42]  On September 17, 2021, Kariya promoted the upcoming Terra bridge, indicated that he was "keenly awaiting" the release of the upcoming Terra bridge.[43]

90.     Also on or around September 17, 2021, Kariya reposted Anchor protocol marketing materials.[44]

91.     On September 21, 2021, Jump and Kariya posted on Twitter, promoting Terra and its interoperability through Wormhole.[45]

92.     On September 22, 2021, Kariya repeated a deleted promotion regarding Terra and its cross-chain interoperability capabilities through Wormhole.[46]

93.     On October 11, 2021, in a now-deleted blog on the Insights portion of Jump's website titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market," Jump touted Terra as one of the future "winners" for stablecoins.  Specifically, Jump told investors that UST was a "prominent example" of algorithmic stablecoins, insisting: "We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."[47]

---

[40]    *Id.*
[41]    *Id.*
[42]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 14, 2021, 9:30 AM), https://twitter.com/KanavKariya/status/1437770771628167169.
[43]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 17, 2021, 3:26 PM), https://twitter.com/KanavKariya/status/1438947586682073094.
[44]    @armaniferrante, X (F/K/A TWITTER) (Sept. 16, 2021, 11:28 PM), https://twitter.com/armaniferrante/status/1438706351295827968.
[45]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 21, 2021, 12:59 PM), https://twitter.com/KanavKariya/status/1440360033372426252.
[46]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 22, 2021, 11:00 AM), https://twitter.com/KanavKariya/status/1440692450431954944.
[47]    Peter Johnson and Shanav Mehta, *Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market*, JUMPCAP. (Oct. 11, 2021),

94.     This statement was false and misleading because Defendants omitted facts that undermined their opinion about the stability of UST. In particular, Defendants knew that Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed.

95.     On October 19, 2021, Kariya made a post promoting Terra tokens and the cross chain use of UST through Wormhole.  Kariya exclaimed "It's here, it's here!!!   Cross chain UST."[48]

96.     Kariya then reposted Terra promotions regarding Wormhole support of Terra, stating "Get your UST to Solana, Ethereum and BSC."[49]

97.     On October 20, 2021, Kariya reposted promotions that UST will be available on the Solana blockchain.[50]

98.     On October 29, 2021, Jump and Wormhole promoted Terra bridging in Wormhole marketing pieces.[51]

99.     On November 3, 2021, Jump reposted marketing pieces for Terra sales on the Apricot exchange using Jump's Wormhole protocol.[52]

100.     On November 4, 2021, both Jump and Wormhole promoted the use of the Terra bridge on Wormhole.[53]

101.     Also on November 4, 2021, Jump and Wormhole posted about listing UST on the Aave Protocol.[54]

---

https://web.archive.org/web/20220518222646/https://jumpcap.com/insights/stablecoins-the-impending-rise-of-a-multi-trillion-dollar-market.

[48]     Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Oct. 19, 2021, 5:37 PM), https://twitter.com/KanavKariya/status/1450576975647498241.

[49]     Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Oct. 19, 2021, 5:41 PM), https://twitter.com/KanavKariya/status/1450577850348703744.

[50]     @solana,     X     (F/K/A     TWITTER)     (Oct.     20,     2021,     8:37     AM), https://twitter.com/solana/status/1450803289889595395.

[51]     @wormholecrypto,     X     (F/K/A     TWITTER)     (Oct.     29,     2021,     11:22     AM), https://twitter.com/wormholecrypto/status/1454106361382408194.

[52]     @apricotfinance,     X     (F/K/A     Twitter)     (Nov.     3,     2021,     7:53     AM), https://twitter.com/apricotfinance/status/1455910983407476741?s=42.

[53]     @wormholecrypto,     X     (F/K/A     Twitter)     (Nov.     4,     2021,     10:35     AM), https://twitter.com/wormholecrypto/status/1456314180580085765?s=42.

[54]     @larry0x,     X     (F/K/A/     Twitter)     (Nov.     4,     2021,     8:52     AM), https://twitter.com/larry0x/status/1456288202776580100?s=42.

102.    On November 9, 2021, Jump made a post promoting the Terra ecosystem and the use of the Wormhole bridge.[55]

103.    On November 11, 2021, Jump reposted Terra promotions about its new website.[56]

104.    On November 23, 2021, Kariya retweeted Wormhole marketing regarding the liquidity of Terra Tokens.[57]

105.    On December 1, 2021, Kariya reposted marketing about UST being added to Jump's Pyth Network of price oracles.[58]

106.    On December 2, 2021, Jump reposted a marketing tweet from Orion platform promoting UST and LUNA.[59]

107.    On December 2, 2021, Jump reposted news that UST was getting added to Jump's Pyth Network of price oracles.[60]

108.    On December 6, 2021, Kariya reposted that UST would be supported at "thousands of locations on the Flexa network."[61]

109.    On December 14, 2021, Kariya reposted a Terra promotion that the Kraken exchange had listed LUNA tokens.[62]

110.    On December 23, 2021, Kariya reposted Do Kwon's promotion that UST was going to be listed on the HuobiGlobal exchange.  Kariya stated that "Slowly, then all of a sudden. Exchange adoption is key for stablecoins. Probably an obvious opinion at this point, but don't see

---

[55]    @jump_, X (F/K/A Twitter) (Nov. 9, 2021, 6:12 AM), https://twitter.com/jump_/status/1458074913407918083?s=42
[56]    @terra_money, X (F/K/A/ Twitter) (Nov. 11, 2021, 9:57 PM), https://twitter.com/terra_money/status/1459037520520306692?s=42.
[57]    @wormholecrypto, X (F/K/A Twitter) (Nov. 23, 2021, 1:11 PM), https://twitter.com/wormholecrypto/status/1463208698805989384.
[58]    @Mariobern_, X (F/K/A Twitter) (Dec. 1, 2021, 9:18 AM), https://twitter.com/Mariobern_/status/1466048974540840964.
[59]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Dec. 2, 2021, 10:55 AM), https://twitter.com/KanavKariya/status/1466435961336774662.
[60]    @Mariobern_, X (F/K/A Twitter) (Dec. 1, 2021, 6:18 AM), https://twitter.com/mariobern_/status/1466048974540840964?s=42.
[61]    @FlexaHQ, X (F/K/A Twitter) (Dec. 6, 2021, 6:32 PM), https://twitter.com/FlexaHQ/status/1468000445926985737.
[62]    @terra_money, X (F/K/A Twitter) (Dec. 14, 2021, 2:49 PM), https://twitter.com/terra_money/status/1470843465592279044.

28

1  any other decentralized stablecoins ever catching up with the moon. Too deeply embedded across

2  the cryptoverse."[63]

3      111.    Thereafter, on December 23, 2021, Kariya then tweeted "all at once" and reposted

4  that UST was also available for sale on the large cryptocurrency exchange Binance.[64]

5      112.    Also on December 23, 2021, Kariya reposted Terra marketing pieces regarding

6  Jump's Wormhole protocol.[65]

7      113.    On January 10, 2022, Kariya tweeted a promotion that LUNA tokens were getting

8  listed on the Mango Markets exchange.  Kariya stated, "Luna wrapped by Wormhole, priced by

9  Pyth, trading on an OB on Solana [] It's beautiful."[66]

10      114.    Also on January 10, 2022, Kariya admitted to Jump having profited from the

11  scheme, stating "the hotness of fresh money can be jarring" and that "We're up 100% over the last

12  year."[67]

13      115.    On or around January 19, 2022, Jump and TFL announced the formation of the

14  Luna Foundation Guard – a Singapore-based non-profit organization – for the purported purpose

15  of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability

16  of Terra's algorithmic stablecoins."[68]

17      116.    Jump (via Kariya), as a cofounder and creator of the Luna Foundation Guard,

18  exercised control over the Company and directed and/or authorized, directly or indirectly, the

19  statements that the Luna Foundation Guard made to the public.

20      117.    The announcement noted previous criticisms directed towards algorithmic

21  stablecoins like UST, but the Luna Foundation Guard, at the behest of Jump, downplayed the

---

[63]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Dec. 23, 2021, 9:27 PM), https://twitter.com/KanavKariya/status/1474023919262871561.

[64]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Dec. 24, 2021, 12:46 AM), https://twitter.com/KanavKariya/status/1474255102701563908.

[65]    @terra_money, X (F/K/A Twitter) (Dec. 23, 2021, 2:49 PM), https://twitter.com/terra_money/status/1474104777524998153.

[66]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Jan. 10, 2022, 7:33 PM), https://twitter.com/KanavKariya/status/1480699284278452225.

[67]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Jan. 10, 2022, 10:08 PM), https://twitter.com/KanavKariya/status/1480738288835121158.

[68]    The Intern, *Formation of the Luna Foundation Guard (LFG)*, Medium (Jan. 19, 2022), https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b#:~:text=We're%20pleased%20to%20announce,sustainability%20and%20stability%20of%20Terra's.

29

"misconception" that algorithmic stablecoins are "unsustainable." The Luna Foundation Guard went on to state that a previous depegging that occurred in May 2021 was not a sign that UST was more unstable than disclosed, but rather, a learning opportunity that UST was able to capitalize on:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, ***UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving its design and adoption strategy.*** Still, ***questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on***.
>
> *     *     *
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions. These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.[69]

[Emphasis added.]

118.    According to its website:

> **The Luna Foundation Guard ("LFG")** is a nonprofit organization established in the Republic of Singapore dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting the research and development of various aspects enveloping open-source software and applications, the LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.
>
> **A decentralized economy needs a decentralized currency**
>
> The LFG is primarily focused on Terra. Terra is a decentralized, open-source public blockchain built to support a suite of fiat-pegged, algorithmic stablecoins. Primarily, this includes **TerraUSD (UST)** – the flagship stablecoin of the Terra network and the leading decentralized stablecoin in DeFi by market cap.
>
> Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. **This is primarily accomplished by the Terra protocol design**, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless arbitrage incentives and counter-cyclical monetary policy levers to

---

[69]    Defendants' public statements attributing UST's recovery from the May 2021 depegging to the resiliency of algorithmic stablecoins – rather than an infusion of capital – are materially misleading, and feature prominently in the SEC's fraud allegations. *See* SEC Compl. ¶¶152-68.

maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins.

In connection with its stewardship and support of the Terra ecosystem in general, **LFG is establishing a decentralized UST Reserve protocol** – a non-profit initiative to provide a further layer of support to ensure that UST maintains its peg. In an event where the market price of UST materially deviates from the USD peg, holders of UST will be able to close the arbitrage and bring the market price of UST back to the peg by swapping UST for major, non-correlated assets like BTC that capitalize the reserve. The reserve functions as a release valve for swelling pressure to exit UST to LUNA on-chain, dampening the reflexivity of the system by reducing the dilution of the LUNA supply during severe contractions and restoring the peg in real-time and maintaining an alternative arbitrage opportunity outside of the Terra protocol itself.

The UST Reserve serves as **a perpetual decentralized asset reserve** for members of the community. Neither LFG nor any other entity that assisted with the UST Reserve protocol profit from it.

119.    The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem. Building reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins. . . ."

120.    In addition to deploying "capital backing" to prop up TFL's stablecoins and Anchor Protocol, the Luna Foundation Guard also was tasked with providing funding and grants for builders, researchers, community members, and developers working "in the interest of the Terra economy categorized into 3 primary groups: Open-Source Technology Development, Research & Education, and Community Growth."

121.    The Luna Foundation Guard is overseen and operated by a "Governing Council, initially comprised of the following leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem."  The founding members of the Luna Foundation Guard's Governing Council included: Kwon and Nicholas Platias from TFL; Kanav Kariya, the President of Jump Crypto; Remi Tetot, co-founder of RealVision TV; Jonathan Caras, the Project Lead at Levana Protocol; and José Maria Delgado co-founder of Delphi Digital.

122.    The Luna Foundation Guard was initially funded with a 50 million LUNA gift on January 22, 2022, from TFL to "help bootstrap its stabilizing reserves and grants framework."

123.    Also on January 19, 2022, Kariya retweeted the LFG announcement, commenting, "LFG."[70]

124.    On January 19, 2022, Kariya made a post promoting the Anchor protocol.[71]

125.    On January 27, 2022, Kariya made a post promoting "pryzm" or "PRISM," a protocol on the Terra ecosystem.[72]

126.    The foregoing are false ad misleading. Defendants knew that UST was the foundation for the Terra ecosystem. Defendants knew too that UST had failed as an algorithmic stablecoin and that but for Jump's intervention, purchasing large amounts of UST and manually re-pegging UST to the U.S. dollar, UST could not have re-pegged. In that context, Defendants promoted the Terra ecosystem in the face of an inadequate stablecoin.

127.    On January 28, 2022, Jump's President, Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning MIM and UST tokens and the possibility that the Anchor yield could be impacted if a depegging event occurred.  "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."[73]  Kariya further stated, "A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."[74]

---

[70]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 19, 2022, 10:05 PM), https://twitter.com/KanavKariya/status/1483999171862573061.
[71]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 19, 2022, 6:16 PM), https://twitter.com/KanavKariya/status/1483941391977926663.
[72]    @Pryzm_Zone, X (F/K/A TWITTER) (Jan. 27, 2022, 3:13 PM), https://twitter.com/Pryzm_Zone/status/1486794389229813770.
[73]    Zhu Su (@Zhusu), X (F/K/A TWITTER) (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/ status/1486930299711897605.
[74]    Zhu Su (@Zhusu), X (F/K/A TWITTER) (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/ status/1486930300773056516.

128.    On January 29, 2022, Kariya made a post promoting the increased liquidity of the LUNA token.[75] Kariya also posted promoting the "Terra Agora" governance proposal.[76]

129.    On February 10, 2022, Kwon announced that the Luna Foundation Guard's Governing Council (which included Kariya) had voted to capitalize the Anchor Yield Reserve by 450 million UST.

130.    Also on February 10, 2022, Kariya promoted LUNA trading pairs via Jump's Wormhole protocol.[77] Kariya also posted promotions regarding Anchor protocol and Wormhole.[78]

131.    On February 16, 2022, Kariya made a post promoting Three Arrows Capital, its LFG partner.[79]

132.    On February 22, 2022, the Luna Foundation Guard, at the behest of Defendants, issued a press release announcing the closing of a private sale of $1B in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem. . . . The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[80]

133.    On February 22, 2022, the LFG, at the behest of Defendants, announced: Announcement of the $1 billion private token sales led by Jump Crypto and Three Arrows Capital, with participation from DeFinance Capital, Republic Capital, GSR, Tribe Capital, etc.

> 1/ One common criticism of algorithmic stablecoins is their reflexive nature and the hypothetical risk of a "bank run" scenario where demand to sell the stable

---

[75]    Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (Jan. 29, 2022, 2:15 PM), https://twitter.com/KanavKariya/status/1487504699267944450.

[76]    @jump_, X (F/K/A Twitter) (Jan. 29, 2022, 4:34 PM), https://twitter.com/jump_/status/1487539562066976780.

[77]    @astroport_fi, X (F/K/A Twitter) (Feb. 10, 2022, 3:56 PM), https://twitter.com/astroport_fi/status/1491878654359572488.

[78]    @wormholecrypto, X (F/K/A Twitter) (Feb. 10, 2022, 11:19 AM), https://twitter.com/wormholecrypto/status/1491809045719785473.

[79]    @PythNetwork, X (F/K/A Twitter) (Feb. 16, 2022, 6:03 PM), https://twitter.com/PythNetwork/status/1494085038039785472.

[80]    Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022), https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm..

outstrips supply in a way that causes compounding price decreases in both native tokens.

> 2/ Although the widespread adoption of $UST as a consistently stable asset through market volatility should already refute this, a decentralized Reserve can provide an additional avenue to maintain the peg in contractionary cycles that reduces the reflexivity of the system.[81]

134. Jump President and Luna Foundation Guard Governing Council member Kariya proclaimed in the press release that:

> UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[82]

135. That same day Jump endorsed Kariya's comments, stating: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."[83]

136. Jump also promoted its relationship with TFL and the future prospects of UST on February 22nd: "We're excited to share our latest collaboration with @terra_money. . . .  Our goal is to make DeFi more accessible and meaningful for everyone. . . .  By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."[84]

137. Kariya tweeted in response that "$1B to absorb liquidity crunches [] All contractions in the economy have caused reflexive movement (by design). Allowing for a big chunk of withdrawals in short span through different means can be really impactful LFG has a broad mandate, and we're excited to support it."[85]

---

[81]    Terra Powered by LUNA (@terra_money), X (F/K/A TWITTER) (Feb. 22, 2022, 11:40 AM), https://twitter.com/terra_money/status/1496162890369404933?lang=en.

[82]    *Id.*

[83]    jump-crypto (@jump_), X (F/K/A TWITTER) (Feb 22, 2022, 10:05 AM), https://twitter.com/jump_/status/1496184268976013319.

[84]    jump-crypto (@jump_), X (F/K/A TWITTER) (Feb. 22, 2022, 9:02 AM), https://twitter.com/jump_/status/1496168648356028420.

[85]    Kanav Kariya (@KanavKariay), X (F/K/A TWITTER) (Feb. 22, 2022, 1:46 PM), https://twitter.com/KanavKariay/status/1496194701048877059.

34

138.   Also on February 22, 2022, Kariya tweeted regarding the LFG's bitcoin buy.[86] Kariya also reposted Do Kwon's tweet, as well as 3AC's tweet.[87]

139.   On February 25, 2022, Kariya reposted a promotion of a podcast that was to feature Do Kwon and Kariya.

140.   On March 1, 2022, Jump began a podcast series entitled the "Ship Show" to promote the Terra Tokens.  The podcast was hosted by Eden, a community manager at Jump Crypto.  The first two guests on Ship Show were Kwon and Kariya, who promoted the stability and security of the UST and LUNA peg as Terra's two most "attractive" features.  It was during this podcast published by Jump that Judge Rakoff found the "SEC's most direct evidence of a misstatement to investors".  SMJ Order at 61.

141.   Jump's host introduced Kariya and Kwon and referred to them as "two of the biggest minds in the space."  Kariya stated "Jump's doing a whole bunch of things in this space.  One of the most exciting things we're involved in is the Terra ecosystem, so excited to be on this one with Do."  *See* Transcript: The Ship Show (Podcast) March 1, 2022, attached as Ex. 61 to the Henkin Decl.

142.   Evidencing their longstanding relationship, Kwon stated, "I've known Kanav [Kariya] for years now. We first connected in I think 2019. And then we, yeah, it's been a really long time, man."

143.   Kariya stated "So we put in the two of the early governance proposals that helped scale the UST floor back when UST was a 10 million supply last December, when the market module had limited liquidity relative to the liquidity that was reflected on the centralized venues, and in helping protocols that are working through complex trading problems, implement these strategies to achieve kind of maximum success while being aligned with them in the best way possible, right."  *Id.*

---

[86]   Kanav Kariya (@KanavKariay), X (F/K/A Twitter) (Feb. 22, 2022, 1:48 PM), https://twitter.com/KanavKariya/status/1496195289182519305.
[87]   @KyleLDavies, X (F/K/A Twitter) (Feb. 22, 2022, 11:09 AM), https://twitter.com/KyleLDavies/status/1496155279083274244.

144.     Kariya continued, making misleading statements regarding the nature of the Terra Token trading and the strength of the UST/LUNA peg, stating "And as you said at the start of the show, I think we've come a giant, giant amount of ways in LUNA liquidity throughout the broader ecosystem, relative to even a year ago, when it was trading, I think, probably less than $100 million or so daily.  And so that in itself adds a lot of margin in there being. . . .  Taken deep enough book that can absorb these moves. But on extraneous circumstances entail situations, which of course do happen, sometimes there are contracted short periods where the outflows, for example, can be of a larger quantity than the liquidity in the book at that point in time can facilitate. And so this is kind of like a classic liquidity crisis. And for periods of those natures, it's extremely useful to have a reserve that can step in until the market is able to kind of reconsolidate liquidity around those positions. And so the LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime." *Id.*

145.     Kwon, thereafter, compared the LFG to Microstrategy and its CEO Michael Saylor, one of the world's largest holders of bitcoin, stating, "And I think the expectation is that LFG and Michael Saylor are going to compete on whatever it is that Saylor does."  Kariya responded in agreement, "I'm betting on the LFG horse here."  Kariya, in an effort to promote investment into the Terra ecosystem, promoted that "we're super, super early." *Id.*

146.     Kariya continued, misleadingly promoting the Terra ecosystem and the stability of the peg, stating, "Yeah, I think scaling with the float as it comes out will be quite important. So that the liquidity reserve is commensurate with the adoption of UST and the liquidity that's needed to absorb some of those 10 percentage moves in the expansion or contraction of the economy. And so, working through with Do [Kwon] and the rest of the LFG team on potential ways to execute that most effectively, and then potentially diversify. So I think there'll be some cool stuff coming out pretty soon." *Id.*

147.    Additionally, on Jump's March 1, 2022, then-Twitter talk show, Kwon discussed UST's de-peg in May 2021, falsely stating:

> . . . [I]t took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.

SEC Compl. ¶164; *see also id.* ¶¶162-63.

148.    Jump produced this podcast, hosted it, and published it.    Defendant Kariya retweeted the link to it.[88]    At no point did Jump mention the May 2021 bailout or correct Kwon's misstatements.

149.    Jump's statements were materially false and misleading.    Despite the statements to the contrary, UST did not "automatically self-heal[]."    UST's "[a]lgorithmic, calibrated adjustments of economic parameters" failed.    In fact, UST's peg to the dollar was not restored until Jump intervened, purchasing UST in large amounts to restore UST's price to one dollar.    While the statements above led investors to believe UST's peg was restored by the algorithm, in fact, it was only the deliberate actions of "human agents," including TFL, Kwon, and Jump, that ultimately led to the restoration of the peg.    *See* SEC Compl. ¶165.

150.    Jump and Kariya knew, or were reckless in not knowing, that these statements were materially false and misleading.    They knew that Jump had intervened to buy up UST – Kariya discussed it multiple times that day and Jump's founder personally directed Jump's trading.    In fact, Jump was rewarded for its role in restoring the peg by having the terms of its loan agreements modified to Jump's benefit.    *See* SEC Compl. ¶166.

151.    Jump never disclosed that it was its multi-million-dollar bailout of the peg, and not the algorithm, that restored UST's peg.    Instead, it misled investors who were actively buying and trading UST to believe that the algorithm had "self-heal[ed]" to restore the peg without any human involvement.    *Id.* ¶167.

---

[88]    The Ship Show (@shipshow_), X (F/K/A TWITTER) (Mar. 1, 2022. 7:54 PM), https://twitter.com/shipshow_/status/1498823962297466880.

1   152.   Jump's misrepresentations and omissions about the May 2021 de-peg were material

2   because an objective investor would find that the necessity of human intervention to re-peg UST

3   – rather than simply the normal working of the algorithm –altered the total mix of information

4   about the securities in the Terra ecosystem.   Investors, however, were unaware that, while

5   promoting the Terra ecosystem and its foundational stable coin UST, Jump had intervened to

6   restore the peg.   Investors continued to buy and hold UST (including as offered and sold with

7   Anchor Protocol) on the belief that the algorithm, not a manipulative scheme, had worked to

8   restore the peg to the dollar.  *Id.* ¶168.  Many of these investors were holding Terra Tokens in May

9   2022, when UST de-pegged from the U.S. dollar again and did not recover, leading to the collapse

10  of the entire Terraform ecosystem.

11  153.   On March 5, 2022, Kariya retweeted LFG posts regarding the demand for UST.[89]

12  154.   On March 6, 2022, Kariya retweeted promotions regarding UST and its purported

13  trading volume.[90]

14  155.   On March 7, 2022, Kariya retweeted LFG statements regarding the "curve pool", a

15  stablecoin-to-stablecoin trading venue, being unbalanced.

16  156.   On March 8, 2022, Kariya announced that "UST is in high demand atm and is

17  generally trading at a premium."[91]

18  157.   On March 9, 2022, Jump announced "hackerhouse" with Jump promoting

19  development in Terra ecosystem and promote Terra adoption.[92]   Kariya likewise reposted the

20  announcement.[93]

21  158.   On March 10, 2022, Kariya made a post promoting the Anchor Protocol.[94]

22

23  [89]   Luna Foundation Guard (@LFG_org), X (F/K/A TWITTER) (Mar. 5, 2022, 1:59 AM), https://twitter.com/LFG_org/status/150000295752969011114.

24  [90]   @lunadealer,   X   (F/K/A   TWITTER)   (Mar.   6,   2022,   6:42   AM), https://twitter.com/lunadealer/status/1500436715978334211.

25  [91]   Kanav Kariva (@KanavKariva), X (F/K/A TWITTER) (Mar. 8, 2022, 5:33 AM), https://twitter.com/ KanavKariya/status/1501189252075429891.

26  [92]   Jump   Crypto   (@jump_),   X   (F/K/A   TWITTER)   (Mar.   9,   2022,   8:02   AM), https://twitter.com/jump_/status/1501543826929815555.

27  [93]   José Maria Macedo (@ZeMariaMacedo), X (F/K/A TWITTER) (Mar. 9, 2022, 6:16 PM), https://twitter.com/ZeMariaMacedo/status/1501698582755348480.

28  [94]   Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Mar. 10, 2022, 7:33 PM), https://twitter.com/KanavKariya/status/1502080166083837954.

159.    On March 10, 2022, Jump promoted an article on the Jump Crypto website, titled "Yield Farming for Serious People," which purports to "illuminate" the concept of "yield farming" (*i.e.*, earning compounding returns on crypto assets) for investors.[95]  Jump instructed investors on the "first major form of yield farming" – delegating tokens to transaction validators in exchange for a share of the proceeds.  Importantly, Jump provides the following solicitation for Terra securities: "There are many examples, but consider two prominent ones that are more retail-facing. First, traders on Coinbase have the option to stake their Ether on the platform, i.e., delegate their Ether to Coinbase as it participates in upgrading the Ethereum network to Ethereum 2.0, in exchange for interest of around 5% (at the time of writing). Second, Terra traders can use the Terra Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards."[96]  This promotion provides a link to an article titled "Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem,"[97] which encourages investors to stake LUNA directly through the Terra Station wallet.

160.    Around the same time, two of TFL's early investors, Polychain Capital and Arca, proposed a cut to the yield rate in the Anchor Protocol.  Luna Foundation Guard Governing Council members Kariya of Jump and José Marie Macedo of Delphi Digital rejected the proposal. Similarly, the Anchor Protocol's official then-Twitter account publicly endorsed another post voicing objections to the proposal.

161.    On March 11, 2022, Kariya appeared on the Real Vision podcast with Raoul Pal. Real Vision was one of Jump's partners in the LFG.[98]

162.    On March 15, 2022, Kariya made a promotion regarding Wormhole and Terra swapping.[99]

---

[95]    Jump Crypto (@jump_), X (F/K/A TWITTER) (Mar. 10, 2022, 2:49 PM), https://twitter.com/jump_/status/1502008785166290944?s=20.

[96]    Nihar Shah and Lucas Baker, *Yield Farming for Serious People*, JUMP_ (Mar. 10, 2022), https://jumpcrypto.com/yield-farming-for-serious-people/.

[97]    Daryl Loh, *Here's How To Stake $LUNA And Earn Rewards In The Terra Ecosystem*, CHAINDEBRIEF (Dec. 23, 2021), https://chaindebrief.com/how-to-stake-luna-earn-rewards-terra/.

[98]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Mar. 11, 2022, 9:31 AM), https://twitter.com/KanavKariya/status/1502291037548601344.

[99]    @wormholecrypto, X (F/K/A TWITTER) (Mar. 15, 2022, 12:55 PM), https://twitter.com/wormholecrypto/status/1503777027144531970.

1      163.    On March 23, 2022, Kariya reposted a tweet from Do Kwon regarding UST and

2    Wormhole.[100]

3      164.    On March 25, 2022, Kariya promoted that UST trading was not available through

4    Wormhole on the Axelar exchange.[101]

5      165.    On March 26, 2022, Kariya reposted a promotion that of TraderJoe crypto exchange

6    regarding Terra and UST.[102]

7      166.    On March 28, 2022, Kariya reposted a video promoting the LFG's bitcoin

8    purchase.[103]

9      167.    On March 30, 2022, Kariya reposted a promotion about Terra cross chain liquidity

10   through Jump's wormhole protocol on the Acala and Karura crypto exchanges.[104]

11     168.    On March 31, 2022, Kariya reposted a promotion about UST sales and rewards on

12   the Pangolin crypto exchange.[105]

13     169.    On April 5, 2022, Kariya reposted a promotion about the trading volume on the

14   Solana-Terra bridge.[106]

15     170.    On April 6, 2022, Kariya made a twitter post promoting the Terra ecosystem

16   project, the Nebula protocol.[107]

17

18

19

20

---

21   [100]   Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Mar. 23, 2022, 4:20 AM),
22   https://twitter.com/KanavKariya/status/1506546520295972867.
     [101]   Trader Joe (@TraderJoe_xyz), X (F/K/A TWITTER) (Mar. 25, 2022, 4:05 AM),
23   https://twitter.com/TraderJoe_xyz/status/1507267518360129537.
     [102]   Anthony Ramirez (@apram89), X (F/K/A TWITTER) (Mar. 26, 2022, 7:31 AM),
24   https://twitter.com/apram89/status/1507681685017665542.
     [103]   @danku_r,      X     (F/K/A    TWITTER)     (Mar.    28,    2022,    6:00    PM),
25   https://twitter.com/danku_r/status/1508564753509236742.
     [104]   Acala (@AcalaNetwork), X (F/K/A TWITTER) (Mar. 30, 2022, 11:56 AM),
26   https://twitter.com/AcalaNetwork/status/1509197955626115079.
     [105]   Pangolin (@pangolindex), X (F/K/A TWITTER) (Mar. 31, 2022, 6:30 AM),
27   https://twitter.com/pangolindex/status/1509478108709089284.
     [106]   UniWhales DAO (@uniwhalesio), X (F/K/A TWITTER) (Apr. 5, 2022, 12:22 PM),
28   https://twitter.com/uniwhalesio/status/1511378639669059585.
     [107]   Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 6, 2022, 2:46 PM),
     https://twitter.com/KanavKariya/status/1511777464799961093.

40

171.    On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX (Avalanche) tokens to "help bolster its UST Decentralized Forex Reserve."[108] Jump brokered this deal because it was closely connected to Avalanche.  Kariya even spoke at the March 25, 2022 Avalanche Summit in Barcelona, Spain.  Jump also has significant investment in the Avalanche ecosystem.

172.    Also on April 7, 2022, Kariya issued a promotion highlighting the LFG's use of AVAX as a reserve asset.[109]

173.    On April 12, 2022, Kariya reposted a Do Kwon tweet, which promoted the use of Terra Tokens on Jump's wormhole ecosystem.[110]

174.    Around the same time, Kwon himself continued to taunt "poor" crypto investors, making jokes during a May 3rd interview about how he reveled in the idea of watching the cryptocurrency project fail: "95% [of coins] are going to die, but there's also entertainment in watching [them] die too."

175.    Also on May 3, 2022, Kariya appeared on a podcast entitled "Validated" where he promoted the Terra ecosystem and its cross-chain capabilities.[111]  In discussing the potential for bad actors to harm investors, Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that."  This statement was false and misleading because Jump had colluded with TFL/Kwon to bail out the peg in May 2021.  Kariya also falsely described Jump's compliance, stating that "all these phones are heavily, heavily regulated, you know, don't support about 20 years of its reputation and the giant business behind making a lot of this happen and we're definitely incentive aligned."  This statement was false,

---

[108]    Sarah Cohen, *LFG to Acquire $100M in Avax to Strategically Align Terra and Avalanche Ecosystems,* PRWEB (Apr. 7, 2022), https://www.prweb.com/releases/lfg_to_acquire_100m_in_avax_to_strategically_align_terra_and_avalanche_ecosystems/prweb18577009.htm.

[109]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 7, 2022, 1:24 PM), https://twitter.com/KanavKariya/status/1512119136649941002.

[110]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 12, 2022, 11:42 AM), https://twitter.com/KanavKariya/status/1513905395298885639.

[111]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (May 3, 2022, 11:09 AM), https://twitter.com/KanavKariya/status/1521507207694585856.

misleading, and/or incomplete because Jump used the auto-deleting communications application Signal for its communications with TFL and Kwon, and did not otherwise have its incentives aligned with investors.

176.     On May 5, 2022, Kariya reposed a Wormhole promotion about UST.[112]

177.     A few days later, the UST/LUNA death spiral began.

**E.     The Truth Emerges**

178.     Both the size of the deposits in Anchor and the ballooning interest payments owed to investors became too much for the Terra ecosystem to bear.  In early May 2022, structural vulnerabilities within the Terra ecosystem, that were known to Jump but hidden from investors, precipitated a massive selloff of both UST and LUNA.

179.     The price of UST and LUNA Tokens dropped by 91% and 99.7% between May 7, 2022, and May 12, 2022, after it was revealed that TFL's largest digital assets were unstable and unsustainable.

180.     As the following chart from *CoinDesk*[113] shows, the Anchor Protocol saw its total value locked ("TVL") ***fall by $11 billion*** between May 9, 2022, and May 11, 2022:



---

[112]     @wormholecrypto, X (F/K/A Twitter) (May 5, 2022, 12:13 PM), https://twitter.com/wormholecrypto/status/1522248137695498240.
[113]     Shaurya Malwa, *Terra's LUNA Drops to Almost $1 After 90% Weekly Plunge*, CoinDesk (May 11, 2022), https://www.coindesk.com/markets/2022/05/11/terras-luna-drops-to-under-8-after-90-weekly-plunge/.

181.     LUNA's price crashed over 99.7% in less than a week, with the most precipitous drops occurring between May 9 and May 12, 2022, as the following chart[114] demonstrates:



LUNA hovers above 10 cents at writing time. (TradingView)

182.     UST faced similarly steep drops in price.  Starting with the de-pegging between May 7, 2022, and May 9, 2022, UST fell from $1 to just $0.07 by May 25, 2022.

183.     In a "post-mortem analysis" of the Terra ecosystem collapse, Luna Foundation Guard Governing Council member, Remi Tetot ("Tetot"), admitted what TFL had denied all along – that the Anchor Protocol's 20% yield was not sustainable or stable despite constant statements to the contrary up until the collapse.  Worse still, Defendants knew all along there was a significant risk of a death spiral if they did not continually attract new investors to the Terra ecosystem.  Tetot revealed that the 20% yield was a marketing ploy to increase investment in the Terra ecosystem.  The growth was too much and too fast for Anchor to handle, and TFL and the Luna Foundation Guard were unable to scale their hyped-up defense mechanisms sufficiently.   Some of these defenses, like reserve pools, were not even ready despite promises otherwise.  As a result of these failures, UST's vulnerability was increased, exposing it to exactly the type of collapse of UST that TFL's CEO Kwon previously dismissed.  In particular, Tetot candidly confessed:

> They called Luna a Ponzi because of the 20% yield on Anchor, while a proposal was being worked on to have new parameters and make the yield sustainable around 10–12%.  Unfortunately, it didn't have time to make it . . . ***20% yield was essentially the marketing budget and the cost of customer acquisition, we knew it wasn't***

---

[114]     Shaurya Malwa, *Terra's LUNA Has Dropped 99.7% in Under a Week. That's Good for UST*, COINDESK (May 12, 2022), https://www.coindesk.com/markets/2022/05/12/terras-luna-has-dropped-997-in-under-a-week-thats-good-for-ust/.

*sustainable*, but I think it was acceptable for the time being, yield should have been dynamic as the system grow.

\* \* \*

Looking back at it, the 20% yield was a mistake because it increased UST demand too quickly, and *the defence mechanisms were not scaling at the same pace or were not ready yet* (BTC Reserves, 4Pool); *that growth didn't give time to the system to adjust accordingly and increased weaknesses*.

I was too confident in 4Pool and BTC reserves; *while the strategic moves were made, they were not technically ready, leaving room for what happened*.

[Emphasis added.]

184.    Tetot later attempted to deflect the blame of the failure of TFL's algorithmic stablecoin to "human behavior" instead of the failures of Defendants.  Tetot acknowledged that he had been "very vocal about LUNA" and "became an easy target once Luna crashed, and to be fair I earned it, so no hard feeling about it."  Despite his own role in the misleading promotion of the Terra ecosystem, Tetot still chastised "smaller investors" with "heartbreaking stories" about the fall of UST/LUNA: "It looks like many people put all their savings or took debt to participate in Anchor, which is insane, crypto is very risky and I would never recommend such behaviour (and never have!)."  But this was precisely what Three Arrows Capital's CEO Zhu advised investors to do just days before the collapse.[115]  Just as hypocritically, while after the fact he called such behavior "insane," Tetot himself earlier admitted that "my entire crypto portfolio was into Luna, and I watched it melt from 8 digits to 0."

185.    Jump is currently under investigation by the DOJ for its communications in connection with the UST stablecoin.[116]

F.    **Jump Profits from the Fraud**

186.    Jump profited significantly from its fraud, earning approximately $1.28 billion by selling the LUNA acquired from TFL under the terms of the 2019 and 2020 loan agreements, as

---

[115]    Zhu Su (@zhusu), X (F/K/A TWITTER) (Dec. 25, 2021, 9:49 PM), https://twitter.com/zhusu/ status/1508603726143328256.

[116]    Yueqi Yang, et al., *US Prosecutors Are Digging Into Group Chats on Terra Bailout*, BLOOMBERG (Mar. 13, 2023, 5:39 PM EDT), https://www.bloomberg.com/news/articles/2023-03-13/us-prosecutors-are-digging-into-jane-street-jump-trading-chats-on-terra-bailout.

modified in exchange for its surreptitious intervention to re-peg UST to the U.S. dollar manually when the algorithm it touted had failed.  *See* SEC Compl. ¶160.

187.     On September 14, 2021, with the price of LUNA tokens soaring, Kariya tweeted "We've tripled over the last year, have billions of dollars committed across space and we're aggressively growing."

188.     On January 10, 2022, Kariya admitted to Jump having profited from the scheme, stating that "We're up 100% over the last year."

189.     Given Jump's significant profits from its actions, it is not surprising that Kariya was reportedly "upbeat despite [the] Terra fiasco."[117]

## G.     The Terra Tokens Are Unregistered Securities

### 1.     Terra Tokens Are Securities

190.     Judge Rakoff granted the SEC's motion for summary judgment, finding that the Terra Tokens are securities SMJ Order at 2-3; 35-47, and ruling that TFL's sale of Terra Tokens without registering them violated Sections 5 and 12 of the Securities Act of 1933. SMJ Order at 36-47.

191.     Under §2(a)(1) of the Securities Act, a "security" is defined to include an "investment contract."  15 U.S.C. §77b(a)(1).  An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world

---

[117]     Katherine Doherty and Yueqi Yang, *Why Jump Crypto's Kanav Kariya Is Upbeat Despite Terra Fiasco*, NDTV Profit (June 20, 2022, 9:44 AM IST), https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-fiasco-3082509.

1   fall within the ordinary concept of a security.'"   *W.J. Howey*, 328 U.S. at 299 (citation omitted).

2   Accordingly, in analyzing whether something is a security, "form should be disregarded for

3   substance," and the emphasis should be "on the economic realities underlying a transaction, and not

4   on the name appended thereto." *Forman*, 421 U.S. at 848-49.

5        192.   As a threshold matter, TFL has not registered any offering of securities pursuant to

6   the Securities Act, nor has it registered the Terra Tokens as a class of securities under the Exchange

7   Act.  TFL has also not registered with the SEC as a broker or dealer under §15(a) of the Exchange

8   Act, or as an investment company under §7(a) of the Investment Company Act.

9        193.   In the SEC Compl., the SEC, the regulatory agency with jurisdiction over the

10   registration of securities, alleged (similarly to the initial complaint in this case, (ECF No. 1)) that

11   Terra Tokens were offered, promoted, and sold as unregistered securities under the *Howey* test,

12   and detailed the reasons why. *See* SEC Compl. ¶¶39-103.[118] Of course, the SEC's allegations are

13   no longer mere allegations, as Judge Rakoff has entered judgment that the Terra Tokens are

14   securities. *See* SMJ Order at 2-3; 35-47.

15        194.   TFL and Kwon repeatedly stated that the crypto assets would increase in value

16   based on Terraform's development, maintenance, and promotion of its blockchain, protocols, and

17   the entire Terraform ecosystem.  They also promoted the ability to trade Terraform's crypto assets

18   on the secondary market, with the success of the investment again depending on their efforts. *Id.*

19   ¶39.

20        195.   TFL and Kwon further touted the expertise and success of the Terraform team,

21   including Kwon, claiming that Terraform was "led by serial entrepreneurs" and was a team with

22   "deep relevant expertise," and provided biographies or links to LinkedIn profiles that highlighted

23   TFL employees' and Kwon's expertise in crypto assets, finance, and technical experience with

24   software coding, engineering, and development. *Id.* ¶40.

25

26

---

27   [118]   It is well-established that "if an agency's interpretation of a statute or regulation is not
clearly outside its authority, then the courts should defer to the agency's expertise." *See, e.g.,*

28   *Good Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 954 (9th Cir. 1979) (citations
omitted).

196.     Jump also advertised its considerable efforts to ensure that UST – the "lynchpin of the [Terraform] ecosystem" – maintained its $1.00 peg.  These efforts included when, in January 2022, it announced the creation of the Luna Foundation Guard, with the purpose of serving as an "asset reserve [] to back the UST."  The Luna Foundation Guard was funded with a "gift" of 50 million LUNA (at the time, worth billions of dollars) directly from TFL.  *Id.* ¶41.

197.     TFL and Kwon also aggressively marketed TFL's crypto asset securities to U.S. investors, by posting information and promotional materials to accounts on several publicly accessible online social media platforms, such as Twitter accounts, blog posts, YouTube, and messaging applications like Telegram. Kwon and other TFL employees also gave interviews to the media promoting TFL's crypto assets, including U.S.-based media outlets.  *Id.* ¶42.

198.     In addition, Kwon and other TFL employees traveled to the United States to meet with existing and potential investors in order to solicit investment in Terraform's crypto asset securities, including holding meetings in San Francisco and New York, and to attend and speak at an industry conference and events in New York.  These U.S.-based promotional efforts also included a partnership with the Washington Nationals, which resulted in the word "Terra" being placed on every seat behind home plate and elsewhere around the stadium in Washington, D.C. TFL and Do Kwon also arranged to have several of their crypto assets listed for trading on several major crypto asset trading platforms, including a prominent U.S.-based trading platform.  *Id.* ¶43.

199.     Investors who bought the Terra Tokens invested money or other valuable consideration in a common enterprise:  namely, the Terra ecosystem.  Investors had a reasonable expectation of profit based upon the efforts of the TFL and Do Kwon, including, among other things, these Defendants obtaining favorable listings of their Terra Tokens on U.S.-based cryptocurrency exchanges, and maintaining the stability of the Terra ecosystem.

200.     In addition to the reasons provided in the SEC's analysis and Judge Rakoff's Order, the Terra Tokens qualify as a security under the *Howey* test for the reasons below.

### a.     Terra Token Investors Invested Money

201.     Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens.

202.   The Terra Tokens were listed on U.S.-based cryptocurrency exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other digital currencies.

203.   TFL and Kwon, supported by Jump, sold Terra Tokens to the general public through global, online cryptocurrency exchanges during its so-called launch.

204.   Every purchase of Terra Tokens by a member of the public is an investment contract.

   **b.**  **Terra Token Investors Were Intertwined in a Common Enterprise with Defendants**

205.   Additionally, investors were passive participants in the Terra Tokens' launch and the potential profits of Plaintiffs and the Class were intertwined with those of TFL and of other investors.

206.   TFL and Kwon also were responsible for supporting the Terra Tokens, pooled investors' assets, and controlled those assets.

207.   TFL and Kwon pooled the funds received from investors to develop the Terraform ecosystem and increase the value of LUNA. LUNA investors shared equally in LUNA price increases, or suffered LUNA price decreases equally, so that if one investor profited, all investors did as well.  Because LUNA is fungible, the fortunes of LUNA purchasers were tied to one another, and each depended on the success of TFL and Kwon's efforts and strategy and the Terraform ecosystem as a whole.  *See* SEC Compl. ¶46.

208.   Specifically, TFL sent proceeds of its sales of LUNA to crypto asset wallet addresses that it controlled, in order to fund TFL's efforts to develop its operations. In fundraising presentations, TFL and Kwon explained how TFL would use the proceeds from LUNA sales to help grow and expand the Terraform ecosystem.  For example, in August 2018, when TFL announced its first raise of capital of $32 million, it noted that "Terra will invest the initial seed capital in building the modern financial system on the blockchain."  In fact, TFL's presentations to investors stated that at least 20% of the initial billion LUNA tokens would be used for development and operations.  *Id.* ¶47.

209.   In addition, throughout the Class Period, TFL and Do Kwon held a significant amount of LUNA, tying their fortunes with LUNA investors' fortunes.  TFL owned hundreds of millions of LUNA tokens through the Class Period.  In 2020, Kwon tweeted that he had purchased 50 million LUNA, in addition to the 70 million LUNA that he owned from the time that the blockchain launched in 2019.  *Id.* ¶48.

### c.   Investors Purchased the Terra Tokens with a Reasonable Expectation of Profit from Owning Them

210.   Investors in the Terra Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The Terra Tokens were sold to investors prior to the Terra ecosystem being fully developed and able to handle the scale and scope of TFL's operations.  For pre-functional tokens, the primary purpose for purchasing Terra Tokens was to make a profit or accumulate additional Terra Tokens from various rewards programs, rather than to utilize the Terra Tokens themselves for a task.

### d.   Investors Expected Profits from the Terra Tokens to Be Derived from the Managerial Efforts of Others

211.   Investors' profits in the Terra Tokens were to be derived from the managerial efforts of others – specifically, TFL, Kwon, and the Luna Foundation Guard. Terra Token investors relied on the managerial and entrepreneurial efforts of these entities to manage, oversee, and/or develop the projects funded by the sale of the Terra Tokens.

212.   Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

213.   Each of the Terra Tokens was a security at issuance because profit from the Terra Tokens would be derived primarily from the managerial efforts of Luna's teams developing the associated networks on which the Terra Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

214.   Investors in Terra Tokens relied on the managerial and entrepreneurial efforts of TFL, Kwon, and the Luna Foundation Guard, the Company to manage, market, and develop the Terra ecosystem.

215.   TFL and Kwon promoted LUNA as an investment that would increase in value with the increased usage of the Terraform blockchain that could result from their continued development and maintenance.  They stated publicly that as the Terraform ecosystem grew, based on their efforts, the value of LUNA would grow as well.  As Kwon explained in an April 7, 2021 thread on Twitter (referring to LUNA as "moon"): "A bet on the moon is very simple: . . . The moon's fate in the long run is tied to how widely the money gets used and transacted."  *See* SEC Compl. ¶50.

216.   In that same April 7, 2021 thread, Kwon touted that the value of LUNA could grow as the Terraform "ecosystem" grows, specifically tying the potential growth to his own efforts (which he promised would be successful by touting that he would "kick ass") while investors remained passive (or "s[a]t back") in the enterprise.  *Id.* ¶51.

217.   As one Terraform employee stated in Terraform's publicly-available Telegram messaging application, the "[v]alue of Luna grows as Terra [ecosystem] gets adopted and used." Another Terraform employee noted in an online Ask-Me-Anything interview on Reddit: "[i]n the long-run … Terra's transaction volume will be the main determinant of Luna's value."  *Id.* ¶52 (ellipsis in original).

218.   According to an action by the New York State Attorney General filed on February 22, 2023 (*New York v. Vino Glob. Ltd. d/b/a Coinex*) concerning the sale of unregistered securities (including LUNA) by a cryptocurrency exchange:[119]

> LUNA is a cryptocurrency created by Terraform Labs ("Terraform").  Metz Aff. ¶28.  The Website provides investors with information about the LUNA token, including Luna's distribution scheme, an introduction to the Terraform network, and links to the Terraform network's official website and whitepaper.  *See* Ex. 17 to Metz Aff.  From its inception, the LUNA token was promoted as an investment that would increase in value as a result of the development of other Terraform

---

[119]   Plaintiffs incorporate by reference herein the allegations in paragraphs 45-48 of the Verified Petition and Order to Show Cause, *New York v. Vino Glob. Ltd. d/b/a Coinex*, Index No. 450503/2023 (N.Y. Sup. Ct. Feb. 22, 2023) as well as the Metz Affidavit in Support of the Verified Complaint ("Metz Aff.") and related exhibits.

applications.  Metz Aff. ¶29.  The Terraform whitepaper issued in April 2019 explains that LUNA was "growth-driven" and further discussed the creation of applications to create demand and encourage its use.  *See* Ex. 19 to Metz Aff.

Terraform founder Do Kwon frequently spoke about LUNA's growth potential and value as an investment. For instance, on March 22, 2021, using his publicly known Twitter handle, Do Kwon described LUNA as being "designed to defend Terra stability at a diverse array of market conditions and accrue value to the moon at all of those market conditions." Metz Aff. ¶30.  Do Kwon further used Twitter to promote the ability of LUNA token holders to earn double-digit returns by staking their assets, as he did on November 20, 2021.  *Id*.  Additionally, on March 9, 2022, in a Tweet exchange with a critic, Do Kwon argued that people who purchased LUNA were not poor precisely because they had purchased LUNA, propagating the notion that buying LUNA would generate profit for purchasers.  *Id*.

The price of LUNA increased substantially once Terraform projects launched.  *See* Exs. 21.1 – 21.2 to Metz Aff.  The creation of demand for LUNA was largely dependent upon Terraform, which drove the growth of LUNA by creating other applications and platforms such as its Mirror Protocol, which allowed users to invest in "synthetic stocks," using tokens that tracked the prices of stocks and allowed users to purchase and sell tokens and its Anchor Protocol, which also allowed users to make a token deposit and receive 20% annual yields (which were heavily subsidized by Terraform). *Id.*  The growth and adoption of the LUNA token remained largely dependent upon Terraform projects.  Terraform told investors that, if they used LUNA on these platforms, they would earn returns upwards of 20% interest.  *Id.*  As expected, the price of LUNA saw a substantial increase with the launch of these other Terraform applications and platforms.  *Id.*

Terraform used sales of LUNA to raise funds for its operations, including its other projects.  Metz Aff. ¶32.  In a blog post titled Introducing Project Dawn, Do Kwon publicly announced that Terraform committed to "unlock at most 3 million LUNA per month for all operating costs . . . " and that those LUNA would cover expenditures "for critical infrastructure improvements and core technologies to supplement the accelerating growth of the Terra ecosystem" and would also finance "all other [Terraform] operating costs such as employee token distribution." Metz Aff. ¶32.  The blog post, and other communications by Terraform, were available to CoinEx users because CoinEx provided a link to the Terraform website. *See* Ex. 17 to Metz Aff.

219.    Additionally, in marketing materials distributed to potential investors in January 2019, TFL described purchases of LUNA as "investments" and LUNA buyers as "investors." The same materials noted that "top global exchanges and funds" had already "invested in" TFL (referring to their purchase of LUNA), and that TFL had raised $32 million in July 2018 from an "elite group of VCs" referring to venture capital firms.  *See* SEC Compl. ¶53.

220.    TFL and the Luna Foundation Guard typically held themselves out to investors as experts in the blockchain and crypto field. Investors in the Terra Tokens reasonably expected TFL and the Luna Foundation Guard to provide significant managerial efforts to support the functionality and promotion of TFL's algorithmic stablecoin UST and LUNA.

221.    TFL and the Luna Foundation Guard also worked to develop, support, and grow the Terraform ecosystem, and publicly touted these efforts through a variety of forums, including widely accessible online social media platforms, such as accounts on Twitter and Medium, messaging applications with public channels like Telegram, and YouTube.  TFL's stated efforts to grow the Terraform ecosystem included four substantial version upgrades of the Terraform blockchain, adding new back-end technical features and front-end user applications, entering into partnerships with collaborators, and otherwise extensively and publicly promoting the Terraform ecosystem.  *Id.* ¶55.

222.    TFL and Kwon also provided monthly "Community Updates" on publicly available *Medium* blog posts, which discussed their coding and development of the Terraform ecosystem. Relatedly, TFL employees including Kwon touted their efforts to develop and support the Terraform ecosystem in monthly investor emails that they distributed called "Terraform Labs Investor Update" (later renamed to "Terraform Labs Ecosystem Update").  The recipients of these "Updates" had email addresses that included, for example, an email group "investment@terra.money."   These emails highlighted TFL's engineering, coding, and the integration of applications into the Terraform ecosystem.  These emails also announced that TFL was hiring for positions "key" to the ecosystem's development.  *Id.* ¶57.

223.    Investors in Terra Tokens thus reasonably expected TFL and Kwon to provide significant managerial efforts after the token launch.

224.    This dependency on the managerial efforts of TFL and Kwon, however, was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Terra Tokens were designed and intended to operate, if an investor was even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Terra Tokens were securities until the platform at issue, and its relevant "ecosystem,"

had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens they had acquired were securities.  It was only after certain revelations that provided more information about TFL and its backers' intents and UST/LUNA's algorithmic vulnerabilities that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

### 2. Investors Would Not Reasonably Have Understood that Terra Tokens Were Securities

225.   In connection with the sale of Terra Tokens, the Company and Luna Foundation Guard made statements that reasonably led Plaintiffs and Class members to conclude that the Terra Tokens were not securities.

226.   As noted above, the Company refused to register Terra Tokens with the SEC, which indicated to investors that these were not securities.  No such valid exemption from registration requirements exists for Terra Tokens.

227.   Additionally, TFL created and developed numerous decentralized applications designed to create a use for the Terra Tokens, suggesting to investors that Terra Tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).

228.   At the time of the Terra Token launches, TFL and Kwon took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects – particularly decentralized finance projects involving algorithmic stablecoins – work.  Considering the new technology at issue and the Company's other statements, many investors were understandably unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.

229.   Moreover, the UST/LUNA project was advertised as developing revolutionary and cutting edge blockchain technology and algorithmic stablecoins that were equally safe and reliable to other over-collateralized stablecoins on the market.

230.   In addition to claiming UST/LUNA's technical superiority over other cryptocurrencies, the Company also indicated that it would benefit financially and use the funds

raised through Terra Tokens to continue to enhance the Terra ecosystem-related products and support the growth of the project.

231.    At the time of the Terra Tokens respective launches, TFL and Kwon took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Terra Tokens would be better than other cryptocurrencies, many individuals were unaware that Terra Tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all Terra Tokens were issued by Kwon and the Company after being minted at very little economic cost – and enormous potential upside – to them.

232.    The creation of Terra Tokens by TFL and Kwon occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management. that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that the Terra Tokens were something other than a security when they were a security.

233.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Terra Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

**3.    SEC's Previous Statements and Findings**

234.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" ("Framework") in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

235.    The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

236.    In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect

to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature"?

237.    The Framework further notes that the "stronger the[] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"

238.    The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

239.    At the time of the Terra Tokens' respective launches, TFL and Kwon actively marketed the token launch and the Terra ecosystem, thereby necessitating continued managerial efforts.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

240.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through for example, buybacks, "burning," or other activities."

241.    As noted above, all of the Terra Tokens in circulation were created at the direction of Kwon and TFL.  Additionally, Kwon and Platias also created the protocols by which the Terra Tokens are burned.

242.    The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"

243.    Here, TFL, Kwon, and the Luna Foundation Guard have discussed the long-term prospects on years-long time frames, continually noting how the Terra ecosystem will "evolve" in the future.

244.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."

245.    Here, LUNA's whitepaper focuses extensively on the ability of the Terra Token smart contract to engineer trading of the Terra Token.

246.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."

247.    Here, the Company, along with the Luna Foundation Guard Defendants, readily admitted that they are the arbiters of funding for Terra ecosystem, making other managerial judgments or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

248.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."

249.    Here, several of the promoters – including but not limited to Kwon and the Luna Foundation Guard – retain a significant interest in the Terra Tokens.

250.    On May 7, 2021, on CNBC's "'Squawk Box'" television program, chairman of the SEC, Gary Gensler, stated that "'a lot of crypto tokens – I won't call them cryptocurrencies for

1  this moment – *are indeed securities*. . . ."[120]   [Emphasis added.]   In addition to being the

2  Chairman of the SEC, Mr. Gensler is also a world-renowned expert on cryptocurrencies and

3  blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of

4  Management at the Massachusetts Institute of Technology ("MIT").[121]

5  251.   In a June 14, 2018, speech entitled "Digital Asset Transactions:  When Howey Met

6  Gary (Plastic)," then director of the SEC's division of corporation finance, William Hinman,

7  observed about "when a digital asset transaction may no longer represent a security offering:"[122]

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

> A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[123]

252.   As discussed above, the circumstances surrounding the creation of the Terra Token

demonstrate that a small group of centralized insiders maintained exclusive control over the Luna

project.

---

[120]   Jesse Pound, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/ 2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[121]   Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[122]   William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic): Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[123]   *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

253.    Finally, the SEC has earlier concluded that another virtual currency (*i.e.*, DAO tokens) that are substantially similar to Terra Tokens are "securities and therefore subject to the federal securities laws."   As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[124]

### 4.    Other Commentary from Regulators

254.    Stablecoins, in particular, have come under scrutiny by regulators recently, given the rapid growth of the $130 billion market.

255.    For example, in June 2021, Representative Warren Davidson from Ohio, one of crypto's loudest advocates on Capitol Hill, said that in his view, not all stablecoins should be treated as securities, but stablecoins that specifically are backed by securities should fall under the same sort of regulatory regime: "'if you've got a stablecoin that is essentially backed by securities, it gets hard to say that it's not a security.'"[125]

256.    More recently, in February of 2023, the SEC set its sights on another stablecoin, the Binance-branded, dollar-pegged stablecoin, BUSD.  As publicly reported, the issuer of the stablecoin has received a Wells notice from the SEC, and has been ordered by the New York State Department of Financial Services to stop minting the token.[126]

### CLASS ALLEGATIONS

257.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Terra Tokens and were subsequently damaged thereby.

---

[124]    Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov/ news/press-release/2017-131.

[125]    Nikhilesh De, *State of Crypto: Stablecoin Rules are Coming*, COINDESK (July 20, 2021), https://www.coindesk.com/policy/2021/07/20/state-of-crypto-stablecoin-rules-are-coming/.

[126]    https://www.wsj.com/articles/crypto-firm-paxos-faces-sec-lawsuit-over-binance-usd-token-8031e7a7;   https://www.reuters.com/technology/binance-stablecoin-backer-ordered-stop-issuing-token-binance-ceo-2023-02-13/.

258. The Class Period is defined as the period between March 17, 2021, and May 25, 2022.[127]

259. Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

260. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Luna and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that the Class consists of at least hundreds of people. The number of Class members can be determined based on Jump's and other third party's records.

261. **Commonality**: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.    whether the Terra Tokens are securities under the Securities Act;

    b.    whether Defendants controlled TFL at the time of the improper sale of unregistered Terra Tokens in violation of the Securities Act;

    c.    whether Defendants misleadingly promoted marketed Terra Tokens, issuing materially false and misleading statements with scienter;

    d.    whether Defendants employed a device, scheme, or artifice to defraud and/or engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon Plaintiffs and the Class,

    e.    whether Plaintiffs and the Class relied upon the stability of UST and, in turn, all of Defendants' statements, promoting the securities in the Terra ecosystem that were

---

[127] Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

materially false by virtue of the failure of the algorithm Defendants surreptitiously

acted to hide;

f.       whether Defendants' fraudulent schemes, actions, course of business conduct, and

materially misleading statements and omissions caused loss to Plaintiffs and the

Class;

g.       whether Plaintiffs and Class members have suffered damages, and, if so, the nature

and extent of those damages.

262.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and the Class members' claims all arise out of Jump's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Terra Tokens.

263.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

264.    **Predominance**: Questions of law or fact common to class members predominate over any questions affecting only individual members of the Class. Specifically, the foundation of the entire Terra ecosystem was the purported algorithm's ability to stabilize UST at $1 U.S. dollar without human intervention. All investors in Terra tokens, therefore, relied on the algorithm's supporting the stability of UST. In addition, as a result of their participation and control over the scheme to defraud, Defendants received a material pecuniary benefit of over $1 billion. As such, Defendants were duty bound to disclose, but omitted, that the algorithm had failed and only through their human intervention  did UST re-peg. Accordingly, Defendants' omission is actionable and the reliance presumption in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) applies.

265.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by

each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.  Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case.  Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

266.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## V.    COUNTS

### COUNT I

**Section 10(b) and SEC Rule 10b-5(b)**
**(Against All Defendants)**

267.    Plaintiffs restate and realleges all preceding allegations above as if fully set forth herein.

268.    Plaintiffs bring this claim for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

269.    Plaintiffs bring this claim on behalf of all Class members who purchased Terra Tokens from March 17, 2021, to May 25, 2022.

270.    The Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). Defendants sold these securities to Plaintiffs and the other Class members during and after the Terra Tokens respective launches.

271.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities

1  exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact

2  necessary in order to make the statements made, in the light of the circumstances under which they

3  were made, not misleading."

4      272.   In connection with the March 2021 launch of Terra Tokens, Defendants

5  disseminated, approved, and/or endorsed the false statements described herein, which these

6  Defendants knew or recklessly should have known were materially misleading in that they

7  contained material misrepresentations and failed to disclose material facts necessary in order to

8  make the statements made, in light of the circumstances under which they were made, not

9  materially misleading.

10      273.   Defendants employed devices, schemes, and artifices to defraud; made untrue

11  statements of material fact and omitted to state material facts necessary to make the statements

12  made not misleading; and engaged in acts, practices, and a course of business that operated as a

13  fraud and deceit upon the Class members that resulted in artificially high market prices for Terra

14  Tokens in connection with the March 2021 launch, in violation of Section 10(b) of the Exchange

15  Act and Rule 10b-5 promulgated thereunder.

16      **Misrepresentations and Omissions**

17      274.   Defendants' untrue statements and omissions of material facts in connection with

18  the sale of Terra Tokens include at least the following:

19          a)      Defendants improperly omitted the existence of the scheme to re-peg UST

20  and their participation therein, including their trading large blocks of UST. In or around May 2021,

21  to effectuate the scheme, Jump traded large blocks of UST. Specifically, Jump's "active" trading

22  was categorized in bookstacker_UST.  The Trading Firm's records from May 23, 2021, show UST

23  being accumulated from "9:25 CDT to 10:01 [AM] CDT, after which time [the Trading Firm]

24  pauses trading until [2]:30 CDT [PM]. From [2]:30 CDT to [10]:40 CDT [PM], bookstacker_UST

25  accumulates another 6.7 million in UST. By the start of the day on May 24, bookstacker_UST held

26  19.5 million UST. From May 24 to May 25 6:03 CDT, the time that UST reached $0.99,

27  bookstacker_UST purchased another 4.4 million UST, ending its position with a total of 24.0

28  million UST."  SEC Action Defs.' SMJ Mem. at 37-38 n.30. In addition, as a result of their

participation and control over the scheme to defraud—manipulating the value of UST to cause a re-peg through human intervention when the algorithm had failed—Defendants received a material pecuniary benefit of over $1 billion for their participation. Kwon, on behalf of TFL, agreed to remove the loan agreement conditions requiring Jump to achieve the requisite benchmarks to receive the loaned LUNA tokens.  Instead, TFL agreed to deliver on specified dates, without conditions, specific amounts of the remaining 61,458,334 LUNA tokens to Jump under the agreements.  Under the modified terms of the agreements, the final LUNA delivery to Jump was to occur by September 1, 2025. Id. ¶158.  On the day in question, May 23, 2021, a Jump executive told employees, "I spoke to Do [Kwon] and he's going to vest us."  SMJ Order at 11, 56.

(1) Defendants' trading in UST and its pecuniary benefit achieved therefrom rendered it legally bound to disclose its participation in the re-peg scheme and the reasons therefore. In the face of this duty, Defendants improperly omitted that their human intervention—trading UST—and not the algorithm, had caused the May 2021 re-peg of UST.

b) On June 9, 2021, TFL released a document that quoted Jump multiple times, linked to Jump's posts, and made false statements regarding the peg, stating "Understanding how various levers of the protocol and its ecosystem of apps interact at such a scale crystallizes during excessive volatility that spotlight points of pressure in the system. As the UST peg normalized, this was a function of the on-chain liquidity absorbing the volatility off-chain gradually, and as we said, it would not happen overnight. Two weeks later, the Terra protocol is humming along once again, with the UST market cap growing 6% MoM despite the massive contraction induced by the extreme market volatility."  Given Jump's partnership with, and control over, TFL, and given the fact that Jump was directly quoted and linked to in TFL's document multiple times, it is clear that Jump directed and/or authorized the statements to be made to the public.

(1) This statement was false and misleading because it failed to disclose Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed.

c)    On August 9, 2021, TFL and Jump (through its Wormhole project) made statements that referred to UST as a "censorship-resistant, infinitely scalable, algo-pegged USD stablecoin".  This statement was made by TFL at the behest of Jump because it was made in connection with Jump's Wormhole project.

(1)    This statement is false and misleading because the UST system was not "infinitely-scalable."  Indeed, as the project got larger, more capital would be required to prevent the death spiral.  Moreover, referring to UST as an "algo-pegged USD stablecoin" is false and misleading because it was not the UST/LUNA algorithm that kept the $1.00 peg.  Instead, it was Jump's significant monetary intervention in May 2021 that kept UST pegged to $1.00.

d)    On or around September 14, 2021, Defendants Jump and/or Kariya published a blog referring to "Terra's stability mechanism" as effective to "balance safety".

(1)    This statement was false and misleading because the stability mechanism did not balance safety.  Instead, the stability mechanism had previously failed and the promoted "safety" was illusory.  Instead, Defendants knew that Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed.  Jump's blog also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

e)    On October 11, 2021, in a now-deleted blog, Jump stated, "We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."

(1)    This statement is false and misleading because the purported UST/LUNA algorithm is referred to as an "elegant solution" even though Jump knew that it had already failed to keep its $1.00 peg, but secretly spent tens of

millions of dollars in May 2021 to restore the peg.  Indeed, Defendants omitted facts that undermined their opinion about the stability of UST.  Defendants knew that Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed.  Moreover, referring to UST as a "decentralized stablecoin" is misleading because UST was not decentralized, it was highly centralized and subject to the whims of TFL, Kwon, and Jump.  Moreover, UST was not even a "stablecoin" because the UST/LUNA algorithm could not realistically keep UST's peg to $1.00 without significant monetary intervention. The blog also created the false impression that Jump was organically excited about TFL and UST, in contrast to the reality that Jump was highly incentivized to promote TFL due to the LUNA token loans it had received from TFL.  Indeed, the blog omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

f)      On or around January 19, 2022, at the behest of Defendants, the Luna Foundation Guard issued a press release that falsely stated that "UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy."

(1)      This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST *did not* weather a massive reflexive draw down in May.  Instead, UST's peg to $1.00 was the result of Jump's undisclosed financial intervention to the tune of tens of millions of dollars.

g)      Luna Foundation Guard's website stated, at the behest of Defendants, that, "Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. This is primarily accomplished by the Terra protocol design, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless

arbitrage incentives and counter-cyclical monetary policy levers to maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins."

    (1)    This statement was false and misleading because the "Terra protocol design" did not "maintain the peg". Instead, UST's peg to $1.00 was the result of Jump's undisclosed financial intervention to the tune of tens of millions of dollars.

    h)    On January 28, 2022, Defendant Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning MIM and UST tokens and the possibility that the Anchor yield could be impacted if a depegging event occurred. Kariya falsely stated that, "It's difficult to imagine a sustained mass exodus to UST given the circumstances."

    (1)    This statement was false and misleading because Defendants knew that a "mass exodus" had already been secretly averted in the May 2021 $1.00 peg bailout. The statement gave investors false assurance about a big risk to the entire Terra ecosystem that Jump knew had already previously materialized. Kariya also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

    i)    On February 22, 2022, in an LFG press release, the Luna Foundation Guard announced the closing of a private sale of $1 billion in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem. . . . The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[128]

    (1)    This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST was not as "stable" as promoted, that the algorithm had not and could not maintain peg of UST/LUNA during periods of high volatility in the market; and that Anchor's staking rewards program was

---

[128] Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022), https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm

unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

j)    Also in the February 22, 2022, LFG press release, Kanav Kariya, President of Jump Crypto and member of the Luna Foundation Guard's Governing Council stated:

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[129]

(1)    This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST was not nearly as "stable" as promoted given that it knew it had already had to bail out the peg and thus knew that the $1.00 peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market. This statement was also false and misleading because the reserve was "not ready" and was nowhere near sufficient size to protect the peg. Furthermore, the LFG operated nothing like a governmental central bank as it was controlled by conflicted insiders like Jump and Kwon and was tasked with propping up the price of unregistered securities.  This statement also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

k)    On March 1, 2022, Jump published a podcast entitled the "Ship Show" to promote the Terra Tokens.  The podcast was hosted by Eden, a community manager at Jump Crypto.  The first two guests on Ship Show were Kwon and Kariya, who promoted the stability and security of the UST and LUNA peg as Terra's two most "attractive" features.  It was during this podcast published by Jump that Judge Rakoff found the "SEC's most direct evidence of a misstatement to investors".  SMJ Order at 61.  On this podcast that Jump published, Kwon discussed UST's de-peg in May 2021, falsely stating:

> . . . [I]t took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to

---

[129]    *Id.*

whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.

SEC Compl. ¶164; *see also id.* ¶¶162-63. Jump produced this podcast, hosted it, and published it. Defendant Kariya retweeted the link to it.

> (1)　　This statement was false and misleading. In context, Defendants were duty bound to disclose but omitted the May 2021 bailout and failed to correct Kwon's misstatements.  More, Despite the statements to the contrary, UST did not "automatically self-heal[]."  UST's "[a]lgorithmic, calibrated adjustments of economic parameters" failed.  In fact, UST's peg to the dollar was not restored until Jump intervened, purchasing UST in large amounts to restore UST's price to one dollar.  While the statements above led investors to believe UST's peg was restored by the algorithm, in fact, it was only the deliberate actions of "human agents," including TFL, Kwon, and Jump, that ultimately led to the restoration of the peg. *See* SEC Compl. ¶165.

l)　　On May 3, 2022, Kariya appeared on a podcast where he promoted the Terra ecosystem and its cross chain capabilities.  When asked about the potential for bad actors in the space to harm investors, Kariya gave investors false assurances that, "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that."[130]  In discussing the potential for bad actors to harm investors, Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that."

> (1)　　This statement was false and misleading because Jump had colluded with TFL/Kwon to bail out the peg in May 2021.

m)　　During the May 3, 2022, podcast, Defendants, through  Kariya also described Jump's compliance, stating that "all these phones are heavily, heavily regulated, you

---

[130]　　Kanav Kariya (@KanavKariya), X (F/K/A Twitter) (May 3, 2022, 11:09 AM), https://twitter.com/KanavKariya/status/1521507207694585856.

know, don't support about 20 years of its reputation and the giant business behind making a lot of this happen and we're definitely incentive aligned."

   (1) This statement was false, misleading, and/or incomplete because Jump used the auto-deleting communications application Signal for its communications with TFL and Kwon, and did not otherwise have its incentives aligned with investors.

**Materiality/Falsity**

275. The forgoing misrepresentations and omissions were each material.

276. These misrepresentations and omissions related to: (i) the stability of the UST/LUNA algorithmic stablecoin pair, and the Terra ecosystem itself; and (ii) the ability for the Luna Foundation Guard to defend and maintain the peg of UST/LUNA during periods of high volatility in the market.

277. Information regarding whether the UST/LUNA algorithm succeeding in maintaining the $1 peg or whether Jump previously spent tens of millions to bail out the peg in May 2021, as Defendants' own public statements illustrate, are material – and they had a significant impact on the market price and trading volume for Terra Tokens.

278. Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

**Scienter**

279. Jump acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

280. Jump's failure to disclose such information demonstrates that Jump intended that it would sell hundreds of millions of dollars' worth of discounted LUNA Tokens at significant profits while the price was artificially inflated.  Jump executed this plan, too, by selling hundreds of

millions of dollars' worth of discounted LUNA Tokens on the market during that period, reaping huge profits for itself and its personnel.

281.    Jump had the motive not to disclose these facts because such disclosure would have been self-defeating – it would have massively lowered the selling price of the UST and LUNA Tokens and thus effectively precluded Jump from securing such significant profits from its sale of discounted tokens.

282.    Jump had actual knowledge regarding the scheme to bail out the peg.  Indeed, Kariya had five signal calls with Do Kwon on the key date of the bailout of the peg.  Likewise, Jump's founder, Disomma, personally led Jump's UST trading efforts.  SMJ Order at 56.

283.    Jump's scienter is further demonstrated by the fact that Jump personnel, including a confidential witness, are working with the SEC in establishing the case against TFL and Kwon. *Id.* at 56-57.  Judge Rakoff made evidentiary rulings that Jump CW accounts are admissible as statements against interest suggesting Jump's, and those individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  SMJ Order at 57.

284.    Moreover, the SMJ Order ruled that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore UST's peg."  *Id.* at 57-58.  Such statements are thus likewise admissible under Federal Rule of Evidence 803(3).  *Id.*

285.    Jump's scienter can also be demonstrated by the fact that it is currently under investigation by the DOJ for its communications in connection with the UST stablecoin.[131]

286.    Jump's scienter is additionally supported by its efforts to distance its business from crypto sector following the fall of Terra.  For example, in May 2023, Jump announced that it would be exiting the U.S. cryptocurrency trading market.  At the same time, another crypto market making firm, Jane Street Group, also announced it was halting its crypto trading activities.

---

[131]    *See* n.126, *supra*.

Importantly, unlike Jane Street Group who exited the crypto market completely, Jump only left the U.S. market in response to severe regulatory scrutiny in the U.S. and pivoted to expanding its digital asset-facing business overseas.[132]  Jump's crypto business partners also subsequently severed their connections with the beleaguered trading firm.  The Robinhood exchange ended its business relationship with Jump in July 2023, choosing Jump competitor, B2C2, as the replacement firm to service Robinhood's crypto trading business.[133]  Jump also parted ways with the Wormhole project in November 2023.  This was reported as a "significant development within the cryptocurrency industry."[134]  "[S]everal key members of the Wormhole team, including the CEO and COO, have left Jump Trading Group to independently manage the Wormhole project. This move comes less than two years after Jump Trading's hefty $320 million investment in Wormhole."[135]  Finally, Jump Crypto also had a mass exodus of employees following the Terra collapse.  Following the Terra collapse, numerous Jump Crypto employees resigned – some doing so without even having another job lined up.[136]

287.   Jump's scienter is further supported by the fact that Kariya and Disomma both invoked their Fifth Amendment right against self-incrimination when questioned by the SEC concerning the May 2021 peg bailout.  *See* SMJ Order at 11, 56-57.

**Reliance, Economic Loss, and Loss Causation**

288.   As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the Terra Tokens was artificially inflated.

---

[132]   *See US Regulatory Crackdown Prompts Jane Street And Jump Crypto To Exit*, INVESTING.COM (May 10, 2023), https://www.investing.com/news/cryptocurrency-news/us-regulatory-crackdown-prompts-jane-street-and-jump-crypto-to-exit-3078250.

[133]   *Robinhood Ends Crypto Partnership with Jump Trading – What's Going On?*, CRYPTONEWS.COM (Aug. 30, 2023), https://cryptonews.com/news/robinhood-ends-crypto-partnership-with-jump-trading-whats-going-on.htm.

[134]   *Jump Trading Group Exits Wormhole Project in Crypto Scale-Back*, COINUNITED.IO (Nov. 18, 2023), https://coinunited.io/news/en/2023-11-18/crypto/cunews-jump-trading-group-exits-wormhole-project-in-crypto-scale-back.

[135]   *Id.*

[136]   *See 27-year-old that lost Jump Trading $200m is losing top staff*, EFINANCIALCAREERS.COM (Oct. 18, 2023), https://www.efinancialcareers.com/news/2023/10/jump-trading-crypto-kanav-kariya.

289.    In reliance on the promise that UST was stable and that the algorithm sufficed to re-peg UST to the US dollar when it materially diverged, investors purchased UST as a springboard to purchasing other securities within the Terra ecosystem. Further relying on the absence of material adverse information that Jump knew or recklessly should have known of but failed to disclose in public statement, Plaintiffs and the other Class members acquired Terra Tokens at artificially high prices and were damaged thereby.

290.    As a direct and proximate result of Jump's wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of Terra Tokens and are entitled to an award compensating them for such damages.

291.    Indeed, the price of Terra Tokens dropped significantly as the market discovered, that:  (1) UST was not as "stable" as promoted; (2) the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and (3) that both the UST/LUNA algorithmic stablecoin pair and Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

292.    The price of UST and LUNA Tokens dropped by 91% and 99.7% in a week when it was revealed that TFL's largest digital assets were unstable and unsustainable.

293.    As a direct and proximate result of Jump's wrongful conduct, Plaintiffs and the other Class Members have suffered damages in connection with their purchase or acquisition of UST/LUNA Tokens during the Class Period.

294.    The SEC's expert, Dr. Mizrach, found that Jump's trading increased UST's price by $0.62 over a particular half-hour period, when the actual price increased by just $0.03.  Dr. Mizrach's analysis showed that, in the absence of Jump's trading during that period, the price would have been $0.62 lower than it was.  In other words, had Jump not made its trades during that period, UST's price would have declined by $0.59 rather than increase by $0.03, as it did. SMJ Order at 20.

295.    In addition, as a direct and proximate result of Defendants' wrongful conduct, Jump has generated and retained ill-gotten in connection with the May 2022 collapse of UST/LUNA

Tokens, such that Plaintiffs and the other Class members are entitled to the disgorgement of Jump's ill-gotten gain from such misconduct.

**COUNT II**

**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5(a) and (c) Promulgated Thereunder**
**(Against All Defendants)**

296.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

297.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder.

298.    During the Class Period, Defendants, individually and in concert with others, directly or indirectly, employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Terra Tokens from March 17, 2021, through May 25, 2022.

299.    Critical to the sale of Terra Tokens was the UST stablecoin that Jump stated was to be pegged to the U.S. dollar.  Any failure of the purported algorithm to quickly restore to $1.00 (U.S.) the peg would materially and adversely impact the entire Terraform ecosystem.  In May 2021, the stablecoin fell materially below $1.00 (U.S.).  The purported algorithm failed to restore the stablecoin to the peg.  Instead, Defendants secretly colluded with TFL and Do Kwon to restore the peg through human intervention, by-passing the algorithm. In a successful attempt to manipulate the value of UST, Jump purchased "massive amounts" of the stablecoin, executing these purchases to restore the peg.  Given that the UST stablecoin was "the lynchpin for the entire [Terraform] ecosystem," Defendants' surreptitious human intervention to re-peg UST to the U.S. dollar when the algorithm had failed, constituted acts, practices, device, scheme, artifice, and/or course of business that operated as a fraud or deceit upon Plaintiffs and members of the Class.

300.    Jump acted with scienter in that they knew or were severely reckless in not knowing that (a) the purported algorithm had failed, (b) they resorted to human intervention to re-peg the stablecoin, and (c) in the absence of their acts, practices, device, scheme, artifice, and course of

business, the entire Terraform ecosystem was in danger of was in danger of collapse. By virtue of its knowledge or severely reckless disregard of the collusive agreement to intervene to re-peg the stablecoin to $1.00 (U.S.) when the purported algorithm had failed, Jump's misconduct evidences an intent to defraud investors.

301.   As a result of the foregoing, the value of UST and, in turn, the prices of Terra Tokens was artificially inflated during the Class Period. In ignorance of Jump's acts, practices, device, scheme, artifice, and course of business, Plaintiffs and the Class purchased Terra Tokens at prices that were artificially inflated as a result of Defendants' violation of SEC Rule 10b-5(a) and (c). Defendants participated in an intentional scheme—manipulating the value of UST to cause a re-peg through human intervention when the algorithm had failed—for the purpose of protecting the Terra ecosystem from collapse. In addition, through their scheme to defraud, Defendants received a large pecuniary benefit. But for Defendants' surreptitious intervention, UST would have failed to re-peg, causing a collapse of the Terra ecosystem in 2021.

302.   In reliance on the fact that UST was stable and that the purported algorithm sufficed to re-peg UST to the US dollar when it materially diverged, investors purchased UST as a springboard to purchasing other securities within the Terra ecosystem. Further relying on the absence of Defendants' scheme or artifice to defraud about which Defendants knew or severely recklessly disregarded and omitted, Plaintiffs and the Class acquired Terra Tokens at artificially high prices and were damaged thereby. Had Plaintiffs and the other members of the Class been aware that it was Jump's conduct and not the algorithm that had re-pegged the stablecoin to $1.00 (U.S.), they would not have purchased Terra Tokens at the artificially inflated prices that they did, or at all.

303.   As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

304.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Terra Tokens from March 17, 2021, through May 25, 2022.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT III**

**Violations of Section 20(a) of the Exchange Act
(Against Defendants Kariya and Disomma)**

305.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

306.    This Count is asserted against Defendants Kariya and Disomma under § 20(a) of the Exchange Act, 15 U.S.C. §78(t).

307.    Because of Defendants Kariya and Disomma's positions of control and authority over Jump, Defendants Kariya and Disomma participated in the operation and management of Jump, and conducted and participated, directly and indirectly, in the conduct of Jump's business affairs.

308.    Because of their positions of control and authority, these Defendants were able to, and did, control the specific wrongful conduct related to the depeg and subsequently-made false statements concerning the stability of the algorithm. These Defendants exercised their power and authority to cause Jump to engage in the wrongful acts complained of herein.  These Defendants, therefore, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TFL securities.

309.    Because of their positions of control and authority, these Defendants possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the members of the Class complain.

310.    By reason of the above conduct, Defendants Kariya and Disomma are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Jump.

**COUNT IV**

**Violation of Sections 15 of the Securities Act**
**(Against all Defendants)**

311.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference, each and every allegation contained in the preceding paragraphs of this Complaint, and further allege as follows:

312.   This Count is asserted against Defendants under §15 of the Securities Act, 15 U.S.C. §77o.

313.   On December 28, 2023, Judge Rakoff entered judgment in favor of the SEC, establishing that TFL violated §§ 5 and 12(a)(2) of the Securities Act of 1933, a primary violation.

314.   Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act.  Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Terra Tokens securities as described herein.

315.   Defendants had the power to direct or cause the direction of the management and policies of TFL and the Luna Foundation Guard, through ownership of voting securities, by contract, subscription agreement, or otherwise.

316.   Defendants also had the power to direct or cause the direction of the management and policies of TFL.

317.   By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages suffered.

**VI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.      Appoint Plaintiffs as representatives of the Class and The Rosen Law Firm, P.A., as Class counsel;

C.      Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D.      Award post-judgment interest on such monetary relief;

E.      Award reasonable attorneys' fees and costs; and

F.      Grant such further relief that this Court deems appropriate.

## VII.    JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED:  January 25, 2024

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
Pronouns: he/him/his
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg (*pro hac vice*)
Pronouns: he/him/his
Michael Cohen
Pronouns: he/him/his
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
          mcohen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

and

Sean T. Masson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
smasson@scott-scott.com

*Additional Counsel*

THIRD AMENDED CLASS ACTION COMPLAINT