1
2
3
4

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

5  *Lead Counsel for Lead Plaintiff and the Proposed Class*

6  [Additional Counsel on Signature Page.]

7

8
9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

10

11  NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,

12  Plaintiff,

13  v.

14  TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL,
15  DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS
16  CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON,

17  Defendants.

18

Case No. 5:22-cv-03600-PCP

**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.   NATURE OF THE CASE ........................................................................................1
II.  PARTIES ...........................................................................................................8
III. JURISDICTION AND VENUE .........................................................................9
IV. FACTUAL ALLEGATIONS ............................................................................10
     A.  Background on Jump ...............................................................................10
     B.  Jump's Role as Liquidity Partner, Statutory Underwriter, and Market
         Maker for TFL ........................................................................................13
     C.  The Terra Ecosystem ..............................................................................19
         1.   TFL ..............................................................................................19
         2.   Do Kwon ......................................................................................20
         3.   The Terra Tokens ........................................................................21
              a.   *Native and Governance Tokens* .....................................21
              b.   *Stablecoins* .....................................................................23
              c.   *Mirrored Assets* ..............................................................23
     D.  Defendants Engaged in a Fraudulent Scheme in Connection with the May
         2021 De-Peg..........................................................................................24
     E.  Jump Knowingly Misleads Investors Concerning the Stability of UST and
         LUNA ......................................................................................................38
     F.  The Truth Emerges ..................................................................................60
     G.  Jump Profits from the Fraud ...................................................................62
     H.  Jump Subsidiary Tai Mo Shan Settles with the SEC ..............................63
     I.   The Terra Tokens Are Unregistered Securities ......................................66
         1.   Terra Tokens Are Securities ........................................................66
              a.   Terra Token Investors Invested Money ...........................68
              b.   Terra Token Investors Were Intertwined in a Common
                   Enterprise .......................................................................69
              c.   Investors Purchased the Terra Tokens with a Reasonable
                   Expectation of Profit from Owning Them .......................70
              d.   Investors Expected Profits from the Terra Tokens to Be
                   Derived from the Managerial Efforts of Others..............70
V.   CLASS ALLEGATIONS .................................................................................74
VI.  COUNTS...........................................................................................................77
         COUNT I .................................................................................................77
         COUNT II................................................................................................88
         COUNT III...............................................................................................90
         COUNT IV...............................................................................................92
         COUNT V.................................................................................................93
         COUNT VI...............................................................................................94
         COUNT VII..............................................................................................95
         COUNT VIII.............................................................................................96
VII. PRAYER FOR RELIEF ..................................................................................97
VIII. JURY DEMAND ............................................................................................98

i

Lead Plaintiff Michael Tobias and named plaintiff Nick Patterson (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, including, among other things, a review of court filings, various press releases, and public statements issued by Defendants, analyst and media reports, and other commentary analysis and publicly disclosed reports and information about Defendants. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## I.    NATURE OF THE CASE

1.    Plaintiffs bring this Class Action Complaint under §§ 5, 12, and 15 of the Securities Act of 1933 ("Securities Act"), and §§10(b), 20(a), and 9(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Defendants Jump Trading LLC ("Jump Trading"); Jump Trading's subsidiary/affiliate, Jump Crypto Holdings LLC ("Jump Crypto"); Jump Crypto's subsidiary/affiliate, Tai Mo Shan Limited ("Tai Mo Shan" and with Jump Trading and Jump Crypto, "Jump"); Jump Crypto president, Kanav Kariya ("Kariya"); and Jump Trading founder, William DiSomma ("Disomma" and with Jump Trading, Jump Crypto, Tai Mo Shan, and Kariya, "Defendants"). This action is brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Terra Tokens[1] between March 17, 2021, and May 25, 2022, inclusive ("Class Period"), and who were damaged thereby ("Class"), excluding Defendants and Terraform Labs, Ltd. ("Terraform" or "TFL"), and their officers, directors, predecessors, successors,. assigns, agents, and any entity in which any excluded person owns a material interest.

---

[1]    "Terra Tokens" are digital assets in the Terraform ecosystem, including native and governance tokens, so-called "stablecoins," financial products such as "mirrored assets," bonded assets, liquidity pool tokens and tokens associated with various Terraforma protocols.

2.    The Defendants, who are all affiliated with the high-frequency, proprietary trading firm known as Jump, played a central role in establishing, backing, and then, in 2021, fraudulently saving the Terraform crypto ecosystem. Terraform, a now-defunct crypto ecosystem, raised billions of dollars selling illegally unregistered securities, promising investors an algorithm that would maintain the peg of its stablecoin, UST, to the U.S. dollar. The entire ecosystem rested upon the stability of UST, and the algorithm's ability automatically to burn coins if the price fell materially below $1 or to release coins if it rose materially above $1. In May 2021, UST fell materially below $1. Unbeknownst to investors, however, the algorithm failed to repeg UST. To avoid a catastrophic crash, with TFL and Do Kwon – who recently pleaded guilty to conspiracy to commit criminal securities fraud – Defendants agreed to purchase tens of millions of dollars of UST, artificially inflating its price and restoring the peg. Investors bit, purchasing billions of UST and other securities in the Terra ecosystem. Only a year later, UST fell materially below the peg. This time, however, Defendants did not rescue UST. Terra's stablecoin collapsed, followed by its entire ecosystem, destroying billions of dollars in value and leaving investors with nothing.

3.    Terraform's collapse reverberated through the global markets and then the courts, where civil and criminal enforcement actions have unearthed a litany of Defendants' misconduct. Specifically, in addition to underwriting Terraform's unregistered securities, Defendants surreptitiously rescued UST in May of 2021 when it de-pegged from the dollar and would have spiraled out of control if not for Defendants' actions.

4.    While Defendants raked in over a billion dollars from their misconduct surrounding this purported "re-peg," they have not yet been held accountable for their role in what has now been adjudicated to have been a fraudulent scheme violating federal securities laws.

5.    On April 5, 2024, following a nine-day trial in the United States District Court for the Southern District of New York, the jury unanimously found Terraform and its CEO Do Kwon ("Kwon") liable for defrauding investors in the crypto asset securities known as Terra Tokens. The jury found defendants liable on every count.[2]

---

[2]    *See SEC v. Terraform Labs Pte Ltd.*, 1:23-cv-01346 (S.D.N.Y.).

6.     Leading up to trial, on December 28, 2023, Judge Jed S. Rakoff ruled the Terra Tokens to be unregistered securities as a matter of law, granting summary judgment to the SEC on its claim that Terraform and Kwon had violated §§5 and 12(a) of the Securities Act by selling unregistered Terra Tokens, including UST and LUNA.[3] No one appealed the judgment.

7.     At trial, the SEC proved the fraudulent scheme that Defendants Jump, Kariya, and DiSomma actively participated in and enabled. That is, without Defendants' own affirmative actions to manipulate the price of UST, Terraform's algorithm could not have re-pegged UST. In turn, Defendants' actions, supporting UST when the algorithm had failed, staved off a total collapse of the Terra ecosystem in 2021, over a year before its actual collapse for the algorithm's failure. In discovery, the SEC questioned Defendants Kariya and DiSomma about Defendant Jump's participation in this fraudulent scheme. In direct response to questions concerning this fraudulent scheme and Defendants' manipulation of UST, Defendants Kariya and Disomma both invoked their Fifth Amendment right against self-incrimination.

8.     The fraudulent scheme concerned the algorithmic underpinnings of UST. Specifically, Terraform and Kwon claimed that the algorithm maintained the 1=1 ratio of UST to the U.S. dollar without human intervention, releasing UST automatically if the peg rose materially above $1 and burning UST if the peg fell below $1. Therefore, this algorithm purportedly allowed the UST stablecoin to maintain its peg without a cash reserve or other means of stabilization.

9.     In May 2021, UST de-pegged, falling materially below the U.S. dollar. The purported algorithm Terraform and Kwon had touted to lure investment in the Terraform ecosystem failed to re-peg UST.

10.     In a surreptitious agreement and scheme between Terraform and Kwon and Defendants, with actual intent to manipulate the price of UST themselves because the algorithm

---

[3]     Plaintiffs incorporate herein by reference in their entirety the complaint (and its amendments) in *SEC v. Terraform Labs PTE LTD.*, 23-cv-01346 (S.D.N.Y.), (Dkt. No. 1) ("SEC Compl.") (attached as Exhibit 1) and Judge Rakoff's opinion on cross motions for summary judgment (Dkt. No. 149) ("SMJ Order") (attached as Exhibit 2). The SMJ Order is also reported as *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023). While Plaintiffs append certain documents for convenience, they incorporate by reference all documents cited herein in their entirety.

had failed, Jump agreed to purchase UST, buying tens of millions of dollars of UST, thereby removing it from the market and causing UST to re-peg to the U.S. dollar. With actual knowledge of their agreement and scheme to intervene, manipulating the price of UST, Defendants were duty bound to refrain from or to disclose their trading, its purpose, and the material information on which they based their agreement with TFL and Kwon.

11.    After knowingly and surreptitiously manipulating the price of UST precisely because the algorithm had failed, Defendants publicly touted the algorithm's success in accomplishing the re-peg. Relying on the ostensible success of the algorithm in re-pegging UST, including Defendants' knowingly false public statements, investors poured assets, both fiat and crypto currencies, into the Terraform ecosystem, purchasing billions of dollars of UST and other Terra Tokens. In exchange for manipulating the price of UST, Terraform enabled Defendants to sell Terra Tokens to investors on favorable terms, from which Defendants reaped over a billion dollars in profit.

12.    In May 2022, once again, UST de-pegged from the dollar. Again, the algorithm failed to re-peg UST. This time, having reaped their own profit, however, Defendants did not intervene. UST crashed, causing the entire Terraform ecosystem to collapse, rendering virtually worthless all Terra Tokens. As a direct and proximate result of Defendants' fraudulent scheme and fraudulent statements thereon, Plaintiffs and the Class suffered total loss of their investments in the Terraform ecosystem.

13.    In response to the SEC's questions during his August 2023, deposition, Defendant Kariya exercised his Fifth Amendment rights in response to questions regarding his communications with Do Kwon concerning the re-peg in 2021. In response to similar questions during his deposition, Defendant Disomma also exercised his Fifth Amendment rights when questioned about Jump's role in the manipulation of UST in May 2021.

14.    Defendant Jump is one of the largest private trading firms in the world, engaging in algorithmic trading of a variety of asset classes, including digital and traditional assets. Jump also engages in trading and market-making in various cryptocurrencies through its

subsidiaries/affiliates, Jump Crypto and Tai Mo Shan. Jump operated as the "liquidity provider and general business partner"[4] of TFL and Do Kwon.

15.    TFL operated the Terra blockchain and its related protocols, which hosted, supported, and funded a community of decentralized financial applications and products known collectively as the Terra ecosystem. TFL's primary focus was developing, marketing, and selling a suite of digital assets and financial products within the Terra ecosystem. These digital assets, including UST, LUNA and others, are collectively referred to herein as "Terra Tokens."

16.    The partnership between the Defendants, TFL, and Kwon caused billions of dollars of damage to Terra Token investors, resulting in the SEC's action in which the SEC succeeded in proving both that the Terra Tokens were unregistered securities and that the agreement to manipulate the value of the UST manually when the algorithm had failed constituted a fraudulent scheme.

17.    Judge Rakoff's SMJ Order further made rulings that the account of a confidential witness (former employee at Jump) was admissible as statements against interest indicating Jump's, and associated individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability."[5]

18.    The SMJ Order also ruled that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore UST's peg."

19.    At trial, the SEC proved that Jump knowingly manipulated trading of UST to restore UST's peg, and thereby defrauded investors. The government's expert testified: "*My conclusion is that had it not been for Jump's trading, that the peg would not have been restored, and that UST's price would have come very close to zero [in May of 2021]*."[6]

---

[4]    *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment, No. 23-cv-01346 (S.D.N.Y.), ECF No. 100 at 5.
[5]    Fed. R. Evid. 804(b)(3)(A). SMJ Order at 57.
[6]    04.02.2024 Tr. 1307-08.

20.     Moreover, the former Jump employee, James Hunsaker, testified to Defendants' actual knowledge of the fraudulent re-peg. He testified that, on May 19, 2021, he joined a Zoom call with Defendants Kariya and DiSomma and others at Jump. On the call, Defendant Kariya explained that he had spoken to Do Kwon and that, if Jump helped to re-peg UST, then Kwon would "vest" Jump, meaning, execute a loan with Jump on highly lucrative terms favoring Jump.[7]

21.     The documentary evidence is damning. The SEC introduced an internal Terraform chat discussing the crash in which an employee acknowledged that: "***they [Jump] saved our ass***."[8] In another exhibit, a Jump employee wrote to Defendant Disomma on May 24, 2021: "***seems like the prop to Do was well timed***."[9] There are others.

22.     In addition to the SEC's successful enforcement action, Kwon has now pleaded guilty to criminal charges as a result of his scheme with Jump. On March 23, 2023, Montenegro authorities arrested Kwon as he attempted to board a flight to Dubai in the United Arab Emirates (which does not have an extradition treaty with the United States) using a fake passport.[10] The same day, the U.S. Department of Justice ("DOJ") indicted Kwon, charging him with conspiracy, wire fraud, and securities fraud. The indictment refers to Jump as "a United States trading and investment firm" that Kwon contacted to "obtain their assistance in altering the market price of UST."[11]

23.     The United States unsealed a superseding indictment against Kwon on January 2, 2025.[12] The superseding indictment references additional internal Jump correspondence and other evidence supporting the DOJ's charge that "KWON claimed that the Terra Protocol on its own

---

[7]     03.29.2024 Tr. 856-63.
[8]     SEC Ex. 073.
[9]     SEC Ex. 068.
[10]    Parikshit Mishra, Jack Schickler, *Do Kwon Arrested in Montenegro: Interior Minister*, COINDESK (Mar. 23, 2023, updated May 9, 2023), https://www.coindesk.com/business/2023/03/23/do-kwon-arrested-in-montenegro-interior-minister/.
[11]    Indictment, *U.S.A. v. Do Hyeong Kwon*, No. 1:23-cr-00151 (S.D.N.Y.), https://downloads.coindesk.com/legal/United_States_v_Kwon.pdf.
[12]    *See* DOJ Press Release, *Do Kwon Extradited to the United States From Montenegro To Face Charges Relating to Fraud Resulting In $40 Billion In Losses* (Jan. 2, 2025), https://www.justice.gov/usao-sdny/pr/do-kwon-extradited-united-states-montenegro-face-charges-relating-fraud-resulting-40.

had caused the successful restoration of UST's $1 value after it dropped below 92 cents in or about May 2021. That was a lie. In truth, after the Terra Protocol failed to restore UST's $1 peg in May 2021, KWON contracted with executives at [Jump] to have [Jump] purchase large amounts of UST to artificially support UST's $1 peg. UST's $1 peg was restored in May 2021 only after [Jump] strategically purchased millions of dollars of UST for the purpose of artificially propping up the peg."[13]

24.     On August 12, 2025, in the lead-up to his criminal trial, Do Kwon pleaded guilty to a charge of conspiracy to commit securities fraud, commodities fraud and wire fraud, and a charge of wire fraud. While the Sentencing Guidelines would call for a term of life in prison, Do Kwon faces a statutory maximum of 25 years in prison. As part of Do Kwon's guilty plea, the government has agreed to advocate for a term of imprisonment not to exceed 12 years.

25.     At his sentencing hearing, Kwon allocuted, describing his criminal conduct and leaving no doubt that he was pleading guilty due to the fraudulent scheme with Jump, stating:

> Between 2018 and 2022, in the Southern District of New York, and elsewhere, ***I knowingly agreed with others to engage in a scheme to defraud, and indeed did in fact defraud*** purchasers of cryptocurrencies issued by my company Terraform Labs… In furtherance of the scheme, I used means of communication that traveled in foreign and interstate commerce. Specifically, following the de-pegging of UST stable coin in May 2021, ***I made false and misleading statements of why it regained its peg by failing to disclose a trading firm's role in restoring that peg***.[14]

26.     In addition, on December 20, 2024, the SEC announced a cease-and-desist order and settlement with Tai Mo Shan, a wholly owned subsidiary of Jump Crypto.[15]

27.     The SEC found that Tai Mo Shan violated Section 5(a) and (c) of the Securities Act by acting as a statutory underwriter for the Terra Tokens. The SEC also found that Tai Mo Shan misled the investing public about the functionality of UST's algorithmic mechanism by engaging in undisclosed trading to stabilize the price of UST at $1 in May of 2021, in exchange for valuable

---

[13]     Superseding Indictment, *U.S.A. v. Do Hyeong Kwon*, No. 1:23-cr-00151, Dkt. No. 10, ¶2(a) (S.D.N.Y. Jan 2, 2025) ("Superseding Indictment").
[14]     Plea Tr., *United States v. Do Kwon*, 23-cv-00151, at 31 (S.D.N.Y. Aug. 12, 2025).
[15]     *In re Tai Mo Shan Limited*, SEC Administrative Proceeding, File No. 3-22382 (Dec. 10, 2024) ("C&D Order") (attached as Exhibit 3).

1    vesting from Terraform. Tai Mo Shan admitted the SEC's jurisdiction in the case, agreeing to pay

2    a total of $123 million to settle the charges.

3        28.    Thus, the SEC has already established liability and fined Defendants for selling

4    unregistered securities by underwriting the Terra Tokens and for deceiving investors by secretly

5    re-pegging UST in May of 2021.

6        29.    As a direct and proximate result of Defendants' illegal actions, Jump profited by

7    over $1 billion from the fraudulent scheme, while Plaintiffs and the Class suffered a total loss from

8    their investments in Terra Tokens.

9    **II.    PARTIES**

10        ***Plaintiffs***

11        30.    Lead Plaintiff Michael Tobias ("Tobias") is a resident and citizen of the state of

12    New York, living in New York. As set forth in the certification he submitted to the Court (Dkt.

13    Nos. 19-3 and 19-4) Lead Plaintiff Tobias purchased at least that number of Terra Tokens during

14    the Class Period and suffered losses as a result of Defendants' conduct.

15        31.    Plaintiff Nick Patterson ("Patterson") is a resident and citizen of Illinois, living in

16    Chicago, Illinois. As set forth in the certification he previously submitted to the Court (Dkt. Nos.

17    1, 25-3), Plaintiff Patterson purchased Terra Tokens, including UST, LUNA, ANC, Mirrored

18    Assets, and Bonded Assets during the Class Period and suffered losses as a result of Defendants'

19    conduct.

20        ***Defendants***

21        32.    Defendant Jump Trading LLC ("Jump Trading") is a limited liability company

22    organized under the law of Delaware, with its headquarters located at 600 West Chicago Avenue,

23    Suite 600, Chicago, Illinois 60654. It is a registered broker-dealer with the SEC and a member of

24    various exchanges. Jump has many subsidiaries/affiliates.

25        33.    Defendant Jump Crypto Holdings LLC ("Jump Crypto") is a limited liability

26    company organized under the law of Delaware. Jump Crypto is a subsidiary/affiliate of Jump

27    Trading. On information and belief, Jump Crypto is the alter ego of Jump and operates as Jump's

28    crypto-related unit and/or division. According to Jump's annual Report filed with the SEC for the

year 2023, Jump Crypto is controlled by the same managing members as Jump Trading. Jump announced the launch of Jump Crypto on September 14, 2021, although the entity appears to have been formed earlier. According to the trial testimony of a former employee, Jump Crypto was an "external name," and internally it was known as "Team Illini," after the mascot of the University of Illinois.[16]

34.    Defendant Tai Mo Shan Limited is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands. Tai Mo Shan is a wholly owned subsidiary of Jump Crypto. On information and belief, Tai Mo Shan is the alter ego of Jump Crypto and Jump Trading, operating as a unit and/or division of Jump. Tai Mo Shan's role in the events at issue was not public until, at earliest, the SEC's trial against Terraform and Do Kwon in April 2024.

35.    According to the LinkedIn profile of Defendant Kanav Kariya ("Kariya"), Kariya was a software engineering intern at Jump from January through August 2017. From July 2018 through September 2020, Kariya served as a quantitative researcher at Jump. From September 2020 through September 2021, Kariya served as the Director of Strategic Initiatives, Digital Assets for Jump. From September 2021 through June of 2024, Kariya served as the President of Jump Crypto. Defendant Kariya was the public face of Jump Crypto and was in charge of managing the relationships between Jump and others in the crypto community. Defendant Kariya was personally involved in, and corresponded directly with, Do Kwon during the fraudulent re-peg of UST in May 2021.

36.    Defendant William DiSomma ("DiSomma") is a founder and co-owner of Jump Trading. Defendant DiSomma ran the Jump Crypto team, and personally directed the trading of UST to reestablish the peg in May 2021.

## III.    JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, 15 U.S.C. §78aa, and 15 U.S.C. §77v(a). Alternatively, this Court has jurisdiction under 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and

---

[16]    03.29.2024 Tr. 845-47.

1  (3) there is minimal diversity because Plaintiffs and at least one Defendant are citizens of different

2  states.

3      38.    This Court may exercise jurisdiction over Defendants because they have continuous

4  and systematic contacts with this District, do substantial business in this State and within this

5  District, and engage in unlawful practices in this District as described in this Complaint and the

6  SEC Compl., subjecting themselves to personal jurisdiction in this District and rendering this

7  Court's exercise of jurisdiction proper and necessary.

8      39.    Notably, Jump itself moved to have a separate class action – involving the same

9  underlying facts alleged here – transferred to this District, notwithstanding that Kariya and Jump

10  are located in Chicago, arguing, *inter alia*, that "the legally significant events in this case occurred

11  nationwide, if not worldwide, as the Terra ecosystem and related tokens were developed outside

12  of Illinois. . . ."[17]

13      40.    Furthermore, Jump actively conducted business throughout the United States and

14  within this District in connection with the promotion and sale of Terra Tokens.

15      41.    TFL created the Terra Tokens which were then loaned and sold to Jump for sale to

16  investors in the United States. Jump sold and otherwise made the unregistered securities it sold

17  available to U.S. investors.

18      42.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because

19  certain Defendants live and/or conduct business in this District, therefore, a substantial part of the

20  events or omissions giving rise to the claims alleged herein occurred in this District.

21  **IV.    FACTUAL ALLEGATIONS**

22      **A.    Background on Jump**

23      43.    Jump is one of the largest private trading firms in the world, focusing on algorithmic

24  and high-frequency trading strategies. In particular, Jump engages in algorithmic trading of a

25  variety of asset classes, including both traditional and digital assets.

26

27

28  _____
[17]  *See* Motion to Transfer Venue to the Norther District of California, *Kim v. Jump Trading, LLC*, No. 1:23-cv-02921 (N.D. Ill. June 9, 2023), Dkt. No. 28.

44.     Jump has been active in the digital assets sector since 2017, being one of the first proprietary trading firms to begin trading Bitcoin and Ethereum.

45.     As noted in an article from *Crain's Chicago Business* on Kariya and Jump: "industry players say Jump is widely seen as a bigger risk-taker than most traditional trading firms when it comes to crypto. Competitors like Jane Street and Susquehanna International Group also have venture capital arms that make crypto-related investments. But none of them operates on Jump's scale or integrates trading and incubating startups the way Jump does."[18] Indeed, through Jump Crypto, Jump took on an oversized position in the crypto industry, becoming more than a simple trading firm. As *CoinDesk* reported in March of 2022: "[Jump] now dominates every aspect of the crypto ecosystem – operating a market-making business, a venture capital arm and, increasingly, a team of in-house developers who contribute to projects on several major blockchains."[19]

46.     The *CoinDesk* article also reported that Jump "has emerged as a uniquely powerful presence in the decentralized finance (DeFi) space, branching further from its trading roots to become active builders, investors, governance voters and community members. The firm even executed what some observers called DeFi's first bailout, putting up $320 million that was exploited in a hack of the Jump-backed Wormhole cross-chain bridge."[20]

47.     The Wormhole "bailout" refers to an episode that occurred in 2022 following a hack of Wormhole, a cross-chain bridge for transferring crypto that Jump had acquired the year before.

48.     Jump took a lax approach to internal oversight over its crypto-related investments like Wormhole. In particular, despite being previously dubbed the "Guardian of the Wormhole network,"[21] in February 2022, Wormhole's smart contract was hacked, resulting in the theft of

---

[18]     *Jump Trading prowls for edge with crypto winter hammering peers*, CHI. BUS. (June 17, 2022), https://www.chicagobusiness.com/finance-banking/jump-trading-prowls-edge-cryptocurrency-winter-hammering-peers.

[19]     *Jump Crypto Wants You to Know Its Name*, CoinDesk (Mar. 25, 2022), https://www.coindesk.com/business/2022/03/25/jump-crypto-wants-you-to-know-its-name/.

[20]     *Id.*

[21]     @wormholecrypto, X (F/K/A TWITTER) (Sept. 14, 2021, 9:50 AM), https://twitter.com/wormholecrypto/status/1437775731917037574?s=20.

over $340M in various digital assets. Without taking responsibility for the lack of security that led to the hack, Jump sought to spin itself as being philanthropic to the "community members" by announcing it had "replaced" the missing funds.[22] In reality, however, Jump bailed out itself out using money it raised from retail investors and Sam Bankman-Fried.[23] This misleading bail out strategy was later modified and employed by Defendants in relation to TFL and the Terra Tokens.

49.     Jump's risky trading strategies have previously been the subject of government investigation. For example, in May 2018, one of Jump's trading algorithms malfunctioned, triggering deficiencies in Jump's capital requirements. On September 12, 2019, the NYSE Chicago[24] announced that it had reached a settlement with Jump related to these issues.[25] The NYSE Chicago determined that Jump had failed to maintain sufficient risk management controls intended to reduce the risk of erroneous orders and that the controls present "were not reasonably designed to address the risks presented by Jump's business." The Jump Trading Order further noted that Jump had "generally failed to sufficiently document" how its ineffective internal controls were implemented. As a result, NYSE Chicago found that Jump had violated Exchange Act Rules 15c3-1, 15c3-5(b) and 15c3-5(c)(1) and NYSE Chicago, Article 6, Rule 5 & Article 7, Rule 3(a)(1)(A).  Under the terms of the settlement, Jump was ordered to pay a $250,000 fine.

50.     In addition, Jump has been accused of using its connections to front run another multi-billion-dollar cryptocurrency collapse. Specifically, Jump is alleged to have leveraged its relationship with the now-defunct cryptocurrency exchange FTX and FTX's affiliated trading firm Alameda Research, to exit Jump's positions in advance of the total collapse of the FTX ecosystem. An article entitled, *A look at Jump Crypto and its shady past*, reported that "Jump was accused of colluding with Sam Bankman-Fried's Alameda Research on seed funding rounds and yield

---

[22]     @jump_,    X    (F/K/A    Twitter)    (Feb.    3,    2022,    1:13    PM), https://twitter.com/jump_/status/1489301013408497666?s=20

[23]     *See*    @bradmillscan,    X    (F/K/A    Twitter)    (Dec.    12,    2022), https://twitter.com/bradmillscan/status/1602483390946709507?s=20.

[24]     The NYSE Chicago, now known as NYSE Texas and formerly known as the Chicago Stock Exchange, is a national securities exchange for option contingent stock trades.

[25]     Order Instituting Proceedings, Accepting Settlement, Making Findings, and Imposing Sanctions, *In Matter of: Jump Trading, LLC*, No. 2018-11-00017 (Sept. 12, 2019) (the "Jump Trading Order").

farming investments. Others have alleged that Jump withdrew $300 million in assets from FTX the day before the exchange paused withdrawals."[26]

51.    Exhibits in the Sam Bankman-Fried criminal trial demonstrated that Jump executives and FTX executives had Signal chats with auto-deletion set to one week. Kariya was in a signal chat with Sam Bankman-Fried and other FTX executives entitled "Wormhole <> Alameda." It began on April 11, 2022, with auto-deletion set to one week. Upon information and belief, Defendants specifically used Signal chats and its auto-deletion function in their communications with Kwon and TFL to hide evidence that could be potentially uncovered in litigation and subject Defendants to civil and/or criminal liability.

52.    Jump's history of frontrunning misconduct is very much in keeping with its collusive, illegal behavior that defrauded Terra Token investors.

**B.    Jump's Role as Liquidity Partner, Statutory Underwriter, and Market Maker for TFL**

53.    Starting in 2019, Jump played an integral role in the Terra ecosystem, partnering with Terraform and Do Kwon to underwrite the Terra Tokens and serve as their distributor, promoter, and market maker through several "loan" transactions, described below.

54.    In the SMJ Order, Judge Rakoff found that in November 2019 and September 2020, on behalf of TFL, Kwon negotiated and signed agreements with Jump, issuing loans from TFL to Jump of 30 million and 65 million LUNA tokens, respectively.[27]

55.    At the SEC's trial against TFL and Do Kwon, the government elicited that these loans to Jump were papered as loans to Jump Crypto subsidiary, Tai Mo Shan.

56.    The September 2020 loan of 65 million LUNA tokens to Jump was signed by Do Kwon as lender and a director of Tai Mo Shan as borrower:

---

[26]    *A look at Jump Crypto and its shady past*, PROTOS (Nov. 17, 2022), https://protos.com/a-look-at-jump-crypto-and-its-shady-past/.
[27]    *See* SMJ Order at 4-5.

LENDER:

Terraform Labs Limited

By: _Do kwon_____

Name: Do Kwon
Title: Founder
Date: 07 September 2020

BORROWER:

TAI MO SHAN LIMITED

By: _____

Name: Tak Fujishima
Title: Director
Date: 08 September 2020

**PLAINTIFF'S EXHIBIT**
**P060**
23-cv-1346 (JSR)

57.     The September 2020 loan agreement "came about because a Jump executive, Defendant Kariya,[28] emailed Kwon a proposal to obtain tens of millions of additional LUNA tokens (the paired token of UST) at a discounted price to 'thicken up LUNA markets further.'"[29]

58.     In Defendant Kariya's email outlining the proposal, he wrote: "***Hey Do, … I believe [in the below proposal] we've structured incentives that align us in the most direct fashion, with numbers that push the boundaries of what is attainable in the market. These targets hopefully provide the flywheel effects that propel Terra to the top of the stablecoin pyramid***."[30]

---

[28]     SEC Ex. 284.
[29]     SMJ Order at 5.
[30]     *Id.*

59.    Defendant Kariya outlined his proposal for Jump to receive millions of LUNA tokens, vesting over the next two years, then wrote: "***Gentleman's agreement: 1. We will support trading on terra stable coin pairs on all exchange we're connected to and help maintain the peg 2. We will thicken up LUNA markets further*** 3. We will tap our partners to help grow adoption of Terra stable coins (exchanges, DeFi partners, OTC, etc…) 4. Terraform labs will facilitate OTC creation/redemption of Terra stable coins on best efforts basis. We have a number of exciting ideas on we how we can work together to achieve both, these numbers and broader adoption in the DeFi ecosystem, and we're ready to get going!"[31]

60.    According to the Superseding Indictment: "Separate from those formal agreements, in or about August 2020, the Trading Firm and Terraform entered a 'gentleman's agreement' for the Trading Firm to help maintain UST's $1 peg. That agreement was reflected in an August 25, 2020 email between an executive at the Trading Firm ('Trading Firm Executive-1') and DO HYEONG KWON, the defendant, and was not publicly disclosed. In the email, Trading Firm Executive-1 proposed financial incentives 'that align us in the most direct fashion,' and referenced the 'gentleman's agreement' that, among other things, the Trading Firm would 'support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg.'"[32]

61.    The Superseding Indictment continues: "In a subsequent internal email, Trading Firm Executive-1 sent an email stating that he viewed the Trading Firm's investment with Terraform as potentially resulting in a 'multi-billion dollar enterprise' and 'a pile of profits and money printing machine that spits out a continuous stream of widely adopted stablecoins.'"[33]

62.    Thus, months in advance of the May 2021 de-peg, Defendants had actual knowledge that the algorithm might fail and that TFL would call upon Jump to assist with stabilization.

---

[31]    *Id.*
[32]    Superseding Indictment ¶24.
[33]    *Id.*

63.     In addition, the November loan to Jump was mentioned in the SEC's C&D Order with Tai Mo Shan, which found that TFL made a loan of LUNA tokens to Tai Mo Shan in November 2019, in return for which Tai Mo Shan performed underwriting services.[34]

64.     According to the C&D Order: "Beginning in November 2019, Tai Mo Shan entered into agreements with Terraform, the issuer of LUNA, pursuant to which Tai Mo Shan would receive LUNA crypto assets being offered and sold as securities in exchange for providing services. Rather than receive a fee for its services, under these agreements, Tai Mo Shan obtained a loan of LUNA from Terraform, through which Tai Mo Shan received a large number of LUNA for a period of time, typically two years, after which Tai Mo Shan had the option of returning the tokens at no cost or purchasing the loaned tokens at the price specified in the agreement."[35]

65.     Describing these November 2019 and September 2020 "loans," the SEC's complaint against TFL explained the way in which these two transactions were, in substance, ways for Jump to underwrite and publicly distribute the Terra Tokens: "Terraform's 'loan[s]' to the U.S. Trading Firm and the U.S. Trading Firm's subsequent sales thus allowed public investors, including those in the U.S., to acquire or transact in LUNA through transactions in the secondary market and generated speculative interest in LUNA. These two transactions between Terraform, its subsidiary, and the U.S. Trading Firm [], were, in essence, public distributions of LUNA by Terraform. The U.S. Trading Firm acquired the LUNA from Terraform and its subsidiary and sold it into the market directly with Terraform's knowledge and expressed intent that the LUNA provided would be so distributed in order to 'improve liquidity.'"[36]

66.     Further evidencing Jump's participation in, and control of, Terraform's sales of crypto assets to investors, on January 13, 2020, Do Kwon wrote an email to a list of recipients he refers to as "Terra's leading investor group," with the subject line: "*[CONFIDENTIAL] Regarding liquidity partnership.*"[37]

---

[34]     C&D Order, 3.
[35]     *Id.*
[36]     SEC Complt., ¶¶109-10.
[37]     SMJ Order at 5; SEC Ex. 282.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-CV-03600-PCP

67.     In it, Kwon announced to Terra's leading investor group "an important arrangement we've entered into with Jump Trading," and notes that "[a]t Jump's request, we are keeping this arrangement strictly confidential and the size of the notified parties small (5 firms), so would appreciate it if all of you could do the same."[38]

68.     Kwon continued that: "Though all our adoption metrics have been steadily inclining over the past half-year, the performance of the Luna token has been rather lackluster partly due to our team's inexperience with secondary markets & trading operations."[39]

69.     Kwon continued that: "Therefore, we've agreed to enter a partnership with Jump Trading whereby: ***Jump will deploy its own resources to improve liquidity of Terra and Luna***; Jump will deploy a validator and participate in on-chain governance; ***Jump is rewarded with call options for Luna at above current market prices (30, 40, 50 cents) over the next three years to align incentives to improve markets.***"[40]

70.     Kwon continued: "To provide initial Luna liquidity, Terraform Labs had loaned Jump trading 30M Luna."[41]

71.     Kwon concluded: "This represents a significant departure from our previous strategy of staying neutral to our token's secondary market conditions, so we decided it would be important to let our strongest supporters know in the interest of transparency. Please talk to me on telegram @dokwon if you have any questions regarding."[42]

72.     Thus, Jump was more than a mere investor or lender to TFL. Instead, it participated in and/or controlled TFL by virtue of its expertise (which TFL and Kwon admittedly lacked) in secondary markets and its ability to provide the required support, liquidity and market making for Terra Token sales.

73.     Further substantiating Jump's role in underwriting the unregistered Terra Tokens, TFL also loaned as many as 4 million MIR tokens to Jump, in an agreement that expressly required

---

[38]    *Id.*
[39]    *Id.*
[40]    *Id.*
[41]    *Id.* (referring to the November 2019 loan).
[42]    *Id.*

Jump to trade MIR tokens on crypto asset trading platforms and to provide Terraform with reports of its trading.[43]

74.    Moreover, at a deposition in the SEC action, former COO and CFO of Terraform, Arrash Christopher Amani, testified that Jump was the market maker for Terraform Labs:

```
 5    Q.  What is Jump Crypto?
 6    A.  I don't know.  It's a -- it's a -- my
 7  understanding is it's a -- it's a market maker in
 8  crypto.  And an investment firm.
 9    Q.  When you say "market maker," can you tell
10  me what you mean by that phrase?
11    A.  I don't understand market makers that well,
12  but I just know that they provide liquidity and
13  trade, trade crypto for profit.
14    Q.  Did you understand that Jump Crypto acted
15  as a market maker for Terraform Labs?
16    A.  They --
17      MR. HENKIN:  Objection to the form.
18    A.  Yes.
```

75.    All of this activity occurred well before Jump even announced the formal launch of its crypto division, Jump Crypto, on September 14, 2021.[44][45] In congratulating Jump Crypto – a "consummate Terra partner"[46] – on its public launch, TFL stated: "Thrilling to see @JumpCryptoHQ officially launch! Jump has quietly played a pivotal role in the Terra ecosystem for a long time. . . ."[47] "The Terra economy is magnified significantly with Jump Crypto by its

---

[43]    SMJ Order at 8, 45.

[44]    @jump_, X (F/K/A TWITTER) (Sept. 14, 2021, 9:46 AM), https://twitter.com/jump_/status/1437774885703594002?s=20.

[45] In fact, leading up to the September 2021 launch of Jump Crypto, Terraform offered to help Jump on its messaging. *See* SEC Ex. 428 ("If you need help to amplify major news stories, feel free to reach out. We're also currently putting together an interview and marketing pipeline for ecosystem projects and partners through some podcasts, influencers, and shows. So if Jump is interested in getting more exposure via visual and audio mediums, we'd be happy to help facilitate those opportunities as they arise. It'd be great to get you guys some exposure for Jump Crypto once the news breaks to help define the differentiation between Jump Crypto and Jumo Trading across those mediums.").

[46]    @terra_money, X (F/K/A TWITTER) (Sept. 14, 2021, 10:32 AM), https://twitter.com/terra_money/status/1437786236601708544?s=20.

[47]    @terra_money, X (F/K/A TWITTER) (Sept. 14, 2021, 10:32 AM), https://twitter.com/terra_money/status/1437786233485266945?s=20.

side. #LUNAtics, please give them a follow, offer your support, and help amplify their bold new endeavor into crypto. Institutions are here, and @JumpCryptoHQ . . . is leading the way on Terra."[48] Defendant Kariya replied that "It's been a real pleasure working with @stablekwon and the Terra team over the last couple years. A+ folks."[49]

## C.    The Terra Ecosystem

### 1.    TFL

76.    TFL was a Seoul-based company founded in 2018 by Kwon and Daniel Shin that, as noted by the SEC, "regularly transacts business in the United States, include[ing] by contracting with U.S.-based companies, such as a prominent digital asset-trading platform incorporated in Delaware. Several employees of [TFL] appear to reside in the United States, including Terraform's General Counsel (located in Pennsylvania), its Business Development lead (located in Texas), its Head of Research [Platias] (located in California), and its Director of Special Products (located in New York)."[50]

77.    TFL operated the Terra blockchain, the platform supporting the Terra ecosystem's decentralized financial products and services. These products and services took the form of "decentralized applications" and protocols built by TFL. With respect to financial products, TFL created three main types of digital assets: (1) tokens that are native to the Terra ecosystem; (2) stablecoins; and (3) the various Mirrored Assets, Bonded Assets, and LP Tokens.

78.    According to South Korea's Supreme Court Registry Office court documents, Do Kwon dissolved TFL's headquarters on May 4, 2022, and the Seoul branch on May 6, 2022. The

---

[48]    @terra_money,    X    (F/K/A    TWITTER)    (Sept.    14,    2021,    10:32    AM), https://twitter.com/terra_money/status/1437786243295764501?s=20.
[49]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 14, 2021, 12:57 PM), https://twitter.com/KanavKariya/status/1437822736693407745?s=20.
[50]    *SEC v. Terraform Labs PTE, Ltd.*, No. 1:21-mc-00810 (S.D.N.Y. Nov. 12, 2021), Declaration of Roger J. Landsman in Support of U.S. Securities and Exchange Commission's Application for an Order to Show Cause and for an Order Requiring Compliance with Subpoenas, ECF No. 4.

decision came following a general shareholder meeting on April 30, 2022, with Do Kwon acting as the liquidator.[51]

79.    As mentioned, Judge Rakoff granted summary judgment to the SEC on its claim that TFL and Kwon engaged in unregistered offers and sales of securities in violation of Sections 5(a) and 5(c) of the Securities Act on December 28, 2023. On April 5, 2024, a unanimous jury found TFL and Kwon liable for securities fraud relating to, *inter alia*, the fraudulent scheme alleged here.

80.    On January 21, 2024, TFL filed for bankruptcy in the United States District Court for the District of Delaware.[52]

81.    On June 13, 2024, the SEC announced that TFL and Kwon had agreed to pay over $4.5 billion following the unanimous jury verdict.[53]

### 2.    Do Kwon

82.    *The New York Times* has described Defendant Kwon as "a trash-talking entrepreneur" who caused a "$40 Billion Crash."[54] One of Kwon's go-to insults is to demean and delegitimize his detractors and critics of the Terra Tokens by dismissing them as "poor."

83.    UST/LUNA was not Kwon's first trip around the failed stablecoin block. Kwon has had similar failures with previous attempts to market and sell a stablecoin. For example, in 2021, Kwon launched the Basis Cash ("BAC") token, another algorithmic stablecoin project that sought and failed to maintain a $1 peg. A former engineer at Terraform Labs, Hyungsuk Kang, claimed that Basis Cash was a side project created by him and Do Kwon. Since Kwon's previous

---

[51]    *See* Kevin Helms, *Do Kwon Dissolved Terraform Labs Korea Days Before Collapse of Terra LUNA, UST*, BITCOIN (May 19, 2021), https://news.bitcoin.com/dokwon-dissolved-terraform-labs-korea-days-before-collapse-of-terra-luna-ust/.

[52]    *In Re: Terraform Labs Pte. Ltd*, 24-BK-10070 (Bankr. D. Del).

[53]    *See* SEC Press Release, *Terraform and Kwon to Pay $4.5 Billion Following Fraud Verdict* (June 13, 2024), https://www.sec.gov/newsroom/press-releases/2024-73.

[54]    David Yaffe-Bellany and Erin Griffith, *How a Trash-Talking Crypto Founder Caused a $40 Billion Crash* (May 18, 2022), https://www.nytimes.com/2022/05/18/technology/terra-luna-cryptocurrency-do-kwon.html.

1    algorithmic stablecoin failed, it is possible that he could have anticipated UST's failure to maintain

2    the peg.[55]

3         84.    After becoming a fugitive from justice, Kwon was arrested on March 23, 2023,

4    attempting to board a plane in Montenegro with falsified travel documents. Kwon was indicted by

5    the Department of Justice the same day, and extradited to the United States on December 31, 2024.

6    The DOJ unsealed a superseding indictment on January 2, 2025.

7         85.    On August 12, 2025, Kwon pleaded guilty to conspiracy to commit securities fraud,

8    commodities fraud and wire fraud, and a count of wire fraud.[56]

9         86.    In his guilty plea, Do Kwon admitted that "[b]etween 2018 and 2022, in the

10    Southern District of New York, and elsewhere, I knowingly agreed with others to engage in a

11    scheme to defraud, and indeed did in fact defraud purchasers of cryptocurrencies issued by my

12    company Terraform Labs."[57]

13         87.    Further, Do Kwon stated in open court that: "***Specifically, following the de-***

14    ***pegging of UST stable coin in May 2021, I made false and misleading statements of why it***

15    ***regained its peg by failing to disclose a trading firm's role in restoring that peg. I understood***

16    ***that purchasers of UST relied on those false statements when making their purchases. What I***

17    ***did was wrong, and I want to apologize for my conduct.***"[58]

18              **3.    The Terra Tokens**

19         88.    The various Terra Tokens are described further as follows:

20              ***a.    Native and Governance Tokens***

21         •    LUNA – launched in or around April 2019, LUNA tokens are the native token for

22              TFL. The Terra protocol runs on a Proof of Stake (PoS) blockchain, where miners

23

24

---

25    [55]    Sam Kessler and Danny Nelson, *UST's Do Kwon Was Behind Earlier Failed Stablecoin,*
      *Ex-Terra Colleagues Say*, COINDESK (May 11, 2022), https://www.coindesk.com/tech/2022/05/
26    11/usts-do-kwon-was-behind-earlier-failed-stablecoin-ex-terra-colleagues-say/.

27    [56] Plea Tr., *United States v. Do Kwon*, 23-cr-00151, at 31 (S.D.N.Y. Aug. 12, 2025).

28    [57] *Id*.
      [58] *Id*.

21

need to stake the native token LUNA to mine Terra transactions. LUNA tokens are also the pair to the UST algorithmic stablecoin.

- ANC – is the governance token for the Anchor Protocol and it is minted by TFL on the Terra blockchain. ANC "is designed to capture a portion of Anchor's yield, allowing its value to scale linearly with Anchor's assets under management (AUM)**.** Anchor distributes protocol fees to ANC stakers pro-rata to their stake, benefitting stakers as adoption of Anchor increases. . . ."[59] ANC tokens are also "used as incentives to bootstrap borrow demand and provide initial deposit rate stability." Investors in the Anchor Protocol receive their 20% APY on their UST deposits in the form of ANC tokens, which can be subsequently exchanged for other cryptocurrencies.

- aUST – A token provided when UST tokens are deposited into Anchor Protocol.

- vUST – An arbitrage UST token that aims to enforce the UST peg by exploiting arbitrage opportunities.

- MIR – Mirror Token functions as a governance-type token for the Mirror Protocol. It allows investors to interact with Mirrored Assets (discussed below).

89. Cryptocurrency markets are notoriously volatile, with intraday price and/or exchange rate swings of 10% in a few hours occurring regularly. These wild fluctuations make cryptocurrencies generally less suitable as a medium of exchange for routine transactions like purchases. Stablecoins purport to solve this problem by attempting to tie or "peg" their market value to an external collateral with less volatility, such as another currency (*e.g.*, U.S. dollars), commodity (*e.g.*, gold), or financial instrument (*e.g.*, stocks, cryptocurrencies, etc.). The price of a stablecoin (including those developed by TFL) is supposed to always remain at $1, and

---

[59] Anchor Token (ANC) whitepaper, ANCHOR PROTOCOL, https://docs.anchorprotocol.com/protocol/anchor-token-anc (last visited Oct. 30, 2025) [emphasis in original].

developers of these digital assets have devised two primary ways to maintain price stability: over-collateralization with fiat reserves[60] and algorithmic stablecoins.

### b. Stablecoins

90.    UST – TerraUS ("UST"), TFL's flagship digital asset and the foundation of the entire Terra ecosystem, was an algorithmic stablecoin that operated through a pair of tokens (the UST stablecoin itself and another digital asset that backs the stablecoin, e.g. LUNA) and a smart contract that regulates the relationship between the two (*i.e.*, the algorithm). Instead of swapping UST for $1 in dollar reserves as with over-collateralized stablecoins, investors could exchange one UST stablecoin for $1 worth of TFL's LUNA. To maintain UST's 1:1 parity with the U.S. dollar, TFL claimed that its algorithm mints and burns UST and LUNA to control the supply and keep the value of UST steady at $1.

### c. Mirrored Assets

91.    TFL also promoted and sold so-called "mirrored" or synthetic assets (a/k/a "mAssets"), which are essentially derivative products that track the price of a particular underlying asset. The mAssets "mirror" equity or other types of securities traded in the United States, including those traded on U.S. national securities exchanges, such as shares of Tesla, Inc., stock or the ProShares VIX Short-Term Futures ETF (ticker "VIXY"), in that they were designed so that their value rises and falls with the value of those securities. The mAssets corresponding to those equities have been named, for example, "mTesla" or "mVIXY." According to TFL's website, "mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets." TFL also sold a MIR governance token to interact with the Mirrored Assets.

92.    The Mirrored Assets include, but are not limited to, the following:

- <u>mBTC</u> – Mirrored Bitcoin is a synthetic asset tracking the price of Bitcoin. It can be minted on TFL's Mirror Protocol, which references on-chain prices.

---

[60]    Over-collateralized stablecoins maintain fiat reserves with enough cash or cash equivalents on hand to cover each respective stablecoin on a 1-to-1 basis.  Similar kinds of stablecoins operate by using a cryptocurrency like Ether ("ETH") deposited into its smart contracts as the collateral.

23

- mETH – Mirrored Ether is a synthetic asset tracking the price of Ethereum's native token, Ether. It can be minted on TFL's Mirror Protocol, which references on-chain prices.

- mVIXY – Mirrored ProShares VIX is a synthetic version of the VIXY, which tracks stock market volatility.

**D.    Defendants Engaged in a Fraudulent Scheme in Connection with the May 2021 De-Peg**

93.    Defendants engaged in a manipulative scheme with TFL and Do Kwon to mislead investors about the stability of Terraform's stablecoin, UST, and the algorithm that purportedly monitored and automatically maintained the peg of UST's price to the U.S. dollar. Specifically, in May 2021, when the value of UST de-pegged from the U.S. dollar, falling to about $0.90, in exchange for LUNA that Jump intended to and sold to investors, Jump, with TFL and Kwon, secretly implemented a scheme for Jump to manipulate the price of UST. Jump purchased large blocks of UST from investors, removing them from the market – effectively burning them – to cause the price of UST to rise, restoring its value.[61]

94.    The Superseding Indictment referred to this scheme as a "secret," "quid pro quo agreement": "After UST began to lose its $1 peg in May 2021, DO HYEONG KWON, the defendant, negotiated a secret oral agreement with the Trading Firm pursuant to which the Trading Firm agreed to purchase tens of millions of dollars of UST and LUNA for the purpose of artificially propping up UST's $1 peg. In exchange, KWON agreed to accelerate the delivery of LUNA to the Trading Firm under the parties' investment agreements. This *quid pro quo* agreement between Terraform and the Trading Firm was never memorialized in writing, and the accelerated LUNA delivery schedule was not included in a written contract between the parties until in or about July 2021."[62]

95.    After the price of UST rose as a result of these efforts, with knowledge of its participation in the scheme to manipulate the price of UST when the algorithm had failed,

---

[61]    SEC Compl. ¶152.
[62]    Superseding Indictment ¶27.

24

1    Defendants falsely and misleadingly touted to investors that UST's algorithm had successfully re-

2    pegged UST to the dollar, misrepresenting that the re-peg had occurred without human

3    intervention and misleadingly omitting the real reason for the re-peg: Jump's intervention.[63]

4        96.    From 2019, when UST was first coded onto the Terraform blockchain, until mid-

5    May 2021, UST experienced no significant market disruptions.[64] But on May 19, 2021, UST began

6    to de-peg from the U.S. dollar. On May 23, 2021, UST's price declined sharply, dropping to nearly

7    $0.90. That morning and throughout the day, Jump – through President of Jump Crypto, Defendant

8    Kariya – communicated repeatedly with Kwon. In these communications, Kwon expressed

9    concern over UST's value and discussed with Jump how to restore UST's peg to the dollar.[65] TFL

10   and Kwon admitted in briefing that there "were five Signal calls" that day between Kariya and

11   Kwon.[66]

12       97.    In collusion and coordination with TFL and Kwon, Jump responded by purchasing

13   large quantities of UST throughout the day on May 23 and continuing through May 27, 2021, in

14   an effort to restore UST's peg. Ultimately, Jump made net purchases of over 62 million UST over

15   at least two crypto asset trading platforms. UST's market price began to rise shortly after Jump's

16   purchases, restoring the peg to near $1.[67] The secret agreement between TFL and Jump is clearly

17   documented: Kariya first called Kwon at 9:10 AM CDT. According to its own trading records,

18   Jump began actively trading at approximately 9:30 AM CDT, and Kariya again called Mr. Kwon

19   at 9:58 AM CDT. Per the Call Log, at 3:22 PM CDT, Mr. Kwon called Kariya, and called him

20   again at 4:25 PM CDT and 4:55 PM CDT.[68]

21       98.    At trial, the SEC introduced a photograph of Defendant Kariya displaying his call

22   history with Do Kwon from May of 2021, revealing a cluster of five calls on May 23, 2021.[69]

23

24

25   _____

[63]    SEC Compl. ¶153.
[64]    *Id.* ¶155.
[65]    *Id.* ¶156.
[66]    *See* SEC Action, Dkt. No. 100 ("Defs.' SMJ Mem.") at 6.
[67]    SEC Complt. ¶157.
[68]    *See* SEC Action Defs.' SMJ Mem. at 37-38.
[69]    SEC Ex. 258a.

99.     In fact, at deposition, right after Defendant Kariya invoked his Fifth Amendment right against self-incrimination; refusing to answer whether he and Jump agreed to restore UST's peg in exchange for valuable vesting from Terraform, Defendant Kariya was shown a video of Defendant Kariya scrolling through his phone, evidencing communications between him and Do Kown.

100.     When asked whether the video reflected the communications between him and Do Kwon, Defendant Kariya again invoked his Fifth Amendment protection, refusing to answer the question:

```
 6  BY MS. STAREN:
 7      Q    And what was being depicted on the
 8  screen of your phone in that video?
 9      MR. CLARK:  Object to form.
10  BY THE WITNESS:
11      A    On the instruction of counsel I exercise
12  my rights under the Fifth Amendment and decline to
13  answer the question at this time.
14  BY MS. STAREN:
15      Q    The screen of your phone was reflecting
16  a series of communications between yourself and Do
17  Kwon, correct?
18      MR. HENKIN:  Object to form, lack of
19  foundation.
20  BY THE WITNESS:
21      A    On the instruction of counsel I exercise
22  my rights under the Fifth Amendment and decline to
23  answer the question at this time.
```

101.     Jump's stabilizing trading was documented in bookstacker_UST, a means of tracking Jump's transactions in UST. Jump's records from May 23, 2021, show UST being accumulated from "9:25 CDT to 10:01 [AM] CDT, after which time [Jump] pauses trading until [2]:30 CDT [PM]. From [2]:30 CDT to [10]:40 CDT [PM], bookstacker_UST accumulates another 6.7 million in UST. By the start of the day on May 24, bookstacker_UST held 19.5 million UST. From May 24 to May 25 6:03 CDT, the time that UST reached $0.99, bookstacker_UST purchased another 4.4 million UST, ending its position with a total of 24.0 million UST."[70] Shortly thereafter, Kwon, on behalf of TFL, agreed to remove the loan agreement conditions requiring Jump to

---

[70]     SEC Action Defs.' SMJ Mem. at 37-38 n.30.

achieve the requisite benchmarks to receive the loaned LUNA tokens. Instead, TFL agreed to deliver on specified dates, without conditions, specific amounts of the remaining 61,458,334 LUNA tokens to Jump as agreed. Under the modified terms of the contracts, the final LUNA delivery to Jump was to occur by September 1, 2025.[71]

102.    The Superseding Indictment described Jump's stabilizing trades this way: "The Trading Firm's purchases of UST on May 23, 2021 and May 24, 2021 were principally aimed at artificially propping up the market price of UST, as opposed to obtaining UST at the best available price in the market. For example, the Trading Firm placed orders on a cryptocurrency exchange to purchase UST at prices that were higher than the prevailing market price on that exchange. In other words, the Trading Firm agreed to pay more than market price for UST as part of an effort to artificially inflate the value of UST to its advertised $1 price."[72]

103.    TFL's head of communications, Brian Curran took notes at a division head meeting that day, writing that Kwon announced that the *"[p]eg had to be defended"* and that *"Jump was deploying $100 million to buyback UST*."[73] The SEC introduced the notes of that meeting, in a document entitled: "Weekly HQ Call – 5/23, Emergency Responses & Priorities," at trial.[74]

104.    Later, in a chat reflecting on the de-peg, another Terra executive told Curran: "Do said if Jump hadn't stepped in we actually might've been fucked."[75] Another Terraform employee added that "they [Jump] saved our ass."[76]

105.    That sentiment was echoed in an internal Terraform employee resource manual from 2021, which described Jump as "quietly one of the biggest players in crypto" and "the biggest on-chain market maker of UST and saved our ass in May this year."[77]

106.    The SEC also introduced an internal Jump slack chat from May 24, 2021 discussing the de-peg, started by Defendant DiSomma.[78] DiSomma wrote, in a section titled: "2021-05-23

---

[71]    SEC Complt. ¶158.
[72]    Superseding Indictment ¶30.
[73]    SMJ Order at 12.
[74]    SEC Ex. 72.
[75]    SEC Ex. 73.
[76]    *Id.*
[77]    Superseding Indictment, ¶32.
[78]    SEC Ex. 68.

issues," that LUNA was "under massive selling pressure, LUNA down 40% - fear of a bank run given that UST is 'backed' by LUNA… ***Needed to support UST directly on Kucoin***."[79]

107.    Later in the chat, former Jump Chief Investment Officer, Dave Olsen, writes to DiSomma: "***seems like the prop to Do was well timed. Lots of wood to chop still, but feels like a good start. That how you're seeing it?***" DiSomma replies: "We bracing for another sell storm. It's a good start," to which another Jump executive writes: "***did we get him to vest us?***"[80]

108.    In another set of texts between Curran and TFL's head of business development, Jeff Kuan ("Kuan") discussing the de-peg (submitted as summary judgment evidence in the SEC action), Kuan wrote to Curran on May 23, 2021, "***Do just randomly called me . . . [W]e're speaking to jump about a solution***."[81] Curran added, "***Spoke with Do, we're gonna deploy $250 million from stability reserve through Jump to stabilize the peg***." Curran followed up just over 20 minutes later, "***Jump has already started buying . . . May not need entire $250 million***."[82] That conversation was introduced at trial.[83]

109.    A day later, once the peg had been restored by Jump's undisclosed stabilizing trades, Terraform's official then-Twitter account posted: "Terra's not going anywhere . . . $1 parity on UST already recovered."[84] This tweet was also introduced at trial.[85]

110.    The same day, May 24, 2021, Do Kwon tweeted a screenshot of the price of UST back at $1, boasting: "I see. Back to work."[86]

111.    Jump's role in bailing out the peg was purposefully hidden from the investing public.  In a chat between TFL's head of communications and its head of business development, these executives stated that Jump was TFL's only market maker that they knew of, and mused "Is Jump willing to publicly disclose their relationship with us tho?  Seems like they are pretty private".  In discussing the peg and "speaking to jump about a solution", one executive "suggested

---

[79]    *Id.*
[80]    *Id.*
[81]    SMJ Order at 55.
[82]    *Id.*
[83]    SEC Ex. 71.
[84]    SMJ Order at 55-56
[85]    SEC Ex. 74.
[86]    SEC Ex. 75.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-cv-03600-PCP

1  we do some [communications] around it" but was told by Kwon to "hold tight." The executives

2  later described considerations about "whether to give real-time update or wait and do a longer

3  post-mortem once things settle down".[87]

4      112.    In a sworn declaration cited by the SMJ Order, an SEC whistleblower (known there

5  as "CW-1" but whose identity was later revealed as James Hunsaker when he testified at trial)

6  stated that he worked at Jump in May 2021 and participated in a Zoom meeting on or about May

7  23, 2021, in which Jump officers were present.[88] In that meeting, CW1 heard the executive tell

8  Jump's co-founder, "I spoke to Do and he's going to vest us."[89] Before that statement, Jump's co-

9  founder had told CW-1 "that Terraform had made a deal with Jump to promote the adoption of

10  UST."[90] Later on or about May 23, 2021, CW-1 saw and heard Jump's co-founder direct traders

11  "to adjust the parameters of the [Jump] trading models to control the price, quantity, and timing of

12  UST orders."[91] CW-1 also heard Jump's co-founder say that "he was willing for Jump to risk about

13  $200 million to help restore the peg."[92] In the aftermath, once UST's price returned to $1.00 a few

14  days later, CW-1 "heard [Jump's co-founder] provide general feedback to the Jump Crypto trading

15  team on the sale of UST, for example, advising them not to cause another de-peg by selling too

16  quickly."[93]

17      113.    TFL and Kwon represented in their summary judgment briefing that Jump had

18  "requested that communications be done through Signal."[94] TFL further submitted that Kariya had

19  "no Signal messages between him and Mr. Kwon on May 23, 2021, either because (a) there were

20  no messages between the two or (b) they were deleted by the disappearing messages function in

21  the President's Signal app, which the record demonstrates that he, not Mr. Kwon, turned on for

---

[87]    SEC Ex. 71.
[88]    SMJ Order at 56.
[89]    *Id*.
[90]    *Id*.
[91]    *Id*.
[92]    *Id*.
[93]    *Id*.
[94]    *See* SEC Action Defs.' SMJ Mem. at 37.

their chat."[95] TFL and Kwon also admitted that there "were five Signal calls" between Kariya and Kwon.[96]

114.    Indeed, in chats with Kwon, Kariya stated that Jump's "Compliance feels much more comfortable here with the disappearing chats" that they were "strongly pushed to move all conversation here…" and that "Compliance really stepping up the heat on moving over to Signal."[97]  Upon information and belief, this move to use Signal's "disappearing chats" was done by Defendants, Kwon, and TFL in an attempt to hide evidence of their misconduct from discovery.

115.    The SEC also submitted declarations from Keone Hon ("Hon"), another former Jump employee, and Brandon Ackley ("Ackley"), a current member of "ownership entities within Jump Trading Group" and former employee of Jump Operations LLC.[98] Both declarations state that Jump indeed made trades of UST on May 23, 2021.  For instance, Hon wrote that "[s]ometime over the weekend of May 22, 2021, . . . [he] was instructed to purchase UST for Jump Trading" even though he "was not responsible for trading crypto assets" at that time.[99] Hon also wrote that, "I believe, other Jump Crypto team members were also purchasing UST."[100]

116.    Judge Rakoff found that the Jump confidential witness accounts were admissible under Federal Rule of Evidence 804(b)(3) as statements against interest, reasoning that Jump's, and those individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).[101]

117.    Judge Rakoff also agreed with the SEC that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore

---

[95]    *Id.*
[96]    *Id*. at 6.
[97]    @aosipovich, X (Apr. 10, 2024, 1:02 PM), https://x.com/aosipovich/status/1778106293175107647 [https://perma.cc/N6ZZ-YMU3].
[98]    SMJ Order at 58-59.
[99]    *Id*. at 59.
[100]   *Id*.
[101]   *Id*. at 57.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-cv-03600-PCP

UST's peg."[102] Such statements are thus likewise admissible under Federal Rule of Evidence 803(3).

118.    The SMJ Order also rejected a challenge to the SEC's expert witness, Dr. Bruce Mizrach.[103] Dr. Mizrach found that Jump's trading increased UST's price by $0.62 over a particular half-hour period, when the actual price increased by just $0.03. Dr. Mizrach's analysis showed that, in the absence of Jump's trading during that period, the price would have been $0.62 lower than it was. In other words, had Jump not made its trades during that period, UST's price would have declined by $0.59 rather than increase by $0.03, as it did.[104]

119.    Summing up the SEC's evidence, Judge Rakoff stated the "evidence is compelling."[105] Judge Rakoff's SMJ Order refers to Jump more than 90 times.

120.    At trial, the former Jump employee and SEC whistleblower, James Hunsaker, took the stand, providing additional testimonial evidence on Jump's illicit repeg of UST that he had described in his sworn declaration.

121.    Hunsaker testified that he started working at Jump in 2014 and was responsible for all the technology used by the trading team.[106] In 2021, he started working for the division at Jump known as Jump Crypto, which was the arm of Jump involved in trading crypto.[107]

122.    Hunsaker explained both Defendant DiSomma's and Defendant Kariya's roles within Jump Crypto. Defendant DiSomma, one of Jump's founders and owners, ran the team, directed the lead trader on trading strategies, set strategic initiatives, and approved any sort of deal strategy or trading strategy.[108] Defendant Kariya "was one of the original, or he was an early member of Jump Crypto" and "[a]t some point he became president of Jump Crypto."[109] Kariya

---

[102]    *Id.* at 57-58.
[103]    *See* SMJ Order at 14-21.
[104]    *Id.* at 20-21.
[105]    SMJ Order at 60.
[106]    03.29.2024 Tr. 845-46.
[107]    *Id.* at 846-47.
[108]    *Id.* at 850-52.
[109]    *Id.* at 852.

was "the public face of Jump Crypto," in charge of interfacing between Jump and other projects/companies within the crypto community.[110]

123.    As to the background relationship between Jump and TFL, Defendant DiSomma told Hunsaker in the spring of 2021 that Jump wants to incentivize UST adoption because Jump had a deal with TFL to increase the amount of TFL being traded.[111] Hunsaker described Jump's partnership with TFL as one of Jump's two major deals.[112]

124.    Hunsaker also provided a firsthand account of the de-peg that began on or around May 19, 2021, and Jump's intervention to restore the peg and stabilize the price of UST.

125.    Hunsaker first learned about the de-peg on May 19 from chatter in Jump's slack chat application.[113]

126.    A few days later, the price of UST began to fall further, deviating more significantly from its $1 peg. Although it was a weekend day, Hunsaker joined a group Zoom meeting to discuss the de-peg.[114] On that meeting, Defendant DiSomma discussed the Terraform situation when Hunsaker joined the call.[115] A few minutes later, Defendant Kariya joined the call "**and very quickly said to Bill [DiSomma], I spoke to Do, he's going to vest us**."[116]

127.    Hunsaker explained "**[t]hat the previous vesting conditions no longer applied, and if Jump helped with the depeg, that the deal would be fulfilled**."[117]

128.    Right after Defendant Kariya made that statement on the zoom call, Defendant DiSomma began directing the traders on a new strategy. In particular, Defendant DiSomma directed the traders to adjust the parameters of the trading models so that Jump was not acting like a market maker, as it usually did, but aggressively buying and accumulating UST.[118]

---

[110]    *Id.* at 852-53.
[111]    *Id.* at 854.
[112]    *Id.* at 857.
[113]    *Id.* at 856.
[114]    *Id.* at 857.
[115]    *Id.* at 858.
[116]    *Id.*
[117]    *Id.* at 859.
[118]    *Id.* at 859-62.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-cv-03600-PCP

129.    As a direct result of Jump's trading UST purchases, Jump and Terraform were able to restore UST's $1 peg. At that point, Jump had accumulated a large position of UST, more UST than Defendant DiSomma wanted to own. In response, Defendant DiSomma instructed Jump to sell the UST, ***"[b]ut he was saying sell it very carefully not to cause like another depeg event. Because if Jump just started dumping the UST on the market, it would also cause the price of UST to drop again, so he didn't want that to happen***."[119]

130.    According to Hunsaker, DiSomma expressed that he "was willing to risk up to a couple hundred million dollars to do this," because saving the TFL ecosystem would financially benefit Jump and the Individual Defendants.[120]

131.    Traders were especially incentivized to follow Disomma's orders to stabilize the LUNA and UST markets after being told "that's where your bonuses will come from."[121]

132.    Finally, expert witness Dr. Mizrach testified at trial, providing statistical evidence to corroborate Hunsaker's account and testifying "that had it not been for Jump's trading, that the peg would not have been restored, and that UST's price would have come very close to zero."[122]

133.    Dr. Mizrach, an economics professor at Rutgers University, thoroughly analyzed Jump's trading records, explaining that, between May 23 and May 27, 2021, while Jump traded some UST on the Terra blockchain, most of Jump's trading took place off of the Terra blockchain, on centralized cryptocurrency exchanges such as KuCoin.[123]

134.    Dr. Mizrach opined that: "[t]he Jump trading that I found restored the peg was going on centralized exchanges like KuCoin."[124]

135.    Notably, when asked whether a member of the public in May 2021 could have seen that "Jump was buying large amounts of UST off-chain," meaning outside of the Terra blockchain on exchanges like KuCoin, Dr. Mizrach answered in the negative, because "[t]hat information is

---

[119]    *Id*. at 862.
[120]    *Id*.
[121]    SEC Ex. 576.
[122]    04.02.2024 Tr. 1307-08.
[123]    *Id*. at 1342-43, 1336.
[124]    *Id*. at 1336.

1    not available to the public from the centralized exchange. We don't know who is trading with

2    whom on those exchanges. We can only typically find that out if we get confidential records."[125]

3           136.    The SEC introduced a chart Dr. Mizrach prepared from Jump's trading records,

4    showing Jump's cumulative position of UST on the KuCoin exchange:



Figure 1: Jump's Cumulative and Net USDT-UST Position on KuCoin

Source: Jump Trading Data[13], May 1 to May 31, 2021.

**PLAINTIFF'S EXHIBIT P199**
23-cv-1346 (JSR)

137.    According to Dr. Mizrach's testimony, the chart "shows that Jump was primarily

acting in the first roughly two-thirds of this chart as a market maker or liquidity provider, both

buying and selling roughly equal amounts of UST," and clarified that "a market maker is simply

someone who wants to both buy and sell a particular asset, but the market maker tries to keep a

relatively flat position." Dr. Mizrach continued, "[t]hey don't want to accumulate a lot or wind up

very short. And so they try to balance over a period of days or hours even to try to keep their

position approximately at zero."[126]

---

[125]    *Id.* at 1357-58.
[126]    *Id.* at 1345.

138.    Dr. Mizrach further testified that "[t]he big green lines begin on May 23rd, and this is when Jump changes their trading posture from being a market maker to being more of a directional trader, making a decision to actually become a large purchaser of UST," clarifying that "a directional trader is someone who begins to accumulate a position in one direction, and, again, this takes them well away from the zero line. And as you can see after May 23rd, Jump continues to accumulate and become a large net purchaser approaching 40 million by the end of the month of UST."[127]

139.    Dr. Mizrach explained that, in the end of May, there was still some "market making that's going on, but this is netting out the combination of their market making activities and their directional trades, and it says that the trading posture has shifted. They still are doing some market making, but on balance, they're ending each day with more UST."[128]

140.    Accordingly, Dr. Mizrach concluded, Jump traded anonymously on centralized exchanges, supporting the restoration of UST's peg.[129]

141.    Dr. Mizrach then showed the jury the chart admitted into evidence as Exhibit 197:

**Figure 3.10 Jump Net Purchases of UST on KuCoin with Tether by Half Hour**



<u>Source</u>: Jump Trading data SEC-JUMPTRADE-E-0033600 to 602.



---

[127]    *Id.* at 1346.
[128]    *Id.*
[129]    *Id.*

1

2          142.     The above chart reflects Jump's trading between UST and Tether on Kucoin,

3   focusing specifically on May 23.[130] Tether is another stablecoin that could be swapped for UST

4   on the KuCoin exchange.[131]

5          143.     Dr. Mizrach explained this chart to the jury: "So at 1430 in Greenwich time over in

6   England, about five hours ahead of Chicago, we see that there's a surprising change in Jump's

7   trading posture to purchase just in one half hour approximately 10 million UST, and that net

8   purchase at that time between -- in that half hour, was the equivalent of what Jump had traded

9   typically on two entire days."[132] He continued: "And so, again, green means, as it did in the prior

10  chart, net purchases. So they become a large net purchaser in that half an hour and make net

11  purchases of more than 10 million UST. In fact, during this particular timeframe, Jump only

12  purchases. They don't sell UST."[133]

13         144.     Finally, Dr. Mizrach demonstrated in a chart how, over time, UST de-pegged from

14  the U.S. dollar and then re-pegged corresponding to Jump's anonymous purchases on centralized

15  exchanges:

16

17

18

19

20

21

22

23

24

25

26

27  [130]     *Id*. at 1346-47.
    [131]     *Id*. at 1343.
28  [132]     *Id*. at 1348.
    [133]     *Id*.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-CV-03600-PCP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



Figure 3.4: UST Depreciation with Respect to U.S. Dollars

Sources: Logs[18] of the data feed from the KuCoin Exchange from May 19 to May 27, 2021. Expert's log of Kraken Exchange data feed of the Tether-USD market.



19    145.    Dr. Mizrach explained that this chart reflects "the change in price of UST with

20  respect to U.S. dollars in the period from May 19th to May 27th," and that, "in the early part of the

21  graph you begin to see the depeg, the decline in UST's value relative to the dollar. It's falling

22  below 98 cents as you can see on May 19th. As we move forward, we also then begin to see the

23  really large decline in UST's price on May 23rd, and the price I believe trades just a little bit below

24  93 cents at that particular point in time on May 23rd. And then as you move on from May 23rd,

25  you see the restoration of the peg."[134]

26    146.    Dr. Mizrach concluded: "My opinion is that Jump's trading on the centralized

27  exchanges on KuCoin in the Tether UST pair and also in Bitcoin was a critical component in

28

---

[134]    *Id*. at 1349-50.

restoring the peg of UST to $1," and further that: "May 23, 2021 is the period in the chart that we had just taken away where we see the peg begins to move away from its bottom. ***So my view is that the peg would have probably been permanently lost if it had not been for Jump's trading on May 23rd***."[135]

E.    **Jump Knowingly Misleads Investors Concerning the Stability of UST and LUNA**

147.    Immediately after secretly intervening to restore UST's peg in May 2021, Jump began materially misleading investors about the repegging of UST to the U.S. dollar that had occurred. Specifically, Jump's statements and promotions all misleadingly omitted the true cause of UST's re-peg: Jump's deliberate intervention to restore the peg in exchange for vested tokens.

148.    Jump promoted the Terra Tokens through, among other means, websites, web applications, social media accounts, podcast interviews, and through U.S. media. The promotions all had the same talking points: the stability and sustainability of the UST peg and the ecosystem it supports.

149.    Immediately after the surreptitious de-peg and repeg event, Jump, under the guise of submitting a new governance proposal in the Terra ecosystem, worked with TFL to sow misinformation into the market about the strength of the peg, the viability of the UST peg, and the strength of the Terra ecosystem.

150.    Jump's proposal had the effect of misleading investors into believing that the algorithm had held up in times of market volatility and that Jump's presence would improve stability, as evidenced by an investor within the Terra Network group on Signal stating in the chat: "I don't really see how UST has lost trust. In fact UST has held its peg amazingly well for an algorithmic stablecoin that has a marketcap of 2B USD (even in a black swan event of sorts) [. . .] Add to it that Jump liquidity has brought it a new proposal to improve on-chain liquidity which on implementation should work to further reduce UST deviations further."[136]

---

[135]    *Id*. at 1350-51.
[136]    Ex. 40 to Henkin Decl. (ECF No. 103-40) at *11.

151.    Jump's authoring proposals for Terra's governance further gave investors misleading confidence in the peg and the Terra ecosystem. For example, investors commenting on the news of Jump's proposal found it to be positive and optimistic for Terra's future prospects, stating that "Jump trading prop[osal] will make it 100x stronger," "Jump Trading is involved in terra? thats pretty big," and "Jump trading prop is mega bullish on top of that."[137] These comments further establish that Jump's statements were material to investors.

152.    On May 24, 2021, TFL published a 29-post thread on its official Twitter account, discussing the de-peg.[138]  At no point did either TFL or Defendants disclose that UST's peg to the dollar was restored as the result of Jump's efforts, and not the success of the algorithm. For example, in posts #23-25, TFL stated:

> On-chain swap spread are healing (ranging between 3-4%) as liquidations on Anchor wind down, arb opportunities on third-party venues incentivize buying UST, the market for LUNA becomes oversold and diamond hands, gloriously holding the line, glean a profitable opportunity. The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense a stress test in live conditions as can ever be expected. We just experienced a black swan.  Despite sharp dislocations, the on-chain swap spreading is mending, UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed – buttressing the growth of the Terra economy as the system bounces back from distress.[139]

153.    Later on in post # 28, TFL mentions Jump by name,[140] still omitting that it was Jump's purchases of UST that restored the UST peg and not the algorithm TFL and Jump promoted.  Despite being explicitly referenced by name, Jump did not issue any additional or follow-up statements correcting the omission.

154.    On June 9, 2021, Terra released a document that quoted Jump multiple times, linked to Jump's posts, and made false statements regarding the peg, stating "Understanding how various levers of the protocol and its ecosystem of apps interact at such a scale crystallizes during excessive

---

[137]    Ex. 40 to Henkin Decl. (ECF 103-40) at *322, *340.
[138]    @terra_money, X (F/K/A Twitter) (May 24, 2021, 6:51 AM), https://twitter.com/terra_money/status/1396780917314621444?s=20.
[139]    @terra_money, X (F/K/A Twitter) (May 24, 2021, 6:51 AM), https://twitter.com/terra_money/status/1396780959899344896?s=20.
[140]    @terra_money, X (F/K/A Twitter) (May 24, 2021, 6:52 AM), https://twitter.com/terra_money/status/1396781211595407360?s=20.

volatility that spotlight points of pressure in the system. As the UST peg normalized, this was a function of the on-chain liquidity absorbing the volatility off-chain gradually, and as we said, it would not happen overnight. Two weeks later, the Terra protocol is humming along once again, with the UST market cap growing 6% MoM despite the massive contraction induced by the extreme market volatility."[141]

155.    The foregoing statements were recklessly false and/or misleading because the algorithm did not restore the price; rather, Jump purposefully interfered and purchased large blocks of UST to restore the peg in exchange for being able to unload its considerable Terra Token holdings at a greater premium once the price rose after investor confidence returned under false pretenses. Further, despite being quoted in this June 9, 2021 document and having Jump's posts included in the document, Jump took no steps to ever cure the misstatements made by TFL even though it was contemporaneously aware of the misleading statements and omissions being made.

156.    Meanwhile, Jump and TFL – through Kwon and Kariya, respectively – continued to work together to boost the circulation of Terra Tokens and protect the reputation of UST as a reliable stablecoin. For instance, in a June 2021 email chain, Kwon and Defendant Kariya discussed a range of collaborations between the two firms. Kwon wrote, "Initial PR efforts for the firm are probably going to pyth and wormhole [two joint projects], but I think it would be strong validation of UST as an unbiased, decentralized algo stablecoin if Jump started to be more visible and vocal of its support behind the project."[142]  Kwon also stated that it needed Jump's services to mechanize the Terra Tokens to users because if TFL were to do so, "it could see as though we are offering unlicensed money transmitter services in the United States."[143]  Evidencing the closeness between the firms, Kwon tells Kariya that "We do not have any other trading firm with which was have enough incentive alignment to trust with large balances of funds[.]"[144]  In response, Kariya

---

[141]    The Intern, *Stablecoins — Defining the Terra Algorithmic Design*, MEDIUM (June 9, 2021), https://medium.com/terra-money/stablecoins-defining-the-terra-algorithmic-design-5d952fdf68d.
[142]    SEC Ex. 259.
[143]    *Id.*
[144]    *Id.*

referred to the autodeleting messaging app, stating "Not sure if you've had a chance to check Signal."

157.    Similarly, in a July 2021 email exchange between Kariya and others at Jump and multiple employees of Terraform, discussing further collaboration, Kariya connected communications employees at the two firms to "coordinate efforts between our teams."[145] Later, a Jump employee wrote to his TFL counterpart: "Excited about comms collaboration between Jump and TFL. Sounds like mutually beneficial synergy."[146]

158.    On August 9, 2021, TFL and Jump (through Wormhole) released a statement that "Terra Goes Live on Wormhole V2". This statement falsely described UST as a "censorship-resistant, infinitely scalable, algo-pegged USD stablecoin."[147]

159.    Sometime on or before September 1, 2021, Kwon held an "AMA" ("Ask Me Anything") where he interfaced directly with team members at Jump.  Thereafter, Jump began to receive its deliveries of LUNA coins under the new vesting schedule.[148]  After receiving one LUNA token as test transaction on September 9, 2021, Jump received 4,799,999 LUNA tokens on September 11, 2021.[149]  Given the price of LUNA tokens ranged from $37.66 to $44.34 per token on September 11, 2021, this transfer was worth between $180.7 million and $221.8 million.[150]

160.    On September 14, 2021, Jump formally announced its Jump Crypto division. TFL tweeted that Jump has quietly played a pivotal role in the Terra ecosystem for a long time and is one of the most well-reputed, talented, and strategically important firms in the broader market. Defendant Kariya retweeted, stating "It's been a real pleasure working with @stablekwon and the

---

[145]    SEC Ex. 428.
[146]    *Id.*
[147]    The Intern, *Terra Goes Live on Wormhole V2*, MEDIUM (Aug. 9, 2021), https://medium.com/terra-money/terra-goes-live-on-wormhole-v2-12df49d446d2#:~:text=2-,Wormhole%20V2%20for%20Terra%20is%20here.,)%2C%20and%20now%20%E2%80%94%20Terra.
[148]    SEC Ex. 262.
[149]    TERRA FINDER, *Transaction Details* (Sept. 11, 2021) https://finder.terra.money/classic/tx/099326E48443467970EE0CCCA9DD91B8E31549EAC98C6172CAF136BB6F0D44EE [https://perma.cc/N8SL-JS3V].
[150]    COINMARKETCAP, *Terra Classic Price History*, https://coinmarketcap.com/currencies/terra-luna/historical-data/ [https://perma.cc/SGA2-QCCK].

Terra team over the last couple years. A+ folks." Concurrently, Jump Crypto published the "Introducing Jump Crypto" blog post written by Kariya on its website.[151] The blog highlighted "Terra's stability mechanism" as effective to "balance safety" and claimed that Jump's "data engineering pipelines and battle experience in the markets have uniquely enabled us to analyze these complex systems and meaningfully contribute to the discussion."[152] This blog also touted Jump as "one of the guardians helping secure the [Wormhole] network."[153]

161.    Also on September 14, 2021, with the price of LUNA tokens soaring, Kariya tweeted "We've tripled over the last year, have billions of dollars committed across space and we're aggressively growing".[154] On September 17, 2021, Kariya promoted the upcoming Terra bridge, indicated that he was "keenly awaiting" the release of the upcoming Terra bridge.[155]

162.    Also on or around September 17, 2021, Kariya reposted Anchor protocol marketing materials.[156]

163.    On September 21, 2021, Jump and Kariya posted on Twitter, promoting Terra and its interoperability through Wormhole.[157]

164.    On September 22, 2021, Kariya repeated a deleted promotion regarding Terra and its cross-chain interoperability capabilities through Wormhole.[158]

---

[151]    *Introducing Jump Crypto*, JUMP (Sept. 13, 2021), https://jumpcrypto.com/writing/introducing-jump-crypto/ (last visited Oct. 30, 2025).
[152]    *Id.*
[153]    *Id.*
[154]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 14, 2021, 9:30 AM), https://twitter.com/KanavKariya/status/1437770771628167169.
[155]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 17, 2021, 3:26 PM), https://twitter.com/KanavKariya/status/1438947586682073094.
[156]    @armaniferrante, X (F/K/A TWITTER) (Sept. 16, 2021, 11:28 PM), https://twitter.com/armaniferrante/status/1438706351295827968.
[157]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 21, 2021, 12:59 PM), https://twitter.com/KanavKariya/status/1440360033372426252.
[158]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Sept. 22, 2021, 11:00 AM), https://twitter.com/KanavKariya/status/1440692450431954944.

165.    On October 1, 2021, Jump received 1.2 million LUNA tokens[159] from Terra worth between $43.8 million and $47.9 million given the price range of $36.56 to 39.98.[160]

166.    On October 11, 2021, in a now-deleted blog on the Insights portion of Jump's website titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market," Jump touted Terra as one of the future "winners" for stablecoins. Specifically, Jump told investors that UST was a "prominent example" of algorithmic stablecoins, insisting: "We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. *We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin*."[161]

167.    This statement was false and misleading because Defendants omitted facts that undermined their opinion about the stability of UST. In particular, Defendants knew, but omitted, that it was their own May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed.

168.    On October 19, 2021, Kariya made a post exclaiming "It's here, it's here!!!  Cross chain UST," to promote Terra Tokens and the cross-chain use of UST through Wormhole.[162]

169.    Kariya then reposted Terra promotions regarding Wormhole support of Terra, stating "Get your UST to Solana, Ethereum and BSC."[163]

---

[159]    TERRA    FINDER,    *Transaction    Details*    (Oct.    1,    2021), https://finder.terra.money/classic/tx/3BCB0C90D815C4D630018BF3C5E83BCE6F7F8CA84B1 B364EF46BFB0D5592CB24 [https://perma.cc/MPF6-GWFY].

[160]    COINMARKETCAP, *supra* note 150.

[161]    Peter Johnson and Shanav Mehta, *Stablecoins: The Impending Rise of a Multi-Trillion Dollar    Market*,    JUMPCAP.    (Oct.    11,    2021), https://web.archive.org/web/20220518222646/https://jumpcap.com/insights/stablecoins-the-impending-rise-of-a-multi-trillion-dollar-market.

[162]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Oct. 19, 2021, 5:37 PM), https://twitter.com/KanavKariya/status/1450576975647498241.

[163]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Oct. 19, 2021, 5:41 PM), https://twitter.com/KanavKariya/status/1450577850348703744.

43

170.    On October 20, 2021, Kariya reposted promotions that UST will be available on the Solana blockchain.[164]

171.    On October 29, 2021, Jump and Wormhole promoted Terra bridging in Wormhole marketing pieces.[165]

172.    On November 1, 2021, Jump received 1.2 million LUNA tokens from Terra in two transactions of 500,000 and 700,000 tokens.[166]  Given the price range of $41.59 to $44.35 on that day, this transfer was worth between $49.9 million and $53.2 million.[167]

173.    On November 3, 2021, Jump reposted marketing pieces for Terra sales on the Apricot exchange using Jump's Wormhole protocol.[168]

174.    On November 4, 2021, both Jump and Wormhole promoted the use of the Terra bridge on Wormhole.[169]

175.    Also on November 4, 2021, Jump and Wormhole posted about listing UST on the Aave Protocol.[170]

176.    On November 9, 2021, Jump made a post promoting the Terra ecosystem and the use of the Wormhole bridge.[171]

177.    On November 11, 2021, Jump reposted Terra promotions about its new website.[172]

---

[164]    @solana, X (F/K/A Twitter) (Oct. 20, 2021, 8:37 AM), https://twitter.com/solana/status/1450803289889595395.

[165]    @wormholecrypto, X (F/K/A Twitter) (Oct. 29, 2021, 11:22 AM), https://twitter.com/wormholecrypto/status/1454106361382408194.

[166]    TERRA FINDER, *Account Detail*, https://finder.terra.money/classic/address/terra1uza3c9hpnp50np7t8ph5s5vqc0alggvv57q7zu

[167]    https://coinmarketcap.com/currencies/terra-luna/historical-data/ [https://perma.cc/9EF8-BNBQ].

[168]    @apricotfinance, X (F/K/A Twitter) (Nov. 3, 2021, 7:53 AM), https://twitter.com/apricotfinance/status/1455910983407476741?s=42.

[169]    @wormholecrypto, X (F/K/A Twitter) (Nov. 4, 2021, 10:35 AM), https://twitter.com/wormholecrypto/status/1456314180580085765?s=42.

[170]    @larry0x, X (F/K/A Twitter) (Nov. 4, 2021, 8:52 AM), https://twitter.com/larry0x/status/1456288202776580100?s=42.

[171]    @jump_, X (F/K/A Twitter) (Nov. 9, 2021, 6:12 AM), https://twitter.com/jump_/status/1458074913407918083?s=42.

[172]    @terra_money, X (F/K/A/ Twitter) (Nov. 11, 2021, 9:57 PM), https://twitter.com/terra_money/status/1459037520520306692?s=42.

178.    On November 23, 2021, Kariya retweeted Wormhole marketing regarding the liquidity of Terra Tokens.[173]

179.    On December 1, 2021, Kariya reposted marketing about UST being added to Jump's Pyth Network of price oracles.[174]

180.    On December 2, 2021, Jump reposted a marketing tweet from Orion platform promoting UST and LUNA.[175]

181.    On December 2, 2021, Jump reposted news that UST was getting added to Jump's Pyth Network of price oracles.[176]

182.    On December 2, 2021, Jump received 1.2 million LUNA tokens[177] from Terra worth between $73.5 million and $79.4 million given the price range of $61.30 to $66.21.[178]

183.    On December 6, 2021, Kariya reposted that UST would be supported at "thousands of locations on the Flexa network."[179]

184.    On December 14, 2021, Kariya reposted a Terra promotion that the Kraken exchange had listed LUNA tokens.[180]

185.    On December 23, 2021, Kariya reposted Do Kwon's promotion that UST was going to be listed on the HuobiGlobal exchange. Kariya stated that "Slowly, then all of a sudden. Exchange adoption is key for stablecoins. Probably an obvious opinion at this point, but don't see

---

[173]    @wormholecrypto, X (F/K/A TWITTER) (Nov. 23, 2021, 1:11 PM), https://twitter.com/wormholecrypto/status/1463208698805989384.
[174]    @Mariobern_, X (F/K/A TWITTER) (Dec. 1, 2021, 9:18 AM), https://twitter.com/Mariobern_/status/1466048974540840964.
[175]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Dec. 2, 2021, 10:55 AM), https://twitter.com/KanavKariya/status/1466435961336774662.
[176]    @Mariobern_, X (F/K/A TWITTER) (Dec. 1, 2021, 6:18 AM), https://twitter.com/mariobern_/status/1466048974540840964?s=42.
[177]    TERRA FINDER, *Transaction Details* (Dec. 2, 2021), https://finder.terra.money/classic/tx/605A05BEDFB80CF8E567A50562710333CD8011215C2C 18333A9C0BEEB75EBC5B [https://perma.cc/FJY5-5R5K].
[178]    COINMARKETCAP, *supra* note 150.
[179]    @FlexaHQ, X (F/K/A TWITTER) (Dec. 6, 2021, 6:32 PM), https://twitter.com/FlexaHQ/status/1468000445926985737.
[180]    @terra_money, X (F/K/A TWITTER) (Dec. 14, 2021, 2:49 PM), https://twitter.com/terra_money/status/1470843465592279044.

45

1   any other decentralized stablecoins ever catching up with the moon. Too deeply embedded across

2   the cryptoverse."[181]

3        186.    Thereafter, on December 23, 2021, Kariya tweeted "all at once" and reposted that

4   UST was available for sale on Binance (a large cryptocurrency exchange).[182]

5        187.    Also on December 23, 2021, Kariya reposted Terra marketing pieces regarding

6   Jump's Wormhole protocol.[183]

7        188.    On January 3, 2022, Jump received 1.2 million LUNA tokens[184] from Terra worth

8   between $106.4 million and $112.5 million given the price range of $88.69 to $93.79.[185]

9        189.    On January 10, 2022, Kariya tweeted a promotion that LUNA tokens were getting

10  listed on the Mango Markets exchange. Kariya stated, "Luna wrapped by Wormhole, priced by

11  Pyth, trading on an OB on Solana [] It's beautiful."[186]

12       190.    Also on January 10, 2022, Kariya admitted to Jump having profited from the

13  scheme, stating "the hotness of fresh money can be jarring" and that "We're up 100% over the last

14  year."[187]

15       191.    On or around January 19, 2022, Jump and TFL announced the formation of the

16  Luna Foundation Guard – a Singapore-based non-profit organization – for the purported purpose

---

21  [181]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Dec. 23, 2021, 9:27 PM),
22  https://twitter.com/KanavKariya/status/1474023919262871561.
    [182]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Dec. 24, 2021, 12:46 AM),
23  https://twitter.com/KanavKariya/status/1474255102701563908.
    [183]    @terra_money,    X    (F/K/A    TWITTER)    (Dec.    23,    2021,    2:49    PM),
24  https://twitter.com/terra_money/status/1474104777524998153.
    [184]    TERRA    FINDER,    *Transaction    Details*    (Jan.    3,    2022),
25  https://finder.terra.money/classic/tx/5EA476C8F8E395D62481C2C1CB9779657BFBB3450063
26  2BED7B922D36971C0469 [https://perma.cc/7N9M-AWAR].
    [185]    COINMARKETCAP, *supra* note 150.
27  [186]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 10, 2022, 7:33 PM),
    https://twitter.com/KanavKariya/status/1480699284278452225.
28  [187]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 10, 2022, 10:08 PM),
    https://twitter.com/KanavKariya/status/1480738288835121158.

of "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."[188]

192.    Jump (via Kariya), as a cofounder and creator of the Luna Foundation Guard ("LFG"), exercised control and directed and/or authorized, directly or indirectly, the statements that the Luna Foundation Guard made to the public.

193.    The announcement noted previous criticisms directed towards algorithmic stablecoins like UST, but the Luna Foundation Guard, at the behest of Jump, downplayed the "misconception" that algorithmic stablecoins are "unsustainable." The Luna Foundation Guard went on to state that a previous de-pegging that occurred in May 2021 was not a sign that UST was more unstable than disclosed, but rather, a learning opportunity that UST was able to capitalize on:

> By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, ***UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy***.    Still, ***questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on***.
>
> *            *            *
>
> In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions.  These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and innovative mechanisms to support algorithmic stablecoin models amid volatility.[189]

[Emphasis added.]

194.    According to its website:

> **The Luna Foundation Guard ("LFG")** is a nonprofit organization established in the Republic of Singapore dedicated to creating and providing greater economic sovereignty, security, and sustainability of open-source software and applications that help build and promote a truly decentralized economy. Through community stewardship, fostering innovation, and supporting the research and development of

---

[188]    The Intern, *Formation of the Luna Foundation Guard (LFG)*, MEDIUM (Jan. 19, 2022), https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b#:~:text=We're%20pleased%20to%20announce,sustainability%20and%20stability%20of%20Terra's.
[189]    Defendants' public statements attributing UST's recovery from the May 2021 de-pegging to the resiliency of algorithmic stablecoins – rather than an infusion of capital – are materially misleading, and feature prominently in the SEC's fraud allegations.  *See* SEC Compl. ¶¶152-68.

various aspects enveloping open-source software and applications, the LFG serves as a vital nexus of resources and guidance for an emerging DeFi technology stack.

**A decentralized economy needs a decentralized currency**

The LFG is primarily focused on Terra. Terra is a decentralized, open-source public blockchain built to support a suite of fiat-pegged, algorithmic stablecoins. Primarily, this includes **TerraUSD (UST)** – the flagship stablecoin of the Terra network and the leading decentralized stablecoin in DeFi by market cap.

Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. **This is primarily accomplished by the Terra protocol design**, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless arbitrage incentives and counter-cyclical monetary policy levers to maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins.

In connection with its stewardship and support of the Terra ecosystem in general, **LFG is establishing a decentralized UST Reserve protocol** – a non-profit initiative to provide a further layer of support to ensure that UST maintains its peg. In an event where the market price of UST materially deviates from the USD peg, holders of UST will be able to close the arbitrage and bring the market price of UST back to the peg by swapping UST for major, non-correlated assets like BTC that capitalize the reserve. The reserve functions as a release valve for swelling pressure to exit UST to LUNA on-chain, dampening the reflexivity of the system by reducing the dilution of the LUNA supply during severe contractions and restoring the peg in real-time and maintaining an alternative arbitrage opportunity outside of the Terra protocol itself.

The UST Reserve serves as **a perpetual decentralized asset reserve** for members of the community. Neither LFG nor any other entity that assisted with the UST Reserve protocol profit from it. [190]

195.    The Luna Foundation Guard's so-called "core mandate" was to "buttress the stability of the UST peg and foster the growth of the Terra ecosystem. Building reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins. . . ."

196.    In addition to deploying "capital backing" to prop up TFL's stablecoins and protocols, the Luna Foundation Guard also was tasked with providing funding and grants for builders, researchers, community members, and developers working "in the interest of the Terra

---

[190]    The Luna Foundation Guard, https://lfg.org/missionandvision/ (last visited Oct. 30, 2025).

1    economy categorized into 3 primary groups: Open-Source Technology Development, Research &

2    Education, and Community Growth."

3        197.    The Luna Foundation Guard is overseen and operated by a "Governing Council,

4    initially comprised of the following leaders and experts in the industry, which will expand to

5    include leading builders in the Terra ecosystem." The founding members of the Luna Foundation

6    Guard's Governing Council included: Kwon and Nicholas Platias from TFL; Defendant Kanav

7    Kariya, President of Jump Crypto; Remi Tetot, co-founder of RealVision TV; Jonathan Caras, the

8    Project Lead at Levana Protocol; and José Maria Macedo, co-founder of Delphi Digital. [191]

9        198.    The Luna Foundation Guard was initially funded with a 50 million LUNA gift on

10    January 22, 2022, from TFL to "help bootstrap its stabilizing reserves and grants framework."

11        199.    Also on January 19, 2022, Kariya retweeted the LFG announcement, commenting,

12    "LFG."[192]

13        200.    The foregoing were all false and misleading. Defendants knew that UST was the

14    foundation for the Terra ecosystem. Defendants knew too that UST had failed as an algorithmic

15    stablecoin. Specifically, they knew that but for Jump's intervention in purchasing large amounts

16    of UST, forcing UST to re-pegging the U.S. dollar, UST could not have re-pegged on its own.

17    Stated another way, Defendants promoted the Terra ecosystem even though they knew that its

18    foundation was an inadequate stablecoin.

19        201.    The representations concerning the LFG were false and misleading. While the Luna

20    Foundation Guard (LFG) was repeatedly described as an independent, community-governed

21    reserve protecting UST's peg. Defendants knew, and failed to disclose, that the LFG reserves were

22    wholly controlled by Do Kwon. Contrary to claims that the LFG was "overseen and operated" by

23    a governing council, the LFG's reserves were effectively controlled from a wallet solely accessible

24    to Kwon, who repeatedly transferred hundreds of millions in bitcoin without approval or oversight

25    from any council.

26

27    ────────────────────────

[191]    *Id.*

28    [192]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 19, 2022, 10:05 PM), https://twitter.com/KanavKariya/status/1483999171862573061.

202.    Internal records for the LFG show that, contrary to the representations about a "governing" counsel, LFG was established only as a "non-director subcommittee" whose powers were limited to "advis[ing] and giv[ing] recommendations" and performing acts "deemed necessary or advisable by the Directors…."  The LFG was legally governed by a two person board of directors consisting of Kwon and a Singaporean business consultant, not the six members of the governing council as publicly represented.[193]

203.    On January 28, 2022, Defendant Kariya posted a thread on Twitter discussing the "confusion and panic" that would result from a de-pegging event. "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."[194]  Kariya further stated, "A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple days and not impactful to prospects of the project.  Crazily enough, on this 'bearish' day, there has been a net burn of LUNA."[195]

204.    On January 29, 2022, Kariya made posts promoting the increased liquidity of the LUNA token, and the "Terra Agora" governance proposal. [196][197]

205.    On February 1, 2022, Jump received 1.2 million LUNA tokens[198] from Terra worth between $60.9 million and $64.7 million given the price range of $50.82 to $53.99.[199]

---

[193]    Superseding Indictment ¶43(a).

[194]    Zhu Su (@Zhusu), X (F/K/A TWITTER) (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/ status/1486930299711897605.

[195]    Zhu Su (@Zhusu), X (F/K/A TWITTER) (Jan. 27, 2022, 9:13 PM), https://twitter.com/KanavKariya/ status/1486930300773056516.

[196]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Jan. 29, 2022, 2:15 PM), https://twitter.com/KanavKariya/status/1487504699267944450.

[197]    @jump_, X (F/K/A TWITTER) (Jan. 29, 2022, 4:34 PM), https://twitter.com/jump_/status/1487539562066976780.

[198]    TERRA FINDER, *Transaction Details* (Feb. 2, 2022), https://finder.terra.money/classic/tx/A76C6B65EACA186A8F4E674525E39628C7714461D6F5 5674DDB598C919F3C1C0 [https://perma.cc/X43P-YUWH].

[199]    COINMARKETCAP, *supra* note 150.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-cv-03600-PCP

206.    On February 10, 2022, Kwon announced that the Luna Foundation Guard's Governing Council (which included Kariya) voted to capitalize the Anchor Yield Reserve with 450 million UST.

207.    Also on February 10, 2022, Kariya promoted LUNA trading pairs via Jump's Wormhole protocol.[200] Kariya also posted promotions regarding Anchor protocol and Wormhole.[201]

208.    On February 8, 2022, KWON stated in a public forum on the internet that "[t]he reason we've set up LPG is to decentralize decision making processes in the Terra ecosystem, and having multiple directors (all building on the Tena ecosystem) make the decision instead of one person is an important step in that direction."[202]

209.    On February 22, 2022, the Luna Foundation Guard issued a press release announcing the closing of a private sale of $1B in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem. . . .  The Reserve assets can be utilized in instances where protracted market selloffs deter buyers from restoring the UST peg's parity, and deteriorate the Terra protocol's open market arbitrage incentives."[203]

210.    On February 22, 2022, LFG announced $1 billion in private token sales led by Jump Crypto and Three Arrows Capital:

> 1/ One common criticism of algorithmic stablecoins is their reflexive nature and the hypothetical risk of a "bank run" scenario where demand to sell the stable outstrips supply in a way that causes compounding price decreases in both native tokens.

> 2/ Although the widespread adoption of $UST as a consistently stable asset through market volatility should already refute this, a decentralized Reserve can

---

[200]    @astroport_fi,    X    (F/K/A    TWITTER)    (Feb.    10,    2022,    3:56    PM), https://twitter.com/astroport_fi/status/1491878654359572488.
[201]    @wormholecrypto,    X    (F/K/A    TWITTER)    (Feb.    10,    2022,    11:19    AM), https://twitter.com/wormholecrypto/status/1491809045719785473.
[202]    Superseding Indictment at ¶41(c)
[203]    Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a_ Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022), https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm.

provide an additional avenue to maintain the peg in contractionary cycles that reduces the reflexivity of the system.[204]

211.    Defendant Kariya proclaimed in the press release that:

UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[205]

212.    That same day Jump endorsed Kariya's comments, stating: "As @KariyaKanav has mentioned, the UST Forex Reserve will strengthen confidence in the peg [g]iving users confidence by following central banks that hold a variety of foreign currencies to protect against severe market risks."[206]

213.    Jump also promoted its relationship with TFL and the future of UST on February 22nd: "We're excited to share our latest collaboration with @terra_money. . . .  Our goal is to make DeFi more accessible and meaningful for everyone. . . .  By making $UST more accessible we can create the decentralized finance world that keeps us moving forward."[207]

214.    Kariya tweeted in response that "$1B to absorb liquidity crunches [] All contractions in the economy have caused reflexive movement (by design). Allowing for a big chunk of withdrawals in short span through different means can be really impactful LFG has a broad mandate, and we're excited to support it."[208]

215.    Also on February 22, 2022, Kariya tweeted regarding the LFG's bitcoin buy.[209]

---

[204]    Terra Powered by LUNA (@terra_money), X (F/K/A TWITTER) (Feb. 22, 2022, 11:40 AM), https://twitter.com/terra_money/status/1496162890369404933?lang=en.

[205]    *Id.*

[206]    iump-crypto (@jump_), X (F/K/A TWITTER) (Feb 22, 2022, 10:05 AM), https://twitter.com/jump_/status/1496184268976013319.

[207]    jump-crypto (@jump_), X (F/K/A TWITTER) (Feb. 22, 2022, 9:02 AM), https://twitter.com/jump_/status/1496168648356028420.

[208]    Kanav Kariya (@KanavKariay), X (F/K/A TWITTER) (Feb. 22, 2022, 1:46 PM), https://twitter.com/KanavKariay/status/1496194701048877059.

[209]    Kanav Kariya (@KanavKariay), X (F/K/A TWITTER) (Feb. 22, 2022, 1:48 PM), https://twitter.com/KanavKariay/status/1496195289182519305.

216.    On February 25, 2022, Kariya reposted a promotion of a podcast that was to feature Do Kwon and Kariya.

217.    On March 1, 2022, Jump received 1.2 million LUNA tokens[210] from Terra worth between $103.5 million and $113.2 million given the price range of $86.28 to $94.41.[211]

218.    On March 1, 2022, Jump began a podcast series entitled the "Ship Show" to promote the Terra Tokens.  The podcast was hosted by Eden, a community manager at Jump Crypto.  The first two guests on Ship Show were Kwon and Kariya, who promoted the stability and security of the UST and LUNA peg as Terra's two most "attractive" features.  It was during this podcast published by Jump that Judge Rakoff found the "SEC's most direct evidence of a misstatement to investors."[212]

219.    Jump's host introduced Kariya and Kwon and referred to them as "two of the biggest minds in the space."  Kariya stated "Jump's doing a whole bunch of things in this space. One of the most exciting things we're involved in is the Terra ecosystem, so excited to be on this one with Do."[213]

220.    Evidencing their longstanding relationship, Kwon stated, "I've known Kanav [Kariya] for years now. We first connected in I think 2019. And then we, yeah, it's been a really long time, man."[214]

221.    Kariya stated, "So we put in the two of the early governance proposals that helped scale the UST floor back when UST was a 10 million supply last December, when the market module had limited liquidity relative to the liquidity that was reflected on the centralized venues, and in helping protocols that are working through complex trading problems, implement these

---

[210]    TERRA    FINDER,    *Transaction    Details*    (Mar.    1,    2022), https://finder.terra.money/classic/tx/2E83E667FE4738BADC603B7754FE01F829DBA0006100 7E8F286B56E29BB39214 [https://perma.cc/K8RV-PHWS].

[211]    COINMARKETCAP, *supra* note 151.

[212]    SMJ Order at 61.

[213]    *See* Transcript: The Ship Show (Podcast) March 1, 2022, attached as Ex. 61 to the Henkin Decl.

[214]    *Id.*

strategies to achieve kind of maximum success while being aligned with them in the best way possible, right."[215]

222.    Kariya continued, making misleading statements regarding the nature of the Terra Token trading and the strength of the UST/LUNA peg, stating:

> And as you said at the start of the show, I think we've come a giant, giant amount of ways in LUNA liquidity throughout the broader ecosystem, relative to even a year ago, when it was trading, I think, probably less than $100 million or so daily. And so that in itself adds a lot of margin in there being. . . . Taken deep enough book that can absorb these moves. But on extraneous circumstances entail situations, which of course do happen, sometimes there are contracted short periods where the outflows, for example, can be of a larger quantity than the liquidity in the book at that point in time can facilitate. And so this is kind of like a classic liquidity crisis. And for periods of those natures, it's extremely useful to have a reserve that can step in until the market is able to kind of reconsolidate liquidity around those positions. And so the LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime.[216]

223.    Kwon, thereafter, compared LFG to Microstrategy and its CEO Michael Saylor, one of the world's largest holders of bitcoin, stating, "And I think the expectation is that LFG and Michael Saylor are going to compete on whatever it is that Saylor does." Kariya responded in agreement, "I'm betting on the LFG horse here." Kariya, in an effort to promote investment into the Terra ecosystem, promoted that "we're super, super early."[217]

224.    Kariya continued, misleadingly promoting the Terra ecosystem and the stability of the peg, stating, "Yeah, I think scaling with the float as it comes out will be quite important. So that the liquidity reserve is commensurate with the adoption of UST and the liquidity that's needed to absorb some of those 10 percentage moves in the expansion or contraction of the economy. And so, working through with Do [Kwon] and the rest of the LFG team on potential ways to execute that most effectively, and then potentially diversify. So I think there'll be some cool stuff coming out pretty soon."[218]

---

215    *Id.*
216    *Id.*
217    *Id.*
218    *Id.*

225.    Additionally, on Jump's March 1, 2022, then-Twitter talk show, Kwon discussed UST's de-peg in May 2021, falsely stating:

> . . . [I]t took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.[219]

226.    Jump produced this podcast, hosted it, and published it. Defendant Kariya retweeted the link to it.[220] At no point did Jump mention the May 2021 bailout or correct Kwon's misstatements.

227.    Jump's statements were materially false and misleading. Despite the statements to the contrary, UST did not "automatically self-heal[]" and UST's "[a]lgorithmic, calibrated adjustments of economic parameters" failed. In fact, UST's peg to the dollar was not restored until Jump intervened, purchasing UST in large amounts to restore UST's price to one dollar. While the statements above led investors to believe UST's peg was restored by the algorithm, in fact, it was only the deliberate actions of "human agents," in particular TFL, Kwon, and the Defendants, that ultimately led to the restoration of the peg.[221]

228.    Defendants knew, or were reckless in not knowing, that these statements were materially false and misleading. They knew that Jump had intervened to buy up UST – Defendant Kariya discussed it multiple times that day and Jump's founder, Defendant DiSomma, personally directed Jump's trading. Jump was rewarded for its role in restoring the peg by having the terms of its loan agreements modified to Jump's benefit.[222]

229.    Defendants never disclosed that it was Jump's bailout of the peg, and not the algorithm, that restored UST's peg. Instead, it misled investors who were actively buying and trading UST to believe that the algorithm had "self-heal[ed]" to restore the peg without any human involvement.[223]

---

[219]    SEC Compl. ¶164; *see also id.* ¶¶162-63.
[220]    The Ship Show (@shipshow_), X (F/K/A TWITTER) (Mar. 1, 2022. 7:54 PM), https://twitter.com/shipshow_/status/1498823962297466880.
[221]    SEC Compl. ¶165.
[222]    *Id.* ¶166.
[223]    *Id.* ¶167.

230.     Jump's misrepresentations and omissions about the May 2021 de-peg were material because an objective investor would find that the necessity of human intervention to re-peg UST – rather than simply the normal working of the algorithm – altered the total mix of information about the securities in the Terra ecosystem. Investors, however, were unaware that, while promoting the Terra ecosystem and its foundational stable coin UST, Jump had secretly intervened to restore the peg.

231.     On March 5, 2022, Kariya retweeted LFG's misleading posts regarding the demand for UST.[224]

232.     On March 6, 2022, Kariya retweeted promotions regarding UST and its purported trading volume.[225]

233.     On March 7, 2022, Kariya retweeted LFG statements regarding the "curve pool," a stablecoin-to-stablecoin trading venue, being unbalanced.

234.     On March 8, 2022, Kariya announced that "UST is in high demand atm and is generally trading at a premium."[226]

235.     On March 9, 2022, Jump announced "hackerhouse" with Jump promoting development in the Terra ecosystem and promoting Terra adoption.[227] Kariya likewise reposted the announcement.[228]

236.     On March 10, 2022, Jump promoted an article on the Jump Crypto website, titled "Yield Farming for Serious People," which purports to "illuminate" the concept of "yield farming" (*i.e.*, earning compounding returns on crypto assets) for investors.[229] Jump instructed investors on

---

[224]     Luna Foundation Guard (@LFG_org), X (F/K/A TWITTER) (Mar. 5, 2022, 1:59 AM), https://twitter.com/LFG_org/status/1500002957529690114.
[225]     @lunadealer, X (F/K/A TWITTER) (Mar. 6, 2022, 6:42 AM), https://twitter.com/lunadealer/status/1500436715978334211.
[226]     Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Mar. 8, 2022, 5:33 AM), https://twitter.com/ KanavKariya/status/1501189252075429891.
[227]     Jump Crypto (@jump_), X (F/K/A TWITTER) (Mar. 9, 2022, 8:02 AM), https://twitter.com/jump_/status/1501543826929815555.
[228]     José Maria Macedo (@ZeMariaMacedo), X (F/K/A TWITTER) (Mar. 9, 2022, 6:16 PM), https://twitter.com/ZeMariaMacedo/status/1501698582755348480.
[229]     Jump Crypto (@jump_), X (F/K/A TWITTER) (Mar. 10, 2022, 2:49 PM), https://twitter.com/jump_/status/1502008785166290944?s=20.

56

the "first major form of yield farming" – delegating tokens to transaction validators in exchange for a share of the proceeds. Importantly, Jump provides the following solicitation for Terra securities: "There are many examples, but consider two prominent ones that are more retail-facing. First, traders on Coinbase have the option to stake their Ether on the platform, i.e., delegate their Ether to Coinbase as it participates in upgrading the Ethereum network to Ethereum 2.0, in exchange for interest of around 5% (at the time of writing). Second, Terra traders can use the Terra Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards."[230] This promotion provided a link to an article titled "Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem,"[231] which encouraged investors to stake LUNA directly through the Terra Station wallet.

237.    On March 15, 2022, Kariya made a promotion regarding Wormhole and Terra swapping.[232]

238.    On March 23, 2022, Kariya reposted a tweet from Do Kwon regarding UST and Wormhole.[233]

239.    On March 25, 2022, Kariya promoted that UST trading was not available through Wormhole on the Axelar exchange.[234]

240.    On March 26, 2022, Kariya reposted a promotion of TraderJoe crypto exchange regarding Terra and UST.[235]

241.    On March 28, 2022, Kariya reposted a video promoting LFG's bitcoin purchase.[236]

---

[230]    Nihar Shah and Lucas Baker, *Yield Farming for Serious People*, JUMP_ (Mar. 10, 2022), https://jumpcrypto.com/yield-farming-for-serious-people/.

[231]    Daryl Loh, *Here's How To Stake $LUNA And Earn Rewards In The Terra Ecosystem*, CHAINDEBRIEF (Dec. 23, 2021), https://chaindebrief.com/how-to-stake-luna-earn-rewards-terra/.

[232]    @wormholecrypto, X (F/K/A TWITTER) (Mar. 15, 2022, 12:55 PM), https://twitter.com/wormholecrypto/status/1503777027144531970.

[233]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Mar. 23, 2022, 4:20 AM), https://twitter.com/KanavKariya/status/1506546520295972867.

[234]    Trader Joe (@TraderJoe_xyz), X (F/K/A TWITTER) (Mar. 25, 2022, 4:05 AM), https://twitter.com/TraderJoe_xyz/status/1507267518360129537.

[235]    Anthony Ramirez (@apram89), X (F/K/A TWITTER) (Mar. 26, 2022, 7:31 AM), https://twitter.com/apram89/status/1507681685017665542.

[236]    @danku_r, X (F/K/A TWITTER) (Mar. 28, 2022, 6:00 PM), https://twitter.com/danku_r/status/1508564753509236742.

242.    On or about March 29, 2022, Kwon stated in a podcast that the approximately $3 billion worth of bitcoin held in the LFG Reserve at the time was held by the LPG Governing Council in secure "multisig" (short or "multi-signature") wallets, i.e., cryptocurrency wallets that require multiple private keys to approve a transaction. Specifically, Kwon stated about the LFG Reserve, "so the Luna Foundation Guard has a, you know, has a council of about seven people, so its secured in a multisig held by the council members."

243.    On March 30, 2022, Kariya reposted a promotion about Terra cross chain liquidity through Jump's wormhole protocol on the Acala and Karura crypto exchanges.[237]

244.    On March 31, 2022, Kariya reposted a promotion about UST sales and rewards on the Pangolin crypto exchange.[238]

245.    Also on March 31, 2022, Jump received 1.2 million LUNA tokens[239] from Terra worth between $122.4 million and $130.4 million given the price range of $102.02 to 108.68.[240]

246.    On April 5, 2022, Kariya reposted a promotion about the trading volume on the Solana-Terra bridge.[241]

247.    On April 6, 2022, Kariya made a twitter post promoting the Terra ecosystem project, the Nebula protocol.[242]

248.    On April 7, 2022, the Luna Foundation Guard announced that it acquired $100 million in AVAX (Avalanche) tokens to "help bolster its UST Decentralized Forex Reserve."[243]

---

[237]    Acala (@AcalaNetwork), X (F/K/A TWITTER) (Mar. 30, 2022, 11:56 AM), https://twitter.com/AcalaNetwork/status/1509197955626115079.

[238]    Pangolin (@pangolindex), X (F/K/A TWITTER) (Mar. 31, 2022, 6:30 AM), https://twitter.com/pangolindex/status/1509478108709089284.

[239]    TERRA FINDER, *Transaction Details* (Apr. 1, 2022), https://finder.terra.money/classic/tx/DC2D884D38E122E6634962AD4C752B21B4668F08653B 6EE76597C30E1C4DEA44 [https://perma.cc/9JM6-3XT4].

[240]    COINMARKETCAP, *supra* note 151.

[241]    UniWhales DAO (@uniwhalesio), X (F/K/A TWITTER) (Apr. 5, 2022, 12:22 PM), https://twitter.com/uniwhalesio/status/1511378639669059585.

[242]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 6, 2022, 2:46 PM), https://twitter.com/KanavKariya/status/1511777464799961093.

[243]    Sarah Cohen, *LFG to Acquire $100M in Avax to Strategically Align Terra and Avalanche Ecosystems*, PRWEB (Apr. 7, 2022), https://www.prweb.com/releases/lfg_to_acquire_ 100m_in_avax_to_strategically_align_ terra_and_avalanche_ecosystems/prweb18577009.htm.

Jump brokered this deal because it was closely connected to Avalanche. Kariya even spoke at the March 25, 2022, Avalanche Summit in Barcelona, Spain. Jump also has significant investment in the Avalanche ecosystem.

249.    Also on April 7, 2022, Kariya issued a promotion highlighting LFG's use of AVAX as a reserve asset.[244]

250.    On April 12, 2022, Kariya reposted a Do Kwon tweet, promoting the use of Terra Tokens on Jump's wormhole ecosystem.[245]

251.    Around the same time, Kwon himself continued to taunt "poor" crypto investors, making jokes during a May 3rd interview about how he reveled in the idea of watching the cryptocurrency project fail: "95% [of coins] are going to die, but there's also entertainment in watching [them] die too."

252.    Also on May 3, 2022, Kariya appeared on a podcast entitled "Validated" where he promoted the Terra ecosystem and its cross-chain capabilities.[246] In discussing the potential for bad actors to harm investors, Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that." This statement was false and misleading because Jump had colluded with TFL and Kwon to bail out the peg in May 2021.

253.    Kariya also falsely described Jump's compliance, stating that "all these phones are heavily, heavily regulated, you know, don't support about 20 years of its reputation and the giant business behind making a lot of this happen and we're definitely incentive aligned." This statement was false, misleading, and/or incomplete because Jump used the auto-deleting communications application Signal for its communications with TFL and Kwon, and did not otherwise have its incentives aligned with investors.

---

[244]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 7, 2022, 1:24 PM), https://twitter.com/KanavKariya/status/1512119136649941002.
[245]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (Apr. 12, 2022, 11:42 AM), https://twitter.com/KanavKariya/status/1513905395298885639.
[246]    Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (May 3, 2022, 11:09 AM), https://twitter.com/KanavKariya/status/1521507207694585856.

254. On May 4, 2022, Jump received 1.2 million LUNA tokens[247] from Terra worth between $98.7 million and $105.5 million given the price range of $82.27 to $87.96.[248]

255. On May 5, 2022, Kariya reposted a Wormhole promotion about UST.[249]

256. A few days later, the UST/LUNA death spiral began.

257. Until the death spiral of early May 2022, all purchasers of Terra Tokens relied on the algorithm that was purportedly maintaining UST's peg to the dollar and underlying the Terra ecosystem. As UST was an algorithmic stablecoin purportedly maintained by algorithm and not by cash reserves or other means of stabilization, investors were told to rely on the algorithm, and they did. Investors continued to buy and hold UST on the belief that the algorithm, not a manipulative scheme, had worked to restore the peg to the dollar.[250] In May 2022, many of these investors were holding Terra Tokens when UST de-pegged from the U.S. dollar again, did not recover, and led to the collapse of the entire Terraform ecosystem.

## F.    The Truth Emerges

258. In early May 2022, structural vulnerabilities within the Terra ecosystem, that were known to Defendants but hidden from investors, precipitated a massive selloff of both UST and LUNA.

259. The price of UST and LUNA Tokens dropped by 91% and 99.7% between May 7, 2022, and May 12, 2022, after it was revealed that TFL's largest digital assets were unstable and unsustainable.

260. On May 8, 2022 Jump personnel asked Kwon "will we need lfg multisig for settlement?" to which Kwon responded, "no we will not, we haven't moved funds there yet."[251]

---

[247]    TERRA FINDER, *Transaction Details* (May 4, 2022), https://finder.terra.money/classic/tx/1ED9F7C4FD8D3C80E395258745C3747E7B1003373478F 67DA57B0291D5CED948 [https://perma.cc/29NW-DRMG].
[248]    COINMARKETCAP, *supra* note 150.
[249]    @wormholecrypto, X (F/K/A TWITTER) (May 5, 2022, 12:13 PM), https://twitter.com/wormholecrypto/status/1522248137695498240.
[250]    *Id.* ¶168.
[251]    Superseding Indictment ¶42(b).

261.    On May 9, 2022, as the prices for Terra Tokens plummeted, Do Kwon attempted to calm the market by tweeting: "Deploying more capital – steady lads."[252]

262.    But it was too late. LUNA's price crashed over 99.7% in less than a week, with the most precipitous drops occurring between May 9 and May 12, 2022, as the following chart[253] demonstrates:



263.    UST faced similarly steep drops in price. Starting with the de-pegging between May 7, 2022, and May 9, 2022, UST fell from $1 to just $0.07 by May 25, 2022.

264.    The Superseding Indictment states that, even as Defendants and Kwon had re-pegged UST in 2021, they were "[un] able to do so in May 2022 when the market had expanded substantially. In the midst of the May 2022 crash, one Trading Firm trader remarked to his colleagues that the Trading Firm's defense of UST's peg in May 2021 took place in 'simpler times,' and noted that '[u]nfortunately it wasn't so simple this time' compared to when 'about $100 M[illion] committed was enough to re-peg.' The May 2022 crash of UST and LUNA resulted in over $40 billion in investor losses."[254]

---

[252]    SEC Ex. 353.
[253]    Shaurya Malwa, *Terra's LUNA Has Dropped 99.7% in Under a Week. That's Good for UST*, COINDESK (May 12, 2022), https://www.coindesk.com/markets/2022/05/12/terras-luna-has-dropped-997-in-under-a-week-thats-good-for-ust/.
[254]    Superseding Indictment ¶40.

### G.    Jump Profits from the Fraud

265.    The loan modifications between Jump and TFL/Kwon, agreed to in May of 2021 in exchange for Jump's restoration of the peg, were subsequently reduced to writing in a July 21, 2021 agreement signed by Kwon. Under the terms of the modified agreement, Jump received LUNA tokens at $0.40 per token, even during periods when LUNA was trading at more than $90 in the secondary market.[255]

266.    That modified agreement was admitted into evidence at the SEC's trial.[256] It is signed by Do Kwon on behalf of Terraform Labs as lender, and signed by a director of Jump subsidiary, Tai Mo Shan Limited, as borrower. An earlier modification of the same loan agreement was entered into evidence as well.[257]

267.    Jump profited significantly from the fraud, earning approximately $1.28 billion by selling the LUNA acquired from TFL under the terms of the 2019 and 2020 loan agreements, as modified in exchange for its surreptitious intervention to re-peg UST to the U.S. dollar manually when the algorithm it touted had failed.[258]

268.    On September 14, 2021, with the price of LUNA tokens soaring, Kariya tweeted: "We've tripled over the last year, have billions of dollars committed across space and we're aggressively growing."

269.    On January 10, 2022, Kariya admitted to Jump having profited from the scheme, stating that "We're up 100% over the last year."

270.    Given Jump's significant profits from its actions, it is not surprising that Kariya was reportedly "upbeat despite [the] Terra fiasco."[259]

271.    As the DOJ summarized in the Superseding Indictment: "The Trading Firm earned substantial profits as a result of the restoration of UST's $1 market price in May 2021. In total, the

---

[255]    SEC Compl. ¶159.
[256]    SEC Ex. 69b.
[257]    SEC Ex. 65b.
[258]    SEC Compl. ¶160.
[259]    Katherine Doherty and Yueqi Yang, *Why Jump Crypto's Kanav Kariya Is Upbeat Despite Terra Fiasco*, NDTV PROFIT (June 20, 2022, 9:44 AM IST), https://www.ndtv.com/business/why-jump-cryptos-kanav-kariya-is-upbeat-despite-terra-fiasco-3082509.

1  Trading Firm made over $1 billion in profits from its investment in Terraform's cryptocurrencies,

2  principally by exercising options to purchase LUNA at around 40 cents per token under its

3  agreements with Terraform. Then selling significant quantities of that LUNA prior to the May

4  2022 crash, when LUNA's market price peaked at over $115 per token. Over 90% of the Trading

5  Firm's profits on LUNA were made between May 2021 and May 2022. Thus, said profits would

6  not have been obtained had LUNA and UST crashed in May 2021 rather than May 2022."[260]

7       **H.    Jump Subsidiary Tai Mo Shan Settles with the SEC**

8       272.    On December 10, 2024, the SEC announced a cease-and-desist order and settlement

9  with Tai Mo Shan, the wholly owned subsidiary of Jump Crypto.

10      273.    The SEC found that, beginning in May 2019, Tai Mo Shan entered into agreements

11  with TFL pursuant to which Tai Mo Shan would receive LUNA tokens – unregistered securities –

12  in exchange for performing services typical of a statutory underwriter; that is, acting as a conduit

13  for the transfer of the securities to the public market.[261]

14      274.    The SEC found: "Tai Mo Shan entered into its first agreement to acquire LUNA on

15  November 19, 2019, approximately seven months after LUNA's April 24, 2019, launch on the

16  Terra blockchain, but prior to its wider public availability on crypto asset trading platforms."[262]

17      275.    The SEC found: "Tai Mo Shan acquired certain LUNA crypto assets offered and

18  sold as securities with a view toward distribution, as evidenced by the fact that Tai Mo Shan offered

19  and resold LUNA as securities into the market on U.S.-based crypto asset trading platforms,

20  shortly after acquiring the crypto assets from Terraform."[263]

21      276.    The SEC found: "From January 2021 to May 2022, Tai Mo Shan facilitated the

22  distribution of LUNA offered and sold as securities by engaging in one-sided trading strategies on

23  U.S.-based crypto asset trading platforms designed to liquidate its LUNA holdings acquired from

24

25

26

27  [260]   Superseding Indictment ¶33.
    [261]   C&D Order, 3.

28  [262]   *Id*.
    [263]   *Id*.

Terraform by transferring those securities to the public and adding to LUNA's circulating supply. Tai Mo Shan profited from these transactions."[264]

277.    The SEC concluded: "As a result of the conduct described above, Tai Mo Shan violated Sections 5(a) and 5(c) of the Securities Act because Tai Mo Shan directly or indirectly offered and sold crypto assets being offered and sold as securities on U.S.-based crypto asset trading platforms through the use of interstate commerce when no registration statement was in effect and no exemption from such registration applied."[265]

278.    The SEC also found that Tai Mo Shan acted negligently during the 2021 de-peg and re-peg of UST.

279.    In particular, the SEC found that Tai Mo Shan engaged "in a course of conduct that caused investors to be deceived about the efficacy of Terraform's arbitrage mechanism, which the public believed—based on Terraform's prior statements—solely maintained UST's peg to the U.S. dollar."[266]

280.    The SEC found: "On May 23, 2021, the price of UST began to sharply fall below its $1 peg. At that time, Tai Mo Shan and Terraform entered into a verbal agreement whereby Terraform agreed to fully vest the remaining portion of LUNA that was owed to Tai Mo Shan pursuant to its loan agreements with Terraform. Tai Mo Shan made purchases of UST on May 23, 2021 and subsequent days, in a manner that diverged from its historic trading pattern for UST by building a large long position in UST, accumulating more than $20 million worth of UST."[267]

281.    The SEC found: "On May 23, 2021, the price of UST began to sharply fall below its $1 peg. At that time, Tai Mo Shan and Terraform entered into a verbal agreement whereby Terraform agreed to fully vest the remaining portion of LUNA that was owed to Tai Mo Shan pursuant to its loan agreements with Terraform. Tai Mo Shan made purchases of UST on May 23,

---

[264] *Id.*
[265] *Id.*
[266] *Id.*
[267] *Id.* at 4.

2021 and subsequent days, in a manner that diverged from its historic trading pattern for UST by building a large long position in UST, accumulating more than $20 million worth of UST."[268]

282.    The SEC found: "The investing public, which looks to centralized trading platforms for up-to-the-moment market data, would have seen additional demand for, and upward price movement in, UST, but would not have been aware of the extent of UST demand that was coming from Tai Mo Shan's purchases. In light of Terraform's public statements regarding how the arbitrage mechanism operated, Tai Mo Shan should have known that its trading would mislead the investing public to believe that Terraform's arbitrage mechanism, which was coded into Terraform's blockchain, alone raised the price of UST back up to $1. Tai Mo Shan should have known that purchasing UST and supporting its price in this manner misled the market about the stability of UST's peg and the effectiveness of Terraform's algorithm meant to maintain that stability."[269]

283.    The SEC also found: "Tai Mo Shan and Terraform's agreement was memorialized on July 21, 2021. Pursuant to this amended agreement, Tai Mo Shan began receiving monthly installments of unlocked LUNA in September 2021. Tai Mo Shan earned a profit of approximately $73,452,756 million from the sale of the additional LUNA that Tai Mo Shan received from the amended agreement."[270]

284.    The SEC concluded that, "[a]s a result of the negligent conduct described above, Tai Mo Shan violated Section 17(a)(3) of the Securities Act, which makes it unlawful for any person in the offer or sale of a security to engage 'in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.'"[271]

285.    Tai Mo Shan admitted the SEC's jurisdiction in the case and agreed to pay a total of $123 million to settle the charges.[272]

---

[268]    *Id.*
[269]    *Id.*
[270]    *Id.*
[271]    *Id.*
[272]    *Id.* at 1, 5.

I.    **The Terra Tokens Are Unregistered Securities**

1.    **Terra Tokens Are Securities**

286.    Judge Rakoff granted the SEC's motion for summary judgment, finding that the Terra Tokens are securities and ruling that TFL's sale of Terra Tokens without registering them violated Sections 5 and 12 of the Securities Act of 1933.[273]

287.    The SEC, citing Judge Rakoff's order, also found the LUNA tokens that Tai Mo Shan distributed to the public to be unregistered securities.[274]

288.    Under §2(a)(1) of the Securities Act, a "security" is defined to include an "investment contract." 15 U.S.C. §77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *W.J. Howey*, 328 U.S. at 299 (citation omitted). Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

289.    As a threshold matter, TFL has not registered any offering of securities pursuant to the Securities Act, nor has it registered the Terra Tokens as a class of securities under the Exchange Act. TFL has also not registered with the SEC as a broker or dealer under §15(a) of the Exchange Act, or as an investment company under §7(a) of the Investment Company Act.

---

[273]    SMJ Order at 2-3, 36-47.
[274]    C&D Order, 3.

290.    In the SEC Complaint, the SEC, the regulatory agency with jurisdiction over the registration of securities, alleged (similarly to the initial complaint in this case, (Dkt. No. 1)) that Terra Tokens were offered, promoted, and sold as unregistered securities under the *Howey* test, and detailed the reasons why.[275] Now, as Judge Rakoff has entered judgment that the Terra Tokens are securities, the SEC's allegations are no longer mere allegations.[276]

291.    TFL and Kwon repeatedly stated that the crypto assets would increase in value based on Terraform's development, maintenance, and promotion of its blockchain, protocols, and the entire Terraform ecosystem. They also promoted the ability to trade Terraform's crypto assets on the secondary market, with the success of the investment again depending on their efforts.[277]

292.    TFL and Kwon further touted the expertise and success of the Terraform team, including Kwon, claiming that Terraform was "led by serial entrepreneurs" and was a team with "deep relevant expertise," and provided biographies or links to LinkedIn profiles that highlighted TFL employees' and Kwon's expertise in crypto assets, finance, and technical experience with software coding, engineering, and development.[278]

293.    Jump also advertised its considerable efforts to ensure that UST – the "lynchpin of the [Terraform] ecosystem" – maintained its $1.00 peg. These efforts included when, in January 2022, it announced the creation of the Luna Foundation Guard, with the purpose of serving as an "asset reserve [] to back the UST." The Luna Foundation Guard was funded with a "gift" of 50 million LUNA (at the time, worth billions of dollars) directly from TFL.[279]

294.    TFL and Kwon also aggressively marketed TFL's crypto asset securities to U.S. investors, by posting information and promotional materials to accounts on several publicly accessible online social media platforms, such as Twitter accounts, blog posts, YouTube, and

---

[275]    SEC Compl. ¶¶39-103. It is well-established that "if an agency's interpretation of a statute or regulation is not clearly outside its authority, then the courts should defer to the agency's expertise." *See, e.g.*, *Good Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 954 (9th Cir. 1979) (citations omitted).

[276]    *See* SMJ Order at 2-3; 35-47.

[277]    SEC Compl. ¶39.

[278]    *Id.* ¶40.

[279]    *Id.* ¶41.

messaging applications like Telegram. Kwon and other TFL employees also gave interviews to the media promoting TFL's crypto assets, including U.S.-based media outlets.[280]

295.    In addition, Kwon and other TFL employees traveled to the United States to meet with existing and potential investors in order to solicit investment in Terraform's crypto asset securities, including holding meetings in San Francisco and New York, and to attend and speak at an industry conference and events in New York. These U.S.-based promotional efforts also included a partnership with the Washington Nationals, which resulted in the word "Terra" being placed on every seat behind home plate and elsewhere around the stadium in Washington, D.C. TFL and Do Kwon also arranged to have several of their crypto assets listed for trading on several major crypto asset trading platforms, including a prominent U.S.-based trading platform.[281]

296.    Investors who purchased Terra Tokens invested money or other valuable consideration in a common enterprise: namely, the Terra ecosystem. Investors had a reasonable expectation of profit based upon the efforts of the TFL and Do Kwon, including, among other things, these Defendants obtaining favorable listings of their Terra Tokens on U.S.-based cryptocurrency exchanges, and maintaining the stability of the Terra ecosystem.

297.    In addition to the reasons provided in the SEC's analysis and Judge Rakoff's Order, the Terra Tokens qualify as a security under the *Howey* test for the reasons below.

### a.    Terra Token Investors Invested Money

298.    Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase the Terra Tokens.

299.    The Terra Tokens were listed on U.S.-based cryptocurrency exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other digital currencies.

300.    TFL and Kwon, supported and underwritten by Jump, sold Terra Tokens to the general public through global, online cryptocurrency exchanges during its so-called "launch."

---

[280]    *Id.* ¶42.
[281]    *Id.* ¶43.

301.    Defendants, along with Kwon and TFL, promoted Terra Tokens to Plaintiffs and putative class members as investments with the prospect of financial gain.

302.    Every purchase of Terra Tokens by a member of the public was an investment contract.

### b.    Terra Token Investors Were Intertwined in a Common Enterprise

303.    Additionally, investors were passive participants in the Terra Tokens' launch and the potential profits of Plaintiffs and the Class were intertwined with those of TFL and of other investors.

304.    TFL and Kwon also were responsible for supporting the Terra Tokens, pooled investors' assets, and controlled those assets.

305.    TFL and Kwon pooled the funds received from investors to develop the Terraform ecosystem and increase the value of LUNA. LUNA investors shared equally in LUNA price increases, or suffered LUNA price decreases equally, so that if one investor profited, all investors did as well. Because LUNA is fungible, the fortunes of LUNA purchasers were tied to one another, and each depended on the success of TFL and Kwon's efforts and strategy and the Terraform ecosystem as a whole.[282]

306.    Specifically, TFL sent proceeds of its LUNA sales to crypto asset wallet addresses that it controlled, in order to fund TFL's continuing efforts to develop its operations. In fundraising presentations, TFL and Kwon explained how TFL would use the proceeds from LUNA sales to help grow and expand the Terraform ecosystem. For example, in August 2018, when TFL announced its first raise of capital of $32 million, it noted that "Terra will invest the initial seed capital in building the modern financial system on the blockchain." In fact, TFL's presentations to investors stated that at least 20% of the initial billion LUNA tokens would be used for development and operations.[283]

---

[282]     *Id*. ¶46.
[283]     *Id*. ¶47.

307.     In addition, throughout the Class Period, Defendants, TFL, and Do Kwon held a significant amount of LUNA, tying their fortunes with LUNA investors' fortunes. As the blockchain transactions confirmed, Defendants owned hundreds of millions of LUNA tokens throughout the Class Period.

                **c.**     **Investors Purchased the Terra Tokens with a Reasonable Expectation of Profit from Owning Them**

308.     Investors in the Terra Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits and financial gain. The Terra Tokens were sold to investors prior to the Terra ecosystem being fully developed and able to handle the scale and scope of TFL's operations. For pre-functional tokens, the primary purpose for purchasing Terra Tokens was to make a profit or accumulate additional Terra Tokens from various rewards programs, rather than to utilize the Terra Tokens themselves for a task.

                **d.**     **Investors Expected Profits from the Terra Tokens to Be Derived from the Managerial Efforts of Others**

309.     Investors' profits in the Terra Tokens were to be derived from the managerial efforts of others—specifically, TFL, Kwon, and the Luna Foundation Guard. Terra Token investors relied on the managerial and entrepreneurial efforts of these entities to manage, oversee, and/or develop the projects funded by the sale of the Terra Tokens.

310.     Purchasers of pre-functional tokens necessarily relied on the managerial efforts of others to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens will operate was the primary factor in their price, that is, until such tokens transitioned into functional utility tokens.

311.     Each of the Terra Tokens was a security at issuance because profit from the Terra Tokens would be derived primarily from the managerial efforts of the teams developing the associated networks on which the Terra Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold or Bitcoin.

312.    Investors in Terra Tokens relied on the managerial and entrepreneurial efforts of TFL, Kwon, and the Luna Foundation Guard to manage, market, promote and develop the Terra ecosystem.

313.    TFL and Kwon promoted LUNA as an investment that would increase in value with the increased usage of the Terraform blockchain that could result from their continued development and maintenance. They stated publicly that as the Terraform ecosystem grew, based on their efforts, the value of LUNA would grow as well. As Kwon explained in an April 7, 2021 thread on Twitter (referring to LUNA as "moon"): "A bet on the moon is very simple: . . . The moon's fate in the long run is tied to how widely the money gets used and transacted."[284]

314.    In that same April 7, 2021 thread, Kwon touted that the value of LUNA could grow as the Terraform "ecosystem" grows, specifically tying the potential growth to his own efforts (which he promised would be successful by touting that he would "kick ass") while investors remained passive (or "s[a]t back") in the enterprise.[285]

315.    As one Terraform employee stated in Terraform's publicly available Telegram messaging application, the "[v]alue of Luna grows as Terra [ecosystem] gets adopted and used." Another Terraform employee noted in an online Ask-Me-Anything interview on Reddit: "[i]n the long-run . . . Terra's transaction volume will be the main determinant of Luna's value."[286]

316.    According to an action by the New York State Attorney General, filed on February 22, 2023 (*New York v. Vino Glob. Ltd. d/b/a Coinex*), concerning the sale of unregistered securities (including LUNA) by a cryptocurrency exchange:[287]

> LUNA is a cryptocurrency created by Terraform Labs ("Terraform"). Metz Aff. ¶28. The Website provides investors with information about the LUNA token, including Luna's distribution scheme, an introduction to the Terraform network, and links to the Terraform network's official website and whitepaper. *See* Ex. 17 to Metz Aff. From its inception, the LUNA token was promoted as an investment that would increase in value as a result of the development of other Terraform

---

[284]    SEC Compl. ¶50.
[285]    *Id.* ¶51.
[286]    *Id.* ¶52 (ellipsis in original).
[287]    Plaintiffs incorporate by reference herein the allegations in paragraphs 45-48 of the Verified Petition and Order to Show Cause, *New York v. Vino Glob. Ltd. d/b/a Coinex*, Index No. 450503/2023 (N.Y. Sup. Ct. Feb. 22, 2023) as well as the Metz Affidavit in Support of the Verified Complaint ("Metz Aff.") and related exhibits.

applications.  Metz Aff. ¶29.  The Terraform whitepaper issued in April 2019 explains that LUNA was "growth-driven" and further discussed the creation of applications to create demand and encourage its use.  *See* Ex. 19 to Metz Aff.

Terraform founder Do Kwon frequently spoke about LUNA's growth potential and value as an investment. For instance, on March 22, 2021, using his publicly known Twitter handle, Do Kwon described LUNA as being "designed to defend Terra stability at a diverse array of market conditions and accrue value to the moon at all of those market conditions." Metz Aff. ¶30.  Do Kwon further used Twitter to promote the ability of LUNA token holders to earn double-digit returns by staking their assets, as he did on November 20, 2021. *Id.*  Additionally, on March 9, 2022, in a Tweet exchange with a critic, Do Kwon argued that people who purchased LUNA were not poor precisely because they had purchased LUNA, propagating the notion that buying LUNA would generate profit for purchasers. *Id.*

The price of LUNA increased substantially once Terraform projects launched. *See* Exs. 21.1 – 21.2 to Metz Aff.  The creation of demand for LUNA was largely dependent upon Terraform, which drove the growth of LUNA by creating other applications and platforms such as its Mirror Protocol, which allowed users to invest in "synthetic stocks," using tokens that tracked the prices of stocks and allowed users to purchase and sell tokens and its Anchor Protocol, which also allowed users to make a token deposit and receive 20% annual yields (which were heavily subsidized by Terraform). *Id.*  The growth and adoption of the LUNA token remained largely dependent upon Terraform projects.  Terraform told investors that, if they used LUNA on these platforms, they would earn returns upwards of 20% interest. *Id.*  As expected, the price of LUNA saw a substantial increase with the launch of these other Terraform applications and platforms. *Id.*

Terraform used sales of LUNA to raise funds for its operations, including its other projects. Metz Aff. ¶32.  In a blog post titled Introducing Project Dawn, Do Kwon publicly announced that Terraform committed to "unlock at most 3 million LUNA per month for all operating costs . . . " and that those LUNA would cover expenditures "for critical infrastructure improvements and core technologies to supplement the accelerating growth of the Terra ecosystem" and would also finance "all other [Terraform] operating costs such as employee token distribution." Metz Aff. ¶32.  The blog post, and other communications by Terraform, were available to CoinEx users because CoinEx provided a link to the Terraform website.  *See* Ex. 17 to Metz Aff.

317.    Additionally, in marketing materials distributed to potential investors in January 2019, TFL described purchases of LUNA as "investments" and LUNA buyers as "investors." The same materials noted that "top global exchanges and funds" had already "invested in" TFL

(referring to their purchase of LUNA), and that TFL had raised $32 million in July 2018 from an "elite group of VCs" referring to venture capital firms.[288]

318.    TFL and the Luna Foundation Guard held themselves out to investors as experts in the blockchain and crypto field. Investors in the Terra Tokens reasonably expected TFL and the Luna Foundation Guard to provide significant managerial efforts to support the functionality and promotion of TFL's algorithmic stablecoin UST and LUNA.

319.    TFL and the Luna Foundation Guard also worked to develop, support, and grow the Terraform ecosystem, and publicly touted these efforts through a variety of forums, including widely accessible online social media platforms, such as accounts on Twitter and Medium, messaging applications with public channels like Telegram, and YouTube. TFL's stated efforts to grow the Terraform ecosystem included four substantial version upgrades of the Terraform blockchain, adding new back-end technical features and front-end user applications, entering into partnerships with collaborators, and otherwise extensively and publicly promoting the Terraform ecosystem.[289]

320.    TFL and Kwon also provided monthly "Community Updates" on publicly available *Medium* blog posts, which discussed their coding and development of the Terraform ecosystem. Relatedly, TFL employees, including Kwon, touted their efforts to develop and support the Terraform ecosystem in monthly investor emails that they distributed called "Terraform Labs Investor Update" (later renamed to "Terraform Labs Ecosystem Update"). The recipients of these "Updates" had email addresses that included, for example, an email group "investment@terra.money." These emails highlighted TFL's engineering, coding, and the integration of applications into the Terraform ecosystem. These emails also announced that TFL was hiring for positions "key" to the ecosystem's development.[290]

321.    Investors in Terra Tokens thus reasonably expected TFL and Kwon to provide significant managerial efforts after the token launch.

---

[288]    SEC Compl. ¶53.
[289]    *Id.* ¶55.
[290]    *Id.* ¶57.

322.    This dependency on the managerial efforts of TFL and Kwon, however, was not apparent at issuance to a reasonable investor. Considering the limited available information about how these Terra Tokens were designed and intended to operate, if an investor was even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Terra Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop. In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens they had acquired were securities. It was only after certain revelations that provided more information about TFL and its backers' intents and UST/LUNA's algorithmic vulnerabilities that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

## V.    CLASS ALLEGATIONS

323.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Terra Tokens and were subsequently damaged thereby.

324.    The Class Period is defined as the period between March 17, 2021, and May 25, 2022.[291]

325.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; (d) TLF and their officers, directors, predecessors, successors, assigns, agents, and any entity in which any excluded person owns a material interest; and (e) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

326.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the

---

[291]    Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

Class is currently unknown, such information being in the sole possession of Terraform and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people. The number of Class members can be determined based on third party records.

327.    **Commonality**: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    whether the Terra Tokens are securities under the Securities Act;

b.    whether Defendants served as statutory underwriters for the Terra Tokens;

c.    whether Defendants controlled TFL at the time of the improper sale of unregistered Terra Tokens in violation of the Securities Act;

d.    whether Defendants misleadingly promoted and marketed Terra Tokens, issuing materially false and misleading statements with scienter;

e.    whether Defendants employed a device, scheme, or artifice to defraud and/or engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon Plaintiffs and the Class on which Plaintiffs and the Class relied;

f.    whether Plaintiffs and the Class relied upon the stability of UST and, in turn, all of Defendants' statements, promoting the securities in the Terra ecosystem were materially false by virtue of the failure of the algorithm Defendants surreptitiously acted to hide;

g.    whether Defendants' fraudulent schemes, actions, course of business conduct, and materially misleading statements and omissions caused loss to Plaintiffs and the Class;

h.    whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

328.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class

1    members. Plaintiffs' and the Class members' claims all arise out of Jump's uniform

2    misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the

3    sale of Terra Tokens.

4        329.    **Adequacy**: Plaintiffs have no interests that conflict with the interests of the Class

5    and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent

6    and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their

7    counsel will fairly and adequately protect the interests of the Class.

8        330.    **Predominance**: Questions of law or fact common to class members predominate

9    over any questions affecting only individual members of the Class. Specifically, the foundation of

10   the entire Terra ecosystem was the purported algorithm's ability to stabilize UST at $1 U.S. dollar

11   without human intervention. All investors in Terra tokens, therefore, relied on the algorithm

12   supporting the stability of UST. In addition, as a result of their participation and control over the

13   scheme to defraud, Defendants received a material pecuniary benefit of over $1 billion. As such,

14   Defendants were duty bound to disclose, but omitted, that the algorithm had failed and only

15   through their human intervention did UST re-peg. Accordingly, Defendants' omission is

16   actionable and the reliance presumption in *Affiliated Ute Citizens of Utah v. United States*, 406

17   U.S. 128 (1972) applies.

18       331.    **Superiority**: A class action is superior to all other available means of fair and

19   efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by

20   each individual Class member is relatively small compared to the burden and expense of individual

21   prosecution of the complex and extensive litigation necessitated by the Company's conduct. It

22   would be virtually impossible for individual Class members to effectively redress the wrongs done

23   to them. Even if Class members could afford individualized litigation, the court system could not.

24   Individualized litigation would increase delay and expense to all parties, and to the court system,

25   because of the complex legal and factual issues of this case. Individualized rulings and judgments

26   could result in inconsistent relief for similarly situated individuals. By contrast, the class action

27   device presents far fewer management difficulties, and provides the benefits of single adjudication,

28   economy of scale, and comprehensive supervision by a single court.

332.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## VI.    COUNTS

### COUNT I

**Violations of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5(b)**
**(Against All Defendants)**

333.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

334.    Plaintiffs bring this claim for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

335.    Plaintiffs bring this claim on behalf of all Class members who purchased Terra Tokens from March 17, 2021, to May 25, 2022.

336.    The Terra Tokens are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and were sold to Plaintiffs and the other Class members.

337.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

338.    In connection with the sale of Terra Tokens, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

339.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements

1    made not misleading; and engaged in acts, practices, and a course of business that operated as a

2    fraud and deceit upon the Class members that resulted in artificially high market prices for Terra

3    Tokens, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

4    **Misrepresentations and Omissions**

5    340.    Defendants' untrue statements and omissions of material facts in connection with

6    the sale of Terra Tokens include at least the following:

7         a)        Defendants improperly omitted the existence of the scheme to re-peg UST

8    and their participation therein, including their trading large blocks of UST. In or around May 2021,

9    to effectuate the scheme, Jump traded large blocks of UST. Jump's active trading was documented

10   in bookstacker_UST. The Trading Firm's records from May 23, 2021, show UST being

11   accumulated from "9:25 CDT to 10:01 [AM] CDT, after which time [the Trading Firm] pauses

12   trading until [2]:30 CDT [PM]. From [2]:30 CDT to [10]:40 CDT [PM], bookstacker_UST

13   accumulates another 6.7 million in UST. By the start of the day on May 24, bookstacker_UST held

14   19.5 million UST. From May 24 to May 25 6:03 CDT, the time that UST reached $0.99,

15   bookstacker_UST purchased another 4.4 million UST, ending its position with a total of 24.0

16   million UST."[292] In addition, as a result of their participation and control over the scheme to

17   defraud—manipulating the value of UST to cause a re-peg through human intervention when the

18   algorithm had failed—Defendants received a material pecuniary benefit of over $1 billion for their

19   participation. Kwon, on behalf of TFL, agreed to remove the loan agreement conditions requiring

20   Jump to achieve the requisite benchmarks to receive the loaned LUNA tokens. Instead, TFL agreed

21   to deliver on specified dates, without conditions, specific amounts of the remaining 61,458,334

22   LUNA tokens to Jump under the agreements. Under the modified terms of the agreements, the

23   final LUNA delivery to Jump was to occur by September 1, 2025.[293] On May 23, 2021, the day

24   that Do Kown and Defendant Kariya had come to the illicit agreement to re-peg UST in exchange

25

26

27

28   [292]    SEC Action Defs.' SMJ Mem. at 37-38 n.30.
     [293]    *Id.* ¶158.

1    for valuable vesting, Defendant Kariya told other Jump employees, "I spoke to Do [Kwon] and

2    he's going to vest us."[294] SMJ Order at 11, 56.

3              (1)      Defendants' trading in UST and its pecuniary benefit achieved

4                       therefrom rendered it legally bound to disclose its participation in the re-peg

5                       scheme and the reasons therefore. In the face of this duty, Defendants improperly

6                       omitted that their human intervention—trading UST—and not the algorithm, had

7                       caused the May 2021 re-peg of UST.

8              b)      On June 9, 2021, TFL released a document that quoted Jump multiple times,

9    linked to Jump's posts, and made false statements regarding the peg, stating: "Understanding how

10   various levers of the protocol and its ecosystem of apps interact at such a scale crystallizes during

11   excessive volatility that spotlight points of pressure in the system. As the UST peg normalized,

12   this was a function of the on-chain liquidity absorbing the volatility off-chain gradually, and as we

13   said, it would not happen overnight. Two weeks later, the Terra protocol is humming along once

14   again, with the UST market cap growing 6% MoM despite the massive contraction induced by the

15   extreme market volatility." Given Jump's partnership with, and control over, TFL, and given the

16   fact that Jump was directly quoted and linked to in TFL's document multiple times, it is clear that

17   Jump directed and/or authorized the statements to be made to the public.

18             (1)      This statement was false and misleading because it failed to disclose

19                      Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the

20                      re-peg when the algorithm had failed.

21             c)      On August 9, 2021, TFL and Jump (through its Wormhole project) made

22   statements that referred to UST as a "censorship-resistant, infinitely scalable, algo-pegged USD

23   stablecoin." This statement was made by TFL at the behest of Jump because it was made in

24   connection with Jump's Wormhole project.

25             (1)      This statement is false and misleading because the UST system was

26                      not "infinitely-scalable." Indeed, as the project got larger, more capital would be

27                      required to prevent the death spiral. Moreover, referring to UST as an "algo-pegged

28   ───────────────
     [294]    SMJ Order at 11, 56.

USD stablecoin" is false and misleading because it was not the UST/LUNA algorithm that kept the $1.00 peg. Instead, it was Jump's significant monetary intervention in May 2021 that kept UST pegged to $1.00.

d)　　On or around September 14, 2021, Defendants Jump and/or Kariya published a blog referring to "Terra's stability mechanism" as effective to "balance safety."

(1)　　This statement was false and misleading because the stability mechanism did not balance safety. Instead, the stability mechanism had previously failed and the promoted "safety" was illusory. Instead, Defendants knew that Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed. Jump's blog also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

e)　　On October 11, 2021, in a now-deleted blog, Jump stated, "We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."

(1)　　This statement is false and misleading because the purported UST/LUNA algorithm is referred to as an "elegant solution" even though Jump knew that it had already failed to keep its $1.00 peg, but secretly spent tens of millions of dollars in May 2021 to restore the peg. Indeed, Defendants omitted facts that undermined their opinion about the stability of UST. Defendants knew that Jump's May 2021 intervention to re-peg UST to the U.S. dollar accomplished the re-peg when the algorithm had failed. Moreover, referring to UST as a "decentralized stablecoin" is misleading because UST was not decentralized, it was highly centralized and subject to the whims of TFL, Kwon, and Jump. Moreover, UST was not even a "stablecoin" because the UST/LUNA algorithm could not

realistically keep UST's peg to $1.00 without significant monetary intervention. The blog also created the false impression that Jump was organically excited about TFL and UST, in contrast to the reality that Jump was highly incentivized to promote TFL due to the LUNA token loans it had received from TFL. Indeed, the blog omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

f)    On or around January 19, 2022, at the behest of Defendants, the Luna Foundation Guard issued a press release that falsely stated that "UST weathered a massive, reflexive drawdown in the LUNA price in May – learning important lessons and improving upon its design and adoption strategy."

(1)    This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST **did not** weather a massive reflexive draw down in May. Instead, UST's peg to $1.00 was the result of Jump's undisclosed financial intervention to the tune of tens of millions of dollars.

g)    Luna Foundation Guard's website stated, at the behest of Defendants, that, "Unlike other stablecoins that are backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability and scalability of its supply without the centralized control or capital-inefficient designs of incumbents. This is primarily accomplished by the Terra protocol design, which, through its native staking, governance, and reserve asset, LUNA, delivers permissionless arbitrage incentives and counter-cyclical monetary policy levers to maintain the peg during periods of both contractionary and expansionary demand cycles of its stablecoins."

(1)    This statement was false and misleading because the "Terra protocol design" did not "maintain the peg." Instead, UST's peg to $1.00 was the result of Jump's undisclosed financial intervention to the tune of tens of millions of dollars.

h)    On January 28, 2022, Defendant Kariya, posted a thread on Twitter discussing the "confusion and panic" concerning MIM and UST tokens and the possibility that the

Anchor yield could be impacted if a de-pegging event occurred.  Kariya falsely stated that, "It's difficult to imagine a sustained mass exodus to UST given the circumstances."

(1)    This statement was false and misleading because Defendants knew that a "mass exodus" had already been secretly averted in the May 2021 $1.00 peg bailout.  The statement gave investors false assurance about a big risk to the entire Terra ecosystem that Jump knew had already previously materialized.  Kariya also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

i)    On February 22, 2022, in an LFG press release, the Luna Foundation Guard announced the closing of a private sale of $1 billion in mostly Bitcoin to "provide a further layer of support using assets that are considered less correlated to the Terra ecosystem. . . .  The Reserve assets can be utilized in instances where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."[295]

(1)    This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST was not as "stable" as promoted, that the algorithm had not and could not maintain peg of UST/LUNA during periods of high volatility in the market.

j)    Also in the February 22, 2022, LFG press release, Kanav Kariya, President of Jump Crypto and member of the Luna Foundation Guard's Governing Council stated:

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . .  It can be used to help protect the peg of the UST stablecoin in stressful conditions.  This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.[296]

(1)    This statement was false and misleading because Defendants were duty bound to disclose but omitted that UST was not nearly as "stable" as promoted

---

[295]    Nick Rodriguez, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWEB (Feb. 22, 2022), https://www.prweb.com/releases/luna_foundation_guard_lfg_raises_1_billion_for_a_bitcoin_denominated_forex_reserve_for_terras_ust_stablecoin/prweb18511880.htm

[296]    *Id.*

given that it knew it had already had to bail out the peg and thus knew that the $1.00 peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market. This statement was also false and misleading because the reserve was "not ready" and was nowhere near sufficient size to protect the peg. Furthermore, the LFG operated nothing like a governmental central bank as it was controlled by conflicted insiders like Jump and Kwon and was tasked with propping up the price of unregistered securities. This statement also omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens.

k)        On March 1, 2022, Jump published a podcast entitled the "Ship Show" to promote the Terra Tokens. The podcast was hosted by Eden, a community manager at Jump Crypto. The first two guests on Ship Show were Kwon and Kariya, who promoted the stability and security of the UST and LUNA peg as Terra's two most "attractive" features. It was during this podcast published by Jump that Judge Rakoff found the "SEC's most direct evidence of a misstatement to investors."[297] On this podcast that Jump published, Kwon discussed UST's de-peg in May 2021, falsely stating:

> . . . [I]t took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.[298]

Jump produced this podcast, hosted it, and published it. Defendant Kariya retweeted the link to it.

(1)        This statement was false and misleading. In context, Defendants were duty bound to disclose but omitted the May 2021 bailout and failed to correct Kwon's misstatements. More, despite the statements to the contrary, UST did not "automatically self-heal[]." UST's "[a]lgorithmic, calibrated adjustments of economic parameters" failed. In fact, UST's peg to the dollar was not restored until Jump intervened, purchasing UST in large amounts to restore UST's price to one

---

[297]    SMJ Order at 61.
[298]    SEC Compl. ¶164; *see also id.* ¶¶162-63.

dollar.  While the statements above led investors to believe UST's peg was restored by the algorithm, in fact, it was only the deliberate actions of "human agents," including TFL, Kwon, and Jump, that ultimately led to the restoration of the peg.

l)      On May 3, 2022, Kariya appeared on a podcast where he promoted the Terra ecosystem and its cross-chain capabilities.  When asked about the potential for bad actors in the space to harm investors, Kariya gave investors false assurances that, "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that."[299]  In discussing the potential for bad actors to harm investors, Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that."

(1)      This statement was false and misleading because Jump had colluded with TFL/Kwon to bail out the peg in May 2021.

m)      During the May 3, 2022, podcast, Defendants, through Kariya also described Jump's compliance, stating that "all these phones are heavily, heavily regulated, you know, don't support about 20 years of its reputation and the giant business behind making a lot of this happen and we're definitely incentive aligned."

(1)      This statement was false, misleading, and/or incomplete because Jump used the auto-deleting communications application Signal for its communications with TFL and Kwon and did not otherwise have its incentives aligned with investors.

**Materiality/Falsity**

341.      The forgoing misrepresentations and omissions were each material.

342.      Specifically, these misrepresentations and omissions related to: (i) the stability of the UST/LUNA algorithmic stablecoin pair, and the Terra ecosystem itself; and (ii) the ability for the Luna Foundation Guard to defend and maintain the peg of UST/LUNA during periods of high

---

[299]      Kanav Kariya (@KanavKariya), X (F/K/A TWITTER) (May 3, 2022, 11:09 AM), https://twitter.com/KanavKariya/status/1521507207694585856.

1    volatility in the market.  All of these have a significant impact on the desirability, security, and

2    thereby price of UST/LUNA.

3    343.    Additionally, information regarding the UST/LUNA algorithm's ability to maintain

4    the $1 peg, or that Jump previously spent tens of millions of dollars to bail out the peg in May

5    2021, is also material. As Defendants' aforementioned statements illustrate, these had a significant

6    impact on the market price and trading volume for Terra Tokens.

7    344.    Accordingly, there is a substantial likelihood that the disclosure of the omitted facts

8    would have been viewed by the reasonable investor as having significantly altered the "total mix"

9    of information made available.

10    **Scienter**

11    345.    Defendants acted with scienter in engaging in the forgoing misconduct, in that they

12    either had actual knowledge of the misrepresentations and omissions of material facts set forth

13    herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose

14    such facts, even though such facts were available to them.

15    346.    Jump's failure to disclose such information demonstrates that Jump intended that it

16    would sell hundreds of millions of dollars' worth of discounted LUNA Tokens for significant

17    profits at artificially inflated prices.  Jump went on to execute this plan, selling hundreds of millions

18    of dollars' worth of discounted LUNA Tokens on the market during the inflation period, reaping

19    huge profits for itself and its personnel.

20    347.    Jump was motivated not to disclose these facts because such disclosure would have

21    been self-defeating—it would have massively lowered the selling price of the UST and LUNA

22    Tokens precluding Jump from securing the massive pre-determined profits from its sale of

23    discounted tokens.

24    348.    Jump had actual knowledge regarding the scheme to bail out the peg.  Indeed,

25    Defendant Kariya had five signal calls with Do Kwon on the key date of the bailout of the peg.

26    Likewise, Jump's founder, Defendant DiSomma, personally led Jump's UST trading efforts.[300]

27

28    _____
[300]     SMJ Order at 56.

349.    Jump's scienter is further demonstrated by the fact that Jump personnel, including the ex-confidential witness, worked with the SEC in establishing the case against TFL and Kwon.

350.    Additionally, Judge Rakoff made evidentiary rulings that Jump CW accounts are admissible as statements against interest suggesting Jump's, and those individuals', participation in a secret agreement to restore UST's peg would tend to expose those individuals "to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).[301]

351.    Moreover, the SMJ Order ruled that "contemporaneous statements by Jump executives concerning the capital Jump was willing to risk and what Terraform was offering in return, together with changes in Jump's trading practices, tend to show the state of mind of Jump executives -- specifically, their intent, motive, and plan to conspire with Terraform to restore UST's peg."[302] Such statements are thus likewise admissible under Federal Rule of Evidence 803(3).[303]

352.    Jump's scienter is additionally supported by its efforts to distance its business from the crypto sector following the fall of Terra.  For example, in May 2023, Jump announced that it would be exiting the U.S. cryptocurrency trading market.  At the same time, another crypto market-making firm, Jane Street Group, also announced it was halting its crypto trading activities. Importantly, unlike Jane Street Group who exited the crypto market completely, Jump only left the U.S. market in response to severe regulatory scrutiny in the U.S. and pivoted to expanding its digital asset-facing business overseas.[304]  Jump's crypto business partners also subsequently severed their connections with the beleaguered trading firm.  The Robinhood exchange ended its business relationship with Jump in July 2023, choosing Jump competitor, B2C2, as the replacement firm to service Robinhood's crypto trading business.[305]  Jump also parted ways with

---

[301]    *Id.* at 57.

[302]    *Id.* at 57-58.

[303]    *Id.*

[304]    *See US Regulatory Crackdown Prompts Jane Street And Jump Crypto To Exit*, INVESTING.COM (May 10, 2023), https://www.investing.com/news/cryptocurrency-news/us-regulatory-crackdown-prompts-jane-street-and-jump-crypto-to-exit-3078250.

[305]    *Robinhood Ends Crypto Partnership with Jump Trading – What's Going On?*, CRYPTONEWS.COM (Aug. 30, 2023), https://cryptonews.com/news/robinhood-ends-crypto-partnership-with-jump-trading-whats-going-on.htm.

the Wormhole project in November 2023.  This was reported as a "significant development within the cryptocurrency industry."[306]  "[S]everal key members of the Wormhole team, including the CEO and COO, have left Jump Trading Group to independently manage the Wormhole project. This move comes less than two years after Jump Trading's hefty $320 million investment in Wormhole."[307]  Finally, Jump Crypto also had a mass exodus of employees following the Terra collapse.  Following the Terra collapse, numerous Jump Crypto employees resigned – some doing so without even having another job lined up.[308]

353.    Jump's scienter is further supported by the fact that Defendants Kariya and DiSomma both invoked their Fifth Amendment right against self-incrimination when questioned by the SEC concerning the May 2021 peg bailout.[309]

**Reliance, Economic Loss, and Loss Causation**

354.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the Terra Tokens was artificially inflated.

355.    In reliance on the promise that UST was stable and that the algorithm sufficed to re-peg UST to the U.S. dollar when it materially diverged, investors purchased UST as a springboard to purchasing other securities within the Terra ecosystem. Further, in the absence of material adverse information that Jump knew or recklessly should have known but failed to disclose in public statement – their bulk-buying of UST to re-peg USD – Plaintiffs and the other Class members acquired Terra Tokens at artificially high prices and were thereby damaged when the price plummeted.

---

[306]    *Jump Trading Group Exits Wormhole Project in Crypto Scale-Back*, Coinunited.io (Nov. 18, 2023), https://coinunited.io/news/en/2023-11-18/crypto/cunews-jump-trading-group-exits-wormhole-project-in-crypto-scale-back.

[307]    *Id.*

[308]    *See 27-year-old that lost Jump Trading $200m is losing top staff*, Efinancialcareers.com (Oct. 18, 2023), https://www.efinancialcareers.com/news/2023/10/jump-trading-crypto-kanav-kariya.

[309]    *See* SMJ Order at 11, 56-57.

FOURTH AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:22-cv-03600-PCP

356.    As a direct and proximate result of Jump's wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of Terra Tokens and are entitled to an award compensating them for such damages.

357.    Indeed, the price of Terra Tokens dropped significantly as the market discovered, that:  (1) UST was not as "stable" as promoted; (2) the peg of UST/LUNA would be unable to be maintained during periods of high volatility in the market; and (3) that both the UST/LUNA algorithmic stablecoin pair and Anchor's staking rewards program was unstainable and could not be maintained with the either the Forex Reserve Fund or the Anchor Yield Reserve fund.

358.    The price of UST and LUNA Tokens dropped by 91% and 99.7% in a week when it was revealed that TFL's largest digital assets were unstable and unsustainable.

359.    As a direct and proximate result of Jump's wrongful conduct, Plaintiffs and the other Class Members have suffered damages in connection with their purchase or acquisition of UST/LUNA Tokens during the Class Period.

360.    The SEC's expert, Dr. Mizrach, found that Jump's trading increased UST's price by $0.62 over a particular half-hour period, when the actual price increased by just $0.03.  In other words, Dr. Mizrach's analysis showed that had Jump not made its trades during the inflation period, UST's price would have declined by $0.59, rather than increase by $0.03-which it did. SMJ Order at 20. Dr. Mizrach's trial testimony further bolsters his analysis.

361.    In addition, as a direct and proximate result of Defendants' wrongful conduct, Jump has generated and retained ill-gotten in connection with the May 2022 collapse of UST/LUNA Tokens, such that Plaintiffs and the other Class members are entitled to the disgorgement of Jump's ill-gotten gain from such misconduct.

## COUNT II

### Violations of Section 10(b) of the Securities Exchange Act
### and Rule 10b-5(a) and (c) Promulgated Thereunder
### (Against All Defendants)

362.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

363.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder.

364.    During the Class Period, Defendants, individually and in concert with others, directly or indirectly, employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Terra Tokens from March 17, 2021, through May 25, 2022.

365.    Critical to the sale of Terra Tokens was the UST stablecoin that was purportedly pegged algorithmically to the U.S. dollar. Any failure of the purported algorithm to quickly restore to $1.00 (U.S.) the peg would materially and adversely impact the entire Terraform ecosystem. In May 2021, the stablecoin fell materially below $1.00 (U.S.). The purported algorithm failed to restore the stablecoin to the peg. Instead, Defendants secretly colluded with TFL and Do Kwon to restore the peg through human intervention, bypassing the algorithm. In a successful attempt to manipulate the value of UST, Jump purchased "massive amounts" of the stablecoin, executing these purchases to restore the peg. Given that the UST stablecoin was "the lynchpin for the entire [Terraform] ecosystem," Defendants' surreptitious human intervention to re-peg UST to the U.S. dollar when the algorithm had failed, constituted acts, practices, device, scheme, artifice, and/or course of business that operated as a fraud or deceit upon Plaintiffs and members of the Class.

366.    Jump acted with scienter in that they knew or were severely reckless in not knowing that (a) the purported algorithm had failed, (b) they resorted to human intervention to re-peg the stablecoin, and (c) in the absence of their acts, practices, device, scheme, artifice, and course of business, the entire Terraform ecosystem was in danger of was in danger of collapse. By virtue of its knowledge or severely reckless disregard of the collusive agreement to intervene to re-peg the stablecoin to $1.00 (U.S.) when the purported algorithm had failed, Jump's misconduct evidences an intent to defraud investors.

367.    As a result of the foregoing, the value of UST and, in turn, the prices of Terra Tokens were artificially inflated during the Class Period. In ignorance of Jump's acts, practices, device, scheme, artifice, and course of business, Plaintiffs and the Class purchased Terra Tokens

at prices that were artificially inflated as a result of Defendants' violation of SEC Rule 10b-5(a) and (c). Defendants participated in an intentional scheme—manipulating the value of UST to cause a re-peg through human intervention when the algorithm had failed—for the purpose of saving the Terra ecosystem from collapse. In addition, Defendants received a large pecuniary benefit though their fraudulent scheme. But for Defendants' surreptitious intervention, UST would have failed to re-peg, causing a collapse of the Terra ecosystem in 2021.

368.    In reliance on the fact that UST was stable and that the purported algorithm sufficed to re-peg UST to the U.S. dollar when it materially diverged, investors purchased UST as a springboard to purchasing other securities within the Terra ecosystem. Further relying on the absence of Defendants' scheme or artifice to defraud about which Defendants knew or severely recklessly disregarded and omitted, Plaintiffs and the Class acquired Terra Tokens at artificially high prices and were damaged thereby. Had Plaintiffs and the other members of the Class been aware that it was Jump's conduct and not the algorithm that had re-pegged the stablecoin to $1.00 (U.S.), they would not have purchased Terra Tokens at the artificially inflated prices that they did, or at all.

369.    As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

370.    By reason of the foregoing, Defendants have violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Terra Tokens from March 17, 2021, through May 25, 2022.

## COUNT III

### Violations of Section 9(a)(2) and 9(a)(6) of the Securities Exchange Act
### (Against all Defendants)

371.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

372.    This Count is asserted against Defendants under §9(a)(2) and §9(a)(6) of the Securities Exchange Act, 15 U.S.C. §78i.

373.    During the Class Period, Defendants, individually and in concert with others, effected a series of transactions that manipulated security prices for the Terra Tokens purchased by Plaintiffs and others similarly situated from March 17, 2021, through May 25, 2022.

374.    Critical to the sale of Terra Tokens was the UST stablecoin that was purportedly pegged algorithmically to the U.S. dollar. Any failure of the purported algorithm to quickly restore to $1.00 (U.S.) the peg would materially and adversely impact the entire Terraform ecosystem. In May 2021, the stablecoin fell materially below $1.00 (U.S.). The purported algorithm failed to restore the stablecoin to the peg. Instead, Defendants secretly colluded with TFL and Do Kwon to restore the peg through human intervention, bypassing the algorithm. In a successful attempt to manipulate the value of UST, Jump purchased "massive amounts" of the stablecoin, executing these purchases to restore the peg, manipulating the price of the Terra Tokens.

375.    When Defendants agreed with TFL and Do Kwon to restore the peg through human intervention bypassing the algorithm, Defendants intended to, and did, stop the collapse of the price of UST, creating artificial trading for the purpose of halting the onslaught of sales and inducing buying in UST.

376.    Defendants' artificial propping up of UST had the purpose of stabilizing the price of UST at its $1 peg, and did stabilize UST at its $1 peg, where it remained throughout the Class Period, inducing Plaintiffs and the other members of the Class to purchase Terra Tokens.

377.    Defendants' re-peg of UST was done to manipulate the market, in contravention of SEC rules and regulations, as evidenced by the numerous SEC enforcement actions targeting this elicit re-peg as described at length herein.

378.    As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

379.    By reason of the foregoing, Defendants have violated Sections 9(a)(2) and 9(a)(6) of the Securities Exchange Act and are liable to the Plaintiffs and the other members of the Class

for substantial damages which they suffered in connection with their purchase of Terra Tokens from March 17, 2021, through May 25, 2022.

## COUNT IV

### Violations of Section 20(a) of the Securities Exchange Act
### (Against Defendants Kariya and DiSomma)

380.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

381.    This Count is asserted against Defendants Kariya and DiSomma under § 20(a) of the Exchange Act, 15 U.S.C. §78(t).

382.    Because of Defendants Kariya and DiSomma's positions of control and authority over Jump, Defendants Kariya and DiSomma participated in the operation and management of Jump, and conducted and participated, directly and indirectly, in the conduct of Jump's business affairs.

383.    Because of their positions of control and authority, these Defendants were able to, and did, control the specific wrongful conduct related to the de-peg and subsequent false statements concerning the stability of the algorithm. Furthermore, these Defendants exercised their power and authority to cause Jump to engage in the wrongful acts complained of herein.  These Defendants, therefore, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TFL securities.

384.    Because of their positions of control and authority, these Defendants possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the members of the Class complain.

385.    By reason of the above conduct, Defendants Kariya and DiSomma are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Jump.

**COUNT V**

**Violations of Sections 5 and 12(a)(1) of the Securities Act**
**(Against All Defendants)**

386.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

387.    This Count is asserted against all Defendants in violation of §5 and §12(a)(1) of the Securities Act.

388.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

389.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security[.]" *Id.* § 77e(c).

390.    The Terra Tokens were unregistered securities because they satisfy all elements of the *Howey* Test, as pleaded here, and in addition, a federal court has already issued a judgment finding them to be unregistered securities.[310]

391.    Moreover, the C&D Order found that the LUNA tokens distributed by Jump's subsidiary and alter ego, Tai Mo Shan, constituted unregistered securities and that Tai Mo Shan

---

[310]    SMJ Order at 2-3, 36-47.

1   served as the statutory underwriter for these unregistered securities in violation of Sections 5(a)

2   and 5(c) of the Securities Act.[311]

3       392.    The loans to Tai Mo Shan that formed the basis of the C&D findings "were, in

4   essence, public distributions of LUNA."[312] These loans, papered as between Terraform and Jump's

5   affiliate Tai Mo Shan, were orchestrated by Defendant Kariya and others at Jump Crypto and Jump

6   Trading.[313]

7       393.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who

8   offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to

9   subsection (b), to the person purchasing such security from him, who may sue either at law or in

10  equity in any court of competent jurisdiction, to recover the consideration paid for such security

11  with interest thereon, less the amount of any income received thereon, upon the tender of such

12  security, or for damages if he no longer owns the security." 15 U.S.C. § 77e(a).

13      394.    Accordingly, Defendants have violated Sections 5(a), 5(c), and 12(a)(1) of the

14  Securities Act.

15      395.    By virtue of the conduct alleged herein, these Defendants are liable for the wrongful

16  conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or

17  damages suffered.

**COUNT VI**

**Violations of Sections 15 of the Securities Act
(Against Defendants Kariya and DiSomma)**

21      396.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth

22  herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any

23  allegation that could be construed as alleging or sounding in fraud or intentional or reckless

24  misconduct.

25

26

---

27  [311]    C&D Order, 1-3, 5.
    [312]    *See* SEC Complt., ¶¶109-10.
28  [313]    *See* SMJ Order at 5; SEC Ex. 284.

397.    This Count is asserted against Defendants Kariya and DiSomma under §15 of the Securities Act, 15 U.S.C. §77o.

398.    Defendants Kariya and DiSomma, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act. By controlling the Defendants' violation of the Securities Act as set forth in the prior Count, these Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Terra Tokens securities as described herein.

399.    Defendants Kariya and DiSomma had the power to direct or cause the direction of the management and policies of Defendants through ownership of voting securities, by contract, subscription agreement, or otherwise, and accordingly are liable for Defendants' violations of the Securities Act.

400.    By virtue of the conduct alleged herein, Defendants Kariya and DiSomma are liable for the wrongful conduct complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages suffered.

## COUNT VII

### Violations of Sections 15 of the Securities Act
### (Against Defendants Jump Trading, Jump Crypto, Kariya, and DiSomma)

401.    Plaintiffs, repeat and reallege all preceding allegations above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

402.    This Count is asserted against Defendants Jump Trading, Jump Crypto, Kariya, and DiSomma under §15 of the Securities Act, 15 U.S.C. §77o.

403.    On December 20, 2024, the SEC announced a cease-and-desist order and settlement with Tai Mo Shan, the wholly owned subsidiary of Jump Crypto. *In re Tai Mo Shan Limited*, SEC Administrative Proceeding, File No. 3-22382 (Dec. 10, 2024).

404.    The SEC found that Tai Mo Shan violated Section 5(a) and 5(c) of the Securities Act by underwriting the Terra Tokens finding, *inter alia*, that: "[f]rom January 2021 to May 2022, Tai Mo Shan, directly or indirectly, offered and sold securities through the use of interstate commerce when no registration statement was in effect with respect to these offers and sales. Specifically, Tai Mo Shan acted as a statutory underwriter with respect to certain of its offers and sales of LUNA, a crypto asset issued by Terraform Labs PTE Ltd. ('Terraform') and offered and sold as a security. As a result of this conduct, Tai Mo Shan violated Sections 5(a) and (c) of the Securities Act."

405.    Defendants Jump Trading, Jump Crypto, Kariya, and DiSomma, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act. By controlling Tai Mo Shan's violation of the Securities Act, these Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Terra Tokens securities as described herein.

406.    These Defendants had the power to direct or cause the direction of the management and policies of Tai Mo Shan through ownership of voting securities, by contract, subscription agreement, or otherwise, and accordingly are liable for Tai Mo Shan's violations of the Securities Act.

407.    By virtue of the conduct alleged herein, these Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## COUNT VIII

### Violation of Sections 15 of the Securities Act
### (Against all Defendants)

408.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

409.    This Count is asserted against Defendants under §15 of the Securities Act, 15 U.S.C. §77o.

410.    On December 28, 2023, Judge Rakoff entered judgment in favor of the SEC, establishing that TFL violated § 5 and 12(a)(2) of the Securities Act, a primary violation.

411.    Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act. By serving as statutory underwriters – acting as a conduit for the transfer of the securities to the public market – Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Terra Tokens securities as described herein.

412.    By serving as statutory underwriters – acting as a conduit for the transfer of the securities to the public market – Defendants had the power to direct or cause the direction of the management and policies of TFL through ownership of voting securities, by contract, subscription agreement, or otherwise.

413.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.    Appoint Plaintiffs as representatives of the Class and The Rosen Law Firm, P.A., as Class counsel;

C.    Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D.    Award post-judgment interest on such monetary relief;

1        E.    Award reasonable attorneys' fees and costs; and

2        F.    Grant such further relief that this Court deems appropriate.

3    **VIII.   JURY DEMAND**

4        Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all

5    issues so triable.

6    DATED: October 31, 2025

7                             **THE ROSEN LAW FIRM, P.A.**

8                             /s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)

9                             Pronouns: he/him/his
355 South Grand Avenue, Suite 2450

10                            Los Angeles, CA 90071
Telephone: (213) 785-2610

11

12                            Email: lrosen@rosenlegal.com

13                            and

14                            Jacob A. Goldberg (*pro hac vice*)
Pronouns: he/him/his

15                            Michael Cohen (*pro hac vice*)
Pronouns: he/him/his

16                            275 Madison Avenue, 40th Floor
New York, NY 10016

17                            Telephone: (212) 686-1060

18                            Email: jgoldberg@rosenlegal.com
        mcohen@rosenlegal.com

19

20                            *Lead Counsel for Plaintiffs and the Putative Class*

21                            **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

22                            John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com

23                            600 W. Broadway, Suite 3300
San Diego, CA 92101

24                            Telephone: 619-233-4565

25                            and

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sean T. Masson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
smasson@scott-scott.com

*Additional Counsel for Plaintiffs*