**ZUCKERMAN SPAEDER LLP**
Aitan D. Goelman (admitted *pro hac vice*; D.C. Bar No. 44636)
Miles R. Clark (admitted *pro hac vice*; D.C. Bar No. 489388)
Christopher R. MacColl (admitted *pro hac vice*; D.C. Bar No. 1049153)
J. Benjamin Jernigan (admitted *pro hac vice*; D.C. Bar No. 90008695)
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com
bjernigan@zuckerman.com

**KOBRE & KIM LLP**
Daniel A. Zaheer (Bar No. 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel: (415) 582-4800
daniel.zaheer@kobrekim.com

*Attorneys for Kanav Kariya*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, TAI MO SHAN LTD., KANAV KARIYA, and WILLIAM DISOMMA,<br><br>Defendants. | Case No. 5:22-cv-03600-PCP<br><br>**DEFENDANT KANAV KARIYA'S MOTION TO DISMISS**<br><br>Honorable P. Casey Pitts<br>Hearing Date: May 7, 2026, 10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ II

TABLE OF AUTHORITIES ........................................................................................ III

NOTICE OF MOTION AND MOTION TO DISMISS ............................................... 1

I.     BACKGROUND ............................................................................................. 2

II.    LEGAL STANDARD ..................................................................................... 4

III.   ARGUMENT ................................................................................................... 4

    A.    ALL SECURITIES ACT COUNTS (V-VIII) ARE TIME-BARRED AS AGAINST KARIYA .................................................................................................... 5

    B.    COUNTS I-IV MUST BE DISMISSED BECAUSE UST IS NOT A SECURITY. ............... 6

    C.    PLAINTIFFS FAIL TO PLEAD THAT THE OTHER "TERRA TOKENS" ARE SECURITIES. .................................................................................... 9

    D.    ALL COUNTS SOUNDING IN MANIPULATION (II–IV) MUST BE DISMISSED .............. 9

        1.    Kariya did not control or direct trading activities .................................... 10

        2.    Negotiating terms of a crypto token loan is not market manipulation. .... 11

        3.    Plaintiffs' improper group pleading cannot be the basis for a claim ....... 13

        4.    Plaintiffs fail to allege Kariya's scienter to fraudulently manipulate. ..... 14

        5.    Open-market stablecoin trades cannot constitute manipulation. ............. 14

    E.    ALL COUNTS SOUNDING IN FRAUD BY MISSTATEMENT (I & IV) MUST BE DISMISSED. ....................................................................................... 15

        1.    Plaintiffs' claims cannot be based on statements Kariya did not make. ................................................................................................ 15

        2.    None of the statements attributed to Kariya can support a claim. .......... 17

    F.    COUNTS I AND IV MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO PLEAD KARIYA'S SCIENTER AS TO THE ALLEGED STATEMENTS. ......................... 24

    G.    ALL REGISTRATION COUNTS (V-VIII) MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE KARIYA'S PARTICIPATION OR CONTROL. .............................................................................................. 25

IV.   CONCLUSION .............................................................................................. 25

1

2

## TABLE OF AUTHORITIES

3

Page(s)

**Cases**

4 *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*,
    2022 WL 3598246 (D. Ariz. Aug. 23, 2022)..................................................... 13

5 *AnchorBank, FSB v. Hofer*,
    649 F.3d 610 (7th Cir. 2011) ......................................................................... 12

6 *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...................................................................... 14, 15

7 *Baxter v. A.R. Baron & Co.*,
    1995 WL 600720 (S.D.N.Y. Oct. 6, 1995) ....................................................... 14

8 *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)............................................................................... 12, 13

9 *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .......................................................................... 21

10 *Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1997) .......................................................................... 12

11 *Cornielsen v. Infinium Cap. Mgmt., LLC*,
    916 F.3d 589 (7th Cir. 2019) .......................................................................... 24

12

13 *Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) .................................................................... 11, 14

14 *Donovan v. GMO-Z.com Tr. Co.*,
    779 F. Supp. 3d 372 (S.D.N.Y. 2025) .............................................................. 7

15 *Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)...................................................................................... 14

16

17 *ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ........................................................................ 15

18 *Fabian v. LeMahieu*,
    2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ..................................................... 5

19 *Fujisawa Pharm. Co. v. Kapoor*,
    1999 WL 543166 (N.D. Ill. July 21, 1999)...................................................... 24

20

21 *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ........................................................................ 23

22 *Furlong Fund LLC v. VBI Vaccines, Inc.*,
    2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) .................................................. 10

23 *Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ......................................................................... 7

24 *Howard v. Everex Systems, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .................................................................. 10, 16

25

26 *Huynh v. Chase Manhattan Bank*,
    465 F.3d 992 (9th Cir. 2006) ........................................................................... 4

27 *In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..................................................... 10, 16

28

iii

*In re Celsius Network LLC*,
  668 B.R. 722 (Bankr. S.D.N.Y. 2025) ............................................................... 8

*In re CytRx Corp. Sec. Litig.*,
  2015 WL 5031232 (C.D. Cal. July 13, 2015) ................................................... 23

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) .................................................. 18

*In re GlenFed, Inc. Sec. Litig.*,
  60 F.3d 591 (9th Cir. 1995) ............................................................................... 12

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................................... 14

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017) .................................................... 17

*In re Med. Cap. Sec. Litig.*,
  2010 WL 11508331 (C.D. Cal. Aug. 11, 2010) .................................................. 5

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...................................................................... 14, 24

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ..................................................................................... 15, 23

*Kelley v. Rambus, Inc.*,
  2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) ............................................... 14, 17

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ........................................................ 2, 24

*Louisiana-Pac. Corp. v. ASARCO, Inc.*,
  5 F.3d 431 (9th Cir. 1993) ................................................................................... 6

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982) ............................................................................................ 7

*Mehedi v. View, Inc.*,
  2024 WL 3236706 (N.D. Cal. June 28, 2024) .................................................. 14

*Mehta v. Angell Energy*,
  2019 WL 4750142 (D.N.J. Sept. 30, 2019) ...................................................... 24

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .......................................................................... 25

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
  2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ............................................. 21, 22

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................. 20, 21, 24

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ................................................................. 10, 16, 22

*Patterson v. Jump Trading LLC*,
  710 F. Supp. 3d 692 (N.D. Cal. 2024) ....................................................... passim

*Salameh v. Tarsadia Hotel, Corp.*,
  726 F.3d 1124 (9th Cir. 2013) ........................................................................ 7, 9

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) .......................................................................................... 15

iv

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................ 14, 15

*Seaman v. California Bus. Bank*,
   2013 WL 5890726 (N.D. Cal. Oct. 30, 2013) ......................................................... 14

*SEC v. Binance Holdings Ltd.*,
   738 F. Supp. 3d 20 (D.D.C. 2024) ......................................................................... 7

*SEC v. Daifotis*,
   2011 WL 2183314 (N.D. Cal. June 6, 2011) ......................................................... 13

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................... 6, 9

*SEC v. Lucent Techs., Inc.*,
   610 F. Supp. 2d 342 (D.N.J. 2009) ....................................................................... 12

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................................................... 15

*SEC v. Payward*,
   2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ........................................................ 7

*SEC v. Ripple Labs, Inc.*,
   682 F. Supp. 3d 308 (S.D.N.Y. 2023) ........................................................ 6, 7, 8, 9

*SEC v. Uberuaga*,
   2009 WL 10725921 (S.D. Cal. Apr. 2, 2009) ......................................................... 2

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ........................................................................ 12, 13

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ......................................................................... 17, 24

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ................................................................... 5

*SEC v. Terraform Labs Pte., Ltd.*,
   708 F. Supp. 3d 450 (S.D.N.Y. 2023). ...................................................... 5, 7, 8, 23

*U.S. ex rel. Ahumada v. NISH*,
   756 F.3d 268 (4th Cir. 2014) .............................................................................. 14

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................................................. 9

*United States ex rel. Osinek v. Permanente Med. Grp.*,
   2022 WL 16943886 (N.D. Cal. Nov. 14, 2022) ....................................................... 6

*United States v. Corinthian Colleges*,
   655 F.3d 984 (9th Cir. 2011) .............................................................................. 17

*Wang v. Zymergen Inc.*,
   744 F. Supp. 3d 995 (N.D. Cal. 2024) .................................................................... 5

*Weston Fam. P'ship v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ............................................................................... 20

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
   738 F. Supp. 3d 1182 (N.D. Cal. 2024) ............................................................... 6, 7

**Statutes**

15 U.S.C. § 77e ............................................................................................................. 5

15 U.S.C. § 77l(a)(1) ..................................................................................................... 5

15 U.S.C. § 77m ..................................................................................................... 1, 5, 6

15 U.S.C. § 78i(a)(2) (Section 9(a)(2)) ................................................................ 14, 17

15 U.S.C. § 78u-4 ................................................................................................ 1, 4, 24

15 U.S.C. § 78u-5(c)(1) ................................................................................................ 20

**Rules**

Fed. R. Civ. P. 12(b) ...................................................................................................... 1

Fed. R. Civ. P. 15(c)(1)(C) ........................................................................................... 6

Fed. R. Civ. P. 9(b) ................................................................................................... 1, 4

**NOTICE OF MOTION AND MOTION TO DISMISS**

**PLEASE TAKE NOTICE** that on May 7, 2026, at 10:00 a.m., or at such other date and time as may be agreed to or ordered, in the United States District Court for the Northern District of California, before the Honorable P. Casey Pitts, in Courtroom 8, 4th Floor, Robert F. Peckham Courthouse, 280 South First Street, San José, CA 95113, Kanav Kariya ("Kariya") will and hereby does respectfully move to dismiss all claims asserted against him.

Kariya moves to dismiss Counts I-VIII of the Fourth Amended Complaint, ECF No. 176 ("the Complaint" or "FAC"), pursuant to Federal Rules of Civil Procedure 9(b) & 12(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, with prejudice.

**STATEMENT OF ISSUES TO BE DECIDED**

1.    Whether Counts V–VIII against Kariya are time-barred by the one-year statute of limitations and the three-year statute of repose in 15 U.S.C. § 77m.

2.    Whether Plaintiffs may assert securities-law claims against Kariya based on non-securities transactions, including secondary-market UST purchases by other persons.

3.    Whether Counts I–IV should be dismissed as to Kariya because Plaintiffs have not pleaded that (1) Kariya made any actionable misstatement or omission, engaged in a scheme to defraud, or engaged in manipulative trading, (2) Kariya acted with scienter, or (3) any Plaintiff relied on a misstatement or scheme by Kariya or otherwise suffered a loss caused by his conduct.

4.    Whether Counts IV, VI, VII, and VIII should be dismissed as to Kariya because Plaintiffs have not plausibly alleged that Kariya was a "control person," and because the underlying violations are not plausibly alleged.

5.    Whether Counts V-VIII should be dismissed as to Kariya because Plaintiffs have not pleaded that (1) Kariya offered or sold any security or issued any prospectus, or (2) any Plaintiff, let alone the putative class, purchased securities from Kariya or in connection with any statements he made about the crypto tokens at issue.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs made speculative bets on crypto tokens issued by Terraform Labs ("TFL"). When the market lost confidence in those tokens in May 2022, Plaintiffs lost money. They now seek to

1

shift all of their losses onto Kanav Kariya—a fellow optimist about TFL before the crash—because he helped renegotiate a loan of tokens from TFL to his employer, Jump, and did not himself disclose purchases of TFL's stablecoin UST that were directed and executed by other Jump employees a year before the crash. Plaintiffs contend that, absent those May 2021 purchases of UST, all TFL token prices would have collapsed in 2021, they would not have bought TFL tokens thereafter, and they would be better off today.

The implausibility and untimeliness of Plaintiffs' claims against Kariya are underscored by the fact that they did not add him to their shifting cast of defendants until the fourth iteration of their complaint in 2024. ECF No. 156. While Plaintiffs were aware of Kariya's public support for the Terra ecosystem when they filed this lawsuit in 2022—the initial complaint mentioned Kariya fifteen times and quoted him at length, *see* ECF No. 1—Plaintiffs chose not to sue him then or in two subsequent pleadings. And for good reason. Plaintiffs do not allege that Kariya ever personally bought or sold the tokens at issue. He did not issue any securities or prospectuses, offer tokens for sale, or offer to buy them. He did not own Jump. He did not direct other Jump employees to execute any relevant trade. He made no statements that were false or misleading, or on which any Plaintiff claims to have relied. And his own statements acknowledged the volatility and risks inherent in crypto investing generally and of the TFL tokens specifically.

So why is Kariya here now? Because he invoked his Fifth Amendment rights. On the advice of counsel, while the DOJ was investigating the collapse of TFL, Kariya asserted that privilege in the SEC's case against TFL and its CEO. Kariya's invocation in that case, where no claim was ever brought against him, does not matter here.[1] It does not make Plaintiffs' claims plausible, let alone particularized and consistent with the PSLRA. Every claim against him should be dismissed.

## I.     BACKGROUND

The Complaint alleges[2] that Kariya joined Jump as an intern during his sophomore year of

---

[1] *See, e.g.*, *SEC v. Uberuaga*, 2009 WL 10725921, at *4 (S.D. Cal. Apr. 2, 2009) (SEC could not rely "on a defendant's Fifth Amendment invocation in other proceedings"); *see also Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (similar).

[2] Kariya adopts and incorporates by reference the factual background set forth in the Jump Defendants' brief (at 3-6). This summary accepts as true the disputed (and demonstrably false)

college and became a quantitative researcher following his graduation in 2018. FAC ¶ 35. In 2020, he was promoted to Director of Strategic Initiatives, Digital Assets, and he served in that role until after the May 2021 purchases of UST at issue in this case. *Id.* On May 23, 2021, as selling pressure caused UST to deviate from its intended $1.00 peg, Kariya spoke with TFL's Kwon and reported back to his superiors at Jump that Kwon would lift certain "vesting conditions" on a loan agreement between the companies if "Jump helped with the depeg." *Id.* ¶¶ 59, 126-27. In September 2021, Kariya was promoted to President of Jump Crypto and became its "public face." *Id.* ¶ 122.

The Plaintiffs cannot and do not allege that Kariya actually *ran* Jump or had authority to set strategic initiatives or direct any trading strategy, or indeed to authorize trading of any kind. They cannot and do not allege that Kariya was a member of, or played any role in, the company's trading teams. In fact, Plaintiffs explicitly allege that others at Jump held all of these authorities. *See, e.g.*, *id.* at ¶¶ 122, 128-29.

Jump promoted development of the Terra ecosystem. *Id.* ¶ 235. As the "public face" of Jump Crypto, Kariya made statements related to the TFL tokens and ecosystem. Plaintiffs assert fraud claims against Kariya based on the following six public statements:

**First**, Kariya used the words "Terra's stability mechanism" and "balance safety" in a September 14, 2021 blog associated with the public launch of Jump Crypto. *Id.* ¶ 340(d). **Second**, Kariya tweeted on January 28, 2022 about the possibility of "confusion and panic" and wrote that it was "difficult to imagine a sustained mass exodus [*from stablecoin MIM*] *to* UST given the circumstances." *Id.* ¶ 340(h) (emphasis added). **Third**, in February 2022, after hundreds of millions of dollars were contributed to a stability reserve to support UST's peg, Kariya commented:

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.

*Id.* ¶ 340(j). **Fourth**, on or about March 1, 2022, Kariya retweeted a link to a podcast that he had appeared on with TFL CEO Do Kwon, during which Plaintiffs contend that *Kwon (not Kariya)*

---

allegations in the Complaint. It includes only those factual allegations that pertain specifically to Kariya and limited additional relevant information in sources cited by the Complaint.

made misleading statements that UST had "naturally heal[ed] back to spot" days after Jump's purchases of UST in May 2021. *Id.* ¶ 340(k). **Fifth**, in statements during a May 3, 2022, podcast that the Complaint misstates, while describing the *Pyth network*—a Jump-sponsored protocol that delivers high-frequency price data and is unrelated to the UST peg— Kariya expressed the opinion that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that . . . there is almost no possibility for [] collusion . . . ." FAC ¶ 340(l). **Sixth**, during the same podcast, Kariya supposedly described "all these *phones* [as] heavily, heavily regulated" when Jump's compliance team encouraged the use of auto-deleting chats. FAC ¶ 340(m). In fact, Plaintiffs misquote Kariya, who said "*firms*"—meaning the firms that contribute price data to the Pyth network—not "phones."

Plaintiffs contend that these statements were materially false because they suggested UST's peg was stable, and/or that they were materially misleading because they did not disclose Jump's 2021 purchases of UST, details of its relationship with TFL, or its data security protocols. Kariya left Jump in June 2024. *Id.* ¶ 35.

## II.    LEGAL STANDARD

As explained in William DiSomma's and Jump's motions, Plaintiffs must do more than satisfy the ordinary plausibility standard: they must plead fraud with particularity under Rule 9(b) and meet the PSLRA's heightened pleading requirements. *See* 15 U.S.C. § 78u-4(b). Claims should be dismissed under the statute of limitations when "the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006).

## III.    ARGUMENT

Kariya incorporates by reference the arguments of the Jump Defendants and William DiSomma to the extent applicable. Plaintiffs' claims are, however, uniquely deficient as to Kariya. Specifically: (1) Counts V–VIII are time-barred; (2) all counts fail because the UST purchases at issue were not securities transactions and the Complaint fails to plead other tokens were securities; (3) the manipulation claims fail because Kariya is not alleged to have directed or executed the purportedly manipulative trades, and arm's-length stablecoin purchases cannot constitute

4

1  manipulation; (4) none of Kariya's statements are plausibly alleged to be fraudulent; (5) Plaintiffs

2  do not plead a strong inference of Kariya's scienter; and (6) the registration-based counts fail

3  because Kariya did not participate in any relevant securities sale or control any relevant entity.

### A.    All Securities Act Counts (V-VIII) Are Time-Barred As Against Kariya.

5          The statute of limitations on Counts V-VIII ran long before Plaintiffs sued Kariya. Each of

6  these claims is subject to the one-year limitation period found in 15 U.S.C. § 77m, which provides:

7  "No action shall be maintained . . . to enforce a liability created under section 77*l*(a)(1) of this title,

8  unless brought within one year after the violation upon which it is based."[3] The one-year limitation

9  period runs from the date of the "violation"—the "sale of the security"—and is not subject to any

10  discovery rule. *In re Med. Cap. Sec. Litig.*, 2010 WL 11508331, at *3-4 (C.D. Cal. Aug. 11, 2010);

11  *Fabian v. LeMahieu*, 2019 WL 4918431, at *8 (N.D. Cal. Oct. 4, 2019). Counts V-VIII are all

12  premised on unregistered securities distributions alleged to have taken place, at the latest, by May

13  2022.[4] The one-year limitation period therefore expired, at the latest, by May 2023.

---

15  [3] Count V asserts violations of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act. FAC ¶¶ 389-
16  91. Section 12(a)(1) is codified in 15 U.S.C. § 77*l*(a)(1) and creates a private right of action against
   a person who "offers or sells a security in violation of section 77e." 15 U.S.C. § 77e, in turn,
17  codifies Section 5. Count VI is a Securities Act Section 15 control person claim against Kariya
   asserting vicarious liability for the violations alleged in Count V, *see* FAC ¶¶ 389-400, and is
18  subject to the same limitations period. *See Stichting Pensioenfonds ABP v. Countrywide Fin.
   Corp.*, 802 F. Supp. 2d 1125, 1131 (C.D. Cal. 2011); *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995,
19  1007 (N.D. Cal. 2024). Count VII is a Section 15 control person claim derivative of alleged Section
   5 violations allegedly committed by Tai Mo Shan. FAC ¶ 406. Count VIII is a Section 15 control
20  person claim derivative of a Section 5 violation that TFL allegedly committed. FAC ¶ 410.

21  [4] Count V (and derivatively Count VI) allege that the SEC Cease and Desist Order found that
   LUNA tokens distributed by Tai Mo Shan constituted unregistered securities, *id.* ¶ 391; these
22  alleged sales took place "[f]rom January 2021 to May 2022," FAC. Ex. 3 at 2, 4. Count V (and,
   derivatively, Count VI) further alleges that "[t]he loans to Tai Mo Shan that formed the basis of
23  the C&D findings "'were, in essence, public distributions of LUNA.'" FAC ¶ 392 (quoting ¶¶ 109-
   110 of the SEC Complaint). The cited paragraphs of the incorporated SEC Complaint reference
24  "two" loan "transactions," one "in November 2019" and one "[i]n September 2020." FAC Ex. 3
   ¶¶ 108-110. The Count VII control person claim derives from Tai Mo Shan's alleged Section 5(a)
25  and 5(c) violations for selling LUNA "[f]rom January 2021 to May 2022." FAC ¶ 404 (citation
   omitted). The Count VIII control person claim derives from alleged TFL unregistered offers and
26  sales of LUNA and MIR that underpinned Judge Rakoff's grant of summary judgment to the SEC
27  on Section 5 claims against TFL (Count VIII also purports to reference a Judge Rakoff grant of
   judgment on a Section 12(a)(2) violation, but there was no such claim in that case). *Id.* ¶ 410; *see*
28  *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 462, 474-476, 485 (S.D.N.Y. 2023). The

But Plaintiffs did not sue Kariya until January 25, 2024, when he was named in the Third Amended Complaint, ECF No. 156. And there is no plausible argument that Plaintiffs did not name Kariya previously because of a mistake as to his identity. Thus, the claims against Kariya do not relate back to any previous complaint. *See* Fed. R. Civ. P. 15(c)(1)(C); *Louisiana-Pac. Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir. 1993); *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1204 (N.D. Cal. 2024).

For the reasons stated in Jump's brief (at 35-40), Counts V, VII, and VIII are also independently untimely under the three-year statute of repose found in 15 U.S.C. § 77m. So is Count VI, a control person claim that takes Count V as its primary violation. FAC ¶ 398. As Jump's authorities show, the expiration of the repose period as to these claims before they were brought for the first time in the Fourth Amended Complaint vested Kariya with a substantive right of repose that precludes relation back to the Third Amended Complaint or any other complaint.[5]

### B.    Counts I-IV Must Be Dismissed Because UST Is Not A Security.

Counts I–IV rest on the premise that Jump's May 2021 purchases of UST were securities transactions. *See* FAC ¶¶ 333-413. They were not.

Under *SEC v. W.J. Howey Co.*, a financial instrument qualifies as a security when "a person invests [1] his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99 (1946). The test focuses on "the economic reality and totality of circumstances surrounding the offers and sales . . . ." *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 323 (S.D.N.Y. 2023). "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be

---

SEC claim was based on alleged unregistered sales "from at least April 2018 through May 2022." FAC Ex. 1 ¶¶ 1, 104-117.

[5] Even if relation back to the Third Amended Complaint was available, portions of Counts V-VIII would still have occurred before January 25, 2021, more than three years before Plaintiffs sued Kariya. Because relation back is unavailable as to a newly-named defendant after a statute of repose has expired, and, independently, because Plaintiffs' failure to name Kariya as a defendant before the Third Amended Complaint was not a mistake, the repose provision bars Counts V-VIII against Kariya to the extent that they are based on sales before January 25, 2021. *See United States ex rel. Osinek v. Permanente Med. Grp.*, 2022 WL 16943886, at *10-11 (N.D. Cal. Nov. 14, 2022).

served, and the factual setting as a whole." *Marine Bank v. Weaver*, 455 U.S. 551, 561 n.11 (1982). For instance, "if the original citrus groves in *Howey* were later resold, those resales may or may not constitute investment contracts, depending on the totality of circumstances surrounding the later transaction." *Ripple Labs*, 682 F. Supp. 3d at 323; *see also Donovan v. GMO-Z.com Tr. Co.*, 779 F. Supp. 3d 372, 386 (S.D.N.Y. 2025). Plaintiffs must demonstrate that the financial instruments in question were securities at the time of the relevant trades.[6]

Plaintiffs contend that Jump employees (other than Kariya) engaged in securities transactions when they bought UST in May 2021, because the SEC successfully argued that TFL violated the Securities Act in its action against TFL. FAC ¶ 6. While this Court previously rejected an argument advanced by TFL (and adopted by Jump), *see* ECF Nos. 115, 122, that "Terra Tokens" were not securities, *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710 (N.D. Cal. 2024), Kariya was not a party at that time, and the law has evolved since then. Moreover, those arguments largely ignored case-dispositive differences between TFL's issuance and sale of its tokens and Jump's secondary-market purchases of UST in May 2021. Three points should be considered.

***First***, the courts and the SEC now agree that ***crypto assets are generally not securities when they are bought and sold in the secondary market***. The case law is clear. *See, e.g.*, *SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 60 (D.D.C. 2024) (stablecoin sales were not securities transactions where purchasers would not share in sellers' returns); *Donovan*, 779 F. Supp. 3d at 387 (stablecoin pegged to Japanese yen was not a security); *cf. Ripple Labs, Inc.*, 682 F. Supp. 3d at 329 (discussing secondary-market trades). As Judge Rakoff recognized in the SEC's case against TFL, "UST on its own [is] ***not a security*** . . . ." *Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d at 472 (emphasis added). That "fact" was "undisputed by the SEC." *Id.* Judge Rakoff found that this fact did not matter in the context of the SEC's case against TFL, because TFL issued and offered UST "in combination with the Anchor Protocol" which guaranteed investors a 20% return.

---

[6] *See Salameh v. Tarsadia Hotel, Corp.*, 726 F.3d 1124, 1131-32 (9th Cir. 2013) (requiring an investment contract's elements be satisfied at the time of the particular transaction); *SEC v. Payward*, 2024 WL 4511499, at *11 (N.D. Cal. Aug. 23, 2024) (holding that primary- and secondary-market sales of crypto assets should be analyzed separately); *see also Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (en banc).

*Id.* But that is irrelevant to whether *Jump's* secondary-market purchases of UST were securities transactions, and Plaintiffs have not alleged that they were.

The SEC's commissioners have also confirmed the sharp line dividing issuers' sales of crypto to raise capital, like those at issue in the SEC's case against TFL, from secondary market trades, like those at issue here. Chairman Atkins has explained that "most crypto assets are not themselves securities," and that while crypto assets can underlie or overlay investment contracts, crypto tokens are not securities when they do not incorporate investment contracts.[7] Similarly, Commissioner Peirce has identified as securities only those crypto assets that are intrinsically securities, offered "as part of an investment contract," or "[t]okenized securities," and Commissioner Uyeda has also recognized that many crypto tokens are not securities.[8]

**Second**, *Howey*'s second prong is aligned with the foregoing precedent and guidance. Jump's May 2021 purchases of UST to support its publicly announced $1.00 peg were ***not an investment in a common enterprise***. The purchases were a response to "fear of a bank run" on UST during a period when the algorithm that provided an arbitrage opportunity between UST and its $1.00 peg was allegedly not functioning. FAC ¶¶ 2, 106. Jump was in no way "investing in a common enterprise" through these trades. It was not buying UST from TFL, and the sellers in these trades were free to use Jump's payments however they wished. *Cf. Ripple Labs, Inc.*, 682 F. Supp. 3d at 329 (crypto assets were not securities as sellers were not obligated to use proceeds on the enterprise); *In re Celsius Network LLC*, 668 B.R. 722, 749 (Bankr. S.D.N.Y. 2025). All that is plausibly alleged is that Jump bought UST below $1, believing (correctly) that its peg could be restored and that Jump later profited by selling its UST for around $1. That is an investment in UST, but not an investment in a common enterprise.

**Third**, Jump's May 2021 UST purchases cannot satisfy *Howey*'s third prong because Jump

---

[7] *See* Paul S. Atkins, Chairman, U.S. Sec. & Exch. Comm'n, *The SEC's Approach to Digital Assets: Inside "Project Crypto,"* Remarks at the Fed. Reserve Bank of Phila. (Nov. 12, 2025), https://perma.cc/6L6R-ASTH.

[8] Hester M. Peirce, Comm'r, U.S. Sec. & Exch. Comm'n, *There Must Be Some Way Out of Here* (Feb. 21, 2025), https://perma.cc/TQ9E-UZ6J; *see* Mark T. Uyeda, Comm'r, U.S. Sec. & Exch. Comm'n, *Remarks at the Crypto Task Force Roundtable on Custody* (Apr. 25, 2025), https://perma.cc/HZL8-XPJ8.

1   *lacked an expectation of "profits solely from the efforts of the promoter or a third party,"* 328

2   U.S. at 299, when Plaintiffs' core allegation is that Jump profited from a market reevaluation of

3   the stability of UST that *Jump caused* over the course of several hours by betting heavily on (and

4   thereby supporting) UST's $1 peg. *See* FAC ¶¶ 136, 141, 144. As indicated above, Jump's

5   purchases were not investments in TFL at all. "'Jump was buying large amounts of UST off-chain,'

6   meaning outside of the Terra blockchain on [secondary] exchanges like KuCoin." FAC ¶ 135.

7   While "anyone who buys or sells, for example, a horse or an automobile hopes to realize a

8   profitable investment," *Ripple Labs*, 682 F. Supp. 3d at 329 (cleaned up), when that hope is not

9   paired with some expectation of profits "derived from the entrepreneurial or managerial efforts of

10  others" (i.e. from TFL) but from mere market changes in the asset's price, those purchases are not

11  securities transactions. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

12       **C.      Plaintiffs Fail To Plead That The Other "Terra Tokens" Are Securities.**

13       Plaintiffs fail to identify the transactions involving the undifferentiated "Terra Tokens" at

14  issue in Counts V–VIII to which *Howey* should be applied. The same is true of the unexplained,

15  passing references to "Terra Tokens," LUNA, or "UST/LUNA" in Counts I-IV—counts that are

16  clearly premised on statements about, or trading in, UST. The Complaint spills pages of ink

17  asserting that all Terra Tokens are securities based on TFL's issuance and sales of those tokens

18  and Judge Rakoff's opinion in the SEC's case against TFL (which is both distinguishable and not

19  dispositive here), FAC ¶¶ 286-322, but Plaintiffs concede that reasonable investors could not

20  determine "whether the Terra Tokens" at the time of their unidentified trades "were securities,"

21  *id* ¶ 322. Plaintiffs' failure to identify the transactions at issue, other than the May 2021 UST

22  purchases, makes it impossible for Kariya—who was not a party to any trade—to address their

23  allegations under *Howey*, and requires dismissing Counts I–VIII. *See Salameh*, 726 F.3d at 1131.

24       **D.      All Counts Sounding In Manipulation (II–IV) Must Be Dismissed.**

25       Counts II, III, and IV seek to hold Defendant Kariya liable for *Jump's* allegedly

26  manipulative trading activity around the 2021 de-peg. FAC ¶¶ 365, 374, 384. Plaintiffs attempt

27  this both by using group pleading to lump Kariya together with "Defendants" in counts that allege

28  trading only on the part of Jump (Counts II and III) and by bringing an Exchange Act Section 20(a)

9

control person claim seeking to hold Kariya vicariously liable for Jump's "wrongful conduct related to the de-peg." (Count IV), FAC ¶ 383. These attempts fail.

### 1. Kariya did not control or direct trading activities.

Plaintiffs do not allege that Kariya was a control person within the meaning of Section 20(a), which would require a "strong inference of (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (citing *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)). For the reasons stated below and in Jump's brief (at 29-35), and in this Court's prior opinion, Plaintiffs have not plausibly alleged any primary manipulation violation against Jump or anyone else. *Patterson*, 710 F. Supp. 3d at 716-17. Even if they had, they have not pled a strong inference of Kariya's control over Jump.

Plaintiffs allege that Kariya was "President of Jump Crypto," FAC ¶ 35, but an "individual's status as an officer or director" of an entity alleged to have committed the primary violation "is insufficient, standing alone, to demonstrate the exercise of control." *See Amgen*, 544 F. Supp. 2d at 1037; *Howard*, 228 F.3d at 1065; *Furlong Fund LLC v. VBI Vaccines, Inc.*, 2016 WL 1181710, at *7 (S.D.N.Y. Mar. 25, 2016). There are no allegations that Kariya held a controlling interest in Jump or any other entity (and he did not). Moreover, Kariya only became President of Jump Crypto in September 2021. FAC ¶ 35. Thus, Plaintiffs' control person theory as to events that took place before September 2021—including the May 2021 trading around the time of the de-peg—cannot even get off the ground.

More fundamentally, for control, an officer must, at a minimum, oversee the *specific transactions* that form the basis of the alleged primary violations. *See, e.g.*, *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1163-64 (9th Cir. 1996) (finding control absent where Chairman and CEO did not "exercise[] direct or indirect control over the debenture offering" at issue "itself," and explaining that a director who "had nothing to do with the preparation of the prospectuses" at issue was not a controlling person). Counts II and III allege primary violations based on Jump's *trading* in UST. FAC ¶¶ 365, 374, 366. But there is not a single allegation in the Complaint that Kariya played any role in, much less controlled, Jump's trading in any asset.

To the contrary, Plaintiffs explicitly allege that individuals other than Kariya ran Jump and made all strategic and trading decisions, including those related to UST and Terra. *See* FAC ¶ 122 (alleging that others at Jump "ran the team, directed the lead trader on trading strategies, set strategic initiatives, and approved any sort of deal strategy or trading strategy"), ¶ 128 (others "began directing the traders on a new strategy" of "aggressively buying and accumulating UST"), ¶ 129 (others "instructed Jump to sell the UST"). Kariya was merely "'the public face of Jump Crypto,' in charge of interfacing between Jump and other projects/companies within the crypto community." FAC ¶ 122 (citation omitted). The Complaint's allegations that Kariya tweeted about TFL's tokens and corresponded with potential business partners for Jump do not raise any inference that he controlled the trades that Plaintiffs contend were manipulative—especially given Plaintiffs' allegations that others directed the trading.

The only allegation that Kariya played any role with respect to the 2021 de-peg is that he spoke to Do Kwon about Jump's willingness to support the UST peg and Kwon's willingness to modify the terms of a loan deal between Jump and TFL to accelerate the vesting of tokens. FAC ¶¶ 96-98, 112, 126. According to Plaintiffs, after Kariya relayed this information, "Defendant DiSomma"—not Kariya—"began directing the traders on a new strategy" of buying UST. *Id.* ¶¶ 112, 128, 348 (alleging that "DiSomma[] personally led Jump's UST trading efforts" and that Defendant Kariya merely spoke with Kwon). The allegations that Kariya negotiated terms of a loan of LUNA from TFL to Jump and acted as a go-between regarding a modification of the terms do not come close to asserting that Kariya had control over Jump's trading in UST (or other assets).

### 2.   Negotiating terms of a crypto token loan is not market manipulation.

Allegations that Kariya participated in arranging a loan deal pursuant to which others at Jump decided to engage in allegedly manipulative trading do not amount to a claim that Kariya himself participated in manipulative trading. Plaintiffs do not allege that the loan transaction itself constituted market manipulation; nor could they. The Rule 10b-5(a) and (c) manipulation claims in Count II and the Section 9(a)(2) and 9(a)(6) manipulation claims in Count III all require allegations of market activity designed to affect prices by sending a false signal to the market, which a private loan agreement between two companies could not. *See Desai v. Deutsche Bank*

*Sec. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009) (per curiam) ("Manipulative conduct . . . actionable under Rule 10b-5(a) or (c) . . . includes activities designed to affect the price of a security by artificially stimulating market activity."); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 616-617 (7th Cir. 2011) ("To show a violation of section 9(a) . . . a private plaintiff must plead," among other things, that "a series of transactions in a security created actual or apparent trading in that security or raised or depressed the market price of that security."); 15 U.S.C. § 78i(a)(2); *id.* § 78i(a)(6); *id.* § 78i(f) (persons liable under Section 9 include only those "who willfully participate[] in any act or transaction in violation" of the section).

Nor can Plaintiffs hold Kariya liable for trading conduct in which he did not participate by alleging in Count II a scheme to defraud under Rules 10b-5(a) and (c). There is no private right of action under Section 10(b) for aiding and abetting, or for conspiracy. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994); *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995). Scheme liability is not a back door into vicarious or secondary liability; rather, the plaintiff must allege that "each defendant committed a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). "[T]he defendant's own conduct"—not the conduct of others involved in the scheme—"must be viewed alone for whether it had the purpose and effect of creating a false appearance of fact in furtherance" of the scheme. *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048, 1050 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008). To be "manipulative" or "deceptive" under Section 10(b), conduct must communicate a false appearance of fact to the plaintiff. *See SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009).

Plaintiffs do not allege that Kariya engaged in any conduct in furtherance of the alleged manipulative trading scheme that created a false appearance to any audience. Kariya did not participate in Jump's May 2021 trading in UST that Plaintiffs allege sent a false signal to the market. FAC ¶ 368. Even if the Complaint could be stretched to allege that Kariya helped arrange a deal that incentivized Jump to help maintain UST's peg, that would not state a scheme claim against Kariya: "It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or

overall scheme must have had a deceptive purpose and effect." *Simpson*, 452 F.3d at 1048 (emphasis in original). Plaintiffs do not allege that *the loan deal itself* was unlawful or deceptive to the market; after all the deal did not send any signal, let alone a false one, to anybody. *Id.* at 1050 ("Participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended that another party would . . . effectuate a fraud."); *see SEC v. Daifotis*, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011), *modified on reconsideration*, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011).

Thus, this Court relied on *Simpson* to hold that allegations that TFL agreed to remove loan conditions and provide LUNA to Jump, and that Jump spoke with Kwon before Jump's re-peg trading, were "not enough to state a claim for manipulative or deceptive conduct" even against Jump. *Patterson*, 710 F. Supp. 3d at 716-17. To now hold that Plaintiffs have stated a claim against Kariya based on allegations that he participated in a non-trading subset of these events would distort Section 10(b)'s scheme coverage into including the aiding-and-abetting and conspiracy concepts the Supreme Court rejected in *Central Bank. See Simpson*, 452 F.3d at 1048 n.5, 1049.

### 3.  **Plaintiffs' improper group pleading cannot be the basis for a claim.**

Without any basis to allege Kariya's involvement in or control over the allegedly manipulative trading activity, Plaintiffs make allegations about "Defendants" generally based on Jump's alleged conduct.[9] That does not suffice to state a fraud claim against Kariya under Rule 9(b) or the PSLRA. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012); *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*, 2022 WL 3598246, at *4 (D. Ariz. Aug. 23, 2022). Under Rule 9(b), the Court may "consider only" allegations "specific" to a defendant in deciding

---

[9] Paragraph 364 (Count II) alleges that "*Defendants*, individually and in concert with others," engaged in manipulative acts, but the subsequent paragraphs fail to make any allegations specific to Kariya. Paragraph 373 (Count III) uses the same language. Paragraph 365 (Count II) alleges that "*Defendants* secretly colluded with TFL and Do Kwon" and refers to "*Defendants'* surreptitious human intervention," but specifically attributes the intervention only to "Jump['s] purchase[s]." Paragraph 374 (Count III) discusses "Jump['s] purchase[s]" but then attempts to sweep more broadly by group-pleading that "*Defendants* secretly colluded with TFL and Do Kwon to restore the peg." Paragraph 367 (Count III) alleges that "Defendants participated in an intentional scheme" by way of causing a re-peg. Count III similarly relies on "Defendants' re-peg" and "Defendants' artificial propping up." FAC ¶¶ 376-77 (emphasis added throughout).

whether Plaintiffs have stated a claim against that defendant, *see U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 281 n.9 (4th Cir. 2014), and the Plaintiff must "specify what manipulative acts were performed" and "which defendants performed them." *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, *6 (S.D.N.Y. Oct. 6, 1995). And group pleading—such as alleging that "each of the Defendants" took certain actions—is "inadequate to state a claim under the PSLRA." *See Mehedi v. View, Inc.*, 2024 WL 3236706, at *15–16 (N.D. Cal. June 28, 2024); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1092 (C.D. Cal. 2008); *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *6 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 Fed. App'x 570 (9th Cir. 2010).

### 4. Plaintiffs fail to allege Kariya's scienter to fraudulently manipulate.

Even if Kariya's actions in securing an agreement to remove vesting conditions from a loan from TFL to Jump could somehow constitute manipulation, that allegation is nowhere near sufficient to create a "strong inference" of Kariya's scienter to defraud, *see Desai*, 573 F.3d at 939; *Seaman v. California Bus. Bank*, 2013 WL 5890726, at *6 (N.D. Cal. Oct. 30, 2013), or that he "willfully" participated in any manipulation, 15 U.S.C. § 78i(f).

### 5. Open-market stablecoin trades cannot constitute manipulation.

Even if Kariya had directed the trades discussed in the Complaint (and he did not), those trades were not manipulative. Counts II–IV recast support for UST's peg as illicit manipulation— even though those purchases were incentivized by, and publicly touted as an intended feature of, UST's design. *See, e.g.*, FAC ¶¶ 126–29, 340(g). A manipulation claim requires "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). It also requires an "artificial" price impact that distorts the "natural interplay of supply and demand" by sending "a false pricing signal to the market." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007); *accord Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1236-37 (C.D. Cal. 2015). Classic manipulation involves "wash sales, matched orders, or rigged prices" intended to mislead by artificially affecting market activity. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). And manipulative intent must be the "but for" cause of the transaction. *SEC v. Masri*, 523 F. Supp.

14

2d 361, 372 (S.D.N.Y. 2007) (emphasis in original). Trading driven by a *bona fide* "investment purpose[] or other economic reason[]" cannot "artificially affect[]" the price. *Id.* at 373.

UST is a stablecoin. Its price was designed to be "pegged" at $1.00. Open-market, arm's length purchases made to profit off that peg cannot constitute securities-law "manipulation" for two related reasons. FAC ¶ 340(c)(1). *First*, manipulation targets movement to an "artificial" price untethered from supply and demand. But UST's design—through its mint/burn mechanism—created the very arbitrage opportunity that incentivized buying below $1 and thereby profiting if the $1 peg was maintained. Purchases like Jump's are precisely the trading UST's mint/burn algorithm was designed to encourage. *Second*, calling peg-support "manipulation" misunderstands the economics of an algorithmic stablecoin: over any meaningful horizon, the price must be binary—either the peg holds at $1 or the system fails. FAC ¶ 7. Buying below $1 is simply an economically rational wager on the algorithm and the peg; selling reflects the opposite view or concern. Such trading sends no "false pricing signal," *cf. ATSI*, 493 F.3d at 100; *ScripsAmerica*, 119 F. Supp. 3d at 1236, rather it reflects rational bets in the marketplace from those with competing views. And buy-side trades, like Jump's, have an inherent *bona fide* "investment purpose," succeeding if the peg prevails and failing if it does not. *Masri*, 523 F. Supp. 2d at 373.

### E.    All Counts Sounding In Fraud By Misstatement (I & IV) Must Be Dismissed.

#### 1.    Plaintiffs' claims cannot be based on statements Kariya did not make.

Of the thirteen allegedly misleading statements or omissions in Count I, FAC ¶ 340(a)-(m), Plaintiffs allege that Kariya was a speaker for at most six. *Id.* ¶¶ 340 (d), (h), (j), (k), (*l*), (m). Only the "maker" of a statement can be liable under Rule 10b-5. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) (citing *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43, 166 (2011)). The Court may not consider the non-Kariya statements/omissions—which Plaintiffs allege were made by either Jump or LFG—in assessing whether Plaintiffs state a claim against Kariya. FAC ¶¶ 340(a), (b), (c), (e), (f), (g), (i).

Plaintiffs again attempt a control person theory and use group pleading to try to shoehorn in liability for Kariya based on Jump's and LFG's statements. But again, Plaintiffs fail to allege Kariya's control as to the specific conduct at issue. *See Paracor Fin., Inc.*, 96 F.3d at 1163. For

15

one thing, Kariya was not even President of Jump at the time of the first three statements/omissions listed in Count I. FAC ¶ 340(a)-(c). Moreover, there are no allegations that Kariya had control over Jump's or LFG's formulation, approval, or issuance of any of their statements (before or after he was given the title President), or over the employees who undertook these tasks. *See Howard*, 228 F.3d at 1066 (discussing Ninth Circuit case in which a CEO was not a control person in part because he "did not even read the memorandum" at issue and a director was not a control person "in part because he did not prepare the prospecti [*sic*]" at issue); *Amgen*, 544 F. Supp. 2d at 1037 (distinguishing between "non-speaking Defendants" and defendants alleged to have "participated in drafting, preparing, and/or approving public reports and other statements").

Plaintiffs assert in conclusory fashion that "Jump (via Kariya)" exercised control over LFG and LFG's statements, FAC ¶ 192, but they fail to allege that Kariya had even general control over LFG, much less control as to its specific statements. All they say is that Kariya was one member of a six-person LFG "Governing Council" "comprised of . . . leaders and experts in the industry." *Id.* ¶ 197. But the Complaint expressly alleges that the Governing Council was *not* in control of LFG: "*Contrary to claims that the LFG was 'overseen and operated' by a governing council*, the LFG's reserves were effectively controlled from a wallet solely accessible to Kwon . . . without approval or oversight from any council." *Id.* ¶ 201 (emphasis added). In fact, "[t]he LFG was legally governed by a two person board of directors . . . *not the six members of the governing council*[.]" *Id.* ¶ 202 (emphasis added). All the Council could do was advise and make recommendations to the board and take board-approved actions. *Id.* Kariya's status as a single member of a Governing Council that the Complaint affirmatively alleges had only a ceremonial role does not support any inference that he controlled the issuance of specific LFG statements.

Finally, the allegedly improper omission described at ¶ 340(a) is asserted only as to "Defendants." *Id.* ¶ 340(a); FAC Ex. 4 ¶ 340(a) (not listing Kariya as a speaker for this allegation). In a similar manner, Paragraphs 340(f) and (g) allege in unsupported, conclusory fashion that LFG

made certain statements "at the behest of Defendants."[10] These group allegations cannot state a claim against Kariya. *See United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (under Rule 9(b), a complaint must allege an individual defendant's "role in making a false statement"); *Kelley*, 2008 WL 5170598, at *6, *aff'd*, 384 Fed. App'x 570 (9th Cir. 2010) (explaining that the PSLRA eliminated any group-pleading "inference that certain documents and statements were the collective work of individuals with 'direct involvement' in high-level operations"); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364 (5th Cir. 2004).

### 2.   None of the statements attributed to Kariya can support a claim.

As for the statements Plaintiffs allege Kariya actually made, Plaintiffs' theories of falsity, materiality, reliance, and loss causation all turn on the premise that his statements misled investors regarding the ability of the algorithm to maintain UST's peg without assistance, when the peg ultimately did not withstand "periods of high volatility in the market." *See* FAC ¶¶ 340(d)(1), (h)(1), (j)(1), (k)(1), (*l*)(1), (m)(1), 355, 357. But Plaintiffs have not pleaded that Kariya made any misrepresentations or omissions regarding the algorithm's ability to maintain the peg (or that were otherwise false) or on which Plaintiffs could have reasonably relied (or in fact relied). And Plaintiffs' failure sufficiently to plead that Kariya obscured the "truth" whose revelation they contend caused the Terra Tokens' price to drop necessarily means they have failed to plead loss causation.[11] *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017).

*Paragraphs 340(l) and 340(m).* Two of the six statements for which Plaintiffs allege Kariya was a speaker *do not relate to UST, LUNA, or the Terra ecosystem at all*. Paragraphs 340(*l*) and 340(m) consist of misleadingly cherry-picked and even misquoted statements from a May 3, 2022 podcast.[12] At the very beginning of the podcast, Kariya briefly mentions Terra as one

---

[10] The Complaint alleges that the LFG statement in ¶ 340(f) was made "at the behest of Jump," not Kariya. FAC ¶ 193. The previous allegation discussing the LFG statement in ¶ 340(g), ¶ 194, does not allege that LFG made the statement at anyone's behest but its own.

[11] Plaintiffs also fail to plead the reliance and loss causation elements for the additional reasons discussed in Jump's brief (at 25-29).

[12] The Court may consider the entire podcast, which Plaintiffs incorporate into their Complaint by quoting and relying on "portions" thereof. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *9 (N.D. Cal. Mar. 21, 2018). The (apparently) auto-generated transcript from the

17

of a number of collaborations on which Jump has worked. Goelman Ex. 1 at 2, 0:51 (mentioning Wormhole, Pyth, Solana, and Terra). Nineteen minutes later, the podcast host asks Kariya about one of these projects—not Terra, but Pyth. *Id.* at 8, 19:39 ("In your mind, what is it that Pyth offers that other Oracle solutions don't offer?"). Kariya explains that Pyth "is a very hyper specialized tool" for sharing "high fidelity financial data," *id.*, and the host notes that some critics say that there is an "inherent kind of conflict of interest" within Pyth because the firms providing price data are also engaged in their own trading operations, *id.* at 9, 21:49. The host then asks Kariya how Pyth has "gone about setting up incentives to make sure that *the users of Pyth* and *the contributors to Pyth* are not at odds with one another?" *Id.* (emphasis added). It is in response to this question—about data quality within *Pyth*, with no discussion of anything related to Terra—that Kariya makes the statements excerpted in Paragraphs 340(*l*) and 340(m). He explains that the data-contributing trading firms are in competition with one another, and that Pyth uses algorithms to assess the quality of data firms provide. *Id.* at 9-10, 22:44. Thus, Kariya explains—in the statement excerpted in Paragraph 340(*l*) —"there is almost no possibility for[,] one[,] collusion across these landscapes, given the composition of the people in the network and the incentive structure again is obviously explicitly set up to discourage that." *Id.* at 10, 22:44. In his next sentence, Kariya says—in the statement excerpted in Paragraph 340(m)—that "all these [firms] are heavily, heavily regulated . . . [Jump's put] about 20 years of its reputation and a giant, giant business behind kind of making a lot of this happen. And we're definitely incentive aligned to make this thing as successful as it can possibly be." *Id.*[13] Not until nearly 10 minutes later, when the discussion has shifted to a wholly different topic, does anybody (the host) mention Terra. *Id.* at 14, 34:04.

No reasonable investor would have understood these statements about Pyth's resistance to "collu[sion]" on the part of data-contributing firms as having anything to do with TFL, its assets,

show's website is attached as Exhibit 1 to the Declaration of Aitan D. Goelman. The audio is available from Apple Podcasts at https://perma.cc/7GNK-W8Y7 and from Solana.com.

[13] These alterations are to the transcript, which says "forms" instead of "firms" and "I spoke" instead of "Jump's put." Kariya, who is a national of the Republic of India and lives there, speaks with his native accent. The audio (Apple Podcasts circa 25:21) is clear that he says "firms" (not "phones") and "Jump's put."

or whether Jump "had colluded with TFL/Kwon to bail out the peg in May 2021." FAC ¶ 340(*l*)(1). Moreover, in Paragraph 340(m), Plaintiffs allege that Kariya said "all these *phones* are heavily, heavily regulated," FAC ¶ 340(m) (emphasis added) when the audio and context make clear that he said "all these *firms* are heavily, heavily regulated"—i.e., the financial firms that provide data to Pyth. Correcting Plaintiffs' obvious misquote makes nonsense of their falsity theory, that Jump did not use regulated phones but rather "the auto-deleting . . . Signal" app. *Id.* ¶ 340(m)(1).

**Paragraph 340(h).** Though the Twitter thread at Paragraph 340(h) does relate in a general sense to UST, it is entirely unrelated to the issues Plaintiffs say rendered it false or caused their losses.[14] Plaintiffs allege that it was misleading for Kariya to tweet that "It's difficult to imagine a sustained mass exodus to UST given the circumstances," because "Defendants knew that a 'mass exodus' had already been secretly averted in the May 2021 $1.00 peg bailout." FAC ¶ 340(h)(1).

But the risk Plaintiffs allege the statement covered up, and that ultimately caused their losses, was a mass exodus *from* UST: "a massive selloff" of UST of the sort that eventually occurred in May 2022. *Id.* ¶¶ 258, 357-58. Kariya was discussing an entirely different risk to an entirely different set of investors: an exodus not from UST, but "*to* UST." The Twitter thread discussed a program in which investors could borrow MIM—a non-Terra, overcollateralized stablecoin from the Abracadabra ecosystem that is not referenced elsewhere in the Complaint— against aUST,[15] leaving them "with a long UST, short MIM position earning 100%+ APY via Anchor." Goelman Decl. Ex. 2.[16] Kariya explains in his Twitter thread that investors in this situation might be incentivized to unwind their position "if [the] MIM peg falls under stress," which would leave them "with UST instead of MIM." *Id.* This would put upward pressure on MIM, moving MIM back up toward its peg. *Id.* But for investors to unwind in this manner would mean "giving up their 100%+ APY yield," so certain investors might wait before unwinding (and thereby pushing the price of MIM back up toward its peg); therefore "we 'could' see a continued

---

[14] The Court previously held that Plaintiffs had not stated a claim based on this thread, *Patterson*, 710 F. Supp. 3d at 714.

[15] aUST is "[a] token provided when UST tokens are deposited into Anchor Protocol." FAC ¶ 88.

[16] Ex. 2 reproduces the January 28, 2022, thread containing the language Plaintiffs quote. The Complaint uses a faulty link. FAC ¶ 203.

MIM depegging for a bit."[17] *Id.* In Kariya's opinion, it was "tough to imagine" that certain investors would "take a hit" (unwinding so they have "UST instead of MIM" and thereby giving up on the Anchor yield) just because of "ideological concerns" (i.e., the desire to push MIM back up toward its peg). *See id.* "[G]iven the circumstances," Kariya opines, "[i]t's difficult to imagine a sustained mass exodus *to* UST." *Id.* (emphasis added). In other words, investors won't unwind their borrowing positions, leaving them with more UST and less MIM. This discussion of the potential for investors to obtain *more* UST in spite of a de-peg *of MIM* is not relevant to the risk central to Plaintiffs' falsity, materiality, reliance, scienter, and loss causation arguments—that *UST* would de-peg and cause investors to *sell off* UST.[18]

Moreover, "difficult to imagine" is a non-actionable forward-looking opinion. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (subjective statements "preceded by qualifiers, such as 'We believe,'" were non-actionable). And Kariya accompanied his forward-looking opinion with "a meaningful cautionary statement," so it is subject to the PSLRA's safe harbor provision, *Weston Fam. P'ship v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (citing 15 U.S.C. § 78u-5(c)(1)): "The primary reason I wrote this is to understand what I got wrong. Please fire away." Goelman Decl. Ex. 2.

***Paragraph 340(d).*** In another misquote, Plaintiffs allege that Kariya stated in a blog post that "Terra's stability mechanism" was "effective to 'balance safety.'" FAC ¶ 340(d). That is not what the post says; it does not use the term "effective" or discuss effectiveness in connection with Terra. The post announces Jump Crypto and provides examples of Jump's engagement with

---

[17] Thus, the "de-pegging event" Plaintiffs say Kariya discussed was a de-pegging of MIM, not UST. FAC ¶ 340(h).

[18] Plaintiffs also allege that this thread was misleading because it "omitted any description of the loans Jump received from TFL such that it was highly incentivized to promote investment in Terra Tokens," but Plaintiffs omit that Kariya explained "[f]or full disclosure" that Jump held "positions in LUNA and UST." Goelman Decl. Ex. 2. Plaintiffs fail to explain why a specific description of the loan agreement was required, so their allegation fails under the PSLRA. *Patterson*, 710 F. Supp. 3d at 714. For the same reasons explained in Jump's brief (at 19-21), information about the loans was not required to make the statement non-misleading, and Kariya was under no duty to disclose the information. Plaintiffs' repetition of this loan-omission assertion fares no better for the statements at Paragraphs 340(d) and 340(j), *see infra*.

"exciting projects" including:

> Terra governance proposals - There is a lot of cool, complex economic machinery behind some of the most exciting and successful projects in the DeFi landscape. Terra's stability mechanism is a great example of this. It requires solving for a number of crucial market parameters in a highly dimensional space to balance the safety and elasticity of the platform. Our data engineering pipelines and battle experience in the markets have uniquely enabled us to analyze these complex systems and meaningfully contribute to the discussion.[19]

The post does not represent that the mechanism effectively balances safety against other factors, or even explain how it strikes the balance—Plaintiffs do not provide any PSLRA-compliant explanation of their apparent assumption that "safety" refers to UST's ability to remain pegged to the dollar, as opposed to some other factor (such as resistance to a hack). No reasonable investor could have walked away from this statement with the impression that the UST algorithm was sure-fire guaranteed to maintain the peg in all circumstances.

Moreover, this statement, especially in its context as part of the post's expression that the stability mechanism is "a great example" of "cool complex economic machinery," is a non-actionable opinion because it was "subjective" and not "capable of objective verification." *See Apollo Grp. Inc.*, 774 F.3d at 606-07 (9th Cir. 2014) (citation modified); *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 WL 3187688, at *9 (C.D. Cal. Jan. 17, 2017).[20]

**Paragraph 340(j).** This Court previously concluded that the Paragraph 340(j) statement appeared to be an expression of opinion rather than a knowingly false statement of fact, and nothing in the Fourth Amended Complaint changes the analysis. *Patterson*, 710 F. Supp. 3d at 714. Kariya stated: "UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST. . . . It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions."

---

[19] Kanav Kariya, *Introducing Jump Crypto*, Jump Crypto (Sep. 12, 2021), https://perma.cc/M6A6-DE4Q; FAC ¶ 160 n.151.

[20] Plaintiffs also fail to allege that Kariya did not believe the opinions he expressed in this or other statements or that he knew facts that "seriously" undermined them. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

FAC ¶ 340(j). Thus, in the context of announcing the Reserve, Kariya expressed his vague, subjective, forward-looking opinion that it would strengthen market confidence in UST. *Cf. Oaktree Principal Fund V, LP*, 2017 WL 3187688, at *9 ("statements that a company . . . 'is confident' that certain projections will be realized in the future" are forward-looking).

None of the Plaintiffs' explanations for why this statement was misleading hold up. Plaintiffs say Kariya should have mentioned that "UST was not nearly as 'stable' as promoted" because "Defendants" knew based on the 2021 bailout that the algorithm could not hold the $1 peg in the face of market volatility absent intervention. *See* FAC ¶ 340(j)(1). But the entire thrust of Kariya's statement and the surrounding press release discussion is that the algorithm may not suffice by itself to maintain the peg, and so the Reserve would serve as a potential "additional avenue" and "further layer of support" to help "maintain" the peg where the algorithm alone would not suffice.[21] A statement explaining that the algorithm might need assistance cannot be misleading because it fails to mention an instance in which the algorithm allegedly needed assistance. *See also* FAC ¶ 194; *Paracor*, 96 F.3d at 1159 ("[T]he representations the Investors received . . . must be viewed in light of all the information then available to the market.") (citation modified).[22]

Nor is there any allegation in the Complaint that, to the extent the LFG Reserve was undercapitalized or "not ready," FAC ¶ 340(j)(1), Kariya or anyone at Jump was aware of this at the time of the February 22, 2022 statement or at any time before the crash. *See* FAC ¶¶ 241, 260 (alleging that, during the crash, Jump asked Kwon whether the Reserve would be deployed).

***Paragraph 340(k).*** At Paragraph 340(k), Plaintiffs rehearse yet another set of statements from which they previously tried and failed to state a claim. *Patterson*, 710 F. Supp. 3d at 715. Plaintiffs allege that Kariya and Kwon appeared as guests on the March 1, 2022 Ship Show podcast

---

[21] Press Release, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWeb (Feb. 22, 2022), https://perma.cc/YWC5-KQUN (last visited Dec. 17, 2025); FAC ¶ 340(i) n.1.

[22] Moreover, Kariya did not "promote[]" UST or its algorithm as indefatigably "stable" in the face of "high volatility." *See* FAC ¶ 340(j)(1). Plaintiffs seem to be referring to Kariya's use of the term "stablecoin," but the mere use of that word is not a representation that the coin's value would never deviate from $1.00. The Complaint quotes Kariya's acknowledgment that the peg could experience "stressful conditions" when extra reserve would be used to "protect the peg." *Id.* ¶¶ 340(j).

hosted by a Jump employee, where Kariya "promoted the stability and security of the UST and LUNA peg as Terra's two most 'attractive' features." FAC ¶ 340(k). But it was the host, not Kariya, who stated, in the context of asking Kwon "to explain more about how UST achieved stability," that "[t]he two attractive features of Terra are its security and stability." Goelman Decl. Ex. 3 at 19, 34:20; *see* FAC ¶ 19 n. 213.[23]

Plaintiffs rely on *Kwon's* statements on the podcast that they say gave the impression that the algorithm alone was sufficient to maintain the peg, but even if this were a fair reading of Kwon's statements (it is not), Kariya had no duty to correct any misstatement by Kwon.[24] *See, e.g.*, *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *7 (C.D. Cal. July 13, 2015); *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1052 (7th Cir. 2012) (MGIC corporation did not have a duty to correct statements made by executives of a related corporation during an MGIC-hosted conference call). Nor does the allegation that Kariya "retweeted the link" to the podcast Jump had already published somehow transform him into the liable "maker" of Kwon's statements. FAC ¶ 340(k); *see Janus Capital Grp.*, 564 U.S. at 142-43 (mere publishing of another's statement does not transform one into the "maker" of the statement, as "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed"). In any event, *Kariya's* own statements on the podcast made clear that the algorithm might need assistance to maintain the peg.[25] No

---

[23] Even if the quoted "attractive" statement could somehow be attributed to Kariya, it is textbook, non-actionable opinion; the same is true of the host's vague statement that Terra features an undefined concept of "stability."

[24] It was this "comment by Kwon," not anything Kariya said, that Judge Rakoff described as the "SEC's most direct evidence of a misstatement to investors." *Terraform Labs Pte.*, 708 F. Supp. 3d at 481-82. Judge Rakoff did not hold that this statement was misleading; he held there was a genuine dispute given the argument that "when the interview with Mr. Kwon is read in context, it is clear that Mr. Kwon was discussing the speed at which the mint-burn mechanism -- which itself depends on human intervention by those who use the mechanism -- 'heals' the exchange rate in times of high slippage cost." *Id.* at 482 (citation omitted).

[25] After Kwon answered the host's "attractive" question in part by referencing the algorithm, Kariya jumped in to explain that in "periods" of a "liquidity crisis," "it's extremely useful to have a reserve that can step in." FAC ¶ 222; Goelman Decl. Ex. 3 at 20, 35:49. The LFG reserve was meant to "step in . . . when there are extreme price movements." FAC ¶ 222; Goelman Decl. Ex. 3 at 20, 35:49.

reasonable investor could have interpreted Kariya's statements to represent that the algorithm by itself would be capable of maintaining the peg in all circumstances, and no reasonable investor would have relied on that idea in purchasing Terra Tokens.

### F.    Counts I and IV Must Be Dismissed Because The Complaint Fails To Plead Kariya's Scienter As To The Alleged Statements.

Even if Plaintiffs had sufficiently alleged actionable misleading statements as to Kariya, Count I would fail for the independent reason that it is *entirely devoid* of any allegations that Defendant Kariya made any statement with scienter. Under the PSLRA, a plaintiff must plead a strong inference of scienter as to "*each individual defendant.*" *See Cornielsen v. Infinium Cap. Mgmt.*, LLC, 916 F.3d 589, 602 (7th Cir. 2019) (emphasis in original); *Apollo Grp.*, 774 F.3d at 607. A plaintiff cannot plead scienter in group fashion. *Southland Sec. Corp.*, 365 F.3d at 364-65.

Under the heading "Scienter," Paragraph 345 states that "Defendants acted with scienter," an impermissible group allegation. *See Cornielsen*, 916 F.3d at 599. The rest of the scienter allegations are specific to Jump, which Kariya did not control. FAC ¶¶ 346 ("Jump's failure to disclose such information demonstrates that Jump intended"); 348 ("Jump had actual knowledge"); 347 ("Jump was motivated"); 349 ("Jump's scienter is . . ."); 350 (confidential witness accounts in Judge Rakoff's opinion allegedly show "Jump's" knowledge); 352 ("Jump's scienter is additionally supported by"); 353 ("Jump's scienter . . . is further supported by").

To be sure, two of these allegations about *Jump's* scienter do mention Kariya. Paragraph 353 alleges that "Jump's scienter" (not Kariya's) is "supported by" Kariya's invocation of the Fifth Amendment in another proceeding. But invocation of the Fifth Amendment in one proceeding cannot support an adverse inference in another. *Kyung Cho*, 890 F. Supp. 2d at 1203; *Mehta v. Angell Energy*, 2019 WL 4750142, at *3 (D.N.J. Sept. 30, 2019); *Fujisawa Pharm. Co. v. Kapoor*, 1999 WL 543166, at *9 (N.D. Ill. July 21, 1999). Paragraph 348 seeks to establish *Jump's* "knowledge regarding the scheme to bail out the peg" based on the allegation that Kariya had calls with Kwon on the date of the "bailout" and that DiSomma "personally led Jump's trading efforts." But that allegation does not support any inference of scienter as to any particular statement Kariya made, much less the "strong" inference the PSLRA requires. 15 U.S.C. § 78u-4(b)(2)(A). There

24

are no other allegations in the Complaint to support a "strong inference" that Kariya made any of the statements attributed to him "with an intent to deceive, manipulate, or defraud." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). To suffice under the PSLRA, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 1066 (citation omitted). None of the statements attributed to Kariya come close to establishing scienter.[26]

### G. All Registration Counts (V-VIII) Must Be Dismissed Because the Complaint Fails to Plausibly Allege Kariya's Participation Or Control.

Count V alleges that Tai Mo Shan unlawfully distributed securities and Count VI alleges that Kariya controlled these violations. Count VII similarly alleges that Kariya was a control person as to Tai Mo Shan's role as statutory underwriter for offers and sales of LUNA. And Count VIII seeks to hold Kariya liable as a control person for alleged TFL failures to register Terra Tokens. But the Complaint does not contain any allegations to support the idea that Kariya controlled Tai Mo Shan or TFL, or that he controlled its distribution of tokens. As Jump's brief (at 40-43) explains, no Jump entity controlled Tai Mo Shan or TFL; *a fortiori* neither did Kariya, who did not control the trading of any Jump entity. Plaintiffs' impermissible group pleading further exposes the lack of factual basis in the Complaint for these claims. *E.g.*, FAC ¶ 406 (alleging that "Defendants" had control over Tai Mo Shan through "ownership of voting securities"; without any allegation that Kariya owned shares). Moreover, for the reasons explained in Jump's brief (at 36-40), Counts V-VIII fail because Plaintiffs have not sufficiently pled any primary violation, including because they have not sufficiently alleged that any Jump entity, much less Kariya, was a seller. As Jump's brief explains, Kariya did not deal with any purchaser, and none of his statements alleged in the Complaint urged anyone to buy Terra Tokens. Jump Brief at 36-39.

## IV. CONCLUSION

For those reasons, the Court should dismiss all counts as against Kanav Kariya.

---

[26] As explained in Jump's brief (at 18), Plaintiffs' allegations regarding Kariya's use of the Signal app do not establish a strong inference of scienter.

Dated:  December 23, 2025

/s/ Aitan D. Goelman
Aitan D. Goelman (admitted *pro hac vice*)
Miles R. Clark (admitted *pro hac vice*)
Christopher R. MacColl (admitted *pro hac vice*)
J. Benjamin Jernigan (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com
bjernigan@zuckerman.com

Daniel A. Zaheer (Bar No. 237118)
KOBRE & KIM LLP
150 California Street, 19th Floor
San Francisco, CA 94111
Tel: (415) 582-4800
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Kanav Kariya*

### CERTIFICATION PURSUANT TO LOCAL RULE 5-1(i)(3)

I hereby certify pursuant to Local Rule 5-1(i)(3) that the signatory to this document and its attached Declaration, Aitan D. Goelman, has concurred in this filing.

/s/ Christopher R. MacColl
Christopher R. MacColl