**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:22-cv-03600-PCP |
| Plaintiff, | |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN LIMITED'S MOTION TO DISMISS** |
| TERRAFORM LABS, PTE. LTD., JUMP TRADING LLC, TRIBE CAPITAL, DEFINANCE CAPITAL/ DEFINANCE TECHNOLOGIES OY, THREE ARROWS CAPITAL PTE. LTD., NICHOLAS PLATIAS, and DO KWON, | |
| Defendants. | Honorable P. Casey Pitts<br><br>Hearing Date: May 7, 2026, 10:00 am |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF RELEVANT FACTS .......................................................... 2

    A.   Defendants' Role as Liquidity Provider, Statutory Underwriter, and Market Maker for TFL and its Unregistered Securities ........................................... 2

    B.   When UST De-Pegs in May of 2021, Defendants Engage in a Fraudulent Scheme to Re-Peg it Manually .................................................................. 4

    C.   Defendants Mislead Investors Concerning the Stability of UST and the Terra Ecosystem ................................................................................................... 4

    D.   Defendants Reap Substantial Profit From their Fraud ............................... 5

    E.   After the Ecosystem Collapses and the Truth Emerges, the Reckoning Begins ................................................................................................................... 5

        1.   A Court Rules that Terra Tokens are Unregistered Securities and a Jury Finds TFL and Kwon Liable for Securities Fraud ............................... 5

        2.   Kwon Pleads Guilty for His Role in the Fraud ............................... 6

        3.   TMSL Settles with the SEC ................................................... 6

III.  ARGUMENT ...................................................................................................... 7

    A.   Legal Standard .......................................................................................... 7

    B.   Plaintiffs' Claims are Timely Under All Limitations and Repose Periods .............. 7

        1.   The Timeline Belies Defendants' Assertions of Untimeliness .................... 7

        2.   Counts I, II, and III are Timely ................................................. 8

        3.   Counts V, VII, and VIII Relate Back to the SAC ........................... 10

            a)   The Statute of Limitations Has not Run........................... 10

            b)   The Operative Complaint is Within the Statute of Repose ............ 11

        4.   The Repose Period for Count VIII did not expire in April 2021 ............... 12

    C.   The Complaint is Not an Impermissible Group Pleading ....................... 13

    D.   The Complaint Adequately Alleges Market Manipulation ..................... 15

        1.   The Complaint Adequately Alleges Section 9(a)(2) Violations ................. 18

i

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

2.   The Complaint Adequately Pleads a Section 9(a)(6) Claim ...................... 20

3.   The Complaint Adequately Alleges Jump Rule 10b-5(a) and (c) Violations ................................................................................................ 21

E.   The Complaint Adequately Alleges Jump's Rule 10b-5(b) Violations ................. 24

1.   The Complaint Alleges Actionable Misstatements and Omissions ........... 24

a)   The Statements are Actionably False and Misleading ................... 24

b)   The Challenged Statements are not Protected as Opinions or Puffery ............................................................................................. 28

c)   Defendants are the Makers of the Challenged Statements ............. 30

d)   The Complaint Alleges Actionable Omissions in Violation of a Duty ............................................................................................. 33

2.   The Complaint Adequately Alleges Scienter For All Fraud-Based Claims .......................................................................................................... 35

3.   The Complaint Adequately Pleads Class-wide Reliance ........................... 39

4.   The Complaint Adequately Alleges Loss Causation .................................. 43

F.   Plaintiffs Have Alleged that Defendants are Statutory Sellers Under the Securities Act .................................................................................................... 45

G.   Plaintiffs Have Alleged Control Person Claims ...................................................... 48

1.   Jump Trading and Jump Crypto Controlled TMSL ................................... 49

2.   The Jump Defendants Controlled TFL ...................................................... 50

IV.   CONCLUSION ......................................................................................................... 52

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abdo v. Fitzsimmons*,
4
   2021 WL 616324 (N.D. Cal. Feb. 17, 2021)............................................................... 31

5

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)............................................................................... 34, 39, 40

6

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
7
   785 F. Supp. 2d 799 (N.D. Cal. 2011) ............................................................ 22, 23

8

*ASARCO, LLC v. Union Pac. R. Co.*,
   765 F.3d 999 (9th Cir. 2014)......................................................................... 10

9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
10
   493 F.3d 87 (2d Cir. 2007)............................................................... 15, 22, 23

11

*Basic Inc. v. Levinson*,
12
   485 U.S. 224 (1988).......................................................................................... 42

13

*Beach v. Ocwen Fed. Bank*,
   523 U.S. 410 (1998)........................................................................................ 11

14

*Berson v. Applied Signal Tech., Inc.*,
15
   527 F.3d 982 (9th Cir. 2008)...................................................................... 28, 33

16

*Binder v. Gillespie*,
17
   184 F.3d 1059 (9th Cir. 1999)........................................................................ 41

18

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975)................................................................... 40, 41

19

*Briosos v. Wells Fargo Bank*,
20
   737 F. Supp. 2d 1018 (N.D. Cal. 2010) ........................................................ 12

21

*CFTC v. Wilson*,
22
   2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............................................. 22

23

*Chemetron Corp. v. Bus. Funds, Inc.*,
   682 F.2d 1149 (5th Cir. 1982).................................................................. 18, 19

24

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
25
   878 F.3d 36 (2d Cir. 2017).............................................................................. 21

26

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
27
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................. 29, 32

28

*Crane Co. v. Westinghouse Air Brake Co.*,
    419 F.2d 787 (2d Cir. 1969) ........................................................................... 15, 16, 21

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ........................................................................... 24, 39

*Dirks v. S.E.C.*,
    463 U.S. 646 (1983) ........................................................................... 34

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008) ........................................................................... 34

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................... 44

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ........................................................................... 7

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ........................................................................... 31, 32

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015) ........................................................................... 51

*Fezzani v. Bear, Stearns & Co. Inc.*,
    716 F.3d 18 (2d Cir. 2013) ........................................................................... 23

*Fezzani v. Bear, Stearns & Co.*,
    384 F. Supp. 2d 618 (S.D.N.Y. 2004) ........................................................................... 18

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021) ........................................................................... 31

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ........................................................................... 27, 29

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ........................................................................... 30, 32

*Hollifiel v. Resolute Cap. Partners Ltd., LLC*,
    2023 WL 4291524 (C.D. Cal. May 12, 2023) ........................................................................... 48

*Houghton v. Leshner*,
    2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) ........................................................................... 45, 46, 48

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ........................................................................... 16

*In re Bank of Am. Corp.*,
    2011 WL 740902 (N.D. Cal. Feb. 24, 2011) ........................................................................... 22, 43

*In re En Pointe Techs., Inc. Secs. Litig.*,
  2003 WL 27392762 (S.D. Cal. Aug. 25, 2003) ........................................................ 21

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................................. 38

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  490 F. Supp. 2d 784 (S.D. Tex. 2007) .................................................................. 17

*In re Envision Healthcare Corp. Sec. Litig.*,
  2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022) ...................................................... 11

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ..................................................................... 30

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) ............................................................................ 45

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................ 7

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................. 34, 43

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010) .................................................................. 43

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................................ 7

*In re Ripple Labs, Inc. Litig.*,
  2024 WL 3074379 (N.D. Cal. June 20, 2024) ......................................................... 13

*In re Rocket Fuel, Inc. Sec. Litig.*,
  2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ......................................................... 30

*In re Silver Lake Grp., LLC Sec. Litig.*,
  108 F.4th 1178 (9th Cir. 2024) ...................................................................... 34, 42

*In re Stratosphere Corp. Sec. Litig.*,
  1 F. Supp. 2d 1096 (D. Nev. 1998) ..................................................................... 51

*In re SVB Fin. Grp. Sec. Litig.*,
  2025 WL 1676800 (N.D. Cal. June 13, 2025) ......................................................... 29

*In re Teva Sec. Litig.*,
  671 F. Supp. 3d 147 (D. Conn. 2023) ................................................................... 44

*In re Tezos Sec. Litig.*,
  No., 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ..................................................... 48

*In re Venator Materials PLC Sec. Litig.*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................................ 31

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)............................................................. 19, 38

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   2 F.4th 1199 (9th Cir. 2021)................................................................ 42

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
   712 F. Supp. 2d 958 (N.D. Cal. 2010) ................................................ 50

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ................................................................... 30, 39

*Kilkenny v. Arco Marine Inc.*,
   800 F.2d 853 (9th Cir. 1986) .............................................................. 11

*Junge v. Geron Corp.*,
   2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ..................................... 44

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)................................................. 27, 28, 33

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) .............................................. 18

*Little v. First California Co.*,
   532 F.2d 1302 (9th Cir. 1976) ............................................................ 41

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ............................................................ 43

*Lorenzo v. SEC*,
   587 U.S. 71 (2019) ...................................................................... 39, 40

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .............................................................................. 25

*Matter of Cady, Roberts & Co.*,
   40 S.E.C. 907 (Nov. 8, 1961) ............................................................. 34

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ............................................................................. 8

*Miguel v. Country Funding Corp.*,
   309 F.3d 1161 (9th Cir. 2002)............................................................ 11

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................... 35

vi

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

*Nguyen v. Radient Pharms. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ............................................................. 44

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................. 28

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ............................................................................. 33

*Pino v. Cardone Cap., LLC*,
   55 F.4th 1253 (9th Cir. 2022) ...................................................................... 45, 48

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ............................................................................................. 47

*Ploss v. Kraft Foods Grp., Inc.*,
   197 F. Supp. 3d 1037 (N.D. Ill. 2016) ............................................................ 22

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ............................................................................. 24

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
   790 F. Supp. 3d 763 (N.D. Cal. 2025) ................................................. 24, 25, 33

*Samuels v. Lido Dao*,
   757 F. Supp. 3d 951 (N.D. Cal. 2024) ................................................... 46, 47, 48

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................. 25

*Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*,
   12 F.4th 337 (3d Cir. 2021) .......................................................................... 11, 12

*SEC v. Drucker*,
   1983 WL 1369 (S.D.N.Y. Sept. 26, 1983) ..................................................... 16, 18

*SEC v. Rose*,
   2007 WL 9826042 (S.D. Tex. Sept. 5, 2007)................................................... 16

*SEC v. Sierra Brokerage Servs.*,
   *Co.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009) .................................................. 15

*SEC v. TFL*,
   708 F. Supp. 3d 450 (S.D.N.Y. 2023) ......................................................... 8, 51

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015)....................................................... 22, 43

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015) ..................................................... passim

*Special Situations Fund III QP, L.P. v. Brar*,
   2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ................................................ 50

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ................................................ 20, 35, 36, 39

*Tivoli LLC v. Sankey*,
   2015 WL 12683801 (C.D. Cal. Feb. 3, 2015) ................................................ 14

*United States ex rel. Carter v. Halliburton Co.*,
   315 F.R.D. 56 (E.D. Va. 2016) ................................................ 11

*United States ex rel. Ginger v. Ensign Grp., Inc.*,
   2022 WL 4110166 (C.D. Cal. Mar. 10, 2022) ................................................ 14

*United States v. Lloyd*,
   807 F.3d 1128 (9th Cir. 2015) ................................................ 27, 33

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ................................................ 14

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................ 23

*Wang v. Zymergen Inc.*,
   744 F. Supp. 3d 995 (N.D. Cal. 2024) ................................................ 51

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) ................................................ 16

*Zakinov v. Ripple Labs, Inc.*,
   2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ................................................ 13

**Statutes**

15 U.S.C. § 78i(a)(2) ................................................ 18

15 U.S.C. § 78i(a)(6) ................................................ 20

28 U.S.C. § 1658 ................................................ 8

**Rules**

Fed. R. Civ. P. 15 ................................................ 10, 11

Fed. R. Civ. P. 15(c) ................................................ 10, 11

Fed. R. Civ. P. 15(c)(1)(C) ................................................ 10

1

**Regulations**

2

17 C.F.R. § 230.405 ................................................................................................................. 50

3

17 C.F.R. § 240.10b-5(b) ........................................................................................................ 25

4

17 C.F.R. § 242.104 ................................................................................................................ 20

5

17 C.F.R. § 242.104(a) ........................................................................................................... 20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ix

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

## I.    INTRODUCTION

In a parallel proceeding, the United States Securities and Exchange Commission ("SEC") presented evidence at trial of the very fraudulent scheme the Complaint alleges. A jury found Terraform Labs ("TFL") and Do Kwon ("Kwon") liable on every count. Subsequently, Jump's subsidiary, Defendant Tai Mo Shan Limited ("TMSL"), executed a consent decree with the SEC finding that TMSL violated the Securities Act, misleading the market as to the stability of UST's algorithm during the 2021 de-peg and acting as statutory underwriter for TFL's unregistered securities. In response to questions about Jump's active participation in this fraudulent scheme to re-peg UST to the dollar when the algorithm failed, Defendants Disomma and Kariya invoked their Fifth Amendment right against self-incrimination. Do Kwon pleaded guilty, receiving a 15-year prison sentence for his fraudulent conduct in which Defendants here knowingly participated.

Notwithstanding, Defendants assert that Complaint paragraph 194 comprises a "critical admission . . . fatal to [Plaintiffs'] case." Mot. 1. Defendants argue that, because in January 2022, they participated in the Luna Foundation Guard ("LFG") purportedly to stabilize UST during periods of volatility and because Defendant Kariya explained on a podcast in March 2022 that "extreme price movements" were possible, no "conceivable causal connection" exists between their fraud and the damage the Class suffered when UST de-pegged in May of 2022, causing the collapse of the entire Terra ecosystem. Mot. 1. But the "disclosure" of the LFG was in no way whatsoever corrective, and failed to alert investors that UST had already de-pegged and that the algorithm had failed to re-peg without Defendants' knowing intervention. Thus, through UST's May 2022 collapse, investors never knew that, without Defendants' knowing and active participation in the fraudulent scheme to re-peg UST, the Terraform ecosystem would have collapsed in May 2021.

Defendants confuse truth-on-the-market, a materiality argument, with loss causation. To plead loss causation, Plaintiffs must simply allege that the Defendants' fraud proximately caused their losses—that the consequences of UST's May 2022 collapse were foreseeable when Defendants knowingly participated in the fraudulent re-peg. The Complaint adequately pleads loss causation and Defendants' truth on the market argument fails as a matter of both fact and law.

Next, Defendants insist they engaged in "lawful trading," believing that "UST was a worthwhile project" and that it was worth $1 when they purchased it for materially less. Mot. 2. First, whether Defendants' trades were lawful in a vacuum is irrelevant to whether they knowingly manipulated the price of UST. Second, they ignore UST's principal selling point—that the algorithm, itself, would re-peg UST to $1 without human intervention. At the time of Defendants' May 2021 trades that manipulated UST, therefore, they knew that no cash reserve protected the peg and the algorithm had failed. The Complaint pleads that absent Defendants' trading, UST and the Terra ecosystem would have collapsed. Accordingly, Defendants' actual knowledge that the algorithm had failed and their participating in the manipulation of UST's price indicates that Defendants did not believe, indeed could not have believed, that UST was "worthwhile." More, Defendants purchased UST "at prices higher than the prevailing market price," indicating their willingness to forego profit to achieve their manipulation. If Defendants purchased because they thought it was worthwhile, they would have maximized profit. They did not, indicating that their purpose was to manipulate the price of UST. Coupled with their billion-dollar motive—Jump's receiving and selling LUNA tokens less the $70 million they spent manipulating UST—the Complaint pleads with particularity that Defendants' attempt at exculpation fails.

Defendants' other arguments fare no better. Because the Complaint states claims that Defendants manipulated UST and also misled investors through a series of culpable misstatements and omissions, Defendants' Motion to Dismiss (Dkt. No. 208 or "Mot.") should be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Defendants' Role as Liquidity Provider, Statutory Underwriter, and Market Maker for TFL and its Unregistered Securities

Defendants Jump Trading LLC ("Jump Trading"), its subsidiary/affiliate, Jump Crypto Holdings LLC ("Jump Crypto"), and its subsidiary/affiliate, TMSL) (collectively, "Jump" or, for the purposes of this memorandum, "Defendants") operate together as one of the largest private trading firms in the world. ¶¶1, 14.[1] Jump engages in trading and market-making in various

---

[1] Citations to "¶" are to the paragraphs of the Plaintiffs' Fourth Amended Complaint ("Complaint"). Dkt. 176.

cryptocurrencies and digital assets. ¶14. Jump operated as the "liquidity provider and general business partner" of TFL and its founder and CEO, Kwon, before TFL and Kwon were charged by the SEC and found liable for selling unregistered securities and committing securities fraud and Kwon pleaded guilty in a federal criminal action and received a 15-year prison sentence. ¶¶ 14, 24, 6-7.

The Terra digital ecosystem refers to TFL's blockchain and suite of digital assets and financial products. ¶15. The flagship digital asset and foundation of the entire Terra ecosystem was an algorithmic stablecoin known as UST. ¶90. As an algorithmic stablecoin, UST purported to remain pegged to the dollar not by collateral but by an algorithm that provided an arbitrage mechanism to encourage traders to keep the value of UST at $1. ¶90. The algorithm functioned by regulating the relationship between UST and another digital asset known as LUNA. ¶90. To maintain UST's 1:1 parity with the U.S. dollar, the algorithm purported to function by minting and burning UST and LUNA to control the supply and keep the value of UST steady at $1. ¶90. Investors could exchange $1 worth of UST for $1 worth of LUNA, which was essentially a bet on the continued growth and usage of the Terra ecosystem and could be used to invest in the ecosystem's array of digital assets ("Terra Tokens"). *See* ¶¶1, 88-92, 313-15.

Starting in 2019, Jump played an integral role in the Terra digital ecosystem, partnering with TFL and Kwon to underwrite unregistered securities known as Terra Tokens and serve as their distributor, promoter, and market maker through, *inter alia*, several "loan" transactions. ¶53. Jump had agreements with TFL to improve the liquidity of LUNA, UST and other Terra Tokens such as MIR. ¶¶69, 73; *see* ¶74: ("Q: Did you understand that Jump Crypto acted as a market maker for Terraform Labs? [TFL COO and CFO]: "Yes."). As Judge Rakoff found in the summary judgement order finding the Terra Tokens to constitute unregistered securities, TFL loaned tens of millions of Terra Tokens to Jump so that Jump could distribute them on the market to retail investors. ¶¶54-59. Separate from the formal agreements between TFL and Jump, they also entered into a secret gentleman's agreement that Jump would help maintain UST's peg if necessary. ¶¶59-61. The "loan" transactions at issue, arranged by emails directly between Kwon at TFL and Defendant Kariya at Jump, were papered as loans from TFL to Jump's subsidiary/affiliate, TMSL. ¶¶56-59.

**B.    When UST De-Pegs in May of 2021, Defendants Engage in a Fraudulent Scheme to Re-Peg it Manually**

In May 2021, when the value of UST de-pegged from the U.S. dollar, falling to about $0.90, Jump – along with TFL and Kwon – secretly implemented a scheme for Jump to manipulate the price of UST. ¶93. Jump purchased large blocks of UST outside of the Terra blockchain, removing them from the market, effectively burning them, causing the price of UST to rise and re-peg to the dollar. ¶¶93-97, 133-136. Defendants did not do this for free, but exploited TFL and Kwon in a moment of crisis: In exchange for deploying their own capital to manually re-peg UST, Defendants got Kwon to agree to accelerate the delivery of LUNA tokens to Jump and modify the terms of the parties' earlier agreements. ¶94. This was a secret, quid pro quo agreement that was not memorialized in writing. ¶94.

The Superseding Indictment against Kwon described Jump's stabilizing trades this way: "The Trading Firm's purchases of UST on May 23, 2021 and May 24, 2021 were principally aimed at artificially propping up the market price of UST, as opposed to obtaining UST at the best available price in the market. For example, the Trading Firm placed orders on a cryptocurrency exchange to purchase UST at prices that were higher than the prevailing market price on that exchange. In other words, the Trading Firm agreed to pay more than market price for UST as part of an effort to artificially inflate the value of UST to its advertised $1 price." ¶102. In an internal chat, a TFL employee remarked that "they [Jump] saved our ass." ¶104.

**C.    Defendants Mislead Investors Concerning the Stability of UST and the Terra Ecosystem**

Following Jump's secret intervention, executives at Jump and TFL made several statements and omissions indicating to investors that the repeg was the result of the algorithm's "self-healing" mechanisms working as promised. Despite knowing the falsity and/or misleading nature of these statements and omissions, Jump kept quiet. Jump never disclosed that it secretly intervened to manually re-peg UST when the algorithm failed and that it was Jump's massive off-chain purchases – not the functioning of the algorithm – that had re-pegged UST. ¶104. Not only did Jump fail to disclose its massive trades, but Jump also made a series of statements and omissions suggesting that the algorithm had successfully re-pegged UST and, accordingly, that the Terra ecosystem had

resiliently weathered the storm. ¶¶147-257. This was false and misleading.

**D.    Defendants Reap Substantial Profit From their Fraud**

In exchange for Jump's secret intervention to re-peg UST manually when the algorithm had failed, Defendants got Kwon to agree to a series of loan modifications. ¶265. These loan modifications, when later reduced to writing, allowed Jump to receive LUNA tokens for $.40 per token at a time when LUNA was trading at more than $90 in the secondary market. ¶266. By offloading these LUNA tokens before the Terra ecosystem crashed in May of 2022 – selling into a market that did not know that UST's algorithm had already failed and that Jump had secretly intervened to prop it up manually – Jump earned over $1 billion in profit. ¶271.

**E.    After the Ecosystem Collapses and the Truth Emerges, the Reckoning Begins**

When UST de-pegged again in May of 2022, it led to the collapse of the entire Terra ecosystem. ¶¶258-271. Watching $40 billion get washed away over night, one Jump trader commented to his colleague that the 2021 re-peg had taken place in "simpler times" and noted that "'[u]nfortunately it wasn't so simple this time' compared to when 'about $100 M[illion] committed was enough to re-peg.'" ¶264.

**1.    A Court Rules that Terra Tokens are Unregistered Securities and a Jury Finds TFL and Kwon Liable for Securities Fraud**

Following the collapse of the Terra ecosystem, the SEC charged TFL and Kwon with selling unregistered securities and engaging in a massive securities fraud. ¶¶5-8. Leading up to trial, Judge Rakoff found the Terra Tokens to be unregistered securities as a matter of law, granting summary judgment to the SEC on its claim that TFL and Kwon had violated §§5 and 12(a) of the Securities Act by selling unregistered Terra Tokens, including UST and LUNA. ¶6. At trial, the SEC presented extensive evidence of the fraudulent scheme at issue here – that Defendants, along with TFL and Kwon, intervened to re-peg UST manually when the algorithm had failed, misleading the market into believing that the algorithm had successfully re-pegged UST – and the jury found defendants liable on every count. ¶¶5-8. In discovery, the SEC questioned Jump executives Defendants Kariya and DiSomma about Jump's participation in this fraudulent scheme. ¶7. In direct response to questions concerning this scheme and Defendants' manipulation of UST, Defendants Kariya and

1    Disomma both invoked their Fifth Amendment right against self-incrimination. ¶7.

2    ### 2.   Kwon Pleads Guilty for His Role in the Fraud

3        In addition to the SEC's successful enforcement action, Kwon has now pleaded guilty to

4    criminal charges relating to the scheme with Jump. Allocuting at his sentencing hearing, Kwon

5    stated: "Specifically, following the depegging of UST stable coin in May 2021, I made false and

6    misleading statements of why it regained its peg by failing to disclose a trading firm's role in

7    restoring that peg. I understood that purchasers of UST relied on those false statements when making

8    their purchases. What I did was wrong, and I want to apologize for my conduct." ¶87.

9    ### 3.   TMSL Settles with the SEC

10        The SEC has announced a cease-and-desist order and settlement with TMSL, finding that,

11   beginning in 2019, TMSL entered into agreements with TFL pursuant to which TMSL received

12   LUNA tokens in exchange for performing the services of a statutory underwriter; that is, acting as

13   a conduit for the transfer of securities to the public market. ¶¶272-273. The SEC found that TMSL

14   facilitated the distribution of LUNA by transferring LUNA from TFL to the public in violation of

15   Section 5 of the Securities Act because no registration statement was in effect. ¶¶274-277.

16        The SEC also found that TMSL misled the market during the 2021 de-peg, stating that "Tai

17   Mo Shan engaged 'in a course of conduct that caused investors to be deceived about the efficacy of

18   Terraform's arbitrage mechanism.'" ¶279. The SEC found:

19
20           The investing public, which looks to centralized trading platform for up-to-the-
             moment market data, would have seen additional demand for, and upward price
             movement in, UST, but would not have been aware of the extent of UST
21           demand that was coming from Tai Mo Shan's purchases. In light of Terraform's
             public statements regarding how the arbitrage mechanism operated, Tai Mo
22           Shan should have known that its trading would mislead the investing public to
             believe that Terraform's arbitrage mechanism, which was coded into
23           Terraform's blockchain, alone raised the price of UST back up to $1. Tai Mo
             Shan should have known that purchasing UST and supporting its price in this
24           manner misled the market about the stability of UST's peg and the effectiveness
             of Terraform's algorithm meant to maintain that stability.
25
     ¶282. The SEC concluded that, "[a]s a result of the negligent conduct described above, TMSL

26   violated Section 17(a)(3) of the Securities Act, which makes it unlawful for any person in the offer

27   or sale of a security to engage 'in any transaction, practice, or course of business which operates or

28

1   would operate as a fraud or deceit upon the purchaser.'" ¶284.

2   **III.    ARGUMENT**

3       **A.    Legal Standard**

4       In deciding a motion to dismiss, the Court must "take all allegations of material fact as true

5   and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec.*

6   *Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). A theory that is facially plausible should survive a

7   motion to dismiss. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *see also E.*

8   *Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 936 (9th Cir. 2023) (crediting alleged facts

9   and drawing inferences in plaintiffs' favor).

10      **B.    Plaintiffs' Claims are Timely Under All Limitations and Repose Periods**

11      Defendants advance a skewed timeline of events in which Plaintiffs supposedly made a

12  "strategic choice" not to pursue Jump Crypto and TMSL. *See* Mot. at 9-13. The actual timeline of

13  pleadings and events belies Defendants' contentions.

14          **1.    The Timeline Belies Defendants' Assertions of Untimeliness**

15      The initial complaint named both Jump Crypto and Jump Trading LLC, companies with the

16  same address. Dkt. 1 at ¶¶10-11. The initial complaint refers to these two Jump entities together as

17  "Jump." ¶12. The First Amended Complaint identifies these parties the same way. Dkt. 88 at ¶¶17-

18  19. In early 2023, the SEC filed its enforcement action against TFL and Kown. *SEC v. TFL*, 23-cv-

19  01346 (S.D.N.Y. Feb 16, 2023). For the first time, Plaintiffs learned of the May 2021 re-peg and the

20  participation of a trading firm. While the SEC's complaint did not name Jump, SEC Dkt. 1 at ¶108,

21  the press identified that Jump participated in the re-peg.

22      The February 2023 Second Amended Complaint ("SAC"), Dkt. 102, named Jump Trading

23  LLC, "acting by, through, in conjunction with, and with the participation of its business unit and/or

24  division, Jump Crypto (together, 'Jump')". SAC, ¶18. The SAC alleges that Jump Crypto is a

25  business unit and/or division. For the first time in the SAC, Plaintiffs focused on the May 2021 re-

26  peg that the SEC only publicly revealed the week before. Moreover, relying on Defendants' words,

27  the SAC pleads that Jump formally launched its crypto division, Jump Crypto, on September 14,

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

2021. SAC, ¶56. As the illicit re-peg took place months *before* the launch of Jump Crypto, the proper party appeared to be Jump Trading rather than Jump Crypto, yet to be safe, the SAC named Jump Trading LLC acting through Jump Crypto. SAC, ¶18.

In April 2023, the SEC filed an amended complaint. SEC Dkt. 25. Again, the SEC did not publicly identify Jump as a co-conspirator in the May 2021 re-peg. *Id.* ¶108. The public learned of Jump's participation in the illegal scheme only in December 2023, when Judge Rakoff's summary judgment order mentioned Jump Crypto Holdings, LLC. *SEC v. TFL*, 708 F. Supp. 3d 450, 458 (S.D.N.Y. 2023). On January 25, 2024, Plaintiffs filed the Third Amended Complaint ("TAC"), Dkt. 156, adding Defendants Disomma and Kariya and continuing to treat Jump Crypto as a unit/division of Jump. TAC, ¶¶17-19. Following further investigation, the operative Complaint separately named three Jump entities, Jump Trading LLC ("Jump Trading"), Jump Crypto Holdings LLC ("Jump Crypto"), and TMSL, defining these three collectively as "Jump," alleging the three entities are alter egos of one another. ¶¶1, 32-34.

The Complaint leveraged the December 2024 SEC cease and desist order and settlement with TMSL, revealing, *inter alia*, that TMSL, the wholly-owned subsidiary of Jump Crypto, violated Sections 5(a) and (c) of the Securities Act, "act[ing] as a statutory underwriter with respect to certain of its offers and sales of LUNA, a crypto asset issued by Terraform . . . and offered and sold as a security." ¶¶403-04.

### 2.    Counts I, II, and III are Timely

Defendants argue that the two-year statute of limitations has run on Plaintiffs' securities fraud and market manipulation claims in Counts I, II, and III as against Jump Crypto and TMSL. Mot. 9-13. Defendants are wrong. Not only would these claims relate back to earlier pleadings under Rule 15(c), but the claims are timely anyway under the plain terms of the statute, providing that the claims must be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 644–48 (2010).

Defendants assert that no later than December 28, 2023, Plaintiffs knew that the "U.S. Trading Firm" in the SEC action referred to "Jump Crypto" rather than "Jump Trading" because Plaintiffs filed a copy of Judge Rakoff's December 28, 2023, summary judgment order in this Court.

*See* Dkt. 154 (attaching as a recent decision). But, Defendants assert, Plaintiffs separated out Jump Crypto from Jump Trading in the operative Complaint rather than the TAC. *See* Mot. 12-13. This argument is baseless. As Defendants concede, Plaintiffs did not know that the "U.S. Trading Firm" in the SEC's case referred to Jump Crypto until December 28, 2023. Any filing before December 27, 2025, then is timely. Plaintiffs filed the operative, separating Jump Crypto from Jump Trading, on October 31, 2025, Dkt. 176, well within the two-year limitations period. Contrary to Defendants' insinuations, Plaintiffs did not make a "strategic choice" to drop Jump Crypto Holdings LLC from the case, as Plaintiffs have identified Jump Crypto specifically in every complaint they filed, either as a unit/division of Jump Trading LLC or as its own entity, and timely named it in the operative complaint.[2]

Defendants also argue that Plaintiffs "were fully aware of TMSL and its alleged involvement in this case by July 7, 2023" because, on that date, opposing motions to dismiss the SAC, Plaintiffs included a LUNA loan contract among TFL and ***TMSL***." Mot. 10 (citing Dkt. 128-11). But this filing is irrelevant. First, the loan among TFL and TMSL did not inform Plaintiffs of TMSL's significance in the case. Rather, Plaintiffs only learned that TMSL acted as a statutory underwriter for unregistered LUNA tokens when the SEC released its cease and desist order and settlement with TMSL in December of 2024. Second, the contract itself strengthens Plaintiffs' argument that TMSL and the two other Jump entities were alter egos of one another. *See* Dkt. 128-11 at 6 ("Borrower: ***Tai Mo Shan Limited*** 600 W Chicago Ave #825 Chicago IL 60654 Email: ***legal@jumptrading.com***") (emphasis added).

---

[2] In response to the court's query why the SEC redacted Jump's name from pleadings, on November 27, 2023, Jump Crypto Holdings LLC filed a letter, stating, "[w]e write on behalf of third-party Jump Crypto Holdings LLC (and entities within the Jump Trading Group, hereinafter collectively referred to as 'Jump')." SEC Dkt. 134. The letter did not clarify which entity was the "U.S. Trading Firm," indicating instead that Jump operates through a web of legal entities.

3.     **Counts V, VII, and VIII Relate Back to the SAC**

a)     **The Statute of Limitations Has not Run**

Defendants next argue that the one-year statute of limitations for Plaintiff's Securities Act claims against Jump Crypto and TMSL expired on May 20, 2023. Mot. 10. Assuming that is the correct date, the claims are timely because, under Federal Rule 15(c), the Complaint's allegations relate back to the February 23, 2023 SAC. Dkt. 102.

An amendment relates back to the date of the earlier pleading when it "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c). A pleading, therefore, relates back when it involves "the same conduct, transaction, or occurrence" that "will likely be proved by the same kind of evidence offered in support of the original pleading." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (cleaned up) (citation omitted). A common core of operative facts, providing defendants with fair notice of the claim suffices to relate new allegations to a prior pleading. *Id.* Courts liberally apply the relation back doctrine. *Id.* at 1004–05 (Rule 15's core purpose is to allow decision on the merits rather than procedural technicalities) (citation omitted).

Counts V, VII and VIII allege violation of the Securities Act for Defendants' failure-to-register. The SAC, Count V, alleged that Jump, one of the "Luna Foundation Guard Defendants," controlled the failure to register Terra Tokens. SAC, ¶¶295-299 (Jump, among others, controlled unregistered sale of Terra Tokens). Thus, Counts V, VII and VIII against Jump Crypto and TMSL in the operative complaint relate back to the SAC. Rule 15(c)(1)(C) specifically allows the amendment to change the party or the naming of the party against whom a claim is asserted, when the claim arises out of the same conduct and defendants had or should have had notice, which is not challenged here. Defendants argue instead that Rule 15 does not apply where plaintiffs were fully aware of the new defendant's identity and role in the case, but strategically decided not to sue them. Mot. 10. That, however, is inapplicable here. Plaintiffs learned – and could only have learned – that the U.S. Trading Firm referred to Jump Crypto, as well as the full role that TMSL played in the

1    Securities Act violations, after they filed the SAC.[3]

2         The SAC alleged Jump's control over sales of unregistered securities. The Complaint's

3    adding of Jump Crypto and TMSL as defendants for claims that arose out of the same conduct as

4    the SAC's timely claims against Jump satisfies Rule 15. These claims relate back.

5              **b)    The Operative Complaint is Within the Statute of Repose**

6         Nor does the statute of repose prevent adding Defendants Jump Crypto and TMSL. Arguing

7    otherwise, Defendants misread Ninth Circuit precedent, parsing language from a different statute

8    and contending that Rule 15(c)'s relation-back doctrine cannot apply to statutes of repose. *See* Mot.

9    16 (citing *Miguel v. Country Funding Corp.*, 309 F.3d 1161 (9th Cir. 2002)).
10

11        But *Miguel* interpreted a different statute from the one at issue here. In *Miguel*, the Ninth

12   Circuit evaluated a statute providing for the expiration of the underlying right, not whether the

13   plaintiff could bring an action. *Miguel*, 309 F.3d at 1164. The *Miguel* court relied on *Beach v. Ocwen*

14   *Fed. Bank*, 523 U.S. 410, 417 (1998), in which the Supreme Court distinguished between the right

15   itself and the bringing of an action. *Id.* at 417 (explaining that statute related not to "a suit's
16
     commencement but of a right's duration").
17

18        Under the Securities Act's repose, courts have rejected the argument that relation back under

19   Rule 15(c) violates a jurisdictional barrier of the type at issue in *Miguel*. *See Se. Pennsylvania*

20   *Transportation Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 344–52 (3d Cir. 2021) (Rule 15(c)'s

21   relation back applies to Securities Act repose, rejecting defendants' jurisdictional and Rules

22   Enabling Act arguments); *In re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *3-5

23   (M.D. Tenn. Sept. 29, 2022) (following *Orrstown*, allowing relation back over the statute of repose

24   under the Exchange Act); *United States ex rel. Carter v. Halliburton Co.*, 315 F.R.D. 56, 63-65

25

26   _____

27   [3] *Kilkenny v. Arco Marine Inc.*, cited at Mot. 10, is inapposite, preventing relation back for "a
     plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party,"
28   discouraging "piecemeal litigation." 800 F.2d 853, 857-58 (9th Cir. 1986).

1  (E.D. Va. 2016), *aff'd*, 866 F.3d 199 (4th Cir. 2017) (similar as to the statute of repose found in

2  FCA); *Briosos v. Wells Fargo Bank*, 737 F. Supp. 2d 1018, 1024–26 (N.D. Cal. 2010)

3  (distinguishing *Miguel* as about the expiration of the underlying right and not about repose).

4      *Orrstown* is persuasive, recognizing that relation back is consistent with the purpose of

5  repose. "The 'touchstone' of the relation-back analysis," the Third Circuit explained, is fair notice

6  to defendants. *Orrstown*, 12 F.4th at 348-49. While "a repose statute's purpose is to give defendants

7  protection after a certain amount of time, it does not defeat that purpose for a plaintiff to bring an

8  action within the time allotted—even if the plaintiff later amends the precise form of its pleadings."

9  *Id.* at 349. Accordingly, the Securities Act claims against Jump Crypto and TMSL in Counts V, VII,

10  and VIII are timely.[4]

### 4.    The Repose Period for Count VIII did not expire in April 2021

13      Finally, Defendants contend that because ¶106 of the SEC's complaint alleges that TFL

14  engaged in "large-scale unregistered public distribution of LUNA' beginning in April 2018," then

15  the three-year statute of repose for Count VIII – the control person claims against all Defendants for

16  controlling TFL's Securities Act violations – must have expired in April of 2021. Mot. 40, n.23.

17  Defendants are wrong for two reasons.

18      First, Defendants ignore the many Terra Tokens other than LUNA; tokens which were not

19  launched until well within the limitations period. *See* Superseding Indictment ¶11 ("Terraform

20  publicly announced the launch of UST in or about ***September 2020***"); ¶12(b) (Mirror, a platform

21  launched in or about ***December 2020*** that allowed for the creation, buying, and selling of synthetic

22  versions of financial assets"). Accordingly, because the first complaint filed in this case, in June of

23  2022, alleged Securities Act control person claims against Jump, Count VIII is timely as to UST,

---

[4] Defendants argue that the statute of repose "expired in January 2024, if not sooner." Mot. 36. Accordingly, Plaintiffs' claims are timely for repose purposes whether they relate back to the February 23, 2023, SAC or January 25, 2024, TAC.

MIR and the other Terra Tokens that were not even arguably offered for public sale until after June of 2019.

Second, as to LUNA, the factual record is murkier, but Defendants' claim that the SEC alleged a "large-scale unregistered public distribution of LUNA" beginning in April 2018 is misleading at best. *See* Mot. 40, n.23 (citing SEC Complt. 106). Rather, the SEC alleged that Terraform sold 200 million LUNA to **Jump and other institutional investors** between April and September 2018. SEC Complt. ¶106. That paragraph goes on to state: "Terraform distributed to some of the investors less than a year after the executed agreements… The terms of these agreements reflect the expectation that most, if not all, of these purchasers would sell their LUNA into public markets.  In other words, Defendants were essentially embarking on a large-scale unregistered public distribution of LUNA." *Id*. Thus, it was the resale of LUNA into public markets that constituted the "large-scale unregistered public distribution of LUNA," and the SEC goes on to allege that: "In **July 2020**, the U.S. Trading Firm began actively selling LUNA into the market, allowing public investors to purchase LUNA through transactions in secondary markets." SEC ¶109. According to the SEC, then, LUNA was bona fide offered to the public in July of 2020. At worst, that date is a factual issue not appropriate for resolution on the pleadings. *See Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *10 (N.D. Cal. Feb. 26, 2020) (denying motion to dismiss because when security was bona fide offered to the public presented a factual issue).[5] [6]

**C.    The Complaint is Not an Impermissible Group Pleading**

While the Complaint refers to Jump Trading, its subsidiary/affiliate, Jump Crypto, and its subsidiary/affiliate, TMSL, together as "Jump," this is entirely permissible and logical given the very close relationship between these three related corporate entities. "There is no flaw in a pleading,

---

[5] Defendants cite the *Ripple* case to support their argument that the statute of repose on the Securities Act claims has expired. *See* Mot. 36 (citing *In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, at *2 (N.D. Cal. June 20, 2024)). The case they are citing is a summary judgment order, however, as the court was revisiting the repose issue with the benefit of the evidentiary record, after having rejected defendants' statute of repose argument on the motion to dismiss.

[6] Jump also waived this argument by not raising it the first time that it moved to dismiss Plaintiffs' claim that it controlled TFL's Securities Act violations. *See* Dkt. No. 115.

however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *Tivoli LLC v. Sankey*, 2015 WL 12683801, at *4 (C.D. Cal. Feb. 3, 2015) ("Plaintiff frequently refers collectively to the four target entities—Targetti Poulsen, Hanzhou, and Duralamp, each subsidiaries of Targetti Sankey… The Court agrees with Plaintiffs—the Complaint does not deprive each defendant of fair notice of the conduct attributed to them; instead, the Complaint can fairly be read to claim that each of the moving Defendants participated in the specific wrongful conduct alleged. As the entity defendants are alleged to be related entities, and given the nature of the claims, it is entirely possible that the allegations of wrongdoing are intended to include each and every entity defendant"). Defendants' contention that Plaintiffs' operative complaint is a group pleading for the reasons found in the Court's opinion as to the Second Amended Complaint ignores that the Court was commenting on the original group of defendants, which included a wide range of *non-Jump parties*. *See* Mot. 6-7. Those have been removed. Moreover, referring collectively to related corporate entities acting together, as the Jump entities do, is ubiquitous in corporate litigation. *See, e.g.,* SEC Dkt. No. 25, ¶108 (referring to Jump as "a U.S.-based proprietary trading firm, through an affiliate, (together, the 'U.S. Trading Firm')." SEC Dkt. No. 25, ¶108.

In addition, the Complaint pleads with great particularity – although courts apply Rule 8 pleading standards rather than Rule 9(b) here – that the three Jump entities are alter egos of one another. *See* ¶¶33-34, *United States ex rel. Ginger v. Ensign Grp., Inc.*, 2022 WL 4110166, at *4 (C.D. Cal. Mar. 10, 2022) (applying Rule 8, not Rule 9(b) pleading standards to alter ego allegations); *id*. at 3 ("in cases where the alleged fraud was 'perpetrated by sophisticated corporate entities that are related to each other' and plaintiffs allege that defendants were alter egos of each other, courts have held that collective allegations are sufficient to put defendants on notice") (citation omitted). "To satisfy the alter ego test, [plaintiff] must make out a *prima facie* case (a) that there is such a unity of interest and ownership between Defendants and their subsidiaries that the entities no longer exist; and (b) that the failure to disregard Defendants' separate identities would result in fraud or injustice." *Id*. at 5.

1    The allegations amassed in the Complaint on this point are overwhelming. *First*, at the SEC's

2    trial, it became clear that the loans from TFL to "Jump" were papered as loans to TMSL. ¶¶55-56.

3    *Second*, the "Jump executive" whose emails with Kown precipitated these loans – papered as loans

4    to TMSL – was Defendant Kariya. ¶¶55-56. *Third*, it is clear from the documents (some of which

5    Defendants cite here, *see* Mot. 10, n.8) that TMSL and Jump are the same. *See, e.g.,* Dkt. No. 128-

6    11 at 6 ("Borrower: **Tai Mo Shan Limited** 600 W Chicago Ave [**address of the other two Jump**

7    **entities**] #825 Chicago IL 60654 Email: **legal@jumptrading.com**"). *Fourth*, former Jump employee

8    Hunsaker testified that Jump Crypto was simply the "external name" of the division under the

9    control of Defendant Kariya. *See* ¶33. *Fifth*, the Jump employee also testified that in 2021, he started

10    working for the division at Jump known as Jump Crypto, which was the arm of Jump involved in

11    trading crypto. ¶121. He testified that Defendant DiSomma (founder and owner of the parent, **Jump**

12    **Trading**) ran the **Jump Crypto** team, with Defendant Kariya serving as its public face. ¶¶326, 122.

13    In sum, Plaintiffs referred to these entities as the same because they were.

14        **D.    The Complaint Adequately Alleges Market Manipulation**

15        The Complaint's allegations plead paradigmatic manipulation under Sections 9 and 10. "The

16    gravamen of manipulation is deception of investors into believing that prices at which they purchase

17    and sell securities are determined by the natural interplay of supply and demand, not rigged by

18    manipulators." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 77 (S.D.N.Y. 2015) (citation

19    omitted). "In identifying activity that is outside the 'natural interplay of supply and demand,' courts

20    generally ask whether a transaction sends a false pricing signal to the market." *ATSI Commc'ns, Inc.*

21    *v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007).

22        Within the broad range of deceptive conduct that can constitute market manipulation, courts

23    regularly find conduct designed to artificially affect the price of a security available on the market

24    to be actionable. *See SEC v. Sierra Brokerage Servs. Co.*, 608 F. Supp. 2d 923, 962-68 (S.D. Ohio

25    2009) (defendants "attempted to control the supply of Bluepoint's shares by preventing mass sell-

26    offs" through agreements with other shareholders). Courts have similarly found that secret market

27    purchases which "inevitably distort[] the market picture" constitute market manipulation. *Crane Co.*

28

*v. Westinghouse Air Brake Co.*, 419 F.2d 787, 792–94 (2d Cir. 1969); *see also SEC v. Rose*, 2007 WL 9826042, at *13-14 (S.D. Tex. Sept. 5, 2007) (similar facts).

Defendants' secret re-peg of UST, like the transactions in *Crane*, would have caused the price of Terra Tokens to drop if disclosed to the market. *See Crane*, 419 F.2d at 792–94; *SEC v. Drucker*, 1983 WL 1369, at *22 (S.D.N.Y. Sept. 26, 1983) (defendants obtained "control over the supply of available stock" by orchestrating transfers from third parties). Not only did Defendants' conduct, intervening to re-peg when the algorithm had failed, prevent the price of UST from plummeting, but it also enabled Defendants to convey, falsely, that in real-world stress conditions, the algorithm prevailed when it had not. Defendants' re-peg of UST in May of 2021 – which was intended to and did signal to the market that the return of the peg was due to the successful functioning of the stablecoin's algorithm rather than to Defendants' manual purchases of UST – constitutes actionable manipulation, both under Section 9(a) and Section 10(b) of the Exchange Act.

Unable to parry the manipulation claims, Jump advances a baseless narrative about its subjective belief at the time it manipulated the price of UST. It asserts that the Complaint fails to plead that it "did not value UST at $1 at the time of the alleged UST purchases during the May 2021 depeg." Mot. 35. That, Jump continues, is fatal to the manipulation claims because, it insists, this Court should find that it acted with a permissible profit motive. *Id.* Accepting the Complaint's well-pleaded facts as true and drawing all reasonable inferences in Plaintiffs' favor, however, the Complaint plausibly pleads manipulation, and Defendants' counter-narrative is implausible. Even under Rule 9(b)'s stringent pleading standards, Defendants cannot defeat scienter by simply asserting they acted in good faith when that is at odds with the well-pleaded facts. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 886 (N.D. Cal. 2023) (rejecting defendant's proffered inference that company simply "acted in good faith in unprecedented circumstances"); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025–26 (C.D. Cal. 2008) (rejecting unfounded assertion that "Plaintiff 'does not allege any facts to suggest that [defendant] did not genuinely believe what he was saying'").

In May 2021, when it manipulated UST's price, Jump could not have believed UST was worth $1. First, at that time, UST had no hard-currency reserve. ¶¶88-90. Rather, UST's primary

feature was algorithmic stabilization, automatically burning coins if UST fell below $1 and releasing coins if it rose above $1. *Id.* Absent a working algorithm, therefore, nothing supported UST's peg to the dollar. In May 2021, therefore, Defendants knew that (1) UST de-pegged, ¶¶93-94, (2) the algorithm failed, ¶95, and (3) without Jump's intervention—manually burning UST by purchasing $70 million worth—at best UST would have remain de-pegged and, at worst, the Terra ecosystem would have collapsed, wiping out Jump's previous investments in Terra tokens. ¶¶53-75. On the other hand, for its $70 million investment to re-peg UST, Jump profited over $1 billion on the unrestricted LUNA it received in exchange for its manipulating UST. ¶271.

Second, Jump ignores allegations that while manipulating UST's price, it **sacrificed** profit, further undermining any inference of nonmanipulative trading. Jump placed orders to purchase UST in May 2021—"aimed at artificially propping up the market price of UST, as opposed to obtaining UST at the best available price"—at "prices that were **higher than the prevailing market price on that exchange**." ¶102. To inflate UST's value, "[Jump] agreed to pay **more than market price for UST as part of an effort to artificially inflate the value of UST to its advertised $1 price**." ¶102 (emphasis added). That Defendants paid more than prevailing market prices for UST belies the nonmanipulative motive they claim exculpates them.

Third, a Jump employee testified that, right after Jump manipulated UST's price to re-peg it, Defendant Disomma instructed traders to offload UST carefully so as not to cause another de-peg. Accordingly, Jump did not believe the UST they just re-pegged to $1 – in response to a verbal agreement and in return for over $1 billion – was actually worth $1. *See, e.g.*, ¶¶129, 267.

Last, Defendants argue that invoking the Fifth Amendment in a separate case does not satisfy the applicable pleading standards. Mot. 25. Jump misleads. Plaintiffs insist on no special adverse inference at the pleading stage. Rather, in a holistic analysis of the Complaint's allegations, coupled with allegations that, inter alia, (1) nothing supported UST's peg, (2) Jump sacrificed profit in its May 2021 UST trades, (3) Jump unloaded its UST shortly after it manipulated the price and caused the re-peg, and (4) Jump extracted over $1 billion from TFL in return, Jump principals' invoking their right against self-incrimination supports a cogent and at least as compelling inference that Jump knowingly or recklessly manipulated UST's price. *See, e.g.*, *In re Enron Corp. Sec., Derivative &*

1   *"ERISA" Litig.*, 490 F. Supp. 2d 784, 822 (S.D. Tex. 2007) (witness's invoking Fifth Amendment

2   right in SEC investigation supports scienter, considering that in a civil case, the court might draw

3   an adverse inference later in the proceedings).[7] Plaintiffs have pleaded that Defendants' re-peg was

4   designed to, and did, induce others to continue to transact in UST and other Terra Tokens on the

5   mistaken belief that the algorithm underlying UST was functioning and kept UST pegged to $1.

### 1.    The Complaint Adequately Alleges Section 9(a)(2) Violations

7       Plaintiffs have stated a claim under 9(a)(2). "To assert a claim under Section 9(a)(2), a

8   plaintiff must show (1) a series of transactions in a security creating actual or apparent trading in

9   that security or raising or depressing the price of that security, (2) carried out with scienter and (3)

10  for the purpose of inducing the security's sale or purchase by others." *Sharette*, 127 F. Supp. 3d at

11  78 (citation and citations marks omitted). Section 9(a)(6) is similar, but the series of transactions

12  must be "for the purpose of pegging, fixing, or stabilizing the price of such security in contravention

13  of such rules and regulations as the Commission may prescribe as necessary or appropriate in the

14  public interest or for the protection of investors." §9(a)(6). The statutory text requires that plaintiffs

15  prove scienter and willful participation—the transactions must be done for the purpose of inducing

16  others to trade the security, for Section 9(a)(2), and for the purpose of "pegging, fixing, or

17  stabilizing" for Section 9(a)(6). The statute does not require plaintiff to prove reliance. *See Sharette*,

18  127 F. Supp. 3d at 77–78 (quoting 15 U.S.C. § 78i(a)(2)).

19      Defendants cite cases purporting to require proof of reliance for Sections 9(a)(2) and 9(a)(6).

20  *See* Mot. 34 (citing *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004) for

21  9(a)(2) and *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982), *cert. granted*,

22  *judgment vacated*, 460 U.S. 1007 (1983) for 9(a)(6)). This line of cases, ignoring the statute's text,

23  descends from a footnote in the Fifth Circuit's 1982 *Chemetron* case that found reference to a

24  reliance requirement in the "legislative history of s 9." *Chemetron*, 682 F.2d at 1162 n.20. That

25

---

26  [7] *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203–04 (N.D. Cal. 2012) is inapposite.
    Here, Defendants' invocations were aimed specifically at Jump's role in the re-peg. In addition, the
27  *Kyung Cho* case noted that the SEC case there contained only unproven allegations. *Id.* The SEC
    case here led to a unanimous jury verdict as to the scheme Plaintiffs allege.
28

1    legislative history, however, is inapplicable to Sections 9(a)(2) and 9(a)(6). In addition to

2    manipulation claims, Section 9, through subsection (a)(4), renders actionable false statements. The

3    reasoning behind this legislative history requiring investors to rely on false statements is not

4    applicable to Section 9 manipulation claims. *See id.* at 1163 n.20.

5          More, even if Sections 9(a)(2) and 9(a)(6) somehow require proof of reliance, no such

6    requirement can diverge from the plain, unambiguous text of those sections. Thus, pleading and

7    proving reliance would be reliance on the "actual or apparent active trading in such security, or

8    raising or depressing the price of such security," §9(a)(2), and on the "series of transactions" "for

9    the purpose of pegging, fixing, or stabilizing," §9(a)(6). The Complaint suffices, alleging reliance

10   "on the algorithm that was purportedly maintaining UST's peg to the dollar" and that Plaintiffs

11   "continued to buy and hold UST on the belief that the algorithm, not a manipulative scheme, had

12   worked to restore the peg to the dollar." ¶257; *In re Tai Mo Shan Limited*, SEC Administrative

13   Proceeding, File No. 3-22382 (Dec. 10, 2024) (or "TMSL C&D"), ¶12 ("The investing public,

14   which looks to centralized trading platforms for up-to-the moment market data, would have seen

15   additional demand for, and upward price movement in, UST, but would not have been aware of the

16   extent of UST demand that was coming from Tai Mo Shan's purchases").

17         Defendants next point out that "Plaintiffs' purchases all took place in 2022, long after the

18   purported May 2021 transactions, and Plaintiffs offer no allegations that May 2021 transactions

19   continued to affect the price over six months later." Mot. 35. There is no reason the Plaintiffs'

20   transactions must be contemporaneous with Defendants'. In addition, Defendants are ignoring the

21   Complaint, which alleges that, without Defendants' trading, the entire ecosystem would have

22   collapsed, citing testimony from the SEC's trial on the re-peg: "So my view is that the peg would

23   have probably been permanently lost if it had not been for Jump's trading on May 23rd." ¶146.

24         Finally, Jump asserts that the TMSL C&D findings do not establish the Section 9 violation

25   because Section 17(a)(3) violations require negligence. Mot. 35-36. That is a red herring. The

26   Complaint leverages the facts within the TMSL C&D, not its conclusions. *See In re VeriFone*

27   *Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012) ("The district court erred in

28   concluding that 'the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong

19

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

inference of scienter.' At this stage, we accept [plaintiff's] allegations as true") (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007))). Together with the Complaint's many other allegations from findings of law, trial transcripts, indictments and allocution, the TMSL C&D supports the cogent inference that Jump willfully manipulated the price of the securities at issue and, relatedly, that its stabilization was deceptive. That cogent inference is at least as compelling as Jump's counter-inference that it believed in UST's value. This Court should deny dismissal of the Complaint's Section 9 claims.

### 2.    The Complaint Adequately Pleads a Section 9(a)(6) Claim

Relying on no cases, Defendants seek dismissal of the 9(a)(6) claim for failure to identify a specific SEC rule or regulation. *See* Mot. 35 (citing ¶377, alleging Jump's manipulation of UST contravened SEC rules and regulations). Defendants' argument fails.

The Exchange Act grants the SEC the authority to promulgate rules allowing the "pegging, fixing or stabilizing the price of a security" in certain circumstances such as when necessary for the protection of investors, *see* 15 U.S.C. § 78i(a)(6); 17 C.F.R. § 242.104 (establishing guidelines for acts of stabilization). This is why only "pegging, fixing, or stabilizing" transactions not permitted by SEC rules are actionable under Section 9. While there are permissible stabilization practices that underwriters can engage in in certain circumstances, it is axiomatic that they are not done to manipulate or deceive the market. *See, e.g.*, 17 C.F.R. § 242.104(a) (preamble to section, stating principle that "[n]o stabilizing shall be effected [that] *is the result of activity that is fraudulent, manipulative, or deceptive under the securities laws*, or any rule or regulation thereunder").

Here, for instance, the SEC found, and provided detailed supporting factual allegations, that TMSL's stabilization practices violated Section 17(a)(3) of the Securities Act, rendering it illegal to engage in acts *that operate as a fraud or deceit*. *See* TMSL C&D, ¶¶2, 12, 14. TMSL's deception is the reason the SEC found a Section 17(a)(3) violation. TMSL C&D, ¶12. Indeed, according to the SEC, investors saw additional demand but were unaware that material UST demand related to TMSL's purchases. The SEC continued that "Tai Mo Shan should have known that purchasing UST and supporting its price in this manner misled the market about the stability of UST's peg and the effectiveness of Terraform's algorithm meant to maintain that stability." *Id*. Jump's deception

renders its manipulation of UST to stabilize it unlawful under SEC rules. Having pleaded that deception with requisite particularity, ¶¶373-377, the Complaint adequately alleges a Section 9 violation.

### 3. The Complaint Adequately Alleges Jump Rule 10b-5(a) and (c) Violations

Defendants attack the sufficiency of the scienter and reliance allegations, asserting that the Complaint fails "adequately [to] tie their losses to the Jump Entities' alleged trading." Mot. 30. These arguments fail.

Actionable market manipulation includes any "conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *In re En Pointe Techs., Inc. Secs. Litig.,* 2003 WL 27392762, at *5 (S.D. Cal. Aug. 25, 2003) (cleaned up). "A claim of market manipulation under Section 10(b) and Rule 10b-5 requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Sharette*, 127 F. Supp. 3d at 77.

Continuing to ignore the numerous allegations demonstrating that they knew or recklessly disregarded that UST's $1 peg that they manipulated was an artificial price, Defendants cite cases that actually support the Complaint's adequacy. *See* Mot. 32-33 (relying on *City of Providence, Crane* and others). In those cases, the defendants' conduct was deceptive—actionable manipulation—because investors believed that "the natural interplay of supply and demand" determined price and not manipulation. *See City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, 878 F.3d 36, 50 (2d Cir. 2017); *Crane*, 419 F.2d at 792–95. Moreover, the *Crane* court's description of the manipulative activity that distorted the market price corresponds neatly to the SEC's description of Jump's actions through TMSL. *Compare id.* at 793–95 (extraordinary buying with secret, off-market sales "distorted the market picture and deceived public investors" by creating the illusion of "a wide-based demand for" the securities) *with* TMSL C&D, ¶12 (investors who "look[] to centralized trading platforms for up-to-the moment market data, would have seen

1    additional demand for, and upward price movement in, UST" unaware that TMS purchases created

2    that additional demand").

3         On a motion to dismiss, courts determine whether a complaint states a claim for market

4    manipulation not by accepting a defendant's unfounded assertion that it believed the security it

5    manipulated had upside and was "temporarily trading below its true value," Mot. 32, but by

6    weighing all inferences in plaintiff's favor as to the transaction's nature, purpose and effect. *See*

7    *Sharette*, 127 F. Supp. 3d at 85–86 ("Plaintiffs have pleaded with enough particularity, and 'to the

8    extent possible,' the nature (large-scale coordinated short sales), purpose (to drive down the price

9    of ECD stock), and effect of the fraudulent conduct (the depression of the price of ECD's stock

10   price) and the roles of the defendants"). Defendants' cases offer them no support. In *CFTC v. Wilson*,

11   after a bench trial, the court found that certain practices influencing commodity prices were not

12   manipulative because "[t]he inescapable conclusion from the evidence introduced at trial is that

13   DRW's bids, and the consequent settlement prices" resulted from "free competition." 2018 WL

14   6322024, at *14 (S.D.N.Y. Nov. 30, 2018). In *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, the court

15   did not doubt the core premise that manipulation requires pleading that defendants misled investors

16   by "artificially affecting market activity," but the claim there failed because the plaintiff, due to its

17   position as the stock's issuer, was aware of the practices at issue in the case. *See* 119 F. Supp. 3d

18   1213, 1236-37 (C.D. Cal. 2015). Plaintiffs have stated a claim.

19        While Defendants attempt to incorporate their reliance and causation arguments for the

20   Complaint's Rule 10b-5(b) claims into their argument under Section 10b-5(a) and (c), Mot. 33,

21   Defendants gloss over key differences. Defendants' reliance and causation arguments would be

22   misplaced here even if they were winning arguments on Section 10b-5(b) (which they are not).

23        Defendants argue that Plaintiffs are not entitled to the fraud-on-the-market presumption of

24   reliance, Mot. 33, however, in a market manipulation case under Rule 10b-5(a) and (c), a plaintiff

25   need only allege reliance on "an assumption of an efficient market free of manipulation." *ATSI,* 493

26   F.3d at 101 (2d. Cir. 2007); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 815–

27   16 (N.D. Cal. 2011) (citing *ATSI*); *In re Bank of Am. Corp.*, 2011 WL 740902, at *13 (N.D. Cal.

28   Feb. 24, 2011) (same); *see also Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1054 (N.D.

Ill. 2016) (citing *ATSI* and explaining that "investors generally assume that they are trading on 'an efficient market free of manipulation'"). This is not the same market efficiency required for the fraud-on-the-market presumption under *Basic v. Levinson*, and the Second Circuit has elaborated that it does "not read *ATSI's* reference to 'reliance on an assumption of an efficient market free of manipulation' as referring to a liquid, efficient market with prices publicly reported in real time. We read *ATSI's* reference to an 'efficient' market to mean only a bona fide market free of manipulation." *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 23 (2d Cir. 2013).

Here, the Complaint alleges reliance on UST's stability and the algorithm's sufficiency to maintain the peg. ¶368. Further, due to the lack of any hard-currency reserve, the Complaint alleges, investors would not have purchased UST or other Terra ecosystem securities had they known that the algorithm already failed. ¶368. The Complaint adequately alleges reliance because investors relied on both the algorithm's promise to support the peg and the ostensible reality that the algorithm worked in practice. These allegations are "specific enough to give defendants notice" so that they can "defend against the charge," and therefore the allegation satisfies Rule 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

The Complaint pleads "reliance on an assumption of an efficient market free of manipulation" just like the plaintiff did in *Anschutz*, 785 F. Supp. 2d at 815–16. There, plaintiff (TAC) brought a 10b-5 claim against Deutsche Bank Securities Inc. (DBSI), alleging that DBSI manipulated the market for auction rate securities (ARS) that DBSI underwrote. The allegation was that, to create the appearance of sufficient liquidity in the market, DBSI propped up the market for the ARSs by placing "support bids" in every auction for the securities at issue. *Id.* at 808. The plaintiff alleged that "[g]iven [DBSI's] conduct supporting the auctions, DBSI knew that auctions would fail in the event that DBSI decided to stop placing bids, which it decided to do in July 2007 and did in August 2007, resulting in the collapse of the market for these securities." *Id.* Denying dismissal, on the reliance element, the court ruled that the complaint sufficed because the absence of failure of previous auctions rendered reasonable the plaintiff's reliance on an efficient market free of manipulation. *Id.* at 816. Here, Jump's manipulation of UST's price, itself, led UST investors

to believe not only in the algorithm's promise, but in its actual effectiveness—that the algorithm automatically re-pegged UST.[8]

As for Defendants' argument that Plaintiffs have failed to "adequately tie their losses to the Jump Entities' alleged trading," Mot. 33, Defendants are ignoring the compelling trial evidence, pleaded in the Complaint, demonstrating both that it was Jump's trading that re-pegged UST on May 23, 2021, and also that members of the public would not have known that Jump's trading had re-pegged UST as Jump's massive buying took place "off-chain." ¶¶135-46; *see also* TMSL C&D, ¶12 ("The investing public, which looks to centralized trading platforms for up-to-the moment market data, would have seen additional demand for, and upward price movement in, UST, but would not have been aware of the extent of UST demand that was coming from Tai Mo Shan's purchases"). Because Defendants' re-peg of UST is a textbook example of actionable market manipulation under Sections 9 and 10, Defendants' motion to dismiss should be denied.[9]

## E.    The Complaint Adequately Alleges Jump's Rule 10b-5(b) Violations

### 1.    The Complaint Alleges Actionable Misstatements and Omissions

#### a)    The Statements are Actionably False and Misleading

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). "Even if a statement is not false, it may be misleading if it omits material information." *Retail Wholesale Dep't*

---

[8] Defendants' citation to *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009), for the argument that the *Affiliated Ute* presumption of reliance is not applicable in manipulation cases, Mot. 33, is misplaced. That was a class certification decision in which the Ninth Circuit "conclude[d] that the district court did not abuse its discretion in refusing to adopt the integrity of the market presumption. On the contrary, it permissibly declined to certify the class under Rule 23(b)(3) on the ground that individual issues pertaining to the issue of reliance predominate over common ones." *Desai*, 573 F.3d at 942.

[9] To the extent Defendants rely on their "truth-on-the-market" defense in opposing Plaintiffs' market manipulation claims, *see* Mot. 33, the argument fails for the same reason it fails against the misstatement and omission claims.

*Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 775 (N.D. Cal. 2025) (Pitts, J.). Accordingly, the law requires disclosure "when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (cleaned up).

Here, Defendants knew in advance of each statement that UST's algorithm had failed and only through Jump's secret manipulation did UST re-peg in May 2021 and avoid the Terra ecosystem's collapse. Accordingly, all of the statements that Defendants made or controlled that touted the sustainability of the Terra ecosystem and the stability of UST's algorithm were false or misleading. Moreover, because Defendants chose to speak on the subject of the Terra ecosystem and the stability of its algorithmic underpinning, they were dutybound not to omit material facts that rendered their statements misleading. *See Stitch Fix, Inc.*, 790 F. Supp. 3d at 775-76.

After attempting to dodge liability for statements Defendants claim were made by others or that they strain to portray as nonactionable opinions, Jump defends three particular statements as misquoted or mischaracterized. Mot. 17-19. None of Defendants' attempts to finesse the statements exculpates. First, asked about the potential for bad actors in the space to harm investors, with actual knowledge that Jump manipulated UST's price, Defendant Kariya assured investors that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that." ¶340(l). Having just colluded to manipulate UST, in turn maintaining the viability of the Terra ecosystem, the Complaint pleads with specificity that Kariya could not have believed his statement. Defendants argue that the statement was not about the Terra ecosystem, but about a decentralized

market data distribution network called Pyth. Mot. 18. This is a non-sequitur: Pyth was one of several joint projects that Defendants worked on with TFL. *See, e.g.,* ¶¶156, 179, 181, 189. It was not separate from, but a part of, the Terra ecosystem that Defendants had conspired to prop up.

Relatedly, Defendant Kariya's statement in ¶340(m) is actionable because it was misleading to tout Jump's compliance and suggest it was "heavily, heavily regulated," when Jump had conspired with TFL, used the auto-deleting communications application Signal for its communication with TFL and Kwon, and, in chats with Kwon, Defendant Kariya stated that Jump's "Compliance feels much more comfortable here with the disappearing chats" that they were "strongly pushed to move all conversation here…" and further that "Compliance really stepping up the heat on moving over to Signal." ¶114. Defendant Kariya's statement is false and misleading, whether he said that the "phones" or the "firms" are heavily regulated, as they were not.[10]

Finally, as to the false and misleading statement in ¶340(d), the complete statement is not mischaracterized, but false and misleading in light of the stability mechanism's failure. That is, with knowledge that the algorithm had failed, with respect to a verifiable fact, Kariya falsely stated that the algorithm "requires solving for a number of crucial market parameters in a highly dimensional space to balance the safety and elasticity of the platform." ¶340(d). With knowledge that the algorithm had failed "[to] solv[e] for a number of crucial market parameters," not only was the verifiable fact false, but Kariya could not have believed the opinion he attached to the verifiable fact. *See* Section III.E.1.b, *infra*.

Defendants point out that the blog post did not state that the mechanism was *effective* to balance safety and elasticity. Mot. 19 (emphasis in motion). First, the statement implies

---

[10] To the extent Defendant Kariya was expressing the idea that Jump is "heavily, heavily regulated" as a registered broker-dealer, *see* ¶32, that regulation covers its traditional trading business and not the network of actors he was asked about on the podcast. *See* ¶340 (l)-(m).

effectiveness, referring to the stability mechanism as one of the "most exciting and successful projects in the DeFi landscape." Knowing the algorithm had failed, Kariya could not have believed that. *See id*. Second, worse still, Kariya implied a verifiable fact—the algorithm's ability to solve for crucial market parameters. Whether he expressed its effectiveness is irrelevant. He knew verifiable information—the algorithm failed. Defendants' attempt to wordsmith this statement is a non-starter because, even if part of this statement is an opinion, the statement is actionable as it created an misleading impression. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 778–79 (9th Cir. 2023) ("[T]he statements include phrases [that] might render the statements *opinions*…, but it does not follow that the statements do not create [a misleading impression]" (emphasis in original)).

This statement and the others touting the algorithm's stability and resiliency, *see, e.g.*, ¶¶340(f)-(h), misleads not for what it said but for what it omitted. As the Ninth Circuit has clarified repeatedly, "'[a] broker cannot affirmatively tell a misleading half-truth about a material fact to a potential investor … [because] the duty to disclose in these circumstances arises from the telling of a half-truth, independent of any responsibilities arising from a truth relationship.'" *United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015). Because Defendants chose to tout the stability of the ecosystem, they were dutybound to disclose both the algorithm's failure and Jump's intervention to save the peg when it failed. The statement, just like that in ¶340(f), reporting that "UST weathered a massive reflective downturn in the LUNA price in May" is misleading (assuming UST's continued survival due to Jump's manipulation could be construed as weathering a downturn) because it suggests the algorithm worked as advertised and omits Defendants' role behind the scenes.

This case is just like *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1012 (9th Cir. 2018), where the Ninth Circuit reversed dismissal of a securities action, reasoning: "Orexigen's statement that 'the USPTO published the patent,' gives rise to a duty to elaborate." *Id.* That was

27

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP

because Orexigen's statement suggested that the USPTO published the patent on its own when, in reality, Orexigen itself had played a role in the publication. *Id.* at 1012–1013; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of."). Finally, Kwon acknowledged that his statements misled precisely because he omitted Defendants' role in restoring the peg. *See* ¶25 ("Specifically, following the de-pegging of UST stable coin in May 2021, ***I made false and misleading statements of why it regained its peg by failing to disclose a trading firm's role in restoring that peg***."). The same goes for Defendants.

### b)    The Challenged Statements are not Protected as Opinions or Puffery

Defendants cannot escape liability by mischaracterizing their words as protected statements of opinion, benign expressions of corporate optimism, or mere puffery. Mot. 16-17. Indeed, the Complaint pleads with particularity facts showing not only that Defendants knew and omitted information about the algorithm's failure that belied their opinions, but that Defendants did not believe these statements.

First, only one of the statements that Jump identifies as an opinion is really a statement of opinion. *See* ¶340(e) (Jump assuring in a blogpost from October 2021 that, inter alia, "We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."). But opinion statements are nevertheless actionable where a defendant does not believe it or omits "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). As discussed above, Plaintiffs have identified omitted material facts – that the algorithm had already

failed and Defendants needed to re-peg it manually – that render Defendants' rosy opinion of UST's stability mechanism misleading. *See Forescout,* 63 F.4th at 778-79 (9th Cir. 2023) ("[T]he statements include phrases [that] might render the statements *opinions*…, but it does not follow that the statements do not create [a misleading impression]" (emphasis in original)).

Defendants' statements are also not puffery. "'Puffery' is not actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial," but "determining whether a given statement is material entail[s] delicate, fact-intensive assessments that are more properly left to the jury." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025). Here, Defendants' statements are actionable because of the context in which they were made: Defendants poured praise on a stability mechanism they knew did not work. As the Ninth Circuit has explained, even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Forescout Techs., Inc.*, 63 F.4th at 770. Thus, *Forescout* held that phrases such as "tracking very well" and "very large pipeline" were misleading because they "contravened the unflattering facts in [Forescout's] possession" and were made in response to specific questions. *Id.* at 770–771. This case is similar, and bears no relation to the cases that Defendants rely on, which find generalized optimism concerning a company's long-term business prospects to be puffery. *See* Mot. 16-17 (citing *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063–64 (N.D. Cal. 2012)). Defendants' statements – statements that praised UST as an "infinitely-scalable, algo-pegged USD stablecoin," ¶340(c); one that "weathered a massive, reflexive drawdown," "learning important lessons and improving upon its design and adoption strategy," ¶340(f) – provided the market with the impression of a state of affairs that differed in a material way from what actually existed. The statements are actionable.

### c)    Defendants are the Makers of the Challenged Statements

Defendants try to evade liability for six statements on the ground that they were not their "maker," but these statements can be attributed to them under binding Supreme Court caselaw.

In *Janus*, the Supreme Court addressed the question who "made" certain allegedly false statements contained in mutual fund prospectuses for purposes of determining liability under the federal securities laws, and held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Court explained that "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142–43. "Nothing in *Janus* precludes a single statement from having multiple makers." *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015).

First, the misstatements in ¶¶340(g) and (i), a post from the LFG's website and a LFG press release, respectively, can be attributed to Defendants. Plaintiffs allege that "Jump (via Kariya), as a cofounder and creator of the Luna Foundation Guard ('LFG'), exercised control and directed and/or authorized, directly or indirectly, the statements that the Luna Foundation Guard made to the public." ¶192. Further, Defendant Kariya, in his role as President of Jump Crypto, ¶35, was a founding member of the LFG's Governing Council. ¶197. Because the LFG stated publicly that it was "overseen and operated" by the Governing Council, the members of the Governing Council are liable for the LFG's misstatements. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1187 (D. Or. 2015) (officers were makers of statements under Janus when their approval was necessary for publication); *In re Rocket Fuel, Inc. Sec. Litig.,* 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (similar). *Abdo v. Fitzsimmons*, which Defendants rely upon, is distinguishable because there the court reasoned, *inter alia*, that "the ODs delegated authority over the content of

those statements to others." *Abdo v. Fitzsimmons*, 2021 WL 616324, at *10 (N.D. Cal. Feb. 17, 2021). That is not the case here. In addition, Defendants are wrong that the allegations in the Complaint "squarely undermine" Plaintiffs' allegation that Defendants controlled LFG's statements. *See* Mot. 16. While the Superseding Indictment against Kwon would later reveal that Kwon and a Singaporean business consultant secretly controlled the LFG's assets, ¶202, the issue here is control over LFG's public statements.

The misstatement in ¶340(f) is similar. While Defendants contend that this press release was "authored by TFL" on "TFL's Medium site," *see* Mot. 15, the statement itself makes clear that it is a statement of the LFG. *See, e.g.*, ¶191 n.188 ("Are you interested in pushing the boundaries of stablecoin innovation? The LFG is currently seeking to hire highly motivated individuals with deep experience in the industry as it ramps up its grants framework this year. Let's build decentralized money, together. jobs@lfg.org"). *See ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) (noting that "attribution to another party generally indicates that the attributed party is the 'maker'").

Defendants are also liable for the statements made in the conversation between Defendant Kariya and Kwon on the "Ship Show" podcast. ¶340(k). Plaintiffs have pleaded that "Jump produced this podcast, hosted it, and published it" and that "Defendant Kariya retweeted the link to it." *Id*. While Defendants cite cases finding that there is no general duty to correct the misstatements of others, Mot. 15-16, courts after *Janus* have found that "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 665 (S.D. Tex. 2021). That reasoning applies here, with respect

1    to Kwon's words spoken on Jump's podcast, especially given that the conversation took place with

2    Defendant Kariya for the purpose of promoting the Terra Tokens. ¶340(k).

3         Finally, while Defendants argue they cannot be liable for the misstatements set out in

4    ¶¶340(b) and (c), which are blog posts on TFL's Medium site, Plaintiffs have alleged that

5    Defendants are the "makers" of these statements under *Janus* because their approval was necessary

6    for publication. First, the June 9, 2021 blog post in ¶340(b) quotes Jump multiple times. While the

7    blog post cites many third parties and links to the underlying sources, the post does not provide any

8    links for Jump's quotes, but simply pastes them into the body of the post in quotation marks as being

9    "From Jump." ¶154, n.141. That provides the impression that TFL and Jump worked on this blog

10   post together, and "[n]othing in *Janus* precludes a single statement from having multiple makers."

11   *See Glickenhaus & Co.*, 787 F.3d at 427; *ESG Cap. Partners,* 828 F.3d at 1033.

12

13        Next, the misstatement alleged in ¶340(c) is an August 9, 2021 blog post officially unveiling

14   Wormhole. Not only is Wormhole a joint project of TFL and Jump, and not only does the post

15   repeatedly cite the "Wormhole team," ¶158, n.157, but the Complaint cites an email from June 2021

16   between TFL and Jump on the topic of coordinating upcoming PR efforts between the firms

17   concerning Wormhole. ¶156, n.142. The Complaint here therefore contains much greater indicia of

18   control than in *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, which Defendants cite,

19   rejecting as insufficient "bare assertions" that "amount to nothing more than a 'formulaic recitation

20   of the elements' of a claim.'" *See* Mot. 14 (citing 880 F. Supp. 2d 1045, 1071 (N.D. Cal. 2012)).

21   Discovery will reveal additional coordination efforts between TFL and Defendants and demonstrate

22   this blog post (and others) to be a joint statement made by Defendants as well as TFL but, at this

23   stage, Plaintiffs have stated a claim that Defendants are the makers under *Janus*.

24

25

26

27

28

1

2

### d) The Complaint Alleges Actionable Omissions in Violation of a Duty

3    The Complaint pleads actionable omissions. First, Plaintiffs have alleged that the Defendants

4    told half-truths, statements that, even if they could be construed to be technically accurate, were

5    misleading in the absence of what Defendants omitted. As the Ninth Circuit has held repeatedly,

6    choosing to discuss a topic triggers a duty to disclose facts sufficient to make one's statements not

7    misleading. *See, e.g., Berson*, 527 F.3d at 987 (9th Cir. 2008); *Lloyd*, 807 F.3d at 1153 (9th Cir.

8    2015); *Khoja*, 899 F.3d at 1012; *see also Stitch Fix, Inc.*, 790 F. Supp. 3d at 776.

9

10    Separate and apart from Defendants' false and misleading half-truths, however, Defendants

11    would still have a duty to disclose the fraudulent re-peg to the market. In light of Defendants' trading

12    in UST and the pecuniary benefit achieved therefrom, Defendants – who were not normal market

13    participants but were distributing Terra Tokens to the public; operating under a "gentleman's

14    agreement" with Defendants to maintain the peg; and also, as the SEC has now found, acting through

15    TMSL as a statutory underwriter – had a duty to disclose that their manipulation, not the algorithm,

16    had re-pegged UST.

17    In the Ninth Circuit, "[a] number of factors are used to determine whether a party has a duty

18    to disclose: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit

19

20    that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was

21    relying upon the relationship in making his investment decision, and (5) the defendant's activity in

22    initiating the transaction." *See Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1157 (9th

23    Cir. 1996). These factors demonstrate a duty to disclose: Defendants were powerful insiders who

24    had conspired with TFL to manually re-peg UST when the algorithm had failed, raking in over $1

25    billion, had agreements to distribute and increase the liquidity of various Terra Tokens and a

26    gentleman's agreement to protect the peg if necessary, and Defendant TMSL was a statutory

27

28

underwriter. ¶¶65-74. Plaintiffs, on the other hand, were retail investors left to rely on an algorithm that, as Defendants knew, did not work.

Applying similar principles, courts have found that underwriters and others in positions analogous to Defendants have a duty to disclose material information to the investing public before trading, and are among the insiders on whom the law imposes a duty to disclose material nonpublic information in their possession or abstain from trading. *See, e.g., Dirks v. S.E.C.*, 463 U.S. 646, 653–54 (1983) (citing *Matter of Cady, Roberts & Co.*, 40 S.E.C. 907 (Nov. 8, 1961)); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 641-42 (D.C. Cir. 2008); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 384 n.157 (S.D.N.Y. 2003) ("Allocating Underwriters were under a duty to disclose under yet another analysis: Where an insider trades in securities, it is well-settled that she is under a duty to disclose all material information."); *see also In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1189 (9th Cir. 2024) ("[o]ne trading while in possession of material, non-public information has a duty to publicly disclose that information").

The Supreme Court's opinion in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), is instructive. While usually cited for its holding that positive proof of reliance is not required where defendant's fraud primarily involves omissions, *id.* at 152–54, the case discusses duty to disclose as well, with the Supreme Court explaining that: "In the light of the congressional philosophy and purpose, so clearly emphasized by the Court, we conclude that the Court of Appeals viewed too narrowly the activities of defendants Gale and Haslem. We would agree that if the two men and the employer bank had functioned merely as a transfer agent, there would have been no duty of disclosure here." *Id.* at 151–52. The Supreme Court imposed a duty of disclosure because they were active in market making in the relevant securities. *Id.* Defendants here were similarly active in market making, with Defendants playing a key role in ensuring the public distribution and liquidity of various Terra Tokens and TMSL acting as statutory underwriter for LUNA. *See* ¶¶65-

74. Defendants' insider role as underwriter and market maker imposed a duty to disclose or abstain. Instead, in violation of that duty, Defendants traded, raking in over a billion dollars based on the information that it possessed and the market did not.

> ### 2.    The Complaint Adequately Alleges Scienter For All Fraud-Based Claims

Plaintiffs may plead scienter by alleging "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (citation omitted). An inference of scienter is strong "if a reasonable person would deem the inference…cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Thus, a tie goes to the plaintiff. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in original).

Leveraging (1) an SEC enforcement action against TFL that focused on the precise fraud alleged here and led to a conviction on all counts; (2) Defendants Kariya and DiSomma's invocation of the Fifth Amendment right against self-incrimination when asked about Defendants' role in the re-peg; (3) a criminal securities fraud case against Kwon in which he admitted to this fraud and received a 15-year prison sentence; (4) an SEC consent decree finding that TMSL, in engaging in massive undisclosed stabilizing trades, albeit negligently, "misled members of the investing public about the efficacy of Terraform's so-called "algorithmic stablecoin;" and (5) a trove of incriminating documentary evidence and trial testimony, Plaintiffs' Compliant adequately pleads a cogent inference of scienter that is at least as compelling as any counter-inference.

Defendants surreptitiously manipulated UST to re-peg it when the algorithm had failed, reaping over a billion dollars in proceeds. In an effort to weave from whole cloth a counter-inference, Defendants contend that their continued interaction with the Terra ecosystem after their knowing

manipulation of UST establishes their belief in its viability and longevity. Mot. 23-24. Defendants'

counternarrative is at odds with the Complaint's well-pleaded allegations, as well as common sense.

First, Defendants' actions belie their belief in the Terra ecosystem's viability and longevity

and evince consciousness of guilt. Jump was not shy about touting the Terra ecosystem publicly. As

such, if Jump truly believed in the ecosystem's viability and longevity, nothing could have generated

more investor support than publicly disclosing its massive off-chain purchases made to restore the

peg. Defendants' counter-inference depends entirely on what they claim was a belief in the Terra

ecosystem, when their silence coupled with the outsized profit they reaped from their manipulation

belie that belief. As noted above, Defendants could not have believed in an algorithmic stablecoin

and the ecosystem it supported when the algorithm had already failed.

Second, that Defendants reaped over $1 billion in proceeds directly from their manipulation

of UST supports a strong inference of scienter. Jump had a billion dollar motive to scheme, to

manipulate, and to deceive investors. Even as motive and opportunity alone cannot satisfy the

PSLRA's strong inference requirement, they are material to the holistic analysis of a complaint's

scienter allegations. *Tellabs,* 551 U.S. at 325. Rather than maintaining some earnest belief in the

Terra ecosystem's viability, in exchange for manually re-pegging UST, Defendants received Terra

Tokens pursuant to the altered vesting conditions, memorialized in writing in or about July 2021,

¶94, and then turned around and sold them for a massive profit. Moreover, Plaintiffs plead evidence

that Defendants did not have faith in the "viability and longevity" of the ecosystem. *See* ¶129 (after

the re-peg, "Defendant DiSomma instructed Jump to sell the UST, ***"[b]ut he was saying sell it very***

***carefully not to cause like another depeg event. Because if Jump just started dumping the UST***

***on the market, it would also cause the price of UST to drop again, so he didn't want that to***

***happen")***. In sum, Jump's $70 million intervention was made not because of Jump's belief in the

future viability of the Terra ecosystem, but rather to secure its side deal with TFL and Kwon which allowed Defendants to extract over a billion dollars worth of LUNA tokens.

Third, as argued above, the Complaint alleges that Defendants paid more than the prevailing market price on exchanges for UST during the re-peg. *See* Section III.D, *supra*. Offering to pay more than the market price does not evince innocuous bargain hunting; it evinces manipulative intent to artificially distort the price of an asset. *See Sharette*, 127 F. Supp. 3d at 85–86. Next, to the extent Defendants suggest that the algorithm did not fail because "market participants purchasing UST when the price was below $1 was precisely how the 'algorithm' was designed to work," Mot. 23, they ignore all of Defendant Mizrach's trial testimony, cited in the Complaint, which shows that it was Jump's off-chain trades – not the algorithm – that restored the peg. ¶¶132-46. As for the claim that Defendant Kariya's statement "extreme price movements, which do happen every sometime" demonstrates that Defendants were being candid with the market rather than deceptive, Mot. 22-23, Defendants ignore that Jump had knowingly and surreptitiously re-pegged UST when the algorithm had failed. The counter-inference Defendants propose – that they believed in the value of an algorithmic stablecoin that had already failed – makes no sense. In context, Jump's omission of the algorithm's failure and its manipulation of UST supports their knowledge or recklessness for fraud.

Defendants also ignore the trove of documentary evidence showing their scienter. For instance, "The SEC introduced an internal Terraform chat discussing the crash in which an employee acknowledged that: '***they [Jump] saved our ass***.' In another exhibit, a Jump employee wrote to Defendant Disomma on May 24, 2021: '***seems like the prop to Do was well timed.***'" ¶21. These descriptions point toward knowledge of a scheme to prop up UST where the algorithm had failed, saving the Terra ecosystem from imminent collapse. These are not the descriptions of an innocent belief in that ecosystem's "viability and longevity." Nor are Defendants' evasive actions and efforts to cover their tracks consistent with the inference of nonfraudulent intent that Defendants are now

asking the Court to draw. Defendants Kariya and Disomma both invoked the Fifth Amendment right against self-incrimination when asked about Jump's role in the re-peg. In addition, Defendants purposefully chose to use disappearing messaging platform to avoid potential regulatory compliance issues, with Defendant Kariya stating in chats with Kwon that Jump's "Compliance feels much more comfortable here with the disappearing chats" that they were "strongly pushed to move all conversation here…" and that "Compliance really stepping up the heat on moving over to Signal." ¶114. All of these efforts to conceal demonstrate Defendants' scienter. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 696–697 (S.D. Tex. 2002) (efforts to conceal fraudulent activity can contribute to an inference of scienter).

Finally, Defendants nitpick several of Plaintiffs' allegations, arguing that alone they are insufficient to plead a strong inference of scienter. *See* Mot. 25. Even if that were true, the legal inquiry is a holistic one. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012) (scienter inquiry is holistic and courts must not let a piecemeal analysis obscure the holistic view). Thus, Plaintiffs are not arguing that Defendant Kariya and Disomma's invocation of the Fifth Amendment right to silence "establishes" Defendants' scienter; nor the fact that TMSL has entered into a settlement with the SEC finding that it "negligently" misled the market as to the stability of the peg "establishes" Defendants' scienter; nor even that Kwon's allocution admitting that his role in the de-peg was criminal "establishes" Defendants' scienter. *See* ¶94 (Superseding Indictment against Kwon describing re-peg as "***secret oral agreement*** with the Trading Firm pursuant to which the Trading Firm agreed to purchase tens of millions of dollars of UST and LUNA for the purpose of ***artificially*** propping up UST's $1 peg"); ¶87 (Kwon stated in open court that: "following the depegging of UST stable coin in May 2021, I made false and misleading statements of why it regained its peg by failing to disclose a trading firm's role in restoring that peg. I understood that purchasers of UST relied on those false statements when making their purchases. ***What I did was***

*wrong, and I want to apologize for my conduct*.”). Though an understatement, Plaintiffs argue only what they must: Taken collectively, the inference of scienter is strong. *See Tellabs,* 551 U.S. at 324.

### 3. The Complaint Adequately Pleads Class-wide Reliance

Defendants assert that the Complaint fails to plead reliance for any Exchange Act claims. Mot 25-27. For the following reasons, their arguments fail.

First, no question exists that *Affiliated Ute*, 406 U.S. 128, applies to the manipulation claims, supporting both individual and class reliance. That is so because more recent Supreme Court precedent renders *Desai v. Deutsche Bank Securities Ltd*., 573 F.3d 931 (9th Cir. 2009) unviable. In *Desai,* the Ninth Circuit premised its holding that the district court did not abuse its discretion by refusing to apply the *Affiliated Ute* reliance presumption to Rule 10b-5(a)/(c) claims on a sharp distinction between Rule 10b-5(b) claims and 10b-5(a)/(c) claims. It stated, “manipulative conduct has always been distinct from actionable omissions.” *Id*. at 940. Based on this false distinction, the Ninth Circuit stated, “[i]f such nondisclosure of a defendant’s fraud was an actionable omission, then every manipulative conduct case would become an omissions case.” In turn, “[i]f that were so,” the Court continued, “then all of the Supreme Court’s discussion of what constitutes manipulative activity would be redundant. We decline,” it concluded, “to read the Supreme Court’s case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise.” *Id*. at 941.

A decade later, however, the Supreme Court squarely rejected *Desai*’s foundation, invalidating its holding. In *Lorenzo v. SEC*, 587 U.S. 71 (2019), the Supreme Court held that a banker was liable for violations of Rule 10b-5(a) and (c) when he disseminated to investors a misleading statement for which he was not a “maker” under *Janus*, 564 U.S. 135 (2011). *Lorenzo*, 587 U.S. at 78 (“dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5”). In so holding, the Supreme Court

rejected *Desai*'s premise that "each of these provisions should be read as governing different, mutually exclusive, spheres of conduct." *Id.* at 80. The Supreme Court stated that it "and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Id.* (citations omitted).  Rejecting the notion that the overlap among sections was "surplusage," the Supreme Court stated, "[e]ach succeeding prohibition" was thus meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." *Id.* (citations omitted). Indeed, in discussing the overlap among rule 10b-5's sections, the Supreme Court cited *Affiliated Ute* as an example of a defendants conduct "falling within the very language of one or the other of those subparagraphs, a course of business or a device, scheme, or artifice that operated as a fraud." *Id.* at 81 (citing *Affiliated Ute*, 406 U.S. at 153) (cleaned up). Because manipulation and misrepresentation claims are substantively fluid, legal principle and logic mandate the application of the same reliance principles to all of Rule 10b-5's sections.

Therefore, the *Affiliated Ute* presumption applies to Rule 10b-5(a) and (c) where concealment of a scheme effectively omits material information. First, in *Affiliated Ute*, even as the plaintiffs brought a 10b-5(b) claim, the Supreme Court rejected a restrictive reading of Rule 10b-5, noting that while section (b) specifies untrue statements and omissions, the "activities, outlined above, disclose, within the very language of one or the other of those subparagraphs, a course of business or a device, scheme, or artifice that operated as a fraud upon" the sellers. *Id.* at 152–53 (cleaned up). That is, in that case, the conduct constituting a 10b-5(b) violation also violated 10b-5(a)/(c). Second, in reversing dismissal for failure to plead reliance, the Supreme Court did not distinguish between Rule 10b-5's sections, holding instead that "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary" it continued, "is that the facts withheld be material . . . ." *Id.* at 153–54; *see also Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975) (*Affiliated Ute* presumption's

logic is that direct proof of reliance in omissions cases would require "proof of a speculative negative," that investor would not have bought had they known). Here, the same is true. Whether because of omission (10b-5(b)) or device, scheme, or artifice to defraud (10b-5(a)/(c)), Jump's manipulating UST when the algorithm had failed was material, undisclosed information. Pleading and proving actual reliance is unnecessary and therefore the Complaint adequately pleads Rule 10b-5(a) and (c) claims.

Second, even if *Affiliated Ute* does not apply to Rule 10b-5(a)/(c) claims, the Complaint alleges, but Defendants ignore, that the Complaint pleads primarily Jump's omissions with respect to the de-peg and Jump's manipulative conduct to re-peg UST. The Court's task is to "analytically characterize [the] action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case" (where the presumption would be unavailable). *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). Defendants assert, however, that the "bulk of Plaintiffs' allegations attributable to the Jump Entities are alleged misstatements." Mot. 26. Not so. The Complaint's main thrust is Jump's manipulation of UST when the algorithm failed, which Defendants omitted. While the market could see that UST appeared to weather a storm based on the recovery in price, the market was left to believe, given that UST is an algorithmic stablecoin, that the algorithm was responsible. That Defendants and TFL, instead, conspired to manually restore the algorithm and did not tell anyone what they had done constitutes an actionable omission. *See Blackie*, 524 F.2d at 908 (applying the *Affiliated Ute* presumption because proof of materiality of omitted information with common sense notion that investors do not purchase to lose value establishes causal nexus between omission and transaction); *Little v. First California Co.*, 532 F.2d 1302, 05 (9th Cir. 1976) (where investors purchased notes and alleged that corporate insiders failed to disclose material information, the Ninth Circuit afforded investors the *Affiliated Ute* presumption, citing *Blackie*).

Defendants rely on *In re Volkswagen "Clean Diesel" Mktg.* in painting this as primarily a misstatement case, Mot. 26, but it is distinguishable. In *Volkswagen*, the plaintiff alleged pages of affirmative misstatements on which the plaintiff and its investment advisor directly relied. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021). Rejecting the application of *Affiliated Ute*, the court found that the omissions were "the inverse of the affirmative misrepresentations described above," ruling that misrepresentations were primary, not omissions. *Id.* at 1208. This case is different. Here, when the algorithm failed, Jump conspired surreptitiously to re-peg UST, omitting its participation, and supporting investors' faith that the algorithm performed when it did not. Having made no affirmative statement about the re-peg as it occurred and shortly thereafter, Defendants' omission is not the inverse of any misstatement, but the core of Plaintiffs' case. Coupled with Defendants' insider trading, rendering them duty bound to disclose their scheme or refrain from trading, *see In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1189 (9th Cir. 2024) ("[o]ne trading while in possession of material, non-public information has a duty to publicly disclose that information"), the heart of the case against Defendants is their omission in the face of a duty to disclose.[11] Because Defendants' fraud primarily concerns omissions, therefore, *Affiliated Ute*'s presumption of reliance applies.

Further, for subsequent, affirmative statements, the Complaint pleads indicia of market efficiency, supporting the applicability of the fraud-on-the-market presumption. Under this presumption, plaintiffs who purchase or sell securities rely on the integrity of the market price, and thus on any material misrepresentations. *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). The fraud-on-the-market presumption applies to both statements and omissions as well as acts of market

---

[11] Following the re-peg, Jump submitted to the Terra community a governance proposal aimed at improving future on-chain liquidity but did not address the re-pegging of UST that had just occurred. ¶¶147-152.

manipulation, because the "[t]he false premise, regardless of whether it is conveyed by a written misstatement or by manipulative misconduct, is then reflected in the price of the security." *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010). "Whether a market is efficient 'is not a pure question of law' and normally should not be decided on a motion to dismiss"). *Id.* at 395 (citing *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003) (collecting cases)). Accordingly, while the fraud-on-the-market theory applies only where plaintiffs have alleged an efficient market, courts recognize that plaintiffs need not establish market efficiency at the pleading stage. *See e.g. Bank of Am. Corp.*, 2011 WL 740902, at *14 (alleging existence of efficient market suffices to overcome motion to dismiss).

The Complaint alleges indicia of efficiency, including that the Terra Tokens had been traded by a wide variety of retail investors for several years and that the market responded to information, as evidenced by the fact that the market for all of the Terra Tokens crashed together in response to the failure of the algorithm to re-peg UST in May of 2022. This suffices to allege market efficiency at this stage. *See id*. *ScripsAmerica, Inc. v. Ironridge Glob. LLC,* 119 F. Supp. 3d 1213, 1253-58 (C.D. Cal. 2015), Mot. 27, is unavailing, because the court conducted an extensive efficiency analysis that courts universally apply to determine market efficiency at the class certification stage on the basis of a developed record. *Id.* at 1253–58. Because the Complaint alleges facts supporting that Terra Tokens traded on a developed and efficient market that incorporated material public news, Plaintiffs are entitled to the fraud-on-the-market presumption of reliance at this stage. *See In re Bank of Am. Corp.*, 2011 WL 740902, at *14.

### 4.    The Complaint Adequately Alleges Loss Causation

Loss causation "is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Plaintiffs may also

plead "materialization of the risk," *i.e.*, that the loss "proximately flowed from the alleged hazard, which the false or misleading statements obscured." *Junge v. Geron Corp.*, 2022 WL 1002446, *7 (N.D. Cal. Apr. 2, 2022). Pleading loss causation is "not meant to impose a great burden upon a plaintiff" but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

As noted above, Defendants have confused loss causation for materiality. Defendants attempt to defeat loss causation by injecting a sort of "truth on the market" argument, contending that no reasonable investor could be misled because, since the LFG was formed in January of 2022 specifically to support the peg with an initial reserve of over a billion dollars that could be deployed to help stabilize UST during periods of volatility, then the market knew that a de-peg was a possibility. Mot. 27-29. But because "truth on the market" is a fact-intensive argument as to materiality, courts regularly reject this sort of attempt to raise it on a motion to dismiss. *See, e.g., In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 197–98 (D. Conn. 2023) (question of whether disclosures revealed new information to the market is a "truth-on-the-market" defense that is intensely fact-specific and "rarely an appropriate basis for dismissing a [Section] 10(b) complaint"); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *6-*7 (C.D. Cal. Oct. 20, 2011) ( "the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis").

Even if this argument were proper on a motion to dismiss, however, Defendants' claim to have found a fatal flaw in the Complaint lurking in Paragraph 194 fails because this does not come anywhere close to being a complete disclosure. The very next paragraph, quoting the LFG's website, states: "The Luna Foundation Guard's so-called 'core mandate' was to '***buttress the stability of the UST peg*** and foster the growth of the Terra ecosystem. Building reserves that ***backstop the peg of algorithmic stablecoins*** amid volatility and funneling resources into research that further advances what's possible with stablecoins. . . .'" ¶195 (emphasis added). While the market knew that a de-

1    pegging event and times of market volatility were possible, the market did not know that the peg

2    had ***already failed*** and needed to be manually rescued by Defendants. Defendants knew this secret

3    information. The market did not.

### F.    Plaintiffs Have Alleged that Defendants are Statutory Sellers Under the Securities Act

6        Defendants attempt to dodge liability under the Securities Act by arguing that they are not

7    statutory sellers under Section 12(a). Mot. 37-40. Defendants are wrong.

8        "Solicitation is broadly construed in the Ninth Circuit." *Houghton v. Leshner*, 2023 WL

9    6826814, at *3 (N.D. Cal. Sept. 20, 2023) (commenting on the Ninth Circuit's *Pino* case). In *Pino*,

10   the Ninth Circuit elaborated on the requirement that, to plead the "seller" element, plaintiff must

11   plead that Defendants "'engage[d] in solicitation,' *i.e.*, "solicit[ed] the purchase [of the securities],

12   motivated at least in part by a desire to serve his own financial interests or those of the securities

13   owner." *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257–58 (9th Cir. 2022).

14       The Ninth Circuit in *Pino* reversed a district court's finding that a complaint had not pleaded

15   "solicitation" where defendants' alleged solicitation consisted solely of social media statements

16   (Instagram posts and Youtube videos), defendants had not directly and actively solicited plaintiffs'

17   investment, and plaintiff did not allege reliance. *Id.* at 1257. The Ninth Circuit squarely rejected the

18   argument that solicitation must be "direct or targeted towards a particular purchaser to fall within §

19   12," *id.* at 1258, or that "plaintiff must allege a relationship 'not unlike contractual privity' between

20   purchaser and seller, which cannot be created by a broadly distributed communication." *Id.* at 1259.

21   Explaining that "[t]o conclude that [defendants'] social media communications fall outside the Act's

22   protections would be at odds with Congress's remedial goals," the Ninth Circuit "conclude[d] that

23   § 12 contains no requirement that a solicitation be directed or targeted to a particular plaintiff, and

24   accordingly, [we] join the Eleventh Circuit in holding that a person can solicit a purchase, within

25   the meaning of the Securities Act, by promoting the sale of a security in a mass communication."

26   *Id.* at 1260; see *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1182 (9th Cir. 2024)

27   (finding defendants solicited the purchase of securities by disseminating articles).

28

Moreover, "courts in this district have held that a plaintiff has adequately pled solicitation where they have stated that the defendant has been 'comprehensive[ly] involve[d] with the design, operation and monetization of a cryptocurrency enterprise.' *Samuels v. Lido Dao*, 757 F. Supp. 3d 951, 968 (N.D. Cal. 2024) (citing *Houghton* 2023 WL 6826814, at *3 (N.D. Cal. Sept. 20, 2023)). The *Houghton* court, rejecting the argument that the so-called "partner defendants" behind the COMP cryptocurrency token and protocol could not be liable as statutory sellers because they were mere "collateral' participants" in secondary market transactions, held: "The plaintiffs' numerous allegations regarding the Partner Defendants' roles with Compound and then Compound DAO, including their design and governance decisions, their efforts to successfully monetize COMP and bring it to secondary markets, and their public comments, plausibly plead solicitation under *Pino.*" *Houghton*, 2023 WL 6826814, at *3

That reasoning applies. Just like in *Lido Dao* and *Houghton*, Plaintiffs have alleged that Defendants were "comprehensive[ly] involve[d] with the design, operation and monetization of a cryptocurrency enterprise," *see Lido Dao*, 757 F. Supp. 3d at 968, and made promotional statements to solicit securities transactions that were in their financial interest. *See id*. at 969. This states a claim. First, the SEC has found that TMSL, in acting as statutory underwriter and serving as a "conduit for the transfer of securities to the public" "directly or indirectly offered and sold crypto assets being offered and sold as securities on U.S.-based crypto asset trading platforms." TMSL C&D, ¶¶6-8. Defendants' comprehensive involvement in designing, operating and monetizing this cryptocurrency enterprise goes well beyond that, though, and includes Defendants' central role as liquidity partner, statutory underwriter and market maker for myriad offerings of unregistered securities between 2019 and 2022. ¶¶53-75. Further demonstrating Defendants' role in soliciting sales of Terra Tokens is Defendants' barrage of mass communications promoting Terra Tokens to the public. *See, e.g.,* ¶¶147-51, 158, 160-64, 166, 168-71, 173--81, 183-87, 189–95, 199, 203-04, 207, 211-16, 221-24, 231-41, 243-244, 247, 249, 250, 252, 255.

Defendants' arguments to the contrary fall flat. First, they stress that the only statement the Complaint specifically identifies as a "solicitation for Terra securities" is ¶236. Mot. 39. *See* ¶236 ("Jump provides the following solicitation for Terra securities… 'Terra traders can use the Terra

Station app to stake their Luna, i.e., delegate their Luna tokens to one of several different validators who process the Terra network, in exchange for rewards,'" and linking to an article titled "Here's How to Stake $LUNA and Earn Rewards in the Terra Ecosystem."). That might be true, but the Complaint pleads a whole section of promotions just like this. *See, e.g.*, ¶148 (introducing this lengthy section of Complaint, stating: "Jump promoted the Terra Tokens through, among other means, websites, web applications, social media accounts, podcast interviews, and through U.S. media. The promotions all had the same talking points: the stability and sustainability of the UST peg and the ecosystem it supports.").

Defendants try to brush away these promotional statements as not definitive enough to constitute a solicitation, Mot. 39, but the statements are plainly attempts to persuade people to buy Terra Tokens,[12] and Defendants' barrage of tweets and other mass communications are functionally identical to the social media campaigns that courts have found sufficient. *See, e.g., Lido Dao*, 757 F. Supp. 3d at 959, 968 ("These posts generally advertised that LDO could be purchased on the relevant exchange; for example, one post announced: 'LDO is coming to Coinbase [beach emoji] Deposits/withdrawals are live, with trading to go live at 9AM PT on 17 November.' Lido also posted about increases in LDO's price and about high LDO trading volumes").

Finally, Defendants mislead by selectively citing and emphasizing quotations to make it seem as though pleading solicitation is much harder than it is. *See* Mot. 38 ("in *Pinter v. Dahl*, 486 U.S. 622 (1988), the U.S. Supreme Court made clear that Section 12(a)(1) liability 'extends only to the person who ***successfully*** solicits the purchase' by Plaintiffs of the alleged security… Here, the 4AC does not allege anywhere that Plaintiffs bought any 'Terra Token' because of alleged solicitation by Jump Crypto Holdings LLC.") (Emphasis in Mot.) Defendants can emphasize anything they wish, but reliance is not a requirement of Section 12. *See Lido Dao*, 757 F. Supp. 3d at 959, 968 ("a plaintiff does not need to plead either reliance or causation to state a Section 12

---

[12] Kwon admitted that he intended his positive statements touting the stability of UST and the Terra ecosystem—indistinguishable from, and often spoken in tandem with, Defendants'—to solicit Terra Token purchases. *See* ¶87 (Kwon admitted lying about the re-peg and omitting Jump's "role in restoring that peg" knowing that UST purchasers relied on false statements).

claim. Given that reliance is not required, that a solicitation must be 'successful' is better understood as requiring that 'a sale has taken place.') (Internal citations omitted). Similarly, Defendants argue that "[t]he 4AC does not allege that any of the Jump Entities transacted directly with Plaintiffs, much less passed **to Plaintiffs** title to any of the 'Terra Tokens,' Mot. 37, and that "none of the statements are alleged to have been directed at Plaintiffs." Mot. 39. "But the Ninth Circuit has held that solicitation does not need to be 'direct or personal to a particular purchaser,' or akin to 'contractual privity.'" *Lido Dao*, 757 F. Supp. 3d at 969 (citing *Pino*, 55 F.4th at 1259–60); *see also In re Tezos Sec. Litig.*, No., 2018 WL 4293341, at *3, 9-10 (N.D. Cal. Aug. 7, 2018) (plaintiff adequately alleged solicitation as to certain defendants even where plaintiff did not allege that he had any "awareness of any of the defendant-specific promotional or procedural activity").

Defendants' cases are irrelevant because they are from out-of-circuit or inconsistent with the decidedly broad view of solicitation that the Ninth Circuit adopted in *Pino* or both. *See* Mot. 38-39.[13] Because Defendants are statutory sellers under established Ninth Circuit caselaw, Plaintiffs have stated a claim.

### G.     Plaintiffs Have Alleged Control Person Claims

Plaintiffs have alleged two control person claims as to Defendants here. First, Count VII alleges that Jump Trading and Jump Crypto controlled Tai Mo Shan's violation of the Securities

---

[13]     To the extent there is one district court case decided after *Pino* requiring what *Pino* did not, it is clearly wrong. *See* Mot. 39, n.22 (citing *Hollifel v. Resolute Cap. Partners Ltd., LLC*, 2023 WL 4291524, at *6 (C.D. Cal. May 12, 2023) (finding complaint deficient because it pleaded defendants "engaged in general solicitation" by hosting "investor seminars, dinners, and radio shows," but "Plaintiffs do not allege that they attended any seminars or dinners or listened to any radio shows.")). *Hollifel's* requirement of some form of reliance or personalized viewership is plainly inconsistent with *Pino*, as other courts have explained. *See Lido Dao*, 757 F. Supp. 3d at 969 ("So if solicitation can be achieved through mass communications, and individual plaintiffs do not need to have relied on or had their purchases caused by these communications, it is unclear why a plaintiff would need to have seen them… [Defendant] cites *Hollifield v. Resolute Capital Partners Ltd.*, in which a district court held that the plaintiffs had not pled solicitation because they did not allege that they attended any of the seminars or dinners, or listened to any of the radio shows, through which some of the defendants allegedly engaged in solicitation. But *Hollifield* did not discuss or distinguish *Pino* in reaching this conclusion, so this Court declines to follow it."). Other courts have read *Hollifel* as an inartful way of finding the allegations of solicitation to be overly generalized and conclusory, rather than specific and detailed, as they were in *Houghton*, and as they are here. *See Houghton*, 2023 WL 6826814, at *3 (distinguishing *Hollifel* on that basis).

Act. *See* ¶406. Second, Count VIII alleges that Jump Trading, Jump Crypto, and Tai Mo Shan (the entity Defendants the Complaint refers to as "Jump," ¶1, controlled TFL's violations of the Securities Act that have already been found by Judge Rakoff. *See* ¶412. Both are well-pleaded.

### 1.    Jump Trading and Jump Crypto Controlled TMSL

First, there is nothing "conclusory" or "boilerplate" about Plaintiffs' allegation that Jump Trading and Jump Crypto controlled – meaning had authority to exercise decision-making power over or had day-to-day involvement in the operations of – TMSL. *See* Mot. 41. To the contrary, through the meticulous matching up of the SEC's findings and trial evidence as to Jump Trading and Jump Crypto with the SEC's findings against TMSL, the Complaint pleads specific facts demonstrating the requisite control. To be specific, in its order granting partial summary judgment to the SEC and finding as a matter of law that TFL violated the Securities Act by selling unregistered securities, Judge Rakoff wrote: "In November 2019 and September 2020, Kwon negotiated and signed, on behalf of Terraform, agreements with a U.S. crypto asset trading firm, Jump Crypto Holdings LLC ('Jump'), to receive loans of 30 million and 65 million LUNA tokens, respectively." *SEC v. TFL*, 708 F. Supp. 3d 450, 458 (S.D.N.Y. 2023). When the SEC later revealed its trial evidence, it became clear that these loans were papered as loans to TMSL. *See* ¶¶55-56 (September 2020 loan of 65 million LUNA from TFL (signed by Kwon) to TMSL). More, Judge Rakoff found that "[t]he second loan agreement, in September 2020, came about because a Jump executive emailed Kwon a proposal to obtain tens of millions of additional LUNA tokens at a discounted price to "thicken up LUNA markets further." *SEC v. TFL*, 708 F. Supp. 3d at 458; ¶57. That email, which was introduced at the SEC's trial as SEC Exhibit 284, revealed the "Jump Executive" to be Defendant Kariya. ¶57, n.28. Defendant Kariya is the head of Jump Crypto. ¶35.

As to TMSL's violations of the Securities Act, the SEC found that ***TMSL*** violated the Securities Act by receiving loans of LUNA from Terraform, and then distributing them via crypto asset trading platforms to the public, when no registration statement was in effect. *See* TMSL C&D, ¶¶5-8. Thus, the SEC found that ***TMSL*** violated the Securities Act for what ***Defendant Kariya*** and ***Jump Crypto*** did. As mentioned, Jump's control of Tai Mo Shan is plain from the documents as well. *See, e.g.,* Dkt. No. 128-11 at 6 ("Borrower: ***Tai Mo Shan Limited*** 600 W Chicago Ave #825

Chicago IL 60654 Email: *legal@jumptrading.com*") (emphasis added). Finally, a Jump employee

testified at trial that, while Defendant Kariya was the "public face of Jump Crypto" and managed

the relationships with others in the crypto community, ¶122, Defendant DiSomma – founder and

owner of **Jump Trading** – ran the **Jump Crypto** team. ¶¶1, 36, 122. Accordingly, this situation is

nothing like the cases Defendants rely on, finding control person allegation deficient when they are

boilerplate, conclusory, or based on the defendants' role in the company. *See, e.g.,* Mot. 40-41

(citing *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *10 (N.D. Cal. Mar. 26,

2015). Because the Complaint pleads vast and detailed factual allegations that the Jump entities

controlled (and for all intents and purposes, *were*) TMSL, Count VII should not be dismissed.

## 2.    The Jump Defendants Controlled TFL

The Complaint also pleads that Defendants controlled TFL's violations of the Securities Act.

Defendants confuse the issue by repeating their contention that the Complaint is an "impermissible

group pleading" and then arguing that "Plaintiffs' conclusory claims of control are undermined by

their allegations that the Jump Entities and TFL were separate and that Jump was a business partner

of TFL." Mot. 43. To be clear, Plaintiffs allege that the Jump entities are alter egos *of one another*.

Plaintiffs do not allege that TFL was an alter ego of anyone. That Defendants and TFL were separate

entities, however, does not defeat Plaintiffs' allegations that Defendants controlled TFL for the

purposes of the Section 15 of the Securities Act. The test is whether "the alleged controlling person

possessed, directly or indirectly, the power to direct or cause the direction of the management and

policies of the individual allegedly liable for the primary violation." *See, e.g., In re Wells Fargo

Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 969 (N.D. Cal. 2010); *see also* 17 C.F.R. §

230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the

direction of the management and policies of a person, whether through the ownership of voting

securities, by contract, or otherwise").

Here, Plaintiffs plead that Defendants possessed, directly or indirectly, power over TFL under the

Securities Act. First, the Order finding TFL's Securities Act violation as a matter of law itself relied

on the indispensable role played by Jump, noting Kwon's admission that, prior to partnering with

Jump, "LUNA's liquidity had been 'rather lackluster partly due to our team's inexperience with

secondary markets & trading operations." *SEC v. TFL*, 708 F. Supp. 3d at 475. Defendants rely on *In re Stratosphere Corp. Sec. Litig.*, holding that "Plaintiffs have merely alleged that 'but for' the Underwriters' participation, the Stock Offering could not have been accomplished," and explaining that "[t]his type of proximate causation is not a sufficient basis for 'control person' liability, which requires the exercise of actual power or influence over a company," 1 F. Supp. 2d 1096, 1122 (D. Nev. 1998), but Plaintiffs here allege far more than that.

As Plaintiffs allege (leveraging the Superseding Indictment against Kwon and enforcement action against TFL), separate and apart from the formal written agreements between TFL and Jump, at least as of August 2020, TFL and Jump entered into a secret gentleman's agreement that involved Jump receiving millions of LUNA tokens vesting over the next two years in exchange for Jump supporting the trading of Terra Tokens on exchanges, "thickening up" LUNA markets, and even defending the peg. ¶¶57-61. This is not an underwriter playing a required, "but-for" role in an issuer's offering. This demonstrates Jump's ability to control TFL and its securities law violations. *See Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1012–13 (N.D. Cal. 2024) (Pitts, J.) (complaint stated a Section 15 claim against three minority investors, each of whom could have prevented the company from going public). *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 575 (S.D.N.Y. 2015) (Section 15 "inquiry is necessarily context and fact dependent"). Accordingly, Plaintiffs have pleaded Defendants' control over TFL's Securities Act violations at this stage.

1

IV.    **CONCLUSION**

2

For the reasons stated above, Defendants' Motion to Dismiss should be denied.[14]

3

DATED: February 23, 2026                **THE ROSEN LAW FIRM, P.A.**

4

                                                       /s/ *Laurence M. Rosen*

5

Laurence M. Rosen, Esq. (SBN 219683)
Pronouns: he/him/his

6

355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071

7

Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

8

9

Jacob A. Goldberg (*pro hac vice*)
Pronouns: he/him/his

10

Michael Cohen (*pro hac vice*)
Pronouns: he/him/his

11

275 Madison Avenue, 40th Floor
New York, NY 10016

12

Telephone: (212) 686-1060
Email: jgoldberg@rosenlegal.com
            mcohen@rosenlegal.com

13

14

*Lead Counsel for Plaintiffs and the Putative Class*

15

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

16

John T. Jasnoch (CA 281605)
Email: jjasnoch@scott-scott.com

17

600 W. Broadway, Suite 3300
San Diego, CA 92101

18

Telephone: 619-233-4565

19

Sean T. Masson (*pro hac vice*)

20

The Helmsley Building
230 Park Avenue, 24th Floor

21

New York, NY 10169
Telephone: 212-223-6444

22

Email: smasson@scott-scott.com

23

*Additional Counsel for Plaintiffs*

24

25

26

27

28

---

[14] If the Court dismisses, Plaintiffs request leave to amend for the reasons provided in Plaintiffs' Opposition to Defendant Kariya's Motion to Dismiss, including Kwon's request to disclose Jump's participation in the re-peg and Jump's refusal. Kariya Opp., IV.G.

PLAINTIFFS' OPPOSITION TO DEFENDANTS JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN
LIMITED'S MOTION TO DISMISS, CASE NO. 5:22-cv-03600-PCP