**ZUCKERMAN SPAEDER LLP**
Aitan D. Goelman (admitted *pro hac vice*; D.C. Bar No. 44636)
Miles R. Clark (admitted *pro hac vice*; D.C. Bar No. 489388)
Christopher R. MacColl (admitted *pro hac vice*; D.C. Bar No. 1049153)
J. Benjamin Jernigan (admitted *pro hac vice*; D.C. Bar No. 90008695)
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com
bjernigan@zuckerman.com

**KOBRE & KIM LLP**
Daniel A. Zaheer (Bar No. 237118)
150 California Street, 19th Floor
San Francisco, CA 94111
Tel: (415) 582-4800
daniel.zaheer@kobrekim.com

*Attorneys for Kanav Kariya*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK PATTERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>JUMP TRADING LLC, JUMP CRYPTO HOLDINGS LLC, TAI MO SHAN LTD., KANAV KARIYA, and WILLIAM DISOMMA,<br><br>Defendants. | Case No. 5:22-cv-03600-PCP<br><br>**DEFENDANT KANAV KARIYA'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Honorable P. Casey Pitts<br>Hearing Date: May 7, 2026, 10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

I.      The Statute of Limitations Bars the Securities Act Claims. ............................................... 1

II.     Plaintiffs Ignore *Howey*'s Requirements and the SEC's Guidance. ................................... 4

III.    Plaintiffs Do Not Allege That Kariya Made Any Misleading Statements........................... 5

IV.     Kariya Did Not Engage In Market Manipulation. ............................................................. 10

V.      Plaintiffs Do Not Plead A "Strong Inference" That Kariya Acted With Scienter. ........... 12

CONCLUSION ......................................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ........................................................................................ 4

*CFTC v. Crombie*,
2013 WL 3957506 (N.D. Cal. July 26, 2013)................................................................ 12

*Cook v. Avien, Inc.*,
573 F.2d 685 (1st Cir. 1978)............................................................................................ 4

*CP Stone Fort Holdings, LLC v. John*,
2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) ................................................................ 11

*Fabian v. LeMahieu*,
2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ................................................................... 4

*Grunewald v. United States*,
353 U.S. 391 (1957)........................................................................................................ 13

*Heck v. Triche*,
775 F.3d 265 (5th Cir. 2014) ......................................................................................... 12

*In re Brocade Commc'ns Sys., Inc. Derivative Litig.*,
615 F. Supp. 2d 1018 (N.D. Cal. 2009) .................................................................. 2, 3, 4

*In re Glob. Cord Blood Corp. Sec. Litig.*,
2026 WL 444770 (S.D.N.Y. Feb. 17, 2026)................................................................. 11

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005) ........................................................................... 11

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ............................................................................ 6

*In re Vitamin C Antitrust Litig.*,
995 F. Supp. 2d 125 (E.D.N.Y. 2014) ............................................................................. 3

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)......................................................................................................... 8

*Krupski v. Costa Crociere S. p. A.*,
560 U.S. 538 (2010).................................................................................................... 3, 4

*Lorenzo v. SEC*,
587 U.S. 71 (2019)........................................................................................................... 8

*Louisiana-Pac. Corp. v. ASARCO, Inc.*,
5 F.3d 431 (9th Cir. 1993) .............................................................................................. 2

iii

*McMurtry v. Wexford Health Sources, Inc.*,
   2021 WL 1165102 (N.D. Ill. Mar. 26, 2021)...............................................................................3

*Nelson v. Adams USA, Inc.*,
   529 U.S. 460 (2000)........................................................................................................................3

*Ohio v. Reiner*,
   532 U.S. 17 (2001)........................................................................................................................13

*Patterson v. Jump Trading LLC*,
   710 F. Supp. 3d 692 (N.D. Cal. 2024) ................................................................................. 6, 10

*Rodriguez v. Profit Sharing Plan II Admin. Comm.*,
   740 F. Supp. 3d 1023 (S.D. Cal. 2024)........................................................................................4

*Romero v. Countrywide Bank, N.A.*,
   740 F. Supp. 2d 1129 (N.D. Cal. 2010) ......................................................................................3

*SEC v. Terraform Labs Pte. Ltd.*,
   708 F. Supp. 3d 450 (S.D.N.Y. 2023) ................................................................................. 5, 10

*SEC v. Terraform Labs Pte. Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) ................................................................................. 5, 12

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)........................................................................................................................4

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ................................................................................. 10, 11, 12

*Slochower v. Bd. of Higher Ed. of City of New York*,
   350 U.S. 551 (1956)......................................................................................................................13

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008)......................................................................................................................11

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .....................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)......................................................................................................................13

*United States v. Omnicare, Inc.*,
   2011 WL 1059148 (N.D. Ill. Mar. 21, 2011)..............................................................................2

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ............................................................................................. 6, 7, 8

*White v. Sabatino*,
   526 F. Supp. 2d 1143 (D. Haw. 2007)........................................................................................4

*Wilkins-Jones v. Cnty. of Alameda*,
   2012 WL 3116025 (N.D. Cal. July 31, 2012).............................................................................4

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .....................................................................................................13

iv

**Statutes**

15 U.S.C. § 77m.................................................................................................... 4

**Rules**

Fed. R. Civ. P. 15 ............................................................................................. 2, 3

**Regulations**

Application of the Federal Securities Laws
   to Certain Types of Crypto Assets and Certain
   Transactions Involving Crypto Assets,
   17 CFR pt. 231, 234 (2026) ............................................................................ 5

17 C.F.R. § 240.10b–5(b) .................................................................................... 8

**Other Authorities**

6A Wright & Miller's Federal
   Practice & Procedure § 1498.3 (3d ed.)......................................................... 2

v

**INTRODUCTION**

Faced with a motion demonstrating that their claims against Kanav Kariya are fatally deficient, Plaintiffs point to other parties, offer up bombastic labels, and ignore dispositive issues. Their response to the statute of limitations is to invoke earlier complaints that brought no claims against Kariya. Their response to the absence of any false statement by Kariya is to point to statements by Do Kwon, TFL, and LFG. Their response to the lack of particularized allegations giving rise to a strong inference of Kariya's scienter is to invoke conclusions about the scienter of Do Kwon and TFL. And when confronted with the absence of any trade that Kariya directed or executed, they describe trading directed and executed entirely by other Jump employees. Throughout, Plaintiffs treat Judge Rakoff's rulings in the SEC's case against TFL and Kwon—a case involving different defendants in a different posture—as though they are binding on this Court and dispositive of every issue Kariya raises here. They are neither.

For many arguments in the Motion, Plaintiffs simply go silent. They fail to address the elements of the *Howey* test. They largely ignore the argument that open-market purchases of a stablecoin designed to maintain its stated $1 peg cannot constitute "manipulation." They fail to explain why this Court should reach a different result than it did when it held—on the same underlying allegations—that Jump's communications with Kwon and modified loan terms failed to state a claim for manipulative or deceptive conduct. They never grapple with the fact that Kariya's own statements repeatedly acknowledged that UST's algorithm might need supplemental support, which is the opposite of concealment.

Now on their fifth complaint, Plaintiffs cannot allege that Kariya directed or controlled a single relevant trade; they cannot identify a statement he made that was false; they cannot plead facts supporting a strong inference of his scienter; and many of their claims are untimely. The Complaint should be dismissed without leave to amend.

**I.      The Statute of Limitations Bars the Securities Act Claims.**

Plaintiffs concede that the statute of limitations on their Securities Act claims (Counts V-VIII) began to run by May 25, 2022 at latest. Opp. at 8-9. The one-year limitations period thus expired by May 25, 2023—long before Plaintiffs first sued Kariya on January 25, 2024.

Plaintiffs (Opp. at 7-8) contend that their untimely claims "relat[e] back" because they arise from "the same core course of conduct" that was "at the center of this litigation" before Kariya was named. That might suffice to satisfy Federal Rule of Civil Procedure 15(c)(1)*(B)*—which allows relation back against an *existing defendant*. But Rule 15(c)(1)*(C)* imposes "considerably stricter rules" for *new defendants*, like Kariya. *United States v. Omnicare, Inc.*, 2011 WL 1059148, at *7 (N.D. Ill. Mar. 21, 2011). Within 90 days, the new defendant must have had (i) "notice" of the action such that he "will not be prejudiced in defending" it, and (ii) actual or constructive knowledge that the action would have been brought against him "but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). Plaintiffs meet neither requirement.

***No mistake.*** Plaintiffs fundamentally misunderstand Rule 15(c)(1)(C)(ii) when they argue that they made a "mistake" because they did not have sufficient information to sue Kariya until some unspecified date.[1] Opp. at 8-9. "The mistake under Rule 15(c) has to be as to identity." *Louisiana-Pac. Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir. 1993). The rule applies when a plaintiff "misdescribes" the party it intended to sue, not when the plaintiff does not name a party at all due to "lack of knowledge." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1498.3 (3d ed.). Neither lack of certainty as to "whether [a] potential defendant may be found liable" nor development of a new legal theory qualifies an omission as a "mistake." *See, e.g.*, *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1041 (N.D. Cal. 2009).

Plaintiffs acknowledge that they knew as of their June 17, 2022 initial Complaint that Kariya played a role in "the very conduct" from which their claims against him "arise." Opp. at 8. Indeed, that Complaint brought Section 12(a)(1) claims against TFL, Kwon, and Nicholas Platias for promoting the sale of Terra Tokens. Initial Compl. ¶¶ 194-203, ECF No. 1. It alleged that Kariya, "the President of Jump Crypto," "was promoting the demand for UST," *id.* ¶¶ 42, 114, and detailed his statements. *See also* 2d Am. Compl. ¶¶ 53, 131, 147, 282-91, ECF No. 102. Now, Plaintiffs bring claims against Kariya and others based on "Defendants'" purported "barrage of

---

[1] Some of the information Plaintiffs insist they needed in order to sue Kariya—"Tai Mo Shan's role in the events"—was, according to Plaintiffs, not available until "April 2024," *after* Plaintiffs finally did sue Kariya. Plaintiffs' insistence that they could not possibly have sued Kariya until they had information they did not yet have when they sued him is nonsense.

2

mass communications promoting Terra"—including statements *that appeared in the original Complaint*. Pls.' Opp. Jump MTD at 46, ECF No. 209 (citing 4th Am. Compl. ¶ 203 ("4AC"), ECF No. 176 (Compl. ¶ 100); 4AC ¶ 211 (Compl. ¶ 107); and 4AC ¶ 234 (Compl. ¶ 112)). All of the statements at issue are public Tweets, blog posts, or podcasts that were accessible to Plaintiffs throughout the limitations period.

"[M]aking a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010); *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 463, 467 n.1 (2000).[2] That rule holds even where the information necessary to sue the new defendant was "exclusively within" a defendant's "control." *Romero v. Countrywide Bank, N.A.*, 740 F. Supp. 2d 1129, 1144 (N.D. Cal. 2010).[3] Plaintiffs did not mistakenly think one of the originally named defendants played a role in the underlying events that Kariya in fact played—they understood the role Kariya played as distinct from other parties, but chose not to sue him.[4]

***No notice or knowledge of mistake.*** Plaintiffs do not contend that Kariya had notice of the suit such that his ability to defend was not prejudiced. Fed. R. Civ. P. 15(c)(1)(C)(i); *Romero*, 740 F. Supp. 2d at 1143. Nor do they argue he had such notice or knowledge of any mistake *by March 24, 2023*, 90 days after the Second Amended Complaint (the most recent complaint without claims against Kariya). Fed. R. Civ. P. 15(c)(1)(C)(ii). Kariya had no reason even to know about the prior

---

[2] *See also McMurtry v. Wexford Health Sources, Inc.*, 2021 WL 1165102, at *12 (N.D. Ill. Mar. 26, 2021) ("Changing one's mind about who to sue . . . does not qualify as mistaken identity.").

[3] Plaintiffs suggest facts were "concealed," but they do not identify who concealed them or how, nor do they explain how Jump's non-public trading moves prevented them from suing Kariya for his supposed promotion of UST. Opp. at 10 (citing 4AC ¶¶ 135-36). In any event, Plaintiffs concede they have long known Kariya played a role in the public conduct at issue.

[4] The Supreme Court's statement in *Krupski* that a plaintiff could make a mistake when she knew of a party's existence but "harbor[ed] a misunderstanding about his status or role in the events giving rise to the claim at issue" is not to the contrary. 560 U.S. at 549. There, the plaintiff intended to sue a cruise-ship operator but instead sued a similarly named, related corporation with no operative role. Here, Plaintiffs understood Kariya's role and chose not to sue him. *See In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 130 (E.D.N.Y. 2014) (*Krupski*'s starting point "was a suit against the wrong party, and all of its discussion of knowledge must be seen in that context.").

3

complaints, and nothing in them would have provided any reason to think (much less know) that Plaintiffs' decision to sue Kwon, TFL, and Platias—not Kariya—was a mistake "rather than [a] choice." *Wilkins-Jones v. Cnty. of Alameda*, 2012 WL 3116025, at \*17 (N.D. Cal. July 31, 2012); *Brocade*, 615 F. Supp. 2d at 1036; *compare Krupski*, 560 U.S. at 554-55 (defendant was on notice of mistake where it was obvious "from the face of the complaint" that the plaintiff had made a mistake).

*No tolling.* Plaintiffs' few words (at 7) about "delayed discovery/inquiry notice" do not attempt to meet their "burden" of establishing any of the elements of equitable tolling, which include "extraordinary circumstances." *Rodriguez v. Profit Sharing Plan II Admin. Comm.*, 740 F. Supp. 3d 1023, 1032 (S.D. Cal. 2024) (citations omitted). In any event, "equitable tolling does not apply to Section 12(a)(1) claims, *regardless of the circumstances*." *Fabian v. LeMahieu*, 2019 WL 4918431, at \*8 (N.D. Cal. Oct. 4, 2019) (emphasis in original). Nor are section 12(a)(1) claims subject to a discovery rule. *E.g.*, *id.* at \*8 n.6 ("[U]nder the explicit language of [the statute], the limitations period runs from the date of the violation irrespective of whether the plaintiff knew of the violation." (quoting *Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir. 1978)). Plaintiffs' theory that they are entitled to relation back because they later learned new information would read in a discovery rule for 12(a)(1) claims, contrary to the plain text of 15 U.S.C. § 77m.

## II.    Plaintiffs Ignore *Howey*'s Requirements and the SEC's Guidance.

Plaintiffs do not address their failure to plead that the 2021 UST purchases at issue were investments from which Jump expected "profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The words "efforts of others" never appear in the Opposition. Nor does "[l]aw of the case" absolve Plaintiffs from pleading the elements of *Howey*. Opp. at 1, 9. When an amended complaint is filed, "[t]he district court is not [] bound by any law of the case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018). And due process requires that Kariya be afforded the opportunity to litigate these issues himself—not bound by rulings that addressed arguments made by a since-dismissed defendant before Kariya was named. *See White v. Sabatino*, 526 F. Supp. 2d 1143, 1152 (D. Haw. 2007).

Kariya's arguments are also new. The Court's previous ruling addressed arguments by

4

UST-issuer TFL that *Howey* categorically "did not apply to digital assets" and that the lead plaintiff could not prevail because he had only purchased UST. *See* ECF No. 117 at 11.[5] Since then, the SEC has confirmed—consistent with *Howey*—that crypto assets whose value derives from "the programmatic operation of a crypto system" as opposed to the managerial efforts of others are not securities.[6] Moreover, applying *Howey* to the secondary-market trades at issue reinforces that "UST on its own was not a security." *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 472 (S.D.N.Y. 2023).[7] Unlike TFL—which issued UST *and* offered 20% interest on UST deposits through its Anchor Protocol—neither Jump's May 2021 purchases nor Plaintiffs' subsequent purchases of UST conveyed funds to TFL or entitled the purchaser to profits from the efforts of others. *See id.* at 473. Plaintiffs therefore identify no investment that satisfies *Howey*.

**III.     Plaintiffs Do Not Allege That Kariya Made Any Misleading Statements.**

*Kariya's statements.* Plaintiffs rely heavily on Judge Rakoff's holding that Kwon's and TFL's "touting" of the algorithm as the sole cause of the re-peg imposed upon *Kwon and TFL* a duty to disclose Jump's assistance. *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 183-84, 200 (S.D.N.Y. 2023); Opp. at 14-16. But unlike Kwon and TFL, Kariya is not alleged to have "'ascribed the re-peg' . . . to an automated process" or to have made any statement about the cause of the re-peg at all; accordingly, he had no duty to disclose Jump's role. Opp. at 14 (citation omitted).

Compare Kwon's assertion that the peg had automatically self-healed during the 2021 de-peg with Kariya's alleged "public promotion of Terra's 'stability mechanism.'" Opp. at 16. In the referenced blog post, Kariya pointed to "Terra's stability mechanism" as an "example" of "cool complex economic machinery behind some of the most exciting and successful projects in the

---

[5] TFL's *Howey* arguments were abbreviated and unaccompanied by significant case law. Jump adopted them without elaboration. *See* ECF Nos. 115 at 18, 138 at 11.

[6] Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, Securities Act Release No. 33-11412, Exchange Act Release No. 34-105020, 17 C.F.R. pt. 231, 234 (2026), https://www.sec.gov/files/rules/interp/2026/33-11412.pdf (last visited Mar. 23, 2026).

[7] Plaintiffs suggest (Opp. at 10) that *they* expected profits from UST, but Plaintiffs' UST purchases are not investments in any TFL common enterprise, and UST's stable price promises no profits.

KARIYA REPLY IN SUPPORT OF MOT. TO DISMISS
CASE NO. 5:22-CV-3600-PCP

DeFi landscape," and observed that it "requires solving for a number of crucial market parameters in a highly dimensional space to balance the safety and elasticity of the platform."[8] Kariya did not discuss the 2021 de-peg, and he, unlike Kwon (as alleged in *Terraform*), never suggested that the 2021 re-peg resulted solely from "self-healing."[9] Nor do Plaintiffs allege that Kariya's view that the "stability mechanism" "require[d]" the solving for of parameters to balance safety and elasticity "directly contradict[ed]" anything Kariya "knew at that time." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). Even crediting Plaintiffs' unexplained assumption that "stability mechanism" referred to the algorithm, the statement merely described its general purpose, not any objective or specific degree of stability. It was non-actionable opinion.

The same is true of the Kariya statement quoted in a February 22, 2022 LFG press release: Plaintiffs admit that Kariya "invoke[ed] [an] analogy" when he compared the reserve to a central bank and "opined" that the reserve would strengthen confidence in the peg. Opp. at 5, 15. These opinions were incapable "of objective verification."[10] *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994 (N.D. Cal. 2017) (citation omitted). And unlike Kwon (as alleged in *Terraform*), Kariya never asserted that the UST algorithm was capable of restoring the peg all by itself, and therefore did not "obscure" that the algorithm had needed Jump's help. *See* Opp. at 15. Indeed, Kariya acknowledged the algorithm might not suffice alone—hence the reserve "to help protect the peg of the UST stablecoin in stressful conditions." 4AC ¶ 340(j).

Plaintiffs say Kariya should have disclosed "that the new reserve was woefully inadequate to prevent another collapse," but the Complaint does not allege that Kariya knew it was inadequate. Opp. at 15. To the contrary, the only available inference is that Kariya believed that the reserve was adequate. To the extent that Jump's alleged purchase of $100 million in UST in 2021 caused

---

[8] Kanav Kariya, *Introducing Jump Crypto*, Jump Crypto (Sep. 12, 2021), https://perma.cc/M6A6-DE4Q; 4AC ¶ 160 n.151.

[9] The algorithm maintaining UST's $1 peg relied on active trading by market participants—not automated trading, and the Complaint does not allege otherwise. What Kwon meant by "self-healing" is unclear, but Kariya did not make that statement, and market forces—including traders using the algorithm—indeed held UST's peg relatively steady for months after May 2021.

[10] As this Court has already concluded. *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 714 (N.D. Cal. 2024).

6

the re-peg, someone in Kariya's position would have naturally believed that the LFG's $3 billion reserve was easily sufficient to support the peg. *Id.* ¶¶ 103, 242, 248-49, 264, 293. Moreover, Plaintiffs themselves allege that reserve finances were "solely accessible" to Kwon without "oversight" from the toothless LFG council on which Kariya sat, *id.* ¶¶ 201-02; and that as late as the May 2022 crash, Kariya asked Kwon whether he would be deploying the reserve. *Id.* ¶ 260; *see id.* ¶¶ 242, 261 (during the 2022 crash, Kwon announced that he was "[d]eploying more capital").[11] The only reasonable inference is that Kariya thought the reserve would help stave off a crash, not that it lacked sufficient funds to do so.

Kariya's remaining statements have nothing to do with the subject matter of this case. The Opposition tellingly does not engage with the context of the statements excerpted in paragraphs 340(*l*) and 340(h), which makes plain that these statements were not related to the "fact" Plaintiffs contend Kariya improperly omitted: that Jump had intervened to assist the UST peg. Opp. at 15, 16. These statements were not related to the UST peg at all. Kariya's statement about there being little possibility for collusion (¶ 340(*l*)) referred to the possibility of collusion on the part of a non-Jump trading firm gaming the data it contributes to the non-Terra, Jump-sponsored Pyth price-data-sharing tool in order to benefit its own trading position.[12] MTD at 17-19, ECF No. 206. And Kariya's Twitter thread mused that it was "difficult to imagine a sustained mass exodus *to* UST" on the part of holders of non-Terra stablecoin MIM, because by making that move, these holders would be giving up on yields they were earning. 4AC ¶ 340(h) (emphasis added); MTD at 19-20. The thread had nothing to do with the performance of the UST peg, or whether there would be a

_____

[11] Plaintiffs attribute this request to "Jump personnel," 4AC ¶ 260, but their own allegations identify Kariya as "Trading Firm Executive-1" from the Kwon Superseding Indictment, *id.* ¶¶ 59-60—the person who allegedly made this request. Their allegation is therefore that Kariya asked whether Kwon would use "the LFG Reserve to protect UST's peg." *See* Superseding Indictment ¶ 43(b), *United States v. Kwon*, No. 1:23-cr-00151 (S.D.N.Y.), ECF No. 10.

[12] Plaintiffs say that "Kariya was asked about risks to the crypto ecosystem from 'bad actors.'" Opp. at 16 (quoting 4AC ¶ 252). But the "bad actors" language comes from the Complaint's mischaracterization, not the podcast itself. The actual question concerned potential conflicts of interest between firms contributing data to Pyth and Pyth users. *See* MTD at 18. And Kariya did not reference "the industry's incentive structures," Opp. at 16—he referenced "the incentive structure again," referring to his just-discussed Pyth "incentive design mechanism" that punished providers of bad data. MTD Ex. 1 at 10.

"run" or "exodus" *from* UST that would threaten the stability of the peg. Opp. at 15. Bringing up the 2021 re-peg in these contexts not only was not necessary to render the statements non-misleading, *Twitter*, 29 F.4th at 620, it would have been so beside the point as not to make sense.[13]

    ***Kwon's, TFL's, and LFG's statements.*** Count I is brought under SEC Rule 10b-5(b), which makes it unlawful to "make" a misleading statement. 17 C.F.R. § 240.10b–5(b). Only the "person or entity with ultimate authority over [a] statement, including its content and whether and how to communicate it" "makes" the statement under Rule 10b–5(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Plaintiffs' argument that Kariya is liable for Kwon's "self-healing" statement because Kariya retweeted a link to the near-hour-long podcast in which Kwon made the statement is directly contrary to *Janus*. For their Rule 10b–5(b) claim, *Janus compels* what Plaintiffs (Opp. at 14) call "splitting hairs over attribution." *Id.* ("And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed . . . . [I]t is the speaker who takes credit—or blame—for what is ultimately said."); *see* MTD Ex. 3.[14]

---

[13] At page 6 of their Opposition, Plaintiffs appear improperly to attempt to amend their complaint by asserting that various Kariya statements *not* listed in Count I's list of "[m]isrepresentations and omissions" or on the Exhibit 4 "chart of misleading statements" were misleading. Opp. at 6 (citing 4AC ¶¶ 230-34, including the March 8, 2022 statement that UST was in high demand and was trading at a premium). In any event, Plaintiffs have not alleged that these statements were untrue when made or that Kariya had any reason to doubt their truth. *See Twitter*, 29 F.4th at 619.

[14] Because Count I is brought under Rule 10b–5(b), Plaintiffs' citation to *Lorenzo v. SEC* misses the mark. *Lorenzo* held that in certain circumstances, a person who does not "make" a statement and therefore is not liable under Rule 10b–5(b) "can be found to have violated the *other* parts of Rule 10b–5" for "disseminat[ing]" the false statements of others "with intent to defraud." 587 U.S. 71, 74, 83 (2019) (emphasis in original). In any event, Kariya retweeted a link to a podcast in which his *own* statements highlighted that non-algorithmic assistance—the reserve—might be needed to maintain the peg. Nor did Kariya have any duty to correct any misstatement by Kwon. MTD at 23-24. Kariya did not adopt or approve Kwon's statement via the Tweet or after or during the podcast itself. MTD Ex. 3 at 27 (immediately after Kwon's "self-healing" statement in response to a question from a participant named "Tundra," Tundra jumps in and engages in a further colloquy with Kwon; a different participant ("k.chang") then asks another question of Kwon on a different topic; Kariya does not speak again until over three minutes after Kwon's "self-healing" statement and does not discuss the algorithm or the peg). These circumstances do not give rise to any inference that Kariya's tweet disseminated any Kwon misstatement with intent to defraud. *See Lorenzo*, 587 U.S. at 75-76 (investment banker at a firm soliciting prospective investors in a debenture offering sent emails with misstatements about the debenture offeree's

8

The Opposition spills much ink arguing that Kariya should be directly liable as a "maker" of statements that came not "from his own mouth" but "from entities under his influence." Opp. at 14. But the Opposition mentions only one such purported statement: A January 19, 2022 post on TFL's Medium site stating that UST "weathered" a "drawdown in the LUNA price." Opp. at 4 (citing 4AC ¶ 340(f)).[15] Without citation to any supporting allegation in the Complaint—because there is no such allegation—Plaintiffs imagine that Kariya "authorized" this "release" "in his dual roles at Jump and LFG." *Id.* Of course, Kariya's only "role" with respect to LFG was a seat on the LFG Governing Council, which Plaintiffs allege was a ceremonial body without influence over anything. *See* MTD at 16. And Plaintiffs are wrong even to call this an "LFG . . . press release"; it appeared on a TFL site. The Opposition insists that Kariya "assumed an active role in shaping" a false narrative about UST; that he was at the center of "the communications strategy" (it does not say whose communications strategy) "to prop up market confidence"; and that he was "a driving force behind the misrepresentations" of LFG and TFL, "even if not the public facing speaker." Opp. at 13-14. But in support of these arguments, Plaintiffs offer only a hodgepodge of allegations that do not come close to supporting an inference that Kariya had the "ultimate authority" over the content and communication of this specific TFL post necessary to make him a liable "maker" of the statement, or that he had such authority over any statement of LFG or any other entity.[16] For

---

finances "at the direction of his boss, who supplied the content and 'approved' the messages"; emails invited investors to call the sender, not the boss, with any questions).

[15] The piece was posted by an author named "The Intern." https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b. It was not written by Kariya, and in any event, Plaintiffs fail to explain how it was false or misleading.

[16] Plaintiffs cite the allegation that "Jump (via Kariya) . . . directed and/or authorized, directly or indirectly, the statements" of LFG, 4AC ¶ 192, but this allegation is conclusory and contradicted elsewhere in the complaint, MTD at 16. Plaintiffs' other cited allegations do not suggest Kariya was the maker of any LFG or TFL statement. Other than a rehearsal of Kariya's own non-misleading statements, Kariya's retweet of a podcast containing Kwon statements, and the allegation that Kariya and Kwon spoke about the vesting arrangement, 4AC ¶¶ 96, 160, 126-128, 203, 211, 225-27, 252, the only Kariya-specific allegation cited is that Kariya replied to a TFL tweet with: "It's been a real pleasure working with @stablekwon and the Terra team over the last couple years. A+ folks." *Id.* ¶¶ 75, 100. The remaining allegations concern Jump, TFL, and Kwon mentioning each other in statements, *id.* ¶¶ 66-67, 139, 152-55; Jump and Kwon entering the accelerated vesting arrangement, *id.* ¶¶ 101, 265-67; and Jump transmitting proposals about Terra governance, *id.* ¶¶ 150-51. Plaintiffs tack on the conclusory allegation that "Jump . . . worked with

9

the same reasons, Plaintiffs have not alleged that Kariya was a control person with respect to statements by LFG or any other entity. *See* MTD at 15-16.

## IV.    Kariya Did Not Engage In Market Manipulation.

There is no private right of action for aiding and abetting or conspiracy to engage in market manipulation. MTD at 11. For scheme liability, "the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose ***and*** effect." *Patterson*, 710 F. Supp. 3d at 717 (second emphasis added) (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006)).[17] The Complaint does not allege Kariya engaged in any of the conduct Count II alleges deceived the market, namely "Jump's surreptitiously purchasing hundreds of millions in UST." Opp. at 11; 4AC ¶ 365; *see also* MTD at 10-11.[18]

Instead, Plaintiffs frame the Complaint as alleging that "Kariya helped strike a secret bargain: in exchange [for] TFL's dramatically sweetening Jump's LUNA token deal, Jump"—not Kariya—"came to UST's rescue" by engaging in "massive off-chain trades" that sent the market a price signal that was deceptive because the market did not know Jump was the purchaser. Opp. at 11. That is, Plaintiffs say their claim is that Kariya facilitated a deal between Jump and Kwon,

---

TFL" to communicate with the market about the strength of the peg (¶ 149) and that "Defendants" made false statements about the re-peg having been the result of the algorithm (¶ 95); but as explained above, Kariya made no such statements.

[17] The Opposition presents argument in support of the Count II Section 10(b) scheme manipulation claim but does not respond to Kariya's argument that the Count III Section 9 manipulation claim should be dismissed, including because the Complaint affirmatively alleges that Kariya had nothing to do with trading activity. Accordingly, Count III should be dismissed.

[18] Jump's trading is the *only* conduct alleged to have deceived or manipulated the market in furtherance of the scheme alleged in Count II. 4AC ¶ 365; *see* Opp. at 11-13 (arguing that Jump's "intervention in the UST market" sent a deceptive signal to the market). Count II does not allege that any misstatements were deceptive or manipulative acts in furtherance of the scheme alleged. The statements alleged in support of the distinct misrepresentation claim in Count I are not relevant to Count II; in any event, Kariya did not make or disseminate any misleading statements. That renders Count II distinct from the *Terraform* litigation. There, Judge Rakoff analyzed whether TFL and Kwon's disseminations of false statements were deceptive or manipulative acts, not whether entering into an accelerated vesting agreement in exchange for Jump purchasing UST was *itself* an actionable deceptive or manipulative act. *E.g., Terraform II*, 708 F. Supp. 3d at 478, 481 ("[A]n agreement with Jump to defend UST's peg is only fraudulent if a reasonable investor would have been materially misled. For evidence of such deception, the SEC points to what it contends were [TFL and Kwon's] misstatements . . . ."). The latter theory is the only one Plaintiffs have attempted to plead against Kariya in Count II.

10

pursuant to which Jump (not Kariya) engaged in trading that Plaintiffs contend was manipulative.

Even accepting this characterization, Plaintiffs fail to state a claim against Kariya. Arranging an agreement that incentivizes manipulation by others is not itself actionable manipulative or deceptive conduct, and Plaintiffs cannot bring a claim for conspiracy or aiding and abetting. *See Simpson*, 452 F.3d at 1048 n.5 ("A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of this scheme."); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) ("At worst, the banks designed and entered into the transactions knowing or even intending that Parmalat or its auditors would misrepresent the nature of the arrangements. . . . [I]n other words, they aided and abetted it.") (quoted favorably in *Simpson*, 452 F.3d at 1050); *In re Glob. Cord Blood Corp. Sec. Litig.*, 2026 WL 444770, at *21-23 (S.D.N.Y. Feb. 17, 2026) ("Courts have distinguished conduct that merely facilitates a scheme to defraud from the commission of an affirmatively deceptive or manipulative act.").[19]

Plaintiffs say that the "vesting concession" Kariya allegedly negotiated was "tied to Jump 'helping with the depeg,'" but it was *Jump's "help[ful]" trading*, not the vesting, that they allege sent a deceptive signal to the market. Opp. at 11-12. The alleged vesting deal itself had no public audience; it was not, for instance, a "sham[]" designed to mislead the public into thinking a transaction had occurred when in fact it had not.[20] *See Parmalat*, 376 F. Supp. 2d at 505; *Simpson,* 452 F.3d at 1040, 1053 (even though alleged to have "contained suspect qualities," "[t]he transactions involving [the defendant] did not create a false appearance until they were viewed in conjunction with [another party's] actions before and after the transactions").[21] Jump's purchasing,

---

[19] In defense of their pervasive group pleading, Plaintiffs (at 12) cite a case analyzing common law conspiracy claims not subject to the PSLRA, but even in that context, group pleading fails under Rule 9(b)). *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007).

[20] That "[n]o member of the investing public had knowledge" of the loan-deal-facilitation conduct Count II attributes to Kariya also means that Count II does not plead the reliance element against Kariya. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008).

[21] For the proposition that "features of transactions themselves can give rise to manipulative intent," Plaintiffs (at 12) cite a case that asked whether market-facing trading activity, "placing passive orders . . . and then reversing position," was manipulative (and concluded it was not). *CP Stone Fort Holdings, LLC v. John*, 2016 WL 5934096, at *5-6 (N.D. Ill. Oct. 11, 2016).

11

not emails and calls to Kwon to discuss the deal, is the conduct alleged to have deceived the market. "[O]nly those defendants" who themselves "use or employ a manipulative or deceptive device" may be held liable on a scheme claim, and Kariya did not. *Simpson*, 452 F.3d at 1049.[22]

Nor is Kariya a control person with respect to Jump's trades. Even if control person liability does not require "day-to-day micromanagement of each trade," Opp. at 19, it certainly requires the authority to control the trades at issue. *CFTC v. Crombie*, 2013 WL 3957506, at *25 (N.D. Cal. July 26, 2013) (control person "must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability") (citation omitted); *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014). The Complaint does not allege that Kariya had any such authority; it affirmatively alleges that others did instead. 4AC ¶¶ 122, 128, 129.

In all events, as the Jump Entities' and Mr. DiSomma's briefs explain, Jump's trades were not manipulative. An open-market trade that profits if the trader is correct to bet that a stablecoin is worth its $1 peg is a *bona fide* investment that sends no false price signal. MTD at 14-15.[23]

**V.    Plaintiffs Do Not Plead A "Strong Inference" That Kariya Acted With Scienter.**

Plaintiffs' case for scienter rests on the conduct and profits of others, statements that were not misleading, and Judge Rakoff's ruling that Kwon's scienter could be inferred, in part, from

---

[22] Plaintiffs' argument that they sufficiently plead Kariya's scienter with respect to Jump's "peg defense," Opp. at 12—which, as explained below, is wrong in any event—is beside the point as to whether they have pleaded the distinct element that Kariya himself engaged in conduct that deceived the market. *Simpson*, 452 F.3d at 1048 n.5 (explaining the difference between the scienter element and the requirement for scheme liability that the defendant be a primary violator rather than an aider/abettor, which requires that the defendant personally take an action that deceived the market). Thus, when Judge Rakoff made the statement quoted at page 12 of the Opposition about Kwon's personal negotiation of an arrangement with Jump to help restore the peg, he was holding that the SEC had pleaded the scienter element against Kwon, not that it had sufficiently alleged the primary violator element. *Terraform I*, 684 F. Supp. 3d at 200-01.

[23] Plaintiffs say Jump's trading was misleading because it "conceal[ed] the algorithms' failure," Opp. at 11, but the algorithm's inherent nature was to incentivize profitable trades by providing an arbitrage opportunity. Plaintiffs cite no authority to support the proposition that trades with such a *bona fide* economic purpose were deceptive merely because they could lift the price as any asset purchase might. Plaintiffs' theory that the algorithm was designed to maintain the peg without any reliance on trading is incoherent. The algorithm did not conduct trades; it only ever offered an arbitrage opportunity that allowed traders to exchange LUNA for UST, at a price point that incentivized trades valuing UST at $1. *See* 4AC ¶ 194.

12

Kwon's statement on a podcast to which Kariya once retweeted a link. None of that supports a strong inference that Kariya acted with scienter. Nor does his invocation of Fifth Amendment rights that protect "innocent men."[24] Plaintiffs have no authority holding that a defendant's invocation in a different proceeding provides a basis for such an inference. The law is clear it cannot. *See* MTD at 2 n.1, 24. Moreover, every government investigation into TFL's collapse has concluded without charges against or settlements with Kariya.

At its core, Plaintiffs' scienter theory rests on two allegations: that Kariya (1) renegotiated a loan incentivizing Jump's UST trades and knew of those trades, and (2) called UST's "stability mechanism" "cool" without disclosing that Jump had supported the peg months earlier. These allegations fall far short of the PSLRA's requirement that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The far more compelling inference is that Kariya was a twenty-five-year-old employee who followed reasonable guidance from experienced superiors—not the "mastermind" or "extort[ionist]" Plaintiffs conjure. Opp. at 1, 12. Kariya did not run the team, direct trades, or hold approval authority. 4AC ¶ 122. He acted on advice from Jump's compliance professionals. *Id.* ¶ 114. He never publicly commented on the reasons for the re-peg or denied Jump's alleged role, and not disclosing his employer's trades conformed with industry norms. His own statements coincided with Jump's participation in a billion-dollar reserve that Kariya publicly acknowledged might be needed to support the peg. *Id.* ¶ 211. His recognition that UST could de-peg and need non-algorithmic support undercuts any inference that he was concealing that risk. Once the conclusory language and borrowed allegations about the motives of others are removed, the Complaint's allegations about what Kariya said and did comport with the truth: he never harbored scienter to defraud anyone.

## CONCLUSION

For those reasons, all counts against Kanav Kariya should be dismissed with prejudice.

---

[24] *Grunewald v. United States*, 353 U.S. 391, 421 (1957); *see also Ohio v. Reiner*, 532 U.S. 17, 21 (2001); *Slochower v. Bd. of Higher Ed. of City of New York*, 350 U.S. 551, 557 (1956).

13

Dated:  March 25, 2026

/s/ Aitan D. Goelman
Aitan D. Goelman (admitted *pro hac vice*)
Miles R. Clark (admitted *pro hac vice*)
Christopher R. MacColl (admitted *pro hac vice*)
J. Benjamin Jernigan (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com
bjernigan@zuckerman.com

Daniel A. Zaheer (Bar No. 237118)
KOBRE & KIM LLP
150 California Street, 19th Floor
San Francisco, CA 94111
Tel: (415) 582-4800
daniel.zaheer@kobrekim.com

*Attorneys for Defendant Kanav Kariya*

14