UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable P. Casey Pitts, District Judge

| | | |
|---|---|---|
| PATTERSON,<br><br>Plaintiff,<br><br>vs.<br><br>TERRAFORM LABS PTE LTD., et al.,<br><br>Defendants.<br>______________________________ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. C 22-03600-PCP |

San Jose, California
Thursday, May 7, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 10:07 - 11:15, 11:24 - 12:56 = 2 HOURS, 40 MINUTES

APPEARANCES:

For Plaintiff:

The Rosen Law Firm, PA
101 Greenwood Avenue
Suite 520
Jenkintown, Pennsylvania 19046
BY: JACOB A. GOLDBERG, ESQ.

The Rosen Law Firm
275 Madison Avenue
Floor 40
New York, New York 10016
BY: MICHAEL A. COHEN, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Plaintiff:

Scott+Scott Attorneys at Law LLP
600 West Broadway
Suite 3300
San Diego, California 92101
BY: JOHN T. JASNOCH, ESQ.

For Defendants:

Zuckerman Spaeder LLP
2100 L Street Northwest
Suite 400
Washington, DC 20037
BY: CHRISTOPHER R. MACCOLL, ESQ.
JOHN B. JERNIGAN, ESQ.

Kobre & Kim LLP
800 Third Avenue
Floor 6
New York, New York 10022
BY: JONATHAN D. COGAN, ESQ.
STEVEN W. PERLSTEIN, ESQ.

Kobre Kim
1919 M Street Northwest
Suite 410
Washington, DC 20036
BY: ERIKA L. BERMAN, ESQ.

KKL LLP
350 Fifth Avenue
Floor 77
New York, New York 10118
BY: PAUL M. KRIEGER, ESQ.
BENJAMIN PEROTIN, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Thursday, May 7, 2026 10:07 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

(Portion of proceedings unavailable for transcription.)

MR. COGAN: The Court is focused on the disclosures that I was referring to from January, February, and March of 2022. If the Court would just give me one moment, I just want to walk through what is alleged in the complaint.

And if we could, Erika, bring up please the first slide.

So, your Honor, we just put a slide together of the timeline.

So as your Honor alluded to, there is an allegation that in May of 2021, the Jump Defendants, they allege, manipulated the market when there was a depeg event in order to bring the price of UST back up to the peg. So it had depegged. The Plaintiffs allege that there was then a secret agreement between Jump and TFL for Jump to intervene to help restore the peg and that the peg was restored and no one ever disclosed that that is how the peg wound up getting restored. And then the allegations are that statements were then made in the following months that implied that UST is stable and that the algorithm works on its own to restore the peg. The Plaintiffs don't buy during that period of

time.

There is then a series of disclosures that your Honor was referring to and I think are worth actually looking very closely at the language that was being used, about the stability of the peg on its own. They start in -- again, they start before the Plaintiffs ever buy. And, in fact, with respect to Tobias, who's the court-appointed -- the court-recognized lead Plaintiff in the case, all of these disclosures happen before, not after, Tobias buys. And they start on January 19th of 2022 -- Erika, could we go to the next slide for a moment? -- where in the January 19th -- I'm looking at -- to the left of the slide, your Honor. In the January 19th disclosure, the LUNA Foundation Guard formation is announced, and it says that LFG's core mandate is to "buttress the stability of the UST peg." It goes on to say, "Building reserves that" --

THE COURT: And I've had a chance to review the briefs well. So, I mean, I guess the question is, is there -- you know, is there a difference between, say, sort of, "We are going to put this in place, we think it'll work to keep the chain -- to keep this -- the UST stable and to stabilize it in periods of instability," you know, and there's sort of optimistic statements about the ability of the LFG to provide that service. Is that adequate to preclude a finding of loss causation where they didn't also

disclose that in fact it has previously repegged and that these were the circumstances that were necessary in order to bring it back into stability? I mean, that would be their theory, I think.

MR. COGAN: So I think that that may be their theory, but there are two major problems with it, okay?

One is, query -- and I don't think the Court needs to address this right now, but query -- whether or not it would be even material in the context of these disclosures where you're saying we've got $1 billion reserve that can be deployed to restore it because there will be periods of volatility.

THE COURT: Right. I mean, I -- and I think you're right to say -- I'm not sure that's before me. I understand, you know, there may be an argument at some point in this case that, in fact, there was no market -- even if I finally pleaded market manipulation, at the end of the day, there is no market manipulation because everyone operating in this market or a reasonable consumer operating in this market would have understood in May 2021 and in January -- the other times that some degree of manual intervention is required --

MR. COGAN: Right.

THE COURT: -- to maintain these things. I mean, that may be the way crypto worked, and that's -- I -- that

seems to be -- that's more a question for perhaps summary judgment or after -- you know, it's a factual question about what a reasonable consumer operating in this market would understand, I think.

MR. COGAN: Right. So I think we're agreeing with each other. The Court doesn't need to reach this materiality point that I'm making.

The point that I'm making is, if the fraud is not, "You didn't tell us that the thing could become unstable and need outside support," but the fraud is Jump and everyone else, "You intervened a year earlier to restore it, and you didn't tell us that?" right? Jump, you -- there's a fact, "You intervened earlier, and you didn't tell us that." Then in order to plead loss causation, they would have to show that a corrective disclosure was made, meaning, in other words, the market was told, Jump actually jumped in, for lack of a better term, in May -- in March -- excuse me, May of 2021 to restore the peg, and then you would have had to see a dip in price right after that. That's not what they're able to allege here. There is no allegation in the case that there was a corrective disclosure focusing on what they're now claiming the fraud to be, as your Honor just articulated it, right, which is not that the thing could be volatile and need outside support, but that the thing once before was volatile and secretly needed outside support. You would

need -- in order to allege loss causation, under Dura and BofI Holdings, the Ninth Circuit's law on this, you would need a corrective disclosure. The market would have need to have been told, "Hey, by the way" --

THE COURT: What do I do? What if it's the opportunity for the corrective disclosure was never provided because the entire ecosystem collapsed as a result of this problem before we ever had a corrective disclosure? I mean, we only learned of this because -- by the time we learned of this information, right, there was no market for UST or LUNA anymore.

MR. COGAN: Right. And that's a major problem in alleging loss causation. They have to allege not only that there was a fraudulent misrepresentation and all of the things that we talked about previously, right? But they have to allege that the fraudulent inflation of UST, which is what I think that they're alleging here, that that became known to the market, and it was that disclosure that is what caused the loss, as opposed to volatile markets. And, you know, there was a volatile crypto market. It could be any one of a number of different things that could have caused the loss. And so this is what the Supreme Court in Dura was focused on. This is what BofI Holdings was focused on, which is, not only do you have to allege all of the things that we focused on so far, all the elements of fraud, but

the final element is you have to allege that the proximate cause of your loss, Plaintiff, was the fraud, the thing that I guess they're saying was concealed, which is now not "this thing was volatile and it didn't work on its own," which is what they were originally alleging, but it's simply, "Okay. Fine. Maybe you disclosed that it was volatile and it could become unpegged, but you didn't tell us that Jump intervened on a specific occasion to fix it in May 2021. And the failure to disclose that is what actually proximately caused our loss." And so I think as your Honor alluded to -- because clearly they cannot allege -- they don't allege, they cannot allege that there was a corrective disclosure. I think what they try to do, although they don't argue it, is to say, well, maybe this is like a materialization of the risk situation. But if you really think about it, that doesn't make any sense. I just want to orient the Court to, again, what I think both parties agree is the law on materialization of the risk, okay? It's a loss. This is from the Jung (phonetic) case, or maybe it's pronounced Jung (pronouncing) from Plaintiffs' briefing. "Loss proximately flowed from the alleged hazard which the false or misleading statements obscured." Obviously, the fact that Jump intervened in May 2021 is not itself a hazard that some fraud obscured. The hazard they would have to argue that was obscured was that the thing became volatile and -- or

the thing can become volatile and might need external support in order to be repegged, except for they can't argue that and they don't argue that because it is beyond a doubt, if you look at the disclosures from January, February, and March 2022, that the market is being told that this thing can experience extreme price movements, that we've now got $1 billion reserve that can be deployed.

THE COURT: I guess the concern I have is this starts to sound very much like what we were saying is not on the -- before the Court right now, which is, sort of, what did the market reasonably understand about the nature of these products at the time, from May 2021 through May 2022. Right. You have an argument that there were some statements to the market. They have identified other statements. Whether those statements are -- you know, there's -- even if those statements are not actionable as securities fraud, it is possible that they provide the context for trying to think about on a motion to dismiss where I have to draw inferences in their favor what the market would understand about the extent to which that kind of manual intervention is required. And I think the theory would be that it wasn't just that some degree of manual intervention was required. It was, in fact, TFL in May 2021 was effectively willing to set up a system that would generate $1 billion in profits for the Jump Trading entities for its role in maintaining --

stepping in and maintaining the stability of the -- you know, that might be a different degree of intervention in the stabilizing of the UST than the market would have reasonably understood. And, in fact, a year later, even the billion dollars in the LFG was insufficient to maintain the stability and prevent the system from collapsing. I mean, that would seem to be the theory that they would be pursuing, but --

MR. COGAN: I think that is the theory that they're pursuing. I think the problem that I'm articulating is that there is just an additional element in addition to saying, "You lied" or "you had a duty to disclose, but you didn't, and you obscured the truth," there is an additional element, which is that you have to demonstrate that that lie or that obscuring of the truth was the proximate cause of your eventual loss. And so here the problem is that if the only thing that they're alleging that wasn't disclosed was, "Oh, Jump also intervened in May 2021 to restore the peg and no one ever told us that," then they have to allege either that there was a corrective disclosure, which they don't, or they have to allege that there was a hazard that was obscured.

THE COURT: And I think that's their theory is that the scope of the hazard that was -- you know, that this constituted market manipulation, particularly, which that's

separate and apart from the question -- the misrepresentation claims. If this did constitute market manipulation, it had the effect of obscuring the extent of the hazard that existed. And, you know, again, that Jump for its role in addressing the hazard the first time it came up made $1 billion --

MR. COGAN: Yeah. So --

THE COURT: -- and that that -- you know, that that was -- that that was that hazard and that the extent of the hazard and the risk and the amount of money that even in that instance would be necessary to prevent that initial depegging down to 90 cents was, you know, apparently worth $1 billion and that -- you know, that that was ultimately realized in May 2022.

MR. COGAN: Okay. I mean, your Honor, I think that the one -- I don't want to belabor it. I think the one point that I would just ask your Honor to look at carefully on this issue is just the question of whether in light of the disclosures that were made, right, which they're stuck with, that are alleged in their complaint, whether the hazard, which is that it could become depegged again and require support, had been obscured such that they've adequately pled loss --

THE COURT: No. And I understand that. I think the thing I'm just struggling with, again, is how do I think

about those questions on a 12(b)(6) motion and whether, you know, it might be that we already know in May 2021 that a billion -- it takes $1 billion in value to repeg this. And so is the billion --

MR. COGAN: Yeah, I --

THE COURT: -- so is the billion dollars that is set forth for the LFG actually -- is it sort of -- is it not -- is it not fully disclosing the hazard if in fact what was needed was $5 billion, $10 billion?

MR. COGAN: But, your Honor, I do think that you may -- I want to make sure that the Court is not understanding the complaint incorrectly. There's no allegation in the complaint, and it would be false if they did, that Jump deployed like $1 billion worth of capital. And then --

THE COURT: No, it generated $1 billion in profit.

MR. COGAN: That's the allegation, right? But the amount of trading that it did -- it didn't take $1 billion worth of -- you know --

THE COURT: No, I understand that. I understand that.

MR. COGAN: Okay.

THE COURT: I guess I'm saying it seems to be that it was ultimately, in some sense, worth $1 billion to TFL, that Jump's intervention was -- you know, it was willing to

enter into a, you know -- and I know there were some pre-existing loan agreements, but the end result was a pretty substantial profit for Jump Trading as a result of this. You know, so that demonstrates some value to TFL from Jump's intervention.

MR. COGAN: Yeah. I think I would respectfully submit that the amount of value to TFL or the amount of money that Jump allegedly made out of this isn't relevant to the question of whether or not the -- whatever it was that they're claiming was obscured here is what proximately caused the drop in May of 2022.

Your Honor, if the Court doesn't have further questions on that, I want to go on --

THE COURT: We have a lot of issues, so yeah, please.

MR. COGAN: Yeah.

So on the -- go back to the first slide for a second. I just want to point out one more thing on the timeline here, which is the reliance point, okay? I say that the timeline highlights Plaintiffs' inability to plead loss causation and reliance. And I just want to make one point on reliance. There's a lot of briefing on reliance. I won't belabor it all here. But there is a major reliance problem based on the facts as it relates particularly to their market manipulation theory.

The Plaintiffs are arguing that to plead reliance for market manipulation, which I think everyone agrees they have to do, that they're able to do that because the Plaintiffs relied on a -- or were entitled to rely on a market free of manipulation. That's their -- that's what they say in their briefing. The problem with it from the timeline is that there is no allegation that in the run-up to when they actually purchased, which is the, kind of, box that starts around February of 2022, which is when the Plaintiffs start to purchase, that that market was not free of manipulation, meaning, in other words, the allegation in this case is that there was a moment in time in May of 2021 when UST depegged and that Jump allegedly manipulated the market -- and we can talk about why they haven't pled manipulation -- but that after that, it was restored and that it remained restored from May of '21 through the remainder of '21 and, you know, essentially until -- their allegation is until May of '22. And the Plaintiffs buy eight, nine months later. And so they have to allege, again, reliance, and they're saying that they're able to allege reliance because they relied on a market free of manipulation. But there is no allegation in this case, and it defies, I think, the facts as they've alleged it that in February of '22 when they started to buy, that that was a market that was being manipulated, meaning, in other words, if the Plaintiffs had bought in May of '21,

you know, right after the alleged manipulation -- so it comes back to the dollar and then they start buying -- that would be a closer call on the question of whether or not they had alleged reliance on a market free of manipulation, but -- on the facts as they've alleged it. But here, there is this giant gap of time where the Plaintiffs do not allege the market continued to be propped up through a continuous manipulation.

THE COURT: Well, let me -- I mean, is there -- I guess there's a version of whether they just have to put that in, whether there's a sentence they need to put in their complaint to that effect or whether you're saying that because of the LNG -- or LFG announcements, that that affirmatively demonstrates that the market had -- was being manipulated, which is the argument.

MR. COGAN: I'm sorry, I didn't follow the question. I'm sorry.

THE COURT: I mean, is this -- are we saying, "Okay. I'll give them leave to amend," then they'll add a paragraph that says, "This was -- we haven't -- yes, we haven't identified any manipulation of the market between then and the time that we purchased it, and we just need to say that," or are you saying that they've pleaded -- affirmatively pleaded that there was manipulation of the market between those times?

MR. COGAN: No, no, I'm -- I think I'm saying none of those. What I'm saying is that when they bought, they're not alleging that the market was plagued by manipulation, right? They need to allege that they relied on a market that was free of manipulation, and in the run-up to when they bought, by their own allegations --

THE COURT: So your argument is that the manipulation of the market had dissipated by the time they purchased?

MR. COGAN: I think that the argument is absolutely that -- and I think this is what they allege, that Jump intervened for a brief period of time in May of '21 to restore it, it was successfully restored, and then many, many months later, they bought.

Now, their argument in response is, yeah, but it's still a but for causation issue, right? Like, had you not restored it in May of '21, then it would have, you know, remained low or would have collapsed, but they have to allege that they relied on a market free of manipulation, and their own timeline shows that when they bought, it had been restored, and it maintained on its own for a period of time, almost a full year, before they bought.

THE COURT: Okay.

MR. COGAN: I want to -- your Honor mentioned the -- I think the manipulation flaw that we had, I think,

previously addressed or I think your Honor alluded to it, and I just want to touch on why I don't think that the Plaintiffs have remedied at all what I see as a fundamental problem with their theory of manipulation.

We argued -- or I argued -- you didn't argue. I argued about this last time, and the Court ultimately found --

And, Erika, if we could go to the manipulation slide.

So the Court ultimately found that if Jump truthfully believed it was purchasing the tokens below their real value, then I think we argued, and I think the Court observed, that that would be inconsistent with manipulation. And we just think that it is, meaning, in other words, their allegation on manipulation is that because they allege that the Jump Defendants traded with the purpose of restoring the peg, as opposed to, like, the primary purpose of making a profit on an arbitrage here because it did drop below a dollar, because the primary purpose, they allege, was to restore the peg, that in and of itself qualifies as manipulative intent. And I think that just reflects a fundamental misunderstanding of the law on market manipulation. The law on market manipulation -- we cite cases. There's some on the slide here. There's a lot in the brief -- is, the mere intent to affect price, which is what they're saying, that Jump intended to affect the price, to bring it back up to a dollar, is not by itself sufficient

to plead manipulative intent. You have to --

THE COURT: Do any of the cases that deal with this issue address the possibility that it is not -- you know, not -- what you're manipulating in the market is not market information about the appropriate price of the security at issue, but in fact that you're manipulating the market's knowledge about an underlying feature of the security, so that -- I mean, the theory here is that it's not that the market was manipulated about the value of UST. It was that the market was manipulated as to the stability and its ability to self-correct.

MR. COGAN: Right.

THE COURT: There's -- so there's a distinction there between a classic market manipulation of price theory.

MR. COGAN: Right.

THE COURT: And I know I did this before. The good part about being a district judge is I can disagree with my colleagues and myself if I think I got it wrong the first time --

MR. COGAN: Yeah.

THE COURT: -- or -- and I'm on a new complaint with some different allegation. So I guess that there's a distinction there that might be relevant, which is what is -- you know, if the -- if -- they manipulated the market by concealing the inability of the UST to be self-correcting

and stabilized, as opposed to just that they manipulated the market by misleading the market about the price -- the proper value of the UST.

MR. COGAN: Yeah.

THE COURT: That seems to be a relevant distinction.

MR. COGAN: I think my reaction to the question, your Honor, is that the concept of misleading the market about the stability is relevant to the fraud theory. But on market manipulation, I think that their allegation is that they were proximately harmed by the restoring of the peg to a dollar a year earlier. And the point that I'm making is that the manipulation case law that is -- that, you know, I think we've cited at length in our brief, and I don't see anything in the Plaintiffs' cases that undermines it, is that as long as you're buying at prices that are beneath your subjective assessment of fair value -- so, here, either Jump believes UST is a worthwhile project and is worth a dollar, it's a viable, stable coin that has temporarily depegged and can be restored and improved and is worth a dollar, or it doesn't. If it believes that UST is worth a dollar, which they do not allege that Jump did not genuinely believe in their complaint -- if it believes that it's genuinely worth a dollar, then it is not manipulation to buy at below a dollar -- buying below your subjective assessment

of fair value.

By the way, the -- not to spend too much time going back to the -- what we refer to as the disclosures that were made in 2022, but what's being talked about, and I think this is unique to a stable coin, right, what's being talked about in the beginning of 2022 is using a reserve to defend the peg when it starts to dislocate during periods of volatility, right? They're saying there's $1 billion reserve that can be deployed to help bring it back to a dollar, which is what the Plaintiffs are alleging that Jump did in this case. There's no suggestion by the Plaintiffs that what was being described in the beginning of 2022, right, using the reserve in periods of instability to restore the peg, there's no suggestion that that would be market manipulation. It's the exact same thing with respect to what Jump is alleged to have done here, which is, during a period of instability, it became depegged from a dollar, and it intervened and bought at 91, 92, 93 cents, and eventually the peg was restored, and their allegation at least is that it was restored as a result of Jump's trading.

But the bottom line on manipulation is -- and, you know, I think the language that I have highlighted on the slide makes the point. The mere intent to affect price, which is what they're saying is the manipulation here, the intent to affect price is not itself sufficient to allege

market manipulation. What you need to do is, you need to buy, or, in other cases, it could be sell, with the intent to mislead the marketplace about your subjective valuation, meaning, in other words, to send a false price signal to the market. There is no allegation and there couldn't be an allegation that that's what Jump was doing. Their allegation is simply that they were buying with the purpose of moving the price.

THE COURT: Is there a Ninth Circuit case law that applies this rule? I mean, I noticed this is Southern District in New York, so I think Second Circuit. I mean, I remember that -- I'm looking at my prior order, and I relied on the Ninth Circuit case, which just says that it has to mislead -- intend to mislead investors by artificially affecting market activity --

MR. COGAN: Right.

THE COURT: -- seems to be the Ninth Circuit's --

MR. COGAN: I think everyone agrees -- I'm sorry to interrupt. Yeah. I think everyone agrees that that is the legal standard. It just begs the question, then, what does it mean -- what does artificiality mean? And I don't think that there's a dispute between the parties as to what artificiality means.

To answer your question directly, your Honor, I don't know that there's a Ninth Circuit case that analyzes the

point that I'm making. It's not just the Second Circuit. I just happen to know there was a district court case not too long ago in Chicago that made the exact same point. It was a spoofing case where the allegation was that people were buying on one side of the market to push orders into -- the market into another order on the other side of the market. And the instruction to the jury in that case was, you have to allege more, that the spoof orders are intended to affect the price, which is all the allegation was. You have to allege that you were buying -- you were placing orders with more than mere intent to affect price, but at prices that did not reflect genuine supply and demand, meaning a genuine assessment of your valuation of the security or whatever the product is that you're referring to.

THE COURT: So let me -- just so I make sure I understand. And I do -- and we have a lot to talk through, so --

MR. COGAN: Yeah.

THE COURT: -- maybe we can turn to some of the other issues.

This -- so, as I understand it, the theory is effectively that even though the allegations are that Jump here purchased above -- you know, went out in the market and purchased for a value above the then market value of the USTs, that that wouldn't be market manipulation if the --

let's say a traditional stock, you know, the stock is currently trading at eight dollars. You think that in the near future it's going to be trading at $16, so you go out and try to get as much as you can for nine dollars because you think you'll pick up more -- you'll be able to get as much as possible if you offer a market premium. I mean, the theory there would be you're -- you think you're going to make money, and you're willing to sacrifice a little in the momentary transaction in order to --

MR. COGAN: There's two issues.

THE COURT: Okay.

MR. COGAN: One is, I think their allegation that I think you're alluding to, which is that we -- I think there's an allegation that we bought at above prevailing prices.

THE COURT: That's right.

MR. COGAN: I think that's just confusing what the -- what that -- I think the inference that you're drawing about what that means actually is probably not what they're alleging. I think what they're alleging is simply that -- you know, in any market, there's a bid-ask spread, right? I'm going to buy at 10. I'll sell at 11, right? No one would ever transact unless someone crosses the spread, like the buyer has to move up to 11 or the seller has to move down to 10, right? Or there would never be a transaction.

I think that what -- laying aside what -- the language that they use in their complaint, I think all they're referring to, based on how markets work and exchanges work, is that Jump crossed the bid-ask spread during this period of time in May of 2021 to buy at the prices that people were willing to sell. So there was no buyer at 91 cents, let's just say, and then it bought at 91. And then there was no buyer at 92, and then it bought at 92. I think that's what they're alleging.

To answer your Honor's question about the hypothetical where a stock is trading at eight, but you think that it is going to trade at 16 soon. I think that's basically right. The way I would maybe slightly modify it is to say that as long as your genuine assessment of fair value is that this is worth 16, it's going to get there soon, maybe it'll take a while, but I value this thing at 16, it's not manipulation to buy at under 16. And so I think that that is the fundamental problem with their theory.

And I would just note that the Plaintiffs talk -- I mean, they cite cases -- I'm going to draw your attention to one of the cases that I think they discuss at length on this. I actually think it supports us. It's the Crane (phonetic) case cited in their briefing. I think it actually makes our point. The allegation in that case was that the defendant was seeking to drive a price up to $50,

which was relevant because they were -- the allegation in that case was if the price got to $50, a tender offer would be defeated, while at the same time was selling at 44. So there was allegations and evidence in that case that the subjective view as to fair value was at, like, 44 and that the defendant was nonetheless buying at 50 for the purpose of defeating a transaction. That's very different than what you have here, which is no allegation that Jump didn't genuinely believe in this thing.

They say in their briefing Jump didn't -- couldn't have genuinely believed in this thing, but all of their factual allegations are that this was genuine belief and enthusiasm for a new product. I mean, the allegation is that Jump put money in to be part of the LFG reserve. Jump is absolutely behaving in a way that is consistent with someone who genuinely believes in the viability of UST, this stable coin.

And so this is not a situation where they're making factual allegations -- I've got to plead this with particularity -- where they're making factual allegations that would support a reasonable inference that Jump didn't really believe -- and, actually it would be a strong inference -- a strong inference that Jump didn't really believe That UST was a viable worthwhile project that had temporarily dislocated and could be restored and could go on

to be this incredibly successful stable coin.

THE COURT: And just so I'm clear, that -- the scienter requirement applies to both the Section 9 and the Section 10b-5 claims?

MR. COGAN: Yeah. I think the Section 9 claim is even higher. I believe that -- we cite this in our briefing. I think there's a willful -- willfulness component as well. But in terms of pleading --

THE COURT: But in terms of PSLRA --

MR. COGAN: Yeah.

THE COURT: -- strong inference of scienter, that applies equally to both claims.

MR. COGAN: I certainly think so. I don't believe there's any briefing suggesting the contrary, and it sounds in fraud, and so I would certainly expect that the PSLRA's standing -- standard applies.

THE COURT: Let me -- maybe I can get some -- you know, I think we have, obviously, the misstatement and omission claims, the 10b-5 claims and the variations thereon. I'm not sure how much -- I mean, I think I'm interested in hearing from Plaintiffs on the question of whether there's proper attribution of those claims. But at the end of the day, I think, as in all of these cases, that's going to be an issue that is just a question of me largely working carefully through the briefing and thinking

about each of the claims and whether there is a statement that's not (indiscernible) that is --

MR. COGAN: Yeah.

THE COURT: -- and that the -- that those issues (indiscernible), so I'm not -- if there's any points you want to add on that, but I think -- I do want to hear from you on the timeliness issues --

MR. COGAN: Yeah.

THE COURT: -- that's been raised.

MR. COGAN: Okay. So let's do this. I will set aside the -- going through the 13 statements, and we'll rely on our briefing on that unless there are questions that come up.

On the timeliness issues, with the Court's permission, I'm going to ask my colleague, Mr. Perlstein, to address those.

THE COURT: Uh-huh.

MR. PERLSTEIN: Good morning, your Honor.

THE COURT: Good morning.

MR. PERLSTEIN: Steve Perlstein on -- with Mr. Cogan, representing Jump Crypto, Jump Trading, and TMSL.

So we raised several different timeliness issues. I'm happy to address any questions you have on any of them.

THE COURT: Well, let me ask you. I mean, there -- you know, there are different sets of claims that we have

at issue here.

MR. PERLSTEIN: Right.

THE COURT: So -- and there are -- I think I want to start with the claims that were asserted against Jump Trading in the prior complaints or at least in, you know, an admittedly timely complaint as to Jump Trading. And it strikes me, you know, in looking through all this -- I mean, why isn't it the case that this is -- really we're in exactly the circumstance that Rule 15(c) contemplates, which is there's a lot of confusion about who they should be suing, you know, who they should be suing on these claims. There's no argument that, you know, given the relationship between these entities, that notice was provided and that -- you know, that they see -- they're now at a point where they've sort of been able to figure this out. There's, you know, a separate question of what do I do with the fact that they might have asserted these quite a bit earlier if not for the year and a half stay that was the result of the Ninth Circuit appeal? But the bigger question is just why isn't it the case that this is exactly the kind of circumstance that Rule 15(c) is intended to address, which is they're trying to figure out who they should be suing on these claims. There's this complicated relationship between these three different entities. They sued the one they thought was at the top of this relationship. And now

they're on the point of saying, "Okay. We're going to put them all in here, and, you know, at the end of the day, we'll figure out if they're all alter egos, such that we can just get a judgment against Jump Trading and it doesn't matter, or if we in fact need to pursue claims against these independently."

MR. PERLSTEIN: There's a lot to unpack there, for sure.

THE COURT: Sorry. I tend to do that with my questions.

MR. PERLSTEIN: No, I appreciate that.

So I think maybe the way to organize this -- so you have counts one, two, and three, which are the Exchange Act claims? As to counts one, two, and three, we're not making an argument on timeliness with respect to Jump Trading.

THE COURT: Right. I understand that.

MR. PERLSTEIN: We are making an argument as to timeliness as to Jump Crypto and TMSL --

THE COURT: Right.

MR. PERLSTEIN: -- and under binding law, those claims can't relate back, and I can walk through why, but just at a high level, the issue is they're not allowed to relate back the claims, and I can tell you why.

So then you get to section -- the Section 5 and 12(a) claim, which is count five under the Securities Act. There,

that claim is barred by the statute of repose, which again they're not allowed to relate back on. That's a new claim as to everybody in this complaint.

THE COURT: Right.

MR. PERLSTEIN: So --

THE COURT: Because that's what I was trying to -- I want to set aside the discussion of the new claims in this complaint because I think that the focus, at least as a starting point, as I was reading through this, why this is not the classic instance for application of Rule 15(c) -- I guess I'll ask you the other question of, you know, they did previously sue TMSL on this matter, correct?

MR. PERLSTEIN: No, they did previously sue Jump Crypto in the --

THE COURT: Okay.

MR. PERLSTEIN: -- in the original complaint, in the first amended complaint. They then dropped them out of the second -- the second amended complaint and the third amended complaint.

THE COURT: And there was never a judgment entered against -- and there was no Rule 54(b) interlocutory judgment entered with respect to Jump Crytpo, correct?

MR. PERLSTEIN: No, but that doesn't --

THE COURT: Okay.

MR. PERLSTEIN: That's not relevant information --

THE COURT: Well -- I mean, I don't know if you -- you've cited my pri (sic). There was a lot of cites to my decision in Wang vs. Zymergen. I was surprised that no one was addressing the fact that I had concluded there that if the plaintiff was timely sued and then dismissed from the case, that unless there's a Rule 54(b) judgment, the statute of limitations doesn't run during that period of time.

MR. PERLSTEIN: As to -- well, as to Jump Trading, sure.

THE COURT: No, Jump Crypto. That was a case in which there were defendants that had been sued. The court there actually granted a motion to --

MR. PERLSTEIN: Right.

THE COURT: -- dismiss without prejudice. The plaintiffs, after developing further evidence, re -- amended -- reasserted those claims. The defendants said that the statute of limitations had run during the time that they were not in the case, and I concluded that's actually a misapplication of the rules and that the statute -- because there was no interlocutory judgment, the statute -- they got sued in a timely fashion, they could be re-added to the case later.

MR. PERLSTEIN: I hear you, your Honor. And I guess I'm just -- I'm looking at the case law in -- for relation back, and the way I understand --

THE COURT: That -- that's -- if -- there's no need for relation back if Jump Crypto was sued in a timely fashion under this analysis --

MR. PERLSTEIN: Right.

THE COURT: -- because even though they were dropped, there was never a judgment in their favor, meaning that there was -- the statute of limitations didn't start to run again at that point.

MR. PERLSTEIN: Right.

THE COURT: So we're -- we are -- that for -- so that that -- under that analysis, the relevant date for purposes of claims against Jump Crypto is when they first sued Jump Crypto in any of the complaints. And if that was timely, then we have timely claims.

MR. PERLSTEIN: I hear you. So I hear what you're saying. I guess I'm just looking for the case.

THE COURT: And I -- I mean, I noticed some of the cases. You cited the Judge Freeman decision, which I specifically distinguished and said I don't -- I'm not following, although I don't know that she was really dealing with the issues that are addressed here, so there's -- I know they did cite my decision in Wang vs. Zymergen for a different point. They didn't cite it for this point. But, you know, the parties were certainly given that decision.

MR. PERLSTEIN: Right. I hear what you're saying

on Jump Crypto, but for -- well, for this Securities Act claim, right, which is a new claim, that certainly wouldn't apply, right?

THE COURT: Yeah. No, I -- that's why I wanted to start --

MR. PERLSTEIN: Okay.

THE COURT: -- by talking about the claims that have always been in the case against Jump Trading or once asserted against Jump Crypto that are not at this point --

MR. PERLSTEIN: Right.

THE COURT: -- and are now being asserted against TMSL.

MR. PERLSTEIN: So let me -- if we can take a step back from that. I don't -- I want to question, but I want to sort of make sure I orient the Court in terms of the statute of limitations, and then how it works with respect to the new Defendants in this case.

So for counts one, two, and three, I think everybody agrees the statute of limitations is two years from the discovery of the conduct at issue.

THE COURT: Right.

MR. PERLSTEIN: I don't think that's an exceptional proposition. The Plaintiffs were aware of the conduct at issue at -- for count one in the complaint -- count one in the operative complaint is the exact same facts

as count one in the original complaint from June of '22. So the two-year notice period would expire in June of '24, right?

As to counts two and three, those are the same facts.

THE COURT: Then the case was stayed at that point, right?

MR. PERLSTEIN: The case was up on appeal and stayed. I don't disagree with that.

But as to counts two and three, those facts were originally alleged in the second amended complaint in February of 2023, so that two-year period would run by February of 2025, which is also before the operative complaint in October of '25. So I don't think there's any dispute that the two-year -- the two -- that this complaint is outside of that two-year period, right? And the reason --

THE COURT: As I said, Jump Crypto was first sued on these claims before that, correct?

MR. PERLSTEIN: Jump Crypto was sued --

THE COURT: Okay.

MR. PERLSTEIN: For -- but what -- so -- I mean -- I guess there is a wealth of case law in the Ninth Circuit that says when you drop a defendant from the case or if a defendant is dismissed, at that point they're treated as a new defendant when you bring them back in.

THE COURT: Is there a Ninth Circuit case that holds that? I mean, this is -- as I said, this is the issue, that there's a portion of my -- the cited Wang vs. Zymergen opinion that's in their opposition brief deals with this issue, and I thought pretty -- I think I thought pretty carefully on the issue and tried to reach what I thought was the proper conclusion.

MR. PERLSTEIN: Right. So I think the -- so in terms of the Ninth Circuit, the Webster case certainly stands for the proposition that the plaintiff's discovery of the statement's falsity is sufficient to start the running of the statute of limitations.

THE COURT: Right. This is a separate issue on --

MR. PERLSTEIN: Right.

THE COURT: -- the question of the effect of the dropping of a plaintiff or the defendant in a particular claim and whether that you treat them as having never been sued for purposes of the statute of limitations in the future.

MR. PERLSTEIN: I mean, that -- the cases under -- when you look at the cases in relation back, and we're looking at Jones (phonetic), I think -- let me see. Right? So I think it really is a relation -- it's not a statute of limitations issue at that point. It's a relation back issue because once the plaintiff is aware of a defendant's

identity and their role in the case within the statutory period, if they drop them from the suit or they're dismissed, when they -- when they come back in, it's -- they're treated as a new defendant.

THE COURT: Then again, is that -- this is Jones vs. Matthews you're relying --

MR. PERLSTEIN: Jones vs. Matthews. I don't see -- I don't --

THE COURT: That was a Central District of Illinois case. Is that right?

MR. PERLSTEIN: That's a Central District of Illinois case. I think the Knight v. Power (phonetic) case also, which is not Ninth Circuit but is Northern District of California, in Knight, they said,

"Where the plaintiff knows the identity of the proper parties within the statutory period, the plaintiff's failure to name those parties represents a tactical mistake, and there's no mistake in identity which the defendant might have had knowledge."

And in Knight, because the defendants were named in the original action, there was no relation back when the defendants were dismissed from the action and then later renamed in the amended complaint.

THE COURT: And then again, that's -- it was involuntary dismissal, but that's precisely what happened in Wang vs. Zymergen, and I concluded that the statute of limitations hadn't run. And so --

MR. PERLSTEIN: I hear you on that. And I don't want to spend time --

THE COURT: Okay.

MR. PERLSTEIN: -- to convince you (indiscernible) proposition that --

THE COURT: So why is it not the case that as to -- sorry, I thought I had it. TMSL. Is that right?

MR. PERLSTEIN: TMSL, yes.

THE COURT: Okay. Why is it not the case that as to the -- as to that Defendant we are in the classic Rule 15(c) category of there is difficulty understanding who exactly the proper Defendant would be on these claims. I don't think it's just a question of knowing of the existence of this entity, which is -- again, I know you've noted that they knew there was a contract with this entity, but it's not just a question that they know the entity existed. They need some reason to think that that entity is the proper Defendant as to these claims if that entity was on notice and the other requirements of Rule 15(c) are satisfied. So why isn't this precisely the circumstance where you would relate back under 15(c)?

MR. PERLSTEIN: So Plaintiffs in July of '23 put in the contract between TMSL and TFL. That's basically the operative conduct -- contract that -- that's Plaintiffs' --

THE COURT: Well, they may have thought -- they may have thought that ultimately -- I mean, they have an argument about alter ego status that's between these entities, but that they're --

MR. PERLSTEIN: Right.

THE COURT: You know, we regularly -- I mean, we have all these tech companies here in this case -- court regularly, and the number of LLC sub-entities that get -- technically are contracting parties or otherwise, they don't necessarily --

MR. PERLSTEIN: Right.

THE COURT: -- you know, oftentimes you'll sue Alphabet Incorporated, and there's -- there may --

MR. PERLSTEIN: Right.

THE COURT: -- be a lot of underlying --

MR. PERLSTEIN: Right.

THE COURT: -- dynamics that need to be resolved, and there might be a need at some point to add one of them as a defendant, depending On the relief sought --

MR. PERLSTEIN: Right.

THE COURT: -- but I mean that seems to be precisely the circumstance where you say, "Look, notice was

provided." The fact that they knew this entity had some legal existence wasn't necessarily enough for them to say at that point, "Oh, we need to sue them right now or our claims are going to be lost," particularly where we have this complicated issue, which is -- I mean, where they -- I guess the obligation before the running of the statute of limitations was to seek to have the stay of this proceeding lifted for the limited purpose of filing an amended complaint that would avoid statute of limitations purposes. Is that what they should have done?

MR. PERLSTEIN: Right. So I -- the situation when you say, "Listen, there are 30 entities. We just found out about this entity, and so we're naming this entity now," I would agree with you that is exactly why you have relation back. But, you know, and then this is the Calcagni case, which is a Ninth Circuit case from 1986, right? The third element is, the party must or should have known that but for a mistake concerning the identity of the -- the identity, action would have been brought against it. They can't make that showing here because, as I was saying, in July of '23, Plaintiffs attached, like, the key contract showing how they don't say the Jump entities were compensated. That's an agreement between TMSL and TFL. It's not just some agreement. It's like the key agreement in the case for them. After that, in early 2024, they bring the third

amended complaint, right? And then a year and a half later, they file this complaint in October of '25. Once they file the third amended complaint and they don't name TMSL, having it be clear that they know about TML's (sic) existence and their alleged key role in this whole thing, TMS -- there's no way TMSL could think it was a mistake that they didn't get sued at that point. They know the identity. They made a conscious decision not to sue, and relation back doesn't apply in that circumstance.

THE COURT: Well, what if -- I mean, do they need to know that TMSL is an entity that has meaningful existence as opposed to being a purely, you know, corporate shell used for the purposes of Jump Trading's, you know, organizing of its assets --

MR. PERLSTEIN: I mean, the test is pretty clear that they just need to know the identity, and I want to get to what I think is a good case for this, where the facts are pretty good. One second. Oh, here. Thank you. Sorry. Thank you for indulging me, your Honor.

So we cite to a Louisiana case v. ASARCO, which is a Ninth Circuit case from 1993. So in that case, plaintiffs originally sued the successor in interest to a company called Industrial Lime (phonetic) Products. The district court then dismissed the purported successor because it found it wasn't really the successor. They then named the

original -- the -- they then named sort of the prior entity, and the district court in the Ninth Circuit found that Industrial Lime Products did not relate back to the original suit against the successor in interest because the plaintiffs knew who Industrial Lime Products was and they just made a mistake about whether they were a culpable party. That's a Ninth Circuit case.

So it's the identity that's important. And here there's no question that they knew about the identity. In their opposition brief, what they say is we didn't know about the significance of the entity. That's not the test. First of all, I would actually quibble with that because, as I said, this was not just some random contract. This was the contract that actually supposedly provided the Jump entities with all of the compensation, right? So this was a key contract. They were aware of TMSL in July of '23. They filed the third amended complaint in 2024 and they don't name TMSL. At that point, TMSL reasonably believes that they are out of the suit because they're aware of the identity and they didn't name them. So then when they go back and then name them in the fourth amended complaint in October '25, that doesn't relate back.

And so we would ask your Honor to look carefully at ASARCO, which is 5 F.3d 431 Ninth Circuit. It's cited in our briefing.

So that's the TMSL claim. Unless there are other questions on that, I'll be happy to address --

THE COURT: No, I think --

MR. PERLSTEIN: -- (indiscernible) the securities point.

THE COURT: Yeah, I think the new claims -- and I guess the issue is, the parties spent a lot of time arguing about whether the statute of repose prohibits application of Rule 15(c) to these claims. I mean, it seems to me that there's a -- there's sort of a preliminary issue, which is just -- so, as I understand it, registration claims were asserted against TFL and Do Kwon in the original complaint --

MR. PERLSTEIN: Right.

THE COURT: -- correct?

MR. PERLSTEIN: But not against -- not against any of the Jump entities.

THE COURT: Right. So the question seems to be, given that there were no allegations about registration-related conduct against these entities in the -- any of the prior complaints, is there -- you know, whether or not both 15(c) is available, do these claim -- the new claims here arise out of the same events or occurrences that were alleged in a prior complaints against at least Jump Trading, right? I mean, and -- it seems to me that they're the

preliminary issue. It may not be -- it's not -- it may not be necessary to address this question of whether Rule 15(c) is potentially available for claims if the fact is they just don't satisfy the requirement for relation back because it's a different series of events. But then the complicating factor is, given that they alleged it against TFL, is that enough to say that -- if Rule 15(c) is available, it arises out of the same series of occurrences or events.

MR. PERLSTEIN: You know, I'm sure Plaintiffs will say it's close enough. I think it is -- it's a separate -- it's a separate set of facts. Even as to Jump Trading, this is a complete -- you know TFL and Jump Crypto, you know, were not defendants at all. TMSL is a Defendant for the first time here, so that's the cleanest one. Even as to Jump Trading, it's a separate set of underlying facts, we would say, and it's the first time a claim against Jump Trading was brought under the Securities Act is in October '25, which is well past the three-year statute of repose when the statute of repose -- there -- and, you know, I'm sure you saw this in the briefing, there was some infighting about what's the relevant date for, you know, the first bona fide offer to the public. Frankly, it doesn't really matter because I think -- you know, we reference places in the complaint where they said LUNA was actually offered for sale and launched in 2019 and that some other cryptocurrencies

were earlier than that. I think Plaintiff goes through and talks about some of the cryptocurrencies that were launched in 2020. It doesn't really matter because I think everybody would agree, you know, at the very latest, the first bona fide offer to the public was January of '21. And if you use January of '21, the three-year statute of repose runs in 2024, well before this complaint was brought in October '25. So I think any -- we're happy, for purposes of this motion, just to use the January '21 date, but that's -- the statute of repose then clearly kicks in.

And then from there -- well, Plaintiffs' argument is, "Well, we can use relation back," but if you look at Miguel (phonetic), which is a Ninth Circuit case, which we cite on page, I believe, 36 of our brief clearly says that the statute of repose can't -- isn't affected by relation back and would violate the rules enabling --

THE COURT: There's a real question about what -- what to do in Miguel, given that apparently the court was entirely misconstruing the relevant --

MR. PERLSTEIN: Well --

THE COURT: -- statute at issue in that case.

MR. PERLSTEIN: So --

THE COURT: I mean, the Supreme Court subsequently said that's actually just a deadline for requesting decision.

MR. PERLSTEIN: The --

THE COURT: It's not deadline for filing the case. I mean a -- you know, the subsequent -- that doesn't -- it's a question of what to do with it, given that the Supreme Court subsequently said you totally -- this construction of the statutory scheme is just flat out wrong.

MR. PERLSTEIN: I think I can actually help you with that. So the Ninth Circuit in McOmie, which is 667 F.3d 1325, which is a 2012 case -- I don't believe actually McOmie is cited in the briefing, but McOmie is cited in Orrstown which is a Third Circuit case that the Plaintiffs rely on, and Orrstown makes reference to McOmie. And in McOmie, the Ninth Circuit found that they adhere to Miguel's conclusion that a statute of repose represents an absolute bar. There's actually -- it's on the right hand side of the page, on the lower part. They actually make reference to the Supreme Court decision about, like -- the fact that it was jurisdictional or not jurisdictional. So they scrub -- the Ninth Circuit scrubs that part of the ruling, but then adheres to the fact that a statute of repose still is an absolute bar. And even Orrstown, which the first -- even Orrstown, which the Plaintiffs cite, which is a Third Circuit case, to try to get around Miguel, first of all is I think Orrstown actually supports us because they acknowledge the McOmie case in the Ninth Circuit, and Orrstown's ruling

is much more narrow than Plaintiffs would like to give it credit for. Orrstown simply said that relation back is okay when a plaintiff merely seeks to amend a timely filed complaint without adding entirely new claims or parties. And you don't have to take my word for what Orrstown really means. I would refer your Honor to Judge Chen's case in the United States ex rel. v. Ossinek (phonetic), which we cite in our brief -- reply brief at 16, which is a Northern District of California case from 2002. In Ossinek, Judge Chen explains that the statute of repose is a substantive right to be free from liability after a legislatively determined time period, and permitting relation back in that circumstance would violate the rules enabling that. And when Judge Chen looked at Orrstown, he agreed with --

THE COURT: No -- I mean, I understand, I guess, but I think I only have to address this dispute if I think that it's possible that they could demonstrate (indiscernible) --

MR. PERLSTEIN: That's right.

THE COURT: -- under 15(c), correct?

MR. PERLSTEIN: I think the --

THE COURT: Okay.

MR. PERLSTEIN: -- threshold issue you addressed would also resolve the issue. So assuming you resolve it in Plaintiffs' favor, they would still lose, but if you resolve

it in our favor, then we don't need to get to Orrstown or Miquel for sure.

THE COURT: Thank you.

Unless there's anything else you want to offer -- we've been going for quite a period of time.

MR. PERLSTEIN: The only other argument I want to touch on briefly is under the Securities Act, that the Plaintiffs have not properly alleged that anybody was a statutory seller. I can do that relatively briefly, if that's okay.

THE COURT: Sure. Okay.

MR. PERLSTEIN: So Plaintiffs' count five is the Section 12(a)(1) claim, you know, and there's been a lot of gloss on what 12(a)(1) means, but to start with the statute, it says, "Any person that offers or sells the securities," right, in violation of Section 5. So 12(a)(1) talks about offer or sell the security. Both in Pino, the Ninth Circuit case, and Pinter v. Dahl, basically, the way you satisfy the seller requirement is either, one, you pass title or, two, you successfully solicit. I don't think there's any disagreement here that none of our clients pass title to the Plaintiff, so the real issue is can they -- did they properly allege successfully solicit? I think if you look at the three entities in turn, you know, it's clear that they haven't.

As to Jump Trading, it's the easiest because there's no allegation of any kind about solicitation.

As to TMSL, the only allegation that even gets close to solicitation is they say TMSL is a statutory underwriter. But there's case law in the Northern District of California -- this is -- we cite a bunch of cases. I would point your Honor to the In re Violin (phonetic) case. And In re Violin says,

> "Issuers and underwriters are not sellers within the meaning of Section 12 unless they actively participate in negotiations with the plaintiff/purchaser."

So the allegation that TMSL was a statutory underwriter, even taken as true, which we take it for the purpose of a motion to dismiss, does not satisfy the statutory seller element. So TMSL should be out of that claim.

THE COURT: Let me ask you, just so I -- so -- what are the -- if they are a statutory seller, how do claims of liability differ from the other claims that have been asserted, 10b-5, Section 9?

MR. PERLSTEIN: Well --

UNIDENTIFIED SPEAKER: A broad question.

THE COURT: I mean, is there a different duty that

applies to statutory sellers? Is it a negligence duty, or is what -- I mean, what is the --

MR. PERLSTEIN: Well --

THE COURT: -- what is the reason they are pursuing --

MR. PERLSTEIN: Well, I -- so --

THE COURT: -- this claim as opposed to the other ones? We sort of got every single piece of the (indiscernible).

MR. PERLSTEIN: Sure. Well, I would certainly defer to my colleagues on why they decided to do it, but one reason that I could imagine is that 12(a)(1) has -- doesn't have the scienter requirement that, say, like a 10(b) claim does, so it gets them, like, a different set of -- a different set of potential liability.

So -- but to get to 12(a)(1), you have to have -- you have to be a statutory seller. For TMSL and Jump Trading, it's easy that they're not.

For Jump Crypto, I also think it's -- when you look at the allegations, it's also pretty easy to see that there's nothing that comes close to Jump Crypto successfully soliciting a purchase by Plaintiffs.

Plaintiffs -- there's only one allegation in the complaint that Plaintiffs say that was a solicitation. That's paragraph 236. In their opposition brief, they say,

"No, no, that's the only place we use the word solicitation, but all of these other allegations could count as a solicitation as to Jump Crypto." Even assuming that interpretation of the complaint is correct, which I would disagree with, I don't think it really matters, because even if you want to take all of those allegations as solicitations, Plaintiffs never allege that they saw them. They never allege that they influenced their buying decision in any way. Plaintiffs' theory of liability would pretty much make everything a solicitation, which, given the other -- or lack of elements in 12(a)(1), becomes very important.

This is actually -- this case in Plaintiffs' theory of what counts as a successful solicitation is even inconsistent with Pino, which they rely on. Pino, we acknowledge, allows for non-directed solicitations. So putting something on the internet could be a solicitation under Pino, but Pino itself, you still have -- there still has to be an obligation (sic) that it influenced or at least Plaintiffs saw it. That allegation doesn't exist in this complaint. In Pino itself, the plaintiff actually alleged that he invested in the securities two days after attending a marketing presentation hosted by the defendants. So -- and this is at 1256 of the decision,

> "Plaintiff Luis Pino alleges he invested a total of $10,000 in Fund five and Fund

six. Pino further alleges he invested
in Fund five two days after attending a
marketing presentation hosted by
Cardone, one of the defendants."

So even Pino, which does expand Pinter, and you don't disagree with that, but even Pino has a limit.

And then -- I won't go through all of Plaintiffs' other cases, but they cite two recent cases and then also another case, Tezos, from 2018, which both of those newer cases rely on. We would ask your Honor to really carefully take a look at Tezos here because Tezos has two different types of defendants. One set of defendants got dismissed, and the other set of defendants stayed in. The defendant that got dismissed was somebody called Draper. Draper owned -- was a minority owner in the cryptocurrency at issue. Plaintiff, according to the allegation, was a well-known crypto investor. According to the complaint, plaintiff -- Draper was the first prominent venture capitalist to embrace crypto. And Draper said he wanted to make sure that the coins got promoted. So that's all the allegations against Draper. The court in Tezos dismissed Draper because they said the court found, without averments that he was -- that the Plaintiff was cognizant of or influenced by Draper's involvement in the Tezos project, plaintiff's statutory seller claim against Draper is not plausible. In contrast

to the defendant the court kept in, DLS, DLS was involved in the creation of the cryptocurrency, the oversight of the cryptocurrency, the monetization of the cryptocurrency. There, the court let that defendant stay in the cases of the -- at least the statutory seller for purposes of a motion to dismiss. But when you look at the allegations, we weren't alleged to be the creator of the cryptocurrency. We didn't have day-to-day oversight of the cryptocurrency. Plaintiffs' allegation here is effectively we were a market maker or a liquidity provider and a promoter generally. We look a lot more like Draper than we do, like, the defendants where the Tezos case stated a claim. So --

THE COURT: Does the theory of promotion depend on the same -- I mean, is the same -- do I need to undertake the same analysis of whether each of the statements was made by these Defendants as -- to the extent they're relying on statements made by --

MR. PERLSTEIN: I think you would for --

THE COURT: -- seller TFL.

MR. PERLSTEIN: No, I'm sorry. Yeah, I think you would, because what Plaintiffs have to allege is that Defendants successfully solicited a sale. So, certainly, if Jump Crypto didn't make the statement, they couldn't have -- that can't be a statement that successfully solicited a sale that -- but then --

THE COURT: And I guess there's -- you know, obviously, that -- I think the main area where that has come up is the question of 10b-5, but is there any reason there would be a different analysis under this section?

MR. PERLSTEIN: One doesn't pop to mind, though. My only -- I had -- I -- candidly, I hadn't thought about a question quite like that. What I would say is the 12(a)(1) statutory seller and what it means to successfully solicit, there is quite a bit of case law on that issue in that context. You do see some cases that talk about seller under 12(a), and sometimes they're talking about a 12(a)(1) case, and sometimes they're talking about a 12(a)(2) case. I don't think there's a difference there. I will defer to you on this. I probably would -- I would probably stay within the Section 12 area because I think there is -- the law is pretty robust there. I don't know if it would translate directly from the 10(b) context.

THE COURT: Okay. I mean, it could be that there is a -- that statutory sellers have duties with respect to third-party speech that don't apply under Section 10(b)(5).

MR. PERLSTEIN: Yeah.

THE COURT: Okay.

MR. PERLSTEIN: So I think --

THE COURT: Okay.

MR. PERLSTEIN: -- that's basically everything,

unless your Honor has other questions.

THE COURT: No, I don't. You know, we've been going for about an hour, 15 minutes, so I do want to give the court reporter a moment to take a break. I know that we've been saying a lot of words.

So what I'll do is take a -- just take a quick five-minute break, and then we'll hear from Plaintiffs on this motion -- this primary motion.

The one thing I forgot to say earlier, I did want to disclose that the law clerk who is working with me on this case has a spouse who was -- could be a putative class member in this case but has disclaimed any interest in a recovery in this case, just so everyone is aware.

Thank you.

(Proceedings recessed briefly.)

MR. COGAN: Your Honor, very briefly on the Wang point. You know, I see the reference in Plaintiffs' opposition brief to Wang. Obviously, the issue that you raised, neither side briefed. I -- we would ask for an opportunity if -- to brief Wang. I think the reason why it could be important here, the premise of the interlocutory judgment, at least as to Jump Crypto, I don't think holds because Jump Crypto was never served with the original complaints. So the statute of limitations sure may have started, but if they were never served, it will pick up

again. So the idea that it will be timely then when they come back (indiscernible) fourth amended complaint, I don't think under the facts here would actually justify that. So if -- it seems like an issue your Honor cares about, so we would be happy to brief that issue.

THE COURT: Okay.

MR. COGAN: (Indiscernible).

THE COURT: I take your point. And if I -- it may be, if I conclude that every -- that there's relation back generally, that I don't need to address the issue. I take your point that the question of service may pose distinct issues that -- when presented in that case.

MR. COGAN: Thank you, your Honor.

THE COURT: Great. Thank you.

Let me hear from the Plaintiffs.

MR. GOLDBERG: Good morning, your Honor. Jacob Goldberg from The Rosen Law Firm on behalf of Plaintiffs.

And the scheme in this case relates to the failure of the algorithm and its critical nature to the entire ecosystem. The scheme isn't to raise the price, although that was the effect, as Doctor Misrock (phonetic) testified. Your Honor, you cite Simpson, and the Defendants seem to wish to ignore it, so let's go over Simpson.

What Simpson says, your Honor, is the principal purpose and effect is to create a false appearance of fact. Again,

the complaint pleads with specificity through the trial-accepted testimony of Doctor Misrock that there was effect from Jump's trading, so let's focus on principal purpose. Does principal purpose -- as the Justice Department accused TFL of doing, does principal purpose mean only purpose? No, it means principal purpose. So, effectively, what my friend argues with respect to trying to chase spread and taking a directional position, which is not what Jump Trading or Jump Crypto does, they took a directional position, against their trading practices, to attempt to raise the price of this stock because the algorithm had failed. So even if Jump said, "Hey, we think that when we're finished manipulating this price, it will be a dollar and we will be able to profit by a dime or six to $7 million, we're going to make $1 billion from the LUNA that we sell," the principal purpose here was to restore the peg where the algorithm had failed, without which, again, as the complaint pleads with particularity, Doctor Misrock says, would have destroyed the ecosystem.

THE COURT: How do you deal with their loss causation arguments? I mean, that's where they started. And they said that there's the major problem with loss causation here, given that all of the Plaintiffs who are before me purchased after -- you know, they purchased I think in March 2022 or thereafter. Is that right?

MR. GOLDBERG: Yeah. Their recitation of the Plaintiffs' purchase dates is correct.

THE COURT: Okay.

MR. GOLDBERG: Your Honor, the touchstone, as my friend well knows, of proximate causation is foreseeability. Was it foreseeable in 2021 that a -- the algorithm would fail again and the ecosystem would collapse? Was that foreseeable in 2021? And we submit to you that the complaint pleads that it was, and that is in fact what happened. So then the only way that the Defendants can sever the link -- the proximate causal link between May of 2021 and May of 2022 is to say that there was some sort of correction, which the LFG does not do. It is -- these statements in and of themselves, as we've alleged, are deceitful. What my friends take out from their charts are things about the algorithmic stable coin. So, for example, they say, "Building reserves that backstop the peg." They leave out algorithmic stable coin. The LFG and the reserve it created were a backstop. LFG also said that -- and now I'm quoting from 193, your Honor, that,

> "The algorithmic stable coin UST had weathered a storm, but we think it's good to have suspenders, too."

So the market sees and says, "Oh, good, the algorithm worked, but now we're getting a little bit better." My

friend lauds -- he pats himself on the back and says, "It's $1 billion." But what we know, your Honor, is that after the algorithm purportedly worked, but through his client's deceit was hidden the fact that it failed, after that, money poured in. And by the time of LFG, there's 18 billion of UST, which makes the reserve seem somewhat inadequate. And, in fact, ultimately, for various reasons, it was. But what they said was, "This algorithm worked, and this is a backstop." If investors know that the backstop is the only thing that protects the peg, they will see this differently.

So what they're saying is, our deceitful statements which said that we -- that the algorithm survived the black swan event, several of the --

THE COURT: I guess -- okay. There's a separate question about the deceitful statements versus the market manipulation, and I think I was starting with thinking about the theory -- the arguments they've made that you can't show loss causation as to your market manipulation claims, which I think is distinct from the question of loss causation as to your 10b-5 and related claims, correct?

MR. GOLDBERG: Well -- so the 10b-5(a) and (c) -- and/or 10b-5(b), the loss causation can overlap between the three claims. As we know for Lorenzo, the statements can form a major part of a scheme to defraud. So the statements here from Mr. Kwon, from Mr. Kariya, and -- that say that

the algorithm had worked, "We weathered this event," those statements are all part and parcel of the scheme because they disable investors from knowing the truth that this algorithm doesn't work in times of crisis and that in 2021, they needed to -- human intervention to repeg UST.

So this is all part and parcel, and the touchstone still is foreseeability. If it's foreseeable that this risk will materialize in the future, then there is a -- then there is a proximate causal link, which our friends can try at summary judgment and trial to sever by somehow saying that a future deceitful statement severs the link, the foreseeability, the proximate causal link between the initial manipulation and what happened after. The initial manipulation is not a one-off, it doesn't happen in a vacuum. Money pours into this ecosystem because the algorithm works. And the algorithm does not work until May of 2022. And that is foreseeable based on the pleadings and the complaint. That is foreseeable, and therefore the complaint establishes, through materialization of the risks, loss causation.

THE COURT: So let me -- let's turn to the issue that we were just talking about with your colleague. Why is it the case that the new claims that have been asserted for the first time against Jump Trading as well as against Jump Crypto and TMSL here are not untimely because they've never

-- you've never alleged any claims involving their status as -- the obligations to register or otherwise, correct, until this complaint. And that -- why is that not a different series of events or occurrences than what was alleged in the prior complaints?

MR. GOLDBERG: Well -- so the second amended complaint that the Court dismissed for insufficiency brings us squarely into the Merck sphere. And in Merck, you will recall Justice Breyer writes that you have to know the facts that support all the elements. In Merck, it was scienter. Here, the critical date is December of 2023.

Forgive me, your Honor, I should have started by saying I would like to talk first about the Exchange Act claims and then the Securities Act claims.

In December of 2023, the summary judgment order that Judge Rakoff filed gave us an enormous amount of information that supports the claims that we had initially made and that this Court dismissed. We filed our case in the fourth amended complaint. You noted that there was a big delay here and that may impact this, but it really doesn't for the Exchange Act because we filed our complaint October 31st of 2025, which is within two years of Judge Rakoff's order. Now, after Judge Rakoff's order, your Honor, we have superseding indictments, we have trial, we have Doctor Misrock's testimony. Before the summary judgment, the

exhibits were filed under seal. So our first piece of specific information came in December of 2023. Now, because the peg, the manipulation, and the statements were all after May of 2021, the Exchange Act propose we put that at May of 2026, so we can't file a claim after that at all. However, the two years, assuming that Judge Rakoff's order alone is enough, and it may or may not be, but let's use that as the date, we have until December of 2025 or two years to file a claim, and the claims were filed within -- against all Defendants. So when your Honor says -- well, when your Honor points to your Wang decision, it's sort of similar. It doesn't matter that we didn't sue anyone before December 27th of 2025 because we were within the statute. According to Merck, this -- we did not have information -- as this Court ruled, we did not have sufficient information in the complaint to state a claim under the Exchange Act for anybody. Judge Rakoff's opinion is as good as any to put a pin in as the critical date. And because we filed within two years of that, these claims are -- these claims are just timely. There's no relation back issue. There's no repose issue. They're just timely.

With respect to the Securities Act, there is -- there are claims in the second amended complaint timely filed, the Defendants did not raise this issue, timely filed that TFL was engaged in violation of Sections 5 and 12 and that Jump

controlled TFL for purposes of the sale of unregistered securities. So we knew that there was a unregistered security sale. The Court dismissed those claims. By the time we got to amend, what we knew from Judge Rakoff's order, from the superseding indictments, and from the trial transcript is exactly who did what, and these are the defendants who do it.

Now, my colleagues are thinking that there -- or are implying -- impugning us, saying that there's some sort of craft going on here, but mistake can certainly mean carelessness, but mistake also can mean, in the context of 15(c), insufficient information. The claim is timely. The information we receive about party and fact relates back to that original claim, and therefore the Exchange Act claims too are timely based on relation back.

So if the Court has any questions.

THE COURT: I mean, I guess I'm just -- so your theory is that as long as you asserted that claim against an entirely different defendant in the second amended complaint with an -- and alleging that Jump had some role in it but declining to sue Jump on those claims in the second amended complaint, that that's sufficient to justify relation back?

MR. GOLDBERG: Yes.

THE COURT: Okay. Are there any cases you're aware of where relation back was -- you know, the classic

example here would be you're -- you know, like, you are -- you have a set of events, you have various legal theories. Down the road, you think you have another legal theory against the same defendant arising out of the same series of events and so you want to add a new legal claim. And that's pretty clearly contemplated by the theory of relation back for statute of limitations purposes here.

What are the cases where you, you know, made a choice not to sue a particular defendant on a particular claim in an earlier complaint, and, nonetheless, you're allowed to relate back, not under a 15(c) notice theory necessarily but on a same series of occurrences or events theory?

MR. GOLDBERG: Well, so -- forgive me, your Honor, I'm blanking on the cases, but we've cited some in our brief.

But let me just say that the claim against Jump as a controlled person of the seller without the facts that we now know from the subsequent disclosures are, these securities -- the -- Terra's ecosystem securities, some of which were involved in unregistered sales, those securities are the subject of a claim that Jump has notice of because we allege that they were a controlled person for purposes of this claim. And then --

THE COURT: So I guess the question is -- I mean, again, this is the issue. You allege that they were a

controlled person for purposes of this claim, but you didn't sue them on the claim. I mean, why didn't you allege a controlled person theory of liability as to this claim if you have that allegation in your complaint?

MR. GOLDBERG: We -- forgive me. Maybe I misheard. We did allege a controlled person claim in the second amended complaint against Jump. Did I --

THE COURT: Well, did you allege a -- one of the basis for their controlled person liability in the second amended complaint was their control of TFL's conduct as a seller of unregistered securities?

MR. GOLDBERG: That's the claim. And then what we learn through subsequent developments is that TMSL was a statutory underwriter according to the cease and desist order and that Jump, for example, and Jump Crypto were selling LUNA and promoting it and soliciting sales of LUNA. That was the whole purpose, we're going to thicken the market from LUNA. So these are things that we didn't know at the time, but now we know. And so those things relate back to the second amended complaint because they're part and parcel of the sale of the same securities.

So we believe that this is relation back, the -- effectively the quintessence of it. We just didn't know things we didn't know. But we knew that there was a claim based on the SEC's February 16th complaint, if memory

serves. And by late February, I think, 2023, we had filed our second amended complaint which alleges -- I recall, your Honor, that the SEC's complaint was against Mr. Kwon and TFL, which alleges that there was improper unregistered sales of securities.

THE COURT: And what does -- remind me, on the statute of repose question, under that, so the securities were purchased in May -- March 2022. Is that right?

MR. GOLDBERG: Well -- so it depends on how the Court pegs the date. If it's the first sale, as my friend said, it's January of 2021, so we have until January of 2024 before the repose. And, therefore, having brought the claim in February of 2023, just after the world learned of these sales of unregistered securities, that makes us timely under repose.

THE COURT: If you can relate back.

MR. GOLDBERG: Well, yes, your Honor.

THE COURT: Okay.

MR. GOLDBERG: Yes, your Honor.

THE COURT: And why shouldn't I conclude -- you know, I know there's a lot about the value of Miguel and thinking about this, but why are they wrong in saying that the Ninth Circuit has said that you can't use relation back in order to revive a claim that hasn't been timely pursued for purposes of the statute of repose?

MR. GOLDBERG: Well, so my memory of Miquel is that they were talking about right versus the limitation, right? So the Tyler (phonetic) right had expired. She -- the Plaintiff had not --

THE COURT: Right. I mean, it's distinguishable, but I think that they're saying the Ninth Circuit has since stood by the idea that the point of a statute of repose is that once that period of time passes and the defendant hasn't been sued on that time period, whether -- I mean, I think you're probably right to say it's not jurisdictional. There are these things that are -- there's some loose language that we've been working to clean up about what is truly jurisdictional and what's not. But the underlying point is that where you have a statute of repose, that is -- you know, goes beyond the statute of limitations to provide the Defendant with certainty that if they haven't been sued on that claim by time -- on that claim by the time of -- that the statute of repose runs, that they are protected from that claim.

MR. GOLDBERG: Yeah.

THE COURT: And in relation to that, applying Rule 15(c) to allow the reassertion of that claim outside the statute of repose would be contrary to the purpose served by those statutes.

MR. GOLDBERG: I think, your Honor, that perhaps

this is a summary judgment issue because if I remember correctly from the Ninth Circuit's cases, it's not about what the Plaintiff knew, it's about -- the repose is about what the Defendant knew. And in relation to that, it's about what the Defendant knows. This is all about notice. So the question is, when Jump is sued as a controlled person of a statutory seller, are they -- is Jump -- let's just deal with Jump Trading, forgive me, and I'll call it Trading -- does Trading know that it is plausible, based on the facts -- the underlying facts that --

THE COURT: I mean, that is the Rule 15(c) analysis. And I think the point is it's not -- you know, the idea of a statute of repose is that the claim isn't asserted. It's not -- you know, you can't avoid the statute of repose by saying, "I sent a letter to the defendant, and they didn't agree that (indiscernible) the statute of limitations or the statute of repose." They didn't -- I mean, you can't do that. So you could be fully on notice and if you don't file it within a time period, generally you're out of luck.

MR. GOLDBERG: Yeah. I think Orrstown may help here. If the claim is brought based on substantially similar facts, then the repose shouldn't be an issue. Now maybe, your Honor, it's an issue with respect to crypto -- Jump Crypto and TMSL, but it certainly isn't with respect to

Jump, because Jump is on notice that it is connected to these claims. And then additional facts come out to elucidate, and that's why, with respect to Jump Trading at least --

THE COURT: But, again, it's not -- the problem is it's not just a question of facts coming out. It's a question of just simply asserting the claim.

MR. GOLDBERG: Fair enough. I think that I would argue that the claim is asserted for purposes of the repose and its certainty requirement in the second amended complaint. And all we add with respect to Jump Trading --

THE COURT: Well -- and am I right in understanding that you are now asserting it directly against Jump Trading as opposed to a theory of controlled person --

MR. GOLDBERG: You are correct, your Honor.

THE COURT: -- liability, correct?

MR. GOLDBERG: Yes.

THE COURT: Okay. Okay. Let -- there's been a lot discussed. We obviously talked a lot. Let me -- are there other particular points you thought that you wanted to raise in response to their presentation?

MR. GOLDBERG: Your Honor, again, I'll be brief about this Simpson issue. The facts are that -- that Judge Rikoff found compelling as he let these claims go to trial. Jump Crypto was offered -- well, forgive me, Jump Crypto

extorted a change in vesting when the peg -- when the -- when USTD pegged for a promise they had made in 2020 to help repeg. They changed their trading parameters and risked up to 200 million in capital. The reason why this spread notion and any belief in a dollar is a red herring is because the principal purpose here was to repeg UST when the algorithm had failed. And that is what, by the way, the Justice Department alleged, and that is what Simpson requires. If the principal purpose is deceit, like here it was, or, forgive me, the facts create, your Honor, at least an equally compelling inference that the principal purpose was deceit and not, as my friends argue, some sort of spread capture --

By the way, your Honor, the trading here is sort of important. There's a chart from Doctor Misrock where it shows when Jump begins taking directional positions. Before that, they're at zero. They do not hold anything. The whole point of high frequency trading is making money from spreads. And now they've bought it, and they're holding it. And they only do that once Mr. Kwon agrees to vest them early.

So we assert and the complaint pleads with particularity, Mr. Disomma says there's going to be a bank run, LUNA is down 40-percent. I think that's paragraph 106, your Honor. And then he directs traders to change trading

protocols with respect to price and quantity. And what we also know, your Honor, is that this was across Jump's entities, that there were Jump traders who were buying UST, that there were Jump Crypto persons buying it, and TMSL was buying it. We know this because TMSL owned about 20 million, and there was about 65 to 70 million in total that the Jump entities purchased.

So the question here is, is the principal purpose that the allegations of the complaint would support, does the principal purpose equal deceit, and is that as compelling as our friends thought that some sort of subjective belief -- some sort of subjective belief is relevant?

With respect to some of the statements, your Honor, I want to focus on two. One is the LFG statements, paragraphs 193 to 195, and the other are the Ship Show podcast. The Defendants have argued that these are statements of other persons. However, Mr. Kariya himself retweeted these statements. First, he retweeted the LFG statement which said, "We survived an event based on the algorithm," effectively. That's in paragraph 193. In that case, he, by tweeting it, is in complete control of making a statement. And in his tweet, he says, "LFG," which means Mr. Kariya is adopting in control a statement of someone else, and it becomes his. Similarly, with the Ship Show, when Mr. Kwon boasts about the repeg and the algorithm's role in the repeg

from May of 2021, Mr. Kariya and Jump Crypto have complete control over the editing of that podcast. Not only do they not edit out a false statement, but then Mr. Kariya himself tweets the link, effectively adopting what is in that for himself, because if Janus is to be believed, then control over the statement, adopting someone else's statement, is the same thing as making it yourself. So that's what we would argue about those statements.

THE COURT: I mean, I guess -- the question seems to be, under Janus, you know, is that conveying that -- I'm not -- you know, it's almost like, do you have to add, "Retweet does not equal endorsement" before you retweet something to avoid people understanding that you are -- you may be sharing someone else's statement but you aren't necessarily making the statement yourself? Is it the case that any corporate entity, you know, if they have a corporate account that tweets certain things, that they're liable potentially under Section 10b-5 for -- 10-5(b) (sic), you know, for anything that is tweeted, even if it's clearly, you know, "Here's a Time magazine article of interest -- that might be of interest," that if there's a false statement in there that bears on anything they do, that's a basis for liability?

MR. GOLDBERG: I don't think there's a hard and fast rule. I think that a Time magazine article from Nike

about growing flowers may not really bear on Nike's business. And in that instance, even if that Time magazine article about growing --

THE COURT: But if it said something about Nike's business, then they're liable for the fact that they retweeted it if that misleads investors?

MR. GOLDBERG: If it is materially false, how is it -- forgive me, Nike is the maker of that statement once they retweet it, your Honor. If they say, per your example, "We're disassociating ourselves from this, but we thought you should know about it." Fair enough. That is not what Mr. Kariya --

THE COURT: Unless that's what -- that is now the general understanding of retweet does not equal endorsement.

MR. GOLDBERG: Is that the general understanding? I mean --

THE COURT: I don't know. It's -- I'm just -- there's a -- if the -- the hook is retweeting the statements of others. I'll have to look at -- relook at Janus and the other cases applying it to determine whether I think that is sufficient.

MR. GOLDBERG: I think that that's a worthwhile exercise, your Honor, because what he does with respect to Ship Show, over which, by the way, he has control, and that's not -- if my memory serves me, that's not a retweet.

The LFG statement is a retweet.

THE COURT: Well, no, your -- I think your statement was -- what you were saying earlier was that with Ship Show, it was -- there's one theory, there was an obligation to edit it, there was an obligation to correct the false (indiscernible), but that you also made -- you -- I think your suggestion was that he then tweeted a link to the podcast somehow increased the extent to which it was his own statement or a statement of Jump.

MR. GOLDBERG: It makes it his own.

THE COURT: And who is -- on your theory, who is -- which entities are potentially liable for those two actions?

MR. GOLDBERG: Mr. Kariya and, through respondeat superior, which is available in the Securities Exchange Act context, his employers, which are Jump Crypto and Jump Trading.

THE COURT: Okay. There's no theory that the other Individual Defendant would be --

MR. GOLDBERG: For those statements, no.

THE COURT: Okay.

MR. GOLDBERG: If the Court has no questions.

THE COURT: I've got a lot of paper, and I don't -- I will give two minutes more if there's anything else you would like to offer. Otherwise, we can turn to the other

two motions that are pending.

MR. COGAN: I'll take 30 seconds of those two minutes, and I think two points.

One, under Janus, and we cite this in our brief, and we cover it, merely publishing the statement of another does not make you the maker of the statement, and we cite case law in support of that proposition.

Then the other thing -- I don't want to belabor it, but on loss causation, the one thing I would encourage the Court to look at, having listened to the argument that was just made, which is, if it was reasonably foreseeable back in 2021 that this could happen again, then when it eventually did happen again in 2022, that was the proximate cause, starts to sound a lot like what the Supreme Court was concerned about in Dura Pharmaceuticals when it talked about how giving plaintiffs a private right of action under the Securities Laws is not intended to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause. So I would just submit that the loss causation argument that was just advanced to your Honor does not meet what one has to allege in order to satisfy loss causation.

THE COURT: Okay.

MR. COGAN: I'll let Mr. Perlstein take the rest

of our two minutes.

THE COURT: Okay.

MR. PERLSTEIN: I'm going to try not to use all of it.

Very briefly on a couple of points. So, starting with statutory seller, if I heard my friend correctly, they really only learned about Jump Crypto and TMSL in 2023 and 2024. I would think that would be case dispositive on whether or not Jump Crypto or TMSL could have been -- could have successfully solicited the Plaintiffs. This looks a lot like the Tezos case where they dismissed defendant Draper because they had no -- there was no allegation that they were even aware of Draper. So I think that the statutory seller point -- I'm sure they're not technically conceding it, but I think it is pretty clear at this point.

I also -- in terms of what my friend said they learned in 2023, I think that theory just expanded somewhat right now. And this was asked to Jump Crypto. What was in the briefing at opposition brief pages eight and nine, that in December of 2023, it was the first time they knew the identity of the US trading firm in the SEC's case, that that was Jump Crypto Holding. That's just demonstrably not true. Jump Crypto was a defendant in the initial case in 2022. Jump Crypto was a defendant in the amended complaint in 2023. And then Jump Crypto got dropped from the second

amended complaint, and then the third amended complaint.

So I think there were -- as far as the limitations argument goes, I think there are two issues with Plaintiffs' theory. First, I think they're wrongly focused on the identity of the Defendant. The issue -- and this is the Webster case as well. The issue is, were they aware of the conduct? And they certainly were aware of the conduct by -- because they sued on it in 2022 and 2023, which would make this -- the 2025 complaint untimely. So -- and there's nothing they needed to know -- there's nothing they learned in December 2023 because they were aware of Jump Crypto already. So I don't want to belabor the point.

And then the last point I would make is -- coming back to Miguel. So in Plaintiffs' briefing on Miguel, they try to -- they say the court was distinguishing between different types of statutes of repose. Respectfully, I don't think that's correct. Miguel relies on Beach, a Supreme Court case, and I think if your Honor looks at the Beach case, your Honor will see what the Beach case was doing was distinguishing between statute of limitations, where you can have relation back, and statutes of repose where you cannot. And then after Miguel, as I mentioned, the McOmie case, which kind of addresses the hiccup in Miguel about whether repose arguments are jurisdictional, but it adheres to Miguel that a statute of repose cuts off

rights. And then most recently, in the Ripple case, which we cite -- which we cite the district court case in our briefing, and as I think I mentioned, the Ripple case was recently affirmed at 2026 WL20631. The Ninth Circuit and -- both the Ninth Circuit case and the district court case confirm that this is a statute of repose, so it should cut off things that --

THE COURT: Let me ask you one -- just the question, I think, is if -- at least as to Jump Trading -- you know, going back to where I started, is it -- are they correct in effectively saying because there was a controlled person theory of liability as to these registration claims asserted in the second amended complaint, that there would be relation back, if not for the statute of repose bar in the application of relation back?

MR. PERLSTEIN: I don't think so because they could have asserted -- it's a separate set of facts, right? One is about the primary violation, and the other -- the set of facts they allege was about alleged control. Now, we don't really think they -- you know, we don't really think they alleged that Jump Trading controlled TFL. In fact, the allegations were that they had a gentleman's agreement between them and other things, so I don't think there's a real allegation of control.

But putting that aside, allegations about whether you

controlled the defendant are much different than allegations that you committed a primary violation. They didn't make that claim until 2025. So, even as to Jump Trading, it's just a new claim, so it shouldn't -- even if you could theoretically relate back for statute of repose, which I don't think you can, but even if you could, this wouldn't get there.

THE COURT: Okay. Thank you.

MR. PERLSTEIN: Thank you.

THE COURT: Sure.

MR. GOLDBERG: Just two seconds.

The second amended complaint alleges a 10(b) claim against Jump Crypto. This Court dismissed it, putting this squarely within (indiscernible) to amend within two years of finding out new information.

THE COURT: Okay. Thank you.

So we have the two other motions to dismiss. I don't know if there's a preference in terms of if you've had a chance to talk about the order in which it makes sense to address those.

MR. KRIEGER: Your Honor, on behalf of Mr. Disomma, we were planning on going next --

THE COURT: Okay.

MR. KRIEGER: -- but before --

THE COURT: No. Go ahead, please.

MR. KRIEGER: Your Honor, Paul Krieger on behalf of Mr. Disomma.

Each of the points that Counsel to Jump made equally apply to Mr. Disomma individually and warrant the dismissal of the counts against him.

I'm going to try and focus briefly today on the allegations that are particularly deficient as to Mr. Disomma individually. I'm going to start with the statute of limitations, your Honor.

So that's the most straightforward ground for dismissal against Mr. Disomma individually for counts five through eight. They're simply time barred. As to Mr. Disomma, there's not any dispute about what that statute of limitations is for those particular counts. It's one year for Section 12(a)(1) and one year for Section 15. Plaintiffs' last purchase of the purported unregistered securities was on May 20th, 2022, which would mean the statute of limitations expired as to Mr. Disomma on May 20th, 2023. And the first time Mr. Disomma was sued in this matter wasn't until January 25th of 2024, well after the one year statute of limitations has expired.

And on the relation back point, the Plaintiffs here can't relate back this complaint to the second amended complaint as to Mr. Disomma because there's not -- this is not a situation of mistaken identity, and they don't even

argue that in their opposition to our motion to dismiss, so they've waived that argument. But there is no -- there is no concern here or allegation that there's a mistaken identity as to Mr. Disomma, who was well known as the co-founder and principal of Jump Trading for many, many years.

In addition, the statute of repose applies here as well to Mr. Disomma. He was not named, as I said, in the complaint until January 2024, which is more than three years after the statute of -- the bona fide sale of these securities first occurred. In fact, I would say, as the Plaintiffs note in their opposition to our brief, that TerraForm publicly announced the launch of UST in September 2020, that's ECF 209 and 12, and the latest launch of the Mirror was in December 2020, so three years after each of those are before Mr. Disomma was even sued in this matter.

I would also point out that counts five through seven are new as to Mr. Disomma, and those were only alleged in October of 2025, which is well after the three years of the statute of repose.

THE COURT: Just remind me, so is -- I think my order on the last motion to dismiss and the motion to compel was in January 4th, 2024, or something along those lines. Was there a third amended complaint filed after that but before the whole matter was stayed?

MR. KRIEGER: There was a third amended complaint, the first one naming Mr. Disomma, which was filed on January 25th, 2024.

THE COURT: Okay. Thank you. That's helpful.

MR. KRIEGER: Turning to the securities fraud counts, moving away from the statute of limitations and the statute of repose, Mr. Disomma, your Honor, isn't even identified in Plaintiffs' own chart of the alleged misstatements, that's ECF 176-4, and as my friend acknowledged, they're not even imputing some of those misstatements to Mr. Disomma. The standard under Janus is that they have to allege that Mr. Disomma had a active -- sorry, a substantial role, that he was actively involved and knew about these statements and how they were going to be made.

THE COURT: And it seems to me like the -- I mean, I -- and I've read the briefing carefully. It seems to me the question is, why is it not the case that at least as to some of the claims that are here, that they can assert controlled person liability?

MR. KRIEGER: Moving to controlled person liability, your Honor?

THE COURT: Yeah.

MR. KRIEGER: Yeah. So a few issues there. First, claims five through eight, which are all controlled

person liability, are time-barred.

THE COURT: Okay.

MR. KRIEGER: So putting that issue to the side. The allegations as to Mr. Disomma's controlled person liability are deficient in the complaint because it's essentially conclusory, and it's not sufficient to allege just because he was the co-owner of Jump, that he was, therefore, a control person of all of the Jump entities. They don't allege with particularity which entities, even the relevant entities here, Mr. Disomma actually had control over. And the case law also is -- shows that you have to allege that Mr. Disomma went beyond his activity in decision-making in this specific trading at issue, that he had a broader control over these entities, and the complaint doesn't make that out.

THE COURT: Okay. I mean, as to the misrepresentation or, you know, omission claims -- I mean, why is it -- why haven't they adequately pleaded controlled person liability? I mean, as to those in particular. I mean, given his role at the company and his -- haven't they adequately pleaded that, you know, in his role, he was -- ultimately had control over the corporate communications of Jump Trading?

MR. KRIEGER: Because you have -- are you talking about primary liability for these statements or control?

THE COURT: No, control. Control. Personal liability for the statements.

MR. KRIEGER: Yeah. I mean, I will reiterate what I just said, your Honor, which is I -- the complaint doesn't allege sufficiently that he had control over these entities because they only allege his involvement in these particular trades in this particular episode, and they need to do more than that.

THE COURT: Okay. Anything else you wanted to offer?

MR. KRIEGER: Just one moment, your Honor. I don't want to belabor this.

Your Honor, I would just offer that on the solicitation point, I don't think that the Defendants have properly alleged that Mr. Disomma himself solicited any of the purchases here for similar reasons to why they can't attribute the statements to Mr. Disomma. Again, there has to be a direct and active role, and they haven't made that out. So I'll put that out (indiscernible).

THE COURT: Okay. Thank you.

I think maybe what makes sense -- maybe I'll hear from Counsel for Mr. Kariya on that motion as well, and then I'll hear from Plaintiffs in response to both motions at once, since there's a lot of overlap.

MR. JERNIGAN: So Ben Jernigan on behalf of Kanav

Kariya. Here with me today is Mr. Chris MacColl.

So we're here on the fifth iteration of the complaint, and Plaintiffs are still trying to find somebody to blame for the actions of Do Kwon, somebody other than Do Kwon and somebody other than his company, TFL. The latest target of the ever-widening shotgun approach to finding new Defendants is Kanav Kariya, who was a 25-year-old at the time of the events in question.

THE COURT: When -- so let me ask, was he named in the January 2024 complaint, or is this --

MR. JERNIGAN: The third amended complaint.

THE COURT: Okay. So it's the same operative --

MR. JERNIGAN: Yes, your Honor.

THE COURT: Okay.

MR. JERNIGAN: And we agree for the reasons stated by other Defense counsels that Plaintiffs haven't stated a claim against anybody. And in a minute, if it pleases the Court, Mr. MacColl is going to stand up and say a few words about another reason why that's true, which is that UST was not a security under the Howey framework.

But I would like to spend my time to focus on some reasons why Mr. Kariya is uniquely situated and why the claims are particularly deficient against him.

First, he's not alleged to have directed or participated in any trading activity. That's fatal to the

manipulation claims in the complaint as a matter of law, full stop.

Second, he's not alleged to have made any false or misleading statements. None of the statements in the complaint have Kariya ascribing the cause of the 2021 repegging event to the algorithm or to anything else. In fact, he didn't discuss the 2021 repegging event at all. That's fatal to Plaintiffs' theories for why his statements were false or misleading.

And, third, all the registration act -- the registration claims are plainly time-barred against Mr. Kariya. And I would like to zoom in on each of those three points if I can.

First is the manipulation. This one is simple. Those claims are premised on the theory that Jump's trading in UST sent a false signal to the market. The claims are premised on trading, so they can't state a claim against Kariya who's not alleged to have traded. The most Plaintiffs can even argue -- and this -- we don't agree that they've alleged this -- is that Mr. Kariya served as a go-between on agreement between Do Kwon and Jump, pursuant to which others at Jump engaged in a course of trading conduct Plaintiffs contend was manipulative.

For the reasons other Counsel have said, we don't agree that they've sufficiently alleged any manipulative trading

occurred. But even if they had, this series of events would not state a claim against Mr. Kariya. As the Ninth Circuit held in Simpson v. AOL, to be liable on a scheme manipulation claim, which is what's attempted to be pleaded in count two, the Defendant must personally have committed an act that had a deceptive effect on the public. With having only been alleged to play a non-public role in a non-public agreement in relation to the trading, Kariya is not alleged to have committed any act that could have deceived anybody.

Another way of putting this is that even stretching the complaint further than it can bear, the manipulation allegations against Kariya sound, at most, in aiding and abetting or maybe in conspiracy. But the Supreme Court in Central Bank of Denver of course held that those theories are not available to private plaintiffs. Now, the SEC can sometimes pursue those theories, but as Plaintiffs have reminded us, the SEC thoroughly investigated the collapse of TFL, even litigated it through trial against other parties, but they chose to bring no claims against Mr. Kariya. And I say this to illustrate that the Central Bank of Denver rule exists to screen out claims just like this, attempts by private plaintiffs to advance precluded aiding and abetting theories under other names, thereby displacing a role that Congress assigned only to the prosecutorial discretion of

the public enforcement agencies.

I want to respond to something my friend on the other side said. He said that the statements are at issue under the count two manipulation theories. There are a few problems with that.

First, that's an amendment of the complaint via argument. Rule 9(b) alleges them -- requires them to say the what of what conduct they allege to (indiscernible) in connection with count two. If you look at count two, it's all about the trading. They don't allege any misleading statements in count two.

And, second, the theory my friend on the other side advanced is that -- even about statements -- is that they concealed that this trading had occurred -- Jump's trading had occurred. But Kariya didn't make any statement about the 2021 repeg event or its cause, so he can't have concealed what Plaintiffs say the statements conceal, even if they were part of the count two claim, which they're not.

So -- and that leads me to his statements. And that's really the core point for count one. Plaintiffs helpfully tell us their theory on this on page one of their brief against Mr. Kariya. There, they assert that he ascribed in his statements the 2021 repeg to the self-healing of the algorithm when really it was Jump. I want to be clear about this. That assertion is simply false. Nowhere in the

complaint is Mr. Kariya alleged to have said anything about the cause of the repeg at all or even the 2021 repeg event at all. It's revealing, the self-healing language they quote on page one of their brief -- they put it in quotes but they don't cite -- if you look at their actual complaint, it's Do Kwon who's alleged to have said that. It's paragraph 225.

Which brings me to another point that was made earlier, this -- the idea that somehow retweeting the podcast -- near hour-long podcast in which that statement was made adopted and endorsed it. That's inconsistent with Janus, which requires him to have ultimate authority over the statement. And Janus also says that within a document that contains a broad set of statements, attribution of the statement is normally dipositive evidence of who said it. So this was an oral statement by Do Kwon, and it's attributed to him. And, of course, Mr. Kariya's own statements on the podcast affirmatively disclosed that the algorithm might not always suffice in periods of volatility to maintain the peg and that external help in the form of the reserve would be needed.

Counsel also said the complaint alleges that Kariya edited either this podcast or the LFG statement. That allegation is not in the complaint. He's not alleged to have edited any statements or played any role in them.

So what about the statements he actually did make? Well, they were either entirely unrelated to the ability of the peg to be maintained by the algorithm in the event of a sell-off or they were vague, optimistic expressions of opinion, not representations as to any verifiable fact, or they made clear that the algorithm alone might not suffice and would need external help again in the form of the reserve. And Plaintiffs earlier advanced the theory that, well, the reserve is part of the scheme because it was saying there was an additional backstop when really that wasn't true. There's no allegation in the complaint that Kariya did not believe his statements about the reserve when he said them. In fact, the complaint affirmatively alleges otherwise. At 201, it says that the reserve finances were in a wallet accessible only to Do Kwon. Kariya didn't have visibility into the capitalization of the reserve. At 260, it says that as late as the May '22 crash, after these statements, Kariya still believed that the reserve was stepping to help. He asked Do, are you going to deploy the reserve? So that defeats both scienter as to these statements, and it defeats the idea that they were false because they didn't contradict anything Kariya knew when he said them. Now that's the standard in the Koja (phonetic) case that Plaintiffs cite.

Finally, I'll say a word about the statute of

limitations. Counts five through eight are plainly time-barred as against Kariya. As Counsel for Mr. Disomma said, there's no dispute, the latest possible purchase of the securities occurred in May 2022, the one-year period ran in May 2023, well before Mr. Kariya was sued for the very first time in January 2024, and there can't be any relation back.

These counts turn on the theory that some of Kariya's Twitter statements were solicitations. We don't agree that they have sufficiently pleaded that for many of the reasons Mr. Perlstein said, but the point for statute of limitations purposes is that these statements both appeared, some of them all the way back in the first amended complaint -- the first complaint and were attributed to Kariya in the first complaint. And as for other statements, they were on Twitter and publicly available to Plaintiffs throughout the limitations period. In other words, Plaintiffs knew who Kariya was and the role he played and the theory they now try to advance against him after the statute of limitations has run. That's not a mistake as to his identity, and so there can't be any relation back under Rule 15(c)(1)(C).

And I'll just wrap it up by offering an observation, your Honor. Plaintiffs' approach to arguing that they stated a claim against Mr. Kariya seems to be to say, well, where we've alleged that there's smoke, we've necessarily

alleged that there's fire. And not only that, we've necessarily alleged that anyone even remotely around the smoke must be liable for the fire. Kariya spoke to a bad actor, Do Kwon, therefore Plaintiffs want the Court to say he must be liable. Others around Kariya engaged in a course of trading Plaintiffs wrongly say was manipulative. Plaintiffs want the Court to then say, "That must be attributable to Kariya, too." But that doesn't work. It doesn't work under Rule 9(b), and it doesn't work under the Private Securities Litigation Reform Act. There's no proximity liability under the Securities Laws. Instead, those rules require the Court to look specifically at what is and is not alleged against Mr. Kariya individually, not group-pleaded Defendants. When that's done, it's clear he didn't take any deceptive public act in connection with the alleged trading manipulation and that he didn't make any misleading statements of verifiable fact.

All claims against him should be dismissed with prejudice. And if the Court has questions on those points, I would like to take them. And if not, Mr. MacColl will address the security -- the Howey issue.

THE COURT: Okay. You can have a minute or two on the securities issue. Thank you.

MR. MACCOLL: Thank you, your Honor. I'll be very brief. It sounds like you have a case of what I had last

weekend, and it wasn't fun.

UST is not on its own a security. That is what Judge Rakoff said in his decision, which the Plaintiffs cited and incorporated into their brief. And Plaintiffs don't make out a case here that it at some point became a security as to either the purchases of the lead Plaintiff or the trades that Jump did. This is a global issue for all of the Defendants, and they've adopted the argument. I'm speaking to it because it's addressed in our brief. We haven't been before Court when it addressed this issue previously, and I wanted to spend just a -- I mean talking a little bit further about it.

THE COURT: I mean, am I right to understand the argument is that even if buying into the TerraForm ecosystem constituted purchase of a security for purposes of these standards, that transactions that are solely transactions as between -- you know, solely the purchase and sale of the Bitcoins separate and apart from the TerraForm ecosystem could still not be -- thinking about, you know, what I previously had ruled, and, obviously, I could revisit that, but if I think that the analysis there was correct, am I right in understanding the argument is that there could still be transactions that are purely the purchase and sale of these Bitcoins that would not constitute the purchase and sale of a security?

MR. MACCOLL: Yeah. So I think your Honor is talking about Bitcoin when -- and you mean LUNA, the --

THE COURT: Yes.

MR. MACCOLL: -- sort of variable price --

THE COURT: Or -- well, either. I mean, I --

MR. MACCOLL: Yes.

THE COURT: -- but it's UST, which is what --

MR. MACCOLL: Right. Right. There's no link between UST and Bitcoin as far as --

THE COURT: Cryptocurrencies, I'm sorry.

MR. MACCOLL: Cryptocurrencies, right. Our argument is that you cannot say that just because one can trade UST for other cryptocurrencies in this ecosystem, that UST is necessarily a security. You have to look at the security -- the supposed security that is being purchased. That's UST. And, you know, if you were to say, "Well, anything you can trade for something in this ecosystem becomes a security," the dollar in my pocket becomes a security.

THE COURT: Well -- I mean, I think that the analysis, as I recall, was that you were purchasing into a TerraForm ecosystem that was sort of accompanied by, you know, representations about profit and representations about the potential for gain from a common enterprise. That was what I think I concluded last time around was sufficient to

plead that what was going on here involved the sale of a security. So the question is, is that something wrong, or is there some distinction you're drawing here between what I considered last time and what's before me now?

MR. MACCOLL: I think your Honor was mistaken last time. The arguments that we're advancing right now were not made last time. They were advanced by TFL, which was saying -- which was making categorical arguments about all of its tokens because it was engaged in litigation elsewhere. Jump adopted those but didn't engage in detail. We've engaged in detail, and we believe you have to look at and analyze UST.

And here's why UST simply is not a security, there is no promise of profits. When you buy UST, you are buying something that is algorithmically pegged at a dollar. You are accepting something that is not going to go up in value. And that is the last element, sometimes it's the third element, sometimes it's the fourth element. It's the last element of -- of course -- of Howey is there has to be an expectation of profits, you know, solely from the efforts of others. Here we have neither an expectation of profits in UST because it's pegged to a stable price, nor do we have efforts of others with respect to Jump's trades because Plaintiffs' entire theory is that they were profiting through their own conduct. That's the simple heart of the argument.

THE COURT: Okay. Thank you.

MR. MACCOLL: Thank you, your Honor.

THE COURT: And then we'll give Plaintiffs a short opportunity to respond.

MR. COHEN: Good afternoon, your Honor. This is Michael Cohen for The Rosen Law Firm. I'm going to address briefly -- and I know it's been a lot -- briefly a few points directed at Defendant Disomma.

We're here today, and he opens his brief -- he portrays himself as an executive who believed in UST and the ecosystem and who could make money based on the trading opportunities that the depeg presented. And that's a theme throughout the other Defendants as well. They didn't manipulate anything because they believed it was worth a dollar. And just -- especially as to Disomma, the -- and I also heard that the complaint is anemic to Disomma, there aren't many mentions of him, but the mentions of him are damning in this -- in the fourth amended complaint. We heard about paragraph 102, which is the superseding indictment -- this is the Department of Justice -- and they describe the stabilizing trades as,

"Jump's purchases were principally aimed at artificially propping up the market price of UST as opposed to obtaining UST at the best price in the market. For

example, they placed orders higher than the prevailing price."

Now, this is not crossing the spread. This is not looking for a good deal. Any who -- I do a lot of deal hunting. I try to get things at the best price. So this is different. And this is the trading that Defendant Disomma personally directed, and that's in our complaint. We have paragraph 128, right after Defendant Kariya hung up the phone with Do Kwon, and he very quickly said to Bill Disomma, "I spoke to Do. He's going to vest us." Right after Defendant Kariya made that statement, Defendant Disomma immediately began directing traders on a new strategy. He directed the traders to adjust the parameters, so that Jump was not acting like a market maker, as it usually did, but aggressively buying and accumulating UST. So these are the trades that the indictment, after investigating this for years, says was principally aimed at artificially propping up the market price for UST.

And, also, we have Defendant Disomma's own words. Plaintiffs never get that in securities cases. We have paragraph 106. He references fear of bank run. He writes -- this is Disomma writing, "Needed to support UST directly on KuCoin." And then paragraph 107, someone writes to Defendant Disomma, "Seems like the prop to Do was well-timed." So -- and now we're hearing today in the

briefs that Jump's trading was not manipulative because if you buy something under the subjective value, it's not manipulative. But in what world is a prop to Do a trade based on your subjective value? I mean, Do is in prison. So this is a prop to Do. And maybe in discovery there will be other e-mails that suggest deal hunting or legitimate trading or benign business strategies, but these -- this theory is directly contrary to all of the evidence in the complaint. And then --

THE COURT: I mean, all of this just goes right to the question of whether you've stated a claim -- a time -- I mean, there's a separate timeliness issue, I guess, but whether you've stated a claim as to market manipulation arising from --

MR. COHEN: Yes, your Honor.

THE COURT: -- what happened in May 2021. And I think there were -- let's set that aside for a second. I think what would be even more helpful to hear from you on is the question of timeliness and then the question of whether you've adequately pleaded controlled person liability or direct liability for any of the other allegations in the complaint.

MR. COHEN: Those are my next two things, your Honor. Thank you.

So timeliness, briefly -- I know we've heard a lot

about it, but --

THE COURT: And I'll ask you to slow down a little bit for the court reporter's sake.

MR. COHEN: And I'll slow it down for the court reporter.

So as to Disomma -- and there's some overlap here. Defendant Disomma's timeliness arguments are -- they're limited to the Securities Act. They're counts five through eight. And so you can see right there that the Exchange Act complaint -- the Exchange Act counts against everyone are simply timely because they're two and five, it's five years from the facts of the violation and two years from when Plaintiffs learned of the facts, and that's simply timely. The learning of the true facts of Tai Mo Shan Limited is in December of 2024. That earlier contract just shows that a loan was papered to Tai Mo Shan Limited. In fact, if you look at why that loan was put into the record, the -- it was a personal jurisdiction motion.

THE COURT: Right. So --

MR. COHEN: The SEC was arguing that it was Jump.

THE COURT: As I understand (indiscernible) you know, we're here sort of now talking about the Individual Defendants' motion. So --

MR. COHEN: Right. So --

THE COURT: -- why is there -- talk about the

Securities Act claim and why you think those are --

MR. COHEN: Sure. The -- yes, your Honor. So the second amended complaint, February of 2023 is the date. The Securities Act counts relate back to the second amended complaint, and I can tell you why. So in that complaint, we brought a controlled person claim against Jump for controlling the unregistered sale of Terra tokens that were issued by -- in the second amended complaint, issued and sold by TerraForm Labs. So at that -- and that date, which is 2/23, February 2023, makes it timely. So at that time, we knew and we asserted. As your Honor --

THE COURT: Timely as to Jump, but you have to have --

MR. COHEN: Right.

THE COURT: -- relation back as to asserting the claim against a different Defendant whose existence was something of which you were aware --

MR. COHEN: Yes.

THE COURT: -- at the time, presumably.

MR. COHEN: Absolutely, your Honor. And as your Honor mentioned earlier, if we had written a letter, it would not suffice. So we brought the count against -- we brought a controlled person allegation against Jump for controlling the unregistered sale of the Terra tokens. And what we later learned is that Jump had a subsidiary called

Jump Crypto. And while we had known -- and Tai Mo Shan Limited. And while we had known those names, we did not know until December 2023 that the US trading firm -- this was all anonymized -- Judge Rakoff, in December of 2023, defined the US trading firm in his summary judgment order as Jump Crypto. We had thought it was going to be Jump Trading, and I can tell you why.

THE COURT: Well, no, but the question here is the Individual Defendants.

MR. COHEN: Absolutely.

THE COURT: Right.

MR. COHEN: Absolutely, your Honor. So Defendant Disomma, and he raises in his brief that he's been -- it's been well-known for decades that he's been -- that he's the owner of Jump. That's true, but that's neither here nor there. What Plaintiffs learned of Disomma's role in the facts of this case, and that's that he took the Fifth Amendment under questioning by the SEC, and that's also the trial testimony from the witness Hunsacker (phonetic) in the SEC's trial, and that's in April of 2024. So, at that time, the Plaintiff learns that Defendant Disomma himself is involved in Jump Crypto and is responsible for the allegations in Plaintiffs' complaint. To be specific, your Honor, we have Doctor Hunsacker's testimony, and he testifies in paragraph 122 --

THE COURT: So --

MR. COHEN: -- specifically about Kariya --

THE COURT: Right. I mean, the question is -- I guess the question is just, whatever happened later, why wasn't it the case that you were sufficiently on notice of him to include him as a Defendant when you sued Jump on control theory of liability in 2023?

MR. COHEN: Yes, your Honor. I would say that there's relation back under Rule 15 for insufficient information, and I can tell you why. The cases that we heard about today do not involve insufficient information. The Ninth Circuit case that was mentioned does not involve a plaintiff with insufficient information at the time, and neither do any of the cases. They cited a case called Powers, and that's -- and the district court's -- it's a quote, and the district court found that plaintiffs knew of the role that defendants played in the alleged wrongdoing throughout the litigation and pleaded facts that could have supported a claim against them but chose not to name them. So there -- it's not just knowing that the name, like, we knew Defendant Disomma owned Jump Trading, but at the trial here in April 2024, Hunsacker says Disomma ran Jump Crypto, set strategic initiatives, and approved any sort of deal --

THE COURT: Did you -- was there someone else at Jump that you were under the impression would have been the

individual who would have controlled person liability?

MR. COHEN: We wouldn't know, your Honor. It's both large and has been around for decades, as they say. So Plaintiffs did not know that Defendant Disomma would be a personal Defendant. We know he's the owner of the umbrella, the biggest entity, but we did not know that until this trial, and that's in April of 2024. So once we learned that, we add Defendant Disomma, and this is the same occurrence as the -- asserting a second amended complaint. And that's helpful because Rule 15 is for when the facts arise from the same facts, occurrence, nucleus of information, whatever it is, so there's relation back.

THE COURT: Okay.

MR. COHEN: That's my second thing, your Honor. That's timeliness.

And briefly on control, which is the next thing that your Honor mentioned, it's similar, your Honor. On paragraph 122 of our complaint, we learned that Defendant Disomma, although he's the owner of Jump Trading, we learned that he runs Jump Crypto, and he directs the trader and trading strategies, set strategic initiatives, and approves any sort of deal. We also learned that he allows Defendant Kariya to be the public face of Jump Crypto and to interface between Jump and others in the crypto community. And not only is that the testimony in general, we see that happening

in our complaint. We see Defendant Kariya talk to Do Kwon, and he immediately comes back into the room. This is the pandemic, so it's on Zoom, and it's on the weekend, but he tells Defendant Disomma, "Do is going to -- Do is going to vest us," and immediately Disomma stands up and directs the trading.

THE COURT: Right. I mean --

MR. COHEN: So we see that control. We did not know that before, your Honor.

THE COURT: Well, I think that the other question is the question of the adequacy as to holding him liability for something other -- liable for something other than what happened in May 2021, right? And I think the question of whether you've adequately pleaded controlled person liability as to the retweets and the L -- the LUNA Foundation -- LGF or -- whether those things -- I mean, that's -- why is it sufficient that you've pleaded a controlled person liability as to those -- that conduct?

MR. COHEN: Yes, your Honor.

Briefly, I would say that this dynamic here that we can see in Kariya interfacing with others and then reporting back to Defendant Disomma and Disomma directing, that based on what the testimony was at the trial, it's certainly plausible that the ultimate authority over what Jump Crypto says and does relies -- it rests with Defendant Disomma.

THE COURT: Oh, but I mean, here were the theory -- a lot of these, the theory is it's not what Jump Crypto says and does. It's actually what Jump -- what other entities that you would like to -- whose language -- whose statements you would like to ascribe to Jump Crypto say and do. I mean, we're getting many degrees away from --

MR. COHEN: Sure.

THE COURT: -- the person who made -- the Do Kwon saying something or the LFG saying something.

MR. COHEN: That's -- and we heard a lot from Defendant Disomma that Plaintiffs do not allege Disomma talked directly to Do Kwon. But, of course, Kariya did and told Disomma what he had said.

The -- and this is almost my last thing, your Honor. On the entities, so we have -- the complaint pleads, actually, with particularity that Disomma controls all of these entities because Disomma directs the trading, Disomma owns Jump Trading, he directs the team at Jump Crypto. That's the testimony. And then in the SEC's cease and desist order against Tai Mo Shan Limited, it's a -- it personifies the entities, which is a little odd, but it says there was a verbal conversation between Tai Mo Shan Limited and TerraForm, and we know in real life that conversation was between Defendant Kariya and Do Kwon. And that's the conversation after which --

THE COURT: But, I mean, it is the case -- am I wrong in saying that, you know, that it's not the case that one's status standing alone as the CEO of a company means that you have liability for every statement that's made under the Securities and Exchange Act?

MR. COHEN: Absolutely, your Honor. But status alone, I would say, is not what we're alleging. Here, after the conversation between Kariya and Do Kwon, Disomma directs trading.

THE COURT: I'm asking less about that than about the other issues, but I think I understand.

MR. COHEN: And that's Tai Mo Shan, and Kariya is at Jump Crypto, and Disomma is at Jump Trading. So Disomma is directing this enterprise, and it's pleaded in their complaint.

Finally, lastly, on solicitation. Solicitation is very broad in the Ninth Circuit. Under Pino, it can be YouTube posts. It can be social media. It --

THE COURT: And is there anything that Mr. Disomma was -- is personally alleged to have done? What -- and if so, what is it?

MR. COHEN: Absolutely. So in the Lido DAO case, being instrumental in bringing crypto tokens to market is solicitation. The reasoning there is really good, and it deals with the exact argument we heard today about

successfully soliciting sales.

THE COURT: So -- and what exactly is the allegation about what Mr. Disomma did in this?

MR. COHEN: So the -- Disomma controlling Jump played not a role like an underwriter, a but for role in an offering. They were instrumental in the ecosystem. And I can tell you specifically why. They were the only market maker. Through TMSL, they served as the statutory underwriter, allowing the public to purchase, for their own financial benefit, Terra tokens. They had a side agreement to thicken up markets for LUNA, which is to distribute LUNA, and a gentleman's agreement to --

THE COURT: But just so I understand that these are all about what Jump did and it's his role in Jump that you're alleging. There's not -- there's not a -- there's no allegation that he communicated to the market, that he reached out to people personally to do this. Is that right?

MR. COHEN: It's just control. And though it's absolutely based on his title, based on what we see in paragraphs 122 to 128, I think it's certainly plausible at the motion to dismiss that he's soliciting, through Jump, transactions for his own financial gain. And under Lido DAO, that is sufficient in the Ninth Circuit for -- to make someone a statutory seller under the Securities Act.

THE COURT: Okay. Thank you.

MR. COHEN: Thank you.

THE COURT: I'll hear if someone wants to address the motion to dismiss the claims against Mr. Kariya.

MR. JASNOCH: Good afternoon, your Honor. John Jasnoch, Scott and Scott. May it please the Court.

I want to be brief, but I think a very fair reading of the complaint is that perhaps the most culpable person in all of this is Defendant Kariya. We have the fact that he was the one who negotiated directly with Do Kwon to vest Jump of its LUNA tokens. We have the evidence of the gentleman's agreement way back in 2020. We have -- to Defendant Kariya's state of mind, your Honor, we have the fact that they were doing Signal calls and that there were deletions of texts. He states that compliance feels much more comfortable with the disappearing chats and that he has heat to move to Signal. Judge Rakoff ruled that the state of mind as to the Jump executives was against their interests and ruled that these statements were admissible. You have the --

THE COURT: I mean, I think I would -- I understand the overall theory. I think that what is important to respond to, you know, first is the argument that the -- whether or not he was involved in -- let's start with the May 2021 incident, whether or not he was responsible for it, whether or not he led to it, that he

wasn't the one actually doing the trading, such that he can't be held liable on that ground and that effectively this is an aiding and abetting theory of liability of -- for market manipulation. Why are they wrong beyond that?

MR. JASNOCH: Because making the agreement is not aiding and abetting. He's -- that's an action that --

THE COURT: But it's not an action directed to the market, right? There's the -- the action is the -- going into the market to purchase UST in order to stabilize its price, repeg it, correct?

MR. JASNOCH: I wouldn't say that, your Honor. I would say the action is his going to Do Kwon and establishing that the tokens would be vested. That is an action that he took.

THE COURT: But then I guess their argument is that's not the market manipulation. The market manipulation is the piece of it wherein Jump Crypto agreed that it would go into the market and purchase sufficient UST to repeg the UST to one dollar, correct? I mean, that was their argument is that -- and they're saying that at least -- maybe they're wrong, but their theory is that those who can be liable on a market manipulation theory are only those ones who are actually interacting with the market and not those who are perhaps doing nefarious things in the background, but they aren't the ones manipulating the market.

MR. JASNOCH: I would not -- it's really that he is integral to the scheme, your Honor, although he is not the one physically pressing the mouse button to purchase the tokens, he was instrumental to the overall scheme to hide the fact that this manipulation had taken place.

THE COURT: Oh, but, again, I guess they're also -- maybe they're wrong, but they also think that sounds like your -- it's a conspiracy theory of some kind, which I think they also say is not a basis for liability, correct?

MR. JASNOCH: It's a scheme, your Honor. And that's what I would submit.

Now, a couple of points that had not been raised previously. There was some suggestions in the briefing that -- as to certain false and misleading statements, that Defendant Kariya was not actually talking about the Terra ecosystem. Those suggestions are false, your Honor. And as to the Pyth or the Pyth (pronouncing), what they say that -- you know, he was discussing Pyth or Pyth -- that's P-Y-T-H -- and thus it's not false and misleading as to Terra LUNA. I would direct your attention to paragraph 156, which is Kanav Kariya and Do Kwon speaking about Pyth as it relates directly to Terra tokens. Again, Kariya says, "I would like to move to Signal." Paragraph 181, he's discussing pricing. Well, Pyth, your Honor, is known as an oracle, which is a -- something that market participants can look to for prices,

and it's run by Jump. And in paragraph 181 --

THE COURT: The question -- as I understood it, the argument is, it's not that there's no relationship between UST and Pyth. It's that the particular conversation at issue was addressing the concern that Pyth could be used to allow effectively price fixing and price coordination across actors in the field and that they were saying they think that its decentralized nature makes that not likely. I mean, they're saying, in context, it's very clear, there's a specific thing they're talking about, and they're responding to it, and it doesn't -- it's just simply not talking about whether Jump and TerraForm or Do Kwon might be engaging in other conduct -- coordinated conduct in the market. It's just -- they weren't talking about this kind of coordinated conduct. That was the thing that was at issue in that statement.

MR. JASNOCH: And that's what I'm taking issue with, your Honor. If you direct your attention to paragraphs 156, 181, and 189, and I think when you read the statement in context with those paragraphs, it's clear that when they're talking about Pyth, they're talking about, in general, the pricing of Terra tokens. Same goes to the allegations as to the MIM token. They say, "Oh, we're not talking about UST. We're talking about MIM." MIM is known as Magic Internet Money. It's also known as Abracadabra.

And what happened with this protocol is it was by and large a protocol for the deposit of UST. Paragraph 203, there is over $900 million of UST in Abracadabra, and so by discussing MIM, they're broadly discussing UST.

A few more items that have not been addressed, your Honor, is that -- then I guess -- as to Howey, your Honor, you know, your Honor's opinion, I think, got it right. Judge Rakoff's summary judgment opinion got it right. That was with the full benefit of discovery and an expert record. Do Kwon's criminal judgment necessarily requires a finding that these were securities. The Tai Mo Shan order, that was Defendants' own families that agreed that these were unregistered securities when they issued in the consent decree.

THE COURT: Well, since they denied liability, I thought it was (indiscernible) the representation that was entering into a consent decree without any acknowledgment of liability on the underlying claims. Is that wrong?

MR. JASNOCH: I think that's right, your Honor, but I think that's still pretty significant evidence that, yes, these are unregistered securities. The SEC interpretive guidance that they cite in their papers, that has no rule of law. That does not displace Howey.

THE COURT: I mean, I see that, but what is the -- what is wrong with their theory that this is unique in the

sense that it's pegged, and so that it's not -- you know, it's not like a stock whose purpose is to purchase it or other securities with the idea that the success of the company will drive increase in value of the stock or result in dividends, and that's why you purchase it. I mean, the idea that this is -- the whole purpose of this is to be a stable coin, is to not change in value. You're not -- instead of purchasing something that is going to vary in value. Now, there might be separate problems, but the theory is that this is a -- it's designed, at least as it's marketed to the community, to the public, as to be not something that increases in value based on the -- the -- you know, profits generated by a common enterprise, but instead it's designed to be stable.

MR. JASNOCH: The one token is designed to keep its peg, but what makes it unique is that it's exchangeable into the LUNA token, and it's part of the broader ecosystem. And really the main selling point of UST is that it can be used to be staked in the Anchor Protocol. It can be staked in these other protocols for interest payments. And that's where you get the expectation of profit.

And so although the token is pegged to a dollar or it was supposed to be pegged to a dollar, it still has that expectation of profit because of its interaction with the broader ecosystem.

And, finally, your Honor, we address leave to amend in the opposition to Defendant Kariya's brief. There were some sentencing materials in connection with Do Kwon's sentencing. In those materials, Do Kwon asserts that Kariya told him that Jump did not want the bailout to become public. He said that this arrangement was wrongful, that he was the one that was led astray by Jump, and that it was really a don't ask, don't tell relationship between Do Kwon and Jump. So to the extent your Honor is inclined to dismiss any of the claims here, we would ask for leave to amend to add these additional facts.

THE COURT: Okay. Thank you. I will give one minute to each of the Counsel -- each of the Defendants, if there's any other points you would like to make.

MR. KRIEGER: Your Honor, Paul Krieger again for Mr. Disomma. Very briefly.

Your Honor picked up on something that I think is important. The allegations that Mr. Disomma was a controlled person of the relevant entities are deficient overall, but there are -- certainly, the complaint is devoid of allegations that Mr. Disomma had any controlled person responsibility over the 13 alleged misstatements. I think that was an important point. I just wanted to emphasize that.

Thank you, your Honor.

THE COURT: Okay. Thank you.

MR. MACCOLL: Chris MacColl for Mr. Kariya, your Honor.

Very, very briefly on the Abracadabra meme thread that Mr. Kariya posted. It ends with, "The primary reason I wrote this is to understand if I got it wrong." He's not asserting any objective facts there that could be the subject of a manipulation claim.

The notion that he is the most culpable person in this whole thing when we're talking about Do Kwon who, of course, has been convicted and sentenced is absurd. I just want to remind the Court, Mr. Kariya did not trade. He did not direct trading. He did not run the team. He is a go-between. I think your Honor understood that as to the manipulation claims.

And on the stable coin securities point, I just wanted to add that the law is evolving. I encourage the Court to take a look at Donovan and Binance. I would also submit that something that's a security at the time of its issuance isn't necessarily always a security. That's clear from the SEC's guidance. It's also very clear from the Ripple case.

And lastly, on scienter, your Honor, you know, Mr. Kariya is an employee at the time of the trades. He's taking direction. He has not been charged by any regulator, despite the extensive investigations into all of this. The

most probable inference there and the correct one is that he didn't do anything wrong. He certainly didn't commit fraud, and under the PSLRA and Rule 9(b), we think the claims should all be dismissed without leave to amend. Thank you.

THE COURT: Thank you. I've got a lot to think about. I appreciate the briefing and argument today. I will take all of the motions under submission, and I need to get a decision out forthwith.

Is there anything else that we need to address right now?

MR. COGAN: Your Honor, it was unclear to me whether the Court would accept narrow briefing on the issue related to the Wang case that the Court had raised today. If so, then we would want to just set a schedule for that.

THE COURT: Let me think about whether I -- that would be valuable. If so, I'll issue a short order with guidance as to the -- you know, the page length and otherwise.

MR. COGAN: Thank you for your time.

THE COURT: Okay. Thank you, and have a good afternoon and good weekend.

(Proceedings adjourned at 12:56 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Friday, May 15, 2026