UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICK PATTERSON,

Plaintiff,

v.

JUMP TRADING LLC, et al.,

Defendants.

Case No. 5:22-cv-03600-PCP

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

Re: Dkt. Nos. 206, 207, 208

In this putative securities class action, lead plaintiffs Michael Tobias and Nick Patterson assert various securities fraud claims against corporate defendants Jump Trading LLC, its subsidiary Jump Crypto Holdings LLC, and Jump Crypto's subsidiary Tai Mo Shan Limited ("TMSL"), as well as individual defendants Kanav Kariya (Jump Crypto's president) and William DiSomma (Jump Trading's founder). Defendants now move to dismiss plaintiffs' fourth amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Court grants in part and denies in part the motions to dismiss.

**BACKGROUND**

This case originates in the allegedly fraudulent activities of Terraform Labs.[1] Terraform operated a blockchain and protocol that hosted numerous coins, including UST and its companion coin LUNA. Terraform advertised UST as an algorithmic stablecoin pegged to the U.S. dollar. The algorithm would purportedly mint and burn Terra tokens to keep the value of UST at $1. In doing so, it promised "investors," or holders of all Terra tokens, that the ecosystem provided both

[1] For the purposes of defendants' motions to dismiss, the Court accepts the truth of the facts alleged in plaintiffs' fourth amended complaint.

United States District Court
Northern District of California

stability and liquidity.

Jump Trading, Jump Crypto, and TMSL (together, "Jump") make up a high-frequency, proprietary trading firm that has been active in the digital assets sector since 2017. Beginning in 2019, Jump partnered with Terraform to underwrite Terraform's tokens. As part of that deal, Jump entered into a November 2019 agreement with Terraform to receive 30 million LUNA tokens that would be vested over the course of two years. Later, in September 2020, Terraform agreed to give Jump 65 million more LUNA tokens with the same vesting clause. The 2020 loan materialized because Kariya, speaking on behalf of Jump, proposed a "gentleman's agreement" between the two companies to "help maintain the peg" and "thicken up LUNA markets further." Both loans allowed Jump to underwrite and publicly distribute Terra tokens through secondary markets, at least partly for the purpose of improving the liquidity of LUNA. Plaintiffs allege that Jump was more than an investor in Terraform and instead was virtually controlling Terraform "by virtue of its expertise… in secondary markets and its ability to provide the required support, liquidity, and market making for Terra [t]oken sales."

In May 2021, the price of UST dropped precipitously below $1 and the algorithm failed to adjust. At the behest of DiSomma, who "personally directed Jump's trading" during the depeg event, defendants agreed to purchase 62 million UST, inflating its value and restoring the stablecoin's peg. In a parallel proceeding, an expert testified that had it not been for Jump's trading in May 2021, the peg never would have been restored, and UST's price would have dropped to close to zero. Whatever the purpose, defendants' purchase temporarily worked, but the underlying issue remained. A year later, the price of UST fell again. This time, defendants did nothing. The stablecoin collapsed, bringing the entire Terraform ecosystem down with it and resulting in billions of dollars of losses.

Jump allegedly generated over $1 billion in profits from its investments in Terraform, with 90% of that made between May 2021 and May 2022. In between those dates, defendants made multiple statements about the strength of the algorithm and its success in repegging to the dollar. They also sold vast sums of LUNA. The loans mentioned above were originally structured to vest over two years. But on May 23, 2021—as the price of UST plunged below $1—Jump and

Terraform entered into a verbal agreement to fully vest the remaining portion of LUNA owed to Jump in exchange for its help repegging UST. Following the first crash, Jump exercised its options to purchase LUNA at 40 cents per token before turning it around to sell to the public. DiSomma instructed Jump traders to sell the UST slowly, so as to not cause the price of the stablecoin to drop again. During that year, LUNA's price peaked at over $115 per token—more than a 28,000% increase.

Do Kwon, the founder and CEO of Terraform, later pleaded guilty to conspiracy to defraud in violation of 18 U.S.C. § 871 and wire fraud in violation of 18 U.S.C. §§ 1343, 1342. Transcript of Sentencing at 10, *United States v. Do Kwon*, No. 23-cr-00151 (S.D.N.Y. Dec. 30, 2025), Dkt. No. 67. Kwon and Terraform were also found liable for the offer and sale of unregistered securities in violation of Sections 5(a) and (c) of the Securities Act. *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 474 (S.D.N.Y. 2023). TMSL separately settled with the SEC over violations of Sections 5(a), (c) and 17(a)(3), all stemming from its actions in the May 2021 trade. In re Tai Mo Shan Ltd., Exchange Act Release No. 11349, Admin. Proceeding File No. 3-22382 (Dec. 20, 2024).

In this lawsuit, plaintiffs attempt to hold Jump and the individual defendants responsible for their role in the UST meltdown. Plaintiffs bring the following causes of action in their fourth amended complaint: securities fraud based on misstatements and omissions, securities fraud based on market manipulation, sale of unregistered securities, control person liability against individual defendants for Jump's role in several violations of the Securities Act of 1933, and control person liability against all defendants for Terraform and TMSL's sale of unregistered securities.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a

cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

"A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act (PSLRA)]." *In re VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires that, "when fraud is alleged, a party must state with particularity the circumstances constituting fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (cleaned up). A plaintiff must allege the "who, what, when, where, and how" of each alleged misrepresentation. *Id.*

The PSLRA creates additional "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). It requires that "a complaint plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, [specify] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity

all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009) (omission in original). To adequately plead scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 991. A "strong inference" of scienter exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In the Ninth Circuit, a court must conduct a two-part inquiry to determine whether this standard is met: "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). The strong inference standard applies only to the element of scienter, not to falsity. *Id.* ("Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a strong inference standard of plausibility.").

## ANALYSIS

### I. Alter Ego Liability

As noted already, putative securities fraud class actions are subject to the pleading requirements of the PSLRA. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Defendants argue that plaintiffs fail to meet these pleading standards because they engage in impermissible group pleading by treating the Jump defendants as one. Defendants also argue that plaintiffs cannot fix their claims by alleging that Jump Trading, Jump Crypto, and TMSL are alter egos of one another, as alter ego liability should be determined by the law of the principle place of business. The laws of both Delaware (Jump Trading and Crypto's principal place of business) and the Cayman Islands (TMSL's principal place of business) have stringent standards for veil-piercing that, according to defendants, plaintiffs do not meet.

Contrary to defendants' contention, "[i]n determining whether alter ego liability applies, [courts] apply the law of the forum state." *Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-

United States District Court
Northern District of California

SI, 2023 WL 9019050, at *3 (N.D. Cal. Nov. 15, 2023) (citing *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010)).[2] Accordingly, the applicable alter ego doctrine is governed not by Delaware or Caymen law but by California law. In California, those who allege an alter ego relationship must show "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769 n.3 (9th Cir. 1992). Determining alter ego status is a "peculiarly factual issue." *Tomaselli v. Transamerica Ins. Co.,* 25 Cal. App. 4th 1269, 1284 (1994). At the pleading stage, alter ego status may be alleged if a plaintiff pleads facts that show a "unity of interest [ ] and undercapitalization of the corporate entity." *Mieuli v. DeBartolo*, No. C-00-3225 JCS, 2001 WL 777447, at *10 (N.D. Cal. Jan. 16, 2001) (citation omitted); *see also Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 512 (2010) (listing factors for consideration of alter egos).

Plaintiffs allege that Jump Crypto is "controlled by the same managing members as Jump Trading," and that TMSL is a "wholly owned subsidiary of Jump Crypto" which, "on [plaintiffs'] information and belief," operated as a "unit and/or division of Jump." They point to exhibits indicating that TMSL borrowed LUNA from Terraform, that TMSL used "legal@jumptrading.com" as the contact information for their legal department, and that all three Jump entities shared the same address. They further note that TMSL was the entity that was originally granted the September 2020 loan of Terra even though the loan itself was negotiated by Kariya, the president of Jump Crypto. TMSL was also the recipient of the November 2019 loan, but in an email to an investor group Kwon announced that Jump Trading had been the recipient of the loan.

Taken together, these allegations are enough to meet Rule 9(b)'s pleading standard. And

---

[2] Defendants cite *Shaffer v. Heitner*, 433 U.S. 186 (1977), in support of their contrary argument, but that case addressed only "the liabilities of officers or directors *to* the corporation and its stockholders." *Id.* at 215 n.44. Plaintiffs here are not pursuing a derivative action on behalf of any corporation or its stockholders but are instead seeking to hold defendants directly liable for the harm caused to putative class members.

United States District Court
Northern District of California

because plaintiffs successfully allege that the three organizations are alter egos, plaintiffs' "group pleading" is permissible. *Cf. United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) (noting that while Rule 9(b) does not allow a complaint to lump defendants together, collective allegations may be "used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct").

## II. Securities Fraud Based on Misstatements and Omissions

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Rule 10b-5(b), promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person to make false statements or omit material facts in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5(b), a plaintiff must plead: "(1) a material misrepresentation or omission [by the defendant]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance [upon the misrepresentation or omission]; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (citation omitted). Defendants argue that the securities fraud claim must be dismissed because they fail to adequately plead elements one, two, four, and six.

### A. False Statements and Omissions

Plaintiffs allege that defendants made thirteen misstatements or omissions in violation of Section 10(b). Six of those statements were made by others not party to the suit, and seven were made by the defendants.

#### 1. Statements Made by Others

Under federal securities laws, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Defendants argue that they are not liable for six statements on the grounds that they were not the makers of those

statements. Instead, they contend, the makers of the statements were Terraform, an entity called the Luna Foundation Guard (LFG), and Do Kwon.

**a. Terraform**

Plaintiffs argue that Jump is liable for multiple statements in blog posts about Terraform. First is a statement made by Terraform that quoted Jump and linked to Jump's posts. Next, plaintiffs allege that Jump is liable for statements made in a blog post that referred to UST as a "censorship-resistant, infinitely scalable, algo-pegged USD stablecoin."

Plaintiffs argue that Jump is the maker of both statements because the blog posts could not have been published without their approval. Their theory is that because Jump was directly quoted in the first blog post, it "provides the impression" that the two companies "worked on" the blog post together. But interpreting *Janus* to mean that anyone quoted in a blog post, article, or press release is liable for all statements made within that writing extends it far beyond the Supreme Court's holding. *Janus Cap. Grp., Inc.*, 564 U.S. at 142. Because plaintiffs allege no further facts indicating control over the statement, the Court cannot find that Jump "made" the statement at issue.

A month after the first blog post was published, Kariya connected communications employees at both Terraform and Jump to "coordinate efforts between [the] teams." The second blog post was released shortly after the communications collaboration. While some of these allegations could support a finding of authority over the statements, they are not enough. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012), is instructive. In that case, the plaintiff sued a corporate board chairman under Section 10(b), claiming that the defendant had "ultimate authority" over public statements made on behalf of the company by its CEO and CFO. *Id.* at 1071. The court declined to find that the chairman was the maker of the statements because the plaintiff failed to allege a causal chain between the statements and the chairman's supposed authority. The connection here is even more tenuous. Unlike a board chairman, Jump did not have any governing control over Terraform. Nor is a vague allegation of a collaboration between communication teams enough to find otherwise, particularly under the stringent standards of Rule 9(b). Finally, plaintiff's insistence that discovery will "reveal



United States District Court
Northern District of California

United States District Court
Northern District of California

additional coordination efforts" is unavailing. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) (discovery should not be used as a means of conducting a "fishing expedition").

**b. LFG**

Plaintiffs next argue that any statement by LFG is attributable to Jump because Kariya was a co-founder of LFG and served on its governing counsel. They allege that Jump, via Kariya, exercised control over statements that LFG made to the public. But plaintiffs never plead specific facts that show defendants' control over these statements. To the contrary, they allege that the governing counsel's powers were limited and that legal governing power was held by a two-person board of which Kariya was not a part. Plaintiffs' allegations would therefore require the court to infer that Kariya's role as a corporate officer automatically gave him authority over LFG's statements. *Id.*; *see also Hampton v. Aqua Metals, Inc.*, No. 17-CV-07142-HSG, 2020 WL 6710096, at *17 (N.D. Cal. Nov. 16, 2020) ("An individual's role as an officer—on its own—is insufficient for the individual to be deemed to have 'made' a statement under Janus for purposes of 10(b)."); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (same); *but cf. Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1376 (N.D. Cal. 2014) (holding that plaintiffs sufficiently alleged that a CEO and chairman of the board had ultimate authority over the statements). Like the allegations above, such contentions do not meet the heightened standards of Rule 9(b).

**c. Kwon**

Jump started a podcast called "Ship Show" to promote Terra Tokens. It was hosted by an employee of Jump Crypto and produced and published by Jump. The first episode featured a discussion between Kariya and Kwon. During the podcast, Kwon made allegedly misleading statements, including claiming that when the UST depegs "the protocol automatically self-heals the exchange rate," which is "why it took several days for the peg to recover." Kariya did not correct these alleged misstatements. Plaintiffs now seek to hold defendants liable for Kwon's statements, arguing that because the conversation took place for the purpose of promoting Terra, Kariya had a duty to correct Kwon.

The person who "makes" a statement is one who has authority over the content of that

statement, chooses whether to communicate it, and chooses how it is communicated. *Janus Cap. Grp., Inc.*, 564 U.S. at 144. "Merely preparing or publishing another's statement does not make someone the 'maker' of the statement, and attribution to another party generally indicates that the attributed party is the 'maker.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) (citing *Janus Cap. Grp., Inc.*, 564 U.S. at 142–43). Plaintiffs' theory would require this Court to find that an executive who allows third parties to make misleading statements in his presence but does not author the statements himself is liable under Section 10(b).

The courts are split as to whether *Janus* allows for such liability, *see In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 275 n.29 (D. Mass. 2022) (collecting cases), and the Ninth Circuit has not ruled on the issue either way. Without binding precedent on the issue, the Court finds that the First Circuit's analysis in *S.E.C. v. Tambone*, 597 F.3d 436 (1st Cir. 2010) (en banc), decided the year before *Janus*, is particularly convincing. As the First Circuit explained in that case, after the Supreme Court had held that Rule 10b-5's private right of action does not extend to aiders and abettors who substantially assist the making of a statement without actually making it, Congress amended Section 20 of the Exchange Act to clarify that *the SEC* may sue individuals who aid or abet primary violators of securities laws. *Id.* at 446 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). In doing so, Congress ignored the SEC's exhortations to also allow for a *private* right of action under Section 20. *Id.* Noting Congress's decision to limit Rule 10b-5's private right of action to primary violations and not secondary violations like those arising under Section 20, the First Circuit determined that allowing a defendant to be held liable for a third-party's misstatements would "shoehorn[]" secondary violations into a category reserved for primary violations—a result the First Circuit deemed contrary to both congressional intent and Supreme Court precedent. *Id.*

Although decided the year before *Janus*, *Tambone's* reasoning adheres to the principles the Supreme Court applied in the latter case, which reaffirmed *Central Bank* in holding that reading "make" broadly would "substantially undermine" the earlier case by rendering aider and abettor violations superfluous and cautioning that courts must interpret Section 10(b) narrowly. *Janus Cap. Grp., Inc.*, 564 U.S. at 142. Applying these principles, the Court cannot find that Kariya (or

the remaining defendants vicariously) is liable for Kwon's statement that "the protocol automatically self-heals" merely because the statement was made in Kariya's presence during a podcast recording. Instead, under *Janus* and *Tambone*, Kariya was not the maker of that statement.

**2. Statements Made by Defendants**

Plaintiffs next allege that defendants are liable for seven statements directly made by them. The Court considers the content of each statement individually.

The first six statements were all made directly by Kariya. First, plaintiffs seek liability for Kariya's (then Twitter) thread discussing the "confusion and panic" that could result from a depeg. Plaintiffs focus on Kariya's statement that it was "difficult to imagine a sustained mass exodus to UST given the circumstances," arguing that the statement was false and misleading because defendants knew that a mass exodus had already been averted during the May 2021 depeg event, and that defendants omitted that they were "highly incentivized" to promote Terra tokens. Defendants point out that this statement discusses an exodus *to* UST, not from it. Plaintiffs fail to meaningfully address why a discussion about investors in other tokens likely not choosing to purchase UST somehow connects to their underlying theory of fraud. Accordingly, this statement is not actionable.

Next, plaintiffs premise liability on the following statement by Kariya in an LFG press release:

> The UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin UST…. It can be used to help protect the peg of the UST stablecoin in stressful conditions. This is similar to how many central banks hold reserves of foreign currencies to back monetary liabilities and protect against dynamic market conditions.

Plaintiffs offer a number of arguments as to why this statement was misleading: Kariya omitted the fact that UST was not as stable as the statement indicated given that it had already been bailed out by defendants; the statement mischaracterizes the size and strength of the reserve; the statement mischaracterizes the independence of LFG's governing structure; and the statement omits any description of the LUNA loans that incentivized Jump to promote Terra tokens. None of these arguments are convincing or particularly relevant. Kariya's statement is a description of how

LFG's reserve would operate and protect UST during a depeg event. Plaintiffs fail to argue why, in a statement that already acknowledges the potential instability of UST, Kariya was further obligated to explain that a depegging event had already occurred.

Plaintiffs next allege that defendants are liable for the statement made by Kariya on a podcast that "all these phones are heavily, heavily regulated, you know, don't support about 20 years of its reputation and the giant business behind making a lot of this happen and we're definitely incentive aligned." Defendants point out that the allegation materially misquotes Kariya by substituting the word "firms" with "phones." In opposition, plaintiffs appear to concede that the statement was about "firms" and not "phones." They continue on to argue that defendants' use of the auto-deleting app Signal to communicate with Terraform and Kwon renders their statement actionable. But the mere fact that defendants spoke to Terraform using Signal does not render their statement that firms are heavily regulated false or misleading.

The last two statements by Kariya concern purportedly misleading omissions. First, plaintiffs allege that Kariya's statement, "I spoke to Do [Kwon] and he's going to vest us," is a material omission because defendants failed to disclose the existence of a scheme to repeg UST in exchange for vesting the rest of Jump's promised LUNA. Next, plaintiffs allege that a blog post by Jump and/or Kariya stating that "Terra's stability mechanism" helps "balance safety" misleadingly omits any description of the outstanding loans from Terraform to Jump that incentivized defendants to promote their investment in Terra coins. Plaintiffs also argue that the statement was misleading because the stability mechanism had previously failed. Defendants argue that these statements are not actionable because plaintiffs failed to allege any duty by Jump to disclose the alleged omissions.

"Rule 10b–5 is violated by nondisclosure only when there is a duty to disclose." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). There are "[a] number of factors are used to determine whether a party has a duty to disclose: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction." *Id.*

Plaintiffs allege that Terraform's two loans to Jump, which effectively transferred millions of LUNA to the firm, transformed Jump into an underwriter and market maker capable of publicly distributing the Terra tokens. Plaintiffs further allege that Jump did its best to hide that relationship from the public. They point to an email from Kwon to small group of investors about (what he called) the "liquidity partnership" between the two companies, where he noted that Jump requested that the arrangement remain "strictly confidential." In that same email, Kwon admitted that the new arrangement was a "significant departure from [Terraform's] previous strategy of staying neutral to [its] token's secondary market conditions." Plaintiffs argue that this imbalance of information pits "powerful insiders," i.e. defendants, against "retail investors left to rely on an algorithm that … did not work."

The Supreme Court first considered whether silence may constitute fraud under 10(b) in *Chiarella v. United States*, 445 U.S. 222, 227 (1980), holding that while the mere purchaser of a stock has no duty to a prospective seller to disclose material facts, a corporate insider who obtained confidential information by reason of their position does. *Id.* at 228–29. Market makers like Jump, who plaintiffs allege provided liquidity and stability to the Terra ecosystem, thus have a duty to disclose the existence of relevant material facts. *Id*. at 230. While defendants are correct that the "mere possession of nonpublic market information" does not in itself create a duty to disclose, *id*. at 235, Jump's role as a market maker, combined with its tangled incentives and eventual realization of enormous profits from the LUNA holdings, tips the analysis towards finding that defendants did, in fact, have a duty to disclose its role in the repeg, at least when making statements that touted the ability of the algorithm to keep the value of UST steady without outside intervention. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (the decision to discuss a topic triggers the duty to do so in a manner that is not misleading).

This is not true, however, for Kariya's statement that Kwon would "vest" Jump. Kariya made this statement during a Zoom discussion about the depeg, in a meeting with only Jump employees. Section 10(b) creates no duty to disclose when the relationship is between employees, even if the maker of the statement is an employer.

The last challenged statement concerns an omission by Jump. In a blog post, Jump stated:

> We believe there will be several winners in the stablecoin space, as there is a spectrum of users who put more or less value on the elements of decentralization, stability, capital efficiency, and integration with regulatory regimes. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin.

Plaintiffs allege that this statement is both false and misleading, while defendants argue that it is a statement of opinion expressing enthusiasm about the Terra ecosystem.

Opinions are actionable if a defendant omits information that "makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "[D]epending on the circumstances, [ ] an opinion statement [ ] convey[s] facts about how the speaker has formed the opinion." *Id*. at 188. For example, the statement that an investor *believes* his conduct is lawful is clearly an opinion, but nonetheless a misleading one if the investor makes the statement despite a retaining lawyer's contrary advice, or even after not consulting a lawyer at all. *Id.* That is because, in the context of securities markets, an investor expects the opinion to be based on at least some meaningful legal inquiry rather than intuition. *Id.*

Here, Jump's blog post touted Terra and UST's stability. The statement would lead a reasonable investor to assume that Jump was not in possession of any information that indicated that the algorithm had already failed once and may possibly fail again. Accordingly, Jump's failure to discuss the prior depeg in the statement could reasonably mislead an investor in Terra and UST.

**3. DiSomma**

Unlike Kariya, individual defendant DiSomma is not alleged to have directly made any statement or omission. Plaintiffs' argument—that DiSomma was in control of the statements made by others, and thus the "maker" of the statements—collapses the distinction between direct liability and control person liability. In *Janus*, the Supreme Court rejected a nearly identical argument, noting that the party's "theory of liability based on a relationship of influence resembles

United States District Court
Northern District of California

the liability imposed by Congress" when it passed § 20(a). *Janus Cap. Grp., Inc.*, 564 U.S. at 146. Accepting the party's theory would necessarily require reading into Rule 10b-5 "a theory of liability similar to [ ] but broader in application than [ ] what Congress has already created expressly elsewhere." *Id.* Under the facts alleged by plaintiffs, DiSomma's liability for the actionable statements turns on the requirements of § 20(a) and he may not be held directly liable for those statements under Rule 10b-5.

* * *

Plaintiffs have successfully demonstrated that two statements by defendants are potentially false and misleading: a blogpost by Jump and/or Kariya that "Terra's stability mechanism" effectively "balance[s] safety" and a blogpost by Jump that it "believe[s]" that "Terra and their[sic] dollar stablecoin UST … is the most elegant solution for creating a highly scalable and more decentralized stablecoin." Only these statements are actionable. Any claim premised on the other statements is dismissed.

**B. Scienter**

To survive a motion to dismiss, the complaint must show that "the defendants made false or misleading statement either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 900–91. Courts evaluating scienter must first determine "whether any of the plaintiff's allegations alone [are] sufficient to create a strong inference of scienter." If none standing alone do, then the court considers "the allegations holistically." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). A strong inference "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d at 605. "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient." *Id.*

Defendants claim that any representations after the depeg event were rooted in their genuine belief in UST's viability and longevity. Plaintiffs, in turn, argue that defendants purchased UST in May 2021 for the purpose of propping up their future shares of LUNA. In doing so, they manipulated the markets to overly value Terra tokens—the very same tokens they received in

exchange for their help with the repeg. For support, plaintiffs point to the fact that defendants reaped over $1 billion in proceeds in the year between UST repeg and its collapse. Plaintiffs also allege that on May 23 and 24, 2021, Jump placed orders to purchase UST at prices higher than the prevailing market prices, all for the purpose of defending the peg. As UST started to unravel, DiSomma told Jump employees that Jump "[n]eeded to support UST directly." One Jump executives responded that "the prop to Do [Kwon] was well timed," while another asked, "did we get [Kwon] to vest us?" Later, one Terraform employee reflecting on the buyback wrote, "[Jump] saved our ass."

Defendants argue that the buyback was a savvy business decision: They bought UST for more than the prevailing market price because they truly thought it was worth more than the purchase price. In the end it was, as evidenced by their enormous profits. Despite defendants' attempts to argue otherwise, however, this windfall establishes a strong connection between defendants' alleged misrepresentations and their personal financial gain. As the Ninth Circuit has noted, "a strong correlation" between the alleged Section 10(b) violations and a defendant's financial gain "may occasionally be compelling enough to support an inference of scienter." *Zucco Partners, LLC*, 552 F.3d at 1004; s*ee also Tellabs, Inc.*, 551 U.S. at 325 ("[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference."). A finding of scienter is further supported by the immediate near-collapse of the Terra financial system. The inference that defendants knowingly invested in a valueless security before cashing out is at least as compelling as the inference that defendants were mistakenly bullish on a bad bet. Plaintiffs' allegations thus support the conclusion that the decision to purchase UST was based not on sound investing but an attempt to artificially inflate the price of a security in which defendants were heavily leveraged, and that defendants were therefore aware of the falsity of the two potentially actionable statements identified above.

**C. Reliance**

The most direct way for a plaintiff to demonstrate reliance is to show that he was aware of the statement and purchased a security based on that specific misrepresentation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Reliance may be presumed if there is an

omission of a material fact by one with a duty to disclose, or under a "fraud-on-the-market" theory where the Court assumes that a plaintiff relied on public misstatements whenever he buys or sells a security at the price set by the market. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). A plaintiff is entitled to a rebuttable presumption of reliance under the fraud-on-the-market theory if he demonstrates that "the alleged misrepresentations were publicly known …, that the that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Erica P. John Fund, Inc.*, 563 U.S. at 811 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988)).

A market is efficient if the "the stock prices reflect public information." *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999). Although there is no binding methodology to determine market efficiency, the Ninth Circuit has in the past relied on the five *Cammer* factors: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S–3; and (5) whether there are empirical facts showing a cause and effect relationship between unexpected corporate events and an immediate response in the stock price. *Id.*

Plaintiffs—in pleading that once it became clear that UST's algorithm did not work, the stablecoin's price crashed—only allege the fifth factor. But at this stage of the litigation, that is sufficient. First, market efficiency is rarely a question appropriate for resolution on a motion to dismiss. *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) (collecting cases). Second, the "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price … is the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (noting that the fifth factor is "the most important *Cammer* factor in certain cases."). Courts in this circuit have thus found that plaintiffs alleging only the fifth *Cammer* factor have adequately pleaded the element of reliance. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000).

Plaintiffs' failure to allege the other *Cammer* factors is excusable given that those factors were originally developed in the context of common stock securities. For example, as to the second factor, traditional analysts rarely covered crypto markets. Likewise, the third *Cammer* factor looks to the number of market makers or arbitrageurs as a method for measuring liquidity, *In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *10 (N.D. Cal. Mar. 11, 2024) (citation omitted), but the identify of such entities in the context of crypto markets is not well-established. One academic paper suggests looking to whether the cryptocurrency is listed on the top three exchanges—Kraken, Binance, or Coinbase—as stronger evidence of liquidity. Robert E. Bishop et al., *Crypto Litigation and Market Efficiency*, 16 Harv. Bus. L. Rev. 123, 145 (2026). The fourth *Cammer* factor, whether a company is eligible to file an S-3 Registration Statement, is almost always lacking in cryptocurrency securities fraud cases as most cryptocurrencies—particularly at the time of the alleged injury—do not register as securities. *Cf.* Matt Levine, The SEC Comes for Crypto, Money Stuff (Bloomberg Opinion), June 6, 2023, https://www.bloomberg.com/opinion/ articles/2023-06-06/the-sec-comes-for-crypto. Given the inapplicability of three of the five factors to cryptocurrencies, plaintiffs' allegation of the fifth factor is sufficient to allege reliance at the motion to dismiss stage.

**D. Loss Causation**

To properly plead a violation of Rule 10b-5, a plaintiff must show that a misrepresentation caused his loss. Often, this is done by showing that once "'the truth became known,'" the price of the security was reduced or eliminated. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S 336, 347 (2005)). A "truth becom[ing] known" occurs most commonly when "information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *Id.* at 790. An event that reveals an earlier statement to be false may also serve as the triggering factor. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (discussing the "materialization of the risk" approach to loss causation). But these are just two of an "infinite variety" of theories of causation that could apply to a securities action. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citing *Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State*

*Council of Carpenters,* 459 U.S. 519, 536 (1983)). The question is deceptively simple: Did defendant's misstatement foreseeably cause the plaintiff's loss? *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018).

At the pleading stage, plaintiffs need merely allege that the fraud plausibly caused their loss—a relatively low burden. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 954 (9th Cir. 2023); *In re Seagate Tech. Holdings PLC Sec. Litig.*, No. 23-CV-03431-RFL, 2025 WL 1744505, at *10 (N.D. Cal. May 12, 2025). The most common way to show loss causation is by identifying a corrective disclosure in which "information correcting the misstatement or omission that is the basis for the action is disseminated to the market" and reveals the truth concealed by the defendant's misstatements, causing the price of the security to decline. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (citation omitted). "An event can be corrective when it merely discloses a consequence of concealed information (for example, an earnings miss), even if the connection between the cause and the consequence is not made explicitly in the disclosure." *Jaeger v. Zillow Grp., Inc.*, 746 F. Supp. 3d 1025, 1036 (W.D. Wash. 2024), *aff'd,* No. 24-6605, 2025 WL 2741642 (9th Cir. Sept. 26, 2025) (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018)); *see also AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 833 F. Supp. 3d 1034, 1045 (N.D. Cal. 2026). Plaintiffs allege that defendants obscured that the algorithm had previously failed and that the peg had to be manually restored, that the May 2022 depeg made it clear that the algorithm could fail, and that, in response, the value of Terra tokens tanked.[3] "To be corrective, the disclosure need not precisely mirror the

[3] The distinction between a corrective disclosure theory of causation and a materialization-of-the-risk theory of causation (which has not yet been recognized by the Ninth Circuit) is blurred in a case like this. Defendants suggested to the market that the algorithm would not allow UST to drop below $1, which allegedly "inflated the stock price." *In re Apple Inc. Sec. Litig.*, No. 4:19-CV-2033-YGR, 2022 WL 354785, at *12 (N.D. Cal. Feb. 4, 2022). When UST depegged, the falsity of defendants' statements was revealed and "the corrective disclosures removed [that] inflation." *Id*. But the facts also fit a materialization-of-the-risk theory, as defendants' omissions about the previous depegging "concealed the price-volatility risk," which, when the stablecoin depegged again, "materialized and played some part in diminishing the market value of" UST. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005). Where the misrepresentation itself is about a risk not occurring, either theory may be applicable. *See Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 897 (N.D. Cal. 2024) (treating corrective disclosure and materialization-of-the-risk as one and the same).

earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207–08 (9th Cir. 2020) (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)). Plaintiffs sufficiently allege that the corrective disclosure belied defendants' earlier statements and caused the value of Terra tokens to plummet.

Defendants argue that their alleged fraud could not have proximately caused plaintiffs' losses because the market was aware of the possibility of a depeg event before plaintiffs purchased Terra tokens. Defendants point out that plaintiffs purchased their UST and LUNA after the announcement of the LFG, whose public purpose was to "buttress the stability of the UST peg" during a "classic liquidity crisis" by establishing a reserve that consisted of approximately a billion dollars' worth of Bitcoin. In defendants' view, the LFG's creation revealed the possibility of depegging to the public. Defendants further argue that because UST collapsed months *after* the disclosure of the LFG reserve (and the purported acknowledgement thereby that a depeg event was possible), the mere possibility of a depegging event could not have possibly caused the collapse.

Defendants' defense is a kind of truth-on-the-market theory. Under that doctrine, a defendant can escape liability for an omission by showing that the truth of the matter was already known and factored into market prices. *Provenz v. Miller*, 102 F.3d 1478, 1492 n.4 (9th Cir. 1996) (citing John M. Newman, Jr. et al., *Basic Truths: The Implications of the Fraud-On-The-Market Theory for Evaluating the "Misleading" and "Materiality" Elements of Securities Fraud Claims,* 20 J. Corp. L. 571, 576 (1995)). This is a fact-specific defense, often inappropriate for resolution at the motion to dismiss stage. *See id*. at 1493 (defense not appropriate for resolution at the summary judgement stage); *see also Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd,* 568 U.S. 455 (2013) (defense not appropriate for resolution at the class certification stage). More fundamentally, however, defendants' argument fails to account for the alleged fact that the LFG did not hold anywhere near enough to conceivably restore UST in the event of a depeg. As one member of Jump remarked, the May 2021 depeg occurred in "simpler times" when $100 million was enough to repeg UST and avert a catastrophic event. The May 2022 depeg, by contrast, resulted in over $40 billion in losses. Whether or not the creation of the LFG

informed the market that a minor depeg event might occur, it is at least plausible that the market remained unaware that an event of the May 2022 depeg's size and scope was possible. Indeed, it is entirely possible that the LFG's creation created precisely the opposite impression by suggesting that a $100 million reserve would be sufficient to address any minor instabilities. The market's knowledge of LFG's creation therefore does not defeat plaintiffs' pleading of causation.

Defendants separately contend that even if plaintiffs adequately plead but-for causation, they have not pleaded proximate cause. But "[t]o prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme*, 881 F.3d at 753 (citations omitted). Plaintiffs sufficiently allege a causal connection between defendants' material misrepresentations and plaintiffs' subsequent losses, and the foreseeable consequence of defendants' concealment of the prior depeg was the artificial inflation of the Terra token's price. They have therefore pleaded both but-for and proximate causation.

## III. Market Manipulation

Market manipulation is "a term of art" that "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 (1976). The somewhat amorphous concept may take many forms, though common examples are wash sales, matched orders, or a concerted effort to artificially restrict the supply (and thereby raise prices) by participating in either a series of or a mass planned purchase of a security. S. REP. 73-792, 8 (1934). Plaintiffs assert two claims of manipulation under 10(b) and 9(a). Defendants argue that both claims should be dismissed because plaintiffs do not allege that defendants committed a manipulative act.[4] Defendants' argument fails.

### A. 10b-5 Scheme Liability

"[M]anipulative conduct typically constitutes 'a scheme … to defraud' in violation of Rule

---

[4] Defendants' arguments about scienter, reliance, and loss causation are duplicative of their arguments above and fail for the same reasons.

10b-5(a) or a 'course of business which operates … as a fraud or deceit upon any person' in violation of Rule 10b-5(c)." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009). The analysis is similar to the analysis for 10(b) liability for misstatements and omissions but with two key differences. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). Instead of a misstatement or omission, plaintiffs must allege that a defendant committed a deceptive or manipulative act in furtherance of the alleged scheme and specific intent to defraud.

Defendants' alleged scheme was the restoration of the peg and subsequent coverup of the fact that the underlying algorithm failed to perform as promised. The complaint alleges that defendants collaborated with Terraform to "aggressively buy[] and accumulat[e] UST" during the May 2021 depeg. Together, defendants purportedly created an impression of the stablecoin's stability and sustainability then slowly and privately divested from it, profiting enormously while doing so. The individual defendants—Kariya and DiSomma—are alleged to have committed specific and concrete acts to collaborate with Terraform and direct Jump's trading during the depeg event. These allegations are sufficient to plead that defendants committed a deceptive or manipulative act in furtherance of the alleged scheme.

Intent to create an artificial price is sufficient to show intent to manipulate a market. *See Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982) (citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476–77 (1977)). Intent is a particularly important element of these types of claims because, often, "scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). Defendants allegedly manipulated the value of UST by obfuscating the failure of the algorithm when they intervened to repeg the stablecoin. Plaintiffs argue that defendants showed the requisite intent because they knew that the algorithm had failed when they intervened. Without that intervention, the entire Terraform ecosystem likely would have collapsed.

Defendants counter that they genuinely believed that UST was worth $1 in May 2021 when they purchased vast amounts of the token and that plaintiffs do not specifically allege otherwise. Like all of the claims at issue here, market manipulation claims are subject to Rule 9(b)'s heightened pleading standards. But because it involves "facts solely within the defendant's

knowledge … at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, No. C 09-03529 JSW, 2011 WL 1152568, at *5 (N.D. Cal. Mar. 28, 2011) (citing *ATSI Commc'ns, Inc.*, 493 F.3d at 102). Plaintiffs allege that defendants' massive buy-up occurred shortly after the depeg event even though, absent a working algorithm, there was nothing supporting UST's peg to the dollar and, absent a peg, any stablecoin was virtually worthless. At this stage, plaintiffs have plausibly alleged that defendants did not believe that UST was worth what they paid.

**B. 9(a) Liability**

Section 9 generally prohibits market manipulation. *Ernst & Ernst*, 425 U.S. at 207. Plaintiffs bring claims under Sections 9(a)(2) and (a)(6). While the analysis for claims brought under Section 9(a) closely parallels those brought under Section 10(b), *Phunware, Inc. v. UBS Sec. LLC*, No. 23 CIV. 6426 (DEH), 2025 WL 2636568, at *2 (S.D.N.Y. Sept. 12, 2025), 9(a) requires specific showings of scienter. Plaintiffs alleging a cause of action under Section 9(a)(2) must plead intent to induce others to trade in a security, 15 U.S.C.A. § 78i(a)(2), while 9(a)(6) requires alleging "the purpose of pegging, fixing, or stabilizing the price of [a] security" in contravention of a specific rule or regulation, 15 U.S.C.A. § 78i(a)(6). As shown above, plaintiffs sufficiently alleged intent under both Sections 9(a)(2) and 9(a)(6) by alleging that defendants purposefully and artificially inflated the price of UST. Doing so necessarily required the inducement of others into believing that UST was worth at least $1 and that Terra tokens were worth what plaintiffs paid for them.

Defendants next argue that plaintiffs' Section 9(a)(6) claim must be dismissed because that provision requires a predicate violation and never identify an underlying statute or rule defendants purportedly violated. The text of the statute is as follows:

> It shall be unlawful for any person … [t]o effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security other than a government security for the purpose of pegging, fixing, or stabilizing the price of such security *in contravention of such rules and regulations as the Commission may prescribe* as necessary or appropriate in the public interest or for the

> protection of investors.

15 U.S.C.A. § 78i(a)(6) (emphasis added).

The majority of market manipulation claims are brought under Sections 10(b) and 9(a)(2). § 7:122. Section 9(a)(2), 2 Bromberg & Lowenfels on Securities Fraud § 7:122 (2d ed.). There is very little case law on the phrase at issue in 9(a)(6). Defendants cite a vacated Fifth Circuit decision for their contention that a plaintiff must specifically identify the predicate SEC "rules and any conditions they impose if a plaintiff is pursuing a s 9(a)(6) claim." *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1165 n.38 (5th Cir. 1982), *cert. granted, judgment vacated*, 460 U.S. 1007 (1983). Defendants, however, read a requirement into provision that does not exist.

The primary purpose of the 1934 Exchange Act was to protect investors against manipulation of stock prices. *Ernst & Ernst*, 425 U.S. at 195. But after "most careful consideration," Congress provided an exception for the practice of "'pegging,' or fixing or stabilizing the price of a security." S Rep. No. 792, 73d Cong., 2d Sess. 8–9 (1934). At the time of the passage of the act, price stabilization to combat flipping at the outset of a security offering was both well-established and well-accepted.

> The "pegging" of security prices is regulated by paragraph (6). Many experts are of the opinion that the artificial stabilization of a security at a given price serves no useful economic function. On the other hand the practice has been wide-spread on the part of many investment bankers who regard it legitimate, particularly if the public is aware of the plan. Instead of being prohibited, therefore, this practice is left to such regulation by the Commission as it may deem necessary for the prevention of activities detrimental to the interests of investors.

H.R. REP. NO. 1383, 73d Cong., 2d Sess. at 22 (1934). *See also Friedman v. Salomon/Smith Barney, Inc.*, No. 98 CIV. 5990(NRB), 2000 WL 1804719, at *5 (S.D.N.Y. Dec. 8, 2000), *aff'd*, 313 F.3d 796 (2d Cir. 2002) (citing *United States v. Morgan*, 118 F. Supp. 621, 635 (S.D.N.Y.1953)). Accordingly, instead of banning all securities manipulation, Congress carved out a limited form and delegated its regulation to the SEC.

Rule 104 of Regulation M governs stabilizing transactions during a public offering. *Myers v. Merrill Lynch & Co.*, 249 F.3d 1087, 1089 (9th Cir. 2001); *see also* 17 C.F.R. § 242.104). It does so by permitting stabilization for the purpose of stopping or slowing a price decline during a

public offering. The regulation goes on to provide that every form of stabilization falling outside of that exception is "prohibited." *Id*.

Both the legislative history and the statutory scheme make clear that the text of the provision does not require a plaintiff to have pleaded a predicate SEC violation where, as here, the SEC has exercised its regulatory authority to prohibit all forms of stabilization other than those it has expressly authorized. As demonstrated above, plaintiffs sufficiently plead their 9(a)(6) claim by alleging that defendants purchased "massive amounts" of UST in May 2021 in order to restore the peg through human intervention, prevent the collapse of UST, and artificially inflate the value of the stablecoin. Defendants did so in contravention of several SEC rules, including—as shown above—10(b). Defendants, in turn, make no argument that the alleged activity was stabilization permitted by the Commission. Both of plaintiffs' Section 9(a) market manipulation claims may therefore proceed.

## IV. Control Person Liability

To plead control person liability under 20(a), a plaintiff must allege: "(1) a primary violation of federal securities laws … and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Determining whether a defendant is a controlling person is primarily a factual question, *id.*, and while an underlying securities fraud violation is subject to a heightened pleading standard, any allegations of control are "subject to Rule 8's less stringent standard." *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1010 (N.D. Cal. 2024). A defendant may assert a "good faith defense by 'proving the absence of scienter' and a failure to directly or indirectly induce the violations at issue." *Id*. (citing *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993)).

As explained above, plaintiffs sufficiently allege three primary violations of federal securities laws by Jump: securities fraud based on misleading statements and omissions, and market manipulation in violation of both 10(b) and 9(a). Plaintiffs' securities fraud claim is based on two actionable statements: a blogpost by Jump and a blogpost by "Jump and/or Kariya." But plaintiffs do not plead any facts suggesting that either DiSomma or Kariya had control over the posts. *See Howard*, 228 F.3d at 1065 (a control person is liable under 20(a) when he has "authority

over the process of preparing and releasing the [actionable] statements”).[5]

With respect to the market manipulation claims, however, plaintiffs have sufficiently alleged that the individual defendants Kariya and DiSomma exercised control over the primary violators, as they are both alleged to have exercised control over Jump.[6]

On behalf of Jump, Kariya negotiated the early vesting of Jump’s outstanding LUNA tokens in exchange for its assistance with the repeg. At the motion to dismiss stage, this is sufficient to have alleged that he was involved “in the day-to-day affairs of [Jump]” and that, in negotiating the deal, had “power to control [Jump’s] actions,” including its alleged market manipulation. *Id.*

Kariya provides two responses. First, he argues that it was Jump’s trading, not the vesting, that sent a deceptive signal to the market, and that his actions were therefore too attenuated from the underlying violating act to trigger liability. This argument, however, overlooks the allegation that the vesting was an integral part of the overall market manipulation scheme. *See Baroi v. Platinum Condo. Dev., LLC*, 914 F. Supp. 2d 1179, 1193 (D. Nev. 2012) (“[A]pplication of securities laws cannot be avoided by breaking up a transaction or scheme into a series of purportedly separate agreements. Rather, the Court must view the transaction or scheme in its entirety in determining whether it is within or without the Act.”) (cleaned up).

Second, Kariya argues that he lacks the required scienter. He argues that the “more compelling inference” is that, as a young employee, he followed reasonable guidance from experienced supervisors. But plaintiffs sufficiently allege that Kariya exercised actual power and made at least one actionable omission. *See* compl. ¶ 340(d). Taken holistically, plaintiffs’ allegations create a strong inference of scienter. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1058.

---

[5] As for the blogpost by “Jump and/or Kariya,” Kariya cannot be liable on a control person theory for his own statement. *Retail Wholesale Dep’t Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 781 (N.D. Cal. 2025) (“A plaintiff may not pursue a claim for ‘controlling person’ liability under Section 20(a) where they also assert direct liability [for the same conduct] under Section 10(b).”).

[6] Section 20(a) does not require that the controlling person also be primarily liable under Section 10(b). *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 964 (D. Ariz. 2010).

DiSomma, too, wielded control over the Jump entities. Plaintiffs allege that DiSomma "ran" Jump Crypto, "directed the lead trader on trade strategies, set strategic initiatives, and approved any sort of deal strategy or trading strategy." DiSomma also "personally directed Jump's trading" during the depeg event. DiSomma raises a new scienter argument, not mentioned by other defendants, claiming that the fact that Jump continued to hold and acquire additional LUNA after allegedly coming to understand that it was, in layman's terms, a ticking timebomb weighs against a finding of intent. But DiSomma misconstrues the authority he cites for support. In *In re Rigel Pharms., Inc. Sec. Litig.*, the Ninth Circuit determined that the fact that defendants held the security "between the allegedly fraudulent statements and the subsequent public disclosure of the detailed data" weighed against a finding of scienter. 697 F.3d 869, 884 (9th Cir. 2012). But unlike the defendants in *In re Rigel Pharms*., who never sold their stock during that time period, defendants sold enough UST prior to its collapse to generate more than $1 billion in profits. DiSomma's insistence that it would have "ma[de] no sense" to continue acquiring (and subsequently, selling) UST after knowing it was "propped up by fraud" is undermined by his company's enormous profits. At the motion to dismiss stage, plaintiffs' allegations sufficiently support a strong inference of scienter.

**V. Sale of Unregistered Securities**

Section 12(a)(1) creates a private remedy for plaintiffs seeking to impose liability on anyone who offers or sells a security in violation of Section 5's registration and prospectus delivery requirements. Plaintiffs' remaining claims are all permutations of their allegation that defendants failed to register securities. Count V asserts claims under Sections 5(a), 5(c), and 12(a)(1) against all defendants. Count VI assets Section 15 (control person liability) claims against individual defendants Kariya and DiSomma for the violations in Count V. Count VII asserts Section 15 claims against all defendants except TMSL for the Section 5(a) and (c) violations that TMSL admitted in a parallel proceeding, *In re Tai Mo Shan Limited*, SEC Administrative Proceeding, File No. 3-22382 (Dec. 10, 2024). Count VIII asserts claims against all defendants for the violations of Section 5(a) and (c) that Terraform admitted to in a parallel proceeding, *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 474 (S.D.N.Y. 2023). Their

claims against Kariya and DiSomma are barred by the relevant statutes of repose, while their claims against the remaining defendants may proceed.

**A. UST is a security.**

Defendants first ask the Court to revisit its previous holding that Terra Tokens, including UST, are securities. *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710 (N.D. Cal. 2024) ("*Patterson I*"). They argue that since this Court's decision last year, the law has evolved. While they are correct that some courts now find that stablecoins are not securities, those courts' reasoning does not apply to the case at hand.

Under Section 2(a)(1) of the Securities Act, "investment contracts" are securities. An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The Ninth Circuit has distilled that test into three parts: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009). Relying on the *Howey* test in *Patterson I*, the Court previously held that Terra Tokens—including UST—are securities. Revisiting the decision solely in the context of the stablecoin does not change the Court's reasoning.

Whether a contract is an investment contract is largely an objective inquiry. *See Warfield*, 569 F.3d at 1021 ("[C]ourts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect.") (citation omitted); *but cf. id.* ("[T]he subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts."). Defendants argue that UST should be considered in isolation. But doing so would negate several key characteristics of UST. First, defendants were allegedly promised that once they purchased UST, their additional LUNA options would also vest. Second, Terraform frequently touted UST as the "centerpiece of demand for the Terra ecosystem," where its role was to "buttress[] the growth of the Terra economy." UST functioned as a lynchpin to a larger crypto ecosystem, and the other tokens' value—particularly LUNA's, which was minted and burned to keep UST "stable" at $1—rose and fell with it. *See also Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 472 (S.D.N.Y. 2023) (considering UST's role



United States District Court
Northern District of California

within the Terra ecosystem and holding that it is a security).

Defendants also point to the SEC's recently-issued non-binding interpretation regarding when and how to clarify crypto assets as securities. *See* 17 CFR Parts 231, 241. While defendants are correct that the SEC now interprets "covered stablecoins" to not be securities, *id*. at 23, the stablecoin described by plaintiffs is not "covered." *See* U.S. Securities and Exchange Commission, Division of Corporation Finance, Staff Statement on Stablecoins (Apr. 4, 2025), available at https://www.sec.gov/newsroom/speeches-statements/statement-stablecoins-040425 (the "Staff Stablecoin Statement") (describing a covered stablecoin in part as one with "assets held in a reserve with a USD-value that meets or exceeds the redemption value of the Covered Stablecoins in circulation"). In May 2021, LFG had not yet been formed and no reserve backing UST existed. Additionally, at no point was LFG's reserve large enough to sufficiently back UST. At most, it held $1 billion in assets. At the time of the crash, UST was worth at least $40 billion. The SEC's interpretation by its own terms therefore does not apply to the stablecoin system at issue here.

Accordingly, the Court will not revisit its prior conclusion that UST was a security.

**B. Timeliness**

Plaintiffs filed their initial complaint on June 17, 2022, naming Jump Trading and Jump Crypto.[7] On January 15, 2024, they filed an amended complaint naming Jump Trading, Kariya, and DiSomma. On October 31, 2025, they filed their fourth amended complaint—the one at issue, here—adding TMSL. Based on this timeline, defendants contend that plaintiffs' failure to register claims are barred by both the statute of limitations and the statute of repose, and that plaintiffs cannot relate their claims against the new defendants (TMSL, Jump Crypto, Kariya, and DiSomma) back to the original complaint.[8]

---

[7] Plaintiffs dropped Jump Crypto in their second and third amended complaint before adding it back in the fourth amended complaint.

[8] Jump Crypto and TMSL also argue that Claims I-III are barred by the statute of limitations. These claims are each subject to a two-year statute of limitations that begins to toll "after the discovery of the facts constituting the violation." *See* 28 U.S.C. § 1658(b)(1). In the Ninth Circuit, the statute of limitations is generally an affirmative defense rather than an element of the plaintiff's claim. *See Lasko v. Caliber Home Loans*, No. 20-17181, 2022 WL 728820, at *1 (9th Cir. Mar. 10, 2022) (noting that "a statute of limitations is an affirmative defense, not a cause of action") (citing *United States v. Allahyari*, 980 F.3d 684, 686 (9th Cir. 2020)). "When a motion to

Any cause of action alleging failure to register is subject to a one-year statute of limitation beginning on the date the plaintiff purchases the unregistered security and a three-year statute of repose beginning on the date when the security was first offered to the public. 15 U.S.C. § 77m.[9] Plaintiffs' last purchase of tokens was on May 20, 2022. Accordingly, their statute of limitations expired on May 20, 2023. TMSL first sold LUNA to the public in January 2021. Therefore, the statute of repose for Counts V-VII expired in January 2024. The parties dispute when the statute of repose for Count VIII expired for the sale of UST, though plaintiffs offer evidence that UST was first offered to the public in September 2020.[10] For the purposes of this motion, the Court will

---

dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled" or that the claims were timely. *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). Thus, to survive a motion to dismiss, plaintiffs "simply need to plead facts demonstrating a potential factual dispute that could affect whether the defense applies." *Rabin v. Google LLC*, 725 F.Supp.3d 1028, 1031 (N.D. Cal. 2024). Plaintiffs allege that they did not know that Jump Crypto should be named as its own entity until December 28, 2023, and that they did not learn of TMSL's relevance until December 2024. As the "discovery of the[se] facts" occurred within the two-year limitation period before filing the instant complaint, Claims I-III fall within the statute of limitations.

[9] The Ninth Circuit has not determined whether the statute of repose begins when the security was first or last offered to the public. *See Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 922815, at *6 (N.D. Cal. Feb. 26, 2020). But as *Zakinov* noted:

> § 77m includes both a three-year statute of repose and a one year-statute of limitations…. If the court were to interpret the statute of repose to commence at the time of the last bona fide public offer … the statute of repose would generally bar a § 77l(a)(1) claim ***only if*** such claim fell within a tolling exception to § 77m's one-year statute of limitations. Absent such an exception, the one-year statute of limitation would bar the § 77l(a)(1) claim two years before the statute of repose could take effect.

*Zakinov*, 2020 WL 922815, at *6. The Court agrees that the last-offer rule would "eviscerat[e]" the statute of repose, *id.*, and like the majority of other courts in this district will apply the first-offer rule. *See Booth v. Strategic Realty Tr., Inc.*, No. 13-CV-04921-JST, 2014 WL 3749759, at *7 (N.D. Cal. July 29, 2014) ("Most courts recognize that a security is 'bona fide offered to the public' on the date on which the registration statement for the security is declared effective by the SEC.") (citation omitted); *see also In re Ripple Labs, Inc. Litig.*, No. 24-7599, 2026 WL 206301, at *2 (9th Cir. Jan. 27, 2026); *Valenti v. Dfinity USA Rsch. LLC*, No. 21-CV-06118-JD, 2025 WL 902031, at *1 (N.D. Cal. Mar. 25, 2025); *Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004).

[10] The Court takes judicial notice of the superseding indictment in *U.S.A. v. Do Hyeong Kwon*, No. 1:23-cr-00151, Dkt. No. 10, ¶2(a) (S.D.N.Y. Jan 2, 2025). *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (noting that courts may take judicial notice of court filings.).

assume that the statute of repose for Count VIII expired in September 2023.

**1. Statute of Limitations**

The date that amended claims are treated as having been filed is determined in part by Federal Rule of Civil Procedure 15, which governs amendments to pleadings. Rule 15(c) sets out the circumstances where an amendment to a pleading "relates back to the date of the original pleading" and is treated as though it was filed on that date. Rule 15(c)(1)(B) allows relation back when the amendment asserts a claim that arises "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Rule 15(c)(1)(C) allows relation back when the amendment changes the party or the naming of the party against whom the claim is asserted under the following circumstances: (i) when Rule 15(c)(1)(B)'s "conduct, transaction, or occurrence" test is met; (ii) when the party brought in by amendment received such notice of the action so that it will not be prejudiced in defending on the merits; and (iii) when the party knew or should have known that the action would have been brought against it, but for a mistake concerning the its identity. "[R]elation back under Rule 15(c)(1)(C) depends not just on the pleadings but on questions of fact focused on the defendant, including whether the defendant had actual notice of the action and whether the defendant knew (or should have known) that it would have been named except for a mistake." *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1009 (N.D. Cal. 2024). For that reason, this question is often not appropriate for resolution on a motion to dismiss.

Plaintiffs' amended pleading easily satisfies the requirements of Rule 15(c)(1)(B), as the Section 5 and 12 claims arise out of the "conduct, transaction, or occurrence" set out in the original amended complaint: the "unregistered sale of securities." Dkt. 1 ¶ 202. The allegations against Jump Crypto are entirely governed by Rule 15(c)(1)(B): It was named in the original complaint, and because there has been no entry of final judgment as to Jump Crypto, it has remained a party to the suit. *See* Wang, 744 F. Supp. at 1008. Therefore, the claims against Jump Crypto relate back to the filing of the original complaint.

As already noted, the operative complaint sufficiently alleges that the three corporate defendants are alter egos of each other. *Supra* I. It therefore adequately pleads that TMSL received

notice of this action when Jump Trading was named in the original complaint and that TMSL knew or should have known that the action would eventually be filed against it. *See Johannsen v. Brown*, 797 F. Supp. 835, 839 (D. Or. 1992) (holding that a defendant's alter egos knew or should have known that, but for a mistake concerning their identities, the action would have been filed against them and relating back the amended complaint to the original). Finally, given DiSomma's position as founder and co-owner of Jump Trading and Kariya's position as president of Jump Crypto, the Court can infer that the individual defendants received sufficient notice and either knew or should have known that the action would have named them but for a mistake.

A mistake is not limited to a party's existence. *Wang*, 744 F. Supp. at 1009. Instead, it is an "erroneous belief" about "a party's identity." *Id*. (citing *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 549 (2010)). A plaintiff may be mistaken about a party's identity even if she knows who that party is and generally what that party does. *Krupski*, 560 U.S. at 549. If a plaintiff sues another person instead of a party, even knowing that both parties exist, then she has mistaken the proper party's identity and what role it played in the "conduct, transaction, or occurrence." *Id*.

Defendants argue that plaintiffs could not have been mistaken about the identity of TMSL because they submitted evidence tied to their second amended complaint that showed that TMSL, not Jump Trading or Jump Crypto, was the counterparty to the loan agreement from Terraform that vested millions of LUNA tokens in exchange for restoring the peg. While defendants are correct that plaintiffs had information that clearly indicated TMSL's central role in the transaction that serves as the basis for their theory of market manipulation, plaintiffs' allegation that TMSL is Jump Trading's alter ego is enough to survive this kind of attack, at least at a motion to dismiss stage. *See N.L.R.B. v. O'Neill*, 965 F.2d 1522, 1529 (9th Cir. 1992) (when two parties are alter egos, service on one is sufficient to initiate proceedings against both within the statute of limitations).

Finally, defendants argue that it was a deliberate choice and not a mistake to overlook Kariya as a proper defendant. Kariya was referenced in the initial complaint and identified both as "Jump President" and "President of Jump Crypto." The original complaint also premised part of its 10b claim on one statement by Kariya. According to defendants, plaintiffs therefore had enough

information when they filed the original complaint to identify Kariya as a proper party to the suit. Plaintiffs respond that, at that time, their capacity to plead Kariya's role with the specificity demanded by Rule 9(b) was constrained by concealed and nonpublic information. The biggest difference between the original complaint and the third amended complaint—when the individual defendants were added—is the trove of information released in the parallel S.D.N.Y. action in front of Judge Rakoff. Filings in that case helped plaintiffs connect Jump's purchases of UST between May 23, 2021, and May 27, 2021, with Kariya. Specifically, plaintiffs highlighted that Kariya called Kwon approximately twenty minutes before Jump began its series of mass purchases.

Relation back under Rule 15(c)(1)(C) depends not on the amending party's knowledge but on what the party to be added knew or should have known during the Rule 4(m) period that it would have been named as a defendant but for an error. *Krupski*, 560 U.S. at 548. Plaintiffs' amendments show two things: first, that once they ascertained Kariya's role in the alleged scheme, they added him to the suit; second, that Kariya either knew or should have known that whoever arranged the deal between Terraform and Jump—i.e., the allegedly fraudulent behavior which spanned this action—would be named in the suit.

Plaintiffs may relate back their claims against defendants. Of course, whether plaintiffs can actually prove the elements of the relation back doctrine is a question of fact that cannot be resolved on the pleadings. But plaintiffs have sufficiently alleged that the claims against defendants relate back. The Court therefore denies the motion to dismiss based on a statute of limitations defense.

**2. Statute of Repose**

Plaintiffs, however, must overcome another timeliness hurdle: the three-year statute of repose that applies to the sale of unregistered securities. 15 U.S.C. § 77m. The fourth amended complaint was filed more than a year after that period expired. Plaintiffs urge the Court to apply Rule 15(c) and relate back the fourth amended complaint to their earlier timely one. Defendants argue that doing so would impermissibly modify substantive rights in violation of the Rules

United States District Court
Northern District of California

Enabling Act.[11]

A statute of limitations "creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'" *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (citing Black's Law Dictionary 1546 (9th ed. 2009)). "A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action." *Id*. Federal statutes of repose are "relatively rare." *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 397 (2d Cir. 2016), *as amended* (Apr. 29, 2016) (citing Christopher R. Leslie, *Den of Inequity: The Case for Equitable Doctrines in Rule 10b-5 Cases,* 81 Cal. L. Rev. 1587, 1642 (1993)).

"The purpose of a statute of repose is to create an absolute bar on a defendant's temporal liability." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 507 (2017) ("*CalPERS*"). This provides a substantive right, as it extinguishes the cause of action if a certain condition, i.e. the passage of time, is met. *See Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013) (holding that statutes of repose provide substantive rights); *Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 351 (3d Cir. 2021) (same); *Webb v. United States*, 66 F.3d 691, 700–01 (4th Cir. 1995) (same); *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996) (same). And if a statute of repose creates a substantive right, it cannot be modified by the Rules Enabling Act. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); 28 U.S.C. § 2072(b).

That the Federal Rules cannot modify the substantive right established by a statute of repose is not dispositive here, however, because a statute of repose only limits the right to "*bring* a

---

[11] Defendants rely on *Miguel v. Country Funding Corp*., 309 F.3d 1161 (9th Cir. 2002), for support. But *Miguel* is not applicable here. First, it was abrogated by the Supreme Court when it determined that the Ninth Circuit had misconstrued the statute at issue in *Miguel*. *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1100 (9th Cir. 2018) (citing *Jesinoski v. Countrywide Home Loans, Inc.*, 574 U.S. 259, 262 (2015)). Second, *Miguel*'s reasoning was rooted in the assertion that a statute of repose is jurisdictional—something the Supreme Court has repeatedly made clear is not the case. *See Musacchio v. United States*, 577 U.S. 237, 246 (2016) (citing *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154 (2013)); *see also McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1329 (9th Cir. 2012) ("Consistent with this intervening Supreme Court precedent, though the three-year statute is mandatory and enforceable, we withdraw [*Miguel's*] characterization of [the statute at issue] as jurisdictional."), *abrogated on other grounds as recognized by Hoang*, 910 F.3d at 1100.

civil action." *CTS Corp.*, 573 U.S. at 8 (*emphasis added*). Plaintiffs first asserted their unregistered securities claims in the timely-filed second amended complaint, and both Jump Trading and Jump Crypto were named as defendants in that complaint. Accordingly, as to those two defendants, plaintiffs brought their claims within the statute of repose.

To be certain, plaintiffs did not include that claim against those two defendants in each amended complaint filed prior to the operative complaint. But as both this Court and the Third Circuit have recognized, an action that has been filed does not terminate until entrance of final judgment. *Orrstown*, 12 F.4th at 347; *see also Wang*, 744 F. Supp. 3d at 1008 ("[B]ecause the Court did not enter final judgment as to the [defendant], the order dismissing the Section 15 claim against the [defendant] did not end the action as to the Section 15 claim or the [defendant], and the [defendant] remained part[y] to this action."). If an action was initiated within the repose period and never proceeded to final judgment, then an amendment that is otherwise permissible under Rule 15 would not impermissibly enlarge the period of repose. Because plaintiffs initially brought their unregistered securities claims against Jump Trading and Jump Crypto before the expiration of the statute of repose and their reassertion of those claims in the operative complaint properly relates back to the filing of that complaint under Rule 15(c), neither the statute of limitations nor the statute of repose bars those claims. And because TMSL is alleged to be an alter ego rather than a newly added defendant, the addition of that party is no more than a factual amendment permitted under Rule 15(c).

The analysis differs, however, with respect to the individual defendants. An amendment outside the repose period cannot add new legal claims or parties, because permitting such a change would abridge the defendant's substantive rights. *Orrstown*, 12 F.4th at 350; *see also United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 2022 WL 16943886, at *10 (N.D. Cal. Nov. 14, 2022) (declining to apply *Orrstown* when plaintiffs sought to add a new claim or new parties); *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1203 (N.D. Cal. 2024), *motion to certify appeal granted,* No. 20-CV-07835-JSW, 2024 WL 4831889 (N.D. Cal. June 3, 2024) (a complaint that does not add new claims but only adopts the allegations within the original complaint is nothing more than a continuation of the litigation already in progress). Both

Kariya and DiSomma were added as defendants to plaintiffs' unregistered securities claims after the period of repose had already expired. The Court cannot apply Rule 15 to permit such an abridgement of the individual defendants' substantive right to repose. Therefore, Counts V through VIII are dismissed as to the individual defendants.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the motion to dismiss counts V through VIII to the extent that are asserted against Kariya and DiSomma and DENIES the motion to dismiss those counts as to the other defendants. The Court DENIES the motion to dismiss Counts I through III to the extent they are premised on the potentially false or misleading statements and omissions identified above, with the exception of any direct liability for defendant DiSomma, whose separate motion to dismiss Counts I through III is GRANTED. The Court GRANTS the motion to dismiss Count IV against both Kariya and DiSomma as to securities fraud based on misstatements and omissions but DENIES the motion as to the market manipulation claims.

This is plaintiffs' fifth attempt to plead securities violations in the instant action. After five bites, there is barely any apple left. The claims dismissed herein are therefore dismissed with prejudice and without leave to amend. *See Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1194 (9th Cir. 2008) ("MHC deserves no second bite at the complaining apple.").

**IT IS SO ORDERED.**

Dated: September 2, 2026

P. Casey Pitts
United States District Judge